# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2                  EASTERN DIVISION
 3
     DANIELLE GAMINO,
 4   individually and on
     behalf of all other
 5   similarly situated,
 6          Plaintiff,
     vs.                    Case No.
 7   KPC HEALTHCARE HOLDINGS,  5:20-cv-01126-SB (SHK)
 8   INC., et al.,
 9          Defendants.
     _____
10   DANIELLE GAMINO,
11   individually and on
     behalf of all other
12   similarly situated,
13          Plaintiff,
     vs.                    2:00 p.m.
14   SPCP GROUP, LLC,
15          Defendant,      Hybrid Deposition, with
     and                    the witness, her counsel
16   KPC HEALTHCARE, INC.   and the stenographer
17   EMPLOYEE STOCK OWNERSHIP  live, other counsel
18   PLAN,                  appearing via
            Nominal         videoconference
19          Defendant.
     _____
20    CONTINUED DEPOSITION OF DANIELLE GAMINO, VOLUME II
21            TUESDAY, MARCH 15, 2022
     Reported by:
22   VALERIE N. ALMAND, RPR, CRR, CRC
23   JOB No. 5126052
24
25   PAGES 206 - 252
```

                                                Page 206

```
 1          Q.  That's all I needed to know, thank you.
 2     All right.
 3               I am going to try and use Exhibit Share
 4     here to put in front of everybody else what should
 5     be previously been marked as Exhibit 14 in this
 6     case.  Give me a second.
 7               MR. BARTON:  It's the class action
 8     complaint.
 9     BY MR. ALAMUDDIN:
10          Q.  Okay.  Do you have Exhibit 14 in front of
11     you?
12          A.  Are they supposed to be numbered?  Or I'm
13     just taking the top one.
14               MR. BARTON:  No, it's the bottom one.
15     BY MR. ALAMUDDIN:
16          Q.  14 should have been prenumbered already.
17          A.  I have it.
18          Q.  I take it you recognize this document,
19     correct?
20          A.  Yes.
21          Q.  Do you recognize this as being the
22     original complaint you filed in this action in
23     June of 2020?
24          A.  Correct.
25          Q.  Now, at the time this original complaint
```

Page 214

1      was filed had you ever heard of Silver Point

2      Capital?

3            A.   I had not.

4            Q.   When did you first hear about an entity

5      called Silver Point Capital?

6            A.   From my lawyers.

7            Q.   And when did you hear about them from

8      your lawyers?

9            A.   Honestly, I couldn't give you an exact

10     date, if that's what you're looking for.

11           Q.   Well, let's try and narrow it down.  Did

12     you hear about Silver Point Capital from your

13     lawyers before calendar year 2022?

14           A.   I'm not -- honestly, I'm not sure what

15     the date was.  I'm not sure.  I know that it was

16     after -- it was after this first -- first claim

17     was filed.

18                MR. ALAMUDDIN:  Okay.  I'm having

19     problems with Exhibit Share.  Give me one second.

20     Can we go off the record for a second?

21                MR. BARTON:  Sure.

22                (Off-the-record discussion)

23     BY MR. ALAMUDDIN:

24           Q.   All right.  We'll go back and try to

25     narrow down the date.  Would it be accurate to say

```
 1      that all the information that you know about
 2      Silver Point Capital comes from your lawyers?
 3           A.  Yes.
 4           Q.  Have you done any research or
 5      investigation into Silver Point Capital
 6      independent of counsel?
 7           A.  I've attempted to.
 8           Q.  Tell me what you've tried to do.
 9           A.  Just a basic Google search.
10           Q.  And when did you do a Google search on
11      Silver Point Capital?
12           A.  When my attorneys provided me with
13      information about SPCP.
14           Q.  And when would that have been?
15           A.  Again, I'm not certain on the date.
16           Q.  But your Google search would have been
17      done around the same time that you first learned
18      about Silver Point Capital from your lawyers?
19           A.  Correct.
20           Q.  How much time did you spend Googling
21      Silver Point Capital?
22           A.  I couldn't tell you, honestly.  I
23      couldn't -- I couldn't give you an estimate of
24      time.
25           Q.  Was it less than an hour?
```

Page 216

1       A.  I honestly couldn't tell you.  I'm not

2   comfortable estimating time, because I really

3   don't know.

4       Q.  Did you hit on their website?

5       A.  I don't honestly remember what I found.

6   I remember I had trouble finding something on

7   them.  I recall that.  But I don't recall now what

8   I found when I was searching.

9       Q.  Can you tell me why you decided to Google

10  Silver Point?

11      A.  Because I wanted to see for myself.  I

12  wanted more information on it.

13      Q.  And sitting here today what do you know

14  about the company?

15      A.  That it's a financial company.  They

16  provide financing for companies.

17      Q.  Do you know sitting here today what the

18  company's relationship with KPC Healthcare is or

19  was?

20      A.  They provided financing related to the

21  ESOP transaction.

22      Q.  Who did they provide the financing to?

23      A.  To, I believe it was Dr. Chaudhuri.

24      Q.  Do you know what the purpose of that

25  financing that they provided was?

Veritext Legal Solutions
866 299-5127

1    A.   I do.   It was to finance -- finance the

2    purchase of -- sorry, if you could just give me a

3    second, because I don't want to misstate it.

4    Q.   Sure.

5    A.   They provided the financing for

6    Dr. Chaudhuri so that he could -- I'm sorry,

7    that's as much of an explanation as I can give.

8    They provided the financing for Dr. Chaudhuri

9    related to the ESOP.

10    Q.   Okay.   So what you're telling me is your

11    understanding is that Silver Point Capital

12    provided financing to Dr. Chaudhuri related to the

13    ESOP.   Do you know what the purpose -- do you know

14    what Dr. Chaudhuri did with this financing?

15    A.   I don't think I'm understanding your

16    question.

17    Q.   Let me see if I can break this down a

18    little bit more.   What type of financing did

19    Silver Point Capital provide to Dr. Chaudhuri?

20    A.   Are you -- maybe I'm still not

21    understanding.   Are you asking what did they get

22    in return?   Or, like, I don't understand.

23    Q.   Well, I'll take that question.   What did

24    Silver Point Capital receive in return for

25    providing financing to Dr. Chaudhuri?

Page 218

```
 1          A.  It's my understanding that they -- there
 2     was -- they received a promissory note, they
 3     received warrants and cash in the transaction.  I
 4     think there were several things.  But those are
 5     the things that stand out to me.
 6          Q.  And where does this understanding stem
 7     from?
 8          A.  From my lawyers, and from reading the
 9     complaint.
10          Q.  Do you have any independent understanding
11     of Silver Point Capital's role in the events
12     leading up to this case outside of what you
13     learned from your lawyers?
14          A.  No, I'd say no.
15          Q.  And do you know what Dr. Chaudhuri did
16     with the financing that he received from Silver
17     Point Capital?
18          A.  He -- yeah.  He -- I'm sorry, give me one
19     second.  He sold his shares to the ESOP for more
20     than their fair market -- more than their fair
21     market value.  I'm sorry.
22          Q.  No, that's fine.  But I guess my question
23     was a little different.  You had testified earlier
24     that Silver Point Capital provided financing to
25     Dr. Chaudhuri in return for receiving a promissory
```

Page 219

```
 1    connection with the ESOP transaction?
 2         A.  I guess I'm not understanding the point
 3    of your question.  Why was it necessary?
 4    Because --
 5         Q.  Let me ask it this way.  You testified
 6    earlier that Dr. Chaudhuri sold his shares to the
 7    ESOP for more than adequate consideration,
 8    correct?
 9         A.  Right.
10         Q.  He did not need Silver Point Capital's
11    money to do that, did he?
12         A.  I don't know.
13         Q.  So do you know why Dr. Chaudhuri needed
14    money from Silver Point Capital in connection with
15    this transaction?
16         A.  No.  I wasn't part of the transaction, so
17    I couldn't tell you.
18         Q.  Do you know if -- do you know if the
19    money that Dr. Chaudhuri asked for from Silver
20    Point Capital was even related to the ESOP
21    transaction?
22         A.  I don't know the details -- I don't know
23    any more of the details other than what I've told
24    you, so I don't know why he wanted the money and
25    what he did with -- I can't tell you.
```

Page 221

1    year prior to 2015 was significantly different,

2    and had they -- they did their due diligence, and

3    that should have been a red flag.

4         Q.  Had who done their due diligence?

5         A.  No, I said they did their due diligence,

6    and so that price difference should have been a

7    red flag.

8         Q.  Who's the "they" in that answer?

9         A.  SPCP, yeah.

10        Q.  Do you know if Silver Point Capital was a

11   party to the ESOP transaction?

12        A.  It's my understanding that they provided

13   the financing to Dr. Chaudhuri, and that's how

14   they participated.

15        Q.  Do you know if they played any role

16   outside of that in the ESOP transaction?

17        A.  Outside of that as far as the ESOP, they

18   didn't participate in the ESOP but they benefitted

19   from the transaction.

20        Q.  How did they benefit from the ESOP

21   transaction, though?

22        A.  Well, they benefited from the financing

23   of -- with Dr. Chaudhuri.  So by getting the

24   promissory note and the warrants, the cash.  Is

25   that answering your question?

Page 224

1          A.   The valuation of IHHI from when --

2          Q.   And do you know who -- do you know who

3     conducted that valuation?

4          A.   Off the top of my head, no.  I believe

5     it's mentioned somewhere in the complaint.  I

6     could be wrong, but I think it is.  But I couldn't

7     tell you right now.

8          Q.   Do you know what the relationship is

9     between Silver Point Capital and KPC currently?

10         A.   Currently, I do not.

11         Q.   Do you know if Silver Point Capital still

12    has warrants for shares of KPC?

13         A.   I believe from my understanding they do

14    still have some of the things that they received

15    in relation to that transaction.

16         Q.   During the time that you -- you no longer

17    work for KPC; is that right?

18         A.   That's correct.

19         Q.   During the time that you worked for KPC

20    did you have any idea of who SPCP was or what role

21    they played with respect to the ESOP transaction?

22         A.   I did not.

23         Q.   Okay.  I am introducing what we're

24    marking Exhibit 58, which is the warrant purchase

25    agreement.

Page 227

```
 1                 (Defendants' Exhibit 58 marked)
 2       BY MR. ALAMUDDIN:
 3             Q.  Do you have it in front of you,
 4       Ms. Gamino?
 5             A.  I do.
 6             Q.  Have you seen this document before?
 7             A.  I believe it was presented at the last
 8       deposition.
 9             Q.  Actually, I don't think it was.
10             A.  No?
11             Q.  Which is why I'm introducing it now.
12             A.  I apologize.  Then I don't -- I don't
13       believe I have, then.
14             Q.  Do you recall reading this document at
15       any time?
16             A.  I don't believe so, no.
17             Q.  The first page of this document reads,
18       Warrant Purchase Agreement Among KPC Healthcare
19       Holdings, Inc., a California Corporation and SPC
20       Group, LLC, a Delaware Limited Liability Company.
21       Do you see that?
22             A.  No, I don't.  You said the first page?
23             Q.  The top page of the document, the front
24       page.
25             A.  And it says what again?  I'm sorry.
```

Page 228

1        Q.   Warrant Purchase Agreement Among KPC
2    Healthcare Holdings, a California Corporation and
3    SPCP Group, LLC, a Delaware Limited Liability
4    Company, as the seller.
5        A.   Yeah, I see it.
6        Q.   Do you know why, if the financing was
7    provided to Dr. Chaudhuri, that this warrant
8    purchase agreement is between KPC Healthcare and
9    SCPC instead of Dr. Chaudhuri?
10        MR. BARTON:  Objection, no foundation.
11        A.   I'd imagine it would be -- the financing
12    would be with KPC, then, I mean, if that's what
13    you're getting at.
14    BY MR. ALAMUDDIN:
15        Q.   Sitting here today -- sitting here today
16    do you know whether the financing was with
17    Dr. Chaudhuri or with KPC?
18        A.   I believe it was with Dr. Chaudhuri.
19        Q.   And, again, that belief is based on what
20    you learned from your lawyers; is that right?
21        A.   That was my understanding, but I could be
22    mis -- I could be wrong.
23        Q.   But whatever understanding you had stems
24    from your attorneys; is that correct?
25        MR. BARTON:  Objection to form,

                                            Page 229

```
1    mischaracterizes prior testimony.
2         MR. ALAMUDDIN:  I'm sorry, Joe, I
3    couldn't hear that.
4         MR. BARTON:  Mischaracterizes prior
5    testimony.
6         MR. ALAMUDDIN:  Thank you.
7         A.  I could have just misunderstood, yes.
8    BY MR. ALAMUDDIN:
9         Q.  Right, no, and that's fine.  But I just
10   want to make sure that whatever understanding you
11   had about Silver Point Capital's role in the
12   transaction stems from discussions with your
13   lawyers.
14        A.  No, I understood what you said.  I'm just
15   stating, again, I may have just misunderstood.
16        MR. BARTON:  Objection, again
17   mischaracterizes prior testimony.
18        A.  Again, I may have just misunderstood
19   what --
20   BY MR. ALAMUDDIN:
21        Q.  What is it that you may have
22   misunderstood, then?
23        A.  That the loan was provided to
24   Dr. Chaudhuri.
25        Q.  Let me explore just a little bit more
```

Page 230

1     Q.   Yes.  Do you know if the ESOP itself

2     purchased the warrants from SCPC?

3     A.   I don't know that, no.

4     Q.   I think you testified in your earlier

5     deposition that as part of your responsibilities

6     as a class representative you spent some time

7     reviewing documents that have been produced in

8     connection with this case.  Do you recall that

9     testimony?

10     A.   I do, yes.

11     Q.   And I think you testified that this time

12     you spent, you couldn't say the exact time, but

13     somewhere around five hours reviewing documents.

14     Would that be an accurate statement?

15     A.   I think that that's what was originally

16     said, and that might have been what was originally

17     said in the previous deposition.

18     Q.   Right.  And so what I want to do is use

19     that as a launching pad.  Has there been

20     additional time that you've spent reviewing

21     documents or materials in this case since your

22     initial deposition?

23     A.   Yes.

24     Q.   How much additional time have you spent

25     reviewing information?

Veritext Legal Solutions
866 299-5127

1    A.   Honestly, I'd rather not estimate time.

2  I didn't feel comfortable estimating time last

3  time, because I don't feel like it's very

4  accurate, and I'd rather not do it this time.

5    Q.   Recognizing that you won't be able to

6  give me an accurate time period, could you

7  ballpark a time for me?

8    A.   I'd rather not.  I mean, I go on line and

9  review everything that's been uploaded to the

10 court, I review most things that are uploaded.  So

11 I'm spending a good amount of time reviewing

12 everything, but I'd rather not give you a

13 timeframe because it's really hard to quantify

14 that.

15   Q.   Can you tell me how often -- do you have

16 like a routine or set schedule, or how often you

17 go and review things periodically?

18   A.   I check every couple days to see if

19 something new has been put on, either by my lawyer

20 or one of you guys.  My lawyers send me things

21 when they're going to submit something.  So every

22 few days I'll regularly check, and then when

23 something has been, then I go through and review

24 it.

25   Q.   During the amount of this review that

1   you've been telling me about, can you recall

2   anything SCPC related?

3        A.  Well, the ones that have -- what do you

4   mean, S -- say that again.

5        Q.  As part of this periodic review going on

6   line, reviewing documents and information in this

7   case, can you recall anything that you reviewed

8   that relates to SCPC?

9        A.  Yeah, the -- we have the amended

10  complaint, you guys submitted yours asking for it

11  to be denied combining the cases.  Yeah, there's

12  been several.

13       Q.  You're referring to the pleadings in this

14  case, correct?

15       A.  Correct, I believe that's what I'm

16  referring to.

17       Q.  I see.  So thank you for clarifying.  I

18  guess outside of the pleadings have you reviewed

19  any of the documents that have been produced by

20  the defendants in this case to your lawyers?

21       A.  I guess I'd have to know what documents

22  you're referring to to know if I've reviewed them.

23       Q.  Well, let me ask you a more basic

24  question.  Has your reviewing information in this

25  case been limited to the pleadings that have been

Page 235

1    filed?

2          MR. BARTON:  Objection to form.

3       A.  It's been what my lawyers have provided

4    me and what's been -- what's been uploaded to the

5    court.  So again, if there's something specific

6    you're wanting to know if I've seen provided by

7    you guys, I'd have to know what it is.

8    BY MR. ALAMUDDIN:

9       Q.  Well, let me ask you this question:  Are

10   you aware that in this case that your lawyers have

11   asked the defendants to produce documents as part

12   of discovery?

13      A.  Yes.

14      Q.  Okay.  And do you have access -- have you

15   been provided with access to the documents that

16   have been produced in this case by the defendants?

17      A.  I know that if -- I've been told that if

18   I wanted to see anything that I could.

19      Q.  And have you made that request?  Have you

20   wanted to see anything that's been produced in

21   this case?

22      A.  There's not been anything specifically

23   that I felt I needed to see.

24      Q.  So is the answer to my question no, you

25   haven't asked to see anything that's been

Page 236

1    produced?

2         A.  Well, to that specific question, no, I

3    haven't asked specifically for any document.

4              (Defendants' Exhibit 59 marked)

5    BY MR. ALAMUDDIN:

6         Q.  All right, Ms. Gamino, I've introduced

7    Exhibit -- what I've marked Exhibit 59, which is

8    the class action complaint, the original one filed

9    against SCPC and KPC Healthcare dated August 27th,

10   2021.  Do you have that in front of you?

11        A.  Yes.

12        Q.  All right.  If you could turn to page --

13   page -- page 31, paragraph 119?

14        A.  Okay.

15        Q.  Do you have that in front of you?

16        A.  I do.

17        Q.  I want to ask you about the first

18   sentence that reads, On information and belief,

19   Alerus, acting as Trustee of the KPC ESOP, caused

20   the KPC ESOP to purchase 100% percent of the

21   common stock warrants owned by SCPC Group.  Do you

22   see that?

23        A.  I do.

24        Q.  Do you know what the basis for that

25   allegation was?

Page 237

1          A.   Do you mind if I read it first, read the

2     whole thing?

3          Q.   Of course, please go ahead.

4          A.   Okay.   And your question was, again?   I'm

5     sorry.   The first sentence?

6          Q.   Do you know what the basis -- my question

7     was:   Do you know what the basis was for the

8     allegation in paragraph 119 of the complaint, that

9     Alerus caused the KPC ESOP to purchase 100 percent

10    of the common stock warrants owned by SCPC?

11         A.   Well, it's my understanding that Alerus

12    was supposed to be the fiduciary, so they were

13    supposed to oversee the transaction, and by

14    allowing this to happen they weren't acting in the

15    best interest of the ESOP.

16         Q.   No, I understand that.   But my question

17    was a little bit more specific, which is do you

18    know what the basis was for the contention that

19    Alerus caused the ESOP itself to purchase 100

20    percent of the common stock warrants owned by

21    SCPC?

22         MR. BARTON:   Objection, asked and

23    answered.

24         A.   I'm pretty sure that answered your

25    question, though.   It --

Veritext Legal Solutions
866 299-5127

```
 1     BY MR. ALAMUDDIN:
 2          Q.   I don't think so.  My question is exactly
 3     here the complaint is asserting that the KPC ESOP
 4     itself through Alerus purchased the stock warrants
 5     from SCPC.
 6          A.   Right.
 7          Q.   And I guess what I want to know is do you
 8     know what the factual basis for the assertion that
 9     the ESOP itself purchased the stock warrants was?
10          A.   How do I know that the ESOP purchased the
11     warrants?  That's your question?
12          Q.   Yes, exactly.
13          A.   Well, the warrants, I'm not sure.
14          Q.   If we go back to the prior exhibit, which
15     is the First Amended Complaint, the one that was
16     filed in November which amended the original
17     complaint, I want you to take a look at page 20,
18     paragraph 73.
19          A.   Yes.  And paragraph 73.
20          Q.   Yes, ma'am.
21          A.   Okay.
22          Q.   In paragraph 73 the allegation states
23     that as part of the 2015 ESOP transaction
24     defendant SCPC Group sold its common stock warrant
25     entitling the holder to acquire 79,182,635 shares
```

Page 239

1    of common stock of KPC to KPC.  Do you see that?

2         A.  I see that paragraph, yes.

3         Q.  Do you know why, when the original

4    complaint alleged that the warrants were sold to

5    the ESOP, why this was changed to the warrants

6    being sold to KPC itself?

7         A.  I'm not sure what your -- I'm not

8    understanding what your question is.

9         Q.  Sure.  The original complaint we looked

10   at from June of -- or August 2021, excuse me, said

11   that Alerus caused the KPC ESOP to purchase the

12   warrants.  This amended complaint says that the

13   warrants were sold to KPC, not the KPC ESOP.  And

14   I guess my question is:  Do you know why that

15   change was made from the original complaint to the

16   amended complaint?

17        A.  So you're referring to the error that my

18   lawyers made?  Is that --

19        Q.  Okay.  So is that your answer, that it

20   was an error that your lawyers made?

21        A.  I'm aware that my lawyers made a mistake,

22   and they had to correct it.

23        Q.  Got it.  How did you become aware of that

24   error?

25        A.  They made me aware of it.

```
 1        Q.  Would you have known that there was a
 2   mistake outside of any conversations with your
 3   lawyers?
 4        A.  I mean, it's possible when I read through
 5   these, but I -- it's possible I could have missed
 6   it too.  So really, I'm not sure.  But that's what
 7   they're here for.
 8        Q.  It's safe to say that you didn't catch
 9   the mistake before they did, would that be fair?
10        A.  That's fair.
```
11        Q.  Do you believe that you're in a position
12   to adequately supervise your lawyers when it comes
13   to the claims against SCPC?
14        A.  Yes.
15        Q.  Tell me why you believe that.
16        A.  Well, I feel like I've been doing a good
17   job so far.  I've asked questions, I've been
18   participating, I've been reviewing any documents
19   that I've been provided and that have been made
20   available on line.  So I don't think it would be
21   any different going forward.
22        Q.  Do you feel you have a sufficient
23   understanding of the SCPC part of the case --
24   well, let me back up a second.  Do you feel that
25   you have as good an understanding of the SCPC part

                                          Page 241

```
 1                      CERTIFICATE
 2    STATE OF GEORGIA:
 3    COUNTY OF FULTON:
 4              I hereby certify that the foregoing
 5    transcript was taken down, as stated in the caption,
 6    and the colloquies, questions and answers were
 7    reduced to typewriting under my direction; that the
 8    transcript is a true and correct record of the
 9    evidence given upon said proceeding.
10              I further certify that I am not a relative
11    or employee or attorney of any party, nor am I
12    financially interested in the outcome of this
      action.
13              I have no relationship of interest in this
14    matter which would disqualify me from maintaining my
15    obligation of impartiality in compliance with the
16    Code of Professional Ethics.
17              I have no direct contract with any party
18    in this action and my compensation is based solely
      on the terms of my subcontractor agreement.
19              Nothing in the arrangements made for this
20    proceeding impacts my absolute commitment to serve
21    all parties as an impartial officer of the court.
22              This the 18th day of March, 2022.
23
24
              Valerie N. Almand
25
              Valerie Almand, CRR, RPR, CRC, B-531

                                          Page 248
```