UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION - RIVERSIDE

| | | |
|---|---|---|
| DANIELLE GAMINO, | ) | Case No. EDCV 20-1126-SB (SHKx) |
| | ) | |
| Plaintiff, | ) | Riverside, California |
| | ) | Wednesday, April 27, 2022 |
| v. | ) | 3:30 P.M. to 4:34 P.M. |
| | ) | |
| KPC HEALTHCARE HOLDINGS, | ) | VIDEOCONFERENCE HEARING |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE

Appearances:              See Page 2

Deputy Clerk:             Danalyn Castellanos

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:


For the Plaintiff:       Block & Leviton LLP
                         By:  COLIN M. DOWNES
                              ROBERT J. BARTON
                         1633 Connecticut Avenue NW, Suite 200
                         Washington, D.C.  20009
                         (202) 734-7046
                         colin@blockleviton.com
                         jbarton@blockleviton.com



For the Defendants:      McDermott Will & Emery LLP
                         By:  JULIAN L. ANDRE
                         2049 Century Park East, Suite 3200
                         Los Angeles, California  90064
                         (310) 551-9335
                         jandre@mwe.com

                         Groom Law Group Chartered
                         By:  SHAUN A GATES
                         1701 Pennsylvania Avenue, Suite 1200
                         Washington, D.C.  20006
                         (202) 861-5437
                         sgates@groom.com

                         Morgan, Lewis & Bockius LLP
                         By:  SARI ALAMUDDIN
                         110 North Wacker Drive, Suite 2800
                         Chicago, Illinois  60606
                         (312) 324-1000
                         sari@alamuddin@morganlewis.com

RIVERSIDE, CALIFORNIA, WEDNESDAY, APRIL 27, 2022, 3:30 P.M.

(Call to Order of the Court.)

THE CLERK:  Calling case No. 5:20-CV-01126-SB-SHK, *Danielle Gamino v. KPC Healthcare Holdings.*

Counsel, please state your appearances beginning with the plaintiff.

COLIN M. DOWNES:  Colin Downes with Block & Leviton for plaintiff and the class, and I'm joined by my colleague Joseph Barton, also of Block & Leviton.

JULIAN L. ANDRE:  Good afternoon, Your Honor. Julian Andre on behalf of the KPC defendants.  I'm joined by my co-counsel Ted Becker.

SARI ALAMUDDIN:  And Sari Alamuddin on behalf of Defendant SPCP.

SHAUN A. GATES:  And Shaun Gates on behalf of Defendant Alerus Financial.

THE COURT:  Okay.  Thank you.  Just writing down the names of everybody.

So I reviewed the briefing provided by the parties, and I went back and actually reviewed some of the orders that were referenced in the briefing, specifically the -- so it's ECF 253 -- this is the -- these are the papers related to the motion to compel -- 253, 260, and 263.  I also read just for -- by way of background, the Court's first order regarding the dismiss -- order -- motion to dismiss, which is ECF 76,

and also ECF 174, which was the -- granting the First Amended Complaint -- leave -- I reviewed the First Amended Complaint, and ECF 209, which was Judge Blumenfeld's order denying motions to dismiss the First Amended Complaint.  I also reviewed -- and the ECF number escapes me, and I don't have it up -- the order regarding SPCP -- the denial of the motion to dismiss in that matter as well.

So I think I have a fairly good understanding of some of the issues and the statutes at play, particularly 502(a)(2) and 409 and then 502(a)(3), the requirement of whether a party is a fiduciary or a non-fiduciary, and how 502(a)(3) can apply to folks who are fiduciaries, where as 502 -- I'm sorry -- 502(a)(2) applies to fiduciaries, whereas 502(a)(3) can apply to fiduciaries as well as non-fiduciaries.

Let me now turn it over to, then, plaintiffs to see if they'd like to add anything in addition to the papers that were filed or would like to emphasize anything before I ask my questions because in the course of your arguments, you may answer my questions.  So I'll turn it over to plaintiffs first.

MR. DOWNES:  Sure, Your Honor.  And I'll be brief and just address a few points that we want to emphasize.

THE COURT:  Sure.

MR. DOWNES:  First is the issue that you just

alluded to, which is that there is a distinction between 502(a)(2) and 502(a)(3), which was addressed in the briefing. 502(a)(2) is only available against Dr. Chaudhuri and Mr. Thomas if they're found to be fiduciaries. That's something that's disputed by the parties. In the event that the Court finds that they are fiduciaries, the remedy of surcharge would be available against them. Surcharge does not require equitable tracing. In the event that they aren't, plaintiff would be limited to the remedies available under 502(a)(3), such as a constructive trust, which would require the tracing of an identifiable res. But even in the event that the -- that plaintiff pursued remedies under 502(a)(2), 502(a)(2) explicitly makes reference to the availability of profits, and plaintiff may need to quantify those profits in order for the judge to -- the district court judge to frame an appropriate disgorgement order.

The cleanest articulation of these principles is in *Foster*, one of the cases that plaintiffs -- plaintiff cited. In that case, on a 406(a) claim, the court found that plaintiff could not pursue the remedies of surcharge because the defendants in question, it held, were not fiduciaries and could not pursue the remedy of disgorgement because plaintiffs in that case had failed to identify a traceable res against which relief could be had.

THE COURT: And that's the case that Judge Corley

decided out of the Northern District of California?

MR. DOWNES:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  I'm just trying to get my head around all the information that's floating around in there.  Okay.  Go ahead.

MR. DOWNES:  The second key point under relevance that plaintiff would like to emphasize is that the parties don't really dispute whether the discovery sought is relevant to the claims in this case.  Defendants take the position that this discovery is not relevant to liability but appear to concede that it is relevant to remedies.  And this case is not bifurcated.  Plaintiffs -- excuse me.  Defendants haven't sought to have this case bifurcated between liability and remedies.  There's one expert deadline.  There's one trial date.  Even if the Court were to not agree with plaintiff and find that these issues don't go to liability, they certainly do go to remedies, and thus this discovery should still be produced at this phase.

Notably, defendants do not identify a single case seeking a constructive trust or seeking disgorgement in which tracing discovery of this kind was denied.  The need for this discovery is driven by the remedies that are being sought by plaintiff in this case.

And briefly, to touch on the last issue here on proportionality.  Defendants' arguments on proportionality

are conclusory.  There's no evidence of the burden that would actually be imposed on either Dr. Chaudhuri or Mr. Thomas by compliance with the discovery.  There's no statement of how many accounts there are that would be a part of the inquiry, how many different custodians it would be necessary to go to, to get statements, how many transactions there had been subsequently involving the proceeds of the 2015 ESOP transaction.

Dr. Chaudhuri no doubt has extensive assets.  The public record suggests that he has interests as diverse as a nuclear power plant in Ukraine, a medical school in West Bangladesh, and real estate holdings in Southern California and in Las Vegas, but none of those are relevant here unless they are -- have touched or been commingled with the proceeds of the transaction.  The discovery is limited to those proceeds, the ways in which they -- subsequently have been uses, and the monies with which they have subsequently been commingled.

And here, the factors identify (inaudible) -6(b)(1) lean decisively in favor of production of the discovery.  The relevant resources of the parties are dramatic.  Ms. Gamino is a medical coder.  Mr. Chaudhuri -- or Dr. Chaudhuri and Mr. Thomas are, respectively, a billionaire and his long-time attorney.  There's a significant amount in controversy in this case -- in the

millions of dollars -- and this discovery is important in a case like this where plaintiff is seeking equitable relief, rather than money damages.

Your Honor, those are the only items that I wanted to highlight and emphasize.  I'm happy to answer any questions that you have.

THE COURT:  Let me hear from defense, and then I'll come back and ask you folks questions.

MR. ANDRE:  Thank you very much, Your Honor.  And I'll start by emphasizing a few key issues we think the Court should focus on, and then I'd also like to address a couple of things that Mr. Downes said.

At the outset, the discovery that plaintiff is seeking here is not relevant, it is overly burdensome, and it is vastly disproportionate to the needs of this case. Plaintiff is seeking discovery here that they have, themselves, described in other documents they filed in other courts as extensive, personally and financially invasive, and time-consuming.  The discovery they are seeking here under any other circumstance -- as cited in the cases we've cited -- would not be discoverable pretrial.  What they are seeking here is quintessentially the type of financial discovery that would only be allowed in a judgment debtor proceeding to enforce an existing judgment.  What they're claiming here, though, is that because they are seeking other appropriate

equitable relief that that effectively entitles them to unlimited access to our clients' personal and sensitive financial information.  There is no support for that.

Plaintiff notes that we haven't cited a case -- plaintiff has not cited a single ESOP case in which the discovery they seek here has been allowed.  They closest they come is in connection with the reply they included a minute sheet from a case *Gamache* in the District of Georgia.  It -- Mr. Downes's declaration says they sought basically the exact same discovery they seek here in that case.  And we don't know exactly what the court ordered in that case, we don't know why the court ordered it, but what we do know from that one-page slip sheet that plaintiff attached is the court did not order nearly what they've requested in this case.  What the court in *Gamache* ordered, according to that one page -- I believe it's Exhibit 1 or 2 to Mr. Downes's most recent declaration -- was some interrogatory responses and contact information for a handful of financial institutions, not the vast amount of financial records plaintiffs are seeking here.

As far as disproportionality, again, this is a case about appropriate equitable relief, and what constitutes appropriate equitable relief is largely ignored by plaintiff. They're not seeking anything that could be remotely considered equitable with respect to these discovery requests.  They ignore the fact that this case is in fact

about an overpayment.  It's not addressed in their reply other than a sentence and, I believe, a footnote, but this is really about an overpayment, and any appropriate equitable relief that they seek discovery about or anything has to be tied to that overpayment, not the entire amount of consideration.

The other thing that I think is fundamentally unequitable about what they're seeking here is that, when they talked about the distinction about 502(a)(2), right -- 502(a)(2) allows much broader range of remedies against fiduciaries because fiduciaries bear the brunt of responsibility.  502(a)(3) is against non-fiduciaries, and it's just limited to other appropriate equitable relief, and what we have here is a situation where the discovery they're seeking from our clients under the non-fiduciary standard is vastly greater than what they are seeking against the individuals they claim are the primary alleged wrongdoers.

Mr. Downes notes that this is also relevant to 502(a)(2).  As far as I know, they've never sought this from Alerus, who they are seeking relief under 502(a)(2), it's not necessary under 502(a)(2), and to allow it in the non-fiduciary context, I think, is just fundamentally unfair and disproportionate to what the circumstances are.

The other point I want to raise is that in -- it's not really clear to me why we're even here fighting about

this.  We've said and represented in our papers that we do not dispute -- I mean, the element of a 502(a)(3) claim requires them to establish that there is -- that they are entitled -- that they would be entitled to other appropriate equitable relief, that they would have to identify a specific fund to which a constructive trust (indecipherable).  We've indicated that we don't dispute that.

Mr. Downes cites to *Foster*.  I don't know what the -- that was clearly a disputed issue in that case.  It will not be one in this case if the motion to compel is denied. We are not claiming that they -- that other appropriate equitable relief would not be available in some form or another.  We are not claiming that they cannot identify a specific fund, and we do believe that the court can, if it chooses, still decide what is an appropriate equitable remedy without any of the information that Mr. Downes is seeking in this -- the plaintiffs are seeking in this case.

If the court determines at the end of trial that there needs to be additional information to effectuate his relief, he can order it.  If the court feels that additional information is necessary for him to reach that determination, the court can order it.  But this is not going to be a disputed issue at trial like it was in *Foster*, and yet we are still here seeking -- with plaintiff seeking discovery that would entitle them to effectively nearly virtually unlimited

access to our clients' finances for seven years to fight over an issue we're saying shouldn't be an issue.

And so that is our big concern, that what they are seeking is both unnecessary, it's irrelevant, and it is vastly inequitable and completely divorced from what they're actually -- in this case is actually about. This case is about an overpayment. It's not about every cent of consideration that they sought, and those issues have gone completely unaddressed by plaintiff.

Two other points I'd like to make: We talked about disgorgement of profits. Plaintiff has used that word a lot. First of all, those disgorgement of profits would still have to be tied to the overpayment. Plaintiffs, throughout this case, said that the proceeds that rightfully belong to the trust is the amount in excess of fair market value, the overpayment. It's not disgorgement of all profits from every cent in consideration.

Secondly, with respect to disgorgement of profits, plaintiff still has not cited to a single case where what they allege here has been required, not just disgorgement of the money they received in excess of fair market value but any profits upon that and any profits upon that. They are trying to turn this into a forensic accounting case, and they have yet to cite a single ESOP case where subsequent disgorgement of profits has been ordered. And again, the

court can order a disgorgement of profits.  In fact, disgorgement of profits is oftentimes used by a different name: accounting for profit.  The court can order a accounting of profits based on -- from the defendants, and that would be an equitable remedy in and of itself.

The other issue I want to touch on is to briefly respond to plaintiff's claim with respect to proportionality. What is required under these discovery requests are, on their face, so excessively overbroad and disproportionate.  I mean, they've never given any explanation as to why they need names and contact information for every person who received money from Dr. Chaudhuri and Mr. Thomas or why they need their accountant's name or their financial advisors' names or anything like that.

And when Mr. Downes talks about "any time the funds touched or comingled" -- which is what this covers -- unless these funds -- and my understanding is they have not.  We've said the funds were in fact -- there been comingling.  We said that in the interrogatory responses.  That means that any time any cent in the least seven years from either of these transactions touched another account, it brings that account into play and it brings every transaction from that account into play, and so it does not take the gigantic leap or a declaration or an affidavit to show how extremely overbroad and burdensome these requests would be.

What Mr. Downes described in the affidavit, as far as what type of affidavit would do, would take a lot of work. That would require us to do the same overly burdensome -- basically us to conduct a tracing analysis on our own -- a burdensome tracing analysis on our own just to respond to their motion to compel, let alone to respond to their discovery requests, and we think that the Court can, on its face, see that these requests are, in addition to being irrelevant, in addition to being premature, in addition to being unnecessary, are overly broad and unduly burdensome.

With that, I'd -- happy to answer any questions the Court might have.

THE COURT:  Mr. Downes, do you want to respond to anything before I start asking questions?

MR. DOWNES:  Briefly, Your Honor.

THE COURT:  Sure.

MR. DOWNES:  First, with respect to the point about plaintiff not citing any ESOP cases, it's true that plaintiff has not cited to an ESOP case that is directly on point. What's missing from defendants' briefing is an explanation of why that distinction makes a difference here.  Ordinary principles of equity applied in other complex litigation involving constructive trust and disgorgement of profits apply these principles.  Courts regularly order the production of discovery like that sought here in such cases,

including an ERISA cases.  I'd refer Your Honor specifically to *UnitedHealth v. Dowdy*, a case out of the Middle District of Florida.  In that case, which involved a plan fiduciary suing a participant who had received an overpayment, the court ordered similar discovery to that sought here: financial discovery necessary to trace the proceeds, determine whether they currently existed or not or had been subsequently dissipated.

Defendants have not provided any argument for why the fact that this case involves an ESOP as opposed to recovery of an overpayment to a beneficiary or as opposed to allegations of embezzlement or fraud makes a doctrinal difference from the perspective of the equitable remedies that apply or the scope of discovery that's relevant to them.

With respect to the *Gamache* case, an ESOP case in which a court did order substantially similar discovery produced, I can clarify why it is that the court's order only reflects ordering interrogatory responses and the contact information for financial institutions.  It's because in that case the defendants took the position that they did not have any documents responsive to the requests, that they did not have any of the statements.  They responded to the interrogatories under court order and provided plaintiff -- the plaintiffs in that case with the contact information for those financial institutions.  The plaintiffs in that case

proceeded to serve subpoenas on all of the financial institutions that were identified by the defendants in order to get substantially the same documents regarding their accounts and the funds that had been in them over the course of the preceding ten years as those which are sought in this case.

Defendants assert that any recovery of profits will be tied to an overpayment.  That is not necessarily true with respect to all the forms of relief that are sought by plaintiff.  For instance, the district court has expressly contemplated the availability of the remedy of recission, which would involve the complete unwinding of the transaction and all of the subsequent -- and all -- the unwinding of the subsequent uses of the proceeds.  However, even if the amount of profits that plaintiff can seek disgorgement of are tied to the amount of -- to the amount of the overpayment on an unjust enrichment theory -- even there, plaintiff would still be entitled to discovery sufficient to quantify the profits that are attributable to that overpayment.

With respect to the scope of 502(a)(2) and 502(a)(3) and the inequity of not pursuing similar discovery from Alerus, all Alerus got out of this transaction was its relatively di minimis professional fee.  The persons who got substantial economic benefits out of this transaction are Defendants Chaudhuri, Thomas, and SPCP.  That's why they're

the subjects of this discovery.

And to the extent that defendants argue it's inequitable that this discovery is sought against non-fiduciaries and not fiduciaries, to some extent that's just a consequence of the nature of the remedies that are available against fiduciaries versus non-fiduciaries.  When you have a fiduciary, you can pursue the remedy of surcharge against them.  There's not any dispute in this case that Alerus acted in a fiduciary capacity in connection with the 2015 ESOP transaction.  There is such a dispute with respect to Dr. Chaudhuri and Mr. Thomas, and so plaintiff needs to pursue tracing discovery in order to ensure the availability of 502(a)(3) remedies in addition to 502(a)(2) remedies.

With -- and just to address these last two points about why it's relevant to inquire as to who received monies from Defendants Chaudhuri and Thomas and why it's necessary to identify their advisors -- take the last first.  With respect to identification of the advisors, the -- you can see why we need that discovery, because -- for the same reason that counsel pursued that in the *Gamache* case, because it may be necessary to pursue discovery from the nonparty custodians to the extent it's not in the possession of defendants.

And with respect to who received monies, subsequent transferees of proceeds of the transaction are potentially persons against whom equitable relief can be had.  If one of

the defendants subsequently transferred that res into somebody else's possession and they were aware of that, they may have taken it subject to a constructive trust and thus it would still be possible to trace those assets out of the possession of the defendants to those other individuals.

Those are all the points I wanted to touch on, Your Honor.

THE COURT:  Let me first ask -- so maybe I'm a little confused here but Alerus -- this question is to Mr. Downes.  Alerus is -- you're alleging is a fiduciary in this transaction; correct?

MR. DOWNES:  Yes, Your Honor.

THE COURT:  Okay.  And as a fiduciary, they -- Alerus is also subject to relief under 502(a)(2); correct?

MR. DOWNES:  Correct, Your Honor.

THE COURT:  And 502(a)(2) allows for equitable as well as legal remedies; correct?

MR. DOWNES:  I would say equitable and remedial relief.  That's correct.

THE COURT:  Okay.  Okay.  So I'll just call it "remedial legal" just because the case law seems to call them legal remedies versus equitable remedies.

So -- but there is this argument that defendants, particularly Dr. Chaudhuri and Mr. Thomas, may be making that they are not fiduciaries; is that correct, Mr. Downes?

MR. DOWNES:  Correct, Your Honor.

THE COURT:  So in that case, if they are not fiduciaries, the only route for recovery would be under 502(a)(3)?

MR. DOWNES:  Correct.

THE COURT:  Okay.  And 502(a)(3) allows for equitable relief only?

MR. DOWNES:  Yes, Your Honor.  Appropriate equitable relief.

THE COURT:  Okay.  Appropriate equitable relief. So under Drs. -- under Dr. -- against Dr. Chaudhuri and Mr. Thomas, you have the flexibility in the broader availability of legal and equitable relief, where -- and that's the same -- so that's exactly where -- if they're a fiduciary, that's exactly where Alerus is; correct?

MR. DOWNES:  If they are fiduciaries, then, yes, they're subject to 502(a)(2) and subject to the broader relief available against fiduciaries under 409(a).

THE COURT:  Right.  So that's available against Alerus as well?

MR. DOWNES:  Yes, Your Honor.

THE COURT:  Okay.  And for -- and plaintiffs can litigate their cases however they want to -- the parties can. You haven't chosen to go after this tracing remedy -- or -- I'm sorry -- tracing route against Alerus; correct?

MR. DOWNES:  Correct, Your Honor.

THE COURT:  Okay.

MR. DOWNES:  And in part because that's -- there is no meaning -- maybe counsel for Alerus disagrees, but I don't think there is any meaningful dispute in this case about whether or not Alerus acted as a fiduciary in connection with the 2015 ESOP transaction.

THE COURT:  Well, what I'm getting at is I think the -- the tracing really relates to the equitable relief.

MR. DOWNES:  Yes, Your Honor.

THE COURT:  Okay.  So I'm just trying to -- maybe I misheard the argument earlier that -- and I'm just trying to get it straight in my head.  Then you could seek tracing information, under your current theory, against Alerus as well because they're a fiduciary; right?

MR. DOWNES:  Correct, Your Honor.

THE COURT:  You're just choosing not to?

MR. DOWNES:  That's right.  We have not, to date, served such discovery against Alerus.

THE COURT:  Okay.  Now, let me -- the other -- the phraseology that's used in your motion is that the tracing information is necessary to establish an "element" of your case, right.  You use that term "element," and I guess that has a different meaning to me in trial, where you have to show, you know, duty, breach, cause, harm in a negligence

case.  So in an ERISA case, you're telling me that you have to show where all the assets went from the initial account in order to seek a proper res over which equitable relief may be granted?

MR. DOWNES:  Not quite, Your Honor.

THE COURT:  Okay.

MR. DOWNES:  I think what I'd say is that the -- the elements that plaintiff has to prove up depend on the type of relief sought.

THE COURT:  Okay.

MR. DOWNES:  That's *Cigna Corp. v. Amara*, a Supreme Court case.  It makes the point that in these ERISA actions for equitable relief, the showing that a plaintiff has to make is governed by the remedy that they are seeking. Certainly the remedies that plaintiff is seeking would require a showing of the continued existence of a res that is traceable to the ill-gotten gains of the defendants, and so that would be something that they would have to show at trial.

THE COURT:  Okay.  But now is it an element? Meaning, if you don't prove it, you don't get that relief?

MR. DOWNES:  It may be, Your Honor.

THE COURT:  So no?

MR. DOWNES:  Courts have taken different approaches to managing these issues.  I would point you to *Foster v.*

*Adams,* where certainly the court took the position on summary judgment that this was something that plaintiff needed to prove up in order to have a claim --

THE COURT:  Well --

MR. DOWNES:  -- before it distinguished claims for disgorgement --

THE COURT:  Let me stop you there.

Mr. Andre, in that case that is cited out of the Northern District, it does appear, based on the summary judgment ruling, they're dismissing the claim.  Did I hear you correct that Dr. Chaudhuri and Mr. Thomas do not intend on seeking the dismissal of the claims based on the lack of identifiable res for restitution?

MR. ANDRE:  Correct, Your Honor.  Our position is that the element they have to establish is that there is -- that other appropriate equitable relief is available and that there is a specific fund.  The specific fund they identified and argued was sufficient to meet that element is the proceeds.  We do not believe they will have to prove anything else at trial.  We do not intend to argue that they have to prove anything else at trial.

THE COURT:  Okay.  So I -- that, to me, is a little -- it's --

(Pause.)

THE COURT:  Excuse me.  I'm just trying to

organize my thoughts.

(Pause.)

THE COURT:  Mr. Downes, do you -- do the plaintiffs know where the initial payment for the ESOP transaction -- what account it went into?

MR. DOWNES:  Yes, Your Honor.

THE COURT:  Okay.

MR. DOWNES:  In opposition, defendants have identified materials produced by a nonparty to the litigation in two separate documents that, if combined, do appear to indicate the initial accounts to which the cash consideration component of the 2015 ESOP transaction consideration was directed.

THE COURT:  Right.

MR. DOWNES:  I will note that that does not include any of the subsequent amounts received under the notes or the quality assurance fund rights that were received, but it does state where that initial cash consideration was directed to.

THE COURT:  Okay.  So that's -- my question was the QAF payments.  The QAF payments -- looks like it's an ongoing obligation that is being paid into a particular account.  Is that your understanding, Mr. Downes?

MR. DOWNES:  That is my understanding --

THE COURT:  Okay.

MR. DOWNES:  -- and the same is true of the

payments on the note.

THE COURT:  On the payment on the note.  Okay.  And who's -- so -- and I apologize.  The note is held by Dr. Chaudhuri and Mr. Thomas?

MR. DOWNES:  My understanding is that the -- that they each received notes in consideration for their separate components of the transaction.

THE COURT:  Understood.  Okay.  And so there -- those payments that they received on those notes as part of the transaction are ongoing payments that are coming in is your understanding?

MR. DOWNES:  That is my understanding, Your Honor.

THE COURT:  Okay.

So, Mr. Andre, turning, then, to the -- it would seem that they should at least get information regarding where the initial payment for the ESOP transactions went into, and has that been provided by you folks?

MR. ANDRE:  So the discovery -- our initial responses included the same -- citations to the same documents that Mr. Downes mentioned that were cited in our opposition.  So they've had that information, and it lists the amounts that went into the specific bank account numbers.  They've had that information since it was produced, and then we specifically pointed that to them in our responses to their discovery requests in January.

THE COURT:  So in your -- I'm sorry.  So in your responses you identified those documents as being responsive to that particular request?

MR. ANDRE:  Yes.

THE COURT:  Okay.  And with respect to the ongoing QAF payments, has information been provided regarding what accounts those payments are going into?

MR. ANDRE:  Your Honor, I don't believe we have specifically provided that information.

THE COURT:  Okay.

MR. ANDRE:  That's something, certainly, we're -- we'd be happy to consider doing.  Those discussions broke down with plaintiff's counsel.  So, if there's a question as far as, you know, supplementing our interrogatory responses -- and I believe during the informal discovery conference you had identified the first interrogatory in this set as far as identifying the payments that had been received and where those went, you know, we'd be fine supplementing that response --

THE COURT:  Okay.  But --

MR. ANDRE:  -- providing that information.

THE COURT:  So here's my -- here's my -- I'll tell you a little bit of an issue I have: Why didn't you do it in the first place?  I mean, that seems pretty reasonable; right?  I get the whole tracing stuff can be a little

difficult, but you got to give something, rather than saying, "Nope.  Nada."

MR. ANDRE:  And, Your Honor, I think that the concern -- I understand the Court's point.  Our understanding, at least how we read everything up until this dispute has gone beyond what initially was, was that the focus was going to be on the cash consideration, which largely exceeds any potential overpayment they could claim. So the issue with respect to ongoing QAF payments or payments on notes, which I don't believe comes -- is going to be as much as the cash consideration -- I mean, the cash consideration component for Dr. Chaudhuri, I believe, was $89 million.

So that's where we felt the initial -- largely the dispute was.  And that was, frankly, during our discussions and meet-and-confers, still where the dispute was, was over tracing about the $89 million.  So had that really been the request during our first meet-and-confer, I think we would be in a different position with respect to those.  And I'm not casting aspersions on plaintiff's counsel.  My response is that really hasn't been a focus until this briefing --

THE COURT:  (Indecipherable.)

MR. ANDRE:  -- from my perspective.

THE COURT:  Got it.  Okay.

MR. ANDRE:  Mr. Downes may disagree, but from our

perspective, that wasn't where we're -- where we were focused on.

THE COURT: Okay. So let me -- there is this -- in my mind, there's this whole -- I was thrown off by the use of the term "element" in the briefing. Again, in my pea brain it's, you know, duty, breach, cause, harm, is it something you have to prove, almost like an element of a case in a jury charge. Perhaps I've missed -- and it looks like -- and then I read that case out of -- again, *Foster*, where it appeared to be an element, but then I was looking through the other cases, and I couldn't really tell what the elements of proof are necessary for this type of a case. Because these are -- you know, bench trials -- go ahead, Mr. Downes. You want to say something.

MR. DOWNES: To some extent, Your Honor, I think that that's a result of what happens when you're looking at these flexible equitable remedies that courts apply when they're sitting in equity.

THE COURT: Uh-huh.

MR. DOWNES: It's not quite as simple as you have a set of elements to your negligence claim and then, once you do that, you get damages. Instead, you know, courts -- the availability of different remedies for a wrong terms on, you know, different criteria, different elements that plaintiff has the need to prove up in order to establish their

entitlement to a particular form of equitable relief.

THE COURT:  So what I hear you saying, Mr. Downes, is that "Look, this is our shot.  We have one shot at this, and that's going to be, presumably, at the bench trial before Judge Blumenfeld, where we're going to have to say and put in evidence, 'We want constructive trusts over'" -- A, B, C, D, E, F, G -- "'and here's why.'"  And so it's not like a situation where, let's say, a -- you know, a damages award is entered against a company and then you go and seek the money.

Am I hearing you correct, Mr. Downes, that you basically need this because you got one shot before Judge Blumenfeld under the current order and the way this trial is currently structured to show why certain assets should belong as -- in a constructive trust?  Is that fair to say?

MR. DOWNES:  That's correct, Your Honor.

THE COURT:  Okay.

MR. DOWNES:  And courts do handle these cases in a variety of ways.

THE COURT:  Okay.

MR. DOWNES:  Sometimes they are bifurcated between liability and remedies.  Sometimes they are not.  Sometimes a judge enters subsequent writs in aid of an order awarding equitable relief.  Other times a judge has a bench trial and they issue their finding of fact and their conclusions of

law, they make an order, and they enter a judgment, and then they're done, and that's the conclusion of the case.

THE COURT:  Uh-huh.

MR. DOWNES:  So plaintiff needs to be prepared to make whatever showing the district court is going to require at trial.

MR. ANDRE:  Your Honor, if I may?

THE COURT:  Absolutely.

MR. ANDRE:  I think the one thing that Mr. Downes is missing, at least from that analysis, is we're taking a position that they don't have to do that.  And obviously, I can't imagine a scenario in which Judge Blumenfeld is going to prejudice us if they've basically taken us at our word.

THE COURT:  Mr. Andre, you -- Mr. Andre, you've appeared before plenty of district judges.  You don't know what's going to happen in trial, right.  We've been in front of several judges, who I'll -- who shall remain unnamed, where you don't know what's going to happen at trial.

MR. ANDRE:  Understood, Your Honor.  And I do respect that.

THE COURT:  Yeah.

MR. ANDRE:  I think that, though, the issue here is their answer that this is necessary basically comes down to "Well, it might be," and to make our clients go through this extraordinary exercise over something that maybe they'll have

to do -- and it's not just that maybe they'll have to do it. Again, what they are seeking is really divorced from the facts of this case.

Mr. Downes talks about, you know, the trial elements of equitable relief and you can throw out all the various potential equitable remedies there, but what they're still seeking in discovery here is for remedies that -- or at least an expansive scope of remedies that have never been ordered in this type of case before, and that's why when I say it's an ESOP case -- that's why it's relevant.  You may cite -- they want to trace subsequent profits from the proceeds, right, not just where the money went, how much of it is still there, but then subsequent profits.  The example we used during the informal discovery conference -- I believe it was Your Honor's -- is, you know, Dr. Chaudhuri buys a boat.  You know, Mr. Downes's theory is not only is plaintiff entitled to the boat, they're entitled to any profits made if they chartered out the boat as part of a fishing business.

There is no case law that they've cited or we've found where that has been actually ordered in an ESOP case. In an ESOP case, in an overpayment case, what we've seen -- and I think in *Chesemore* kind of demonstrates it -- that, if there is disgorgement of profits (indecipherable), it's typically because the loss isn't available to recover, and even then, the profits here would be the overpayment.  So

what we have is plaintiff seeking extraordinarily overbroad and burdensome discovery that maybe -- maybe they'll have to present -- and they've never asked the court about -- and we're saying they don't have to present -- for remedies that are so broad and have never been awarded in a similar case, and that's our problem at that point.

THE COURT:  Let me -- so let's use that -- the boat analogy, Mr. Downes, and then I'm going to add a different wrinkle to it once you answer that question.

So the boat analogy that Mr. Andre just mentioned -- that is the plaintiff's position; right?  That basically, if he bought a boat and chartered it out and made money on the charter, that those profits would also be subject to a constructive trust?

MR. DOWNES:  Correct, Your Honor.

THE COURT:  Okay.

MR. DOWNES:  And just to be clear, that's not just plaintiff's position.  That's a -- that's the position that's borne out in the major equitable treatises.  You see that approach taken all the time in mine-run unjust-enrichment cases.

THE COURT:  Okay.  So the other aspect of that, then, would be -- I want to go back to the overpayment aspect of it.  If the -- are you saying, then, that -- or the -- is the plaintiff's position that any money obtained, you know,

whether it's -- and I'm just -- this is an -- by example. Let's say it was worth 50 million -- a fair -- the fair value was 50 million but the ESOP paid 70-.  So there's a -- let's say, an overpayment of 20-.  Okay?  Are you saying, then, that -- let's say he bought one boat for 20 million and one boat for 5 million, right -- again, and we're getting into the complications of -- the 20 million was the overpayment, and the 5 million, let's say, was part of a payment that is appropriate -- just for purposes -- from a tracing standpoint, is it basically, then, the plaintiff's choice depending on which boat was more profitable to get money from?

MR. DOWNES:  Essentially, yes, Your Honor.  If you look at the -- if you look at the treatises discussion of this, when you comingle funds, some of which you've received subject to a constructive trust and it all goes into one account --

THE COURT:  But -- no, no.  I'm not talking about a comingled, sir.  I'm talking about -- it came into one account.  70 million came into one account, right.  So -- and I don't -- go ahead.

MR. DOWNES:  So of that 70 million, in the hypothetical, only 20 million consisted of the overpayment. When it hit the account, it was commingled because now you have the 50 million and the 20 million in one comingled

$70 million fund in the account.  Then you go out and you buy a boat, one that cost 20 million, one that cost 5 million. You know, irrespective of the order in which that happens, the way that these equitable tracing principles work is that there's a -- is it a presumption that, when somebody takes funds subject to a trust, distributes them out, that the plaintiff can pursue whatever the most pecuniarily beneficial route out of that account was.

THE COURT:  Understood.

MR. DOWNES:  And a presumption attaches that has to be -- that has to be rebutted by the party who took funds subject to the trust that any particular profitable use of funds, then, was not made with trust assets.

THE COURT:  Uh-huh.  Okay.

MR. ANDRE:  Your Honor, may I briefly?

THE COURT:  Please.

MR. ANDRE:  I'll do my best to be brief.

THE COURT:  No, no.  Please do.  This is -- look -- and I apologize in advance.  This is a tough issue for me, and there's -- overlaying there's other legal issues that are unique to ESOPs, coupled with I haven't pulled a remedies book in God knows how long but -- this is -- so this is bringing back horrible memories from law school.

But I'm just trying to -- because -- I'm trying to, one -- because you said this is not relevant, and that's what

I'm struggling with, Mr. Andre.  I'm trying to find the relevance because there is -- it's not an element per se but -- to prove -- but it is going to be a form of relief that we don't know how Judge Blumenfeld is going to require -- what Judge Blumenfeld is going to require of plaintiffs to show during the trial in order to get the relief because this may be their only shot.

MR. ANDRE:  So -- I understand that.  Our position is it's not relevant --

THE COURT:  How?  But -- okay.  But how -- Okay.  Okay.

(Indecipherable.  Technical issue with audio.)

MR. ANDRE:  -- $20 million, and you're going to disgorge any profits from that $20 million and order an accounting of profits.  At that time, we'd be required to turn over an accounting, demonstrate to plaintiffs that these are the profits, and turn over those profits.  The specific fund, as plaintiffs have already identified, is the money that the res -- that they're attaching the equitable relief to is the money that they know our clients received, the consideration they know our clients received, and they can and the court can attach whatever equitable relief to that set of funds.

THE COURT:  Okay.

MR. ANDRE:  Mr. Downes cited *UnitedHealth*, right,

and the reason we said in our brief that *UnitedHealth* supports us -- because the principal issue in *UnitedHealth* was whether the defendant had actually received the settlement funds.  That is what they were really looking for in *UnitedHealth*.  They claimed he got this money, right.  They needed to prove that he got this money so they could attach equitable relief to it.  That's not in dispute here, Your Honor.  There is consideration that we don't dispute that was paid that the court can attach equitable relief to.  The court could order the disgorgement --

THE COURT:  What would -- if -- let's say plaintiffs win out.  What would the court attach?

MR. ANDRE:  To the proceeds from -- the order would attach to the proceeds of the payment: the cash consideration, the QAF --

THE COURT:  But doesn't it have to be an account, actually?  My understanding is that you can't attach amorphous cash.  That's a legal remedy.  It has to attach to a res.  What res would attach?

MR. ANDRE:  I think it would -- I mean, well, they -- first of all, they know the accounts where the money went into.  If that's an issue, again -- I mean, we're not going to dispute that, that -- so -- and I understand the Court struggling with it in that this is something that's never -- we don't know -- our position is Judge Blumenfeld doesn't

need to do that, and generally speaking, you know, most judges, when they're told they don't need to go that far, oftentimes don't.

But, you know, the point I wanted to respond to specifically -- and Mr. Downes mentioned, you know, that kind of plaintiffs get to choose what's more beneficial to them. That's not really what the law is, Your Honor.  This is an equitable remedy and other appropriate equitable relief. What -- when they cite -- I believe they cited to *Donovan*, right, the language "what's the most advantageous to the beneficiaries."  It isn't about, you know, what's going to give the beneficiaries the biggest windfall.  That's not what a case in equity is about.  It's about -- when you're talking about what's the most advantageous is are there -- if there's a couple different types of remedies, one that would put the beneficiary in a closer position to what they should have been, as opposed to another that may not quite put them in that position, that's when you're talking about what's "most advantageous."  It's not what's going to give them the most amount of money, what's going to make --

THE COURT:  Okay.  So --

MR. ANDRE:  -- so that --

THE COURT:  I'm sorry.  But that decision is going to be up to the district judge.

MR. ANDRE:  Yeah.  Understood.  I just -- it --

THE COURT:  Yeah.  Yeah.

MR. ANDRE:  My point in terms of as far as when you're talking about -- Mr. Downes -- why this other thing is relevant, as -- the -- one of the issues that we have here is Mr. Downes is using theoretical equitable principles that have never been applied in a case like this --

THE COURT:  Uh-huh.

MR. ANDRE:  -- to justify discovery that we don't believe is relevant to the issues Judge Blumenfeld's going to have to decide now, that we have said on the record Judge Blumenfeld's not going to have to decide now, that we are not going to dispute now, to see discovery that goes far beyond what any case has ever said they'd be entitled to.

THE COURT:  Have you folks considered stipulating to Judge Blumenfeld to address these -- so the tracing issues can be addressed upon a finding such that "Look, we're not contesting it" -- defendants are saying, "We're not contesting it," plaintiffs are saying, "That's fine" -- because plaintiffs are going to have to spend a lot of money on this, too, to go through this.

Have you folks considered that -- such a stipulation to the district judge, Mr. Downes?

MR. DOWNES:  Your Honor, we did discuss that.  I mean, it was initially an idea that one of plaintiff's counsel had.  We discussed it at some length with the

KPC defendants, and as we explained to them, we were not able to get sufficient comfort with a stipulation that would cover plaintiff's needs such that this discovery would be unnecessary, including --

THE COURT:  What I -- and I just don't mean a stipulation.  I meant something where you could get in front of Judge Blumenfeld and he would give his acquiescence to it as well.

MR. DOWNES:  Sure.  And my understanding is that, at least in this district, a stipulation between the parties would need to be filed on the docket and court approved in order to have effect.

But even if the issue of demonstrating the res over which recovery is to be had could be bracketed by stipulation, there would still be the issue of profits.  Plaintiff is entitled to disgorgement of profits, and discovery to quantify such profits is appropriate in disgorgement in unjust enrichment cases, and no stipulation to -- you know, to ask the district court judge to defer consideration on these points is going to obviate the need for that discovery.

THE COURT:  Well, it may delay it.  It's not going to obviate it.  What -- I think what the defendants are also saying is, like, "Let's get to that point, and then, if there's additional discovery that's needed, it's going to" --

it's to some effect kicking the can down the road, but it's kicking the can down the road with more information.

MR. DOWNES:  Right.  I --

THE COURT:  So --

MR. DOWNES:  -- I understand, Your Honor.  And I think at this point we're constrained by the schedule that's in place in the case.

THE COURT:  Sure.  Sure.

MR. DOWNES:  We have a rapidly approaching expert discovery deadline and --

THE COURT:  I got you.  So let me ask you this, then: How far do they have to go?  I mean, let's say it goes into one account.  It gets disbursed in certain payments.  I don't know how it gets paid to his personal account.  His personal account is used to -- how far down the road do we have to go -- I mean, down the line do we have to go?

MR. DOWNES:  Your Honor --

THE COURT:  -- a dollar amount?  Like, "Hey, a transaction of," you know, 100,000, 200,000 or something to bracket it?

MR. DOWNES:  Your Honor, with plaintiff's motion, class counsel submitted a letter that we sent to the other side in the meet-and-confer process that proposed staging discovery precisely along this -- along these lines, starting with the accounts into which proceeds had actually themselves

been received, getting statements for those, running forward from the date they were received to the present.  We -- because the nature of the tracing discovery, it's hard to say blind, like we are now, how far you actually have to go but we --

THE COURT:  (Indecipherable.)

MR. DOWNES:  -- in that letter we offered to limit the size of transactions we would follow.  We offered to limit, you know, what other accounts we would seek materials from as long as the aggregate transfers to those accounts fell under specified thresholds and --

THE COURT:  Okay.

MR. DOWNES:  -- not to investigate any transactions, likewise, below certain dollar value thresholds.

THE COURT:  Okay.  And what was the -- I'm sorry.  Excuse -- again, there's a lot of information sloshing around in this little head.  What was the response?

MR. ANDRE:  May I, Your Honor?

THE COURT:  Sure.

MR. ANDRE:  So -- and just to give background, in February we had our first meet-and-confer.  After that, Mr. Becker spoke to Mr. Feinberg, who is the other plaintiff's counsel who's not on the call, and Mr. Feinberg had raised the issue of a stipulation, and that's -- we

thought was how this was going to get resolved.  We were going to get (indecipherable) stipulation we could all address it that way.  We then received --

THE COURT:  (Indecipherable.)

MR. ANDRE:  -- we then received their letter in March -- that Mr. Downes -- where there were some limits -- I forget if was a $1,000 transaction or a $10,000 transaction -- but largely would still require us to go through, albeit piecemeal, all the same discovery that they're claiming here. We felt it was still much broader, and it was certainly not what we were expecting.  We conferred them with them again twice, I think, a week or so later, and that's when we tried again to reach the issue of a stipulation.

What we had offered them was we'd provide letters from the financial institutions that are holding these account -- that are holding the funds that would show how much went in and how much remained, which we represented we think is going to cover, probably, any overpayment, and then would enter into any stipulations necessary to make sure there's no prejudice for them at trial.  We also, I think, had flagged the idea of agreeing that all the funds that are in those accounts would remain in those accounts during the pendency of it.  We were told they'd get back to us, and the response we got a couple weeks later was "We're at an impasse," and so now here we are.  And --

THE COURT:  Okay.

MR. ANDRE:  -- so we didn't view -- the March letter we viewed as a step backwards from where we had been a month before and where we thought we would be --

THE COURT:  Okay.

MR. ANDRE:  -- and we made what we thought was a very fair offer, which would basically cover any concern they could have, and here we are.

THE COURT:  Understood.

Okay.  I think I've received -- it looks like both sides have said, "It's everything in the request or nothing." That's kind of how I read -- I haven't seen any sort of a compromise that's been offered.

Is that fair to say, from plaintiff?

MR. DOWNES:  Your Honor, I'd refer you to what's at ECF 253-7.  That's the letter that I made reference to on March 2nd where we proposed this staged process for compliance.

THE COURT:  Okay.

MR. DOWNES:  That was the offer that we made to try to reduce the burden of compliance with these requests by limiting the number of transactions and accounts and -- transfers and transactions involving comingled funds that would be subject to these requests.

THE COURT:  Got it.  Okay.  Is that something you

folks would still be fine with?

MR. DOWNES:  Yes, Your Honor.  Plaintiff would still be fine with --

THE COURT:  I see Mr. Barton shaking his head so --

MR. DOWNES:  -- compliance --

ROBERT J. BARTON:  I think we have a -- we have a timing problem at this point, Your Honor.  I mean, I --

THE COURT:  Well, and so I -- I got --

MR. BARTON:  -- that's our problem.

THE COURT:  I'm -- I got the timing.  I'm aware of that -- your discovery deadline line and your end of May expert deadline, which is actually the part that scares me more because of the tracing that's going to have to happen but --

MR. DOWNES:  And I will note, Your Honor, that even that proposal held open the possible necessity to go beyond the scope of what was there.  The goal was to try to stage what we had a dispute over so that at an earlier phase we could dispose of the most clearly relevant material, that there's no -- well, that there's at least less of dispute that plaintiff would be entitled to pursue but the statements for the accounts into which funds were received from then until they either go to zero value or the present as a starting point for compliance.  That way we could narrow the dispute as to things that are more -- that are further

afield.  That was the structure that was contemplated at that time.  Mr. Barton is correct that we have time constraints now that we didn't have in February.

THE COURT:  Sure.  Okay.  Okay.

And, Mr. Andre, any compromise that you would like to cite to in the paper, or it's no -- none of it?

MR. ANDRE:  No, Your Honor.  I mean, we've always been -- we've remained from the outset willing to try to resolve this in a way that doesn't prejudice our clients and doesn't prejudice plaintiffs.  I mean, we're still willing to do that.  I think what Mr. Downes is pointing to as a proposal is still an immense lift and one that, again, I think we are still willing to provide.  I had mentioned we will certainly -- we're willing to update our interrogatory responses.  We're still willing to provide evidence showing that those funds are still held in those accounts, which would, at a minimum, demonstrate that there is a res to which they could attach and address the Court's concern -- you asked the question as to what the actual specific would be.  That would certainly address that.  We remain willing to enter into any stipulation.

I think the appropriate course of action would be that the Court, you know, have us update that interrogatory response -- the first one -- as to where the money went, provide information demonstrating that -- how much of the

funds are still there, which is what we offered to do in the first place, and that will be more than enough for them at this point.

I do want to address the issue of timing and -- to say, you know, this is a contentious issue. I mean, it's -- plaintiffs know this is -- what they've -- they have themselves said (indecipherable) evasive and financially sensitive personal information. This wasn't requested until the case had been pending for about a year and a half. We did try to reach a resolution, the resolutions kind of dragged out and -- but we're kind of where we are in this case, I think, because this issue didn't -- wasn't raised until towards the end and it's really dragged out.

So, again, I don't think the timing should require us to go above and beyond because it also cuts against them. I mean, we -- this is a ton --

THE COURT: Well, here's -- let me say something to that, Mr. Andre. I don't know if it's a ton.

MR. ANDRE: Fair enough.

THE COURT: Right? I mean, look, we all just had to do taxes and get our documents together for our accountants or whoever, and it's kind of not that hard to put statements together -- you know, thankfully because of the electronic mechanisms that we have at our disposal now. And that's why I was trying to see if there's a break point that

we could reach on how far down of a staging makes sense to me -- the steps.  We're kind of at a -- and I appreciate, Mr. Andre, your position that, look, this discovery didn't come until late in the game -- or later in the game and we are where we are, but I didn't want to rule on this without actually giving you folks the adequate time to brief it because it is a contentious issue, and it's a sensitive issue and I appreciate that.  And I'm just -- you know, again, that's why I asked, if it's all or nothing, it's very difficult for me to then -- I don't -- and this is a judicial philosophy issue that many judges struggle with: Like, are we refs, or are we supposed to be Solomonic and come up with a third way?  And I don't -- that's something we constantly struggle with, and it goes from case to case and issue to issue.

So in this one I'm looking at the RFPs and the interrogatories that were propounded.  I'm -- and I've said this maybe to you folks before -- you think you're dealing with imperfect information?  I'm like three levels behind you, right.  And so I've got to make my best guess based upon this imperfect information.  And it's going to be a tough one for me, but I'll endeavor to get this out to you folks by next week because I know -- and I want to give you the opportunity to -- one side may want to appeal this to Judge Blumenfeld, and I want to give you the opportunity to

do that in a meaningful way.  Okay?

Is there anything further, then, today, Mr. Downes?

MR. DOWNES:  I'll just address one last point, Your Honor, which is--

THE COURT:  Please.

MR. DOWNES:  -- the issue that Mr. Andre raised about -- he's raised it a few times, and so I want to make sure I touch on it -- this issue of presenting letters stating the amounts that are currently in the accounts that originally received cash consideration.  I just want to explain to Your Honor why that was not an acceptable resolution for plaintiff, and it was really -- it was a few reasons.  One is because that was not a solution that addressed quantification of profits; two, because just knowing where it went in and how much is there doesn't establish that the former is -- that the latter is traceable to the former.  There is everything in between 2015 and the most recent statement that you need to trace through in order to establish that it's actually a res.

Those were the primary issues that plaintiff had with -- and, number three -- excuse me -- was that I respectfully disagree with Mr. Andre's characterization of the QAF rights and the note payments as not having been timely raised.  This is something that plaintiff's counsel has discussed with counsel for the KPC defendants at every

meet-and-confer on this issue since we first discussed it in, I think, January.  The proposal from the KPC defendants also did not address those subsequently received funds, and so that was just not a resolution of this, Solomonic or otherwise, that made sense from plaintiff's perspective, and that was why we brought this to the Court's attention.

That's the only issue I wanted to briefly address, Your Honor.

THE COURT:  I appreciate that.

Mr. Andre, last word, sir.

MR. ANDRE:  I think that every issue Mr. Downes has raised we can still address in a way that does not require us to produce seven years of personal and sensitive financial information, and I think the Court can craft -- you know, if it believe -- and I believe -- it seems that you do -- that plaintiff should be entitled to something and we're willing to give them something that we can provide information sufficient as far as where the subsequent funds went, how much the subsequent funds went, as well as, you know, I always assumed that whatever letter we'd be providing from the financial institutions would cover the fact that the money had -- how much of the funds initially received had stayed there, right.  So using Mr. Downes's principle of equitable tracing, if $10 million goes into an account and the balance never drops between $10 million and there's still

$10 million in the account, you got $10 million traceable funds.

So we appreciate the Court's time and consideration of this issue.  It is important to our clients, it is sensitive; so we appreciate you giving us an opportunity to, if it goes the other way, you know, see what has to be done but I -- we appreciate your time, and thank you.

THE COURT:  I appreciate your patience with me as well.  Thank you, all.  Have a great day.

MR. DOWNES:  Thank you, Your Honor.

MR. ANDRE:  Thank you, Your Honor.

THE COURT:  Thank you.

THE CLERK:  Court is now adjourned.

(Proceedings adjourned at 4:34 p.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Julie Messa              April 30, 2022
Julie Messa, CET**D-403       Date
Transcriber