MORGAN, LEWIS & BOCKIUS LLP
Aimee Mackay, Bar No. 221690
aimee.mackay@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
Tel:   +1.213.612.2500
Fax:   +1.213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
Sari Alamuddin (admitted *pro hac vice*)
sari.alamuddin@morganlewis.com
Deborah Davidson (admitted *pro hac vice*)
deborah.davidson@morganlewis.com
110 N. Wacker Drive
Chicago, IL 60606-1511
Tel: +1.312.324.1000
Fax: +1.312.324.1001

Attorneys for Defendant
SPCP GROUP, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE GAMINO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SPCP GROUP, LLC,<br><br>Defendant.<br><br>and<br><br>KPC HEALTHCARE INC. EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>Nominal Defendant. | Case No. 5:20-cv-01126-SB-SHK [Consolidated Case Number]<br><br>**JOINT APPENDIX OF EVIDENCE RE: MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: August 5, 2022<br>Time:  8:30 am<br>Judge:  Hon. Stanley Blumenfeld, Jr.<br>Ctrm:  6C |

# JAE  PART 1 OF 5
# EXHIBITS 1-11

| Exhibit No. | Document Name | Page Nos. |
|---|---|---|
| 1 | Declaration of Thomas Banks ("Banks Decl.") | JAE 0001 – JAE 0007 |
| 2 | Banks Decl. Ex. A, Amendment and Restatement to the Credit Agreement (Feb. 7, 2013) ("2013 Credit Agreement"), SPCP_0000004312 | JAE 0008 – JAE 0629 |
| 3 | Banks Decl. Ex. B, Payoff Letter (Feb. 14, 2014), SPCP_0000003147 | JAE 00630 – JAE 0639 |
| 4 | Banks Decl., Ex. C, Feb. 19, 2015 E-mail, SPCP_0000027769 | JAE 0640 – JAE 0641 |
| 5 | Banks Decl. Ex. D, Project Solus: Confidential Business Profile (Feb. 2015), SPCP_0000027770 | JAE 0642 – JAE 0650 |
| 6 | Banks Decl., Ex. E., Aug. 5, 2015 E-mail, SPCP_0000018837 | JAE 0651 – JAE 0652 |
| 7 | Banks Decl., Ex. F, Letter of Intent & Summary Term Sheet, SPCP_0000018838 | JAE 0653 – JAE 0671 |
| 8 | Banks Decl., Ex. G, Subordinated Debt Offering & Detachable Warrants Term Sheet, SPCP_0000018856 | JAE 0672 – JAE 0678 |
| 9 | Banks Decl., Ex. H, Aug. 13, 2015 E-mail, SPCP_0000019081 | JAE 0679 – JAE 0681 |
| 10 | Banks Decl. Ex. I, Silver Point Capital Memo (Sept. 16, 2015), SPCP_0000018948 | JAE 0682 – JAE 0683 |

| Exhibit No. | Document Name | Page Nos. |
|---|---|---|
| 11 | Banks Decl., Ex. J, Credit Agreement dated August 28, 2015, KPCDEF_000433 | JAE 0684 – JAE 0797 |
| 12 | Banks Decl., Ex. K, Schedule 2.01 to Credit Agreement (Lenders and Commitments), KPCDEF_000546 | JAE 0798 – JAE 0842 |
| 13 | Banks Decl., Ex. L, Stock Purchase Agreement between the KPC Healthcare, Inc. Employee Stock Ownership Trust, Dr. Kali Pradip Chaudhuri, and KPC, dated August 28, 2015 ("Stock Purchase Agreement"), MCD00000144 | JAE 0843 – JAE 0909 |
| 14 | Banks Decl., Ex. M, Warrant Purchase Agreement between KPC and William Thomas, dated August 28, 2015 ("Thomas Warrant Purchase Agreement"), bearing Bates stamps KPCDEF_002368 | JAE 0910 – JAE 0955 |
| 15 | Exhibit 33 to Fournier Dep., SRR Analysis of Transaction Fairness, ALERUS_0000016 | JAE 0956 – JAE 1097 |
| 16 | Exhibit 58 to Deposition of Danielle Gamino, Warrant Purchase Agreement between KPC and SPCP, dated August 28, 2015 ("SPCP Warrant Purchase Agreement"), MCD00044381 | JAE 1098 – JAE 1181 |
| 17 | Exhibit 185 to Banks Dep., Fair Value Memo (Dec. 31, 2013), SPCP_0000000798 | JAE 1182 – JAE 1190 |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

JOINT APPENDIX OF EVIDENCE RE:
MOTION FOR SUMMARY JUDGMENT
5:20-CV-01126-SB-SHK

| Exhibit No. | Document Name | Page Nos. |
|---|---|---|
| 18 | Exhibit 190 to Banks Dep., Fair Value Memo (Dec. 31, 2014) SPCP_0000028064 | JAE 1191 – JAE 1199 |
| 19 | Exhibit 191 to Banks Dep., March 5, 2015 E-mail, SPCP_0000020617 | JAE 1200 – JAE 1201 |
| 20 | Exhibit 194 to Banks Dep., July 14, 2015 E-mail SPCP_0000024183 | JAE 1202 – JAE 1204 |
| 21 | Exhibit 197 to Banks Dep., Valuation Memo (August 6, 2015), SPCP_0000029617 | JAE 1205 – JAE 1213 |
| 22 | Exhibit 259 to Ernberg Dep., FTI Project Solus Draft Due Diligence Report (Aug. 4, 2015), FTI-CSPV_0000452. | JAE 1214 – JAE 1325 |
| 23 | Exhibit 260 to Ernberg Dep., Marwood Project Solus Report, EUREKA_045308 | JAE 1326 – JAE 1436 |
| 24 | Excerpts of Transcript of the Deposition of Thomas Banks ("Banks Dep. Tr.") | JAE 1437 – JAE 1489 |
| 25 | Excerpts of Transcript of Deposition of Jens Ernberg ("Ernberg Dep. Tr.") | JAE 1490 – JAE 1514 |
| 26 | Excerpts of Transcript of Deposition of Mark Fournier ("Fournier Dep Tr.") | JAE 1515 – JAE 1518 |
| 27 | Excerpts of Transcript of Deposition of Michael Harden ("Harden Dep. Tr.") | JAE 1519 – JAE 1530 |
| 28 | Excerpts of Transcript of Deposition of William Thomas ("Thomas Dep. Tr.") | JAE 1531 – JAE 1536 |
| 29 | Excerpts of Transcript of Deposition of Allison Wilkerson ("Wilkerson Dep. Tr.") | JAE 1537 – JAE 1541 |

| Exhibit No. | Document Name | Page Nos. |
|---|---|---|
| 30 | Form 10-K filed by Integrated Healthcare Holdings, Inc. with U.S. Securities and Exchange Commission (fiscal year ended March 31, 2012), SPCP_0000001187 | JAE 1542 – JAE 1622 |
| 31 | Excerpts of Expert Report of Annapoorani Bhat (May 27, 2022) ("Bhat Report") | JAE 1623 – JAE 1627 |
| 32 | Excerpts of Defendant SPCP Group LLC's Amended Responses to Plaintiff's Fifth Set of Interrogatories. | JAE 1628 – JAE 1636 |
| 33 | KPC Healthcare Holdings, Inc. Flow of Funds Memo Exhibit, EUREKA_041134 | JAE 1637 – JAE 1646 |
| 34 | KPC Healthcare, Inc. ESOP Transaction Lender Presentation by Eureka, July 2015, EUREKA_045761 | JAE 1647 – JAE 1698 |
| 35 | Email from Thomas Banks to Ian Carvalho and Andrew Margius, dated September 1, 2015, SPCP_0000022179 | JAE 1699 – JAE 1700 |
| 36 | Defendant SPCP Group, LLC's Responses to Plaintiff's First Set of Requests for Admission dated March 8, 2022 | JAE 1701 – JAE 1710 |
| 37 | Investor Rights Agreement among KPC Healthcare, Inc. Employee Stock Ownership Trust and Dr. Kali Pradip Chaudhuri, William E. Thomas, SPCP Group, LLC, and KPC Healthcare Holdings, Inc., August 31, 2015, KPCDEF_002510 | JAE 1711 – JAE 1757 |

| Exhibit No. | Document Name | Page Nos. |
|---|---|---|
| 38 | Email from Bill Thomas to Thomas Banks dated August 25, 2015, SPCP_0000021400 | JAE 1758 – JAE 1759 |
| 39 | Email from Lin Chen to Thomas Banks dated March 5, 2015, SPCP_0000029612 | JAE 1760 – JAE 1762 |
| 40 | KPC Healthcare Holdings, Inc. Analysis of Transaction Fairness issued August 28, 2015 by Stout Risius Ross, STOUT_0000016 | JAE 1763 – JAE 1905 |
| 41 | Email from Phillip Chou to Bill Thomas dated August 6, 2015, EUREKA_032870 | JAE 1906 – JAE 1908 |
| 42 | Defendant SPCP Group, LLC's Responses to Plaintiff's Second Set of Requests for Admission dated April 6, 2022 | JAE 1909 – JAE 1917 |
| 43 | Independent Trustee Engagement Agreement between Alerus and KPC Healthcare dated May 6, 2015, ALERUS_004075336 | JAE 1918 – JAE 1928 |
| 44 | Email from Michael Harden to Phillip Chou dated August 24, 2015, EUREKA_046974 | JAE 1929 – JAE 1937 |
| 45 | Excerpts of Transcript of Deposition of Steven Blake ("Blake Depo.") | JAE 1938 – JAE 1944 |
| 46 | Further Excerpts of Transcript of Deposition of Thomas Banks ("Banks Depo.") | JAE 1945 – JAE 1955 |
| 47 | Further Excerpts of Transcript of Deposition of William Thomas ("Thomas Depo.") | JAE 1956 – JAE 1970 |
| 48 | Further Excerpts of Transcript of Deposition of Jens Ernberg ("Ernberg Depo.") | JAE 1971 – JAE 1980 |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

JOINT APPENDIX OF EVIDENCE RE:
MOTION FOR SUMMARY JUDGMENT
5:20-CV-01126-SB-SHK

| Exhibit No. | Document Name | Page Nos. |
|---|---|---|
| 49 | Further Excerpts of Transcript of Deposition of Allison Wilkerson ("Wilkerson Depo.") | JAE 1981 – JAE 1986 |
| 50 | Excerpts of Transcript of Deposition of Kali Priyo Chaudhuri ("Priyo Depo.") | JAE 1987 – JAE 1991 |
| 51 | Excerpts of Transcript of Deposition of Suzanne Richards ("Richards Depo.") | JAE 1992 – JAE 1996 |

## CERTIFICATION PURSUANT TO LOCAL RULE 5-4.3.4(a)(2)

Pursuant to Local Rule 5-4.3.4(a)(2), Defendant's counsel attests that all other signatories listed, and on whose behalf this filing is jointly submitted, concur in the filing's content and have authorized the filing.

Dated: July 5, 2022                    MORGAN, LEWIS & BOCKIUS LLP


By */s/ Aimee Mackay*
Aimee Mackay
Sari Alamuddin (*pro hac vice*)
Deborah Davidson (*pro hac vice*)

*Attorneys for Defendant*
SPCP GROUP, LLC

Dated: July 5, 2022                    BLOCK & LEVITON LLP


By */s/ R. Joseph Barton*
R. Joseph Barton

*Attorneys for Plaintiff*
Danielle Gamino

# EXHIBIT 1

1   MORGAN, LEWIS & BOCKIUS LLP
    Aimee Mackay, Bar No. 221690
2   aimee.mackay@morganlewis.com
    300 South Grand Avenue
3   Los Angeles, CA 90071-3132
    Tel:  +1.213.612.2500
4   Fax:  +1.213.612.2501

5   MORGAN, LEWIS & BOCKIUS LLP
    Sari Alamuddin (admitted *pro hac vice*)
6   sari.alamuddin@morganlewis.com
    Deborah Davidson (admitted *pro hac vice*)
7   deborah.davidson@morganlewis.com
    110 N. Wacker Drive
8   Chicago, IL 60606-1511
    Tel: +1.312.324.1000
9   Fax: +1.312.324.1001

10
    Attorneys for Defendant
11  SPCP GROUP, LLC

12              UNITED STATES DISTRICT COURT
13              CENTRAL DISTRICT OF CALIFORNIA

14  DANIELLE GAMINO, individually and on       Case No. 5:21-cv-01466-SB-SHK
    behalf of all others similarly situated,    (consolidated with Case No. 5:20-
15                                               cv-01126-SB-SHK)
                 Plaintiff,
16                                               **DECLARATION OF THOMAS**
         vs.                                     **BANKS IN SUPPORT OF**
17                                               **DEFENDANT SPCP GROUP**
    SPCP GROUP, LLC,                             **LLC'S MOTION FOR**
18                                               **SUMMARY JUDGMENT**
                 Defendant, and
19
    KPC HEALTHCARE, INC. EMPLOYEE
20  STOCK OWNERSHIP PLAN,

21               Nominal Defendant.

22

23       I, Thomas Banks, declare:

24       1.    I am a Managing Director at Silver Point Capital, L.P.  Silver Point

25  Capital L.P. is the manager for SPCP Group, LLC.  I have held the position of

26  Managing Director or Senior Analyst since 2008 (there were no differences in

27

28                                              DECLARATION OF THOMAS BANKS IN
                                 1              SUPPORT OF DEFENDANT'S MOTION
MORGAN, LEWIS &                                 FOR SUMMARY JUDGMENT;
  BOCKIUS LLP                                   NO. 5:21-CV-01466-SB-SHK
 ATTORNEYS AT LAW
   LOS ANGELES

1    responsibilities between the two roles).   In my position at Silver Point Capital, L.P.,

2    I lead a team of investment analysts that make investments in securities and loans.

3        2.     Silver Point Capital, L.P. manages investment funds on behalf of its

4    clients, including clients who invest assets in the Silver Point Capital Fund, L.P., (the

5    "Onshore Fund"), (2) the Silver Point Capital Offshore Master Fund, L.P. (the

6    "Offshore Fund"), and (3) the Silver Point Specialty Credit Fund, L.P.  SPCP Group

7    LLC is owned by the Onshore and the Offshore funds.  Together, I refer to these

8    entities as "Silver Point."

9        3.     The Silver Point Specialty Credit Fund, L.P. was launched in July 2015

10   and specializes in investing in healthy middle-market companies.

11       4.     Since April 2010, Silver Point has invested in KPC Healthcare

12   Holdings, Inc. ("KPC"), formerly known as Integrated Healthcare Holdings, Inc.

13   ("IHHI") (the "Company").  As a Managing Director and Senior Analyst at Silver

14   Point Capital, L.P., I have been responsible for the Onshore Fund's investments in

15   the Company.

16       5.     Between April 2010 and February 2014, Silver Point provided a term

17   loan to the Company.  Between April 2010 and August 2015, Silver Point held

18   unexercised warrants to purchase shares of the Company's stock.

19       6.     In my position at Silver Point Capital, L.P., I have prepared fair value

20   memoranda assessing the estimated market value of Silver Point's position in

21   investments like the Company warrants, which have no observable public price. The

22   fair value memoranda purport to value SPCP's position related to a company or asset,

23   not the company or asset itself.

24       7.     In overseeing Silver Point's investments in the Company, I believed that

25   the Company had significant potential for strong financial performance based on the

26   performance of comparable hospitals, but that it required both managerial changes

27   and time before its performance could improve to meet its potential.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

DECLARATION OF THOMAS BANKS IN
SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT;
NO. 5:21-CV-01466-SB-SHK

8.    I understand that on August 28, 2015, the Company executed a transaction with several other parties whereby the Company's employee owned stock ownership plan purchased 100% of the Company's stock (the "Stock Purchase").

9.    Silver Point was not a party to the Stock Purchase, nor was any Silver Point entity.  Silver Point did not participate in any due diligence meetings regarding the Stock Purchase with the Company or any other party to the transaction or its agents, advisors, or consultants.  In fact, to my knowledge, I have never even met Michael Harden, Mark O'Keefe, or Phillip Chou of Eureka Capital Partners; Nels Carlson or Michael Flesch of Alerus Financial N.A.; Mark Fournier, Joe Demetrius, or Vikram Sinnathamby of Stout Risius Ross; or Michael Holzman or Chris Horner of Holzman & Horner PLLC.

10.    Silver Point sold its unexercised warrants to purchase Company stock to the Company on August 28, 2015.  In anticipation of the warrant sale, I prepared a memorandum that attempted to value Silver Point's unexercised warrants based on a valuation of the Company.  The memorandum concluded that the Company had an equity value ranging from ███████ to ███████, with a midpoint valuation of ███████.  In preparing the memorandum, I did not receive or consult any valuation report or similar document prepared by the Company or any other party to the Stock Purchase or its agents, advisors, or consultants.

11.    Silver Point contributed $10 million to the ███████ syndicated loan headed by Credit Suisse that financed the Stock Purchase.  Silver Point's decision to finance a part of the loan was governed by its own internal analysis of the Company's potential value, which was based only on the information Silver Point had previously received about the Company.

12.    In my experience, sophisticated lenders will typically not provide a traditional leverage loan (i.e., a loan without warrants or other equity consideration)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

DECLARATION OF THOMAS BANKS IN
SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT;
NO. 5:21-CV-01466-SB-SHK

to a company unless they believe that the loan amount does not exceed 50%-65% of the company's total capital structure (i.e., both debt and equity).

13.     I believe that Credit Suisse is a sophisticated lender, and that it would not have agreed to provide a ███████ loan to the Company had it believed the loan exceeded 50%-65% of the Company's total capital structure.

14.     Attached as Exhibit A to my declaration is a true and correct copy of an Amendment and Restatement to the Credit Agreement, dated February 7, 2013, bearing Bates stamps SPCP_0000004312 – SPCP_0000004932.

15.     Attached as Exhibit B to my declaration is a true and correct copy of a Payoff Letter, dated February 14, 2014, bearing Bates stamps SPCP_0000003147 – SPCP_0000003155.

16.     Attached as Exhibit C to my declaration is a true and correct copy of an e-mail I received from Bill Thomas, dated February 19, 2015, bearing Bates stamp SPCP_0000027769.

17.     Attached as Exhibit D to my declaration is a true and correct copy of a document titled "Project Solus: Confidential Business Profile," which was attached to the e-mail I received from Bill Thomas dated February 19, 2015, bearing Bates stamps SPCP_0000027770 – SPCP_0000027770_7.

18.     Attached as Exhibit E to my declaration is a true and correct copy of an e-mail I received from Bill Thomas, dated August 5, 2015, bearing Bates stamp SPCP_0000018837.

19.     Attached as Exhibit F to my declaration is a true and correct copy of a document titled "Letter of Intent & Summary Term Sheet," which was attached to the e-mail I received from Billed Thomas dated August 5, 2015, bearing Bates stamps SPCP_0000018838 to SPCP_0000018855.

20.     Attached as Exhibit G to my declaration is a true and correct copy of a document titled "Subordinated Debt Offering & Detachable Warrants Term Sheet,"

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

DECLARATION OF THOMAS BANKS IN
SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT;
NO. 5:21-CV-01466-SB-SHK

JAE 0005

which was attached to the e-mail I received from Billed Thomas dated August 5, 2015, bearing Bates stamps SPCP_0000018856 to SPCP_0000018861.

21.     Attached as Exhibit H to my declaration is a true and correct copy of an e-mail I sent to Bill Marcus, dated August 13, 2015, bearing Bates stamps SPCP_0000019081 - SPCP_0000019082.

22.     Attached as Exhibit I to my declaration is a true and correct copy of a Silver Point Capital memorandum dated September 16, 2015, bearing Bates stamp SPCP_0000018948.

23.     Attached as Exhibit J to my declaration is a true and correct copy of the Credit Agreement dated August 28, 2015, bearing Bates stamps KPCDEF_000433 – KPCDEF_00545.

24.     Attached as Exhibit K to my declaration is a true and correct copy of the schedules to the Credit Agreement dated August 28, 2015, bearing Bates stamps KPCDEF_000546 – KPCEDF_000589.

25.     Attached as Exhibit L to my declaration is what I understand to be a true and correct copy of the Stock Purchase Agreement between the KPC Healthcare, Inc. Employee Stock Ownership Trust, Dr. Kali Pradip Chaudhuri, and KPC, dated August 28, 2015 ("Stock Purchase Agreement"), bearing Bates stamps MCD00000144 – MCD00000209.

26.     Attached as Exhibit M to my declaration is what I understand to be a true and correct copy of the Warrant Purchase Agreement between KPC and William Thomas, dated August 28, 2015 ("Thomas Warrant Purchase Agreement"), bearing Bates stamps KPCDEF_002368 - KPCDEF_002412.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF THOMAS BANKS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; NO. 5:21-CV-01466-SB-SHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Executed in ___breenwich___, Connecticut, on June _16_ , 2022.

_____

Thomas Banks

Morgan, Lewis & Bockius
LLP
Attorneys at Law
Los Angeles

6

DECLARATION OF THOMAS BANKS IN
SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT;
NO. 5:21-CV-01466-SB-SHK

# EXHIBIT 2

EXECUTION VERSION

## AMENDMENT AND RESTATEMENT TO THE CREDIT AGREEMENT

This AMENDMENT AND RESTATEMENT TO THE CREDIT AGREEMENT (this "Agreement") is made as of February 7, 2013, by and among (i) INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("IHHI"), WMC-SA, INC., a California corporation ("WMC-SA"), WMC-A, INC., a California corporation ("WMC-A"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("Chapman"), COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("Coastal" and together with IHHI, WMC-SA, WMC-A and Chapman, the "Borrowers"), PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("PCHI"), and GANESHA REALTY, LLC, a California limited liability company ("Ganesha", and together with PCHI, the "Amendment Parties") (ii) SPCP GROUP IV, LLC, a Delaware limited liability company ("SP 1"), and SPCP Group, LLC, a Delaware limited liability company ("SP 2"), and (iii) SILVER POINT FINANCE, LLC, a Delaware limited liability company ("Silver Point").

## RECITALS

WHEREAS, (i) the Borrowers, (ii) PCHI, ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("OC-PIN") and Ganesha (collectively, the "Credit Parties"; and OC-PIN may be referred to herein as the "Guarantor"), (iii) SP 1 and SP 2 (each, an "Existing Lender" and collectively, the "Existing Lenders") and (iv) Silver Point (the "Lender Agent") are parties to that certain Credit Agreement dated as of October 9, 2007 (as amended by Amendment No. 1 to Credit Agreement dated April 2, 2009 and the Acknowledgment, Waiver and Consent and Amendment to Credit Agreements dated April 2, 2009, the Omnibus Credit Agreement Amendment dated as of April 13, 2010, Amendment to $80,000,000 Credit Agreement dated August 30, 2010, and Amendment No. 4 to Credit Agreement and Consent dated as of August 1, 2012, the "Existing Credit Agreement"), providing, subject to the terms and conditions thereof, for extensions of credit (by means of loans) to be made, by the Existing Lenders to the Borrowers;

WHEREAS, the Borrowers have advised the Lender Agent and the Existing Lenders that the Borrowers intend to repay in full all amounts outstanding under the Existing Credit Agreement due solely to SP 1 on February 7, 2013 (the "SP 1 Payoff Date") in connection with the execution and delivery of this Agreement and the Restated Credit Agreement (as defined below), with the proceeds of additional loans to be disbursed by SP 2 pursuant to the Restated Credit Agreement, and the Amendment Parties, the Lender Agent and the Existing Lenders consent to such repayment;

WHEREAS, the Borrowers, the Amendment Parties, the Lender Agent and SP 2 (the "Lender") desire to amend the Existing Credit Agreement in certain respects, including without limitation to extend the Maturity Date, modify the interest rate and increase the original principal amount of the $45,000,000 Real Estate Term Loan (as defined in the Existing Credit Agreement) on the terms and conditions set forth below;

WHEREAS, the Borrowers, the Amendment Parties, the Lender Agent and the Lender have agreed that the Existing Credit Agreement shall, on the Restatement Effective Date (as defined below), be amended and restated in the form attached hereto as Exhibit A (the "Restated Credit Agreement");

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and subject to the conditions set forth herein, the parties hereto hereby agree as follows:

#4849-9380-9938v20

CONFIDENTIAL

SPCP_0000004312

SECTION 1.   <u>Defined Terms; Interpretation</u>.   Unless otherwise specified, capitalized terms used but not defined herein have the meanings assigned to such terms in the Restated Credit Agreement.   The rules of construction set forth in <u>Annex A</u> of the Restated Credit Agreement are hereby incorporated by reference herein, *mutatis mutandis*.

SECTION 2.   <u>SP 1 Payoff</u>.

(a)   Each of the Lender Agent and SP 1 confirms that the aggregate amount (the "<u>SP 1 Payoff Amount</u>") as of the SP 1 Payoff Date necessary to pay in full all amounts owing by the Borrowers to SP 1 under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) is $8,139,256.35 (consisting of (i) the principal amount of $8,119,633.90 and (ii) the interest amount of $19,622.45), subject to the same being paid by wire to, and confirmed received not later than 5:00 p.m. (New York time) on the SP 1 Payoff Date by, the Lender Agent in U.S. Dollars in immediately available funds to the account of the Lender Agent.   In the event the SP 1 Payoff Amount is not received by the time specified above on the SP 1 Payoff Date in accordance with the terms of this Agreement the SP 1 Payoff Amount will be subject to adjustment.

(b)   The Borrowers and the Amendment Parties acknowledge and agree that (i) as of the Effective Time, SP 1 shall have no further obligation, duty, liability or responsibility under the Existing Credit Agreement, any other Loan Document or any other document or agreement executed and/or delivered in connection therewith (except as otherwise expressly provided herein and except for such obligations, duties, liabilities or responsibilities that are otherwise expressly stated in the Existing Credit Agreement or any such Loan Document as surviving that agreement's or document's termination, which in any such case shall, as so specified, survive without prejudice and remain in full force and effect), (ii) if any payment at any time made to the Lender Agent or SP 1 on account of the SP 1 Payoff Amount is ever avoided, rescinded, set aside or must otherwise be returned or repaid by the Lender Agent or SP 1, whether in bankruptcy, reorganization, insolvency or similar proceedings involving the Borrowers or the Amendment Parties or otherwise, then such amount and the obligations and liability of the Borrowers and the Amendment Parties under the Existing Credit Agreement and the other Loan Documents intended to be paid shall immediately be reinstated with full force and effect, without need for any action by any person, and shall be enforceable against the Borrowers and the Amendment Parties and their successors and assigns as if such payment had never been made, and (iii) forever releases and discharges SP 1 and its agents, officers, and directors from any and all claims, suits or causes of action the Borrowers and the Amendment Parties may have against SP 1 or its agents, officers and directors arising out of or relating to the Loan Documents.

(c)   The Existing Lenders and Lender Agent (i) acknowledge and agree that, as of the Effective Time, all indebtedness of the Borrowers and the Amendment Parties to the SP 1 in respect of the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) shall be fully paid and discharged; and (ii) consent to the repayment of the SP 1 Payoff Amount solely to SP 1 notwithstanding anything to the contrary in the Existing Credit Agreement or any other Loan Document.

SECTION 3.   <u>Amendment and Restatement of the Existing Credit Agreement</u>. Effective on the Restatement Effective Date (as defined below), the Existing Credit Agreement is hereby amended and restated to read in its entirety in the form of the Restated Credit Agreement attached as <u>Exhibit A</u> hereto.   From and after the effectiveness of such amendment and restatement, the terms "Agreement", "this Agreement", "herein", "hereinafter", "hereto", "hereof" and words of similar import, as used in the Restated Credit Agreement, shall, unless the context otherwise requires, refer to the

#4849-9380-9938v20

**JAE 0010**

CONFIDENTIAL

SPCP_0000004313

Restated Credit Agreement, and the term "Credit Agreement", as used in the other Loan Documents, shall mean the Restated Credit Agreement, as may be further amended, supplemented or otherwise modified from time to time.  This Agreement shall constitute a "Loan Document" under the Restated Credit Agreement.

SECTION 4.  MidCap Consent.  Subject to the satisfaction of the conditions precedent specified in Section 6 below, but effective as of the date hereof, Lender Agent, the Existing Lenders and the Lender consent, under the Existing Credit Agreement, the Restated Credit Agreement and all other Loan Documents, to the increase in the aggregate available revolving commitments from $30,000,000 to $35,000,000 under the Credit and Security Agreement, dated as of August 30, 2010, among the Borrowers, MidCap Financial, LLC, as agent for lenders, and lenders party thereto (the "MidCap Facility"), including without limitation Section 1.17 of the Existing Credit Agreement and Section 1.17 of the Restated Credit Agreement, and waive compliance by the Borrowers, PCHI and Ganesha with the provisions of Section 1.4(b) of the Existing Credit Agreement and Section 1.4(b) of the Restated Credit Agreement solely with respect to, and to effectuate, the increase in the aggregate available revolving commitments from $30,000,000 to $35,000,000 under the MidCap Facility.  For the avoidance of doubt, the consent hereunder is limited solely to increasing the aggregate available revolving commitments from $30,000,000 to $35,000,000 and not to any other amendment of the MidCap Facility that may require consent of Lender Agent and/or the Lender under the A/R Facility Intercreditor Agreement and the Loan Documents.

SECTION 5.   Representations and Warranties.  To induce the other parties hereto to enter into this Agreement, each Borrower and each Amendment Party hereby represents and warrants with respect to itself to each Existing Lender and the Lender Agent that:

(a)     The execution, delivery and performance by the Borrowers and Amendment Parties of this Agreement:  (i) are within such Person's power; (ii) have been duly authorized by all necessary corporate or limited liability company action; (iii) do not contravene any provision of such Person's bylaws or operating agreement; (iv) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (v) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument, including without limitation the A/R Facility, to which such Person is a party or by which such Person or any of its property is bound; and (vi) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Lender Agent for the benefit of the Existing Lenders pursuant to the Loan Documents.  Each Borrower and each Amendment Party has obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement.  This Agreement has been duly executed and delivered by each Borrower and each Amendment Party and constitutes a legal, valid and binding obligation of each Borrower and Amendment Party enforceable against it in accordance with its terms, except as the enforceability of this Agreement may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

(b)     Except as set forth on Schedule 5(b) hereto, each of the representations and warranties made by each Borrower and each Amendment Party set forth in Section 3 of the Restated Credit Agreement is true and correct in all material respects (or if already qualified by materiality, in all respects) on and as of the Restatement Effective Date as if made on and as of the Restatement Effective Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct in

#4849-9380-9938v20

CONFIDENTIAL

all material respects (or if already qualified by materiality, in all respects) as of such specific date).

(c)     No Default or Event of Default has occurred and is continuing as of the date hereof and as of the Restatement Effective Date.

SECTION 6.     Conditions Precedent; Effectiveness.     As provided in Section 3 above, the amendment and restatement of the Existing Credit Agreement contemplated hereby shall become effective, as of the date (the "Restatement Effective Date") and effective simultaneously with and as of the time of receipt by the Lender Agent of the SP 1 Payoff Amount in the manner described above in Section 2 ("Effective Time"), upon which the following conditions precedent have been satisfied (or waived by the Existing Lenders):

(a)     Existing Lenders shall have received reasonably satisfactory evidence that there shall have been no material adverse change in the business, assets, properties, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of IHHI and its Subsidiaries, taken as a whole, since September 30, 2012.

(b)     On the Restatement Effective Date, the following statements shall be true and the Lender Agent shall have received a certificate signed by a duly authorized officer of the Borrowers and the Amendment Parties, dated the Restatement Effective Date, setting forth the following:

(i)     Except as set forth on Schedule 3.12A to the Restated Credit Agreement, there is no pending or (to the knowledge of the Borrowers or the Amendment Parties) threatened action or proceeding affecting the Borrowers or the Amendment Parties or any of their respective Subsidiaries before any court, governmental agency or arbitrator that is reasonably likely to have a Material Adverse Effect.

(ii)     Each of the representations and warranties set forth in Sections 5(b) and (c) hereof.

(iii)     No event or circumstance shall have occurred that has or reasonably could be expected to have a Material Adverse Effect as to the Borrowers and the Amendment Parties.

(c)     The Borrowers shall have paid to the Lender Agent on the Restatement Effective Date:

(i)     the SP 1 Payoff Amount for the benefit of SP 1 from the proceeds of the Loans to be disbursed under the Restated Credit Agreement,

(ii)     the repurchase price in an aggregate amount equal to $840,868.25, to SP 1 pursuant to the Repurchase Agreement (as defined below) from the proceeds of the Loans to be disbursed under the Restated Credit Agreement, and

(iii)     all reasonable and documented invoiced fees and expenses of the Lender Agent and the Existing Lenders (including the reasonable and documented invoiced fees and expenses of counsel to the Lender Agent).

#4849-9380-9938v20

**JAE 0012**

CONFIDENTIAL

(d)     The Lender Agent shall have received on or before the Restatement Effective Date the following in form and substance reasonably satisfactory to the Lender Agent and in sufficient copies for the Lender:

(i)     A copy of the articles of incorporation for each Borrower and a copy of the articles of organization for each Amendment Party, certified by the Secretary of State for the state of incorporation or organization dated as of a recent date reasonably satisfactory to the Lender Agent prior to the Restatement Effective Date.

(ii)     A certificate of good standing issued by the applicable state of incorporation or organization for each Borrower and each Amendment Party, certified by the Secretary of State for the state of incorporation or organization dated as of a recent date reasonably satisfactory to the Lender Agent prior to the Restatement Effective Date.

(iii)     The bylaws or operating agreement for each Borrower and each Amendment Party, certified to be true and accurate by the corporate secretary of each Borrower and by the manager of each Amendment Party.

(iv)     An incumbency certificate (officers and directors, or managers and members) for each Borrower and each Amendment Party, certified to be true and accurate by the corporate secretary of each Borrower and by the manager of each Amendment Party.

(v)     The resolutions duly adopted by the board of directors of each Borrower and the resolutions duly adopted by all managers of each Amendment Party, authorizing the transactions set forth in this Agreement.

(vi)     A favorable opinion of counsel licensed to practice law and in good standing in the State of California for PCHI, Ganesha, WMC-A, WMC-SA, Coastal and Chapman, addressed to the Lender Agent and the Existing Lenders, dated as of the Restatement Effective Date and in form and substance reasonably satisfactory to the Lender Agent.

(vii)     A favorable opinion of counsel licensed to practice law and in good standing in the State of Nevada for IHHI, addressed to the Lender Agent and the Existing Lenders, dated as of the Restatement Effective Date and in form and substance reasonably satisfactory to the Lender Agent.

(viii)     The Lender Agent shall have received from each Borrower and each Amendment Party the results of recent UCC searches with respect to each Borrower and each Amendment Party, which are reasonably satisfactory to the Lender Agent.

(e)     The Lender Agent (and its counsel) shall have received from each Borrower and each Amendment Party either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Lender Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(f)     The Lender Agent (and its counsel) shall have received from each Borrower and each Amendment Party (i) a counterpart of the Confirmation attached as Exhibit B hereto (the "Confirmation") signed on behalf of such party or (ii) written evidence reasonably satisfactory to

#4849-9380-9938v20

CONFIDENTIAL

SPCP_0000004316

the Lender Agent (which may include telecopy transmission of a signed signature page of the Confirmation) that such party has signed a counterpart of the Confirmation.

(g)   The Lender Agent (and its counsel) shall have received from IHHI (i) Amendment No. 1 to the Common Stock Warrant for SPCP Group, LLC attached as <u>Exhibit C-1</u> hereto, Amendment No. 1 to the Common Stock Warrant for KPC Resolution Company, LLC attached as <u>Exhibit C-2</u> hereto and Amendment No. 1 to the Common Stock Warrant for Kali P. Chaudhuri, M.D. attached as <u>Exhibit C-3</u> hereto (together, the "<u>Warrant Amendments</u>") signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Lender Agent (which may include telecopy transmission of a signed signature page of each Warrant Amendment) that such party has signed a counterpart of each of the Warrant Amendments.

(h)   Contemporaneously herewith, IHHI shall have purchased the Common Stock Warrant from SPCP Group IV, LLC pursuant to the terms of the Warrant Repurchase Agreement attached as Exhibit D hereto (the "<u>Repurchase Agreement</u>").

(i)   Upon consummation of the repurchase of the Common Stock Warrant pursuant to the Repurchase Agreement, the Lender Agent (and its counsel) shall have received from IHHI the Common Stock Warrant for SPCP Group, LLC attached as Exhibit E hereto signed on behalf of such party.

SECTION 7.   <u>Amendments; Waivers</u>.   This Agreement may be amended, waived, modified or supplemented only by written agreement signed by each Borrower, each Amendment Party, the Lender and the Lender Agent.

SECTION 8.   <u>Notices</u>.   All notices hereunder shall be given in accordance with the provisions of Section 11.12 of the Restated Credit Agreement.

SECTION 9.   <u>Headings</u>.   The Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.   <u>Effect of Amendment</u>.   Except as expressly set forth in this Agreement, this Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect, the rights, remedies, powers or privileges of Lender Agent or any Lender under the Existing Credit Agreement or any other Loan Documents, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other Loan Documents, all of which are ratified and affirmed in all respects and shall continue in full force and effect.  Nothing contained in this Agreement shall be deemed to entitle the Borrowers or the Amendment Parties to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other Loan Documents in similar or different circumstances.

SECTION 11.   <u>Release</u>.   Each Borrower and each Amendment Party voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself and all of its respective parents, subsidiaries, affiliates, members, managers, predecessors, successors, and assigns, and each of their respective current and former directors, officers, shareholders, agents, and employees (collectively, "<u>Releasing Parties</u>"), does hereby fully and completely release, acquit and forever discharge the Lender Agent, each Existing Lender, their respective successors and assigns and each of their respective affiliates, subsidiaries, predecessors, directors, officers, partners, attorneys, employees, agents and representatives (collectively referred to as the "<u>Releasees</u>") of and from any and all

#4849-9380-9938v20

**JAE 0014**

actions, causes of action, suits, debts, disputes, damages, claims, obligations, liabilities, costs, expenses
and demands of any kind whatsoever, at law or in equity, whether matured or unmatured, liquidated or
unliquidated, vested or contingent, choate or inchoate, known or unknown that the Releasing Parties (or
any of them) has against the Releasees or any of them (whether directly or indirectly). Each Borrower
and each Amendment Party acknowledges that the foregoing release is a material inducement to Lender
Agent's and Existing Lenders' decision to enter into this Agreement and to agree to the modification
made contemplated hereunder.

      SECTION 12.   Miscellaneous.   This Agreement may be executed in any number of
counterparts, all of which taken together shall constitute one and the same instrument and any of the
parties to this Agreement may execute this Agreement by signing any such counterpart. Facsimile and
electronically copied signatures on this Agreement shall be deemed the equivalent of original signatures.
This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective
successors and permitted assigns. This Agreement shall be governed by, and construed in accordance
with, the law of the State of Nevada.

*[Remainder of this page intentionally left blank]*

#4849-9380-9938v20

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

**EXISTING LENDER:**

SPCP GROUP IV, LLC,
a Delaware limited liability company

By: Silver Point C&I Opportunity GP, LLC

By: _____
Name: _____
Title: _____

**EXISTING LENDER AND LENDER:**

SPCP Group, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**LENDER AGENT:**

SILVER POINT FINANCE, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to Amendment and Restatement to Credit Agreement]

#4849-9380-9938

CONFIDENTIAL

SPCP_0000004319

**BORROWERS:**

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation

By: _____
Name: Kenneth K. Westbrook
Title: CEO

WMC-A, INC., a California corporation

By: _____
Name: Kenneth K. Westbrook
Title: CEO

WMC-SA, INC., a California corporation

By: _____
Name: Kenneth K. Westbrook
Title: CEO

COASTAL COMMUNITIES HOSPITAL, INC., a California corporation

By: _____
Name: Kenneth K. Westbrook
Title: CEO

CHAPMAN MEDICAL CENTER, INC., a California corporation

By: _____
Name: Kenneth K. Westbrook
Title: CEO

[Signature Page to Amendment and Restatement to Credit Agreement]

#4849-9380-9938

CONFIDENTIAL

SPCP_0000004320

AMENDMENT

**CREDIT PARTIES:**

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a
California limited liability company

By: _____
Name: _Jacob Sweidan_____
Title: _co-manager_____

By: _____
Name: _____
Title: _____

GANESHA REALTY, LLC, a California
limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to Amendment and Restatement to Credit Agreement]

#4849-9380-9938v7

**JAE 0018**

CONFIDENTIAL

SPCP_0000004321

AMENDMENT

~~CREDIT~~ PARTIES:

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a
California limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

GANESHA REALTY, LLC, a California
limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to Amendment and Restatement to Credit Agreement]

CONFIDENTIAL

**Exhibit A**

**Restated Credit Agreement**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004323

EXECUTION VERSION

AMENDED AND RESTATED CREDIT AGREEMENT
($47,277,000 TERM LOAN)

Originally dated as of October 9, 2007 and
Amended and Restated on February 7, 2013

among

INTEGRATED HEALTHCARE HOLDINGS, INC.,

WMC-A, INC.,

WMC-SA, INC.,

CHAPMAN MEDICAL CENTER, INC., and

COASTAL COMMUNITIES HOSPITAL, INC.,

as Borrowers,

THE CREDIT PARTIES SIGNATORY HERETO,

as Credit Parties,

THE GUARANTORS SIGNATORY HERETO,

as Guarantors,

and

SPCP GROUP LLC,

as Lender

and

SILVER POINT FINANCE, LLC

as Lender Agent.

#4830-9595-3170v19

**JAE 0021**

CONFIDENTIAL

# TABLE OF CONTENTS

Page

1.    AMOUNT AND TERMS OF CREDIT FACILITIES ................................................ 2

   1.1    Term Loan. .......................................................................................................... 2
   1.2    Use of Proceeds .................................................................................................. 3
   1.3    [Intentionally Omitted.] ...................................................................................... 3
   1.4    Prepayments ........................................................................................................ 3
   1.5    Interest; Payments .............................................................................................. 6
   1.6    Maximum Lawful Rate of Interest ..................................................................... 7
   1.7    Cash Management System ................................................................................... 7
   1.8    [Intentionally Omitted.] ...................................................................................... 7
   1.9    [Intentionally Omitted.] ...................................................................................... 7
   1.10   Certain Notices ................................................................................................... 7
   1.11   Receipt of Payments ........................................................................................... 7
   1.12   Loan Account ...................................................................................................... 8
   1.13   Access ................................................................................................................. 8
   1.14   Taxes ................................................................................................................... 9
   1.15   Capital Adequacy; Increased Costs; Illegality ................................................... 9
   1.16   Single Loan ......................................................................................................... 10
   1.17   A/R Financing ..................................................................................................... 10

2.    CONDITIONS PRECEDENT .................................................................................... 10

   2.1    Conditions Precedent to the Closing Date .......................................................... 10
   2.2    Further Conditions Precedent to Making Loans; Further Conditions Precedent to Funding Advances ...................................................................................................... 18
   2.3    Place of Closing; Delivery of Loan Documents to Closing Date Lender; Deposits Into Escrow; Close of Escrow; Distribution of Funds and Documents .......................... 20

3.    REPRESENTATIONS AND WARRANTIES ............................................................ 27

   3.1    Borrowers and Credit Parties. ............................................................................. 28
   3.2    Power, Authorization, Enforceable Obligations ................................................. 30
   3.3    Financial Statements and Projections ................................................................. 30
   3.4    Material Adverse Effect ...................................................................................... 31
   3.5    Ownership of Collateral; Liens ........................................................................... 32
   3.6    Labor Matters ...................................................................................................... 32
   3.7    Ventures, Subsidiaries and Affiliates; Outstanding Stock .................................. 32
   3.8    Government Regulation ....................................................................................... 33
   3.9    Margin Regulations ............................................................................................. 33
   3.10   Taxes ................................................................................................................... 34
   3.11   ERISA ................................................................................................................. 34
   3.12   No Litigation ....................................................................................................... 35
   3.13   Brokers ................................................................................................................ 35
   3.14   Intellectual Property ........................................................................................... 35
   3.15   Full Disclosure .................................................................................................... 35
   3.16   Environmental Matters ........................................................................................ 36

#4830-9595-3170v19

CONFIDENTIAL

SPCP_0000004325

3.17    Insurance ................................................................................................ 37
3.18    Deposit and Disbursement Accounts ...................................................... 37
3.19    Vendor Relations ................................................................................... 37
3.20    Bonding; Licenses; Permits ................................................................... 37
3.21    Solvency ................................................................................................ 37

4.    FINANCIAL STATEMENTS AND INFORMATION ......................................... 38

4.1    Reports and Notices ............................................................................... 38
4.2    Communication with Accountants ......................................................... 38

5.    AFFIRMATIVE COVENANTS ........................................................................ 38

5.1    Maintenance of Existence and Conduct of Business ............................. 38
5.2    Payment of Charges ............................................................................... 38
5.3    Books and Records ................................................................................ 39
5.4    Insurance; Damage to or Destruction of Collateral. .............................. 39
5.5    Compliance with Applicable Laws ........................................................ 40
5.6    Supplemental Disclosure ....................................................................... 40
5.7    Intellectual Property ............................................................................... 41
5.8    Environmental Matters ........................................................................... 41
5.9    Landlord Agreements ............................................................................. 42
5.10    Further Assurances ................................................................................ 42
5.11    Qualified Cash ....................................................................................... 42
5.12    Operation of Business ............................................................................ 42
5.13    After-Acquired Property; Acquisition of other Real Property Interests .... 42
5.14    Observer Status on Borrower's Board of Directors ................................ 42
5.15    Independent Directors ............................................................................ 43
5.16    Financial Reports, Notices and Other Information ................................. 43

6.    NEGATIVE COVENANTS ............................................................................... 45

6.1    Mergers, Subsidiaries, Etc .................................................................... 45
6.2    Investments; Line of Credit Loan and Advances .................................. 45
6.3    Indebtedness .......................................................................................... 45
6.4    Employee Loans and Affiliate Transactions.......................................... 46
6.5    Capital Structure and Business .............................................................. 46
6.6    Guaranteed Indebtedness ....................................................................... 46
6.7    Liens ...................................................................................................... 46
6.8    Sale of Collateral and Intellectual Property .......................................... 46
6.9    ERISA .................................................................................................... 46
6.10    Hazardous Materials .............................................................................. 47
6.11    Restricted Payments............................................................................... 47
6.12    Change of Corporate Name, State of Organization or Location; Change of Fiscal
Year    ........................................................................................................ 47
6.13    No Impairment of Intercompany Transfers ........................................... 47
6.14    [Intentionally Omitted.] ......................................................................... 47
6.15    Dr. Shah ................................................................................................. 47
6.16    Shareholder Blocking Rights ................................................................. 48
6.17    Financial Covenants............................................................................... 48

#4830-9595-3170v19

JAE 0023

CONFIDENTIAL

7.    TERM ........................................................................................................ 50

    7.1    Termination.................................................................................... 50
    7.2    Survival of Obligations Upon Termination of Financing Arrangements ................. 51

8.    EVENTS OF DEFAULT; REMEDIES ..................................................... 51

    8.1    Events of Default .......................................................................... 51
    8.2    Remedies........................................................................................ 55
    8.3    Waivers .......................................................................................... 56

9.    ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF LENDER ................... 56

    9.1    Assignment and Participations. ................................................... 56
    9.2    Reliance, Etc .................................................................................. 57

10.    SUCCESSORS AND ASSIGNS ................................................................ 58

11.    MISCELLANEOUS ................................................................................. 58

    11.1    Complete Agreement; Modification of Agreement..................... 58
    11.2    Amendments and Waivers.......................................................... 58
    11.3    Fees and Expenses ..................................................................... 59
    11.4    No Waiver.................................................................................... 60
    11.5    Remedies..................................................................................... 61
    11.6    Severability................................................................................ 61
    11.7    Conflict of Terms ....................................................................... 61
    11.8    Attorneys' Fees; Indemnification .............................................. 61
    11.9    Time of the Essence ................................................................... 61
    11.10    Confidentiality ........................................................................... 62
    11.11    GOVERNING LAW. ................................................................. 62
    11.12    Notices ........................................................................................ 63
    11.13    Section Titles .............................................................................. 63
    11.14    Counterparts................................................................................ 63
    11.15    WAIVER OF JURY TRIAL ...................................................... 64
    11.16    Press Releases and Related Matters........................................... 64
    11.17    Reinstatement ............................................................................. 64
    11.18    Advice of Counsel ...................................................................... 65
    11.19    No Strict Construction ............................................................... 65
    11.20    Limitation on Each Borrower's and Each Credit Party's Liability .................... 65
    11.21    Lender Agent .............................................................................. 65

12.    [Intentionally Omitted.] ........................................................................... 66

13.    SURETYSHIP WAIVERS ........................................................................ 66

    13.1    Suretyship Waivers..................................................................... 66
    13.2    Election of Remedies .................................................................. 69

#4830-9595-3170v19

**JAE 0024**

EXECUTION

## INDEX OF ANNEXES, EXHIBITS AND DISCLOSURE SCHEDULES

<u>ANNEXES</u>

| | |
|---|---|
| <u>Annex A</u> | Definitions |
| <u>Annex B</u> | Cash Management System |
| <u>Annex C</u> | Collateral Reports |
| <u>Annex D</u> | Notice Addresses |
| <u>Annex E</u> | Fixed Charge Coverage Ratio Worksheet |

<u>EXHIBITS</u>

| | |
|---|---|
| <u>Exhibit "A"</u> | Form of Term Note |
| <u>Exhibit "B"</u> | [Intentionally Omitted] |
| <u>Exhibit "C"</u> | [Intentionally Omitted] |
| <u>Exhibit "D"</u> | Form of Notice of Request for Advance |
| <u>Exhibit "E"</u> | Form of Deed of Trust |
| <u>Exhibit "F"</u> | Form of Absolute Assignment |
| <u>Exhibit "G"</u> | Form of Security Agreement |
| <u>Exhibit "H"</u> | Form of Collateral Assignment of Contracts |
| <u>Exhibit "I"</u> | Form of Deposit Account Security Agreement |
| <u>Exhibit "J"</u> | Form of Control Agreement |
| <u>Exhibit "K"</u> | Form of Post-Closing Agreement |
| <u>Exhibit "L"</u> | Form of Intellectual Property Security Agreement |
| <u>Exhibit "M"</u> | Form of Environmental Indemnity Agreement |
| <u>Exhibit "N"</u> | Form of Guaranty Agreement |
| <u>Exhibit "O"</u> | Form of Intercreditor Agreement |
| <u>Exhibit "P"</u> | Form of Pledge Agreement |
| <u>Exhibit "Q"</u> | Form of Stock Power |
| <u>Exhibit "R"</u> | Form of Membership Power |
| <u>Exhibit "S"</u> | Form of Landlord's Consent and Estoppel Certificate (Chapman Leases) |
| <u>Exhibit "T"</u> | Form of Landlord's Consent and Estoppel Certificate (Triple Net Lease) |
| <u>Exhibit "U"</u> | Form of Warrant |

#4830-9595-3170v19

CONFIDENTIAL

SPCP_0000004328

EXECUTION

<u>DISCLOSURE SCHEDULES</u>

| | |
|---|---|
| <u>Disclosure Schedule 2.1(b)</u> | Required Consents and Approvals |
| <u>Disclosure Schedule 2.1(c)</u> | Capital Structure of Each Borrower |
| <u>Disclosure Schedule 3.1</u> | Executive Office, Collateral Locations, FEIN |
| <u>Disclosure Schedule 3.5</u> | Schedule of Real Estate Owned and Leased |
| <u>Disclosure Schedule 3.6</u> | Labor Matters |
| <u>Disclosure Schedule 3.7</u> | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| <u>Disclosure Schedule 3.10</u> | Taxes |
| <u>Disclosure Schedule 3.11</u> | ERISA Plans |
| <u>Disclosure Schedule 3.12</u> | Litigation |
| <u>Disclosure Schedule 3.13</u> | Brokers |
| <u>Disclosure Schedule 3.14</u> | Intellectual Property |
| <u>Disclosure Schedule 3.16</u> | Environmental Matters |
| <u>Disclosure Schedule 3.17</u> | Insurance (With Copies of All Certificates of Insurance) |
| <u>Disclosure Schedule 3.18</u> | Deposit and Disbursement Accounts |
| <u>Disclosure Schedule 3.20</u> | Bonding; Licenses; Permits |
| <u>Disclosure Schedule 6.3</u> | Indebtedness |
| <u>Disclosure Schedule 6.4</u> | Transactions with Affiliates and Employees |
| <u>Disclosure Schedule 6.7</u> | Existing Liens. |

#4830-9595-3170v19

CONFIDENTIAL

SPCP_0000004329

## AMENDED AND RESTATED CREDIT AGREEMENT
### ($47,277,000 Term Loan)

This AMENDED AND RESTATED CREDIT AGREEMENT ("**Agreement**"), dated as of February 7, 2013, is made by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-A, INC., a California corporation ("**WMC-A**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-A, WMC-SA, Chapman and Coastal are hereinafter together referred to as "**Borrowers**" and individually as a "**Borrower**"); PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"); ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**"); GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**", and together with PCHI and OC-PIN, the "**Credit Parties**" and individually as a "**Credit Party**"; and OC-PIN and PCHI are hereinafter together referred to as the "**Guarantors**" and individually as a "**Guarantor**"); and SPCP GROUP, LLC, a Delaware limited liability company (together with its permitted successors and assigns, the "**Lenders**"), and SILVER POINT FINANCE, LLC, a Delaware limited liability company, as Lender Agent ("**Silver Point**" or "**Lender Agent**"). Initially capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings ascribed to them in Annex A.

## RECITALS

A.      PCHI owns the fee simple title in the Western Medical Center - Anaheim, in the Western Medical Center - Santa Ana, and in the Coastal Communities Hospital (including the medical office buildings located thereon).  PCHI leases the Western Medical Center — Anaheim, the Western Medical Center – Santa Ana, and the Coastal Communities Hospital (including the medical office buildings located thereon) to IHHI pursuant to the Triple Net Lease.  IHHI subleased the Western Medical Center - Anaheim to WMC-A; IHHI subleased the Western Medical Center - Santa Ana to WMC-SA; and IHHI subleased the Coastal Communities Hospital (including the medical office buildings located thereon) to Coastal.  IHHI owns all (100%) of the Stock of WMC-A, WMC-SA and Coastal.

B.      IHHI leases the Hospital Facility and the related medical office buildings located at the Chapman Medical Center from the Hospital Landlord and from the MOB Landlord pursuant to the Chapman Leases.  IHHI subleased the Hospital Facility and the related medical office buildings to Chapman.  IHHI owns all (100%) of the Stock of Chapman.

C.      OC-PIN is a Shareholder of IHHI.

D.      IHHI, WMC-A, WMC-SA, Coastal and Chapman are in the business of delivering acute care services to the public through the acute care Hospital Facilities; incident thereto, IHHI, WMC-A, WMC-SA, Coastal and Chapman are in the business of owning, operating and/or leasing medical office buildings and other healthcare businesses related thereto.

E.      IHHI, WMC-A, WMC-SA, Chapman, and Coastal, as borrowers, PCHI, Ganesha, West Coast, and OC-PIN, as the credit parties, the several lenders from time to time party thereto

CONFIDENTIAL                                                                                     SPCP_0000004330

and Medical Provider Financial Corporation III, as lender agent were parties to that certain Credit Agreement dated as of October 9, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**$10,700,000 Credit Agreement**") that provided, subject to the terms and conditions thereof, for loans made by the lenders party thereto to the borrowers party thereto in an aggregate principal of $10,700,000.

F.      IHHI, WMC-A, WMC-SA, Chapman, and Coastal, as borrowers, PCHI, Ganesha, West Coast, and OC-PIN, as the credit parties, the several lenders from time to time party thereto and Medical Provider Financial Corporation I, as lender agent were parties to that certain Credit Agreement dated as of October 9, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**$50,000,000 Credit Agreement**"), that provided, subject to the terms and conditions thereof, for extensions of credit (by means of loans) made by the lenders party thereto to the borrowers party thereto in an aggregate principal or face amount not exceeding $50,000,000.

G.      Pursuant to the payoff letter dated as of August 30, 2010 among Silver Point, as successor lender agent, IHHI, WMC-A, WMC-SA, Chapman, and Coastal, as borrowers, PCHI, and Ganesha, the loans and all other obligations of the borrowers and the credit parties under the $10,700,000 Credit Agreement, the $50,000,000 Credit Agreement, and the $35,000,000 Non-Revolving Line of Credit Loan have each been paid in full and all unfunded commitments thereunder terminated, and the $10,700,000 Credit Agreement, the $50,000,000 Credit Agreement, all provisions relating to the $35,000,000 Non-Revolving Line of Credit Loan in this Agreement and the Intercreditor Agreement were terminated.  The references to such loans, obligations, agreements and provisions set forth in this Agreement and the other Loan Documents are historic and have no binding force or effect on the Borrowers or the Credit Parties.

H.      The parties hereto desire to amend the Original Credit Agreement in certain respects (including, without limitation, to extend the Maturity Date (as defined in the Original Credit Agreement) and increase the facility amount) by restating the Original Credit Agreement in its entirety.

I.      All Annexes, Disclosure Schedules, Exhibits and other attachments, or documents expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement.  These Recitals shall be construed as part of the Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants and conditions hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Borrowers, Lenders, Lender Agent, Credit Parties and Guarantors agree as follows:

## 1.      AMOUNT AND TERMS OF CREDIT FACILITIES

1.1      <u>Term Loan</u>.  (a) Lenders made the aggregate principal amount of $45,000,000 available to Borrowers on the Closing Date.  Pursuant to Amendment No. 4 to Credit Agreement

CONFIDENTIAL                                                                 SPCP_0000004331

and Consent dated as of August 1, 2012, the aggregate principal amount of the Loans was increased to $46,350,000.  SPCP Group IV, LLC, as Lender under the Original Credit Agreement, simultaneously with the effectiveness of this Agreement, is being repaid in full in the aggregate amount of $8,139,256.35 as of the Restatement Effective Date ($8,119,633.90 on account of principal and $19,622.45 on account of interest), and SPCP Group, LLC's aggregate commitment to make Loans, simultaneously with the effectiveness of this Agreement, is being increased by an amount of $9,046,633.90 (the "**Restatement Increase Amount**"), such increase being made available as of the Restatement Effective Date.  After the borrowing of the Restatement Increase Amount, as of the Restatement Effective Date, the aggregate principal amount of the Existing Real Estate Term Loans is $47,277,000.  All Existing Real Estate Term Loans shall remain outstanding as of the Restatement Effective Date and shall be "Loans" for all purposes of this Agreement and the other Loan Documents.

(b)     On the Restatement Effective Date, SPCP Group, LLC, as Lender, which holds an Existing Real Estate Term Note shall be entitled to continue such Existing Real Estate Term Note; provided that at the Lender's option such Lender's Existing Real Estate Term Note may be exchanged for a new Term Note in the form of Exhibit "A" attached hereto.  The Term Note represents the obligation of Borrowers, jointly and severally, individually and collectively, to repay the Loan to Lenders.  During the term of the Term Note, Borrowers shall not be required to make any payments of principal, however, Borrowers shall pay interest to Lenders on the entire principal balance outstanding from time to time, in arrears, on each applicable Interest Payment Date, at the Interest Rate applicable to the Loan, and the entire balance of unpaid principal, plus all accrued but unpaid interest thereon and all other non-contingent Obligations due and owing thereunder, shall be due and payable in full in a single payment in immediately available funds, on the Maturity Date.

1.2     Use of Proceeds.  Borrowers shall utilize the proceeds of the Restatement Increase Amount (a) to repay the amounts owing by the Borrowers to SPCP Group IV, LLC under the Original Credit Agreement, (b) to repurchase the warrant previously issued by IHHI to SPCP Group IV, LLC pursuant to the Repurchase Agreement, and (c) for working capital and general corporate purposes of Borrowers.

1.3     [Intentionally Omitted.]

1.4     Prepayments.

(a)     Voluntary Prepayments.  Borrowers may prepay all, but not less than all, Loan at any time; provided that the Borrowers shall pay to the Lender Agent, for the ratable account of each Lender, (A) a prepayment premium of 5.0% of the principal amount of the Loan being prepaid in the case of a voluntary prepayment made on or prior to December 31, 2013 and (B) a prepayment premium of 2.0% of the principal amount of the Loan being prepaid in the case of a voluntary prepayment made on or after January 1, 2014 and on or prior to December 31, 2014.

(b)     Mandatory Prepayments.  Notwithstanding the foregoing, (i) immediately upon receipt by Borrowers or Credit Parties of any cash proceeds of any sale or other disposition of any Collateral, Borrowers shall (or, without limiting the obligation of the Borrowers to make

CONFIDENTIAL

such payment, may cause the Credit Party receiving such cash proceeds to) prepay the Loans in an amount equal to all such proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrowers in connection therewith (in each case, paid to non-Affiliates), (B) transfer taxes, and (C) an appropriate reserve for income taxes; and (ii) immediately upon receipt by Borrowers or Credit Parties of any payment or reimbursement of enhanced federal matching funds, net of: provider fees, pledged funds due to the California Health Foundation & Trust and estimated federal and state taxes on such net funds (assuming a marginal blended tax rate of 40%) received from Medi-Cal upon implementation of California AB1383 (or any substitute, replacement or successor legislation or payments) ("**Net QAF Funds**"), Borrowers shall prepay any outstanding principal amounts under the A/R Facility in an amount equal to 80% of such Net QAF Funds; <u>provided</u> Borrowers shall not be required to prepay such amounts below the aggregate principal amount of $10,000,000 and provided, further, that in the case of a prepayment under the A/R Facility, any commitments which remain outstanding in excess of such $10,000,000 may not be reborrowed, without the prior written consent of Lender Agent unless the proceeds of such borrowing are used by Borrower solely for the purpose of making quality assurance or enhanced funds payments relating to federal matching funds and related payments of taxes and pledged funds due to the California Health Foundation & Trust so long as the Borrowers deliver to the Lender Agent an officer's certificate certifying to the amount of such borrowing and the use of the proceeds thereof solely for such purpose (for the avoidance of doubt, the Borrowers shall not be restricted in their use of proceeds with respect to all or any portion of the aggregate commitment amount of $10,000,000 under the A/R Facility). Any prepayment pursuant to clause (i) of the immediately foregoing sentence shall be applied in accordance with Section 1.4(c) (Application of Prepayments). The following shall not be subject to mandatory prepayment under this subsection: (1) proceeds of sales of Inventory in the ordinary course of business; (2) proceeds of collection of Accounts in the ordinary course of business (except as otherwise set forth herein); and (3) proceeds of sales of Equipment and other personal property in the ordinary course of business so long as such Equipment and other personal property is replaced (if necessary in the exercise of prudent business judgment) by Equipment and other personal property of equal or greater value or utility. Notwithstanding anything to the contrary set forth herein, this Section 1.4(b) shall not apply to the Borrowers or Credit Parties if the Borrowers or Credit Parties repay in full in cash all Obligations outstanding under this Agreement and the other Loan Documents with (x) the proceeds of such payments or reimbursement of enhanced federal matching funds, (y) any loans made under the A/R Facility, or (z) any combination of proceeds described in the preceding clause (x) or loans described in the preceding clause (y).

(c)  Application of Prepayments.  Any prepayments made pursuant to Section 1.4 (a) or (b) (Prepayments) above shall be applied as follows: first, to reimbursable expenses of Lenders then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Loans; third, and last, in such order as Lenders shall determine in their sole and absolute discretion, to the principal balance of the Loans until the same has been paid in full. If an Event of Default has occurred and is continuing, Lenders shall have the absolute right, in their sole discretion, to determine which of the Obligations shall be paid and in what order and amounts.

CONFIDENTIAL                                                        SPCP_0000004333

(d)     _Application of Prepayments from Insurance and Condemnation Proceeds._ Prepayments from insurance or condemnation proceeds in accordance with Section 5.4(a) (Insurance) shall be applied to the Loans in the manner described in Section 1.4(c) (Application of Prepayments) above.

(e)     _No Implied Consent._  Nothing in this Section 1.4 (Prepayments) shall be construed to constitute a Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

(f)     [_Intentionally Omitted._]

(g)     _Reliance on Notices; Appointment of Borrower's Representative._ Lenders or Lender Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Request for Advance or other notice believed by Lenders or Lender Agent to be genuine.  Lenders or Lender Agent may assume that each Person executing and delivering any notice in accordance herewith, including without limitation the Notice of Request for Advance, was duly authorized, unless the responsible individual acting thereon for Lenders or Lender Agent has actual knowledge to the contrary.  Borrowers hereby designate each and any of Kenneth K. Westbrook, Steven R. Blake, and any other officer of IHHI appointed by the board of directors of IHHI to be a "Borrower's Representative" hereunder, the written notice of which appointment has been given to Lender Agent (any such individual, an "**Authorized Individual**"), as Borrower's Representative for the purposes of issuing Notices of Request for Advances, giving instructions with respect to the disbursement of the proceeds of the applicable Loan, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of Borrowers under the Loan Documents.  Borrower's Representative hereby accepts such appointment.  Lenders or Lender Agent may regard any notice or other communication pursuant to any Loan Document from Borrower's Representative as a notice or communication from Borrowers, and may give any notice or communication required or permitted to be given to Borrowers hereunder to Borrower's Representative on behalf of Borrowers.  Borrowers agree that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower's Representative shall be deemed for all purposes to have been made by Borrowers and shall be binding upon and enforceable against Borrowers to the same extent as if the same had been made directly by Borrowers.  Borrowers may, by written notice to Lender Agent, seek to terminate the appointment of an Authorized Individual if there is only one Authorized Individual at such time as Borrower's Representative and propose appointment of replacement Borrower's Representative; provided, however, said proposed replacement Borrower's Representative (i) must be an officer or director of IHHI, and (ii) must be acceptable to Lender Agent in its sole discretion.  Lender Agent shall within ten (10) Business Days from receipt of said notice deliver a written notice to Borrowers either approving, or disapproving, of said proposed replacement.  If Lender Agent timely delivers a notice to Borrowers disapproving the proposed replacement(s), or fails to timely deliver any notice to Borrowers, then such Authorized Individual shall remain as Borrower's Representative until an acceptable replacement(s) is proposed by Borrowers and approved by Lender Agent.  If Lender Agent timely approves said proposed replacement, then from and after the date Lender Agent delivers written notice of approval of said proposed replacement to Borrowers, such Authorized

CONFIDENTIAL                                                                                    SPCP_0000004334

Individual shall cease to be Borrower's Representative and the proposed replacement shall become Borrower's Representative.

1.5     <u>Interest; Payments</u>.

(a)     <u>Interest on Loans</u>.   During the term of the Loans, Borrowers shall pay interest to the Lenders on all outstanding Advances, in arrears, on each applicable Interest Payment Date, at the Interest Rate.

(b)     <u>Principal on the Loans</u>.   The Borrowers hereby unconditionally promise to pay the unpaid principal amount of the Loans on the Maturity Date.

(c)     <u>Payment Date</u>.   If any payment on any Loan becomes due and payable on a day other than a Business Day, the due date thereof will be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable Interest Rate during such extension.

(d)     <u>Computation of Interest</u>.   All computations of interest shall be made by Lenders at the applicable Interest Rate and calculated on the basis of a three hundred sixty (360) day year comprised of twelve (12) months of thirty (30) days each.

(e)     <u>Default Rate</u>.   Notwithstanding the foregoing, so long as an Event of Default has occurred and is continuing under any Loan Document, the Interest Rate applicable to the Loans shall be increased to the Default Rate, and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.   Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.   All interest payments owing hereunder or under any of the other Loan Documents, including interest accruing at the Default Rate, shall constitute additional Obligations hereunder and shall be secured by the Collateral.

(f)     <u>Payment to Lenders' Account</u>.   All payments by Borrowers to Lender Agent for the account of the Lenders hereunder shall be made to the following deposit account unless and until Lender Agent or any Lender directs otherwise:

> Bankers Trust
> ABA: 021-001-033
> A/C Name: Global Loan Services
> A/C #: 99907998
> Ref: IHHI

(g)     <u>Interest Period</u>.   If on the third Business Day prior to the expiration of any Interest Period applicable to an Advance of the Loans, IHHI has failed to select, or is not permitted to select, a new Interest Period to be applicable to such Loans, IHHI shall be deemed to have selected an Interest Period of three months.   Unless consented to by each Lender, no Interest Period longer than one month may be selected at any time when a Default or Event of Default has occurred and is continuing.

**JAE 0032**

1.6     Maximum Lawful Rate of Interest.  Notwithstanding anything to the contrary set forth in Section 1.5 (Interest;  Payments), if a court of competent jurisdiction determines in a final unappealable order that the rate of interest payable hereunder exceeds the Maximum Lawful Rate, then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.  In no event shall the total interest received by Lenders pursuant to the terms hereof exceed the amount that such Lenders could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.  Any payments made by Borrowers in excess of the Maximum Lawful Rate shall be considered voluntary prepayments of the Loans under Section 1.4(a) (Voluntary Prepayments); provided that no prepayment premium set forth therein shall be applicable to any such payments.

1.7     Cash Management System.  On or prior to the Closing Date, Borrowers will establish and will maintain until the Termination Date, the Cash Management System described in Annex B (Cash Management System) attached hereto, including but not limited to the provisions of the Deposit Account Security Agreement and related Control Agreements.  Notwithstanding anything to the contrary herein or in any other Loan Documents, the provisions relating to cash management, deposit account security agreements or control agreements, including, without limitation, this Section 1.7, shall be subject to the A/R Facility.

1.8     [Intentionally Omitted.]

1.9     [Intentionally Omitted.]

1.10    Certain Notices.

       (a)     At least three (3) Business Days prior to the Closing Date, Borrowers shall execute and deliver to Lenders and the Lender Agent a Notice of Request for Advance requesting that Lenders make initial Advances under the Loans.

       (b)     At least three (3) Business Days prior to (i) the Restatement Effective Date and (ii) the expiration of each Interest Period, IHHI shall execute and deliver to Lender Agent a Notice of Interest Period selecting the duration of the initial Interest Period, and if no such notice is delivered, the provisions of Section 1.5(g) shall apply.

1.11    Receipt of Payments.  Borrowers shall make each payment under this Agreement and the Notes not later than 5:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to Lender Agent for the account of the Lenders described in Section 1.5(f) (Payment to Lenders' Account) above.  For purposes of computing interest as of any date, all payments shall be deemed received on the Business Day on which immediately available funds therefore are received in Lender Agent's deposit account prior to 5:00 p.m. (New York time).  Payments received in good and immediate funds after 5:00 p.m. (New York time) on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

       (a)     Application and Allocation of Payments.

CONFIDENTIAL

SPCP_0000004336

(i)      <u>Application of Payments</u>.  So long as no Event of Default has occurred and is continuing, for each Loan, (1) scheduled monthly payments shall be applied first, to reimbursable expenses of Lenders then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Loan; third, and last, to the principal balance of the Loan until the same has been paid in full; and (2) voluntary prepayments and mandatory prepayments shall be applied as set forth in <u>Section 1.4(c)</u> (Application of Prepayments).  As to any other payment, and as to all payments made when an Event of Default has occurred and is continuing, Borrowers and the Credit Parties hereby irrevocably waive the right to direct the application of any and all payments received from or on behalf of Borrowers, and Borrowers hereby irrevocably agree that Lenders shall have the continuing exclusive right to apply any and all such payments against the Obligations of Borrowers as Lenders may deem advisable notwithstanding any previous entry by Lenders in the Loan Account or any other books and records.

(ii)      <u>Charges to the Loans</u>.  Lenders are authorized to, and in their sole and absolute discretion may, charge to its respective Loans (which charges shall be deemed to be Advances requested by Borrowers) on behalf of Borrowers and cause to be paid all expenses, Charges, costs (including insurance premiums in accordance with <u>Section 5.4</u> (Insurance)) and interest and principal, other than principal of the Loan, if and to the extent Borrowers fail to pay promptly any such amounts as and when due.  Such charges to the Loan shall not waive any Event of Default due to Borrower's non-payment, unless Lenders in their sole and absolute discretion, agrees in writing.  At Lenders' option and to the extent permitted by law, any charges so made shall constitute part of the Loan, and shall be secured by the Collateral.

1.12    <u>Loan Account</u>.  Lenders shall maintain a Loan Account on its books to record all Advances, all payments made by Borrowers, and all other debits and credits as provided in this Agreement with respect to the Loan or any other Obligations.  All entries in the Loan Account shall be made in accordance with Lenders' customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on Lenders' most recent printout or other written statement, shall, absent demonstrable error, be presumptive evidence of the amounts due and owing to Lenders by Borrowers; <u>provided</u> that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations.  Lenders shall render to Borrower's Representative a monthly accounting of transactions with respect to the Loans setting forth the balance of the Loan Account as to Borrowers for the immediately preceding month.  Unless Borrower's Representative notifies Lenders in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) calendar days after the date of Borrower's Representative's receipt thereof, each and every such accounting shall be presumptive evidence of all matters reflected therein.  Only those items expressly objected to in such notice and explaining the basis for such objection(s) shall be deemed to be disputed by Borrowers.

1.13    <u>Access</u>.  Borrowers and Credit Parties (other than Ganesha) shall, during normal business hours, from time to time upon 24 hours prior notice as frequently as Lenders reasonably determines to be appropriate:  (a) provide Lenders and any of its officers, employees and agents access to its properties, facilities, advisors, officers and employees of Borrowers and Credit Parties (other than Ganesha) and to the Collateral for purposes of exercising and enforcing Lenders' rights and remedies under the Loan Documents, (b) permit Lenders and any of its

CONFIDENTIAL                                                        SPCP_0000004337

officers, employees and agents, to inspect, audit and make extracts from Borrower's and Credit Party's (other than Ganesha's) respective books and records pertaining to the Loans and the Collateral, and (c) permit Lenders and its officers, employees and agents, to inspect, review, evaluate and make test verifications and counts of the Collateral of Borrowers and Credit Parties. If an Event of Default has occurred and is continuing, Borrowers and Credit Parties (other than Ganesha) shall provide such access to Lenders at all times and without advance notice. Furthermore, so long as any Event of Default has occurred and is continuing, Borrowers shall use commercially reasonable efforts to provide Lenders with access to their suppliers and customers. Borrowers and Credit Parties (other than Ganesha) shall make available to Lenders and its counsel reasonably promptly originals or copies of all books and records that Lenders may reasonably request. Borrowers and Credit Parties (other than Ganesha) shall deliver any document or instrument necessary for Lenders as it may from time to time request, to obtain records from any service bureau or other Person that maintains records for Borrowers and Credit Parties pertaining to the Loans or the Collateral.

    1.14   <u>Taxes</u>.

        (a)   <u>No Deduction for Taxes</u>.  Any and all payments by Borrowers hereunder (including any payments made pursuant to <u>Section 13</u> (Suretyship Waivers) or under the Notes shall be made, in accordance with this <u>Section 1.14</u> (Taxes), free and clear of and without deduction for any and all present or future Taxes.  If Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder (including any sum payable pursuant to <u>Section 13</u> (Suretyship Waivers)) or under such Notes, (i) the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 1.14</u> (Taxes)) Lenders receive an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions, and (iii) Borrowers shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law.  Within thirty (30) days after the date of any payment of Taxes, Borrower's Representative shall furnish to Lenders the original or a certified copy of a receipt evidencing payment thereof.

        (b)   <u>Indemnity for Taxes</u>.  Borrowers hereby agree to indemnify, defend, protect and hold Lenders free and harmless from any claim or demand for payment of, and within ten (10) calendar days of receipt of demand therefor agrees to pay to Lenders, (i) any and all Taxes that Borrowers are obligated to pay pursuant to this <u>Section 1.14</u> (Taxes) (including any Taxes imposed by any jurisdiction on amounts payable under this <u>Section 1.14</u> (Taxes)), plus (ii) the full amount of any additional liability (including penalties, interest and expenses) payable or paid by Lenders arising therefrom or with respect thereto, whether or not the same were correctly or legally asserted.  Notwithstanding the foregoing, Lenders remains ultimately responsible for paying any and all income taxes measured by Lenders' own gross income.

    1.15   <u>Capital Adequacy; Increased Costs; Illegality</u>.

        (a)   <u>Capital Adequacy</u>.  If any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by Lenders with any request or directive compliance regarding capital adequacy, reserve requirements or similar requirements (whether or

CONFIDENTIAL          SPCP_0000004338

not having the force of law), in each case, adopted after the Closing Date, from any Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by Lenders and thereby reducing the rate of return on Lenders' capital as a consequence of its obligations hereunder, then Borrowers shall from time to time upon demand by Lenders pay to Lenders additional amounts sufficient to compensate Lenders for such reduction. A certificate as to the amount of that reduction and showing the basis of the computation thereof submitted by Lenders to Borrower's Representative shall be presumptive evidence of the matters set forth therein.

(b)     Increased Costs. If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to Lenders of agreeing to make or making, funding or maintaining the Loans, then Borrowers shall from time to time, upon demand by Lenders pay to Lenders additional amounts sufficient to compensate Lenders for such increased cost. A certificate as to the amount of such increased cost, submitted to Borrower's Representative by Lenders, shall be presumptive evidence of the matters set forth therein. Lenders agree that, as promptly as practicable after they become aware of any circumstances referred to above which would result in any such increased cost, Lenders shall, to the extent not inconsistent with Lenders' internal policies of general application, use reasonable commercial efforts to minimize costs and expenses incurred by it and payable to it by Borrowers pursuant to this Section 1.15(b) (Increased Costs). Provided, however, the amounts due from Borrowers under Sections 1.15(a) and (b) (Capital Adequacy; Increased Costs) shall not include amounts attributable to Lenders' non-compliance with any requirement of any Governmental Authority or to Lenders' non-payment of its own income taxes or to any increase in Lenders' income taxes.

1.16     Single Loan. The Loans to Borrowers and all of the other Obligations of Borrowers arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrowers secured by the Liens on all of the Collateral.

1.17     A/R Financing. If at any time the A/R Facility terminates, Lenders shall immediately and automatically have a first lien on the A/R Facility Collateral and the Borrowers shall execute any and all agreements or documents and make any and all filings as requested by Lenders in order to give effect thereto.

## 2.     **CONDITIONS PRECEDENT**

2.1     Conditions Precedent to the Closing Date. Closing Date Lender shall not be obligated to take, fulfill, or perform any action hereunder, nor shall Closing Date Lender be obligated to fund any portion of the Loans, until the following conditions precedent have been satisfied or provided for in a manner satisfactory to Closing Date Lender, in its sole discretion, or waived in writing by Closing Date Lender:

(a)     Credit Agreement; Disclosure Schedules. Two (2) duplicate original counterparts of this Agreement shall have been duly executed by and delivered by each Borrower and each Credit Party and each Guarantor to Closing Date Lender; and Closing Date Lender

CONFIDENTIAL                                                                                          SPCP_0000004339

shall have received original updated two (2) sets of Disclosure Schedules in form and substance satisfactory to Closing Date Lender, each dated and executed by each Borrower.

(b)    Approvals.  Closing Date Lender shall have received satisfactory evidence that each Borrower and each Credit Party have obtained, or in the case of necessary Governmental Authority approvals, have applied for, all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Loan Documents.  Disclosure Schedule 2.1(b) attached hereto lists all required consents and approvals of all Governmental Authorities and all other Persons.

(c)    Capital Structure; Other Indebtedness.  The capital structure of each Borrower and each Credit Party (other than Ganesha) as of the Closing Date, the ownership of each Borrower and each Credit Party (other than Ganesha) as of the Closing Date, and the terms and conditions of all Indebtedness of each Borrower and each Credit Party (other than Ganesha) as of the Closing Date, shall certified by each applicable Person to Closing Date Lender and must be acceptable to Closing Date Lender in its sole and absolute discretion.  The capital structure of each Borrower as of the Effective Date is set forth in Disclosure Schedule 2.1(c) attached hereto.

(d)    Charter Documents.  Each Borrower and each Credit Party (including each Guarantor) shall have delivered the following documents to Closing Date Lender:

(i)    A copy of the articles of incorporation for each Borrower and a copy of the or articles of organization for each Credit Party, certified by the Secretary of State for the state of incorporation or organization within the most recent 30 day period prior to the Closing Date of this Agreement.

(ii)    A certificate of good standing issued by the applicable state of incorporation or organization for each Borrower and each Credit Party, certified by the Secretary of State for the state or incorporation or organization within the most recent 30 day period prior to the Closing Date of this Agreement.

(iii)    The bylaws or operating agreement for each Borrower and each Credit Party, certified to be true and accurate by the corporate secretary of each Borrower and by the manager of each Credit Party within the most recent 30 day period prior to the Closing Date of this Agreement.

(iv)    An incumbency certificate (officers and directors, or managers and members) for each Borrower and each Credit Party (including each Guarantor), certified to be true and accurate by the corporate secretary of each Borrower and by the manager of each Credit Party within the most recent 30 day period prior to the Closing Date of this Agreement.

(v)    The unanimous written consent of the board of directors of each Borrower and the unanimous written consent of all managers of each Credit Party (including each Guarantor), authorizing the transactions set forth in this Agreement and the other Loan Documents, executed by each such director or manager within most recent 30 day period prior to the Closing Date of this Agreement.

CONFIDENTIAL                                                                      SPCP_0000004340

(e)     <u>Voluntary Resignation of Dr. Shah</u>.  Based on Closing Date Lender's prior experience in connection with the Previous Loans, Closing Date Lender has determined in the exercise of its discretion that it is unable to work with Dr. Shah and that it will not make the Loans available to Borrowers unless Dr. Shah shall have voluntarily resigned as a director of and from all other management positions with or in IHHI prior to the Closing Date.

(f)     <u>Plan Regarding Engagement of Independent Directors</u>.  Closing Date Lender shall have received from IHHI and approved, in its sole discretion, a Plan Regarding Engagement of Independent Directors.

(g)     <u>Appraisal</u>.  Closing Date Lender shall have received from IHHI and approved, in its sole discretion, the Appraisal.

(h)     <u>Loan to Value Ratio</u>.  The sum of the Existing Real Estate Term Loan and the $35,000,000 Non-Revolving Line of Credit Loan shall not exceed seventy percent (70%) of the Appraised Value of the Properties as set forth in the Appraisal.

(i)     <u>Due Diligence</u>.  Closing Date Lender shall have completed its business and legal due diligence and shall have waived all objections thereto.

(j)     <u>Title Commitment</u>.  For each of the Properties, the Title Company shall have delivered a Title Commitment to Closing Date Lender in form and content acceptable to Closing Date Lender in its sole and absolute discretion.

(k)     <u>Notes</u>.  The Borrowers shall have each executed and delivered to Closing Date Lender one (1) original of each of the following Notes:

(i)     To Closing Date Lender, the Existing Real Estate Term Note in the form of <u>Exhibit "A"</u> attached to the Original Credit Agreement; and

(ii)     To Closing Date Lender, the promissory note evidencing the $35,000,000 Non-Revolving Line of Credit in the form of <u>Exhibit "B"</u> attached to the Original Credit Agreement.

(l)     <u>Notices of Request for Advance</u>.  Borrower's Representative shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Notice of Request for Advance in the form of <u>Exhibit "D"</u> attached hereto, requesting initial Advances from each of the Loans in the minimum amounts required by this Agreement.

(m)     <u>$80,000,000 Deeds of Trust</u>.

(i)     With respect to the Western Medical Center - Anaheim, PCHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original $80,000,000 Deed of Trust in the form of <u>Exhibit "E"</u> attached hereto, with the legal description describing the fee simple interest in the Western Medical Center – Anaheim;

CONFIDENTIAL                                                                        SPCP_0000004341

(ii)    With respect to the Western Medical Center - Santa Ana, PCHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original $80,000,000 Deed of Trust in the form of <u>Exhibit "E"</u> attached hereto, with the legal description describing the fee simple interest in the Western Medical Center – Santa Ana;

(iii)    With respect to the Coastal Communities Hospital (and medical office buildings), PCHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original $80,000,000 Deed of Trust in the form of <u>Exhibit "E"</u> attached hereto, with the legal description describing the fee simple interest in the Coastal Communities Hospital;

(iv)    With respect to the Chapman Medical Center:

(A)    IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original $80,000,000 Deed of Trust in the form of <u>Exhibit "E"</u> attached hereto, with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as MOB Tenant, in the Chapman MOB Lease; and

(B)    IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original $80,000,000 Deed of Trust in the form of <u>Exhibit "E"</u> attached hereto, with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease.

(n)    <u>Absolute Assignment of Leases and Rents</u>.

(i)    With respect to the Western Medical Center - Anaheim, PCHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Absolute Assignment of Leases and Rents in the form of <u>Exhibit "F"</u> attached hereto, with the legal description describing the fee simple interest in the Western Medical Center - Anaheim;

(ii)    With respect to the Western Medical Center — Santa Ana, PCHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Absolute Assignment of Leases and Rents in the form of <u>Exhibit "F"</u> attached hereto, with the legal description describing the fee simple interest in the Western Medical Center - Santa Ana;

(iii)    With respect to the Coastal Communities Hospital, PCHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Absolute Assignment of Leases and Rents in the form of <u>Exhibit "F"</u> attached hereto, with the legal description describing the fee simple interest in the Coastal Communities Hospital;

CONFIDENTIAL

(iv)     With respect to the Chapman Medical Center:

(A)     IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Absolute Assignment of Leases and Rents in the form of Exhibit "F" attached hereto, with the legal description describing (1) the fee simple interest Chapman Medical Center, and (2) IHHI's interest, as MOB Tenant, in the Chapman MOB Lease; and

(B)     IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Absolute Assignment of Leases and Rents in the form of Exhibit "F" attached hereto, with the legal description describing (1) the fee simple interest Chapman Medical Center, and (2) IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease.

(o)     Security Agreement.   Borrowers shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Security Agreement in the form of Exhibit "G" attached hereto.

(p)     Collateral Assignment of Contracts.

(i)     With respect to the Western Medical Center - Anaheim, IHHI and WMC-A shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Collateral Assignment of Contracts in the form of Exhibit "H" attached hereto, with the legal description describing the fee simple interest in the Western Medical Center - Anaheim;

(ii)     With respect to the Western Medical Center - Santa Ana, IHHI and WMC-SA shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Collateral Assignment of Contracts in the form of Exhibit "H" attached hereto, with the legal description describing the fee simple interest in the Western Medical Center — Santa Ana;

(iii)     With respect to the Coastal Communities Hospital (and medical office buildings), IHHI and Coastal shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Collateral Assignment of Contracts in the form of Exhibit "H" attached hereto, with the legal description describing the fee simple interest in the Coastal Communities Hospital;

(iv)     With respect to the Chapman Medical Center:

(A)     IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Collateral Assignment of Contracts in the form of Exhibit "H" attached hereto, with the legal description describing (1) the fee simple interest in

CONFIDENTIAL

the Chapman Medical Center, and (2) IHHI's interest, as MOB Tenant, in the Chapman MOB Lease; and

(B)      IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Collateral Assignment of Contracts in the form of Exhibit "H" attached hereto, with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease.

(q)      Deposit Account Security Agreement.

(i)      With respect to the Western Medical Center — Anaheim, IHHI and WMC-A shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Deposit Account Security Agreement in the form of Exhibit "I" attached hereto, with the legal description describing the fee simple interest in the Western Medical Center — Anaheim;

(ii)      With respect to the Western Medical Center - Santa Ana, IHHI and WMC-SA shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Deposit Account Security Agreement in the form of Exhibit "I" attached hereto, with the legal description describing the fee simple interest in the Western Medical Center – Santa Ana;

(iii)      With respect to the Coastal Communities Hospital (and medical office buildings), IHHI and Coastal shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Deposit Account Security Agreement in the form of Exhibit "I" attached hereto, with the legal description describing the fee simple interest in the Coastal Communities Hospital;

(iv)      With respect to the Chapman Medical Center:

(A)      IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Deposit Account Security Agreement in the form of Exhibit "I" attached hereto, with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as MOB Tenant, in the Chapman MOB Lease; and

(B)      IHHI shall have executed, acknowledged and delivered to Closing Date Lender (or shall have deposited the same into Escrow as, when and if required by Closing Date Lender) one (1) original Deposit Account Security Agreement in the form of Exhibit "I" attached hereto, with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease.

CONFIDENTIAL                                    SPCP_0000004344

(r)     Control Agreement.    Borrowers and Bank shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Control Agreement in the form of Exhibit "J" attached hereto.

(s)     Post-Closing Agreement.  Borrowers shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Post-Closing Agreement in the form of Exhibit "K" attached hereto.

(t)     Intellectual Property Security Agreement.  Borrowers shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Intellectual Property Security Agreement in the form of Exhibit "L" attached hereto.

(u)     Environmental Indemnity Agreement.  Borrowers and the Credit Parties (other than Ganesha) shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Environmental Indemnity Agreement in the form of Exhibit "M" attached hereto.

(v)     Guaranty Agreement.  Guarantors shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Guaranty Agreement in the form of Exhibit "N" attached hereto.

(w)     Intercreditor Agreement.  Borrowers shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Intercreditor Agreement in the form of Exhibit "O" attached hereto.

(x)     Pledge Agreement.  IHHI, Ganesha and West Coast shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Pledge Agreement in the form of Exhibit "P" attached hereto.

(y)     Stock Power.  IHHI shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Stock Power in the form of Exhibit "Q" attached hereto.

(z)     Membership Power.  Ganesha and West Coast shall have executed and delivered to Closing Date Lender two (2) duplicate original counterparts of the Membership Power in the form of Exhibit "R" attached hereto.

(aa)     Landlord's Consent and Estoppel Certificate (Chapman Hospital Lease). The Landlord under the Chapman Hospital Lease shall have executed and delivered to Closing Date Lender, for the benefit of Closing Date Lender, two (2) duplicate original counterparts of the Landlord's Consent and Estoppel Certificate in the form of Exhibit "S" attached hereto.

(bb)     Landlord's Consent and Estoppel Certificate (Chapman MOB Lease).  The Landlord under the Chapman MOB Lease shall have executed and delivered to Closing Date Lender, for the benefit of Closing Date Lender, two (2) duplicate original counterparts of the Landlord's Consent and Estoppel Certificate in the form of Exhibit "S" attached hereto.

**JAE 0042**

CONFIDENTIAL                                                                          SPCP_0000004345

(cc)   Landlord's Consent and Estoppel Certificate (Triple Net Lease).   PCHI, landlord under the Triple Net Lease, shall have executed and delivered to Closing Date Lender, for the benefit of Closing Date Lender, two (2) duplicate original counterparts of the Landlord's Consent and Estoppel Certificate in the form of Exhibit "T" attached hereto.

(dd)   Warrant.  IHHI shall have executed and delivered to Closing Date Lender one (1) original Warrant in the form of Exhibit "U" attached hereto.

(ee)   Legal Opinions.

(i)   Legal Opinion of California Counsel.  An original legal opinion (from counsel licensed to practice law and in good standing in the State of California) for PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman regarding the transactions contemplated by this Agreement and the other Loan Documents shall be delivered to Closing Date Lender, containing among other things legal opinions with respect to the following:  (A) the valid existence of PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman in the State of California; (B) the good standing of PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman in the State of California; (C) the requisite power of PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman to execute this Agreement and the other Loan Documents; (D) that the execution of this Agreement and the other Loan Documents by PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman will not constitute a breach or default under any contracts or agreements executed by or to which PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman is a party; (E) that the choice of law provisions set forth in this Agreement and the other Loan Documents are enforceable; and (F) such other opinions that Closing Date Lender  may require.

(ii)   First Legal Opinion of Nevada Counsel.  A first original legal opinion (from counsel licensed to practice law and in good standing in the State of Nevada) for IHHI and OC-PIN regarding the transactions contemplated by this Agreement and the other Loan Documents shall be delivered to Closing Date Lender, containing among other things legal opinions with respect to the following:  (A) the valid existence of IHHI and OC-PIN in the State of Nevada; (B) the good standing of IHHI and OC-PIN in the State of Nevada; (C) the requisite power of IHHI and OC-PIN to execute this Agreement and the other Loan Documents; (D) that the execution of this Agreement and the other Loan Documents by IHHI and OC-PIN will not constitute a breach or default under any contracts or agreements executed by or to which IHHI and OC-PIN is a party; (E) that the choice of law provisions set forth in this Agreement and the other Loan Documents are enforceable; and (F) such other opinions that Closing Date Lender may require.

(iii)   Second Legal Opinion of Nevada Counsel.  A second original legal opinion from counsel (licensed to practice law and in good standing in the State of Nevada) for all Borrowers and all Credit Parties and all Guarantors regarding the transactions contemplated by this Agreement and the other Loan Documents shall be delivered to Closing Date Lender, containing among other things legal opinions with respect to the following:  (A) that this Agreement and the other Loan Documents comply with Nevada law; (B) that this Agreement and the other Loan Documents are enforceable under Nevada law; (C) that the choice of Nevada law under this Agreement and the other Loan Documents is valid and enforceable under Nevada law;

CONFIDENTIAL                                                                    SPCP_0000004346

(D) that the Interest Rate applicable to each of the Loans is not usurious under Nevada law; and (E) such other matters as Closing Date Lender may require.

(ff)     Fairness Opinion.  A fairness opinion executed by a qualified, independent, third-party professional financial advisor or investment bank opining as to (i) the fairness of the transactions contemplated by this Agreement as between the Borrowers and Credit Parties and Guarantors, and (ii) an allocation of fair value to each Hospital Facility, in form and substance satisfactory to Closing Date Lender.

(gg)     Closing and Funding Checklist - Other Documents and Instruments.  Each Borrower and each Credit Party and each Guarantor shall have executed (where required) and delivered to Closing Date Lender each of the other documents, exhibits, disclosure schedules, instruments and other items listed in the Closing and Funding Checklist, in form and content satisfactory to Closing Date Lender.

(hh)     $50,000,000 Credit Agreement.  All conditions precedent to the obligation of Medical Provider Financial Corporation I (as lender) under Article 4 of the $50,000,000 Credit Agreement shall have been satisfied or provided for in a manner satisfactory to said lender, in its sole discretion, or waived in writing by said lender

(ii)     Documents Required by Title Commitment.  Each Borrower shall have executed (where required) and deposited into Escrow all documents and instruments required by the Title Commitment and/or the Escrow Company.

(jj)     $10,700,000 Credit Agreement.  All conditions precedent to the obligation of Medical Provider Financial Corporation III under Article 2 of the $10,700,000 Credit Agreement shall have been satisfied or provided for in a manner satisfactory to said Medical Provider Financial Corporation III, in its sole discretion, or waived in writing by Medical Provider Financial Corporation III.

2.2     Further Conditions Precedent to Making Loans; Further Conditions Precedent to Funding Advances.  The obligations of Closing Date Lender to making the Loans to Borrowers and to funding any Advances under the Loans to Borrowers, shall be subject to the following further conditions precedent:

(a)     Further Conditions Precedent to Making Loans.  Closing Date Lender shall not be obligated to make any of the Loans to Borrowers unless and until the following additional conditions precedent have been satisfied or provided for in a manner reasonably satisfactory to Closing Date Lender, or waived in writing by Closing Date Lender, on or before the Closing Date:

(i)     Loan Documents.  All Loan Documents having been executed and delivered on or before the Closing Date shall remain in full force and effect, and Closing Date Lender shall have received such further documents, instruments, agreements and legal opinions as Closing Date Lender shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, each in form and substance satisfactory to Closing Date Lender.

CONFIDENTIAL                SPCP_0000004347

(ii) $50,000,000 Credit Agreement.  All loan documents having been executed and delivered on or before the closing date of the transaction contemplated by the $50,000,000 Credit Agreement shall remain in full force and effect, and the lender under the $50,000,000 Credit Agreement shall have received such further documents, instruments, agreements and legal opinions as such lender shall reasonably request in connection with the transactions contemplated by the $50,000,000 Credit Agreement and the loan documents referenced therein, each in form and substance satisfactory to said lender.

(iii) Approvals.   Closing Date Lender shall have received (A) satisfactory evidence (or, shall, in its reasonable discretion, continue to be satisfied with such evidence received under Section 2.1(b) (Approvals)), that each Borrower and each Credit Party have obtained, or in the case of necessary Governmental Authority approvals, have applied for, all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Loan Documents to which they are parties or a signatory, or (B) an officer's certificate signed by an executive officer of each Borrower in form and substance satisfactory to Closing Date Lender affirming that no such consents or approvals are required.

(iv) Timing.  The closing must occur by the Closing Date.

(v) Collateral.   Closing Date Lender shall have approved of the Collateral in its sole and absolute discretion.

(vi) Changes to Disclosure Schedules.  Borrowers shall have delivered to Closing Date Lender updates to all Disclosure Schedules as required by Section 5.6 (Supplemental Disclosure), and Closing Date Lender shall have approved in its discretion all updates to the Disclosure Schedules as have been delivered to Closing Date Lender on or before the Closing Date.

(vii) No Material Adverse Effect.  No event or circumstance shall have occurred that has or reasonably could be expected by Closing Date Lender to have a Material Adverse Effect.

(viii) Title Policies.  Title Company shall irrevocably be committed to issue the Title Policy to Closing Date Lender on the Closing Date for each Property, at Borrowers' sole cost and expense, in form and content acceptable to Closing Date Lender in its sole discretion.

(ix) Escrow.  Borrowers shall have opened Escrow at the offices of the Title Company and the escrow officer shall be prepared to close Escrow on the terms and conditions set forth in the Escrow Instructions on deposit therein.

(b) Conditions to Funding Advances.  Closing Date Lender shall not be obligated to fund any Advance under any of the Loans to Borrowers on the Closing Date or on any other date if:

CONFIDENTIAL                                                                              SPCP_0000004348

(i)      Any representation or warranty by any Borrower or by any Credit Party or by any Credit Party or by any Guarantor contained herein or in any other Loan Document is untrue or incorrect in any material respect as of such date;

(ii)     Any Default or Event of Default has occurred and is continuing or would result after giving effect to any Advance; or

(iii)    Any event or circumstance shall have occurred that has or reasonably could be expected by Closing Date Lender to have a Material Adverse Effect.

The request by any Borrower or Borrower's Representative that Closing Date Lender fund an Advance under any Loan on the Closing Date or on any other date shall in each event be deemed to constitute, as of the date thereof, (A) a representation and warranty by all Borrowers and all Credit Parties and all Guarantors that the conditions precedent in this Section 2.2 (Further Conditions Precedent to Making Loans; Further Conditions Precedent to Funding Advances) to which it is a party or a signatory have been satisfied, and (B) a reaffirmation by each Borrower and by each Credit Party and by each Guarantor of their respective obligations under the Loan Documents.

2.3    Place of Closing; Delivery of Loan Documents to Closing Date Lender; Deposits Into Escrow; Close of Escrow; Distribution of Funds and Documents.    The transactions contemplated by this Agreement and the other Loan Documents will close on the Closing Date, as follows:

(a)      Place Of Closing.  Unless otherwise agreed in writing by Borrowers and Closing Date Lender, the Closing will take place on the Closing Date at the offices of Medical Capital Corporation, 2100 South State College Blvd., Anaheim, California 92806, Attn:  Joseph J. Lampariello, President and COO, telephone:  714-935-3100.

(b)      Delivery of Loan Documents to Closing Date Lender's Counsel.  Each Borrower shall, not less than three (3) Business Days prior to the Closing Date, deliver or cause to be delivered to legal counsel for Closing Date Lender  the following Loan Documents, each duly executed by each Borrower, each Credit Party (where applicable), each Guarantor (where applicable), any other Person required by this Agreement, and, where required, witnessed, acknowledged and in recordable form, with all exhibits, schedules and annexes (each pre-approved by Closing Date Lender ) attached and executed as required:

(i)      Two (2) duplicate original counterparts of this Agreement, executed by each Borrower and each Credit Party and each Guarantor and with all completed Annexes and Disclosure Schedules attached.

(ii)     One (1) original of the Existing Real Estate Term Note, executed by Borrowers.

(iii)    One (1) original of the promissory note evidencing the $35,000,000 Non-Revolving Line of Credit Loan, executed by Borrowers.

(iv)     [Intentionally Omitted]

#4830-9595-3170v19                                    20

CONFIDENTIAL                                                            SPCP_0000004349

(v)     Two (2) duplicate original counterparts of the Notice of Request for Advance, executed by Borrower's Representative.

(vi)     Two (2) duplicate original counterparts of the Security Agreement, executed by Borrowers.

(vii)     Two (2) duplicate original counterparts of the Collateral Assignment of Contracts re Western Medical Center - Anaheim, executed by IHHI and WMC-A.

(viii)     Two (2) duplicate original counterparts of the Collateral Assignment of Contracts re Western Medical Center — Santa Ana, executed by IHHI and WMC-SA.

(ix)     Two (2) duplicate original counterparts of the Collateral Assignment of Contracts re Coastal Community Hospital, executed by IHHI and Coastal.

(x)     Two (2) duplicate original counterparts of the Collateral Assignment of Contracts re Chapman MOB Lease, executed by IHHI.

(xi)     Two (2) duplicate original counterparts of the Collateral Assignment of Contracts re Chapman Hospital Lease, executed by IHHI.

(xii)     Two (2) duplicate original counterparts of the Deposit Account Security Agreement re Western Medical Center - Anaheim, executed by IHHI and WMC-A.

(xiii)     Two (2) duplicate original counterparts of the Deposit Account Security Agreement re Western Medical Center - Santa Ana, executed by IHHI and WMC-SA.

(xiv)     Two (2) duplicate original counterparts of the Deposit Account Security Agreement re Coastal Community Hospital, executed by IHHI and Coastal.

(xv)     Two (2) duplicate original counterparts of the Deposit Account Security Agreement re Chapman MOB Lease, executed by IHHI.

(xvi)     Two (2) duplicate original counterparts of the Deposit Account Security Agreement re Chapman Hospital Lease, executed by IHHI.

(xvii)     Two (2) duplicate original counterparts of the Control Agreement, executed by Borrowers and Bank.

(xviii) Two (2) duplicate original counterparts of the Post-Closing Agreement, executed by Borrowers.

(xix)     Two (2) duplicate original counterparts of the Intellectual Property Security Agreement, executed by Borrowers.

(xx)     Two (2) duplicate original counterparts of the Environmental Indemnity Agreement, executed by Borrowers and by each Credit Party (other than Ganesha).

#4830-9595-3170v19

21

CONFIDENTIAL

SPCP_0000004350

(xxi)   Two (2) duplicate original counterparts of the Guaranty Agreement, executed by each Guarantor.

(xxii)   Two (2) duplicate original counterparts of the Intercreditor Agreement, executed by Borrowers.

(xxiii)   Two (2) duplicate original counterparts of the Pledge Agreement, executed by IHHI, Ganesha and West Coast.

(xxiv)   Two (2) duplicate original counterparts of the Stock Power executed by IHHI.

(xxv)   All original Stock certificates in WMC-A, WMC-SA, Coastal and Chapman owned, held or controlled by IHHI.

(xxvi)   Two (2) duplicate original counterparts of the Membership Power executed by Ganesha and West Coast.

(xxvii)   All original Membership Certificates in PCHI owned, held or controlled by Ganesha; and all Membership Certificates in PCHI owned, held or controlled by West Coast.

(xxviii)   Two (2) duplicate original counterparts of the Landlord's Consent and Estoppel Certificate (Chapman MOB Lease), executed by the Landlord under the Chapman MOB Lease.

(xxix)   Two (2) duplicate original counterparts of the Landlord's Consent and Estoppel Certificate (Chapman Hospital Lease), executed by the Landlord under the Chapman Hospital Lease.

(xxx)   Two (2) duplicate original counterparts of the Landlord's Consent and Estoppel Certificate (Triple Net Lease), executed by PCHI.

(xxxi)   One (1) original Warrant, executed by IHHI.

(xxxii)   Two (2) original executed opinions of California legal counsel for PCHI, West Coast, Ganesha, WMC-A, WMC-SA, Coastal and Chapman, executed by said counsel.

(xxxiii)   Two (2) original executed first opinions of Nevada legal counsel for IHHI and OC-PIN, executed by said Nevada counsel.

(xxxiv)   Two (2) original executed second opinions of Nevada legal counsel for all Borrowers and Credit Parties and Guarantors, executed by said Nevada counsel.

(xxxv)   One (1) original executed fairness opinion, in form and content acceptable to Closing Date Lender.

**JAE 0048**

CONFIDENTIAL                                                    SPCP_0000004351

(xxxvi) All other documents, instruments, agreements, Annexes, Schedules, Exhibits not set forth above but required by the Closing and Funding Checklist.

(c)    Deposits Into Escrow.   Unless otherwise set forth below, Borrowers and Closing Date Lender  shall, not less than two (2) Business Days prior to the Closing Date, deposit the following documents, instruments and other items into Escrow, each duly executed and, where appropriate, witnessed, acknowledged and in recordable form, with all exhibits, schedules and annexes (each pre-approved by Closing Date Lender ) attached and executed as required:

(i)    One (1) copy of this Agreement, executed by Closing Date Lender, by each Borrower and by each Credit Party and by each Guarantor and with all completed Annexes and Disclosure Schedules and Exhibits attached.

(ii)    With respect to the Western Medical Center - Anaheim, one (1) original $80,000,000 Deed of Trust executed and acknowledged by PCHI with the legal description describing the fee simple interest in the Western Medical Center - Anaheim.

(iii)    With respect to the Western Medical Center - Santa Ana, one (1) original $80,000,000 Deed of Trust executed and acknowledged by PCHI with the legal description describing the fee simple interest in the Western Medical Center - Santa Ana.

(iv)    With respect to the Coastal Communities Hospital, one (1) original $80,000,000 Deed of Trust executed and acknowledged by PCHI with the legal description describing the fee simple interest in the Coastal Communities Hospital.

(v)    With respect to the Chapman Medical Center:

(A)    one (1) original $80,000,000 Deed of Trust executed and acknowledged by IHHI with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as MOB Tenant, in the Chapman MOB Lease; and

(B)    one (1) original $80,000,000 Deed of Trust executed and acknowledged by IHHI with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease.

(vi)    With respect to the Western Medical Center - Anaheim, one (1) original Absolute Assignment of Leases and Rents executed and acknowledged by PCHI, IHHI and WMC-A with the legal description describing the fee simple interest in the Western Medical Center - Anaheim.

(vii)    With respect to the Western Medical Center - Santa Ana, one (1) original Absolute Assignment of Leases and Rents executed and acknowledged by PCHI, IHHI and WMC-SA with the legal description describing the fee simple interest in the Western Medical Center - Santa Ana.

CONFIDENTIAL                                                                                      SPCP_0000004352

(viii)   With respect to the Coastal Communities Hospital, one (1) original Absolute Assignment of Leases and Rents executed and acknowledged by PCHI, IHHI and Coastal with the legal description describing the fee simple interest in the Coastal Communities Hospital.

(ix)   With respect to the Chapman Western Medical Center:

(A)   one (1) original Absolute Assignment of Leases and Rents executed and acknowledged by IHHI with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease; and

(B)   one (1) original Absolute Assignment of Leases and Rents executed and acknowledged by IHHI with the legal description describing (1) the fee simple interest in the Chapman Medical Center, and (2) IHHI's interest, as MOB Tenant, in the Chapman MOB Lease.

(x)   Escrow Instructions executed by each Borrower and each Credit Party and each Guarantor.

(xi)   For each Property, all UCC-1 Financing Statements (Fixture Filing) as are required by Closing Date Lender  under the Loan Documents, naming the applicable Person's as Debtor.

(xii)   All other documents, resolutions, charter documents, affidavits and items required by any Title Company pursuant to and as set forth in any Title Commitment.

(xiii)   By 11:00 a.m. Los Angeles time on the Closing Date, Closing Date Lender  and Borrowers shall deposit into Escrow any funds required by this Agreement.

(d)   <u>Close of Escrow; Recordation of Loan Documents</u>.   At such time as (i) Escrow Holder holds for the account of Closing Date Lender  each of the documents, instruments and funds set forth above; (ii) each Borrower, each Credit Party, each Guarantor and Closing Date Lender  have complied with their respective obligations under this Agreement and their respective Escrow Instructions; (iii) Escrow Holder is prepared to close and consummate the transactions contemplated by the $50,000,000 Credit Agreement and has complied with the escrow instructions by the parties to the $50,000,000 Credit Agreement; (iv) Escrow Holder is prepared to close and consummate the transactions contemplated by the $10,700,000 Credit Agreement and has complied with the escrow instructions by the parties to the $10,700,000 Credit Agreement; and (v) the Title Company is irrevocably prepared to issue and deliver each Title Policy to Closing Date Lender  on the Closing Date, then Escrow Holder shall close Escrow as follows:

(i)   With respect to fee simple interest at Western Medical Center - Anaheim, Escrow Holder will (1) release from record all existing Closing Date Lender  Liens re the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Previous Accounts Receivable Purchase Agreement, and all Previous UCC-1 Financing Statements (Fixture Filings) except any Previous UCC-1 Financing Statements (Fixture Filings)

**JAE 0050**

CONFIDENTIAL                                                                                     SPCP_0000004353

recorded against each of the Properties in conjunction with the Previous $10,700,000 Term Loan; (2) cause the Western Medical Center - Anaheim $80,000,000 Deed of Trust to be recorded as a first Lien and encumbrance against the fee simple title of the Western Medical Center - Santa Ana; (3) cause the Western Medical Center - Anaheim Absolute Assignment of Leases and Rents to be recorded as a Lien and encumbrance against the fee simple title of the Western Medical Center -Anaheim; and (4) cause the Western Medical Center - Anaheim UCC-1 Financing Statement (Fixture Filing) to be recorded, in each case subject only to the applicable Permitted Exceptions.

   (ii) With respect to the fee simple interest at Western Medical Center — Santa Ana, Escrow Holder will (1) release from record all existing Closing Date Lender Liens re the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Previous Accounts Receivable Purchase Agreement, and all Previous UCC-1 Financing Statements (Fixture Filings) except any Previous UCC-1 Financing Statements (Fixture Filings) recorded against each of the Properties in conjunction with the Previous $10,700,000 Term Loan; (2) cause the Western Medical Center - Santa Ana $80,000,000 Deed of Trust to be recorded as a first Lien and encumbrance against the fee simple title of the Western Medical Center - Santa Ana; (3) cause the Western Medical Center - Santa Ana Absolute Assignment of Leases and Rents to be recorded as a Lien and encumbrance against the fee simple title of the Western Medical Center – Santa Ana; and (4) cause the Western Medical Center — Santa Ana UCC-1 Financing Statement (Fixture Filing) to be recorded, in each case subject only to the applicable Permitted Exceptions.

   (iii) With respect to the fee simple interest at Coastal Communities Hospital, Escrow Holder will (1) release from record all existing Closing Date Lender Liens re the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Previous Accounts Receivable Purchase Agreement, and all Previous UCC-1 Financing Statements (Fixture Filings) except any Previous UCC-1 Financing Statements (Fixture Filings) recorded against each of the Properties in conjunction with the Previous $10,700,000 Term Loan; (2) cause the Coastal Communities Hospital $80,000,000 Deed of Trust to be recorded as a first Lien and encumbrance against the fee simple title of the Coastal Communities Hospital; (3) cause the Coastal Communities Hospital Absolute Assignment of Leases and Rents to be recorded as a Lien and encumbrance against the fee simple title of the Coastal Communities Hospital; and (4) cause the Coastal Communities Hospital UCC-1 Financing Statement (Fixture Filing) to be recorded, in each case subject only to the applicable Permitted Exceptions.

   (iv) With respect to IHHI's interest, as MOB Tenant, in the Chapman MOB Lease at the Chapman Medical Center, Escrow Holder will (1) release from record all existing Closing Date Lender Liens re the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Previous Accounts Receivable Purchase Agreement, and all Previous UCC-1 Financing Statements (Fixture Filings) except any Previous UCC-1 Financing Statements (Fixture Filings) recorded against each of the Properties in conjunction with the Previous $10,700,000 Term Loan; (2) cause the Chapman Medical Center $80,000,000 Deed of Trust (Chapman MOB Lease) to be recorded as a first Lien and encumbrance against IHHI's interest, as MOB Tenant, in the Chapman MOB Lease; (3) cause the Chapman Medical Center Absolute Assignment of Leases and Rents (Chapman MOB Lease) to be recorded as a Lien and encumbrance against IHHI's interest, as MOB tenant, in the Chapman MOB Lease; and

CONFIDENTIAL

(4) cause the Chapman Medical Center UCC-1 Financing Statement (Fixture Filing) (Chapman MOB Lease) to be recorded against Chapman's interest, as MOB Tenant, in the Chapman MOB Lease, in each case subject only to the applicable Permitted Exceptions.

(v)     With respect to IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease at the Chapman Medical Center, Escrow Holder will (1) release from record all existing Closing Date Lender Liens re the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Previous Accounts Receivable Purchase Agreement, and all Previous UCC-1 Financing Statements (Fixture Filings) except any Previous UCC-1 Financing Statements (Fixture Filings) recorded against each of the Properties in conjunction with the Previous $10,700,000 Term Loan; (2) cause the Chapman Medical Center $80,000,000 Deed of Trust (Chapman Hospital Lease) to be recorded as a first Lien and encumbrance against IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease; (3) cause the Chapman Medical Center Absolute Assignment of Leases and Rents (Chapman Hospital Lease) to be recorded as a Lien and encumbrance against IHHI's interest, as Hospital tenant, in the Chapman Hospital Lease; and (4) cause the Chapman Medical Center UCC-1 Financing Statement (Fixture Filing) (Chapman Hospital Lease) to be recorded against Chapman's interest, as Hospital Tenant, in the Chapman Hospital Lease, in each case subject only to the applicable Permitted Exceptions

(e)     <u>Distribution of Funds and Documents by Escrow Holder at Closing</u>. When Escrow Holder is in the position to close Escrow as required by <u>Section 2.3(d)</u> (Close of Escrow; Recordation of Loan Documents) immediately above, but in no event later than the Closing Date, Escrow Holder shall distribute funds and documents then on deposit in Escrow to Borrowers as set forth in Closing Date Lender 's separate escrow instructions.

(f)     <u>Distribution of Documents by Escrow Holder</u>.

(i)     The original and one (1) copy of each Closing Date Lender 's Title Policy to Closing Date Lender.

(ii)     A true and correct copy of each of the $80,000,000 Deeds of Trust to Closing Date Lender (with a copy to Borrowers) as recorded.

(iii)     A true and correct copy of each of the Absolute Assignment of Leases and Rents to Closing Date Lender (with a copy to Borrowers) as recorded.

(iv)     A true and correct copy of each UCC-1 Financing Statement (Fixture Filing) to Closing Date Lender (with a copy to Borrowers) as recorded.

(v)     Final settlement statement to Closing Date Lender  and to Borrowers with respect to distribution of amounts deposited into this Escrow.  Even though the following amounts were not deposited into Escrow, said final settlement statement shall list the total amount of the Advances made by Closing Date Lender  to Borrowers pursuant to this Agreement but which were withheld by Closing Date Lender  to pay in full the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Origination Fees and Closing Date Lender 's Costs.

**JAE 0052**

CONFIDENTIAL                                                                                    SPCP_0000004355

(g)    Distribution of Documents by Closing Date Lender at Closing.   When Escrow Holder has closed Escrow and distributed the documents and funds as and when required by this Agreement, Closing Date Lender  shall cause the documents then in its possession to be distributed as follows:

(i)    To Borrower's Representative:   one (1) duplicate original counterpart of the Absolute Assignments of Leases and Rents; the Security Agreement; the Collateral Assignments of Contracts; the Deposit Account Security Agreements; the Control Agreement; the Post-Closing Agreement; the Intellectual Property Security Agreement; the Environmental Indemnity Agreement; the Guaranty Agreement; the Intercreditor Agreement; the Pledge Agreement; the Stock Power; the Membership Power; the Landlord's Consent and Estoppel Certificate (Chapman MOB Lease); the Landlord's Consent and Estoppel Certificate (Chapman Hospital Lease) and the Landlord's Consent and Estoppel Certificate (Triple Net Lease).

(ii)    To Borrower's Representative:  one (1) copy of the Existing Real Estate Term Note; one (1) copy of the promissory note evidencing the $35,000,000 Non-Revolving Line of Credit Loan; and one (1) copy of the fairness opinion.

(iii)    To Closing Date Lender:  one (1) duplicate original counterpart of the Absolute Assignments of Leases and Rents; the Security Agreement; the Collateral Assignments of Contracts; the Deposit Account Security Agreements; the Control Agreement; the Post-Closing Agreement; the Intellectual Property Security Agreement; the Environmental Indemnity Agreement; the Guaranty Agreement; the Intercreditor Agreement; the Pledge Agreement; the Stock Power; the Membership Power; the Landlord's Consent and Estoppel Certificate (Chapman MOB Lease); the Landlord's Consent and Estoppel Certificate (Chapman Hospital Lease); and the Landlord's Consent and Estoppel Certificate (Triple Net Lease).

(iv)    To Closing Date Lender:  the original executed Existing Real Estate Term Note; the original executed promissory note evidencing the $35,000,000 Non-Revolving Line of Credit Loan; the original, executed Warrant; the original of each of the executed legal opinions; and the original executed fairness opinion.

## 3.    REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Loans, Borrowers make the following representations and warranties to Lenders with respect to Borrowers; each Credit Party makes the following representations and warranties to Lenders with respect to itself; and each Guarantor makes the following representations and warranties to Lenders with respect to itself.  Each and all of said representations and warranties (i) shall be true, correct, complete and accurate on the Closing Date, on each subsequent funding date and on the Restatement Effective Date (unless expressly limited to a particular date), and (ii) shall survive the execution and delivery of this Agreement (it being understood, that, for purposes of any representation and warranty expressly made as of the Closing Date, each subsequent funding date and the Restatement Effective Date with reference to, or qualified by, a Disclosure Schedule, such reference shall include such updated version, if any, of such Disclosure Schedule as may be made effective (including by consent of

CONFIDENTIAL                                                                    SPCP_0000004356

Lender Agent for the benefit of Lenders) pursuant to Section 5.6 (Supplemental Disclosure) on or before the Closing Date).

3.1    Borrowers and Credit Parties.  Corporate Existence; Compliance with Applicable Laws.

(i)    IHHI (1) is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada; (2) is registered as a foreign corporation in the State of California and is qualified to do business in and is doing business in the State of California; (3) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (4) has the requisite power and authority and the legal right to own, pledge, mortgage, or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (5) has applied for all licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (6) is in compliance with its bylaws; and (7) is in compliance in all material respects with all other Applicable Laws.

(ii)    WMC-A, WMC-SA, Coastal and Chapman are each (1) corporations duly organized, validly existing and in good standing under the laws of the State of California; (2) doing business in the State of California; (3) duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (4) has the requisite power and authority and the legal right to own, pledge, mortgage, or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (5) has applied for all licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (6) is in compliance with its bylaws; and (7) is in compliance in all material respects with all other Applicable Laws.

(iii)    PCHI and Ganesha are each (1) limited liability companies duly organized, validly existing and in good standing under the laws of the State of California; (2) doing business in the State of California; (3) duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (4) have the requisite power and authority and the legal right to own, pledge, mortgage, or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (5) have applied for all licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the

CONFIDENTIAL

SPCP_0000004357

extent required for such ownership, operation and conduct; (6) is in compliance with its operating agreement; and (7) is in compliance in all material respects with all other Applicable Laws.

(iv)    OC-PIN is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada; (2) is registered as a foreign limited liability company in the State of California and is qualified to do business in and is doing business in the State of California; (3) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (4) has the requisite power and authority and the legal right to own, pledge, mortgage, or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (5) has applied for all licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (6) is in compliance with its operating agreement; and (7) is in compliance in all material respects with all other Applicable Laws.

(b)    Executive Office, Collateral Locations, FEIN.  As of the Closing Date, the name of each Borrower and each Credit Party and each Guarantor, as its name appears in official filings in the States of Nevada and California (as applicable), and the current location of each Borrower's and each Credit Party's and each Guarantor's chief executive office and the premises at which any Collateral is located are set forth in Disclosure Schedule 3.1B.  None of such locations has changed within the four (4) months preceding the Closing Date (except that Collateral may have been transferred from one Hospital Facility to another during said period) and each Borrower and Credit Party and each Guarantor has only one state of incorporation or organization and has not changed the state of incorporation or organization at any time within the five (5) year period prior to the Closing Date.  During the preceding five (5) years, no Borrower and no Credit Party and no Guarantor has conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 3.1A.  Each Borrower and each Credit Party and each Guarantor is the sole owner of all of its names listed on Schedule 3.1A, and any and all business done and invoices issued in such names are such Borrower's and/or such Credit Party's and such Guarantor's sales, business and invoices.  Each trade name of each Borrower and each Credit Party and each Guarantor represents a division or trading style of such Borrower and/or such Credit Party and/or such Guarantor.  All Accounts of each Borrower and each Credit Party (other than Ganesha) and each Guarantor (other than Ganesha) arise, originate and are located, and all of the Collateral and all books and records in connection therewith or in any way relating thereto or evidencing the Collateral are located and shall be located, in and at such locations other than goods in transit and immaterial amounts of property.  All of the Collateral is located only in the continental United States.  Each Borrower's and each Credit Party's (other than Ganesha) and each Guarantor's (other than Ganesha) Medicare and Medicaid Provider Numbers are set forth on Schedule 3.1A.  In addition, Disclosure Schedule 3.1A lists the federal employer identification number of each Borrower and each Credit Party and each Guarantor.

CONFIDENTIAL                                                                  SPCP_0000004358

3.2     <u>Power, Authorization, Enforceable Obligations</u>.   The execution, delivery and performance by Borrowers of the Loan Documents to which it is a party and the creation of all Liens provided for therein:  (a) are within such Person's power; (b) have been duly authorized by all necessary corporate or limited liability company action; (c) do not contravene any provision of such Person's bylaws or operating agreement; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Person is a party or by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Lender Agent for the benefit of Lenders pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, except those referred to in <u>Section 2.1(b)</u> (Approvals), all of which will have been duly obtained, made or complied with prior to the Closing Date.   Each of the Loan Documents shall be duly executed and delivered by Borrowers and Credit Parties and each such Loan Document shall constitute a legal, valid and binding obligation of Borrowers and Credit Parties enforceable against it in accordance with its terms.   Credit Parties hereby make the foregoing representations and warranties in clauses (d), (e), (f) and (g) of this <u>Section 3.2</u> (Power, Authorization, Enforceable Obligations) with respect to the execution, delivery and performance by Credit Parties of the Loan Documents to which Credit Parties are a party and the creation of all Liens provided for therein.

3.3     <u>Financial Statements and Projections</u>.   Except for the Projections, all Financial Statements delivered to Lender Agent for the benefit of Lenders by Borrowers that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the financial position of Borrowers as of the dates thereof and the results of their operations and cash flows for the periods then ended.   Credit Parties (other than Ganesha) hereby represent and warrant to Lenders that all financial statements delivered to Lender Agent for the benefit of Lenders by Credit Parties present fairly in all material respects the financial position of the Credit Parties as of the dates thereof, and since the date of the most recent financial statements submitted to Lender Agent for the benefit of Lenders, there has not occurred any Material Adverse Effect or, to Credit Parties' knowledge, any other event or condition that would reasonably be likely to have a Material Adverse Effect.

(a)     <u>Financial Statements</u>.   The Financial Statements which have been delivered by Borrowers to Lender Agent for the benefit of Lenders on or before the date hereof are comprised of:

(i)     The consolidated, unaudited balance sheets of Borrowers as of September 30, 2012, and the related statements of income and cash flows of Borrowers for the six (6) month period then ended.

(ii)     The unaudited balance sheet(s) at September 30, 2012 of Borrowers and the related consolidated statement(s) of income and cash flows of Borrowers for the Fiscal Quarter then ended.

CONFIDENTIAL                                                            SPCP_0000004359

(b)      Pro Forma.  The pro forma financial statements which have been delivered by Borrowers to Lender Agent for the benefit of Lenders on or before the date hereof were prepared by Borrowers giving pro forma effect to the Related Transactions, was based on the unaudited consolidated and consolidating balance sheets of Borrowers and its Subsidiaries, and were prepared in accordance with GAAP (to the extent applicable), with only such adjustments thereto as would be required in accordance with GAAP.

(c)      Projections.  All Projections which have been delivered by Borrowers to Lender Agent for the benefit of Lenders were prepared by Borrowers in light of Borrower's past experience, but including reasonably estimated future payments of known contingent liabilities, and reflect projections on an annual basis for 2012/2013.  The Projections are based upon the same accounting principles as those used in the preparation of the financial statements described above with certain normalizing assumptions made by Borrowers, and the estimates and assumptions stated therein, all of which Borrowers believe to be reasonable and fair in light of current conditions and current facts known to Borrowers and, as of the Restatement Effective Date, reflect Borrower's good faith and reasonable estimates of the future financial performance of Borrowers for the period set forth therein.

3.4      Material Adverse Effect.

(a)      Borrowers.  The Borrowers hereby represent to Lenders that, between the Effective Date and the Closing Date:  (i) to the best of Borrower's knowledge, after due inquiry, there has not been any material increase in contingent or noncontingent liabilities, liabilities for Charges, or obligations with respect to long-term leases or unusual forward or long-term commitments of Borrowers, (ii) to the best of Borrower's knowledge, after due inquiry, there has not been any material decrease in the assets of Borrowers, (iii) no contract, lease or other agreement or instrument has been entered into by Borrowers or has become binding upon Borrower's assets and, to the knowledge of Borrowers, no law or regulation applicable to Borrowers has been adopted that has had or could reasonably be expected to have a Material Adverse Effect with respect to Borrowers or the Collateral, (iv) to the best of Borrower's knowledge, after due inquiry, neither Borrowers nor any of the Credit Parties is in default under any material contract, lease or other agreement or instrument, that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect with respect to Borrowers or the Collateral, and (v) to the best of Borrower's knowledge, after due inquiry, no event has occurred, that alone or together with other events, has had, or could reasonably be expected to have, a Material Adverse Effect with respect to Borrowers or the Collateral.

(b)      Credit Parties.  The Credit Parties (other than Ganesha) hereby represent to Lenders that, between the Effective Date and the Closing Date:  (i) to the best of each Credit Party's knowledge, there has not been any material increase in contingent or noncontingent liabilities, liabilities for Charges, or obligations with respect to long-term leases or unusual forward or long-term commitments of Borrowers, (ii) to the best of each Credit Party's knowledge, there has not been any material decrease in the assets of any Credit Party, (iii) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon Credit Parties assets and, to the knowledge of Credit Parties, no law or regulation applicable to Credit Parties or to Borrowers has been adopted that has had or could reasonably be expected to have a Material Adverse Effect with respect to Credit Party's or

CONFIDENTIAL                                                SPCP_0000004360

Borrowers or the Collateral, (iv) to the best of each Credit Party's knowledge, neither Borrowers nor any of the Credit Parties is in default under any material contract, lease or other agreement or instrument, that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect with respect to Borrowers or the Credit Parties or the Collateral, and (v) to the best of each Credit Party's knowledge, no event has occurred, that alone or together with other events, has had, or could reasonably be expected to have, a Material Adverse Effect with respect to Borrowers or the Credit Parties or the Collateral.

3.5     Ownership of Collateral; Liens.     Borrowers and Credit Parties (other than Ganesha) (a) each separately own good, valid and marketable title to or a valid leasehold interest in, all of its properties and assets, including all of its Collateral whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Encumbrances, and (b) is in compliance in all material respects with each lease to which it is a party or otherwise bound. None of the Collateral is subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions known to Borrowers or to Credit Parties that may result in any Liens (including Liens arising under Environmental Laws or other Applicable Laws) other than Permitted Encumbrances. Disclosure Schedule 3.5 attached hereto sets forth a list of all real estate and leases to be owned or held by Borrowers immediately after the Closing Date.  Each Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets are valid and subsisting and are in full force and effect.

3.6     Labor Matters.  Except as set forth on Disclosure Schedule 3.6, as of the Closing Date, (a) no strikes or other material labor disputes against Borrowers are pending or, to any Borrower's or to any Credit Party's knowledge, threatened; (b) hours worked by and payment made to employees of Borrowers comply in all material respects with the Fair Labor Standards Act and other Applicable Laws; (c) all payments due from Borrowers for employee health and welfare insurance have been paid or accrued as a liability on the books of Borrowers; (d) Borrowers are not a party to or bound by any collective bargaining agreement, management agreement, consulting agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement unless true and complete copies of any agreements described on Disclosure Schedule 3.6 have been delivered to Lenders; (e) there is no organizing activity involving Borrowers pending or, to Borrower's or Credit Party's knowledge, threatened by any labor union or group of employees of Borrowers;  (f) except as otherwise disclosed on Disclosure Schedule 3.6, there are no representation proceedings pending or, to Borrower's or Credit Party's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of employees of any Borrower has made a pending demand for recognition; and (g) there are no material complaints or charges against any Borrower pending or, to the knowledge of Borrowers or Credit Parties, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by any Borrower of any individual.

3.7     Ventures, Subsidiaries and Affiliates; Outstanding Stock.  Except as listed on Disclosure Schedule 3.7, the Borrowers and the Credit Parties have no Subsidiaries.  Disclosure Schedule 3.7 states the authorized and issued capitalization of each Borrower and of each Credit Party (other than Ganesha), the number and class of equity securities and/or ownership, voting or

CONFIDENTIAL

partnership interests issued and outstanding of each Borrower and each Credit Party (other than Ganesha) and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing).  The ownership or partnership interests of each Credit Party are not certificated, the documents relating to such interests do not expressly state that the interests are governed by Article 8 of the Uniform Commercial Code, and the interests are not held in a securities account.  The outstanding equity securities and/or ownership, voting or partnership interests of each Borrower and each Credit Party (other than Ganesha) have been duly authorized and validly issued and are fully paid and non-assessable, and with respect to equity pledged to Lender Agent for the benefit of the Lenders, each Person listed on Disclosure Schedule 3.7 owns beneficially and of record all the equity securities and/or ownership, voting or partnership interests it is listed as owning free and clear of any Liens other than Liens created by the Collateral Documents and Liens created under the A/R Facility.  Disclosure Schedule 3.7 also lists the directors, members, managers and/or partners of each Borrower and each Credit Party (other than Ganesha).  Except as listed on Disclosure Schedule 3.7, no Credit Party (other than Ganesha) owns an interest in, participates in or engages in any joint venture, partnership or similar arrangements with any Person.  Except as set forth in Disclosure Schedule 3.7, as of the Closing Date, there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Borrower or any Credit Party (other than Ganesha) has issued or may be required to issue, sell, repurchase or redeem any of its Stock.  All outstanding Indebtedness and Guaranteed Indebtedness of Borrowers and Credit Parties (other than Ganesha) as of the Closing Date identified in Section 6.3 (Indebtedness) is described in Disclosure Schedule 6.3.

3.8    Government Regulation.   No Borrower is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940.  No Borrower is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder.  The making of the Loans by Lenders to Borrowers, the application of the proceeds thereof and repayment thereof and the consummation of the Related Transactions will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission or other Applicable Laws binding on Borrowers.

3.9    Margin Regulations.    Borrowers are not engaged, nor will they engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect.  Borrowers do not own any margin stock, and none of the proceeds of the Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any stock or for any other purpose that might cause the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board.  Borrowers will not take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.  Each Credit Party (other than Ganesha) hereby makes the foregoing representations, warranties and covenants to Lenders set forth in this Section 3.9 (Margin Regulations) with respect to such Credit Party.

CONFIDENTIAL                                                                      SPCP_0000004362

3.10    Taxes.  Except as described in Disclosure Schedule 3.10, all Federal and other material tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by Borrowers have been filed with the appropriate Governmental Authority, and all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof excluding Charges or other amounts being contested in accordance with Section 5.2(b) (Right to Contest Charges) and unless the failure to so file or pay would not reasonably be expected to result in fines, penalties or interest in excess of $100,000 in the aggregate.  Proper and accurate amounts have been withheld by Borrowers for all periods in full and complete compliance with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities.  Disclosure Schedule 3.10 sets forth as of the Closing Date and the Closing Date those taxable years for which each Borrower's tax returns are currently being audited by the IRS or any other applicable Governmental Authority, and any assessments or threatened assessments in connection with such audit, or otherwise currently outstanding. Except as described in Disclosure Schedule 3.10, as of the Closing Date, no Borrower has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges.  Borrowers are not liable for any Charges:  (a) under any agreement (including any tax sharing agreements) or (b) to Borrower's and Credit Party's knowledge, as a transferee.  As of the Closing Date, Borrowers have not agreed or been requested to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise.  Each Credit Party (other than Ganesha) hereby make the foregoing representations, warranties and covenants to Lenders set forth in this Section 3.10 (Taxes) with respect to all Charges and tax returns of such Credit Party.

3.11    ERISA.

(a)    Disclosure Schedule 3.11 lists, as of the Closing Date, for each Borrower (i) all ERISA Affiliates and (ii) all Plans and separately identifies all Pension Plans, including Title IV Plans, Multiemployer Plans, and all Retiree Welfare Plans.  Copies of all such listed Plans have been delivered to Lenders.  Except with respect to Multiemployer Plans, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, and nothing has occurred that would cause the loss of such qualification or tax-exempt status.  Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the IRC and its terms, including the timely filing of all reports required under the IRC or ERISA.  Neither any Borrower nor any ERISA Affiliate has failed to make any material contribution or pay any material amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan.  No "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, has occurred with respect to any Plan, that would subject any Borrower to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC.

(b)    Except as set forth in Disclosure Schedule 3.11:  (i) no Title IV Plan has any material Unfunded Pension Liability; (ii) no ERISA Event has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of Borrowers, threatened material claims (other than claims for benefits in the normal course), sanctions, actions or

CONFIDENTIAL

lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; (iv) neither any Borrower nor any ERISA Affiliate has incurred or reasonably expects to incur any material liability as a result of a complete or partial withdrawal from a Multiemployer Plan; and (v) within the last five years no Title IV Plan of any Borrower or any ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 4041 of ERISA, nor has any Title IV Plan of any Borrower or any ERISA Affiliate (determined at any time within the last five years) with material Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14( of ERISA) of any Borrower or any ERISA Affiliate (determined at such time).

     3.12   <u>No Litigation</u>.  Except as set forth in <u>Disclosure Schedule 3.12A</u>, no Litigation, action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of Borrowers or Credit Parties, threatened against Borrowers, before any Governmental Authority or before any arbitrator or panel of arbitrators, (a) that challenges the execution, delivery and performance of Borrower's or Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) that has a reasonable risk of being determined adversely to Borrowers or Credit Parties and that, if so determined, could reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Disclosure Schedule 3.12B</u>, as of the Closing Date there is no Litigation pending or, to Borrower's or Credit Party's knowledge, threatened, that seeks damages in excess of One Hundred Thousand Dollars ($100,000) or injunctive relief against, or alleges criminal misconduct of, Borrowers.

     3.13   <u>Brokers</u>.  Except as set forth on <u>Disclosure Schedule 3.13</u>, no broker or finder brought about the obtaining, making or closing of the Loans or the Related Transactions, and neither Borrowers nor any Affiliates thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

     3.14   <u>Intellectual Property</u>.  As of the Closing Date, Borrowers own or will own, and have or will have, rights to use all Intellectual Property necessary to continue to conduct its business as now conducted by it or presently proposed to be conducted by it, and each Patent, Trademark, registered Copyright and License is listed, together with application or registration numbers, as applicable, in <u>Disclosure Schedule 3.14</u>.  Borrowers conduct their businesses and affairs without knowingly infringing or interfering with any Intellectual Property of any other Person which could reasonably be expected to have a Material Adverse Effect.  Except as set forth in <u>Disclosure Schedule 3.14</u>, neither Borrowers nor Credit Parties is aware of any material infringement claim by any other Person with respect to any Intellectual Property.

     3.15   <u>Full Disclosure</u>.  All representations and warranties made in any of the Loan Documents by Borrowers or Credit Parties or Guarantors shall be made after giving full effect to the transactions contemplated in this Agreement.  No information contained in this Agreement, any of the other Loan Documents, Financial Statements or Collateral Reports or other written reports from time to time prepared by Borrowers or Credit Parties or Guarantors and delivered hereunder or any written statement prepared by Borrowers or Credit Parties or Guarantors and furnished by or on behalf of Borrowers or Credit Parties or Guarantors to Lender Agent for the benefit of Lenders pursuant to the terms of this Agreement contains or will contain any untrue

CONFIDENTIAL                                        SPCP_0000004364

statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances under which they were made. Projections from time to time delivered hereunder are or will be based upon the estimates and assumptions stated therein, all of which Borrowers and Credit Parties (other than Ganesha) and Guarantors (other than Ganesha), as applicable, believed at the time of delivery to be reasonable and fair in light of current conditions and current facts known to Borrowers and Credit Parties (other than Ganesha) and Guarantors (other than Ganesha), as applicable, as of such delivery date, and reflect Borrower's and Credit Party's (other than Ganesha's) and Guarantor's (other than Ganesha's) good faith and reasonable estimates of the future financial performance of Borrowers and of the other information projected therein for the period set forth therein. The Liens granted to Lender Agent for the benefit of Lenders pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Encumbrances.

3.16   <u>Environmental Matters</u>.   Each Borrower and each Credit Party (other than Ganesha) and each Guarantor represent and warrant to Lenders as follows:

(a)   Except as set forth in <u>Disclosure Schedule 3.16,</u> as of the date hereof, no Borrower and no Credit Party and no Guarantor knows of any Hazardous Material which is present, used, manufactured, handled, generated, transported, stored, treated, discharged, released, buried or disposed of on, in, under or about any Property in violation of applicable Environmental Laws;

(b)   To the best of each Borrower's and each Credit Party's and each Guarantor's knowledge, following diligent inquiry, there has not been any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Material by any prior owners of prior occupants of any Property or by any third parties on, in, under or about any Property;

(c)   As of the date hereof there is no pending or, to each Borrower's and each Credit Party's and each Guarantor's knowledge, threatened litigation or proceedings before any administrative agency in which any person or entity alleges the release, threat of release, placement on, under or about any Property by any Borrower or any Credit Party or any Guarantor, or the manufacture, handling, generation, transportation, storage, treatment, discharge, burial or disposal on, in, under or about any Property by any Borrower or any Credit Party or any Guarantor, or the transportation to or from any Property by any Borrower or any Credit Party or any Guarantor, of any Hazardous Material, in violation of Environmental Laws;

(d)   As of the date hereof, no Borrower and no Credit Party and no Guarantor has received any notice and no Borrower and no Credit Party and no Guarantor has any actual knowledge that any Governmental Authority or any employee or agent thereof been determined, or threatens to determine, that there is a presence, release, threat of release, placement on, in, under or about any Property caused by any Borrower or by any Credit Party or by any Guarantor, or the manufacture, handling, generation, transportation, storage, treatment, discharge, burial or disposal on, in, under or about any Property caused by any Borrower or any Credit Party or any Guarantor, or the transportation to or from any Property by any Borrower or any Credit Party or any Guarantor, of any Hazardous Material, in violation of Environmental Laws; and

CONFIDENTIAL                                                                              SPCP_0000004365

(e)     To each Borrower's and each Credit Party's and each Guarantor's knowledge, there have been no communications or agreements with any Governmental Authority or any private entity indicating that there has occurred, a release, threat of release, placement on, in, under or about any Property by any Borrower or any Credit Party or any Guarantor, or the manufacture, handling, generation, transportation, storage, treatment, discharge, burial or disposal on, in, under or about any Property by any Borrower or any Credit Party or any Guarantor, or the transportation to or from any Property by any Borrower or by any Credit Party or by any Guarantor, of any Hazardous Material in violation of any Environmental Laws.

3.17    Insurance.  Disclosure Schedule 3.17 lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by Borrowers, as well as a brief description thereof, and a copy of each current certificate of insurance naming Lender Agent for the benefit of Lenders as an additional co-insured.

3.18    Deposit and Disbursement Accounts.  Disclosure Schedule 3.18 lists all banks and other financial institutions at which Borrowers maintain or will maintain deposit, commodities, investment or other accounts as of each of the Closing Date, including any Disbursement Accounts, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.  Disclosure Schedule 3.18 shall, as of the Closing Date, identify which deposit accounts of each entity are used to receive Governmental Authority payments.

3.19    Vendor Relations.  As of the Closing Date, there exists no actual or, to the knowledge of Borrowers or Credit Parties or Guarantors, threatened termination or cancellation of, or any material adverse modification or change in the business relationship of Borrowers with any supplier essential to its operations.

3.20    Bonding; Licenses; Permits.  Except as set forth on Disclosure Schedule 3.20, as of the Closing Date, no Borrower is a party to or bound by any surety bond agreement or bonding requirement with respect to products or services sold by it or any trademark or patent license agreement with respect to products sold by it.  Disclosure Schedule 3.20 lists, as of the Closing Date, each permit each Borrower is required to obtain and maintain in order to conduct its respective Business in its respective Hospital Facility.  Each Borrower has all permits required to conduct its business, each of which is in full force and effect and is not the subject of any pending or to its knowledge, threatened withdrawal.

3.21    Solvency.  Both before and after giving effect to (a) the Loans to be made or incurred on the Closing Date or such other date as Advances are made or incurred, (b) the disbursement of the proceeds of such Advances pursuant to the instructions of Borrower's Representative; (c) the consummation of the other Related Transactions; and (d) the payment and accrual of all transaction costs in connection with the foregoing, Borrowers are each and will be Solvent.

CONFIDENTIAL                    SPCP_0000004366

## 4.   FINANCIAL STATEMENTS AND INFORMATION

4.1   Reports and Notices.
(a)   Borrowers hereby agree that, from and after the Closing Date and until the Termination Date, they shall deliver to Lender Agent for the benefit of Lenders, the various Collateral Reports at the times, to the Persons and in the manner set forth in Annex D (Notice Addresses) including all certifications required with respect to Certified Cash balances.

(b)   Borrowers hereby agree that, from and after the Restatement Effective Date and until the Termination Date, they shall deliver to Lenders, copies of each Borrowing Base Certificate (as defined in the A/R Facility) delivered to the A/R Facility Lender Agent.

4.2   Communication with Accountants.   Borrowers and Credit Parties authorize Lenders to communicate and/or meet directly with all independent certified public accountants of Borrowers, and Borrowers shall authorize and shall instruct those accountants to communicate and/or meet with Lenders with regard to any and all financial statements and supporting financial documentation relating to Borrowers with respect to the business, results of operations and financial condition of Borrowers.   Prior to communicating with the independent public accounts of Borrowers, Lenders shall deliver a reasonable advance written notice to Borrowers stating the purpose and scope of the communication and/or meeting.

## 5.   AFFIRMATIVE COVENANTS

To induce Lenders to make the Loans, Borrowers and Credit Parties and Guarantors, as applicable, make the following affirmative covenants in favor of Lenders, each of which shall survive the execution and delivery of this Agreement.

5.1   Maintenance of Existence and Conduct of Business.   Borrowers and Credit Parties and Guarantors shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate and/or limited liability company existence and its material rights; continue to conduct its business substantially as conducted prior to the Closing Date, anticipated to be conducted, or as otherwise permitted hereunder; at all times maintain, preserve and protect all of their assets and properties necessary to the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices.

5.2   Payment of Charges.

(a)   Obligation to Pay Charges.   Subject to Section 5.2(b) (Right to Contest Charges), Borrowers shall pay and discharge or cause to be paid and discharged promptly all Charges payable by them, including (i) Charges imposed upon them, their income and profits, or any of their property (real, personal or mixed) and all Charges with respect to Taxes, social security and unemployment withholding with respect to their employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees in possession of any Collateral, in each case, before any thereof shall become past due, except in the case of clauses (ii) and (iii) where the failure to pay or discharge such Charges would not result in aggregate liabilities in excess of $100,000.

CONFIDENTIAL                                                                 SPCP_0000004367

(a)     Right to Contest Charges.    Borrowers may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in Section 5.2(a) (Obligation to Pay Charges); provided, that (i) adequate reserves with respect to such contest are maintained on the books of Borrowers, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges; (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) Borrowers shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lenders evidence reasonably acceptable to Lenders of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to Borrowers or the conditions set forth in this Section 5.2(b) (Right to Contest Charges) are no longer met.

5.3     Books and Records.    Borrowers shall keep adequate books and records with respect to their business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP (except as otherwise disclosed on the Financial Statements).

5.4     Insurance; Damage to or Destruction of Collateral.

(a)     Insurance.  Borrowers shall, upon Lender Agent's request, in Disclosure Schedule 3.17, list all existing policies of insurance that they carry and maintain, along with the names and contact information for each existing insurance carrier, which policies and carriers shall be subject to the prior written consent of Lender Agent, which consent shall not be unreasonably withheld.  If Lender Agent fails or refuses to approve Borrower's existing policies of insurance or existing insurance carriers, then Borrowers agrees to increase or change its insurance coverage or change its insurance carrier as required by Lenders, and the same shall be listed in Disclosure Schedule 3.17.  Thereafter, Borrowers shall, at its sole cost and expense, maintain the policies of insurance described on Disclosure Schedule 3.17 as approved by Lender Agent for the benefit of Lenders or may obtain and maintain other policies of insurance in form and amounts and with insurers reasonably acceptable to Lender Agent.  All policies of insurance (or the loss payable and additional insured endorsements delivered to Lender Agent) that relate to coverage involving the Collateral shall contain provisions pursuant to which the insurer agrees to provide thirty (30) days prior written notice to Lender Agent in the event of any non-renewal, cancellation or amendment of any such insurance policy.  If Borrowers at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above, or to pay all premiums relating thereto, Lender Agent may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Lender Agent deem advisable.  Lenders and Lender Agent shall have no obligation to obtain insurance for Borrowers or pay any premiums therefor.  By doing so, Lenders shall not be deemed to have waived any Default or Event of Default arising from Borrower's failure to maintain such insurance or pay any premiums therefore.  All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrowers to Lender Agent for the benefit of Lenders and shall be additional Obligations hereunder secured by the Collateral, and shall bear interest at the Default Rate until paid in full to Lenders.

CONFIDENTIAL                                                                    SPCP_0000004368

(b)     Lenders' Insurance Rights.  Upon any change in Borrower's insurance risk profile (as determined by Borrower's insurance broker or as reasonably determined by Lenders pursuant to and based upon generally recognized insurance underwriting standards (including changes caused by changes in laws affecting the potential liability of a Borrowers), Lenders reserves the right to require additional forms and limits of insurance to, in Lenders' reasonable opinion, adequately protect Lenders' interests and Lien in all or any portion of the Collateral and to ensure that Borrowers are protected by insurance in amounts and with coverage customary for its industry.  If reasonably requested by Lenders, Borrowers shall to deliver to Lenders from time to time a report of a reputable insurance broker, reasonably satisfactory to Lenders, with respect to its insurance policies.

(c)     Endorsements.  Borrowers shall deliver to Lenders, in form and substance reasonably satisfactory to Lenders, endorsements to all general liability and other liability policies naming Lender Agent as an additional insured.  Borrowers shall irrevocably make, constitute and appoint Lender Agent (and all officers, employees of Lenders designated by Lender Agent), so long as any Default or Event of Default has occurred and is continuing, as each Borrower's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under all policies of insurance relating to coverage of the Collateral, endorsing the name of Borrowers on any check or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect to such policies of insurance.  Lender Agent shall have no duty to exercise any rights or powers granted to it pursuant to the foregoing power-of-attorney.  Borrower's Representative shall promptly notify Lender Agent of any loss, damage, or destruction to the Collateral in the amount of $100,000 or more, whether or not covered by insurance.  After deducting from such proceeds (i) the expenses incurred by Lenders in the collection or handling thereof, and (ii) amounts required to be paid to creditors (other than Lenders) having Permitted Encumbrances, Lenders may, at their option, apply such proceeds to the reduction of the Obligations in accordance with Section 1.3(c) (Application of Prepayments).  Notwithstanding the foregoing, if the casualty giving rise to such insurance proceeds could not reasonably be expected to have a Material Adverse Effect, Lenders shall permit Borrowers to replace, restore, repair or rebuild the property.

5.5     Compliance with Applicable Laws.  Borrowers shall comply in all material respects with all federal, state, local and foreign laws and regulations applicable to it, including those relating to ERISA, labor laws, Environmental Laws and Environmental Permits.

5.6     Supplemental Disclosure.  On the Closing Date, and thereafter from time to time as may be reasonably requested by Lenders, Borrowers shall supplement and update each Disclosure Schedule attached to this Agreement, or any representation herein or in any other Loan Document, with respect to any matter hereafter arising that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or that is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements or updates to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); provided that (a) no such supplement or update to any such Disclosure Schedule or representation shall amend, supplement or otherwise modify any Disclosure Schedule or representation, or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as

CONFIDENTIAL                                                      SPCP_0000004369

consented to by Lenders in writing, and (b) no supplement or update shall be required or permitted as to representations and warranties that expressly relate only to the Closing Date (except as set forth in the introduction to <u>Section 3</u> (Representations and Warranties) for purposes of representations and warranties made as of the Closing Date). If any Borrower has a material "commercial tort claim" (as defined in the Code), it shall promptly notify Lenders in writing of the existence thereof.<u>Intellectual Property</u>. Borrowers and Credit Parties will conduct their business and affairs without material infringement of or material interference with any Intellectual Property of any other Person.

5.8 <u>Environmental Matters</u>. Each Borrower and each Credit Party (other than Ganesha) shall (a) comply with and use commercially reasonable efforts to cause each Borrower and its employees, agents and representatives at any Property to comply with all Environmental Laws; (b) without limiting the generality of clause (a) above, not engage in, permit or acquiesce in to any Hazardous Material Activity on, under or about any Property, except in strict accordance with all Environmental Laws, and with then prudent business practices as determined by said Borrower or Credit Party; (c) immediately advise Lenders in writing of (i) the receipt by any Borrower or any Credit Party of written notice of any and all Hazardous Material Claims, (ii) any knowledge by any Borrower or any Credit Party that any Property does not comply with any Environmental Laws, (iii) any remedial action taken by any Borrower or any Credit Party or any other Person in response to any Hazardous Materials or Hazardous Materials Activity on, under or about any Property, or to any Hazardous Material Claims, and (iv) any Borrower's or any Credit Party's discovery of the presence of any Hazardous Materials or Hazardous Material Activity on, in, under or about any Property or any real property immediately adjacent to any Property whether or not the same requires notice to be given to any governmental entity or agency under Environmental Laws; and (d) submit to Lenders, promptly upon receipt or preparation, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals, proposed removal or other remedial work contracts and similar information prepared or received by any Borrower or any Credit Party in connection with any remedial work or Hazardous Materials relating to any Property. If Lenders at any time have a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Borrower or any Credit Party (other than Ganesha) or any Environmental Liability of any Borrower or any Credit Party (other than Ganesha) arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any Property or any of their other real estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then such Borrower and/or Credit Party (other than Ganesha) shall, upon a Lender's written request (i) cause the performance of such environmental investigations including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at such Borrower's or such Credit Party's expense, as Lenders may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Lenders and shall be in form and substance reasonably acceptable to Lenders, and (ii) if such Borrower or Credit Party shall not have timely performed such environmental investigations, permit Lenders or its representatives to have access to all real estate for the purpose of conducting such environmental investigations and testing as Lenders reasonably deems appropriate, including subsurface sampling of soil and groundwater. Each Borrower and Credit Party (other than Ganesha) shall reimburse Lenders for the costs of such investigations and the same will constitute a part of the Obligations secured hereunder.

CONFIDENTIAL

5.9     <u>Landlord Agreements</u>.  With respect to any location where any material amount of Collateral is stored or located, Lenders may require Borrowers to provide a reasonable landlord or mortgagee agreement or bailee letter as a condition to the continued storage of the Collateral at such location(s).  Borrowers shall timely and fully pay and perform all obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located.

5.10    <u>Further Assurances</u>.  Borrowers and Credit Parties each agree that it shall, at Borrower's or Credit Party's expense and upon the reasonable request of Lenders, duly execute and deliver, or cause to be duly executed and delivered, to Lenders such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lenders to carry out more effectively the provisions and purposes of this Agreement and each Loan Document.

5.11    <u>Qualified Cash</u>.  Borrowers shall deposit all net cash proceeds of Collateral as Qualified Cash in a Qualified Cash Account subject to the right of Borrowers to withdraw such cash proceeds.  From and during the continuance of an Event of Default, Lenders may exercise all rights under the applicable Control Agreements relating to any Qualified Cash, including the right to deliver applicable control exercise notices to each applicable bank and securities intermediary and cause all such Qualified Cash to be forwarded immediately to a collection account designated by Lenders through daily sweeps (or as otherwise directed by Lenders); <u>provided</u> that so long as the A/R Facility is in effect, the provisions of this <u>Section 5.11</u> shall be subject to the A/R Facility.

5.12    <u>Operation of Business</u>.  Borrowers shall have and maintain at all times from the Closing Date until the Obligations have been paid in full (other than indemnification Obligations), sufficient approvals, consents, and permits from all necessary Governmental Authorities to fully operate the Business in accordance with Applicable Laws.  Borrowers shall use their best efforts and use appropriate diligence to secure all approvals, consents and permits as and when required by Applicable Laws to fully operate the Business.

5.13    <u>After-Acquired Property; Acquisition of other Real Property Interests</u>.  In the event from time to time Borrower acquires any fee interest in any real property or improvements or any master leasehold interest or ground leasehold interest in any real property or improvements, then Borrowers agree to promptly notify Lenders in writing at least ten (10) Business Days prior to such acquisition and to execute, acknowledge and deliver to Lenders at least five (5) Business Days prior to such acquisition a deed of trust or mortgage for recordation on said other real property or improvements, as a first lien or encumbrance on Borrower's fee interest or, if applicable, on Borrower's interest in a master lease or ground lease.  Each such deed of trust or mortgage shall secure repayment of the Obligations, including but not limited to repayment of the Loans.  All reasonable expenditures incurred by Lenders in performing this paragraph shall be additional Obligations payable upon demand and delivery of reasonable backup documentation, and shall bear interest at the Default Interest Rate from the date of demand for payment until paid in full.

5.14    <u>Observer Status on Borrower's Board of Directors</u>.  Until the Loan is paid in full and satisfied, IHHI hereby grants Lender Agent non-voting observer status with respect to all

CONFIDENTIAL

meetings of its board of directors (and committees thereof) and all meetings of its shareholders (and committees thereof), excluding meetings (or portions thereof) held in executive session called in good faith and that relate matters not in IHHI's ordinary course of business. Concurrently with delivery of all notices of meetings and agendas to its directors and shareholders, IHHI agrees to and shall deliver a copy of each such notice and agenda to Lender Agent.

5.15   <u>Independent Directors</u>.  Until the Loan is paid in full and satisfied, Independent Directors shall at all times constitute a majority of the directors serving as members of IHHI's board of directors.

5.16   <u>Financial Reports, Notices and Other Information</u>.

(a)   <u>Financial Statements and Other Reports</u>.  Each Borrower will deliver to Lender Agent:  (1) as soon as available, but no later than thirty (30) days after the last day of each month (or forty-five (45) days after the last day of the last month of each Fiscal Quarter), a company prepared consolidated balance sheet and income statement covering Borrowers' and their consolidated Subsidiaries' consolidated operations during the period, prepared under GAAP, consistently applied (except for ordinary course adjustments to such monthly financial statements which are taken in good faith, actuarial adjustments for self-insurance retention and disproportionate share payment adjustments), in a form reasonably acceptable to Lender Agent; (2) as soon as available, but no later than one hundred fifty (150) days after the last day of each Fiscal Year, audited consolidated financial statements prepared under GAAP, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm acceptable to Lender Agent in its reasonable discretion; (3) within five (5) days of delivery or filing thereof by any Borrower, copies of all statements, reports and notices made available to such Borrower's security holders or to any holders of Subordinated Debt and copies of all reports and other filings made by such Borrower with any stock exchange on which any securities of such Borrower are traded and/or the United States Securities and Exchange Commission; (4) a prompt report of any legal actions pending or threatened in writing against any Borrower or any of its Subsidiaries that are not covered by insurance (including Borrower's self-insured retention amounts) and could reasonably be expected to result in damages or costs to any Borrower or any of its Subsidiaries of $500,000 or more; (5) prompt written notice of an event that materially and adversely affects the value of any material Intellectual Property; (6) budgets, sales projections, operating plans and other financial information and other information, reports or statements regarding the Borrowers, their business and the Collateral as Lender Agent may from time to time reasonably request; (7) concurrent with the delivery of its audited consolidated financial statements prepared under GAAP, a reconciliation between its interim fourth quarter report and any adjustments thereafter in connection with finalizing its audited consolidated financial statements prepared under GAAP, consistently applied; (8) promptly upon their becoming available, copies of all interest rate and currency hedging agreements that any Borrower or any of its Subsidiaries is party to and all Material Contracts (as defined in the A/R Facility) to the extent such documents are filed with the United States Securities and Exchange Commission; (9) every Fiscal Quarter (but not more frequently unless an Event of Default then exists and is continuing), a schedule of Eligible Accounts (as defined in the A/R Facility) and the thirty (30) largest Account Debtors (as defined

**JAE 0069**

CONFIDENTIAL                                                                                    SPCP_0000004372

in the A/R Facility) during such quarter; (10) within ten (10) days after the preparation or issuance thereof, copies of financial statements (other than those required to be delivered pursuant to clauses (1) and (2) above) prepared by, for or on behalf of Borrowers and any other notes, reports and other materials related thereto, including, without limitation, any pro forma financial statements; (11) promptly upon receipt thereof, copies of any reports submitted to a Borrower by its independent accountants in connection with any interim audit of the books of such Person or any of its Affiliates and copies of each management control letter provided by such independent accountants; (12) within fifteen (15) days after the execution thereof, a copy of any contracts with the federal government or with a Governmental Authority in the State of California; (13) as soon as available, but no later than one (1) day after the commencement of each Fiscal Year, consolidated month by month projected operating budgets, annual projections, profit and loss statements, and cash flow reports of and for Borrowers for such upcoming Fiscal Year (including an income statement for each month and a balance sheet as of the end of the last month in each Fiscal Quarter); and (14) any additional information, documents, statements, reports and other materials that are provided to the agent or the lenders under the A/R Facility.

      (b)    <u>Notices</u>.  Borrowers will give prompt written notice to Lender Agent:  (1) of any litigation or governmental proceedings pending or, to Borrower's knowledge, threatened (in writing) against Borrowers or any Credit Party which would reasonably be expected to have a Material Adverse Effect with respect to Borrowers or any Credit Party or which in any manner calls into question the validity or enforceability of any Loan Document; (2) upon any Borrower becoming aware of the existence of any Default or Event of Default (which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto); (3) if any Borrower is in breach or default under or with respect to any Material Contract (as defined in the A/R Facility), or if any Borrower is in breach or default under or with respect to any other contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect; (4) of any strikes or other labor disputes pending or, to any Borrower's knowledge, threatened in writing against any Borrower; (5) if there is any infringement or claim of infringement by any other Person with respect to any Intellectual Property rights of any Borrower that could reasonably be expected to have a Material Adverse Effect, or, to Borrower's knowledge, if there is any claim by any other Person that any Borrower in the conduct of its business is infringing on the Intellectual Property rights of others that could reasonably be expected to have a Material Adverse Effect; and (6) of all returns, recoveries, disputes and claims relating to any of the Borrowers' accounts receivable that involve more than $500,000; (7) any other development, event, fact, circumstance or condition that would reasonably be likely to have a Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto; (8) to the extent not otherwise delivered pursuant to another provision hereof, any notice given by a Borrower to any other lender of a Borrower, which notice to Lenders shall be accompanied by a copy of the applicable notice given to the other lender; (9) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability or any material modification to any special program or the amounts payable to a Borrower thereunder; (10) receipt of any notice by a Borrower regarding termination of any manager of any facility owned, operated or leased by a Credit Party; and (11) promptly after a Borrower or any authorized officer of a Borrower obtains knowledge thereof, any oral or written communication from the IRS or otherwise with respect to any tax investigations, relating to a

CONFIDENTIAL                                 SPCP_0000004373

Borrower directly, or relating to any consolidated tax return which was filed on behalf of a Borrower, in respect of (x) any tax assessment or possible tax assessment, (y) years that are designated open pending tax examination or audit, or (z) information that could give rise to an IRS tax liability or assessment.

**6.     NEGATIVE COVENANTS**

To induce Lenders to make the Loans, Borrowers and Credit Parties, as applicable, make the following negative covenants in favor of Lenders, each of which shall survive the execution and delivery of this Agreement.

6.1     <u>Mergers, Subsidiaries, Etc</u>.     Borrowers shall not, directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary in addition to the existing Subsidiaries of Borrowers; or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person, without first receiving the prior written consent of Lenders.

6.2     <u>Investments; Line of Credit Loan and Advances</u>.     Borrowers shall not make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise, except that:  (a) Borrowers may hold investments constituting notes payable, or stock or other securities issued to Borrowers pursuant to negotiated agreements with respect to settlement of such issuer's accounts in the ordinary course of business consistent with past practices; (b) Borrowers may invest Qualified Cash in Qualified Cash Accounts (i) as of the Closing Date in the kinds and types of investments that they are then so invested, and (ii) thereafter, as to any new investments made after the Closing Date in other kinds and types of investments as are in conformity with Borrower's investment policies previously adopted by its board of directors or managers so long as Lender Agent's Liens for the benefit of the Lenders remain perfected therein, and (c) Borrowers may invest cash and cash equivalents (other than Qualified Cash in the Qualified Cash Accounts) (i) as of the Closing Date in the kinds and types of investments that they are then so invested, and (ii) thereafter, as to any new investments made after the Closing Date in other kinds and types of investments as are in conformity with Borrower's investment policies previously adopted by its board of directors; <u>provided</u> that so long as the A/R Facility is in effect, Borrowers may invest all cash and cash equivalents pursuant to the terms of the A/R Facility (as in effect on the A/R Facility Closing Date or as amended, supplemented or otherwise modified in accordance with the terms of the A/R Facility Intercreditor Agreement) and subject to the terms of the A/R Facility Intercreditor Agreement.

6.3     <u>Indebtedness</u>.

(a)     Borrowers shall not create, incur or assume any Indebtedness, except (without duplication) (i) Indebtedness created after the date hereof by conditional sale or other title retention agreements (including Capital Leases) or in connection with purchase money Indebtedness with respect to Equipment and Fixtures or other capital assets acquired by Borrowers in the ordinary course of business; (ii) the Loans and the other Obligations; (iii) unsecured Indebtedness (other than Funded Debt) incurred in the ordinary course of

CONFIDENTIAL                                                                                                  SPCP_0000004374

Borrower's business; (iv) Indebtedness created after the date hereof for financing of insurance premiums; and (v) Indebtedness under the A/R Facility.

(b)    Borrowers shall not, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Funded Debt prior to its scheduled due date, other than the A/R Facility and the Obligations.

6.4    <u>Employee Loans and Affiliate Transactions</u>.  Except as set forth in <u>Disclosure Schedule 6.4</u>, no Borrower is a party to any transaction with any of its Affiliates.  Borrowers shall not enter into or be a party to any transaction with any Affiliate thereof except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms that are no less favorable to Borrowers than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of Borrowers.  Borrowers shall not enter into any lending or borrowing transaction with any employees of Borrowers, except loans to its respective employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs, pension plan advances, and similar purposes.

6.5    <u>Capital Structure and Business</u>.  No Borrower or Credit Party (other than Ganesha) shall amend its charter, articles, bylaws or operating agreement from versions delivered to the Lenders on the Restatement Effective Date without first receiving the prior written consent of Lenders.  No Borrower or Credit Party (other than Ganesha) shall engage in any business other than the businesses currently engaged in by it, without first receiving the prior written consent of Lenders.

6.6    <u>Guaranteed Indebtedness</u>.  Borrowers shall not create, incur, or assume any Guaranteed Indebtedness unless such Guaranteed Indebtedness would be permitted to be incurred directly by Borrowers pursuant to <u>Section 6.3</u> (Indebtedness).

6.7    <u>Liens</u>.  Except (i) the A/R Facility Liens and (ii) as set forth in <u>Disclosure Schedule 6.7</u>, no Borrower is subject to any existing Liens (excluding Lender Agent's Liens).  Borrowers shall not create, incur, assume or permit to exist any Lien on or with respect to any of the Collateral (whether now owned or hereafter acquired) except for Permitted Encumbrances.

6.8    <u>Sale of Collateral and Intellectual Property</u>.  Borrowers shall not sell, transfer, convey, assign, license or otherwise dispose of any interest in Collateral, other than in the ordinary course of business, with an aggregate value in excess of $100,000.  Borrowers shall not sell, transfer, convey, assign, license or otherwise dispose of any interest in Intellectual Property.

6.9    <u>ERISA</u>.  Borrowers shall not cause or permit any ERISA Affiliate to, cause or permit to occur (a) an event that could result in the imposition of a Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA or (b) an ERISA Event to the extent such ERISA Event would reasonably be expected to result in taxes, penalties and other liabilities in an aggregate amount in excess of $100,000 in the aggregate.

CONFIDENTIAL                                                                                SPCP_0000004375

6.10   <u>Hazardous Materials</u>.  Borrowers shall not cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any real property owned or leased by Borrowers where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any real property owned or leased by Borrowers or any of the Collateral, other than such violations or Environmental Liabilities that could not reasonably be expected to have a Material Adverse Effect.

6.11   <u>Restricted Payments</u>.  During the term of this Agreement, Borrowers shall not make any Restricted Payment, except (a) employee loans permitted under Section 6.4 (Employee Loans and Affiliate Transactions), (b) so long as no Event of Default shall have occurred and is continuing, dividends and distributions by Borrowers to its Shareholders or partners or members, (c) ordinary course payments to Borrowers and/or to Credit Parties for services rendered to the Business, (d) declare, pay or make dividends or distributions payable in its stock, or split-ups or reclassifications of its stock, and (e) redeem its capital stock from terminated employees pursuant to, but only to the extent required under, the terms of the related employment agreements.

6.12   <u>Change of Corporate Name, State of Organization or Location; Change of Fiscal Year</u>.  No Borrower and no Credit Party and no Guarantor shall (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) change its chief executive office, principal place of business, corporate offices or locations at which Collateral is held or stored, or the location of their records concerning the Collateral, (c) change the type of entity that it is, (d) change its organization identification numbers issued by its state of its incorporation or organization, or (e) change its state of incorporation or organization or incorporate or organize in any additional jurisdictions, in each case without at least ten (10) Business Days prior written notice to Lenders and provided that Borrowers and Credit Parties and Guarantors shall have taken such actions and executed such documents as Lenders reasonably requests in connection therewith to continue the perfection of any Liens in favor of Lender Agent in any Collateral, and <u>provided</u> further that, any change to such Borrowers or such Credit Party's or such Guarantor's jurisdiction or state of incorporation or organization, such new jurisdiction or state of incorporation or organization shall be located in the United States.  Borrowers shall not change their Fiscal Year without giving Lenders at least thirty (30) calendar days prior written notice thereof.

6.13   <u>No Impairment of Intercompany Transfers</u>.  Borrowers shall not directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions.

6.14   <u>[Intentionally Omitted.]</u>

6.15   <u>Dr. Shah</u>.  Until the Loan is paid in full and satisfied, Borrowers will not, directly or indirectly, permit Dr. Shah to be nominated, or elected, or appointed, or directly or indirectly compensated, paid, engaged, retained or become, an officer, or director, or employee, or manager, or supervisor, or consultant, or agent, or representative of, IHHI, WMC-A, WMC-SA, Coastal or Chapman.

**JAE 0073**

CONFIDENTIAL                                                   SPCP_0000004376

6.16   Shareholder Blocking Rights.  No Borrower shall issue any Stock that grants or provides any direct or indirect owner thereof any Shareholder Blocking Rights.

6.17   Financial Covenants.  Minimum EBITDA.  The Borrowers will not at any time permit, for the Test Period ending June 30, 2013 and each Test Period thereafter, EBITDA to be less than $20,000,000.

(b)   Minimum Adjusted EBITDA.  The Borrowers will not at any time permit, for (i) the Test Period ending March 31, 2014, Adjusted EBITDA to be less than $2,500,000, (ii) the Test Period ending June 30, 2014, Adjusted EBITDA to be less than $2,500,000, (iii) the Test Period ending September 30, 2014, Adjusted EBITDA to be less than $2,500,000, (iv) the Test Period ending December 31, 2014, Adjusted EBITDA to be less than $2,500,000, (v) the Test Period ending March 31, 2015, Adjusted EBITDA to be less than $5,000,000, (vi) the Test Period ending June 30, 2015, Adjusted EBITDA to be less than $5,000,000, (vii) the Test Period ending September 30, 2015, Adjusted EBITDA to be less than $5,000,000, (viii) the Test Period ending December 31, 2015, Adjusted EBITDA to be less than $5,000,000 and (ix) for the Test Period ending March 31, 2016, Adjusted EBITDA to be less than $7,500,000.

(c)   Fixed Charge Coverage Ratio.  The Borrowers will not permit the Fixed Charge Coverage Ratio (as defined in and calculated pursuant to the Worksheet in Annex E) as of the last day of any Fiscal Quarter set forth below to be less than the ratio set forth below for such period:

| Period | Ratio |
|---|---|
| Any given Fiscal Quarter, measured on a trailing four quarter basis, beginning with the Fiscal Quarter ending June 30, 2013 (which shall be the **"Defined Period"** for purposes of Annex E) | 1.00 to 1.00 |

Evidence of Compliance.  Borrowers shall furnish to Lender Agent, at the time of delivery of the financial statements required by clauses (1) and (2) of Section 5.16 (Financial Statements and Other Reports), evidence (in form and content satisfactory to Lender Agent) of Borrowers' compliance with the covenants in this Section 6.17 and evidence that no Default or Event of Default resulting from the provisions of this Section 6.17 has occurred and is continuing. Such evidence shall include, without limitation, (a) a statement and report, on a form approved by Lender Agent, detailing Borrowers' calculations, and (b) if requested by Lender Agent, back-up documentation (including, without limitation, invoices, receipts and other evidence of costs incurred during such quarter as Lender Agent shall reasonably require) evidencing the propriety of the calculations.

(d)   Defined Terms.  For purposes of this Section 6.17, the following definitions shall apply:

'Adjusted EBITDA' means, for any period, the sum, without duplication, of the following for each Borrower and PCHI collectively on a consolidated basis:  Net

CONFIDENTIAL

Income, plus (a) Interest Expenses, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, (e) all other non-cash, non-recurring charges and expenses, excluding accruals for cash expenses made in the ordinary course of business, (f) loss from any sale of assets, other than sales in the ordinary course of business, (g) the portion of lease payments paid by any Borrower to PCHI in respect of lease payments which are attributable to interest, (h) the QAF Recovery Adjustment, (i) the warrant repurchase price under the Repurchase Agreement to the extent deducted from Net Income, and (j) any amendment, consent, origination or other transaction fees and legal expenses payable or paid by any Borrower or PCHI and relating to the Loan Documents or to the A/R Facility, to the extent deducted from Net Income, minus (i) gains from any sale of assets, other than sales in the ordinary course of business, and (ii) other extraordinary or non-recurring gains minus (if a positive number) or plus (if a negative number), the Net QAF Funds for such period (but only to the extent that such Net QAF Funds were included by any Borrower in the calculation of Net Income for such period), in each case determined in accordance with GAAP.

'EBITDA' means, for any period, the sum, without duplication, of the following for each Borrower and PCHI collectively on a consolidated basis: Net Income, plus (a) Interest Expenses, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, (e) all other non-cash, non-recurring charges and expenses, excluding accruals for cash expenses made in the ordinary course of business, (f) loss from any sale of assets, other than sales in the ordinary course of business, (g) the portion of lease payments paid by any Borrower to PCHI in respect of lease payments which are attributable to interest, (h) the warrant repurchase price under the Repurchase Agreement to the extent deducted from Net Income, and (i) any amendment, consent, origination or other transaction fees and legal expenses payable or paid by any Borrower or PCHI and relating to the Loan Documents or to the A/R Facility, to the extent deducted from Net Income minus (i) gains from any sale of assets, other than sales in the ordinary course of business, and (ii) other extraordinary or non-recurring gains, in each case determined in accordance with GAAP.

'Interest Expense' means, for any period, for Borrowers and PCHI collectively on a consolidated basis, (a) total interest expense (including without limitation attributable to Capital Leases in accordance with GAAP), (b) fees with respect to all outstanding Indebtedness including without limitation capitalized interest but excluding commissions, discounts and other fees owed with respect to letters of credit and bankers' acceptance financing and (c) net costs under any interest rate hedging agreements.

'Net Income' means, for any period, the net income (or loss) of Borrowers and PCHI collectively on a consolidated basis determined in accordance with GAAP; provided, however, that such amount shall exclude (a) the income (or loss) of any Person (other than any Borrower, any Credit Party or any of their respective Subsidiaries) in which any other Person (other than any Borrower, any Credit

CONFIDENTIAL                                                                    SPCP_0000004378

Party or any of their respective Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to a Borrower or PCHI by such Person, (b) the income (or loss) of any Person accrued prior to the date it becomes a Borrower or is merged into or consolidated with a Borrower or PCHI or that Person's assets are acquired by a Borrower or PCHI, (c) the income of any Subsidiary of any Borrower or PCHI to the extent that the declaration or payment of dividends or similar distributions of that income by that Subsidiary is not at the time permitted by operation of the terms of the charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) compensation expense resulting from the issuance of capital stock, stock options or stock appreciation rights issued to former or current employees, including officers, of a Borrower or PCHI, or the exercise of such options or rights, in each case to the extent the obligation (if any) associated therewith is not expected to be settled by the payment of cash by a Borrower or PCHI or any affiliate thereof, and (e) compensation expense resulting from the repurchase of capital stock, options and rights described in clause (d) of this definition of Net Income.

'QAF Recovery Adjustment' means, for any Test Period during which Net Income was reduced by any Net QAF Funds (such reduction, the "**Maximum Amount**"), any reduction in Net Income related to Medicaid or Medicaid Managed Care payment rates (including DSH and similar payments by the State and Counties of California for indigent care) recognized in accordance with GAAP, initially calculated by reference to payment rates included in Net Income as of September 30, 2012 and, following any QAF Recovery Adjustment calculated by reference to such September 30, 2012 payment rates, by reference to the payment rates included in Net Income for the most recent QAF Recovery Adjustment; provided that (i) California AB1383 or any substitute, replacement or successor legislation or payments or implementing regulations are in effect during such Test Period; (ii) the Borrowers provide evidence to Lender Agent that such QAF Recovery Adjustment is reasonably expected to result in an increase in Net QAF Funds and (iii) in no event may the QAF Recovery Adjustment exceed the Maximum Amount.

'Test Period' means, with respect to each Fiscal Quarter beginning with the Fiscal Quarter ending June 30, 2013, the four most recent Fiscal Quarters then ended (taken as one accounting period).

## 7.   TERM

7.1   Termination.  The financing arrangements contemplated hereby shall be in effect until the earlier of the date when the Loans and other Obligations (other than indemnification Obligations) have been paid in full and satisfied or the Maturity Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date without demand by Lenders.

CONFIDENTIAL

**JAE 0076**

SPCP_0000004379

7.2     <u>Survival of Obligations Upon Termination of Financing Arrangements</u>.  Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of Borrowers or Credit Parties or the rights of Lenders or Lender Agent relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Maturity Date.  Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon Borrowers and Credit Parties, and all rights of Lenders or Lender Agent, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; <u>provided</u>, that the provisions of <u>Section 11</u> (Miscellaneous), the payment obligations under <u>Section 1</u> (Amount and Terms of Credit Facilities), and the indemnities contained in the Loan Documents shall survive the Maturity Date.

## 8.     **EVENTS OF DEFAULT; REMEDIES**

8.1     <u>Events of Default</u>.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an Event of Default hereunder:Any Borrower fails to make any payment of interest or of principal on any Loan within five (5) calendar days after the same is due and payable, <u>provided</u>, that if any Borrower fails to make any payment within such five (5) calendar day period, interest at the Default Rate shall accrue from the due date for such payment on all Obligations and the Loans.

(b)     Borrowers fail to pay or reimburse Lenders for any costs or expenses reimbursable under this Agreement or under any other Loan Document, or Borrowers fail to make payment of any Obligations (not specifically referenced in any other subsection of this <u>Section 8.1</u>) within ten (10) calendar days following Lenders' demand for such reimbursement or payment thereof; <u>provided</u>, that if any Borrower fails to pay such amount within said ten (10) calendar day period, interest at the Default Rate shall accrue from the due date for such payment on all Obligations and on the Loans.

(c)     Borrowers or Credit Parties fail or neglect to perform, keep or observe any provision of this Agreement (not specifically referenced in any other subsection of this <u>Section 8.1</u>) applicable to them and the same shall remain unremedied for ten (10) Business Days or more after the earlier of (i) Borrower's or Credit Party's actual knowledge thereof, or (ii) Borrower's or Credit Party's receipt of notice thereof from Lenders.

(d)     Borrowers fail or neglect to perform, keep or observe any of the provisions of <u>Section 4.1</u> (Reports and Notices) or any provisions set forth in <u>Annex B</u> (Cash Management System) or <u>Annex C</u> (Collateral Reports), respectively, and the same shall remain unremedied in whole or in part for thirty (30) calendar days or more after the earlier of (i) said Borrower's actual knowledge thereof, or (ii) said Borrower's receipt of notice thereof from Lenders.

CONFIDENTIAL                                                                                    SPCP_0000004380

(e)      Borrowers deliver a supplement or update to any Disclosure Schedule as required by <u>Section 5.6</u> (Supplemental Disclosure) and Lenders fail to approve of the same because such supplement or update (i) discloses the existence of an Event of Default, or (ii) discloses a Material Adverse Effect, or (iii) discloses any fact or circumstance which, with the passage of time or otherwise, would constitute an Event of Default or Material Adverse Effect.

(f)      Borrowers or Credit Parties or Guarantors fail or neglect to timely perform, keep or observe any other provision of any of the Loan Documents required to be performed by it and the same shall remain unremedied in whole or in part for ten (10) Business Days after receipt of notice thereof from Lenders.

(g)      Any Guarantor fails or neglects to timely perform, keep or observe any provision of the Guaranty Agreement and the same shall remain unremedied in whole or in part for ten (10) Business Days after receipt of notice thereof from Lenders.

(h)      [reserved]

(i)      [reserved]

(j)      (i) A default or breach occurs under any other agreement, document or instrument to which any Borrower or any Credit Party is or are a party that is not cured within any applicable grace period therefor, such default or breach is not waived in writing by Lenders or Lender Agent, on behalf of the Lenders, and such default or breach involves the failure to make any payment when due in respect of any Indebtedness or Guaranteed Indebtedness (other than the Obligations) of Borrowers or Credit Parties in an amount in excess of $100,000; or (ii) an event, condition or circumstance occurs that causes, or permits any holder of Indebtedness or Guaranteed Indebtedness or a trustee to cause, Indebtedness or Guaranteed Indebtedness or a portion thereof to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or the holder of such Indebtedness or Guaranteed Indebtedness or such trustee has the right to demand cash collateral in respect of such Indebtedness or Guaranteed Indebtedness, in each case, regardless of whether such right is exercised, by such holder or trustee.

(k)      Any representation or warranty herein or in any Loan Document or in any written statement, report, Financial Statement or certificate made or delivered to Lenders or Lender Agent by Borrowers or Credit Parties is untrue or incorrect in any material respect as of the date when made or deemed made.

(l)      Assets of Borrowers or Credit Parties with a fair market value of $100,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or general assignee for the benefit of creditors of Borrowers or such Credit Parties and such condition continues for thirty (30) calendar days or more.

(m)      A case or proceeding is commenced against any Borrower or any Credit Party seeking a decree or order in respect of said Borrower or Credit Party (i) under the Bankruptcy Code, or any other applicable federal, state or foreign bankruptcy or other similar law, (ii) appointing a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar

CONFIDENTIAL

official) for said Borrower or Credit Party or for any substantial part of said Borrower's or Credit Party's assets, or (iii) ordering the winding-up or liquidation of the affairs of any Borrower or Credit Party, and such case or proceeding shall remain undismissed or unstayed for sixty (60) calendar days or more or a decree or order granting the relief sought in such case or proceeding is granted by a court of competent jurisdiction.

(n)     Any Borrower or any Credit Party (i) files a petition seeking relief under the Bankruptcy Code, or any other applicable federal, state or foreign bankruptcy or other similar law, (ii) consents to or fails to contest in a timely and appropriate manner the institution of proceedings thereunder or the filing of any such petition or the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) for such Borrower or Credit Party or for any substantial part of such Borrower's or Credit Party's assets, (iii) makes a general assignment for the benefit of creditors, (iv) takes any action in furtherance of any of the foregoing; or (v) admits in writing its inability to, or is generally unable to, pay its debts as such debts become due.

(o)     A final judgment or judgments for the payment of money in excess of $100,000 in the aggregate at any time are outstanding against Borrowers or Credit Parties (which judgments are not covered by insurance policies as to which liability has been accepted in writing by the insurance carrier), and the same is/are not, within thirty (30) calendar days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay.

(p)     Any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Borrower or any Credit Party or any Guarantor shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document ceases to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(q)     Any Change of Control occurs.

(r)     A Material Adverse Effect shall exist as determined in the reasonable judgment of Lenders.

(s)     IHHI fails or refuses, more than once during any consecutive twelve (12) month period, for any reason, to grant Lender Agent non-voting observer status with respect to all meetings of its board of directors and all meetings of its shareholders.

(t)     IHHI fails or refuses, more than once during any consecutive twelve (12) month period, for any reason to deliver to Lender Agent, concurrently with delivery to all shareholders, a notice and agenda of each annual meeting, special meeting or emergency meeting of shareholders.

(u)     IHHI fails or refuses, more than once during any consecutive twelve (12) month period, for any reason to deliver to Lender Agent, concurrently with delivery to all

CONFIDENTIAL                                                                    SPCP_0000004382

directors, a notice and agenda of each annual meeting, regular meeting, special meeting or emergency meeting of directors.

(v)     More than once during any consecutive twelve (12) month period, the directors or shareholders of IHHI waive notice of a directors meeting and fail to deliver advance notice to Lender Agent of said waiver of directors meeting.

(w)     More than once during any consecutive twelve (12) month period, the directors or shareholders of IHHI take any action without a meeting, which action was required or permitted to be taken at a meeting, and fail to deliver advance notice of the taking of said action to Lender Agent.

(x)     More than once during any consecutive twelve (12) month period, the directors or shareholders of IHHI hold a meeting by written consensus and fail to deliver advance notice of said meeting by consensus to Lender Agent.

(y)     Dr. Shah at any time is nominated, or elected, or appointed, or directly or indirectly is compensated, paid, engaged, retained or becomes, an officer, or director, or employee, or manager, or supervisor, or consultant, or agent, or representative of, IHHI, WMC-A, WMC-SA, Coastal or Chapman.

(z)     Independent Directors cease to constitute a majority of directors on IHHI's board of directors, and replacement Independent Director(s) acceptable to Lenders in their sole discretion are not appointed, or nominated and elected, to IHHI's board of directors within thirty (30) calendar days after the date such Independent Directors cease to constitute a majority of directors on IHHI's board of directors.

(aa)     IHHI, as tenant, commits a breach or default under the Triple Net Lease and the same remains uncured following receipt of all required notices and expiration of all applicable cure periods.

(bb)     (dd) IHHI, as tenant, commits a breach or default under any of the Chapman Leases and the same remains uncured following receipt of all required notices and expiration of all applicable cure periods.

(cc)     Without first receiving the prior written consent of the Lenders (which consent may be granted or withheld by any Lender in its sole discretion):

(i)     IHHI for any reason terminates the sublease with WMC-A for the Western Medical Center - Anaheim;

(ii)     IHHI for any reason terminates the sublease with WMC-SA for the Western Medical Center - Santa Ana;

(iii)     IHHI for any reason terminates the sublease with Coastal for the Coastal Communities Hospital; or

CONFIDENTIAL                                   SPCP_0000004383

(iv)    IHHI for any reason terminates any of the sub-subleases with Chapman for any portion of the Chapman Medical Center.

(dd)    PCHI ceases to own all (100%) of the fee simple title (i) in the Western Medical Center - Anaheim, or (ii) in the Western Medical Center - Santa Ana; or (iii) in the Coastal Communities Hospital.

(ee)    Borrowers or Credit Parties fail or neglect to perform, keep or observe any provision of Section 6.17 (Financial Covenants) applicable to them and the same shall remain unremedied for five (5) days or more after the earlier of (i) Borrower's or Credit Party's actual knowledge thereof, or (ii) Borrower's or Credit Party's receipt of notice thereof from Lender Agent.

8.2    Remedies.  Lenders shall be entitled to enforce payment and performance of the Indebtedness and Obligations and to exercise all rights and powers under this Agreement and the other Loan Documents or other agreement or any laws now or hereafter in force.  No remedy herein conferred upon or reserved to any Lender is intended to be exclusive of any other remedy set forth herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  Every power or remedy given by this Agreement or any of the other Loan Documents to Lender Agent or any Lender in any capacity or to which Lender Agent or any Lender may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Lender Agent and Lender Agent and any Lender may pursue inconsistent remedies.  Lender Agent's and Lenders' remedies upon the occurrence and continuance of an Event of Default include, but are not limited to, the following:

(a)    Accelerate Maturity Date of Line of Credit Loan.  If any Event of Default has occurred and is continuing, Lender Agent may, with the consent of the Lenders, without notice, accelerate the Maturity Date of the Loans and declare all of the Obligations, including all amounts due under the Loans, to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers and Credit Parties (in their respective capacities as Credit Parties and Guarantors).

(b)    [Intentionally Omitted.]

(c)    Increase Rate of Interest to Default Rate.  If any Event of Default has occurred and is continuing, Lender Agent may without notice except as otherwise expressly provided herein, increase the rate of interest applicable to the Loans to the Default Rate.

(d)    Other Remedies.  If any Event of Default has occurred and is continuing, Lender Agent may without notice:  (i)  make application to a court of competent jurisdiction for, and obtain from such court as a matter of strict right, the appointment of a receiver of the Business, which receiver shall have all the usual powers and duties of receivers in similar cases, including the full power to maintain and otherwise operate the Business upon such terms as may be approved by the court; and (ii) exercise any other rights and remedies provided to Lenders under the Loan Documents, or at law or equity, including all remedies provided under the Code; provided, that upon the occurrence of an Event of Default specified in Sections 8.1(m) or (n)

CONFIDENTIAL

**JAE 0081**

SPCP_0000004384

(Events of Default), all of the Obligations and the Loans, shall become immediately due and payable without declaration, notice or demand by any Person.

8.3     Waivers.   Except as otherwise provided for in this Agreement or by applicable law, each Borrower and each Credit Party and each Guarantor waive (including for purposes of Section 13 (Suretyship Waivers)):   (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default (unless specifically required in this Agreement), nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lenders on which Borrowers or Credit Parties or Guarantors may in any way be liable, and hereby ratifies and confirms whatever the Lender Agent, on behalf of Lenders or Lenders may do in this regard, (b) all rights to notice and a hearing prior to any Lender's taking possession or control of, or to any Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing a Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 9.     **ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF LENDER**

9.1     Assignment and Participations.  Assignment to Qualified Assignee.   Subject to the terms of this Section 9.1 (Assignment and Participations), any Lender may make an assignment to a Qualified Assignee of, or sell participations in, at any time or times, the Loan Documents and the Loans, or any portion thereof or interest therein, including any Lender's rights, title, interests, remedies, powers or duties thereunder.  Any assignment by a Lender shall:  (i) require the execution of an assignment agreement in form and content reasonably satisfactory to, and acknowledged by, Lender Agent; and (ii) be conditioned on such assignee representing to Lender Agent that it is purchasing the applicable Loan to be assigned to it for its own account, for investment purposes and not with a view to the distribution thereof.  In the case of an assignment by a Lender under this Section 9.1(a) (Assignment to Qualified Assignee), the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as such Lender hereunder.  The original Lender shall be relieved of its obligations hereunder with respect to the assigned portion thereof from and after the date of such assignment.  Borrowers and Credit Parties and Guarantors hereby acknowledge and agree that any assignment shall give rise to a direct obligation of Borrowers to the assignee and that the assignee shall be considered to be a "Lender." In the event a Lender assigns or otherwise transfers all or any part of the Obligations, such Lender shall so notify Borrowers and Credit Parties and Guarantors, and Borrowers shall, upon the request of such new Lender, execute one or more new notes in exchange for any of the Notes (upon the same terms), if any, being assigned.  Notwithstanding the foregoing provisions of this Section 9.1(a) (Assignment to Qualified Assignee), any Lender may at any time pledge the Obligations held by it and any Lender's rights under this Agreement and the other Loan Documents to a financial institution.

(b)     Participations.   Any participations by a Lender of all or any part of the aggregate commitment of a Lender to make Advances under the Loans shall be made with the understanding that all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participations, and that the holder of any such participation shall not be entitled to require such Lender to take or omit to take any action hereunder except actions

CONFIDENTIAL                                                                                                    SPCP_0000004385

directly affecting (i) any reduction in the principal amount of, or interest rate payable with respect to, any Loan in which such holder participates, (ii) any extension of the scheduled amortization of the principal amount of any Loan in which such holder participates or the final maturity date thereof, and (iii) any release of all or substantially all of the Collateral (other than in accordance with the terms of this Agreement, the Collateral Documents or the other Loan Documents).  Solely for purposes of <u>Section 1.14</u> (Taxes), and <u>Section 1.15</u> (Capital Adequacy; Increased Costs; Illegality), Borrowers and Credit Parties and Guarantors acknowledge and agree that a participation shall give rise to a direct obligation of Borrowers to the participant (in each case subject to the terms and conditions in such Sections applicable to Lenders) and the participant shall be considered to be a "Lender."  The Borrowers and Credit Parties and Guarantors further consent to the voting provisions set forth in Section 3 of the Participation Agreement.

(c)     <u>Cooperation to Effect Assignments and Participations</u>.  Borrowers and Credit Parties shall assist Lenders under this <u>Section 9.1</u> (Assignment and Participations) as reasonably required to enable Lenders to effectuate any such assignment or participations, including the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and, if requested by a Lender, the preparation of informational materials for, and the participation of management in meetings with, potential assignees or participants.  Borrowers and Credit Parties shall certify the correctness, completeness and accuracy, in all material respects of all descriptions of Borrowers and Credit Parties and their respective affairs contained in any selling materials provided by them and all other information provided by them and included in such materials.

(d)     <u>Disclosures by Lenders</u>.  A Lender may furnish any information concerning Borrowers and the Credit Parties in the possession of a Lender from time to time to assignees and participants (including prospective assignees and participants); <u>provided</u> that such Lender shall obtain from assignees or participants confidentiality covenants substantially equivalent to those contained in <u>Section 11.10</u> (Confidentiality).

9.2     <u>Reliance, Etc</u>.  Neither Lenders nor any of its Affiliates nor any of their respective directors, officers, employees or attorneys shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for damages caused by its or their own gross negligence or willful misconduct.  Without limiting the generality of the foregoing, each Lender:  (a) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to Borrowers or Credit Parties and shall not be responsible to Borrowers or Credit Parties for any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of Borrowers and Credit Parties or to inspect the Collateral (including the books and records) of Borrowers or Credit Parties; (d) shall not be responsible to Borrowers or Credit Parties for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (e) shall incur no liability under or in respect of this Agreement or

CONFIDENTIAL

SPCP_0000004386

the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopy, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

## 10.   SUCCESSORS AND ASSIGNS

This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrowers, Credit Parties, Lenders and Lender Agent, and their respective successors and assigns (including, in the case of Borrowers and Credit Parties, a debtor-in-possession on behalf of a Borrower or a Credit Party), except as otherwise provided herein or therein.  Neither Borrowers nor Credit Parties may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Lender Agent and each of the Lenders, which consent may be granted or withheld by Lender Agent and each Lender in its sole and absolute discretion.  Any such purported assignment, transfer, hypothecation or other conveyance by Borrowers or Credit Parties without the prior express written consent of Lender Agent and each Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrowers, Credit Parties, Lenders and Lender Agent with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 11.   MISCELLANEOUS

11.1   Complete Agreement; Modification of Agreement.  This Agreement and the other Loan Documents (including all annexes, exhibits, and disclosure schedules attached hereto or thereto) constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in Section 11.2 (Amendments and Waivers).  The Original Credit Agreement and any other term sheet, letter of interest, commitment letter, fee letter or confidentiality agreement, if any, between Borrowers or Credit Parties, Lenders and Lender Agent or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

11.2   Amendments and Waivers.   Signed by Representatives.   No amendment, modification, termination or waiver of or consent with respect to any provision of this Agreement that waives compliance with the conditions precedent set forth in Article 2 (Conditions Precedent) to the making of any of the Loans shall be effective unless the same shall be in writing and signed by Lender Agent and Borrowers.  No waiver or consent with respect to any Default or any Event of Default shall be effective for purposes of the conditions precedent to the making of the Loans unless the same shall be in writing and signed by Lender Agent and Borrowers.

(b)   Must Be In Writing.  No amendment, modification, termination or waiver shall, unless in writing and signed by Lender Agent and Borrowers:  (i) reduce the principal amount of or the Interest Rate applicable to the Loans; (ii) extend any scheduled payment date or the Stated Maturity Date; (iii) waive, forgive, defer, extend or postpone any payment of interest; or (iv) release any Guarantor or, except as otherwise permitted herein or in the other Loan

**JAE 0084**

CONFIDENTIAL                                                                              SPCP_0000004387

Documents, release, or permit Borrowers or Credit Parties to sell or otherwise dispose of, any Collateral.  Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.  Notwithstanding the foregoing, no amendment, modification, termination or waiver shall be required for Lender to take additional Collateral pursuant to any Loan Document.  No amendment, modification, termination or waiver of any provision of any of the Notes shall be effective without the written concurrence of the holder of that Note.  No notice to or demand on Borrowers or Credit Parties in any case shall entitle Borrowers or Credit Parties to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 11.2 (Amendments and Waivers) shall be binding upon each holder of the Note in question at the time outstanding and each future holder of said Note.

(c)     Termination of Liens.  Upon payment of the Loans in full in cash and performance of all Obligations (other than indemnification Obligations), and a release of all existing and future claims (whether known or unknown) against each Lender and Lender Agent, and so long as no suits, actions, proceedings or claims are pending against any Indemnified Person, Lender Agent, on behalf of the Lenders, shall promptly upon receipt of written request from Borrowers deliver to Borrowers such termination statements, Lien releases and other documents necessary or appropriate to evidence the termination of the Liens securing payment of the Obligations.

(d)     Lender Voting.  In addition to the terms set forth in the foregoing clauses (a) through (c) of this Section 11.2, if at any time there is more than one Lender hereunder, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Borrower or Credit Party therefrom, shall in any event be effective without the written concurrence of one or more Lenders having or holding Loans representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Loans.

11.3     Fees and Expenses.  Borrowers shall reimburse Lender Agent and each Lender for (i) all fees, costs and expenses (including the reasonable fees and expenses of all of Lender Agent's and each Lender's outside attorneys, advisors, consultants and auditors), and (ii) all fees, costs and expenses, including the reasonable fees, costs and expenses of other advisors (including environmental and management consultants and appraisers), incurred in connection with the negotiation, preparation and filing and/or recordation of the Loan Documents, or incurred in connection with any amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or Related Transactions Documents, or advice provided in connection with a breach or Default under the Loans or Lender Agent's and each Lender's rights hereunder or thereunder, or in connection with any of the following:

(a)     Any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender Agent, Lenders, Borrowers, Credit Parties or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, this Agreement, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrowers and/or Credit Parties or any other Person that may be obligated to Lenders by virtue of the Loan

CONFIDENTIAL                                                                                         SPCP_0000004388

Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring or forbearance of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (a) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct.

(b)     Any attempt to enforce any remedies of Lenders against Borrowers and/or Credit Parties or any other Person that may be obligated to Lenders by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring or forbearance of the Loans during the pendency of one or more Events of Default.

(c)     Any workout or restructuring or forbearance of the Loans during the pendency of one or more Events of Default.

(d)     Efforts by Lenders to (i) monitor the operations, financial condition and/or regulatory status of the Business after an Event of Default occurs under this Agreement or under any of the other Loan Documents; (ii) evaluate, observe or assess Borrowers or Credit Parties or their respective business affairs after a breach or Default under this Agreement or under any of the other Loan Documents; and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral; including, as to each of clauses (a) through (c) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other statutory and non-statutory fees and costs incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 11.3 (Fees and Expenses), all of which shall be payable, on demand, by Borrowers to Lenders.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees shall include:  a Lender's Costs, fees, costs and reasonable expenses of attorneys, accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, statutory and non-statutory costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

11.4     No Waiver.  Lender Agent's or a Lender's failure, at any time or from time to time, to require strict performance by Borrowers or Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of Lender Agent or such Lender thereafter to demand strict compliance and performance herewith or therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type.  Subject to the provisions of Section 11.2 (Amendments and Waivers), none of the undertakings, agreements, warranties, covenants and representations of Borrowers or Credit Parties contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by Borrowers or Credit Parties shall be deemed to have been suspended or waived by Lenders, unless such waiver or suspension is by an instrument in writing signed by

CONFIDENTIAL                                   SPCP_0000004389

Lender Agent and each Lender and directed to Borrower's Representative specifying such suspension or waiver.

11.5    Remedies.  Each Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that a Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

11.6    Severability.  Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

11.7    Conflict of Terms.  Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

11.8    Attorneys' Fees; Indemnification.

(a)    Attorneys' Fees.  If any action or proceeding is brought by any party against any other party, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and statutory and non-statutory costs incurred in connection with the prosecution or defense of such action.  The foregoing includes, without limitation, attorneys' fees and costs of investigation incurred in appellate proceedings, costs incurred in establishing the right to indemnification, expert or other witness fees, copy and facsimile and telephone charges, courier and messenger charges, court costs, fees of charges of any arbitrator or mediator or arbitration or mediator service, or in connection with, any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code, 11 U.S.C. 101 et seq., or any successor statutes.  For purposes of this Agreement, the term "attorneys' fees" or "attorneys' fees and costs" shall also include the fees and expenses of counsel to the parties hereto, which may include the allocable costs of in-house counsel, printing, photostating, duplicating and other expenses, air freight charges, and fee billed for law clerks, paralegals and other persons not admitted to the bar but performing services under the supervision of an attorney.

(b)    Indemnification.  Should any Lender, as a result of its relationship with Borrowers or Credit Parties or Guarantors contemplated hereby, be made a party to any litigation instituted by Borrowers or Credit Parties or Guarantors against a Person other than such Lender, or any litigation instituted against Borrowers or Credit Parties or Guarantors by any Person other than such Lender, Borrowers shall jointly and severally indemnify, defend, protect and hold harmless such Lender from any and all loss, cost, liability, damage or expense incurred by such Lender, including attorneys' fees and costs, in connection with the litigation.

11.9    Time of the Essence.  Time is of the essence in the performance of each and every term, condition and covenant of this Agreement.

**JAE 0087**

CONFIDENTIAL                                                                                            SPCP_0000004390

11.10  <u>Confidentiality</u>.   Lender Agent and each Lender agrees to use commercially reasonable efforts to maintain as confidential all information provided to them by Borrowers and/or Credit Parties which is designated in a writing delivered to Lender Agent or any Lender as confidential (provided, that, all non-public financial information and financial projections provided by Borrowers or Credit Parties to Lender Agent or Lenders shall be deemed confidential whether or not so designated in writing as confidential) for a period of one (1) year following receipt thereof, except that Lender Agent or Lenders may disclose such information (a) to Persons employed or engaged by Lender Agent or such Lender; (b) to any bona fide assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this <u>Section 11.10</u> (Confidentiality) and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any Governmental Authority or reasonably believed (based on advice of counsel) by Lender Agent or such Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Lender Agent's or such Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under this Agreement or the other Loan Documents or in connection with any Litigation relative to this Agreement or the other Loan Documents or the transactions related hereto or thereto to which Lender Agent or Lender is a party; or (f) that ceases to be confidential through no fault of Lender Agent or such Lender.  If Lender Agent or such Lender is required in any proceeding, by any court decree, subpoena or legal or administrative order or process, to disclose any such confidential information, Lender Agent or such Lender will use commercially reasonable efforts to give Borrowers and Credit Parties, as applicable, prompt written notice of such request so that Borrowers or Credit Parties may seek an appropriate protective order.  If in the absence of a protective order, Lender Agent or such Lender is compelled in a proceeding to disclose any such confidential information, Lender Agent or such Lender may disclose such portion of such confidential information that it is compelled to disclose; <u>provided</u>, however, that Lender Agent or such Lender shall use commercially reasonable efforts to provide Borrowers and Credit Parties, as applicable, written notice of the information to be disclosed as far in advance of its disclosure as is practicable.

11.11  <u>GOVERNING LAW</u>.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT AND IN ANY OF THE OTHER LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  BORROWERS AND CREDIT PARTIES AND LENDER EACH HEREBY CONSENT AND AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE STATE OF NEVADA, CLARK COUNTY, CITY OF LAS VEGAS, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN OR AMONG BORROWERS AND CREDIT PARTIES ON THE ONE HAND, AND LENDER ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; <u>PROVIDED</u>, THAT EACH LENDER, LENDER AGENT, EACH BORROWER AND EACH CREDIT PARTY ACKNOWLEDGE THAT ANY

CONFIDENTIAL                                                                                     SPCP_0000004391

APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF CLARK COUNTY, NEVADA; <u>PROVIDED</u> FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.  EACH BORROWER AND EACH CREDIT PARTY AND LENDER EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH BORROWER, EACH CREDIT PARTY, LENDER AGENT AND EACH LENDER HEREBY WAIVE ANY OBJECTION THAT ANY BORROWER OR ANY CREDIT PARTY, LENDER AGENT OR ANY LENDER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENT TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  EACH BORROWER, EACH CREDIT PARTY, LENDER AGENT AND EACH LENDER HEREBY AGREE THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE AT THE ADDRESSES SET FORTH IN <u>ANNEX D</u> OF THIS AGREEMENT.

11.12   <u>Notices</u>.  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered:  (a) upon the earlier of actual receipt or three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic transmission, telecopy or facsimile transmission (with such electronic transmission, telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this <u>Section 11.12</u> (Notices)); (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in Annex D (Notice Addresses) or to such other address (or facsimile number) as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrower's Representative or Lender) designated in <u>Annex D</u> (Notice Addresses) to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

11.13   <u>Section Titles</u>.  The Section titles and headings contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

11.14   <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

CONFIDENTIAL                                                                                          SPCP_0000004392

11.15  <u>WAIVER OF JURY TRIAL</u>.   BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG ANY LENDER, LENDER AGENT, ANY BORROWER AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.16  <u>Press Releases and Related Matters</u>.  Borrowers and Credit Parties agree that neither they nor their respective Affiliates will in the future issue any press releases or other public disclosure using the name of any Lender, Lender Agent or its Affiliates or referring to this Agreement, the other Loan Documents or the Related Transactions Documents without at least two (2) Business Days' prior written notice to Lender Agent and each Lender and without the prior written consent of Lender Agent and each Lender (which consent will not be unreasonably withheld) unless (and only to the extent that) Borrowers or Credit Parties or their respective Affiliate are required to do so under law, regulation or any applicable exchange rules or OTC bulletin board rules, then, in any event, Borrowers, Credit Parties or their respective Affiliates will use commercially reasonable efforts to consult with Lender Agent and each Lender before issuing such press release or other public disclosure.  Borrowers and Credit Parties consent to the publication by Lender Agent and each Lender of advertising material relating to the financing transactions contemplated by this Agreement using Borrower's and Credit Party's name, product photographs, logo or trademark, without the consent of Borrowers or Credit Parties.  Lender Agent and each Lender may provide to industry trade organizations information necessary and customary for inclusion in league table measurements unless such disclosure would violate or any applicable exchange rules or OTC bulletin board rules applicable to Borrowers.

11.17  <u>Reinstatement</u>.  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Borrowers or Credit Parties for liquidation or reorganization, or should Borrowers or Credit Parties become insolvent or make a general assignment for the benefit of any creditor or creditors, or should a receiver or trustee be appointed for all or any significant part of any Borrower's or any Credit Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

CONFIDENTIAL                                                                                    SPCP_0000004393

11.18   <u>Advice of Counsel</u>.   Each of the Borrowers and each of the Credit Parties represent to Lender Agent and the Lenders and Lender Agent and each Lender represent to said Borrowers and to said Credit Parties, that they have each discussed this Agreement and, specifically, the provisions of <u>Section 11.11</u> (Governing Law) and <u>Section 11.15</u> (Waiver of Jury Trial), with their legal counsel.

11.19   <u>No Strict Construction</u>.   The parties hereto have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

11.20   <u>Limitation on Each Borrower's and Each Credit Party's Liability</u>.   Anything to the contrary notwithstanding, if any Fraudulent Transfer Law is determined by a court of competent jurisdiction to be applicable to the obligation of any Borrower or any Credit Party under this Agreement or under any other Loan Documents, said obligations shall be limited to a maximum aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under said Fraudulent Transfer Laws, in each case after giving effect to all other liabilities of such Borrower and such Credit Party, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Borrower or such Credit Party in respect of intercompany indebtedness to any other Borrowers or Credit Parties or Affiliates of Borrowers or Credit Parties).

11.21   <u>Lender Agent</u>.

(a)   <u>Appointment of Lender Agent</u>.   Silver Point Finance, LLC, a Delaware limited liability company ("<u>Silver Point</u>"), is hereby appointed Lender Agent hereunder and under the other Loan Documents and each Lender hereby authorizes Silver Point to act as its agent in each such capacity in accordance with the terms hereof.   Lender Agent hereby agrees to act upon the express conditions contained herein and the other Loan Documents, as applicable.   The provisions of this section are solely for the benefit of the Lender Agent and each Lender and no Borrower or Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.   In performing its functions and duties hereunder, the Lender Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Borrowers, Credit Parties or any of their respective Subsidiaries.

(b)   <u>Powers and Duties</u>.   Each Lender authorizes the Lender Agent to take such action on each Lender's behalf and to exercise such powers, rights and remedies and perform such duties hereunder and under the other Loan Documents as are specifically delegated or granted to the Lender Agent by the terms hereof or otherwise agreed in writing by each Lender, together with such actions, powers, rights and remedies as are reasonably incidental thereto.   The Lender Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents.   The Lender Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.   The Lender Agent shall not have or be deemed to have, by reason hereof or any of the other Loan Documents, a fiduciary

CONFIDENTIAL                                                                 SPCP_0000004394

relationship in respect of each Lender; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Lender Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

(c)     <u>Successor Agent</u>.  The Lender Agent may assign its rights and duties as Lender Agent hereunder to an Affiliate of Silver Point without the prior written consent of, or prior written notice to, any Borrower, Credit Party or any Lender; <u>provided</u> that the Borrowers, Credit Parties and Lenders may deem and treat such assigning Lender Agent as the relevant Lender Agent for all purposes hereof, unless and until such the Lender Agent provides written notice to Borrowers, Credit Parties and Lenders of such assignment.  Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as the Lender Agent hereunder and under the other Loan Documents.  In addition, with the unanimous consent of all Lenders in the event there is more than one Lender hereunder, Lenders may remove the Lender Agent and appoint a successor Lender Agent without the consent of Borrowers, Credit Parties or the Lender Agent.

(d)     <u>Lenders under Security and Guaranty</u>.  Each Lender hereby further authorizes the Lender Agent, on behalf of and for the benefit of each Lender, to be the agent for and representative of each Lender with respect to the Guaranty, the Collateral and the Loan Documents related thereto.  With the written consent or authorization from each Lender, the Lender Agent may execute any documents or instruments necessary to (i) release or subordinate any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets or for the establishment of the A/R Facility by Borrowers that, in either case, is permitted by the Loan Documents and (ii) release any Guarantor from its guaranty if such release is permitted under the Loan Documents.  After the payment in full of the Obligations (other than indemnification Obligations), the Lender Agent shall, upon request of the Borrowers and the consent of each Lender (such consent not to be unreasonably withheld), take such actions as shall be required to promptly release the security interest in the Collateral and to promptly release each Guarantor from its guaranty under the Guaranty Agreements to which it is a party.

(e)     <u>Loan Document Provisions</u>.  For all purposes hereunder and under the other Loan Documents, any provision requiring any action, consent or vote of a "Lender" may be taken or given by the Lender Agent acting at the direction of the Lenders.

**12.     [Intentionally Omitted.]**

**13.     <u>SURETYSHIP WAIVERS</u>**

13.1     <u>Suretyship Waivers</u>.  Because Credit Parties are not direct borrowers from Lenders under this Agreement, although the Loans directly and indirectly benefit each Person comprising Borrowers and Credit Parties, it is possible that the Credit Parties could be construed as guarantors or sureties of Borrowers and of each other and thereby have certain rights and remedies accorded to them that were not intended to be available to any of them.  Accordingly, in order to induce the Lenders to provide the credit facilities and accommodations provided for herein, each Person which is a Borrower or a Credit Party for itself agrees as follows:

CONFIDENTIAL                                              SPCP_0000004395

(a)     Irrevocable Waivers.  The waivers provided in this section are intended to be irrevocable and to apply to all present and future Obligations of Borrowers and Credit Parties to Lenders, including those arising under successive transactions which shall either continue the Obligations, increase or decrease them, or from time to time, create new Obligations, after all or any prior Obligations have been satisfied, and notwithstanding the dissolution, liquidation or bankruptcy of Borrowers, Credit Parties, or Guarantors, of all or any portion of the Obligations, or other event or proceeding affecting Borrowers or Credit Parties or Guarantors of any portion of the Obligations.

(b)     Separate and Independent Obligations of Credit Parties.  The Obligations of Credit Parties hereunder are separate and independent of (i) Borrower's obligation to pay Lenders principal and interest under the Term Note and the other Obligations hereunder, and (ii) the liabilities and obligations of Credit Parties which are Guarantors.  A separate action or actions may be brought and prosecuted against Credit Parties whether or not any action is brought and prosecuted against Borrowers, and whether or not Credit Parties are joined in any such action or actions.  Borrowers and Credit Parties waive the benefit of any statute of limitations affecting the Obligations hereunder or the enforcement thereof.

(c)     Authority of Lenders.  Credit Parties and Guarantors hereby authorize Lenders, without notice or demand and without affecting their liability hereunder, from time to time to:  (i) amend, alter, restate, replace, modify, renew, extend, accelerate or otherwise change the time for payment or the terms of the Obligations with Borrowers, including increasing or decreasing the Interest Rate thereon or the principal amount thereof; (ii) accept partial payments on the Obligations from Borrowers or Guarantors; (iii) accept new or additional documents, instruments or agreements relative to the Obligations; (iv) take and hold security or additional guaranties for the payment of the Obligations, and amend, alter, exchange, substitute, transfer, enforce, waive, subordinate, terminate, modify and release in any manner any such security or guaranties; (v) apply such security and direct the order or manner of sale thereof as Lenders in their sole discretion may determine; (vi) release or substitute any Guarantor; (vii) settle, release on terms satisfactory to Lenders (or by operation of law or otherwise), compound, compromise, collect or otherwise liquidate any indebtedness or security in any manner, consent to the transfer of security and bid and purchase at any sale, without affecting or impairing the Obligations of Borrowers or Credit Parties or Guarantors hereunder; or (viii) enforce any other right or remedy granted to Lenders under this Agreement or under any of the other Loan Documents or under any Guaranty Agreement.  No action which Lenders shall take or fail to take in connection with this Agreement or any of the Loan Documents, or any of them, or any security for the Obligations or other undertakings of Borrowers, nor any course of dealing with Borrowers or Credit Parties or Guarantors, or any course of dealing with any other person or legal entity, shall release Borrower's Obligations or Credit Party's or Guarantor's responsibilities hereunder, shall affect this Agreement or the other Loan Documents in any way, or afford Borrowers or Credit Parties or Guarantors any recourse against Lenders.  Without limiting the generality of the foregoing, Borrowers agree that this Agreement shall extend and be applicable to each new or replacement Note delivered by Borrowers pursuant thereto without notice to or further consent from Credit Parties or Guarantors.

(d)     Waiver of Rights Against Lenders.  Borrowers and Credit Parties and Guarantors waive any right to require Lenders to:   (i) proceed against Borrowers, against

CONFIDENTIAL                                                                  SPCP_0000004396

Guarantors, against Credit Parties, or against anyone else; (ii) proceed against or exhaust any security for the Obligations, or to marshal assets or to marshal assets of any Person in any particular order; (iii) except as required by applicable law, give notice of the terms, time and place of any public or private sale of any real or personalty securing the Obligations; or (iv) pursue any other remedy in such Lender's power whatsoever.  Each Person which is a Borrower, Guarantor, or a Credit Party waives any defense arising by reason of any disability or other defense of Borrowers, Guarantors, or Credit Parties, or by reason of the cessation from any cause whatsoever of the liability of Borrowers, Guarantors, or Credit Parties, or by reason of any act or omission of Lenders or other Persons which directly or indirectly results in or aids the discharge or release of Borrowers, Guarantors, or Credit Parties, or any of the Obligations or any security therefor by operation of law or otherwise, or by reason of the amendment, modification, renewal, extension or other change in any of the Obligations.  Borrowers, Credit Parties and Guarantors waive all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Agreement and of the existence, creation, or incurring of new or additional Obligations, and all other notices and demands of any kind and description now or hereafter provided for by any statute or rule of law, except for such notices and demands as specifically required by this Agreement.  Borrowers, Guarantors, and Credit Parties expressly waive any right whatsoever to, or right whatsoever to participate in, any security now or hereafter held by Lenders, reimbursement, indemnity, exoneration, contribution or any other claim under local, state or federal law, including, without limitation, 11 U.S.C. 547, which it may now or hereafter have against Borrowers, Guarantors, or Credit Parties, or any other Person directly or contingently liable for the Obligations, or against or with respect to Borrower's or Credit Party's or Guarantor's property (including, without limitation, any Collateral under any of the Loan Documents) arising from the existence or performance of this Agreement until all of the Obligations have been indefeasibly paid or satisfied in full.

(e)     Representations and Warranties.  Borrowers, Guarantors, and Credit Parties represent and warrant to each Lender that:  (i) this Agreement is executed at each Borrower's, each Guarantor's, and each Credit Party's request; (ii) Guarantors, and Credit Parties have each established adequate means of obtaining from Borrowers on a continuing basis financial and other information pertaining to Borrower's Business and Borrower's financial condition; and (iii) Guarantors and Credit Parties are now and will be completely familiar with the Business, operation and financial condition of Borrowers and its assets and of its Business.  Borrowers, Guarantors and Credit Parties hereby waive and relinquish any duty on the part of Lender to disclose to any of said parties any matter, fact or thing relating to the Business, operation or financial condition of Borrowers and their respective assets now known or hereafter known by any Lender during the term of this Agreement.  With respect to any present or future Obligations of Borrowers to any Lender, such Lender need not inquire into the authority of Borrowers, and any Obligations made or created in reliance upon the professed exercise of such powers.

(f)     No Set-Off, Counterclaim, Etc.  So long as any of the Obligations under this Agreement remain unpaid or undischarged, neither Guarantors nor Credit Parties will, by paying any sum recoverable hereunder (whether or not demanded by Lenders) or by any means or on any other ground, (i) claim any set-off or counterclaim against Borrowers, Guarantors, or Credit Parties in respect of any Obligations or other indebtedness by virtue of the right of

**JAE 0094**

CONFIDENTIAL                                                                      SPCP_0000004397

subrogation, by operation of law or otherwise; (ii) in any proceedings under federal bankruptcy law or insolvency proceedings of any nature, assert its rights in competition with Lender in respect of any payment hereunder because of any claims which Guarantors or Credit Parties may have against Borrowers or any other Person; or (iii) be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of Borrowers, Guarantors, or Credit Parties or other Person, or the benefit of any of any other security for any Obligation which, now or hereafter, Lenders may hold or in which it may have any share or interest.

13.2    <u>Election of Remedies</u>.  If Lenders may, under Applicable Laws, proceed to realize its benefits under any of the Loan Documents granting a Lien upon any Collateral, whether owned by Borrowers or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, such Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this <u>Section 13</u> (Suretyship Waivers).  If, in the exercise of any of its rights and remedies, such Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against Borrowers or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, Borrowers hereby consent to such action by such Lender and waive any claim based upon such action, even if such action by such Lender shall result in a full or partial loss of any rights of subrogation that Borrowers might otherwise have had but for such action by such Lender. Any election of remedies that results in the denial or impairment of the right of Lenders to seek a deficiency judgment against Borrowers shall not impair Guarantor's or Credit Party's obligations to pay the full amount of the Obligations applicable to it.  In the event Lenders shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Lenders may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by Lenders but shall be credited against the Obligations.

*[Signature Page Follows]*

CONFIDENTIAL

**JAE 0095**

SPCP_0000004398

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized representatives as of the date first above written.

**LENDERS:**

SPCP Group, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**LENDER AGENT:**

SILVER POINT FINANCE, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE CONTINUES]

**JAE 0096**

CONFIDENTIAL

SPCP_0000004399

**BORROWERS:**

INTEGRATED   HEALTHCARE   HOLDINGS, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

WMC-A, INC., a California corporation

By: _____
Name: _____
Title: _____

WMC-SA, INC., a California corporation

By: _____
Name: _____
Title: _____

COASTAL  COMMUNITIES  HOSPITAL, INC., a California corporation

By: _____
Name: _____
Title: _____

CHAPMAN   MEDICAL   CENTER,   INC.,   a California corporation

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE CONTINUES]

#4830-9595-3170v19

CONFIDENTIAL

SPCP_0000004400

**CREDIT PARTIES:**

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

GANESHA REALTY, LLC, a California limited liability company

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE CONTINUES]

#4830-9595-3170v19

CONFIDENTIAL

SPCP_0000004401

ANNEX A
TO
AMENDED AND RESTATED
CREDIT AGREEMENT ($47,277,000 Term Note)

### DEFINITIONS

Initially capitalized terms used in this Agreement shall (unless otherwise provided elsewhere in the Loan Documents) have the following respective meanings. All references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to sections, Exhibits, Schedules or Annexes of or to this Credit Agreement:

"**Absolute Assignment**" means each of the following:

(a)     the Absolute Assignment of Leases and Rents With License Back re Western Medical Center - Anaheim, dated as of the Closing Date, by and among Closing Date Lender, PCHI and WMC-A in the form of Exhibit "F" attached hereto;

(b)     the Absolute Assignment of Leases and Rents With License Back re Western Medical Center — Santa Ana, dated as of the Closing Date, by and among Closing Date Lender, PCHI and WMC-SA in the form of Exhibit "F" attached hereto;

(c)     the Absolute Assignment of Leases and Rents With License Back re Coastal Communities Hospital, dated as of the Closing Date, by and among Closing Date Lender, PCHI and Coastal in the form of Exhibit "F" attached hereto;

(d)     the Absolute Assignment of Leases and Rents With License Back re Chapman MOB Lease, dated as of the Closing Date, by and among Closing Date Lender and IHHI in the form of Exhibit "F" attached hereto; and

(e)     the Absolute Assignment of Leases and Rents With License Back re Chapman Hospital Lease, dated as of the Closing Date, by and among Closing Date Lender and IHHI in the form of Exhibit "F" attached hereto.

"**Accounts**" means (i) the right to receive payment of rent, occupancy payments and other similar payments due and owing by any Person using or occupying space in any real property owned or leased by Borrowers, plus (ii) the future right to receive payment of any monetary obligations, whether or not earned by performance, now or hereafter existing, arising under or in relation to each Borrower's Business.

"**Advance**" means any advance of funds under the Loans.

"**Affiliate**" means, with respect to any Person (excluding Lender), (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 10% or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers and partners, and (d) in the case of Borrowers, the immediate family members, spouses and lineal descendants of individuals

**JAE 0099**

CONFIDENTIAL                                                                                 SPCP_0000004402

who are Affiliates of Borrowers.  For the purposes of this definition, "**control**" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Amended and Restated Credit Agreement by and among Borrowers, Credit Parties, Guarantors, Lenders, and Lender Agent, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Amendment and Restatement Agreement**" means the Amendment and Restatement to the Credit Agreement dated as of February 7, 2013 (and as amended, restated or otherwise modified from time to time) among Borrowers, Ganesha, PCHI, SPCP Group IV, LLC, Lenders and Lender Agent.

"**Amendment No. 3 Effective Date**" means April 13, 2010.

"**Annexes**" means, together, Annex A (Definitions), Annex B (Cash Management System), Annex C (Collateral Reports) and Annex D (Notice Addresses) attached to this Agreement.

"**Applicable Laws**" means all federal, state and local laws, statutes, codes, regulations, rules, acts, ordinances of all Governmental Authorities, departments, commissions, boards, courts, authorities, agencies, officials and officers, including without limitation, Environmental Laws, all building, safety, health, use laws, the Fair Labor Standards Act, 29 U.S.C. §§201 et seq., the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. Section 18a, the Worker Adjustment and Retraining Notification Act, 29 U.S.C. 2101, et seq., as amended, and the California version of the WARN Act, and any deed restrictions or other requirements of record applicable to the Collateral or to Borrowers or Credit Parties, or to their respective businesses.

"**Appraisal**" means an appraisal of the Properties prepared by Marshall & Stevens, M.A.I.

"**Appraised Value**" means the fair market value of the Properties as set forth in the Appraisal.

"**A/R Facility**" means (a) the Credit and Security Agreement, dated as of or about August 30, 2010, among MidCap Financial, LLC, as administrative agent and a lender, the Borrowers and the other parties thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time or (b) any Permitted Refinancing thereof.

"**A/R Facility Closing Date**" means (a) August 30, 2010 or (b) with respect to any Permitted Refinancing of the A/R Facility, the closing date of such facility.

"**A/R Facility Collateral**" means the "Revolving Collateral" as such term is defined in the A/R Facility Intercreditor Agreement.

CONFIDENTIAL

**JAE 0100**

SPCP_0000004403

"**A/R Facility Intercreditor Agreement**" means (a) the Intercreditor Agreement, dated as of or about August 30, 2010, among MidCap Financial, LLC, the Lender Agent, the Borrowers and the Credit Parties, as amended, restated, supplemented or otherwise modified from time to time subject to the terms and conditions of the A/R Facility Intercreditor Agreement and (b) any intercreditor or subordination documentation entered with respect to any replacement A/R Facility in form reasonably agreed to by Lender Agent and substantially consistent with the A/R Facility Intercreditor Agreement referred to in clause (a) of this definition.

"**A/R Facility Lender Agent**" means the Agent as defined in the A/R Facility.

"**A/R Facility Liens**" means a first and prior assignment of and security interest in the A/R Facility Collateral and the proceeds and products thereof.

"**Authorized Individual**" has the meaning ascribed to it in Section 1.5(g).

"**Bank**" means Wells Fargo Bank, N.A., located at 2030 Main Street, Suite 900, Irvine, California 92614.

"**Bankruptcy Code**" means the provisions of Title 11 of the United States Code, 11 U.S.C. §101 et seq.

"**Borrowers**" means IHHI, WMC-A, WMC-SA, Chapman and Coastal.

"**Borrower's Representative**" means an Authorized Individual at the address of IHHI, or any replacement therefor approved by Lender as required by this Agreement.

"**Business**" means the business of Borrowers as defined in the Recitals set forth above.

"**Business Day**" means each day of the year that is not a Saturday or Sunday and which day (a) is not a day on which federally-chartered banking institutions in New York, New York are required to close, and (b) is a not a regularly scheduled holiday in the state of New York or in the United States.

"**Capital Expenditure(s)**" means, with respect to any Person, all expenditures (by the expenditure of cash or the incurrence of Indebtedness) by such Person during any measuring period for any fixed assets or improvements or for replacements, substitutions or additions thereto that have a useful life of more than one year and that are required to be capitalized under GAAP.

"**Capital Lease**" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"**Capital Lease Obligation**" means, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

CONFIDENTIAL                                                                      SPCP_0000004404

"**Cash Collateral Account**" has the meaning ascribed to it Annex B (Cash Management System).

"**Cash Management System**" means the cash management system described in Annex B (Cash Management System).

"**Certified Cash**" means the net amount of Dollars in unrestricted cash and cash equivalents of Borrowers that is/are in Deposit Accounts or securities accounts maintained by a branch of a bank or securities intermediary within the United States and which are identified in Disclosure Schedule 3.18 (Deposit and Disbursement Accounts), as updated by Borrowers from time to time, as Certified Cash Accounts, which Certified Cash Accounts are not subject to any Liens, statutory liens or rights of offset, any overdraft, or any other charge or priority in favor of any Person other than Lender or, for any Deposit Account or securities account, the rights of the applicable bank or securities intermediary maintaining such Deposit Account or securities account with respect to customary account charges relating thereto (provided, that any amounts subject to any such rights in favor of any such bank or securities intermediary shall be excluded from Certified Cash for purposes of calculation of the amount thereof).  For the avoidance of any doubt, the amount of Borrowers' marketable securities and Qualified Cash at the time of any determination shall be deemed to constitute Certified Cash but only to the extent they are not subject to any Liens, statutory liens or rights of offset, any overdraft, or any other charge or priority in favor of any Person other than Lender.

"**Change of Control**" means that any of the following have occurred:  (a) Kali P. Chaudhuri, M.D. and his Affiliates no longer beneficially own a majority of the outstanding shares (and/or securities readily convertible into or exercisable for shares) of Voting Stock on a fully diluted basis of IHHI; or (b) during any period of twelve (12) consecutive calendar months, Persons who at the beginning of such period constituted the majority of the board of directors of any Borrower or the majority of the managers of PCHI (together with any new Person whose nomination or election or appointment was approved by the required vote of the shareholders or members) cease for any reason (other than death or personal disability) to constitute a majority of the board of directors of any Borrower or the majority of the managers of PCHI; or (c) IHHI ceases to own, directly or indirectly, and control, all (100%) of the Stock of WMC-A, WMC-SA, Chapman and Coastal; or (d) Kenneth K. Westbrook ceases to be Chief Executive Officer or Director of IHHI, or WMC-A, or WMC-SA, or Chapman, or Coastal, and a replacement Chief Executive Officer acceptable to Lender in its sole discretion is not employed by the applicable Borrower within thirty (30) calendar days after the date that Kenneth K. Westbrook is no longer Chief Executive Office or Director of IHHI, or WMC-A, or WMC-SA, or Chapman, or Coastal; (e) Ganesha ceases to own, directly or indirectly, at least 49% of the membership interests of PCHI or any other Person (other than any entity the shareholders and shareholdings of which are substantially the same as the non-Ganesha shareholders and shareholdings of PCHI on the Amendment No. 3 Effective Date) and its Affiliates owns, directly or indirectly, a greater percentage of membership interests of PCHI than Ganesha; or (f) Kali P. Chaudhuri, M.D. ceases to own, directly or indirectly, a majority of the outstanding Voting Stock of Ganesha. Notwithstanding the foregoing, a Change of Control shall not occur as a result of the exercise by Kali P. Chaudhuri, M.D., SPCP Group IV, LLC, SPCP Group, LLC or their respective Affiliates or designees or assigns of the warrants issued by IHHI to Kali P. Chaudhuri, M.D., KPC Resolution Company, LLC (so long as it is controlled by Kali P. Chaudhuri, M.D.), SPCP Group

CONFIDENTIAL                                                    SPCP_0000004405

IV, LLC, and SPCP Group, LLC or their respective designees or assigns on the Amendment No. 3 Effective Date.

"**Chapman**" means Chapman Medical Center, Inc., a California corporation.

"**Chapman Leases**" means each of the following:

(a)     That certain lease agreement dated December 31, 1984, by and between Chapman Medical, L.P., a California limited partnership, successor-in-interest to Chapman Investments Associates, a California limited liability company, successor-in-interest to James L, Kirby, Successor Trustee of the Taggart Land Trust dated December 29, 1977, Fred D. Pierce, Trustee of the Stanford Land Trust dated December 29, 1977, Lawrence A. Johnson, Trustee of the Oxford Land Trust dated December 29, 1977, James L. Kirby, Successor Co-Trustee of the Cayuga Land Trust dated December 29, 1977, Melia Harper Long, Successor Co-Trustee of the Cayuga Land Trust dated December 29, 1977, and Mattison James Harper, Successor Co-Trustee of the Cayuga Land Trust dated December 29, 1977, as tenants in common doing business under the fictitious name Chapman Investment Associates (collectively, "**Hospital Landlord**"), and Chapman General Hospital, Inc., a California corporation, as the initial Tenant thereunder (the "**Hospital Tenant**").  Said lease agreement was amended by a First Amendment dated April 8, 1985, by a Second Amendment dated April 1, 1989, by a Third Amendment dated November 5, 1990 and by a Fourth Amendment dated August 25, 1994.  Said lease, as amended by the First, Second, Third and Fourth Amendments, shall collectively hereinafter be referred to as the "**Chapman Hospital Lease.**" The 2601 East Chapman Hospital Lease encumbers the real property and hospital improvements commonly described as and located at 2601 East Chapman Avenue, Orange, California.  A memorandum of the Chapman Hospital Lease was recorded on August 30, 1994 as Instrument No. 94-0533295 of the Official Records of the Office of the County Recorder of the County of Orange, State of California.  Hospital Tenant's interest in the Chapman Hospital Lease was assigned and transferred to IHHI on March 5, 2005.

(b)     That certain lease agreement dated December 31, 1984 by and between Chapman Medical, L.P., a California limited partnership, successor-in-interest to Chapman Investments Associates, a California limited liability company, successor-in-interest to James L, Kirby, Successor Trustee of the Taggart Land Trust dated December 29, 1977, Fred D. Pierce, Trustee of the Stanford Land Trust dated December 29, 1977, Lawrence A. Johnson, Trustee of the Oxford Land Trust dated December 29, 1977, James L. Kirby, Successor Co-Trustee of the Cayuga Land Trust dated December 29, 1977, Melia Harper Long, Successor Co-Trustee of the Cayuga Land Trust dated December 29, 1977, and Mattison James Harper, Successor Co-Trustee of the Cayuga Land Trust dated December 29, 1977, as tenants in common doing business under the fictitious name Chapman Investment Associates (collectively, "**MOB Landlord**") and Greatwest Medical Management, Inc., a California corporation, as the initial Tenant (the "**MOB Tenant**").  Said lease agreement was amended by a First Amendment dated April 8, 1985, and by a Second Amendment dated August 25, 1994.  Said lease agreement, as amended by the First Amendment and Second Amendment, shall collectively hereinafter be referred to as the "**Chapman MOB Lease.**" The 2617 East Chapman MOB Lease encumbers the medical office building premises commonly described as and located at 2617 East Chapman Avenue, Orange, California.  A memorandum of the Chapman MOB Lease was recorded on August 30, 1994 as Instrument No. 94-0533296 of the Official Records of the Office of the County Recorder of the

CONFIDENTIAL                                                    SPCP_0000004406

County of Orange, State of California. MOB Tenant's interest in the Chapman MOB Lease was assigned and transferred to IHHI on March 5, 2005.

"**Chapman Medical Center**" means the real property and hospital improvements located at 2601 East Chapman Avenue, Orange, California, and the real property and medical office building improvements located at 2617 East Chapman Avenue, Orange, California.

"**Charges**" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any of Borrowers or any of the Credit Parties, (d) the use of any real property owned or leased by Borrowers or Credit Parties (other than Ganesha and OC-PIN), or (e) any other aspect of the Business of Borrowers or the business of Credit Parties (other than Ganesha and OC-PIN).

"**Chattel Paper**" means any chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by Borrowers or Credit Parties.

"**Closing Date**" means October 9, 2007.

"**Closing Date Lender**" means Medical Provider Financial Corporation II, a Nevada Corporation.

"**Closing and Funding Checklist**" means the closing and funding checklist prepared by Closing Date Lender listing certain documents and information to be delivered in connection with the closing of the Original Credit Agreement and the other Loan Documents and the transactions contemplated thereunder, as described in <u>Annex C</u> (Collateral Reports).

"**Coastal**" means Coastal Communities Hospital, Inc., a California corporation.

"**Coastal Communities Hospital**" means the real property and hospital improvements located at 2701 South Bristol Street and 1901 and 1905 North College Avenue, Santa Ana, California.

"**Code**" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Nevada; <u>provided</u>, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in such Article or Division shall govern; and <u>provided</u> further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender or any Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Nevada, the term "**Code**" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**Collateral**" means the following:

CONFIDENTIAL

(a)     all of each Borrower's tangible personal property, including without limitation all present and future Inventory and Equipment (including items of equipment which are or become Fixtures), now owned or hereafter acquired;

(b)     all of each Borrower's intangible personal property and interests in personal property, including without limitation all present and future Accounts, contract rights, Permits, General Intangibles, Chattel Paper, Documents, Instruments, Deposit Accounts, Investment Property, Supporting Obligations, rights to the payment of money or other forms of consideration of any kind, tax refunds, insurance proceeds, now owned or hereafter acquired, and all intangible and tangible personal property relating to or arising out of any of the foregoing;

(c)     all of each Borrower's Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, now or hereafter owned or acquired by such Borrower; provided, however, that Lender shall not have a Lien in any rights under any Government Contract of any Borrower or in the related Government Account where the taking of such security interest is a violation of an express prohibition contained in the Government Contract (for purposes of this limitation, the fact that a Government Contract is subject to, or otherwise refers to, Title 31, § 203 or Title 41, §15 of the United States Code shall not be deemed an express prohibition against assignment thereof) or is prohibited by applicable law, unless in any case consent is otherwise validly obtained;

(d)     PCHI's fee simple interest in the Western Medical Center - Anaheim, in the Western Medical Center – Santa Ana, and in the Coastal Communities Hospital;

(e)     IHHI's interest, as tenant, in the Triple Net Lease of the Western Medical Center — Anaheim, the Western Medical Center — Santa Ana, and the Coastal Communities Hospital;

(f)     IHHI's interest, as sublandlord, in the sublease of the Western Medical Center - Anaheim to WMC-A, in the sublease of the Western Medical Center - Santa Ana to WMC-SA, and in the sublease of the Coastal Communities Hospital to Coastal;

(g)     IHHI's interest, as MOB Tenant, in the Chapman MOB Lease;

(h)     IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease; and

(i)     any and all additions and accessions to any of the foregoing, and any and all replacements, products and proceeds (including insurance proceeds) of any of the foregoing.

"**Collateral Assignment**" means each of the following:

(a)     the Collateral Assignment of Contracts re Western Medical Center — Anaheim, dated as of the Closing Date, by and among Closing Date Lender, IHHI and WMC-A in the form of Exhibit "H" attached hereto;

(b)     the Collateral Assignment of Contracts re Western Medical Center — Santa Ana, dated as of the Closing Date, by and among Closing Date Lender, IHHI and WMC-SA in the form of Exhibit "H" attached hereto;

CONFIDENTIAL                                                                          SPCP_0000004408

(c)       the Collateral Assignment of Contracts re Coastal Communities Hospital, dated as of the Closing Date, by and among Closing Date Lender, IHHI and Coastal in the form of <u>Exhibit "H"</u> attached hereto;

(d)       the Collateral Assignment of Contracts re Chapman MOB Lease, dated as of the Closing Date, by and among Closing Date Lender  and IHHI in the form of <u>Exhibit "H"</u> attached hereto; and

(e)       the Collateral Assignment of Contracts re Chapman Hospital Lease, dated as of the Closing Date, by and among Closing Date Lender  and IHHI in the form of <u>Exhibit "H"</u> attached hereto.

"**Collateral Documents**" means the $80,000,000 Deeds of Trust, the Absolute Assignments, the Collateral Assignment, the Security Agreement, the Pledge Agreement, the Stock Power, the IP Security Agreement, the UCC-1 Financing Statements, and all similar agreements, documents and instruments entered into guaranteeing payment of, or granting a Lien upon, real and personal property (and interests in real and personal property), and perfecting the Liens, as security for payment of, the Obligations.

"**Collateral Reports**" means the reports with respect to the Collateral referred to in <u>Annex C</u> (Collateral Reports).

"**Contracts**" means all contracts as such term is defined in the Code, now owned or hereafter acquired by any of Borrowers, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any of the Borrowers may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Accounts.

"**Control Agreement**" means prior to April 13, 2010, the Control Agreement dated as of the Closing Date, by and among Closing Date Lender, Borrowers and Bank in the form of <u>Exhibit "J"</u> attached hereto.

"**Copyright License**" means any and all rights now owned or hereafter acquired by any of the Borrowers under any written agreement granting any right to use any Copyright or Copyright registration.

"**Copyrights**" means all of the following now owned or hereafter adopted or acquired by any of the Borrowers or any of the Credit Parties:  (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"**Credit Parties**" means PCHI, OC-PIN and Ganesha, and their respective successors and assigns.

CONFIDENTIAL                                                                                                    SPCP_0000004409

"**Default**" means any event that, with the passage of time or notice or both, would, unless cured or waived in writing by Lender, become an Event of Default.

"**Default Rate**" means a rate of interest which is five percent (5%) per annum above the Interest Rate per annum otherwise applicable to the Loan.

"**Deposit Accounts**" means all deposit accounts as such term is defined in the Code, now or hereafter held in the name of any of the Borrowers.

"**Deposit Account Security Agreement**" means that certain Deposit Account Security Agreement dated as of the Closing Date, by and among the Closing Date Lender and Borrowers in the form of Exhibit "I" attached hereto.

"**Disbursement Accounts**" has the meaning ascribed to it in Annex B (Cash Management System).

"**Disclosure Schedules**" means the Schedules prepared by Borrowers and denominated as Disclosure Schedules 2.1(b) through 6.7 to this Agreement.

"**Documents**" means all documents, as such term is defined in the Code, now owned or hereafter acquired by any of Borrowers, wherever located.

"**Dollars**" or "**$**" means lawful currency of the United States of America.

"**Dr. Shah**" means Anil V. Shah, M.D., an individual.

"**$10,700,000 Credit Agreement**" has the meaning ascribed to it in the Recitals.

"**$35,000,000 Non-Revolving Line of Credit Loan**" means the $35,000,000 non-revolving line of credit loan made by Closing Date Lender to Borrowers pursuant to the Original Credit Agreement.

"**$50,000,000 Credit Agreement**" has the meaning ascribed to it in the Recitals.

"**$80,000,000 Deed of Trust**" means each of the following:

> (a)     the Deed of Trust With Assignment of Rents and Fixture Filing re Western Medical Center - Anaheim, dated as of the Closing Date, executed by PCHI in favor of Closing Date Lender in the form of Exhibit "E" attached hereto;

> (b)     the Deed of Trust With Assignment of Rents and Fixture Filing re Western Medical Center - Santa Ana, dated as of the Closing Date, executed by PCHI in favor of Closing Date Lender in the form of Exhibit "E" attached hereto;

> (c)     the Deed of Trust With Assignment of Rents and Fixture Filing re Coastal Communities Hospital, dated as of the Closing Date, executed by PCHI in favor of Closing Date Lender in the form of Exhibit "E" attached hereto;

CONFIDENTIAL                    SPCP_0000004410

(d)     the Deed of Trust With Assignment of Rents and Fixture Filing re Chapman MOB Lease, dated as of the Closing Date, executed by IHHI in favor of Closing Date Lender in the form of Exhibit "E" attached hereto; and

(e)     the Deed of Trust With Assignment of Rents and Fixture Filing re Chapman Hospital Lease, dated as of the Closing Date, executed by IHHI in favor of Closing Date Lender in the form of Exhibit "E" attached hereto.

"**Effective Date**" means October 9, 2007.

"**Environmental Indemnity Agreement**" means an Environmental Indemnity Agreement dated as of the Closing Date, by and between Borrowers, Credit Parties (other than Ganesha) and Closing Date Lender, in the form of Exhibit "M" attached hereto.

"**Environmental Laws**" means all federal, state and local health, safety, environmental or natural resource laws, statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, authorizations, concessions, franchises and similar items of all federal, state, county, municipal, or other governmental, quasi-governmental, regulatory or administrative authority, agency, board, court, arbitrator, body, instrumentality, commission or other judicial body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to Governmental Authority having jurisdiction, including, without limitation all statutes referred to by name in the definition of Hazardous Materials; and all other state, federal, and local laws, regulations, rules, ordinances and orders which govern:  (i) the existence, cleanup and/or remedy of contamination on real property and improvements; (ii) the emission or discharge of Hazardous Materials into the environment; (iii) the control of Hazardous Materials; (iv) the use, generation, transport, treatment, storage, disposal, removal, or recovery of Hazardous Materials; as well as all applicable judicial and administrative and regulatory decrees, judgments or orders (including without limitation the common law) and all applicable covenants running with the land that relate to the protection of health, safety, environment or natural resources.

"**Environmental Liabilities**" means, with respect to any Person, all environmental liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"**Environmental Losses**" means any and all losses (including diminution in value of a Property), liabilities, damages, demands, claims, actions, judgments, causes of action, assessments, penalties, costs and expenses (including sums paid in settlement of claims), liens, interest, fines or penalties, including without limitation, the fees and disbursements of outside counsel, paralegals and accountants, consultant fees, expert fees, all foreseeable and

CONFIDENTIAL

unforeseeable consequential damages, and all other costs and expenses of any kind or nature, which are suffered or incurred by Lender with respect to a Property or adjacent real property or improvements arising out of or as a result of (i) the occurrence of any Hazardous Material Activity; (ii) any violation of any Environmental Laws or Applicable Laws; (iii) any investigation, inquiry, order, hearing, action, or other proceeding by or before any Governmental Authority in connection with any Hazardous Material Activity; (iv) any Hazardous Material Claims brought, asserted, or alleged against Lender or against any of Lender's directors, officers, shareholders, employees, attorneys, or agents; (v) any actions taken by Lender to enter and inspect a Property pursuant to the rights granted Lender under this Agreement and the other Loan Documents; and (vi) any misrepresentation or inaccuracy in any representation or warranty by any Borrower or any Credit Party or any material breach or failure to perform any covenants or obligations by any Borrower or any Credit Party pursuant to this Agreement relating to environmental matters.

"**Environmental Permits**" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"**Equipment**" means all equipment, as such term is defined in the Code, now owned or hereafter acquired by Borrowers, wherever located.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any other Person, are treated as a single employer within the meaning of Sections 414(b), (c), (m) or (o) of the IRC.

"**ERISA Event**" means (a) with respect to a Title IV Plan, any event described in Section 4043(c) of ERISA for which notice to the PBGC has not been waived; (b) the withdrawal of Borrowers or any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2( of ERISA; (c) the complete or partial withdrawal of Borrowers or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan in a distress termination described in Section 4041 (c) of ERISA or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) with respect to a Title IV Plan, the existence of an "accumulated funding deficiency" (as defined in Section 412 of the IRC or Section 302 of ERISA) whether or not waived, or the failure to make by its due date a required installment under Section 412(m) of the Code or the failure to make any required contribution to a Multiemployer Plan; (g) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to a Title IV Plan; (h) the making of any amendment to any Title IV Plan which could result in the imposition of a lien or the posting of a bond or other security; (i) with respect to a Title IV Plan an event described in Section 4062(e) of ERISA; (j) any other event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the

CONFIDENTIAL                                                      SPCP_0000004412

imposition of liability under Section 4069 or 4212(c) of ERISA; (k) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (1) the loss of a Qualified Plan's qualification or tax exempt status; or (m) the termination of a Plan described in Section 4064 of ERISA.

"**Escrow**" means an escrow account established by the Escrow Company.

"**Escrow Company**" means Chicago Title Insurance Company, Commercial/Industrial, 700 South Flower Street, Suite 800, Los Angeles, California 90017, Attn: Patricia M. Schlageck ("**Sr. Commercial Escrow Officer**"), telephone: 213-488-4358; facsimile: 213-612-4138; email: patricia.schlageck@ctt.com.

"**Escrow Holder**" means Escrow Company.

"**Event of Default**" means that Borrowers and/or Credit Parties have committed one or more of the events described in <u>Section 8.1</u> (Events of Default) of this Agreement.

"**Exhibits**" means any of <u>Exhibits "A" through "T"</u> attached to this Agreement.

"**Existing Real Estate Term Loans**" means the $47,277,000 real estate term loan made by Lenders to Borrowers outstanding as of the Restatement Effective Date.

"**Existing Real Estate Term Note**" means, collectively, promissory notes dated as of the Closing Date, in the aggregate principal amount of $45,000,000, executed by Borrowers in favor of Closing Date Lender pursuant to the Original Credit Agreement.

"**Financial Statements**" means the consolidated income statements, statements of cash flows and balance sheets of each of the Borrowers delivered in accordance with <u>Section 3.4</u> (Financial Statements and Projections) of this Agreement.

"**First Credit Agreement**" means that certain Credit Agreement dated to be effective as of March 3, 2005, by and between Borrowers, Credit Parties and Closing Date Lender. Pursuant to the First Credit Agreement, Closing Date Lender made available to Borrowers the Previous $50,000,000 Acquisition Loan and the Previous $30,000,000 Line of Credit Loan.

"**Fiscal Month**" means any of the monthly accounting periods of Borrowers.

"**Fiscal Quarter**" means any of the quarterly accounting periods of Borrowers, ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means any of the annual accounting periods of Borrowers ending on March 31 of each year.

"**Fixtures**" means all fixtures as such term is defined in the Code, now owned or hereafter acquired by Borrowers or Credit Parties.

CONFIDENTIAL                                                  SPCP_0000004413

"**Fraudulent Transfer Law**" means Section 548 of Title 11 of the United States Code or any applicable provisions of comparable state law.

"**Funded Debt**" means, with respect to any Person, without duplication, all Indebtedness for borrowed money evidenced by notes, bonds, debentures, or similar evidences of Indebtedness and that by its terms matures more than one year from, or is directly or indirectly renewable or extendible at such Person's option under a line of credit or similar agreement obligating the lender or lenders to extend credit over a period of more than one year from the date of creation thereof, and specifically including Capital Lease Obligations, current maturities of long term debt, lines of credit and short term debt extendible beyond one year at the option of the debtor, and also including, in the case of Borrowers, the Obligations and, without duplication, Guaranteed Indebtedness consisting of guaranties of Funded Debt of other Persons.

"**GAAP**" means, as to a particular Person, such accounting practice as, in the opinion of the independent accountants regularly retained by such Person, conforms at the time to Generally Accepted Accounting Principles, consistently applied.

"**Generally Accepted Accounting Principles**" means those principles and practices in the United States of America (a) which are recognized as such by the Financial Accounting Standards Board, (b) which are applied for all periods after the date hereof in a manner consistent with the manner in which such principles and practices were applied to the most recent Financial Statements furnished Lender of the relevant Person, and (c) which are consistently applied for all periods after the date hereof so as to reflect properly the financial condition, and results of operations and changes in financial position, of such Person.  If any change in any accounting principle or practice is required by the Financial Accounting Standards Board in order for such principle or practice to continue as a Generally Accepted Account Principle or practice, all reports and Financial Statements required hereunder shall be prepared in accordance with such changes.

"**Ganesha**" means Ganesha Realty, LLC, a California limited liability company.

"**General Intangibles**" means all general intangibles, as such term is defined in the Code, now owned or hereafter acquired by Borrowers, including all right, title and interest that Borrowers may now or hereafter have in or under any Contract, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefore and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all uncarned premiums), uncertificated securities, choices in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment

CONFIDENTIAL                                                                 SPCP_0000004414

Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the control of Borrowers or any computer bureau or service company from time to time acting for Borrowers.

"**Goods**" means all goods as defined in the Code, now owned or hereafter acquired by Borrowers, wherever located, including embedded software to the extent included in goods as defined in the Code.

"**Governmental Authority**" means any nation or government, any state, county, city, or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Guaranteed Indebtedness**" means as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any Indebtedness, lease, dividend, or other obligation of any other Person in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof.  The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"**Guarantors**" means OC-PIN and PCHI, and their respective successors and assigns.

"**Guaranty Agreement**" means a Guaranty Agreement dated as of the Closing Date, executed by the Guarantors and Closing Date Lender, in the form of Exhibit "N" attached hereto.

"**Hazardous Material**" means any (a) substance, product, waste or other material of any nature whatsoever which is or becomes listed, regulated, or addressed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq. ("**CERCLA**"); the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("**RCRA**"); the Toxic Substances Control Act, 15 U.S.C. Sections 2601 et seq.; the Clean Water Act, 33 U.S.C. Sections 1251 et seq.; the Federal Water Pollution Control Act (33 U.S.C. Section 1251, et seq.) ("**Clean Water Act**" or "**CWA**"); the Atomic Energy Act of 1954 (42 U.S.C. Section 2011, et seq.) ("**AEA**"); the Clean Air Act (42 U.S.C. Section 7401, et seq.); the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 11001, et seq.); the

**JAE 0112**

CONFIDENTIAL                                                                 SPCP_0000004415

Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. Section 136, *et seq.*) ("**FIFRA**"); the Oil Pollution Act of 1990 (P.L. 101-380, 104 Stat. 486); the Safe Drinking Water Act (42 U.S.C. Sections 300f, *et seq.*) ("**SDWA**"); the Surface Mining Control and Reclamation Act of 1974 (30 U.S.C. Sections 1201, *et seq.*); the Toxic Substances Control Act (15 U.S.C. Section 2601, *et seq.*) ("**TSCA**"); the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. Section 7901, *et seq.*) ("**UMTRCA**"); all respective regulations promulgated thereunder; and or any other federal, state or local statute, law, ordinance, resolution, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect, (b) any substance, product, waste or other material of any nature whatsoever which may give rise to liability under any of the above statutes or under any statutory or common law theory based on negligence, trespass, intentional tort, nuisance or strict liability or under any reported decisions of a state or federal court, (c) petroleum or crude oil other than petroleum and petroleum products contained within regularly operated motor vehicles, and (d) asbestos.

"**Hazardous Material Activity**" means any storage, holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Material from, under, into, or across any Property or surrounding real property and improvements or any other use of or operation of any Property or surrounding real property or improvements that creates a risk of Hazardous Material contamination of said Property; provided, however, that Hazardous Material Activity shall not include reasonable incidental use, storage and disposal of Hazardous Materials on the Property provided that such use, disposal and storage complies with the following: (a) such use, disposal and storage shall be limited to customary supplies, including supplies and materials customarily used, stored and disposed of in the normal operations of medical facilities; (b) no such products or supplies create any risk of harm to persons or property including any Collateral under this Agreement and the other Loan Documents; and (c) all such products and supplies are used, stored and disposed of in material compliance with all applicable Environmental Laws.

"**Hazardous Material Claim**" means any and all enforcement, clean-up, removal, remedial or other governmental or regulatory actions, agreements, or orders threatened, instituted or completed pursuant to any Environmental Laws and any all other actions, proceedings, claims, demands or causes of action, whether meritorious or not (including, without limitation, third party claims for contribution, indemnity, personal injury or real or personal property damage), which directly or indirectly relate to, arise from or are based in whole or in part on: (i) the occurrence or alleged occurrence of any Hazardous Material Activity, (ii) any violation or alleged violation of any applicable Environmental Laws relating to a Property or to the ownership, use, occupation or operation thereof; and (iii) any investigation, inquiry, order, hearing, action or other proceeding by or before any Governmental Authority in connection with any Hazardous Material Activity.

"**Hospital Facilities**" and/or "**Hospital Facility**" means Western Medical Center-Anaheim, the Western Medical Center-Santa Ana, the Coastal Communities Hospital and the Chapman Medical Center.

"**Hospital Landlord**" has the meaning assigned to such term in the definition of "Chapman Leases."

CONFIDENTIAL                                                                    SPCP_0000004416

"**IHHI**" means Integrated Healthcare Holdings, Inc., a Nevada corporation.

"**Indebtedness**" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred six (6) months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are unsecured and not overdue by more than six (6) months unless being contested in good faith, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by note, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value of future rental payments under all synthetic leases, (f) all obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (g) all obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (i) the Obligations.

"**Independent Director(s)**" means a Person or Persons who are or who become members of IHHI's board of directors and who (a) are independent of all Borrowers and all Credit Parties, (b) are not now and never have been affiliated with any Borrower or any Credit Party, (c) are not now and never have been employed by or have performed consulting or other services for any Borrower or any Credit Party, (d) are not now and never have been paid or compensated, or received consideration of any kind from, any Borrower or any Credit Party, (e) are not now and never have been directly or indirectly engaged in the full-time practice of clinical medicine (i.e., said Persons are not doctors), and (f) are experienced in the administration and management of acute care hospital facilities such as the Hospital Facilities.

"**Instruments**" means all instruments, as such term is defined in the Code, now owned or hereafter acquired by Borrowers, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Intellectual Property**" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"**Intercreditor Agreement**" means an Intercreditor Agreement dated as of the Closing Date, executed by the Closing Date Lender and Borrowers in the form of Exhibit "O" attached hereto.

CONFIDENTIAL                                                                         SPCP_0000004417

"**Interest Payment Date**" means the first Business Day of each calendar month to occur while any Loan is outstanding, and provided further that, in addition to the foregoing, the Maturity Date shall be deemed to be an Interest Payment Date with respect to any interest that has then accrued under this Agreement.

"**Interest Rate**" means, at any time, the rate per annum equal to the LIBOR Rate plus 10%.

"**Interest Period**" means an interest period of one, two or three months, as selected by IHHI in the Notice of Interest Period, (i) initially, commencing on the Restatement Effective Date; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) the final Interest Period shall conclude on the Maturity Date.

"**Inventory**" means all inventory, as such term is defined in the Code, now owned or hereafter acquired by Borrowers, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of Borrowers for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished' goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in Borrower's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"**Investment Property**" means all investment property as such term is defined in the Code now owned or hereafter acquired by Borrowers, wherever located, including (a) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (b) all securities entitlements of Borrowers, including the rights of Borrowers to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (c) all securities accounts of Borrowers; (d) all commodity contracts of Borrowers; and (e) all commodity accounts held by Borrowers.

"**IP Security Agreement**" means an IP Security Agreement dated as of the Closing Date, between Borrowers and Closing Date Lender in the form of Exhibit "L" attached hereto.

"**IRC**" means the Internal Revenue Code of 1986 and all regulations promulgated thereunder.

"**IRS**" means the Internal Revenue Service.

17

**JAE 0115**

CONFIDENTIAL

SPCP_0000004418

"**Landlord's Consent and Estoppel Certificate (Chapman Leases)**" means each of the following:

      (a)    a Landlord's Consent and Estoppel Certificate (Chapman MOB Lease) executed by the MOB Landlord in favor of Closing Date Lender, in the form of Exhibit "S" attached hereto; and

      (b)    a Landlord's Consent and Estoppel Certificate (Chapman Hospital Lease) executed by the Chapman Hospital Landlord in favor of Closing Date Lender, in the form of Exhibit "S" attached hereto.

"**Landlord's Consent and Estoppel Certificate (Triple Net Lease)**" means that certain Landlord's Consent and Estoppel Certificate (Triple Net Lease) executed by PCHI, in the form of Exhibit "T" attached hereto.

"**Lender**" means SPCP Group IV, LLC, a Delaware limited liability company and SPCP Group LLC, a Delaware limited liability company, and, in each case, if either shall decide to assign all or any portion of the Obligations, such term shall include any assignee(s) of such Lender.

"**Lender Agent**" means Silver Point Finance, LLC, a Delaware limited liability company, and its successors and assigns, in its capacity as agent for the Lenders.

"**Lender's Costs**" means all fees and expenses of Lender in connection with the Loans and all Loan Documents including, but not limited to, all attorneys' fees, costs and expenses paid or incurred by Lender in connection with any application or engagement letter, or term sheet, or any Loan Documents, the fees and disbursements of Lender's counsel, the travel expenses of Lender's personnel and legal counsel related to the Loans, note intangible taxes, if any, and all Closing, escrow, recording and filing fees, expenses and taxes.

"**LIBOR Rate**" means for any Interest Payment Date with respect to an Interest Period, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the Reuters Screen LIBOR01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on such page (or otherwise on such screen), the "**LIBOR Rate**" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Lender Agent or, in the absence of such availability, the rate for that Interest Period will be determined by such alternate method as reasonably selected by Lender Agent in accordance with prevailing customary market practices; provided that, notwithstanding the foregoing, in no event shall the LIBOR Rate at any time be less than 2.00% per annum.

"**License**" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by Borrowers.

"**Lien(s)**" means any agreement or deed of trust, mortgage, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of

CONFIDENTIAL      SPCP_0000004419

any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"**Litigation**" means any action, claim, lawsuit, demand, investigation or proceeding now pending or, to the knowledge of Borrowers or Credit Parties or Guarantors, threatened against Borrowers or Credit Parties or Guarantors, whether before any Governmental Authority or before any arbitrator or panel of arbitrators, or otherwise.

"**Loan Account**" means an account maintained by Lender in its books to record all Advances made by Lender to Borrowers, all payments made by Borrowers to Lender, and all other debits and credits as provided in this Agreement with respect to the Loans or any other Obligations.   All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time.

"**Loan**" means the all real estate term loans made by Lender to Borrowers pursuant to this Agreement.

"**Loan Documents**" means, together, this Agreement, the Notes, the Guaranty Agreement, the Collateral Documents, the Environmental Indemnity Agreement, the Control Agreement, the Post-Closing Agreement, the Side Letter, the Collateral Assignment of Contracts, and all other agreements, instruments, documents and certificates identified in the Closing and Funding Checklist executed and delivered to, or in favor of, Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers or Credit Parties or Guarantors, or any employee of Borrowers or Credit Parties or Guarantors, and delivered to Lender in connection with this Agreement or the transactions contemplated thereby.   Any reference in this Agreement or any other Loan Document to a Loan Document shall include all exhibits and schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"**Material Adverse Effect**" means any circumstance or event, as determined by Lender in the exercise of its reasonable discretion, which (a) has or may reasonably be expected to have any material adverse effect whatsoever upon the validity, performance, perfection or enforceability of the Loan Documents, (b) is, or is reasonably expected to be, material and adverse to the financial condition of the business operations of any Borrower, any Credit Party and/or any Guarantor, (c) is, or is reasonably expected to, materially impair the ability of any Borrower or any Credit Party or any Guarantor to fulfill their respective obligations under the Loan Documents, or (d) would with the passage of time or giving of notice, or both, result in or cause a Default or an Event of Default, or (e) materially impairs or is reasonably expected to materially impair any of the Collateral, or any of Lender Agent's Liens on any of the Collateral, or the priority of such Liens, or (f) materially impairs or is reasonably expected to materially impair Lender's rights and remedies under this Agreement and the other Loan Documents.

**JAE 0117**

CONFIDENTIAL

SPCP_0000004420

"**Maturity Date**" means the date which is the first to occur of (i) the Stated Maturity Date, and (ii) the occurrence or existence of a Default or an Event of Default under any of the Loan Documents with respect to which Lender has exercised its option to accelerate the Maturity Date pursuant to Section 8.2(a) hereof.

"**Maximum Lawful Rate**" means the interest rate that a court of competent jurisdiction determines in a final unappealable order to be the highest rate of interest permissible under applicable law.

"**Membership Certificates**" means all certificates evidencing the ownership of membership interests in a limited liability company.

"**Membership Power**" means the Irrevocable Membership Power dated as of the Closing Date, executed by Ganesha in favor of Closing Date Lender, in the form if Exhibit "R" attached hereto.

"**MOB Landlord**" has the meaning assigned to such term in the definition of "Chapman Leases."

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 3(37) or 4001(a)(3) of ERISA, and to which any Borrower is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"**Net QAF Funds**" has the meaning set forth in Section 1.4(b).

"**Note**" means the Term Note.

"**Notice of Interest Period**" means a notice delivered to the Lender Agent by Borrower's Representative of the applicable Interest Period determined by IHHI, in form and substance reasonably satisfactory to Lender Agent.

"**Notice of Request for Advance**" means a notice delivered to Closing Date Lender  by Borrower's Representative requesting an Advance, in the form of Exhibit "D" attached hereto.

"**Obligations**" means, collectively, the Loans, all Advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrowers or Credit Parties or Guarantors to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, letter of credit agreement or other instrument, arising under this Agreement or any of the other Loan Documents.  This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against Borrowers or Credit Parties or Guarantors in bankruptcy, whether or not allowed in such case or proceeding), fees, expenses, attorneys' fees and any other sum chargeable to Borrowers or Credit Parties or Guarantors under the Agreement or any of the other Loan Documents.

**JAE 0118**

CONFIDENTIAL                                                                    SPCP_0000004421

"**OC-PIN**" means Orange County Physicians Investment Network, LLC, a Nevada limited liability company.

"**Original Credit Agreement**" means the original Credit Agreement dated as of October 9, 2007 among Borrowers, Credit Parties and the Closing Date Lender (as amended by Amendment No. 1 dated April 2, 2009 and the Acknowledgment, Waiver and Consent and Amendment to Credit Agreements dated April 2, 2009, the Omnibus Credit Agreement Amendment dated as of April 13, 2010, Amendment to $80,000,000 Credit Agreement dated August 30, 2010, and Amendment No. 4 to Credit Agreement and Consent dated as of August 1, 2012).

"**Origination Fees**" means the sum of each of the following:

(a) With respect to the Existing Real Estate Term Loan, an origination fee in the amount of SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100 DOLLARS ($675,000.00) (1.5% of $45,000,000); plus

(b) With respect to the $35,000,000 Non-Revolving Line of Credit Loan, an origination fee in the amount of FIVE HUNDRED TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($525,000.00) (1.5% of $35,000,000).

"**Participation Agreement**" means that certain Participation Agreement dated as of April 13, 2010 among Lenders, KPC Resolution Company, LLC and Silver Point Finance, LLC, as participation agent.

"**Patent License**" means rights under any written agreement now owned or hereafter acquired by Borrowers granting any right with respect to any invention on which a Patent is in existence.

"**Patents**" means all of the following in which Borrowers now hold or hereafter acquire any interest: (a) all letters patent of the United States or of any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**PCHI**" means Pacific Coast Holdings Investment, LLC, a California limited liability company.

"**Pension Plan**" means a Plan described in Section 3(2) of ERISA.

"**Permitted Encumbrances**" means, for each Property, the following encumbrances relating thereto: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable or which are being contested in accordance with Section 5.2(b) (Right to Contest Charges); (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar

CONFIDENTIAL

SPCP_0000004422

legislation (excluding Liens under ERISA); (c) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not create a Material Adverse Effect, as determined by Lender in its sole discretion; (d) currently existing or hereafter created Liens in favor of Lender Agent or its Affiliates; (e) any Lien held by an equipment lessor in the equipment so leased; (f) all encumbrances shown in any Title Policy issued on the Closing Date to Lender; (g) inchoate and unperfected workers' compensation, mechanics' or similar Liens arising in the ordinary course of business, <u>provided</u>, that the same are satisfied in the ordinary course of business; (h) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (i) such other liens arising in the ordinary course of business so long as such liens do not create a Material Adverse Effect; and (j)) such endorsements to said Title Policies as Lender deems necessary or appropriate, in its sole discretion.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person (the "**Refinanced Indebtedness**"); <u>provided</u> that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by any amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of the Refinanced Indebtedness, (c) any Lien pledged or granted in connection with such modification, refinancing, refunding, renewal or extension shall be subject to the terms of any intercreditor or subordination documentation governing the Refinanced Indebtedness and (d) any Refinanced Indebtedness shall be subject to the terms and conditions of the A/R Facility Intercreditor Agreement.

"**Person**" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, unincorporated organization, trust, business trust, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"**Plan**" means, at any time, an employee benefit plan, as defined in Section 3(3) of ERISA, that Borrowers or any ERISA Affiliate maintain, contribute to or have an obligation to contribute to or have maintained, contributed to or had an obligation to contribute to at any time within the past seven (7) years on behalf of participants who are or were employed by Borrowers or ERISA Affiliate.

"**Plan Regarding Engagement of Independent Directors**" means a written statement outlining IHHI's plan as to how it intends to identify, engage, nominate and elect Independent Directors to IHHI's board of directors within the time periods required by this Agreement.

"**Pledge Agreement**" means the Pledge Agreement dated as of the Closing Date, by and between IHHI, Ganesha and Closing Date Lender, in the form of <u>Exhibit "P"</u> attached hereto.

22

**JAE 0120**

CONFIDENTIAL

SPCP_0000004423

"**Pledged Entity**" means a Person whose Stock or Membership Interests are pledged pursuant to the Pledge Agreement.

"**Previous Accounts Receivable Purchase Agreement**" means that certain Accounts Purchase Agreement dated as of March 3, 2005, by and between Medical Provider Financial Corporation I (as Buyer) and Borrowers (as Sellers).

"**Previous $50,000,000 Acquisition Loan**" means the $50,000,000 acquisition loan made by Closing Date Lender to Borrowers pursuant to the First Credit Agreement.

"**Previous $50,000,000 Acquisition Note**" means the $50,000,000 acquisition note executed by Borrowers in favor of Closing Date Lender pursuant to the First Credit Agreement.

"**Previous $30,000,000 Line of Credit Loan**" means the $30,000,000 line of credit loan made by Closing Date Lender to Borrowers pursuant to the First Credit Agreement.

"**Previous $30,000,000 Line of Credit Note**" means the $30,000,000 line of credit note executed by Borrowers in favor of Closing Date Lender pursuant to the First Credit Agreement.

"**Previous $10,700,000 Term Loan**" means the $10,700,000 term loan made by Medical Provider Financial Corporation III to Borrowers pursuant to the Second Credit Agreement.

"**Previous $10,700,000 Term Note**" means the $10,700,000 term note executed by Borrowers in favor of Medical Provider Financial Corporation III pursuant to the Second Credit Agreement.

"**Previous Loans**" means, collectively, the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan and the Previous $10,700,000 Term Loan.

"**Previous UCC-1 Financing Statements (Fixture Filings)**" means the UCC-1 Financing Statements (Fixture Filings) recorded against each of the Properties in conjunction with the Previous $50,000,000 Acquisition Loan, the Previous $30,000,000 Line of Credit Loan, the Previous $10,700,000 Term Loan and the Previous Accounts Receivable Purchase Agreement.

"**Proceeds**" means proceeds, as such term is defined in the Code, including (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrowers from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to Borrowers from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of governmental authority), (c) any claim of Borrowers against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the goodwill associated with any Trademark or Trademark License, (d) any recoveries by Borrowers against third parties with respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, (e) all amounts collected on, or distributed on account of,

CONFIDENTIAL

other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"**Projections**" means, for Borrowers, its forecasted consolidated:  (a) balance sheets; (b) profit and loss statements; (c) cash flow statements; and (d) capitalization statements, all prepared on a cash basis, if applicable, and otherwise consistent with the historical Financial Statements of Borrowers with certain normalizing assumptions made by Borrowers, together with appropriate supporting details and a statement of underlying assumptions.

"**Property**" means any of the Hospital Facilities, and "**Properties**" means each of the Hospital Facilities taken together.

"**Qualified Assignee**" means (a) any Lender, any Affiliate of Lender and, with respect to a Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor or by an Affiliate of such investment advisor of such Lender and which is not a competitor or an Affiliate of a competitor of Borrowers, and (b) any commercial bank, savings and loan association or savings bank or any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933) which extends credit or buys loans as one of its businesses, including insurance companies, mutual funds, lease financing companies and commercial finance companies, in each case, which has a rating of BBB or higher from S&P and a rating of Baa2 or higher from Moody's at the date that it becomes a Lender and which, through its applicable lending office, is capable of lending to Borrowers without the imposition of any withholding or similar taxes; <u>provided</u> that no Person proposed to become a Lender after the Closing Date and determined by Lender to be acting in the capacity of a vulture fund or distressed debt purchaser shall be a Qualified Assignee, and no Person or Affiliate of such Person proposed to become a Lender after the Closing Date that holds Subordinated Debt or Stock issued by Borrowers shall be a Qualified Assignee.

"**Qualified Cash**" means, as of any date of determination, the amount of Certified Cash that is subject to perfection in favor of Lender pursuant to any Control Agreement in form and substance satisfactory to Lender, which Control Agreement shall provide, among other things, that the bank or securities intermediary executing such agreement (a) has no rights of setoff or recoupment or any other claim against such account, as the case may be, other than for payment of its service fees and other charges directly related to the administration of such account and, as applicable, for returned checks or other items of payment, and (b) agrees to follow the instructions or entitlement orders of Lender without further consent by Borrowers, including, with respect to funds in any such account, upon the instructions of Lender, to immediately forward by daily sweep all such funds to the Collection Account or as otherwise directed by Lender.

"**Qualified Cash Account**" means any deposit account or securities account that is subject to a Control Agreement in form and substance satisfactory to Lender and holds Qualified Cash.

**JAE 0122**

CONFIDENTIAL

SPCP_0000004425

"**Qualified Plan**" means a Pension Plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"**Recitals**" means the Recitals set forth on the first page of this Agreement.

"**Related Transactions**" means the borrowing of the Loans on the Closing Date, the payment of all fees, costs and expenses associated with all of the foregoing and the execution and delivery of all of the Related Transactions Documents.

"**Related Transactions Documents**" means the Loan Documents and all other agreements or instruments executed in connection with the Related Transactions.

"**Release**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"**Releasing Parties**" and individually, a "**Releasing Party**" means each Borrower, each Credit Party, each Guarantor, and each of their respective predecessors, successors and assigns, and each of their respective officers, directors, shareholders, members, managers, partners (general and limited), employees, agents, representatives, attorneys and assigns.

"**Repurchase Agreement**" has the meaning assigned to such term in the Amendment and Restatement Agreement.

"**Restatement Effective Date**" means the date on which the conditions precedent specified in Section 6 of the Amendment and Restatement Agreement are satisfied (or waived in accordance therewith).

"**Restricted Payment**" means (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any Subordinated Debt; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; and (f) any payment of management fees (or other fees of a similar nature).

"**Retiree Welfare Plan**" means, at any time, a welfare plan (within the meaning of Section 3(1) of ERISA) that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than

CONFIDENTIAL

continuation coverage provided pursuant to Section 4980B of the IRC or other similar state law and at the sole expense of the participant or the beneficiary of the participant.

"**Second Credit Agreement**" means that certain Credit Agreement by and between Medical Provider Financial Corporation III, the Credit Parties and the Borrowers dated to be effective as of December 12, 2005.  Pursuant to the Second Credit Agreement, Medical Provider Financial Corporation III made the Previous $10,700,000 Term Loan to Borrowers.

"**Security Agreement**" means the Security Agreement dated as of the Closing Date, by and between Borrowers and Closing Date Lender, in the form if Exhibit "G" attached hereto.

"**Shareholder**" means, with respect to any Person, each holder of Stock of such Person.

"**Shareholder Blocking Rights**" shall mean any rights of any owner (direct or indirect) of any Pledged Entity which, pursuant to the terms of any agreement or organizational document, has the right to consent, or the effect of requiring such consent, to any foreclosure by Lender under any Security Agreement or Pledge Agreement or otherwise to the exercise of any of Lender's rights and remedies thereunder or otherwise has the right to restrain, delay, impair or otherwise interfere with Lender in the event of Lender's exercise of its rights under any Security Agreement or Pledge Agreement.

"**Side Letter**" means the side letter agreement dated as of February 7, 2013, among SPCP Group IV, LLC, SPCP Group, LLC, Lender Agent, Borrowers, PCHI and Ganesha.

"**Software**" means all software as such term is defined in the Code, now owned or hereafter acquired by Borrowers, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"**Solvent**" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; and (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature.  The amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability.

"**Stated Maturity Date**" means April 13, 2016.

"**Stock**" means all shares, options, warrants, general or limited partnership interests, Membership Interests or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including stock, preferred stock or any other equity security (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

CONFIDENTIAL                                                                    SPCP_0000004427

"**Stock Certificates**" means all certificates evidencing the ownership of Stock in a Person.

"**Stock Power**" means the Irrevocable Stock Power dated as of the Closing Date, executed by IHHI in favor of Closing Date Lender, in the form if Exhibit "Q" attached hereto.

"**Subordinated Debt**" means any unsecured Indebtedness of Borrowers incurred after the Closing Date that is subordinated to the Obligations in a manner and form reasonably satisfactory to Lender, as to right and time of payment and as to any other rights and remedies thereunder.

"**Subsidiary**" means, with respect to any Person, (a) any corporation of which an aggregate of more than 50% of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of 50% or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have a Membership Interest (whether in the form of voting or participation in profits or capital contribution) of more than 50% or of which any such Person is a general partner or manager or may exercise the powers of a general partner.

"**Supporting Obligations**" means all supporting obligations as such term is defined in the Code, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

"**Taxes**" means taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of Lender.

"**Term Note**" means, collectively, promissory notes of even date herewith, in the aggregate principal amount of $47,277,000, executed by Borrowers in favor of Lenders, each in the form of Exhibit "A" attached hereto.

"**Termination Date**" means the date on which (a) the Loans have been repaid in full, (b) all other Obligations (other than indemnification Obligations) due and payable under this Agreement and the other Loan Documents have been discharged, and (c) Borrowers shall have no further right to borrow any monies under this Agreement.

"**Title Commitment(s)**" means, with respect to each Property, an irrevocable commitment issued by the Title Company to Lender in form and content acceptable to Lender, committing to issue the Title Policy with respect to each such Property to Lender on the Closing Date.

"**Title Company**" means Chicago Title Insurance Company, 700 South Flower Street, Suite 800, Los Angeles, California 90017, Attn: Jeffrey L. Hurd ("**Sr. Title Officer**"),

CONFIDENTIAL                                                    SPCP_0000004428

telephone: 213-488-4365; facsimile: 213-243-9168; email: jeff.hurd@ctt.com; and Chicago Title Insurance Company, Division Counsel, 700 South Flower Street, Suite 3305, Los Angeles, California 90017, Attn: Scott M. Green, Associate Counsel ("**Title Attorney**"), telephone: 213-488-4342; facsimile: 213-891-0834; email: greens@ctt.com.

"**Title Policy**" means an ALTA Loan Policy of Title Insurance issued by Title Company to Lender on the Closing Date, with a stated liability in the amount of $80,000,000, insuring that (a) the fee simple interest in the Western Medical Center - Anaheim is vested in PCHI and that the Deed of Trust constitutes a first Lien and encumbrance against the fee simple interest in such Property, subject only to the applicable Permitted Exceptions and with such endorsements as Lender may require in its sole and absolute discretion; (b) the fee simple interest in the Western Medical Center — Santa Ana is vested in PCHI and that the Deed of Trust constitutes a first Lien and encumbrance against the fee simple interest in such Property subject only to the applicable Permitted Exceptions and with such endorsements as Lender may require in its sole and absolute discretion; (c) the fee simple interest in the Coastal Community Hospital is vested in PCHI and that the Deed of Trust constitutes a first Lien and encumbrance against the fee simple interest in such Property subject only to the applicable Permitted Exceptions and with such endorsements as Lender may require in its sole and absolute discretion; (d) the tenant's interest in the Chapman MOB Lease is vested in IHHI and that the Deed of Trust constitutes a first Lien and encumbrance against IHHI's interest, as MOB Tenant, in the Chapman MOB Lease, subject only to the applicable Permitted Encumbrances and with such endorsements as Lender may require in its sole, absolute and unfettered discretion; and (e) the tenant's interest in the Chapman Hospital Lease is vested in IHHI and that the Deed of Trust constitutes a first Lien and encumbrance against IHHI's interest, as Hospital Tenant, in the Chapman Hospital Lease, subject only to the applicable Permitted Encumbrances and with such endorsements as Lender may require in its sole, absolute and unfettered discretion.

"**Title IV Plan**" means a Pension Plan (other than a Multiemployer Plan), that is subject to Title IV of ERISA or Section 412 of the IRC, and that Borrowers or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"**Trademark License**" means rights under any written agreement now owned or hereafter acquired by Borrowers granting any right to use any Trademark.

"**Trademarks**" means all of the following now owned or hereafter existing or adopted or acquired by Borrowers: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

CONFIDENTIAL                                                                                       SPCP_0000004429

"**Triple Net Lease**" means that certain Triple Net Lease dated as of March 3, 2005 (as amended by that certain Amendment #1 to Triple Net Lease dated as of March 3, 2005) by and between PCHI, as lessor, and IHHI, as lessee, pursuant to which PCHI leased the Western Medical Center - Anaheim, the Western Medical Center - Santa Ana, and the Coastal Community Hospital, to IHHI.

"**UCC Financing Statements**" means all UCC-1 Financing Statements (fixture filings and personal property) required by Lender to be filed or recorded pursuant to this Agreement to secure repayment of the Loans and performance of the Obligations.

"**Unfunded Pension Liability**" means, at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of five (5) years following a transaction which might reasonably be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by Borrowers or any ERISA Affiliate as a result of such transaction.

"**Voting Stock**" means, with respect to any Person, any class or classes of capital stock or other ownership interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect directors, managers or trustees (as applicable) of such Person (irrespective of whether or not, at the time, stock of any other class or classes has, or might have, voting power by reason of the happening of any contingency).

"**Warrant**" means the Common Stock Warrant issued by IHHI to Healthcare Financial Management & Acquisitions, Inc., a Nevada corporation (an Affiliate of Closing Date Lender) in the form of Exhibit "U" attached hereto.

"**West Coast**" means West Coast Holdings, LLC, a California limited liability company.

"**Western Medical Center - Anaheim**" means the real property and hospital improvements located at 1025 South Anaheim Boulevard, Anaheim, California.

"**Western Medical Center-Santa Ana**" means the real property and hospital improvements located at 1001 North Tustin Avenue and at 1301 North Tustin in Santa Ana, California.

"**WMC-A**" means WMC-A, INC., a California corporation.

"**WMC-SA**" means WMC-SA, INC., a California corporation.

Unless otherwise specifically provided herein, any accounting term used in the Agreement shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP consistently applied. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. All other undefined terms

**JAE 0127**

CONFIDENTIAL                                                                        SPCP_0000004430

contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control.  Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection or clause refer to such Section, subsection or clause as contained in the Agreement.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular Section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations.  Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of Borrowers or Credit Parties, such words are intended to signify that such Borrowers or such Credit Parties has actual knowledge or awareness of a particular fact or circumstance.

**JAE 0128**

CONFIDENTIAL                                                    SPCP_0000004431

**ANNEX B**
**TO**
**AMENDED AND RESTATED**
**CREDIT AGREEMENT ($47,277,000 Term Note)**

**CASH MANAGEMENT SYSTEM**

Borrowers agree to establish, and to maintain, until the Termination Date, the Cash Management System described below:

1.      Borrowers:  (i) shall not (nor shall it permit any of its Subsidiaries to) open or maintain any deposit, checking, operating or other bank account, or similar money handling account, with any bank or other financial institution except for those accounts identified in Attachment I hereto (to include a petty cash account not to exceed $10,000.00 during any fiscal month, and a payroll account not to exceed an amount equal to one regular payroll at any time, plus all other payroll obligations outstanding); and (ii) shall close or permit to be closed any of the accounts listed in Attachment I hereto, in each case without Lender's prior written consent, and then only after Borrowers have implemented agreements with such bank or financial institution acceptable to Lender.

2.      Commencing on the Closing Date and until the Termination Date, Borrowers shall fully comply with the terms, conditions and procedures set forth in the Deposit Account Security Agreement and the Control Agreement.

3.      Borrowers may maintain, in their name, Disbursement Accounts at a bank or banks acceptable to Lender into which Lender shall, from time to time, deposit proceeds of Advances made pursuant to this Agreement for use solely in accordance with the provisions of this Agreement.  All of the Disbursement Accounts as of the Closing Date are listed in paragraph 2 of Attachment I hereto.

Notwithstanding anything to the contrary herein or in any other Loan Documents, the provisions relating to cash management, deposit account security agreements or control agreements, including, without limitation, this Annex B, shall subject to the A/R Facility.

#4830-9595-3170v19                                     1

CONFIDENTIAL                                                        SPCP_0000004432

**ATTACHMENT I TO CASH MANAGEMENT SYSTEM SCHEDULE**

**LIST OF BANK ACCOUNTS**

**JAE 0130**

CONFIDENTIAL

SPCP_0000004433

**ANNEX C**
**TO**
**AMENDED AND RESTATED**
**CREDIT AGREEMENT ($47,277,000 Term Note)**

**COLLATERAL REPORTS**

Collateral Reports means the following:

1.  <u>Cash Reports</u>.  A report delivered by Borrowers at the request of Lender stating, among other things:  (a) the net amount of Dollars in unrestricted cash and cash equivalents that Borrowers have in their Deposit Accounts; and (b) the net amount of Dollars in unrestricted cash and cash equivalents that Borrowers have in their securities accounts.

2.  <u>Report on Cash Subject to Security Agreements</u>.  A report delivered by Borrowers at the request of Lender stating, among other things the amount of their cash that is subject to perfection in favor of Lender pursuant to any security agreements or other security instruments.

3.  <u>Further Assurances</u>.  As required by <u>Section 5.10</u> (Further Assurances) of this Agreement, such further instruments and assurances as may be necessary or proper in the reasonable opinion of Lenders to carry out the purposes of the Loan Documents.


Notwithstanding anything to the contrary herein or in any other Loan Documents, the provisions in items 1 and 2 above shall subject to the A/R Facility.

CONFIDENTIAL                                                                                    SPCP_0000004434

# ANNEX D
## TO
## AMENDED AND RESTATED
## CREDIT AGREEMENT ($47,277,000 Term Note)

### NOTICE ADDRESSES

**BORROWERS:**

INTEGRATED HEALTHCARE HOLDINGS, INC.
1301 North Tustin Avenue
Santa Ana, California 92705
Attn:  Kenneth K. Westbrook, President and Chief Executive Officer
   Steven R. Blake, Chief Financial Officer
Ph:  714-953-3575
Fax:  714-953-2595

WMC-A, INC.
c/o INTEGRATED HEALTHCARE HOLDINGS, INC.
1301 North Tustin Avenue
Santa Ana, California 92705
Attn:  Kenneth K. Westbrook, President and Chief Executive Officer
   Steven R. Blake, Chief Financial Officer
Ph:  714-953-3575
Fax:  714-953-2595

WMC-SA, INC.
1301 North Tustin Avenue
Santa Ana, California 92705
Attn:  Kenneth K. Westbrook, President and Chief Executive Officer
   Steven R. Blake, Chief Financial Officer
Ph:  714-953-3575
Fax:  714-953-2595

COASTAL COMMUNITIES HOSPITAL, INC.
c/o INTEGRATED HEALTHCARE HOLDINGS, INC.
1301 North Tustin Avenue
Santa Ana, California 92705
Attn:  Kenneth K. Westbrook, President and Chief Executive Officer
   Steven R. Blake, Chief Financial Officer
Ph:  714-953-3575
Fax:  714-953-2595

**JAE 0132**

CONFIDENTIAL
SPCP_0000004435

CHAPMAN MEDICAL CENTER, INC.
c/o INTEGRATED HEALTHCARE HOLDINGS, INC.
1301 North Tustin Avenue
Santa Ana, California 92705
Attn:  Kenneth K. Westbrook, President and Chief Executive Officer
      Steven R. Blake, Chief Financial Officer
Ph:  714-953-3575
Fax:  714-953-2595


CREDIT PARTIES:

PACIFIC COAST HOLDINGS INVESTMENTS, LLC
c/o Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
Attn:  Dr. Chaudhuri
      William Thomas, Esq.
      Dr. Sweidan
Ph:  951-782-8812
Fax:  951-766-9944


GANESHA REALTY, LLC
c/o Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
Attn:  Dr. Chaudhuri
      William Thomas, Esq.
Ph:  951-782-8812
Fax:  951-766-9944


ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC
2621 South Bristol, Suite 304
Santa Ana, California 92704
Attn:  Dr. Shah, Manager
Ph:  714-290-5322
Fax:  714-297-9588


**LENDERS:**

SPCP GROUP IV, LLC and SPCP GROUP, LLC
c/o Silver Point Finance, LLC
Two Greenwich Plaza, First Floor
Greenwich, CT 06830
Attn: Thomas Banks
Email: tbanks@silverpointcapital.com
Facsimile: 201-542-4376

#4830-9595-3170v19

2

**JAE 0133**

CONFIDENTIAL

SPCP_0000004436

**LENDER AGENT:**

SILVER POINT FINANCE, LLC
Two Greenwich Plaza, First Floor
Greenwich, CT 06830
Attn: Thomas Banks
Email: tbanks@silverpointcapital.com
Facsimile: 201-542-4376

CONFIDENTIAL

**JAE 0134**

SPCP_0000004437

**ANNEX E**
**TO**
**AMENDED AND RESTATED**
**CREDIT AGREEMENT ($47,277,000 Term Note)**

Fixed Charge Coverage Ratio Worksheet

"Fixed Charge Coverage Ratio" for the applicable Defined Period (as defined in Section 6.17(c)) means the ratio of Operating Cash Flow (as defined below) to Fixed Charges (as defined below) for such Defined Period.

"Fixed Charges" means:

Interest expense (including interest expense of PCHI) ($_____), net of interest income ($_____), interest paid in kind ($_____) and amortization of capitalized fees and expenses incurred to consummate the financing transaction governed by the A/R Facility and included in interest expense ($_____), included in the determination of net income of Borrowers and their consolidated Subsidiaries for the Defined Period ("Total Interest Expense")                                                                   $_____

Plus:   Any provision for (or less any benefit from) income or franchise taxes included in the determination of net income for the Defined Period                                                                   _____

Scheduled payments of principal for the Defined Period with respect to all Indebtedness (including the portion of scheduled payments under Capital Leases[a] allocable to principal but excluding scheduled repayments of revolving loans and other Indebtedness subject to reborrowing to the extent not accompanied by a concurrent and permanent reduction of the revolving loan commitment in respect of such revolving loan)                                                                   _____

The amount of "Permitted Asset Dispositions" and "Permitted Distributions" as defined in and pursuant to the A/R Facility on the date hereof                                                                   _____

"Operating Cash Flow" means:

EBITDA for the Defined Period (calculated in the manner required by the definition thereof in Section 6.17)                                                                   $_____

Less:   Unfinanced capital expenditures for the Defined Period                                                                   _____

---

[a] Adjustments to exclude the effects of retroactive adjustments (if any) due to changes in accounting rules relating to operating leases to be determined by the parties.

#4830-9595-3170v19

**JAE 0135**

To the extent not already reflected in the calculation of EBITDA, other capitalized costs, defined as the gross amount paid in cash and capitalized during the Defined Period, as long term assets, other than amounts capitalized during the Defined Period as capital expenditures for property, plant and equipment or similar fixed asset accounts

_____

Operating Cash Flow                                                      $

Fixed Charge Coverage Ratio (Ratio of Operating Cash Flow to Fixed Charges) for the Defined Period                                    ___ to 1.0

Minimum Fixed Charge Coverage for the Defined Period          1.00 to 1.0

In Compliance                                                            Yes/No

#4830-9595-3170v19                                    2

CONFIDENTIAL

SPCP_0000004439

## EXHIBIT "A" TO AMENDED AND RESTATED CREDIT AGREEMENT
## ($47,277,000 MILLION FACILITY)

### FORM OF TERM NOTE

SEE ATTACHED

CONFIDENTIAL

**JAE 0137**

SPCP_0000004440

## $47,277,000 AMENDED AND RESTATED TERM NOTE
## (AMENDED AND RESTATED CREDIT AGREEMENT)

$47,277,000.00                                      February 7, 2013
                                                    Las Vegas, Nevada

FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are hereinafter together referred to as the "**Borrowers**"), hereby jointly and severally promise to pay to the order of SPCP GROUP, LLC (the "**Lender**"), the principal amount of FORTY SEVEN MILLION TWO HUNDRED SEVENTY SEVEN THOUSAND DOLLARS AND NO/100 ($47,277,000.00) ("**Loan**") or such lesser amount as may be loaned by the Lender from time to time and be outstanding, together with interest on the unpaid balance of such amount from the date of the initial advance until paid.  This "**Term Note**" is the Term Note issued under the Amended and Restated Credit Agreement ($47,277,000 Term Loan) by and among Borrowers, the Credit Parties named therein, the lenders named therein and SILVER POINT FINANCE, LLC, a Delaware limited liability company ("**Silver Point**" or "**Lender Agent**") of even date herewith (said agreement, as the same may be amended, restated or supplemented from time to time, being herein called the "**Credit Agreement**") to which a reference is made for a statement of all of the terms and conditions of the Loan evidenced hereby, which such terms and conditions are hereby incorporated by reference.  Initially capitalized terms not defined in this Term Note shall have the respective meanings assigned to them in the Credit Agreement.  This Term Note is secured by, among other things, the Collateral Documents referenced in the Credit Agreement, the other Loan Documents referenced therein, and is entitled to the benefit of the rights, remedies and security provided thereby.

Interest on the outstanding principal balance under this Term Note is payable at the Interest Rate provided in the Credit Agreement, or, under the circumstances provided for in the Credit Agreement, at the Default Rate, in immediately available United States Dollars at the times and in the manner specified in the Credit Agreement.  Each Borrower acknowledges that (a) the Lender is authorized under the Credit Agreement to charge the Loan with the amount of any unpaid Obligations of Borrowers to the Lender, (b) the principal amount of the Term Note will be increased by such amounts, and (c) the principal, as so increased, will bear interest as provided for herein and in the Credit Agreement.  Payments received by the Lender shall be applied against principal and interest as provided for in the Credit Agreement.

To the fullest extent permitted by applicable law, Borrowers waive, except to the extent specifically required by the Credit Agreement or other Loan Documents:  (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all of the Obligations, the Loan Documents or this Term Note; (ii) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevin, attachment or

#4831-1562-0370v4                        1

CONFIDENTIAL                                    SPCP_0000004441

levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption laws.

Borrowers each acknowledge that this Term Note is executed as part of a commercial transaction and that the proceeds of this Term Note will not be used for any personal or consumer purpose.

Upon the occurrence of any one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Term Note shall become, or may be declared to be, immediately due and payable, to the extent provided for in the Credit Agreement.

EACH BORROWER ACKNOWLEDGES THAT IT HAS WAIVED ITS RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ON THIS TERM NOTE. THIS TERM NOTE IS GOVERNED BY THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES.

This Term Note replaces in its entirety and is in substitution for but not in payment of that certain $45,000,000 Term Note dated as of October 9, 2007 made by the Borrowers in favor of Medical Provider Financial Corporation II in the maximum principal amount of $45,000,000.00 (the "**Prior Note**"), and does not and shall not be deemed to constitute a novation thereof. The Prior Note shall be of no further force and effect upon the execution of this Term Note.

*(Signatures to Appear on Following Page)*

#4831-1562-0370v4

2

CONFIDENTIAL

SPCP_0000004442

BORROWERS:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation

By: _____
Name:
Title:

WMC-SA, INC.,
a California corporation

By: _____
Name:
Title:

WMC-A, INC.,
a California corporation

By: _____
Name:
Title:

CHAPMAN MEDICAL CENTER, INC.,
a California corporation

By: _____
Name:
Title:

COASTAL COMMUNITIES HOSPITAL, INC.,
a California corporation

By: _____
Name:
Title:

*[Signature Page to Term Note]*

#4831-1562-0370v4

CONFIDENTIAL                    SPCP_0000004443

## EXHIBIT "B" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

[Intentionally Omitted]

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004444

## EXHIBIT "C" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

[Intentionally Omitted]

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004445

## EXHIBIT "D" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

**FORM OF NOTICE OF REQUEST FOR ADVANCE**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004446

## NOTICE OF REQUEST FOR ADVANCE
### ($80 MILLION CREDIT AGREEMENT)

### $35,000,000 NON-REVOLVING LINE OF CREDIT LOAN

_____, 2007

Medical Provider Financial Corporation II
3770 Howard Hughes Parkway, Suite 301
Las Vegas, Nevada 89109
Attn:  Adam Field, Vice President Development

Re:  INTEGRATED HEALTHCARE HOLDINGS, INC.

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement ($80 Million Facility) dated to be effective as of October 9, 2007 (including all annexes, exhibits and schedules thereto, and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "Borrowers" and individually as "**Borrower**"); PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"); WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**"); GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**"); ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**") (PCHI, West Coast, Ganesha and OC-PIN are hereinafter referred to as the "Credit Parties"); and MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**").  Capitalized terms not defined herein shall have the same meaning as in the Credit Agreement.

Borrower's Representative hereby gives irrevocable notice, pursuant to Section 1.2(b) of the Credit Agreement, of the following request for an Advance under the $35,000,000 Non-Revolving Line of Credit Loan:

| | |
|---|---|
| Amount: | $ _____ |
| Requested Date of Borrowing: | _____ |
| Special Instructions (if any): | _____ |
| | _____ |
| Purpose of Borrowing: | _____ |
| Identify Loan Source: | $35,000,000 Non-Revolving Line of Credit Loan |

**JAE 0144**

CONFIDENTIAL                    SPCP_0000004447

Borrower's Representative hereby (a) represents and warrants that the applicable conditions in Sections 2.1 and 2.2 of the Credit Agreement have been satisfied on and as of the date hereof, and will continue to be satisfied on and as of the date of the Advance requested herein, both before and after giving effect thereto and to the application of the proceeds therefrom, and (b) confirms the granting of the Liens to Lender pursuant to the Loan Documents.

IN WITNESS WHEREOF, Borrower's Representative has caused this Notice of Line of Credit Advance to be executed and delivered by its duly authorized officer as of the date first set forth above.

BORROWERS' REPRESENTATIVE:

_____
Signature

_____
Print Name

cc:    Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806
Attn:  Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004448

## EXHIBIT "E" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

**FORM OF DEED OF TRUST**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004449

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Sedgwick, Detert, Moran & Arnold LLP
One Market Plaza, Steuart Tower, 8th
Floor San Francisco, California 94105
Attn:  Gary C. Sheppard, Esq.

---

(Above Space For Recorder's Use)

## DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING AND ASSIGNMENT OF RENTS
### ($80 MILLION FACILITY)

### (FEE INTEREST:  WESTERN MEDICAL CENTER - ANAHEIM)

**CERTAIN OF THE PROPERTY COVERED BY THIS DEED OF TRUST CONSISTS OF GOODS THAT ARE OR WILL BECOME FIXTURES UPON REAL PROPERTY. ACCORDINGLY, THIS DEED OF TRUST ALSO CONSTITUTES AND IS FILED AS A FIXTURE FILING UNDER CALIFORNIA COMMERCIAL CODE SECTION 9502(a) AND (b), AND SHALL REMAIN IN EFFECT AS A FIXTURE FILING UNTIL RELEASED OR SATISFIED OF RECORD OR THE EFFECTIVENESS OF THIS DEED OF TRUST OTHERWISE TERMINATES.**

**THIS DOCUMENT SECURES FUTURE ADVANCES WHICH MAY BE MADE PURSUANT TO THE CREDIT AGREEMENT (AS DEFINED IN THIS DOCUMENT) OR THIS DEED OF TRUST.**

THIS DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING AND ASSIGNMENT OF RENTS (the "**Deed Of Trust**") is made to be effective as of October 9, 2007 ("**Effective Date**") by and among PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**Trustor**," and/or "**Debtor**," and/or "**Borrower**" as the context dictates), whose address is 2621 South Bristol Street, Suite 108, Santa Ana, CA 92704, and CHICAGO TITLE INSURANCE COMPANY (and in such capacity herein called "**Trustee**"), whose address is 700 South Flower Street, Suite 800, Los Angeles, CA 90017, for the benefit of MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation (and in such capacity herein called "**Beneficiary**" and/or "**Secured Party**" and/or "**Lender**"), whose address is 3770 Howard Hughes Parkway, Suite 301, Las Vegas, Nevada 89109.  Unless the context otherwise dictates, all references to Trustor shall mean and include Debtor, and all references to Beneficiary shall mean and include Secured Party.

### RECITALS

A.      Pursuant to that certain Credit Agreement ($80 Million Facility) of even date herewith by and among the Borrowers named therein, the Credit Parties (including Trustor) named therein, and Beneficiary (as Lender) (as amended, restated, supplemented or otherwise

CONFIDENTIAL                                                                    SPCP_0000004450

modified from time to time, the "**Credit Agreement**"), Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers named in the Credit Agreement, Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes**," and individually as a "**Note**").  The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents**."

B.      This Deed Of Trust is given, inter alia, for the purpose of securing repayment of the Loans and the Secured Obligations (as defined below) made by Beneficiary, as lender, to each of the Borrowers.

C.      It is intended by Beneficiary and Trustor that the foregoing Recitals are to be a part of this Deed Of Trust and the agreements made hereunder.

## GRANTING CLAUSES

FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE INDEBTEDNESS HEREIN RECITED, THE TRUST HEREIN CREATED AND THE SECURITY INTEREST AND THE LIEN HEREIN GRANTED, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, TRUSTOR HEREBY IRREVOCABLY GRANTS, CONVEYS, TRANSFERS AND ASSIGNS:

A.      To Trustee, IN TRUST, WITH POWER OF SALE, for the benefit and security of Beneficiary, under and subject to the terms and conditions hereinafter set forth, all of Trustor's right, title and interest, in and to the real property more particularly described in Exhibit "A" attached hereto and made a part hereof (the "**Premises**");

Together with any and all buildings and improvements now existing or hereafter erected on the Premises, including, without limitation fixtures, tenements, attachments, appliances, building equipment, building systems, machinery, and other articles now or hereafter attached to said buildings and improvements (collectively, "**Improvements**");

Together with all interests, estates or other claims, both in law and in equity, which Trustor now has or may hereafter acquire in the Premises or Improvements;

Together with all easements, tenements, hereditaments, appurtenances, rights-of-way and rights now owned or hereafter acquired by Trustor which are used or useful in connection with the Premises or as a means of access thereto, including, without limiting the generality of the foregoing, all rights pursuant to any trackage agreement and all rights to the

#4831-1562-0370v4                                          2

CONFIDENTIAL                                                                        SPCP_0000004451

nonexclusive use of common drive entries, all oil and gas and other hydrocarbons and all other minerals and water and water rights and shares of stock evidencing the same;

Together with all right, title and interest of Trustor in and to all leases, subleases, tenancies, subtenancies, licenses, franchises, occupancy agreements and other agreements covering the Premises, improvements or any portion thereof now or hereafter existing or entered into, and all right, title and interest of Trustor thereunder, including, without limitation, all cash or security deposits, prepaid or advance rentals, and deposits or payments of similar nature;

Together with all right, title and interest of Trustor now or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining the Premises, and any and all sidewalks, vaults, alleys and strips and gores of land adjacent to or used in connection with the Premises;

Together with all the estate, interest, right, title, other claims or demands, both in law and in equity, including claims or demands with respect to the proceeds of insurance in effect with respect to the Premises or Improvements, which Trustor now has or may hereafter acquire in the Premises or Improvements, and any and all awards made for the taking by eminent domain, or by any proceeding of purchase in lieu thereof, of the whole or any part of the Estate (as hereinafter defined), including, without limitation, any awards resulting from a change of grade of streets and awards for severance damages.

All of the estates, interests, rights, titles, claims and demands hereby conveyed and transferred or intended to be conveyed and transferred to Trustee pursuant to granting clause Paragraph A above shall hereinafter collectively be referred to as the "**Estate**."

B.       To Secured Party, A SECURITY INTEREST in any portion of the Premises or Improvements that may be construed to be personal property owned by Debtor, and in all other personal property of every kind and description owned by Debtor, whether now existing or hereafter acquired, now or at any time hereafter affixed or attached to, erected upon, situated in or upon, forming a part of, appurtenant to, used or useful in the construction or operation of or in connection with, or arising from the use or enjoyment of all or any portion of, or from any lease, sublease or agreement pertaining to the Premises, including all presently existing and hereafter arising earnings, Rents and/or subrents, royalties, issues, profits, revenues, license fees, income, space rents, parking facility rents, conference or other room rents, proceeds and other benefits thereof which relate to or arise from the Premises and/or any Improvements thereon or arising from the use, occupation or enjoyment of all or any portion thereof and deriving from any lease, sublease, license, franchise or concession now or hereafter affecting the Premises or any parties thereof (subject, however, to the rights and authorities given hereinbelow to Debtor to collect and apply such rents);

Together with all existing and future leases, subleases, tenancies, subtenancies, licenses, occupancy or rental agreements (including other office, facility or room occupancy or rental agreements) and concessions relating to the use and enjoyment of all or any part of the Premises and Improvements, and any and all deposits, guaranties and other agreements relating to or made in connection with any of such leases;

**JAE 0149**

CONFIDENTIAL

SPCP_0000004452

Together with all existing and future goods, appliances, fixtures, and equipment, and all building service equipment, building materials and machinery of every nature whatsoever now owned or later to be owned by Debtor, and attached or to be attached or affixed to, placed in or on or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises or Improvements, whether stored on the Premises or elsewhere, and including any of the foregoing as may be held in storage, or in transit or otherwise earmarked for the Premises, Improvements or any other such facilities, including, but not limited to, all signs (whether detachable or affixed), pumping plants, irrigation systems, engines, pipes, ditches and flumes; also all gas, electric, power, cooking, heating, cooling, air conditioning, lighting, laundry, refrigeration, incinerating and plumbing fixtures and equipment; also all pumps, tanks, motors, conduits, lining, cleaning, fire prevention, fire extinguishing, ventilating, switchboards and communications apparatuses; also all elevators, escalators and related machinery and equipment; also all shades, awnings, blinds, curtains, drapes and attached and attached floor coverings, and all repair parts, replacement parts; also all television, radio and music cable antennae satellite and video systems; also all partitions, safes, ducts and compressors; also all trees, plants and other items of interior and exterior landscaping; also all visual and electronic surveillance systems;

Together with all proceeds, including all past, present and future claims to and demands for them, of the voluntary or involuntary conversion of the Premises, Improvements, or the other property described above into cash or other property or liquidated claims, including proceeds of all present and future fire hazard or casualty insurance policies and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any damage or injury to the Premises, Improvements, or the other property described above or any part of them, or breach of warranty in connection with the Improvements, or arising out of any transaction financed by funds loaned to Debtor, including causes of action arising in tort, contract, fraud or concealment of a material fact;

All of the personal property and fixtures described in granting clause <u>Paragraph B</u> above shall hereinafter collectively be referred to as the "**Personal Property.**"

The Estate and the Personal Property are hereinafter together sometimes referred to as the "**Property.**"

## <u>SECURING CLAUSES</u>

<u>FOR THE PURPOSE OF SECURING:</u>

(a)     Repayment of the Loans, or so much thereof as may have been advanced from time to time, with interest thereon, as evidenced by the Notes, executed by Borrowers (as that term is defined in the Credit Agreement and the Loan Documents);

(b)     Payment of all sums advanced by Beneficiary as permitted under the Credit Agreement to any Borrower or their successors and assigns, or to any Credit Parties (including Trustor), or to Trustee to protect the Property, with interest thereon at the Default Rate (as defined in the Credit Agreement);

CONFIDENTIAL                                                                        SPCP_0000004453

(c)     Performance of every obligation, covenant or agreement of Borrowers and Credit Parties (including Trustor) contained herein or in the Credit Agreement, the Notes or the Loan Documents;

(d)     Performance of every obligation, covenant and agreement of Borrowers, Credit Parties (including Trustor) contained in any document, instrument or agreement now or hereafter executed by Borrowers or by Credit Parties (including Trustor) which recites that the obligations thereunder are secured by this Deed of Trust, including, without limitation payment of all other sums, with interest thereon, which may hereafter be loaned to Borrowers, or their successors or assigns, by Beneficiary, or its successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust; and

(e)     Payment and compliance with and performance of each and every material provision of any declaration of covenants, conditions and restrictions pertaining to the Property or any portion thereof, and all encumbrances of record which have a priority senior to the lien created hereunder.

All initially capitalized terms used herein which are defined in the Credit Agreement shall have the same meaning herein unless the context otherwise requires.

## AGREEMENT

TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR HEREBY COVENANTS AND AGREES AS FOLLOWS:

1.    **COVENANTS AND AGREEMENTS OF TRUSTOR.**

A.    <u>Payment Of Secured Obligations</u>.  Borrowers shall pay when due the principal of and the interest on the Loans evidenced by the Notes; all charges, fees and other sums as provided in the Loan Documents; the principal of and interest on any future advances secured by this Deed Of Trust; and the principal of and interest on any other indebtedness secured by this Deed Of Trust (collectively, the "**Secured Obligations**").

B.    <u>Maintenance; Repair; Alterations</u>.  Trustor:  (1) shall keep the Property in good condition and repair subject to normal wear and tear; (2) shall not remove, demolish or substantially alter the Property except upon the prior written consent of Beneficiary, which consent shall not be unreasonably withheld; (3) shall complete promptly and in a good and workmanlike manner any improvement which may be now or hereafter constructed on the Property or Improvements and promptly restore in like manner any portion of the Property or Improvements which may be damaged or destroyed thereon from any cause whatsoever, and, subject to any right to insurance proceeds under the Credit Agreement, pay when due all claims for labor performed and materials furnished therefor; (4) shall comply with all laws, ordinances, regulations, covenants, conditions and restrictions now or hereafter affecting the Property or any part thereof or requiring any alterations to Improvements, including, without limitation, all Environmental Laws (defined in the Credit Agreement), the Americans With Disabilities Act, Public Law 101-336, and the California Fair Housing Act of 1992; (5) shall not commit or permit any waste or deterioration of the Property; (6) shall not allow changes in the use for

CONFIDENTIAL    SPCP_0000004454

which all or any part of the Property was intended; and (7) shall not initiate or acquiesce in a change in the zoning classification of the Premises without Beneficiary's prior written consent.

      C.    <u>Required Insurance</u>.  Trustor shall at all times provide, maintain and keep in force or cause to be provided, maintained and kept in force, at no expense to Trustee or Beneficiary, policies of insurance in form and amounts, providing for deductibles (not to exceed the lesser of 1% of the face amount of any such policy or $20,000), and issued by companies, associations or organizations covering such casualties, risks, perils, liabilities and other hazards as required by Beneficiary.

      1.    The Trustor., at its sole cost and expense, shall keep all Improvements, boilers and machinery, and all other Personal Property now or hereafter situated on the Property insured during the term of this Deed of Trust against loss or damage by fire and against loss or damage by other risks now embraced by so called Extended Coverage, and by vandalism and malicious mischief, boiler and machinery (if applicable), flood and/or earthquake insurance (if applicable, all as may reasonably be required by Beneficiary).  If the Property is now, or hereafter becomes, situated in a special flood hazard area as identified by the Federal Insurance Administration, or any successor thereto, or other appropriate authority, governmental or private, then the Trustor shall obtain and maintain at all times thereafter, a policy of flood insurance in such amount as Beneficiary may, from time to time reasonably require, and shall otherwise comply with the requirements of the National Flood Insurance Program.  A Life of Loan Flood Hazard Certificate shall be provided to Beneficiary identifying the Flood Hazard Zone in which the Property is situated.  Trustor shall also provide commercial general liability insurance with such limits for personal injury and death and property damage as Beneficiary may reasonably require.  Trustor shall also maintain terrorism insurance coverage as long as available at commercially reasonable rates and such coverage for hazards as are at the time commonly insured against for properties similar to the Premises and located in or around the region in which the Premises are located, all as determined solely by Beneficiary.

      2.    The Trustor shall initially maintain, until Beneficiary shall otherwise indicate in writing, the following insurance:

      (a)    "All-risk" property insurance with a stated liability of not less than $350,000,000, with a deductible of not more than $100,000, for damage or other loss caused by fire or other casualty or cause including, but not limited to, vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting of pipes and explosion, in an amount not less than one hundred percent (100%) of the replacement cost covering (i) the Property; (ii) all Improvements and Collateral on the Property, (iii) all Personal Property located in or on the Property; and (iv) Trustor's trade fixtures, equipment and other personal property from time to time situated in or on the Property.  The proceeds of such insurance shall be used for the repair or replacement of the property so insured, except that if not so applied or if this Deed of Trust or the Credit Agreement is terminated following a casualty, the proceeds shall be paid to Lender.

      (b)    Commercial general liability insurance, on the so-called "occurrence" form naming Beneficiary as an additional insured, in an amount equal to Ten

CONFIDENTIAL      

Million Dollars ($10,000,000), combined single limit policy, Twenty Million Dollars ($20,000,000) in the aggregate, for personal injury and property damage.

(c)     Business interruption and/or loss of "rental income" insurance, each naming Beneficiary as an additional insured, in an amount sufficient to avoid any co-insurance penalty and to provide proceeds which will cover a period of not less than twelve (12) months from the date of casualty or loss; the term "rental income" shall mean the sum of (A) the total then ascertainable Rents payable under the Leases (defined in the Absolute Assignment of Rents and Leases, defined in the Credit Agreement), and (B) the total ascertainable amount of all other amounts to be received by Trustor from third parties which are, reduced to the extent such amounts would not be received because of operating expenses not incurred during a period of non-occupancy of that portion of the Property then not being occupied.

(d)     At all times during which structural construction, repairs or alterations are being made with respect to the Improvements, Trustor shall also maintain (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above-mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (1) above written in a so-called builder's risk completed value form (w) on a non-reporting basis, (x) against all risks insured against pursuant to the first sentence of this paragraph, (y) including permission to occupy the Property, and (z) with an agreed amount endorsement waiving co-insurance provisions.

3.     All such insurance policies shall be written by a company or companies licensed to do business in the State of California and having a rating of A+8 or better for ratings by Moody's Investors Service, Inc., or A or better for ratings by Fitch Investors Service, L.P. or Standard & Poor's Rating Services.

4.     The original policy or policies and renewals thereof (or, at the sole option of Beneficiary, duplicate originals or certified copies thereof), together with receipts evidencing payment of the premium therefor, shall be deposited with Beneficiary, and Trustor hereby assigns to Beneficiary the proceeds of such policy or policies as additional security for the Secured Obligations. Such insurance may be provided in one policy or separate policies for hazard insurance, rental or business interruption insurance or flood insurance. Each such policy of insurance shall contain a non-contributing loss payable clause and a mortgagee clause in favor of and in form acceptable to Beneficiary and shall provide for not less than thirty (30) days prior written notice to Beneficiary of any intent to modify, cancel, or terminate the policy or policies or the expiration of such policies of insurance, and must include the Beneficiary's loss payable endorsement, form 438BFU (or state equivalent), and such other endorsements as required by Beneficiary, including., but not limited to, a replacement cost endorsement and agreed amount endorsement. If the insurance required under this Paragraph 1.C.4. or any portion thereof is maintained pursuant to a blanket policy, Trustor shall furnish to Beneficiary a certified copy of such policy, together with an original Evidence of Insurance (Acord Form 27) indicating that Beneficiary (and its successors and/or assigns) is an insured under such policy in regard to the Premises and showing the amount of coverage apportioned to the Premises which coverage shall be in an amount sufficient to satisfy the requirements hereof. Not less than ten (10) business days prior to the expiration dates of each policy required of Trustor hereunder, Trustor will

#4831-1562-0370v4                              7

CONFIDENTIAL                                SPCP_0000004456

deliver to Beneficiary a renewal policy or policies marked "premium paid" or accompanied by other evidence of payment and renewal satisfactory to Beneficiary; and in the event of foreclosure of this Deed of Trust, any purchaser or purchasers of the Premises shall succeed to all rights of Trustor, including any rights to unearned premiums, in and to all insurance policies assigned and delivered to Beneficiary pursuant to the provisions of this Section.

5.      Notwithstanding the foregoing, at any time while any amounts remain outstanding under the Loans, upon the request of Beneficiary, Trustor shall be required to maintain such insurance as may from time to time be required under Beneficiary's then current underwriting guidelines.

D.      <u>Delivery Of Policies; Payment Of Premiums</u>.

1.      At Beneficiary's option all policies of insurance shall either have attached thereto a lender's loss payable endorsement for the benefit of Beneficiary in form satisfactory to Beneficiary or shall name Beneficiary as an additional insured.  Trustor shall furnish Beneficiary with an original of all policies of insurance required under <u>Paragraph 1.C (Required Insurance)</u> above or by any Loan Documents, or with evidence of insurance issued by the applicable insurance company for each required policy setting forth the coverage, the limits of liability, the name of the carrier, the policy number and the period of coverage, and otherwise in form and substance satisfactory to Beneficiary.  At least ten (10) business days prior to the expiration of each required policy, Trustor shall deliver to Beneficiary evidence reasonably satisfactory to Beneficiary of the payment of premium and the renewal or replacement of such policy continuing insurance in form as required by this Deed Of Trust.  All such policies shall contain a provision that, notwithstanding any contrary agreement between Trustor and the insurance company, such policies will not be canceled, allowed to lapse without renewal, surrendered or materially amended, which term shall include any reduction in the scope or limits of coverage, without at least ten (10) business days' prior written notice to Beneficiary.

2.      In the event Trustor fails to provide, maintain, keep in force or deliver to Beneficiary the policies of insurance required by this Deed Of Trust or by any Loan Documents, Beneficiary may (but shall have no obligation to) procure such insurance for such risks covering Beneficiary's interest, and Trustor will pay all premiums thereon and reimburse Beneficiary for all amounts paid or incurred by it in connection therewith promptly upon demand by Beneficiary, and, until such payment is made by Trustor, the amount of all such premiums shall be added to the principal amount of the Loans and shall bear interest at the Default Rate (as defined in the Credit Agreement).  After an Event of Default occurs, and upon request by Beneficiary, Trustor shall thereafter deposit with Beneficiary in monthly installments, an amount equal to one-twelfth (1/12) of the estimated aggregate annual insurance premiums on all policies of insurance required by the Credit Agreement, this Deed Of Trust or any of the other Loan Documents.  In such event Trustor further agrees to cause all bills, statements or other documents relating to the foregoing insurance premiums to be sent or mailed directly to Beneficiary.  Upon receipt of such bills, statements or other documents evidencing that a premium for a required policy is then payable, and providing Trustor has deposited sufficient funds with Beneficiary pursuant to <u>Paragraph 1.D (Delivery Of Policies; Payment Of Premiums)</u>, Beneficiary shall timely pay such amounts as may be due thereunder out of the funds so deposited with Beneficiary.  If at any time and for any reason the funds deposited with

#4831-1562-0370v4                                          8

**JAE 0154**

Beneficiary are or will be insufficient to pay such amounts as may be then or subsequently due, Beneficiary shall notify Trustor and Trustor shall within five (5) calendar days deposit an amount equal to such deficiency with Beneficiary.  Notwithstanding the foregoing, nothing contained herein shall cause Beneficiary to be deemed a trustee of said funds or to be obligated to pay any amounts in excess of the amount of funds deposited with Beneficiary pursuant to Paragraph 1.D (Delivery Of Policies; Payment Of Premiums) nor shall anything contained herein modify the obligation of Trustor set forth in Paragraph 1.C (Required Insurance) to maintain and keep such insurance in force at all times.  Beneficiary may commingle said reserve with its own funds and Trustor shall be entitled to no interest thereon.

E.    Casualties; Insurance Proceeds.  Trustor shall give prompt written notice thereof to Beneficiary after the happening of any casualty to or in connection with the Property or any part thereof, in excess of $ 100,000 whether or not covered by insurance.  All casualty insurance policies referred to herein shall provide a Lender's Loss Payable Endorsement using a Form 438BFU (or state equivalent) in favor of Beneficiary, and provide that the Beneficiary shall be entitled to participate in any loss adjustment of $100,000 or more affecting the Property and that, in the absence of written notice by Beneficiary to the insurer that an Event of Default hereunder has occurred, the proceeds of any loss of less than $100,000 may be adjusted by and payable to Trustor.  After an Event of Default occurs, Beneficiary shall be entitled to participate with Trustor in connection with the adjustment of any loss, regardless of amount; however, Beneficiary shall not under any circumstance be responsible for the collection of insurance proceeds in the event of loss.  Beneficiary shall make reasonable efforts to assure that insurance proceeds for any loss where Beneficiary is involved in adjustment of such loss shall be made available for the repair, rebuilding or restoration of damage in a prompt and timely manner, but only as repairs or replacements are effected and continuing expenses become due and payable and provided all applicable conditions specified in the Credit Agreement with respect thereto have been satisfied.  If any one or more of such conditions in the Credit Agreement have not been met, Beneficiary shall not be obligated to make any further disbursements pursuant to the Credit Agreement and Beneficiary shall apply all loss proceeds, after deductions as herein provided, to the repayment of the outstanding balance of the Notes, together with all accrued interest thereon, notwithstanding that the outstanding balance may not be due and payable.  Nothing herein contained shall be deemed to excuse Trustor from repairing or maintaining the Property as required in Paragraph 1.B (Maintenance; Repair; Alterations) or restoring all damage or destruction to the Property, regardless of whether or not there are insurance proceeds available to Trustor or whether or not any such proceeds are sufficient in amount, and the application or release by Beneficiary of any insurance proceeds shall not cure or waive any event, condition or occurrence that would upon notice or with passage of time constitute an Event of Default, nor cure or waive any Event of Default or notice of default under this Deed Of Trust or the Credit Agreement or invalidate any act done pursuant to such notice.

F.    Assignment Of Policies Upon Foreclosure.  In the event of foreclosure of this Deed Of Trust or other transfer of title or assignment of the Property in extinguishment, in whole or in part, of the debt secured hereby, and to the extent assignable, all right, title and interest of Trustor in and to all policies of insurance required by Paragraph 1.C (Required Insurance) shall inure to the benefit of and pass to the successor-in-interest to Trustor, to the purchaser or grantee of the Property.

CONFIDENTIAL                                                                                           SPCP_0000004458

G.     Indemnification; Subrogation; Waiver Of Offset.

1.      If Beneficiary is made a party to any litigation or other legal proceeding concerning the Notes, this Deed Of Trust, any of the Loan Documents, the Premises, the Property or any part thereof or interest therein, or the occupancy of the Premises by Trustor, then Trustor shall indemnify, defend, protect and hold Beneficiary free and harmless from all claims and liabilities by reason of said litigation or other legal proceeding (excluding claims based on gross negligence or willful misconduct of Beneficiary), including reasonable attorneys' fees, statutory and non-statutory costs and expenses and expert witness fees paid or incurred by Beneficiary as a result of any such litigation or other legal proceeding, whether or not any such litigation or other legal proceeding is prosecuted to judgment.  Based on advice of Beneficiary's counsel that its rights might not otherwise be adequately protected or that a potential conflict might exist, the Beneficiary may employ an attorney or attorneys selected by it to protect its rights hereunder, and Trustor shall pay to Beneficiary reasonable attorneys' fees and costs incurred by Beneficiary, whether or not legal action is actually commenced against Trustor by reason of its breach.

2.      Except for the gross negligence and willful misconduct of Beneficiary or Trustee, Trustor waives any and all right to claim or recover against Trustee, Beneficiary, or their respective officers, directors, shareholders, employees, agents and representatives, for loss of or damage to Trustor, the Property, Trustor's property or the property of others under Trustor's control from any cause insured against or required to be insured against by the provisions of this Deed Of Trust.

3.      All sums payable by Trustor pursuant to this Deed Of Trust or the Notes or other Loan Documents shall be paid without notice, demand, counterclaim, setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and the obligations and liabilities of Trustor hereunder shall in no way be released, discharged or otherwise affected (except as expressly provided herein) by reason of:  (a) any damage to or destruction of or any condemnation or similar taking of the Property or any part thereof; (b) any restriction or prevention of or interference by any third party with any use of the Property or any part thereof; (c) any title defect or encumbrance or any eviction from the Premises or any part thereof by title paramount or otherwise; (d) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Beneficiary, or any action taken with respect to this Deed Of Trust by any trustee or receiver of Beneficiary, or by any court, in any such proceeding; (e) any claim which Trustor has or might have against Beneficiary or any other Borrower; (f) any default or failure on the part of Beneficiary to perform or comply with any of the terms hereof or of any other agreement with Trustor; or (g) any other occurrence whatsoever, whether similar or dissimilar to the foregoing; whether or not Trustor shall have notice or knowledge of any of the foregoing.  Except as expressly provided herein, Trustor waives all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution or reduction of any sum secured hereby and payable by Trustor.

H.     Taxes And Impositions.

#4831-1562-0370v4                                 10

**JAE 0156**

CONFIDENTIAL                                                                                    SPCP_0000004459

1.      As used herein, "**Impositions**" shall mean all taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever, including, without limitation, nongovernmental levies or assessments such as maintenance charges, levies or charges resulting from covenants, conditions and restrictions affecting the Property, which are assessed or imposed upon the Property or any portion of it, or become due and payable, and which create, may create or appear to create a lien upon the Premises, or any part thereof, or upon any person, property, equipment or other facility used in the operation or maintenance thereof, or any tax or assessment on the Estate, or any portion of it, in lieu thereof or in addition thereto, or any license fee, tax or assessment imposed on Beneficiary and measured by or based in whole or in part upon the amount of the outstanding obligations secured hereby.  Trustor shall pay at least ten (10) business days prior to delinquency all Impositions. Trustor shall deliver to Beneficiary proof of the payment of the Impositions within ten (10) calendar days after such Impositions are due,

2.      Upon request by Beneficiary after an Event of Default (whether or not continuing), Trustor shall pay to Beneficiary an initial cash reserve in an amount adequate to pay all Impositions for the ensuing tax fiscal year and shall thereafter continue to deposit with Beneficiary, in monthly installments, an amount equal to one-twelfth (1/12) of the sum of the annual Impositions reasonably estimated by Beneficiary, for the purpose of paying the installment of Impositions next due on the Property (funds deposited for this purpose shall hereinafter be referred to as "**Impounds**").  Upon request of Beneficiary, after an Event of Default, Trustor further agrees to cause all bills, statements or other documents relating to Impositions to be sent or mailed directly to Beneficiary.  Upon receipt of such bills, statements or other documents, and provided that Trustor has deposited sufficient Impounds with Beneficiary pursuant to this Paragraph 1.H.2., Beneficiary shall timely pay such amounts as may be due thereunder out of the Impounds so deposited with Beneficiary.  If at any time and for any reason the Impounds deposited with Beneficiary are or will be insufficient to pay such amounts as may then or subsequently be due, Beneficiary may notify Trustor and upon such notice Trustor shall deposit within five (5) calendar days after receipt of such notice an amount equal to such deficiency with Beneficiary.  If after the payment of the Impositions there shall be an excess amount held by Beneficiary, such excess amount shall be refunded to Trustor or credited against the Loans in any manner and in such amount as Beneficiary may elect Beneficiary may commingle Impounds with its own funds and shall not be obligated to pay or allow any interest on any Impounds held by Beneficiary pending disbursement or application hereunder. Beneficiary may reserve for future payment of Impositions such portion of the Impounds as Beneficiary may in its reasonable discretion deem proper.

3.      From and after the occurrence of a continuing Event Of Default hereunder or under any of the Loan Documents, Beneficiary may apply the balance of the Impounds upon any indebtedness or obligation secured hereby in such order as Beneficiary may determine, notwithstanding that said indebtedness or the performance of said obligation may not yet be due according to the terms thereof.  Should Trustor fail to deposit with Beneficiary (exclusive of that portion of said payments which have been applied by Beneficiary upon any indebtedness or obligation secured hereby) sums sufficient to fully pay such Impositions at least ten (10) business days before the due date thereof, Beneficiary may, at Beneficiary's election, but without any obligation so to do, advance any amounts required to make up the deficiency, which advances, if any, shall bear interest at the Default Rate, shall be secured hereby and shall be repayable to

CONFIDENTIAL                                                                                    SPCP_0000004460

Beneficiary as herein elsewhere provided, or at the option of Beneficiary the latter may, without making any advance whatever, apply any Impounds held by it upon any indebtedness or obligation secured hereby in such order as Beneficiary may determine, notwithstanding that said indebtedness or the performance of said obligation may not yet be due according to the terms thereof.  Should any Event Of Default occur or exist on the part of the Trustor in the payment or performance of any of Trustor's obligations under the terms of the Loan Documents, Beneficiary may, at any time at Beneficiary's option, apply any sums or amounts in its possession received pursuant to Paragraphs 1.D.2. and 1.H.3. hereof, to any indebtedness or obligation of the Trustor secured hereby in such manner and order as Beneficiary may elect, notwithstanding said indebtedness or the performance of said obligation may not yet be due according to the terms thereof.  The receipt, use or application of any such Impounds paid by Trustor to Beneficiary hereunder shall not be construed to affect the maturity of any indebtedness secured by this Deed Of Trust or any of the rights or powers of Beneficiary or Trustee under the terms of the Loan Documents or any of the obligations of Trustor or any guarantor under the Loan Documents.

4.     Trustor shall not suffer, permit or initiate the joint assessment of any real and personal property which may constitute all or a portion of the Property or suffer, permit or initiate any other procedure whereby the lien of the Premises taxes and the lien of the personal property taxes shall be assessed, levied or charged to the Premises, or any portion thereof, as a single lien.

5.     If requested by Beneficiary, Trustor shall cause to be furnished to Beneficiary a tax reporting service covering the Property of the type, duration and with a company satisfactory to Beneficiary.

I.     Utilities.  Trustor shall pay or shall cause to be paid on or before the due date all utility charges which are incurred by Trustor for the benefit of the Property and all other assessments or charges of a similar nature, whether or not such charges are or may become liens thereon.

J.     Actions Affecting The Property.  Trustor shall promptly give Beneficiary written notice of and shall appear in and contest any action or proceeding purporting to affect the Property or the security hereof or the rights or powers of Beneficiary or Trustee; and shall pay all statutory and non-statutory costs and expenses, including the cost of evidence of title and reasonable attorneys' fees, in any such action or proceeding in which Beneficiary or Trustee may appear.

K.     Actions By Trustee Or Beneficiary To Preserve The Property.  If any Borrower or any Credit Party (including Trustor) fails to make any payment or to do any act as and in the manner provided in any of the Loan Documents, then upon the occurrence of a Default or Event of Default under the Credit Agreement, Beneficiary and/or Trustee, each in its own discretion. without obligation so to do, without releasing Trustor from any obligation, and without further notice to or demand upon Trustor, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof.  In connection therewith (without limiting their general powers, whether conferred herein, in any other Loan Documents or by law), Beneficiary and Trustee shall have and are hereby given the right, but not the obligation: (1) to enter upon and take possession of the Property; (2) to make additions, alterations, repairs

CONFIDENTIAL                                                                    SPCP_0000004461

and Improvements to the Property which they or either of them may consider necessary or proper to keep the Property in good condition and repair; (3) to appear and participate in any action or proceeding affecting or which may affect the security hereof or the rights or powers of Beneficiary or Trustee; (4) to pay, purchase, contest or compromise any encumbrance, claim, charge, lien or debt which in the judgment of either may affect or appears to affect the security of this Deed Of Trust or be prior or superior hereto; and (5) in exercising such powers, to pay necessary expenses, including attorneys' fees and costs or other necessary or desirable consultants.  Trustor shall, immediately upon demand therefor by Beneficiary and Trustee or either of them, pay to Beneficiary and Trustee an amount equal to all respective costs and expenses incurred by such party in connection with the exercise of the foregoing rights, including, without limitation, costs of evidence of title, court costs, appraisals, surveys and receiver's, trustee's attorneys' fees, Beneficiary's reasonable attorneys' fees, and expert witness fees, together with interest thereon from the date of such expenditures at the Default Rate.

L.    Transfer By Trustor.  In order to induce Beneficiary to make the Loans secured hereby, Trustor agrees, in the event of any transfer of the Property or any portion thereof by Trustor without the prior written consent of Beneficiary or not otherwise in accordance with the Credit Agreement and this Deed Of Trust, that such transfer shall constitute an Event Of Default hereunder without the need for notice or an opportunity to cure and Beneficiary shall have the absolute right at its option, without prior demand or notice, to declare all sums secured hereby immediately due and payable:  Consent to one such transaction shall not be deemed to be a waiver of the right to require consent to future or successive transactions.  Beneficiary may grant or deny such consent in its sole discretion and, if consent should be given, any such transfer shall be subject to this Deed Of Trust, and any such transferee, by taking title to the Estate or the Property, shall be deemed to have assumed all obligations hereunder and agree to be bound by all provisions contained herein.  Such assumption shall not, however, release Trustor or any maker or guarantor of the Notes from any liability thereunder without the prior written consent of Beneficiary, which may be given or withheld in Beneficiary's sole and absolute discretion, As used herein, "transfer" includes (a) the direct or indirect sale, transfer, conveyance, assignment, mortgage, encumbrance, hypothecation or other alienation of the Property, or any portion thereof or interest therein by Trustor, whether voluntary, involuntary, by operation of law or otherwise, (b) the execution of any installment contract, sales or assignment agreement, deed or similar instrument affecting all or a portion of the Estate or the Premises, (c) granting of an option to purchase any portion of or interest in the Estate, (d) the creation of a lien or other encumbrance on the Leases or the Estate or any part thereof or interest in the Property, (e) the sublease or assignment of all or substantially all of the Premises or the Estate; and (f) a Change of Control (as defined in the Credit Agreement).

M.    Survival Of Warranties.  All representations, warranties and covenants of any Borrower or any Credit Party (including Trustor) contained in any Loan application or made to Beneficiary in connection with the Loans secured hereby or contained in the Credit Agreement or any Loan Document are incorporated herein by reference, and shall survive the execution and delivery of this Deed Of Trust and shall remain continuing obligations, warranties and representations of each Borrower and Credit Party (including Trustor) so long as any portion of the obligations secured by this Deed Of Trust remain outstanding.

N.    Eminent Domain.

**JAE 0159**

CONFIDENTIAL                                                                    SPCP_0000004462

1.      In the event that any proceeding or action be commenced for the taking of the Property, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, condemnation or otherwise, or if the same be taken or damaged by reason of any public improvement or condemnation proceeding, or in any other manner, or should Trustor receive any notice or other information regarding such proceeding, action, taking or damage, Trustor shall give immediate written notice thereof to Beneficiary.  After the occurrence of an Event of Default, Beneficiary shall be entitled, at its option, without regard to the adequacy of its security, to commence, appear in and prosecute in its own name any such action or proceeding.  Prior to the occurrence of an Event of Default hereunder or under the Loan Documents, Beneficiary shall have the right to notice and approval of any compromise and settlement of any taking or damage; however, after an continuing Event Of Default, Beneficiary shall also be entitled to make any compromise or settlement in connection with such taking or damage.  All compensation, awards, damages, rights of action and proceeds awarded to Trustor by reason of any such taking or damage (the "**Condemnation Proceeds**") are hereby assigned to Beneficiary as additional security for the payment and performance of the Secured Obligations, and Trustor agrees to execute such further assignments of the Condemnation Proceeds as Beneficiary or Trustee may require.  After deducting therefrom all costs and expenses (regardless of the particular nature thereof and whether incurred with or without suit), including reasonable attorneys' fees and statutory and non-statutory costs and expenses, incurred by it in connection with any such action or proceeding, subject to the terms of the Credit Agreement, Beneficiary shall apply all such Condemnation Proceeds to the restoration of the Property, provided that (a) the taking or damage will not, in Beneficiary's judgment, materially and adversely affect the contemplated use and operation of the Property; and (b) all applicable conditions set forth in the Credit Agreement are met.  If all of the above conditions are met, Beneficiary shall disburse the Condemnation Proceeds in accordance with the Credit Agreement and only as repairs or replacements are effected and continuing expenses become due and payable.

2.      If any one or more of such conditions are not met, Beneficiary shall apply all of the Condemnation Proceeds, after deductions as herein provided, to the repayment of the outstanding balance of the Loans, together with all accrued interest thereon, notwithstanding that said outstanding balance may not be due and payable; and Beneficiary shall have no further obligation to make disbursements pursuant to the Credit Agreement or the other Loan Documents.  If the Condemnation Proceeds are not sufficient to repay the Loans in full, Borrowers shall immediately pay any remaining balance, together with all accrued interest thereon.  Application or release of the Condemnation Proceeds as provided herein shall not cure or waive any condition or occurrence that would upon notice or with passage of time constitute an Event of Default, nor cure or waive any Event of Default or notice of default under this Deed Of Trust or invalidate any act done pursuant to such notice.

O.      Additional Security.  No other security now existing, or hereafter taken, to secure the obligations secured hereby shall be impaired or affected by the execution of this Deed Of Trust and all additional security shall be taken, considered and held as cumulative.  The taking of additional security, execution of partial releases of the security, or any extension of the time of payment of the indebtedness shall not diminish the force, effect or lien of this Deed Of Trust and shall not affect or impair the liability of any maker, surety or endorser for the payment of said indebtedness.  In the event Beneficiary at any time holds additional security for any of the

CONFIDENTIAL

obligations secured hereby, it may enforce the sale thereof or otherwise realize upon the same, at its option, either before, concurrently, or after a sale is made hereunder.

P.    Appointment of Successor Trustee.  Beneficiary may, from time to time, by a written instrument executed and acknowledged by Beneficiary, mailed to Trustor and recorded in the county in which the Premises is located and by otherwise complying with the provisions of applicable law, substitute a successor or successors to any Trustee named herein or acting hereunder.  Such successor shall, without conveyance from the Trustee predecessor, succeed to all title, estate, rights, powers and duties of said predecessor.

Q.    Successors And Assigns.  This Deed Of Trust applies to, inures to the benefit of and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns.  The term "**Beneficiary**" shall mean the owner and holder of the Notes, whether or not named as Beneficiary herein.  In exercising any rights hereunder or taking any actions provided for herein, Beneficiary may act through its employees, agents or independent contractors authorized by Beneficiary.

R.    Inspections.  Upon reasonable notice, Beneficiary, or its agents, representatives or workers, are authorized to enter at any reasonable time upon or in any part of the Premises for the purpose of inspecting the same and for the purpose of performing any of the acts it is authorized to perform hereunder or under the terms of any of the Loan Documents.  Without limiting the generality of the foregoing, Trustor agrees that Beneficiary will have the same right, power and authority to enter and inspect the Premises as is granted to a secured lender under Section 2929.5 of the California Civil Code, and that Beneficiary will have the right to appoint a receiver to enforce this right to enter and inspect the Premises to the extent such authority is provided under California law, including the authority given to a secured lender under Section 564(c) of the California Code of Civil Procedure.

S.    Liens.  Trustor shall pay and promptly discharge, at Trustor's cost and expense, all liens, encumbrances and charges upon the Property, or any part thereof or interest therein; provided, however, that Trustor shall have the right to contest in good faith the validity of any such lien, encumbrance or charge in accordance with the Credit Agreement.  If Trustor shall fail to remove and discharge any such lien, encumbrance or charge within fifteen (15) calendar days, then, in addition to any other right or remedy of Beneficiary, Beneficiary may, but shall not be obligated to, discharge the same, either by paying the amount claimed to be due, or by procuring the discharge of such lien, encumbrance or charge by depositing in a court a bond for the amount claimed or otherwise giving security for such claim, or by procuring such discharge in such manner as is or may be prescribed by law.  Trustor shall, immediately upon demand therefor by Beneficiary, pay to Beneficiary an amount equal to all costs and expenses incurred by Beneficiary in connection with the exercise by Beneficiary of the foregoing right to discharge any such lien, encumbrance or charge, together with interest thereon from the date of such expenditure until repaid in full at the Default Rate.

T.    Trustee's Powers.  At any time, or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed Of Trust and the Notes secured hereby for endorsement, and without affecting the personal liability of any person or entity for payment of the indebtedness secured hereby or the effect of this Deed Of

#4831-1562-0370v4                                    15

CONFIDENTIAL                                                                     SPCP_0000004464

Trust upon the remainder of said Property, Trustee may (1) reconvey any part of said Property, (2) consent in writing to the making of any map or plat thereof, (3) join in granting any easement thereon, or (4) join in any extension agreement or any agreement subordinating the lien or charge hereof.

U.     Beneficiary's Powers.  Without affecting the liability of any other person or entity liable for the payment of any obligation herein mentioned, and without affecting the lien or charge of this Deed Of Trust upon any portion of the Property not then or theretofore released as security for the full amount of all unpaid obligations, Beneficiary may, from time to time and without notice (1) release any person so liable, (2) extend the maturity or alter any of the terms of any such obligation, (3) grant other indulgences, (4) release or reconvey, or cause to be released or reconveyed at any time at Beneficiary's option any parcel, portion or all of the Premises, (5) take or release any other or additional security for any obligation herein mentioned, or (6) make compositions or other arrangements with debtors in relation thereto.

V.     Financial Statements.  Trustor shall deliver to Beneficiary copies of such financial statements in accordance with the Credit Agreement, All such statements shall be prepared in accordance with the requirements of the Credit Agreement and Beneficiary shall have the right to audit and inspect all books and records relating thereto.  Upon reasonable notice, Beneficiary or its representatives shall have the right to examine and make copies of such books and records and all supporting vouchers and invoices at Trustor's principal place of business during regular business hours.

W.     Trade Names.  At the request of Beneficiary, Trustor shall execute a certificate in form satisfactory to Beneficiary listing the trade-names or fictitious business names under which Trustor intends to operate the Property or any business located thereon and representing and warranting that Trustor does business under no other trade names or fictitious business names with respect to the Property.  Trustor shall promptly notify Beneficiary in writing of any change in said trade names or fictitious business names, and will, upon request of Beneficiary, execute any additional financing statements and other certificates necessary to reflect the change in trade names or fictitious business names.

X.     After-Acquired Property; Acquisition of Additional Owned Property.  In the event Trustor acquires any interest in any real property or improvements that are not a part of the Estate as of the date of this Deed of Trust, but which become appurtenant to the Estate, then Trustor agrees to promptly notify Beneficiary reasonably prior to such acquisition and to execute and deliver an amendment to this Deed of Trust to reflect the addition of such real property or improvements to the Estate subject to this Deed of Trust.  In the event Trustor acquires any part or all of the fee simple title to the Estate ("**Additional Owned Property**"), then (a) this Deed of Trust shall automatically be deemed amended to add the legal description of the Additional Owned Property to the legal description of the real property encumbered by this Deed of Trust; (b) this Deed of Trust shall automatically be deemed and shall become a senior lien and encumbrance against the fee title of the Additional Owned Property; (c) within ten (10) calendar days of demand from Beneficiary, Trustor shall execute, acknowledge and deliver to Beneficiary, and Beneficiary shall record, an amendment to this Deed of Trust reflecting Trustor's acquisition of the fee title to the Additional Owned Property and the lien of this Deed of Trust as a first lien and encumbrance against the fee title of the Additional Owned Property,

**JAE 0162**

CONFIDENTIAL                                                                                    SPCP_0000004465

and (d) within ten (10) calendar days of demand from Beneficiary, at Trustor's sole cost and expense, Trustor shall obtain such endorsements to the Title Policy (or a replacement Title Policy) as Beneficiary may reasonably require to insure that the lien of this Deed of Trust is and remains a first lien and encumbrance against the fee title of the Additional Owned Property. Trustor agrees to promptly notify Beneficiary reasonably prior to such acquisition.  In the event Trustor fails or refuses to execute such amendment required pursuant to clause (c) above within ten (10) calendar days after Beneficiary's demand therefor, Trustor hereby grants to Beneficiary a limited power-of-attorney naming Beneficiary as Trustor's attorney-in-fact to execute and record such amendment in the Official Records, and to arrange for such title endorsements as Beneficiary reasonably requires.  Such limited power-of-attorney is coupled with an interest and is therefore irrevocable.  All such reasonable expenditures incurred by Beneficiary in performing this paragraph shall be additional Secured Obligations payable upon demand and delivery of reasonable backup documentation, and shall bear interest at the Default Interest Rate until paid.

Y.      Leases.

1.      Trustor agrees not to enter into any new lease or sublease for any part or all of the Estate, without first securing the prior written consent of Beneficiary, which consent may be given or withheld in Beneficiary's sole discretion; provided, however that Beneficiary's consent shall not be required for office leases of not more than 2,000 square feet, each at market terms, each entered into in the ordinary course of business, and each for a term (including options to extend) not exceeding three (3) years, on a form of sublease approved by Beneficiary in writing in advance (each, an "**Approved Lease**").  An Approved Lease shall not be materially amended, changed, terminated (except in the case of a default thereunder) or modified without the prior written consent of Beneficiary, which consent shall not be unreasonably withheld or delayed.  At Beneficiary's option, Beneficiary may require as a condition of any lease or sublease that the tenant thereunder execute and deliver to Beneficiary a subordination and attornment agreement in form and substance satisfactory to Beneficiary.  Consent to one amendment, change, agreement or modification to any Approved Lease shall not be deemed to be a waiver of the right to require consent to other, future or successive amendments, changes, agreements or modifications.  Trustor shall deliver to Beneficiary true, correct, complete and accurate copies of Trustor's signed copies of all other leases or subleases or executed counterparts thereof, now existing or hereafter made from time to time, affecting all or any part of the Estate.

2.      Trustor shall promptly (a) perform all of the provisions of any leases or subleases of the Estate on the part of the Trustor thereunder to be performed; (b) appear in and defend any action or proceeding in any manner connected with any leases or subleases of the Estate (including, but not limited to, the Leases) or the obligations of Trustor thereunder; (c) within thirty (30) days after request by Beneficiary, deliver to Beneficiary a certificate identifying each lease or sublease of the Estate with particularity and stating whether or not a default by the landlord or tenant thereunder has occurred (and if so, identifying the default with particularity), that no rent thereunder has been prepaid except for the current month, and addressing such other matters as Beneficiary may request; (d) deliver to Beneficiary promptly copies of any notices of default which Trustor may at any time forward to or receive from a tenant or landlord of any such lease or sublease; and (e) within thirty (30) calendar days after

CONFIDENTIAL                                                      SPCP_0000004466

execution, deliver to Beneficiary a fully executed counterpart of each lease or sublease or change, amendment or modification to the leases or subleases or a copy thereof.

3.      Each lease or sublease hereafter executed by Trustor with respect to the Premises shall provide that (a) the tenant thereunder, at the request of any transferee in foreclosure of this Deed of Trust or in lieu thereof, shall attorn to such transferee and shall recognize such transferee as the landlord under such lease or sublease; provided, that such transferee agrees to recognize such lease or sublease and agrees not to disturb the tenant's possession under the lease or sublease so long as there is no event of default by such tenant thereunder; (b) neither Beneficiary nor any such transferee or its successors or assigns shall be bound by (i) any prepayment of an installment of rent or other obligation under any such lease or sublease (more than the equivalent of one month's rent, whether in the form of cash, security deposits, letter of credit or otherwise), or (ii) if otherwise initially required hereunder with respect to a particular lease or sublease, any amendment or modification to any such lease or sublease made without the written consent of Beneficiary or such transferee, or (iii) any obligations under such lease or sublease to have been performed prior to the date that Beneficiary or such transferee shall have acquired title to the Estate; and (c) any Approved Lease shall not be amended, extended or consensually terminated without the prior written consent of Beneficiary.  By the recordation of this Deed of Trust, the foregoing provisions (to the extent applicable) shall be applicable to and binding upon each lease or sublease hereafter executed with respect to the Estate or Improvements, even if not contained expressly in such leases or sublease.  Each tenant, upon request by Beneficiary or such successor in interest, shall execute and deliver an instrument or instruments confirming the foregoing provisions.

4.      At the option of Beneficiary, this Deed of Trust shall become subject and subordinate, in whole or in part (but not with respect to the priority of entitlement to insurance proceeds or any award in condemnation or with respect to any option to purchase), to any and all and leases and subleases of the Estate, upon the execution by Beneficiary and recording thereof, at any time hereafter, in the official records of the county wherein the Estate is situate, of a unilateral declaration to that effect.

5.      Trustor shall not execute an assignment or pledge of the Rents and/or the leases or subleases other than in favor of Beneficiary or unless otherwise permitted by the Credit Agreement.

Z.      Indemnity.  In addition to any other indemnities to Beneficiary specifically provided for in this Deed Of Trust, Trustor hereby agrees to and shall indemnify, defend, protect and save Beneficiary and its authorized representative free and harmless from and against any and all losses, liabilities, suits, obligations, fines, damages, penalties, claims, costs, charges and expenses, including, without limitation, architects', appraisers', surveyors', contractors', subcontractors', engineers' and reasonable attorneys' fees and statutory and non-statutory costs and expenses and all disbursements which may be imposed upon, incurred or asserted against Beneficiary and its authorized representative by reason of:  (1) construction of any Improvements on the Premises; (2) any capital improvements, other work or things done in, on or about the Premises or any part thereof; (3) any use, nonuse, misuse, possession, occupation, alteration, operation, maintenance or management of the Premises or any part thereof or any street, drive, sidewalk, curb, passageway or space comprising apart thereof or adjacent thereto;

#4831-1562-0370v4                                                    18

CONFIDENTIAL                                                    SPCP_0000004467

(4) any negligence or act or omission on the part of Trustor and its agents, contractors, servants, employees, licensees or invitees; (5) any accident, injury (including death) or damage to any person or property occurring in, on or about the Premises or Improvements or any part thereof;

(6)     any lien or claim which may be alleged to have arisen on or against the Premises or any part thereof under the laws of the local or state government or any other governmental or quasi-governmental authority or any liability asserted against Beneficiary with respect thereto;

(7)     any tax attributable to the execution, delivery, filing or recording of this Deed Of Trust, the Notes, the Credit Agreement or the other Loan Documents; (8) any contest due to Trustor's actions or failure to act, permitted pursuant to the provisions of this Deed Of Trust; or (9) any default (including, but not limited, to an Event Of Default) under this Deed Of Trust, the Notes, the Credit Agreement, the other Loan Documents.

AA.     <u>Assignment Of Causes Of Action</u>.  Trustor assigns to Beneficiary, at the option of Beneficiary, all causes of action of Trustor, whether accrued before or after the date of this Deed of Trust, for damage or injury to the Premises or Improvements or any part thereof, or in connection with or affecting the Premises or Improvements or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, and Trustor shall pay to Beneficiary the proceeds therefrom.  Beneficiary may, after deducting therefrom all its expenses, including reasonable attorney's fees, apply such proceeds to the sums secured by this Deed of Trust or to any deficiency hereunder, and pay to Trustor any sums in excess of the amount secured by this Deed of Trust, or may release any moneys so received by Beneficiary or any part thereof, as Beneficiary may elect.  Beneficiary may at the option of Beneficiary (which option shall not be exercisable by Beneficiary until an Event of Default occurs and is continuing) appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof.  Trustor agrees to execute such further assignments and other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Beneficiary shall request.

2.     **REMEDIES UPON DEFAULT**

A.     <u>Events Of Default</u>.  The occurrence of any of the following events shall be an Event Of Default hereunder (an "**Event Of Default**"):

1.     The occurrence or existence of an Event of Default under the Credit Agreement.

2.     The occurrence or existence of an Event of Default (a) under the $45,000,000 Term Note, or (b) under the $35,000,000 Non-Revolving Line of Credit Note.

3.     The occurrence or existence of an Event of Default (a) under the Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents (Western Medical Center — Santa Ana) of even date herewith by and between Trustor, Trustee and Beneficiary, securing repayment of the Loans, or (b) under the Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents (Coastal Communities Hospital) of even date herewith by and between Trustor, Trustee and Beneficiary, securing repayment of the Loans, or (c) under the Leasehold

#4831-1562-0370v4                                   19

CONFIDENTIAL                                                                    SPCP_0000004468

Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents (Chapman Medical Center) of even date herewith by and between the Integrated Healthcare Holdings, Inc., a Nevada corporation ("**IHHI**") (as Trustor), Trustee and Beneficiary, securing repayment of the Loans, or (d) under any other deed of trust or security agreement recorded or filed after the date hereof as an encumbrance against any other real property and improvements owned by any Borrower under the Credit Agreement, the purpose of which is to secure repayment of the Loans and the Notes, or (e) under any of the other Loan Documents.

4.     The occurrence or existence of an Event of Default under the $50,000,000 Revolving Credit Agreement.

5.     The occurrence or existence of an Event of Default under any Deed of Trust as defined in or executed pursuant to the $50,000,000 Revolving Credit Agreement.

6.     The occurrence or existence of an Event of Default under that certain Credit Agreement ($10.7 Million Facility) of even date herewith ("**$10.7 Million Credit Agreement**") by and between the Borrowers named therein, the Credit Parties named therein, and the Lender named therein.

7.     The occurrence or existence of an Event of Default under any Deed of Trust as defined in or executed pursuant to the $10.7 Million Credit Agreement.

8.     The failure of any Borrower or any Credit Party (including Trustor) for any reason to pay any Charges (defined in the Credit Agreement) when due.

9.     The failure of any Borrower or any Credit Party for any reason to pay any Charges defined in the $50,000,000 Revolving Credit Agreement and/or defined in the $10.7 Million Credit Agreement when due.

10.     The occurrence or existence of an Event of Default under any of the Loan Documents not referenced in Paragraphs 2.A. 1 -9 above.

11.     The occurrence or existence of a breach or default or Event of Default under any of the Loan Documents executed in connection with the $50,000,000 Revolving Credit Agreement but not referenced in Paragraphs 2.A.1 - 10 above.

12.     The occurrence or existence of a breach or default or Event of Default under any of the Loan Documents executed in connection with the $10.7 Million Credit Agreement but not referenced in Paragraphs 2.A.1 - 11 above.

B.     <u>Acceleration Upon Default; Additional Remedies</u>.  Upon the occurrence of an Event Of Default, Beneficiary may, at its option, declare all indebtedness secured hereby to be immediately due and payable without any presentment, demand, protest or notice of any kind. Thereafter Beneficiary may:

1.     Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Property, or any part thereof, in its own name or

**JAE 0166**

CONFIDENTIAL                                                                SPCP_0000004469

in the name of Trustee, and do any acts which it deems necessary or desirable to preserve the value, marketability or rentability of the Property, including, without limitation (a) talking possession of Trustor's books and records, (b) if applicable, completing construction of any improvements, (c) maintaining or repairing Improvements or the Premises, (d) increasing the income from the Premises or from Improvements located on the Premises, with or without taking possession of the Premises, (e) entering into, modifying, or enforcing Trustor's interest in the any leases or subleases affecting any portion of the Premises, (f) suing for or otherwise collecting all Rents (defined in the Absolute Assignment of Leases and Rents defined in the Credit Agreement) owing to Trustor under any leases and subleases affecting any portion of the Premises, including those past due and unpaid, and (g) applying the same, less costs and expenses of operation and collection including, without limitation, reasonable attorneys' fees and statutory and non-statutory costs and expenses, upon any indebtedness secured hereby, all in such order as Beneficiary may determine.  The entering upon and taking possession of the Premises, the collection of Trustor's Rents and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder;

       2.     Commence an action to foreclose this Deed Of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof;

       3.     Deliver to Trustee a written declaration of default and demand for sale and a written notice of default and election to cause Trustor's interest in the Property to be sold, which notice Trustee or Beneficiary shall cause to be duly filed for record in the Official Records of the County in which the Premises is located; or

       4.     Exercise all other rights and remedies provided herein, in any Loan Documents or other document or agreement now or hereafter securing all or any portion of the obligations secured hereby, or by law.

       C.     <u>Foreclosure By Power Of Sale</u>.  Should Beneficiary elect to foreclose by exercise of the power of sale herein contained, Beneficiary shall notify Trustee and shall deposit with Trustee this Deed Of Trust and the Notes and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

       1.     Beneficiary or Trustee shall give such notice of default and election to sell as is then required by applicable law.  Trustee shall, without demand on Trustor, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell the Property (including the Estate) at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items as Beneficiary shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale.  Trustee shall deliver to such purchaser or purchasers thereof a trustee's deed conveying the Property so sold, which shall not contain any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof.  Any person, including, without limitation, Trustor, Trustee or Beneficiary may purchase at such sale and Beneficiary shall be entitled to pay the purchase price by crediting the purchase price of the property against the obligations secured hereby.

CONFIDENTIAL

2.      After deducting all costs, fees and expenses of Trustee and of this Trust, including costs of evidence of title in connection with sale, Trustee shall apply the proceeds of sale in the following priority, to payment of: (a) first, all sums expended under the terms hereof, not then repaid, with accrued interest at the Default Rate; (b) second, all other sums then secured hereby; and (c) the remainder, if any, to the person or persons legally entitled thereto.

3.      Subject to California Civil Code Section 2924g, Trustee may postpone sale of all or any portion of the Estate by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

D.      <u>Personal Property</u>.  Pursuant to granting clause <u>Paragraph B</u> above and <u>Paragraph 3 .A</u> (Grant Of Security Interest) below of this Deed Of Trust, Trustor, as Debtor, granted Beneficiary, as Secured Party, a security interest in the Collateral described therein. Upon the occurrence of an Event Of Default, Beneficiary may proceed at its election, in any sequence:  (1) to dispose of any Collateral separately from the sale of Premises in accordance with Division 9 of the California version of the Uniform Commercial Code or other applicable law; and (2) to dispose of some or all of the Property and the Collateral in any combination consisting of both real and personal property together in one or more sales to be held in accordance with the provisions of Section 9601(4) of the California Uniform Commercial Code.

E.      <u>Appointment Of Receiver</u>.  Upon the occurrence of an Event Of Default, Beneficiary, as a matter of right and without notice to Trustor or anyone claiming under Trustor, and without regard to the then value of the Property or the adequacy for any security for the obligations then secured hereby, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Property, and Trustor hereby irrevocably consents to such appointment and waives notice of any application therefor.  Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Beneficiary in case of entry as provided herein.

F.      <u>Remedies Not Exclusive</u>.  Trustee and Beneficiary, and each of them, shall be entitled to enforce payment and performance of any indebtedness or obligations secured hereby and to exercise all rights and powers under this Deed Of Trust or under any Loan Documents or other agreement or any laws now or hereafter in force, notwithstanding some or all of the said indebtedness and obligations secured hereby may now or hereafter be otherwise secured, whether by mortgage, deed of trust, pledge, lien, assignment or otherwise.  Neither the acceptance of this Deed Of Trust nor its enforcement whether by court action or pursuant to the power of sale or other powers herein contained, shall prejudice or in any manner affect Trustee's or Beneficiary's right to realize upon or enforce any other security now or hereafter held by Trustee or Beneficiary, it being agreed that Trustee and Beneficiary, and each of them, shall be entitled to enforce this Deed Of Trust and any other security now or hereafter held by Beneficiary or Trustee in such order and manner as they or either of them may in their absolute discretion determine.  No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  Every power or remedy given by any of the

CONFIDENTIAL                                                    SPCP_0000004471

Loan Documents to Trustee or Beneficiary or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Beneficiary and either of them may pursue inconsistent remedies.

G.    Request For Notice.  Trustor hereby requests a copy of any notice of default and that any notice of sale hereunder be mailed to it at the address set forth in Paragraph 6.F (Notices') of this Deed Of Trust.

H.    Forbearance By Lender Not A Waiver.  Any forbearance by Beneficiary in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy.  The acceptance by Beneficiary of payment of any sum secured by this Deed Of Trust after the due date of such payment shall not be a waiver of Beneficiary's right either to require prompt payment when due of all other sums so secured or to declare an Event Of Default for failure to make prompt payment.  The procurement of insurance or the payment of taxes or other liens or charges by Beneficiary shall not be a waiver of Beneficiary's right to accelerate the maturity of the indebtedness secured by this Deed Of Trust nor shall Beneficiary's receipt of any awards, proceeds or damages under this Deed Of Trust operate to cure or waive Trustor's default in payment of sums secured by this Deed Of Trust.

I.    Environmental Pro visions.  Without limiting any of the remedies provided in the Loan Documents, Borrower acknowledges and agrees that Section 5.8 (Environmental Matters) of the Credit Agreement and Paragraph 1.B. (Maintenance; Repair; Alterations') of this Deed Of Trust are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by the Borrower relating to the Premises security (the "**Environmental Provisions**"), and that Borrower's failure to comply with the Environmental Provisions is a breach of contract such that Beneficiary, as lender, shall have the remedies provided under Section 736 of the California Code of Civil Procedure ("**Section 736**") for the recovery of damages and for the enforcement of the Environmental Provisions.  Pursuant to Section 736, Beneficiary's action for recovery of damages or enforcement of the Environmental Provisions shall not constitute an action within the meaning of Section 726(a) of the California Code of Civil Procedure or constitute a money judgment for a deficiency or a deficiency judgment within the meaning of Sections 580a, 580b, 580d, or 726(b) of the California Code of Civil Procedure. Other than the remedy provided under Section 736, all remedies provided for by the Loan Documents are separate and distinct causes of action that are not abrogated, modified, limited or otherwise affected by the remedies provided under Section 736(a) of the California Code of Civil Procedure.

## 3.    SECURITY AGREEMENT; GRANT OF SECURITY INTEREST.

A.    Grant Of Security Interest.  Pursuant to granting clause Paragraph B above, Trustor, as Debtor, also hereby grants to Beneficiary, as Secured Party, as security for the Secured Obligations, a security interest in all of Trustor's right, title and interest in and to the Personal Property (herein, also referred to as the "**Collateral**").  The grant of a security interest herein is in addition to the grant of any lien or security interest in any other Loans Document.

**JAE 0169**

CONFIDENTIAL                                                                SPCP_0000004472

B.    Remedies.  This Deed Of Trust constitutes a security agreement and fixture filing with respect to the Collateral in which Secured Party is hereby granted a security interest and Secured Party shall have all of the rights and remedies of a secured party under the California version of the Uniform Commercial Code as well as all other rights and remedies available at law or in equity.  Debtor hereby agrees to execute and deliver on demand, and hereby irrevocably constitutes and appoints Secured Party the attorney-in-fact of Debtor to execute, deliver and, if appropriate, to file such security agreements, financing statements, continuation statements or other instruments as Secured Party may request or require in order to impose, perfect or continue the perfection of the lien or security interest created hereby or under any other Loan Documents.  Upon the occurrence and continuation of any Event Of Default hereunder, Secured Party shall have the right to cause any of the Collateral which is personal property to be sold at one or more public or private sales as permitted by applicable law, and Secured Party shall further have all other rights and remedies, whether at law, in equity, or by statute as are available to secured creditors under applicable law.  Any such disposition may be conducted by an employee or agent of Secured Party or Trustee.  Any person or entity, including both Debtor and Secured Party, shall be eligible to purchase any part or all of such Collateral at any such disposition.  If allowed by law, Secured Party, if it is the purchaser, may turn in the Notes as all or part of the amount owing thereon toward payment of the purchase price (or for endorsement of the purchase price as a payment on the Notes if the amount owing thereof exceeds the purchase price).

C.    Expenses.  Expenses of retaking, holding, or preparing the Collateral for sale, or selling the Collateral shall be borne by Debtor and shall include Secured Party's and Trustee's reasonable attorneys' fees and legal expenses.  Debtor, upon demand of Secured Party, shall assemble the Collateral and make it available to Secured Party at the Premises, a place which is hereby deemed to be reasonably convenient to Secured Party and Debtor.  Secured Party shall give Debtor at least ten (10) calendar days' prior written notice of the time and place of any public sale or other disposition of such Collateral or of the time of or after which any private sale or any other intended disposition is to be made, and if such notice is sent to Debtor in the manner provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Debtor.

D.    Fixture Filing.  This Deed Of Trust constitutes under the California version of the Uniform Commercial Code, as amended or recodified from time to time, a financing statement filed as a fixture filing in the Official Records with respect to any and all fixtures included within the term "**Estate**," "**Premises**," "**Property**" or "**Collateral**" as used herein or in the Credit Agreement and with respect to any goods or other personal property that may now be or hereafter become such fixtures.  Trustor is a California limited liability company and its organizational number is 200504710009.

E.    Waiver.  Debtor waives, on behalf of Debtor and any person or entity hereafter claiming any interest in or lien upon all or any part of the Property or Collateral, any right to require Secured Party to (1) proceed against any such person, (2) proceed against or exhaust any Collateral, or (3) pursue any other remedy in its power; and waives any defense arising by reason of any disability or other defense of Debtor or any other person or entity, or by reason of the cessation from any cause whatsoever of the liability of Debtor or any other person or entity.  Until the Secured Obligations shall have been paid or discharged in full, Debtor shall not have

CONFIDENTIAL                                                                                        SPCP_0000004473

any right to subrogation, and Debtor waives any right to enforce any remedy which Secured Party now has or may hereafter have against any other person or entity and waives any benefit of and any right to participate in any Collateral or other security whatsoever now or hereafter held by Secured Party.

## 4.   ABSOLUTE ASSIGNMENT OF RENTS, ISSUES AND PROFITS.

A.    Assignment.  Notwithstanding and independent of any other rights granted to Beneficiary under this Deed Of Trust, Trustor hereby irrevocably, absolutely, presently and unconditionally assigns and transfers to Beneficiary all the Rents and hereby gives to and confers upon Beneficiary the right, power and authority to collect the Rents.  Trustor irrevocably appoints Beneficiary its true and lawful attorney-in-fact, at the option of Beneficiary at any time and from time to time, to demand, receive and enforce payment, to give receipts, releases and satisfactions, and to sue, in the name of Trustor, Trustee or Beneficiary, for all such Rents, and apply the same to the indebtedness secured hereby; provided, however, that so long as an Event Of Default shall not have occurred hereunder and be continuing, Trustor shall have the right to collect such Rents.  Upon the request of Beneficiary, Trustor shall execute and deliver to Beneficiary, in recordable form, a specific assignment of any lease now or hereafter affecting the Property or any portion thereof to evidence further the assignment hereby made.  The assignment of Rents in this Article 4. A (Absolute Assignment Of Rents, Issues And Profits) is intended to be an absolute assignment from Trustor to Beneficiary and not merely an assignment for security only.  Upon the occurrence and continuation of any Event Of Default hereunder, Beneficiary shall have the right to (1) seek appointment of a receiver, (2) obtain possession of the Rents, (3) deliver to any one or more of the tenants or occupants of leases and rental agreements affecting the Premises or Improvements a written demand for turnover of the Rents, (4) deliver to Trustor a written demand for the Rents, and (5) Beneficiary shall further have all other rights and remedies, whether at law, in equity, or by statute as are available to assignees of rents, issues and profits of Premises made in connection with an obligation secured by Premises, whether said statute now exists or will in the future exist.

## 5.   MISCELLANEOUS.

A.    Suretyship Waivers.  Because some of the Secured Obligations are being incurred by the other Borrowers and because the lien created hereunder secures the payment and performance of such Secured Obligations, although the Loans directly and indirectly benefit each person comprising Borrowers, it is possible that Trustor could be construed as a guarantor or surety of the other Borrowers and thereby have certain rights and remedies accorded to them that were not intended to be available to any of them.  Accordingly, in order to induce the Beneficiary to provide the Loans, and the other credit facilities and accommodations provided for in the Credit Agreement and the other Loan Documents, Trustor for itself agrees as follows:

1.    The waivers provided in this Section are intended to be irrevocable and to apply to all present and future Secured Obligations of Trustor and/or the other Borrowers to Beneficiary, including those arising under successive transactions which shall either continue the Secured Obligations, increase or decrease them, or from time to time, create new Secured Obligations, after all or any prior Secured Obligations have been satisfied, and notwithstanding the dissolution, liquidation or bankruptcy of Trustor, the other Borrowers or any Credit Party, or

CONFIDENTIAL                                                     SPCP_0000004474

other event or proceeding affecting the other Borrowers or any Credit Party relating to any portion of the Secured Obligations.

2.      The Secured Obligations of Trustor hereunder are separate and independent of (i) the other Borrower's respective obligation to pay Beneficiary principal and interest under the Notes, and (ii) the liabilities and obligations of any Credit Party.  A separate action or actions may be brought and prosecuted against Trustor whether or not any action is brought and prosecuted against any other Borrower or any Credit Party, and whether or not a particular Borrower is or are joined in any such action or actions.  Trustor waives the benefit of any statute of limitations affecting the Secured Obligations hereunder or the enforcement thereof.

3.      Trustor authorizes Beneficiary, without notice or demand and without affecting its liability hereunder, from time to time to; (i) amend, alter, restate, replace, modify, renew, extend, accelerate or otherwise change the time for payment or the terms of the Secured Obligations with Borrowers, including increase or decrease the rate of interest thereon or the principal amount thereof; (ii) accept partial payments on the Secured Obligations from any Borrower or any Credit Party; (iii) accept new or additional documents, instruments or agreements relative to the Secured Obligations; (iv) take and hold security or additional guaranties for the payment of the Secured Obligations, and amend, alter, exchange, substitute, transfer, enforce, waive, subordinate, terminate, modify and release in any manner any such security or guaranties; (v) apply such security and direct the order or manner of sale thereof as Beneficiary in its sole discretion may determine; (vi) release or substitute any other Borrower or any Credit Party; (vii) settle, release on terms satisfactory to Beneficiary (or by operation of law or otherwise), compound, compromise, collect or otherwise liquidate any indebtedness or security in any manner, consent to the transfer of security and bid and purchase at any sale, without affecting or impairing the Secured Obligations of Trustor hereunder; or (viii) enforce any other right or remedy granted to Beneficiary under this Mortgage and the other Loan Documents.  No such action which Beneficiary shall take or fail to take in connection with this Agreement or any of the Loan Documents, or any of them, or any security for the Secured Obligations or other undertakings of Trustor, nor any course of dealing with Trustor or any course of dealing with any other person or legal entity, shall release Trustor from the payment and performance of the Secured Obligations, affect this Deed of Trust or the other Loan Documents in any way, or afford Trustor any recourse against Beneficiary.  Without limiting the generality of the foregoing, Trustor agrees that this Deed of Trust shall extend and be applicable to each new or replacement Notes delivered by Borrowers pursuant thereto without notice to or further consent from Trustor.

4.      Trustor waives any right to require Beneficiary to:  (i) proceed against any other Borrower under the Notes, against any Credit Party, or against anyone else; (ii) proceed against or exhaust any security for the Secured Obligations; (iii) except as required by applicable law, give notice of the terms, time and place of any public or private sale of any real or personalty securing the Secured Obligations; or (iii) pursue any other remedy in Beneficiary's power whatsoever.  Trustor waives any defense arising by reason of any disability or other defense of any other Borrower, or by reason of the cessation from any cause whatsoever of the liability of Trustor, or by reason of any act or omission of Beneficiary or other persons which directly or indirectly results in or aids the discharge or release of any other Borrower or any of the Secured Obligations or any security therefor by operation of law or otherwise, or by reason

**JAE 0172**

CONFIDENTIAL                                                                                 SPCP_0000004475

of the amendment, modification, renewal, extension or other change in any of the Secured Obligations. Trustor waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Deed Of Trust and of the existence, creation, or incurring of new or additional Secured Obligations, and all other notices and demands of any kind and description now or hereafter provided for by any statute or rule of law, except for such notices and demands as specifically required by this Deed Of Trust. Trustor expressly waives any right whatsoever to, or right whatsoever to participate in, any security now or hereafter held by Beneficiary, reimbursement, indemnity, exoneration, contribution or any other claim under local, state or federal law, including, without limitation, 11 U.S.C., 547, which it may now or hereafter have against the other person comprising Trustor or any other person directly or contingently liable for the Secured Obligations, or against or with respect to Trustor's property (including, without limitation, any collateral under any of the Loan Documents) arising from the existence or performance of this Deed Of Trust until all of the Secured Obligations have been paid or satisfied in full.

5. Trustor represents and warrants to Beneficiary that: (i) this Deed Of Trust is executed at the request of all Borrowers and Credit Parties (including Trustor); (ii) Trustor has established adequate means of obtaining from the Borrowers on a continuing basis financial and other information pertaining to the Borrowers' respective businesses and their respective financial conditions; and (iii) Trustor is now and will be completely familiar with the business, operation and financial condition of the Borrowers and their assets. Trustor hereby waives and relinquishes any duty on the part of Beneficiary to disclose to Trustor any matter, fact or thing relating to the business, operation or financial condition of the Borrowers and their assets now known or hereafter known by Beneficiary during the life of this Deed Of Trust. With respect to any present or future Secured Obligations of Trustor to Beneficiary, Beneficiary need not inquire into the authority of Trustor, and any Secured Obligations made or created in reliance upon the professed exercise of such powers.

6. So long as any of the Secured Obligations under this Deed Of Trust remain unpaid or undischarged, Trustor will not, by paying any sum recoverable hereunder (whether or not demanded by Beneficiary) or by any means or on any other ground, (i) claim any set-off or counterclaim against Trustor or against Borrowers in respect of any Secured Obligations or other indebtedness by virtue of the right of subrogation, by operation of law or otherwise; (ii) in any proceedings under federal bankruptcy law or insolvency proceedings of any nature, assert its rights in competition with Beneficiary in respect of any payment hereunder because of any claims which Trustor may have against the Borrowers; or (iii) be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of Trustor or other person, or the benefit of any of any other security for any Secured Obligation which, now or hereafter, Beneficiary may hold or in which it may have any share or interest.

7. Trustor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the guarantor's (and Trustor's) rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

CONFIDENTIAL

SPCP_0000004476

8.    TRUSTOR WAIVES ALL RIGHTS AND DEFENSES THAT TRUSTOR MAY HAVE BECAUSE THE LOANS OR GUARANTY OBLIGATIONS ARE SECURED BY REAL PROPERTY.  THIS MEANS, AMONG OTHER THINGS: (1) LENDER MAY COLLECT FROM TRUSTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL; (2) IF LENDER FORECLOSES ON ANY REAL PROPERTY COLLATERAL:  (A) THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE; AND (B) LENDER MAY COLLECT FROM TRUSTOR EVEN IF LENDER, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT TRUSTOR MAY HAVE TO COLLECT FROM ANY BORROWER.  THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES TRUSTOR MAY HAVE BECAUSE EACH BORROWER'S DEBT IS SECURED BY REAL PROPERTY.  THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON SECTION 580a, 580b, 580d or 762 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP").

IN ADDITION, TRUSTOR WAIVES ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY LENDER, EVEN THOUGH THAT ELECTION OF REMEDIES, SUCH AS A NONJUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR A GUARANTEED OBLIGATION, HAS DESTROYED TRUSTOR'S RIGHTS BY THE OPERATION OF SECTION 580d OF THE CCP OR OTHERWISE.

6.    **ADDITIONAL WAIVERS.**

A.    Trustor waives any and all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Trustor by reason of California Civil Code Sections 2787 to 2855, inclusive, Sections 2899 and 3433, or other statutory or decisional law.  This means, among other things, that:

1.    Trustor waives and will be unable to raise any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

2.    Trustor waives and will be unable to raise any defense based upon any statute or rule of law which provides that a creditor may be required to pursue the principal obligor or the security for the principal obligation before seeking enforcement against a guarantor or security pledged by the Trustor;

3.    Trustor waives and will be unable to raise any defense based upon any statute or rule of law which provides that a guarantor's obligations may be limited or exonerated

by reason of the creditor's alteration of the principal obligation or of another guaranty, or by reason of the impairment or suspension of the creditor's rights or remedies against the principal, another guarantor, or any security given for the principal obligation or given for other guaranties;

CONFIDENTIAL                                                                    SPCP_0000004477

4.      Trustor waives and will be unable to claim any right to participate in, or the benefit of, any security given for the principal obligation now or hereafter held by Lender; and

5.      Trustor waives and will be unable to claim any right of subrogation and any right to enforce any remedy which Lender may have against the Borrowers.

B.      <u>Amendments</u>.  This Deed Of Trust cannot be modified, amended, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any modification, amendment, change, discharge or termination is sought.

C.      <u>Trustor Waiver Of Rights</u>.  Trustor waives to the extent permitted by law, (1) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Deed Of Trust or to any action brought to enforce the Notes or any other obligation secured by this Deed Of Trust, and (2) any rights, legal or equitable, to require marshaling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433.  Beneficiary shall have the right to determine the order in which any or all of the Property shall be subjected to the remedies provided herein.  Beneficiary shall have the right to determine the order in which any or all portions of the indebtedness secured hereby are satisfied from the proceeds realized upon the exercise of the remedies provided herein.  Nothing contained herein shall be deemed to be a waiver of Trustor's rights under Section 2924c of the California Civil Code.

D.      <u>Statements By Trustor</u>.  Trustor shall, within ten (10) calendar days after written notice thereof from Beneficiary, deliver to Beneficiary a written statement, fully acknowledged, stating the unpaid principal of and interest on the Notes and any other amounts secured by this Deed Of Trust and stating whether any offset, counterclaim or defense exists against such sums and the obligations of the Deed Of Trust.

E.      <u>Loan Statement Fees</u>.  Trustor shall pay the amount demanded by Beneficiary or its authorized loan servicing agent for any statement regarding the obligations secured hereby; provided, however, that such amount may not exceed the maximum amount allowed by law at the time request for the statement is made.

F.      <u>Notices</u>.  All notices served under this Deed Of Trust shall be in writing and shall be served by certified or registered mail, confirmed telephone facsimile, courier service or personal delivery, to the party at its address or fax number appearing below, or to such other address or fax number as specified by notice by such party to the other parties hereunder.  Except as otherwise provided in this Deed Of Trust, service of any such notice shall be deemed effective on the earlier of the day of (1) actual delivery, or (2) forty-eight (48) hours after deposit in the United States mail, registered or certified, or (3) receipt of fax confirmation.

To Beneficiary and Secured Party:

Medical Provider Financial Corporation II
3770 Howard Hughes Parkway, Suite 301
Las Vegas, Nevada 89109
Attn:  Adam Field, Sr. Vice President Development

#4831-1562-0370v4                                29

**JAE 0175**

CONFIDENTIAL                                                        SPCP_0000004478

Telephone:  800-818-1102
Facsimile:  702-735-3739
Email:  AdamF@medicalcapital.com

With a copy to:

Medical Capital Corporation
2100 South State College Blvd.
Anaheim, California 92806
Attn:  Joseph J. Lampariello, President and COO
Telephone:  714-935-3100
Facsimile:  714-935-3114
Email:  JoeyL@medicalcapital.com

with a copy to (which copy shall not constitute notice):

Sedgwick, Detert, Moran & Arnold LLP
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California 94105
Attn:  Gary C. Sheppard, Esq.
Tel:  (415) 781-7900
Fax:  (415) 781-2635

To Trustor and Debtor:

Pacific Coast Holdings Investment, LLC
c/o Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
Attn:  William E. Thomas, Esq.
Telephone:  951-782-8812
Facsimile:  951-766-9944

G.    <u>Acceptance By Trustee</u>.  Trustee accepts this Trust when this Deed Of Trust, duly executed and acknowledged, is made a public record as provided by law.

H.    <u>Captions</u>.  The captions or headings at the beginning of each Section and Paragraph hereof are for the convenience of the parties and are not a part of this Deed Of Trust.

I.    <u>Invalidity Of Certain Provisions</u>.  Every pro vision of this Deed Of Trust is intended to be severable.  In the event any term or provision hereof is declared to be illegal, invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

J.    <u>Subrogation</u>.  To the extent that proceeds of the Notes are used to pay any outstanding lien, charge or prior encumbrance against the Estate, such proceeds have been or will be advanced by Beneficiary at Trustor's request and Beneficiary shall be subrogated to any and

**JAE 0176**

CONFIDENTIAL                                                                                    SPCP_0000004479

all rights and liens held by any owner or holder of such outstanding liens, charges and prior encumbrances, irrespective of whether said liens, charges or encumbrances are released.

K.     Attorneys' Fees.  If the Notes are not paid when due or if any Event Of Default occurs, Trustor promises to pay all statutory and non-statutory costs of enforcement and collection thereof, including, but not limited to, reasonable attorneys' fees and costs, whether or not such enforcement and collection includes the filing of a lawsuit.

L.     No Merger Of Leases.  Upon the foreclosure of the lien created by this Deed Of Trust on the Property pursuant to the provisions hereof, any leases or subleases then existing and affecting all or any portion of the Property shall not be destroyed or terminated by application of the law of merger or as a matter of law or as a result of such foreclosure unless Beneficiary or any purchaser at such foreclosure sale shall so elect.  No act by or on behalf of Beneficiary or any such purchaser shall constitute a termination of any lease or sublease unless Beneficiary or such purchaser shall give written notice thereof to such tenant or subtenant.

M.     Governing Law.  This Deed Of Trust shall be governed and controlled in all respects by the internal laws and decisions of the State of Nevada, except to the extent that laws of the State of California apply to the creation, priority, perfection of the Lien granted hereunder, and the enforcement of any foreclosure remedies by Beneficiary and any of its successors and assigns.

N.     Interpretation.  In this Deed Of Trust the singular shall include the plural and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

O.     Reconveyance By Trustee.  Upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed Of Trust and the Notes to Trustee for cancellation and retention and upon payment by Trustor of Trustee's fees, Trustee shall reconvey to Trustor, or to the person or persons legally entitled thereto, without warranty, any portion of the Property then held hereunder.  The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.  The grantee in any reconveyance may be described as "the person or persons legally entitled thereto." Such grantee shall pay Trustee a reasonable fee and Trustee's costs incurred in so reconveying the Property.

P.     Counterparts.  This document may be executed and acknowledged in counterparts, all of which executed and acknowledged counterparts shall together constitute a single document.  Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this document to physically form one document, which may be recorded.

Q.     Nonforeign Entity.  Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. Premises interest must withhold tax if the transferor is a foreign person.  To inform Beneficiary that the withholding of tax will not be required in the event of the disposition of the Property pursuant to the terms of this Deed Of Trust, Trustor hereby certifies, under penalty of perjury, that:  (1) Trustor is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder; and (2) Trustor's U.S. employer identification

CONFIDENTIAL     SPCP_0000004480

number is 20-2359134; and (3) Trustor's principal place of business is c/o Strategic Global
Management, Inc., 6800 Indiana Avenue, Suite 130, Riverside, CA 92506.  It is understood that
Beneficiary may disclose the contents of this certification to the Internal Revenue Service and
that any false statement contained herein could be punished by fine, imprisonment or both.
Trustor covenants and agrees to execute such further certificates, which shall be signed under
penalty of perjury, as Beneficiary shall reasonably require.  The covenant set forth herein shall
survive the foreclosure of the lien of this Deed Of Trust or acceptance of a deed in lieu thereof.

     R.    <u>No Conflict With Credit Agreement</u>.  In the event of any conflict between the
terms of this Deed Of Trust and the terms of the Credit Agreement, the terms of the Credit
Agreement shall prevail.

NO FURTHER TEXT ON THIS PAGE<br>
SIGNATURE PAGE FOLLOWS

**JAE 0178**

CONFIDENTIAL          SPCP_0000004481

IN WITNESS WHEREOF, Trustor has executed this fee Deed Of Trust ($80 Million Facility:  Western Medical Center - Anaheim) as of the day and year first above written.

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company.


By:  _____
    _____, M.D.,
    Co-Manager


By:  _____
    _____Kali P. Chaudhuri, M.D., Co-Manager

CONFIDENTIAL                                                      SPCP_0000004482

STATE OF _____ )
                    )
COUNT Y OF _____ )

On _____, 2007, before me, _____, personally appeared _____,

[ ]    personally known to me           proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary


## CAPACITY CLAIMED BY SIGNER:

[ ]    Individual(s)              [ ]    Attorney-In-Fact
[ ]    Partner(s)                 [ ]    Subscribing Witness
[ ]    Trustee(s)                 [ ]    Guardian/Conservator
[ ]    Corporate Officer:         [X]    Other:  Co-Manager

## SIGNER IS REPRESENTING:

Name of Person(s) or Entity(ies):  PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company.

STATE OF _____ )
                    )
COUNT Y OF _____ )

On _____, 2007, before me, _____, personally appeared KALI P. CHAUDHURI,

[ ]    personally known to me              proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

#4831-1562-0370v4                          1

**JAE 0180**

WITNESS my hand and official seal.

_____
Signature of Notary

## CAPACITY CLAIMED BY SIGNER:

| | | | |
|---|---|---|---|
| [ ] | Individual(s) | [ ] | Attorney-In-Fact |
| [ ] | Partner(s) | [ ] | Subscribing Witness |
| [ ] | Trustee(s) | [ ] | Guardian/Conservator |
| [ ] | Corporate Officer: | [X] | Other:  Co-Manager |

## SIGNER IS REPRESENTING:

Name of Person(s) or Entity(ies):  PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company.

#4831-1562-0370v4

2

**JAE 0181**

CONFIDENTIAL

SPCP_0000004484

## EXHIBIT "A"

**WESTERN MEDICAL CENTER – ANAHEIM**
**1025 SOUTH ANAHEIM BOULEVARD**
**ANAHEIM, CALIFORNIA**

## LEGAL DESCRIPTION

PARCEL A:

PARCELS 1 AND 2, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 48 PAGE 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND BELOW 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT THE RIGHT TO ENTER UPON ANY PART OF SAID LAND FOR THE PURPOSE OF RECOVERING SAID SUBSTANCES, AS RESERVED BY DESSA I.  WAGONER, A WIDOW, IN DEED DATED APRIL 1, 1960 IN BOOK 5226 PAGE 241, OFFICIAL RECORDS.

PARCEL B:

LOTS 10, 12, 13 AND 14 INCLUSIVE OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, AS SHOWN ON A MAP RECORDED <u>IN BOOK 97. PAGES 19 AND 20.</u> OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL C:

LOT 11 OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED <u>IN BOOK 97. PAGES 19 AND 20</u> OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

CONFIDENTIAL

SPCP_0000004485

## EXHIBIT "F" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

## FORM OF ABSOLUTE ASSIGNMENT

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

**JAE 0183**

SPCP_0000004486

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Sedgwick, Detert, Moran & Arnold LLP
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California 94105
Attn:  Gary C. Sheppard, Esq.

---

(Above Space For Recorder's Use)

## ABSOLUTE ASSIGNMENT
## OF LEASES AND RENTS WITH LICENSE BACK
### ($80 MILLION CREDIT AGREEMENT)

### (WESTERN MEDICAL CENTER - ANAHEIM)

This ABSOLUTE ASSIGNMENT OF LEASES AND RENTS WITH LICENSE BACK made to be effective as of October 9, 2007 ("**Effective Date**") (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "**Assignment of Leases and Rents**"), is made by PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"), INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), and WMC-A, INC., a California corporation ("**WMC-A**") (PCHI, IHHI and WMC-A are sometimes collectively referred to herein as "**Assignors**" and individually as an "**Assignor**"); and MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Assignee**"), in connection with that certain Credit Agreement ($80 Million Facility) of even date herewith, by and between the Borrowers (including IHHI) named therein, the Credit Parties (including PCHI) named therein, and Assignee, as Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").  Initially capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.  This Assignment of Leases and Rents is made with respect to the following facts:

### RECITALS:

A.  PCHI owns the real property and hospital improvements commonly known as the Western Medical Center — Anaheim and located at 1025 South Anaheim Boulevard, Anaheim, California (the "**Premises**").  PCHI (as Lessor) leases the Premises to IHHI (as Lessee) pursuant to that certain Triple Net Lease dated as of March 3, 2005 (as amended by that certain Amendment #1 to Triple Net Lease dated as of March 3, 2005) (together the "**Triple Net Lease**"), and IHHI (as Sublessor) subleases the Premises to WMC-A (as Sublessee) pursuant to that certain Sublease Agreement dated as of March 4, 2005 (as amended from time to time) (together the "**Sublease**").  WMC-A operates the Premises as an acute care hospital facility.  The Premises is more particularly described in Schedule "1" attached hereto and made a part hereof.

B.  Pursuant to the Credit Agreement, Assignee, as Lender, agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of

#4831-1562-0370v4

**JAE 0184**

CONFIDENTIAL

SPCP_0000004487

credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers named in the Credit Agreement.  Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes**," and individually as a "**Note**"). Repayment of the Notes is secured in part by the lien of that certain Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents dated as of the date hereof, executed by PCHI, as Trustor for the benefit of Assignee, as Trustee (the "**Deed of Trust**").  The Deed of Trust is recorded as a first lien and encumbrance against the Premises.  The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents.**"

C.      Assignors are or may be parties to certain rental agreements, occupancy agreements, lease agreements, sublease agreements and other similar agreements from time to time with third parties with respect to the Premises and will from time to time be entering into renewals thereof or comparable agreements relating to the Premises.

D.      Assignee has required the execution and delivery of this Assignment of Leases and Rents as a condition of making the Loans.  This Assignment of Leases and Rents is given, inter alia, for the purpose of securing repayment of the Loans and the performance of the obligations made by Assignors, as Borrowers and/or Credit Parties, to Assignee, as Lender, under the Notes and the Credit Agreement, and to secure the payment and performance of all obligations and liabilities of Assignors hereunder.

E.      It is intended by Assignee and Assignors that the foregoing Recitals are to be made a part of this Assignment of Leases and Rents and the agreements made hereunder.

## ASSIGNMENT

NOW, THEREFORE, for and in consideration of the Recitals and of any financial accommodations or extensions of credit (including, without limitation, any Loans or advances by renewal, refinancing or extension of the Credit Agreement or otherwise) heretofore, now or hereafter made to or for the benefit of any Assignor pursuant to the Credit Agreement or any other agreement, instrument or document executed pursuant to or in connection therewith, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor and Assignee hereby agree as follows:

1.      Assignment by PCHI.  PCHI (as an Assignor) does hereby absolutely and directly (and not merely collaterally) assign, bargain, sell, transfer, convey, set over and deliver unto Assignee (a) all rights of the lessor and/or landlord under the Triple Net Lease and under all other rental agreements, occupancy agreements, lease agreements, sublease agreements, licenses, and other similar agreements relating to the leasing, occupation or rental of all or any portion of

CONFIDENTIAL                                                                                                                                      SPCP_0000004488

the Premises owned or leased by PCHI and/or operated by PCHI, and all other agreements of any kind relating to the use or occupancy of the Premises or any portion thereof, whether now existing or which may be executed at any time in the future during the term of this Assignment of Leases and Rents, and all amendments, extensions and renewals of any of them (together with the Triple Net Lease, the "**PCHI Leases**"), and (b) all rents or other income or payments, payment intangibles, rights to payments and reimbursements from insurance companies and any governmental agencies or programs, and accounts and accounts receivable, regardless of type or source of payment (including but not limited to common area maintenance charges, late charges, default payments, damage claims, insurance proceeds (including rental loss coverage and business interruption coverage), lease termination payments, lease guaranty payments (including guaranties of tenant performance), refunds of any type, prepayment of rents, settlements or judgments of litigation or settlements of past due rents) which may now or hereafter be or become due or owing under the PCHI Leases, and any of them, or on account of the use of the Premises (collectively, the "**PCHI Rents**").  It is intended hereby to establish a present and complete transfer, and direct and absolute assignment of all the PCHI Leases and all rights of the lessor and/or landlord thereunder, and all PCHI Rents, and other payments arising thereunder on account of the use of the Premises to Assignee, with the right, but without the obligation, to collect all of said PCHI Rents which may become due during the term of this Assignment of Leases and Rents.  Concurrently or prior to the execution and delivery of this Assignment of Leases and Rents, PCHI has delivered to Assignee true, correct, complete and accurate copies of each PCHI Lease affecting the Premises.  Within five (5) business days from execution and delivery of any PCHI Lease, PCHI agrees to deposit with Assignee true, correct, complete and accurate copies of the same.

2.      Assignment by IHHI.  IHHI (as an Assignor) does hereby absolutely and directly (and not merely collaterally) assign, bargain, sell, transfer, convey, set over and deliver unto Assignee (a) all rights of the lessor and/or landlord under the Sublease and under all other rental agreements, occupancy agreements, lease agreements, sublease agreements, licenses, and other similar agreements relating to the leasing, occupation or rental of all or any portion of the Premises owned or leased by IHHI and/or operated by IHHI, and all other agreements of any kind relating to the use or occupancy of the Premises or any portion thereof, whether now existing or which may be executed at any time in the future during the term of this Assignment of Leases and Rents, and all amendments, extensions and renewals of any of them (together with the Sublease, the "**IHHI Subleases**"), and (b) all rents or other income or payments, payment intangibles, rights to payments and reimbursements from insurance companies and any governmental agencies or programs, and accounts and accounts receivable, regardless of type or source of payment (including but not limited to common area maintenance charges, late charges, default payments, damage claims, insurance proceeds (including rental loss coverage and business interruption coverage), lease termination payments, lease guaranty payments (including guaranties of tenant performance), refunds of any type, prepayment of rents, settlements or judgments of litigation or settlements of past due rents) which may now or hereafter be or become due or owing under the IHHI Subleases, and any of them, or on account of the use of the Premises (collectively, the "**IHHI Rents**").  It is intended hereby to establish a present and complete transfer, and direct and absolute assignment of all the IHHI Subleases and all rights of the sublessor and/or sublandlord thereunder, and all IHHI Rents, and other payments arising thereunder on account of the use of the Premises to Assignee, with the right, but without the obligation, to collect all of said IHHI Rents which may become due during the term of this

CONFIDENTIAL                                                                                          SPCP_0000004489

Assignment of Leases and Rents.  Concurrently or prior to the execution and delivery of this Assignment of Leases and Rents, IHHI has delivered to Assignee true, correct, complete and accurate copies of each IHHI Sublease affecting the Premises.  Within five (5) business days from execution and delivery of any IHHI Sublease, IHHI agrees to deposit with Assignee true, correct, complete and accurate copies of the same.

     3.    <u>Leases and Rents</u>.  For convenience, the PCHI Leases and the IHHI Subleases are hereinafter together referred to as the "**Leases**," and the PCHI Rents and the IHHI Rents are hereinafter together referred to as the "**Rents**."

     4.    <u>Power of Attorney</u>.  Upon the occurrence and during the continuance of an Event of Default under the Credit Agreement, each Assignor appoints Assignee as the true and lawful attorney of each Assignor with full power of substitution and with power for it and in its name, place and stead, to demand, collect, receive and give complete acquittances for any and all Rents and other amounts herein assigned which may be or become due and payable by the lessees, tenants, subtenants and other occupants of the Premises under the PCHI Leases and the IHHI Subleases (collectively and together, the "**Lessees**") for convenience, and other parties to, or otherwise liable under, any Leases, and at its discretion to file any claim or take any other action or proceeding and make any settlement of any claims, either in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or desirable in order to collect and enforce the payment of any and all Rents and other amounts herein assigned.  The foregoing power is coupled with an interest and is therefore deemed to be irrevocable.  Assignee agrees not to exercise the foregoing power of attorney unless and until there is a continuing Event of Default under the Credit Agreement.  Upon the existence of a continuing Event of Default under the Credit Agreement, the Lessees will be expressly authorized and directed to pay all Rents and other amounts herein assigned to Assignee or such nominee as Assignee may designate in writing delivered to and received by such Lessees who are expressly relieved of any and all duty, liability or obligation to Assignor in respect of all payments so made.

     5.    <u>Enforcement of Assignment</u>.  Assignee is hereby vested with full power to use all measures, legal and equitable, deemed by it necessary or proper to enforce this Assignment of Leases and Rents and to collect the Rents and other amounts assigned hereunder, including the right to enter upon the Premises, or any part thereof, and take possession thereof forthwith to the extent necessary to effect the cure of any default on the part of ay Assignor as lessor and/or landlord in any of the Leases.  Nothing contained herein shall make Assignee a mortgagee-in-possession for any purpose.  Each Assignor hereby grants full power and authority to Assignee to exercise all rights, privileges and powers herein granted at any and all times hereafter, without notice to Assignor, with full power to use and apply all of the Rents and other amounts assigned hereunder to the payment of the costs of managing and operating the Premises and of any indebtedness or liability of Assignor to Assignee, including but not limited to the payment of taxes, special assessments, insurance premiums, damage claims, the costs of maintaining, repairing, rebuilding and restoring the improvements on the Premises or of making same rentable, Attorneys' Fees (as defined in <u>Section 16</u> herein below), and court costs to the extent such fees, costs and expenses are covered by the Notes or by any other Loan Document (defined in the Credit Agreement), paid or incurred in connection with the interpretation and/or enforcement of the Credit Agreement or any of the other Loan Documents and the payment and performance of all Obligations under the Credit Agreement and the other Loan Documents.

CONFIDENTIAL                                SPCP_0000004490

Assignee shall be under no obligation to assert or enforce any of the rights or claims assigned to it hereunder or to perform or carry out any of the obligations of the lessor or landlord under any of the Leases and does not assume any of the liabilities in connection with or arising or growing out of the covenants and agreements of any Assignor in the Leases; and each Assignor covenants and agrees that it will faithfully perform all of the obligations imposed under any and all of the Leases and hereby agrees to indemnify, defend, protect and hold Assignee free and harmless from and against any liability, attorneys' fees, statutory costs, non-statutory costs, loss or damage which may or might be incurred by it under the Leases or by reason of this Assignment of Leases and Rents, and from any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any of the Leases.  This Assignment of Leases and Rents shall not operate to place responsibility for the control, care, management or repair of the Premises, or parts thereof, upon Assignee nor shall it operate to make Assignee liable for the carrying out of any of the terms and conditions of any of the Leases, or for any waste of the Premises by the lessee under any of the Leases or any other party, or for any dangerous or defective condition of the Premises or for any suspected or actual release or contamination of the Premises with or by any hazardous substances or for any suspected or actual violation of any environmental laws, rules and regulations, or for any negligence in the management, upkeep, repair or control thereof resulting in loss or injury or death to any Lessee or its employees, agents, licensees, guests or invitees.  The manner of the application of Rents to the obligations and the other amounts owing under the Loan Documents shall be applied in accordance with the Credit Agreement.

6,      <u>License to Collect</u>.  Subject to the provisions set forth in <u>Section 10</u> below, and provided there is no continuing Default or Event of Default (as said terms are defined in the Credit Agreement), or a material default by any Assignor (as lessor or sublessor) in the payment or performance of any obligation, covenant or agreement of any Assignor contained in any of the Leases, each Assignor shall have a license to collect all Rents and other amounts (the "**License to Collect**") owing under the Leases to the party entitled thereto (but not more than once per month prior to the due date thereof), and to retain such rents and other amounts.

7.      <u>Representations and Warranties of Assignors</u>.  Each Assignor hereby represents and warrants to Assignee that said Assignor is and shall at all times be the sole owner of the entire lessor's/sublessor's interest in each of the Leases; that said Assignor shall not be in default under the Leases and that the Leases are and shall during the term of the Credit Agreement remain valid and enforceable; that said Assignor has not heretofore transferred or assigned the Leases or any of the Rents thereunder or any right or interest therein (nor is any Lease or the Rents subject to any currently effective Lien or assignment other than the Liens in favor of Assignee), nor has it collected in advance or anticipated any of the Rents thereunder; and said Assignor represents and warrants that it is not and shall not be indebted to the Lessees in any manner whatsoever so as to give rise to any right of setoff against, or reduction of, the Rents payable under the Leases.

8.      <u>Assignors' Covenants</u>.  Each Assignor covenants not to materially alter, modify, amend or change the terms of the Leases or give any consent or permission or exercise any option required or permitted by the terms thereof or waive any material obligation required to be performed by any Lessee or execute, cancel or terminate any of the Leases or accept a surrender

CONFIDENTIAL                                                      SPCP_0000004491

thereof or enter into Leases after the date hereof without prior written consent of Assignee. No Assignor will make any further transfer or assignment thereof, or attempt to pledge, assign or encumber any of the Leases or Rents or other amounts payable thereunder, or convey or transfer or suffer a conveyance or transfer the Premises or of any portion or interest therein so as to effect, directly or indirectly, a merger of the estates and rights of, or a termination or diminution of the obligations of, any Lessee thereunder. If any Lessee claims any Assignor is in default under a Lease and the amount due from said Lessee exceeds $10,000, such Assignor further covenants to deliver to Assignee, promptly upon receipt thereof, copies of said Lessee's demands, claims and notices of default.

9.    Termination of this Assignment of Leases and Rents.  Upon indefeasible payment in full of all of the obligations in the Notes, the Credit Agreement and other Loan Documents, this Assignment of Leases and Rents shall be and become null and void, and upon written request from each Assignor, Assignee shall prepare and execute a release document for this Assignment of Leases and Rents; otherwise, it shall remain in full force and effect as herein provided and, with the covenants, warranties and power of attorney herein contained, shall inure to the benefit of Assignee and any subsequent holder of the Notes, and shall be binding upon each Assignor and its respective successors and assigns, and any subsequent owner of any of the Premises.

10.   Rents After Event of Default; Termination of License to Collect.  Each Assignor shall from time to time prior to an Event of Default render such accounts of collections as Assignee may from time to time require. The License To Collect herein granted to Assignor shall terminate immediately and automatically, without further action or documentation, upon the occurrence or existence of an Event of Default; and upon written notice of the Event of Default at any time hereafter given by Assignee to any Lessee, all Rents thereafter payable and all agreements and covenants thereafter to be performed by the Lessee shall be paid and performed by the Lessee directly to Assignee in the same manner as if the above License to Collect had not been granted, without prosecution of any legal or equitable remedies under the Deed of Trust. Any Rents so collected by any Assignor from and after such termination shall be deemed to be trust funds held in trust by such Assignor for the sole benefit of Assignee. Such funds shall be held in a segregated manner and remitted to Assignee upon demand. Any Lessee of the Premises or any part thereof is authorized and directed to pay to the applicable Assignor any Rent herein assigned currently for not more than six (6) calendar months in advance and any payment so made prior to receipt by such Lessee of notice of such Assignor's default shall constitute a full acquittance to Lessee therefor. Notwithstanding any provision herein to the contrary, upon an Event of Default under the Loan Documents, then in addition to any remedy herein stated, Assignee shall be entitled to any remedy provided by law or equity to enforce this Assignment of Leases and Rents, including without limitation, the rights accorded to Assignee under the law where the Premises is located and such enforcement of this Assignment of Leases and Rents by Assignee shall not be deemed to be a violation of this Assignment of Leases and Rents nor an "action" under such law, to the extent permitted by such law. Assignee's remedies in enforcing this Assignment of Leases and Rents shall be cumulative and not exclusive. If Assignee waives any Event of Default or accepts a late cure of such Event of Default, which it may do in its sole and absolute discretion, no Assignor shall be entitled to collect the Rents directly from the Lessees of the Premises unless and until it shall have received written permission from Assignee to do so.

#4831-1562-0370v4                                          6

**JAE 0189**

11.   <u>Choice of Law</u>.  It is understood and agreed that this Assignment of Leases and Rents shall become effective concurrently with the Credit Agreement.  THIS ASSIGNMENT OF LEASES AND RENTS, THE NOTES, THE CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE INTERNAL LAWS OF THE STATE OF NEVADA, EXCEPT TO THE EXTENT THAT THE LAWS OF THE STATE WHERE THE PREMISES IS LOCATED APPLY, TO THE CREATION, PRIORITY OR PERFECTION OF THE ASSIGNMENT AND LIEN GRANTED HEREIN, AND THE ENFORCEMENT OF ANY REMEDIES BY ASSIGNEE OR ITS SUCCESSORS OR ASSIGNS AGAINST THE RENTS, LEASES, LESSEES OR THE PREMISES.

12.   <u>Interpretation</u>.  Each Assignor has had me opportunity to fully negotiate the terms hereof and modify the draftsmanship of this Assignment of Leases and Rents.  Therefore, the terms of the Assignment shall be construed and interpreted without any presumption, inference, or rule requiring construction or interpretation of any provision of this Assignment of Leases and Rents against the interest of the party causing this Assignment of Leases and Rents or any portion of it to be drafted.  Each Assignor is entering into this Assignment of Leases and Rents freely and voluntarily without any duress, economic or otherwise.

13.   <u>Severability</u>.  If any term, covenant or condition of this Assignment of Leases and Rents or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment of Leases and Rents, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Assignment of Leases and Rents shall be valid and enforced to the fullest extent permitted by law.

14.   <u>Counterparts</u>.  This Assignment of Leases and Rents may be executed in one or more counterparts, each of which will be deemed an original, but all of which, when taken together, will constitute one and the same instrument.

15.   <u>Time is of the Essence</u>.  Time is of the essence with respect to each of Assignor's obligations and liabilities hereunder.

16.   <u>Attorneys' Fees</u>.  Each Assignor promises to pay all costs of enforcement and collection thereof, including, but not limited to, reasonable attorneys' and paralegals' fees, statutory costs, non-statutory costs, and including court costs paid or incurred by the Assignee and its successors and assigns (whether incurred in trial or on appeal or in any bankruptcy proceeding), and including administrative and alternative dispute resolution proceedings, and whether or not such enforcement and collection includes the filing of a lawsuit.  In addition, each Assignor promises to pay the attorneys' and paralegals' fees and costs whenever required by this Assignment of Leases and Rents, the Notes, the Credit Agreement and the other Loan Documents.  If any such fees and costs are not paid in full on the date when due, such amounts shall bear interest at the Default Rate from the date of the invoice until paid in full.  All of the fees and costs referenced herein are collectively referred to herein as "**Attorneys' Fees**" and shall be additional obligations as defined in the Credit Agreement and in the other Loan Documents.

CONFIDENTIAL                                                                                  SPCP_0000004493

17.   <u>Notices</u>.  All notices and other communications provided to any party hereto under this Assignment of Leases and Rents shall be in writing and addressed, delivered or transmitted in accordance with the requirements of the Credit Agreement.

18.   <u>Binding Effect</u>.  This Assignment of Leases and Rents shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns, or heirs and personal representatives, as applicable.

19.   <u>No Waiver</u>.  The failure of Assignee to Insist in any instance upon the strict keeping, observance or performance of any covenant, agreement, term, provision or condition of this Assignment of Leases and Rents or to exercise any election herein contained shall not be construed as a waiver or relinquishment for the future of such covenant agreement, term, provision, condition or election, but the same shall continue and remain in full force and effect. No surrender of possession of the Premises or of any part thereof shall release Assignors from any of their respective obligations hereunder.

20.   <u>Waiver of Jury Trial</u>.  THE PARTIES ACKNOWLEDGE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM, A TRIAL BY A COURT SITTING WITHOUT A JURY WOULD BE LESS COSTLY BOTH TO PREPARE FOR AND TO PRESENT AND WOULD MOST LIKELY AVOID A LONGER DELAY IN WAITING FOR JURY TRIAL AVAILABILITY ON THE COURT CALENDAR.  EACH PARTY TO THIS ASSIGNMENT OF LEASES AND RENTS HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS ASSIGNMENT OF LEASES AND RENTS, OR ANY OF THE NOTES, OR THE CREDIT AGREEMENT, OR ANY OF THE OTHER LOAN DOCUMENTS, OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS ASSIGNMENT OF LEASES AND RENTS, THE NOTES, THE CREDIT AGREEMENT ANY OF THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS ASSIGNMENT OF LEASES AND RENTS, OR ANY OF THE NOTES, OR THE CREDIT AGREEMENT, OR ANY OF THE OTHER LOAN DOCUMENTS, MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

21.   <u>Suretyship Waivers</u>.  The suretyship waivers contained in the Credit Agreement shall be applicable to this Assignment of Leases and Rents and shall be deemed to be remade by each Assignor.

22.   <u>Integration</u>.  This Assignment of Leases and Rents and the other Loan Documents embody the entire agreement and understanding among Assignors and Assignee relating to the subject matter hereof and supersede all prior proposals, negotiations, agreements, and understandings relating thereto and may not be contradicted by evidence of prior,

#4831-1562-0370v4                                    8

**JAE 0191**

CONFIDENTIAL                                                                                   SPCP_0000004494

contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

[NO FURTHER TEXT ON THIS PAGE]
[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL                                        SPCP_0000004495

IN WITNESS WHEREOF, Assignors and Assignee have caused this Absolute Assignment of Leases and Rents (Western Medical Center - Anaheim) to be duly executed and delivered as of the date first hereinabove written.

**ASSIGNORS:**

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company

By:_____

_____
[Printed Name and Title]

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation

By:_____

_____
[Printed Name and Title]

WMC-A, INC., a California corporation,

By:_____

_____
[Printed Name and Title]

**ASSIGNEE:**

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,

By:_____
Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004496

STATE OF _____   )
                       )
COUNT Y OF _____   )

On _____, 2007, before me, _____, personally appeared JOSEPH J. LAMPARIELLO,

[ ]   personally known to me          proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the' instrument.

WITNESS my hand and official seal.

_____
Signature of Notary


## CAPACITY CLAIMED BY SIGNER:

[ ]   Individual(s)              [ ]   Attorney-In-Fact
[ ]   Partner(s)                 [ ]   Subscribing Witness
[ ]   Trustee(s)                 [ ]   Guardian/Conservator
[ ]   Corporate Officer:         [X]   Other:  Co-Manager

## SIGNER IS REPRESENTING:

Name of Person(s) or Entity(ies):  MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation

STATE OF _____   )
                       )
COUNT Y OF _____   )

On _____, 2007, before me, _____, personally appeared _____,

[ ]   personally known to me              proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

#4831-1562-0370v4

**JAE 0194**

CONFIDENTIAL                                                  SPCP_0000004497

WITNESS my hand and official seal.

_____
Signature of Notary

## CAPACITY CLAIMED BY SIGNER:

[ ] Individual(s)                    [ ] Attorney-In-Fact
[ ] Partner(s)                       [ ] Subscribing Witness
[ ] Trustee(s)                       [ ] Guardian/Conservator
[ ] Corporate Officer:               [X] Other:  Co-Manager

## SIGNER IS REPRESENTING:

Name of Person(s) or Entity(ies):  PACIFIC COAST HOLDING INVESTMENT, LLC, a California limited liability company.

STATE OF _____      )
                          )
COUNT Y OF _____      )

On _____, 2007, before me, _____, personally appeared _____,

[ ] personally known to me          proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary

## CAPACITY CLAIMED BY SIGNER:

[ ] Individual(s)                    [ ] Attorney-In-Fact
[ ] Partner(s)                       [ ] Subscribing Witness
[ ] Trustee(s)                       [ ] Guardian/Conservator
[ ] Corporate Officer:               [X] Other:  Co-Manager

#4831-1562-0370v4

**JAE 0195**

CONFIDENTIAL

SPCP_0000004498

**SIGNER IS REPRESENTING:**

Name of Person(s) or Entity(ies):  WMC-A, INC., a California corporation.

#4831-1562-0370v4

**JAE 0196**

CONFIDENTIAL

SPCP_0000004499

## <u>SCHEDULE 1 TO ABSOLUTE ASSIGNMENT</u>

1025 SOUTH ANAHEIM BLVD.
ANAHEIM, CA

<u>LEGAL DESCRIPTION</u>

PARCEL A:

PARCELS 1 AND 2, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 48 PAGE 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND BELOW 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT THE RIGHT TO ENTER UPON ANY PART OF SAID LAND FOR THE PURPOSE OF RECOVERING SAID SUBSTANCES, AS RESERVED BY DESSA I.  WAGONER, A WIDOW, IN DEED DATED APRIL 1, 1960 IN BOOK 5226 PAGE 241, OFFICIAL RECORDS.

PARCEL B:

LOTS 10, 12, 13 AND 14 INCLUSIVE OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, AS SHOWN ON A MAP RECORDED <u>IN BOOK 97. PAGES 19 AND 20.</u> OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL C:

LOT 11 OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED <u>IN BOOK 97. PAGES 19 AND 20</u> OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004500

## EXHIBIT "G" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

**FORM OF SECURITY AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004501

EXECUTION

## SECURITY AGREEMENT
### ($80 MILLION CREDIT AGREEMENT)

This SECURITY AGREEMENT (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "**Security Agreement**"), is made to be effective as of October 9, 2007 ("**Effective Date**") by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), COASTAL COMMUNITY HOSPITAL, INC., a California corporation ("**Coastal**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**") and PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**") (IHHI, WMC-SA, WMC-A, Coastal, Chapman and PCHI are hereinafter together referred to as "**Debtors**") in favor of MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**"). This Security Agreement is made in connection with that certain Credit Agreement ($80 Million Facility) dated as of the date hereof by and among the Borrowers named therein (including Debtors), Lender and the Credit Parties named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Initially capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.

### RECITALS

A.     Debtors are each in the business of delivering acute care services to the public through the acute care Hospital Facilities defined in the Credit Agreement.

B.     Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers named in the Credit Agreement. Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes**," and individually as a "**Note**"). Repayment of the Notes is secured in part by (x) the liens of the fee Deeds of Trust, Security Agreement, Fixture Filing and Assignment of Rents dated as of the date hereof encumbering the fee interest in the Western Medical Center – Santa Ana, the Western Medical Center – Anaheim, and the Coastal Community Hospital, executed by PCHI, as Trustor for the benefit of Lender, as Trustee, and (y) by the lien of that certain Leasehold Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents dated as of the date hereof encumbering the tenant's interest in the Chapman Leases, executed by IHHI, as Trustor, for the benefit of Lender, as Trustee (together, the "**Deeds of Trust**"). The Deeds of Trust are recorded as second liens and encumbrances against the applicable fee simple and/or leasehold interests in the Hospital Facilities, junior in priority only to the lien of the $50,000,000 Deeds of Trust The Credit Agreement, the Notes, the Deeds of Trust, and all other agreements, documents, and instruments evidencing and/or

CONFIDENTIAL

**JAE 0199**

SPCP_0000004502

securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents**."

C.      In order to secure the prompt and complete payment, observance and performance of (i) the Loans, (ii) the Obligations as defined in the Credit Agreement, and (in) each Debtor's obligations and liabilities hereunder and in connection therewith (all such Obligations and such obligations and liabilities hereunder being hereinafter referred to collectively as the "**Liabilities**"), Lender has required, as a condition, among others, to entering into the Credit Agreement and the other Loan Documents, that Debtors execute and deliver this Security Agreement.

D.      The parties intend that these Recitals are made a part of this Security Agreement.

## AGREEMENT:

NOW, THEREFORE, for and in consideration of the foregoing and of any financial accommodations or extensions of credit (including, without limitation, any loan or advance by renewal, refinancing or extension of the agreements described hereinabove or otherwise) heretofore, now or hereafter made to or for the benefit of Debtors pursuant to the Credit Agreement or any other agreement, instrument or document executed pursuant to or in connection therewith, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtors and the Lender hereby agree as follows:

**Section 1.**      Defined Terms:  Construction.

(A)      Certain defined terms.  As used herein, the following terms shall have the following meanings:

"**Lien**" means all Liens as defined in the Credit Agreement.

"**Obligations**" means all Obligations as defined in the Credit Agreement.

"**Person**" means all Persons as defined in the Credit Agreement.

"**Requirement of Law**" means, as to Debtors, any law, treaty, rule or regulation (including any federal and state health regulations) or determination of an arbitrator or a court or other Governmental Authority, in each case binding upon any Debtor or any of their property or to which any Debtor or any of their property is subject.

(B)      Unless otherwise defined herein, all terms defined in Article 8 and Article 9 of the Nevada version of the Uniform Commercial Code (the "**Code**") are used herein as defined therein.

(C)      The words "hereby," "hereof," "herein" and "hereunder" and words of like import when used in this Security Agreement shall refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement.  Section references herein are to this Security Agreement unless otherwise specified.

#4831-1562-0370v4                                           2

CONFIDENTIAL                                                                                   SPCP_0000004503

(D)     All terms defined in this Security Agreement in the singular shall have comparable meanings when used in the plural, and vice versa, unless otherwise specified.

(E)     The parties hereto have participated jointly in the negotiation and drafting of this Security Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Security Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Security Agreement.

**Section 2.**     <u>Grant of Lien</u>.  To secure the prompt and complete payment, observance and performance of the Obligations, Debtors hereby each assign and pledge to the Lender, and hereby grant to the Lender, a continuing Lien (junior and subordinate only to the Liens of the $50,000,000 Deeds of Trust and other documents and instruments made in connection with the $50,000,000 Revolving Facility) in all of said Debtor's right, title and interest in and to all of its property and assets, whether personal, tangible or intangible, and whether now owned or existing or hereafter arising or acquired, or in which they now have or at any time in the future may acquire any right, title, or interest (collectively, the "**Collateral**").  Collateral shall include all of the following property and interests in property in which it now has or at any time in the future may acquire any right, title or interest and wheresoever located:

"**Accounts**" means all "account(s)," as defined in the Code, with respect to each Debtor's right to any payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy or policies of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit card or charge card or information contained on or for use with the card, and (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state of governmental unit of a state.  The term includes health care insurance receivables.

"**Books and Records**" of Debtors, including collectively all books, records, board minutes, contracts, licenses, insurance policies, maintenance and warranty records, environmental audits, business plans, files, ledgers, computer programs, computer files, computer discs and other data and Software storage and media devices, computer runs, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities and any and all records and instruments relating to the Collateral or Debtor's business.

"**Chattel Paper**," "**Instruments**," and "**Documents**," including, collectively:  (i) all chattel paper (including tangible chattel paper, intangible chattel paper and electronic chattel paper), rental contracts, and leases (collectively, "**Chattel Paper**"); (ii) all instruments and all payments thereunder, including all certificated securities and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute Chattel Paper (collectively, "**Instruments**"); and (iii) all bills of sale, bills of lading, warehouse receipts and other documents of title, whether or not negotiable, including, without limitation, all other documents which purport to be issued by a Bailee (as

CONFIDENTIAL                                                                    SPCP_0000004504

defined in <u>Section 4(A)</u> below) or agent and purport to cover goods in any Bailee's or agent's possession which are either identified or are fungible portions of an identified mass, and all documents of title made available to the Lender for the purpose of ultimate sale or exchange of goods or for the purpose of loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with goods in a manner preliminary to their sale or exchange (collectively, "**Documents**").

"**Commercial Tort Claims**" set forth from time to time on <u>Schedule 1</u> hereto, plus all other commercial tort claims pledged pursuant to a supplement to this Security Agreement pursuant to <u>Section 5</u> and all payments due or made to such Debtors in connection therewith.

"**Deposit Accounts**" including, collectively, all deposit accounts (whether general or special), and all funds and amounts therein, whether or not restricted or designated for a particular purpose.

"**Equipment**" including, collectively, all equipment as such term is defined in the Code, now owned or hereafter acquired by Debtors, wherever located, including any and all machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal property and all other goods (including Software embedded in such goods) (other than Inventory) of every kind and description that may be now or hereafter used in Debtor's operations or that are owned by Debtors or in which Debtors may have an interest, and all parts, accessories and accessions thereto and substitutions and replacements therefor.

"**General Intangibles**" including, collectively, all general intangibles as defined in the Code and other intangible property of any kind (other than Accounts, Chattel Paper, commercial tort claims, Deposit Accounts, Investment Property and Letter of Credit Rights), including, without limitation, (i) Payment Intangibles, (ii) the uniform resource locators set forth on <u>Schedule 2</u> and the internet websites associated therewith; (iii) all rights to payment for loans, money or funds advanced or sold and other obligations receivable (other than Accounts); (iv) customer lists, credit files, correspondence, and advertising materials; (v) contracts and contract rights; (vi) all interests in partnerships, limited liability companies, joint ventures and other unincorporated Persons (other than the capital stock of any Subsidiary); (vii) all tax refunds and tax refund claims; (viii) all right, title and interest under leases, subleases, licenses and concessions and other agreements relating to real or personal property (but excluding any interest in the underlying real property or personal property if such personal property constitutes equipment or fixtures); (ix) all payments due or made to Debtors in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any property by any person or Governmental Authority; (x) all choses in action, causes of action or other claims (other than Commercial Tort Claims), and all payments due or made to Debtors in connection therewith; (xi) all credits with and other claims against carriers and shippers; (xii) all rights to indemnification; (xiii) all rights, priorities and privileges of Debtors relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including (1) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof; and the right to obtain all renewals thereof ("**Copyrights**"),

CONFIDENTIAL

(2) any written agreement naming Debtors as licensor or licensee granting any right under any Copyright, including the grant of any right to copy, publicly perform, create derivative works, manufacture, distribute, exploit or sell materials derived from any Copyright, (3) all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof and all rights to obtain any reissues or extensions of the foregoing ("**Patents**"), (4) all agreements, whether written or oral, providing for the grant by or to Debtors of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent, (5) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, brand names, labels, service marks, logos and other source or business identifiers, and, in each case, all goodwill associated therewith, all registrations and recordings thereof and all applications in connection therewith, in each case whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, all common-law rights related thereto, and the right to obtain all renewals thereof ("**Trademarks**"), (6) any agreement, whether written or oral, providing for the grant by or to Debtors of any right to use any Trademark (collectively, "**Intellectual Property**"), trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom, advertising materials, slogans, and all goodwill associated with the foregoing; (xiv) all licenses and permits from any Governmental Authority; (xv) all license agreements and franchise agreements; (xvi) all reversionary interests in pension and profit sharing plans and reversionary, beneficial and residual interest in trusts; (xvii) all proceeds of insurance of which Debtors is beneficiary; and (xviii) all letters of credit, guaranties, liens, security interests and other supporting obligations held by or granted to Debtors.

"**Inventory**" including, collectively, all inventory as defined in the Code, including, without limitation, all goods, including Software embedded in such goods, wherever located, whether in the possession of Debtors or of a Bailee and whether consisting of whole goods, spare parts, components, supplies, materials, or returned or repossessed goods), which are held for sale or lease, which are to be furnished (or have been furnished) under any contract of service or which are raw materials, work in process, finished goods or materials used or consumed in Debtor's business.

"**Investment Property**" including, collectively, all of Debtor's investment property, as defined in the Code, other than the Stock of any Subsidiary.

"**Letter of Credit Rights**" including, collectively, all of Debtor's letters of credit and letter of-credit rights, as defined in the Code, now owned or hereafter acquired, including rights to payment or performance under a letter of credit, whether or not such Person, as beneficiary, has demanded or is entitled to demand payment or performance.

"**Other Property**" including, collectively, all money, cash and cash equivalents; all property or interests in property now owned or hereafter acquired by Debtors (but only to the extent not excluded from the Collateral elsewhere in this Security Agreement) which now may be owned or hereafter may come into the possession, custody or control of Debtors in any way and for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection

CONFIDENTIAL

or otherwise); and all proceeds of loans, including, without limitation, the Term Loan, the Line of Credit Loan and the Convertible Loan made under the Credit Agreement.

"**Payment Intangibles**" including, collectively, all payment intangibles as such term is defined in the Code, now owned or hereafter acquired by any Person.

"**Proceeds**" as such term is defined in the Code and, in any event, shall include, collectively:  (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtors from time to time with respect to any Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to Debtors from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (iii) any claim of Debtors against third parties (a) for past, present or future infringement of any Intellectual Property or (b) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license; (iv) any recoveries by Debtors against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (v) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock interests; and (vi) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"**Software**" as such term is defined in the Code, now owned or hereafter acquired by any Person, including, collectively, all computer programs and all supporting information provided in connection with a transaction related to any program.

"**Supporting Obligations**" means all of Debtor's presently existing and hereafter acquired supporting obligations, as defined in the Code.

together, for each component of the Collateral, with all Proceeds thereof, including without limitation accessions and additions thereto, substitutions therefore, and replacements, products thereof and any other property receivable or received from or upon the sale, lease, license, collection, use, exchange or other disposition, whether voluntary or involuntary, of any of the foregoing, including "proceeds" as defined in the Code, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of Debtors from time to time with respect to any of the of the foregoing, any and all payments (in any form whatsoever) made or due and payable to Debtors from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), any and all other amounts from time to time paid or payable under or in connection with any of the foregoing or for or on account of any damage or injury to or conversion of any of the foregoing by any Person, any and all tangible or intangible property received upon the sale or disposition of the foregoing and all proceeds of proceeds.

**JAE 0204**

CONFIDENTIAL                                                                 SPCP_0000004507

**Section 3.** <u>Debtors Remains Liable</u>.  Anything herein to the contrary notwithstanding, (A) Debtors shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Security Agreement and the other Loan Documents had not been executed, (B) the exercise by the Lender of any of its rights hereunder or under the Loan Documents shall not release Debtors from any of its duties or obligations under the contracts and agreements included in the Collateral, and (C) the Lender shall not have any responsibility, obligation or liability under the contracts and agreements included in the Collateral by reason of this Security Agreement or the other Loan Documents, nor shall the Lender be required or obligated, in any manner, to (i) perform or fulfill any of the obligations or duties of Debtors thereunder, (ii) make any payment, or make any inquiry as to the nature or sufficiency of any payment received by Debtors or the sufficiency of any performance by any party under any such contract or agreement or (iii) present or file any claim, or take any action to collect or enforce any claim for payment assigned hereunder.

**Section 4.** <u>Representations and Warranties</u>.  Each Debtor represents and warrants, as to itself only, as of the date of this Security Agreement, and as of each date on which representations and warranties under Article 3 of the Credit Agreement shall be made (except for changes permitted or contemplated by this Security Agreement or the other Loan Documents) until termination of this Security Agreement pursuant to <u>Section 18</u> below:

(A)     The exact legal name, jurisdiction of formation, type of entity and organizational identification number for each Debtor is set forth on <u>Schedule 3</u> hereto.  The locations listed for each Debtor on <u>Schedule 4</u> constitute all locations at which Equipment and/or Inventory of each Debtor is located and where Debtors have exclusive possession and control of such Equipment and Inventory, except for such Equipment and Inventory which is (i) temporarily in transit between such locations, or (ii) temporarily stored with third parties or held by third parties for processing, storage, engineering, evaluation, repairs or sale (each, a "**Bailee**"), as to which all actions required by the Credit Agreement, if any, have been taken.  The proper corporate names of such third party Bailees, the location of such Equipment and Inventory, the nature of the relationship between each Debtor and each Bailee, and the maximum value of Equipment and Inventory held by each Bailee, if greater than $100,000, are set forth in <u>Schedule 5</u>.  <u>Schedules 4</u> and <u>5</u> shall be amended to reflect (1) additional locations acquired or utilized from time to time or (2) new arrangements with third parties for manufacturing, processing, engineering, evaluation, repairs, storage, bailment or consignment, provided, that, in each case each Debtor is in full compliance with the Credit Agreement and <u>Sections 5</u> and <u>8</u> below in connection with such locations.  The chief place of business and chief executive office of each Debtor is located at the address of said Debtor designated as such on <u>Schedule 4</u>.  All Books and Records concerning any Collateral are located at the addresses listed on <u>Schedule 4</u>.

(B)     This Security Agreement creates in favor of the Lender a legal, valid and enforceable security interest in the Collateral.  When financing statements have been filed in the appropriate offices against each Debtor in the locations listed for such Debtor on <u>Schedule 6</u>, the Lender will have a fully perfected first priority Lien on the Collateral in which a security interest may be perfected by such filing, subject only to Liens permitted by the definition of "**Permitted Encumbrances**" in the Credit Agreement.  All other actions to perfect the security interests in Collateral of a type which cannot be perfected by filing have been taken.

#4831-1562-0370v4

7

CONFIDENTIAL

SPCP_0000004508

(C)      Each Debtor is the legal and beneficial owner of its Collateral free and clear of all Liens except for Liens permitted by the definition of Permitted Encumbrances in the Credit Agreement and as created by this Security Agreement.  Each Debtor currently conducts business under its legal name and, in certain areas and for certain operations, the additional trade names listed on Schedule 7.  No Debtor has used any trade names or fictitious names in the past five years, except as set forth on Schedule 7.

(D)      The amount represented by each Debtor from time to time to the Lender as the amount owing by each account debtor or by all account debtors in respect of any Accounts will, at such time, be the correct amount actually and unconditionally owing by such account debtor(s) thereunder to the best of each Debtor's knowledge.

(E)      In the event that any Debtor's Equipment and/or Inventory is in the possession of a Bailee, none of the receipts, Instruments or Documents received and to be received by such Debtor from such Bailee state that the Equipment and/or Inventory covered thereby is to be delivered to bearer or to the order of a named person or to a named person and such named person's assigns.

(F)      Schedule 8 lists (i) all registered Copyrights, all Trademarks, and all Patents and (ii) all other Intellectual Property of Debtors which is material individually or in the aggregate to the operation of the business of each Debtor, in each case separately identifying that owned by each Debtor and that licensed to each Debtor (collectively, the "**Material Intellectual Property**").  The Material Intellectual Property owned by each Debtor is valid, subsisting, unexpired and enforceable, has not been adjudged invalid and has not been abandoned and the use thereof in the business of any Debtor does not knowingly infringe the intellectual property rights of any other Person.  Except as set forth in Schedule 8, none of the Material Intellectual Property owned by any Debtor is the subject of any licensing agreement, dealer agreement or franchise agreement pursuant to which any Debtor is the licensor or franchisor.  No holding, decision or judgment has been rendered by any Governmental Authority that would limit, cancel or question the validity of, or any Debtor's rights in, any Material Intellectual Property.  No action or proceeding seeking to limit, cancel or question the validity of any Material Intellectual Property owned by any Debtor or any Debtor's ownership interest therein, is on the date hereof, pending or, to the knowledge of any Debtor, threatened.  There are no claims or judgments against, or settlements by, or to be paid by any Debtor relating to the Material Intellectual Property.  Schedule 8 shall be updated from time to time, and no less frequently than quarterly, to reflect additional Material Intellectual Property created, acquired or utilized from time to time.

(G)      Schedule 1 lists all Commercial Tort Claims of each Debtor in existence as of the date hereof to the best of each Debtor's knowledge.

(H)      Schedule 2 lists all uniform resource locators owned by all Debtors.

**Section 5.**      Perfection and Maintenance of Security Interests and Liens.  Each Debtor agrees that until termination of this Security Agreement pursuant to Section 18, the Lender's Liens on and against, the Collateral shall continue in full force and effect.  Each Debtor shall perform any and all steps reasonably requested by the Lender to ensure the attachment, perfection and priority of, and to maintain and protect, the Lender's security interests in and

8

**JAE 0206**

CONFIDENTIAL

Liens on and against each Debtor's respective portion of Collateral granted or purported to be granted hereby or to enable the Lender to exercise its rights and remedies hereunder with respect to any Collateral, including, without limitation:

(A)     executing, filing and authorizing the Lender to file any financing or continuation statements, or amendments thereof; in form and substance reasonably satisfactory to the Lender;

(B)     delivering to the Lender all certificates, notes, and other instruments representing or evidencing Collateral, which certificates, notes and other instruments have been duly endorsed in blank, including, but not limited to, note powers, all in form and substance satisfactory to the Lender;

(C)     if required by the Lender, delivering to the Lender warehouse receipts or negotiable Documents covering that portion of the Collateral, if any, located with a Bailee for such receipts or Documents are issued;

(D)     after the occurrence and during the continuance of an "**Event of Default**" (as defined in the Credit Agreement), transferring Equipment and Inventory to warehouses designated by the Lender or taking such other steps as are deemed necessary by the Lender to maintain the Lender's control of the Equipment and Inventory;

(E)     at the request of the Lender, appearing in and defending any action or proceeding which may affect adversely any Debtor's title to, or the security interest of the Lender in, any of the Collateral;

(F)     notifying the Lender in accordance with <u>Section 5.6</u> of the Credit Agreement of any action concerning a Commercial Tort Claim acquired by any Debtor and, unless the Lender otherwise consents, entering promptly into a supplement to this Security Agreement pledging such Commercial Tort Claim to the Lender;

(G)     causing the Lender's name to be noted as secured party on any certificate of title for a titled Inventory or Equipment if such notation is a condition to attachment, perfection or priority of, or the ability of the Lender to enforce the Lien in such Collateral;

(H)     (i) entering into supplemental agreements with respect to Intellectual Property, in form and substance satisfactory to the Lender (including but not limited to the Intellectual Property Security Agreement referenced in the Credit Agreement), for filing with the United States Patent and Trademark Office, United States Copyright Office, or any foreign office serving substantially the same function; (ii) complying with the Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727) (or any similar Requirement of Law with respect to claims owing from Governmental Authorities); and (iii) complying with any Applicable Laws as to any Collateral if compliance therewith is a condition to attachment, perfection or priority of, or the ability of the Lender to enforce, the Lender's Lien in such Collateral or exercise any rights and remedies hereunder; and

(I)     executing and delivering all further instruments and documents, and taking all further action, as the Lender may reasonably request.

CONFIDENTIAL

SPCP_0000004510

**Section 6.**     <u>Financing Statements</u>.  Each Debtor hereby irrevocably authorizes the Lender to file one or more financing or continuation statements and amendments thereto, disclosing the security interest granted to the Lender under this Security Agreement without any Debtor's signature appearing thereon, and the Lender agrees to notify each Debtor when such a filing has been made.  Each Debtor agrees that a carbon, photo graphic, photostatic, or other reproduction of this Security Agreement or of a financing statement is sufficient as a financing statement.

**Section 7.**     <u>Schedule of Collateral</u>.  Each Debtor shall furnish to the Lender from time to time as reasonably requested by the Lender the "**Collateral Reports**" as defined and as required by the Credit Agreement.

**Section 8.**     <u>Equipment and Inventory</u>.  Each Debtor covenants and agrees with the Lender that from the date of this Security Agreement and until termination of this Security Agreement pursuant to <u>Section 18</u>, each Debtor shall:

(A)     Keep its Equipment and inventory (other than Equipment and Inventory sold or disposed of as permitted by the Credit Agreement) at the locations permitted under <u>Section 4(A)</u> (other than such locations where such Collateral was required to be removed pursuant to the provisions of <u>Section 5</u>), and deliver written notice to the Lender at least fifteen (15) days prior to establishing any other location at which it reasonably expects to maintain Equipment and/or Inventory; and

(B)     If any Equipment and/or Inventory of any Debtor is in the possession or control of any Bailee or any of such Debtor's agents, such Debtor shall, upon the Lender's reasonable request, notify such Bailee or agent of the Lender's Lien on such Equipment and/or Inventory and, upon the Lender's reasonable request, direct such Bailee or agent to hold all such Equipment and/or Inventory for the Lender's account and subject to the Lender's instructions.

**Section 9.**     <u>Accounts.  Chattel Paper and General Intangibles</u>.  Each Debtor covenants and agrees with the Lender that from and after the date of this Security Agreement and until termination of this Security Agreement pursuant to <u>Section 18</u>, each Debtor shall:

(A)     Keep its state of formation, principal place of business and chief executive office and the office where it keeps its Books and Records at its address set forth on <u>Schedule 4</u>, and keep the offices where it keeps all originals of all Chattel Paper which evidence Accounts at the locations therefore specified in <u>Section 4(A)</u> or, upon fifteen (15) days' prior written notice to the Lender, at such other locations within the United States in a jurisdiction where all actions required by <u>Section 5</u> shall have been taken with respect to the Accounts, Chattel Paper and General Intangibles.  Each Debtor will hold and preserve such Books and Records (in accordance with such Debtor's usual document retention practices) and Chattel Paper and will upon one (1) business days' notice by Lender permit representatives of the Lender at any time during normal business hours to inspect and make abstracts from such Books and Records and Chattel Paper; and

(B)     In any suit, proceeding or action brought by the Lender under any Account, Chattel Paper or General Intangible comprising part of the Collateral owned by such Debtor,

CONFIDENTIAL

each Debtor will save, indemnify and keep Lender harmless from and against all expenses, loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by Debtor of any obligation or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of Lender from any Debtor and all such obligations of each Debtor shall be and shall remain enforceable against and only against said Debtor and shall not be enforceable against Lender.

**Section 10.**    Leased Real Property.  Each Debtor covenants and agrees with the Lender that from and after the date of this Security Agreement and until termination of this Security Agreement pursuant to Section 18, that:

(A)    Each Debtor agrees that, from and after the occurrence and during the continuance of an Event of Default, the Lender may, but need not, make any payment or perform any act hereinbefore required of any Debtor with respect to any Debtor's owned or leased real property in any form and manner deemed expedient.  All money paid for any of the purposes herein authorized and all other moneys advanced by the Lender to protect the lien hereof shall be additional Liabilities secured hereby and shall become immediately due and payable without notice and shall bear interest thereon at the Default Rate of interest as provided in the Credit Agreement until paid to the Lender in full; and

(B)    Each Debtor agrees that it will not amend any lease in respect of leased real property at which such Debtor maintains Inventory and/or Equipment owned by such Debtor having an individual book value in excess of $100,000 in a manner that adversely affects the interests of Lender, without the Lender's prior written consent.

**Section 11.**    General Covenants.  Each Debtor covenants and agrees with the Lender that from and after the date of this Security Agreement and until termination of this Security Agreement pursuant to Section 18, each Debtor shall:

(A)    Keep and maintain at each Debtor's own cost and expense satisfactory and complete records of each Debtor's Collateral in a manner consistent with each Debtor's current business practice and, where applicable, GAAP, including, without limitation, a record of all payments received and all credits granted with respect to such Collateral.  Each Debtor shall, for the Lender's further security, deliver and turn over to the Lender or the Lender's designated representatives at any time following the occurrence and during the continuation of an Event of Default, any such Books and Records;

(B)    Each Debtor shall, at its expense, perform and observe all of the material terms and provisions of the Accounts, General Intangibles, Instruments, Chattel Paper and insurance pertaining to any Collateral to be performed or observed by it, and maintain such Collateral in full force and effect and enforce Accounts, General Intangibles, Instruments and Chattel Paper in accordance with their terms; and

(C)    No Debtor will (i) except as otherwise permitted by the Credit Agreement, sell or otherwise dispose of, or grant any option with respect to, any of the Collateral without the prior written consent of the Lender, (ii) create or permit to exist any Lien upon or with respect to any of the Collateral, except for the security interest under this Security Agreement and Liens

CONFIDENTIAL                                                                 SPCP_0000004512

permitted by the Credit Agreement, and will defend the Collateral against, and take such other action as is reasonably necessary to remove, any Lien on such Collateral which is not so permitted, (iii) enter into any agreement or understanding that purports to or may restrict or inhibit the Lender's rights or remedies hereunder, including, without limitation, the Lender's right to sell or otherwise dispose of the Collateral, or (iv) use or permit any Collateral to be used unlawfully or in violation of any provision of this Security Agreement, any other Loan Document, any Applicable Laws or any policy of insurance covering the Collateral.

**Section 12.**   <u>Lender Appointed Attorney-in-Fact</u>.  Each Debtor hereby irrevocably appoints the Lender as each Debtor's attorney-in-fact, coupled with an interest, with full authority in the place and stead of each Debtor and in the name of each Debtor or otherwise, from time to time in the Lender's discretion, to take any one or more of the following actions:

(A)     obtain access to records maintained for each Debtor by computer services companies and other service companies or bureaus;

(B)     (i) record evidence of the Lender's security interest, (ii) following notice to each Debtor (which notice shall not be required following fee occurrence of an Event of Default), give notices of the Lender's security interest to any of such Debtor's customers, account debtors or suppliers, or (iii) give other notices of the Lender's security interest; and

(C)     do all other things reasonably necessary to carry out this Security Agreement; provided, that the Lender may only take the following actions following the occurrence and during the continuance of an Event of Default:

(i)        send requests under each Debtor's, the Lender's or a fictitious name to each Debtor's customers or account debtors for verification of Accounts;

(ii)        obtain and adjust insurance required to be paid to the Lender pursuant to the Credit Agreement;

(iii)        ask, demand, collect, sue for, recover, compromise, receive and give acquaintance and receipts for claims and moneys due and to become due under or in respect of any of the Collateral;

(iv)        receive, take, endorse, collect, assign and deliver any drafts or other Instruments, Documents and Chattel Paper, in connection with <u>clause (i)</u> or <u>(ii)</u> above;

(v)        file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable for the collection of any of the Collateral, or otherwise to enforce the rights of the Lender with respect to any of the Collateral; and

(vi)        sell, transfer, assign or otherwise deal in or with the Collateral or any part thereof.

Each Debtor agrees that neither the Lender, nor any of its designees or attorneys-in-fact, will be liable for any act of commission or omission, or for any error of judgment or mistake of

CONFIDENTIAL

fact or law with respect to the exercise of the power of attorney granted under this <u>Section 12</u>, other than as a result of its or their gross negligence or willful misconduct.

**Section 13.**   <u>Lender May Perform; Collection of Accounts</u>.  If any Debtor fails to perform any material agreement contained herein, the Lender may perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall constitute Obligations.  Following the occurrence and during the continuance of an Event of Default, the Lender shall have the right (A) to notify all account debtors to make payments directly to the Lender for application to the Obligations and (B) to enforce each Debtor's rights against the applicable account debtors.  Any payment or performance of any Debtor's Obligations or Liabilities hereunder shall bear interest at the Default Rate from the date incurred until the date repaid in full.

**Section 14.**   <u>Lender's Duties</u>.  The powers conferred on the Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for monies actually received by it hereunder, the Lender shall not have any duty as to any Collateral.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Lender accords its own property, it being understood that the Lender shall be under no obligation to take any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral, but may do so at its option, and all reasonable expenses incurred in connection therewith shall be for the sole account of each such Debtor and shall be added to the Obligations and bear interest at the Default Rate from the date incurred until the date repaid in full.  Each Debtor bears all risk of loss or damage of any of the Collateral, except to the extent such loss or damage shall arise solely from the gross negligence or willful misconduct of the Lender.

**Section 15.**   <u>Remedies</u>.

(A)   In addition to all other rights and remedies granted to it under this Security Agreement, the Credit Agreement, the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Obligations, if any Event of Default shall have occurred, the Lender may exercise all rights and remedies of a secured party under the Code (whether or not the Code applies to the affected Collateral).  Without limiting the generality of the foregoing, each Debtor expressly agrees that upon the occurrence of an Event of Default, Lender, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon any Debtor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code and other applicable law), may forthwith enter upon the premises of each Debtor where any Collateral is located through self-help in compliance with Applicable Laws, without judicial process, without first obtaining a final judgment or giving any Debtor or any other Person notice and opportunity for a hearing on the Lender's claim or action and may collect, receive, assemble, process, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, license, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at a public or private sale or

**JAE 0211**

CONFIDENTIAL                                                                                SPCP_0000004514

sales, at any exchange at such prices as it may deem acceptable, for cash or on credit or for future delivery without assumption of any credit risk. The Lender shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Lender, the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption Debtors hereby release. Such sales may be adjourned and continued from time to time with or without notice. At any such sale or other disposition, the Lender reserves the right to sell for cash, on credit (whether secured or unsecured), or a combination of both, and not to credit the Obligations unless and until any deferred portion of the purchase has actually been paid to Lender in good funds. The Lender shall have the right to conduct such sales on any Debtor's premises or elsewhere and shall have the right to use each Debtor's premises without charge for such time or times as the Lender deems necessary or advisable.

If any Event of Default shall have occurred and be continuing, each Debtor further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at a place or places designated by the Lender which are reasonably convenient to the Lender and such Debtor, whether at such Debtor's premises or elsewhere. Until the Lender is able to effect a sale, lease, or other disposition of Collateral, the Lender shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Lender. The Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Lender's remedies (for the benefit of the Lender), with respect to such appointment without prior notice or hearing as to such appointment.

(B)    Except as otherwise specifically provided herein, each Debtor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law and unless notice is expressly required in the Credit Agreement) of any kind in connection with this Security Agreement or any Collateral.

(C)    To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for the Lender (i) to fail to incur expenses reasonably deemed significant by the Lender to prepare Collateral for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against account debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against account debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as such Debtor, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim

#4831-1562-0370v4

14

CONFIDENTIAL

SPCP_0000004515

disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Lender, to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral.  Each Debtor acknowledges that the purpose of this Section 15(C) is to provide non-exhaustive indications of what actions or omissions by the Lender would not be commercially unreasonable in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 15(C).  Without limitation upon the foregoing, nothing contained in this Section 15(C) shall be construed to grant any rights to any Debtor or to impose any duties on the Lender that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section 15(C).

(D)     The Lender shall not be required to make any demand upon, or pursue or exhaust any of its rights or remedies against, any Debtor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of its rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof.  The Lender shall not be required to marshal the Collateral or any guarantee of the Obligations or to resort to the Collateral or any such guarantee in any particular order, and all of its rights hereunder or under any other Loan Document shall be cumulative.  To the extent it may lawfully do so, each Debtor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.

(E)     Each Debtor agrees that ten (10) days' prior notice by Lender to any Debtor of the time and place of any public sale or of the time after which a private sale may take place is reasonable notification of such matters.  Each Debtor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Lender is entitled.

(F)     The Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and the Lender's compliance therewith will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(G)     Upon the exercise by the Lender of any power, right, privilege, or remedy pursuant to this Security Agreement which requires any consent, approval, registration, qualification, or authorization of any Governmental Authority or any third party, each Debtor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that the Lender or any purchaser of the Collateral may be required to obtain for such consent, approval, registration, qualification, or authorization.  To the maximum extent permitted by applicable law, each Debtor waives all claims, damages, and demands against Lender, its Affiliates, agents, and the officers and employees of any of them arising out of the repossession, retention or sale of any Collateral

**JAE 0213**

CONFIDENTIAL                                                                                      SPCP_0000004516

except such as are determined in a final judgment by a court of competent jurisdiction to have arisen solely out of the gross negligence or willful misconduct of such Person.

(H)     The rights and remedies provided under this Security Agreement are cumulative and may be exercised singly or concurrently and are not exclusive of any rights and remedies provided by applicable law or equity.

**Section 16.**     Exercise of Remedies.  In connection with the exercise of its remedies pursuant to Section 15, the Lender may, but shall have no obligation to:  (A) exchange, enforce, waive or release any portion of the Collateral and any other security for the Obligations; (B) subject to the Credit Agreement, apply such Collateral or security and direct the order or manner of sale thereof as the Lender may, from time to time, determine; and (C) settle, compromise, collect or otherwise liquidate any such Collateral or security in any manner following the occurrence and during the continuance of an Event of Default, without affecting or impairing the Lender's right to take any other further action with respect to any Collateral or security or any part thereof.  Each Debtor waives any right it may have to require Lender to pursue any third Person for any of the Obligations.

**Section 17.**     Injunctive Relief.  Each Debtor recognizes that upon the occurrence of an Event of Default, any remedy of law may prove to be inadequate relief to Lender; therefore, each Debtor agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

**Section 18.**     Termination of this Security Agreement:  Release of Collateral.

(A)     The security interest granted by the Debtors under this Security Agreement shall terminate against all the Collateral when all of the Liabilities have been fully paid and satisfied. Upon such termination and at the written request of all Debtors or their successors or assigns, and at the cost and expense of Debtors or their successors or assigns, the Lender shall execute in a timely manner such instruments, documents or agreements as are reasonably necessary or desirable to terminate the Lender's security interest in the Collateral, and Lender shall make the Collateral held by it available for removal by Debtors in a timely manner at each Debtor's cost and expense, subject to any disposition made by the Lender pursuant to this Agreement.

(B)     Except with respect to termination of certain existing financing statements filed by Lender in connection with certain previous loans made to Debtors by Lender (which financing statements will be terminated on the Effective Date hereof), each Debtor acknowledges that it is not authorized to permit any Person to file any financing statements with respect to any of the Collateral, and that no Debtor is authorized to file any amendment or termination statement with respect to any financing statement, without in each case obtaining the prior written consent of the Lender; and each Debtor agrees that it will not do so without the prior written consent of the Lender, subject to Debtor's rights under Section 9-509(d)(2) of the Code. Any such filing made by any Debtor without Lender's prior written consent shall constitute an immediate Event of Default under the Credit Agreement, this Security Agreement and all of the other Loan Documents for which there shall be no grace nor cure period.

CONFIDENTIAL                                                                                   SPCP_0000004517

**Section 19.**   <u>Successors and Assigns</u>.  This Security Agreement shall be binding upon Debtors and their successors and assigns, and shall inure to the benefit of Lender and its successors and permitted assigns.  Nothing set forth herein or in any other the Loan Document is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Security Agreement, the Credit Agreement or any other Loan Document or any Collateral.  Each Debtor's successors shall include, without limitation, a receiver, trustee or debtor-in-possession of or for such Debtor.

**Section 20.**   <u>APPLICABLE LAW</u>.  THIS SECURITY AGREEMENT SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA.

**Section 21.**   <u>Consent to Jurisdiction and Service of Process</u>.  Debtors each agree that the terms of the Credit Agreement to which each Debtor is a party with respect to consent to jurisdiction and service of process shall apply equally to this Security Agreement.

**Section 22.**   <u>WAIVER OF JURY TRIAL</u>.  DEBTORS AND LENDER HEREBY EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE LENDER AND DEBTOR ARISING OUT OF, OR RELATED TO, THE TRANSACTIONS CONTEMPLATED BY THIS SECURITY AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH.  EACH DEBTOR AND/OR LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECURITY AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**Section 23.**   <u>Waiver of Bond</u>.  Each Debtor waives all requirements that Lender post any bond that would otherwise be required of the Lender in connection with any judicial process or proceeding to realize on the Collateral or any other security for the Obligations, to enforce any judgment or other court order entered in favor of the Lender, or to enforce by specific performance, temporary restraining order, or preliminary or permanent injunction this Security Agreement or any other agreement or document between the Lender and Debtors.

**Section 24.**   <u>Advice of Counsel</u>.  Each Debtor and Lender understand that the Lender's counsel represents only the Lender's and its Affiliates' interests and that Debtors are each advised to obtain their own counsel.  Each Debtor represents and warrants to Lender that it has discussed this Security Agreement and, specifically, the provisions of <u>Sections 20</u> through <u>23</u> hereof, with its attorneys.

**Section 25.**   <u>Expenses</u>.  Each Debtor agrees to pay or reimburse Lender for all reasonable costs and expenses (including the fees and expenses of all counsel, advisors, consultants (including environmental and management consultants) and auditors retained in connection therewith), incurred in connection with:  (a) the preparation, negotiation, execution, delivery, performance and enforcement of the Loan Documents and the preservation of any rights thereunder; (b) collection, including deficiency collections; (c) any amendment, waiver or other modification with respect to the Loans and the other Loan Documents or advice in

CONFIDENTIAL                                                            SPCP_0000004518

connection with the administration of the Loans or the rights thereunder; (d) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or between any combination of Lender, Debtors or any other Person), and an appeal or review thereof, in any way relating to the Collateral, the Loans and the other Loan Documents, or any action taken or any other agreements to be executed or delivered in connection therewith, whether as a party, witness or otherwise; and (e) any effort (i) to monitor the Loans, (ii) to evaluate, observe or assess any Debtor or any other Person or the affairs of such Person, and (iii) to verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of the Collateral.

Section 26.    Severability.  Whenever possible, each provision of this Security Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Security Agreement shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.

Section 27.    Notices.  All notices and other communications required or desired to be served, given or delivered hereunder shall be in writing and shall be served, given or delivered as provided with respect to each Debtor and Lender in the Credit Agreement.

Section 28.    Amendments.  Waivers and Consents.  None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended, and no consent to any departure by any Debtor herefrom shall be effective, except by or pursuant to an instrument in writing which (A) is duly executed by each Debtor and the Lender and (B) complies with the requirements of Section 11.2 of the Credit Agreement.  Any such waiver shall be valid only to the extent set forth therein.  A waiver by the Lender of any right or remedy under this Security Agreement on any one occasion shall not be construed as a waiver of any right or remedy which the Lender would otherwise have on any future occasion.  No failure to exercise or delay in exercising any right, power or privilege under this Security Agreement on the part of the Lender shall operate as a waiver thereof; and no single or partial exercise of any right, power or privilege under this Security Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 29.    Section Titles.  The section titles herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

Section 30.    Execution in Counterparts.  This Security Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 31.    Suretyship Waivers.  The suretyship waivers contained in the Credit Agreement shall be applicable to this Security Agreement and to all other Loan Documents and shall be deemed to be remade by each Debtor.

Section 32.    Time of the Essence.  Time is of the essence for the payment and performance of the Liabilities hereunder.

CONFIDENTIAL                SPCP_0000004519

**Section 33.**   Reinstatement.  This Security Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment of all or any part of the Liabilities are rescinded or must otherwise be returned or restored by Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Debtor or any other Person, or otherwise, all as though such payments had not been made.

**Section 34.**   Entire Agreement.  This Security Agreement represents the final agreement of each Debtor with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements, or subsequent oral agreements, between any Debtor and the Lender.

[NO MORE TEXT ON THIS PAGE]
[SIGNATURE PAGE FOLLOWS]

#4831-1562-0370v4

**JAE 0217**

CONFIDENTIAL

SPCP_0000004520

IN WITNESS WHEREOF, Debtors and Lender have executed this Security Agreement ($80 Million Credit Agreement) as of the date set forth above.

DEBTORS:

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,

By: _____

Larry B. Anderson, President

WMC-SA, INC., a California corporation,

By: _____

Larry B. Anderson, President

WMC-A, INC., a California corporation,

By: _____

Larry B. Anderson, President

COASTAL COMMUNITY HOSPITAL, INC., a California corporation,

By: _____

Larry B. Anderson, President

CHAPMAN MEDICAL CENTER, INC., a California corporation,

By: _____

Larry B. Anderson, President

[SIGNATURE PAGE CONTINUES]

#4831-1562-0370v4

20

**JAE 0218**

CONFIDENTIAL

SPCP_0000004521

DEBTORS (cont.):

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company,

By: _____

Name: _____

Title: _____


LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By: _____
     Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004522

DEBTORS (cont.):

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company,

By: _____

Name: _____

Title: _____


LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By: _____
       Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004523

DEBTORS (cont.):

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company,

By: _____

Name: _____

Title: _____


LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By: _____
      Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004524

## <u>SCHEDULE 1 TO SECURITY AGREEMENT</u>

## COMMERCIAL TORT CLAIMS

None

CONFIDENTIAL

**JAE 0222**

SPCP_0000004525

## <u>SCHEDULE 2 TO SECURITY AGREEMENT</u>

## UNIFORM RESOURCE LOCATORS

1.  chapmanmedicalcenter.com – Chapman

2.  westernmedicalcenter.com – Santa Ana

3.  westernmedanaheim.com – Anaheim

4.  coastalcommhospital.com – Coastal

5.  ihhioc.com – Corporate

2-1

CONFIDENTIAL

SPCP_0000004526

## SCHEDULE 3 TO SECURITY AGREEMENT

## DEBTOR'S ORGANIZATIONAL INFORMATION

| Legal Name | Type of Entity | State of Incorporation | Organizational Identification Number |
|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | Corporation | Nevada | C10133-1988 |
| WMC-SA, Inc. | Corporation | California | 2677248 |
| WMC-A, Inc. | Corporation | California | 2677247 |
| Coastal Communities Hospital, Inc. | Corporation | California | 2677249 |
| Chapman Medical Center, Inc. | Corporation | California | 2676435 |
| Pacific Coast Holdings Investment, LLC | LLC | California | 200504710009 |

CONFIDENTIAL                                                                            SPCP_0000004527

**SCHEDULE 4 TO SECURITY AGREEMENT**

**LOCATIONS OF EQUIPMENT AND INVENTORY**

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | None |
| Coastal Communities Hospital, Inc. | 2701 S Bristol St Santa Ana, CA 92704 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | None |
| Chapman Medical Center, Inc. | 2601 E, Chapman Ave. Orange, CA  92869 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 2601 E, Chapman Ave. Orange, CA  92869 |
| | | | Chapman Medical Office Building 2617 E. Chapman Ave. Orange, CA  92869 |
| WMC-A, Inc. | 1025 S. Anaheim Blvd. Anaheim, CA 92805 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | El Camino Business Center 100 N. Harbor Blvd. Anaheim, CA |
| | | | 1107 S. Anaheim Blvd., Suite 1107 Anaheim, CA  92805 |
| | | | 1101 S. Anaheim Blvd., Suite 1101 Anaheim, CA  92805 |
| | | | 1103 S. Anaheim Blvd., Suite 1103 Anaheim, CA  92805 |
| WMC-SA, Inc. | 1001 N Tustin Ave Santa Ana, CA 92705 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 999 N. Tustin Ave. Suites 105-10 and 205-10 Santa Ana, CA |

CONFIDENTIAL

**JAE 0225**

SPCP_0000004528

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | | | 13522 Newport Avenue #102 Tustin, CA |
| | | | 1001 N. Tustin Avenue Santa Ana, CA |
| Pacific Coast Holdings Investment, LLC | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 | None |

#4831-1562-0370v3

4-2

**JAE 0226**

SPCP_0000004529

## SCHEDULE 5 TO SECURITY AGREEMENT

## LOCATION AND SCHEDULE OF DEBTOR'S EQUIPMENT AND INVENTORY HELD BY BAILEES

None

5-1

CONFIDENTIAL

SPCP_0000004530

## SCHEDULE 6 TO SECURITY AGREEMENT

## DEBTOR'S LOCATIONS FOR PURPOSES OF FILING UCC-1 FINANCING STATEMENTS

**IHHI**:

Nevada (File with Secretary of State)

**WMC-A, Inc.:**

California (File with Secretary of State)

**WMC-SA, Inc.:**

California (File with Secretary of State)

**Coastal Communities Hospital, Inc.:**

California (File with Secretary of State)

**Chapman Medical Center, Inc.:**

California (File with Secretary of State)

**PCHI:**

California (File with Secretary of State)

CONFIDENTIAL

**JAE 0228**

SPCP_0000004531

## SCHEDULE 7 TO SECURITY AGREEMENT

## SCHEDULE OF DEBTOR'S LEGAL AND TRADE NAMES

**Legal Names:**

Integrated Healthcare Holdings, Inc.

WMC-A, Inc.

WMC-SA, Inc.

Coastal Communities Hospital, Inc.

Chapman Medical Center, Inc.

Pacific Coast Holdings Investment, LLC

**Trade Names:**

Western Medical Center – Santa Ana

Western Medical Center – Anaheim

Coastal Communities Hospital

Chapman Medical Center

7-1

**JAE 0229**

CONFIDENTIAL

SPCP_0000004532

**SCHEDULE 8 TO SECURITY AGREEMENT**

**MATERIAL INTELLECTUAL PROPERTY**

Trademarks:  None

Patents:  None

Copyrights:  None

Licenses:  None

#4831-1562-0370v4

**JAE 0230**

CONFIDENTIAL

**EXHIBIT "H" TO AMENDED AND RESTATED CREDIT AGREEMENT
($47,277,000 MILLION FACILITY)**

**FORM OF COLLATERAL ASSIGNMENT OF CONTRACTS**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004534

EXECUTION

# COLLATERAL ASSIGNMENT OF CONTRACTS

## ($80 Million Credit Agreement)

## (WESTERN MEDICAL CENTER - ANAHEIM)

THIS COLLATERAL ASSIGNMENT OF CONTRACTS ($80 Million Credit Agreement) (this "**Assignment**") is made to be effective as of October 9, 2007 ("**Effective Date**") by and among MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation, as Assignee ("**Assignee**"), INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), and WMC-A, INC., a California corporation ("**WMC-A**") (IHHI and WMC-A are hereinafter together sometimes referred to as "**Assignors**"). This Assignment is made in connection with that certain Credit Agreement ($80 Million Facility) of even date herewith (including all annexes, exhibits and schedules thereto, and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), by and among IHHI, WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are also sometimes collectively referred to herein as "**Borrowers**" and individually as "**Borrower**"); PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"); WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**"); GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**"); ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**") (PCHI, West Coast, Ganesha and OC-PIN are hereinafter referred to as the "**Credit Parties**"); and Assignee as Lender. Initially capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.

## RECITALS

A.    WMC-A is in the business of delivering acute care services to the public through the acute care hospital facilities (the "**Business**").

B.    Pursuant to the Credit Agreement, Assignee, as Lender, agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers. Repayment of the Loans is evidenced by (x) that certain $45,000,000 Term Note of even date herewith ("**$45,000,000 Term Note**") and (y) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes**," and individually as a "**Note**").

C.    As a condition precedent to entering into the Credit Agreement, Assignee required that Assignors provide this Assignment and certain other documents on the Closing Date.

**JAE 0232**

CONFIDENTIAL                                                                            SPCP_0000004535

EXECUTION

D.     The parties intend that these Recitals are made a part of this Assignment.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the Recitals (which are hereby incorporated into this Assignment), and in reliance thereon, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignors and Assignee agree as follows:

1.     Assignors hereby assign, transfer, and grant a Lien and security interest, and set over to Assignee, all of Assignor's right, title and interest in and to those certain contracts set forth on Exhibit "A" attached hereto and incorporated herein by reference, with each contracting party thereto (each a "**Contracting Party**") (together with all amendments, modifications, supplements, general conditions, and addenda thereto, heretofore and hereafter entered into in connection with the Business being collectively referred to herein as the "**Contracts**" or individually as a "**Contract**").  The term Contracts shall not include contracts, agreements or documents that are not assignable even if listed on Exhibit "A", such non-assignable contracts being referred to herein as "**Excluded Contracts**."  This Assignment is being made to effectuate in part the terms of that certain Security Agreement ($80 Million Facility) of even date herewith, by and among Assignors, the other Borrowers and Assignee ("**Security Agreement ($80 Million Facility)**").  Assignee shall have all of the rights and remedies contained in the Security Agreement ($80 Million Facility), the Credit Agreement, the other Loan Documents, including this Assignment, and applicable law.  Each of the Recitals on page one hereof are hereby incorporated into this Assignment, and Assignors hereby represent and warrant to Assignee that such Recitals are true and correct in all material respects.

2.     This Assignment is made for the purpose of securing:

2.1     The payment of all Obligations of Assignors under the Credit Agreement and all other Loan Documents, including indebtedness equal to the outstanding, unpaid aggregate of each of the Loans, evidenced by each of the Notes, and any and all renewals, extensions, substitutions or modifications thereof.

2.2     The performance of and compliance with all of the terms, covenants and conditions set forth herein or in the Credit Agreement, the Notes, the Security Agreement ($80 Million Facility), or any other Loan Document.

3.     Concurrently herewith the Assignors have granted to Assignee a Lien in the Contracts pursuant to the Security Agreement ($80 Million Facility) and the other Loan Documents.  This Assignment is made in order to more fully effectuate the Lien in such Contracts.

4.     Assignors further agree:

4.1     Except as may be excused on the basis of a Contracting Party breach, to faithfully abide by, perform and discharge each and every material obligation, covenant and agreement of the Contracts to be performed by Assignors thereunder, at no cost or expense to Assignee, and, without the prior written consent of Assignee in each case, (a) to use

**JAE 0233**

CONFIDENTIAL                                                                 SPCP_0000004536

EXECUTION

commercially reasonable efforts to enforce or secure the performance of each and every material obligation, covenant, condition and agreement contained in the Contracts and to be performed by a Contracting Party; (b) not to modify, extend or in any way alter the material terms of the Contracts or accept a surrender thereof (except in the ordinary course of business); and (c) not to waive, excuse, condone or in any manner release or discharge a Contracting Party of or from the material obligations, covenants, conditions and agreements to be performed by a Contracting Party in the manner and at the place and time specified therein (except in the ordinary course of business).

4.2     That, at no cost or expense to Assignee, Assignors shall appear in and defend any action or proceeding arising under, growing out of or in any manner connected with the Contracts or the obligations, duties or liabilities of Assignors thereunder, and shall pay all reasonable costs and expenses of Assignee in any action or proceeding concerning the Contracts in which Assignee may appear, including reasonable attorneys' fees, expenses and expert witness fees paid or incurred by Assignee as a result of any such litigation, whether or not any such litigation is prosecuted to judgment.  Assignee may employ an attorney or attorneys selected by it to protect its rights hereunder, and Assignors shall pay to Assignee its reasonable attorneys' fees and costs incurred by Assignee, whether or not an action is actually commenced by or against Assignors regarding the Contract.

4.3     That, if after giving effect to all applicable grace periods, Assignors fail to make any payment or to do any act as herein provided or fails to do so promptly upon demand by Assignee, and does not promptly cure such failure, within the larger of the time periods provided in the Credit Agreement or within ten (10) calendar days after written demand, then Assignee shall have the right, but not the obligation, without releasing Assignors from any obligation hereof and without notice to or demand upon Assignors, to make such payment or do such act in such manner and to such extent as Assignee may deem necessary to prevent the material impairment of the security hereof, including, without limitation, the right to appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Assignee and to perform and discharge each and every obligation, covenant and agreement of Assignors contained in the applicable Contract, and in exercising any such rights or powers to employ counsel and pay such reasonable costs and expenses as Assignee shall incur, including, without limitation, reasonable attorneys' fees and costs.  Assignee's exercise of rights under this Assignment shall not constitute a waiver of any of the remedies of Assignee under the Loan Documents, under any other document or agreement, or existing at law, in equity, by statute or otherwise.

4.4     To pay within ten (10) calendar days of written demand all sums required to be expended by Assignee under the authority hereof, together with interest thereon at the Default Rate from the date of such demand notice incurred until the date repaid in full.  Accrued and unpaid interest on past due amounts (including, without limitation, interest on past due interest) shall be compounded monthly, on the last day of each calendar month, to the fullest extent permitted by applicable law.

**JAE 0234**

CONFIDENTIAL                                                                                    SPCP_0000004537

EXECUTION

5.      By acceptance of and/or execution and delivery of this Assignment, the parties mutually agree that:

5.1      Assignors agree that Assignee does not assume any of the Assignor's obligations or duties concerning a Contract until and unless Assignee shall exercise its rights hereunder, and then only to the extent specifically assumed in writing by Assignee.

5.2      Assignors shall and hereby agree to indemnify, defend and hold Assignee harmless from any and all liability, loss or damage that Assignee incurs under the Contracts or under or by reason of this Assignment and from any and all claims and demands whatsoever that are asserted against Assignee by reason of any alleged obligation or undertaking on Assignee's part to perform or discharge any of the terms, covenants or agreements contained in the Contracts or under or by reason of this Assignment except to the extent such liability, loss, damage, claim or demand arises out of the gross negligence or willful misconduct of Assignee or breach of any Contract by Assignee.  Except as expressly provided in the preceding sentence, should Assignee incur any such liability, loss or damage under the Contracts or under or by reason of this Assignment, or in the defense of any such claim or demand, the amount thereof, including costs, expenses and attorneys' fees, together with interest thereon at the Default Rate from the date incurred until the date paid in full, shall be an additional Obligation, and Assignors shall reimburse Assignee therefor immediately upon demand.

5.3      Until the Obligations secured hereby shall have been indefeasibly paid in full, Assignors covenant and agree to transfer and assign to Assignee, and to grant to Assignee, a security interest in any and all subsequent agreements (excluding Excluded Contracts, or any modifications, amendments or replacements thereof), to the extent Assignors receive consent (if required) and as legally permissible, that are entered into pursuant to, in replacement of or to serve substantially the same purpose as the Contracts upon the same or substantially the same terms and conditions as herein contained, and to make, execute and deliver to Assignee, upon demand, any and all instruments that may be necessary therefor.

5.4      Assignors warrant that the Contracts have not been amended or modified except as set forth herein, that no default by Assignors exist thereunder, and that no material event has occurred or exists that, with the giving of notice or the lapse of time or both, would constitute a material default by Assignors thereunder, and that, to the knowledge of Assignors, (a) no material default by a Contracting Party exists thereunder, and (b) no event has occurred or exists that, with the giving of notice or the lapse of time or both, would constitute a material default by a Contracting Party thereunder.

5.5      Except as expressly otherwise provided herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or telex or electronic transmission), and shall be deemed to have been duly given or made (i) when delivered by hand (e.g., messenger, personal service, etc.), or (ii) on the date received when delivered by courier service (e.g., Federal Express, DHL, or similar entities), or (iii) three (3) Business Days after being deposited in the mail, postage prepaid, or (iv) in the case of telecopy notice, when acknowledged as received, or (v) in the case of electronic transmission, on the date delivered if the transmission was received by the addressee by 5:00 p.m. local time on a Business Day, or if received by the addressee after 5:00 p.m. on a Business Day or if

**JAE 0235**

EXECUTION

received by the addressee on a day which is not a Business Day, on the next Business Day, in each case addressed as follows, or to such other address as may be hereafter notified by the respective parties hereto:

If to Assignee:

Medical Provider Financial Corporation II
3770 Howard Hughes Parkway, Suite 301
Las Vegas, Nevada 89109
Attn:  Adam Field, Sr. Vice President Development
Telephone:  800-818-1102
Facsimile:  702-735-3739
Email:  AdamF@medicalcapital.com

With a copy to:

Medical Provider Financial Corporation II
2100 South State College Boulevard
Anaheim, California 92806
Attn:  Joseph J. Lampariello, President and COO
Tel:           (714) 935-3100
Fax:          (714) 935-3114
Email:  JoeyL@medicalcapital.com

If to Assignors:

Integrated Healthcare Holdings, Inc.
1301 North Tustin Ave.
Santa Ana, California 92705
Attn:  Bruce Mogel, CEO
Telephone:  714-953-3575
Facsimile:  714-953-2595
Email:  Bruce.Mogel@IHHIOC.com

WMC-A, Inc.

1301 North Tustin Ave.
Santa Ana, California 92705
Attn:  Bruce Mogel, CEO
Telephone:  714-953-3575
Facsimile:  714-953-2595
Email:  Bruce.Mogel@IHHIOC.com

     5.6    Except for previous assignments permitted by Assignee in writing (which will be terminated as of the Effective Date hereof) and except for assignments to be made by Assignors to Assignee pursuant to that certain Credit Agreement ($50 Million Facility) of even date herewith ("**Credit Agreement ($50 Million Facility)**") executed by and among Lender, the Borrowers (including Assignors) and Credit Parties named therein, and pursuant to that certain

**JAE 0236**

CONFIDENTIAL                                      SPCP_0000004539

EXECUTION

Credit Agreement ($10.7 Million Facility) of even date herewith ("**Credit Agreement ($10.7 Million Facility**") executed by and among the Lender, the Borrowers (including Assignors) and Credit Parties named therein, Assignors hereby represent and warrant to Assignee that Assignors have made no previous assignment of its interest in the Contracts, and, except for transfers to Assignee, Assignors agree not to assign, sell, pledge, transfer, or otherwise encumber its interest in the Contracts so long as this Assignment is in effect.

5.7     This Assignment shall be binding upon and inure to the benefit of the successors and assigns, heirs or legal representatives, as applicable, of Assignors and Assignee.

5.8     This Assignment shall be governed by and construed in accordance with laws of the State of Nevada and the federal laws of the United States.

5.9     This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement, with the same effect as if all parties had signed the same signature page.  Any signature page of this Assignment may be detached from any counterpart of this Assignment and reattached to any other counterpart of this Assignment identical in form hereto but having attached to it one or more additional signature pages.

5.10     Assignee shall simultaneously send to Assignors any notices sent to a Contracting Party under any consent to assignment, provided, however, Assignee's failure to send such notices to Assignors will not affect the validity of the notice to the Contracting Party.

NO FURTHER TEXT ON THIS PAGE
SIGNATURE PAGE FOLLOWS

CONFIDENTIAL                                                     SPCP_0000004540

EXECUTION

IN WITNESS WHEREOF, the parties have executed and delivered this Collateral Assignment of Contracts ($80 Million Facility:  WMC-A) as of the day and year first above written.

ASSIGNORS:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,


By:_____
Larry B. Anderson, President

WMC-A, INC.,
a California corporation,


By:_____
Larry B. Anderson, President


ASSIGNEE:


MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By:_____
Joseph J. Lampariello, President and COO

**JAE 0238**

CONFIDENTIAL

SPCP_0000004541

**<u>EXHIBIT A</u>**

**LIST OF CONTRACTS**

CONFIDENTIAL

SPCP_0000004542

**EXHIBIT "I" TO AMENDED AND RESTATED CREDIT AGREEMENT
($47,277,000 MILLION FACILITY)**

**FORM OF DEPOSIT ACCOUNT SECURITY AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL                                                                      SPCP_0000004543

**DEPOSIT ACCOUNT SECURITY AGREEMENT**
**($80 MILLION CREDIT AGREEMENT)**

**(WESTERN MEDICAL CENTER - ANAHEIM)**

This DEPOSIT ACCOUNT SECURITY AGREEMENT ($80 Million Facility) (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "**Deposit Account Security Agreement ($80 Million Facility)**") is made to be effective as of October 9, 2007 ("**Effective Date**") and is by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-A, INC., a California corporation ("**WMC-A**") (IHHI and WMC-A are hereinafter together referred to as "**Account Holder**"), and MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**"), in connection with the following facts:

RECITALS

A.     PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**") owns the real property and hospital improvements commonly known as the Western Medical Center - Anaheim and located at 1025 South Anaheim Boulevard in Anaheim, California (the "**Hospital Property**"). PCHI (as Lessor) leases the Hospital Property to IHHI (as Lessee), and IHHI (as Sublessor) subleases the Hospital Property to Account Holder (as Sublessee). Account Holder operates the Hospital Property as an acute care hospital facility (the "**Business**"). The Hospital Property is more particularly described in Schedule "1" attached hereto and made a part hereof.

B.     This Deposit Account Security Agreement ($80 Million Facility) is made in connection with that certain Credit Agreement ($80 Million Facility) dated as of the date hereof by and among the Borrowers named therein (including Account Holder), Lender and the Credit Parties named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers. Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes**," and individually as a "**Note**"). The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents.**" Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

C.     As one of the conditions to entering into the Credit Agreement and the other Loan Documents, Lender required that Account Holder grant to Lender a continuing Lien in all

#4831-1562-0370v4

1

**JAE 0241**

EXECUTION

Deposit Accounts (as hereinafter defined) and all of Account Holder's rights represented by the Deposit Accounts to secure the payment and performance of the Obligations under the Credit Agreement.

      D.     In connection with the Business, Account Holder has established with one or more financial institutions identified on Exhibit "A" attached hereto and incorporated herein by reference (collectively the "**Bank**") one or more Deposit Accounts (as hereinafter defined), all of which Deposit Accounts are also identified on Exhibit "A" attached hereto.

## AGREEMENT

      NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are acknowledged, and intending to be legally bound hereby, the Account Holder hereby agrees for the benefit of the Lender as follows:

1.     **INCORPORATION OF RECITALS.**  The Recitals set forth above are hereby fully incorporated by reference into this Deposit Account Security Agreement ($80 Million Facility) and shall be deemed to constitute a part of this Deposit Account Security Agreement ($80 Million Facility).

2.     **DEFINITIONS.**  As used herein the following terms shall have the following meanings:

      (a)     "**Accounts**" shall have the meaning ascribed to such term in the UCC.

      (b)     "**Deposit Accounts**" means each of Account Holder's deposit accounts identified on Exhibit "A" attached hereto.

      (c)     "**Lien**" means any agreement or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, security interest, or encumbrance, or other security agreements or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

3.     **GRANT OF LIEN.**  As additional security for the payment and performance of all of the Obligations of Account Holder to Lender arising under the Credit Agreement, Account Holder hereby grants, pledges, and assigns to the Lender a continuing Lien (which shall remain a continuing and (subject to the provisions of Section 5 below) exclusive Lien) in and to all of its right, title and interest in and to the Deposit Accounts, which includes all rights to any and all funds and balances therein including, but not limited to, all interest derived therefrom, and any Investment Property within the meaning of the Uniform Commercial Code (the "**UCC**") in which the Deposit Accounts may be invested, reinvested, converted into, and any other personal property rights and interests represented by all of Account Holder's ownership of the Deposit Accounts, and in the checks and other payment instructions relating to such Deposit Accounts. This Deposit Account Security Agreement ($80 Million Facility) constitutes a security agreement pursuant to the UCC, and the Lender shall have all the rights of a secured party thereunder.  It is intended and agreed by the Lender and Account Holder that the Deposit Accounts are "deposit accounts" as defined in the UCC and that the Lien therein as granted

CONFIDENTIAL                                     

EXECUTION

hereunder shall be perfected pursuant to UCC upon execution of this Deposit Account Security Agreement ($80 Million Facility) by Account Holder and Lender and the execution and delivery by Account Holder and Lender and the Bank of one or more Control Agreements ($80 Million Facility) in form and substance satisfactory to the Lender (as the same may be modified or amended from time to time, the "**Control Agreements ($80 Million Facility)**").

4.      **CONTROL AGREEMENTS ($80 MILLION FACILITY).**  Account Holder agrees to execute and deliver to Lender and Bank one or more Control Agreements ($80 Million Facility), in form and substance satisfactory to the Lender and Account Holder, in order to comply with applicable state law requirements for perfecting Lender's Lien therein and controlling the disposition of funds in the Deposit Accounts.  Such Control Agreements ($80 Million Facility) shall provide that until and unless the Bank receives from Lender a written notice of the occurrence of an Event of Default, Account Holder shall have the right to deposit and withdraw and otherwise submit orders with respect to the Deposit Accounts.  If Bank receives from Lender a written notice of the occurrence of an Event of Default, Lender shall have the rights and remedies set forth in Section 10 hereinbelow, and Account Holder shall no longer have the right to deposit or withdraw or submit orders with respect to the Deposit Accounts.  If an Event of Default is fully cured, upon the written request of Account Holder, Lender agrees to promptly give notice of such cure to the Bank (with a copy to Account Holder), and after Account Holder receives a copy of Lender's written notice of cure to the Bank, the Account Holder shall once again have the right to deposit and withdraw and otherwise submit orders with respect to the Deposit Accounts.

5.      **WAIVER OF RIGHT OF SET-OFF.**  Such Control Agreements ($80 Million Facility) will provide that, unless otherwise agreed in a writing signed by Lender and Account Holder, if the Bank provides any form of financing or credit to Account Holder, Bank shall waive, with respect to all of its existing and future claims against Account Holder, or any Affiliate of Account Holder, all existing and future rights of set-off and Banker's Liens against the Deposit Accounts and all items (and proceeds thereof) that come into Bank's possession or control in connection with any of the Deposit Accounts; provided, however, that the Bank retains the right to debit the Deposit Accounts for all items deposited in and credited to the Deposit Accounts and subsequently returned unpaid or with respect to which the Bank fails to receive final settlement.

6.      **ESTABLISHMENT OF DEPOSIT ACCOUNTS; NO TRANSFER.**  Account Holder hereby represents and warrants and covenants to the Lender that (a) it owns all rights to the Deposit Accounts free of all Liens other than in favor of the Lender or other than as permitted in Section 5 hereinabove or in the Credit Agreement, and has full power and authority to enter into and perform this Deposit Account Security Agreement ($80 Million Facility), (b) Account Holder shall maintain the Deposit Accounts only with Bank, (c) Account Holder shall not establish, create, open or maintain any deposit accounts (including the Deposit Accounts) at any financial institution other than Bank, (d) Account Holder does not own, control or maintain, and will not own, control or maintain any deposit accounts other than the Deposit Accounts at Bank, and (e) Account Holder shall not sell, transfer, pledge, except as permitted by the Credit Agreement, grant a Lien in, hypothecate, encumber or otherwise convey its right, title or interest in the Deposit Accounts without the prior written consent of the Lender.  Any such attempt to so convey without such prior written consent shall be void, unenforceable, and of no legal effect,

**JAE 0243**

CONFIDENTIAL                                                                          SPCP_0000004546

EXECUTION

and, at the option of the Lender, shall constitute an Event of Default hereunder and under the Credit Agreement.

7.    **ASSIGNMENT BY THE LENDER.**  Without the prior consent of Account Holder, the rights of the Lender under this Deposit Account Security Agreement (Loans) may be assigned by it to its successors and assigns in connection with an assignment, syndication or participation of the Notes and the Loan Documents, and any such holder or assignee shall be entitled to rely upon the representations, warranties and covenants herein made.

8.    **ADDITIONAL DOCUMENTS.**  Account Holder hereby agrees to execute such other documents as may be reasonably requested by the Lender to give effect to the agreements contained herein and to perform such other acts as may be deemed reasonably necessary or appropriate by the Lender to continue or enforce its assigned rights or perfect the Liens granted hereunder, including without limitation any documents reasonably required by each depositary Bank (including the Bank) required in connection with each Control Agreement (Loans).

9.    **EVENT OF DEFAULT.**  The following, at the option of the Lender, and without notice or demand to Account Holder, shall constitute an Event of Default hereunder and under the Credit Agreement:

9.1    The occurrence of any Event of Default under the Credit Agreement or in any of the other Loan Documents (including, but not limited to, the Notes);

9.2    A default shall occur by Account Holder under any Control Agreement (Loans) entered into pursuant to this Deposit Account Security Agreement (Loans); or

9.3    The breach or other default by Account Holder of any covenant or other provision or condition herein and the failure to fully cure such breach or default within ten (10) days after written notice thereof.

10.    **RIGHTS AND REMEDIES.**  Upon the occurrence of an Event of Default, Lender shall have all the rights of a secured creditor under the Uniform Commercial Code, including, but not limited to, the right to give unilateral Entitlement Orders (as defined therein) to the Bank in accordance with the terms of the Control Agreements ($80 Million Facility).  In addition, Lender shall have all rights and remedies under the Loan Documents as well as all rights and remedies at law or in equity.  To the extent Account Holder ever receives proceeds of any Accounts outside of the Deposit Accounts, then Account Holder agrees to hold all such funds in a non-commingled manner in trust for the sole benefit of the Lender, and to remit such funds to Lender, Nothing herein shall require the Lender to:

10.1    Proceed against Account Holder or any Guarantor or any other person or entity; or

10.2    Exhaust the Deposit Accounts or any other security held by the Lender from any Account Holder or any other person or entity in any order; or

10.3    Marshal any Account Holder's assets or proceed against any of the other security for the Obligations under the Credit Agreement before proceeding under this Deposit Account

#4831-1562-0370v4                                    4

**JAE 0244**

                                                    SPCP_0000004547

EXECUTION

Security Agreement (Loans), or to proceed against any Account Holder or any Guarantor in a particular order; or

      10.4    Pursue any other remedy in the Lender's power whatsoever; and Account Holder waives any right or rights, to the extent it otherwise has such rights, to require Lender to proceed in any manner whatsoever, or otherwise inconsistent with the foregoing.

11.    **INUREMENT.**  The provisions of this Deposit Account Security Agreement ($80 Million Facility) shall be binding upon and shall inure to the benefit of Account Holder and the Lender, and their respective successors and assigns, or heirs and personal representatives, as applicable.

12.    **MODIFICATION.**  This Deposit Account Security Agreement ($80 Million Facility) may not be amended, modified, or changed, except only by an instrument in writing and signed by the party against whom enforcement of any amendment, change or modification is sought.

13.    **IRREVOCABLE.**  Account Holder hereby acknowledges and agrees that the assignment and grant of Lien in the Deposit Accounts made under this Deposit Account Security Agreement (Loans) is irrevocable; provided that the Liens granted herein shall terminate upon the Termination Date defined in the Credit Agreement.

14.    **NOTICES.**  All notices (other than the notice of Lien to Bank) served under this Deposit Account Security Agreement (Loans) shall be in writing and shall be served in accordance with the procedures and methods specified in the Credit Agreement and to the parties identified therein.

15.    **GOVERNING LAW.**  Notwithstanding any other choice of law contained in any account agreement between any Account Holder and the Bank and pertaining to the Deposit Accounts, this Deposit Account Security Agreement ($80 Million Facility), and perfection, the effect of perfection or non-perfection, and the priority of a Lien in a deposit account maintained with the Bank, shall be governed by and construed in accordance with the internal laws of the State of Nevada (without regard to its conflict of laws principles).

16.    **SURVIVAL.**  This Deposit Account Security Agreement ($80 Million Facility) shall survive the satisfaction of the Obligations of Account Holder under the Credit Agreement until all of such Obligations are paid in full.

17.    **NO THIRD PARTY BENEFICIARIES.**  The parties intend that nothing contained herein or any other Loan Document shall make any person, firm, or other legal entity (including any trustee in Bankruptcy) a third party beneficiary of any rights, interests or remedies accorded to any party in this Deposit Account Security Agreement (Loans) or in any other Loan Document

18.    **COUNTERPARTS.**  This Deposit Account Security Agreement (Loans) may be executed in one or more counterparts, each of which shall constitute an original but all of which together shall constitute a single Deposit Account Security Agreement (Loans).

[NO FURTHER TEXT ON THIS PAGE]

**JAE 0245**

CONFIDENTIAL

SPCP_0000004548

EXECUTION

IN WITNESS WHEREOF, Account Holder and Lender have executed this Deposit Account Security Agreement ($80 Million Facility:  WMC-A) as of the day and year first above written.

ACCOUNT HOLDER:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,


By: _____
Larry B. Anderson, President


WMC-A, INC.,
a California corporation,


By: _____
Larry B. Anderson, President



LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II,
a Nevada corporation,

By: _____
Joseph J. Lampariello, President and COO

**JAE 0246**

CONFIDENTIAL

SPCP_0000004549

EXECUTION

## SCHEDULE "1" TO
## DEPOSIT ACCOUNT SECURITY AGREEMENT ($80 MILLION FACILITY)


### (WESTERN MEDICAL CENTER - ANAHEIM)
### 1025 SOUTH ANAHEIM BOULEVARD
### ANAHEIM, CALIFORNIA


### LEGAL DESCRIPTION


PARCEL A:

PARCELS 1 AND 2, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 48 PAGE 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND BELOW 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT THE RIGHT TO ENTER UPON ANY PART OF SAID LAND FOR THE PURPOSE OF RECOVERING SAID SUBSTANCES, AS RESERVED BY DESSA I. WAGONER, A WIDOW, IN DEED DATED APRIL 1, 1960 IN BOOK 5226 PAGE 241, OFFICIAL RECORDS;

PARCEL B:

LOTS 10, 12, 13 AND 14 INCLUSIVE OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, AS SHOWN ON A MAP RECORDED IN BOOK 97. PAGES 19 AND 20, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL C:

LOT 11 OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 97. PAGES 19 AND 20 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

#4831-1562-0370v4

**JAE 0247**

CONFIDENTIAL

**EXHIBIT "A"**
**TO**
**DEPOSIT ACCOUNT SECURITY AGREEMENT ($80 MILLION FACILITY)**

**WESTERN MEDICAL CENTER – ANAHEIM**

**SCHEDULE OF DEPOSIT ACCOUNTS**

As of the date of execution of the Deposit Account Security Agreement ($80 Million Facility), the following deposit account numbers constitute the "Deposit Accounts" established by Account Holder and are held by the Bank indicated below:

**FOR IHHI:**

**Bank:**

[_____]
[_____]
[_____]

| Account Number | Account Name | Purpose of Account |
|---|---|---|
| [_____] | [_____] | [_____] |
| [_____] | [_____] | [_____] |
| [_____] | [_____] | [_____] |

**FOR WMC-A:**

**Bank:**

[_____]
[_____]
[_____]

| Account Number | Account Name | Purpose of Account |
|---|---|---|
| [_____] | [_____] | [_____] |
| [_____] | [_____] | [_____] |
| [_____] | [_____] | [_____] |

#4831-1562-0370v4

**JAE 0248**

CONFIDENTIAL

SPCP_0000004551

**<u>EXHIBIT "J" TO AMENDED AND RESTATED CREDIT AGREEMENT</u>**
**<u>($47,277,000 MILLION FACILITY)</u>**

**FORM OF CONTROL AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004552

## RESTRICTED ACCOUNT AND SECURITIES ACCOUNT CONTROL AGREEMENT

### (Access Restricted after Instructions)

This **Restricted Account and Securities Account Control Agreement** (this "Agreement"), dated as of the date specified on the initial signature page of this Agreement, is entered into by and among <u>INTEGRATED HEALTHCARE HOLDINGS.  INC., a Nevada corporation ("IHHI"),  WMC-SA.  INC., a California corporation ("WMC-SA"),  WMC-A INC.. a California corporation ("WMC-A") CHAPMAN MEDICAL CENTER.  INC., a California corporation ("Chapman") and COASTAL COMMUNITIES HOSPITAL INC., a California corporation ("Coastal")</u> ("Company"), <u>MEDICAL PROVIDER FINANCIAL CORPORATION II. a Nevada corporation</u> ("Secured Party") and **Wells Fargo Bank, National Association** ("Bank"), and sets forth the rights of Secured Party and the obligations of Bank with respect to the deposit accounts of Company at Bank identified at the end of this Agreement as the Restricted Accounts (each hereinafter referred to Individually as a "Restricted Account" and collectively as the "Restricted Accounts") and each securities account of Company at Bank linked to any Restricted Account by a sweep mechanism, provided that such securities account either (i) bears an account number identical to the linked Restricted Account or (ii) is separately identified by number at the end of this Agreement as a Securities Account (each hereinafter referred to individually as a "Securities Account" and collectively as "Securities Accounts").  As used In this Agreement, the term "Restricted Account" also refers to each Eurodollar Sweep Account or Preferred Option Sweep Account (each hereinafter an "Offshare Account") maintained by Company and linked to another Restricted Account by a sweep mechanism. Company and Secured Party understand and acknowledge that each Restricted Account which is an Offshore Account is a subaccount, in the name of Company, of an offshore U.S. Dollar-denominated deposit account of Bank maintained with Bank's Grand Cayman branch, and that any transfer of funds Into or out of the Offshore Account, pursuant to Section 4 of this Agreement or otherwise, must pass through the domestic Restricted Account to which the Offshore Account is specifically linked.  Each account numerically designated as a Restricted Account includes, for purposes of this Agreement, and without the necessity of separately listing subaccount numbers, all subaccounts presently existing or hereafter established for deposit reporting purposes and Integrated with the numerically designated Restricted Account by a protocol under which deposits made through the subaccounts are posted only to the numerically designated Restricted Account.

1.      **Secured Party's Interest in Restricted Accounts and Securities Accounts.**  Secured Party represents that it is either (i) a lender who has extended credit to Company and has been granted a security interest In the Restricted Accounts or (ii) such a lender and/or the agent for a group of such lenders (the "Lenders").  Company hereby confirms, and Bank hereby acknowledges, the security interest granted by Company to Secured Party in all of Company's right, title and Interest in and to (i) the Restricted Accounts and all funds now or hereafter on deposit in or payable or withdrawable from the Restricted Accounts (the "Restricted Account Funds"), and (ii) the Securities Accounts and all financial assets, security entitlements, investment property, and other property and the proceeds thereof now or at any time hereafter held in the Securities Accounts (the "Securities Account Assets").  (As used herein, the terms ''investment property,'' "financial asset" and

**JAE 0250**

CONFIDENTIAL                                                                                    SPCP_0000004553

"security entitlement" shall have the respective meanings set forth in the Uniform Commercial Code of the state whose law governs this Agreement.  The parties hereby expressly agree that all property, including without limitation, cash, certificates of deposit and mutual funds, at any time held in any of the Securities Accounts is to be treated as a "financial asset".)  Except as specifically provided otherwise in this Agreement, Company has given Secured Party complete control over the Restricted Accounts, the Restricted Account Funds, the Securities Accounts, and the Securities Account Assets, Company and Secured Party desire to enter into this Agreement to further the arrangements between Secured Party and Company regarding the Restricted Accounts and the Securities Accounts.

2.  **Access to Restricted Accounts and Securities Accounts.**  Secured Party agrees that until Bank receives, and has had a reasonable opportunity to act upon, written instructions from Secured Party directing that Company no longer have access to any Restricted Account Funds or Securities Account Assets (the "Instructions"), Company will be allowed access to the Restricted Account Funds, and access to the Securities Account Assets through redemption of Securities Account Assets and transfer of the proceeds of such redemption in each case to the applicable Restricted Account.  After Bank receives the Instructions, (a) Company will no longer be allowed access to the Restricted Account Funds or Securities Account Assets, and (b) Secured Party will have the exclusive right to direct the disposition of all Restricted Account Funds and Securities Account Assets; and Bank agrees to transfer the Restricted Account Funds and Securities Account Assets to Secured Party in accordance with the provisions of Section 4 below, subject to the conditions set forth in this Agreement.  Company agrees that the Restricted Account Funds and Securities Account Assets should be paid and/or delivered to Secured Party after Bank receives the Instructions, and hereby irrevocably authorizes Bank to comply with the Instructions even If Company objects in any way to the Instructions,

3.  **Balance Reports.**  Bank agrees, at the telephone request of Secured Party on any day on which Bank is open to conduct its regular banking business other than a Saturday, Sunday or public holiday (a "Business Day"), to make available to Secured Party a report ("Balance Report") showing the available balance in the Restricted Accounts and Securities Accounts as of the beginning of such Business Day, either on-line or by facsimile transmission, at Bank's option.  Company expressly consents to this transmission of information.

4.  **Transfers to Secured Party.**  Bank agrees that on each Business Day after it receives the Instructions it will transfer to the Secured Party's account specified at the end of this Agreement with the bank specified at the end of this Agreement or (if no account is so specified) to such account as Secured Party specifies in the Instructions (in either case, the "Secured Party Account") the full amount of the available balance in the Restricted Accounts at the beginning of such Business Day, Including all Restricted Account Funds and Securities Account Assets in all Offshore Accounts or Securities Accounts linked to the Restricted Accounts.  Bank will use the Fedwire system to make each funds transfer; unless for any reason the Fedwire system is unavailable, in which case Bank will determine the funds transfer system to be used in making each funds transfer and the means by which each transfer will be made.  Bank, Secured Party and Company each

CONFIDENTIAL                                                           SPCP_0000004554

agree that Bank will, without further consent of Company, comply with (i) instructions given to Bank by Secured Party greeting disposition of funds in the Restricted Accounts, and (ii) entitlement orders originated by Secured Party directing disposition of Securities Account Assets in the Securities Accounts, subject otherwise to the terms of this Agreement and Bank's standard policies, procedures and documentation in effect from time to time governing the type of disposition requested.  Except as otherwise required by law, Bank will not agree with any third party to comply with instructions or entitlement orders originated by such third party for disposition of funds in any of the Restricted Accounts or Securities Account Assets in any of the Securities Accounts.

5.    **Returned Items.**  Secured Party and Company understand and agree that the face amount ("Returned Item Amount") of each Returned item will be paid by Bank debiting the Restricted Account into which such Returned item was originally deposited, without prior notice to Secured Party or Company.  As used in this Agreement, the term "Returned Item" means (i) any item deposited to a Restricted Account and returned unpaid, whether for insufficient funds or for any other reason, and without regard to the timeliness of such return or the occurrence or timeliness of any drawee's notice of non-payment; (ii) any item subject to a claim against Bank of breach of transfer or presentment Warranty under the Uniform Commercial Code (as adopted in the applicable state) or Regulation CC (12 C.F.R. §229), as in effect from time to time; (iii) any automated clearing house ("ACH") entry credited to a Restricted Account and returned unpaid or subject to an adjustment entry under applicable clearing house rules, whether for insufficient funds or for any other reason, and without regard to the timeliness of such return or adjustment; (iv) any credit to a Restricted Account from a merchant card transaction, against which a contractual demand for chargeback has been made; and (v) any credit to a Restricted Account. made in error.  Company agrees to pay all Returned Item Amounts immediately on demand, without setoff or counterclaim, to the extent there are not sufficient funds in the applicable Restricted Account to cover the Returned Item Amounts on the day they are to be debited from the Restricted Account Secured Party agrees to pay all Returned Item Amounts within thirty (30) calendar days after demand, without setoff or counterclaim, to the extent that (i) the Returned Item Amounts are not paid in full by Company within fifteen (15) calendar days after demand on Company by Bank, and (ii) Secured Party has received proceeds from the corresponding Returned Items.

6.    **Settlement Items.**  Secured Party and Company understand and agree that the face amount ("Settlement Item Amount") of each Settlement Item will be paid by Bank debiting the applicable Restricted Account, without prior notice to Secured Party or Company.  As used In this Agreement, the term "Settlement Item" means (i) each check or other payment order drawn on or payable against any controlled disbursement account or other deposit account at any time linked to a Restricted Account by a zero balance account connection (each a "linked Account"), which Bank cashes or exchanges for a cashier's check or official check over its counters in the ordinary course of business prior to receiving the Instructions and having had a reasonable opportunity to act on them, and which is presented for settlement against the Restricted Account (after having been presented against the Linked Account) after Bank receives the Instructions, (ii) each check or other payment order drawn on or payable against a Restricted Account, which, on the Business Day Bank receives the Instructions, Bank cashes or exchanges for a

CONFIDENTIAL

cashier's check or official check over its counters in the ordinary course of business after Bank's cutoff time for posting, (iii) each ACH credit entry initiated by Bank, as originating depository financial institution, on behalf of Company, as originator, prior to Bank having received the Instructions and having had a reasonable opportunity to act on them, which ACH credit entry settles after Bank receives the instructions, and (iv) any other payment order drawn on or payable against a Restricted Account, which Bank has paid or funded prior to receiving the Instructions and having had a reasonable opportunity to act on them, and which is first presented for settlement against the Restricted Account in the ordinary course of business after Bank receives the Instructions and has transferred Account Funds to Secured Party under Section 4 of this Agreement Company agrees to pay all Settlement Item Amounts Immediately on demand, without setoff or counterclaim, to the extent there are not sufficient funds in the applicable Restricted Account to cover the Settlement Item Amounts on the day they are to be debited from the Restricted Account.  Secured Party agrees to pay all Settlement item Amounts within thirty (30) calendar days after demand, without setoff or counterclaim, to the extent that (i) the Settlement item Amounts are not paid in full by Company within fifteen (15) calendar days after demand on Company by Bank, and (ii) Secured Party has received Account Funds under Section 4 of this Agreement.

7. **Bank Fees.**  Company agrees to pay all Bank's fees and charges for the maintenance and administration of the Restricted Accounts and Securities Accounts and for the treasury management and other account services provided with respect to the Restricted Accounts and Securities Accounts (collectively "Bank Fees"), Including, but not limited to, the fees for (a) the Balance Reports provided on the Restricted Accounts and Securities Accounts, (b) the funds transfer services received with respect to the Restricted Accounts, (c) Returned Items, (d) funds advanced to cover overdrafts in the Restricted Accounts (but without Bank being in any way obligated to make any such advances), and (e) duplicate bank statements on the Restricted Accounts.  The Bank Fees will be paid by Bank debiting one or more of the Restricted Accounts on the Business Day that the Bank Fees are due, without notice to Secured Party of Company.  If there are not sufficient funds in the Restricted Accounts to cover fully the Bank Fees on the Business Day they are debited from the Restricted Accounts, such shortfall or the amount of such Bank Fees will be paid by Company sending Bank a check in the amount of such shortfall or such Bank Fees, without setoff or counterclaim, within fifteen (15) calendar days after demand of Bank.  After Bank receives the Instructions, Secured Party agrees to pay the Bank Fees within thirty (30) calendar days after demand, without setoff or counterclaim, to the extent such Bank Fees are hot paid In full by Company by check within fifteen (15) calendar days after demand on Company by Bank.

8. **Account Documentation.**  Secured Party and Company agree that, except as specifically provided in this Agreement, the Restricted Accounts and Securities Accounts will be subject to, and Bank's operation of the Restricted Accounts and Securities Accounts will be in accordance with, the terms and provisions of (i) Bank's Commercial Account Agreement or other deposit. account agreement governing the Restricted Accounts and (ii) Bank's Acceptance of Services, Master Agreement for Treasury Management Services, and applicable sweep option Service Description or securities account

**JAE 0253**

CONFIDENTIAL                                                                                                      SPCP_0000004556

agreement governing the Offshore Accounts and Securities Accounts (collectively, the "Account Documentation").

9.  **Bank Statements.**  After Bank receives the Instructions, Bank will, upon receiving a written request from Secured Party, send to Secured Party by United States mall, at the address indicated for Secured Party after its signature to this Agreement, duplicate copies of all bank statements on the Restricted Accounts and Securities Accounts which are sent to Company.  Company and/or Secured Party will have thirty (30) calendar days after receipt of a bank statement to notify Bank of an error in such statement.  Bank's liability for such errors is limited as provided in the "Limitation of Liability" section of this Agreement.

10.  **Partial Subordination of Bank's Rights.**  Bank hereby subordinates to the security interest of Secured Party in the Restricted Accounts and Securities Accounts (i) any security interest which Bank may have or acquire In the Restricted Accounts or Securities Accounts, and (ii) any right which Bank may have or acquire to set off or otherwise apply any Restricted Account Funds or Securities Account Assets against the payment of any Indebtedness from time to time owing to Bank from Company, except for debits to the Restricted Accounts permitted under this Agreement for the payment of Returned Item Amounts, Settlement Item Amounts or Bank Fees.

11.  **Bankruptcy Notice; Effect of Filing.**  If Bank at any time receives notice of the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Company (a "Bankruptcy Notice"), Bank will continue to comply with its obligations under this Agreement, except to the extent that any action required of Bank under this Agreement is prohibited under applicable bankruptcy laws or regulations or is stayed pursuant to the automatic stay imposed under the United States Bankruptcy Code or by order of any court or agency.  With respect to any obligation of Secured Party hereunder which requires prior demand upon Company, the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Company shall automatically eliminate the necessity of such demand upon Company by Bank, and shall immediately entitle Bank to make demand on Secured Party with the same effect as if demand had been made upon Company and the time for Company's performance had expired.

12.  **Legal Process, Legal Notices and Court Orders.**  Bank will comply with any legal process, legal notice or court order it receives if Bank determines in its sole discretion that the legal process, legal notice or court order is legally binding on it.

13.  **Indemnification for Following Instructions.**  Secured Party and Company each agree that, notwithstanding any other provision of this Agreement, Bank will not be liable to Secured Party or Company for any losses, liabilities, damages, claims (including, but not limited to, third party claims), demands, obligations, actions, suits, judgments, penalties, costs or expenses, including, but not limited to, attorneys' fees, (collectively, "Losses and Liabilities") suffered or incurred by Secured Party or Company as a result of or in connection with, (a) Bank complying with any binding legal process, legal notice or court order referred to in Section 12 of this Agreement, (b) Bank following any instruction or

CONFIDENTIAL                                                                                      SPCP_0000004557

request of Secured Party, or (c) Bank complying with its obligations under this Agreement. Company will indemnity Bank against any Losses and Liabilities Bank may suffer or incur as a result of or in connection with any of the circumstances referred to in clauses (a) through (c) of this Section 13. To the extent not paid by Company within fifteen (15) calendar days after demand, Secured Party will indemnify Bank against any Losses and Liabilities Bank may suffer or incur as a result of or in connection with any of the circumstances referred to in clause (b) of this Section 13.

14. **No Representations or Warranties of Bank.** Bank agrees to perform its obligations under this Agreement in a manner consistent with the quality provided when Bank performs similar services for its own account. However, Bank will not be responsible for the errors, acts or omissions of others, such as communications carriers, correspondents or clearinghouses through which Bank may perform its obligations under this Agreement or receive or transmit information In performing its obligations under this Agreement. Secured Party and Company also understand that Bank will not be responsible for any loss, liability or delay caused by-wars, failures in communications networks, labor disputes, legal constraints, fires, power surges or failures, earthquakes, civil disturbances or other events beyond Bank's control. **BANK MAKES NO EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE SERVICE OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT**.

15. **Limitation of Liability.** Bank will not be responsible for any Losses and Liabilities due to any cause other than its own negligence or breach of this Agreement, in which case its liability to Secured Party and Company shall, unless otherwise provided by any law which cannot be varied by contract, be limited to direct money damages in an amount not to exceed ten (10) times all the Bank Fees charged or incurred during the calendar month immediately preceding the calendar month in which such Losses and Liabilities occurred (or, if no Bank Fees were charged or incurred in the preceding month, the Bank Fees charged or incurred in the month in which the Losses and Liabilities occurred). Company will indemnify Bank against all Losses and Liabilities suffered or incurred by Bank as a result of third party claims; provided, however, that to the extent such Losses and Liabilities are directly caused by Bank's negligence or breach of this Agreement such indemnity will only apply to those Losses and Liabilities which exceed the liability limitation specified in the preceding sentence. The limitation of Bank's liability and the indemnification by Company set out above will not be applicable to the extent any Losses and Liabilities of any party to this Agreement are directly caused by Bank's gross negligence or willful misconduct. **IN NO EVENT WILL BANK BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, INDIRECT OR PUNITIVE DAMAGES, WHETHER ANY CLAIM IS BASED ON CONTRACT OR TORT, WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO BANK AND REGARDLESS OF THE FORM OF THE CLAIM OR ACTION, INCLUDING, BUT NOT LIMITED TO, ANY CLAIM OR ACTION ALLEGING GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FAILURE TO EXERCISE REASONABLE CARE OR FAILURE TO ACT IN GOOD FAITH.** Any action against Bank by Company or Secured Party under or related to this Agreement must be brought within twelve (12) months after the cause of action accrues.

CONFIDENTIAL

SPCP_0000004558

16. **Termination.**  This Agreement and the Service may be terminated by Secured Party or Bank at any time by either of them giving thirty (30) calendar days prior written notice of such termination to the other parties to this Agreement at their contact addresses specified after their signatures to this Agreement; provided, however, that this Agreement and the Service may be terminated immediately upon written notice (i) from Bank to Company and Secured Party should Company or Secured Party fail to make any payment when due to Bank from Company or Secured Party under, the terms of this Agreement, or (ii) from Secured Party to Bank upon termination or release of Secured Party's security interest in the Restricted Accounts and Securities Accounts.  Company's and Secured Party's obligation to report errors in funds transfers and bank statements and to pay Returned items Amounts, Settlement Item Amounts, and Bank Fees, as well as the indemnifications made, and the limitations on the liability of Bank accepted, by Company and Secured Party under this Agreement will continue after the termination of this Agreement and/or the closure of the Restricted Accounts and/or Securities Accounts with respect to all the circumstances to which they are applicable existing or occurring before such termination or closure, and any liability of any party to this Agreement, as determined under the provisions of this Agreement, with respect to acts or omissions of such party prior to such termination or closure will also survive such termination or closure.  Upon any termination of this Agreement and the Service or closure of the Restricted Accounts all available balances in the Restricted Accounts (including proceeds from redemption of all Securities Account Assets) on the date of such termination or closure will be transferred to Secured Party as requested by Secured Party in writing to Bank.

17. **Modifications, Amendments, and Waivers.**  This Agreement may not be modified or amended, or, any provision thereof waived, except in a writing signed by all the parties to this Agreement.

18. **Notices.**  All notices from one party to another shall be in writing, or be made by a tele-communications device capable of creating a written record, shall be delivered to Company, Secured Party and/or Bank at their contact addresses specified after their signatures to this Agreement, or any other address of any party notified to the other parties in writing, and shall be effective upon receipt.  Any notice sent by a party to this Agreement to another party shall also be sent to all other parties to this Agreement.  Bank is authorized by Company and Secured Party to act on any instructions or notices received by Bank if (a) such instructions or notices purport to be made in the name of Secured Party, (b) Bank reasonably believes that they are so made, and (c) they do not conflict with the terms of this Agreement as such terms may be amended from time to time, unless such conflicting instructions or notices are supported by a court order.

19. **Successors and Assigns.**  Neither Company nor Secured Party may assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Bank, which consent will not be unreasonably withheld or delayed. Bank may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Secured Party, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be

CONFIDENTIAL

required if such assignment or transfer takes place as part of a merger, acquisition or corporate reorganization affecting Bank.

20. **Governing Law.** Company and Secured Party understand that Bank's provision of the Service under this Agreement is subject to federal laws and regulations.  To the extent that such federal laws and regulations are riot applicable this Agreement shall be governed by and be construed In accordance with the laws of the state in which the office of Bank that maintains the Restricted Accounts is located, without regard to conflict of laws principles.

21. **Severability.**  To the extent that this Agreement or the Sen/ice to be provided under this Agreement are inconsistent with, or prohibited or unenforceable under, any applicable law or regulation, they will be deemed ineffective only to the extent of such prohibition or unenforceability and be deemed modified and applied in a manner consistent with such law or regulation.  Any provision of this Agreement which is deemed unenforceable or invalid in any jurisdiction shall not affect the enforceability or validity of the remaining provisions of this Agreement or the same provision in any other jurisdiction.

22. **Counterparts.**  This Agreement may be executed in any number of counterparts each of which shall be an original with the same effect as if the signatures thereto and hereto were upon the same instrument.

23. **Entire Agreement.**  This Agreement, together with the Account Documentation, contains the entire and only agreement among all the parties to this Agreement and between Bank and Company, and Bank and Secured Party, with respect to (a) the Service, (b) the interest of Secured Party and the Lenders in the Restricted Accounts and Restricted Account Funds, (c) the interest of Secured Party and the Lenders in the Securities Accounts and Securities Account Assets, and (c) Bank's obligations to Secured Party and the Lenders in connection with the Restricted Accounts and Securities Accounts.

[SIGNATURE PAGE FOLLOWS]

Restricted Account and Securities Account Control Agreement-Access Restricted after Instructions
(Revised 12-11-06)
#4831-1562-0370v4

Page 8

**JAE 0257**

CONFIDENTIAL

SPCP_0000004560

This Agreement has been signed by the duly authorized officers or representatives of Company, Secured Party and Bank on the date specified below.

**Date:  October 4, 2007**

**Restricted Account Number(s):**        **4121-451496**
**4121-451504**
**4121-451520**
**4121-451512**
**4121-451538**
**4121-451546**
**4121-451561**
**4121-451553**
**4121-451579**
**4121-451587**
**4121-451603**
**4121-451595**
**4121-451439**
**4121-451454**
**4121-451462**
**4121-451447**
**4121-505994**

**Securities Account Number(s):**        _____

**Secured Party Account Number:**        _____

**Bank of Secured Patty Account:**        _____

**[COMPANY]**                            **[SECURED PARTY]**

**By:  Integrated Healthcare Holdings, Inc,**    **By:  MEDICAL PROVIDER FINANCIAL CORPORATION II**

_____        _____

Name:_____       Name:_____

Title:_____       Title:_____

**Address for Notices:**                  **Address for Notices:**

_____        _____

_____        _____

Restricted Account and Securities Account Control Agreement-Access Restricted after Instructions
(Revised 12-11-06)
#4831-1562-0370v4

Page 9

**JAE 0258**

CONFIDENTIAL                                SPCP_0000004561

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name:  Nathan Smith _____

Title:  AVP, Relationship Manager ____

**Address for Notices:**

Wells Fargo Bank _____

2030 Main Street, Suite 900 _____

Irvine, CA 92614 _____

Restricted Account and Securities Account Control Agreement-Access Restricted after Instructions
(Revised 12-11-06)
#4831-1562-0370v4

Page 10

**JAE 0259**

CONFIDENTIAL

SPCP_0000004562

EXECUTION

# CONTROL AGREEMENT
## ($80 MILLION CREDIT AGREEMENT)

This Control Agreement ("**Agreement**") is entered into to be effective as of October 9, 2007 ("**Effective Date**") by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**Companies**" and individually as "**Company**"), and MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**"), and WELLS FARGO BANK, N.A. ("**Bank**") with respect to the following:

A.      This Control Agreement (Loans) is made in connection with that certain Credit Agreement ($80 Million Facility) dated as of the date hereof by and among the Borrowers named therein (including the Companies), Lender and the Credit Parties named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**"), and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers named in the Credit Agreement.  Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**"), and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and the $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes,**" and individually as a "**Note**").  The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents.**"  Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

B.      As one of the conditions to entering into the Credit Agreement and the other Loan Documents, Lender required that the Companies grant to Lender a continuing Lien in all Deposit Accounts (defined below) and all of the Company's rights represented by the Deposit Accounts to secure the payment and performance of the Obligations under the Credit Agreement.

C.      In connection with the operation of its Business, each Company has established one or more deposit accounts (together, the "**Deposit Accounts**") all of which Deposit Accounts are identified on Schedule 1 attached hereto and incorporated herein by this reference.

## EACH COMPANY, LENDER AND BANK AGREES AS FOLLOWS:

1.      **GRANT OF LIEN**.  As additional security for the payment and performance of all of the Obligations of each Company (as Borrower) to Lender arising under the Credit Agreement, each Company hereby grants, pledges, and assigns to the Lender a continuing Lien (which shall

CONFIDENTIAL                                                                          SPCP_0000004563

remain a continuing and exclusive Lien) in and to all of its right, title and interest in and to the Deposit Accounts, which includes all rights to any and all funds and balances therein including, but not limited to, all interest derived therefrom, and any Investment Property within the meaning of the Uniform Commercial Code (the "UCC") in which the Deposit Accounts may be invested, reinvested, converted into, and any other personal property rights and interests represented by all of each Company's ownership of the Deposit Accounts, and in the checks and other payment instructions relating to such Deposit Accounts.  This Control Agreement (Loans) constitutes a security agreement pursuant to the UCC, and the Lender shall have all the rights of a secured party thereunder.  It is intended and agreed by the Lender and each Company that the Deposit Accounts are "deposit accounts" as defined in the UCC and that the Lien therein as granted hereunder shall be perfected pursuant to UCC upon execution of this Control Agreement (Loans) by each Company and Lender.

2.    **INSTRUCTIONS BY EACH COMPANY TO BANK.**

(a)    Each Company specifically instructs Bank as follows:  until and unless the Bank receives from Lender a written notice of the occurrence of an Event of Default, each Company shall have the right to deposit and withdraw and otherwise submit orders with respect to the Deposit Accounts.  If Bank receives from Lender a written notice of the occurrence of an Event of Default set forth in <u>Section 3</u> hereinbelow, Lender shall have the rights and remedies set forth in <u>Section 4</u> hereinbelow, and each Company shall no longer have the right to deposit or withdraw or submit orders with respect to the Deposit Accounts.  If an Event of Default is fully cured, upon the written request of each Company, Lender agrees to promptly give notice of such cure to the Bank.

(b)    No Company shall have any right to modify the instructions set forth above unless consented to in writing by Lender which if given shall also be given by Lender to Bank, and by providing written notice to Bank and to Lender, provided, however, that the modification shall not become effective until ten (10) Business Days after receipt of such notice.  Bank agrees to use commercially reasonable efforts to refrain from implementing such modification for ten (10) Business Days, but Bank shall not be liable for damages (as defined below) in the event that such modification is implemented prior to the expiration of the ten (10) Business Day period.

3.    **EVENT OF DEFAULT.**  The following, at the option of the Lender, and without notice or demand to any Company, shall constitute an Event Of Default hereunder and under the Credit Agreement:

(a)    The occurrence of any Event Of Default under the Credit Agreement or in any of the other Loan Documents (including, but not limited to, the Notes).

(b)    A default shall occur by any Company under this Control Agreement (Loans).

(c)    The breach or other default by any Borrower of any covenant or other provision or condition herein and the failure to fully cure such breach or default within ten (10) days after written notice thereof.

(d)    The occurrence of any Event Of Default under that certain Credit Agreement ($50 Million Facility) dated as of the date hereof by and among the Borrowers named therein

CONFIDENTIAL                                                                    SPCP_0000004564

(including the Companies), MEDICAL PROVIDER FINANCIAL CORPORATION I, a Nevada corporation ("**MPFC I**") and the Credit Parties named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**$50 Million Credit Agreement**").

(e)      The occurrence of any Event Of Default under any of the $50,000,000 Loan Documents defined in the $50 Million Credit Agreement (collectively, the "**$50 Million Loan Documents**").

(f)      The occurrence of any Event Of Default under any Control Agreement ($50 Million Facility) executed in connection with the $50 Million Credit Agreement.

(g)      The occurrence of any Event Of Default under that certain Credit Agreement ($10.7 Million Facility) dated as of the date hereof by and among the Borrowers named therein (including the Companies), MEDICAL PROVIDER FINANCIAL CORPORATION III, a Nevada corporation ("**MPFC III**") and the Credit Parties named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**$10.7 Million Credit Agreement**").

(h)      The occurrence of any Event Of Default under any of the $10,700,000 Loan Documents defined in the $10.7 Million Credit Agreement (collectively, the "**$10.7 Million Loan Documents**").

(i)      The occurrence of any Event Of Default under any Control Agreement ($10.7 Million Facility) executed in connection with the $10.7 Million Credit Agreement.

4.      **RIGHTS AND REMEDIES.**  Upon the occurrence of an Event Of Default, Lender shall have all the rights of a secured creditor under the Uniform Commercial Code, including, but not limited to, the right to give unilateral Entitlement Orders (as defined therein) to the Bank.  In addition, Lender shall have all rights and remedies under the Loan Documents as well as all rights and remedies at law or in equity.  To the extent any Company ever receives proceeds of any amounts outside of the Deposit Accounts, then said Company agrees to hold all such funds in a non-commingled manner in trust for the sole benefit of the Lender, and shall be remitted to Lender upon demand.  Nothing herein shall require the Lender to:

(a)      Proceed against any Company or any other person or entity; or

(b)      Exhaust the Deposit Accounts or any other security held by the Lender from any Company or any other person or entity in any order; or

(c)      Marshal any Company's assets or proceed against any of the other security for the Obligations under the Credit Agreement before proceeding under this Control Agreement (Loans), or to proceed against any Company in a particular order; or

(d)      Pursue any other remedy in the Lender's power whatsoever; and each Company waives any right or rights, to the extent it otherwise has such rights, to require Lender to proceed in any manner whatsoever, or otherwise inconsistent with the foregoing.

5.      **WAIVER OF RIGHT OF SET-OFF.**  If Bank provides any form of financing or credit to any Company, Bank hereby agrees to waive, with respect to all of its existing and future

#4831-1562-0370v4

3

CONFIDENTIAL

SPCP_0000004565

EXECUTION

claims against each Company, or any Affiliate of any Company, all existing and future rights of set-off and banker's Liens against the Deposit Accounts and all items (and proceeds thereof) that come into Bank's possession or control in connection with any of the Deposit Accounts; provided, however, that the Bank retains the right to debit the Deposit Accounts for all items deposited in and credited to the Deposit Accounts and subsequently returned unpaid or with respect to which the Bank fails to receive final settlement.

6.    **CHARGES BY BANK.**

(a)    Bank is permitted to charge the Deposit Accounts for its fees and charges relating to said Deposit Accounts or associated with this Control Agreement (Loans).

(b)    Bank is permitted to charge the applicable Deposit Account in the event (i) any check deposited into such Deposit Account is returned unpaid for any reason or for any breach of warranty claim and (ii) any automated clearing house credit entries (the "**Entries**") that may have been deposited into such Deposit Account are subsequently returned.

(c)    If the balances in the Deposit Accounts are not sufficient to compensate Bank for any fees or charges due Bank in connection with the Deposit Accounts or this Control Agreement (Loans), each Company agrees to pay Bank on demand the amount due Bank.  If the Companies fail to so pay Bank immediately upon demand, Lender agrees to pay Bank within ten (10) Business Days after Bank's demand to Lender to pay such fees or charges.  The failure to so pay Bank shall constitute a breach of this Control Agreement (Loans).  The failure of any Company to compensate bank for fees and charges shall constitute an Event of Default under the Credit Agreement,

(d)    If the balances in a Deposit Account are not sufficient to compensate Bank for any returned check or Entry, each Company agrees to pay Bank on demand the amount due Bank.  If the Companies fail to so pay Bank immediately upon demand, Lender agrees to pay Bank within ten (10) Business Days after Bank's demand to Lender to pay any amount received by Lender with respect to such returned check or Entry.  The failure to so pay Bank shall constitute a breach of this Control Agreement (Loans).  The failure of the Companies to compensate Bank for any returned check or Entry shall constitute an Event of Default under the Credit Agreement.

7.    **DAMAGES.**

(a)    Neither Bank nor Lender will be liable to any Company, nor will Bank be liable to Lender, for any expense, claim, loss, damage or cost ("**Damages**") arising out of or relating to its/their performance under this Control Agreement (Loans) other than those Damages which result directly from its acts or omissions constituting gross negligence or intentional misconduct.

(b)    In no event will Bank or Lender be liable for any special, indirect, exemplary, punitive or consequential damages, including but not limited to lost profits.

(c)    Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Control Agreement (Loans) or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's

#4831-1562-0370v4                                     4

**JAE 0263**

EXECUTION

reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private or common carrier communications or transmission facilities, equipment failure, or negligence or default of any Company or Lender, or (ii) such failure or delay resulted from Bank's reasonable belief that the action would have violated any guideline, rule or regulation of any governmental authority.

(d)     Bank shall have no duty to inquire or determine whether any Company's obligations to Lender are in default.  Bank may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

(e)     Notwithstanding any of the other provisions in this Control Agreement (Loans), in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against any Company, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against any Company, Bank may act as Bank deems necessary to comply with all applicable provisions of governing statutes and shall not be in violation of this Agreement as a result.

(f)     Bank shall be permitted to comply with any writ, levy order or other similar judicial or regulatory order or process concerning the Deposit Accounts or any check and shall not be in violation of the Agreement for so doing; provided, however, that to the extent that such writ or order or process would result in the payment by Bank of any amount to a third party, Bank shall only make such payment if Bank believes in its good faith and commercially reasonable judgment that failure to comply with such order would result in a violation of applicable law.

## 8.     **LOSSES AND LIABILITIES.**

(a)     Each Company hereby indemnifies Bank and Lender against, and holds them harmless from, any and all losses, liabilities, claims, costs, expenses and damages of any nature (including but not limited to allocated costs of staff counsel, other reasonable attorney's fees and any fees and expenses) (collectively, "**Losses and Liabilities**") in any way rising out of or relating to disputes or legal actions concerning Bank's provision of the services described in the Control Agreement (Loans).  This section does not apply to any cost or damage attributable to the gross negligence or intentional misconduct of Bank or Lender.  Each Company's obligations under this section shall survive termination of this Control Agreement (Loans).

(b)     To the extent not paid by any Company within fifteen (15) calendar days after written demand (with a copy of said demand delivered concurrently to Lender), Lender will indemnify Bank against any Losses and Liabilities Bank may suffer or incur as a result of or in connection with Bank following any written instruction or written request of Lender.

(c)     Each Company shall jointly and severally pay to Bank, upon receipt of Bank's invoice, all costs, expenses and attorney's fees (including allocated costs for in- house legal services) incurred by Bank in connection with the enforcement of this Agreement and any instrument or agreement required hereunder, including but not limited to any such costs,

**JAE 0264**

CONFIDENTIAL                                                                    SPCP_0000004567

EXECUTION

expenses and fees arising out of the resolution of any conflict, dispute, motion regarding entitlement to rights or rights of action, or other action to enforce Bank's rights in a case arising under Title 11, United States Code. Each Company agrees to pay Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees incurred by Bank in the administration of this Agreement (including any amendments hereto or instruments or agreements required hereunder). Each Company, jointly and severally, further agrees to indemnify, defend and save harmless Bank against any loss, liability or expenses incurred at any time in connection with this Control Agreement (Loans) or the Deposit Accounts (except to the extent due to Bank's willful misconduct or gross negligence) or incurred at any Company's direction or instruction.

9.      **TERMINATION.**  This Control Agreement (Loans) may be terminated by any one or more Companies only upon not less than ten (10) business days' prior written notice thereof jointly executed by all Companies and Lender.  This Control Agreement (Loans) may be terminated by Lender at any time, with or without cause, seven (7) days following its delivery of written notice thereof to all Companies and Bank.  This Control Agreement (Loans) may be terminated by Bank at any time on not less that thirty (30) days prior written notice delivered to each Company and Lender.  Notwithstanding the foregoing, Bank may terminate this Control Agreement (Loans) at any time upon ten (10) business days' prior written notice to all Companies and Lender if either any Company or Lender materially breaches any of the terms of this Control Agreement (Loans), or any other agreement with Bank involving the borrowing of money or extension of credit.  Upon termination of this Control Agreement (Loans) by any party, any collected and available balances in the Deposit Accounts will be transferred in accordance with Lender's instructions and the Deposit Accounts will be closed.

10.     **REPRESENTATIONS AND WARRANTIES.**  Each party represents and warrants to the other parties as follows:

        (a)     This Control Agreement (Loans) constitutes its duly authorized, legal, valid, binding and enforceable obligation;

        (b)     The performance of its obligations under this Control Agreement (Loans) and the consummation of the transactions contemplated hereunder will not (i) constitute or result in a breach of its certificate or articles of incorporation, by-laws or partnership agreement, as applicable, or the provisions of any material contract to which it is a party or by which it is bound or (ii) result in the violation of any law, regulation, judgment, decree or governmental order applicable to it; and

        (c)     All approvals and authorizations required to permit the execution, delivery, performance and consummation of this Control Agreement (Loans) and the transactions contemplated hereunder have been obtained.

11.     **MISCELLANEOUS.**

        (a)     This Control Agreement (Loans) may be amended only by a writing signed by each Company, Lender and Bank; except that Bank's charges are subject to change by Bank upon thirty (30) days' prior written notice to Company and Lender.

**JAE 0265**

CONFIDENTIAL                                                                          SPCP_0000004568

EXECUTION

(b)      This Control Agreement (Loans) may be executed in counterparts; all such counterparts shall constitute but one and the same agreement.

(c)      Lender and the Companies agree that, except as specifically provided in this Control Agreement (Loans), the Deposit Accounts will be subject to, and Bank's operation of the Deposit Accounts will be in accordance with, the terms and provisions of the standard account documentation between Bank and Companies governing each Deposit Account (the "**Account Documentation**"); provided, that this Control Agreement (Loans) controls in the event of any conflict between this Control Agreement (Loans) and any other document or written or oral statement, including the Account Documentation.  This Control Agreement (Loans) and the Account Documentation supersede all prior understandings, writings, proposals, representations and communications, oral or written, of any party relating to the subject matter hereof.

(d)      This Control Agreement (Loans) shall be interpreted in accordance with California law without reference to that state's principles of conflicts of law.

(e)      Any written notice or other written communication to be given under this Control Agreement (Loans) shall be addressed to each party at its address set forth on the signature page of this Control Agreement (Loans) or to such other address as a party may specify in writing. Except as otherwise expressly provided herein, any such notice shall be effective upon receipt.

(f)      Nothing contained in this Control Agreement (Loans) shall create any agency, fiduciary, joint venture or partnership relationship between or among Bank and any Company or Lender.  Each Company and Lender agree that nothing contained in this Control Agreement (Loans), nor any course of dealing among the parties to this Control Agreement (Loans), shall constitute a commitment or other obligation on the part of Bank to extend credit to any Company or Lender.

(g)      Each Company's obligations under this Control Agreement (Loans) shall be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Control Agreement ($80 Million Credit Agreement) by their duly authorized officers as of the day and year first above written.

COMPANIES:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,

By: _____

_____
[Print Name & Title]

#4831-1562-0370v4                                   7

**JAE 0266**

CONFIDENTIAL

SPCP_0000004569

EXECUTION

WMC-SA, INC., a California corporation,

By:     _____

_____
[Print Name & Title]


WMC-A, INC., a California corporation,

By:     _____

_____
[Print Name & Title]


COASTAL COMMUNITIES HOSPITAL, INC.,
a California corporation,

By:     _____

_____
[Print Name & Title]


CHAPMAN MEDICAL CENTER, INC.,
a California corporation,

By:     _____

_____
[Print Name & Title]


All notices to any Company shall be sent to:

Integrated Healthcare Holdings, Inc.
1301 N. Tustin Avenue
Santa Ana, CA 92705
Attention:  Bruce Mo gel, CEO

**JAE 0267**

CONFIDENTIAL                                                          SPCP_0000004570

EXECUTION

LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,

By: _____

_____
[Print Name & Title]


All notices to Lender shall be sent to:

Medical Provider Financial Corporation III
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, CA 92806
Attention:  Joseph J. Lampariello, President and COO


BANK:

WELLS FARGO BANK, N.A.

By: _____

_____
[Print Name & Title]


All notices to Bank shall be sent to:

Rick Ehreke
Commercial Banking Group
2030 Main Street, Suite 900
Irvine, California 92614
Telephone:  949-251-4151

#4831-1562-0370v4                          9

**JAE 0268**

CONFIDENTIAL                                                  SPCP_0000004571

**SCHEDULE 1**

**CONTROL AGREEMENT ($80 MILLION CREDIT AGREEMENT)**

**LIST OF DEPOSIT ACCOUNTS**

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004572

## EXHIBIT "K" TO AMENDED AND RESTATED CREDIT AGREEMENT
### ($47,277,000 MILLION FACILITY)

## FORM OF POST-CLOSING AGREEMENT

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004573

EXECUTION

## POST-CLOSING AGREEMENT

### ($80 MILLION CREDIT AGREEMENT)

This POST-CLOSING AGREEMENT (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into to be effective as of October 9, 2007 ("**Effective Date**") by and between INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**Borrowers**" and individually as "**Borrower**"); PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"); WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**"); GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**"); ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**") (PCHI, West Coast, Ganesha and OC-PIN are hereinafter referred to as the "**Credit Parties**"); and MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**"), in connection with that certain Credit Agreement ($80 Million Facility) of even date herewith (including all annexes, exhibits and schedules thereto, and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"). Initially capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.

### RECITALS

A. (i) PCHI owns the real property and hospital improvements commonly known as the Western Medical Center — Santa Ana and located at 1001 North Tustin Avenue and 1301 North Tustin Avenue in Santa Ana, California ("**Western Medical Center - Santa Ana**"). PCHI (as Lessor) leases Western Medical Center - Santa Ana to IHHI (as Lessee) pursuant to that certain Triple Net Lease dated as of March 3, 2005 ("**Triple Net Lease**"), and IHHI (as Sublessor) subleases Western Medical Center - Santa Ana to WMC-SA (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 ("**WMC-SA Sublease**"). WMC- SA owns all personal property used in the operation of Western Medical Center — Santa Ana, and WMC-SA operates Western Medical Center — Santa Ana as an acute care hospital facility.

(ii) PCHI owns the real property and hospital improvements commonly known as the Western Medical Center — Anaheim and located at 1025 South Anaheim Blvd. in Anaheim, California ("**Western Medical Center - Anaheim**"), PCHI (as Lessor) leases Western Medical Center — Anaheim to IHHI (as Lessee) pursuant to the Triple Net Lease, and IHHI (as Sublessor) subleases Western Medical Center - Anaheim to WMC-A (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 ("**WMC-A Sublease**"). WMC-A owns all personal property used in the operation of Western Medical Center - Anaheim, and WMC-A operates Western Medical Center - Anaheim as an acute care hospital facility.

CONFIDENTIAL

**JAE 0271**

SPCP_0000004574

(iii)     PCHI owns the real property and hospital improvements commonly known as the Coastal Communities Hospital and located at 2701 South Bristol Street and 1901 and 1905 North College Avenue in Santa Ana, California ("**Coastal Communities Hospital**"). PCHI (as Lessor) leases Coastal Communities Hospital to IHHI (as Lessee) pursuant to the Triple Net Lease, and IHHI (as Sublessor) subleases Coastal Communities Hospital to Coastal (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 ("**Coastal Sublease**").  Coastal owns all personal property used in the operation of Coastal Communities Hospital, and Coastal operates Coastal Communities Hospital as an acute care hospital facility.

(iv)     Chapman Investment Associates (defined in the Credit Agreement) owns the real property and hospital improvements located at 2601 East Chapman Avenue in Orange, California ("**Chapman Hospital**"); and Chapman Investment Associates owns the real property and medical office building improvements located at 2617 East Chapman Avenue in Orange, California ("**Chapman MOB**").  The Chapman Hospital and Chapman MOB are hereinafter together referred to as the "**Chapman Medical Center.**"  Chapman Investment Associates (as Lessor) leases the Chapman Hospital to IHHI (as Lessee) pursuant to the certain lease agreement originally dated as of December 31, 1984 (as amended and revised, the "**Chapman Hospital Lease**"), and IHHI (as Sublessor) subleases Chapman Hospital to Chapman (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 (the "**Chapman Hospital Sublease**"); and Chapman Investment Associates (as Lessor) leases the Chapman MOB to IHHI (as Lessee) pursuant to that certain lease agreement originally dated as of December 31, 1984 (as amended and revised, the "**Chapman MOB Lease**"), and IHHI (as Sublessor) subleases Chapman MOB to Chapman (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 (the "**Chapman MOB Sublease**").  Chapman owns all personal property used in the operation of Chapman Medical Center, and Chapman operates the Chapman Medical Center as an acute care hospital facility.

B.     Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers named in the Credit Agreement.  Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes,**" and individually as a "**Note**").  The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents.**"

C.     For convenience, Western Medical Center - Santa Ana, Western Medical Center - Anaheim, Coastal Communities Hospital, and Chapman Medical Center are hereinafter together sometimes referred to as the "**Hospital Properties**" and individually as a "**Hospital Property.**"

2

CONFIDENTIAL

EXECUTION

D.      To induce the Lender to expressly waive, on a temporary basis, the delivery of certain documents and items and the satisfaction of certain conditions precedent to Closing, Borrowers, Credit Parties and Lender wish to set forth herein the terms and conditions upon which the Lender will agree to the Closing without certain items.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **INCORPORATION OF RECITALS.**  The foregoing Recitals are incorporated by reference as if fully set forth herein.

2.      **EXPRESS WAIVER; CHANGE TO CLOSING DATE.**  This Agreement shall constitute a written waiver and consent made by the Lender under Sections 11.2(a) and (b) (Amendments and Waivers) of the Credit Agreement.  The actual "**Closing Date**" under all of the Loan Documents (as defined in the Credit Agreement) shall mean October 9, 2007 and the references to the Closing Date shall mean October 9, 2007 unless otherwise agreed in writing by Borrowers, Credit Parties and Lender.

3.      **POST-CLOSING OBLIGATIONS OF BORROWERS.**  Following the Closing Date, Borrowers shall, at the times set forth herein, obtain and deliver or cause to be delivered to the Lender, in form and substance reasonably satisfactory to the Lender, all of the required documents and items set forth in the list of post-closing items and documents (the "**Post-Closing List**") attached hereto as Exhibit "A" and incorporated by this reference.  In the event that any delivery made to Lender indicates that further consents, further agreements, or further actions are reasonably required thereby to give effect to such delivery, then each party hereto covenants to obtain or do the same.  The failure of any Borrower to timely comply with any of its obligations under this Agreement and/or the failure of any Borrower to timely deliver to Lender any of the items set forth in the Post-Closing List shall constitute a "**Event of Default**" under this Post-Closing Agreement and an Event of Default under the Credit Agreement and the other Loan Documents.

4.      **LENDER'S ATTORNEYS' FEES AND EXPENSES.**  As a condition of Closing and the initial funding, Borrowers are required to pay Lender its attorneys' fees in the amount invoiced up to the Closing Date.  Said amount will be deducted from the initial Advance under the $35,000,000 Non-Revolving Line of Credit Loan by Lender and paid directly to Lender's attorneys.  Borrowers understand that Lender may continue to incur legal fees and expenses after the Closing to address all of the post-closing matters covered by this Agreement and any other matters which may occur after the Closing.  Accordingly, Borrowers agree to pay reasonable invoices rendered by Lender's counsel, Sedgwick, Detert, Moran & Arnold LLP within ten (10) calendar days after delivery of an invoice to Borrowers.  The failure to pay said invoice shall entitle Lender to make a draw from the $35,000,000 Non-Revolving Line of Credit Loan in the amount of said invoice and pay the same directly to its attorneys.  Payments will be made to the following wire-transfer address:

#4831-1562-0370v4                                    3

**JAE 0273**

                                                                 SPCP_0000004576

EXECUTION

CITIBANK, FSB
ONE SANSOME STREET, 24TH FLOOR
SAN FRANCISCO, CA 94104
ABA#:                          321 171 184
ACCOUNT NAME:        SEDGWICK DETERT MORAN & ARNOLD LLP
ACCOUNT #:               200002905
ATTN:  GARY C. SHEPPARD (2994-128721)
MEDICAL CAPITAL/IHHI REFINANCE

5.      **NOTICES.**  All notices served under this Agreement shall be in writing and shall be served in the same manner as provided by the Credit Agreement.

6.      **GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE.**  THIS AGREEMENT IS A CONTRACT UNDER THE LAWS OF THE STATE OF NEVADA AND SHALL FOR ALL PURPOSES BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEVADA (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW).

7.      **HEADINGS.**  The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

8.      **ENTIRE AGREEMENT, ETC.**  This Agreement supersedes any specifically inconsistent term or condition contained in the Credit Agreement, and expresses the entire understanding of the parties with respect to the matters described herein.  Neither this Agreement nor any term hereof may be amended, changed, waived, discharged or terminated, except as provided in Section 11.2(a) and (b) (Amendments and Waivers) of the Credit Agreement.  This Agreement represents the final agreement between the parties as to the subject matter hereof and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

9.      **SEVERABILITY.**  The provisions of this Agreement are severable, and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

10.     **ASSIGNMENT.**  This Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto resulting from any transfer effected in accordance with the Credit Agreement.  This Agreement may not be assigned except in accordance with the Credit Agreement.

11.     **TIME.**  Time is of the essence for the performance of all obligations hereunder.

12.     **COUNTERPARTS.**  This Agreement may be executed by each party and signatory hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

#4831-1562-0370v4                          4

CONFIDENTIAL

SPCP_0000004577

13.     **TERMINATION.**  This Agreement shall terminate on the satisfaction or waiver by the Lender of each of the items set forth in Exhibit "A" attached hereto and the payment and performance of the other obligations and liabilities hereunder, as evidenced in a writing from the Lender.

14.     **ATTORNEYS' FEES.**  If any action or proceeding is brought by either party against the other party, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and costs incurred in connection with the prosecution or defense of such action. The foregoing includes, without limitation, reasonable attorneys' fees and costs of investigation incurred in appellate proceedings, costs incurred in establishing the right to indemnification, expert or other witness fees, copy and facsimile and telephone charges, courier and messenger charges, court costs, fees of charges of any arbitrator or mediator or arbitration or mediator service, or in connection with, any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code, 11 U.S.C. 101 et seq., or any successor statutes.  For purposes of this Agreement, the term "attorneys' fees" or "attorneys' fees and costs" shall also include the fees and expenses of counsel to the parties hereto, which may include the allocable costs of in-house counsel, printing, photostating, duplicating and other expenses, air freight charges, and fee billed for law clerks, paralegals and other persons not admitted to the bar but performing services under the supervision of an attorney.

[NO FURTHER TEXT ON THIS PAGE]

CONFIDENTIAL

SPCP_0000004578

EXECUTION

IN WITNESS WHEREOF, the undersigned have duly executed this Post-Closing Agreement ($80 Million Credit Agreement) as of the date first set forth above.

BORROWERS:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,


By:_____
Larry B. Anderson, President

WMC-SA, INC.,
a California corporation,


By:_____
Larry B. Anderson, President

WMC-A, INC.,
a California corporation,


By:_____
Larry B. Anderson, President

CHAPMAN MEDICAL CENTER, INC.,
a California corporation,


By:_____
Larry B. Anderson, President

COASTAL COMMUNITIES HOSPITAL, INC.,
a California corporation,


By:_____
Larry B. Anderson, President


[SIGNATURE PAGE CONTINUES]

**JAE 0276**

CONFIDENTIAL                                                                                      SPCP_0000004579

EXECUTION

CREDIT PARTIES:

PACIFIC COAST HOLDINGS INVESTMENT, LLC,
a California limited liability company,

By:_____

Name:_____

Title:_____


WEST COAST HOLDINGS, LLC,
a California limited liability company,

By:_____

Name:_____

Title:_____


GANESHA REALTY, LLC,
a California limited liability company,

By:_____

Name:_____

Title:_____


ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC,
a Nevada limited liability company,

By:_____

Name:_____

Title:_____


[SIGNATURE PAGE CONTINUES]

CONFIDENTIAL

**JAE 0277**

SPCP_0000004580

EXECUTION

LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By:_____
Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004581

# EXHIBIT "A"

## POST-CLOSING LIST

Borrowers agree to deliver to Lender originals of the following fully executed documents in form and substance reasonably satisfactory to the Lender within the time period indicated for each item, measured from the Effective Date of the Credit Agreement unless otherwise indicated:

1.      The fair value opinion dated June 14, 2007 and issued by De Joya Griffith & Company LLC to IHHI shall be revised to make reference to the loan transactions described in the Recitals of this Post-Closing Agreement and shall delivered to Medical Provider Financial Corporation II within ten (10) business days from the Closing Date.

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004582

## EXHIBIT "L" TO AMENDED AND RESTATED CREDIT AGREEMENT
## ($47,277,000 MILLION FACILITY)

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

**JAE 0280**

CONFIDENTIAL

SPCP_0000004583

EXECUTION

## INTELLECTUAL PROPERTY SECURITY AGREEMENT
## ($80 MILLION CREDIT AGREEMENT)

This INTELLECTUAL PROPERTY SECURITY AGREEMENT ($80 Million Credit Agreement) (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "**IP Security Agreement**") is made to be effective as of October 9, 2007 ("**Effective Date**") by and among MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation (the "**Secured Party**"), and INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**Debtors** " and individually as "**Debtor**").  This IP Security Agreement is made in connection with that certain Credit Agreement ($80 Million Facility) of even date herewith (including all annexes, exhibits and schedules thereto, and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), by and among Secured Party (as Lender), the Debtors (as Borrowers) and the Credit Parties named therein.  Initially capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.

A.    In order to secure the prompt and complete payment, observance and performance of all of Borrower's Obligations under the Credit Agreement and the Loan Documents, Secured Party has required, as a condition, among others, to entering into the Credit Agreement and the other Loan Documents, that Debtors execute and deliver this IP Security Agreement.

B.    The Secured Party wishes to assure itself of the performance of the Obligations and grants of security interests of each of the Debtors under that certain Security Agreement ($80 Million Credit Agreement) between Secured Party and Debtors of even date herewith (hereinafter the "**Security Agreement ($80 Million Facility)**").

C.    The parties hereto desire to:  (i) confirm the grant to the Secured Party of a security interest in the intellectual property rights of each Debtor in order for the Secured Party to enjoy full use of its rights under the Security Agreement ($80 Million Facility), and (ii) make a record of its grant of a security interest in the Collateral (as defined below) to Secured Party.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Debtor hereby acknowledges that it has granted to Secured Party a security interest in all of its right, title and interest in, to, and under the Collateral (as defined hereinbelow), and the parties hereby agree as set forth below.  Each Debtor also acknowledges and confirms that the rights and remedies of Secured Party with respect to the security interests in the Collateral granted hereby are more fully set forth in the Security Agreement ($80 Million Facility), the terms and provisions of which are incorporated herein by reference.

**JAE 0281**

CONFIDENTIAL                                                                          SPCP_0000004584

EXECUTION

SECTION 1.   Collateral

For purposes of this IP Security Agreement, "**Collateral**" shall mean and refer to any and all of each Debtor's present and future right, title and interest in and to the following items, together with any and all rights corresponding or similar to the following items, whether arising under United States, multinational or foreign laws or otherwise:

(a)   Any and all copyrights whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof; and the right to obtain all renewals thereof, and whether or not the same also constitute trade secrets, now or hereafter existing, created, acquired or held, including without limitation those set forth on Exhibit "A" attached hereto (collectively, the "**Copyrights**");

(b)   Any and all written agreements naming any Debtor as licensor or licensee granting any right under any Copyright, including the grant of any right to copy, publicly perform, create derivative works, manufacture, distribute, exploit or sell materials derived from any Copyright;

(c)   Any and all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof and all rights to obtain any reissues or extensions of the foregoing, including without limitation the patents and patent applications set forth on Exhibit "B" attached hereto (collectively, the "**Patents**");

(d)   Any and all agreements, whether written or oral, providing for the grant by or to any Debtor of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent;

(e)   Any and all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, brand names, labels, service marks, logos and other source or business identifiers, and, in each case, all goodwill associated therewith, all registrations and recordings thereof and all applications in connection therewith, in each case whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, all common-law rights related thereto, and the right to obtain all renewals thereof, including without limitation those set forth on Exhibit "C" attached hereto (collectively, the "**Trademarks**");

(f)   Any and all trade secret rights, including any rights to unpatented inventions, know-how, operating manuals, license rights and agreements, and confidential information;

(g)   Any and all agreements, whether written or oral, providing for the grant by or to any Debtor of any right to use any Trademark and trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all

#4831-1562-0370v4

**JAE 0282**

CONFIDENTIAL

SPCP_0000004585

proceeds and damages therefrom, advertising materials, slogans, and all goodwill associated with the foregoing;

(h)     Any and all claims for damages by way of past, present and future infringements of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above; and

(i)     All licenses or other rights to use any of the Copyrights, Patents and Trademarks and all license fees and royalties arising from such use to the extent permitted by such license or rights, including, without limitation those set forth on Exhibit "D" attached hereto (collectively, the "**Licenses**").

SECTION 2.   Grant of Security Interest

For valuable consideration, each Debtor hereby grants to the Secured Party a security interest in the Collateral.  The Secured Party may at anytime file a financing statement or statements covering the Collateral, and each Debtor shall execute such documents and take such other steps as are necessary to cooperate with the Secured Party to perfect its security interest granted hereunder.

SECTION 3.   Obligations Secured

This IP Security Agreement and the security interests created hereby are given for the purpose of securing the performance of all Obligations of all Debtors to the Secured Party under the Security Agreement ($80 Million Facility), the Credit Agreement, this IP Security Agreement and the other Loan Documents.  The security interests created hereby are granted in conjunction with the security interests granted to Secured Party under the Security Agreement ($80 Million Facility) and the other Loan Documents.  The rights and remedies of Secured Party with respect to the security interests granted hereby are in addition to those set forth in the Security Agreement ($80 Million Facility) and the other Loan Documents, and those which are now or hereafter available to Secured Party as a matter of law or equity.  Each right, power and remedy of Secured Party provided for herein or in the Security Agreement ($80 Million Facility) or any of the other Loan Documents, or now or hereafter existing at law or in equity shall be cumulative and concurrent and shall be in addition to every right, power or remedy provided for herein and the exercise by Secured Party of any one or more of the rights, powers or remedies provided for in this IP Security Agreement, the Security Agreement ($80 Million Facility) or any of the other Loan Documents, or now or hereafter existing at law or in equity, shall not preclude the simultaneous or later exercise by any person, including Secured Party, of any or all other rights, powers or remedies.

SECTION 4.   Rights to Collateral

So long as there is no Event of Default under the Security Agreement ($80 Million Facility), this IP Security Agreement or the other Loan Documents, Debtor shall retain possession and have full legal and beneficial ownership of the Collateral and shall have the benefit of any increase and bear the risk of any decrease in the value of the Collateral.  Each

CONFIDENTIAL                                                    SPCP_0000004586

EXECUTION

Debtor shall pay all taxes or other charges assessable against it upon or with respect to such
Collateral or any income or distributions therefrom.

SECTION 5.   Covenants

Each Debtor covenants and agrees as follows:

(a)    Each Debtor shall promptly advise Secured Party of any Trademark,
Patent or Copyright not specified in this IP Security Agreement, which is hereafter acquired by
any Debtor;

(b)    No Debtor shall register any Copyrights in the United States Copyright
Office unless it:  (i) has given at least fifteen (15) days' prior written notice to Secured Party of
its intent to register such Copyrights and has provided Secured Party with a copy of the
application it intends to file with the United States Copyright Office; (ii) executes a security
agreement or such other documents as Secured Party may reasonably request in order to maintain
the perfection and priority of Secured Party's security interest in the Copyrights proposed to be
registered with the United States Copyright Office; and (iii) records such security documents
with the United States Copyright Office contemporaneously with the filing of the Copyright
application(s) with the United States Copyright Office.  Each Debtor shall promptly provide to
Secured Party a copy of the Copyright application(s) filed with the United States Copyright
Office, together with evidence of the recording of the security documents necessary for Secured
Party to maintain the perfection and priority of its security interest in such Copyrights.  Each
Debtor shall also provide written notice to Secured Party of any application filed by Debtor in
the United States Patent and Trademark Office for a Patent or to register a Trademark
within 30 days of any such filing; and

(c)    Each Debtor shall protect, defend and maintain the validity and
enforceability of the Trademarks, Patents and Copyrights, use its best efforts to detect
infringements of the Trademarks, Patents and Copyrights, and promptly advise Secured Party in
writing of material infringements detected.

SECTION 6.   Default and Remedies

(a)    For purposes of this IP Security Agreement, any Debtor's breach of any
term, covenant, condition, representation or warranty of or in the Security Agreement
($80 Million Facility), this IP Security Agreement, the Credit Agreement or any other Loan
Document shall constitute an event of default hereunder (each an "**Event of Default**").

(b)    Upon the occurrence of any Event of Default, the Secured Party shall be
entitled all rights and remedies provided under this IP Security Agreement, the Security
Agreement ($80 Million Facility), the Credit Agreement, the other Loan Documents and
applicable law.  All rights and remedies of the Secured Party provided for in this IP Security
Agreement, the Security Agreement ($80 Million Facility), the Credit Agreement and the other
Loan Documents shall be cumulative and shall not be to the exclusion of any additional rights
that the Secured Party may enjoy under applicable law.  All costs and expenses incurred by the
Secured Party in enforcing its rights under this IP Security Agreement, the Security Agreement

**JAE 0284**

CONFIDENTIAL                                                                      SPCP_0000004587

EXECUTION

($80 Million Facility), the Credit Agreement and the other Loan Documents, including legal expenses and reasonable attorneys' fees, shall be borne, jointly and severally, by Debtors.

(c)     The failure of the Secured Party to exercise any right to seek any remedy provided for in this IP Security Agreement, the Security Agreement ($80 Million Facility), the Credit Agreement and the other Loan Documents, and the acceptance by the Secured Party of any partial or delinquent performance by Debtor of any of the Obligations, shall not constitute a waiver by the Secured Party of any of its rights or remedies hereunder or of its right thereafter to enforce this IP Security Agreement, the Security Agreement ($80 Million Facility), the Credit Agreement and the other Loan Documents strictly in accordance with their terms.  No waiver of any rights of the Secured Party, or modification of any term of this IP Security Agreement, shall be enforceable unless in writing and signed by the authorized representative of each of the parties hereto.

SECTION 7.   Miscellaneous

(a)     All notices and other communications required or desired to be served, given or delivered hereunder shall be in writing and shall be served, given or delivered as provided in the Credit Agreement.

(b)     This IP Security Agreement shall be construed and enforced in accordance with the laws of the State of Nevada.

(c)     This IP Security Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[NO FURTHER TEXT ON THIS PAGE]

#4831-1562-0370v4

CONFIDENTIAL

**JAE 0285**

SPCP_0000004588

EXECUTION

IN WITNESS WHEREOF, the parties have executed this IP Security Agreement ($80 Million Facility) on the Effective Date first above written.

**DEBTORS**:

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,

By: _____
    Larry B. Anderson, President

WMC-SA, INC., a California corporation,

By: _____
    Larry B. Anderson, President

WMC-A, INC., a California corporation,

By: _____
    Larry B. Anderson, President

CHAPMAN MEDICAL CENTER, INC., a California corporation,

By: _____
    Larry B. Anderson, President

COASTAL COMMUNITIES HOSPITAL, INC., a California corporation,

By: _____
    Larry B. Anderson, President

**SECURED PARTY**:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation

By: _____
    Joseph J. Lampariello, President and COO

IN WITNESS WHEREOF, the parties have executed this IP Security Agreement ($80 Million Facility) on the Effective Date first above written.

#4831-1562-0370v4

6

CONFIDENTIAL

SPCP_0000004589

EXECUTION

**DEBTORS**:

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,

By: _____

Larry B. Anderson, President

WMC-SA, INC., a California corporation,

By: _____

Larry B. Anderson, President

WMC-A, INC., a California corporation,

By: _____

Larry B. Anderson, President

CHAPMAN MEDICAL CENTER, INC., a California corporation,

By: _____

Larry B. Anderson, President

COASTAL COMMUNITIES HOSPITAL, INC., a California corporation,

By: _____

Larry B. Anderson, President

**SECURED PARTY**:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation

By: _____

Joseph J. Lampariello, President and COO

#4831-1562-0370v4

7

CONFIDENTIAL

SPCP_0000004590

EXECUTION

## EXHIBIT "A"

## COPYRIGHTS

None

#4831-1562-0370v4

1

CONFIDENTIAL

SPCP_0000004591

EXECUTION

**EXHIBIT "B"**

**PATENTS**

None

**JAE 0289**

CONFIDENTIAL                                    SPCP_0000004592

EXECUTION

**EXHIBIT "C"**

**TRADEMARKS**

None

3

**JAE 0290**

CONFIDENTIAL

SPCP_0000004593

EXECUTION

## EXHIBIT "D"

## LICENSES

None

**JAE 0291**

CONFIDENTIAL                                                                 SPCP_0000004594

EXECUTION

**<u>EXHIBIT "M" TO AMENDED AND RESTATED CREDIT AGREEMENT</u>**
**<u>($47,277,000 MILLION FACILITY)</u>**

**FORM OF ENVIRONMENTAL INDEMNITY AGREEMENT**

SEE ATTACHED

**JAE 0292**

CONFIDENTIAL                                                                    SPCP_0000004595

EXECUTION

# ENVIRONMENTAL INDEMNITY AGREEMENT

## ($80 MILLION CREDIT AGREEMENT)

THIS ENVIRONMENTAL INDEMNITY AGREEMENT ("**Indemnity**") is made to be effective as of October 9, 2007 ("**Effective Date**") by INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ('**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**Borrowers**" and individually as "**Borrower**"); PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**"), and ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**") (PCHI, West Coast and OC-PIN are hereinafter collectively referred to as the "**Credit Parties**"), to and for the benefit of MEDICAL PROVIDER FINANCIAL CORPORATION II, INC., a Nevada corporation, and its successors and assigns (sometimes in its capacity as a lender referred to herein as "**Lender**" and sometimes in its capacity as an Indemnified Party referred to herein as "**Indemnitee**"), whose address is 3770 Howard Hughes Parkway, Suite 301, Las Vegas, Nevada 89109, with respect to the following matters:

## RECITALS

A.     This Indemnity is made by the Borrowers and the Credit Parties (hereinafter together referred to as the "**Indemnitors**") in connection with that certain Credit Agreement ($80 Million Facility) dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") by and among the Borrowers, the Credit Parties and Lender.  Initially capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.

B.     (i)     PCHI owns the real property and hospital improvements commonly known as the Western Medical Center — Santa Ana and located at 1001 North Tustin Avenue and 1301 North Tustin Avenue in Santa Ana, California ("**Western Medical Center - Santa Ana**").  PCHI (as Lessor) leases Western Medical Center - Santa Ana to IHHI (as Lessee) pursuant to that certain Triple Net Lease dated as of March 3, 2005 ("**Triple Net Lease**"), and IHHI (as Sublessor) subleases Western Medical Center - Santa Ana to WMC-SA (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 ("**WMC-SA Sublease**"). WMC- SA owns all personal property used in the operation of Western Medical Center - Santa Ana, and WMC-SA operates Western Medical Center – Santa Ana as an acute care hospital facility.  The real property underlying Western Medical Center - Santa Ana is more particularly described in Exhibit "A" attached hereto and made a part hereof.

(ii)     PCHI owns the real property and hospital improvements commonly known as the Western Medical Center - Anaheim and located at 1025 South Anaheim Blvd. in Anaheim, California ("**Western Medical Center – Anaheim**").  PCHI (as Lessor) leases Western Medical Center – Anaheim to IHHI (as Lessee) pursuant to the Triple Net Lease, and

CONFIDENTIAL

**JAE 0293**

SPCP_0000004596

EXECUTION

IHHI (as Sublessor) subleases Western Medical Center — Anaheim to WMC-A (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 (**"WMC-A Sublease"**). WMC-A owns all personal property used in the operation of Western Medical Center - Anaheim, and WMC-A operates Western Medical Center - Anaheim as an acute care hospital facility.  The real property underlying Western Medical Center - Anaheim is more particularly described in Exhibit "B" attached hereto and made a part hereof.

(iii)     PCHI owns the real property and hospital improvements commonly known as the Coastal Communities Hospital and located at 2701 South Bristol Street and 1901 and 1905 North College Avenue in Santa Ana, California (**"Coastal Communities Hospital"**). PCHI (as Lessor) leases Coastal Communities Hospital to IHHI (as Lessee) pursuant to the Triple Net Lease, and IHHI (as Sublessor) subleases Coastal Communities Hospital to Coastal (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 (**"Coastal Sublease"**).  Coastal owns all personal property used in the operation of Coastal Communities Hospital, and Coastal operates Coastal Communities Hospital as an acute care hospital facility. The real property underlying Coastal Communities Hospital is more particularly described in Exhibit "C" attached hereto and made a part hereof.

(iv)     Chapman Investment Associates (defined in the Credit Agreement) owns the real property and hospital improvements located at 2601 East Chapman Avenue in Orange, California (**"Chapman Hospital"**); and Chapman Investment Associates owns the real property and medical office building improvements located at 2617 East Chapman Avenue in Orange, California (**"Chapman MOB"**).  The Chapman Hospital and Chapman MOB are hereinafter together referred to as the **"Chapman Medical Center."**  Chapman Investment Associates (as Lessor) leases the Chapman Hospital to IHHI (as Lessee) pursuant to the certain lease agreement originally dated as of December 31, 1984 (as amended and revised, the **"Chapman Hospital Lease"**), and IHHI (as Sublessor) subleases Chapman Hospital to Chapman (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 (the **"Chapman Hospital Sublease"**); and Chapman Investment Associates (as Lessor) leases the Chapman MOB to IHHI (as Lessee) pursuant to that certain lease agreement originally dated as of December 31, 1984 (as amended and revised, the **"Chapman MOB Lease"**), and IHHI (as Sublessor) subleases Chapman MOB to Chapman (as Sublessee) pursuant to that certain sublease agreement dated as of March 3, 2005 (the **"Chapman MOB Sublease"**).  Chapman owns all personal property used in the operation of Chapman Medical Center, and Chapman operates the Chapman Medical Center as an acute care hospital facility.  The real property underlying Chapman Medical Center is more particularly described in Exhibit "D" attached hereto and made a part hereof.

C.     Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan (**"$45,000,000 Term Loan"**) and (ii) a $35,000,000 non-revolving line of credit loan (**"$35,000,000 Non-Revolving Line of Credit Loan"**) (each as amended, restated, supplemented or otherwise modified from time to time, the **"Loans"**) to the Borrowers.  Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith (**"$45,000,00 Term Note"**) and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith (**"$35,000,000 Non-Revolving Line of Credit Note"**) (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "Notes," and individually as a "Note").  The Credit Agreement, the Notes and all

CONFIDENTIAL

other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "Loan Documents."

D.       For convenience, Western Medical Center - Santa Ana, Western Medical Center - Anaheim, Coastal Communities Hospital, and Chapman Medical Center are hereinafter together sometimes referred to as the "Hospital Properties" and individually as a "Hospital Property."

E.       If any Borrowers or Credit Parties (as defined in the Credit Agreement) were to default under the Credit Agreement or under any of the other Loan Documents, and as a consequence, Indemnitee was to acquire fee ownership (or, in the case of Chapman Medical Center, a leasehold interest) of any of the Hospital Properties through foreclosure or by a conveyance in lieu of foreclosure or otherwise, Indemnitee could potentially incur liability as the owner of the Hospital Property in question for claims arising out of any Hazardous Materials present on, in or under any of the Hospital Properties or arising out of the migration of such materials or substances onto other real property or improvements from the Hospital Properties.

F.       Indemnitee has required that Indemnitors indemnify Indemnitee against such liability pursuant to this Indemnity as a condition to the making of the Loans to the Borrowers.

G.       The parties intend that these Recitals are made a part of this Indemnity.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing and of any financial accommodations or extensions of credit (including, without limitation, the Loans or advances or renewals, refinancing or extensions of the agreements described hereinabove or otherwise) heretofore, now or hereafter made to or for the benefit of Borrowers pursuant to the Credit Agreement or any other agreement, instrument or document executed pursuant to or in connection therewith, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Indemnitors and the Lender hereby agree as follows:

1.       <u>Definition.  As used herein, the term:</u>

(i)       "**Environmental Laws**" means all federal, state and local health, safety, environmental or natural resource laws, statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, authorizations, concessions, franchises and similar items of all federal, state, county, municipal, or other governmental, quasi-governmental, regulatory or administrative authority, agency, board, court, arbitrator, body, instrumentality, commission or other judicial body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to Governmental Authority having jurisdiction, including, without limitation all statutes referred to by name in the definition of Hazardous Materials; and all other state, federal, and local laws, regulations, rules, ordinances and orders which govern:  (i) the existence, cleanup and/or remedy of contamination on real property and improvements; (ii) the emission or discharge of Hazardous Materials into the environment; (iii) the control of Hazardous Materials; (iv) the use, generation, transport, treatment, storage, disposal, removal, or recovery of Hazardous Materials; as well as all applicable judicial and administrative and

**JAE 0295**

CONFIDENTIAL                                                                              SPCP_0000004598

regulatory decrees, judgments or orders (including without limitation the common law) and all applicable covenants running with the land that relate to the protection of health, safety, environment or natural resources.

(ii)     "**Environmental Liabilities**" means, with respect to any Person, all environmental liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

(iii)     "**Environmental Losses**" means any and all losses (including diminution in value of a Property), liabilities, damages, demands, claims, actions, judgments, causes of action, assessments, penalties, costs and expenses (including sums paid in settlement of claims), liens, interest, fines or penalties, including without limitation, the fees and disbursements of outside counsel, paralegals and accountants, consultant fees, expert fees, all foreseeable and unforeseeable consequential damages, and all other costs and expenses of any kind or nature, which are suffered or incurred by Indemnitee with respect to a Property or adjacent real property or improvements arising out of or as a result of (i) the occurrence of any Hazardous Material Activity; (ii) any violation of any applicable Environmental Laws or to the ownership, use, occupancy or operation thereof; (iii) any investigation, inquiry, order, hearing, action, or other proceeding by or before any Governmental Authority in connection with any Hazardous Material Activity; (iv) any Hazardous Material Claims brought, asserted, or alleged against Lender or any of its directors, officers, shareholders, employees, attorneys, or agents; (v) any actions taken by Lender to enter and inspect a Property pursuant to the rights granted Lender under this Agreement and the other Loan Documents; and (vi) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or obligations pursuant to this Agreement relating to environmental matters.

(iv)     "**Environmental Permits**" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

(v)     "**Governmental Authority**" means any nation or government, any state, county, city, or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

(vi)     "**Hazardous Material**" means any (i) substance, product, waste or other material of any nature whatsoever which is or becomes listed, regulated, or addressed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.

CONFIDENTIAL

**JAE 0296**

SPCP_0000004599

Section 9601, et seq. ("**CERCLA**"); the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("**RCRA**"); the Toxic Substances Control Act, 15 U.S.C. Sections 2601 et seq.; the Clean Water Act, 33 U.S.C. Sections 1251 et seq.; the Federal Water Pollution Control Act (33 U.S.C. Section 1251, *et seq.)* ("**Clean Water Act**" or "**CWA**"); the Atomic Energy Act of 1954 (42 U.S.C. Section 2011, *et seq.)* ("**AEA**"); the Clean Air Act (42 U.S.C. Section 7401, *et seq.);* the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 11001, *et seq.);* the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. Section 136, *et seq.)* (**"FIFRA"**); the Oil Pollution Act of 1990 (P.L. 101-380,104 Stat. 486); the Safe Drinking Water Act (42 U.S.C. Sections 300f, *et seq.)* ("**SDWA**"); the Surface Mining Control and Reclamation Act of 1974 (30 U.S.C. Sections 1201, *et seq.);* the Toxic Substances Control Act (15 U.S.C. Section 2601, *et seq.)* (**"TSCA"**); the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. Section 7901, *et seq.)* ("**UMTRCA**"); all respective regulations promulgated thereunder; and or any other federal, state or local statute, law, ordinance, resolution, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect, (ii) any substance, product, waste or other material of any nature whatsoever which may give rise to liability under any of the above statutes or under any statutory or common law theory based on negligence, trespass, intentional tort, nuisance or strict liability or under any reported decisions of a state or federal court, (iii) petroleum or crude oil other than petroleum and petroleum products contained within regularly operated motor vehicles, and (iv) asbestos.

    (vii)   "**Hazardous Material Activity**" means any storage, holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Material from, under, into, or across any Property or surrounding real property and improvements or any other use of or operation of any Property or surrounding real property or improvements that creates a risk of Hazardous Material contamination of said Property; provided, however, that Hazardous Material Activity shall not include reasonable incidental use, storage and disposal of Hazardous Materials on the Property provided that such use, disposal and storage complies with the following:  (i) such use, disposal and storage shall be limited to customary supplies, including supplies and materials customarily used, stored and disposed of in the normal operations of medical facilities; (ii) no such products or supplies create any risk of harm to persons or property including any Collateral under this Agreement and the other Loan Documents; and (iii) all such products and supplies are used, stored and disposed of in material compliance with all applicable Environmental Laws.

    (viii)   "**Hazardous Material Claim**" means any and all enforcement, clean-up, removal, remedial or other governmental or regulatory actions, agreements, or orders threatened, instituted or completed pursuant to any Environmental Laws and any all other actions, proceedings, claims, demands or causes of action, whether meritorious or not (including, without limitation, third party claims for contribution, indemnity, personal injury or real or personal property damage), which directly or indirectly relate to, arise from or are based in whole or in part on:  (i) the occurrence or alleged occurrence of any Hazardous Material Activity, (ii) any violation or alleged violation of any applicable Environmental Laws relating to a Property or to the ownership, use, occupation or operation thereof; and (iii) any investigation, inquiry, order, hearing, action or other proceeding by or before any Governmental Authority in connection with any Hazardous Material Activity.

CONFIDENTIAL

(ix)    "**Indemnified Liabilities**" means all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents.

(x)    "**Indemnified Person**" means Indemnitee, its Affiliates, and each of its officers, directors, members, employees, attorneys, agents, and representatives.

2.    <u>Representations and Warranties</u>.  Indemnitors hereby represent and warrant to Indemnitee, and acknowledge and agree that:

(i)    Except as set forth in <u>Disclosure Schedule 3.16</u> to the Credit Agreement, as of the date hereof, no Indemnitor knows of any Hazardous Material which is present, used, manufactured, handled, generated, transported, stored, treated, discharged, released, buried or disposed of on, in, under or about any Hospital Property in violation of applicable Environmental Laws;

(ii)    To the best of each Indemnitor's knowledge, following diligent inquiry, there has not been any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Material by any prior owners of prior occupants of any Property or by any <u>thir</u>d parties on, in, under or about any Hospital Property;

(iii)    As of the date hereof there is no pending or, to each Indemnitor's knowledge, threatened litigation or proceedings before any administrative agency in which any person or entity alleges the release, threat of release, placement on, under or about any Hospital Property by any Indemnitor, or the manufacture, handling, generation, transportation, storage, treatment, discharge, burial or disposal on, in, under or about any Hospital Property by any Indemnitor, or the transportation to or from any Hospital Property by any Indemnitor, of any Hazardous Material, in violation of Environmental Laws;

(iv)    As of the date hereof, no Indemnitor has received any notice and no Indemnitor has any actual knowledge that any Governmental Authority or any employee or agent thereof been determined, or threatens to determine, that there is a presence, release, threat of release, placement on, in, under or about any Hospital Property caused by any Indemnitor, or the manufacture, handling, generation, transportation, storage, treatment, discharge, burial or disposal on, in, under or about any Hospital Property caused by any Indemnitor, or the transportation to or from any Hospital Property by any Indemnitor, of any Hazardous Material, in violation of Environmental Laws; and

(v)    To each Indemnitor's knowledge, there have been no communications or agreements with any Governmental Authority or any private entity indicating that there has

CONFIDENTIAL

occurred, a release, threat of release, placement on, in, under or about any Hospital Property by any Indemnitor, or the manufacture, handling, generation, transportation, storage, treatment, discharge, burial or disposal on, in, under or about any Hospital Property by any Indemnitor, or the transportation to or from any Hospital Property by any Indemnitor; of any Hazardous Material in violation of any Environmental Laws.

    3.    <u>Covenants</u>.  Each Borrower and each Credit Party shall (a) comply with and use commercially reasonable efforts to cause each Borrower and its employees, agents and representatives at any Property to comply with all Environmental Laws; (b) without limiting the generality of clause (a) above, not engage in, permit or acquiesce in to any Hazardous Material Activity on, under or about any Property, except in strict accordance with all Environmental Laws, and with then prudent business practices as determined by said Borrower or Credit Party; (c) immediately advise Lender in writing of (i) the receipt by any Borrower or any Credit Party of written notice of any and all Hazardous Material Claims, (ii) any knowledge by any Borrower or any Credit Party that any Property does not comply with any Environmental Laws, (iii) any remedial action taken by any Borrower or any Credit Party or any other Person in response to any Hazardous Materials or Hazardous Materials Activity on, under or about any Property, or to any Hazardous Material Claims, and (iv) any Borrower's or any Credit Party's discovery of the presence of any Hazardous Materials or Hazardous Material Activity on, in, under or about any Property or any real property immediately adjacent to any Property whether or not the same requires notice to be given to any governmental entity or agency under Environmental Laws; and (d) submit to Lender, promptly upon receipt or preparation, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals, proposed removal or other remedial work contracts and similar information prepared or received by any Borrower or any Credit Party in connection with any remedial work or Hazardous Materials relating to any Property.  If Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Borrower or any Credit Party or any Environmental Liability of any Borrower or Credit Party arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any Property or any of their other real estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then such Borrower and/or Credit Party shall, upon Lender's written request (i) cause the performance of such environmental investigations including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at such Borrower's or Credit Party's expense, as Lender may from time to time reasonably request, which, shall be conducted by reputable environmental consulting firms reasonably acceptable to Lender and shall be in form and substance reasonably acceptable to Lender, and (ii) if such Borrower shall not have timely performed such environmental investigations, permit Lender or its representatives to have access to all real estate for the purpose of conducting such environmental investigations and testing as Lender reasonably deems appropriate, including subsurface sampling of soil and groundwater.  Each Borrower and Credit Party shall reimburse Lender for the costs of such investigations and the same will constitute a part of the Obligations secured hereunder.

    4.    <u>Indemnity</u>.  Each Indemnitor agrees, as an independent unsecured obligation, separate from any of Indemnitors promises or covenants in the Loan Documents, to indemnify, protect, defend (with counsel approved by Indemnified Persons), and to hold the Indemnified Persons free and harmless from and against any and all Environmental Losses, to the fullest extent permitted by applicable law.  The indemnification provided in this paragraph shall

CONFIDENTIAL      SPCP_0000004602

EXECUTION

specifically apply to and include, without limitation, claims or actions brought by or on behalf of employees of any Indemnitor.  With respect to any indemnity claim made by the Indemnified Persons against any Indemnitor, such Indemnitor hereby expressly waives any immunity to which any Indemnitor may otherwise be entitled under any industrial or worker's compensation laws.  In the event the Indemnified Persons shall suffer or incur any such Environmental Losses, each Indemnitor shall pay to the Indemnified Persons the total of all such Environmental Losses suffered or incurred by the Indemnified Persons, upon demand therefor by such Indemnified Persons, and such amount shall bear interest at the Default Rate from the date payment was due. Notwithstanding the foregoing, any Indemnified Persons may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of the Indemnified Persons, their attorneys shall control the resolution of any claim or proceeding. Each Indemnitor's obligations and liabilities hereunder will survive the satisfaction, release, or cancellation of the Loans, the release, satisfaction and/or discharge of the Notes, and the foreclosure of any Lien or deed in lieu of foreclosure.  Notwithstanding anything in this paragraph to the contrary, this paragraph shall not apply to the introduction and initial release of Hazardous Materials on the Hospital Properties from and after the date that Lender acquires title to or a leasehold interest in any of the Hospital Properties through foreclosure or a deed in lieu of foreclosure (the "Transfer Date").  A separate action may be brought to enforce the provisions hereof, which shall in no way be deemed to be an action on the Notes, whether or not the Loans have been repaid and whether or not Lender would be entitled to a deficiency judgment following a judicial foreclosure, trustee's sale or UCC sale.  This Indemnity, and all rights and obligations hereunder, shall survive performance and repayment of the Obligations under the Credit Agreement, surrender of the Notes, reconveyance of the security documents, release of other Collateral provided in connection with the Loans, trustee's sale or foreclosure under the Loan Documents, acquisition of the Hospital Properties by Lender, and transfer of all of Lender's rights in the Loans, the Loan Documents, and the Hospital Properties.

To the fullest extent permitted by law, the foregoing indemnification shall apply regardless of the fault, active or passive negligence, breach of warranty or contract of Indemnitee.  Without limiting the generality of this Indemnity, this Indemnity is intended to operate as an agreement pursuant to Section 107(e) of CERCLA, 42 U.S.C. Section 9607(e) and under applicable Nevada law, to insure, protect, hold harmless and indemnify Indemnitee for any liability pursuant to such statutes.

5.      Attorneys' Fees and Costs.  On demand, each Indemnitor shall pay or reimburse Indemnitee for the payment of any statutory and non-statutory costs or expenses (including in-house and outside attorneys' fees and disbursements) incurred or expended by Indemnitee in connection with or incidental to (a) any breach of this Indemnity by any Indemnitor hereunder, or (b) the exercise or enforcement by or on behalf of Indemnitee of any of its rights or remedies or any Indemnitor's obligations under this Indemnity, including (i) the enforcement, compromise or settlement of the obligations of this Indemnity, (ii) if prompted by an act or omission of Indemnitor, all actions taken by Indemnitee to protect its rights and remedies hereunder, including but not limited to consultation with an attorney whether or not the matter prompting such consultation is eventually involved in litigation, and (iii) the defense or assertion of the rights or claims of any Indemnitee hereunder, whether by litigation (including litigation in a United States Bankruptcy Court or in any appellate court) or otherwise.

**JAE 0300**

CONFIDENTIAL                                                                                    SPCP_0000004603

EXECUTION

6.  <u>Governing Law</u>.  This Indemnity shall be governed by and construed according to the internal laws of the State of Nevada, without regard to its conflict of laws principles, and under applicable federal law.

7.  <u>Suretyship Waivers</u>.  The suretyship waiver provisions contained in the Credit Agreement are hereby incorporated into this Indemnity by this reference.

8.  <u>Notices</u>.  All notices and other communications required or desired to be served, given or delivered hereunder shall be in writing and shall be served, given or delivered as provided with respect to each Indemnitor and Indemnitee in the Credit Agreement.

9.  **EACH INDEMNITOR AND THE INDEMNIFIED PERSONS HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS INDEMNITY. EACH INDEMNITOR AND THE INDEMNIFIED PERSONS SHALL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY EACH INDEMNITOR. EACH INDEMNITOR AND INDEMNIFIED PARTY ACKNOWLEDGES THAT NEITHER ANY OTHER PERSON ACTING ON BEHALF OF ANY INDEMNITEE OR ANY INDEMNIFIED PARTY HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF JURY TRIAL. EACH INDEMNITOR AND INDEMNIFIED PARTY ACKNOWLEDGES THAT 1) IT BARGAINED AT ARM'S LENGTH AND IN GOOD FAITH, WITHOUT DURESS, 2) THAT THE PROVISIONS HEREOF SHALL BE SUBJECT TO NO EXCEPTIONS WHATSOEVER, 3) THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS INDEMNITY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL AND 4) THAT IT HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. EACH INDEMNITOR AND INDEMNIFIED PARTY SPECIFICALLY ACKNOWLEDGES THAT NO PERSON OR PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PERSON OR PARTY THAT PROVISIONS OF THIS SECTION 9 WILL NOT BE FULLY ENFORCED IN ALL INSTANCES. EACH INDEMNITOR AND INDEMNIFIED PARTY FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION.**

10.  <u>No Third Party Beneficiary</u>.  The terms of this Indemnity are for the sole and exclusive protection and use of Indemnified Persons.  No person or entity shall be a third-party beneficiary hereunder, and no provision hereof shall operate or inure to the use and benefit of any such third party.  It is agreed that those persons and entities included in the definition of Indemnified Persons are not such excluded third party beneficiaries.

11.  <u>Severability</u>.  Whenever possible, each provision of this Indemnity shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Indemnity shall be held to be prohibited or invalid under applicable law, such provision

**JAE 0301**

CONFIDENTIAL                                                             SPCP_0000004604

shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Indemnity.

12.   <u>Amendments.  Waivers and Consents</u>.  None of the terms or provisions of this Indemnity may be waived, altered, modified or amended, and no consent to any departure by any Indemnitor herefrom shall be effective, except by or pursuant to an instrument in writing which (a) is duly executed by Indemnitor and the Lender and (b) complies with the requirements of Section 11.2 of the Credit Agreement.  Any such waiver shall be valid only to the extent set forth therein.  A waiver by the Lender of any right or remedy under this Indemnity on any one occasion shall not be construed as a waiver of any right or remedy which the Lender would otherwise have on any future occasion.  No failure to exercise or delay in exercising any right, power or privilege under this Indemnity on the part of the Lender shall operate as a waiver thereof; and no single or partial exercise of any right, power or privilege under this Indemnity shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

13.   <u>Execution in Counterparts</u>.  This Indemnity may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Indemnity.

14.   <u>Time of the Essence</u>.  Time is of the essence for the payment and performance of the obligations and liabilities hereunder.

15.   <u>Reinstatement</u>.  This Indemnity shall continue to be effective, or be reinstated, as the case may be, if at any time payment of all or any part of the obligations or liabilities hereunder are rescinded or must otherwise be returned or restored by Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Borrowers or Indemnitor or otherwise, all as though such payments had not been made.

16.   <u>Entire Indemnity</u>.  This Indemnity represents the final agreement of the Indemnitors with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements, or subsequent oral agreements, between each Indemnitor and the Lender.

*[Signature Pages Follow]*

CONFIDENTIAL

SPCP_0000004605

EXECUTION

IN WITNESS WHEREOF, each Indemnitor and Indemnitee have executed this Environmental Indemnity Agreement ($80 Million Credit Agreement) as of the date first above written.


INDEMNITORS:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,


By:_____
Larry B. Anderson, President


WMC-SA, INC.,
a California corporation,


By:_____
Larry B. Anderson, President


WMC-A, INC.,
a California corporation,


By:_____
Larry B. Anderson, President


CHAPMAN MEDICAL CENTER, INC.,
a California corporation,


By:_____
Larry B. Anderson, President


[SIGNATURE PAGE CONTINUES]

#4831-1562-0370v4

11

CONFIDENTIAL

SPCP_0000004606

EXECUTION

[SIGNATURE PAGE FOR ENVIRONMENTAL INDEMNITY AGREEMENT]

COASTAL COMMUNITIES HOSPITAL, INC.,
a California corporation,

By:_____
Larry B. Anderson, President

PACIFIC COAST HOLDINGS INVESTMENT, LLC,
a California limited liability company,

By:_____

Name:_____

Title:_____

WEST COAST HOLDINGS, LLC,
a California limited liability company,

By:_____

Name:_____

Title:_____

#4831-1562-0370v4

12

CONFIDENTIAL

SPCP_0000004607

EXECUTION

[CONTINUED SIGNATURE PAGE FOR ENVIRONMENTAL INDEMNITY AGREEMENT]

ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC,
a Nevada limited liability company,

By:_____

Name:_____

Title:_____

INDEMNITEE/LENDER:

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,

By:_____
Joseph J. Lampariello, President and COO

#4831-1562-0370v4                                        13

CONFIDENTIAL                                         SPCP_0000004608

EXECUTION

**EXHIBIT "A" TO ENVIRONMENTAL INDEMNITY AGREEMENT**

**LEGAL DESCRIPTION**

**WESTERN MEDICAL CENTER - SANTA ANA**

1001 NORTH TUSTIN AVENUE AND 1301 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA

PARCEL A:

THAT PORTION OF LOT 4 OF THE FELIPE YORBA TRACT, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 4, PAGE 206 OF MISCELLANEOUS MAPS, RECORDS OF LOS ANGELES COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF A LINE THAT IS PARALLEL WITH AND DISTANT EASTERLY 30.00 FEET, MEASURED AT RIGHT ANGLES FROM THE WESTERLY LINE OF SAID LOT 4, WITH A LINE THAT IS PARALLEL WITH AND DISTANT SOUTHERLY 305.00 FEET, MEASURED AT RIGHT ANGLES FROM THE NORTH LINE OF SAID LOT 4; THENCE NORTH 88° 49' 47" EAST, PARALLEL WITH SAID NORTH LINE OF LOT 4, A DISTANCE OF 718.43 FEET TO A POINT IN THE EASTERLY LINE OF THE LAND DESCRIBED IN DEED TO SIMON WARONKER, RECORDED JANUARY 5, 1965 IN BOOK 7369, PAGE 708 OF OFFICIAL RECORDS; THENCE SOUTH 3° 52' 29" WEST ALONG SAID EASTERLY LINE, 273.66 FEET TO AN ANGLE POINT THEREIN; THENCE SOUTH 0° 06' 02" WEST, ALONG SAID EASTERLY LINE, 32.54 FEET TO A POINT IN A LINE THAT IS PARALLEL WITH AND DISTANT SOUTHERLY 610.14FEET, MEASURED AT RIGHT ANGLES FROM SAID NORTH LINE OF LOT 4; THENCE SOUTH 88° 49' 47" WEST, PARALLEL WITH SAID NORTH LINE OF LOT 4, A DISTANCE OF 695.07 FEET TO SAID LINE THAT IS PARALLEL WITH THE WESTERLY LINE OF LOT 4; THENCE NORTH 0° 54' 3 8" WEST, PARALLEL WITH SAID WESTERLY LINE, 305.14 FEET TO THE POINT OF BEGINNING.

EXCEPTING FROM THAT PORTION OF SAID LAND THAT IS INCLUDED WITHIN THE EAST HALF OF SAID LOT 4, ALL MINERALS, OILS, GASES, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER SAID LAND, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE THEREOF, AS RESERVED IN THE DEED EXECUTED BY THE STATE OF CALIFORNIA, RECORDED JANUARY 5, 1965 IN BOOK 7369, PAGE 708 OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE REMAINDER, ALL INTEREST IN AND TO ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME, IN AND UNDER THE SUBJECT PROPERTY, WITHOUT RIGHT, HOWEVER, TO ENTER UPON THE SURFACE OF SAID LAND OR THE SUBSURFACE AREA THEREOF TO A

#4831-1562-0370v4

CONFIDENTIAL

EXECUTION

DEPTH OF 300 FEET BELOW THE SURFACE, AS RESERVED IN THE DEEDS FROM
SIMON WARONKER AND JEANETTE WARONKER, RECORDED JANUARY 15, 1965.

PARCEL B:

PARCEL B-l:  PARCEL 1, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE
OF CALIFORNIA, AS SHOWN ON PARCEL MAP NO. 85-234, FILED IN BOOK 211,
PAGES 10, 11 AND 12 OF PARCEL MAPS, RECORDS OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION DESCRIBED IN THE DEED TO THE STATE
OF CALIFORNIA RECORDED JANUARY 16, 1984 AS INSTRUMENT NO. 84-020617,
OFFICIAL RECORDS.

ALSO EXCEPT ALL MINERALS, OIL, GASES AND OTHER HYDROCARBONS BY
WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THAT PORTION
OF SAID LOT 2, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE
THROUGH THE SURFACE OF THE UPPER 500 FEET THEREOF, AS SET FORTH IN THE
DEED FROM THE STATE OF CALIFORNIA, RECORDED MAY 4,1971 IN BOOK *9629*,
PAGE 298 OF OFFICIAL RECORDS.

PARCEL B-1A:

ALL OF THOSE CERTAIN EASEMENTS, EXCLUSIVE OR NONEXCLUSIVE (THE
"EASEMENTS"), GRANTED TO OR RESERVED BY WESTERN MEDICAL CENTER, A
CALIFORNIA NONPROFIT CORPORATION (FORMERLY, SANTA ANA - TUSTIN
COMMUNITY HOSPITAL), AS MORE PARTICULARLY SET FORTH IN THAT CERTAIN
OPERATING AND EASEMENT AGREEMENT, DATED AS OF DECEMBER 12, 1979 AND
RECORDED IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA ON
MARCH 24, 1981 IN BOOK 13991, AT PAGES 1798 TO 1825, INCLUSIVE, AS
INSTRUMENT NUMBER 30426 AND AS AMENDED BY THAT CERTAIN AMENDMENT
TO OPERATING AND EASEMENT AGREEMENT DATED AS OF FEBRUARY 22, 1982
AND RECORDED IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA
ON SEPTEMBER 20, 1982 AS INSTRUMENT NUMBER 82-329898, AND AS AMENDED
AND RESTATED BY THAT CERTAIN AMENDED AND RESTATED OPERATING AND
EASEMENT AGREEMENT DATED MARCH 31, 1988, AND RECORDED IN THE
OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA ON MAY 2, 1988
AS INSTRUMENT NO.  88-201966, ALL OF WHICH EASEMENTS ARE COVENANTS
THAT RUN WITH THE LAND TO WHICH THEY PERTAIN AND MAY BE GRANTED BY
THE HOLDER OR HOLDERS THEREOF TO OTHER PERSONS.

PARCEL B-2:

PARCEL 2, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF
CALIFORNIA, AS SHOWN ON PARCEL MAP NO. 82-879, FILED IN BOOK 200,
PAGES 48, 49 AND 50 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY,
CALIFORNIA, AND PARCEL 3, AS SHOWN ON PARCEL MAP NO. 85-234, FILED IN
BOOK 211, PAGES 10, 11 AND 12 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY,
CALIFORNIA.

#4831-1562-0370v4

**JAE 0307**

CONFIDENTIAL

SPCP_0000004610

EXECUTION

EXCEPT ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THAT PORTION OF SAID LOT 2, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OF THE UPPER 500 FEET THEREOF, AS SET FORTH IN THE DEED FROM THE STATE OF CALIFORNIA, RECORDED MAY 4, 1971 IN BOOK 9629, PAGE 298 OF OFFICIAL RECORDS.

PARCEL B-3:

PARCEL 2, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON PARCEL MAP NO. 85-234, FILED IN BOOK 211, PAGES 10, 11 AND 12 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPT ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THAT PORTION OF SAID LOT 2, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OF THE UPPER 500 FEET THEREOF, AS SET FORTH IN THE DEED FROM THE STATE OF CALIFORNIA, RECORDED MAY 4, 1971 IN BOOK 9629, PAGE 298 OF OFFICIAL RECORDS.

#4831-1562-0370v4

**JAE 0308**

CONFIDENTIAL

SPCP_0000004611

EXECUTION

## EXHIBIT "B" TO ENVIRONMENTAL INDEMNITY AGREEMENT

## LEGAL DESCRIPTION

## WESTERN MEDICAL CENTER - ANAHEIM

1025 SOUTH ANAHEIM BOULEVARD
ANAHEIM, CALIFORNIA

PARCEL A:

PARCELS 1 AND 2, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 48 PAGE 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND BELOW 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT THE RIGHT TO ENTER UPON ANY PART OF SAID LAND FOR THE PURPOSE OF RECOVERING SAID SUBSTANCES, AS RESERVED BY DESSA I. WAGONER, A WIDOW, IN DEED DATED APRIL 1, 1960 IN BOOK 5226 PAGE 241, OFFICIAL RECORDS.

PARCEL B:

LOTS 10, 12, 13 AND 14 INCLUSIVE OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, AS SHOWN ON A MAP RECORDED IN BOOK *91*.  PAGES 19 AND 20.  OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL C:

LOT 11 OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 97.  PAGES 19 AND 20 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

#4831-1562-0370v4

**JAE 0309**

CONFIDENTIAL

EXECUTION

**EXHIBIT "C" TO ENVIRONMENTAL INDEMNITY AGREEMENT**

**LEGAL DESCRIPTION**

**COASTAL COMMUNITIES**


2701 SOUTH BRISTOL ST.
SANTA ANA, CA

LEGAL DESCRIPTION

PARCEL A:

THAT PORTION OF PARCEL 2 OF PARCEL MAP NO. 79-887, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 136 PAGES 32 AND 33 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY LYING WITHIN THE LAND SHOWN AS PARCEL 2 OF THAT CERTAIN LOT LINE ADJUSTMENT LL79-10 RECORDED JANUARY 3, 1980 AS INSTRUMENT NO. 2228, IN BOOK 13456 PAGE 985, OFFICIAL RECORDS.

PARCEL B:

PARCEL 2 OF PARCEL MAP, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP FILED IN BOOK 74, PAGES 46 AND 47 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

1901 AND 1905 NORTH COLLEGE AVE.
SANTA ANA, CA

LEGAL DESCRIPTION

THAT PORTION OF LOT 3 OF MABURY TRACT, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 165, PAGE 301 OF DEEDS.  RECORDS OF LOS ANGELES COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTH LINE OF THAT CERTAIN PARCEL OF LAND CONVEYED TO OSCAR GREENWALD BY DEED RECORDED JANUARY 13, 1920 IN BOOK 355, PAGE 205 OF DEEDS, RECORD OF ORANGE COUNTY, CALIFORNIA, SAID POINT BEING 1675.18 FEET WESTERLY FROM THE NORTHEAST CORNER OF SAID PARCEL, SAID POINT ALSO BEING THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO CHARLES C. BRISCO AND WIFE BY DEED RECORDED OCTOBER 16, 1943 IN BOOK 1214, PAGE 275 OF OFFICIAL RECORDS; THENCE SOUTH 0° 47' 00" WEST 435.68 FEET ALONG A LINE PARALLEL TO AND 1675.18 FEET WESTERLY FROM THE EAST LINE OF SECTION 2, TOWNSHIP 5 SOUTH, RANGE 10 WEST, S.B.B.&M., SAID PARALLEL LINE BEING THE EASTERLY

#4831-1562-0370v4

**JAE 0310**

EXECUTION

LINE OF SAID PARCEL CONVEYED TO BRISCO, TO A POINT IN A LINE PARALLEL WITH AND 614.26 FEET NORTHERLY MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF 17TH STREET; THENCE SOUTH 88° 52' 40" WEST 422.68 FEET ALONG LAST MENTIONED PARALLEL LINE TO A POINT IN THE EAST LINE OF THAT CERTAIN PARCEL OF LAND CONVEYED TO STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY BY DEED RECORDED DECEMBER 17, 1963 IN BOOK 2634, PAGE 603 OF OFFICIAL RECORDS; THENCE NORTH 0° 47' 00" EAST 445.00 FEET ALONG THE EAST LINE OF SAID PARCEL CONVEYED TO STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY TO THE NORTHEAST CORNER THEREOF, SAID CORNER BEING ON THE SAID NORTH LINE OF THE PARCEL CONVEYED TO GREENWALD; THENCE SOUTH 89° 51' 30" EAST 422.48 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004614

EXECUTION

## EXHIBIT "D" TO ENVIRONMENTAL INDEMNITY AGREEMENT

## LEGAL DESCRIPTION

## CHAPMAN MEDICAL

### LEGAL DESCRIPTION OF CHAPMAN HOSPITAL

2601 EAST CHAPMAN AVENUE
ORANGE, CALIFORNIA

(A) A leasehold more particularly described as follows, as to Parcel B-1:

A leasehold estate created by that certain lease of said land executed by and between the parties named herein, for the term and upon the terms, covenants and conditions therein provided:

Dated:  December 31, 1984, as amended pursuant to an Agreement dated as of April 8, 1985
Lessor:  James L. Kirby, Trustee, Fred P. Pierce, Trustee, et al.
Lessee:  AHM CGH, Inc., a California corporation
Term:  Expires no later than December 31, 2013
Disclosed by:  Memorandum of Lease
Recorded:  August 30, 1994 as Instrument No. 94-0533295.  Official Records

An Assignment and Assumption of Lease dated March 3,2005 By AHM CGH, Inc., a California Corporation, as Assignor and Integrated Healthcare Holdings, Inc., a Nevada corporation, as assignee, recorded March 8, 2005 as Instrument No. 05-169274.  Official Records.

A Supplement to Assignment and Assumption of Lease dated March 9, 2005 by AHM CGH, Inc., a California corporation, as assignor and Integrated Health care Holdings, Inc., a Nevada corporation, as assignee, recorded March 9, 2005 as Instrument No. 05-175926.  Official Records.

(B) An easement as to Parcel B-3.

PARCEL B-l:

PARCEL 1 OF LOT LINE ADJUSTMENT NO. 94-6, IN THE CITY OF ORANGE, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SAID LOT LINE ADJUSTMENT WAS RECORDED MARCH 1,1995 AS INSTRUMENT NO. 95-81919.  OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL B-2:

INTENTIONALLY OMITTED.

PARCEL B-3:

#4831-1562-0370v4

**JAE 0312**

EXECUTION

NON-EXCLUSIVE EASEMENTS FOR INGRESS, EGRESS, DRIVEWAY, UTILITY AND DRAINAGE PURPOSES AS SET FORTH AND FURTHER DESCRIBED IN A DOCUMENT ENTITLED "AGREEMENT TO QUITCLAIM EXISTING EASEMENT, ESTABLISH NEW EASEMENT, AND FOR MAINTENANCE" RECORDED NOVEMBER 15,1990 AS INSTRUMENT NO. 90-602723 OF OFFICIAL RECORDS OVER PORTIONS OF THE EASTERLY 80 FEET OF THE FOLLOWING DESCRIBED LAND:

THAT PORTION OF LOTS 14 AND 15 IN BLOCK F OF THE A.B. CHAPMAN TRACT SURVEYED BY FRANK LECOUVREUR IN 1870, AS SHOWN ON A MAP RECORDED IN BOOK 102, PAGE 15 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, AS MODIFIED BY LOT LINE ADJUSTMENT 90-2, RECORDED JUNE 25, 1990 AS INSTRUMENT NO. 90-335624 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY RIGHT OF WAY LINE OF CHAPMAN AVENUE (100 FEET WIDE), SAID POINT BEING NORTH 00° 45' 30" EAST, 50.00 FEET FROM THE SOUTHEASTERLY CORNER OF SAID LOT 14; THENCE NORTH 89° 46' 00" WEST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, A DISTANCE OF 444.74 FEET; THENCE NORTH 27° 11' 13" EAST, A DISTANCE OF 473.57 FEET; THENCE SOUTH 89° 46' 00" EAST, A DISTANCE OF 230.26 FEET, TO THE EASTERLY LINE OF SAID LOT 14; THENCE NORTH 00° 45' 30" EAST, ALONG SAID EASTERLY LINE, A DISTANCE OF 5.15 FEET; THENCE SOUTH 89° 46' 00" EAST, A DISTANCE OF 55.0 FEET; THENCE SOUTH 00° 45' 30" WEST, A DISTANCE OF 425,41 FEET, TO THE NORTHERLY RIGHT OF WAY LINE OF SAID CHAPMAN AVENUE; THENCE NORTH 89° 46' 00" WEST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, A DISTANCE OF 55.00 FEET, TO THE POINT OF BEGINNING.

PARCEL C-1:

INTENTIONALLY OMITTED.

PARCEL C-2:

INTENTIONALLY OMITTED.

#4831-1562-0370v4

**JAE 0313**

CONFIDENTIAL

SPCP_0000004616

EXECUTION

<u>LEGAL DESCRIPTION OF CHAPMAN MOB</u>

<u>2617 EAST CHAPMAN AVENUE</u>
<u>ORANGE, CALIFORNIA</u>

(A) A leasehold more particularly described as follows, as to Parcel EE:

A leasehold estate created by that certain lease of said land executed by and between the parties named herein, for the term and upon the terms, covenants and conditions therein provided:

Dated:  December 31, 1984, as amended by an Agreement dated as of April 8, 1985
Lessor:  James L. Kirby, as Trustee, et al.
Lessee:  AHM CGH, Inc., a California corporation
Term:  Expires no later than December 31, 2013
Disclosed by:  Memorandum of Lease
Recorded:  August 30, 1994 as Instrument No. <u>94-0533296.</u>  Official Records

An Assignment and Assumption of Lease dated March 3, 2005 By AHM CGH, Inc., a California Corporation, as Assignor and Integrated Healthcare Holdings, Inc., a Nevada corporation, as assignee, recorded March 8, 2005 as Instrument No. <u>05-169275.</u>  Official Records.

A Supplement to Assignment and Assumption of Lease dated March 9, 2005 by AHM CGH, Inc., a California corporation, as assignor, and Integrated Healthcare Holdings, Inc., a Nevada corporation, as assignee, recorded March 9, 2005 as Instrument No. <u>05-175927</u>, Official Records.

(B) An easement as to Parcel B-3.

PARCEL B-1:

INTENTIONALLY OMITTED.

PARCEL B-2:

PARCEL 1, IN THE CITY OF ORANGE, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP FILED IN <u>BOOK 96, PAGES 19 AND 20 OF PARCEL MAPS.</u>  IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL B-3:

NON-EXCLUSIVE EASEMENTS FOR INGRESS, EGRESS, DRIVEWAY, UTILITY AND DRAINAGE PURPOSES AS SET FORTH AND FURTHER DESCRIBED IN A DOCUMENT ENTITLED "AGREEMENT TO QUITCLAIM EXISTING EASEMENT, ESTABLISH NEW EASEMENT, AND FOR MAINTENANCE" RECORDED NOVEMBER 15, 1990 AS INSTRUMENT NO. <u>90-602723</u> OF OFFICIAL RECORDS OVER PORTIONS OF THE EASTERLY 80 FEET OF THE FOLLOWING DESCRIBED LAND:

CONFIDENTIAL                                                                    SPCP_0000004617

EXECUTION

THAT PORTION OF LOTS 14 AND 15 IN BLOCK F OF THE A.B. CHAPMAN TRACT SURVEYED BY FRANK LECOUVREUR IN 1870, AS SHOWN ON A MAP RECORDED IN BOOK 102, PAGE 15 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, AS MODIFIED BY LOT LINE ADJUSTMENT 90-2, RECORDED JUNE 25, 1990 AS INSTRUMENT NO. 90-335624 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY RIGHT OF WAY LINE OF CHAPMAN AVENUE (100 FEET WIDE), SAID POINT BEING NORTH 00° 45' 30" EAST, 50.00 FEET FROM THE SOUTHEASTERLY CORNER OF SAID LOT 14; THENCE NORTH 89° 46' 00" WEST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, A DISTANCE OF 444.74 FEET; THENCE NORTH 27° 11' 13" EAST, A DISTANCE OF 473.57 FEET; THENCE SOUTH 89° 46' 00" EAST, A DISTANCE OF 230.26 FEET, TO THE EASTERLY LINE OF SAID LOT 14; THENCE NORTH 00° 45' 30" EAST, ALONG SAID EASTERLY LINE, A DISTANCE OF 5.15 FEET; THENCE SOUTH 89° 46' 00" EAST, A DISTANCE OF 55.0 FEET; THENCE SOUTH 00° 45' 30" WEST, A DISTANCE OF 425.41 FEET, TO THE NORTHERLY RIGHT OF WAY LINE OF SAID CHAPMAN AVENUE; THENCE NORTH 89° 46' 00" WEST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, A DISTANCE OF 55.00 FEET, TO THE POINT OF BEGINNING.

PARCEL C-1:

INTENTIONALLY OMITTED.

PARCEL C-2:

INTENTIONALLY OMITTED.

#4831-1562-0370v4

**JAE 0315**

CONFIDENTIAL

SPCP_0000004618

EXECUTION

**EXHIBIT "N" TO AMENDED AND RESTATED CREDIT AGREEMENT**
**($47,277,000 MILLION FACILITY)**

**FORM OF GUARANTY AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL
SPCP_0000004619

## GUARANTY AGREEMENT
## ($80 MILLION CREDIT AGREEMENT)

This GUARANTY AGREEMENT (as the same may be amended, modified, or supplemented from time to time, the "**Guaranty**") is to be effective as of October 9, 2007 ("**Effective Date**"), by WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**") (West Coast and OC-PIN are hereinafter referred to herein as the "**Guarantors**"), in favor of MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**"), with reference to the following facts:

## RECITALS

A.     Guarantors are each a party to that certain Credit Agreement ($80 Million Facility) of even date herewith (including all annexes, exhibits and schedules thereto, and as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), and COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**Borrowers**" and individually as "**Borrower**"); PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"), West Coast, GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and OC-PIN (PCHI, West Coast, Ganesha and OC-PIN are referred to collectively in the Credit Agreement as the "**Credit Parties**"); and Lender.

B.     Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers.  Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes,**" and individually as a "**Note**").  The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents.**"

C.     West Coast owns fifty-one percent (51%) of the membership interests in PCHI. Ganesha owns forty-nine percent (49%) of the membership interests in PCHI.  IHHI owns one hundred percent (100%) of the capital Stock of WMC-SA, WMC-A, Chapman and Coastal.

1

**JAE 0317**

CONFIDENTIAL

SPCP_0000004620

D.      For the purposes set forth in the Credit Agreement, Lender is willing to make the Loans to Borrowers on the terms and conditions set forth in the Credit Agreement.  Among other conditions for making the Loans, Lender has required that the Guarantors guaranty the payment and performance of the Guaranty Obligations (defined below), including repayment of the Loans.

E.      The parties intend that these Recitals are made a part of this Guaranty.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Guaranty, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantors hereby covenant, promise and agree for the benefit of Lender as follows:

1.      <u>Definitions; Certain Matters of Construction</u>.  Unless otherwise set forth herein, (a) initially capitalized terms or matters of construction defined or established in the Credit Agreement shall be applied herein as defined or established therein, (b) any reference to a "Section" shall refer to the relevant section of this Guaranty, and (c) the following terms shall have, unless otherwise provided elsewhere in this Guaranty, the meanings set forth below:

"**Equity Interest**" means all shares of Stock, options and warrants to purchase equity securities or other forms of equity, membership interests, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"**Guaranty Obligations**" shall mean (a) the obligations to repay the Loans under the Notes, (b) the payment and performance obligations under the Credit Agreement, including repayment of the Loans and the Notes, (c) payment and performance obligations under the other Loan Documents, (d) all other indebtedness, liabilities, and obligations of all Borrowers and the Credit Parties to Lender whether now existing or hereafter arising under the Loan Documents, and (e) all indebtedness, liabilities, and Obligations of Guarantors to Lender whether now existing or hereafter arising under this Guaranty or in any of the Loan Documents.

"**Material Adverse Event**" means that any one or more of the following has occurred: (a) any representation or warranty in the Credit Agreement or in any of the other Loan Documents or in any written statement, report, financial statement or certificate made or delivered to Lender by any Borrower or by any Credit Party (including Guarantors) is untrue or incorrect in any material respect as of the date when made or deemed made; or (b) between the Effective Date and the Termination Date, any Borrower or any Credit Party (including Guarantors) commit any act or omit to take any act the result of which constitutes a fraud or intentional misrepresentation as to Lender.

"**Obligations**" means all obligations of Borrower under the Credit Agreement.

CONFIDENTIAL                                                                              SPCP_0000004621

2.     Guaranty.

2.1     Guaranty of the Obligations.

(a)     In consideration of making the Loans to Borrowers under the Credit Agreement, for all other financial accommodations to or for the benefit of Borrowers and Credit Parties, and for other valuable consideration the receipt and sufficiency of which Guarantor hereby acknowledges, Guarantors each hereby unconditionally, irrevocably and absolutely guaranty to Lender, and its respective successors, endorsees, transferees, and assigns, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Guaranty Obligations.

(b)     This Guaranty constitutes a guaranty of payment and performance when due and not of collection, and Guarantors specifically agree that it shall not be necessary or required that Lender, or any of its successors, endorsees, transferees, or assigns assert any claim or demand or enforce any remedy whatsoever against any Borrower, any other guarantor, or with respect to any collateral provided by any Borrower (collectively, "**Collateral**"), before or as a condition to the obligations of Guarantors under this Guaranty.

2.2     Absolute and Irrevocable Guaranty.  The Guaranty Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, or be deemed to be satisfied by, and Guarantors shall not be exonerated, discharged, revoked or released by, any of the following events:

(a)     Lender's exercise or enforcement of, or failure or delay in exercising or enforcing, legal proceedings to collect any of the Loans or the Guaranty Obligations or any power, right, or remedy with respect to any of the Loans, the Guaranty Obligations, or the Collateral, including without limitation:  (i) any action or inaction of Lender to perfect, protect, or enforce any lien upon any Collateral; or (ii) any change in the time, manner, or place of payment of, or in any other term of, any or all of the Loans or the Guaranty Obligations, or any other amendment to, or waiver of, any of the Notes, any other Loan Document, or any other agreement or instrument governing or evidencing any of the Loans or any of the Guaranty Obligations;

(b)     Insolvency, bankruptcy, reorganization, arrangement, adjustment, composition, assignment for the benefit of creditors, appointment of a receiver or trustee for all or any part of any Borrower's or any Guarantor's assets or of the assets of any other Guarantor of the Obligations, liquidation, winding-up, or dissolution of any Borrower or any Guarantor, or any other guarantor of the Obligations;

(c)     Any limitation, discharge, cessation, or partial satisfaction of any of the Loans, the Guaranty Obligations, or the obligations of any other guarantor of the Obligations, or any invalidity, voidability, unenforceability, in whole or in part, of the Notes, this Guaranty, any other Loan Document, or any other document evidencing the Loans or Guaranty Obligations;

(d)     Any merger, acquisition, consolidation or change in structure of any Borrower or any Guarantor or any other guarantor of the Obligations; or any sale, lease,

CONFIDENTIAL

transfer, or other disposition of any or all of the assets or Equity Interests of any Borrower or any Guarantor or any other Guarantor of the Obligations, including, without limitation, any transfer by any Borrower of all or any part of any Collateral, or termination of any Borrower's existence for any reason;

(e)     Any assignment or other transfer, in whole or in part, of Lender's interest in or rights in or under any of the Notes, or any other Loan Document, including, without limitation, this Guaranty, or with respect to any of the Loans, the Guaranty Obligations, or the Collateral;

(f)     Any claim, defense, counterclaim, or setoff that any Borrower or any Guarantor or any other Guarantor of the Obligations may have or assert, including, without limitation, any defense of incapacity, disability, or lack of corporate, organizational or other authority to execute any document relating to any of the Loans, the Guaranty Obligations, the Collateral, or this Guaranty, other than (i) upon the occurrence of the Termination Date, the defense of prior performance, or (ii) any defense based on any applicable provision of the Uniform Commercial Code requiring that Collateral be disposed of in a commercially reasonable manner;

(g)     Any purported revocation by any Guarantor;

(h)     Any cancellation, renunciation or surrender of any pledge, guaranty, or any debt instrument evidencing any of the Loans or the Guaranty Obligations;

(i)     The vote, claim, distribution, election, acceptance, action, or inaction of Lender in any bankruptcy or reorganization case related to any of the Loans, the Guaranty Obligations, or the Collateral; or

(j)     Any other action or circumstances that might otherwise constitute a defense available to, or a legal or equitable discharge of, any surety, any Guarantor or any other Guarantor, except as expressly provided herein;

it being agreed that the Guaranty Obligations shall not be discharged or revoked or released until the Termination Date.

2.3     <u>Demand by Lender</u>.  In addition to the terms set forth herein, and in no manner imposing any limitation on such terms, if any of the Obligations under any of the Notes or the Credit Agreement or the other Loan Documents are declared to be or otherwise becomes immediately due and payable due in whole or in part to the occurrence of a Material Adverse Event(s), then Guarantors, upon demand in writing therefor by Lender, shall promptly pay the Guaranty Obligations to Lender.  Payment by Guarantors shall be made to Lender to be credited and applied to the Obligations, in immediately available funds in lawful money of the United States of America to an account designated by Lender or at the address set forth in the Credit Agreement or at any other address that may be specified in writing from time to time by Lender as provided herein.  Any payment received by Lender with respect to any of the Loans or other Obligations shall reduce the Guaranty Obligations by the amount of such payment.

CONFIDENTIAL                                                              SPCP_0000004623

2.4     <u>Guarantors Waivers</u>.  In addition to any other waivers contained herein, each Guarantor waives, agrees and acknowledges as follows and waives any defense based upon or arising from the following:

(a)     The Guaranty Obligations are the immediate, direct, primary and absolute liabilities of each Guarantor, and are independent of, and not co-extensive with, any of the Loans, the other Obligations or the obligations of any other Guarantor of the Obligations. Each Guarantor expressly waives any right it may have now or in the future to direct or affect the manner or timing of Lender's enforcement of its rights or remedies.  Each Guarantor expressly waives any right he may have now or in the future to revoke this Guaranty.  Each Guarantor expressly waives any right it may have now or in the future to require Lender to, and Lender shall not have any liability to, pursue or enforce first against any Borrower, any of the properties or assets of any Borrower, the Collateral or any other security, guaranty or pledge that may now or hereafter be held by Lender for any of the Loans or for the Guaranty Obligations, or to apply such security, guaranty, or pledge to any of the Loans or to the Guaranty Obligations.  Each Guarantor shall remain liable for the Guaranty Obligations, notwithstanding any judgment Lender may obtain against any Borrower or any Guarantor, any other Guarantor of the Obligations, or any other Person or entity, or any modification, extension or renewal with respect thereto.  Lender shall not be under any liability to marshal any assets in favor of each Guarantor or in payment of any or all of the Loans or the Guaranty Obligations.

(b)     Each Guarantor has entered into this Guaranty based solely upon his/her/its independent knowledge of each Borrower's financial condition, and each Guarantor assumes full responsibility for obtaining any further information with respect to each Borrower or the conduct of each Borrower's business.  Each Guarantor represents that it is now, and during the terms of this Guaranty will be, responsible for ascertaining the financial condition of each Borrower.  Each Guarantor hereby waives any duty on the part of Lender to disclose to any Guarantor, and agrees that it is not relying upon or expecting Lender to disclose to it, any fact known or hereafter known by Lender relating to the operation or condition of any Borrower or its business or relating to the existence, liability, or financial condition of any other Guarantor of the Obligations.  Each Guarantor knowingly accepts the full range of risk encompassed in a contract of continuing guaranty, which risk includes the possibility that a Borrower may incur further indebtedness after such Borrower's financial condition or its ability to pay debts as they mature has deteriorated.

(c)     Except as specifically provided in this Guaranty or applicable law, each Guarantor waives, to the fullest extent permitted by applicable law (i) notice of the acceptance by Lender of this Guaranty, (ii) notice of the existence, creation, payment, nonpayment, performance or nonperformance of all or any of the Guaranty Obligations, (iii) presentment, demand and protest and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all of the Credit Agreement or the other Loan Documents, any of the Notes, commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Guarantors may be liable in any way, and hereby ratifies and confirms whatever Lender may do in this regard, (iv) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to

#4831-1562-0370v4                                    5

CONFIDENTIAL                                                                                    SPCP_0000004624

allowing Lender to exercise any of its remedies, (v) all rights to receive notices from Lender with respect to, or otherwise sent to, each Guarantor or any other Guarantor of the Obligations, (vi) the benefit of all valuation, appraisal, stay, extension, redemption and exemption laws, (vii) the benefit of any law purporting to reduce any Guarantor's obligation in proportion to the principal obligation hereby guarantied, (viii) the benefit of any law purporting to exonerate any Guarantor's obligation upon performance or an offer of performance of the principal obligation, (ix) notice of any extension, modification, renewal, or amendment of any of the terms of any of the Notes or the Credit Agreement or any other Loan Document relating to any of the Loans or the Guaranty Obligations, (x) notice of the occurrence of any Default or Event of Default with respect to any of the Loans, the Guaranty Obligations, the Collateral or otherwise, and (xi) notice of any exercise or non-exercise by Lender of any right, power, or remedy with respect to any of the Loans, the Guaranty Obligations or the Collateral.

(d)     If Lender, under applicable law, may proceed to realize its benefits under the Credit Agreement or any other Loan Document providing for a lien upon any Collateral, whether owned by Borrower or by any other person or entity, either by judicial foreclosure or by nonjudicial sale or enforcement, Lender, at its sole option, may determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Guaranty.

(e)     Each Guarantor represents that each of the Loans and Guaranty Obligations are and shall be incurred by the Borrowers for the permitted uses set forth in the Credit Agreement.  Each Guarantor undertakes all the risks encompassed in any of the Notes, in the Credit Agreement and the other Loan Documents as they may be now or are hereafter agreed upon by Lender and any of the Borrowers.  Prior to the date this Guaranty terminates, Lender, in such manner and upon such terms and at such time as it deems best, and with or without notice to each Guarantor, may release, add, subordinate or substitute security for the any of the Loans or other Guaranty Obligations in accordance with the Credit Agreement.

(f)     A separate action or actions may be brought and prosecuted against any Guarantor whether or not an action is brought against any Borrower, or whether any Borrower or any other Guarantor is joined in any such action or actions.

2.5     <u>Waivers Under Statutes</u>.  Each Guarantor makes the following waivers:

EACH GUARANTOR WAIVES ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY LENDER, EVEN THOUGH THAT ELECTION OF REMEDIES, SUCH AS A NONJUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR A GUARANTEED OBLIGATION, HAS DESTROYED ANY RIGHTS GRANTED TO EACH GUARANTOR PURSUANT TO NEVADA LAW.

2.6     <u>Additional Waivers</u>.

(a)     Until the Termination Date, each Guarantor waives any and all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to any Guarantor by reason of applicable state law. This means, among other things, that:

#4831-1562-0370v4                                   6

CONFIDENTIAL                                                    SPCP_0000004625

(i)      Each Guarantor waives and will be unable to raise any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(ii)      Each Guarantor waives and will be unable to raise any defense based upon any statute or rule of law which provides that a creditor may be required to pursue the principal obligor or the security for the principal obligation before seeking enforcement against a guarantor or security pledged by such guarantor;

(iii)      Each Guarantor waives and will be unable to raise any defense based upon any statute or rule of law which provides that a guarantor's obligations may be limited or exonerated by reason of the creditor's alteration of the principal obligation or of another guaranty, or by reason of the impairment or suspension of the creditor's rights or remedies against the principal, another guarantor, or any security given for the principal obligation or given for other guaranties;

(iv)      Each Guarantor waives and will be unable to claim any right to participate in, or the benefit of, any security given for the principal obligation now or hereafter held by Lender; and

(v)      Each Guarantor waives and will be unable to claim any right of subrogation and any right to enforce any remedy which Lender may have against any Borrower.

(b)      Each Guarantor waives any defense based upon any lack of authority of the officers, directors, partners, members, managers, or agents acting or purporting to act on behalf of any Borrower or any principal of any Borrower or any legal disability or defect in the formation of any Borrower.

(c)      Each Guarantor waives any defense based upon the application by any Borrower of the proceeds of any of the Loans for purposes other than the purposes represented by Borrowers to Lender or intended or understood by Lender or any Guarantor.

(d)      Each Guarantor waives the benefit of any statute of limitations affecting the liability of any Guarantor hereunder or the enforcement hereof, and each Guarantor further agrees that any act or event which tolls any statute of limitations applicable to the obligations of any Borrower shall similarly operate to toll the statute of limitations applicable to any Guarantor's liability hereunder.

(e)      Each Guarantor further waives any and all defenses which are comparable to the waivers set forth in this Guaranty which would otherwise be available to a Guarantor under Nevada or California law (whether based on a statute or decisional law) and any other defenses available to guarantors under Nevada or California law, whether based on a statute or decisional law.

2.7      <u>Benefits of Guaranty</u>.  The provisions of this Guaranty are for the benefit of Lender and its successors, transferees, endorsees, and assigns, and nothing herein shall impair any of the Loans or other Obligations, as between Borrower, Guarantors and Lender.  No such

CONFIDENTIAL                                                                         SPCP_0000004626

transfer, endorsement, or assignment shall increase or diminish any of the Guaranty Obligations hereunder.  This Guaranty binds each Guarantor, and no Guarantor may assign, transfer or endorse this Guaranty.  In the event all or any part of any of the Loans or other Obligations are transferred, endorsed or assigned by Lender to any Person or Persons, any reference to "Lender" herein shall be deemed to refer equally to such Person or Persons.

    2.8 <u>Continuing Guaranty</u>.  (a) This is a continuing guaranty, (b) this Guaranty shall remain in full force and effect until the Termination Date, and (c) the Guaranty Obligations hereunder shall extend to each and every extension or renewal, if any, of any of the Notes, the Credit Agreement or other Loan Documents regardless of whether any of the Loans or other Guaranty Obligations, in successive transactions, may be paid, repaid, advanced or renewed from time to time.

    2.9 <u>Subordination</u>.  Except for compensation and employee benefits due any Guarantor from time to time from any Borrower, and all dividends and distributions permitted pursuant to the Credit Agreement and the Pledge Agreement to be paid or issued to any Guarantor, any and all present and future debts and obligations of each Borrower to any Guarantor are hereby fully and absolutely subordinated to the right and time of payment in full of the Guaranty Obligations to Lender under each of the Note, the Credit Agreement and the other Loan Documents.  Notwithstanding the foregoing, unless an Event of Default shall have occurred, any Borrower may declare and pay dividends to its shareholders, including Guarantors, in accordance with its organizational documents and applicable law.  Any Lien, now existing or hereafter arising, on or in any of the assets of any Borrower in favor of Guarantors, whether created by contract, assignment, subrogation, reimbursement, indemnity, operation of law, principles of equity or otherwise is hereby subordinated in priority to the liens and security interests of Lender, now existing or hereafter arising.  The subordination provisions of this <u>Section 2.9</u> shall be effective regardless of whether demand has been made by Lender and shall remain in effect until the Termination Date.

    3. <u>Representations and Warranties</u>.  To induce Lender to provide the consideration to each Borrower and each Guarantor described above, each Guarantor hereby makes the following representations and warranties, and each and all of which survive the execution and delivery of this Guaranty:

    3.1 <u>Due Authorization</u>.  The execution, delivery and performance by such Guarantor of this Guaranty have been duly authorized by all necessary action of such Guarantor.

    3.2 <u>Binding Obligation</u>.  This Guaranty constitutes the legal, valid and binding obligations of such Guarantor, enforceable against such Guarantor in accordance with its terms.

    3.3 <u>No Conflicts</u>.  To the best of such Guarantor's knowledge, the execution, delivery, and performance by such Guarantor of this Guaranty does not contravene any law or any contractual restriction binding on or affecting such Guarantor, and does not result in or require the creation of any Lien upon or with respect to any of its properties.

CONFIDENTIAL                       SPCP_0000004627

3.4     Consents.  No authorization or approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by such Guarantor of this Guaranty.

3.5     Address and Location of Records.  The address of such Guarantor's principal place of business is accurately set forth on the signature page to this Guaranty.

3.6     No Setoff, Defense, or Counterclaim.  As of the date of this Guaranty, the Guaranty Obligations are not subject to any setoff or defense of any kind against Lender or any Borrower, and such Guarantor specifically waives its right to assert any such defense or right of setoff.  The Guaranty Obligations shall not be subject to any counterclaims, setoffs, or defenses against Lender or any Borrower that may arise in the future, except for (a) any defense of prior performance or payment, or (b) any defense based on any applicable provision of the Uniform Commercial Code requiring that Collateral be disposed of in a commercially reasonable manner, which any Borrower, Guarantors, or other guarantor of the Obligations may have or assert.

4.     Covenants.  Each Guarantor covenants and agrees that until the Termination Date, each Guarantor shall give prompt written notice to Lender (in any event not later than 10 days prior to any change described below) of (a) any change in the location of such Guarantor's principal place of business, (b) any change in the location of books and records pertaining to its business, (c) any change in its name, identity, or structure in any manner which might make any financing statement filed in connection with the Loan Documents incorrect or misleading.

5.     Further Assurances.  Each Guarantor agrees that, at its expense, upon the written request of Lender, it will promptly execute and deliver to Lender any additional instruments or documents reasonably considered necessary by Lender to cause this Guaranty to be, become, or remain valid and effective in accordance with its terms.  Each Guarantor will provide Lender in writing such financial and other information with respect to its assets and liabilities as Lender shall request, in form reasonably satisfactory to Lender.

6.     Reinstatement.  This Guaranty shall remain in full force and effect and continue to be effective, as the case may be, if at any time payment or performance of any of the Loans or the Guaranty Obligations, or any part thereof, pursuant to applicable law, is avoided, rescinded, or reduced in amount, or must otherwise be restored or returned by Lender, or any other obligee of any of the Loans or the Guaranty Obligations, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is avoided, rescinded, reduced, restored or returned, each of the Loans or the Guaranty Obligations, as the case may be, shall be reinstated and deemed reduced only by such amount paid and not so avoided, rescinded, reduced, restored or returned.

7.     Defaults and Remedies.  Upon the occurrence and during the continuance of an Event of Default under any of the Notes or the Credit Agreement or other Loan Documents, Lender may declare any or all of the Guaranty Obligations, immediately and without demand, notice or legal process of any kind, to be, and such Guaranty Obligations shall immediately become, due and payable, and then, or at any subsequent time, Lender may exercise any or all of

**JAE 0325**

its rights and remedies under this Guaranty, any of the Notes, the Credit Agreement, and any other Loan Documents, including the exercise of any rights and remedies of Lender as a secured party against the Collateral, and under applicable law, and in addition may make demand upon Guarantor for the payment of the Guaranty Obligations.  All Guaranty Obligations shall bear interest at the Default Rate from and after the date an Event of Default occurs under any of the Notes.

       8.    <u>Application of Payments</u>.  Any payment made by any Guarantor under this Guaranty shall be applied by Lender as set forth in the Credit Agreement.

       9.    <u>Indemnification</u>.  Each Guarantor agrees to and shall indemnify and hold Lender, and its officers, directors, employees, agents, attorneys and representatives harmless from and against any liabilities, claims and damages, including, without limitation, reasonable costs, attorneys' fees, disbursements and other expenses incurred or arising by reason of the taking or the failure to take action by Lender, in good faith, in respect of any transaction effected under this Guaranty, including, without limitation, any action to enforce payment of the Guaranty Obligations.  The liabilities of each Guarantor under this <u>Section 9</u> shall survive the termination of this Guaranty.

      10.    <u>Notices</u>.  All notices and other communications required or desired to be served, given or delivered hereunder shall be in writing and shall be served, given or delivered as provided in the Credit Agreement.

      11.    <u>Entire Agreement</u>.  This Guaranty, together with the Credit Agreement, each of the Notes, and the other Loan Documents constitutes the entire agreement, and supersedes all prior and contemporaneous oral and written communications and agreements, between the parties with respect to the subject matter hereof

      12.    <u>Limitation of Liability</u>.  Neither Lender nor any of its officers, directors, employees, agents, or counsel, shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own respective gross negligence or willful misconduct.

      13.    <u>Advice of Counsel</u>.  Each Guarantor represents and warrants that it has either obtained the advice of counsel or has had the opportunity to obtain such advice in connection with the terms and provisions of this Guaranty.

      14.    <u>Amendments</u>.  No amendment or waiver of any provisions of this Guaranty, or consent to any departure by any Guarantor therefrom, shall be effective in any event unless the same shall be in writing and signed by Lender and all Guarantors and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

      15.    <u>Consent to Loan Documents</u>.  Each Guarantor hereby acknowledges it has received copies of, and consents to, the Credit Agreement, each of the Notes, and all other Loan Documents.

CONFIDENTIAL          SPCP_0000004629

16.   <u>No Waiver</u>.  No failure on the part of Lender to exercise, and no delay in exercising, any right under the Credit Agreement of any other Loan Document shall operate as a waiver thereof; and no single or partial exercise of any right under the Credit Agreement or any other Loan Document shall preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Credit Agreement and other Loan Documents are cumulative and not exclusive of any remedies provided by law.

17.   <u>Binding Effect</u>.  This Guaranty shall be binding upon and inure to respective benefits of Lender and all Guarantors and their respective successors and assigns, except that no Guarantor shall have the right to assign its rights hereunder or any interest herein without Lender's prior written consent.

18.   <u>Severability</u>.  In the event that any one or more of the provisions contained in the Credit Agreement of any other Loan Documents shall be determined to be invalid, illegal, or unenforceable in any respect for any reason, the validity, legality, and enforceability of any such provision or provisions in every other respect, and the remaining provisions of the Credit Agreement and other Loan Documents shall not be in any way impaired.

19.   <u>Governing Law</u>.  IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, OF THIS GUARANTY AND OF THE CREDIT AGREEMENT, EACH OF THE NOTES AND THE OTHER LOAN DOCUMENTS AND THE GUARANTY OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  EACH GUARANTOR, BY ITS ACCEPTANCE OF THIS GUARANTY, HEREBY CONSENT AND AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE STATE OF NEVADA, CLARK COUNTY, CITY OF LAS VEGAS, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY GUARANTOR AND LENDER PERTAINING TO THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, THAT EACH GUARANTOR ACKNOWLEDGES THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF CLARK COUNTY, NEVADA; PROVIDED FURTHER, THAT NOTHING IN THIS GUARANTY SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.  EACH GUARANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH GUARANTOR HEREBY WAIVES ANY OBJECTION THAT ANY GUARANTOR OR LENDER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENT TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

CONFIDENTIAL                                                                                         SPCP_0000004630

20.      <u>Waiver of Trial By Jury</u>.  Each Guarantor each hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Guaranty, any other Loan Document, or any of the transactions contemplated thereby.

21.      <u>Counterparts</u>.  This Guaranty may be executed in any number of identical counterparts, which shall constitute an original and collectively and separately constitute a single instrument or agreement.

<u>[NO FURTHER TEXT ON THIS PAGE]</u>

CONFIDENTIAL                                                                                                 SPCP_0000004631

IN WITNESS WHEREOF, each Guarantor has executed and delivered this Guaranty Agreement ($80 Million Credit Agreement) to and for the benefit of Lender as of the Effective Date first above written.

<u>GUARANTORS</u>:

WEST COAST HOLDINGS, LLC, a
California limited liability company,


By:  _____
Name:  _____
Title:  _____



2621 South Bristol, Suite 304
Santa Ana, California 92704
Attn:  _____
Ph:  714-290-5322
Fax:  714-297-9588



ORANGE COUNTY PHYSICIANS
INVESTMENT NETWORK, LLC, a
Nevada-limited liability company


By:  _____
Name:  _____
Title:  _____



2621 South Bristol, Suite 304
Santa Ana, California 92704
Attn:  _____
Ph:  714-290-5322
Fax:  714-297-9588

CONFIDENTIAL                                         SPCP_0000004632

**<u>EXHIBIT "O" TO AMENDED AND RESTATED CREDIT AGREEMENT</u>**
**<u>($47,277,000 MILLION FACILITY)</u>**

**FORM OF INTERCREDITOR AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004633

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (**"Agreement"**), dated to be effective as of October 9, 2007 (**"Effective Date"**), **is** by and among MEDICAL PROVIDER FINANCIAL CORPORATION I, a Nevada corporation (**"MPFC I"**)**;** MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation (**"MPFC II"**)**;** and MEDICAL PROVIDER FINANCIAL CORPORATION III, a Nevada corporation (**"MPFC III"**)

## RECITALS

A.      INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation (**"IHHI"**), WMC-SA, INC., a California corporation (**"WMC-SA"**), WMC-A, INC., a California corporation (**"WMC-A"**), CHAPMAN MEDICAL CENTER, INC., a California corporation (**"Chapman"**), COASTAL COMMUNITIES HOSPITAL, INC., a California corporation (**"Coastal"**) (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**$80 Million Borrowers**" and individually as an "**$80 Million Borrower**") are indebted to MPFC II (as "**$80 Million Lender**"), which indebtedness is secured by a continuing first and senior Lien on substantially all of the property of the $80 Million Borrowers including the Collateral (collectively, the "**$80 Million Collateral**") described in that certain Credit Agreement ($80 Million Facility) dated to be effective as of October 9, 2007 (the "**$80 Million Credit Agreement**"), by and among the $80 Million Borrowers described therein, the Credit Parties named therein (**"$80 Million Credit Parties"**) and the $80 Million Lender; and pursuant to a certain Security Agreement (Loans) dated as of the date hereof (the "**$80 Million Security Agreement ("Loans")**" by and among $80 Million Borrowers and the $80 Million Lender; and pursuant to a certain Deposit Account Security Agreement (Loans) dated as of the date hereof (the "**$80 Million Deposit Account Security Agreement (Loans)"**).  Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the $80 Million Credit Agreement.

B.      INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation (**"IHHI"**), WMC-SA, INC., a California corporation (**"WMC-SA"**), WMC-A, INC., a California corporation (**"WMC-A"**), CHAPMAN MEDICAL CENTER, INC., a California corporation (**"Chapman"**), COASTAL COMMUNITIES HOSPITAL, INC., a California corporation (**"Coastal"**) (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as "**$10.7 Million Borrowers**" and individually as an "**$10.7 Million Borrower**") are indebted to MPFC III (as "**$10.7 Million Lender**"), which indebtedness is secured by a continuing second Lien on substantially all of the property of the $10.7 Million Borrowers including the Collateral (collectively, the "**$10.7 Million Collateral**") described in that certain Credit Agreement ($10.7 Million Facility) dated to be effective as of October 9, 2007 (the "**$10.7 Million Credit Agreement**"), by and among the $10.7 Million Borrowers described therein, the Credit Parties named therein (**"$10.7 Million Credit Parties"**) and the $10.7 Million Lender; and pursuant to a certain Security Agreement (Loans) dated as of the date hereof (the "**$10.7 Million Security Agreement ("Loans")**" by and among $10.7 Million Borrowers and the $10.7 Million Lender; and pursuant to a certain Deposit Account Security Agreement (Loans) dated as of the date hereof (the "**$10.7 Million Deposit Account Security Agreement (Loans)"**).  Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the $10.7 Million Credit Agreement.

#4831-1562-0370v4

**JAE 0331**

SPCP_0000004634

C.       INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation (**"IHHI"**), WMC-SA, INC., a California corporation (**"WMC-SA"**), WMC-A, INC., a California corporation (**"WMC-A"**), CHAPMAN MEDICAL CENTER, INC., a California corporation (**"Chapman"**), COASTAL COMMUNITIES HOSPITAL, INC., a California corporation (**"Coastal"**) (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to herein as **"$50 Million Borrowers"** and individually as an **"$50 Million Borrower"**) are indebted to MPFC I (as "$50 **Million Lender"**), which indebtedness is secured by a continuing third Lien on substantially all of the property of the $50 Million Borrowers including the Collateral (collectively, the **"$50 Million Collateral"**) described in that certain Credit Agreement ($50 Million Facility) dated to be effective as of October 9, 2007 (the **"$50 Million Credit Agreement"**), by and among the $50 Million Borrowers described therein, the Credit Parties named therein (**"$50 Million Credit Parties"**) and the $50 Million Lender; and pursuant to a certain Security Agreement (Loans) dated as of the date hereof (the **"$50 Million Security Agreement ("Loans")**" by and among $50 Million Borrowers and the $50 Million Lender; and pursuant to a certain Deposit Account Security Agreement (Loans) dated as of the date hereof (the **"$50 Million Deposit Account Security Agreement (Loans)"**).  Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the $50 Million Credit Agreement.

D.       The parties hereto are executing this Agreement, among other things, to establish their respective Lien priorities with respect to the Senior Lender Collateral.

## <u>AGREEMENT:</u>

NOW, THEREFORE, in consideration of the Recitals and for other good and valuable consideration, the sufficiency of which is acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.       <u>Definitions.  The following initially capitalized terms shall have the meanings as set forth below:</u>

(i)       **"Party"** means, individually, either the $80 Million Lender or the $10.7 Million Lender or the $50 Million Lender, and **"Parties"** means, collectively, the $80 Million Lender and the $10.7 Million Lender and the $50 Million Lender.

(ii)       **"$80 Million Lender Obligations"** means obligations of the $80 Million Borrowers to the $80 Million Lender pursuant to the $80 Million Credit Agreement secured by the $80 Million Collateral.

(iii)       **"$10.7 Million Lender Obligations"** means obligations of the $10.7 Million Borrowers to the $10.7 Million Lender pursuant to the $10.7 Million Credit Agreement secured by the $10.7 Million Collateral.

(iv)       **"$50 Million Lender Obligations"** means obligations of the $50 Million Borrowers to the $50 Million Lender pursuant to the $50 Million Credit Agreement secured by the $50 Million Collateral.

2.      Priority.  Notwithstanding the terms or provisions of any agreement or arrangement which the $80 Million Lender or the $10.7 Million Lender or the $50 Million Lender may now or hereafter have their respective Borrowers or any rule of law and irrespective of (a) the time, order or method of attachment or perfection of any security interest or the recordation or other filing in any public record of any financing statement, or (b) the giving or failure to give notice of the acquisition of expected acquisition of purchase money security interests:

(i)      The $80 Million Lender Obligations and all security interests in the $80 Million Lender Collateral granted to the $80 Million Lender by the $80 Million Borrowers, whether or not perfected, or all other right, title and interest in the $80 Million Collateral now or hereafter granted to or held by the $80 Million Lender, is and shall remain senior to the $10.7 Million Lender Obligations and to the $50 Million Lender Obligations, and to any security interest therein now or hereafter granted by the $10.7 Million Borrowers to the $10.7 Million Lender pursuant to the $ 10.7 Million Credit Agreement or by the $50 Million Borrowers to the $50 Million Lenders pursuant to the $50 Million Credit Agreement; and

(ii)     The $10.7 Million Lender Obligations and all security interests in the $10.7 Million Lender Collateral granted to the $10.7 Million Lender by the $10.7 Million Borrowers, whether or not perfected, or all other right, title and interest in the $10.7 Million Collateral now or hereafter granted to or held by the $10.7 Million Lender, is and shall remain senior to the $50 Million Lender Obligations, and to any security interest therein now or hereafter granted by the $50 Million Borrowers to the $50 Million Lenders pursuant to the $50 Million Credit Agreement.

3.      Enforcement of Security Interest.

(i)      Without the prior consent of the $80 Million Lender, neither the $10.7 Lender nor the $50 Million Lender shall have no right to take any action with respect to the $80 Million Lender Collateral, whether by judicial or non-judicial foreclosure, the seeking of the appointment of a receiver for any portion of their respective Borrower's assets, setoff, or otherwise, unless and until all $80 Million Lender Obligations have been fully and indefeasibly paid.

(ii)     Without the prior consent of the $10.7 Million Lender, the $50 Million Lender shall have no right to take any action with respect to the $10.7 Million Lender Collateral, whether by judicial or non-judicial foreclosure, the seeking of the appointment of a receiver for any portion of their respective Borrower's assets, setoff, or otherwise, unless and until all $10.7 Million Lender Obligations have been fully and indefeasibly paid.

(iii)    If, without the prior consent of the $80 Million Lender, either the $10.7 Million Lender or the $50 Million Lender, in contravention of the terms of this Agreement, shall commence, prosecute or participate in any suit, action or proceeding against the $80 Million Borrowers or initiate any foreclosure sale or proceeding or any other action to enforce its liens on any of the $80 Million Collateral, then the $80 Million Borrowers may interpose as a defense or plea the making of this Agreement, and the $80 Million Lender may intervene and interpose such defense or plea in its name or in the name of $80 Million

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004636

Borrowers.  If, without the prior consent of $80 Million Lender, either the $10.7 Million Lender or the $50 Million Lender, in contravention of the terms of this Agreement, shall attempt to enforce any remedies prohibited by this Agreement, then the $80 Million Lender or the $80 Million Borrowers may, by virtue of this Agreement, restrain the enforcement thereof in the name of the $80 Million Lender or in the name of $80 Million Borrowers.

(iv)   If, without the prior consent of the $10.7 Million Lender, the $50 Million Lender, in contravention of the terms of this Agreement, shall commence, prosecute or participate in any suit, action or proceeding against the $10.7 Million Borrowers or initiate any foreclosure sale or proceeding or any other action to enforce its liens on any of the $10.7 Million Collateral, then the $10.7 Million Borrowers may interpose as a defense or plea the making of this Agreement, and the $10.7 Million Lender may intervene and interpose such defense or plea in its name or in the name of $10.7 Million Borrowers.  If, without the prior consent of $10.7 Million Lender, the $50 Million Lender, in contravention of the terms of this Agreement, shall attempt to enforce any remedies prohibited by this Agreement, then the $10.7 Million Lender or the $10.7 Million Borrowers may, by virtue of this Agreement, restrain the enforcement thereof in the name of the $10.7 Million Lender or in the name of $10.7 Million Borrowers.

(v)   If $80 Million Lender shall, pursuant to the rights granted to such $80 Million Lender under the terms of this Agreement or applicable law, dispose of any or all of the $80 Million Collateral after the occurrence of an Event of Default (as defined in the $80 Million Credit Agreement), such disposition shall be deemed commercially reasonable.

(vi)   If $10.7 Million Lender shall, pursuant to the rights granted to such $10.7 Million Lender under the terms of this Agreement or applicable law, dispose of any or all of the $10.7 Million Collateral after the occurrence of an Event of Default (as defined in the $10.7 Million Credit Agreement), such disposition shall be deemed commercially reasonable.

4.   <u>Covenants and Warranties of the $10.7 Million Lender</u>.  The $10.7 Million Lender covenants and warrants as follows:

(i)   It is the owner of the $10.7 Million Lender Obligations, free and clear of the Liens of any other entity, subject only to Permitted Encumbrances;

(ii)   It has not heretofore subordinated the $10.7 Million Lender Obligations, nor the Lien securing same, to any entity;

(iii)   It will not, at any time while this Agreement is in effect, sell, transfer, pledge, assign, hypothecate or otherwise dispose of any or all of the $10.7 Million Lender Obligations to any entity other than one which agrees in a writing, satisfactory in form and substance to the $80 Million Lender, to become a Party hereto and to succeed to the rights and to be bound by all of the obligations of the $10.7 Million Lender hereunder;

(iv)   It will, at the request of $80 Million Lender, release any Lien it has on the $80 Million Collateral to facilitate its transfer or sale so long as the proceeds thereof are applied against the $80 Million Lender Obligations and any excess is paid to the $10.7 Million Lender to be applied against the $10.7 Million Lender Obligations; and

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004637

(v)     Waives any rights it may have to claim that the enforceability of this Agreement may be affected by any subsequent modification, release, extension, or other change, material or otherwise, in the $80 Million Lender Obligations or the $80 Million Collateral.

5.      <u>Covenants and Warranties of the $50 Million Lender</u>.  The $50 Million Lender covenants and warrants as follows:

(i)     It is the owner of the $50 Million Lender Obligations, free and clear of the Liens of any other entity, subject only to Permitted Encumbrances;

(ii)    It has not heretofore subordinated the $50 Million Lender Obligations, nor the Lien securing same, to any entity;

(iii)   It will not, at any time while this Agreement is in effect, sell, transfer, pledge, assign, hypothecate or otherwise dispose of any or all of the $50 Million Lender Obligations to any entity other than one which agrees in a writing, satisfactory in form and substance to the $80 Million Lender and to the $10.7 Million Lender, to become a Party hereto and to succeed to the rights and to be bound by all of the obligations of the $50 Million Lender hereunder;

(iv)    It will, at the request of $80 Million Lender and/or the $10.7 Million Lender, release any Lien it has on the $80 Million Collateral and/or $10.7 Million Collateral to facilitate its transfer or sale so long as the proceeds thereof are applied against the $80 Million Lender Obligations and then to the $10.7 Million Lender Obligations, and any excess is paid to the $50 Million Lender to be applied against the $50 Million Lender Obligations; and

(v)     Waives any rights it may have to claim that the enforceability of this Agreement may be affected by any subsequent modification, release, extension, or other change, material or otherwise, in the $80 Million Lender Obligations or the $80 Million Collateral or in the $10.7 Million Lender Obligations or the $10.7 Million Collateral.

6.      <u>Covenants and Warranties of the $80 Million Lender</u>.  The $80 Million Lender covenants and warrants as follows:

(i)     It is the owner of the $80 Million Lender Obligations, free and clear of the Liens of any other entity, subject only to the Permitted Encumbrances;

(ii)    It will not, at any time while this Agreement is in effect, sell, transfer, pledge, assign, hypothecate or otherwise dispose of any or all of the $80 Million Lender Obligations to any entity other than one which agrees in a writing, satisfactory in form and substance to the $80 <u>Milli</u>on Lender, to become a Party hereto and to succeed to the rights and to be bound by all of the obligations of the $80 Million Lender hereunder; and

(iii)   It waives any rights it may have to claim that the enforceability of this Agreement may be affected by any subsequent modification, release, extension, or other change, material or otherwise, in the $10.7 Million Lender Obligations or the $10.7 Million Collateral or in the $50 Million Lender Obligations or the $50 Million Collateral..

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004638

7.    Remedy for Breach.  The Parties acknowledge that the any breach hereof is likely to cause irreparable damage to the aggrieved Party.  Therefore, the relief to which such Party shall be entitled in such event shall include, but not be limited to, a mandatory injunction for specific performance, judicial relief to prevent a violation of any of the provisions of this Agreement, damages and any other relief to which it may be entitled at law or in equity.

8.    Effect of Bankruptcy.

(i)    This Agreement shall remain in full force and effect notwithstanding the filing of a petition for relief by or against any Borrower under the Bankruptcy Code of the United States (the "**Bankruptcy Code**").

(ii)    If any $80 Million Borrower shall become subject to a proceeding under the Bankruptcy Code and if the $80 Million Lender shall permit the use of cash collateral or to provide financing to any $80 Million Borrower under either Section 363 or Section 364 of the Bankruptcy Code:

(i)    Adequate notice to the $ 10.7 Million Lender and to the $50 Million Lender shall have been provided for such financing if the $10.7 Million Lender and/or the $50 Million Lender receives notice one (1) business day prior to the entry of the order approving such financing;

(ii)    No objection will be raised by $10.7 Million Lender and/or by the $50 Million Lender to any such financing on the ground of a failure to provide adequate protection for the $10.7 Million Lender's security interest in the $80 Million Collateral and/or the $50 Million Lender 's security interest in the $80 Million Collateral; and

(iii)    Notice of a proposed financing or use of cash collateral shall be deemed given upon the giving of notice by telecopy or hand-delivery to the $10.7 Million Lender and the $50 Million Lender, at the address then reflected in the records of $80 Million Lender.

9.    No Duty To Provide Financial Accommodations.  Nothing contained herein, or in any prior agreement or understanding shall be deemed to create any duty on the part of the $80 Million Lender to extend or continue to extend financial accommodations to any $80 Million Borrower.

10.    Waiver of Marshaling.  The $10.7 Million Lender and the $50 Million Lender each irrevocably waive any right to compel the $80 Million Lender to marshal assets of any $80 Million Borrower; and the $50 Million Lender irrevocably waives any right to compel the $10.7 Million Lender to marshal assets of any $10.7 Million Borrower.

11.    Mutual Waiver of Rights.  All Parties waive, to the full extent permitted by law, all rights under the applicable Uniform Commercial Code §§9-501 et. seq., including rights to notice, rights to surplus funds and rights relating to the commercially reasonable disposition of collateral.

12.    UCC Notices.  In the event that any Party shall be required by the applicable Uniform Commercial Code or any other applicable law to give any notice to the other Party,

#4831-1562-0370v4

**JAE 0336**

such notice shall be given in accordance with Section 17 hereof and five (5) calendar days' notice shall be conclusively deemed to be commercially reasonable.

13.    Perfection of Possessory Security Interests and Security Interests in Deposit Accounts.

(i)    For the limited purpose of perfecting the security interests of the Parties in those types or items of collateral in which a security interest may be perfected by possession, each Party hereby appoints the other as its agent for the limited purpose of possessing on its behalf any such collateral that may come into the possession of such other Party from time to time, and each Party agrees to act as the other's agent for such limited purpose of perfecting the other's security interest by possession through an agent, provided that neither Party shall incur a liability to the other Party by virtue of acting as the other's agent hereunder, and either Party may relinquish possession of collateral in its possession without the consent the other Party, and without incurring liability to the other Party, unless there is an express written agreement to the contrary in effect between the Parties.

(ii)    Reference is hereby made to the $80 Million Deposit Account Security Agreement, which granted to the $80 Million Lender a Lien in the Deposit Accounts owned by the $80 Million Borrowers.  Under said $80 Million Deposit Account Security Agreement (Accounts), $80 Million Lender will be acting for itself as a secured party for purposes of perfecting the $80 Million Lender's Lien in the Deposit Accounts.  The $80 Million Lender, the $10.7 Million Lender and the $50 Million Lender each agree that the procedures for the flow of the Proceeds of the funds in the Deposit Accounts is acceptable to both all Parties.

14.    Benefits of This Agreement.  This Agreement is solely for the benefit of and shall bind the Parties and their respective successors and assigns and no other entity shall have any right, benefit, priority, or interest hereunder.

15.    Modification.  Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement.  Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

16.    Term.  This Agreement shall continue so long as $80 Million Lender, $10.7 Million Lender and/or the $50 Million Lender have a Lien in the $80 Million Collateral.

17.    Enforcement.  In the event that any Party retains counsel to enforce its rights hereunder, the prevailing Party shall recover its attorneys' fees and expenses.

18.    Notices.  Except as expressly otherwise provided herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or telex or electronic transmission), and shall be deemed to have been duly given or made (i) when delivered by hand (e.g., messenger, personal service, etc.), or (ii) on the date received when delivered by courier service (e.g., Federal Express, DHL, or similar entities), or (iii) three (3) Business Days after being deposited in the mail, postage prepaid, or (iv) in the case of telecopy notice, when acknowledged as received, or (v) in the case of electronic transmission,

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004640

on the date delivered if the transmission was received by the addressee by 5:00 p.m. local time on a Business Day, or if received by the addressee after 5:00 p.m. on a Business Day or if received by the addressee on a day which is not a Business Day, on the next Business Day, in each case addressed as follows, or to such other address as may be hereafter notified by the respective parties hereto:

If to $80 Million Lender:

Medical Provider Financial Corporation II
3770 Howard Hughes Parkway, Suite 301
Las Vegas, Nevada 89109
Attn:  Adam Field, Sr. Vice President Development
Telephone:  800-818-1102
Facsimile:  702-735-3739
Email:  adamf@medicalcapital.com

If to $10.7 Million Lender:

Medical Provider Financial Corporation III
3770 Howard Hughes Parkway, Suite 301
Las Vegas, Nevada 89109
Attn:  Joseph J. Lampariello, President and COO
Telephone:  800-818-1102
Facsimile:  702-735-3739
Email:  adamf@medicalcapital.com

If to $50 Million Lender:

Medical Provider Financial Corporation I
3770 Howard Hughes Parkway, Suite 301
Las Vegas, Nevada 89109
Attn:  Joseph J. Lampariello, President and COO
Telephone:  800-818-1102
Facsimile:  702-735-3739
Email:  adamf@medicalcapital.com

In each case, with a copy to:

Medical Capital Corporation
2100 South State College Blvd.
Anaheim, California 92806
Attn:  Joseph J. Lampariello, President and COO
Telephone:  714-935-3100
Facsimile:  714-935-3114
Email:  joeyl@medicalcapital.com

   19.    Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which $80 Million Lender may have,

#4831-1562-0370v4

CONFIDENTIAL                                                                                    SPCP_0000004641

nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by $80 Million Lender of any breach or default by either the $10.7 Million Lender or the $50 Million Lender hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to the $80 Million Lender hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy.  The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which the $80 Million Lender would otherwise have.  Any waiver, permit, consent or approval by the $80 Million Lender of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

20.    Choice of Law.  This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Nevada.

21.    Construction.  This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each Party and its respective attorneys.

22.    Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument.  Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any Party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other Party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other Party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Intercreditor Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**$80 MILLION LENDER:**

MEDICAL PROVIDER FINANCIAL CORPORATION
II, a Nevada corporation,

By:  _____
Joseph J. Lampariello, President and COO

#4831-1562-0370v4

**JAE 0339**

CONFIDENTIAL                                                                                                    SPCP_0000004642

**$10.7 MILLION LENDER:**

MEDICAL PROVIDER FINANCIAL CORPORATION
III, a Nevada corporation,
By: _____
Joseph J. Lampariello, President and COO

**$50 MILLION LENDER:**

MEDICAL PROVIDER FINANCIAL CORPORATION I, a Nevada corporation,

By: _____
Joseph J. Lampariello, President and COO

[SIGNATURE PAGE CONTINUES]

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004643

## ACCEPTED AND AGREED:

The undersigned consent and agree to the foregoing, and agree not to take any action or to omit taking any action which would cause a breach of the foregoing Agreement.

BORROWERS:

INTEGRATED HEALTHCARE
HOLDINGS, INC., a Nevada corporation,


By: _____
Larry B. Anderson, President


WMC-SA, INC., a California corporation,


By: _____
Larry B. Anderson, President


WMC-A, INC., a California corporation,


By: _____
Larry B. Anderson, President


COASTAL COMMUNITIES
HOSPITAL, INC., a California corporation,


By: _____
Larry B. Anderson, President


CHAPMAN MEDICAL CENTER, INC.,
a California corporation,


By: _____
Larry B. Anderson, President


#4831-1562-0370v4

**JAE 0341**

**EXHIBIT "P" TO AMENDED AND RESTATED CREDIT AGREEMENT
($47,277,000 MILLION FACILITY)**

**FORM OF PLEDGE AGREEMENT**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004645

**EXECUTION**

## PLEDGE AGREEMENT
### ($80 MILLION CREDIT AGREEMENT)

THIS PLEDGE AGREEMENT (the "**Pledge Agreement**") dated to be effective as of October 9, 2007 ("**Effective Date**") and is made by and among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") in favor of MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Lender**"). IHHI, West Coast and Ganesha are hereinafter referred to individually as a "**Pledgor**" and collectively as "**Pledgors.**"

### RECITALS:

IHHI, West Coast, Ganesha and Lender are parties to that certain Credit Agreement ($80 Million Facility) of even date herewith ("**Credit Agreement**") by and among IHHI, WMC-SA, INC., a California corporation ("**WMC-SA**"), WMC-A, INC., a California corporation ("**WMC-A**"), CHAPMAN MEDICAL CENTER, INC., a California corporation ("**Chapman**"), COASTAL COMMUNITIES HOSPITAL, INC., a California corporation ("**Coastal**") (IHHI, WMC-SA, WMC-A, Chapman and Coastal are sometimes collectively referred to in the Credit Agreement as "**Borrowers**" and individually as a "**Borrower**"), PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**PCHI**"), ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC, a Nevada limited liability company ("**OC-PIN**"), West Coast, Ganesha, (PCHI, West Coast, Ganesha and OC-PIN are referred to in the Credit Agreement as the "**Credit Parties**"), and Lender. Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

Pursuant to the Credit Agreement, Lender agreed to make (i) a $45,000,000 term loan ("**$45,000,000 Term Loan**") and (ii) a $35,000,000 non-revolving line of credit loan ("**$35,000,000 Non-Revolving Line of Credit Loan**") (each as amended, restated, supplemented or otherwise modified from time to time, the "**Loans**") to the Borrowers named in the Credit Agreement. Repayment of the Loans is evidenced by (1) that certain $45,000,000 Term Note of even date herewith ("**$45,000,00 Term Note**") and (2) that certain $35,000,000 Non-Revolving Line of Credit Note of even date herewith ("**$35,000,000 Non-Revolving Line of Credit** "**Note**") (the $45,000,000 Term Note and $35,000,000 Non-Revolving Line of Credit Note, each as amended, restated, supplemented or otherwise modified from time to time, are sometimes referred to collectively herein as the "**Notes,**" and individually as a "**Note**"). The Credit Agreement, the Notes and all other agreements, documents, and instruments evidencing and/or securing the payment or performance of the Obligations (as defined in the Credit Agreement), including all Loan Documents as defined in the Credit Agreement are hereinafter collectively sometimes referred to as the "**Loan Documents.**"

IHHI owns all (100%) of the Stock of WMC-SA, WMC-A, Coastal and Chapman; West Coast owns fifty-one percent (51%) of the membership interests in PCHI; and Ganesha own forty-nine (49%) of the membership interests in PCHI (collectively, the above stock and membership interests are the "**Pledged Interests**").

#4831-1562-0370v4

2

CONFIDENTIAL

SPCP_0000004646

Among other conditions for making the Loans pursuant to the Credit Agreement,:  Lender has required that the payment and performance of the Obligations (defined in the Credit Agreement) shall be secured by a Lien on substantially all of the assets of the Borrowers and that Pledgors pledge the Pledged Interests to Lender to secure payment and performance of the Obligations.

The parties intend that these Recitals are made a part of this Pledge Agreement.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing and of any financial accommodations or extensions of credit (including, without limitation, any loan or advance by renewal, refinancing or extension of the Loan Documents) heretofore, now or hereafter made to or for the benefit of the Borrowers pursuant to the Credit Agreement or any other agreement, instrument or document executed pursuant to or in connection therewith, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgors and Lender hereby agree as follows:

SECTION 1.   Definitions.

(a)      "**Articles of Incorporation**" means the articles or certificates of incorporation, as applicable, of WMC-SA, WMC-A, Coastal and Chapman, respectively, as amended from time to time.

(b)      "**Articles of Organization**" means the articles of organization of PCHI and West Coast, respectively, as amended from time to time.

(c)      "**Bylaws**" means the duly adopted bylaws of WMC-SA, WMC-A, Coastal and Chapman, respectively, as amended from time to time.

(d)      "**Operating Agreement**" means the duly adopted operating agreement of PCHI and West Coast, respectively, as amended from time to time.

(e)      "**Equity Interests**" means all of the Pledged Interests owned or controlled by Pledgors, including but not limited to all of Pledgor's capital stock, options and warrants to purchase equity securities or other forms of equity, membership interests, general or limited partnership interests or other equivalents (regardless of how designated) of or in WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast including common stock, preferred stock, membership interests or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act) in WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast.

(f)      "**Lien**" means any mortgage, security deed or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and

CONFIDENTIAL                                                                                    SPCP_0000004647

**EXECUTION**

the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

SECTION 2.   Security Interest; Creation of Pledge.

(a)      As security for the payment and performance of the Obligations, each Pledgor hereby pledges, grants and assigns to the Lender, and creates in the Lender a security interest in and Lien on, all of its respective rights, title and interests in, to and under the Pledged Interests owned by it, whether now existing or hereafter acquired or arising, including, without limitation, (i) all of each Pledgor's interest in the capital stock and/or membership interests of WMC-SA, WMC-A, Coastal, Chapman, PCHI, West Coast and Ganesha, including all of each Pledgor's interest in all profits and distributions in or from such Pledged Interests; (ii) all other payments, if any, due or to become due to each of the Pledgors in respect of its respective Pledged Interests pursuant to the Articles of Incorporation, the Articles of Organization, the Bylaws or the Operating Agreement of WMC-SA, WMC-A, Coastal, Chapman, PCHI, West Coast and Ganesha, whether as contractual obligations, damages, insurance proceeds or otherwise; (iii) all of each Pledgor's respective rights, powers and remedies under the Articles of Incorporation, Articles of Organization, Bylaws and Operating Agreement, as shareholders or members thereunder or arising from their ownership of the Pledged Interests pursuant thereto, whether now existing or hereafter arising or acquired; (iv) each Pledgor's rights to receive from time to time any share of profits, income, surplus, distributions, return of capital, distributions (in cash, stock or kind) and other reimbursements and payments from WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast (including, without limitation, specific properties of WMC-SA, WMC-A, Coastal, Chapman, PCHI, West Coast and Ganesha upon dissolution and otherwise); (v) any certificates representing the Pledged Interests, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Interests; (vi) any additional Equity Interests of or in WMC-SA, WMC-A, Coastal, Chapman, PCHI, West Coast and Ganesha from time to time acquired by any Pledgors in any manner (which Equity Interests shall be deemed to be part of the Pledged Interests), and the certificates representing such additional Equity Interests, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests; and (vii) any and all rents, issues, profits, returns, income, allocations, dividends, distributions and proceeds of and from any and all of the foregoing (collectively, the "**Collateral**").

(b)      All certificates and all promissory notes and instruments evidencing the Collateral shall be delivered to and held by or on behalf of Lender pursuant hereto.  All Collateral shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to Lender.

(c)      Pledgors each hereby irrevocably authorize the Lender to file one or more financing statements or continuation statements and amendments thereto, disclosing and perfecting the Lien granted to the Lender under this Pledge Agreement without Pledgor's signature appearing thereon, and the Lender agrees to notify Pledgors when such a filing has been made.  Pledgors each agree that a carbon, photographic, photostatic, or other reproduction of this Pledge Agreement or of a financing statement is sufficient as a financing statement.

**JAE 0345**

CONFIDENTIAL                                                                                    SPCP_0000004648

EXECUTION

SECTION 3.   Distributions.  Prior to the full payment and performance of the Obligations, the Lender shall receive, as Collateral, any and all additional membership interests, partnership interests, capital stock, options, warrants, or other property of any kind received, receivable, distributed or distributable on or by reason of the Collateral pledged hereunder, whether in the form of cash, securities or property or by way of liquidation, conversion, merger, consolidation, redemption or otherwise.  Pledgors shall promptly deliver to the Lender, or cause each Borrower to deliver directly to the Lender, all such property, including any cash distributions representing or constituting any Collateral received or receivable by Pledgors after the date of this Pledge Agreement.  Any such property received by Pledgors shall be held by Pledgors in trust for the Lender and shall forthwith be delivered by Pledgors to the Lender as aforesaid.

SECTION 4.   Registration of Pledge.  Each Pledgor hereby agrees to and shall cause WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast to promptly deliver the original stock certificates and/or membership certificates representing the Pledged Interests in WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast, duly endorsed or subscribed by the appropriate Pledgor or accompanied by appropriate stock powers duly executed in blank by the appropriate Pledgor, to the Lender as additional Collateral.  Any additional instruments or certificates received by Pledgors shall be held by Pledgors in trust, as agent for the Lender, and Pledgors shall immediately advise Lender in writing that each Pledgor is holding the same.

SECTION 5.   Power of Attorney.  Upon the occurrence of and during the continuance of an Event of Default, Pledgors each hereby presently constitute and irrevocably appoint Lender, with full power of substitution and revocation by the Lender, as each Pledgor's true and lawful attorney-in-fact, for the purpose from time to time upon the occurrence and during the continuance of an Event of Default of carrying out the provisions of this Pledge Agreement and taking any action and executing any instrument that the Lender deems necessary or advisable to accomplish the purposes of this Pledge Agreement, including, without limitation, to affix to certificates and documents representing any Collateral the endorsements or other instruments of transfer or assignment delivered with respect thereto and to transfer or cause the transfer of the Collateral, or any part thereof, on the books of Borrower.  The power of attorney granted pursuant to this Pledge Agreement and all authority hereby conferred are granted and conferred solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any power.  This power of attorney is coupled with an interest and is irrevocable as until the Obligations have been paid in full and the Credit Agreement has been terminated by Lender.

SECTION 6.   Representations of Pledgors.  Each Pledgor represents and warrants to the Lender, as to itself only, that:

(a)   Such Pledgor has the power and authority and the legal right to execute, deliver and perform this Pledge Agreement and to grant the Lien on the Collateral contemplated hereby in favor of the Lender;

(b)   The execution, delivery and performance of this Pledge Agreement by such Pledgor and the granting of the Lien on the Collateral contemplated hereby has been duly authorized by all necessary action and does not and will not (i) violate any applicable law, rule or

**JAE 0346**

CONFIDENTIAL                                                          SPCP_0000004649

regulation or any provision of its organizational documents, (ii) conflict with, result in a breach of, or constitute a default under any provision of any Articles of Incorporation or Articles of Organization or Bylaws or Operating Agreement, and any partnership agreement, shareholders agreement, indenture, mortgage or other agreement or instrument to which such Pledgor or any of its Affiliates is a party or by which any of them are their respective properties or assets is bound or subject, or any license, judgment order or decree of any Governmental Authority having jurisdiction over such Pledgor or any of its Affiliates or their respective activities, properties or assets or (iii) result in or require the creation or imposition of any Lien upon or with respect to any properties or assets now or hereafter owned by such Pledgor or any of its Affiliates (other than the Liens created hereunder);

(c)     This Pledge Agreement has been duly executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor enforceable against such Pledgor in accordance with its terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles;

(d)     No consent or authorization of, filing with, or other act by or in respect of, any arbitrator or Governmental Authority and no consent of any other Person is required (i) for the execution, delivery and performance of this Pledge Agreement by such Pledgor, (ii) for the pledge by such Pledgor of the Collateral to the Lender pursuant to this Pledge Agreement, or (iii) for the exercise by the Lender of the rights provided for in this Pledge Agreement or the remedies in respect of the Collateral pursuant to this Pledge Agreement, except such as (A) have been obtained, made or taken and are in full force and effect, (B) may be required under federal or state securities laws in connection with any sale of the Collateral, or (C) in connection with the ownership, as may be required by Governmental Authorities relating to the operation of the Business;

(e)     Such Pledgor is the sole legal and beneficial owner of, and has valid and transferable title to, the Collateral owned by it, free and clear of all Liens, other than the Liens in favor of the Lender created by this Pledge Agreement;

(f)     There are no outstanding options, warrants, shareholders' agreements or other agreements with respect to the Collateral owned by it;

(g)     The Pledged Interests owned by it have been duly authorized and validly issued and are fully paid and non-assessable, and are not subject to, nor will such Pledgor at any time permit them to become subject to, any restrictions governing its issuance, transfer, ownership or control except those limitations described on Schedule I hereto, all of which have been waived;

(h)     The information set forth in Schedule I is true, correct, complete and accurate;

(i)     All actions (including, without limitation, registration of the Lien created hereby on the Pledged Interests owned by it on the books and records of WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast and consent to the filing of UCC-1 financing statements by Lender in all appropriate jurisdictions) required to create and perfect the Lien of the Lender in

CONFIDENTIAL                                                                                          SPCP_0000004650

**EXECUTION**

the Collateral have been taken and the Lien on the Collateral owned by it in favor of the Lender is superior in right to any rights or claims of any other Person;

(j)     As to each Pledgor, the Articles of Incorporation, Articles of Organization, Bylaws and Operating Agreement of each Pledgor (as applicable) delivered to Lender is a true, correct, complete and accurate copy of its Articles of Incorporation, the Articles of Organization, the Bylaws and the Operating Agreement in effect on the date hereof and the same has not, as of the date hereof, been further amended, modified, terminated, nor cancelled or superseded;

(k)     As to each Pledgor, there are no unpaid expenses, capital contributions, costs, fees, charges, interest payments or other payments of any kind required to be funded or contributed by Pledgors pursuant to its respective Articles of Incorporation, or Articles of Organization, or Bylaws, or Operating Agreement, or any corporate or limited liability company resolution that accrued prior to the date hereof;

(l)     There are no actions, suits, proceedings or investigations pending or, to the best knowledge of such Pledgor, threatened, against or affecting such Pledgor that are likely to have a Material Adverse Effect on the validity or enforceability of this Pledge Agreement, or on the validity or priority of the Liens and security interests granted by such Pledgor as provided for herein, before or by any court, arbitrator or Governmental Authority;

(m)     Such Pledgor is not insolvent (as such term is defined in the Credit Agreement); and

(n)     Such Pledgor has been given a true, correct, complete and accurate set of the Credit Agreement and the other Loan Documents and the opportunity to review them with counsel.

SECTION 7.   Obligations of Pledgors.  Each Pledgor further represents, warrants, and covenants to the Lender, with respect to itself and, where specifically stated below, with respect to any other Pledgor or Borrower owned or controlled by it, that:

(a)     Except as expressly provided by the Credit Agreement, such Pledgor will not sell, transfer, convey or otherwise dispose of any interest in the Collateral without the prior written consent of Lender (as determined in Lender's sole discretion).

(b)     Such Pledgor will not suffer or permit any Lien to exist on or with respect to the Collateral except the Lien created under this Pledge Agreement.

(c)     Such Pledgor will, at its own expense, at any time and from time to time at the request of the Lender, do, make, procure, execute and deliver all acts, things, writings, assurances and other documents as may be reasonably requested by the Lender to further enhance, preserve, establish, demonstrate, perfect or enforce the Lender's rights, interests and remedies created by, provided in or emanating from this Pledge Agreement.

(d)     Except as otherwise permitted by the Credit Agreement, without the prior written consent of Lender (as determined in Lender's sole discretion), Pledgors shall not permit itself or any other Pledgor or Borrower owned or controlled by it to issue any additional Equity Interests.

**JAE 0348**

CONFIDENTIAL                                                                          SPCP_0000004651

(e)     Such Pledgor will defend the Lender's right, title and interest in, to and under the Collateral owned by it against the claims and demands of all Persons whomsoever.

(f)     Concurrently with the execution and delivery of this Pledge Agreement, such Pledgor will execute and deliver and cause any other Pledgor or Borrower owned or controlled by it to execute and deliver to the Lender on the date hereof a letter in substantially the forms attached hereto as <u>Exhibits A-l through A-6</u>.

(g)     Such Pledgor shall, at its sole cost and expense, perform and observe all of the terms, covenants, conditions and obligations required to be performed or observed by it under its respective Articles of Incorporation or Articles of Organization or Bylaws or Operating Agreement.

(h)     Upon the occurrence and continuance of an Event of Default, such Pledgor shall not waive any right or remedy under its respective Articles of Incorporation or Articles of Organization or Bylaws or Operating Agreement without the prior written consent of Lender; provided, that no waiver occurring prior to an Event of Default shall have a Material Adverse Effect upon the Liens granted to Lender in the Loan Documents or upon any of Lender's rights or remedies.

(i)     Such Pledgor shall, at its sole cost and expense, with respect to itself and to any other Pledgor or Borrower owned or controlled by it (i) enforce the applicable Articles of Incorporation and Articles of Organization and Bylaws and Operating Agreement in accordance with their terms in such a manner so as to preserve, and not to materially and adversely affect (A) the value of the Collateral or (B) the security interest of Lender in the Collateral, and (ii) appear in and defend any action or proceeding to which any Pledgor is made a party arising under the applicable Articles of Incorporation or Articles of Organization or Bylaws or Operating Agreement of itself and any other Pledgor or Borrower owned or controlled by it and take all additional action to these ends as from time to time may be reasonably requested in writing by Lender.

(j)     Unless otherwise required by law, no Pledgor shall amend or modify the Articles of Incorporation or Articles of Organization or Bylaws or Operating Agreement of WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast in any way that adversely affects the Liens granted to Lender in the Loan Documents or upon any of Lender's rights or remedies, without the prior written consent of Lender.

(k)     No Pledgor shall authorize or enter into any transaction for the termination, dissolution or winding up of, or the merger or consolidation with another entity or entities by, the admission of additional shareholders to, or the elimination of shareholders from, or otherwise effect or change the structure or organization of WMC-SA, WMC-A, Coastal, Chapman, PCHI, West Coast or Ganesha without the prior written consent of the Lender.

SECTION 8.   <u>Rights of Pledgors</u>.

(a)     So long as no Event of Default has occurred and is continuing, Pledgors shall retain ownership and be entitled to vote or consent with respect to the Collateral in any manner not inconsistent with this Pledge Agreement, the Credit Agreement or any other Loan Document.

CONFIDENTIAL

SPCP_0000004652

EXECUTION

Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the exclusive right to vote or give consent with respect to the Collateral.  Upon the occurrence and continuance of an Event of Default, Pledgors each grant to the Lender an immediate and irrevocable proxy to vote the Collateral, but which Lender agrees it shall exercise only upon the occurrence of and during the continuance of an Event of Default, and upon request of the Lender, Pledgors each agree to deliver to the Lender such further evidence of such irrevocable proxy or such further irrevocable proxy to vote the Collateral as the Lender may request.

(b)     Any and all (i) distributions paid or payable in cash in respect of any Collateral whether in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital or otherwise, and (ii) cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for Collateral, shall be forthwith delivered to the Lender in accordance with <u>Section 3</u> hereof, to be held as Collateral and shall, if received by Pledgors, be received in trust for the benefit of the Lender, be segregated from the other property or funds of Pledgors and be forthwith delivered to the Lender as Collateral in the same form as so received (with any necessary endorsement or assignment).

SECTION 9.   <u>Rights of the Lender</u>.

(a)     If any Pledgor fails to perform any agreement contained herein, the Lender may (but shall not be obligated or required to) perform, or cause the performance, of such agreement.

(b)     At any time upon and during the continuance of an Event of Default, the Lender may (but shall not be obligated or required to):

(i)     Cause the Collateral to be transferred to its name or to the name of its nominee or nominees and thereafter exercise as to such Collateral all of the rights, powers and remedies of an owner;

(ii)     Ask for, demand, collect, sue for, recover, compromise, receive and give acquaintances and receipts for monies due or to become due under or in respect of any of the Collateral and hold the same as part of the Collateral, or apply the same to any of the Obligations in such manner as the Lender may direct in its sole discretion;

(iii)     Receive, endorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (ii) above (including, without limitation, all instruments representing dividends, interest payments or other distributions in respect of the Collateral or any part thereof and give full discharge for the same);

(iv)     File any claims or take any actions or institute any proceedings that the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce compliance with the rights of the Lender with respect to any of the Collateral;

(v)     Enter into any extension, subordination, reorganization, deposit, merger, or consolidation agreement, or any other agreement relating to or affecting the Collateral, and in connection therewith deposit or surrender control of such Collateral thereunder, and accept other property in exchange therefor and hold and apply such property or money so received in accordance with the provisions hereof; and

CONFIDENTIAL                                                    SPCP_0000004653

(vi)        Discharge any taxes or Liens levied on the Collateral or pay for the maintenance and preservation of the Collateral; the amount of such payments, plus any and all fees, costs and expenses of the Lender (including reasonable attorneys' fees and disbursements) in connection therewith, shall, at the Lender's option, be reimbursed by Pledgors on demand.

SECTION 10. Event of Default; Remedies.  Upon and during the continuance of an Event of Default under this Pledge Agreement or the Credit Agreement or under any of the other Loan Documents:

(a)        The Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.  In addition, the Lender shall have the right, without demand of performance or other demand, advertisement or notice of any kind, except as specified below, to or upon Pledgors (all and each of which demands, advertisements and/or notices are hereby expressly waived to the extent permitted by law), to proceed forthwith to collect, receive, appropriate and realize upon the Collateral, or any part thereof and to proceed forthwith to sell, assign, give an option or options to purchase, contract to sell, or otherwise dispose of and deliver the Collateral or any part thereof in one or more parcels at public or private sale or sales at any stock exchange, broker's board or at any of the Lender's offices or elsewhere at such prices and on such terms and restrictions (including, without limitation, a requirement that any purchaser of all or any part of the Collateral shall be required to purchase any securities constituting the Collateral solely for investment and without any intention to make a distribution thereof) as the Lender may deem appropriate without any liability for any loss due to decrease in the market value of the Collateral during the period held.  If any notification to Pledgors of the intended disposition of the Collateral is required by law, such notification shall be deemed reasonable and properly given if hand delivered or made by telecopy at least ten (10) calendar days prior to such disposition to the address of Pledgors indicated below.  Any disposition of the Collateral or any part thereof may be for cash or on credit or for future delivery without assumption of any credit risk, with the right to the Lender to purchase all or any part of the Collateral so sold at any such sale or sales, free of any equity or right of redemption, which right or equity is, to the extent permitted by applicable law, hereby expressly waived and released by Pledgors.  At any such sale or other disposition, the Lender reserves the right to sell for cash, on credit (whether secured or unsecured), or a combination of both, and not to credit the Obligations unless and until any deferred portion of the purchase has actually been paid to Lender in good funds.

(b)        All of the Lender's rights and remedies under this Pledge Agreement and under applicable law, including but not limited to the foregoing, shall be cumulative and not exclusive and shall be enforceable alternatively, successively or concurrently as the Lender may deem expedient.

(c)        The Lender may elect to obtain the advice of any independent nationally-known investment banking firm, including any such firm affiliated with Lender, with respect to the method and manner of sale or other disposition of any of the Collateral, the best price reasonably obtainable therefore, the consideration of cash and/or credit terms, or any other details concerning such sale or disposition.

(d)        Each Pledgor recognizes that the Lender may be unable to effect a public sale of all or a part of the Collateral by reason of certain prohibitions contained in the Securities Act

CONFIDENTIAL                                                          SPCP_0000004654

of 1933, as amended (the "**Securities Act**"), or other relevant securities laws in any jurisdiction, but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be required to qualify as "**Accredited Investors**" (as such term is defined in Regulation D promulgated under the Securities Act) or under other exemption, and who will be obligated to agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Each Pledgor agrees that private sales so made may be at prices and on other terms less favorable to the seller than if the Collateral were sold at public sale, and that the Lender has no obligation to delay the sale of any Collateral for the period of time necessary to permit the registration of the Collateral for public sale under the Securities Act or other relevant securities laws in any jurisdictions.  Each Pledgor agrees that a private sale or sales made under the foregoing circumstances shall not be deemed to be commercially unreasonable by virtue of such circumstances.

(e)     If any consent, approval or authorization of, or filing with, any Governmental Authority or any other Person shall be necessary to effectuate any sale or other disposition of the Collateral, or any partial disposition of the Collateral, including, without limitation, under any federal or state securities laws, each Pledgor agrees to execute all such applications, registrations and other documents and instruments as may be required in connection with securing any such consent, approval or authorization, and will otherwise use its best efforts to secure the same.  Each Pledgor further agrees to use its best efforts to effectuate such sale or other disposition of the Collateral as the Lender may deem necessary pursuant to the terms of this Pledge Agreement.

(f)     Upon any sale or other disposition; the Lender shall have the right to deliver, endorse, assign and transfer to the purchaser thereof the Collateral so sold or disposed of.  Each purchaser at any such sale or other disposition, including the Lender, shall hold the Collateral free from any claim or right of whatever kind, including any equity or right of redemption.  Each Pledgor specifically waives, to the extent permitted by applicable law, all rights of stay or appraisal which such Pledgor had or may have under any rule of law or statute now existing or hereafter adopted.

(g)     The Lender shall not be obligated to make any sale or other disposition unless the terms thereof shall be satisfactory to it.  The Lender may, without notice or publication, adjourn any private or public sale, and, upon ten (10) calendar days' prior notice to Pledgors, hold such sale at any time or place to which the same may be so adjourned.  In case of any sale of all or any part of the Collateral, on credit or future delivery, the Collateral so sold may be retained by the Lender until the selling price is paid by the purchaser thereof, but the Lender shall incur no liability in case of the failure of such purchaser to take up and pay for the property so sold and, in case of any such failure, such property may again be sold as herein provided.

SECTION 11. Disposition of Proceeds.  The proceeds of any sale or disposition of all or any part of the Collateral shall be applied (after payment of any amounts payable to the Lender pursuant to Section 13 hereof) by the Lender to the payment of the Obligations in such order as the Lender may elect in its sole discretion.  Any surplus thereafter remaining shall be paid to Pledgors, subject to the rights of any holder of a Lien on the Collateral of which the Lender has actual notice.

SECTION 12. Termination.  This Agreement shall:

CONFIDENTIAL                                                 SPCP_0000004655

EXECUTION

(a)      Create a continuing first priority security interest in the Collateral.

(b)      Remain in full force and effect for so long as any of the Obligations are outstanding or the Lender has any obligation under the Credit Agreement or other Loan Documents.

(c)      Be binding upon each Pledgor and his or its permitted successors and assigns.

(d)      Inure to the benefit of the Lender and its successors, transferees and assigns.

Without limiting the foregoing, the Lender may assign or otherwise transfer the Loans, or any portion thereof, held by it to any other Person in accordance with the terms of the Loan Documents, and such other Person shall thereupon become vested with all the benefits in respect thereof granted herein or otherwise.  Lender shall promptly give Pledgors notice of such assignment or transfer.  Pledgors may not assign his or its rights or delegate his or its obligations under this Agreement without the prior written consent of the Lender.  Upon satisfaction and payment of the Obligations (including, but not limited to, any obligations under the Credit Agreement or other Loan Documents), Lender shall return to each Pledgor any shares of stock, options or warrants representing the Pledged Interests in Lender's possession or under its custody or control.

SECTION 13. Expenses of the Lender.  All reasonable expenses (including, without limitation, attorneys' fees and disbursements) and court costs paid or incurred by the Lender in connection with the failure by Pledgors to perform or observe any provision of this Pledge Agreement, the exercise or enforcement of any rights of the Lender under this Pledge Agreement and the custody or preservation of any of the Collateral and any actual or attempted sale or exchange of, or any enforcement, collection, compromise or settlement respecting, the Collateral, or any other action taken by the Lender hereunder whether directly or as attorney-in-fact pursuant to a power of attorney or other authorization herein conferred, shall be deemed an obligation of Pledgors and shall be deemed an Obligation for all purposes of this Pledge Agreement and the Lender may apply the Collateral to payment of or reimbursement of itself for such liability.

SECTION 14. Lender's Duty.  The Lender shall not be required to take any action hereunder in respect of an Event of Default.  The Lender shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law including, without limitation, acts, omissions, errors or mistakes with respect to the Collateral, except for those arising out of or in connection with the Lender's gross negligence or willful misconduct.  The Lender shall be under no obligation to take any steps necessary to preserve rights in the Collateral against any prior parties but may do so at its option, and all expenses incurred in connection therewith shall be for the account of Pledgors, and shall be added to the obligations secured hereby.

SECTION 15. General Provisions.

(a)      No failure on the part of the Lender to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right, power or remedy hereunder preclude any other or future

**JAE 0353**

CONFIDENTIAL                                                                 SPCP_0000004656

exercise thereof, or the exercise of any other right, power or remedy. The representations, covenants and agreements of Pledgors herein contained shall survive the date hereof.

(b)     No amendment or waiver of any provision of this Pledge Agreement nor consent to any departure by Pledgors herefrom nor release of all or any part of the Collateral shall in any event be effective unless the same shall be in writing, signed by the Lender and Pledgors. Any such waiver or consent or release shall be effective only in the specific instance and for the specific purpose for which it is given.

(c)     The obligations of each Pledgor under this Pledge Agreement shall remain in full force and effect without regard to, and shall not be impaired or affected by:

(i)     any amendment or modification or addition or supplement to the Credit Agreement or any Loan Document, any document or instrument delivered in connection therewith or any assignment or transfer thereof;

(ii)     any exercise, non-exercise or waiver by the Lender of any right, remedy, power or privilege under or in respect of, or any release of any guaranty or collateral provided pursuant to, the Credit Agreement or any other Loan Document;

(iii)     any waiver, consent, extension, indulgence or other action or inaction in respect of the Credit Agreement or any Loan Document or any assignment or transfer of any thereof; or

(iv)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like, of any Pledgor or of WMC-SA, WMC-A, Coastal, Chapman, PCHI and West Coast, or any other Person;

in all cases, whether or not Pledgors shall have notice or knowledge of any of the foregoing.

(d)     Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Pledge Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered upon the earlier of (a) actual receipt; or (b) three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid; or (c) when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section 15(d)); or (d) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid, or (e) when delivered, if hand-delivered by messenger, or (f) in the case of electronic transmission, on the date delivered if the same was received by the addressee by 5:00 p.m. local time on a Business Day, or if received after 5:00 p.m. on a Business Day or if received on a day which is not a Business Day, on the next Business Day, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated below or to such other address (or facsimile number) as may be

CONFIDENTIAL                                                                          SPCP_0000004657

EXECUTION

substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

| | |
|---|---|
| If to Lender: | Medical Provider Financial Corporation II<br>3770 Howard Hughes Parkway, Suite 301<br>Las Vegas, Nevada 89109<br>Attn:  Joseph J. Lampariello, President and COO<br>Telephone:  800-818-1102<br>Facsimile:  702-735-3739<br>Email:  JoeyL@medicalcapital.com |

With a copy to:

Medical Capital Corporation
2100 South State College Blvd.
Anaheim, California 92806
Attn:  Adam Field, Sr. Vice President Development
Telephone:  714-935-3100
Facsimile:  714-935-3114
Email:  AdamF@medicalcapital.com

If to IHHI:

Integrated Healthcare Holdings, Inc.
1301 North Tustin Ave.
Santa Ana, CA 92705
Attn:  Brace Mogel, CEO
Telephone:  714-953-3575
Facsimile:  714-953-2595
Email:  Bruce.Mogel@IHHIOC.com

If to Ganesha:

Ganesha Realty, LLC
c/o Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, CA 92506
Attn:  Dr. Chaudhuri
Telephone:  951-782-8812
Facsimile:  951-766-9944

with a copy to:

Bill Thomas
Email:  bthomas@kpcgc.net

If to West Coast:

West Coast Holdings, LLC
2621 South Bristol, Suite 304
Santa Ana, CA 92704

#4831-1562-0370v4                                14

**JAE 0355**

CONFIDENTIAL                                        SPCP_0000004658

EXECUTION

Attn: _____, M.D., Manager
Telephone:  714-290-5322
Facsimile:  714-297-9588

(e)      IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  PLEDGORS AND LENDER HEREBY CONSENT AND AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE STATE OF NEVADA, CLARK COUNTY, CITY OF LAS VEGAS, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN PLEDGORS AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, THAT LENDER AND PLEDGORS ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF CLARK COUNTY, NEVADA; PROVIDED FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER. PLEDGORS AND LENDER EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND PLEDGORS AND LENDER HEREBY WAIVE ANY OBJECTION THAT SUCH PLEDGORS OR LENDER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENT TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(f)      Pledgors and Lender each hereby irrevocably waive all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Pledge Agreement, the Credit Agreement or any other Loan Document, or any of the transactions contemplated thereby.

(g)      If any provision of this Pledge Agreement is determined by a court of competent jurisdiction to be unenforceable, such provision shall be automatically reformed and construed so as to be valid, operative and enforceable to the maximum extent permitted by the law while most nearly preserving its original intent.  The invalidity of any part of this Agreement shall not render invalid the remainder of the Pledge Agreement.

(h)      This Pledge Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts taken together shall constitute but one and the same instrument.

#4831-1562-0370v4

15

**JAE 0356**

SPCP_0000004659

EXECUTION

(i)      The section headings in this Pledge Agreement are for convenience of reference only and shall not affect the interpretation hereof.

SECTION 16. Consents.

(a)      Pledgors consents to the transfer of management rights to Lender pursuant to the terms hereof following the occurrence and continuance of an Event of Default under the Credit Agreement, if so declared by Lender in writing to Pledgors, and consents to the pledge of Collateral as defined herein and therein.

(b)      Pledgors each consent and agree to the terms of the Credit Agreement and other Loan Documents.

SECTION 17. Reinstatement.  This Agreement shall remain in full force and effect and continue to be effective, as the case may be, if at any time payment or performance of the Obligations or any part thereof, pursuant to applicable law, is avoided, rescinded, or reduced in amount, or must otherwise be restored or returned by Lender, or any other obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is avoided, rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so avoided, rescinded, reduced, restored or returned.

SECTION 18. Rights of Lender.  Nothing contained herein shall (i) release or impair the validity of the principal indebtedness secured hereby, (ii) in any way affect, or impair any Lien granted pursuant hereto or pursuant to the other Loan Documents, or (iii) in any way affect or impair the right of Lender to foreclose any Liens created under or to enforce any other Loan Documents pursuant to the terms thereof.

SECTION 19. Suretyship Waivers.  The suretyship waivers contained in the Credit Agreement shall be applicable to this Pledge Agreement and to all other Loan Documents and be deemed to be remade by Pledgors.

SECTION 20. Satisfaction of Obligations.  At such time as all of the Obligations under the Credit Agreement or other Loan Documents are paid in full or performed and satisfied, the security interest in the Collateral shall terminate and expire, Lender shall return the original share certificates representing the Pledged Interests to Borrower, and (except as otherwise set forth herein or in the other Loan Documents) neither party shall have any further obligation or liability one to the other.

#4831-1562-0370v4                          16

**JAE 0357**

CONFIDENTIAL                                              SPCP_0000004660

**EXECUTION**

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of the day and year first above written.

PLEDGORS

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,


By:  _____
Larry Anderson, President


WEST COAST HOLDINGS, LLC, a California limited liability company,


By:  _____
_____, M.D., Manager


GANESHA REALTY, LLC, a California limited liability company,


By:  _____
_____, _____


LENDER

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By:  _____
Joseph J. Lampariello, President and COO

CONFIDENTIAL                                                                          SPCP_0000004661

**EXECUTION**

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of the day and year first above written.

<u>PLEDGORS</u>

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,

By: _____
Larry Anderson, President

WEST COAST HOLDINGS, LLC, a California limited liability company,

By: _____
_____, M.D., Manager

GANESHA REALTY, LLC, a California limited liability company,

By: _____
_____, _____

<u>LENDER</u>

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,

By: _____
Joseph J. Lampariello, President and COO

CONFIDENTIAL

SPCP_0000004662

EXECUTION

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of the day and year first above written.

PLEDGORS

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,

By: _____
Larry Anderson, President

WEST COAST HOLDINGS, LLC, a California limited liability company,

By: _____
_____, M.D., Manager

GANESHA REALTY, LLC, a California limited liability company,

By: _____
_____, _____

LENDER

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,

By: _____
Joseph J. Lampariello, President and COO

#4831-1562-0370v4                                    19

**JAE 0360**

                                    SPCP_0000004663

EXECUTION

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of the day and year first above written.

<u>PLEDGORS</u>

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation,


By: _____
Larry Anderson, President


WEST COAST HOLDINGS, LLC, a California limited liability company,


By: _____
_____, M.D., Manager


GANESHA REALTY, LLC, a California limited liability company,


By: _____
_____, _____


<u>LENDER</u>

MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation,


By: _____
Joseph J. Lampariello, President and COO

CONFIDENTIAL

**JAE 0361**

SPCP_0000004664

SCHEDULE I

**Pledged Interests**

| Name of Pledgor | Name of Company | Number of Shares/Percentage Membership Interests Owned by Pledgors | Percentage of Economic and Voting Interest | Restrictions on Transfer |
|---|---|---|---|---|
| INTEGRATED HEALTHCARE HOLDING, INC. | WMC-SA, INC. | 1,000 shares | 100% | No Transfers Permitted |
| INTEGRATED HEALTHCARE HOLDING, INC. | WMC-A, INC. | 1,000 shares | 100% | No Transfers Permitted |
| INTEGRATED HEALTHCARE HOLDING, INC. | CHAPMAN MEDICAL CENTER, INC. | 100 shares | 100% | No Transfers Permitted |
| INTEGRATED HEALTHCARE HOLDING, INC. | COASTAL COMMUNITIES HOSPITAL, INC. | 1,000 shares | 100% | No Transfers Permitted |
| WEST COAST HOLDINGS, LLC | PACIFIC COAST HOLDINGS INVESTMENT, LLC | 51% membership interests | 51% | No Transfers Permitted |
| GANESHA REALTY, LLC | PACIFIC COAST HOLDINGS INVESTMENT, LLC | 49% membership interests | 49% | No Transfers Permitted |

#4831-1562-0370v4

**JAE 0362**

CONFIDENTIAL

SPCP_0000004665

Exhibit A-1

_____,2007

Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806

Gentlemen:

Reference is made to the Pledge Agreement dated as of the date hereof (the "**Pledge Agreement**") among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and you, as Lender.  Initially capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement.

In connection with the pledge of the Collateral to you by Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(i)     In accordance with Pledgor's instructions; the undersigned has registered on its books and records your security interest in the Pledged Interests; no other Lien on such Pledged Interests is registered on the books and records of the undersigned;

(ii)     The undersigned shall deliver directly to you at your address set forth in the Pledge Agreement, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, Pledgors by virtue of its ownership of the Pledged Interests issued by the undersigned or upon exercise by Pledgors of any option, warrant or right attached to such Pledged Interests;.

(iii)     The undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral issued by the undersigned, except to the extent Pledgors is entitled to receive such distributions pursuant to the terms of the Pledge Agreement;

(iv)     At any time upon and during the continuance of an Event of Default, upon your written instructions, the undersigned shall register the transfer of such Pledged Interests to you or your nominee, as applicable; and

(v)     If the location where the undersigned keeps his/its business and organizational records changes from 1301 North Tustin Avenue, Santa Ana, CA 92705, without giving you not less than thirty (30) days prior written notice thereof, it shall constitute an Event of Default under the Credit Agreement and the other Loan Documents, including the Pledge Agreement.

#4831-1562-0370v4                                          i

**JAE 0363**

In addition, the undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by the undersigned, the undersigned will, upon your request and at Pledgor's expense, so long as in compliance with applicable law including securities laws:

(a)     provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(b)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law;

(c)     do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a shareholder of the undersigned; and

(d)     recognize the validity and enforceability of any action taken by you under the power of attorney granted by Pledgor in the Pledge Agreement, and promptly follow the instructions given by you pursuant to such authority.

You are hereby authorized, in connection with any sale of the Collateral issued by the undersigned, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral, so long as such prospective purchaser agrees to the provisions of <u>Section 11.10</u> (Confidentiality) of the Credit Agreement.

Very truly yours,

WMC-SA, INC., a California corporation,

By: _____
Larry Anderson, President

**ACKNOWLEDGED, CONSENTED AND AGREED TO:**

<u>PLEDGOR</u>:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,

_____
Bruce Mogel, Chief Executive Office

**JAE 0364**

CONFIDENTIAL                                                                    SPCP_0000004667

Exhibit A-2

_____, 2007

Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806

Gentlemen:

Reference is made to the Pledge Agreement dated as of the date hereof (the "**Pledge Agreement**") among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and you, as Lender.  Initially capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement.

In connection with the pledge of the Collateral to you by Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(i)     In accordance with Pledgor's instructions; the undersigned has registered on its books and records your security interest in the Pledged Interests; no other Lien on such Pledged Interests is registered on the books and records of the undersigned;

(ii)    The undersigned shall deliver directly to you at your address set forth in the Pledge Agreement, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, Pledgors by virtue of its ownership of the Pledged Interests issued by the undersigned or upon exercise by Pledgors of any option, warrant or right attached to such Pledged Interests;

(iii)   The undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral issued by the undersigned, except to the extent Pledgors is entitled to receive such distributions pursuant to the terms of the Pledge Agreement;

(iv)    At any time upon and during the continuance of an Event of Default, upon your written instructions, the undersigned shall register the transfer of such Pledged Interests to you or your nominee, as applicable; and

(v)     If the location where the undersigned keeps his/its business and organizational records changes from 1301 North Tustin Avenue, Santa Ana, CA 92705, without giving you not less than thirty (30) days prior written notice thereof, it shall constitute an Event of Default under the Credit Agreement and the other Loan Documents, including the Pledge Agreement.

**JAE 0365**

CONFIDENTIAL                                                                      SPCP_0000004668

In addition, the undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by the undersigned, the undersigned will, upon your request and at Pledgor's expense, so long as in compliance with applicable law including securities laws:

(a)     provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(b)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law;

(c)     do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a shareholder of the undersigned; and

(d)     recognize the validity and enforceability of any action taken by you under the power of attorney granted by Pledgor in the Pledge Agreement, and promptly follow the instructions given by you pursuant to such authority.

You are hereby authorized, in connection with any sale of the Collateral issued by the undersigned, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral, so long as such prospective purchaser agrees to the provisions of <u>Section 11.10</u> (Confidentiality) of the Credit Agreement.

Very truly yours,


WMC-A, INC., a California corporation,


By:   _____
      Larry Anderson, President


**ACKNOWLEDGED, CONSENTED AND AGREED TO:**


<u>PLEDGOR</u>:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,

_____
Bruce Mogel, Chief Executive Officer


#4831-1562-0370v4                              ii

**JAE 0366**

<u>Exhibit A-3</u>

_____, 2007

Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806

Gentlemen:

Reference is made to the Pledge Agreement dated as of the date hereof (the "**Pledge Agreement**") among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and you, as Lender.  Initially capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement.

In connection with the pledge of the Collateral to you by Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(i)     In accordance with Pledgor's instructions; the undersigned has registered on its books and records your security interest in the Pledged Interests; no other Lien on such Pledged Interests is registered on the books and records of the undersigned;

(ii)     The undersigned shall deliver directly to you at your address set forth in the Pledge Agreement, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, Pledgors by virtue of its ownership of the Pledged Interests issued by the undersigned or upon exercise by Pledgors of any option, warrant or right attached to such Pledged Interests;

(iii)     The undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral issued by the undersigned, except to the extent Pledgors is entitled to receive such distributions pursuant to the terms of the Pledge Agreement;

(iv)     At any time upon and during the continuance of an Event of Default, upon your written instructions, the undersigned shall register the transfer of such Pledged Interests to you or your nominee, as applicable; and

(v)     If the location where the undersigned keeps his/its business and organizational records changes from 1301 North Tustin Avenue, Santa Ana, CA 92705, without giving you not less than thirty (30) days prior written notice thereof, it shall constitute an Event of Default under the Credit Agreement and the other Loan Documents, including the Pledge Agreement.

#4831-1562-0370v4                                         i

**JAE 0367**

In addition, the undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by the undersigned, the undersigned will, upon your request and at Pledgor's expense, so long as in compliance with applicable law including securities laws:

(a)     provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(b)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law;

(c)     do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a shareholder of the undersigned; and

(d)     recognize the validity and enforceability of any action taken by you under the power of attorney granted by Pledgor in the Pledge Agreement, and promptly follow the instructions given by you pursuant to such authority.

You are hereby authorized, in connection with any sale of the Collateral issued by the undersigned, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral, so long as such prospective purchaser agrees to the provisions of <u>Section 11.10</u> (Confidentiality) of the Credit Agreement.

Very truly yours,


CHAPMAN MEDICAL CENTER, INC., a California corporation,


By:     _____
Larry Anderson, President


**ACKNOWLEDGED, CONSENTED AND AGREED TO:**


<u>PLEDGOR</u>:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,

_____
Bruce Mogel, Chief Executive Officer

CONFIDENTIAL                                                                            SPCP_0000004671

Exhibit A-4

_____, 2007

Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806

Gentlemen:

Reference is made to the Pledge Agreement dated as of the date hereof (the "**Pledge Agreement**") among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and you, as Lender.  Initially capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement.

In connection with the pledge of the Collateral to you by Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(i)      In accordance with Pledgor's instructions; the undersigned has registered on its books and records your security interest in the Pledged Interests; no other Lien on such Pledged Interests is registered on the books and records of the undersigned;

(ii)      The undersigned shall deliver directly to you at your address set forth in the Pledge Agreement, any and all instruments and/or certificates evidencing any right, option or warrant or new, additional or substituted securities issued to, or to be received by, Pledgors by virtue of its ownership of the Pledged Interests issued by the undersigned or upon exercise by Pledgors of any option, warrant or right attached to such Pledged Interests;

(iii)      The undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral issued by the undersigned, except to the extent Pledgors is entitled to receive such distributions pursuant to the terms of the Pledge Agreement;

(iv)      At any time upon and during the continuance of an Event of Default, upon your written instructions, the undersigned shall register the transfer of such Pledged Interests to you or your nominee, as applicable; and

(v)      If the location where the undersigned keeps his/its business and organizational records changes from 1301 North Tustin Avenue, Santa Ana, CA 92705, without giving you not less than thirty (30) days prior written notice thereof, it shall constitute an Event of Default under the Credit Agreement and the other Loan Documents, including the Pledge Agreement.

**JAE 0369**

CONFIDENTIAL

SPCP_0000004672

In addition, the undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by the undersigned, the undersigned will, upon your request and at Pledgor's expense, so long as in compliance with applicable law including securities laws:

(a)    provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(b)    do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law;

(c)    do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a shareholder of the undersigned; and

(d)    recognize the validity and enforceability of any action taken by you under the power of attorney granted by Pledgor in the Pledge Agreement, and promptly follow the instructions given by you pursuant to such authority.

You are hereby authorized, in connection with any sale of the Collateral issued by the undersigned, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral, so long as such prospective purchaser agrees to the provisions of Section 11.10 (Confidentiality) of the Credit Agreement.

Very truly yours,


COASTAL COMMUNITIES HOSPITAL, INC., a California corporation,


By:    _____
Larry Anderson, President


**ACKNOWLEDGED, CONSENTED AND AGREED TO:**


PLEDGOR:

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation,

_____
Bruce Mogel, Chief Executive Officer


#4831-1562-0370v4                              ii

CONFIDENTIAL                                                    SPCP_0000004673

Exhibit A-5

_____, 2007

Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806

Gentlemen:

Reference is made to the Pledge Agreement dated as of the date hereof (the "**Pledge Agreement**") among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and you, as Lender.  Initially capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement.

In connection with the pledge of the Collateral to you by Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(i)      In accordance with Pledgor's instructions; the undersigned has registered on its books and records your security interest in the Pledged Interests; no other Lien on such Pledged Interests is registered on the books and records of the undersigned;

(ii)     The undersigned shall deliver directly to you at your address set forth in the Pledge Agreement, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, Pledgors by virtue of its ownership of the Pledged Interests issued by the undersigned or upon exercise by Pledgors of any option, warrant or right attached to such Pledged Interests;

(iii)    The undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral issued by the undersigned, except to the extent Pledgors is entitled to receive such distributions pursuant to the terms of the Pledge Agreement;

(iv)    At any time upon and during the continuance of an Event of Default, upon your written instructions, the undersigned shall register the transfer of such Pledged Interests to you or your nominee, as applicable; and

(v)     If the location where the undersigned keeps his/its business and organizational records changes from 1301 North Tustin Avenue, Santa Ana, CA 92705, without giving you not less than thirty (30) days prior written notice thereof, it shall constitute an Event of Default under the Credit Agreement and the other Loan Documents, including the Pledge Agreement.

#4831-1562-0370v4

i

**JAE 0371**

CONFIDENTIAL

SPCP_0000004674

In addition, the undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by the undersigned, the undersigned will, upon your request and at Pledgor's expense, so long as in compliance with applicable law including securities laws:

(a)     provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(b)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law;

(c)     do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a shareholder of the undersigned; and

(d)     recognize the validity and enforceability of any action taken by you under the power of attorney granted by Pledgor in the Pledge Agreement, and promptly follow the instructions given by you pursuant to such authority.

You are hereby authorized, in connection with any sale of the Collateral issued by the undersigned, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral, so long as such prospective purchaser agrees to the provisions of Section 11.10 (Confidentiality) of the Credit Agreement.

Very truly yours,

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company,

By:     _____
_____, M.D., Co-Manager


**ACKNOWLEDGED, CONSENTED AND AGREED TO:**


PLEDGOR:

WEST COAST HOLDINGS, LLC,
a California limited liability company,

_____
_____, M.D., Manager

**JAE 0372**

CONFIDENTIAL

SPCP_0000004675

Exhibit A-6

_____, 2007

Medical Provider Financial Corporation II
c/o Medical Capital Corporation
2100 South State College Boulevard
Anaheim, California 92806

Gentlemen:

Reference is made to the Pledge Agreement dated as of the date hereof (the "**Pledge Agreement**") among INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation ("**IHHI**"), WEST COAST HOLDINGS, LLC, a California limited liability company ("**West Coast**") and GANESHA REALTY, LLC, a California limited liability company ("**Ganesha**") and you, as Lender.  Initially capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement.

In connection with the pledge of the Collateral to you by Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(i)      In accordance with Pledgor's instructions; the undersigned has registered on its books and records your security interest in the Pledged Interests; no other Lien on such Pledged Interests is registered on the books and records of the undersigned;

(ii)      The undersigned shall deliver directly to you at your address set forth in the Pledge Agreement, any and all instruments and/or certificates evidencing any right, option or warrant and all new, additional or substituted securities issued to, or to be received by, Pledgors by virtue of its ownership of the Pledged Interests issued by the undersigned or upon exercise by Pledgors of any option, warrant or right attached to such Pledged Interests;

(iii)      The undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral issued by the undersigned, except to the extent Pledgors is entitled to receive such distributions pursuant to the terms of the Pledge Agreement;

(iv)      At any time upon and during the continuance of an Event of Default, upon your written instructions, the undersigned shall register the transfer of such Pledged Interests to you or your nominee, as applicable; and

(v)      If the location where the undersigned keeps his/its business and organizational records changes from 1301 North Tustin Avenue, Santa Ana, CA 92705, without giving you not less than thirty (30) days prior written notice thereof, it shall constitute an Event of Default under the Credit Agreement and the other Loan Documents, including the Pledge Agreement.

#4831-1562-0370v4

**JAE 0373**

CONFIDENTIAL

SPCP_0000004676

In addition, the undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by the undersigned, the undersigned will, upon your request and at Pledgor's expense, so long as in compliance with applicable law including securities laws:

(a)     provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(b)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law;

(c)     do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a shareholder of the undersigned; and

(d)     recognize the validity and enforceability of any action taken by you under the power of attorney granted by Pledgor in the Pledge Agreement, and promptly follow the instructions given by you pursuant to such authority.

You are hereby authorized, in connection with any sale of the Collateral issued by the undersigned, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral, so long as such prospective purchaser agrees to the provisions of Section 11.10 (Confidentiality) of the Credit Agreement.

Very truly yours,


PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company,


By:     _____
        _____, M.D., Co-Manager


**ACKNOWLEDGED, CONSENTED AND AGREED TO:**


PLEDGOR:

GANESHA REALTY, LLC,
a California limited liability company,


_____
_____,_____


#4831-1562-0370v4

**JAE 0374**

CONFIDENTIAL

**<u>EXHIBIT "Q" TO AMENDED AND RESTATED CREDIT AGREEMENT</u>**
**<u>($47,277,000 MILLION FACILITY)</u>**

**FORM OF STOCK POWER**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL                                                                    SPCP_0000004678

**IRREVOCABLE STOCK POWER ASSIGNMENT**
**SEPARATE FROM CERTIFICATE**
(WITH RESPECT TO THE SHAREHOLDER INTEREST OF
INTEGRATED HEALTHCARE HOLDINGS, INC. IN
WMC-A, INC.)


[$80 MILLION CREDIT AGREEMENT]


        FOR VALUE RECEIVED, the undersigned, INTEGRATED HEALTHCARE
HOLDINGS, INC., a Nevada corporation ("**Assignor**") does hereby assign, transfer and deliver
to MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation
("**Assignee**") all (100%) of Assignor's stock interests ("**Assigned Stock Interests**") in WMC-A,
INC., a California corporation ("**Company**") represented by Stock Certificate Numbers_____
and_____ for a total of_____ shares of the Company's Common Stock.  The
Assigned Stock Interest constitutes all (100%) of the stock interests in the Company owned, held
or controlled by Assignor.  The Company is authorized to issue a total of_____ shares of
the Company's Common Stock.

        The undersigned does hereby irrevocably constitute and appoint SIDNEY FIELD,
ADAM FIELD and JOSEPH J. LAMPARIELLO as his attorney-in-fact to transfer said stock on
the books of said Company, with Ml power of substitution in the premises.

Dated:_____, 2007


INTEGRATED HEALTHCARE HOLDINGS,
INC., a Nevada corporation


_____
Larry Anderson, President

#4831-1562-0370v4

**JAE 0376**

CONFIDENTIAL                                                       SPCP_0000004679

## EXHIBIT "R" TO AMENDED AND RESTATED CREDIT AGREEMENT ($47,277,000 MILLION FACILITY)

### FORM OF MEMBERSHIP POWER

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004680

## IRREVOCABLE MEMBERSHIP POWER ASSIGNMENT
## SEPARATE FROM CERTIFICATE
(WITH RESPECT TO THE MEMBERSHIP INTEREST OF
WEST COAST HOLDINGS, LLC IN
PACIFIC COAST HOLDINGS INVESTMENT, LLC)

[$80 MILLION CREDIT AGREEMENT]

FOR VALUE RECEIVED, the undersigned, WEST COAST HOLDINGS, LLC, a California limited liability company ("**Assignor**") does hereby assign, transfer and deliver to MEDICAL PROVIDER FINANCIAL CORPORATION II, a Nevada corporation ("**Assignee**") all (100%) of Assignor's membership interests ("**Assigned Membership Interests**") in PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company ("**Company**") for a total of fifty-one (51%) of the Company's membership interests.  The Assigned Membership Interest constitutes all (100%) of the membership interests in the Company owned, held or controlled by Assignor.

The undersigned does hereby irrevocably constitute and appoint SIDNEY FIELD, ADAM FIELD and JOSEPH J. LAMPARIELLO as his attorney-in-fact to transfer said stock on the books of said company, with full power of substitution in the premises.

Dated:_____, 2007

WEST COAST HOLDINGS, LLC, a California limited liability company


_____
_____,_____

#4831-1562-0370v4

**JAE 0378**

CONFIDENTIAL

## EXHIBIT "S" TO AMENDED AND RESTATED CREDIT AGREEMENT
## ($47,277,000 MILLION FACILITY)

**FORM OF LANDLORD'S CONSENT AND ESTOPPEL (CHAPMAN LEASES)**

SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004682

EXECUTION

## LANDLORD'S CONSENT AND ESTOPPEL CERTIFICATE

## CHAPMAN MEDICAL OFFICE BUILDING LEASE

TO:    Medical Provider Financial Corporation I, a Nevada corporation (**"MPFC I"**)
Medical Provider Financial Corporation II, a Nevada corporation (**"MPFC II"**)
Medical Provider Financial Corporation III, a Nevada corporation (**"MPFC HI"**)
Integrated Healthcare Holdings, Inc., a Nevada corporation (**"IHHI"**)

EFFECTIVE DATE:          October 9, 2007

      A.    Chapman Medical Office Building Lease; Chapman Medical, L.P. (hereinafter **"Chapman Medical"**) owns the real property (**"Chapman MOB Real Property"**) and the medical office building located thereon (**"Chapman MOB"**) situated at 2617 East Chapman Avenue in Orange, California.  The Chapman MOB Real Property is more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.  Chapman Medical is the **"Landlord"** and IHHI is the **"Tenant"** pursuant to that certain lease agreement originally dated December 31, 1984 (as modified and amended from time to time (the **"Chapman MOB Lease"**).  Tenant's interest in the Chapman MOB Lease was assigned and transferred to IHHI on March 5, 2005.  Pursuant to the Chapman MOB Lease, Chapman Medical leases the Chapman MOB Real Property and Chapman MOB to IHHI.

      B.    IHHI has informed Chapman Medical of the following:

      1.    Loans:

          (i)    MPFC I proposes making a $50,000,000 Revolving Line of Credit Loan (**"$50 Million Revolving Line of Credit Loan"**) to IHHI and others pursuant to that certain Credit Agreement dated to be effective as of October 9, 2007 (**"$50 Million Credit Agreement"**) by and between the Borrowers named therein (including IHHI), the Credit Parties named therein, and MPFC I (as lender);

          (ii)    MPFC II proposes making an $80,000,000 Loan (**"$80 Million Loan"**) to IHHI and others pursuant to that certain Credit Agreement dated to be effective as of October 9, 2007 (**"$80 Million Credit Agreement"**) by and between the Borrowers named therein (including IHHI), the Credit Parties named therein, and MPFC II (as lender); and

          (iii)    MPFC HI proposes making a $10,700,000 Loan ("$10.7 **Million Loan"**) to IHHI and others pursuant to that certain Credit Agreement dated to be effective as of October 9, 2007 ("$10.7 **Million Credit Agreement"**) by and between the Borrowers named therein (including IHHI), the Credit Parties named therein, and MPFC III (as lender).

      2.    Encumbrances:

          (i)    MPFC II proposes to encumber the Tenant's interest in the Chapman MOB Lease with a first priority deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and absolute assignment of leases and rents with

#4831-1562-0370v4

1

**JAE 0380**

EXECUTION

license back (together, the "**$80 Million Security Documents**") to secure repayment of the $80 Million Loan;

        (ii)     MPFC III proposes to encumber the Tenant's interest in the Chapman MOB Lease with a second priority deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and absolute assignment of leases and rents with license back (together, the "**$10.7 Million Security Documents**") to secure repayment of the $10.7 Million Loan; and

        (iii)     MPFC I proposes to encumber the Tenant's interest in the Chapman MOB Lease with a third priority deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and absolute assignment of leases and rents with license back (together, the "**$50 Million Security Documents**") to secure repayment of the $50 Million Revolving Line of Credit Loan.

      3.     <u>Repayment of Existing Loans</u>:

        (i)     Concurrent with recordation of the $80 Million Security Documents (A) MPFC II will cause to be reconveyed and released from Tenant's interest in the Chapman MOB Lease the existing deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and the existing absolute assignment of leases and rents with license back (together, the "**Existing $80 Million Security Documents**") which secure repayment of a total of existing $80,000,000 in loans made by MPFC II to IHHI and its affiliates (the "**Existing $80 Million Loan**") in March, 2005; and

        (ii)     Concurrent with recordation of the $10.7 Million Security Documents (A) MPFC III will cause to be reconveyed and released from Tenant's interest in the Chapman MOB Lease the existing deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and the existing absolute assignment of leases and rents with license back (together, the "**Existing $10.7 Million Security Documents**") which secure repayment of an existing $10,700,000 loan made by MPFC III to IHHI and its affiliates (the "**Existing $10.7 Million Loan**") in December, 2005.

      C.     On condition that the Existing $80 Million Security Documents and the Existing $10.7 Million Security Documents are released and reconveyed from IHHI's interest, as Tenant, in the Chapman MOB Lease, Landlord consents to IHHI's proposal to encumber the Tenant's interest in the Chapman MOB Lease with the $80 Million Security Documents, the $10.7 Million Security Documents, and the $50 Million Security Documents.

      D.     If for any reason the Chapman MOB Lease is terminated or rejected by IHHI under §365(h)(l) of the Bankruptcy Code, including a termination of the Chapman MOB Lease by Landlord in a proceeding under the Bankruptcy Code or otherwise, Landlord agrees to enter into a new lease for the Chapman MOB upon substantially the same terms (including economic terms) as the original Chapman MOB Lease, as amended, with the successor in ownership to IHHI.  As used herein, a "successor in ownership" means MPFC I and MPFC II and MPFC III and their successors and assigns or any other purchaser at a foreclosure sale by virtue of the exercise of a power of sale contained in any one or more of the deed of trust and fixture filing,

#4831-1562-0370v4

2

**JAE 0381**

CONFIDENTIAL

SPCP_0000004684

assignment of rents, security agreement securing repayment of either the $80 Million Loan, the $10.7 Million Loan or the $50 Million Revolving Line of Credit Loan (collectively, the "**Leasehold Deeds of Trust**"), by foreclosure of any one or the Leasehold Deeds of Trust, by one or more deeds in lieu of foreclosure, or upon the appointment of a receiver pursuant to the terms of any one of the Leasehold Deeds of Trust, or by reason of any other proceedings to enforce any one of the Leasehold Deeds of Trust.

      E.     Chapman Medical hereby certifies to MPFC I and MPFC II and MPFC III as follows:

      1.     A true and correct copy of the Chapman MOB Lease, including all amendments, modifications and other agreements with respect thereto, is attached hereto as Exhibit "B".

      2.     The Chapman MOB Lease has been duly authorized and executed by IHHI and is in good standing and in full force and effect.

      3.     To the best of Landlord's knowledge there is no default under the Chapman MOB Lease or event that with the passage of time or notice would give rise to a default.

      4.     IHHI is presently occupying, the Chapman MOB Real Property and the Chapman MOB.  To the best of Chapman Medical's knowledge, the Chapman MOB Lease has not been assigned by Tenant and no sublease, concession agreement or license covering the Chapman MOB Real Property or the Chapman MOB has been entered into by Tenant, except as follows:  that certain Sublease Agreement dated March 5, 2005, by and between IHHI (as Sublessor) and Chapman Medical Center, Inc., a California corporation (as Sublessee),

      5.     Tenant is currently obligated to pay fixed or base rent under the Chapman MOB Lease in monthly installments of_____ Dollars ($_____).  Rent has been paid under the Chapman MOB Lease through_____,_____.  No rent under the Chapman MOB Lease has been paid more than one (1) month in advance, and no other sums have been deposited with Chapman Medical other than_____(if none, write none) deposited as security under the Chapman MOB Lease.

     This Landlord's Consent has been given by Landlord to MPFC I, MPFC II, MPFC III and IHHI with the understanding that they will rely hereon in connection with the foregoing.

     IN WITNESS WHEREOF, Landlord has executed this Landlord's Consent and Estoppel Certificate as of the_____ day of_____, 2007.

CONFIDENTIAL

EXECUTION

**<u>LANDLORD</u>**

CHAPMAN MEDICAL, L.P., a
California limited partnership,

By:     Chapman Medical LLC,
        a California limited liability company,
        its sole general partner

By:_____
John R. Saunders, Manager.

**JAE 0383**

CONFIDENTIAL                                                                      SPCP_0000004686

## EXHIBIT "A"

## LEGAL DESCRIPTION OF MOB PREMISES

### 2617 EAST CHAPMAN AVENUE
### ORANGE, CALIFORNIA

(A) A leasehold more particularly described as follows, as to Parcel B-2:

A leasehold estate created by that certain lease of said land executed by and between the parties named herein, for the term and upon the terms, covenants and conditions therein provided:

Dated:  December 31, 1984, as amended by an Agreement dated as of April 8, 1985
Lessor:  James L. Kirby, as Trustee, et al.
Lessee:  AHM CGH, Inc., a California corporation
Term:  Expires no later than December 31, 2013
Disclosed by:  Memorandum of Lease
Recorded:  August 30, 1994 as Instrument No. 94-0533296.  Official Records

An Assignment and Assumption of Lease dated March 3, 2005 By AHM CGH, Inc., a California Corporation, as Assignor and Integrated Healthcare Holdings, Inc., a Nevada corporation, as assignee, recorded March 8, 2005 as Instrument No, 05-169275.  Official Records.

A Supplement to Assignment and Assumption of Lease dated March 9, 2005 by AHM CGH, Inc., a California corporation, as assignor, and Integrated Healthcare Holdings, Inc., a Nevada corporation, as assignee, recorded March 9, 2005 as Instrument No. 05-175927.  Official Records.

(B) An easement as to Parcel B-3.

PARCEL B-l:

INTENTIONALLY OMITTED.

PARCEL B-2:

PARCEL 1, IN THE CITY OF ORANGE, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP FILED IN BOOK 96.  PAGES 19 AND 20 OF PARCEL MAPS.  IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL B-3:

NON-EXCLUSIVE EASEMENTS FOR INGRESS, EGRESS, DRIVEWAY, UTILITY AND DRAINAGE PURPOSES AS SET FORTH AND FURTHER DESCRIBED IN A DOCUMENT ENTITLED "AGREEMENT TO QUITCLAIM EXISTING EASEMENT, ESTABLISH NEW EASEMENT, AND FOR MAINTENANCE" RECORDED NOVEMBER 15, 1990 AS INSTRUMENT NO. 90-602723 OF OFFICIAL RECORDS OVER PORTIONS OF THE EASTERLY 80 FEET OF THE FOLLOWING DESCRIBED LAND:

CONFIDENTIAL

THAT PORTION OF LOTS 14 AND 15 IN BLOCK F OF THE A.B. CHAPMAN TRACT
SURVEYED BY FRANK LECOUVREUR IN 1870, AS SHOWN ON A MAP RECORDED IN
BOOK 102, PAGE 15 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY,
AS MODIFIED BY LOT LINE ADJUSTMENT 90-2, RECORDED JUNE 25, 1990 AS
INSTRUMENT NO. 90-335624 OF OFFICIAL RECORDS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY RIGHT OF WAY LINE OF CHAPMAN
AVENUE (100 FEET WIDE), SAID POINT BEING NORTH 00° 45' 30" EAST, 50.00 FEET
FROM THE SOUTHEASTERLY CORNER OF SAID LOT 14; THENCE NORTH 89° 46' 00"
WEST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, A DISTANCE OF 444.74
FEET; THENCE NORTH 27° 11' 13" EAST, A DISTANCE OF 473.57 FEET; THENCE
SOUTH 89° 46' 00" EAST, A DISTANCE OF 230.26 FEET, TO THE EASTERLY LINE OF
SAID LOT 14; THENCE NORTH 00° 45' 30" EAST, ALONG SAID EASTERLY LINE, A
DISTANCE OF 5.15 FEET; THENCE SOUTH 89° 46' 00" EAST, A DISTANCE OF 55.00
FEET; THENCE SOUTH 00° 45' 30" WEST, A DISTANCE OF 425.41 FEET, TO THE
NORTHERLY RIGHT OF WAY LINE OF SAID CHAPMAN AVENUE; THENCE
NORTH 89° 46' 00" WEST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, A
DISTANCE OF 55.00 FEET, TO THE POINT OF BEGINNING.

PARCEL C-1:

INTENTIONALLY OMITTED.

PARCEL C-2:

INTENTIONALLY OMITTED.

CONFIDENTIAL                                                        SPCP_0000004688

**EXHIBIT "B"**

**ATTACH TRUE AND CORRECT COPY OF CHAPMAN MOB LEASE**

#4831-1562-0370v4

**JAE 0386**

CONFIDENTIAL

SPCP_0000004689

**EXHIBIT "T" TO CREDIT AGREEMENT ($80 MILLION FACILITY)**


**FORM OF LANDLORD'S CONSENT AND ESTOPPEL CERTIFICATE (PCHI)**


SEE ATTACHED

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004690

## <u>LANDLORD'S CONSENT AND ESTOPPEL CERTIFICATE</u>

### <u>WESTERN MEDICAL CENTER - SANTA ANA</u>
### <u>WESTERN MEDICAL CENTER – ANAHEIM</u>
### <u>COASTAL COMMUNITY HOSPITAL</u>

TO:    Medical Provider Financial Corporation I, a Nevada corporation (**"MPFC I"**)
        Medical Provider Financial Corporation III, a Nevada corporation (**"MPFC II"**)
        Medical Provider Financial Corporation III, a Nevada corporation (**"MPFC III"**)
        Integrated Healthcare Holdings, Inc., a Nevada corporation (**"IHHI"**)

EFFECTIVE DATE:        October 9, 2007

      A.    PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company (hereinafter **"PCHI"**) owns the real property (**"WMC-SA Real Property"**) and hospital improvements (**"Western Medical Center — Santa Ana"**) located at 1001 North Tustin Avenue and 1301 North Tustin Avenue in Santa Ana, California.  PCHI (as PCHI) leases Western Medical Center - Santa Ana to IHHI (as Tenant) pursuant to that certain Amended and Restated Triple Net Hospital Building Lease dated as of October 1, 2007 (**"Triple Net Lease"**)**.** The WMC-SA Real Property is more particularly described in <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.

      B.    PCHI owns the real property (**"WMC-A Real Property"**) and hospital improvements (**"Western Medical Center — Anaheim"**) located at 1025 South Anaheim Blvd. in Anaheim, California . PCHI (as PCHI) leases Western Medical Center — Anaheim to IHHI (as Tenant) pursuant to the Triple Net Lease.  The WMC-A Real Property is more particularly described in <u>Exhibit "B"</u> attached hereto and incorporated herein by reference.

      C.    PCHI owns the real property (**"Coastal Real Property"**) and hospital improvements (**"Coastal Communities Hospital"**) located at 2701 South Bristol Street and 1901 and 1905 North College Avenue in Santa Ana, California.  PCHI (as PCHI) leases Coastal Communities Hospital to IHHI (as Tenant) pursuant to the Triple Net Lease.  The Coastal Real Property is more particularly described in <u>Exhibit "C"</u> attached hereto and incorporated herein by reference.

      D.    IHHI has informed PCHI of the following:

          1.    <u>Loans</u>:

              (i)    MPFC I proposes making a $50,000,000 Revolving Line of Credit Loan (**"$50 Million Revolving Line of Credit Loan"**) to IHHI and others pursuant to that certain Credit Agreement dated to be effective as of October 9, 2007 (**"$50 Million Credit Agreement"**) by and between the Borrowers named therein (including IHHI), the Credit Parties named therein, and MPFC I (as lender);

#4831-1562-0370v4

CONFIDENTIAL

(ii)     MPFC II proposes making an $80,000,000 Loan (“**$80 Million Loan**”) to IHHI and others pursuant to that certain Credit Agreement dated to be effective as of October 9, 2007 (“**$80 Million Credit Agreement**”) by and between the Borrowers named therein (including IHHI), the Credit Parties named therein, and MPFC II (as lender); and

(iii)    MPFC III proposes making a $10,700,000 Loan (“**$10.7 Million Loan**”) to IHHI and others pursuant to that certain Credit Agreement dated to be effective as of October 9, 2007 (“**$10.7 Million Credit Agreement**”) by and between the Borrowers named therein (including IHHI), the Credit Parties named therein, and MPFC III (as lender),

    2.    <u>Encumbrances</u>:

(i)      MPFC II proposes to encumber PCHI's fee simple interest in the Western Medical Center — Santa Ana, in the Western Medical Center — Anaheim, and in the Coastal Communities Hospital with a first priority deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and absolute assignment of leases and rents with license back (together, the “**$80 Million Security Documents**”) to secure repayment of the $80 Million Loan;

(ii)     MPFC III proposes to encumber PCHI's fee simple interest in the Western Medical Center — Santa Ana, in the Western Medical Center - Anaheim, and in the Coastal Communities Hospital with a second priority deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and absolute assignment of leases and rents with license back (together, the “**$10.7 Million Security Documents**”) to secure repayment of the $10.7 Million Loan; and

(iii)    MPFC I proposes to encumber PCHI's fee simple interest in the Western Medical Center - Santa Ana, in the Western Medical Center — Anaheim, and in the Coastal Communities Hospital with a third priority deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and absolute assignment of leases and rents with license back (together, the “**$50 Million Security Documents**”) to secure repayment of the $50 Million Revolving Line of Credit Loan.

    3.    <u>Repayment of Existing Loans</u>:

(i)      Concurrent with recordation of the $80 Million Security Documents (A) MPFC II will cause to be reconveyed and released from PCHI's fee simple interest in the Western Medical Center - Santa Ana, in the Western Medical Center — Anaheim, and in the Coastal Communities Hospital the existing deed of trust and fixture filing, assignment of rents, security agreement and financing statements, and the existing absolute assignment of leases and rents with license back (together, the “**Existing $80 Million Security Documents**”) which secure repayment of a total of existing $80,000,000 in loans made by MPFC II to IHHI, Chapman Medical and their affiliates (the “**Existing $80 Million Loan**”) in March, 2005; and

(ii)     Concurrent with recordation of the $10.7 Million Security Documents (A) MPFC III will cause to be reconveyed and released from PCHI's fee simple interest in the Western Medical Center - Santa Ana, in the Western Medical Center - Anaheim, and in the Coastal Communities Hospital the existing deed of trust and fixture filing, assignment

#4831-1562-0370v4

CONFIDENTIAL

of rents, security agreement and financing statements, and the existing absolute assignment of leases and rents with license back (together, the "**Existing $10.7 Million Security Documents**") which secure repayment of an existing $10,700,000 loan made by MPFC III to IHHI, Chapman Medical and their affiliates (the "**Existing $10.7 Million Loan**") in December, 2005.

      E.      On condition that the Existing $80 Million Security Documents and the Existing $10.7 Million Security Documents are released and reconveyed from PCHI's fee simple interest in the Western Medical Center - Santa Ana, in the Western Medical Center — Anaheim, and in the Coastal Communities Hospital, (i) PCHI consents to MPFC II's proposal to encumber PCHI's fee simple interest in the Western Medical Center— Santa Ana, in the Western Medical Center — Anaheim, and in the Coastal Communities Hospital with the $80 Million Security Documents, (ii) PCHI consents to MPFC Ill's proposal to encumber PCHI's fee simple interest in the Western Medical Center - Santa Ana, in the Western Medical Center — Anaheim, and in the Coastal Communities Hospital with the $10.7 Million Security Documents, and (iii) PCHI consents to MPFC I's proposal to encumber PCHI's fee simple interest in the Western Medical Center - Santa Ana, in the Western Medical Center - Anaheim, and in the Coastal Communities Hospital with the $50 Million Security Documents.

      F.    1.      Upon receipt by PCHI of written notice from MPFC II that any Borrowers under $80 Million Credit Agreement have committed an event of default thereunder, MPFC II shall have the right to foreclose (or make any conveyance in lieu of such foreclosure) on the fee simple interest in the WMC-SA Real Property, and/or in the WMC-A Real Property, and/or in the Coastal Real Property and cause any or all of those fee simple interests to be sold, assigned, transferred and conveyed to a third party purchaser.

      2.      Upon receipt by PCHI of written notice from MPFC III that any Borrowers under $10.7 Million Credit Agreement have committed an event of default thereunder, MPFC HI shall have the right to foreclose (or make any conveyance in lieu of such foreclosure) on the fee simple interest in the WMC-SA Real Property, and/or in the WMC-A Real Property, and/or in the Coastal Real Property and cause any or all of those fee simple interests to be sold, assigned, transferred and conveyed to a third party purchaser.

      3.      Upon receipt by PCHI of written notice from MPFC I that any Borrowers under $50 Million Credit Agreement have committed an event of default thereunder, MPFC I shall have the right to foreclose (or make any conveyance in lieu of such foreclosure) on the fee simple interest in the WMC-SA Real Property, and/or in the WMC-A Real Property, and/or in the Coastal Real Property and cause any or all of those fee simple interests to be sold, assigned, transferred and conveyed to a third party purchaser.

      G.      PCHI agrees to and shall give MPFC I and MPFC II and MPFC III prompt written notice of any default by tenant under the Triple Net Lease and shall give MPFC I and MPFC II and MPFC III the same period of time to cure any such default as Tenant has under the Triple Net Lease (but without any obligation on the part of MPFC I or MPFC II or MPFC III to do so).

      H.      PCHI hereby certifies to MPFC I and MPFC II and MPFC III as follows:

#4831-1562-0370v4

**JAE 0390**

CONFIDENTIAL

1.     A true and correct copy of the Triple Net Lease, including all amendments, modifications and other agreements with respect thereto, is attached hereto as Exhibit "D".

2.     The Triple Net has been duly authorized and executed by IHHI and is in good standing and in full force and effect.

3.     IHHI is presently occupying the WMC-SA Real Property and the Western Medical Center - Santa Ana.  To the best of PCHI's knowledge, the Triple Net Lease has not been assigned by Tenant and no sublease, concession agreement or license covering the WMC-SA Real Property or the Western Medical Center - Santa Ana has been entered into by Tenant, except as follows:  that certain Sublease Agreement dated March 5, 2005, by and between IHHI (as Sublessor) and WMC-SA, Inc., a California corporation (as Sublessee).

4.     IHHI is presently occupying the WMC-A Real Property and the Western Medical Center — Anaheim.  To the best of PCHI's knowledge, the Triple Net Lease has not been assigned by Tenant and no sublease, concession agreement or license covering the WMC-A Real Property or the Western Medical Center - Anaheim has been entered into by Tenant, except as follows:  that certain Sublease Agreement dated March 5, 2005, by and between IHHI (as Sublessor) and WMC-A, Inc., a California corporation (as Sublessee).

5.     IHHI is presently occupying the Coastal Real Property and the Coastal Communities Hospital.  To the best of PCHI's knowledge, the Triple Net Lease has not been assigned by Tenant and no sublease, concession agreement or license covering the Coastal Real Property or the Coastal Communities Hospital has been entered into by Tenant, except as follows:  that certain Sublease Agreement dated March 5, 2005, by and between IHHI (as Sublessor) and Coastal Communities Hospital, Inc., a California corporation (as Sublessee).

6.     Tenant is currently obligated to pay fixed or base rent under the Triple Net Lease in monthly installments of _____ Dollars ($_____).  Rent has been paid under the Triple Net Lease through_____,_____.  No rent under the Triple Net Lease has been paid more than one (1) month in advance, and no other sums have been deposited with PCHI other than_____(if none, write none) deposited as security under the Triple Net Lease.

7.     PCHI has no knowledge of any uncured defaults by PCHI or Tenant under the Triple Net Lease, except (if there are no exceptions, write "NONE"):

8.     There are no disputes between PCHI and Tenant concerning the Triple Net Lease, the Premises or the improvements therein or thereon, except (if there are no exceptions, write "NONE"):

9.     PCHI has no knowledge of any prior sale, transfer, assignment of encumbrance of the Tenant's interest in the Triple Net Lease, except (if there are no exceptions, write "NONE"): _____

_____

#4831-1562-0370v4

**JAE 0391**

SPCP_0000004694

10.     PCHI is not currently the subject of a bankruptcy proceeding and to the best of its knowledge neither Tenant nor any guarantor is involved in such a proceeding, except (if there are no exceptions, write "NONE"):

11.     PCHI is aware that MPFC I and MPFC II and MPFC III will rely upon the statements made in this Estoppel Certificate, and has therefore adjusted the language hereof as necessary to make it an accurate statement of the current facts concerning the issue.  If no such adjustments have been made, said parties may rely upon the statements in this form as printed. with the foregoing.

IN WITNESS WHEREOF, PCHI has executed this Landlord's Consent and Estoppel Certificate as of the    day of  , 2007.

**LANDLORD**

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a California limited liability company,

By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004695

**EXHIBIT "A"**

**LEGAL DESCRIPTION OF WMC-SA REAL PROPERTY**

PARCEL A:

THAT PORTION OF LOT 4 OF THE FELIPE YORBA TRACT, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 4, PAGE 206 OF MISCELLANEOUS MAPS, RECORDS OF LOS ANGELES COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF A LINE THAT IS PARALLEL WITH AND DISTANT EASTERLY 30.00 FEET, MEASURED AT RIGHT ANGLES FROM THE WESTERLY LINE OF SAID LOT 4, WITH A LINE THAT IS PARALLEL WITH AND DISTANT SOUTHERLY 305.0 FEET, MEASURED AT RIGHT ANGLES FROM THE NORTH LINE OF SAID LOT 4; THENCE NORTH 88° 49' 47" EAST, PARALLEL WITH SAID NORTH LINE OF LOT 4, A DISTANCE OF 718.43 FEET TO A POINT IN THE EASTERLY LINE OF THE LAND DESCRIBED IN DEED TO SIMON WARONKER, RECORDED JANUARY 5, 1965 IN BOOK 7369, PAGE 708 OF OFFICIAL RECORDS; THENCE SOUTH 3° 52' 29" WEST ALONG SAID EASTERLY LINE, 273.66 FEET TO AN ANGLE POINT THEREIN; THENCE SOUTH 0° 06' 02" WEST, ALONG SAID EASTERLY LINE, 32.54 FEET TO A POINT IN A LINE THAT IS PARALLEL WITH AND DISTANT SOUTHERLY 610.14 FEET, MEASURED AT RIGHT ANGLES FROM SAID NORTH LINE OF LOT 4; THENCE SOUTH 88° 49' 47" WEST, PARALLEL WITH SAID NORTH LINE OF LOT 4, A DISTANCE OF 695.07 FEET TO SAID LINE THAT IS PARALLEL WITH THE WESTERLY LINE OF LOT 4; THENCE NORTH 0° 54' 38" WEST, PARALLEL WITH SAID WESTERLY LINE, 305.14 FEET TO THE POINT OF BEGINNING.

EXCEPTING FROM THAT PORTION OF SAID LAND THAT IS INCLUDED WITHIN THE EAST HALF OF SAID LOT 4, ALL MINERALS, OILS, GASES, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER SAID LAND, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE THEREOF, AS RESERVED IN THE DEED EXECUTED BY THE STATE OF CALIFORNIA, RECORDED JANUARY 5, 1965 IN BOOK 7369, PAGE 708 OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE REMAINDER, ALL INTEREST IN AND TO ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME, IN AND UNDER THE SUBJECT PROPERTY, WITHOUT RIGHT, HOWEVER, TO ENTER UPON THE SURFACE OF SAID LAND OR THE SUBSURFACE AREA THEREOF TO A DEPTH OF 300 FEET BELOW THE SURFACE, AS RESERVED IN THE DEEDS FROM SIMON WARONKER AND JEANETTE WARONKER, RECORDED JANUARY 15, 1965.

PARCEL B:

#4831-1562-0370v4

**JAE 0393**

CONFIDENTIAL

SPCP_0000004696

PARCEL B-1:  PARCEL 1, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON PARCEL MAP NO. 85-234, FILED IN BOOK 211, PAGES 10, 11 AND 12 OF PARCEL MAPS, RECORDS OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION DESCRIBED IN THE DEED TO THE STATE OF CALIFORNIA RECORDED JANUARY 16, 1984 AS INSTRUMENT NO. 84-020617, OFFICIAL RECORDS.

ALSO EXCEPT ALL MINERALS, OIL, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THAT PORTION OF SAID LOT 2, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OF THE UPPER 500 FEET THEREOF, AS SET FORTH IN THE DEED FROM THE STATE OF CALIFORNIA, RECORDED MAY 4, 1971 IN BOOK 9629, PAGE 298 OF OFFICIAL RECORDS.

PARCEL B-1A:

ALL OF THOSE CERTAIN EASEMENTS, EXCLUSIVE OR NONEXCLUSIVE (THE "EASEMENTS"), GRANTED TO OR RESERVED BY WESTERN MEDICAL CENTER, A CALIFORNIA NONPROFIT CORPORATION (FORMERLY, SANTA ANA - TUSTIN COMMUNITY HOSPITAL), AS MORE PARTICULARLY SET FORTH IN THAT CERTAIN OPERATING AND EASEMENT AGREEMENT, DATED AS OF DECEMBER 12, 1979 AND RECORDED IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA ON MARCH 24, 1981 IN BOOK 13991, AT PAGES 1798 TO 1825, INCLUSIVE, AS INSTRUMENT NUMBER 30426 AND AS AMENDED BY THAT CERTAIN AMENDMENT TO OPERATING AND EASEMENT AGREEMENT DATED AS OF FEBRUARY 22, 1982 AND RECORDED IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA ON SEPTEMBER 20, 1982 AS INSTRUMENT NUMBER 82-329898, AND AS AMENDED AND RESTATED BY THAT CERTAIN AMENDED AND RESTATED OPERATING AND EASEMENT AGREEMENT DATED MARCH 31, 1988, AND RECORDED IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA ON MAY 2, 1988 AS INSTRUMENT NO. 88-201966, ALL OF WHICH EASEMENTS ARE COVENANTS THAT RUN WITH THE LAND TO WHICH THEY PERTAIN AND MAY BE GRANTED BY THE HOLDER OR HOLDERS THEREOF TO OTHER PERSONS.

PARCEL B-2:

PARCEL 2, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON PARCEL MAP NO. 82-879, FILED IN BOOK 200, PAGES 48, 49 AND 50 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, AND PARCEL 3, AS SHOWN ON PARCEL MAP NO. 85-234, FILED IN BOOK 211, PAGES 10, 11 AND 12 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPT ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THAT PORTION OF SAID LOT 2, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE

#4831-1562-0370v4

CONFIDENTIAL                                                                        SPCP_0000004697

THROUGH THE SURFACE OF THE UPPER 500 FEET THEREOF, AS SET FORTH IN THE DEED FROM THE STATE OF CALIFORNIA, RECORDED MAY 4, 1971 IN BOOK 9629, PAGE 298 OF OFFICIAL RECORDS.

PARCEL B-3:

PARCEL 2, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON PARCEL MAP NO. 85-234, FILED IN BOOK 211, PAGES 10, 11 AND 12 OF PARCEL MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPT ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THAT PORTION OF SAID LOT 2, WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OF THE UPPER 500 FEET THEREOF, AS SET FORTH IN THE DEED FROM THE STATE OF CALIFORNIA, RECORDED MAY 4, 1971 IN BOOK 9629, PAGE 298 OF OFFICIAL RECORDS.

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004698

## EXHIBIT "B"

## LEGAL DESCRIPTION OF WMC-A REAL PROPERTY

PARCEL A:

PARCELS 1 AND 2, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 48 PAGE 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND BELOW 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT THE RIGHT TO ENTER UPON ANY PART OF SAID LAND FOR THE PURPOSE OF RECOVERING SAID SUBSTANCES, AS RESERVED BY DESSA I. WAGONER, A WIDOW, IN DEED DATED APRIL 1, 1960 IN BOOK 5226 PAGE 241, OFFICIAL RECORDS.

PARCEL B:

LOTS 10, 12, 13 AND 14 INCLUSIVE OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, AS SHOWN ON A MAP RECORDED IN BOOK 97, PAGES 19 AND 20, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL C:

LOT 11 OF TRACT NO. 3222, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 97, PAGES 19 AND 20 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004699

**EXHIBIT "C"**

**LEGAL DESCRIPTION OF COASTAL REAL PROPERTY**

2701 SOUTH BRISTOL ST.
SANTA ANA, CA

LEGAL DESCRIPTION

PARCEL A:

THAT PORTION OF PARCEL 2 OF PARCEL MAP NO. 79-887, IN THE CITY OF SANTA
ANA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN
BOOK 136 PAGES 32 AND 33 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY LYING WITHIN THE LAND SHOWN AS PARCEL 2 OF
THAT CERTAIN LOT LINE ADJUSTMENT LL79-10 RECORDED JANUARY 3, 1980 AS
INSTRUMENT NO. 2228, IN BOOK 13456 PAGE 985, OFFICIAL RECORDS.

PARCEL B:

PARCEL 2 OF PARCEL MAP, IN THE CITY OF SANTA ANA, COUNTY OF ORANGE,
STATE OF CALIFORNIA, AS SHOWN ON A MAP FILED IN BOOK 74.  PAGES 46
AND 47 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

1901 AND 1905 NORTH COLLEGE AVE.
SANTA ANA, CA

LEGAL DESCRIPTION

THAT PORTION OF LOT 3 OF MABURY TRACT, IN THE CITY OF SANTA ANA,
COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED
IN BOOK 165, PAGE 301 OF DEEDS, RECORDS OF LOS ANGELES COUNTY,
CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTH LINE OF THAT CERTAIN PARCEL OF LAND
CONVEYED TO OSCAR GREENWALD BY DEED RECORDED JANUARY 13, 1920 IN
BOOK 355, PAGE 205 OF DEEDS, RECORD OF ORANGE COUNTY, CALIFORNIA, SAID
POINT BEING 1675.18 FEET WESTERLY FROM THE NORTHEAST CORNER OF SAID
PARCEL, SAID POINT ALSO BEING THE NORTHEAST CORNER OF THAT CERTAIN
PARCEL OF LAND CONVEYED TO CHARLES C. BRISCO AND WIFE BY DEED
RECORDED OCTOBER 16, 1943 IN BOOK 1214, PAGE 275 OF OFFICIAL RECORDS;
THENCE SOUTH 0° 47' 00" WEST 435.68 FEET ALONG A LINE PARALLEL TO
AND 1675.18 FEET WESTERLY FROM THE EAST LINE OF SECTION 2, TOWNSHIP 5
SOUTH, RANGE 10 WEST, S.B.B.&M., SAID PARALLEL LINE BEING THE EASTERLY
LINE OF SAID PARCEL CONVEYED TO BRISCO, TO A POINT IN A LINE PARALLEL
WITH AND 614.26 FEET NORTHERLY MEASURED AT RIGHT ANGLES TO THE

#4831-1562-0370v4

**JAE 0397**

CONFIDENTIAL                                                      SPCP_0000004700

CENTERLINE OF 17TH STREET; THENCE SOUTH 88° 52' 40" WEST 422.68 FEET ALONG LAST MENTIONED PARALLEL LINE TO A POINT IN THE EAST LINE OF THAT CERTAIN PARCEL OF LAND CONVEYED TO STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY BY DEED RECORDED DECEMBER 17, 1963 IN BOOK 2634, PAGE 603 OF OFFICIAL RECORDS; THENCE NORTH 0° 47' 00" EAST 445.00 FEET ALONG THE EAST LINE OF SAID PARCEL CONVEYED TO STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY TO THE NORTHEAST CORNER THEREOF, SAID CORNER BEING ON THE SAID NORTH LINE OF THE PARCEL CONVEYED TO GREENWALD; THENCE SOUTH 89° 51' 30" EAST 422.48 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004701

## EXHIBIT "D"

## ATTACH TRUE AND CORRECT COPY OF TRIPLE NET LEASE

#4831-1562-0370v4

CONFIDENTIAL

SPCP_0000004702

## EXHIBIT "U" TO CREDIT AGREEMENT ($80 MILLION FACILITY)

### COMMON STOCK WARRANT

SEE ATTACHED

1

**JAE 0400**

CONFIDENTIAL

SPCP_0000004703

EXECUTION

**NEITHER THIS WARRANT NOR THE SECURITIES INTO WHICH THIS WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

## INTEGRATED HEALTHCARE HOLDINGS, INC.
## COMMON STOCK WARRANT

### WARRANT TO PURCHASE SHARES OF COMMON STOCK

THIS COMMON STOCK WARRANT (this "**Warrant**") certifies that, for consideration received, Healthcare Financial Management & Acquisitions, Inc., a Nevada corporation, or its permitted successors or assigns (the "**Holder**" or "**Holders**," as applicable), is entitled to subscribe for and purchase a minimum of 16,880,484 fully paid and nonassessable shares (as adjusted pursuant to Section 3 hereof, the "**Shares**") of the Common Stock (the "**Common Stock**") of Integrated Healthcare Holdings, Inc., a Nevada corporation, (the "**Company**") at a price per Share equal to $0.21 (as adjusted pursuant to Section 3 hereof, the "**Exercise Price**"), subject to the provisions and upon the terms and conditions hereinafter set forth.

    1.    Method of Exercise:  Payment.

    (i)    Exercise.  This Warrant shall be exercisable from and after October 9, 2007 (the "**Initial Exercise Date**") until October 9, 2012 (the "**Expiration Date**").  This Warrant shall be exercisable by Holder from time to time for the Shares (as adjusted pursuant to Section 3 hereof).

    (ii)    Cash Exercise.  The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, by the surrender of this Warrant (with the notice of exercise form attached hereto as Exhibit A duly executed) at the principal office of the Company, and by the payment to the Company, by certified, cashier's or other check acceptable to the Company (or as otherwise provided pursuant to Section 1(c) or 1(e) hereinbelow), of an amount equal to the aggregate Exercise Price of the Shares being purchased.

    (iii)    Net Issue Exercise.  In lieu of exercising this Warrant, the Holder may elect to receive Shares of Common Stock equal to the value of this Warrant (or the portion thereof being canceled) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = \frac{Y(A-B)}{A}$$

#4831-1562-0370v4

1

CONFIDENTIAL

SPCP_0000004704

EXECUTION

Where X      =      the number of the Shares to be issued to the Holder.

      Y      =      the number of the Shares purchasable under this Warrant.

A            =      the fair market value of one Share on the date of election under this Section 1(c).

      B      =      the Exercise Price (as adjusted to the date of such calculation).

(iv)      <u>Fair Market Value</u>.  For purposes of this Warrant, the per share fair market value of the Shares shall mean:

(1)      If the Company's Common Stock is publicly traded, the per share fair market value of the Shares shall be the closing price of such Common Stock as quoted on the Nasdaq National Market or the principal exchange on which the Common Stock is listed, or if not so listed then the fair market value shall be the average of the closing bid and asked prices of such Common Stock as published in <u>The Wall Street Journal</u>, in each case for the trading day immediately prior to the date of determination of fair market value; or

(2)      If the Company's Common Stock is not so publicly traded, the per share fair market value of the Shares shall be determined by either of the foregoing, as elected by Holder in its sole and absolute discretion:  (A) the mutual agreement of the Company and Holder, or (B) alternatively, a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing selected by the Holder in its sole and absolute discretion (the "**Appraiser**").

(v)      <u>Stock Certificates</u>.  Promptly upon receipt of a notice to exercise, the Company will take all necessary actions to authorize the issuance of such Common Stock under this Warrant.  In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within three (3) business days, or four (4) Trading Days (as defined hereinbelow) if the Company's Common Stock is publicly traded and the notice of exercise is received after 4:30 p.m. Eastern Standard Time on a day in which the Company's Common Stock is publicly traded (each a "**Trading Day**") and, unless this Warrant has been fully exercised or has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time.

2.      <u>Stock Fully Paid</u>.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issue thereof (except the Holder's income taxes, if any, that are due and payable with respect to the Shares).

3.      <u>Adjustment to the Number of Shares Issuable and/or the Exercise Price</u>.  The number of Shares issuable upon the exercise of this Warrant and the Exercise Price are subject to adjustment from time to time as set forth in this Section 3. Upon each adjustment pursuant to this Section 3, the Holder shall thereafter prior to the Expiration Date be entitled to purchase the adjusted number of Shares of Common Stock at the Exercise Price as adjusted hereby.  Subject

CONFIDENTIAL      SPCP_0000004705

EXECUTION

to the other provisions of this Section 3, the number of Shares of Common Stock issuable upon the exercise of this Warrant shall be automatically adjusted to be the greater of the following: (1) 16,880,484 Shares of Common Stock (as set forth on page 1 of this Warrant), or (2) Shares of Common Stock representing four and ninety five one-hundredths percent (4.95%) of all Common Stock Equivalents (as defined hereinbelow) of the Company on the date of exercise of this Warrant. "**Common Stock Equivalents**" shall mean, collectively, (i) all shares of Common Stock issued and outstanding, (ii) shares of Common Stock issued or deemed issued as a dividend or distribution, including on any preferred stock, (iii) shares of Common Stock issued or issuable by reason of a dividend, stock split, split-up or other distribution on shares of Common Stock, (iv) shares of Common Stock or Convertible Securities issued or issuable upon the exercise of rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities (as defined hereinbelow) (collectively, "**Options**") or shares of Common Stock issued or issuable upon the conversion or exchange of any evidences of indebtedness, shares, preferred stock or other securities directly or indirectly convertible into or exchangeable for Common Stock ("**Convertible Securities**"), pursuant to the terms of such Option or Convertible Security, (v) shares of Common Stock or Convertible Securities issued or issuable to third parties upon the exercise of rights, options, warrants or otherwise, including, without limitation, to suppliers, banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction, and (vi) shares of Common Stock issued or issuable to employees or directors of, or consultants to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors of the Company.

(i)  If the Company, at any time while this Warrant is outstanding, (i) shall pay a stock dividend payable in shares of its capital stock (whether payable in shares of its Common Stock, preferred stock, or securities convertible into, or exchangeable or exercisable for, Common Stock or of other capital stock of any class), (ii) shall subdivide outstanding shares of Common Stock into a larger number of shares, or (iii) combine outstanding shares of Common Stock into a smaller number of shares, then (x) the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased or decreased to reflect such event, and (y) the Exercise Price shall be adjusted to an amount obtained by multiplying the Exercise Price in effect immediately prior to such event by a fraction equal to the number of Shares for which this Warrant is exercisable immediately prior to such event divided by the number of Shares for which this Warrant is exercisable immediately after such event. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date of a subdivision, combination or reclassification.

(ii)  If the Company, at any time while any Warrants are outstanding, shall distribute to all holders of Common Stock, or holders of any securities convertible into, or exchangeable or exercisable for Common Stock (and not to the Holder), evidences of its indebtedness, assets or any rights or warrants to subscribe for or purchase any security (excluding those referred to in this Section 3), the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased to reflect such event as determined by

**JAE 0403**

EXECUTION

the Appraiser. The Company shall promptly provide a statement to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

(iii) In case of any reclassification of the Common Stock, any consolidation or merger of the Company with or into another person, the sale or transfer of all or substantially all of the assets of the Company or any compulsory share exchange pursuant to which the Common Stock is converted into other securities, cash or property, then, subject to the terms hereof, the Holder shall have the right thereafter to exercise this Warrant into the shares of stock and other securities and property receivable upon or deemed to be held by holders of Common Stock following such reclassification, consolidation, merger, sale, transfer or share exchange, and the Holder shall be entitled upon such event to receive such amount of securities or property as the shares of the Common Stock into which this Warrant could have been exercised immediately prior to such reclassification, consolidation, merger, sale, transfer or share exchange would have been entitled. The terms of any such reclassification, consolidation, merger, sale, transfer or share exchange shall include such terms so as to continue to give to the Holder the right to receive the securities or property set forth in this Section 3(c) upon any exercise following such reclassification, consolidation, merger, sale, transfer or share exchange. This provision shall similarly apply to successive reclassification, consolidations, mergers, sales, transfers or share exchanges.

(iv) For purposes of any computation respecting consideration received, the following shall apply:

(1) in the case of the issuance of shares of Common Stock for cash, the consideration shall be the amount of such cash, provided that in no case shall any deduction be made for any commissions, discounts or other expenses incurred by the Company for any underwriting of the issue or otherwise in connection therewith; and

(2) in the case of the issuance of shares of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined by the Appraiser, whose determination shall be conclusive.

(v) For the purposes of this Section 3, the following clauses shall also be applicable:

(1) Record Date. In case the Company shall promptly take a record of the holders of its Common Stock for the purposes of entitling them (A) to receive a dividend or other distribution payable in Common Stock or in convertible securities, or (B) to subscribe for or purchase Common Stock or securities convertible into, or exchangeable or exercisable for, Common Stock, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

#4831-1562-0370v4

4

**JAE 0404**

EXECUTION

(2)   Treasury Shares.  The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock for the purposes of this Section 3.

4.   Notice of Adjustments.  Whenever the number of Shares purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 3 hereof, the Company shall promptly provide notice to the Holder setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number and class of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

5.   Fractional Shares.  This Warrant may not be exercised for fractional shares.  In lieu of fractional shares the Company shall promptly make a cash payment therefor based upon the per share fair market value of a Share then in effect.

6.   Representations, Warranties and Covenants of the Company.

(i)   The Company represents and warrants to the Holder that all corporate actions on the part of the Company, its officers, directors and stockholders necessary for the sale and issuance of the Shares pursuant hereto and the performance of the Company's obligations hereunder were taken prior to and are effective as of the effective date of this Warrant.  The Company will at all times reserve and keep available, free from preemptive rights, out of the aggregate of its authorized but unissued Common Stock or its authorized and issued Common Stock held in its treasury, for the purpose of enabling it to satisfy any obligation to issue Shares upon exercise of the Warrants, a number of shares of Common Stock equal to the maximum number of Shares (as adjusted from time to time pursuant to Section 3 hereof) which may then be deliverable upon the exercise of this Warrant The Company covenants that all Shares that shall be so issuable and deliverable shall, upon issuance thereof, be duly and validly authorized and issued and fully paid, and nonassessable.

(ii)   The Company has made available to the Holder true, correct and complete copies of its articles of incorporation and bylaws, as amended.  This Warrant is not inconsistent with the Company's articles of incorporation or bylaws, and does not contravene any law or governmental rule, regulation or order applicable to it, does not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract, agreement or other instrument to which it is a party or by which it is bound, and constitutes the legal, valid and binding agreements of the Company, enforceable in accordance with its terms.

(iii)   No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by the Company of its obligations under this Warrant, except for the filing of notices pursuant to Regulation D under the Securities Act and any filing required by applicable state securities law, which filings will be effective by the time required thereby.

**JAE 0405**

CONFIDENTIAL                                                                                           SPCP_0000004708

EXECUTION

(iv)        All issued and outstanding shares of Common Stock or any other securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable.  All outstanding shares of Common Stock and any other securities were issued in full compliance with all federal and state securities laws.  No stockholder of the Company has preemptive rights to purchase new issuances of the Company's capital stock.

(v)        The Company is not, pursuant to the terms of any agreement currently in existence, under any obligation to register under the Securities Act any of its presently outstanding securities or any of its securities which may hereafter be issued.

(vi)        Assuming that the Holder is an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (as defined in Section 9 hereof), the issuance of the Shares upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

(vii)        At the written request of the Holder, in the event the Holder proposes to sell Shares issuable upon the exercise of this Warrant in compliance with Rule 144 promulgated under the Securities Act by the Securities and Exchange Commission, the Company shall furnish to the Holder, within ten (10) days after receipt of such request, a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such rule, as such rule may be amended from time to time.

7.    <u>Restrictive Legend</u>.  The Shares (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

THESE SHARES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLID EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

8.    <u>Transfer of Warrant.</u>

(i)        This Warrant may be sold, transferred, assigned or hypothecated, in whole or in part, by the Holder without the consent of the Company; <u>provided</u>, in each case that any transferee or assignee agrees to be bound by the terms of this Warrant, and such transfer or assignment is in compliance with the Securities Act and the securities law of any applicable jurisdiction.  The Warrant may be divided or combined, upon request to the Company by the Holder, into one or more new warrants representing the same aggregate number of Shares.  For purposes of this Warrant, "<u>control</u>" of a person shall mean the power, direct or indirect, (x) to

#4831-1562-0370v4                    6

CONFIDENTIAL                    SPCP_0000004709

vote or direct the voting of 10% or more of the voting equity of such person or (y) to direct or cause the direction of the management and policies of such person whether by ownership or equity, by contract or otherwise, and "person" means an individual or a corporation, association, partnership, limited liability company, joint venture, organization, business, trust or any other entity or organization, including a government or any subdivision or agency thereof.  The terms and conditions of this Warrant shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties.

 (ii)  No opinion of counsel or "no-action" letter shall be necessary for any transfer or assignment by any Holder.

 9. <u>Registration Rights.</u>

 (i)  The Company shall file a registration statement under the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder (the "**Securities Act**"), covering the resale of all Shares of the Holder as soon as practicable following the Holder's written request to do so, and use its reasonable best efforts to have the registration statement declared effective by the Securities Exchange Commission ("**SEC**") for distribution thereof by means of an underwriting.  The underwriter will be selected by the Company and shall be reasonably acceptable to the Holder.  The Holder shall (together with the Company as provided hereinbelow) enter into an underwriting agreement in a customary form with the underwriter or underwriters selected for such underwriting.  Notwithstanding any other provision of this Section 9(a), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of shares of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.  The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders selected by them.

 (ii)  (1) The Company covenants and agrees with the Holder (and any subsequent Holders of this Warrant and/or Shares) that, in the event the Company proposes to file a registration statement under the Securities Act (including, without limitation, relating to an initial public offering of Company Common Stock or shall receive a request for registration on Form S-3 from any stockholder) with respect to any class of security which becomes or which the Company believes will become effective on or after the Initial Exercise Date and on or before the Expiration Date, then the Company shall in each case give prompt written notice of such proposed filing to the Holder (and any subsequent Holders of this Warrant and/or Shares) at least sixty (60) days before the proposed filing date and, by such notice, shall offer to such Holders the opportunity to include in such registration statement such number of Shares as they may request in writing.

 (2) The Company shall permit, or shall cause the managing underwriter of a proposed offering to permit, the Holders from whom such written requests have been received to include such number of Shares (the "**Piggy-back Shares**") in the proposed offering on terms and

CONFIDENTIAL

conditions no less favorable to the Holders as the terms and conditions applicable to securities of the Company included therein or as applicable to securities of any person other than the Company and the Holders of Piggy- back Shares if the securities of any such person are included therein; provided, however, that the Company shall not be required to honor any such request that is received more than sixty (60) days after the proper giving of the Company's notice or after the Expiration Date.  Notwithstanding any other provision of this Section 9(b), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of shares of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.  The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders selected by them.

(3)     The Company shall be obligated pursuant to this Section 9(b) to include in the piggy-back offering Shares that have not yet been purchased by a Holder so long as such Holder submits an undertaking to the Company that such Holder intends to exercise the Warrant for at least the number of Shares to be included in such piggy- back offering prior to the consummation of such piggy-back offering.  The Company shall use its reasonable best efforts to register or qualify the Shares for offer or sale under the state securities or Blue Sky laws of such states which the Holders of such Shares shall designate.

(4)     If the Company decides not to proceed with the piggy-back offering, the Company will have no obligation to proceed with the offering of the Piggy- back Shares.

(iii)          (1)     To the fullest extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, directors and stockholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "**Exchange Act**"), against any Violation (as defined hereinbelow) and the Company will pay to each such Holder, underwriter, controlling person or other aforementioned person, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action as such expenses are incurred; provided, however, that the indemnity agreement contained in this Section 9(c) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter, controlling person or other aforementioned person. The term "**Violation**" means losses, claims, damages, or liabilities (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations:  (i) any

CONFIDENTIAL                                                                    SPCP_0000004711

EXECUTION

untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by any other party hereto, of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law.

(2)     Each Holder of Shares who participates in a registration pursuant to Section 9 shall indemnify and hold harmless the Company, each of its directors, each of its officers who have signed any such registration statement, and each person, if any, who controls the Company within the meaning of the Securities Act, against any losses, claims, damages or liabilities to which the Company, or any such director, officer or controlling person may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of, or are based upon, any untrue or alleged untrue statement of any material fact contained in any such registration statement, or final prospectus, or any amendment or supplement thereto, or arise out of or are based upon the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any such registration statement, or final prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished by such Holder expressly for use in the preparation thereof; and will reimburse any legal or other expenses reasonably incurred by the Company, or any such director, officer or controlling person in connection with investigating or defending against any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this subparagraph (ii) shall not apply to amounts paid to any claimant in settlement of any suit or claim unless such payment is first approved by such Holder; and, provided further, that the aggregate amount payable by a Holder pursuant to this Section 9(c)(ii) shall not exceed the net proceeds received by such Holder in the registered offering out of which its obligations pursuant to this Section 9(c)(ii) arise.

10.     Rights of Stockholders.  No holder of this Warrant shall be entitled, as a Warrant holder, to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company which may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the holder of this Warrant, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until the Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become deliverable, as provided herein.

11.     Information Rights.  The Company shall deliver to the Holder the following (which may be satisfied by the Company's delivery of the Company's public filings, if applicable, to Holder):

#4831-1562-0370v4                                   9

CONFIDENTIAL                                                                                 SPCP_0000004712

EXECUTION

(i)         as soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Company, a balance sheet and income statement as of the last day of such year; a statement of cash flows for such year, such year end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles, and audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(ii)         as soon as practicable, but in any event within forty five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, schedule as to the sources and application of funds for such fiscal quarter, an unaudited balance sheet and a statement of stockholder's equity as of the end of such fiscal quarter; and

(iii)         as soon as practicable, but in any event with forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the number of common shares issuable upon conversion or exercise of any outstanding securities convertible or exercisable for common shares and the exchange ratio or exercise price applicable thereto and number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Holder to calculate its percentage equity ownership in the Company and certified by the Chief Financial Officer or Chief Executive Officer of the Company as being true, complete and correct.

12.     Inspection and Observer Rights.  The Company shall permit the Holder to visit and inspect the Company's properties, to examine its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times as may be reasonably requested by the Holder.  The Company shall invite a representative of the Holder to attend all regular meetings of its Board of Directors in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors at the same time and in the same manner as provided to such directors; provided, however, (a) that such representative shall agree to hold in confidence and trust all information so provided, and (b) if in the good faith opinion of the Company's legal counsel, the delivery of such information to the Holder's representative, or the attendance of the Holder's representative at such meeting, would breach the Company's attorney - client privilege with its legal counsel with respect to such information, the Company may withhold such information from the Holder's representative, or exclude the Holder's representative from such meeting of the Company's Board of Directors, as the case may be.

13.     Reports Under Exchange Act.  With a view to making available to the Holders the benefits of Rule 144 promulgated by the SEC under the Securities Act ("**SEC Rule 144**") and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(i)         make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the first registration

#4831-1562-0370v4                                  10

statement filed by the Company for the offering of its securities to the general public so long as the Company is subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act;

(ii)          file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(iii)          furnish to any Holder, so long as the Holder holds this Warrants or owns any Shares, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144, the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form.

14.    <u>Expiration of Warrant</u>.  This Warrant shall expire and shall no longer be exercisable after 5:00 p.m., Pacific Standard Time, on the Expiration Date.

15.    <u>Notices</u>.  All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given upon receipt or, if earlier, (a) five (5) days after deposit with the U.S. Postal Service or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one business day after the business day of deposit with Federal Express or similar overnight courier, freight prepaid or (d) one business day after the business day of facsimile transmission, if delivered by facsimile transmission with copy by first class mail, postage prepaid, and shall be addressed (i) if to the Holder, at the Holder's address as set forth on the register maintained by the Company, and (ii) if to the Company, at the address of its principal corporate offices (Attention:  President), which on the date hereof is 1301 N. Tustin Avenue, Santa Ana, California 92705, or at such other address as a party may designate by ten (10) days advance written notice to the other party pursuant to the provisions above.

16.    <u>Warrant Agent.</u>

(i)          The Company shall serve as the initial warrant agent under this Warrant. The Company and the Holder may appoint a new warrant agent as mutually agreed upon by the Company and the Holder.

(ii)          Any corporation into which the Company or any new warrant agent may be merged or any corporation resulting from any consolidation to which the Company or any new warrant agent shall be a party or any corporation to which the Company or any new warrant agent transfers substantially all of its corporate trust or stockholders services business shall be a successor warrant agent under this Warrant without any further act.  Any such successor warrant agent shall promptly cause notice of its succession as warrant agent to be mailed (by first class mail, postage prepaid) to the Holder at the Holder's last address as shown on the register maintained by the warrant agent pursuant to this Warrant.

CONFIDENTIAL                                                                                              SPCP_0000004714

EXECUTION

17.    <u>Payment of Taxes</u>.  The Company will pay all documentary stamp taxes attributable to the issuance of Shares upon the exercise of the Warrants represented by this Warrant.  The Holder shall be responsible for all other tax liability that may arise as a result of holding or transferring the Warrants represented by this Warrant or receiving the Shares under this Warrant.

18.    <u>Replacement of Warrant</u>.  If the certificate evidencing the Warrants is mutilated, lost, stolen or destroyed, the Company shall issue in exchange and substitution for and upon cancellation hereof, or in lieu of and substitution for this Warrant certificate, a new warrant certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and bond or other indemnity, if requested, reasonably satisfactory to it.  A Holder of a replacement warrant certificate also shall comply with such other reasonable regulations and pay such other reasonable charges attributable to the replacement of a warrant certificate.

19.    <u>Governing Law</u>.  This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Nevada.

Issued this 9th day of October, 2007.

**INTEGRATED HEALTHCARE HOLDINGS, INC.,**
A NEVADA CORPORATION


By:_____
Bruce Mogel, Chief Executive Officer



<u>Attachments</u>


Exhibit A - Notice of Exercise
Exhibit B - Form of Transfer

**JAE 0412**

CONFIDENTIAL                                                                SPCP_0000004715

## EXHIBIT A

## NOTICE OF EXERCISE

**TO:**   **INTEGRATED HEALTHCARE HOLDINGS, INC.**

Attention:  President

1.      The undersigned hereby elects to purchase_____ shares of the Common Stock of Integrated Healthcare Holdings, Inc. (the "**Company**") pursuant to the terms of the attached Warrant.

2.      Method of Exercise (Please initial the applicable blank):

——   The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.

——   The undersigned elects to exercise the attached Warrant by means of the net exercise provisions of Section 1(c) of this Warrant, and accordingly requests delivery of a net of of such securities.

3.      Please issue a certificate or certificates representing said Shares in the name of the undersigned or in such other name as is specified below:

_____

(Name)

_____

_____

(Address)

4.      The undersigned hereby represents and warrants that the aforesaid shares of Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale, in connection with the distribution thereof.

_____
(Signature)
Title:_____

_____
(Date)

#4831-1562-0370v4

**JAE 0413**

## EXHIBIT B

## FORM OF TRANSFER
(To be signed only upon transfer of Warrant)

     FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ the right represented by the attached Warrant to purchase_____ shares of the Common Stock of INTEGRATED HEALTHCARE HOLDINGS, INC. (the "**Company**"), to which the attached Warrant relates, and appoints_____ as their true and lawful attorney in fact to transfer such right on the books of the Company, with full power of substitution in the premises.

Dated:_____

(Signature must conform in all respects to
name of Holder as specified on the face of
the Warrant)


_____

_____
(Address)


Signed in the presence of:


_____


#4831-1562-0370v4

**JAE 0414**

CONFIDENTIAL

SPCP_0000004717

# SCHEDULE 1.3

## [As of the Closing Date]

## SOURCES AND USES OF FUNDS

|  | Sources | | Uses | |
|---|---|---|---|---|
| Accounts Receivable Revolver Loan Proceeds | 12,000,000 | (1) | | |
| Real Estate Term Note Proceeds | 45,000,000 | | | |
| Non-Revolving Line of Credit Proceeds | 30,701,477 | (2) | | |
| Convertible Term Loan Proceeds | 10,700,000 | | | |
| Purchase Outstanding Accounts Receivables | | | 12,000,000 | (1) |
| Payoff Existing Acquisition Note | | | 45,000,000 | |
| Payoff Existing Line of Credit Note | | | 27,341,459 | |
| Payoff Existing Convertible Term Note | | | 10,700,000 | |
| Payoff Existing Accrued Interest | | | 949,518 | (3) |
| Debt Origination Fees | | | 2,110,500 | |
| Transaction Closing Costs | | | 300,000 | (4) |
|  | 98,401,477 | | 98,401,477 | |

Notes:

(1) This is a rough estimate of the necessary initial A/R Revolver draw to purchase accounts receivable. The amount will vary based on daily cash activity. The variance may be material.

(2) This amount will vary based on the final closing costs and accrued interest calculations as it is assumed that accrued interest and closing costs will be financed.

(3) The calculation of interest assumes an effective date of 9/30/07. If the effective date of the financing is later, the daily increase to this amount is approximately $31,650.60.

(4) This is a rough estimate of transaction closing costs. The final amount will vary.

SCHEDULE 1.3 - 1

US_ACTIVE-111640559.10

CONFIDENTIAL

SPCP_0000004718

## SCHEDULE 2.1(b)

## REQUIRED CONSENTS AND APPROVALS

No consents and approvals from any Governmental Authorities are required for execution, delivery and performance of this Agreement.  However, many approvals or notices were obtained from or submitted to Governmental Authorities related to the operation of the Borrowers as general acute care hospitals upon acquisition.  These consents and approvals must be updated anytime there is a material change of ownership within the Company (new shareholder who owns 10% or more of the Company).  All consents and approvals have been obtained.

SCHEDULE 2.1(b) - 1

**JAE 0416**

CONFIDENTIAL

SPCP_0000004719

**SCHEDULE 2.1(c)**

**[As of the Effective Date]**

**CAPITAL STRUCTURE OF BORROWER**

**Integrated Healthcare Holdings, Inc.**
Fully Diluted Capital Stock

|  |  | Fully diluted common stock |
|---|---|---|
| Outstanding shares at 7/31/07 & 10/04/07 | (A)  137,095,716 | 137,095,716 |
| Remaining restructuring warrants - KPC |  | 24,878,213 |
| MCC $10.7M convertible note | $   10,700,000 |  |
| Conversion price | $   0.21 |  |
| Converted shares | 50,952,381 | 50,952,381 |
| (Convertible note dated 10/9/07) |  |  |
| Employee stock options granted | 5,190,000 | 5,190,000 |
| Common Stock Equivalents, before 31.09% & 4.95% warrants |  | 218,116,310 |
| MCC warrants: |  |  |
| MCC Amendment 2 to Warrant dated 12/12/05 |  |  |
| 31.09% Converted shares |  |  |
| (Amendment dated 10/1/07) |  |  |
| 4.95% Common Stock Equivalents | 122,903,562 | 122,903,562 |
| (Common Stock Warrant dated 10/1/07) |  |  |

SCHEDULE 2.1(c) - 1

**JAE 0417**

Assumed exercised concurrently

| | |
|---|---:|
| | 341,019,872 |

**Note:** Does not include approximately 15M shares reserved, but ungranted, in the stock option pool.

**Chapman Medical Center, Inc.**

Outstanding Shares                                                                                            100

**Coastal Communities Hospital, Inc.**

Outstanding Shares                                                                                          1,000

**WMC-A, Inc.**

Outstanding Shares                                                                                          1,000

**WMC-SA, Inc.**

Outstanding Shares                                                                                          1,000

"The Board of Directors of the Company has approved a form of Amended and Restated Articles of Incorporation in the form included in this Schedule 2.1(c) (the "Restated Charter").   The Restated Charter provides for 400,000,000 authorized shares of common stock, which, when adopted by the Company, will be sufficient to cover the Company's obligations to issue common stock upon conversion or exercise of the convertible notes and warrants issued to Lender or its affiliates under the credit agreements executed on the date hereof and the existing warrant being amended in connection with the credit agreements.  The adoption of the Restated Charter is subject to majority approval of the Company's shareholders and the filing and mailing of an Information Statement to the Company's shareholders pursuant to Schedule 14C of the Securities and Exchange Commission or a Proxy Statement pursuant to Schedule 14A of the Securities and Exchange Commission.  The Company intends to obtain shareholder approval and comply with the requirements of the Securities and Exchange Commission promptly following the execution of the credit agreements."

SCHEDULE 2.1(c) - 2

CONFIDENTIAL

SPCP_0000004721

## CAPITAL STRUCTURE OF CREDIT PARTIES

### ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC

| Member Name | Percentage Interest |
|---|---|
| Amin, Ashok | 0.234% |
| Brown, Craig | 0.156% |
| Chouhan, Bharat | 0.117% |
| Dang, Surinder | 6.517% |
| Fairwind Investments, LP | 3.536% |
| Hajj, Ahmad | 0.702% |
| Jodhka, Joginder | 2.703% |
| Kapadia, Shilpa | 0.156% |
| Katakia, Madhu | 0.156% |
| Khan, Farhat | 0.117% |
| Kothapa, Sangamitra | 0.234% |
| Lee, Anthony | 0.585% |
| Lohiya, Ghan | 0.676% |
| Ludmir, Jaime | 8.274% |
| Mayer, Ronald | 0.117% |
| Mehta, Milan | 0.117% |
| Meka, Ajay | 14.674% |
| Melikian, Robert | 0.117% |
| Modi, Jasvant | 1.040% |
| Naqvi, Syed | 0.757% |

SCHEDULE 2.1(c) - 3

**JAE 0419**

CONFIDENTIAL

SPCP_0000004722

| Member Name | Percentage Interest |
|---|---|
| OC Healthcare, LLC | 4.648% |
| Rottermann, Israel | 1.170% |
| Salem, Ahmed | 0.234% |
| Salem, Yasser | 2.649% |
| Samimi, Shahin | 0.104% |
| Sankaram, R. | 2.703% |
| Sarode, Praful | 0.351% |
| Sein, Michael | 2.703% |
| Shah, Anil | 38.189% |
| Sweidan, Jacob | 2.703% |
| Walsh, Patrick | 0.624% |
| Weiss, Barry | 0.234% |
| Zarka, Amer | 2.703% |
| | **100.00%** |

SCHEDULE 2.1(c) - 4

**JAE 0420**

CONFIDENTIAL

## WEST COAST HOLDINGS, LLC

| Member Name | Percentage Interest |
|---|---|
| Amin, Ashok | 0.180% |
| Brown, Craig | 0.090% |
| Chouhan, Bharat | 0.090% |
| Dang, Surinder | 2.700% |
| Fairwind Investments, LP | 1.350% |
| Hajj, Ahmad | 0.540% |
| Jodhka, Joginder | 3.331% |
| Kapadia, Shilpa | 0.090% |
| Katakia, Madhu | 0.090% |
| Khan, Farhat | 0.090% |
| Kothapa, Sangamitra | 0.180% |
| Lee, Anthony | 0.450% |
| Lohiya, Ghan | 0.833% |
| Ludmir, Jaime | 9.992% |
| Mayer, Ronald | 0.090% |
| Mehta, Milan | 0.090% |
| Meka, Ajay | 16.653% |
| Melikian, Robert | 0.090% |
| Modi, Jasvant | 0.900% |
| Naqvi, Syed | 0.933% |
| OC Healthcare, LLC | 5.729% |

SCHEDULE 2.1(c) - 5

CONFIDENTIAL

SPCP_0000004724

| Member Name | Percentage Interest |
|---|---|
| Rottermann, Israel | 0.900% |
| Salem, Ahmed | 0.180% |
| Salem, Yasser | 3.264% |
| Samimi, Shahin | 0.090% |
| Sankaram, R. | 3.331% |
| Sarode, Praful | 0.270% |
| Sein, Michael | 3.331% |
| Shah, Anil | 36.763% |
| Sweidan, Jacob | 3.331% |
| Walsh, Patrick | 0.540% |
| Weiss, Barry | 0.180% |
| Zarka, Amer | 3.331% |
| **TOTAL** | **100.00%** |

SCHEDULE 2.1(c) - 6

**JAE 0422**

## PACIFIC COAST HOLDINGS INVESTMENT, LLC

| Name of Member | Percentage Owned |
|---|---|
| WEST COAST HOLDINGS, LLC, a California limited liability company | 51.00% |
| GANESHA REALTY, LLC, a California limited liability company | 49.00% |

SCHEDULE 2.1(c) - 7

**JAE 0423**

CONFIDENTIAL

SPCP_0000004726

## SCHEDULE 3.1

## SCHEDULE 3.1A

### [As of the Restatement Effective Date]

### NAMES, LOCATION OF COLLATERAL, MEDICARE AND MEDI-CAL PROVIDER NUMBERS AND FEIN

| NAME | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER |
|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | NA | NA | 87-0573331 |
| WMC-SA, Inc. | 050746 (ACUTE) 05S746 (PSYCH) | HSC30065H (INPT) ZZT40065H (OUTPT) ZZT30065H (NON-CNTR) HSD30065H (I/P TRANS) HSM30065H (I/P PSYCH) | 55-0883862 |
| WMC-A, Inc. | 050744 (ACUTE) 05S744 (PSYCH) | HSC30594J (INPT) HSP40594J (OUTPT) HSM30594J (I/P PSYCH) HSP30594J (NON-CNTR) HSD30594J (I/P TRANS) | 55-0883859 |
| Coastal Communities Hospital, Inc. | 050747 (ACUTE) 05S747 (PSYCH) 555567 (SNF) | HSC30535I (INPT) HSP40535I (OUTPT) HSP30535I (NON-CNTR) HSD30535I (I/P TRANS) HSM30535I (IP PSYCH) LTC70068G (SUB-ACUTE) | 55-0883863 |

SCHEDULE 3.1 - 1

**JAE 0424**

| NAME | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER |
|---|---|---|---|
| Chapman Medical Center, Inc. | 050745 (ACUTE)<br>05S745 (PSYCH)<br>555709 (SNF) | HSC30550H (INPT)<br>HSP40550H (OUTPT)<br>HSP30550H (NON-CNTR)<br>LTC70108G (SUB-ACUTE)<br>LTC55709G (SNF) | 55-0883864 |
| Pacific Coast Holdings Investment, LLC | NA | NA | 20-2359134 |
| Ganesha Realty, LLC | NA | NA | 34-2036653 |

### TRADE NAMES

| Borrower | Trade Name |
|---|---|
| Coastal Communities Hospital, Inc. | Coastal Communities Hospital |
| Chapman Medical Center, Inc. | Chapman Medical Center |
| WMC-A, Inc. | Western Medical Center – Anaheim |
| WMC-SA, Inc. | Western Medical Center – Santa Ana |

### COLLATERAL LOCATIONS

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Integrated Healthcare | 1301 N. Tustin Avenue | 1301 N. Tustin Avenue | None |

SCHEDULE 3.1 - 2

**JAE 0425**

SPCP_0000004728

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Holdings, Inc. | Santa Ana, CA  92705 | Santa Ana, CA  92705 | |
| Coastal Communities Hospital, Inc. | 2701 S Bristol St Santa Ana, CA 92704 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | None |
| Chapman Medical Center, Inc. | 2601 E, Chapman Ave. Orange, CA  92869 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 2601 E, Chapman Ave. Orange, CA  92869 |
| | | | Chapman Medical Office Building 2617 E. Chapman Ave. Orange, CA  92869 |
| WMC-A, Inc. | 1025 S. Anaheim Blvd. Anaheim, CA 92805 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | El Camino Business Center 100 N. Harbor Blvd. Anaheim, CA |
| | | | 1107 S. Anaheim Blvd., Suite 1107 Anaheim, CA  92805 |
| | | | 1101 S. Anaheim Blvd., Suite 1101 Anaheim, CA  92805 |
| | | | 1103 S. Anaheim Blvd., Suite 1103 Anaheim, CA  92805 |
| WMC-SA, Inc. | 1001 N Tustin Ave Santa Ana, CA 92705 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 999 N. Tustin Ave. Suites 105-10 and 205-10 Santa Ana, CA |
| | | | 13522 Newport Avenue #102 Tustin, CA |
| | | | 1001 N. Tustin Avenue Santa Ana, CA |
| Pacific Coast Holdings Investment, LLC | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 | None |
| Ganesha Realty, LLC | 6800 Indiana Avenue, Suite 130 | 6800 Indiana Avenue, Suite 130 | None |

SCHEDULE 3.1 - 3

**JAE 0426**

SPCP_0000004729

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | Riverside, CA 92506 | Riverside, CA 92506 | |

## SCHEDULE 3.1B

### [As of the Closing Date]

### ADDRESS OF EXECUTIVE OFFICE, FEIN AND SOCIAL SECURITY NUMBERS

| OFFICIAL NAME | TYPE OF ENTITY | ORGANIZATION ID # ISSUED BY STATE OF INCORPORATION OR ORGANIZATION OR STATEMENT THAT NO SUCH NUMBER HAS BEEN ISSUED | STATE OF INCORPORATION OR ORGANIZATION | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER | LOCATION OF CHIEF EXECUTIVE OFFICE |
|---|---|---|---|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | Corporation | C10133-1988 | Nevada | NA | NA | 87-0573331 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |
| WMC-SA, Inc. | Corporation | 2677248 | California | 050746 (ACUTE) 05S746 (PSYCH) | HSC30065H (INPT) ZZT40065H (OUTPT) ZZT30065H (NON-CNTR) HSD30065H (I/P TRANS) HSM30065H (I/P PSYCH) | 55-0883862 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |

SCHEDULE 3.1 - 4

JAE 0427

CONFIDENTIAL

| Official Name | Type of Entity | Organization ID # Issued by State of Incorporation or Organization or Statement that no such Number has been issued | State of Incorporation or Organization | Medicare Provider Number | Medi-Cal Provider Number | FEIN Number | Location of Chief Executive Office |
|---|---|---|---|---|---|---|---|
| WMC-A, Inc. | Corporation | 2677247 | California | 050744 (ACUTE)<br>05S744 (PSYCH) | HSC30594J (INPT)<br>HSP40594J (OUTPT)<br>HSM30594J (I/P PSYCH)<br>HSP30594J (NON-CNTR)<br>HSD30594J (I/P TRANS) | 55-0883859 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |
| Coastal Communities Hospital, Inc. | Corporation | 2677249 | California | 050747 (ACUTE)<br>05S747 (PSYCH)<br>555567 (SNF) | HSC30535I (INPT)<br>HSP40535I (OUTPT)<br>HSP30535I (NON-CNTR)<br>HSD30535I (I/P TRANS)<br>HSM30535I (IP PSYCH)<br>LTC70068G (SUB-ACUTE) | 55-0883863 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |
| Chapman Medical Center, Inc. | Corporation | 2676435 | California | 050745 (ACUTE)<br>05S745 (PSYCH)<br>555709 (SNF) | HSC30550H (INPT)<br>HSP40550H (OUTPT)<br>HSP30550H (NON-CNTR)<br>LTC70108G (SUB-ACUTE)<br>LTC55709G (SNF) | 55-0883864 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |

SCHEDULE 3.1 - 5

JAE 0428

SPCP_0000004731

| OFFICIAL NAME | TYPE OF ENTITY | ORGANIZATION ID # ISSUED BY STATE OF INCORPORATION OR ORGANIZATION OR STATEMENT THAT NO SUCH NUMBER HAS BEEN ISSUED | STATE OF INCORPORATION OR ORGANIZATION | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER | LOCATION OF CHIEF EXECUTIVE OFFICE |
|---|---|---|---|---|---|---|---|
| Pacific Coast Holdings Investment, LLC | LCC | 200504710009 | California | NA | NA | None | 2621 S. Bristol Street, Suite 108 Santa Ana, CA 92704 |
| Ganesha Realty, LLC | LLC | 200426510045 | California | NA | NA | 34-2036653 | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 |
| West Coast Holdings, LLC | LLC | 20054710008 | California | NA | NA | None | 2621 S. Bristol Street, Suite 108 Santa Ana, CA 92704 |

SCHEDULE 3.1 - 6

JAE 0429

| Official Name | Type of Entity | Organization ID # Issued by State of Incorporation or Organization or Statement that no such number has been issued | State of Incorporation or Organization | Medicare Provider Number | Medi-cal Provider Number | FEIN Number | Location of Chief Executive Office |
|---|---|---|---|---|---|---|---|
| Orange County Physicians Investment Network, LLC<br><br>(Previous name Orange County Physician Investment Group, LLC – dissolved 2004) | LLC | LLC197-275 | Nevada | NA | NA | None | 2621 S. Bristol Street, Suite 108 Santa Ana, CA 92704 |

## COLLATERAL LOCATIONS

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | 1301 N. Tustin Avenue Santa Ana, CA 92705 | 1301 N. Tustin Avenue Santa Ana, CA 92705 | None |
| Coastal Communities Hospital, Inc. | 2701 S Bristol St Santa Ana, CA 92704 | 1301 N. Tustin Avenue Santa Ana, CA 92705 | Doctor's Hospital/MOB 1901 N. College Ave. Santa Ana, CA 92705 |

SCHEDULE 3.1 - 7

**JAE 0430**

SPCP_0000004733

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | | | 1901/1905. N. College Ave., Santa Ana, CA |
| Chapman Medical Center, Inc. | 2601 E, Chapman Ave. Orange, CA  92869 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 2601 E, Chapman Ave. Orange, CA  92869 |
| | | | 2617 E, Chapman Ave. Orange, CA  92869 |
| | | | 2922 E, Chapman Ave. Orange, CA  92869 |
| | | | 7630 – B Chapman Ave. Orange, CA  92869 |
| | | | Chapman Medical Office Building 2617 E. Chapman Ave. Orange, CA  92869 |
| WMC-A, Inc. | 1025 S. Anaheim Blvd. Anaheim, CA 92805 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | Walnut Grove Medical Center 947 S. Anaheim Blvd., Suites 210 and 240 Anaheim, CA  92805 |
| | | | El Camino Business Center 100 N. Harbor Blvd. Anaheim, CA |
| | | | 1107 S. Anaheim Blvd., Suite 1107 Anaheim, CA  92805 |
| | | | 1101 S. Anaheim Blvd., Suite 1101 Anaheim, CA  92805 |
| | | | 1103 S. Anaheim Blvd., Suite 1103 Anaheim, CA  92805 |
| | | | Medical Office Building 1491 E. La Palma Ave., Suites |

SCHEDULE 3.1 - 8

**JAE 0431**

SPCP_0000004734

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | | | B, C and Basement<br>Anaheim, CA |
| | | | 2100 W. Lincoln Ave., Suite A<br>Anaheim, CA |
| | | | 979 S. Anaheim Blvd.<br>Anaheim, CA |
| WMC-SA, Inc. | 1001 N Tustin Ave<br>Santa Ana, CA 92705 | 1301 N. Tustin Avenue<br>Santa Ana, CA  92705 | 999 N. Tustin Ave.<br>Suites 105-10 and 205-10<br>Santa Ana, CA |
| | | | 420B "B" St.<br>Tustin, CA |
| | | | 1241 W. 17th St. #1-3<br>Santa Ana, CA |
| | | | 13522 Newport Avenue #102<br>Tustin, CA |
| | | | 4010 E. Chapman #B,C, and D |
| | | | 800 N. Tustin Ave.<br>Santa Ana, CA |
| | | | 1001 N. Tustin Avenue<br>Santa Ana, CA |
| Pacific Coast Holdings Investment, LLC | 2621 South Bristol Street, Suite 304<br>Santa Ana, CA 92704 | 2621 South Bristol Street, Suite 304<br>Santa Ana, CA 92704 | None |

SCHEDULE 3.1 - 9

**JAE 0432**

CONFIDENTIAL

## SCHEDULE 3.5

**[As of immediately after the Closing Date]**

**REAL ESTATE OWNED AND LEASED**

**Western Medical Center – Santa Ana**

**Leased Real Property**

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| 999 N. Tustin Ave.<br>Suites 105-10 and 205-10<br>Santa Ana, CA | MOB | Bank of West |
| 420B "B" St.<br>Tustin, CA | Records | Tustin Guthrie Venture |
| 1241 W. 17th St. #1-3<br>Santa Ana, CA | Clinic | Bristol Partnership |
| 13522 Newport Avenue #102<br>Tustin, CA | Clinic | Sycamore Commercial |
| 4010 E. Chapman #B,C, and D | Clinic | Salına Jason Monica |
| 800 N. Tustin Ave.<br>Santa Ana, CA | Sublease by Physicians | Allan Fainburg |
| 1001 N. Tustin Avenue<br>Santa Ana, CA | Hospital and Parking Lot | Pacific Coast Holdings Investment, LLC |
| 1301 N. Tustin Ave.<br>Santa Ana, CA | Administration Building | Pacific Coast Holdings Investment, LLC |

**Coastal Communities Hospital**

**Leased Real Property**

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Coastal Communities Hospital<br>2701 S. Bristol St.<br>Santa Ana, CA  92704 | Acute Hospital and Parking Lot | Pacific Coast Holdings Investment, LLC |
| Doctor's Hospital/MOB<br>1901 N. College Ave.<br>Santa Ana, CA  92705 | MOB | Pacific Coast Holdings Investment, LLC |
| 1901/1905. N. College Ave., Santa | Hispanic Commision on Alcohol | |

SCHEDULE 3.5 - 1

**JAE 0433**

CONFIDENTIAL

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Ana, CA | and Drug Abuse, Inc. | |

## Chapman Medical Center

## Owned Real Property

| ADDRESS | FACILITY TYPE |
|---|---|
| Chapman Medical Office Building 2617 E. Chapman Ave. Orange, CA  92869 | MOB (Borrower owns building subject to a ground lease) |

## Chapman Medical Center

## Leased Real Property

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Chapman Medical Center 2601 E, Chapman Ave. Orange, CA  92869 | Hospital | Chapman Medical LP |
| Chapman Medical Center 2617 E, Chapman Ave. Orange, CA  92869 | MOB | Chapman Medical LP |
| Chapman Medical Center 2922 E, Chapman Ave. Orange, CA  92869 | Clinic | Mary Center, LLC |
| Chapman Medical Center 7630 – B Chapman Ave. Orange, CA  92869 | Clinic | Miller Family Trust |

SCHEDULE 3.5 - 2

**JAE 0434**

## Western Medical Center – Anaheim

### Leased Real Property

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Walnut Grove Medical Center<br>947 S. Anaheim Blvd.,<br>Suites 210 and 240<br>Anaheim, CA 92805 | Sleep Center and Clinic for Women | California Commercial |
| El Camino Business Center<br>100 N. Harbor Blvd.<br>Anaheim, CA | Sublease to Coldwell Bankers | Granite/El Camino LLC<br>The REMM Group |
| 1107 S. Anaheim Blvd.,<br>Suite 1107<br>Anaheim, CA 92805 | Vacant | Peggy Falkenberg<br>c/o Shaw Properties |
| 1101 S. Anaheim Blvd.,<br>Suite 1101<br>Anaheim, CA 92805 | MOB | Peggy Falkenberg<br>c/o Shaw Properties |
| 1103 S. Anaheim Blvd.,<br>Suite 1103<br>Anaheim, CA 92805 | MOB | Peggy Falkenberg<br>c/o Shaw Properties |
| Medical Office Building<br>1491 E. La Palma Ave.,<br>Suites B, C and Basement<br>Anaheim, CA | MOB | Southern California<br>Universal of Health Services<br>c/o G&M Management<br>Services, Inc. |
| 2100 W. Lincoln Ave., Suite A<br>Anaheim, CA | Clinic | First Street Financial Center |
| 1025 S. Anaheim Blvd.<br>Anaheim, CA | Hospital and Birthing Center | Pacific Coast Holdings Investment, LLC |
| 979 S. Anaheim Blvd.<br>Anaheim, CA | Parking Lot | Pacific Coast Holdings Investment, LLC |

SCHEDULE 3.5 - 3

JAE 0435

CONFIDENTIAL

## SCHEDULE 3.6

### [As of the Closing Date]

## LABOR MATTERS

Three (3) of IHHI's four (4) hospitals have collective bargaining agreements in effect for certain employees. The Service Employees International Union represents approximately 212 employees in WMC-A.  The current collective bargaining agreement applicable to those employees expires on December 31, 2009. In the current agreement, which is effective as of January 1, 2007, pay raises were agreed to which cannot exceed 5%, 8%, and 8%, in years 1,2, and 3 of the Agreement, respectively.

The California Nurses Association represents approximately 500 employees in Coastal Communities Hospital, Chapman Medical Center and WMC-A.  The applicable Collective Bargaining Agreement for these employees expired on December 31, 2006; however, its terms are in effect while the parties pursue a new agreement in a Board of Inquiry process.  The parties are also meeting separate and apart from the Board of Inquiry in an attempt to reach an amicable settlement. Management believes that an Agreement could be reached as early as the end of October, 2007. Pay increases for covered employees are likely to be retroactive to the anniversary of each employee's last pay increase under the currently effective Agreement. The Company does not anticipate the new agreements will have a material adverse effect on our results of operations.

Both unions have filed grievances in connection with allegations the agreement obligated the Company to contribute to a Retiree Medical Benefit Account. The Company does not agree with this interpretation of the agreement but has agreed to submit the matter to arbitration. CNA has also filed grievances related to the administration of increases at one facility, change in pay practice at one facility and several wrongful terminations. We do not anticipate resolution of the arbitrations will have a material adverse effect on our results of operations.

The Company and its subsidiaries are involved in various other legal proceedings most of which relate to routine matters incidental to our business. We do not believe that the outcome of these matters is likely to have a material adverse effect on the Company.

See attached Employment Agreements.

SCHEDULE 3.6 - 1

**JAE 0436**

CONFIDENTIAL

## LIST OF EMPLOYMENT AGREEMENTS

| Title of Document | Effective Date | | Parties |
|---|---|---|---|
| Employment Agreement | 02/22/05 | IHHI | Larry B. Anderson |
| Employment Agreement | 02/22/05 | IHHI | Bruce Mogul |
| Amendment Letter to Employment Agreements | 06/06/05 | IHHI | Anderson, Mogul and James T. Ligon |
| Employment Agreement | 03/21/05 | IHHI | Steve Blake |
| Amendment Letter to Employment Agreement | 02/14/07 | IHHI | Steve Blake |
| Employment Agreement | 05/08/06 | IHHI | J. Scott Shoeffel |
| Personnel Change Notice | 08/06/06 | IHHI | J. Scott Shoeffel |
| Employment Agreement | 11/01/05 | IHHI | Casey Fatch |
| Personnel Change Notice | 04/29/07 | IHHI | Casey Fatch |
| Employment Agreement | 03/07/05 | IHHI | Anil V. Shah, M.D. |
| Severance Agreement and Mutual Releases | 01/09/07 | IHHI | Anil V. Shah, M.D. |
| Employment Offer Letter | 09/10/07 | IHHI | Andy Chao |
| Employment Agreement | 09/10/07 | IHHI | Jerry Kanaly |
| Retainer Letter Agreement | 08/02/07 | IHHI | Alexander Yu |
| Employment Agreement | 12/__/04 | IHHI | Dan Brothman |
| Employment Agreement | 05/08/07 | IHHI | Catherine Anderson |
| Employment Agreement | 12/15/04 | IHHI | Doug Norris |
| Letter of Correction to Employment Agreement | 06/28/07 | IHHI | Doug Norris |
| Employment Agreement | 12/16/04 | IHHI | Kathy Hammack |
| Employment Offer Letter | 10/25/06 | IHHI | Carol McKenna |
| Employment Agreement | 02/20/05 | IHHI | Milan Mehta |
| Employment Agreement | 07/10/06 | IHHI | Craig Myers |
| Offer Letter and Acceptance | 05/25/05 | Coastal | Geri Mikelson, R.N. |
| Employment Agreement | 08/20/07 | IHHI | S. Sean Fowler |
| Employment Agreement | 08/13/07 | IHHI | Deniece Reed |

SCHEDULE 3.6 - 2

**JAE 0437**

CONFIDENTIAL

SPCP_0000004740

| Title of Document | Effective Date | | Parties |
|---|---|---|---|
| Employment Agreement | 04/11/07 | IHHI | Kelly Laban |
| Employment Agreement | 05/01/06 | IHHI | Pamela Giesie |
| Employment Agreement | 12/22/05 | IHHI | Patricia Henry |
| Employment Agreement | 01/01/06 | IHHI | Robert Heinemeier |
| Employment Agreement | 09/01/05 | IHHI | Ray Rivas |
| Employment Agreement | 03/08/05 | IHHI | Ada Yeh |

SCHEDULE 3.6 - 3

**JAE 0438**

## SCHEDULE 3.7

### [As of the Restatement Effective Date]

### VENTURES, SUBSIDIARIES AND AFFILIATES; OUTSTANDING STOCK; DIRECTORS, MEMBERS, MANAGERS OR PARTNERS

**Integrated Healthcare Holdings, Inc.**
Capitalization table
December 31, 2012

Outstanding shares
Affiliates:

| | | |
|---|---|---|
| Kali P. Chaudhuri, M.D. | 128,601,334 | 50.4% |
| Orange County Physicians Investment Network, LLC | 73,798,430 | 28.9% |
| William E. Thomas | 9,748,498 | 3.8% |
| Anil V. Shah, M.D. (1) | 14,700,000 | 5.8% |
| Total outstanding shares held by affiliates | 226,848,262 | 88.9% |
| Others (2) | 28,459,000 | 11.1% |
| Total outstanding shares (3) | 255,307,262 | 100.0% |

(1) Does not include 5,112,000 shares that are in the process of being transferred from Larry Anderson to Dr. Shah.
(2) Includes 19,534,126 shares held in street names.
(3) Total authorized shares: 800,000,000.

Integrated Healthcare Holdings, Inc.
Fully diluted shares
December 31, 2012

| | | | % of outstanding | % of fully diluted | |
|---|---|---|---|---|---|
| Outstanding shares | | | | | |
| Affiliates: | | | | | |
| Kali P. Chaudhuri, M.D. | | 128,601,334 | 50.4% | 19.24% | |
| Orange County Physicians Investment Network, LLC | | 73,798,430 | 28.9% | 11.04% | |
| William E. Thomas | | 9,748,498 | 3.8% | 1.46% | |
| Anil V. Shah, M.D. (1) | | 14,700,000 | 5.8% | 2.20% | |
| Total outstanding shares held by affiliates | | 226,848,262 | 88.9% | | |
| Others (2) | | 28,459,000 | 11.1% | 4.26% | |
| Total outstanding shares | | 255,307,262 | 100.0% | | |
| Outstanding stock options - all fully vested (3) | | 8,085,000 | | 1.21% | |
| Outstanding warrants: | | | | | |
| Kali P. Chaudhuri, M.D. | 170,000,000 | 170,000,000 | | 25.43% | |
| KPC Resolution Company, LLC (Dr. Chaudhuri) | 139,000,000 | 139,000,000 | | 20.80% | 46.2% |
| | 309,000,000 | | | | |
| SPCP Group, LLC (Silver Point Finance, LLC) | 79,182,635 | 79,182,635 | | 11.85% | |
| SPCP Group IV, LLC (Silver Point Finance, LLC) | 16,817,365 | 16,817,365 | | 2.52% | 14.4% |
| | 96,000,000 | | | | |
| Fully diluted (4) | | 668,392,262 | | 100.0% | |

(1) Does not include 5,112,000 shares that are in the process of being transferred from Larry Anderson to Dr. Shah.
(2) Includes 19,534,126 shares held in street names.
(3) Does not reflect changes subsequent to September 30, 2012. Total remaining shares reserved in option pool: 15,440,489.
(4) Total authorized shares: 800,000,000.

SCHEDULE 3.7 - 1

**JAE 0439**

**PACIFIC COAST HOLDINGS INVESTMENT, LLC MEMBERSHIP INTERESTS**

| Member | PCHI Ownership % |
|---|---|
| Ganesha Realty, LLC | 49.00000 |
| Amin, Ashok | 0.09180 |
| Brown, Craig | 0.04590 |
| Chouhan, Bharat | 0.04590 |
| Dang, Surinder | 1.38054 |
| Fairwind Investments, LP | 0.68849 |
| Hajj, Ahmad | 0.27539 |
| Jodhka, Joginder | 1.69878 |
| Kapadia, Shilpa | 0.04590 |
| Katakia, Madhu | 0.04590 |
| Khan, Farhat | 0.04590 |
| Kothapa, Sangamitra | 0.09180 |
| Lee, Anthony | 0.22950 |
| Lohiya, Ghan | 0.42482 |
| Ludmir, Jaime | 5.09582 |
| Mayer, Ronald | 0.04590 |
| Mehta, Milan | 0.04590 |
| Meka, Ajay | 10.19164 |
| Melikian, Robert | 0.04590 |
| Modi, Jasvant | 0.45899 |
| Naqvi, Syed | 0.47582 |
| OC Healthcare, LLC | 2.92173 |
| Rotterman, Israel | 0.45899 |
| Salem, Ahmed | 0.09180 |
| Salem, Yasser | 1.66461 |
| Samimi, Shahin | 0.04590 |
| Sarode, Praful | 0.13770 |
| Sein, Michael | 1.69878 |
| Shah, Anil | 18.74519 |
| Sweidan, Jacob | 1.69878 |
| Walsh, Patrick | 0.27539 |
| Weiss, Barry | 0.09180 |
| Zarka, Amer | 1.69878 |
| **Total** | 100.0000 |

Integrated Healthcare Holdings, Inc.'s wholly owned Subsidiaries are: WMC-A, Inc., WMC-SA, Inc., Coastal Communities Hospital, Inc., and Chapman Medical Center, Inc. Integrated Healthcare Holdings, Inc. does not have any other Subsidiaries.

SCHEDULE 3.7 - 2

**JAE 0440**

Pacific Coast Holdings Investment, LLC and Ganesha Realty, LLC have no Subsidiaries.

Pacific Coast Holdings Investment, LLC does not own an interest in, participate in or engage in any joint venture, partnership or similar arrangements with any Person.

### Integrated Healthcare Holdings, Inc.

| Directors |
| --- |
| Maurice J. DeWald |
| Hon. C. Robert Jameson |
| Ajay G. Meka, M.D. |
| Michael Metzler |
| J. Fernando Niebla |
| William E. Thomas |
| Kenneth K. Westbrook |

### WMC-A, Inc.

| Directors |
| --- |
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### WMC-SA, Inc.

| Directors |
| --- |
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### Coastal Communities Hospital, Inc.

| Directors |
| --- |
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### Chapman Medical Center, Inc.

| Directors |
| --- |
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### Pacific Coast Holdings Investment, LLC

SCHEDULE 3.7 - 3

**JAE 0441**

CONFIDENTIAL

SPCP_0000004744

| Co-Managers | Members |
|---|---|
| Kali P. Chaudhuri, M.D.<br>Jacob Sweidan, M.D. | See table above |

SCHEDULE 3.7 - 4

**JAE 0442**

CONFIDENTIAL

SPCP_0000004745

## **SCHEDULE 3.10**

## **TAXES**

None

SCHEDULE 3.10 - 1

CONFIDENTIAL

SPCP_0000004746

## SCHEDULE 3.11

## ERISA PLANS

The Company administers a 401(k) Plan for its employees that is managed by Fidelity. The Company is in compliance with all testing and auditing requirements for the Plan.  The Company also administers a Plan which allows its employees the opportunity to participate in Flexible Spending Accounts (FSAs) to pay for certain dependent care and medical costs on a pre-tax basis.

SCHEDULE 3.11 - 1

**JAE 0444**

CONFIDENTIAL

SPCP_0000004747

**SCHEDULE 3.12**

**LITIGATION**

**SCHEDULE 3.12A**

**[As of the Restatement Effective Date]**

On June 5, 2009, a potential class action lawsuit was filed against the Company by
Alexandra Avery.  Ms. Avery purports to represent all 12-hourly employees and the complaint
alleges causes of action for restitution of unpaid wages as a result of unfair business practices,
injunctive relief for unfair business practices, failure to pay overtime wages, and penalties
associated therewith. On December 23, 2009, the Company filed an answer to the complaint,
generally denying all of the plaintiff's allegations.  The Company continues to vigorously defend
the action.

On January 25, 2010, a potential class action lawsuit was filed against the company by
Julie Ross.  Ms. Ross purports to represent all similarly-situated employees and the complaint
alleges causes of action for violation of the California Labor Code and unfair competition law.
The Company continues to vigorously defend the action.

On June 16, 2008, Michael Fitzgibbons, M.D., filed a complaint against the Company
alleging malicious prosecution, intentional interference with prospective economic advantage,
defamation, and intentional infliction of emotional distress.  Most of the causes of action in the
June 16, 2008 complaint derive from events precipitating a lawsuit filed by the Company against
Dr. Fitzgibbons in 2005.  On September 9, 2008, the Company filed a "SLAPP Back" motion
seeking to remove the malicious prosecution cause of action from Dr. Fitzgibbons' complaint, as
well as an Anti-SLAPP motion directed to the remaining causes of action.  The Court denied
both motions on October 20, 2008.  The Company appealed the denial of the Anti-SLAPP
motion, which was denied by the Court of Appeal on October 27, 2009.  The remittitur, releasing
jurisdiction back to the trial court, was issued on December 31, 2009.  The parties have been in
trial on this lawsuit throughout the past year and the trial has just resumed, after a long
continuance, on January 22, 2013.

On July 6, 2011, a patient Richard Melendez filed a complaint in Orange County
Superior Court for medical malpractice, negligent hiring, negligent retention, dependent adult
abuse, negligent supervision and violation of Civil Code 51.2 (Sexual Harassment).  On July
29,2010, Melendez was brought to Western Medical Center-Anaheim on a 5150 hold due to the
fact that he threatened suicide.  He claims that he was sexually assaulted by a male nurse on
numerous occasions while in the ER before being transferred to the County mental health
facility.  He is suing for general, special and punitive damages.  The parties have tentatively
agreed to a confidential settlement of $1.5 million.

CONFIDENTIAL

SPCP_0000004748

## SCHEDULE 3.12B

## [As of the Closing Date]

On May 14, 2007, IHHI filed suit in Orange County Superior Court against three of the six members of its Board of Directors and also against IHHI's largest shareholder, OC-PIN. Among other things, the suit alleges that the defendants breached fiduciary duties owed to IHHI by putting their own economic interests above those of IHHI, its other shareholders, creditors, employees and the public-at-large. The suit also alleges that defendants' attempt to change IHHI's management and control of the existing Board could trigger an "Event of Default" under the express terms of IHHI's existing credit agreements with its secured lender. IHHI is seeking, among other items, the appointment of an independent and impartial provisional director.

On May 17, 2007, OC-PIN filed a separate suit against IHHI in Orange County Superior Court. OC-PIN's suit alleges the management issue referred to above must be resolved prior to the completion of the refinancing. OC-PIN further alleges that IHHI's President has failed to call a special shareholders' meeting so that OC-PIN could fill positions on IHHI's Board of Directors. OC-PIN seeks, among other items, to require IHHI to hold a special shareholders meeting whereat the shareholders would vote to fill the vacant seat on the Board of Directors.

Both actions have been consolidated so they can be heard before one judge. IHHI has filed a motion to appoint an independent provisional director to the vacant seventh Board seat. OC-PIN has filed an application for an order noticing a special shareholders meeting. These and other preliminary matters were heard on July 2, 2007 and a ruling issued on July 11, 2007 appointing an independent director for the term of the lawsuit.

In late May 2007, Western Medical Center, Santa Ana ("Medical Center") was notified by a May 25, 2007 letter from the U.S. Department of Health Services, Centers for Medicare and Medicaid Services ("CMS"), that CMS had identified one case that was a potential violation of the federal patient anti-dumping law (officially, the Emergency Medical Treatment and Active Labor Act or "EMTALA").  In June 2007, Lumetra, a Medicare quality improvement organization, notified Medical Center that it was aiding CMS in its investigation of the same matter. Medical Center has responded to CMS and Lumetra that its actions were appropriate and did not violate EMTALA. The complaint from CMS and the notice from Lumetra are the first steps in a determination by the Office of Inspector General ("OIG") of the U.S. Department of Health and Human Services whether to seek enforcement action for a violation of EMTALA. The potential sanctions which may be imposed by the OIG for a violation of EMTALA are a civil money penalty up to $50,000 for a confirmed violation and possible exclusion from the Medicare and Medi-Cal Programs. The Company has notified both CMS and Lumetra that it believes that a violation of the EMTALA statutes and regulations did not occur nor should it be subject to any civil money penalties. As a prophylactic matter it has also reviewed and revised its policies and procedures regarding communication and admission practices through the hospital's emergency department and has conducted further EMTALA in service training.

IHHI was recently served with a Cross-Complaint filed against IHHI by Andrew Weiss alleging causes of action for breach of contract, breach of implied covenant of good faith and fair dealing,

SCHEDULE 3.12 - 2

**JAE 0446**

CONFIDENTIAL

SPCP_0000004749

unjust enrichment, declaratory relief, and negligent misrepresentation.  This action was filed in response to the August 7, 2007 complaint filed by the IHHI against Mr. Weiss.  IHHI does not believe that Mr. Weiss' allegations have merit or that his cross-complaint will have a material adverse impact on the Company.

On August 29, 2007, IHHI filed suit in Orange County against Intercoastal Medical Management, Inc., Maximum Healthcare, Inc. and Fred Siembieda for defamation, breach of contract, breach of fiduciary duty, intentional interference with prospective economic advantage, and violation of Business and Professions Code Section 17200.  Recently, Intercoastal Medical Management, Inc., Maximum Healthcare, Inc. and Fred Siembieda filed a cross-complaint against IHHI alleging negligent and intentional interference with prospective business advantage. IHHI does not believe that the allegations in the cross-complaint have merit or that the cross-complaint will have a material adverse impact on the Company.

SCHEDULE 3.12 - 3

**JAE 0447**

SPCP_0000004750

## SCHEDULE 3.13

## BROKERS

None

**JAE 0448**

CONFIDENTIAL

SPCP_0000004751

## SCHEDULE 3.14

## INTELLECTUAL PROPERTY

None of the Borrowers or other Credit Parties are aware of any infringing or interfering with any Intellectual Property of any other Person which could reasonably be expected to have a Material Adverse Effect.

Copyrights:  None

Patents:  None

Trademarks:  None

Licenses:  None

SCHEDULE 3.14 - 1

**JAE 0449**

CONFIDENTIAL

SPCP_0000004752

## SCHEDULE 3.16

## ENVIRONMENTAL MATTERS

To the knowledge of the Borrowers and Credit Parties, any use, manufacturing, handling, generating, transporting, storing, treating, discharging, releasing, burying, or disposing of hazardous materials is in compliance with all Environmental Laws.

SCHEDULE 3.16 - 1

**JAE 0450**

CONFIDENTIAL

SPCP_0000004753

**SCHEDULE 3.17**

**[As of the Closing Date]**

**INSURANCE**

| Policy Type | Insured | Insurer | Policy Limit |
|---|---|---|---|
| 1.  Executive and Organization Liability | Integrated Healthcare Holdings, Inc. | National Union Fire Insurance Co. of Pittsburgh, Pa. (AIG) | $10,000,000 aggregate |
| 2.  Excess Financial Products | Integrated Healthcare Holdings, Inc. | Navigators Insurance Company | $5,000,000 aggregate |
| 3.  Worker's Compensation and Employers' Liability | Integrated Healthcare Holdings, Inc. | Delos Insurance Company | Statutory limits |
| 4.  Commercial Auto | Integrated Healthcare Holdings, Inc. | Hartford Fire Insurance Company | $1,000,000 per accident |
| 5.  Crime Insurance | Integrated Healthcare Holdings, Inc. | Hartford Fire Insurance Company | $5,000,000 (except $50,000 limit for money orders and counterfeit currency) |
| 6.  Flood; Earthquake; Earthquake Sprinkler Leakage | Integrated Healthcare Holdings, Inc. | Lexington Insurance Company as primary insurer, together with several participating insurers | $50,000,000 aggregate |
| 7.  Employed Lawyers Professional Liability | Integrated Healthcare Holdings, Inc. | Executive Risk Indemnity, Inc. | $2,000,000 ($500,000 defense sublimit) |
| 8.  Employment Practices Liability | Integrated Healthcare Holdings, Inc. et. al. | Lloyd's, London; Executive Risk Specialty (Chubb) | $10,000,000 each claim/annual aggregate - total limit |
| 9.  Excess Liability | Integrated Healthcare Holdings, Inc. | Homeland Insurance Company of New York (OneBeacon) | $5,000,000 |
| 10.  Fiduciary | Integrated Healthcare | Federal Insurance | $5,000,000 |

**JAE 0451**

CONFIDENTIAL

| **Policy Type** | **Insured** | **Insurer** | **Policy Limit** |
|---|---|---|---|
| Liability | Holdings, Inc. | Company (Chubb) | |
| 11.  Hospital Liability | Integrated Healthcare Holdings, Inc.; Southern California Healthcare Registry, Inc.; WMC-SA, Inc.; WMC-A, Inc.; Coastal Communities Hospital, Inc.; Chapman Medical Center, Inc. | Lexington Insurance Company | $20,000,000 |
| 12.  A-Side Directors and Officers Liability | Integrated Healthcare Holdings, Inc. | Westchester Surplus Lines Insurance Company | $5,000,000 |
| 13.  Property Insurance | Integrated Healthcare Holdings, Inc., et al and its affiliated or subsidiary organizations and Pacific Coast Holdings Investment, LLC | Continental Casualty Company (CNA) | $200,000,000 blanket all coverages maximum any one occurrence |

SCHEDULE 3.17 - 2

**JAE 0452**

CONFIDENTIAL

<u>**SCHEDULE 3.18**</u>

**[As of the Closing Date]**

**Deposit and Disbursement Accounts**

Wells Fargo Bank
2030 Main Street, Suite 900
Irvine, CA 92614
Attn: Nathan Smith
T: (949) 251-4162

## LIST OF DEPOSIT ACCOUNTS

| | | |
|---|---|---|
| WMC-SA, INC. (Patient Deposit Account) | 4121-451496 | 55-0883862 |
| WMC-A, INC. (Patient Deposit Account) | 4121-451504 | 55-0883859 |
| Chapman Medical Center, Inc. (Patient Deposit Account) | 4121-451520 | 55-0883864 |
| Coastal Communities Hospital, Inc. (Patient Account) | 4121-451512 | 55-0883863 |
| WMC-SA, INC. (Main Account) | 4121-451538 | 55-0883862 |
| WMC-A, INC. (Main Account) | 4121-451546 | 55-0883859 |
| Chapman Medical Center, Inc. (Main Account) | 4121-451561 | 55-0883864 |
| Coastal Communities Hospital, Inc. (Main Account) | 4121-451553 | 55-0883863 |
| WMC-SA, INC. (Government Deposit Account) | 4121-451579 | 55-0883862 |
| WMC-A, INC. (Government Deposit Account) | 4121-451587 | 55-0883859 |
| Chapman Medical Center, Inc. (Government Deposit Account) | 4121-451603 | 55-0883864 |
| Coastal Communities Hospital, Inc. (Government Deposit Account) | 4121-451595 | 55-0883863 |
| Integrated Healthcare Holdings, Inc. (Main Account) | 4121-451439 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (Accounts Payable) | 4121-451454 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (Patient Refunds) | 4121-451462 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (Payroll Account) | 4121-451447 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (EE Healthcare Claims) | 4121-505994 | 87-0573331 |

**JAE 0453**

CONFIDENTIAL

SPCP_0000004756

**SCHEDULE 3.20**
**Bonding; Licenses; Permits**

**WESTERN MEDICAL CENTER SANTA ANA**
**LICENSES AND PERMITS**
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| **Federal** | | | | |
| Controlled Substance Registratration Certificate | WMC | US Dept. of Justice, Drug Enforcement Administration | BW9321251 | 5/31/2008 |
| Certificate of Accreditation (CLIA) | WMC-SA, Inc (IHHI) | Centers for Medicare & Medicaid Services ("CMS") | CLIA #05D0581257 | 2/9/07-2/8/09 |
| Certificate of Waiver (CLIA) | Family Health Center-Tustin | Centers for Medicare & Medicaid Services ("CMS") | CLIA #05D0951293 | 9/15/06-9/14/08 |
| Certificate of Accreditation (CLIA) | WMC- ABG Lab | Dept. of Health & Human Services - Health Care Financing Adminstration ("HCFA") | CLIA #05D0870670 | 4/8/07-4/6/08 |
| Radio Station License | WMC | Federal Communications Commission | Call Sign WNNL692 | 3/17/04-1/24/14 |
| **State** | | | | |
| Hospital License | WMC-SA, Inc. | State of CA - Dept of Health Services | 60000188 | 3/8/07-3/7/08 |
| Hospital Inpatient Pharmacy Permit | WMC Pharmacy | State of CA - Board of Pharmacy | HSP 46984 | 6/1/2008 |
| Clinical Laboratory License | WMC-SA, Inc. | State of CA - Dept of Health Services | CLIA#05D0581257 Lab ID#: CLF1274 | 4/8/07-4/6/08 |
| Clinical Laboratory Registration | Family Health Center-Tustin | State of CA - Dept of Health Services | CLIA 05D0951293 Lab ID#CLR324081 | 4/8/06-4/6/08 |
| Provisional Tissue Bank License | WMC | State of CA - Dept of Health Services | CNC 80315 | 8/7/07 - 8/6/08 |
| License for the Production of Biologics | WMC | State of CA - Dept of Health Services | Blood Bank ID #9485 | 6/27/07-6/26/08 |
| Permit to Operate Steam Boiler (#8304-75; NB31053) | WMC | State of CA - Dept. of Industrial Relations | 52543 | 6/14/2008 |
| Permit to Operate Steam Boiler (#8303-75; NB31052) | WMC | State of CA - Dept. of Industrial Relations | 52539 | 6/7/2008 |
| EPA Identification | WMCSA | State of CA - Dept of Toxic Substances Control | CAL000292871 | Issued 4/6/05 (Active) |

SCHEDULE 3.20 - 1

**JAE 0454**

CONFIDENTIAL

# WESTERN MEDICAL CENTER SANTA ANA
## LICENSES AND PERMITS
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| Underground Storage Tank Facility Upgrade Compliance Certificate | Not Shown | State of CA | CA CERT. # 10211 | Not Shown (Active) |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A020385-97 NB# 517513 | 4/16/2012 |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A020386-97 NB# 48235J | 4/16/2012 |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A013814-75 NB#145935 | 4/12/2010 |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A013815-75 NB#683547 | 4/12/2010 |
| Renewal of Radiation Machine(s) (Tubes) Registration | WMCSA | State of CA- Health and Human Services Agency | FAC00007150 | 6/30/2008 |
| Radioactive Material License | Tenet Health System dba WMCSA (no name change) | State of CA -Health & Welfare Agency | 0231-30 (amendment 36) | 9/10/2011 |
| Permit to Operate a Conveyance | WMCSA | State of CA - Dept of Industrial Relations | Conveyance #105816 | 2/13/2008 |
| Permit to Operate a Conveyance | WMCSA | State of CA - Dept of Industrial Relations | Conveyance #060615 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060608 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060607 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060463 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator # 060464 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060609 | 10/19/2007 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #103144 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #103148 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #103147 | 1/22/2008 |
| Heliport Permit | WMC Heliport | State of CA - Dept of Transportation | Ora-041 (H) | Issued 4/26/05 (Active) |

SCHEDULE 3.20 - 2

**JAE 0455**

CONFIDENTIAL

## WESTERN MEDICAL CENTER SANTA ANA
## LICENSES AND PERMITS
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| **Regional** | | | | |
| Permit to Operate Internal Combustion Engine | Santa Ana-Tustin Community Hospital | South Coast Air Quality Management District | S02138 | Issued 7/19/1978 (Active) |
| Permit to Operate Diesel Engine | Santa Ana-Tustin Community Hospital | South Coast Air Quality Management District | S02139 | Issued 7/19/1978 (Active) |
| Permit to Operate Boiler | WMCSA | South Coast Air Quality Management District | D61557 | Issued 9/3/1992 (Active) |
| Permit to Operate Boiler | WMCSA | South Coast Air Quality Management District | F49130 | Issued 2/16/2002 (Active) |
| Permit to Construct/Operate UST | WMCSA | South Coast Air Quality Management District | M93837 | Issued 7/4/1990 (Active) |
| **County** | | | | |
| Medical Waste Generator Registration | WMCSA (IHHI) | County of Orange - Health Care Agency | PR0052569 | Active (void with change of ownership) |
| Health Permit - Hospital & Skilled Nursing Kitchen | WMC-SA | County of Orange- Health Care Agency | PR0002432 | Issued 3/8/05 (Active) |
| **City/Local** | | | | |
| Class II Permit - Discharge of Domestic Wastewater | WMCSA | Orange County Sanitation District | 1-2-018 | 3/1/2006 - 2/28/2009 |
| Underground Storage Tank Permit | WMCSA | City of SA Fire Prevention Bureau | 2006-074 | 1/1/2006 - 12/31/06 |
| Business License | WMC | City of Santa Ana | 311821 | 4/1/07 - 3/31/08 |
| **Other** | | | | |
| Certificate of Accreditation | WMCSA | JCAHO | | 2005-2008 |
| Certificate of Accreditation | WMCSA FHC-Tustin | JCAHO | | 2005-2008 |

SCHEDULE 3.20 - 3

**JAE 0456**

SPCP_0000004759

## WESTERN MEDICAL CENTER SANTA ANA
### LICENSES AND PERMITS
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| Accredited Laboratory | WMC | The College of American Pathologists | LAP #2342601 AU-ID 1187898 | 11/8/2007 |
| Accredited Laboratory (Blood Gas Laboratory) | WMC | The College of American Pathologists | LAP #2342603 AU-ID 1362203 | 11/8/2007 |
| Certificate of Accreditation (Transfusion Activities & Donor Center Activities) | WMC | American Assoc. of Blood Banks | None Shown | 12/30/2007 |

SCHEDULE 3.20 - 4

**JAE 0457**

CONFIDENTIAL

# CHAPMAN MEDICAL CENTER
## LICENSE/PERMIT LIST
### [As of the Closing Date]

| TYPE OF LICENSE/PERMIT | ENTITY NAME | LICENSING AGENCY | LICENSE/PERMIT NUMBER | EXPIRATION DATE |
|---|---|---|---|---|
| Accreditation | Chapman Medical Center, Inc. | The Joint Commission | 10002 | 2/8/10 |
| Accreditation | Chapman Medical Center - Main Laboratory | The College of American Pathologist (CAP) | 2340401 | 11/8/07 |
| Accreditation (CLIA) | Chapman Medical Center Laboratory | Centers for Medicare and Medicaid Services | 05D079232 | 2/8/09 |
| Business License Tax Certificate – General Medical and Surgical Hospital | Chapman Medical Center, Inc. | City of Orange | I-115444-L | 2/28/08 |
| Business License Tax Certificate – Gift, Novelty and Souvenir Shops | Chapman Medical Center, Inc. | City of Orange | I-115445-L | 2/28/08 |
| Business License Tax Certificate – Health & Allied Services | Chapman Family Health Center | City of Orange | I-115447-L | 2/28/08 |
| Business License Tax Certificate – Lessors of Real Property (MOB) | Chapman Medical Center, Inc. | City of Orange | I-117535-X | 2/28/08 |
| Business License Tax Certificate – Offices/Clinics | Chapman Medical Center, Inc/Lung Center | City of Orange | I-115446-L | 2/28/08 |
| California Environmental Identification Number | Chapman Medical Center | Department of Toxic Substance Control | CAL000292874 | Ongoing |
| Class II Permit – Discharge of Domestic Wastewater | Chapman Medical Center | Orange County Sanitation District | 2-2-259 | 7/31/09 |
| Clinical Laboratory License | Chapman Medical Center Laboratory | State of California Department of Health Services | CLF 1757 | 4/6/08 |

SCHEDULE 3.20 - 5

JAE 0458

CONFIDENTIAL

SPCP_0000004761

| Type of License/Permit | Entity Name | Licensing Agency | License/Permit Number | Expiration Date |
|---|---|---|---|---|
| Clinical Laboratory License | Chapman Medical Center Cardiopulmonary Laboratory | State of California Department of Health Services | CLF 3420 | 12/31/07 |
| Continuing Education Provider | Chapman Medical Center | California State Board of Registered Nursing | CEP 3303 | 11/30/08 |
| Controlled Substance Registration Certificate | Chapman Medical Center, Inc. | United States Department of Justice – Drug Enforcement Administration | BC9321237 | 8/31/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 107135 – 1Lobby | 6/13/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 107242 – Pass#3 | 6/13/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 107229 – 2Staff | 6/13/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 074718 - #2 Lft | 6/15/08 |
| Fire Code Permit | Chapman Medical Center | Orange Fire Department | 3587 | 9/2007 – Renewal in process |
| General Acute Care Hospital | Chapman Medical Center, Inc. | State of California Department of Health Services | 060000097 | 3/7/08 |
| Health Permit – Hospital/ Skilled Nursing Kitchen | Chapman Medical Center, Inc. | County of Orange Health Care Agency | PR0002457 | Ongoing |
| Hospital Pharmacy Permit | Chapman Medical Center | California State Board of Pharmacy | HSP 46986 | 7/1/08 |
| Internal Combustion Engine – Permit to Operate | Chapman General Hospital | South Coast Air Quality Management District | R-D87488 | 6/30/08 |
| Medi-Cal Provider Number – Inpatient | Chapman Medical Center | Department of Health Services | HSC30550H | Ongoing |
| Medi-Cal Provider Number – Outpatient | Chapman Medical Center | Department of Health Services | HSP40550H | Ongoing |

SCHEDULE 3.20 - 6

**JAE 0459**

CONFIDENTIAL

SPCP_0000004762

| TYPE OF LICENSE/PERMIT | ENTITY NAME | LICENSING AGENCY | LICENSE/PERMIT NUMBER | EXPIRATION DATE |
|---|---|---|---|---|
| Medi-Cal Provider Number – SNF DP/Subacute | Chapman Medical Center | Department of Health Services | LTC70108G | Ongoing |
| Medical Waste Generator Registration | Chapman Medical Center | County of Orange Health Care Agency | PR0052710 | Ongoing |
| Medicare Provider Number – Acute Care | Chapman Medical Center | Department of Health and Human Services – Center for Medicare and Medicaid Services | 05-0745 | Ongoing |
| Medicare Provider Number – Psychiatric | Chapman Medical Center | Department of Health and Human Services – Center for Medicare and Medicaid Services | 05-S745 | Ongoing |
| Medicare Provider Number – Subacute | Chapman Medical Center | Department of Health and Human Services – Center for Medicare and Medicaid Services | 55-5709 | Ongoing |
| Paramedic Receiving Center Designation | Chapman Medical Center | County of Orange Health Care Agency – Emergency Medical Services | N/A | 12/31/09 |
| Permit to Operate Steam Boiler | Chapman Medical Center | State of California DOSH, Pressure Vessel Unit | B016135-03 | 6/20/08 |
| Permit to Operate Steam Boiler | Chapman Medical Center | State of California DOSH, Pressure Vessel Unit | B016136-03 | 7/2/08 |
| Radio Station Authorization | Chapman General Hospitals, Inc. | Federal Communications Commission | WPTV461 | 12/21/11 |
| Radioactive Material License | Chapman Medical Center | State of California Health and Welfare Agency | 1946-30 | 11/4/11 |
| Seller's Permit | Chapman Medical Center, Inc. | California State of Equalization | 100-546210 | Ongoing |

SCHEDULE 3.20 - 7

**JAE 0460**

CONFIDENTIAL

## COASTAL COMMUNITIES HOSPITAL LIST OF LICENSES AND PERMITS
### [As of the Closing Date]

| Type of Permit/License | Entity name | Licensing Agency | Permit/License No. | Term | | |
|---|---|---|---|---|---|---|
| **FEDERAL** | | | | | | |
| Certificate of Accreditation | Coastal Comm Hosp Cardiopulmonary Dept. | Centers for Medicare & Medicaid Services | CLIA ID #05D0687344 | 1/3/2007-1/2/2008 | | |
| Certificate of Accreditation | Coastal Communities Hospital (Lab) | Centers for Medicare & Medicaid Services | CLIA ID #05D0581023 | 1/3/2007-1/2/2009 | | |
| Controlled Substances Registration Certificate | Coastal Communities Hospital | US Dept. of Justice Drug Enforcement Administration | BC9321225 | 7/6/2005-8/31/2008 | | |
| Certified Mammography Facility | Coastal Communities Hospital | US Dept. of Health & Human Services, Food and Drug Administration | ID #168443 | 7/7/2008 | | |
| Radio Station Authorization | Coastal Communities Hospital | Federal Communications Commission | Call Sign KVP665 | 6/5/03-5/27/2013 | | |
| Radio Station Authorization | Coastal Communities Hospital | Federal Communications Commission | Call Sign WPZF286 | 1/6/2004-1/6/2014 | | |
| **STATE** | | | | | | |
| Hospital License | Health Resources Corp. of America - California | State of California Department of Health Services | 60000143 | 3/8/2007-3/7/2008 | | |
| Clinical laboratory License - Cardio Pulmonary Dept. | Coastal Communities Hospital | State of California Department of Health Services | CLIA #05D0687344 Lab ID #CLF2421 | 4/8/2007-4/6/2008 | | |
| Clinical Laboratory License | Coastal Communities Hospital LP | State of California Department of Health Services | CLIA #05D051023 Lab ID #CLF2421 | 4/6/2008 | | |
| Hospital Inpatient Pharmacy Permit | Coastal Communities Hospital LP | State of California Department of Health Services | HSP 46985 | Expires 7/1/2008 | | |

SCHEDULE 3.20 - 8

**JAE 0461**

CONFIDENTIAL

| Type of Permit/License | Entity name | Licensing Agency | Permit/ License No. | Term | | |
|---|---|---|---|---|---|---|
| Mammography X-Ray Equipment and Facility Accreditation Certificate | Coastal Communities Hospital LP | State of California Department of Health Services | 6529 | 7/7/2005-7/7/2008 | | |
| Radiation Machine(s) (Tubes) Registration (X-Ray) | Coastal Communities Hospital LP | State of California Department of Health Services | Clearance #C0035844 | Unknown | | |
| Permit to Operate Steam Boiler (16131-02;NB43707) | Coastal Communities Hospital LP | State of California Department of Industrial Relations | 52556 | 6/12/2006-6/12/2007 | Insurance inspection scheduled for 10/10/07 | |
| Permit to Operate Steam Boiler (21837-95;NB45570) | Coastal Communities Hospital LP | State of California Department of Industrial Relations | 52557 | 6/5/2005-6/5/2007 | | |
| Radioactive Material License | Coastal Communities Hospital LP | State of California Department of Health Services | 2530-30 Docket #050704-2530 Unexpires | Open - Approval Pending | | |
| **REGIONAL** | | | | | | |
| Internal Combustion Engine - Em Elec. Gen. Diesel Permit | Coastal Communities Hospital LP | South Coast Air Quality Management District | D66934 | Exp. 5/16/07 - new certificate not yet received | | |
| **COUNTY** | | | | | | |
| Hazardous Materials Permit | Coastal Communities Hospital | County of Orange Health Care Agency, Environmental Health Division | PR0058065 PR0052836 | Termination 6/30/2008 | | |
| Food Facility Inspection | Coastal Communities Hospital | County of Orange Environmental Health Food Protection Program | F042-16.1258 | Effective 3/28/05 | | |
| Health Permit | Coastal Communities Hospital | Orange County Health Care Agency, Public Health | PR0002455 | Effective 7/26/2007 | | |
| **CITY/LOCAL** | | | | | | |
| Business License | Coastal Communities Hospital | City of Santa Ana | #311810 | Expires 3/31/2008 | | |

SCHEDULE 3.20 - 9

**JAE 0462**

CONFIDENTIAL

| Type of Permit/License | Entity name | Licensing Agency | Permit/ License No. | Term | | |
|---|---|---|---|---|---|---|
| Underground Storage Tank Facility Upgrade Compliance Certificate | Coastal Communities Hospital | Santa Ana Fire Department Underground Tank Division | #10243 | 12/31/2007 | | |
| Blood Gas Proficiency Testing Program | Coastal Communities Hospital LP | California Thoracic Society | N/A | N/A | | |
| Pathology and Clinical Laboratory Services | Coastal Communities Hospital LP | JCAHO | CLIA Cert. #05D05/1023 | 3/23/2008 | | |
| Mammographic Imaging Services Accreditation | Coastal Communities Hospital LP | American College of Radiology | MAP ID #11291-02 | 7/7/2008 | | |
| Certificate of Accreditation | Coastal Communities Hospital LP | JCAHO | None | 8/11/2005; 3 years | | |
| Certificate of Accreditation | Coastal Communities Hospital LP - Long Term Care | JCAHO | None | 8/11/2005; 3 years | | |
| Certificate of Accreditation | Coastal Communities Hospital LP - Laboratory | JCAHO | None | 3/23/06; 2 years | | |

## WMC-SA LIST OF LICENSES AND PERMITS
### [As of the Closing Date]

| items in Blue: waiting on updated license to be received; | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Armored Car | AT Systems, Inc. | Fireman's Fund McGee | MXI 98301323 | 10/1/06-10/1/07 | Admitting | Armored Transport |
| Articles of Incorporation | WMCA | Secretary of State | n/a | issued: 10/5/04 | Admin | Articles of Incorporation |
| Business Tax Receipt & Certification Form | WMCA | City of Anaheim, Business License Division | BUS2005-00805 | 4/6/05-3/8/08 | Admin | Bus Tax Cert |

SCHEDULE 3.20 - 10

**JAE 0463**

SPCP_0000004766

| items in Blue: waiting on updated license to be received: | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Certificate of Accreditation | Respiratory Therapy | State of California | 05D0665455 | 2/28/05-2/27/08 | Respiratory | CLIA |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Children & Families Commission of Orange County | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: County of Orange Healthcare (EMS) | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: David L. & Grace E. Arnold | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Kaiser Permanente | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Regional Center of Orange County | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Shaw Properties | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Registration (Sealer of Weights & Measures) | WMCA | County of Orange; Public Facilities & Resources Dept. | WO-04009.5 | Current | Nutritional Svs | Weights and Measures |
| Clinical Laboratory Registration | WMCA | State of California; Dept of Health Services | 05D0665674 | 4/8/05-4/7/08 | Lab | CLIA |
| Controlled Substance Registration Certificate | WMCA | US Department of Justice; Drug Enforcement Admin | BW9913509 | 8/4/06-5/31/09 | Pharmacy | DEA |
| Conveyance Permit (#2REAR) | WMCA | State of California, Dept of Industrial Relations | 055945 | 8/10/05-8/10/06 | Eng | Conveyance Permit |
| Conveyance Permit (D/W) | WMCA | State of California, Dept of Industrial Relations | 055945 | 8/10/05-8/10/06 | Eng | Conveyance Permit |

SCHEDULE 3.20 - 11

**JAE 0464**

| items in Blue: waiting on updated license to be received: | | | | | **updated:** | **10/11/07-kp** |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Conveyance Permit (Pass) | WMCA | State of California, Dept of Industrial Relations | 095849 | 8/10/05-8/10/06 | Eng | Conveyance Permit |
| CUPA Consolidated Permit | WMCA | Anaheim Fire Prevention Division | Facility Case #FEB-0000014 | None Listed | Eng. | Anaheim Fire Department |
| Fire Alarm and Life Safety System Inspection | WMCA | CalProtection Inc. | | Certificate Inspection: 9/27/07 | Eng. | Fire |
| Fire Code Permit | WMCA | Anaheim Fire Prevention Division | Case No. FIS-0000248 | Expires 10/31/08 | | Anaheim Fire Department |
| Health Certificate | WMCA | Orange County Health Care Agency | PR0002433 (issued 4/5/04) | last inspection: 1/8/07 | Nutritional Svs | County of Orange, Food Safety |
| Hospital Pharmacy Permit | WMCA | State of California, Board of Pharmacy | HSP 46983 | expires: 6/1/08 | Pharmacy | DEA |
| Internal Combustion Engine and Storage Tank Fuel Oil Permit Renewals | WMCA | South Coast Air Quality Management District | D25594; D51240; D54936; D61143 | 5/16/2003-6/1/2004 | Eng | |
| JCAHO | WMCA | Joint Commission | n/a | 2005-2008 | Admin | JCAHO Certificate |
| Liability Insurance | WMCA | Haake Companies | Gen Liab - HCF4000877; Excessive Liab - HCF4000878; MalPractice HCF4000877 | 3/8/07-3/8/08 | Admin | Insurance |
| License, Hospital | WMCA | State of California; Dept of Health Services | 060000117 | 3/08/07-3/07/08 | Admin | DHS License |
| Medical Waste Generator Registration | WMCA | County of Orange Health Care Agency, Environmental Health Medical Waste Management Program | PR0052531; Record ID FA0044738 | expires 6/30/08 | Eng | Permit for Medical Waste |

SCHEDULE 3.20 - 12

**JAE 0465**

SPCP_0000004768

| items in Blue:  waiting on updated license to be received; | | | | | **updated:** | **10/11/07-kp** |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Medical Waste Generator Registration | WMCA | State of California | | | EVS | Permit for Medical Waste |
| Medicare/Medicaid | WMCA | Dept of Health & Human Services | 05-0744 - Medicare; '05-S744 - Psych | effective 3/8/05 | Admin | Medicare - Medicaid |
| MSERC | WMCA | South Coast Air Quality Management District | n/a | STERC - expires 12/31/06; R1612 - expires 12/20/07 | Eng. | SC Air Quality Management |
| Permit to Operate Air Pressure Tank (Compression Room) | WMCA | State of California | Serial #A021849-91 N.B#/SER#893998 | 12/19/05-12/18/10 | Eng. | Air Pressure Tank |
| Permit to Operate Air Pressure Tank (DX Room) | WMCA | State of California | Serial #A020310-96, N.B#/SER#42032; | 12/19/05-12/18/10 | Eng. | Air Pressure Tank |
| Permit to Operate Air Pressure Tank (DX Room) | WMCA | State of California | Serial #A020309-96 N.B#/SER#93797F | 12/19/05-12/18/10 | Eng. | Air Pressure Tank |
| Permit to Operate an Elevator | WMCA | State of California, Dept of Industrial Relations | 55944 | expires 8/10/06 | Eng | Conveyance Permit |
| Permit to Operate an Elevator | WMCA | State of California, Dept of Industrial Relations | 55945 | expires 8/10/06 | Eng | Conveyance Permit |
| Permit to Operate an Elevator | WMCA | State of California, Dept of Industrial Relations | 55946 | expires 8/10/06 | Eng | Conveyance Permit |
| Permit to Operate Underground Storage Tank | WMCA | Anaheim Fire Dept | Permit #248 | 9/8/03-9/7/08 | Eng. | Anaheim Fire Department |
| Radiation Machine(S) (Tubes) Registration | WMCA | Dept of Health & Human Services | | due 5/29/04 | Radiology | Radiation Machine Registration |

SCHEDULE 3.20 - 13

**JAE 0466**

SPCP_0000004769

items in Blue:  waiting on updated license to be received:

| | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Radio Station Authorization | WMCA | Federal Communications Commission | WPJJ629; File #0000448947 | 5/4/01-6/29/01 | Eng. | Radio |
| Radio Station License | WMCA | Federal Communications Commission | WNYJ717, File #9701R187068 | 1/17/97-1/30/02 | Eng. | Radio |
| Radioactive Materials License | WMCA | State of California - Dept of Health & Human Services | 2431-30 | 12/1/04-11/30/05* | Radiology | Radioactive Materials License Unit |
| Recycle - Four Ft. Fluorescent Lamps | Veolia Environmental Services (Grainger/Recycle Paks) Serial #081988500597112 | Veolia Environmental Services | AZ0000337360 | date: 6/26/06 | Eng | Engineering |
| Recycle - Four Ft. Fluorescent Lamps | Veolia Environmental Services (Grainger/Onyx Paks) Serial #081988500596467 | Veolia Environmental Services | AZ0000337360 | date: 5/18/06 | Eng | Engineering |
| Sellers permit | WMCA | California State Board of Equalization | 100-542563 | issued 3/1/05 (doesn't expire) | | Seller's Permit |
| Services Inventory | WMCA | informational only | | | | Service Inventory |
| South Coast Air Quality Permit | WMCA | South Coast Air Quality Mgnt District | I.C.E. - D25594, D54936, D51143;  Storage Tank Fuel Oil D51240 | exp 5/30/07 | Eng | SC Air Quality Management |

SCHEDULE 3.20 - 14

**JAE 0467**

SPCP_0000004770

| items in Blue:  waiting on updated license to be received: | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Vehicle Registration | WMCA | Hartford Fire Insurance | 1994 Chevy Cavalier VIN1G1JC5444R7172003 | 3/8/07-3/8/08 | Eng. | Insurance |
| Vehicle Registration | WMCA | DMV | 1994 Chevy Cavalier VIN 1G1JC5444R7172003 | 4/8/07-4/8/08 | Eng | Insurance |
| Vehicle Registration | WMCA | Hartford Fire Insurance | 1997 Ford   VIN 1FTHE24L4VHA73594 | 3/8/07-3/8/08 | Eng | Insurance |
| Vehicle Registration | WMCA | DMV | 1997 Ford   VIN 1FTHE24L4VHA73594 | 1/31/07-1/31/08 | Eng | Insurance |
| Weighmaster License | Stericycle | Dept of Food and Agriculture | 009533 | expires 8/24/07 | EVS | CDFA, Weighmaster License |

SCHEDULE 3.20 - 15

**JAE 0468**

SPCP_0000004771

## SCHEDULE 6.3

## [As of the Closing Date]

## INDEBTEDNESS

Revolving Credit Agreement ($50,000,000 Facility) dated October 9, 2007 by and among Medical Provider Financial Corporation I and the Credit Parties.

Credit Agreement ($10,700,000 Facility) dated October 9, 2007 by and among Medical Provider Financial Corporation III and the Credit Parties.

Credit Agreement ($80,000,000 Facility dated October 9, 2007 by and among Medical Provider Financial Corporation II and the Credit Parties.

Account Purchase Agreement dated March 9, 2005 by and between Medical Provider Financial Corporation I and WMC-SA, Inc., WMC-A, Inc., Coastal Communities Hospital, Inc. and Chapman Medical Center, Inc.

Additional PCHI Indebtedness: None

Additional OC-PIN Indebtedness:

        Loan to Dr. Surinder Dang, a member of OC-PIN, in the amount of $25,000

        Loan to Dr. Yasser Salem, a member of OC-PIN, in the amount of $200,000

        Loan to Dr. Syed Naqvi, a member of OC-PIN, in the amount of $200,000

Additional West Coast Holdings, LLC Indebtedness: None

**JAE 0469**

CONFIDENTIAL

## SCHEDULE 6.4

### [As of the Restatement Effective Date]

## TRANSACTIONS WITH AFFILIATES AND EMPLOYEES

Rescission, Restructuring and Assignment Agreement dated January 27, 2005 by and among IHHI, Kali P. Chaudhuri, M.D., William E. Thomas, and Dr. Anil V. Shah, M.D.

Amendment to Amended and Restated Triple Net Hospital Building Lease between Pacific Coast Holdings Investment, LLC and Integrated Healthcare Holdings, Inc. dated March 27, 2009.

IHHI (as Sublessor) subleases portions of the Premises (as such term is defined in the Triple Net Lease) known as Western Medical Center-Anaheim to WMC-A, Inc. (as Sublessee), WMC-SA, Inc., and Coastal Communities Hospital, Inc. pursuant to Subleases with those entities.

Settlement Agreement, General Release and Covenant Not to Sue dated April 2, 2009 by and among IHHI, Orange County Physicians Investment Network LLC, Anil V. Shah, M.D., Bruce Mogel, Pacific Coast Holdings Investment, LLC, West Coast Holdings LLC, Kali P. Chaudhuri, M.D., Ganesha Realty LLC, William E. Thomas, and Medical Capital Corporation and related entities.

Stock Purchase Agreement dated April 2, 2009 by and among IHHI, Kali P. Chaudhuir, M.D., Anil V. Shah, M.D., and Orange County Physicians Investment Network LLC.

Acknowledgement, Waiver and Consent and Amendment to Credit Agreements dated April 2, 2009 by and among IHHI and its subsidiaries, Pacific Coast Holdings Investment LLC, Orange County Physicians Investment Network LLC, Ganesha Realty LLC, West Coast Holdings LLC, and Medical Capital Corporation and related entities.

Amended and Restated Memorandum of Understanding dated January 13, 2010 by and among IHHI, Dr. Chaudhuri and KPC Resolution Company LLC, an affiliate of Dr. Chaudhuri.

Omnibus Credit Agreement Amendment dated April 13, 2010 by and among the Company, SPCP Group IV, LLC and SPCP Group, LLC, Silver Point Finance, LLC, PCHI, Ganesha, Dr. Kali P. Chaudhuri and KPC Resolution Company.

The Amendment and Restatement Agreement, this Agreement and all other Loan Documents, dated as of the Restatement Effective Date, by and among IHHI, WMC-A, Inc., WMC-SA, Inc., Coastal Communities Hospital, Inc., Chapman Medical Center, Inc., Pacific Coast Holdings Investment, LLC, Ganesha Realty, LLC, SPCP Group IV, LLC, SPCP Group, LLC and Silver Point Finance, LLC.

CONFIDENTIAL

## SCHEDULE 6.7

## EXISTING LIENS

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| **INTEGRATED HEALTHCARE HOLDINGS, INC.** | NEVADA | UCC-1 # 2007033418-0<br>Filed:  10-9-07<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 20120224607<br>Filed: 8-21-12<br>Continuation | 3150M-U Magnitude MRI System |
| | | UCC-1 2007039734-6<br>Filed: 12-3-07<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Hespironics Hospital Capital Services<br><br>UCC-3 # 2012029331-1<br>Filed:  11-6-12<br>Continuation | Espirit Ventilators |
| | | UCC-1 # 2008001595-8<br>Filed:  1-16-08<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 2012029383-0<br>Filed: 11-7-12<br>Continuation | Servo I Adult Ventilation Systems;<br>Servo I Universal Ventilation Systems |

SCHEDULE 6.7 - 1

**JAE 0471**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 2008023016-8<br>Filed: 7-24-08<br>Secured Party: National City Commercial Capital Company, LLC | Rental Schedule 112553000 to Master Lease Agreement dtd 3-15-2008 |
| | | UCC-1 # 2008026858-5<br>Filed: 8-28-08<br>Secured Party: National City Commercial Capital Company, LLC | Rental Schedule 109977000 to Master Lease Agreement dtd 3-15-2008 |
| | | UCC-1 # 2008028454-1<br>Filed:         9-15-08<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P. | Battery drive set |
| | | UCC-1 # 2010019980-0<br>Filed 8-10-10<br>Secured Party:  Midcap Financial LLC, as Agent | All assets |
| | | UCC-1 # 2010020384-9<br>Filed 8-12-10<br>Secured Party:  Midcap Financial LLC, as Agent | All Assets |
| | | UCC-1 #2010020385-1<br>Filed 8-12-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 2010021225-4<br>Filed 8-25-10<br>Termination<br><br>UCC-3 #2010021378-7<br>Filed 8-26-10<br>Correction | All Assets |

SCHEDULE 6.7 - 2

**JAE 0472**

SPCP_0000004775

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 #2010021817-9<br>Filed 8-31-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 2011012952-6<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All Assets |
| | | UCC-1 #2010021948-6<br>Filed 8-31-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 2011012950-2<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All Assets |
| | | UCC-1 # 2011034549-7<br>Filed 12-22-11<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P. | Steris Scope System |
| | | UCC-1 # 2012005407-4<br>Filed: 2-29-12<br>Secured Party: ConMed Linvatec Finance<br><br>UCC-3 # 2012015787-0<br>Filed 6-11-12<br>Assignment to Optumhealth Bank, Inc. (all Equipment under Schedule No. 001 only)<br><br>UCC-3 # 2012027051-5<br>Filed 10-11-12<br>Assignment to BMO Harris Bank National Association (all Equipment under Schedule No. 002 only) | Equipment under Master Agreement No. 1111201 |

SCHEDULE 6.7 - 3

**JAE 0473**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 2012022725-9<br>Filed 8-24-12<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC<br><br>UCC-3 # 2012025297-3<br>Filed 9-24-12<br>Assignment to Transportation Alliance Bank | Equipment per Contract # 19PW0G; recurring fees per Contract # 19PW0G |
| | | UCC-1 # 2012023259-1<br>Filed 8-29-12<br>Secured Party:  Olympus America Inc. | LCD monitors, LCD roll stand tall fixed height, workstation SI/CO2 standard set, lockable drawer unit, multi remote cable, VCR remote control cable, BNC cable, Olympus printer, serial digital video BNC, flexi-lte tray container, tray, and lid, Olympus HD recorder, Evis exera II gastrovideoscope, endoeye lapard thoraco videoscope, Evis Exera II video processor, Evis Exera II light source. |
| | | UCC-1 # 2012023334-1<br>Filed 8-30-12<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party:  Med One Capital Funding – California, L.P.<br><br>UCC-3 # 2012027598-3<br>Filed 10-17-12<br>Assignment to Prime Alliance Bank | R710 PowerEdge, Backup Exec 2012 Server |
| | | UCC-1 # 2012027315-5<br>Filed 10-15-12<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party:  Med One Capital Funding – California, L.P. | Rubbermaid Medication Cart, Wyse Winterm S30 Thin Client 64 MB Ram; Honeywell Barcode Scanner (all reconditioned) |

SCHEDULE 6.7 - 4

**JAE 0474**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 2013000244-5<br>Filed 1-3-2013<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC | McKesson Enterprise Solution, as detailed in McKesson Contract Number 1-1CSTGP |
| **INTEGRATED HEALTHCARE HOLDINGS, INC.**<br><br>**and**<br><br>**WMC-SA, INC.** | CALIFORNIA | UCC-1 # 07-7141948920<br>Filed:          12-28-07<br>Secured Party:  FPC Funding II, LLC | Equipment pursuant to certain Lease Agreement (number is redacted on financing statement) – medical office equipment related |
| | | UCC-1 # 08-7142019800<br>Filed:          12-28-07<br>Secured Party:  FPC Funding II, LLC | Equipment pursuant to certain Lease Agreement (number is redacted on financing statement) – medical office equipment related |
| **CHAPMAN MEDICAL CENTER, INC.** | CALIFORNIA | UCC-1 #107241563100<br>Filed 8-10-10<br>Secured Party:  Midcap Financial LLC, as Agent | All Assets |
| | | UCC-1 # 10-7243844144<br>Filed 8-30-10<br>Secured Party: Midcap Financial, LLC, as Agent<br><br>UCC-3 #1172700640<br>Filed 5-18-2011<br>Assignment to Midcap Funding IV, LLC, as Agent | All Assets |
| | | UCC-1 # 117295411869<br>Filed 12-27-11<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Equipment – One Staris Scope System |

SCHEDULE 6.7 - 5

**JAE 0475**

SPCP_0000004778

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | | |
| | | UCC-1 #127301427794<br>Filed 2-8-12<br>Secured Party:  Stryker Finance, a Division of Stryker Sales Corporation | Equipment listed on Rental Agreement # MR26485334 – dual trigger rotary, AO small attachment, Adj pin collet 2.0-3.2mm, ¼" chuck w/key, Hudson/modified trinkle attach, sys 6 recip, system 6 sagittal saw, system 6 charger, system 6 aseptic battery kit, sys 6 large sterilization case, revolution cement gun, T's surgical helmet, automatic high vacuum foot pump, cordless driver 3, adjustable pin collet, ¼ inch drill with Jacobs Chuck |
| | | UCC-1 #127324073796<br>Filed 8-8-12<br>Secured Party:  General Electric Capital Corporation | Equipment - One GE Healthcare lightspeed 16 CT System and One Mobile Interim Solutions Landoil Corp Trailer 2001 VIN # ILH142UH411011601 |
| | | UCC-1 # 127324073817<br>Filed 8-8-12<br>Secured Party:  General Electric Capital Corporation | Equipment - One STERIS Corporation V-Pro Max single Door Sterilizer System |

SCHEDULE 6.7 - 6

**JAE 0476**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| **COASTAL COMMUNITIES HOSPITAL, INC.** | CALIFORNIA | UCC-1 # 09-7205562844<br>Filed:        8-13-09<br>Secured Party: Beckman Coulter Inc. | Access 2 Immunoassay Analyzer |
| | | UCC-1 # 09-7207051546<br>Filed:        8-31-09<br>Secured Party: Beckman Coulter Inc. | Access 2 Immunoassay Analyzer |
| | | UCC-1 # 107241562573<br>Filed: 8-10-10<br>Secured Party:  Midcap Financial LLC, as Agent | All assets |
| | | UCC-1 # 107243844407<br>Filed 8-30-10<br>Secured Party:  Midcap Financial LLC, as Agent<br><br>UCC-3 # 1172700639<br>Filed 5-18-11<br>Assignment to  Midcap Funding IV, LLC, as Agent | All assets |
| | | UCC-1 # 107243505148<br>Filed 8-31-10<br>Secured Part:  Alcon Laboratories, Inc. | One demo Infiniti Vision w/o VO |
| | | UCC-1 # 117287316450<br>Filed: 10-10-11<br>Secured Party:  Republic Bank<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Equipment listed in Schedule A - Patient monitor, option module, gas module, wire lead wire set, wire trunk cable with ESIS, NIBP cuff kit adult, NIBP hose 3.5 meter, paper thermal recorder, interface cable, special trade-in discount |

SCHEDULE 6.7 - 7

**JAE 0477**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|------|--------------|---------|------------------|
| | | UCC-1 # 117294567799<br>Filed 12-16-11<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Steris Scope System |
| | | UCC-1 # 12-7323293476<br>Filed 8-2-12<br>Secured Party:  General Electric Capital Corporation | Johnson & Johnson Sterrad Sterilizer System |
| **WMC-A, INC.** | CALIFORNIA | UCC-1 # 107241562694<br>Filed: 8-10-10<br>Secured Party: Midcap Financial LLC, as Agent | All assets |
| | | UCC-1 # 107243843759<br>Filed: 8-30-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 1172700642<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All assets |
| | | UCC-1 # 107249947467<br>Filed 10-29-10<br>Secured Party:  Americorp Financial, LLC | Equipment per Agreement No. 1755101.  Two of each: Demo, bipap vision US can W 02-B, universal stand, basic; adapter plate, universal stand; circuit support arm; bracker, mounting arm; high pressure hose, diss. |
| | | UCC-1 # 127314854590<br>Filed 5-25-12<br>Secured Party: Creekridge Capital LLC<br><br>UCC-3 # 12-73200045 | Equipment under Agreement No 1171600-001 |

SCHEDULE 6.7 - 8

**JAE 0478**

CONFIDENTIAL

SPCP_0000004781

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|------|-------------|---------|------------------|
| | | Filed 7-9-12<br>Assignment to BMO Harris Bank National Association | |
| | | UCC-1 # 12-7325343545<br>Filed 8-16-12<br>Secured Party:  General Electric Capital Corporation | One GE Healthcare GE Lightspeed 16 CT System and one Landholl 2001 Landholl Corp Semi Trailer |
| **WMC-SA, INC.** | CALIFORNIA | UCC-1 # 06-7090887479<br>Filed: 11/03/2006<br>Expires: 11/03/2011<br>Secured Party: General Electric Capital Corporation<br><br>UCC-3 #  1172784579<br>Filed:        7/27/2011<br>Continuation | Collateral: Lease for 1 GE Healthcare Technologies Infinia II Hawkeye Nuclear Camera System. |
| | | UCC-1 #077141978920<br>Filed 12-28-07<br>Secured Party: FPC Funding II, LLC | Equipment listed in Exhibit A to Lease Schedule No. 001 to Master Lease Agreement No. 801146.  MP 161 SPF, MP 2510 SPF, MP 3010 SPF, MP 4500 SPF+Fin+P, MP 3010 SPF+Fin, 1 ecopy workstations w/50 user seats, etc. |
| | | UCC-1 # 08-7143909031<br>Filed:        1-16-08<br>Secured Party: Dade Behring, Inc. | Equipment – RMS & TXL MAX & Easylink |
| | | UCC-1 # 08-7143909273<br>Filed:        1-16-08<br>Secured Party:  Dade Behring, Inc. | Equipment – RMS & TXL MAX |

SCHEDULE 6.7 - 9

**JAE 0479**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 107226266446<br>Filed: 3-22-10<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | GemStar Pain Management Pumps with power supply, pole clamps and 150cc lockbox |
| | | UCC-1 # 107234379117<br>Filed 6-9-10<br>Secured Party: Olympus America Inc. | LF-V Tracheal Incub Video, Visera Cam Head Angl, CLV S-40 Light Source; LCD monitor; Visera Digital Camera; Single Piece E Adapt |
| | | UCC-1 # 107234380260<br>Filed 6-9-10<br>Secured Party: Olympus America Inc. | Evis Exera I; Evis Exera II; BNC Cable, Remote Control Cable; Cable Adapter for Mavigraph; RGB Printer Cable for C |
| | | UCC-1 # 107241562715<br>Filed 8-10-10<br>Secured Party:  Midcap Financial, LLC, as Agent | All assets |
| | | UCC-1 # 107243843870<br>Filed 8-30-10<br>Secured Party:  Midcap Financial, LLC, as Agent<br><br>UCC-3 # 1172700641<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All assets |
| | | UCC-1 # 107246110870<br>Filed 9-27-10<br>Secured Party:  Toshiba America Medical Systems, Inc. | Toshiba Infinix Vascular System; Vital Images Enterprise Workstation System |

SCHEDULE 6.7 - 10

**JAE 0480**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 107252114720<br>Filed 11-19-10<br>Secured Party:  Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc. | Toshiba Infinix Vascular System, Type S; Vital Images Enterprise Workstation System |
| | | UCC-1 # 107252313599<br>Filed 11-22-10<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Philips iU22 Refurbished and Upgraded |
| | | UCC-1 # 117261555386<br>Filed 2-23-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | ATLAS 37 CM Handswitching; Generator Forectriad, Ligasure 5MM Blunt Tip LAP Sealerdivider; Tissue Fusion Open Instrument 13.5M |
| | | UCC-1 # 117266047953<br>Filed 4-11-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | CMC-V System |
| | | UCC-1 # 117272889964<br>Filed 6-13-11<br>Secured Party:  David Holden | Equipment included in Schedule 001 of Master Lease Agreement #801146 |
| | | UCC-1 # 117272893666<br>Filed 6-13-11<br>Secured Party:  Silent Partners FBO Jack Whittington Trust | Equipment included in Schedule 002 of Master Lease Agreement #801146 |

SCHEDULE 6.7 - 11

**JAE 0481**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 117288419152<br>Filed 10-19-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | West-Com Nurse Call System |
| | | UCC-1 # 117288552554<br>Filed 10-22-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: OptumHealth Bank, Inc. | Alaris System Point of Care Units; Alaris System LVP Pumping Modules |
| | | UCC-1 # 117288888364<br>Filed 10-25-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank<br><br>UCC-3 # 1172900033<br>Filed 11-3-11<br>Amendment to add Secured Party: Med One Capital Funding – California, L.P. and Secured Party: Med One Capital Funding, LLC | Hemodynamic System |
| | | UCC-1 # 117291423323<br>Filed 11-14-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | OSI Imaging Table System |
| | | UCC-1 # 117293260910<br>Filed 12-5-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | IV Solution Warming Cabinets |

SCHEDULE 6.7 - 12

JAE 0482

SPCP_0000004785

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 117293391874<br>Filed 12-5-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Olympus BiPolar Resection |
| | | UCC-1 # 117293958328<br>Filed 12-13-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Steris Scope System |
| | | UCC-1 # 127302407894<br>Filed 2-24-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: OptumHealth Bank, Inc.<br><br>UCC-3 # 1273035413<br>Filed 3/6/12<br>Amendment of Secured Party from OptumHealth Bank, Inc. to Republic Bank | Constellation LXT, PurePoint LIO; Fragmentation Handpiece |
| | | UCC-1 # 127303820187<br>Filed 2-24-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Alaris System Point of Care Units; Alaris System LVP Pumping Modules; Alaris System Syringe Module |
| | | UCC-1 # 127303206882<br>Filed 3-2-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Alaris System Point of Care Units; Alaris System LVP Pumping Modules; Alaris System Syringe Module |

SCHEDULE 6.7 - 13

**JAE 0483**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 127316451828<br>Filed 6-7-12<br>Secured Party:  Prime Alliance Bank<br>Secured Party:  Med One Capital Funding, LLC<br><br>UCC-3 # 1273184066<br>Filed 6-26-12<br>Amendment to Collateral<br><br>UCC-3 #1273185297<br>Filed 6-27-12<br>Amendment to change Secured Party from Prime Alliance Bank to Republic Bank | Artic Sun 5000 – Therapeutic Hypothermia Cooling System |
| | | UCC-1 # 127317191779<br>Filed 6-14-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Horizon Cardiology CPACS System |
| | | UCC-1 # 127321146077<br>Filed 7-17-12<br>Secured Party: Creekridge Capital LLC | Equipment included in Agreement No. 0605600-001 |
| | | UCC-1 # 127321299753<br>Filed 7-18-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | West-Com Nurse Call System |
| | | UCC-1 # 127325868961<br>Filed 8-21-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank | Ultra Sound Equipment |

SCHEDULE 6.7 - 14

**JAE 0484**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 127327789440<br>Filed 9-5-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br><br>UCC-3 # 1273319799<br>Filed 10-8-12<br>Amendment to change collateral | Mizuho OSI Orthopedic Table System |

SCHEDULE 6.7 - 15

**JAE 0485**

CONFIDENTIAL

**Exhibit B**

**Confirmation**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004789

EXECUTION VERSION

CONFIRMATION

CONFIRMATION (this "Confirmation") dated as of February 7, 2013, among each of the companies or entities identified under the caption "BORROWERS" on the signature pages hereto (collectively, the "Borrowers"), each of the companies or entities identified under the caption "AMENDMENT PARTIES" on the signature pages hereto ("Amendment Parties", and together with the Borrowers, the "Obligors") and SILVER POINT FINANCE LLC, as successor lender agent for the Lenders under the Amended and Restated Credit Agreement referred to below (in such capacity, together with its successors in such capacity, the "Lender Agent").

The Borrowers, the Amendment Parties, Orange County Physicians Investment Network, LLC ("OC-PIN", together with the Amendment Parties, the "Credit Parties"), SPCP GROUP IV, LLC ("SP 1"), and SPCP Group, LLC ("SP 2", and together with SP1, the "Existing Lenders") and Lender Agent are parties to the Credit Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"), providing for extensions of credit to be made by said Lenders to the Borrowers thereunder. Concurrently with the execution and delivery hereof, the Borrowers, the Amendment Parties, the Existing Lenders and the Lender Agent are entering into an Amendment and Restatement to the Credit Agreement dated as of the date hereof (the "Amendment Agreement"). Pursuant to the Amendment Agreement, the Existing Credit Agreement is being amended and restated in its entirety with an Amended and Restated Credit Agreement dated as of the date hereof (as so amended and restated, and as may be further amended, supplemented or otherwise modified from time to time, the "Amended and Restated Credit Agreement") among the Borrowers, the Credit Parties, the "Lenders" (as defined therein) and Lender Agent. Except as otherwise defined in this Confirmation, terms defined in the Amended and Restated Credit Agreement are used herein as defined therein.

In connection with the Existing Credit Agreement, the Obligors, Existing Lenders and Lender Agent (as successor in interest to Medical Provider Financial Corporation II) have entered into certain agreements listed on Schedule A hereto (such agreements, as amended, supplemented or otherwise modified from time to time, the "Existing Loan Documents").

Each Obligor, by its execution of this Confirmation, hereby represents, warrants and agrees as to itself and not any other Person that (i) it has full power and authority, and has taken all actions necessary, to execute and deliver this Confirmation and to continue to grant the security interests granted by it under the applicable Existing Loan Documents to which it is a party, (ii) it has received a copy of the Amended and Restated Credit Agreement and the other documents executed therewith, (iii) it consents to the Amended and Restated Credit Agreement, (iv) it unconditionally confirms and ratifies that all of its obligations under the Existing Loan Documents to which it is a party shall continue uninterrupted and in full force and effect for the benefit of the Lenders under the Amended and Restated Credit Agreement, (v) it unconditionally confirms that the security interests granted by it under each of the applicable Existing Loan Documents to which it is a party shall continue uninterrupted and in full force and effect in favor of the Lender Agent for the benefit of the Lenders under the Amended and Restated Credit Agreement, (vi) on and after the date hereof, it will continue to obtain benefits from the incurrence of Loans by the Borrowers and (vii) on and after the date hereof, all references in the Existing Loan Documents to the "Credit Agreement" shall be deemed to be and are references to the Amended and Restated Credit Agreement described above.

#4812-7183-4130v10

**JAE 0487**

This Confirmation shall constitute a "Loan Document" for all purposes of the Amended and Restated Credit Agreement.  This Confirmation may be executed in any number of counterparts, all of which taken together shall constitute one and the same amendatory instrument and any of the parties hereto may execute this Confirmation by signing any such counterpart.  This Confirmation shall be governed by, and construed in accordance with, the law of the State of Nevada.

[Remainder of the Page Intentionally Blank]

#4812-7183-4130v10

**JAE 0488**

CONFIDENTIAL

SPCP_0000004791

IN WITNESS WHEREOF, each Obligor has caused this Confirmation to be duly executed and delivered as of the date first above written.

OBLIGORS

**BORROWERS:**

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation

By: _____

Name: Kenneth K. Westbrook

Title: CEO

WMC-A, INC., a California corporation

By: _____

Name: Kenneth K. Westbrook

Title: CEO

WMC-SA, INC., a California corporation

By: _____

Name: Kenneth K. Westbrook

Title: CEO

COASTAL COMMUNITIES HOSPITAL, INC., a California corporation

By: _____

Name: Kenneth K. Westbrook

Title: CEO

CHAPMAN MEDICAL CENTER, INC., a California corporation

By: _____

Name: Kenneth K Westbrook

Title: CEO

#4812-7183-4130                    [Signature Page to Confirmation]

**JAE 0489**

CONFIDENTIAL                                                                 SPCP_0000004792

**AMENDMENT PARTIES:**

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a
California limited liability company

By: _____
Name: _____ JACOB SWEIDAN
Title: _____ CO-MANAGER

By: _____
Name: _____
Title: _____

GANESHA REALTY, LLC, a California
limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to Confirmation]

**JAE 0490**

CONFIDENTIAL

AMENDMENT
CREDIT PARTIES:

PACIFIC COAST HOLDINGS INVESTMENT, LLC, a
California limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

GANESHA REALTY, LLC, a California
limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to Confirmation]

#4812-7183-4130v4

CONFIDENTIAL

SPCP_0000004794

Accepted and Acknowledged by:

SILVER POINT FINANCE LLC,
    as Lender Agent

By _____
Name:    Michael A. Gatto
Title:    Authorized Signatory

#4812-7183-4130

**JAE 0492**

CONFIDENTIAL

SPCP_0000004795

## Schedule A

## Existing Loan Documents[1]

(1) Security Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II, the Borrowers party thereto and Pacific Coast Holdings Investment, LLC ("PCHI").

(2) Guaranty Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II, PCHI and OC-PIN.

(3) Pledge Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Integrated Healthcare Holdings, Inc. ("IHHI"), Ganesha Realty, LLC ("Ganesha")and Medical Provider Financial Corporation II.

(4) Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Western Medical Center – Anaheim dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI and Medical Provider Financial Corporation II.

(5) Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Western Medical Center – Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI and Medical Provider Financial Corporation II.

(6) Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Coastal Communities Hospital, Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI and Medical Provider Financial Corporation II.

(7) Leasehold Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Leasehold Interest: Chapman Medical Center – Medical Office Building Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI and Medical Provider Financial Corporation II.

(8) Leasehold Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Leasehold Interest: Chapman Medical Center – Hospital Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI and Medical Provider Financial Corporation II.

(9) Absolute Assignment of Leases and Rents with License Back re Western Medical Center – Anaheim dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI, IHHI, WMC-A, Inc. ("WMC-A") and Medical Provider Financial Corporation II.

(10) Absolute Assignment of Leases and Rents with License Back re Western Medical Center – Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI, IHHI, WMC-SA, Inc. ("WMC-SA") and Medical Provider Financial Corporation II.

---

[1] As of the date hereof, SP 2 and Lender Agent are successors in interest to Medical Provider Financial Corporation II under each of the Existing Loan Documents.

#4812-7183-4130v10

CONFIDENTIAL

(11) Absolute Assignment of Leases and Rents with License Back re Coastal Communities Hospital dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI, IHHI, Coastal Communities Hospital, Inc. ("Coastal") and Medical Provider Financial Corporation II.

(12) Absolute Assignment of Leases and Rents with License Back re Leasehold Interest: Chapman Medical Center – Medical Office Building Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman Medical Center, Inc. ("Chapman") and Medical Provider Financial Corporation II.

(13) Absolute Assignment of Leases and Rents with License Back re Leasehold Interest: Chapman Medical Center – Hospital Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman and Medical Provider Financial Corporation II.

(14) Collateral Assignment of Contracts re Western Medical Center – Anaheim dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, WMC-A and Medical Provider Financial Corporation II.

(15) Collateral Assignment of Contracts re Western Medical Center – Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, WMC-SA and Medical Provider Financial Corporation II.

(16) Collateral Assignment of Contracts re Coastal Communities Hospital, Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Coastal and Medical Provider Financial Corporation II.

(17) Collateral Assignment of Contracts re Leasehold: Chapman Medical Center – Medical Office Building, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman and Medical Provider Financial Corporation II.

(18) Collateral Assignment of Contracts re Leasehold: Chapman Medical Center – Hospital Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman and Medical Provider Financial Corporation II.

(19) Intellectual Property Security Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II and the Borrowers party thereto.

(20) Environmental Indemnity Agreement, dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II, the Borrowers, PCHI and OC-PIN.

(21) Intercreditor Agreement, dated as of August 30, 2010 (as amended, supplemented or otherwise modified as of the date hereof) among MidCap Financial, LLC, Lender Agent, the Borrowers and the Amendment Parties.

CONFIDENTIAL

**Exhibit C-1**

**Amendment No. 1 to the Common Stock Warrant for SPCP Group, LLC**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004798

**NEITHER THIS AMENDMENT TO WARRANT NOR THE SECURITIES INTO WHICH THE WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

**AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT (SPCP GROUP, LLC)**

This **AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT** (this "Amendment") is made as of February 7, 2013, by and among SPCP GROUP, LLC, a Delaware limited liability company, or its successors or assigns (the "Holder" or "Holders," as applicable), and Integrated Healthcare Holdings, Inc., a Nevada corporation (the "Company").

Holder is entitled to subscribe for and purchase certain fully paid and nonassessable shares (the "Shares") of the Common Stock (the "Common Stock") of the Company pursuant to the terms of the Warrant to Purchase Shares of Common Stock, exercisable from and after April 13, 2010 (as amended, supplemented or otherwise modified and in effect from time to time, the "Warrant"). Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

The Company and the Holder desire to amend the Warrant in certain respects.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Holder hereby agree as follows:

Section 1. Definitions. Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

Section 2. Amendments. Subject to the satisfaction of the conditions precedent specified in Section 4 below, but effective as of the date of this Amendment, the Warrant shall be amended as follows:

2.1. References Generally. References in the Warrant (including references to the Warrant as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Warrant as amended hereby.

2.2. Exercise. The first sentence of Section 1(a) of the Warrant Agreement is hereby amended by deleting "April 13, 2013" and replacing it with "April 13, 2016".

2.3. Net Issue Exercise. Section 1(c) of the Warrant Agreement is hereby amended by deleting the reference to "Section 3(d)" and replacing it with "Section 1(d)".

Section 3. Representations and Warranties. The Company represents and warrants to the Holder that the representations and warranties set forth in Section 7 of the Warrant are true and complete

Amendment No. 1 to Warrant (SPCP Group, LLC)

#4827-8322-3570v5

**JAE 0496**

on the date of this Amendment as if made on and as of the date of this Amendment (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date) and as if each reference in said Section 7 to "this Agreement" included reference to this Amendment.

Section 4.   Conditions Precedent.   This Amendment shall become effective as of the date of this Amendment upon the receipt by Holder of counterparts of this Amendment executed by the Company.

Section 5.   Effect of this Amendment.   Except as expressly provided in this Amendment, the Warrant and each other Loan Document shall remain unchanged and in full force and effect.

Section 6.   Miscellaneous.   This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Amendment by signing any such counterpart.  Delivery of a counterpart by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.  This Amendment shall be governed by, and construed in accordance with, the law of the State of Nevada.

[Remainder of page intentionally blank]

Amendment No. 1 to Warrant (SPCP Group, LLC)

2

#4827-8322-3570v5

**JAE 0497**

CONFIDENTIAL

SPCP_0000004800

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Warrant (SPCP Group, LLC) to be duly executed by their respective authorized representatives as of the day and year first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.

By: _____
Name:   Kenneth K. Westbrook
Title:   CEO

[Signature Page to Amendment No. 1 to Warrant (SPCP Group, LLC)]

#4827-8322-3570

CONFIDENTIAL

SPCP_0000004801

SPCP GROUP, LLC

By: _____

Name:   Michael A. Gatto

Title:   Authorized Signatory

[Signature Page to Amendment No. 1 to Warrant (SPCP Group, LLC)]

#4827-8322-3570

CONFIDENTIAL

SPCP_0000004802

**Exhibit C-2**

**Amendment No. 1 to the Common Stock Warrant for KPC Resolution Company, LLC**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004803

**NEITHER THIS AMENDMENT TO WARRANT NOR THE SECURITIES INTO WHICH THE WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

## AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT (KPC RESOLUTION COMPANY, LLC)

This **AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT** (this "Amendment") is made as of February 7, 2013, by and among KPC RESOLUTION COMPANY, LLC, a California limited liability company, or its successors or assigns (the "Holder" or "Holders," as applicable), and Integrated Healthcare Holdings, Inc., a Nevada corporation (the "Company").

Holder is entitled to subscribe for and purchase certain fully paid and nonassessable shares (the "Shares") of the Common Stock (the "Common Stock") of the Company pursuant to the terms of the Warrant to Purchase Shares of Common Stock, exercisable from and after April 13, 2010 (as amended, supplemented or otherwise modified and in effect from time to time, the "Warrant"). Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

The Company and the Holder desire to amend the Warrant in certain respects.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Holder hereby agree as follows:

Section 1. Definitions. Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

Section 2. Amendments. Subject to the satisfaction of the conditions precedent specified in Section 4 below, but effective as of the date of this Amendment, the Warrant shall be amended as follows:

2.1. References Generally. References in the Warrant (including references to the Warrant as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Warrant as amended hereby.

2.2. Exercise. The first sentence of Section 1(a) of the Warrant Agreement is hereby amended by deleting "April 13, 2013" and replacing it with "April 13, 2016".

2.3. Net Issue Exercise. Section 1(c) of the Warrant Agreement is hereby amended by deleting the reference to "Section 3(d)" and replacing it with "Section 1(d)".

Section 3. Representations and Warranties. The Company represents and warrants to the Holder that the representations and warranties set forth in Section 7 of the Warrant are true and complete

Amendment No. 1 to Warrant (KPC Resolution Company, LLC)

#4832-0673-0514v4

CONFIDENTIAL

on the date of this Amendment as if made on and as of the date of this Amendment (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date) and as if each reference in said Section 7 to "this Agreement" included reference to this Amendment.

Section 4. <u>Conditions Precedent</u>. This Amendment shall become effective as of the date of this Amendment upon the receipt by Holder of counterparts of this Amendment executed by the Company.

Section 5. <u>Effect of this Amendment</u>. Except as expressly provided in this Amendment, the Warrant and each other Loan Document shall remain unchanged and in full force and effect.

Section 6. <u>Miscellaneous</u>. This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Amendment by signing any such counterpart. Delivery of a counterpart by electronic transmission shall be effective as delivery of a manually executed counterpart hereof. This Amendment shall be governed by, and construed in accordance with, the law of the State of Nevada.

[Remainder of page intentionally blank]

Amendment No. 1 to Warrant (KPC Resolution Company, LLC)
2

#4832-0673-0514v4

CONFIDENTIAL

SPCP_0000004805

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Warrant (KPC Resolution Company, LLC) to be duly executed by their respective authorized representatives as of the day and year first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.

By: _____

Name: Kenneth K. Westbrook

Title: CEO

[Amendment No. 1 to Warrant (KPC Resolution Company, LLC)]

#4832-0873-0514

CONFIDENTIAL

SPCP_0000004806

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Warrant (KPC Resolution Company, LLC) to be duly executed by their respective authorized representatives as of the day and year first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.

By:_____
Name:
Title:

KPC RESOLUTION COMPANY, LLC

By:_____
Name:
Title:

Signature Page to Amendment No. 1 to Warrant (KPC Resolution Company, LLC)

#4832-0673-0514

CONFIDENTIAL

SPCP_0000004807

**Exhibit C-3**

**Amendment No. 1 to the Common Stock Warrant for Kali P. Chaudhuri, M.D.**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004808

**NEITHER THIS AMENDMENT TO WARRANT NOR THE SECURITIES INTO WHICH THE WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

### AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT (KALI P. CHAUDHURI, M.D.)

This **AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT** (this "Amendment") is made as of February 7, 2013, by and among KALI P. CHAUDHURI, M.D., an individual, or his successors or assigns (the "Holder" or "Holders," as applicable), and Integrated Healthcare Holdings, Inc., a Nevada corporation (the "Company").

Holder is entitled to subscribe for and purchase certain fully paid and nonassessable shares (the "Shares") of the Common Stock (the "Common Stock") of the Company pursuant to the terms of the Warrant to Purchase Shares of Common Stock, exercisable from and after April 13, 2010 (as amended, supplemented or otherwise modified and in effect from time to time, the "Warrant"). Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

The Company and the Holder desire to amend the Warrant in certain respects.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Holder hereby agree as follows:

Section 1.  Definitions.  Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

Section 2.  Amendments.  Subject to the satisfaction of the conditions precedent specified in Section 4 below, but effective as of the date of this Amendment, the Warrant shall be amended as follows:

2.1.  References Generally.  References in the Warrant (including references to the Warrant as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Warrant as amended hereby.

2.2.  Exercise.  The first sentence of Section 1(a) of the Warrant Agreement is hereby amended by deleting "April 13, 2013" and replacing it with "April 13, 2016".

2.3.  Net Issue Exercise.  Section 1(c) of the Warrant Agreement is hereby amended by deleting the reference to "Section 3(d)" and replacing it with "Section 1(d)".

Section 3.  Representations and Warranties.  The Company represents and warrants to the Holder that the representations and warranties set forth in Section 7 of the Warrant are true and complete on the date of this Amendment as if made on and as of the date of this Amendment (or, if any such

Amendment No. 1 to Warrant (Kali P. Chaudhuri, M.D.)

#4835-7858-1266v3

CONFIDENTIAL

SPCP_0000004809

representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date) and as if each reference in said Section 7 to "this Agreement" included reference to this Amendment.

Section 4.   <u>Conditions Precedent</u>.   This Amendment shall become effective as of the date of this Amendment upon the receipt by Holder of counterparts of this Amendment executed by the Company.

Section 5.   <u>Effect of this Amendment</u>.   Except as expressly provided in this Amendment, the Warrant and each other Loan Document shall remain unchanged and in full force and effect.

Section 6.   <u>Miscellaneous</u>.   This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Amendment by signing any such counterpart.  Delivery of a counterpart by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.  This Amendment shall be governed by, and construed in accordance with, the law of the State of Nevada.

[Remainder of page intentionally blank]

Amendment No. 1 to Warrant (Kali P. Chaudhuri, M.D.)

2

#4835-7858-1266v3

**JAE 0507**

CONFIDENTIAL

SPCP_0000004810

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Warrant (KALI P. CHAUDHURI, M.D.) to be duly executed by their respective authorized representatives as of the day and year first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.

By: _____

Name: Kenneth K. Westbrock

Title: CEO

|Signature Page to Amendment No. 1 to Warrant (Kali P. Chaudhuri, M.D.)|

#4835-7858-1266

CONFIDENTIAL

SPCP_0000004811

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Warrant (KALI P. CHAUDHURI, M.D.) to be duly executed by their respective authorized representatives as of the day and year first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.

By:_____
Name:
Title:

KALI P. CHAUDHURI, M.D.

By:_____
Name:

Signature Page to Amendment No. 1 to Warrant (Kali P. Chaudhuri, M.D.)

#4835-7858-1266

CONFIDENTIAL

SPCP_0000004812

**Exhibit D**

**Repurchase Agreement**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004813

# WARRANT REPURCHASE AGREEMENT

THIS WARRANT REPURCHASE AGREEMENT (the "Agreement"), dated as of February 7, 2013, is made by and between Integrated Healthcare Holdings, Inc., a Nevada corporation (the "Purchaser"), and SPCP Group IV, LLC (the "Warrant Holder").

## R E C I T A L S

WHEREAS, on or about April 13, 2010, the Warrant Holder was issued a warrant to purchase an aggregate 16,817,365 shares of Common Stock of Purchaser at an initial exercise price of $0.07 per share, exercisable until April 13, 2013 (the "Warrant"), a copy of which is attached as Exhibit A hereto.

WHEREAS, Warrant Holder desires to sell to Purchaser, and Purchaser desires to purchase from Warrant Holder, the Warrant on the terms and conditions contained herein.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. Sale and Purchase of Warrant; No Further Rights.

(a) Sale of the Warrant. Concurrently with the execution hereof, Warrant Holder shall sell, transfer and assign the Warrant to Purchaser for a purchase price of $0.12 per share exercisable under the Warrant minus the exercise price of $0.07 per share, or a net purchase price of $0.05 per share, multiplied by 16,817,365 shares exercisable under the Warrant, or an aggregate purchase price of $840,868.25 (the "Purchase Price"). The parties hereto agree that the payment of the Purchase Price shall be in full satisfaction of any and all obligations owed by Purchaser with respect to the Warrant, and Purchaser shall purchase from Warrant Holder, all of the right, title, and interest of Warrant Holder in and to the Warrant.

(b) Deliveries by Purchaser. Concurrently with the execution hereof, Purchaser shall deliver to Warrant Holder the Purchase Price by wire transfer of immediately available funds to bank accounts designated by Warrant Holder or such other form of payment as the parties may agree.

(c) Deliveries by Warrant Holder. Concurrently with the execution hereof, the Warrant Holder shall deliver to Purchaser the Warrant Holder's original Warrant, accompanied by a duly executed Form of Transfer in the form attached hereto as Exhibit B in favor of Purchaser.

(d) Termination of Warrant. At the Closing, the Warrant shall be cancelled and terminated, and Warrant Holder shall have no further rights thereunder.

Section 2. Closing. The closing of the transactions contemplated hereby (the "Closing") shall take place concurrently with the execution hereof (the "Closing Date"), at such place or on such other date as may be mutually agreeable to Warrant Holder and Purchaser.

US_ACTIVE-111779782.4

CONFIDENTIAL

SPCP_0000004814

Section 3.  <u>Representations and Warranties of Warrant Holder</u>.  The Warrant Holder hereby represents and warrants to Purchaser as follows, and such representations and warranties shall survive the Closing:

(a) <u>Authorization</u>.  The Warrant Holder has all requisite power and authority to enter into this Agreement and any other agreements or instruments contemplated hereby, and to perform its obligations hereunder.  This Agreement and all other agreements contemplated hereby each constitutes a valid and binding obligation of the Warrant Holder, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and limitations on the availability of equitable remedies.  The execution and delivery by the Warrant Holder of this Agreement and all other agreements contemplated hereby to which the Warrant Holder is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by the Warrant Holder, do not and shall not conflict with or result in a breach of the terms, conditions or provisions of, or require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or governmental body pursuant to, its limited liability company operating agreement or any material law, statute, rule or regulation to which the Warrant Holder is subject, or any material agreement, instrument, order, judgment or decree to which the Warrant Holder is subject, except where any such condition would not adversely affect the Warrant Holder's ability to its obligations hereunder.  The Warrant Holder has full right, power and authority to sell, assign, transfer and deliver the Warrant to be sold by the Warrant Holder hereunder.

(b) <u>Title</u>.  The Warrant Holder has not transferred, sold, pledged or encumbered the Warrant and has good and valid title to the Warrant, free and clear of any liens, charges, claims, pledges, security interests, conditional sale agreements and other encumbrances whatsoever, whether arising by agreement, operation of law or otherwise, and there are no restrictions on the Warrant Holder's right to transfer the Warrant to Purchaser pursuant to <u>Section 1(c)</u> hereof, other than those imposed by applicable federal and state securities laws.  Upon delivery and payment for the Warrant Holder's Warrant at the Closing, Purchaser shall acquire valid and unencumbered title to the Warrant Holder's Warrant.  No person other than Purchaser has any agreement, option, understanding or commitment (oral or in writing), or any right or privilege capable of becoming an agreement, option or commitment, for the purchase from the Warrant Holder of the Warrant Holder's Warrant.  The Warrant Holder has not exercised or attempted to exercise the Warrant, and shall not do so on or prior to the Closing.

(c) <u>Access to Information; Sophistication; Lack of Reliance</u>.  The Warrant Holder (i) is familiar with the business and financial condition, properties, operations and prospects of Purchaser, (ii) has been provided with such information, documents and other materials concerning Purchaser, including its financial condition, results of operations, prospects, properties or business, to enable the Warrant Holder to form an independent judgment regarding the advisability of the sale of the Warrant Holder's Warrant on the terms and conditions contained herein, (iii) has had such time as the Warrant Holder deems necessary and appropriate to review and analyze such information, documents and other materials to enable it to form such independent judgment, and (iv) has been granted the opportunity to obtain any additional information that the Warrant Holder deems necessary to verify the accuracy of such information, documents and other materials and to ask questions of, and have received satisfactory answers

2

CONFIDENTIAL                                                                                   SPCP_0000004815

from, representatives of Purchaser concerning Purchaser.  The Warrant Holder has also had the opportunity to review the periodic and current reports filed with the United States Securities and Exchange Commission (the "SEC") by Purchaser.  The Warrant Holder's knowledge and experience in financial and business matters is such that the Warrant Holder is capable of evaluating the merits and risks of the Warrant Holder's sale of the Warrant Holder's Warrant. The Warrant Holder has carefully reviewed the terms and provisions of this Agreement and has evaluated its rights and obligations contained herein, and is hereby voluntarily assuming the risks relating to the transactions contemplated hereby.

(d) Arm's-Length Transaction.  The Warrant Holder is dealing with Purchaser on a professional arm's-length basis and neither Purchaser nor any of its respective affiliates or representatives is acting as a fiduciary or advisor to the Warrant Holder with respect to this Agreement and any of the transactions contemplated hereby.

(e) Independent Appraisal.  In connection with this Agreement and the transactions contemplated hereby, the Warrant Holder has made its own independent appraisal of, and investigation into, the value of the Warrant, and, in deciding to enter into this Agreement, the Warrant Holder has not relied on Purchaser or any affiliate, representative or agent of Purchaser with respect to such matters.

(f) No Reliance.  The Warrant Holder acknowledges that (i) there are no, and it is not relying upon any, representations or warranties by or on behalf of Purchaser or any of its affiliates or representatives other than those expressly set forth in this Agreement and (ii) its rights and obligations with respect to this Agreement and the events giving rise thereto are and will be solely as set forth in this Agreement.

Section 4.  Representations and Warranties of Purchaser.  The Purchaser hereby represents and warrants to Warrant Holder as follows, and such representations and warranties shall survive the Closing:

(a) Authorization.  The Purchaser has all requisite power and authority to enter into this Agreement and any other agreements or instruments contemplated hereby, and to perform its obligations hereunder.  This Agreement and all other agreements contemplated hereby each constitutes a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and limitations on the availability of equitable remedies.  The execution and delivery by the Purchaser of this Agreement and all other agreements contemplated hereby to which the Purchaser is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by the Purchaser, do not and shall not conflict with or result in a breach of the terms, conditions or provisions of, or require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or governmental body pursuant to, its limited liability company operating agreement or any material law, statute, rule or regulation to which the Purchaser is subject, or any material agreement, instrument, order, judgment or decree to which the Purchaser is subject, except where any such condition would not adversely affect the Purchaser's ability to its obligations hereunder.

3

**JAE 0513**

CONFIDENTIAL

SPCP_0000004816

(b) <u>Sophistication; Lack of Reliance</u>.  The Purchaser's knowledge and experience in financial and business matters is such that the Purchaser is capable of evaluating the merits and risks of the Purchaser's purchase of the Warrant.  The Purchaser has carefully reviewed the terms and provisions of this Agreement and has evaluated its rights and obligations contained herein, and is hereby voluntarily assuming the risks relating to the transactions contemplated hereby.

(c) <u>Arm's-Length Transaction</u>.  The Purchaser is dealing with Warrant Holder on a professional arm's-length basis and neither Warrant Holder nor any of its respective affiliates or representatives is acting as a fiduciary or advisor to the Purchaser with respect to this Agreement and any of the transactions contemplated hereby.

(d) <u>No Reliance</u>.  The Purchaser acknowledges that (i) there are no, and it is not relying upon any, representations or warranties by or on behalf of Warrant Party or any of its affiliates or representatives other than those expressly set forth in this Agreement and (ii) its rights and obligations with respect to this Agreement and the events giving rise thereto are and will be solely as set forth in this Agreement.

Section 5.  <u>Miscellaneous</u>.

(a) <u>Further Assurances</u>.  From time to time after the Closing, each party shall cooperate and take such action or cause to be taken such action as may be reasonably requested by another party hereto in order to carry out the provisions and purposes of this Agreement and transactions contemplated hereby.

(b) <u>No Assignment</u>.  The rights and obligations of the parties hereto under this Agreement shall inure to the benefit of and shall be binding upon their successors and assigns.  No party hereto may assign either this Agreement (whether by operation of law of otherwise) or any of its rights, interests, benefits or obligations hereunder without the prior written approval of the other parties hereto.

(c) <u>Choice of Law</u>.  The corporate law of the State of Nevada will govern all questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada.

(d) <u>Entire Agreement; Amendments; Severability</u>.  This instrument constitutes the entire agreement with respect to the subject matter hereof between the parties hereto and replaces and supersedes as of the date hereof any and all prior oral or written agreements, understandings and communications between the parties hereto.  This Agreement may only be amended or modified by an agreement in writing executed by each of the parties hereto.  Should any provision of this Agreement be adjudged invalid to any extent by any competent tribunal, such provision will be deemed modified to the extent necessary to make it enforceable.

(e) <u>Counterparts; Section Headings</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  The section headings of this Agreement are for convenience of reference only.  Delivery of an executed counterpart of a signature page of this

CONFIDENTIAL                                                                                                                      SPCP_0000004817

Agreement by facsimile or other form of electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement.

(f)   <u>No Third-Party Beneficiaries</u>.   This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

5

**JAE 0515**

CONFIDENTIAL

SPCP_0000004818

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized representatives as of the date first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.,
a Nevada corporation

By: _____
Name: _Kenneth K. Westbrook_
Title: _____CEO_____


SPCP GROUP IV, LLC,
a Delaware limited liability company

By: Silver Point C&I Opportunity GP, LLC


By: _____
Name: _____
Title: _____

*(Signature Page to Warrant Repurchase Agreement)*

**JAE 0516**

CONFIDENTIAL

INTENDING TO BE LEGALLY BOUND HEREBY, the parties hereto have executed this Agreement on the date first above written.

**INTEGRATED HEALTHCARE HOLDINGS, INC.,** a Nevada corporation

By: _____

Name: _____

Title: _____

**SPCP GROUP IV, LLC,**
a Delaware limited liability company

By: Silver Point C&1 Opportunity GP, LLC

By: _____

Name: ___Michael A. Gaito___

Title: ___Authorized Signatory___

5

*[SIGNATURE PAGE TO WARRANT REPURCHASE AGREEMENT]*

CONFIDENTIAL

SPCP_0000004820

**EXHIBIT A**

## <u>WARRANT</u>

See attached

CONFIDENTIAL

SPCP_0000004821

**NEITHER THIS WARRANT NOR THE SECURITIES INTO WHICH THIS WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

## INTEGRATED HEALTHCARE HOLDINGS, INC.
## COMMON STOCK WARRANT

### WARRANT TO PURCHASE SHARES OF COMMON STOCK

THIS COMMON STOCK WARRANT (this "**Warrant**") certifies that, for consideration received, SPCP GROUP IV, LLC, a Delaware limited liability company, or its successors or assigns (the "**Holder**" or "**Holders**," as applicable), is entitled to subscribe for and purchase SIXTEEN MILLION EIGHT HUNDRED SEVENTEEN THOUSAND THREE HUNDRED SIXTY FIVE (16,817,365) fully paid and nonassessable shares (as adjusted pursuant to Section 3 hereof, the "**Shares**") of the Common Stock (the "**Common Stock**") of Integrated Healthcare Holdings, Inc., a Nevada corporation (the "**Company**"), at a price per Share equal to seven cents ($0.07) (as adjusted pursuant to Section 3 hereof, the "**Exercise Price**"), subject to the provisions and upon the terms and conditions hereinafter set forth.

1.      Method of Exercise; Payment.

        (a)      Exercise. This Warrant shall be exercisable from and after April 13, 2010 (the "**Initial Exercise Date**") through April 13, 2013 (the "**Expiration Date**"). This Warrant shall be exercisable by Holder in whole or in part and from time to time for the Shares (as adjusted pursuant to Section 3 hereof).

        (b)      Cash Exercise. The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, by the surrender of this Warrant (with the notice of exercise form attached hereto as Exhibit A duly executed) at the principal office of the Company, and by the payment to the Company, by wire transfer or certified, cashier's or other check acceptable to the Company (or as otherwise provided pursuant to Section 1(c) hereinbelow), of an amount equal to the aggregate Exercise Price of the Shares being purchased.

        (c)      Net Issue Exercise. In combination with or in lieu of exercising this Warrant for cash pursuant to Section 1(b), the Holder may elect to receive Shares of

CONFIDENTIAL

**JAE 0519**

SPCP_0000004822

Common Stock equal to the value of this Warrant (or any portion thereof) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X \quad = \quad \frac{Y(A-B)}{A}$$

Where X    =    the number of the Shares to be issued to the Holder pursuant to this Section 1(c).

Y    =    the number of the Shares covered by this Warrant in respect of which the net issuance election is made pursuant to this Section 1(c).

A    =    the fair market value of one Share on the date of election under this Section 1(c), as determined in accordance with Section 3(d).

B    =    the Exercise Price in effect under this Warrant on the date of election under this Section 1(c).

(d)    <u>Fair Market Value</u>.  For purposes of this Warrant, the per share fair market value of the Shares shall mean:

(i)    If the class of Shares is traded on a national securities exchange or other over-the-counter quotation system, the fair market value shall be the last reported sale price of a Share on such exchange or other over-the-counter quotation system on the last business day before the effective date of exercise of the net issuance election or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange.

(ii)    If the class of Shares is not so listed and bid and ask prices are not reported, the fair market value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company, as such price shall be determined by either of the following (in each case, the "**Appraiser**"), which determination shall be conclusive and binding on the Company and the Holder for purposes of this Warrant: (A) the mutual agreement of the Company and Holder, or (B) alternatively, if in good faith the Company and the Holder are unable to reach such mutual agreement within five (5) business days, a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing selected by the Holder in its sole and absolute discretion and at the Company's sole cost and expense.

(e)    <u>Stock Certificates</u>.  Promptly upon receipt of a notice to exercise, the Company will take all necessary actions to authorize the issuance of such Common Stock under this Warrant.  In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within three (3) business days, or four (4) Trading Days if the Company's Common Stock is publicly traded and the notice of exercise is received after 1:30 p.m. Pacific Time on a day in

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

2

CONFIDENTIAL

SPCP_0000004823

which the Company's Common Stock is publicly traded (each a "**Trading Day**") and, unless this Warrant has been fully exercised or has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time.

2.    Stock Fully Paid.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be duly authorized, validly issued, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issue thereof (except the Holder's income taxes, if any, that are due and payable with respect to the Shares).

3.    Adjustment to the Number of Shares Issuable and/or the Exercise Price.  The number of Shares issuable upon the exercise of this Warrant and the Exercise Price are subject to adjustment from time to time as set forth in this Section 3.  Upon each adjustment pursuant to this Section 3, the Holder shall thereafter prior to the Expiration Date be entitled to purchase the adjusted number of Shares of Common Stock at the Exercise Price as adjusted hereby.

(a)    If the Company, at any time while this Warrant is outstanding, (i) shall pay a stock dividend payable in shares of its capital stock (whether payable in shares of its Common Stock, preferred stock, or securities convertible into, or exchangeable or exercisable for, Common Stock or of other capital stock of any class), (ii) shall subdivide outstanding shares of Common Stock into a larger number of shares, or (iii) combine outstanding shares of Common Stock into a smaller number of shares, then (x) the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased or decreased to reflect such event, and (y) the Exercise Price shall be adjusted to an amount obtained by multiplying the Exercise Price in effect immediately prior to such event by a fraction equal to the number of Shares for which this Warrant is exercisable immediately prior to such event divided by the number of Shares for which this Warrant is exercisable immediately after such event.  Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date of a subdivision, combination or reclassification.

(b)    If the Company, at any time while this Warrant is outstanding, shall distribute to all holders of Common Stock, or holders of any securities convertible into, or exchangeable or exercisable for Common Stock (and not to the Holder), evidences of its indebtedness, assets or any rights or warrants to subscribe for or purchase any security (excluding those referred to in this Section 3), the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased to reflect such event as determined by the Appraiser.  The Company shall promptly provide a statement to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock.  Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

3

CONFIDENTIAL                                                                 SPCP_0000004824

(c)      In case of any reclassification of the Common Stock, any consolidation or merger of the Company with or into another person, the sale or transfer of all or substantially all of the assets of the Company or any compulsory share exchange pursuant to which the Common Stock is converted into other securities, cash or property, then, subject to the terms hereof, the Holder shall have the right thereafter to exercise this Warrant into the shares of stock and other securities and property receivable upon or deemed to be held by holders of Common Stock following such reclassification, consolidation, merger, sale, transfer or share exchange, and the Holder shall be entitled upon such event to receive such amount of securities or property as the shares of the Common Stock into which this Warrant could have been exercised immediately prior to such reclassification, consolidation, merger, sale, transfer or share exchange would have been entitled.  The terms of any such reclassification, consolidation, merger, sale, transfer or share exchange shall include such terms so as to continue to give to the Holder the right to receive the securities or property set forth in this Section 3(c) upon any exercise following such reclassification, consolidation, merger, sale, transfer or share exchange. This provision shall similarly apply to successive reclassification, consolidations, mergers, sales, transfers or share exchanges.

(d)      If the Company, at any time while this Warrant is outstanding, shall issue additional shares of Common Stock for a consideration per share less than the Exercise Price (a "**Dilutive Issuance**"), then, the Exercise Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Exercise Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Company for such issue would purchase at such Exercise Price, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such additional shares of Common Stock so issued.  For the purposes of this Section 3(d), all shares of Common Stock issuable upon conversion of any outstanding shares of preferred stock and the exercise and/or conversion of any other outstanding securities or rights exercisable for or convertible into shares of Common Stock shall be deemed to be outstanding.  For the purposes of this Section 3(d), the following paragraphs shall also be applicable:

(i)      If the Company, at any time while this Warrant is outstanding, grants any rights to subscribe for, or any rights or options to purchase, or securities convertible into, shares of Common Stock, whether or not such rights or options or rights to convert or exchange are immediately exercisable, and the price per share associated with such rights or options or rights to convert or exchange is less than the Exercise Price, then the total maximum number of shares issuable upon the exercise of such rights or options or upon conversion or exchange of the total maximum amount of such convertible securities issuable upon the exercise of such rights or options shall (as of the date of grant of such rights or options) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d).

(ii)      If the Company, at any time while this Warrant is outstanding,

CONFIDENTIAL                                                                    SPCP_0000004825

issues or sells any convertible securities, whether or not the rights to exchange or convert thereunder are immediately exercisable, and the price per share associated with such convertible securities is less than the Exercise Price, then the total maximum number of shares issuable upon conversion or exchange of such convertible securities shall (as of the date of the issue or sale of such convertible securities) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d); provided that if any such issuance or sale of such convertible securities is made upon exercise of any rights to subscribe for or to purchase or any option to purchase any such convertible securities for which adjustments of the Exercise Price have been or are to be made pursuant to Section 3(d)(i), then no further adjustment shall be made pursuant to this Section 3(d)(ii) by reason of such issuance or sale.

(e)     For purposes of any computation respecting consideration received, the following shall apply:

(i)     in the case of the issuance of shares of Common Stock for cash, the consideration shall be the amount of such cash, provided that in no case shall any deduction be made for any commissions, discounts or other expenses incurred by the Company for any underwriting of the issue or otherwise in connection therewith; and

(ii)     in the case of the issuance of shares of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined by the Appraiser, whose determination shall be conclusive.

(f)     For the purposes of this Section 3, the following clauses shall also be applicable:

(i)     Record Date.  In case the Company shall promptly take a record of the holders of its Common Stock for the purposes of entitling them (A) to receive a dividend or other distribution payable in Common Stock or in convertible securities, or (B) to subscribe for or purchase Common Stock or securities convertible into, or exchangeable or exercisable for, Common Stock, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(ii)     Treasury Shares.  Except for the shares issuable pursuant to the stock purchase agreements entered into by the Company pursuant to the Settlement Agreement, General Release and Covenant Not to Sue on or about April 2, 2009 ("**Purchase Rights**"), the number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock for purposes of this Section 3.

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

5

SPCP_0000004826

(iii)    Exempt Issuance.    Notwithstanding anything to the contrary contained in this Section 3, no adjustments to the number of Shares issuable upon exercise of this Warrant or the Exercise Price shall be made upon an Exempt Issuance. The term "**Exempt Issuance**" means the issuance of (a) shares of Common Stock in an underwritten public offering with an aggregate gross offering price of at least $50,000,000 and a minimum per share offering price of at least double the then-current Exercise Price, (b) shares of Common Stock or options to employees, officers or directors of the Company primarily for compensatory purposes pursuant to any stock or option plan or arrangement duly adopted by the Board of Directors of the Company, provided that any shares issued to any Affiliate, existing shareholder, or other related party of the Company (the "**Related Parties**") in connection with such plans or arrangements are not materially greater than the shares otherwise issued to non-Related Parties for similar service under such plans or arrangements, (c) shares of common stock or options to third-party consultants to the Company who are not Related Parties pursuant to arrangements duly approved by the Board of Directors of the Company, (d) securities upon the exercise or conversion of this Warrant, the other New Warrants (defined below), the Purchase Rights, or other securities or rights exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the Initial Exercise Date, (e) securities issued as consideration for acquisitions or strategic transactions duly approved by the Board of Directors of the Company in a business synergistic with the business of the Company, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities or (f) Common Stock and/or securities convertible into or exercisable for shares of Common Stock that may be issued to Kali P. Chaudhuri, M.D. or his Affiliates in connection with one or more strategic transactions approved by the Board of Directors of the Company as being fair and reasonable and providing consideration to the Company at least commensurate with the shares or securities being issued, provided that the number of shares issued or shares into which such securities are convertible pursuant to all issuances under this clause (f) shall not exceed 55,000,000 shares in aggregate (as appropriately adjusted for stock splits, combinations and similar events).

(iv)    For purposes of this Warrant, the term "Affiliate" shall have the definition given that term in Rule 12b-2 promulgated by the Securities and Exchange Commission under the Exchange Act.

(g)    The Company shall not, by amendment of its articles of incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Warrant by the Company, but shall at all times in good faith assist in carrying out all the provisions of this Section 3 and in taking all such action as may be necessary or appropriate to protect Holder's rights under this Section 3 against impairment.

4.    Notice of Adjustments. Whenever the number of Shares purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 3 hereof, the Company shall promptly provide notice to the Holder setting forth, in reasonable detail, the event requiring the

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

6

CONFIDENTIAL

SPCP_0000004827

adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number and class of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

5.      Fractional Shares. This Warrant may not be exercised for fractional shares.  In lieu of fractional shares the Company shall promptly make a cash payment therefor based upon the per share fair market value of a Share then in effect.

6.      Pre-emptive Rights.  The Company hereby grants to the Holder (so long as SPCP Group IV, LLC or an Affiliate thereof (which term shall include any investment fund managed by SPCP Group IV, LLC or its Affiliates) is and remains the Holder hereof) pre-emptive rights with respect to issuances, other than Exempt Issuances, after the Initial Exercise Date, by the Company of its equity securities or securities or rights convertible into or exercisable for equity securities, where issuance of those securities or rights would result in dilution of the Holder's beneficial ownership (as calculated by the Holder for purposes of Section 13(d) of the Exchange Act of 1934, as amended (the "**Exchange Act**")) of the Common Stock on a fully-diluted and as converted basis, taking into account all securities of the Company held by the Holder which entitle the Holder to acquire Common Stock at any time, including, without limitation, this Warrant, immediately prior to the consummation of the proposed issuance (the "**Pre-Transaction Percentage**").  Each time the Company proposes to issue or offer any shares of, or securities or rights convertible into or exercisable for any shares of, any class of the Company's equity securities (the "**New Shares**") that would reduce the Holder's Pre-Transaction Percentage, other than in Exempt Issuances, the Company shall first make a written offer to the Holder of its pro rata share of the New Shares based on the Holder's Pre-Transaction Percentage (the "**Offer Notice**").  The Offer Notice shall state (a) the Company's bona fide intention to issue or offer the New Shares, (b) the identity of the person(s) to whom the New shares are to be issued or offered, (c) the number of New Shares to be issued or offered, and (d) the price and terms upon which it proposes to issue or offer the New Shares.  The Holder may, by written notice to the Company delivered within ten (10) days of its receipt of the Offer Notice, elect to purchase, at the price and on the terms specified in the Offer Notice, up to its pro rata share of the New Shares.  The closing of the sale to the Holder shall occur simultaneously with the issuance or sale of the New Shares to the other person(s) identified in the Offer Notice, but no earlier than fifteen (15) days following the Holder's receipt of the Offer Notice (unless a shorter period is mutually agreed between the Company and the Holders).  The Holder's pro rata share of the New Shares shall be priced equal to the lowest price paid by any of the other person(s) identified in the Offer Notice, including any such person who may be receiving or purchasing New Shares by virtue of similar pre-emptive or other purchase rights.  If the Company does not consummate the issuance or sale of the New Shares within sixty (60) days following the Holder's receipt of the Offer Notice, then the New Shares shall not be offered, issued or sold unless again offered to the Holder in accordance with this Section 6.

7.      Representations, Warranties and Covenants of the Company.

(a)      The Company represents and warrants to the Holder that all corporate actions on the part of the Company, its officers, directors and stockholders necessary for the sale and issuance of the Shares pursuant hereto and the performance of the Company's obligations hereunder were taken prior to and are effective as of the effective

CONFIDENTIAL

SPCP_0000004828

date of this Warrant, except that the Company may need to obtain stockholder approval to increase its authorized capital to ensure there are sufficient shares of Common Stock available for issuance of the Shares pursuant hereto. The Company covenants and agrees to promptly increase the Company's authorized capital as and to the extent necessary to ensure there are sufficient authorized shares of Common Stock reserved and available for issuance under this Warrant, subject to the Holder's cooperation in approving by vote or written consent from time to time resolutions approving such increases in authorized capital. The Company will procure at its sole expense upon each such authorization and reservation of shares the listing thereof (subject to issuance or notice of issuance) on all stock exchanges on which the Common Stock is then listed or inter-dealer trading systems or markets on which the Common Stock is then traded. The Company will take all such actions as may be necessary to assure that such shares of Common Stock may be so issued without violation of any applicable law or regulation, or of any requirements of any national securities exchange upon which the Common Stock may be listed or inter-dealer trading system on which the Common Stock is then traded, free of any pre-emptive rights except as referenced in Section 7(e) hereof. In furtherance, and not in limitation, of the foregoing, the Company covenants and agrees to prepare and file with the Securities and Exchange Commission preliminary and definitive versions of a Schedule 14C Information Statement and make such other filings and mailings to the Company's stockholders as necessary or appropriate to cause an increase in the Company's authorized capital to a number that is sufficient to accommodate exercise of this Warrant, to become effective as soon as practicable after the Initial Exercise Date.

(b)     The Company has made available to the Holder true, correct and complete copies of its articles of incorporation and bylaws, as amended.  This Warrant is not inconsistent with the Company's articles of incorporation or bylaws, and does not contravene any law or governmental rule, regulation or order applicable to it, does not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract, agreement or other instrument to which it is a party or by which it is bound, and constitutes the legal, valid and binding agreements of the Company, enforceable in accordance with its terms.

(c)     No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by the Company of its obligations under this Warrant, except for the filing of notices pursuant to Regulation D under the Securities Act and any filing required by applicable state securities law, which filings will be effective by the time required thereby.

(d)     All issued and outstanding shares of Common Stock or any other securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable.  All outstanding shares of Common Stock and any other securities were issued in full compliance with all federal and state securities laws.  Except as provided in favor of Kali P. Chaudhuri, M.D. and William E. Thomas in that certain Securities Purchase Agreement dated effective as of July 18, 2008, as amended, among the Company, Kali P. Chaudhuri, M.D. and William E. Thomas ("**2008 SPA**"), no

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

8

CONFIDENTIAL

SPCP_0000004829

stockholder of the Company has preemptive rights to purchase new issuances of the Company's capital stock.

(e)     Except as provided in the 2008 SPA and in warrants (including this Warrant) to purchase up to four hundred five million (405,000,000) shares of Common Stock, which warrants (the "**New Warrants**") were issued by the Company on the Initial Exercise Date, the Company is not, pursuant to the terms of any agreement currently in existence, under any obligation to register under the Securities Act any of its presently outstanding securities or any of its securities which may hereafter be issued.

(f)     Assuming that the Holder is an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (as defined in Section 8 hereof)), the issuance of the Shares upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

(g)     At the written request of the Holder, in the event the Holder proposes to sell Shares issuable upon the exercise of this Warrant in compliance with Rule 144 promulgated under the Securities Act by the Securities and Exchange Commission, the Company shall furnish to the Holder, within three (3) Trading Days after receipt of such request, a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such Rule, as such Rule may be amended from time to time.

8.     <u>Restrictive Legend</u>.  The Shares (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> THESE SHARES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

9.     <u>Transfer of Warrant</u>.

(a)     This Warrant may be sold, transferred, assigned or hypothecated, in whole or in part, by the Holder without the consent of the Company; <u>provided</u>, in each case that any transferee or assignee agrees to be bound by the terms of this Warrant, and such transfer or assignment is in compliance with the Securities Act and the securities law of

CONFIDENTIAL                                                      SPCP_0000004830

any applicable jurisdiction.  The Warrant may be divided or combined, upon request to the Company by the Holder, into one or more new warrants representing the same aggregate number of Shares.  For purposes of this Warrant, "**person**" means an individual or a corporation, association, partnership, limited liability company, joint venture, organization, business, trust or any other entity or organization, including a government or any subdivision or agency thereof.  The terms and conditions of this Warrant shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties.

     (b)    No opinion of counsel or "no-action" letter shall be necessary for any transfer or assignment by any Holder.

    9.    <u>Rights of Stockholders</u>.  No holder of this Warrant shall be entitled, as a Warrant holder, to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company which may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the holder of this Warrant, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until the Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become deliverable, as provided herein.

    10.    <u>Information Rights</u>.  The Company shall deliver to the Holder the following (which may be satisfied by the Company's delivery of the Company's public filings, if applicable, to Holder):

    (a)    as soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Company, a balance sheet and income statement as of the last day of such year and a statement of cash flows for such year, such year end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles, and audited and certified by independent public accountants of nationally recognized standing selected by the Company;

    (b)    as soon as practicable, but in any event within forty five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, schedule as to the sources and application of funds for such fiscal quarter, an unaudited balance sheet and a statement of stockholder's equity as of the end of such fiscal quarter; and

    (c)    as soon as practicable, but in any event with forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the number of common shares issuable upon conversion or exercise of any outstanding securities convertible or exercisable for common shares and the exchange

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

10

ratio or exercise price applicable thereto and number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Holder to calculate its percentage equity ownership in the Company and certified by the Chief Financial Officer or Chief Executive Officer of the Company as being true, complete and correct.

11.     Reports Under Exchange Act.  With a view to making available to the Holders the benefits of Rule 144 promulgated by the Securities and Exchange Commission (the "**SEC**") under the Securities Act ("**SEC Rule 144**") and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)     make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public so long as the Company is subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act;

(b)     file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(c)     furnish to any Holder, so long as the Holder holds this Warrant or owns any Shares, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144, the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form.

12.     Expiration of Warrant.  This Warrant shall expire and shall no longer be exercisable after 5:00 p.m., Pacific Time, on the Expiration Date.

13.     Notices.  All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given upon receipt or, if earlier, (a) five (5) days after deposit with the U.S. Postal Service or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one business day after the business day of deposit with Federal Express or similar overnight courier, freight prepaid or (d) one business day after the business day of facsimile transmission, if delivered by facsimile transmission with copy by first class mail, postage prepaid, and shall be addressed (i) if to the Holder, at the Holder's address as set forth on the register maintained by the Company, and (ii) if to the Company, at the address of its principal corporate offices (Attention: President), which on the date hereof is 1301 N. Tustin Avenue, Santa Ana, California 92705, or at such other address as a party may designate by ten (10) days advance written notice to the other party pursuant to the provisions above.

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10                                   11

14.    <u>Warrant Agent</u>.

(a)    The Company shall serve as the initial warrant agent under this Warrant. The Company and the Holder may appoint a new warrant agent as mutually agreed upon by the Company and the Holder.

(b)    Any corporation into which the Company or any new warrant agent may be merged or any corporation resulting from any consolidation to which the Company or any new warrant agent shall be a party or any corporation to which the Company or any new warrant agent transfers substantially all of its corporate trust or stockholders services business shall be a successor warrant agent under this Warrant without any further act. Any such successor warrant agent shall promptly cause notice of its succession as warrant agent to be mailed (by first class mail, postage prepaid) to the Holder at the Holder's last address as shown on the register maintained by the warrant agent pursuant to this Warrant.

15.    <u>Payment of Taxes</u>.  The Company will pay all documentary stamp taxes attributable to the issuance of Shares upon the exercise of the Warrants represented by this Warrant. The Holder shall be responsible for all other tax liability that may arise as a result of holding or transferring the Warrants represented by this Warrant or receiving the Shares under this Warrant.

16.    <u>Replacement of Warrant</u>.  If the certificate evidencing this Warrant is mutilated, lost, stolen or destroyed, the Company shall issue in exchange and substitution for and upon cancellation hereof, or in lieu of and substitution for this Warrant certificate, a new warrant certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and bond or other indemnity, if requested, reasonably satisfactory to it. A Holder of a replacement warrant certificate also shall comply with such other reasonable regulations and pay such other reasonable charges attributable to the replacement of a warrant certificate.

17.    <u>Governing Law</u>. This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Nevada.

18.    <u>Amendments</u>.  This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

19.    <u>Registration Rights</u>.

(a)    The Company shall file a registration statement under the Securities Act covering the resale of all Shares of the Holder as soon as practicable following the Holder's written request to do so, and use its reasonable best efforts to have the registration statement declared effective by the SEC for distribution thereof by means of an underwriting.  The underwriter will be selected by the Company and shall be reasonably acceptable to the Holder. The Holder shall (together with the Company as provided herein below) enter into an underwriting agreement in a customary form with

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

12

CONFIDENTIAL

SPCP_0000004833

the underwriter or underwriters selected for such underwriting. Notwithstanding any other provision of this Section 19(a), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of Shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting. The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders as selected by them.

(b)     (i)     The Company covenants and agrees with the Holder (and any subsequent Holders of this Warrant and/or Shares) that, in the event the Company proposes to file a registration statement under the Securities Act (including, without limitation, relating to an initial public offering of Company Common Stock or shall receive a request for registration on Form S-3 from any stockholder) with respect to any class of security which becomes or which the Company believes will become effective on or after the Initial Exercise Date and on or before the Expiration Date, then the Company shall in each case give prompt written notice of such proposed filing to the Holder (and any subsequent Holders of this Warrant and/or Shares) at least sixty (60) days before the proposed filing date and, by such notice, shall offer to such Holders the opportunity to include in such registration statement such number of Shares as they may request in writing.

(ii)     The Company shall permit, or shall cause the managing underwriter of a proposed offering to permit, the Holders from whom such written requests have been received to include such number of Shares (the "**Piggy-back Shares**") in the proposed offering on terms and conditions no less favorable to the Holders on the terms and conditions applicable to securities of the Company included therein or as applicable to securities of any person other than the Company and the Holders of Piggy-back Shares if the securities of any such person are included therein; provided, however, that the Company shall not be required to honor any such request that is received more than sixty (60) days after the proper giving of the Company's notice or after the Expiration Date. Notwithstanding any other provision of this Section 19(b)(ii), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities, other than securities to be registered pursuant to the registration rights granted in the 2008 SPA (the "**Other Shares**") and securities to be offered for the account of the Holders of the New Warrants and the Company, are first entirely excluded from the underwriting, and unless the number of Other Shares, on the one hand, and Piggy-back Shares on the other hand, are cut back on a pro rata basis based on the number of Piggy-back Shares and Other Shares requested to be included in such offering. The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

13

fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders selected by them.

       (iii)    The Company shall be obligated pursuant to this Section 19(b)(iii) to include in the piggy-back offering Shares that have not yet been purchased by a Holder so long as such Holder submits an undertaking to the Company that such Holder intends to exercise the Warrant for at least the number of Shares to be included in such piggy-back offering prior to the consummation of such piggy-back offering.  The Company shall use its reasonable best efforts to register or qualify the Shares for offer or sale under the state securities or Blue Sky laws of such states which the Holders of such Shares shall designate.

       (iv)    If the Company decides not to proceed with the piggy-back offering, the Company will have no obligation to proceed with the offering of the Piggy-back Shares.

       (c)    (i)    To the fullest extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, directors and stockholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Violation (as defined herein below) and the Company will pay to each such Holder, underwriter, controlling person or other aforementioned person, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action as such expenses are incurred; provided, however, that the indemnity agreement contained in this Section 19(c)(i) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter, controlling person or other aforementioned person.  The term "**Violation**" means losses, claims, damages, or liabilities (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations:  (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by any other party hereto, of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law.

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

CONFIDENTIAL                              SPCP_0000004835

(ii)    Each Holder of Shares who participates in a registration pursuant to Section 19 shall indemnify and hold harmless the Company, each of its directors, each of its officers who have signed any such registration statement, and each person, if any, who controls the Company within the meaning of the Securities Act, against any losses, claims, damages or liabilities to which the Company, or any such director, officer or controlling person may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of, or are based upon, any untrue or alleged untrue statement of any material fact contained in any such registration statement, or final prospectus, or any amendment or supplement thereto, or arise out of or are based upon the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any such registration statement, or final prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished by such Holder expressly for use in the preparation thereof; and will reimburse any legal or other expenses reasonably incurred by the Company, or any such director, officer or controlling person in connection with investigating or defending against any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this subparagraph (ii) shall not apply to amounts paid to any claimant in settlement of any suit or claim unless such payment is first approved by such Holder; and, provided further, that the aggregate amount payable by a Holder pursuant to this Section 19(c)(ii) shall not exceed the net proceeds received by such Holder in the registered offering out of which its obligations pursuant to this Section 19(c)(ii) arise.

[signature page follows]

JAE 0533

CONFIDENTIAL                                                                                     SPCP_0000004836

Issued this _13th_ day of April, 2010.

INTEGRATED HEALTHCARE HOLDINGS, INC.,
A NEVADA CORPORATION

By: _____

Kenneth K. Westbrook, Chief Executive Officer

Attachments

Exhibit A - Notice of Exercise
Exhibit B - Form of Transfer

WARRANT (SPCP GROUP IV, LLC)

JAE 0534

CONFIDENTIAL                                                                SPCP_0000004837

# EXHIBIT A

## NOTICE OF EXERCISE

TO:   **INTEGRATED HEALTHCARE HOLDINGS, INC.**

Attention: President

1.      The undersigned hereby elects to purchase _____ shares of the Common Stock of Integrated Healthcare Holdings, Inc. (the "**Company**") pursuant to the terms of the attached Warrant.

2.      Method of Exercise (Please initial the applicable blank(s)):

_____   The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full of $_____ for the purchase price of _____ Shares being purchased for cash, together with all applicable transfer taxes, if any.

_____   The undersigned elects to exercise the attached Warrant by means of the net exercise provisions of Section 1(c) of this Warrant, and accordingly requests delivery of a net of _____ of such Shares and a corresponding reduction in the total number of Shares available for further exercise from _____ Shares to _____ Shares.

3.      Please issue a certificate or certificates representing said Shares in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____
(Address)

4.      The undersigned hereby represents and warrants that the aforesaid shares of Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale, in connection with the distribution thereof.

_____
(Signature)
Title: _____

_____
(Date)

#4830-3885- 3893674/023905-0001
1079527.02 a04/13/10

-17-

## EXHIBIT B

### FORM OF TRANSFER
(To be signed only upon transfer of Warrant)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto
_____ the right represented by the attached
Warrant to purchase _____ shares of the Common Stock of **INTEGRATED HEALTHCARE
HOLDINGS, INC.** (the "**Company**"), to which the attached Warrant relates, and appoints
_____ as their true and lawful attorney in fact to transfer such right on the books of
the Company, with full power of substitution in the premises.

Dated: _____

(Signature must conform in all respects to
name of Holder as specified on the face of
the Warrant)

_____

_____
(Address)

Signed in the presence of:

_____

#4830-3885-3893

CONFIDENTIAL

SPCP_0000004839

CONFIDENTIAL

SPCP_0000004840

**EXHIBIT B**

**FORM OF TRANSFER**
(To be signed only upon transfer of Warrant)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto **INTEGRATED HEALTHCARE HOLDINGS, INC.** the right represented by the attached Warrant to purchase 16,817,365 shares of the Common Stock of **INTEGRATED HEALTHCARE HOLDINGS, INC.** (the "**Company**"), to which the attached Warrant relates, and appoints Scott Schoeffel as their true and lawful attorney in fact to transfer such right on the books of the Company, with full power of substitution in the premises.

Dated: _____

                                        **SPCP GROUP IV, LLC**

                                        By: Silver Point C&I Opportunity GP, LLC

                                        By:_____

                                        Name:_____

                                        Title: _____

CONFIDENTIAL                                                       SPCP_0000004841

**Exhibit E**

**Common Stock Warrant to SPCP Group LLC**

[See attached.]

#4849-9380-9938v19

CONFIDENTIAL

SPCP_0000004842

**NEITHER THIS WARRANT NOR THE SECURITIES INTO WHICH THIS WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

## INTEGRATED HEALTHCARE HOLDINGS, INC.
## COMMON STOCK WARRANT

### WARRANT TO PURCHASE SHARES OF COMMON STOCK

THIS COMMON STOCK WARRANT (this "**Warrant**") certifies that, for consideration received, SPCP GROUP, LLC, a Delaware limited liability company, or its successors or assigns (the "**Holder**" or "**Holders**," as applicable), is entitled to subscribe for and purchase SIXTEEN MILLION EIGHT HUNDRED SEVENTEEN THOUSAND THREE HUNDRED SIXTY FIVE (16,817,365) fully paid and nonassessable shares (as adjusted pursuant to Section 3 hereof, the "**Shares**") of the Common Stock (the "**Common Stock**") of Integrated Healthcare Holdings, Inc., a Nevada corporation (the "**Company**"), at a price per Share equal to seven cents ($0.07) (as adjusted pursuant to Section 3 hereof, the "**Exercise Price**"), subject to the provisions and upon the terms and conditions hereinafter set forth.

1.  Method of Exercise; Payment.

    (a)    Exercise. This Warrant shall be exercisable from and after February 7, 2013 through April 13, 2016 (the "**Expiration Date**"). This Warrant shall be exercisable by Holder in whole or in part and from time to time for the Shares (as adjusted pursuant to Section 3 hereof).

    (b)    Cash Exercise. The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, by the surrender of this Warrant (with the notice of exercise form attached hereto as Exhibit A duly executed) at the principal office of the Company, and by the payment to the Company, by wire transfer or certified, cashier's or other check acceptable to the Company (or as otherwise provided pursuant to Section 1(c) hereinbelow), of an amount equal to the aggregate Exercise Price of the Shares being purchased.

    (c)    Net Issue Exercise. In combination with or in lieu of exercising this Warrant for cash pursuant to Section 1(b), the Holder may elect to receive Shares of

CONFIDENTIAL

Common Stock equal to the value of this Warrant (or any portion thereof) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X \quad = \quad \frac{Y(A-B)}{A}$$

Where X   =   the number of the Shares to be issued to the Holder pursuant to this Section 1(c).

     Y   =   the number of the Shares covered by this Warrant in respect of which the net issuance election is made pursuant to this Section 1(c).

     A   =   the fair market value of one Share on the date of election under this Section 1(c), as determined in accordance with Section 1(d).

     B   =   the Exercise Price in effect under this Warrant on the date of election under this Section 1(c).

(d)   <u>Fair Market Value</u>.  For purposes of this Warrant, the per share fair market value of the Shares shall mean:

(i)   If the class of Shares is traded on a national securities exchange or other over-the-counter quotation system, the fair market value shall be the last reported sale price of a Share on such exchange or other over-the-counter quotation system on the last business day before the effective date of exercise of the net issuance election or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange.

(ii)   If the class of Shares is not so listed and bid and ask prices are not reported, the fair market value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company, as such price shall be determined by either of the following (in each case, the "**Appraiser**"), which determination shall be conclusive and binding on the Company and the Holder for purposes of this Warrant: (A) the mutual agreement of the Company and Holder, or (B) alternatively, if in good faith the Company and the Holder are unable to reach such mutual agreement within five (5) business days, a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing selected by the Holder in its sole and absolute discretion and at the Company's sole cost and expense.

(e)   <u>Stock Certificates</u>.  Promptly upon receipt of a notice to exercise, the Company will take all necessary actions to authorize the issuance of such Common Stock under this Warrant.  In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within three (3) business days, or four (4) Trading Days if the Company's Common Stock is publicly traded and the notice of exercise is received after 1:30 p.m. Pacific Time on a day in

CONFIDENTIAL

which the Company's Common Stock is publicly traded (each a "**Trading Day**") and, unless this Warrant has been fully exercised or has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time.

2.   <u>Stock Fully Paid</u>.   All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be duly authorized, validly issued, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issue thereof (except the Holder's income taxes, if any, that are due and payable with respect to the Shares).

3.   <u>Adjustment to the Number of Shares Issuable and/or the Exercise Price</u>.   The number of Shares issuable upon the exercise of this Warrant and the Exercise Price are subject to adjustment from time to time as set forth in this Section 3.   Upon each adjustment pursuant to this Section 3, the Holder shall thereafter prior to the Expiration Date be entitled to purchase the adjusted number of Shares of Common Stock at the Exercise Price as adjusted hereby.

(a)   If the Company, at any time while this Warrant is outstanding, (i) shall pay a stock dividend payable in shares of its capital stock (whether payable in shares of its Common Stock, preferred stock, or securities convertible into, or exchangeable or exercisable for, Common Stock or of other capital stock of any class), (ii) shall subdivide outstanding shares of Common Stock into a larger number of shares, or (iii) combine outstanding shares of Common Stock into a smaller number of shares, then (x) the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased or decreased to reflect such event, and (y) the Exercise Price shall be adjusted to an amount obtained by multiplying the Exercise Price in effect immediately prior to such event by a fraction equal to the number of Shares for which this Warrant is exercisable immediately prior to such event divided by the number of Shares for which this Warrant is exercisable immediately after such event.   Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date of a subdivision, combination or reclassification.

(b)   If the Company, at any time while this Warrant is outstanding, shall distribute to all holders of Common Stock, or holders of any securities convertible into, or exchangeable or exercisable for Common Stock (and not to the Holder), evidences of its indebtedness, assets or any rights or warrants to subscribe for or purchase any security (excluding those referred to in this Section 3), the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased to reflect such event as determined by the Appraiser.   The Company shall promptly provide a statement to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock.   Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

CONFIDENTIAL                                                                SPCP_0000004845

(c)      In case of any reclassification of the Common Stock, any consolidation or merger of the Company with or into another person, the sale or transfer of all or substantially all of the assets of the Company or any compulsory share exchange pursuant to which the Common Stock is converted into other securities, cash or property, then, subject to the terms hereof, the Holder shall have the right thereafter to exercise this Warrant into the shares of stock and other securities and property receivable upon or deemed to be held by holders of Common Stock following such reclassification, consolidation, merger, sale, transfer or share exchange, and the Holder shall be entitled upon such event to receive such amount of securities or property as the shares of the Common Stock into which this Warrant could have been exercised immediately prior to such reclassification, consolidation, merger, sale, transfer or share exchange would have been entitled.  The terms of any such reclassification, consolidation, merger, sale, transfer or share exchange shall include such terms so as to continue to give to the Holder the right to receive the securities or property set forth in this Section 3(c) upon any exercise following such reclassification, consolidation, merger, sale, transfer or share exchange. This provision shall similarly apply to successive reclassification, consolidations, mergers, sales, transfers or share exchanges.

(d)      If the Company, at any time while this Warrant is outstanding, shall issue additional shares of Common Stock for a consideration per share less than the Exercise Price (a "**Dilutive Issuance**"), then, the Exercise Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Exercise Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Company for such issue would purchase at such Exercise Price, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such additional shares of Common Stock so issued.  For the purposes of this Section 3(d), all shares of Common Stock issuable upon conversion of any outstanding shares of preferred stock and the exercise and/or conversion of any other outstanding securities or rights exercisable for or convertible into shares of Common Stock shall be deemed to be outstanding.  For the purposes of this Section 3(d), the following paragraphs shall also be applicable:

(i)      If the Company, at any time while this Warrant is outstanding, grants any rights to subscribe for, or any rights or options to purchase, or securities convertible into, shares of Common Stock, whether or not such rights or options or rights to convert or exchange are immediately exercisable, and the price per share associated with such rights or options or rights to convert or exchange is less than the Exercise Price, then the total maximum number of shares issuable upon the exercise of such rights or options or upon conversion or exchange of the total maximum amount of such convertible securities issuable upon the exercise of such rights or options shall (as of the date of grant of such rights or options) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d).

(ii)      If the Company, at any time while this Warrant is outstanding,

CONFIDENTIAL                                                                                                    SPCP_0000004846

issues or sells any convertible securities, whether or not the rights to exchange or convert thereunder are immediately exercisable, and the price per share associated with such convertible securities is less than the Exercise Price, then the total maximum number of shares issuable upon conversion or exchange of such convertible securities shall (as of the date of the issue or sale of such convertible securities) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d); provided that if any such issuance or sale of such convertible securities is made upon exercise of any rights to subscribe for or to purchase or any option to purchase any such convertible securities for which adjustments of the Exercise Price have been or are to be made pursuant to Section 3(d)(i), then no further adjustment shall be made pursuant to this Section 3(d)(ii) by reason of such issuance or sale.

(e)     For purposes of any computation respecting consideration received, the following shall apply:

(i)     in the case of the issuance of shares of Common Stock for cash, the consideration shall be the amount of such cash, provided that in no case shall any deduction be made for any commissions, discounts or other expenses incurred by the Company for any underwriting of the issue or otherwise in connection therewith; and

(ii)     in the case of the issuance of shares of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined by the Appraiser, whose determination shall be conclusive.

(f)     For the purposes of this Section 3, the following clauses shall also be applicable:

(i)     Record Date.  In case the Company shall promptly take a record of the holders of its Common Stock for the purposes of entitling them (A) to receive a dividend or other distribution payable in Common Stock or in convertible securities, or (B) to subscribe for or purchase Common Stock or securities convertible into, or exchangeable or exercisable for, Common Stock, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(ii)     Treasury Shares.  Except for the shares issuable pursuant to the stock purchase agreements entered into by the Company pursuant to the Settlement Agreement, General Release and Covenant Not to Sue on or about April 2, 2009 ("**Purchase Rights**"), the number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock for purposes of this Section 3.

#4835-5047-3746v4

CONFIDENTIAL

SPCP_0000004847

(iii)   Exempt Issuance.   Notwithstanding anything to the contrary contained in this Section 3, no adjustments to the number of Shares issuable upon exercise of this Warrant or the Exercise Price shall be made upon an Exempt Issuance. The term "**Exempt Issuance**" means the issuance of (a) shares of Common Stock in an underwritten public offering with an aggregate gross offering price of at least $50,000,000 and a minimum per share offering price of at least double the then-current Exercise Price, (b) shares of Common Stock or options to employees, officers or directors of the Company primarily for compensatory purposes pursuant to any stock or option plan or arrangement duly adopted by the Board of Directors of the Company, provided that any shares issued to any Affiliate, existing shareholder, or other related party of the Company (the "**Related Parties**") in connection with such plans or arrangements are not materially greater than the shares otherwise issued to non-Related Parties for similar service under such plans or arrangements, (c) shares of common stock or options to third-party consultants to the Company who are not Related Parties pursuant to arrangements duly approved by the Board of Directors of the Company, (d) securities upon the exercise or conversion of this Warrant, the other New Warrants (defined below), the Purchase Rights, or other securities or rights exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on April 13, 2010 (the "**Initial Exercise Date**"), (e) securities issued as consideration for acquisitions or strategic transactions duly approved by the Board of Directors of the Company in a business synergistic with the business of the Company, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities or (f) Common Stock and/or securities convertible into or exercisable for shares of Common Stock that may be issued to Kali P. Chaudhuri, M.D. or his Affiliates in connection with one or more strategic transactions approved by the Board of Directors of the Company as being fair and reasonable and providing consideration to the Company at least commensurate with the shares or securities being issued, provided that the number of shares issued or shares into which such securities are convertible pursuant to all issuances under this clause (f) shall not exceed 55,000,000 shares in aggregate (as appropriately adjusted for stock splits, combinations and similar events).

(iv)   For purposes of this Warrant, the term "Affiliate" shall have the definition given that term in Rule 12b-2 promulgated by the Securities and Exchange Commission under the Exchange Act.

(g)   The Company shall not, by amendment of its articles of incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Warrant by the Company, but shall at all times in good faith assist in carrying out all the provisions of this Section 3 and in taking all such action as may be necessary or appropriate to protect Holder's rights under this Section 3 against impairment.

4.   Notice of Adjustments. Whenever the number of Shares purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 3 hereof, the Company shall promptly provide notice to the Holder setting forth, in reasonable detail, the event requiring the

CONFIDENTIAL                                    SPCP_0000004848

adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number and class of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

5.     Fractional Shares. This Warrant may not be exercised for fractional shares.  In lieu of fractional shares the Company shall promptly make a cash payment therefor based upon the per share fair market value of a Share then in effect.

6.     Pre-emptive Rights.  The Company hereby grants to the Holder (so long as SPCP Group, LLC or an Affiliate thereof (which term shall include any investment fund managed by SPCP Group, LLC or its Affiliates) is and remains the Holder hereof) pre-emptive rights with respect to issuances, other than Exempt Issuances, after the Initial Exercise Date, by the Company of its equity securities or securities or rights convertible into or exercisable for equity securities, where issuance of those securities or rights would result in dilution of the Holder's beneficial ownership (as calculated by the Holder for purposes of Section 13(d) of the Exchange Act of 1934, as amended (the "**Exchange Act**")) of the Common Stock on a fully-diluted and as converted basis, taking into account all securities of the Company held by the Holder which entitle the Holder to acquire Common Stock at any time, including, without limitation, this Warrant, immediately prior to the consummation of the proposed issuance (the "**Pre-Transaction Percentage**").  Each time the Company proposes to issue or offer any shares of, or securities or rights convertible into or exercisable for any shares of, any class of the Company's equity securities (the "**New Shares**") that would reduce the Holder's Pre-Transaction Percentage, other than in Exempt Issuances, the Company shall first make a written offer to the Holder of its pro rata share of the New Shares based on the Holder's Pre-Transaction Percentage (the "**Offer Notice**").  The Offer Notice shall state (a) the Company's bona fide intention to issue or offer the New Shares, (b) the identity of the person(s) to whom the New shares are to be issued or offered, (c) the number of New Shares to be issued or offered, and (d) the price and terms upon which it proposes to issue or offer the New Shares.  The Holder may, by written notice to the Company delivered within ten (10) days of its receipt of the Offer Notice, elect to purchase, at the price and on the terms specified in the Offer Notice, up to its pro rata share of the New Shares.  The closing of the sale to the Holder shall occur simultaneously with the issuance or sale of the New Shares to the other person(s) identified in the Offer Notice, but no earlier than fifteen (15) days following the Holder's receipt of the Offer Notice (unless a shorter period is mutually agreed between the Company and the Holders).  The Holder's pro rata share of the New Shares shall be priced equal to the lowest price paid by any of the other person(s) identified in the Offer Notice, including any such person who may be receiving or purchasing New Shares by virtue of similar pre-emptive or other purchase rights.  If the Company does not consummate the issuance or sale of the New Shares within sixty (60) days following the Holder's receipt of the Offer Notice, then the New Shares shall not be offered, issued or sold unless again offered to the Holder in accordance with this Section 6.

7.     Representations, Warranties and Covenants of the Company.

(a)     The Company represents and warrants to the Holder that all corporate actions on the part of the Company, its officers, directors and stockholders necessary for the sale and issuance of the Shares pursuant hereto and the performance of the Company's obligations hereunder were taken prior to and are effective as of the effective

#4835-5047-3746v4

7

CONFIDENTIAL
SPCP_0000004849

date of this Warrant, except that the Company may need to obtain stockholder approval to increase its authorized capital to ensure there are sufficient shares of Common Stock available for issuance of the Shares pursuant hereto. The Company covenants and agrees to promptly increase the Company's authorized capital as and to the extent necessary to ensure there are sufficient authorized shares of Common Stock reserved and available for issuance under this Warrant, subject to the Holder's cooperation in approving by vote or written consent from time to time resolutions approving such increases in authorized capital. The Company will procure at its sole expense upon each such authorization and reservation of shares the listing thereof (subject to issuance or notice of issuance) on all stock exchanges on which the Common Stock is then listed or inter-dealer trading systems or markets on which the Common Stock is then traded. The Company will take all such actions as may be necessary to assure that such shares of Common Stock may be so issued without violation of any applicable law or regulation, or of any requirements of any national securities exchange upon which the Common Stock may be listed or inter-dealer trading system on which the Common Stock is then traded, free of any pre-emptive rights except as referenced in Section 7(c) hereof. In furtherance, and not in limitation, of the foregoing, prior to the date hereof, the Company prepared and filed with the Securities and Exchange Commission definitive versions of a Schedule 14C Information Statement and such other filings and mailings to the Company's stockholders as necessary or appropriate to cause an increase in the Company's authorized capital to a number that is sufficient to accommodate exercise of this Warrant.

(b)     The Company has made available to the Holder true, correct and complete copies of its articles of incorporation and bylaws, as amended. This Warrant is not inconsistent with the Company's articles of incorporation or bylaws, and does not contravene any law or governmental rule, regulation or order applicable to it, does not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract, agreement or other instrument to which it is a party or by which it is bound, and constitutes the legal, valid and binding agreements of the Company, enforceable in accordance with its terms.

(c)     No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by the Company of its obligations under this Warrant, except for the filing of notices pursuant to Regulation D under the Securities Act and any filing required by applicable state securities law, which filings will be effective by the time required thereby.

(d)     All issued and outstanding shares of Common Stock or any other securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable. All outstanding shares of Common Stock and any other securities were issued in full compliance with all federal and state securities laws. Except as provided (i) in favor of Kali P. Chaudhuri, M.D. and William E. Thomas in that certain Securities Purchase Agreement dated effective as of July 18, 2008, as amended, among the Company, Kali P. Chaudhuri, M.D. and William E. Thomas ("**2008 SPA**") and (ii) in the New Warrants (as defined below), no stockholder of the Company has preemptive rights to purchase new issuances of the Company's capital stock.

#4835-5047-3746v4

8

CONFIDENTIAL

SPCP_0000004850

(e)     Except as provided in the 2008 SPA and in warrants (including this Warrant) to purchase up to four hundred five million (405,000,000) shares of Common Stock, which warrants (the "**New Warrants**") were issued by the Company on the Initial Exercise Date, the Company is not, pursuant to the terms of any agreement currently in existence, under any obligation to register under the Securities Act any of its presently outstanding securities or any of its securities which may hereafter be issued.

(f)     Assuming that the Holder is an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (as defined in Section 8 hereof)), the issuance of the Shares upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

(g)     At the written request of the Holder, in the event the Holder proposes to sell Shares issuable upon the exercise of this Warrant in compliance with Rule 144 promulgated under the Securities Act by the Securities and Exchange Commission, the Company shall furnish to the Holder, within three (3) Trading Days after receipt of such request, a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such Rule, as such Rule may be amended from time to time.

8.     <u>Restrictive Legend</u>.  The Shares (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> THESE SHARES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

9.     <u>Transfer of Warrant</u>.

(a)     This Warrant may be sold, transferred, assigned or hypothecated, in whole or in part, by the Holder without the consent of the Company; <u>provided</u>, in each case that any transferee or assignee agrees to be bound by the terms of this Warrant, and such transfer or assignment is in compliance with the Securities Act and the securities law of any applicable jurisdiction.  The Warrant may be divided or combined, upon request to the Company by the Holder, into one or more new warrants representing the same aggregate number of Shares.  For purposes of this Warrant, "**person**" means an

**JAE 0548**

CONFIDENTIAL                                                          SPCP_0000004851

individual or a corporation, association, partnership, limited liability company, joint venture, organization, business, trust or any other entity or organization, including a government or any subdivision or agency thereof.  The terms and conditions of this Warrant shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties.

(b)     No opinion of counsel or "no-action" letter shall be necessary for any transfer or assignment by any Holder.

9.     <u>Rights of Stockholders</u>.  No holder of this Warrant shall be entitled, as a Warrant holder, to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company which may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the holder of this Warrant, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until the Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become deliverable, as provided herein.

10.     <u>Information Rights</u>.  The Company shall deliver to the Holder the following (which may be satisfied by the Company's delivery of the Company's public filings, if applicable, to Holder):

(a)     as soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Company, a balance sheet and income statement as of the last day of such year and a statement of cash flows for such year, such year end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles, and audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(b)     as soon as practicable, but in any event within forty five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, schedule as to the sources and application of funds for such fiscal quarter, an unaudited balance sheet and a statement of stockholder's equity as of the end of such fiscal quarter; and

(c)     as soon as practicable, but in any event with forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the number of common shares issuable upon conversion or exercise of any outstanding securities convertible or exercisable for common shares and the exchange ratio or exercise price applicable thereto and number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Holder to calculate its percentage equity ownership in the Company and

#4835-5047-3746v4

10

CONFIDENTIAL

SPCP_0000004852

certified by the Chief Financial Officer or Chief Executive Officer of the Company as being true, complete and correct.

11.   Reports Under Exchange Act.  With a view to making available to the Holders the benefits of Rule 144 promulgated by the Securities and Exchange Commission (the "**SEC**") under the Securities Act ("**SEC Rule 144**") and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)   make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public so long as the Company is subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act;

(b)   file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(c)   furnish to any Holder, so long as the Holder holds this Warrant or owns any Shares, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144, the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form.

12.   Expiration of Warrant.  This Warrant shall expire and shall no longer be exercisable after 5:00 p.m., Pacific Time, on the Expiration Date.

13.   Notices.  All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given upon receipt or, if earlier, (a) five (5) days after deposit with the U.S. Postal Service or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one business day after the business day of deposit with Federal Express or similar overnight courier, freight prepaid or (d) one business day after the business day of facsimile transmission, if delivered by facsimile transmission with copy by first class mail, postage prepaid, and shall be addressed (i) if to the Holder, at the Holder's address as set forth on the register maintained by the Company, and (ii) if to the Company, at the address of its principal corporate offices (Attention: President), which on the date hereof is 1301 N. Tustin Avenue, Santa Ana, California 92705, or at such other address as a party may designate by ten (10) days advance written notice to the other party pursuant to the provisions above.

14.   Warrant Agent.

CONFIDENTIAL

(a)     The Company shall serve as the initial warrant agent under this Warrant. The Company and the Holder may appoint a new warrant agent as mutually agreed upon by the Company and the Holder.

(b)     Any corporation into which the Company or any new warrant agent may be merged or any corporation resulting from any consolidation to which the Company or any new warrant agent shall be a party or any corporation to which the Company or any new warrant agent transfers substantially all of its corporate trust or stockholders services business shall be a successor warrant agent under this Warrant without any further act. Any such successor warrant agent shall promptly cause notice of its succession as warrant agent to be mailed (by first class mail, postage prepaid) to the Holder at the Holder's last address as shown on the register maintained by the warrant agent pursuant to this Warrant.

15.   <u>Payment of Taxes</u>.   The Company will pay all documentary stamp taxes attributable to the issuance of Shares upon the exercise of the Warrants represented by this Warrant.  The Holder shall be responsible for all other tax liability that may arise as a result of holding or transferring the Warrants represented by this Warrant or receiving the Shares under this Warrant.

16.   <u>Replacement of Warrant</u>.  If the certificate evidencing this Warrant is mutilated, lost, stolen or destroyed, the Company shall issue in exchange and substitution for and upon cancellation hereof, or in lieu of and substitution for this Warrant certificate, a new warrant certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and bond or other indemnity, if requested, reasonably satisfactory to it.  A Holder of a replacement warrant certificate also shall comply with such other reasonable regulations and pay such other reasonable charges attributable to the replacement of a warrant certificate.

17.   <u>Governing Law</u>. This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Nevada.

18.   <u>Amendments</u>.  This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

19.   <u>Registration Rights</u>.

(a)     The Company shall file a registration statement under the Securities Act covering the resale of all Shares of the Holder as soon as practicable following the Holder's written request to do so, and use its reasonable best efforts to have the registration statement declared effective by the SEC for distribution thereof by means of an underwriting.  The underwriter will be selected by the Company and shall be reasonably acceptable to the Holder.  The Holder shall (together with the Company as provided herein below) enter into an underwriting agreement in a customary form with the underwriter or underwriters selected for such underwriting.  Notwithstanding any

CONFIDENTIAL                                                                 SPCP_0000004854

other provision of this Section 19(a), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of Shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.  The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders as selected by them.

(b)     (i)     The Company covenants and agrees with the Holder (and any subsequent Holders of this Warrant and/or Shares) that, in the event the Company proposes to file a registration statement under the Securities Act (including, without limitation, relating to an initial public offering of Company Common Stock or shall receive a request for registration on Form S-3 from any stockholder) with respect to any class of security which becomes or which the Company believes will become effective on or after the Initial Exercise Date and on or before the Expiration Date, then the Company shall in each case give prompt written notice of such proposed filing to the Holder (and any subsequent Holders of this Warrant and/or Shares) at least sixty (60) days before the proposed filing date and, by such notice, shall offer to such Holders the opportunity to include in such registration statement such number of Shares as they may request in writing.

(ii)     The Company shall permit, or shall cause the managing underwriter of a proposed offering to permit, the Holders from whom such written requests have been received to include such number of Shares (the "**Piggy-back Shares**") in the proposed offering on terms and conditions no less favorable to the Holders as the terms and conditions applicable to securities of the Company included therein or as applicable to securities of any person other than the Company and the Holders of Piggy-back Shares if the securities of any such person are included therein; provided, however, that the Company shall not be required to honor any such request that is received more than sixty (60) days after the proper giving of the Company's notice or after the Expiration Date. Notwithstanding any other provision of this Section 19(b)(ii), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities, other than securities to be registered pursuant to the registration rights granted in the 2008 SPA (the "**Other Shares**") and securities to be offered for the account of the Holders of the New Warrants and the Company, are first entirely excluded from the underwriting, and unless the number of Other Shares, on the one hand, and Piggy-back Shares on the other hand, are cut back on a pro rata basis based on the number of Piggy-back Shares and Other Shares requested to be included in such offering.  The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders selected by them.

#4835-5047-3746v4

13

CONFIDENTIAL

SPCP_0000004855

(iii)     The Company shall be obligated pursuant to this Section 19(b)(iii) to include in the piggy-back offering Shares that have not yet been purchased by a Holder so long as such Holder submits an undertaking to the Company that such Holder intends to exercise the Warrant for at least the number of Shares to be included in such piggy-back offering prior to the consummation of such piggy-back offering.  The Company shall use its reasonable best efforts to register or qualify the Shares for offer or sale under the state securities or Blue Sky laws of such states which the Holders of such Shares shall designate.

(iv)     If the Company decides not to proceed with the piggy-back offering, the Company will have no obligation to proceed with the offering of the Piggy-back Shares.

(c)     (i)     To the fullest extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, directors and stockholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Violation (as defined herein below) and the Company will pay to each such Holder, underwriter, controlling person or other aforementioned person, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action as such expenses are incurred; provided, however, that the indemnity agreement contained in this Section 19(c)(i) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter, controlling person or other aforementioned person.  The term "**Violation**" means losses, claims, damages, or liabilities (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations:  (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by any other party hereto, of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law.

(ii)     Each Holder of Shares who participates in a registration pursuant to Section 19 shall indemnify and hold harmless the Company, each of its directors, each of its officers who have signed any such registration statement, and each person, if any, who controls the Company within the meaning of the Securities Act, against any losses,

CONFIDENTIAL                                    **JAE 0553**                                    SPCP_0000004856

claims, damages or liabilities to which the Company, or any such director, officer or controlling person may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of, or are based upon, any untrue or alleged untrue statement of any material fact contained in any such registration statement, or final prospectus, or any amendment or supplement thereto, or arise out of or are based upon the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any such registration statement, or final prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished by such Holder expressly for use in the preparation thereof; and will reimburse any legal or other expenses reasonably incurred by the Company, or any such director, officer or controlling person in connection with investigating or defending against any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this subparagraph (ii) shall not apply to amounts paid to any claimant in settlement of any suit or claim unless such payment is first approved by such Holder; and, provided further, that the aggregate amount payable by a Holder pursuant to this Section 19(c)(ii) shall not exceed the net proceeds received by such Holder in the registered offering out of which its obligations pursuant to this Section 19(c)(ii) arise.

[signature page follows]

Issued this 7th day of February , 2013.

INTEGRATED HEALTHCARE HOLDINGS, INC.,
A NEVADA CORPORATION

By: _____

Kenneth K. Westbrook, Chief Executive Officer

Attachments

Exhibit A - Notice of Exercise
Exhibit B - Form of Transfer

**JAE 0555**

CONFIDENTIAL

SPCP_0000004858

# EXHIBIT A

## NOTICE OF EXERCISE

TO:   **INTEGRATED HEALTHCARE HOLDINGS, INC.**

Attention: President

1.      The undersigned hereby elects to purchase _____ shares of the Common Stock of Integrated Healthcare Holdings, Inc. (the "**Company**") pursuant to the terms of the attached Warrant.

2.      Method of Exercise (Please initial the applicable blank(s)):

____      The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full of $_____ for the purchase price of _____ Shares being purchased for cash, together with all applicable transfer taxes, if any.

____      The undersigned elects to exercise the attached Warrant by means of the net exercise provisions of Section 1(c) of this Warrant, and accordingly requests delivery of a net of _____ of such Shares and a corresponding reduction in the total number of Shares available for further exercise from _____ Shares to _____ Shares.

3.      Please issue a certificate or certificates representing said Shares in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____

_____
(Address)

4.      The undersigned hereby represents and warrants that the aforesaid shares of Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale, in connection with the distribution thereof.

_____
(Signature)
Title: _____

_____
(Date)

CONFIDENTIAL                    **JAE 0556**                    SPCP_0000004859

## EXHIBIT B

## FORM OF TRANSFER
(To be signed only upon transfer of Warrant)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ the right represented by the attached Warrant to purchase _____ shares of the Common Stock of **INTEGRATED HEALTHCARE HOLDINGS, INC.** (the "**Company**"), to which the attached Warrant relates, and appoints _____ as their true and lawful attorney in fact to transfer such right on the books of the Company, with full power of substitution in the premises.

Dated: _____

(Signature must conform in all respects to name of Holder as specified on the face of the Warrant)

_____

_____
(Address)

Signed in the presence of:

_____

#4835-5047-3746v4

CONFIDENTIAL

SPCP_0000004860

**Schedule 5(b)**

**Representations and Warranties**

[See attached.]

CONFIDENTIAL

SPCP_0000004861

## SCHEDULE 1.3

### [As of the Closing Date]

## SOURCES AND USES OF FUNDS

| | Sources | | Uses | |
|---|---|---|---|---|
| Accounts Receivable Revolver Loan Proceeds | 12,000,000 | (1) | | |
| Real Estate Term Note Proceeds | 45,000,000 | | | |
| Non-Revolving Line of Credit Proceeds | 30,701,477 | (2) | | |
| Convertible Term Loan Proceeds | 10,700,000 | | | |
| Purchase Outstanding Accounts Receivables | | | 12,000,000 | (1) |
| Payoff Existing Acquisition Note | | | 45,000,000 | |
| Payoff Existing Line of Credit Note | | | 27,341,459 | |
| Payoff Existing Convertible Term Note | | | 10,700,000 | |
| Payoff Existing Accrued Interest | | | 949,518 | (3) |
| Debt Origination Fees | | | 2,110,500 | |
| Transaction Closing Costs | | | 300,000 | (4) |
| | 98,401,477 | | 98,401,477 | |

Notes:

(1) This is a rough estimate of the necessary initial A/R Revolver draw to purchase accounts receivable. The amount will vary based on daily cash activity. The variance may be material.

(2) This amount will vary based on the final closing costs and accrued interest calculations as it is assumed that accrued interest and closing costs will be financed.

(3) The calculation of interest assumes an effective date of 9/30/07. If the effective date of the financing is later, the daily increase to this amount is approximately $31,650.60.

(4) This is a rough estimate of transaction closing costs. The final amount will vary.

SCHEDULE 1.3 - 1

US_ACTIVE-111640559.10

CONFIDENTIAL

SPCP_0000004862

## SCHEDULE 2.1(b)

## REQUIRED CONSENTS AND APPROVALS

No consents and approvals from any Governmental Authorities are required for execution, delivery and performance of this Agreement.  However, many approvals or notices were obtained from or submitted to Governmental Authorities related to the operation of the Borrowers as general acute care hospitals upon acquisition.  These consents and approvals must be updated anytime there is a material change of ownership within the Company (new shareholder who owns 10% or more of the Company).  All consents and approvals have been obtained.

SCHEDULE 2.1(b) - 1

**JAE 0560**

CONFIDENTIAL

SPCP_0000004863

**SCHEDULE 2.1(c)**

**[As of the Effective Date]**

**CAPITAL STRUCTURE OF BORROWER**

**Integrated Healthcare Holdings, Inc.**
Fully Diluted Capital Stock

|  |  |  | Fully diluted common stock |
|---|---|---|---|
| Outstanding shares at 7/31/07 & 10/04/07 | (A) | 137,095,716 | 137,095,716 |
| Remaining restructuring warrants - KPC |  |  | 24,878,213 |
| MCC $10.7M convertible note | $ 10,700,000 |  |  |
| Conversion price | $ 0.21 |  |  |
| Converted shares | 50,952,381 |  | 50,952,381 |
| (Convertible note dated 10/9/07) |  |  |  |
| Employee stock options granted | 5,190,000 |  | 5,190,000 |
| Common Stock Equivalents, before 31.09% & 4.95% warrants |  |  | 218,116,310 |

MCC warrants:

|  |  |  |  |
|---|---|---|---|
| MCC Amendment 2 to Warrant dated 12/12/05 |  |  |  |
| 31.09% Converted shares |  |  |  |
| (Amendment dated 10/1/07) |  |  |  |
| 4.95% Common Stock Equivalents | 122,903,562 |  | 122,903,562 |
| (Common Stock Warrant dated 10/1/07) |  |  |  |

SCHEDULE 2.1(c) - 1

CONFIDENTIAL

SPCP_0000004864

Assumed exercised concurrently

| | 341,019,872 |
|---|---|

**Note:** Does not include approximately 15M shares reserved, but ungranted, in the stock option pool.

**Chapman Medical Center, Inc.**

Outstanding Shares                                                                                      100

**Coastal Communities Hospital, Inc.**

Outstanding Shares                                                                                     1,000

**WMC-A, Inc.**

Outstanding Shares                                                                                     1,000

**WMC-SA, Inc.**

Outstanding Shares                                                                                     1,000

"The Board of Directors of the Company has approved a form of Amended and Restated Articles of Incorporation in the form included in this Schedule 2.1(c) (the "Restated Charter").   The Restated Charter provides for 400,000,000 authorized shares of common stock, which, when adopted by the Company, will be sufficient to cover the Company's obligations to issue common stock upon conversion or exercise of the convertible notes and warrants issued to Lender or its affiliates under the credit agreements executed on the date hereof and the existing warrant being amended in connection with the credit agreements.  The adoption of the Restated Charter is subject to majority approval of the Company's shareholders and the filing and mailing of an Information Statement to the Company's shareholders pursuant to Schedule 14C of the Securities and Exchange Commission or a Proxy Statement pursuant to Schedule 14A of the Securities and Exchange Commission.  The Company intends to obtain shareholder approval and comply with the requirements of the Securities and Exchange Commission promptly following the execution of the credit agreements."

SCHEDULE 2.1(c) - 2

CONFIDENTIAL

SPCP_0000004865

**CAPITAL STRUCTURE OF CREDIT PARTIES**

**ORANGE COUNTY PHYSICIANS INVESTMENT NETWORK, LLC**

| Member Name | Percentage Interest |
|---|---|
| Amin, Ashok | 0.234% |
| Brown, Craig | 0.156% |
| Chouhan, Bharat | 0.117% |
| Dang, Surinder | 6.517% |
| Fairwind Investments, LP | 3.536% |
| Hajj, Ahmad | 0.702% |
| Jodhka, Joginder | 2.703% |
| Kapadia, Shilpa | 0.156% |
| Katakia, Madhu | 0.156% |
| Khan, Farhat | 0.117% |
| Kothapa, Sangamitra | 0.234% |
| Lee, Anthony | 0.585% |
| Lohiya, Ghan | 0.676% |
| Ludmir, Jaime | 8.274% |
| Mayer, Ronald | 0.117% |
| Mehta, Milan | 0.117% |
| Meka, Ajay | 14.674% |
| Melikian, Robert | 0.117% |
| Modi, Jasvant | 1.040% |
| Naqvi, Syed | 0.757% |

SCHEDULE 2.1(c) - 3

**JAE 0563**

CONFIDENTIAL

SPCP_0000004866

| Member Name | Percentage Interest |
|---|---|
| OC Healthcare, LLC | 4.648% |
| Rottermann, Israel | 1.170% |
| Salem, Ahmed | 0.234% |
| Salem, Yasser | 2.649% |
| Samimi, Shahin | 0.104% |
| Sankaram, R. | 2.703% |
| Sarode, Praful | 0.351% |
| Sein, Michael | 2.703% |
| Shah, Anil | 38.189% |
| Sweidan, Jacob | 2.703% |
| Walsh, Patrick | 0.624% |
| Weiss, Barry | 0.234% |
| Zarka, Amer | 2.703% |
| | **100.00%** |

SCHEDULE 2.1(c) - 4

**JAE 0564**

CONFIDENTIAL

SPCP_0000004867

## WEST COAST HOLDINGS, LLC

| Member Name | Percentage Interest |
|---|---|
| Amin, Ashok | 0.180% |
| Brown, Craig | 0.090% |
| Chouhan, Bharat | 0.090% |
| Dang, Surinder | 2.700% |
| Fairwind Investments, LP | 1.350% |
| Hajj, Ahmad | 0.540% |
| Jodhka, Joginder | 3.331% |
| Kapadia, Shilpa | 0.090% |
| Katakia, Madhu | 0.090% |
| Khan, Farhat | 0.090% |
| Kothapa, Sangamitra | 0.180% |
| Lee, Anthony | 0.450% |
| Lohiya, Ghan | 0.833% |
| Ludmir, Jaime | 9.992% |
| Mayer, Ronald | 0.090% |
| Mehta, Milan | 0.090% |
| Meka, Ajay | 16.653% |
| Melikian, Robert | 0.090% |
| Modi, Jasvant | 0.900% |
| Naqvi, Syed | 0.933% |
| OC Healthcare, LLC | 5.729% |

SCHEDULE 2.1(c) - 5

CONFIDENTIAL

SPCP_0000004868

| **Member Name** | **Percentage Interest** |
|---|---|
| Rottermann, Israel | 0.900% |
| Salem, Ahmed | 0.180% |
| Salem, Yasser | 3.264% |
| Samimi, Shahin | 0.090% |
| Sankaram, R. | 3.331% |
| Sarode, Praful | 0.270% |
| Sein, Michael | 3.331% |
| Shah, Anil | 36.763% |
| Sweidan, Jacob | 3.331% |
| Walsh, Patrick | 0.540% |
| Weiss, Barry | 0.180% |
| Zarka, Amer | 3.331% |
| **TOTAL** | **100.00%** |

SCHEDULE 2.1(c) - 6

**JAE 0566**

### PACIFIC COAST HOLDINGS INVESTMENT, LLC

| Name of Member | Percentage Owned |
|---|---|
| WEST COAST HOLDINGS, LLC, a California limited liability company | 51.00% |
| GANESHA REALTY, LLC, a California limited liability company | 49.00% |

SCHEDULE 2.1(c) - 7

**JAE 0567**

CONFIDENTIAL

SPCP_0000004870

## SCHEDULE 3.1

## SCHEDULE 3.1A

### [As of the Restatement Effective Date]

### NAMES, LOCATION OF COLLATERAL, MEDICARE AND MEDI-CAL PROVIDER NUMBERS AND FEIN

| NAME | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER |
|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | NA | NA | 87-0573331 |
| WMC-SA, Inc. | 050746 (ACUTE)<br>05S746 (PSYCH) | HSC30065H (INPT)<br>ZZT40065H (OUTPT)<br>ZZT30065H (NON-CNTR)<br>HSD30065H (I/P TRANS)<br>HSM30065H (I/P PSYCH) | 55-0883862 |
| WMC-A, Inc. | 050744 (ACUTE)<br>05S744 (PSYCH) | HSC30594J (INPT)<br>HSP40594J (OUTPT)<br>HSM30594J (I/P PSYCH)<br>HSP30594J (NON-CNTR)<br>HSD30594J (I/P TRANS) | 55-0883859 |
| Coastal Communities Hospital, Inc. | 050747 (ACUTE)<br>05S747 (PSYCH)<br>555567 (SNF) | HSC30535I (INPT)<br>HSP40535I (OUTPT)<br>HSP30535I (NON-CNTR)<br>HSD30535I (I/P TRANS)<br>HSM30535I (IP PSYCH)<br>LTC70068G (SUB-ACUTE) | 55-0883863 |

SCHEDULE 3.1 - 1

**JAE 0568**

CONFIDENTIAL

| NAME | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | | FEIN NUMBER |
|---|---|---|---|---|
| Chapman Medical Center, Inc. | 050745 (ACUTE) 05S745 (PSYCH) 555709 (SNF) | HSC30550H (INPT) HSP40550H (OUTPT) HSP30550H (NON-CNTR) LTC70108G (SUB-ACUTE) LTC55709G (SNF) | | 55-0883864 |
| Pacific Coast Holdings Investment, LLC | NA | NA | | 20-2359134 |
| Ganesha Realty, LLC | NA | NA | | 34-2036653 |

## TRADE NAMES

| Borrower | Trade Name |
|---|---|
| Coastal Communities Hospital, Inc. | Coastal Communities Hospital |
| Chapman Medical Center, Inc. | Chapman Medical Center |
| WMC-A, Inc. | Western Medical Center – Anaheim |
| WMC-SA, Inc. | Western Medical Center – Santa Ana |

## COLLATERAL LOCATIONS

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Integrated Healthcare | 1301 N. Tustin Avenue | 1301 N. Tustin Avenue | None |

SCHEDULE 3.1 - 2

CONFIDENTIAL

SPCP_0000004872

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Holdings, Inc. | Santa Ana, CA  92705 | Santa Ana, CA  92705 | |
| Coastal Communities Hospital, Inc. | 2701 S Bristol St Santa Ana, CA 92704 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | None |
| Chapman Medical Center, Inc. | 2601 E, Chapman Ave. Orange, CA  92869 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 2601 E, Chapman Ave. Orange, CA  92869 |
| | | | Chapman Medical Office Building 2617 E. Chapman Ave. Orange, CA  92869 |
| WMC-A, Inc. | 1025 S. Anaheim Blvd. Anaheim, CA 92805 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | El Camino Business Center 100 N. Harbor Blvd. Anaheim, CA |
| | | | 1107 S. Anaheim Blvd., Suite 1107 Anaheim, CA  92805 |
| | | | 1101 S. Anaheim Blvd., Suite 1101 Anaheim, CA  92805 |
| | | | 1103 S. Anaheim Blvd., Suite 1103 Anaheim, CA  92805 |
| WMC-SA, Inc. | 1001 N Tustin Ave Santa Ana, CA 92705 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 999 N. Tustin Ave. Suites 105-10 and 205-10 Santa Ana, CA |
| | | | 13522 Newport Avenue #102 Tustin, CA |
| | | | 1001 N. Tustin Avenue Santa Ana, CA |
| Pacific Coast Holdings Investment, LLC | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 | None |
| Ganesha Realty, LLC | 6800 Indiana Avenue, Suite 130 | 6800 Indiana Avenue, Suite 130 | None |

SCHEDULE 3.1 - 3

**JAE 0570**

CONFIDENTIAL

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | Riverside, CA 92506 | Riverside, CA 92506 | |

## SCHEDULE 3.1B

### [As of the Closing Date]

## ADDRESS OF EXECUTIVE OFFICE, FEIN AND SOCIAL SECURITY NUMBERS

| OFFICIAL NAME | TYPE OF ENTITY | ORGANIZATION ID # ISSUED BY STATE OF INCORPORATION OR ORGANIZATION OR STATEMENT THAT NO SUCH NUMBER HAS BEEN ISSUED | STATE OF INCORPORATION OR ORGANIZATION | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER | LOCATION OF CHIEF EXECUTIVE OFFICE |
|---|---|---|---|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | Corporation | C10133-1988 | Nevada | NA | NA | 87-0573331 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |
| WMC-SA, Inc. | Corporation | 2677248 | California | 050746 (ACUTE) 05S746 (PSYCH) | HSC30065H (INPT) ZZT40065H (OUTPT) ZZT30065H (NON-CNTR) HSD30065H (I/P TRANS) HSM30065H (I/P PSYCH) | 55-0883862 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |

SCHEDULE 3.1 - 4

**JAE 0571**

CONFIDENTIAL

| OFFICIAL NAME | TYPE OF ENTITY | ORGANIZATION ID # ISSUED BY STATE OF INCORPORATION OR ORGANIZATION OR STATEMENT THAT NO SUCH NUMBER HAS BEEN ISSUED | STATE OF INCORPORATION OR ORGANIZATION | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER | LOCATION OF CHIEF EXECUTIVE OFFICE |
|---|---|---|---|---|---|---|---|
| WMC-A, Inc. | Corporation | 2677247 | California | 050744 (ACUTE)<br>05S744 (PSYCH) | HSC30594J (INPT)<br>HSP40594J (OUTPT)<br>HSM30594J (I/P PSYCH)<br>HSP30594J (NON-CNTR)<br>HSD30594J (I/P TRANS) | 55-0883859 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |
| Coastal Communities Hospital, Inc. | Corporation | 2677249 | California | 050747 (ACUTE)<br>05S747 (PSYCH)<br>555567 (SNF) | HSC30535I (INPT)<br>HSP40535I (OUTPT)<br>HSP30535I (NON-CNTR)<br>HSD30535I (I/P TRANS)<br>HSM30535I (IP PSYCH)<br>LTC70068G (SUB-ACUTE) | 55-0883863 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |
| Chapman Medical Center, Inc. | Corporation | 2676435 | California | 050745 (ACUTE)<br>05S745 (PSYCH)<br>555709 (SNF) | HSC30550H (INPT)<br>HSP40550H (OUTPT)<br>HSP30550H (NON-CNTR)<br>LTC70108G (SUB-ACUTE)<br>LTC55709G (SNF) | 55-0883864 | 1301 N. Tustin Ave., Santa Ana, CA. 92705 |

SCHEDULE 3.1 - 5

**JAE 0572**

CONFIDENTIAL

| Official Name | Type of Entity | Organization ID # Issued by State of Incorporation or Organization or Statement that no such number has been issued | State of Incorporation or Organization | Medicare Provider Number | Medi-Cal Provider Number | FEIN Number | Location of Chief Executive Office |
|---|---|---|---|---|---|---|---|
| Pacific Coast Holdings Investment, LLC | LCC | 200504710009 | California | NA | NA | None | 2621 S. Bristol Street, Suite 108 Santa Ana, CA 92704 |
| Ganesha Realty, LLC | LLC | 200426510045 | California | NA | NA | 34-2036653 | 6800 Indiana Avenue, Suite 130 Riverside, CA 92506 |
| West Coast Holdings, LLC | LLC | 20054710008 | California | NA | NA | None | 2621 S. Bristol Street, Suite 108 Santa Ana, CA 92704 |

SCHEDULE 3.1 - 6

**JAE 0573**

SPCP_0000004876

| OFFICIAL NAME | TYPE OF ENTITY | ORGANIZATION ID # ISSUED BY STATE OF INCORPORATION OR ORGANIZATION OR STATEMENT THAT NO SUCH NUMBER HAS BEEN ISSUED | STATE OF INCORPORATION OR ORGANIZATION | MEDICARE PROVIDER NUMBER | MEDI-CAL PROVIDER NUMBER | FEIN NUMBER | LOCATION OF CHIEF EXECUTIVE OFFICE |
|---|---|---|---|---|---|---|---|
| Orange County Physicians Investment Network, LLC<br><br>(Previous name Orange County Physician Investment Group, LLC – dissolved 2004) | LLC | LLC197-275 | Nevada | NA | NA | None | 2621 S. Bristol Street, Suite 108 Santa Ana, CA 92704 |

## COLLATERAL LOCATIONS

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| Integrated Healthcare Holdings, Inc. | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | None |
| Coastal Communities Hospital, Inc. | 2701 S Bristol St Santa Ana, CA 92704 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | Doctor's Hospital/MOB 1901 N. College Ave. Santa Ana, CA  92705 |

SCHEDULE 3.1 - 7

**JAE 0574**

SPCP_0000004877

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | | | 1901/1905. N. College Ave., Santa Ana, CA |
| Chapman Medical Center, Inc. | 2601 E, Chapman Ave. Orange, CA  92869 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | 2601 E, Chapman Ave. Orange, CA  92869 |
| | | | 2617 E, Chapman Ave. Orange, CA  92869 |
| | | | 2922 E, Chapman Ave. Orange, CA  92869 |
| | | | 7630 – B Chapman Ave. Orange, CA  92869 |
| | | | Chapman Medical Office Building 2617 E. Chapman Ave. Orange, CA  92869 |
| WMC-A, Inc. | 1025 S. Anaheim Blvd. Anaheim, CA 92805 | 1301 N. Tustin Avenue Santa Ana, CA  92705 | Walnut Grove Medical Center 947 S. Anaheim Blvd., Suites 210 and 240 Anaheim, CA  92805 |
| | | | El Camino Business Center 100 N. Harbor Blvd. Anaheim, CA |
| | | | 1107 S. Anaheim Blvd., Suite 1107 Anaheim, CA  92805 |
| | | | 1101 S. Anaheim Blvd., Suite 1101 Anaheim, CA  92805 |
| | | | 1103 S. Anaheim Blvd., Suite 1103 Anaheim, CA  92805 |
| | | | Medical Office Building 1491 E. La Palma Ave., Suites |

SCHEDULE 3.1 - 8

**JAE 0575**

SPCP_0000004878

| Borrower | Chief Place of Business | Chief Executive Office | Other Locations |
|---|---|---|---|
| | | | B, C and Basement<br>Anaheim, CA |
| | | | 2100 W. Lincoln Ave., Suite A<br>Anaheim, CA |
| | | | 979 S. Anaheim Blvd.<br>Anaheim, CA |
| WMC-SA, Inc. | 1001 N Tustin Ave<br>Santa Ana, CA 92705 | 1301 N. Tustin Avenue<br>Santa Ana, CA  92705 | 999 N. Tustin Ave.<br>Suites 105-10 and 205-10<br>Santa Ana, CA |
| | | | 420B "B" St.<br>Tustin, CA |
| | | | 1241 W. 17th  St. #1-3<br>Santa Ana, CA |
| | | | 13522 Newport Avenue #102<br>Tustin, CA |
| | | | 4010 E. Chapman #B,C, and D |
| | | | 800 N. Tustin Ave.<br>Santa Ana, CA |
| | | | 1001 N. Tustin Avenue<br>Santa Ana, CA |
| Pacific Coast Holdings Investment, LLC | 2621 South Bristol Street, Suite 304<br>Santa Ana, CA 92704 | 2621 South Bristol Street, Suite 304<br>Santa Ana, CA 92704 | None |

SCHEDULE 3.1 - 9

**JAE 0576**

CONFIDENTIAL

SPCP_0000004879

## SCHEDULE 3.5

**[As of immediately after the Closing Date]**

## REAL ESTATE OWNED AND LEASED

## Western Medical Center – Santa Ana

### Leased Real Property

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| 999 N. Tustin Ave. Suites 105-10 and 205-10 Santa Ana, CA | MOB | Bank of West |
| 420B "B" St. Tustin, CA | Records | Tustin Guthrie Venture |
| 1241 W. 17th St. #1-3 Santa Ana, CA | Clinic | Bristol Partnership |
| 13522 Newport Avenue #102 Tustin, CA | Clinic | Sycamore Commercial |
| 4010 E. Chapman #B,C, and D | Clinic | Salina Jason Monica |
| 800 N. Tustin Ave. Santa Ana, CA | Sublease by Physicians | Allan Fainburg |
| 1001 N. Tustin Avenue Santa Ana, CA | Hospital and Parking Lot | Pacific Coast Holdings Investment, LLC |
| 1301 N. Tustin Ave. Santa Ana, CA | Administration Building | Pacific Coast Holdings Investment, LLC |

## Coastal Communities Hospital

### Leased Real Property

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Coastal Communities Hospital 2701 S. Bristol St. Santa Ana, CA  92704 | Acute Hospital and Parking Lot | Pacific Coast Holdings Investment, LLC |
| Doctor's Hospital/MOB 1901 N. College Ave. Santa Ana, CA  92705 | MOB | Pacific Coast Holdings Investment, LLC |
| 1901/1905. N. College Ave., Santa | Hispanic Commision on Alcohol | |

SCHEDULE 3.5 - 1

**JAE 0577**

CONFIDENTIAL

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Ana, CA | and Drug Abuse, Inc. | |

## Chapman Medical Center

## Owned Real Property

| ADDRESS | FACILITY TYPE |
|---|---|
| Chapman Medical Office Building<br>2617 E. Chapman Ave.<br>Orange, CA  92869 | MOB (Borrower owns building subject to a ground lease) |

## Chapman Medical Center

## Leased Real Property

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Chapman Medical Center<br>2601 E, Chapman Ave.<br>Orange, CA  92869 | Hospital | Chapman Medical LP |
| Chapman Medical Center<br>2617 E, Chapman Ave.<br>Orange, CA  92869 | MOB | Chapman Medical LP |
| Chapman Medical Center<br>2922 E, Chapman Ave.<br>Orange, CA  92869 | Clinic | Mary Center, LLC |
| Chapman Medical Center<br>7630 – B Chapman Ave.<br>Orange, CA  92869 | Clinic | Miller Family Trust |

SCHEDULE 3.5 - 2

**JAE 0578**

## Western Medical Center – Anaheim

## Leased Real Property

| Building Name and Address | Use | Name of Landlord |
|---|---|---|
| Walnut Grove Medical Center<br>947 S. Anaheim Blvd.,<br>Suites 210 and 240<br>Anaheim, CA 92805 | Sleep Center and Clinic for Women | California Commercial |
| El Camino Business Center<br>100 N. Harbor Blvd.<br>Anaheim, CA | Sublease to Coldwell Bankers | Granite/El Camino LLC<br>The REMM Group |
| 1107 S. Anaheim Blvd.,<br>Suite 1107<br>Anaheim, CA 92805 | Vacant | Peggy Falkenberg<br>c/o Shaw Properties |
| 1101 S. Anaheim Blvd.,<br>Suite 1101<br>Anaheim, CA 92805 | MOB | Peggy Falkenberg<br>c/o Shaw Properties |
| 1103 S. Anaheim Blvd.,<br>Suite 1103<br>Anaheim, CA 92805 | MOB | Peggy Falkenberg<br>c/o Shaw Properties |
| Medical Office Building<br>1491 E. La Palma Ave.,<br>Suites B, C and Basement<br>Anaheim, CA | MOB | Southern California<br>Universal of Health Services<br>c/o G&M Management<br>Services, Inc. |
| 2100 W. Lincoln Ave., Suite A<br>Anaheim, CA | Clinic | First Street Financial Center |
| 1025 S. Anaheim Blvd.<br>Anaheim, CA | Hospital and Birthing Center | Pacific Coast Holdings Investment, LLC |
| 979 S. Anaheim Blvd.<br>Anaheim, CA | Parking Lot | Pacific Coast Holdings Investment, LLC |

SCHEDULE 3.5 - 3

**JAE 0579**

CONFIDENTIAL

**SCHEDULE 3.6**

**[As of the Closing Date]**

**LABOR MATTERS**

Three (3) of IHHI's four (4) hospitals have collective bargaining agreements in effect for certain employees. The Service Employees International Union represents approximately 212 employees in WMC-A.  The current collective bargaining agreement applicable to those employees expires on December 31, 2009. In the current agreement, which is effective as of January 1, 2007, pay raises were agreed to which cannot exceed 5%, 8%, and 8%, in years 1,2, and 3 of the Agreement, respectively.

The California Nurses Association represents approximately 500 employees in Coastal Communities Hospital, Chapman Medical Center and WMC-A.  The applicable Collective Bargaining Agreement for these employees expired on December 31, 2006; however, its terms are in effect while the parties pursue a new agreement in a Board of Inquiry process.  The parties are also meeting separate and apart from the Board of Inquiry in an attempt to reach an amicable settlement. Management believes that an Agreement could be reached as early as the end of October, 2007. Pay increases for covered employees are likely to be retroactive to the anniversary of each employee's last pay increase under the currently effective Agreement. The Company does not anticipate the new agreements will have a material adverse effect on our results of operations.

Both unions have filed grievances in connection with allegations the agreement obligated the Company to contribute to a Retiree Medical Benefit Account. The Company does not agree with this interpretation of the agreement but has agreed to submit the matter to arbitration. CNA has also filed grievances related to the administration of increases at one facility, change in pay practice at one facility and several wrongful terminations. We do not anticipate resolution of the arbitrations will have a material adverse effect on our results of operations.

The Company and its subsidiaries are involved in various other legal proceedings most of which relate to routine matters incidental to our business. We do not believe that the outcome of these matters is likely to have a material adverse effect on the Company.

See attached Employment Agreements.

SCHEDULE 3.6 - 1

**JAE 0580**

CONFIDENTIAL

SPCP_0000004883

## LIST OF EMPLOYMENT AGREEMENTS

| Title of Document | Effective Date | | Parties |
|---|---|---|---|
| Employment Agreement | 02/22/05 | IHHI | Larry B. Anderson |
| Employment Agreement | 02/22/05 | IHHI | Bruce Mogul |
| Amendment Letter to Employment Agreements | 06/06/05 | IHHI | Anderson, Mogul and James T. Ligon |
| Employment Agreement | 03/21/05 | IHHI | Steve Blake |
| Amendment Letter to Employment Agreement | 02/14/07 | IHHI | Steve Blake |
| Employment Agreement | 05/08/06 | IHHI | J. Scott Shoeffel |
| Personnel Change Notice | 08/06/06 | IHHI | J. Scott Shoeffel |
| Employment Agreement | 11/01/05 | IHHI | Casey Fatch |
| Personnel Change Notice | 04/29/07 | IHHI | Casey Fatch |
| Employment Agreement | 03/07/05 | IHHI | Anil V. Shah, M.D. |
| Severance Agreement and Mutual Releases | 01/09/07 | IHHI | Anil V. Shah, M.D. |
| Employment Offer Letter | 09/10/07 | IHHI | Andy Chao |
| Employment Agreement | 09/10/07 | IHHI | Jerry Kanaly |
| Retainer Letter Agreement | 08/02/07 | IHHI | Alexander Yu |
| Employment Agreement | 12/__/04 | IHHI | Dan Brothman |
| Employment Agreement | 05/08/07 | IHHI | Catherine Anderson |
| Employment Agreement | 12/15/04 | IHHI | Doug Norris |
| Letter of Correction to Employment Agreement | 06/28/07 | IHHI | Doug Norris |
| Employment Agreement | 12/16/04 | IHHI | Kathy Hammack |
| Employment Offer Letter | 10/25/06 | IHHI | Carol McKenna |
| Employment Agreement | 02/20/05 | IHHI | Milan Mehta |
| Employment Agreement | 07/10/06 | IHHI | Craig Myers |
| Offer Letter and Acceptance | 05/25/05 | Coastal | Geri Mikelson, R.N. |
| Employment Agreement | 08/20/07 | IHHI | S. Sean Fowler |
| Employment Agreement | 08/13/07 | IHHI | Deniece Reed |

SCHEDULE 3.6 - 2

**JAE 0581**

CONFIDENTIAL

| Title of Document | Effective Date | Parties | |
|---|---|---|---|
| Employment Agreement | 04/11/07 | IHHI | Kelly Laban |
| Employment Agreement | 05/01/06 | IHHI | Pamela Giesie |
| Employment Agreement | 12/22/05 | IHHI | Patricia Henry |
| Employment Agreement | 01/01/06 | IHHI | Robert Heinemeier |
| Employment Agreement | 09/01/05 | IHHI | Ray Rivas |
| Employment Agreement | 03/08/05 | IHHI | Ada Yeh |

SCHEDULE 3.6 - 3

**JAE 0582**

CONFIDENTIAL

SPCP_0000004885

## SCHEDULE 3.7

### [As of the Restatement Effective Date]

### VENTURES, SUBSIDIARIES AND AFFILIATES; OUTSTANDING STOCK; DIRECTORS, MEMBERS, MANAGERS OR PARTNERS

**Integrated Healthcare Holdings, Inc.**
Capitalization table
December 31, 2012

Outstanding shares
Affiliates:

| | | |
|---|---:|---:|
| Kali P. Chaudhuri, M.D. | 128,601,334 | 50.4% |
| Orange County Physicians Investment Network, LLC | 73,798,430 | 28.9% |
| William E. Thomas | 9,748,498 | 3.8% |
| Anil V. Shah, M.D. (1) | 14,700,000 | 5.8% |
| Total outstanding shares held by affiliates | 226,848,262 | 88.9% |
| Others (2) | 28,459,000 | 11.1% |
| Total outstanding shares (3) | 255,307,262 | 100.0% |

(1) Does not include 5,112,000 shares that are in the process of being transferred from Larry Anderson to Dr. Shah.
(2) Includes 19,534,126 shares held in street names.
(3) Total authorized shares: 800,000,000.

**Integrated Healthcare Holdings, Inc.**
Fully diluted shares
December 31, 2012

| | | | % of outstanding | % of fully diluted | |
|---|---:|---:|---:|---:|---:|
| Outstanding shares | | | | | |
| Affiliates: | | | | | |
| Kali P. Chaudhuri, M.D. | | 128,601,334 | 50.4% | 19.24% | |
| Orange County Physicians Investment Network, LLC | | 73,798,430 | 28.9% | 11.04% | |
| William E. Thomas | | 9,748,498 | 3.8% | 1.46% | |
| Anil V. Shah, M.D. (1) | | 14,700,000 | 5.8% | 2.20% | |
| Total outstanding shares held by affiliates | | 226,848,262 | 88.9% | | |
| Others (2) | | 28,459,000 | 11.1% | 4.26% | |
| Total outstanding shares | | 255,307,262 | 100.0% | | |
| Outstanding stock options - all fully vested (3) | | 8,085,000 | | 1.21% | |
| Outstanding warrants: | | | | | |
| Kali P. Chaudhuri, M.D. | 170,000,000 | 170,000,000 | | 25.43% | |
| KPC Resolution Company, LLC (Dr. Chaudhuri) | 139,000,000 | 139,000,000 | | 20.80% | 46.2% |
| | 309,000,000 | | | | |
| SPCP Group, LLC (Silver Point Finance, LLC) | 79,182,635 | 79,182,635 | | 11.85% | |
| SPCP Group IV, LLC (Silver Point Finance, LLC) | 16,817,365 | 16,817,365 | | 2.52% | 14.4% |
| | 96,000,000 | | | | |
| Fully diluted (4) | | 668,392,262 | | 100.0% | |

(1) Does not include 5,112,000 shares that are in the process of being transferred from Larry Anderson to Dr. Shah.
(2) Includes 19,534,126 shares held in street names.
(3) Does not reflect changes subsequent to September 30, 2012.  Total remaining shares reserved in option pool: 15,440,489.
(4) Total authorized shares: 800,000,000.

SCHEDULE 3.7 - 1

**JAE 0583**

**PACIFIC COAST HOLDINGS INVESTMENT, LLC
MEMBERSHIP INTERESTS**

| Member | PCHI Ownership % |
|---|---|
| Ganesha Realty, LLC | 49.00000 |
| Amin, Ashok | 0.09180 |
| Brown, Craig | 0.04590 |
| Chouhan, Bharat | 0.04590 |
| Dang, Surinder | 1.38054 |
| Fairwind Investments, LP | 0.68849 |
| Hajj, Ahmad | 0.27539 |
| Jodhka, Joginder | 1.69878 |
| Kapadia, Shilpa | 0.04590 |
| Katakia, Madhu | 0.04590 |
| Khan, Farhat | 0.04590 |
| Kothapa, Sangamitra | 0.09180 |
| Lee, Anthony | 0.22950 |
| Lohiya, Ghan | 0.42482 |
| Ludmir, Jaime | 5.09582 |
| Mayer, Ronald | 0.04590 |
| Mehta, Milan | 0.04590 |
| Meka, Ajay | 10.19164 |
| Melikian, Robert | 0.04590 |
| Modi, Jasvant | 0.45899 |
| Naqvi, Syed | 0.47582 |
| OC Healthcare, LLC | 2.92173 |
| Rotterman, Israel | 0.45899 |
| Salem, Ahmed | 0.09180 |
| Salem, Yasser | 1.66461 |
| Samimi, Shahin | 0.04590 |
| Sarode, Praful | 0.13770 |
| Sein, Michael | 1.69878 |
| Shah, Anil | 18.74519 |
| Sweidan, Jacob | 1.69878 |
| Walsh, Patrick | 0.27539 |
| Weiss, Barry | 0.09180 |
| Zarka, Amer | 1.69878 |
| **Total** | 100.0000 |

Integrated Healthcare Holdings, Inc.'s wholly owned Subsidiaries are:  WMC-A, Inc., WMC-SA, Inc., Coastal Communities Hospital, Inc., and Chapman Medical Center, Inc.  Integrated Healthcare Holdings, Inc. does not have any other Subsidiaries.

SCHEDULE 3.7 - 2

**JAE 0584**

Pacific Coast Holdings Investment, LLC and Ganesha Realty, LLC have no Subsidiaries.

Pacific Coast Holdings Investment, LLC does not own an interest in, participate in or engage in any joint venture, partnership or similar arrangements with any Person.

### Integrated Healthcare Holdings, Inc.

| Directors |
|---|
| Maurice J. DeWald |
| Hon. C. Robert Jameson |
| Ajay G. Meka, M.D. |
| Michael Metzler |
| J. Fernando Niebla |
| William E. Thomas |
| Kenneth K. Westbrook |

### WMC-A, Inc.

| Directors |
|---|
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### WMC-SA, Inc.

| Directors |
|---|
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### Coastal Communities Hospital, Inc.

| Directors |
|---|
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### Chapman Medical Center, Inc.

| Directors |
|---|
| Kenneth K. Westbrook |
| Daniel Brothman |
| Steven Blake |

### Pacific Coast Holdings Investment, LLC

SCHEDULE 3.7 - 3

**JAE 0585**

CONFIDENTIAL

| Co-Managers | Members |
|---|---|
| Kali P. Chaudhuri, M.D.<br>Jacob Sweidan, M.D. | See table above |

SCHEDULE 3.7 - 4

**JAE 0586**

SPCP_0000004889

## SCHEDULE 3.10

## TAXES

None

**JAE 0587**

CONFIDENTIAL

SPCP_0000004890

## SCHEDULE 3.11

## ERISA PLANS

The Company administers a 401(k) Plan for its employees that is managed by Fidelity. The Company is in compliance with all testing and auditing requirements for the Plan.  The Company also administers a Plan which allows its employees the opportunity to participate in Flexible Spending Accounts (FSAs) to pay for certain dependent care and medical costs on a pre-tax basis.

SCHEDULE 3.11 - 1

**JAE 0588**

SPCP_0000004891

**SCHEDULE 3.12**

**LITIGATION**

**SCHEDULE 3.12A**

**[As of the Restatement Effective Date]**

On June 5, 2009, a potential class action lawsuit was filed against the Company by Alexandra Avery. Ms. Avery purports to represent all 12-hourly employees and the complaint alleges causes of action for restitution of unpaid wages as a result of unfair business practices, injunctive relief for unfair business practices, failure to pay overtime wages, and penalties associated therewith. On December 23, 2009, the Company filed an answer to the complaint, generally denying all of the plaintiff's allegations. The Company continues to vigorously defend the action.

On January 25, 2010, a potential class action lawsuit was filed against the company by Julie Ross. Ms. Ross purports to represent all similarly-situated employees and the complaint alleges causes of action for violation of the California Labor Code and unfair competition law. The Company continues to vigorously defend the action.

On June 16, 2008, Michael Fitzgibbons, M.D., filed a complaint against the Company alleging malicious prosecution, intentional interference with prospective economic advantage, defamation, and intentional infliction of emotional distress. Most of the causes of action in the June 16, 2008 complaint derive from events precipitating a lawsuit filed by the Company against Dr. Fitzgibbons in 2005. On September 9, 2008, the Company filed a "SLAPP Back" motion seeking to remove the malicious prosecution cause of action from Dr. Fitzgibbons' complaint, as well as an Anti-SLAPP motion directed to the remaining causes of action. The Court denied both motions on October 20, 2008. The Company appealed the denial of the Anti-SLAPP motion, which was denied by the Court of Appeal on October 27, 2009. The remittitur, releasing jurisdiction back to the trial court, was issued on December 31, 2009. The parties have been in trial on this lawsuit throughout the past year and the trial has just resumed, after a long continuance, on January 22, 2013.

On July 6, 2011, a patient Richard Melendez filed a complaint in Orange County Superior Court for medical malpractice, negligent hiring, negligent retention, dependent adult abuse, negligent supervision and violation of Civil Code 51.2 (Sexual Harassment). On July 29,2010, Melendez was brought to Western Medical Center-Anaheim on a 5150 hold due to the fact that he threatened suicide. He claims that he was sexually assaulted by a male nurse on numerous occasions while in the ER before being transferred to the County mental health facility. He is suing for general, special and punitive damages. The parties have tentatively agreed to a confidential settlement of $1.5 million.

CONFIDENTIAL

## SCHEDULE 3.12B

### [As of the Closing Date]

On May 14, 2007, IHHI filed suit in Orange County Superior Court against three of the six members of its Board of Directors and also against IHHI's largest shareholder, OC-PIN. Among other things, the suit alleges that the defendants breached fiduciary duties owed to IHHI by putting their own economic interests above those of IHHI, its other shareholders, creditors, employees and the public-at-large. The suit also alleges that defendants' attempt to change IHHI's management and control of the existing Board could trigger an "Event of Default" under the express terms of IHHI's existing credit agreements with its secured lender. IHHI is seeking, among other items, the appointment of an independent and impartial provisional director.

On May 17, 2007, OC-PIN filed a separate suit against IHHI in Orange County Superior Court. OC-PIN's suit alleges the management issue referred to above must be resolved prior to the completion of the refinancing. OC-PIN further alleges that IHHI's President has failed to call a special shareholders' meeting so that OC-PIN could fill positions on IHHI's Board of Directors. OC-PIN seeks, among other items, to require IHHI to hold a special shareholders meeting whereat the shareholders would vote to fill the vacant seat on the Board of Directors.

Both actions have been consolidated so they can be heard before one judge. IHHI has filed a motion to appoint an independent provisional director to the vacant seventh Board seat. OC-PIN has filed an application for an order noticing a special shareholders meeting. These and other preliminary matters were heard on July 2, 2007 and a ruling issued on July 11, 2007 appointing an independent director for the term of the lawsuit.

In late May 2007, Western Medical Center, Santa Ana ("Medical Center") was notified by a May 25, 2007 letter from the U.S. Department of Health Services, Centers for Medicare and Medicaid Services ("CMS"), that CMS had identified one case that was a potential violation of the federal patient anti-dumping law (officially, the Emergency Medical Treatment and Active Labor Act or "EMTALA").  In June 2007, Lumetra, a Medicare quality improvement organization, notified Medical Center that it was aiding CMS in its investigation of the same matter. Medical Center has responded to CMS and Lumetra that its actions were appropriate and did not violate EMTALA. The complaint from CMS and the notice from Lumetra are the first steps in a determination by the Office of Inspector General ("OIG") of the U.S. Department of Health and Human Services whether to seek enforcement action for a violation of EMTALA. The potential sanctions which may be imposed by the OIG for a violation of EMTALA are a civil money penalty up to $50,000 for a confirmed violation and possible exclusion from the Medicare and Medi-Cal Programs. The Company has notified both CMS and Lumetra that it believes that a violation of the EMTALA statutes and regulations did not occur nor should it be subject to any civil money penalties. As a prophylactic matter it has also reviewed and revised its policies and procedures regarding communication and admission practices through the hospital's emergency department and has conducted further EMTALA in service training.

IHHI was recently served with a Cross-Complaint filed against IHHI by Andrew Weiss alleging causes of action for breach of contract, breach of implied covenant of good faith and fair dealing,

CONFIDENTIAL

unjust enrichment, declaratory relief, and negligent misrepresentation.  This action was filed in response to the August 7, 2007 complaint filed by the IHHI against Mr. Weiss.  IHHI does not believe that Mr. Weiss' allegations have merit or that his cross-complaint will have a material adverse impact on the Company.

On August 29, 2007, IHHI filed suit in Orange County against Intercoastal Medical Management, Inc., Maximum Healthcare, Inc. and Fred Siembieda for defamation, breach of contract, breach of fiduciary duty, intentional interference with prospective economic advantage, and violation of Business and Professions Code Section 17200.  Recently, Intercoastal Medical Management, Inc., Maximum Healthcare, Inc. and Fred Siembieda filed a cross-complaint against IHHI alleging negligent and intentional interference with prospective business advantage. IHHI does not believe that the allegations in the cross-complaint have merit or that the cross-complaint will have a material adverse impact on the Company.

SCHEDULE 3.12 - 3

**JAE 0591**

## SCHEDULE 3.13

## BROKERS

None

**JAE 0592**

CONFIDENTIAL

SPCP_0000004895

## SCHEDULE 3.14

## INTELLECTUAL PROPERTY

None of the Borrowers or other Credit Parties are aware of any infringing or interfering with any Intellectual Property of any other Person which could reasonably be expected to have a Material Adverse Effect.

Copyrights:  None

Patents:  None

Trademarks:  None

Licenses:  None

SCHEDULE 3.14 - 1

**JAE 0593**

CONFIDENTIAL

SPCP_0000004896

## SCHEDULE 3.16

## ENVIRONMENTAL MATTERS

To the knowledge of the Borrowers and Credit Parties, any use, manufacturing, handling, generating, transporting, storing, treating, discharging, releasing, burying, or disposing of hazardous materials is in compliance with all Environmental Laws.

SCHEDULE 3.16 - 1

**JAE 0594**

CONFIDENTIAL

SPCP_0000004897

**SCHEDULE 3.17**

**[As of the Closing Date]**

**INSURANCE**

| Policy Type | Insured | Insurer | Policy Limit |
|---|---|---|---|
| 1. Executive and Organization Liability | Integrated Healthcare Holdings, Inc. | National Union Fire Insurance Co. of Pittsburgh, Pa. (AIG) | $10,000,000 aggregate |
| 2. Excess Financial Products | Integrated Healthcare Holdings, Inc. | Navigators Insurance Company | $5,000,000 aggregate |
| 3. Worker's Compensation and Employers' Liability | Integrated Healthcare Holdings, Inc. | Delos Insurance Company | Statutory limits |
| 4. Commercial Auto | Integrated Healthcare Holdings, Inc. | Hartford Fire Insurance Company | $1,000,000 per accident |
| 5. Crime Insurance | Integrated Healthcare Holdings, Inc. | Hartford Fire Insurance Company | $5,000,000 (except $50,000 limit for money orders and counterfeit currency) |
| 6. Flood; Earthquake; Earthquake Sprinkler Leakage | Integrated Healthcare Holdings, Inc. | Lexington Insurance Company as primary insurer, together with several participating insurers | $50,000,000 aggregate |
| 7. Employed Lawyers Professional Liability | Integrated Healthcare Holdings, Inc. | Executive Risk Indemnity, Inc. | $2,000,000 ($500,000 defense sublimit) |
| 8. Employment Practices Liability | Integrated Healthcare Holdings, Inc. et. al. | Lloyd's, London; Executive Risk Specialty (Chubb) | $10,000,000 each claim/annual aggregate - total limit |
| 9. Excess Liability | Integrated Healthcare Holdings, Inc. | Homeland Insurance Company of New York (OneBeacon) | $5,000,000 |
| 10. Fiduciary | Integrated Healthcare | Federal Insurance | $5,000,000 |

SCHEDULE 3.17 - 1

**JAE 0595**

CONFIDENTIAL

| Policy Type | Insured | Insurer | Policy Limit |
|---|---|---|---|
| Liability | Holdings, Inc. | Company (Chubb) | |
| 11.  Hospital Liability | Integrated Healthcare Holdings, Inc.; Southern California Healthcare Registry, Inc.; WMC-SA, Inc.; WMC-A, Inc.; Coastal Communities Hospital, Inc.; Chapman Medical Center, Inc. | Lexington Insurance Company | $20,000,000 |
| 12.  A-Side Directors and Officers Liability | Integrated Healthcare Holdings, Inc. | Westchester Surplus Lines Insurance Company | $5,000,000 |
| 13.  Property Insurance | Integrated Healthcare Holdings, Inc., et al and its affiliated or subsidiary organizations and Pacific Coast Holdings Investment, LLC | Continental Casualty Company (CNA) | $200,000,000 blanket all coverages maximum any one occurrence |

SCHEDULE 3.17 - 2

**JAE 0596**

**SCHEDULE 3.18**

**[As of the Closing Date]**

**Deposit and Disbursement Accounts**

Wells Fargo Bank
2030 Main Street, Suite 900
Irvine, CA  92614
Attn: Nathan Smith
T: (949) 251-4162

### LIST OF DEPOSIT ACCOUNTS

| | | |
|---|---|---|
| WMC-SA, INC. (Patient Deposit Account) | 4121-451496 | 55-0883862 |
| WMC-A, INC. (Patient Deposit Account) | 4121-451504 | 55-0883859 |
| Chapman Medical Center, Inc. (Patient Deposit Account) | 4121-451520 | 55-0883864 |
| Coastal Communities Hospital, Inc. (Patient Account) | 4121-451512 | 55-0883863 |
| WMC-SA, INC. (Main Account) | 4121-451538 | 55-0883862 |
| WMC-A, INC. (Main Account) | 4121-451546 | 55-0883859 |
| Chapman Medical Center, Inc. (Main Account) | 4121-451561 | 55-0883864 |
| Coastal Communities Hospital, Inc. (Main Account) | 4121-451553 | 55-0883863 |
| WMC-SA, INC. (Government Deposit Account) | 4121-451579 | 55-0883862 |
| WMC-A, INC. (Government Deposit Account) | 4121-451587 | 55-0883859 |
| Chapman Medical Center, Inc. (Government Deposit Account) | 4121-451603 | 55-0883864 |
| Coastal Communities Hospital, Inc. (Government Deposit Account) | 4121-451595 | 55-0883863 |
| Integrated Healthcare Holdings, Inc. (Main Account) | 4121-451439 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (Accounts Payable) | 4121-451454 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (Patient Refunds) | 4121-451462 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (Payroll Account) | 4121-451447 | 87-0573331 |
| Integrated Healthcare Holdings, Inc. (EE Healthcare Claims) | 4121-505994 | 87-0573331 |

SCHEDULE 3.18 - 1

**JAE 0597**

CONFIDENTIAL

**SCHEDULE 3.20**
**Bonding; Licenses; Permits**

**WESTERN MEDICAL CENTER SANTA ANA**
**LICENSES AND PERMITS**
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| **Federal** | | | | |
| Controlled Substance Registratration Certificate | WMC | US Dept. of Justice, Drug Enforcement Administration | BW9321251 | 5/31/2008 |
| Certificate of Accreditation (CLIA) | WMC-SA, Inc (IHHI) | Centers for Medicare & Medicaid Services ("CMS") | CLIA  #05D0581257 | 2/9/07-2/8/09 |
| Certificate of Waiver (CLIA) | Family Health Center-Tustin | Centers for Medicare & Medicaid Services ("CMS") | CLIA #05D0951293 | 9/15/06-9/14/08 |
| Certificate of Accreditation (CLIA) | WMC- ABG Lab | Dept. of Health & Human Services - Health Care Financing Adminstration ("HCFA") | CLIA #05D0870670 | 4/8/07-4/6/08 |
| Radio Station License | WMC | Federal Communications Commission | Call Sign WNNL692 | 3/17/04-1/24/14 |
| **State** | | | | |
| Hospital License | WMC-SA, Inc. | State of CA - Dept of Health Services | 60000188 | 3/8/07-3/7/08 |
| Hospital Inpatient Pharmacy Permit | WMC Pharmacy | State of CA - Board of Pharmacy | HSP 46984 | 6/1/2008 |
| Clinical Laboratory License | WMC-SA, Inc. | State of CA - Dept of Health Services | CLIA#05D0581257 Lab ID#: CLF1274 | 4/8/07-4/6/08 |
| Clinical Laboratory Registration | Family Health Center-Tustin | State of CA - Dept of Health Services | CLIA 05D0951293 Lab ID#CLR324081 | 4/8/06-4/6/08 |
| Provisional Tissue Bank License | WMC | State of CA - Dept of Health Services | CNC 80315 | 8/7/07 - 8/6/08 |
| License for the Production of Biologics | WMC | State of CA - Dept of Health Services | Blood Bank ID #9485 | 6/27/07-6/26/08 |
| Permit to Operate Steam Boiler (#8304-75; NB31053) | WMC | State of CA - Dept. of Industrial Relations | 52543 | 6/14/2008 |
| Permit to Operate Steam Boiler (#8303-75; NB31052) | WMC | State of CA - Dept. of Industrial Relations | 52539 | 6/7/2008 |
| EPA Identification | WMCSA | State of CA - Dept of Toxic Substances Control | CAL000292871 | Issued 4/6/05 (Active) |

SCHEDULE 3.20 - 1

**JAE 0598**

CONFIDENTIAL

## WESTERN MEDICAL CENTER SANTA ANA
## LICENSES AND PERMITS
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| Underground Storage Tank Facility Upgrade Compliance Certificate | Not Shown | State of CA | CA CERT. # 10211 | Not Shown (Active) |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A020385-97 NB# 517513 | 4/16/2012 |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A020386-97 NB# 48235J | 4/16/2012 |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A013814-75 NB#145935 | 4/12/2010 |
| Permit to Operate Air Pressure Tank | WMC | State of CA - Dept of Industrial Relations | Serial #A013815-75 NB#683547 | 4/12/2010 |
| Renewal of Radiation Machine(s) (Tubes) Registration | WMCSA | State of CA- Health and Human Services Agency | FAC00007150 | 6/30/2008 |
| Radioactive Material License | Tenet Health System dba WMCSA (no name change) | State of CA -Health & Welfare Agency | 0231-30 (amendment 36) | 9/10/2011 |
| Permit to Operate a Conveyance | WMCSA | State of CA - Dept of Industrial Relations | Conveyance #105816 | 2/13/2008 |
| Permit to Operate a Conveyance | WMCSA | State of CA - Dept of Industrial Relations | Conveyance #060615 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060608 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060607 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060463 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator # 060464 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #060609 | 10/19/2007 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #103144 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #103148 | 1/22/2008 |
| Permit to Operate an Elevator | WMCSA | State of CA - Dept of Industrial Relations | Elevator #103147 | 1/22/2008 |
| Heliport Permit | WMC Heliport | State of CA - Dept of Transportation | Ora-041 (H) | Issued 4/26/05 (Active) |

SCHEDULE 3.20 - 2

**JAE 0599**

SPCP_0000004902

## WESTERN MEDICAL CENTER SANTA ANA
### LICENSES AND PERMITS
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| **Regional** | | | | |
| Permit to Operate Internal Combustion Engine | Santa Ana-Tustin Community Hospital | South Coast Air Quality Management District | S02138 | Issued 7/19/1978 (Active) |
| Permit to Operate Diesel Engine | Santa Ana-Tustin Community Hospital | South Coast Air Quality Management District | S02139 | Issued 7/19/1978 (Active) |
| Permit to Operate Boiler | WMCSA | South Coast Air Quality Management District | D61557 | Issued 9/3/1992 (Active) |
| Permit to Operate Boiler | WMCSA | South Coast Air Quality Management District | F49130 | Issued 2/16/2002 (Active) |
| Permit to Construct/Operate UST | WMCSA | South Coast Air Quality Management District | M93837 | Issued 7/4/1990 (Active) |
| **County** | | | | |
| Medical Waste Generator Registration | WMCSA (IHHI) | County of Orange - Health Care Agency | PR0052569 | Active (void with change of ownership) |
| Health Permit - Hospital & Skilled Nursing Kitchen | WMC-SA | County of Orange- Health Care Agency | PR0002432 | Issued 3/8/05 (Active) |
| **City/Local** | | | | |
| Class II Permit - Discharge of Domestic Wastewater | WMCSA | Orange County Sanitation District | 1-2-018 | 3/1/2006 - 2/28/2009 |
| Underground Storage Tank Permit | WMCSA | City of SA Fire Prevention Bureau | 2006-074 | 1/1/2006 - 12/31/06 |
| Business License | WMC | City of Santa Ana | 311821 | 4/1/07 - 3/31/08 |
| **Other** | | | | |
| Certificate of Accreditation | WMCSA | JCAHO | | 2005-2008 |
| Certificate of Accreditation | WMCSA FHC-Tustin | JCAHO | | 2005-2008 |

SCHEDULE 3.20 - 3

**JAE 0600**

CONFIDENTIAL

## WESTERN MEDICAL CENTER SANTA ANA
## LICENSES AND PERMITS
*As of the Closing Date*

| Type of Permit/License | Entity Name | Licensing Agency | Permit / License No. | Term / Expiration |
|---|---|---|---|---|
| Accredited Laboratory | WMC | The College of American Pathologists | LAP #2342601 AU-ID 1187898 | 11/8/2007 |
| Accredited Laboratory (Blood Gas Laboratory) | WMC | The College of American Pathologists | LAP #2342603 AU-ID 1362203 | 11/8/2007 |
| Certificate of Accreditation (Transfusion Activities & Donor Center Activities) | WMC | American Assoc. of Blood Banks | None Shown | 12/30/2007 |

SCHEDULE 3.20 - 4

**JAE 0601**

SPCP_0000004904

## CHAPMAN MEDICAL CENTER
## LICENSE/PERMIT LIST
### [As of the Closing Date]

| TYPE OF LICENSE/PERMIT | ENTITY NAME | LICENSING AGENCY | LICENSE/PERMIT NUMBER | EXPIRATION DATE |
|---|---|---|---|---|
| Accreditation | Chapman Medical Center, Inc. | The Joint Commission | 10002 | 2/8/10 |
| Accreditation | Chapman Medical Center - Main Laboratory | The College of American Pathologist (CAP) | 2340401 | 11/8/07 |
| Accreditation (CLIA) | Chapman Medical Center Laboratory | Centers for Medicare and Medicaid Services | 05D079232 | 2/8/09 |
| Business License Tax Certificate – General Medical and Surgical Hospital | Chapman Medical Center, Inc. | City of Orange | I-115444-L | 2/28/08 |
| Business License Tax Certificate – Gift, Novelty and Souvenir Shops | Chapman Medical Center, Inc. | City of Orange | I-115445-L | 2/28/08 |
| Business License Tax Certificate – Health & Allied Services | Chapman Family Health Center | City of Orange | I-115447-L | 2/28/08 |
| Business License Tax Certificate – Lessors of Real Property (MOB) | Chapman Medical Center, Inc. | City of Orange | I-117535-X | 2/28/08 |
| Business License Tax Certificate – Offices/Clinics | Chapman Medical Center, Inc/Lung Center | City of Orange | I-115446-L | 2/28/08 |
| California Environmental Identification Number | Chapman Medical Center | Department of Toxic Substance Control | CAL000292874 | Ongoing |
| Class II Permit – Discharge of Domestic Wastewater | Chapman Medical Center | Orange County Sanitation District | 2-2-259 | 7/31/09 |
| Clinical Laboratory License | Chapman Medical Center Laboratory | State of California Department of Health Services | CLF 1757 | 4/6/08 |

SCHEDULE 3.20 - 5

**JAE 0602**

CONFIDENTIAL

| TYPE OF LICENSE/PERMIT | ENTITY NAME | LICENSING AGENCY | LICENSE/PERMIT NUMBER | EXPIRATION DATE |
|---|---|---|---|---|
| Clinical Laboratory License | Chapman Medical Center Cardiopulmonary Laboratory | State of California Department of Health Services | CLF 3420 | 12/31/07 |
| Continuing Education Provider | Chapman Medical Center | California State Board of Registered Nursing | CEP 3303 | 11/30/08 |
| Controlled Substance Registration Certificate | Chapman Medical Center, Inc. | United States Department of Justice – Drug Enforcement Administration | BC9321237 | 8/31/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 107135 – 1Lobby | 6/13/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 107242 – Pass#3 | 6/13/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 107229 – 2Staff | 6/13/08 |
| Conveyance Permit (Elevator) | Chapman Medical Center | State of California DOSH – ERT Unit | 074718 - #2 Lft | 6/15/08 |
| Fire Code Permit | Chapman Medical Center | Orange Fire Department | 3587 | 9/2007 – Renewal in process |
| General Acute Care Hospital | Chapman Medical Center, Inc. | State of California Department of Health Services | 060000097 | 3/7/08 |
| Health Permit – Hospital/ Skilled Nursing Kitchen | Chapman Medical Center, Inc. | County of Orange Health Care Agency | PR0002457 | Ongoing |
| Hospital Pharmacy Permit | Chapman Medical Center | California State Board of Pharmacy | HSP 46986 | 7/1/08 |
| Internal Combustion Engine – Permit to Operate | Chapman General Hospital | South Coast Air Quality Management District | R-D87488 | 6/30/08 |
| Medi-Cal Provider Number – Inpatient | Chapman Medical Center | Department of Health Services | HSC30550H | Ongoing |
| Medi-Cal Provider Number – Outpatient | Chapman Medical Center | Department of Health Services | HSP40550H | Ongoing |

SCHEDULE 3.20 - 6

**JAE 0603**

CONFIDENTIAL

| TYPE OF LICENSE/PERMIT | ENTITY NAME | LICENSING AGENCY | LICENSE/PERMIT NUMBER | EXPIRATION DATE |
|---|---|---|---|---|
| Medi-Cal Provider Number – SNF DP/Subacute | Chapman Medical Center | Department of Health Services | LTC70108G | Ongoing |
| Medical Waste Generator Registration | Chapman Medical Center | County of Orange Health Care Agency | PR0052710 | Ongoing |
| Medicare Provider Number – Acute Care | Chapman Medical Center | Department of Health and Human Services – Center for Medicare and Medicaid Services | 05-0745 | Ongoing |
| Medicare Provider Number – Psychiatric | Chapman Medical Center | Department of Health and Human Services – Center for Medicare and Medicaid Services | 05-S745 | Ongoing |
| Medicare Provider Number – Subacute | Chapman Medical Center | Department of Health and Human Services – Center for Medicare and Medicaid Services | 55-5709 | Ongoing |
| Paramedic Receiving Center Designation | Chapman Medical Center | County of Orange Health Care Agency – Emergency Medical Services | N/A | 12/31/09 |
| Permit to Operate Steam Boiler | Chapman Medical Center | State of California DOSH, Pressure Vessel Unit | B016135-03 | 6/20/08 |
| Permit to Operate Steam Boiler | Chapman Medical Center | State of California DOSH, Pressure Vessel Unit | B016136-03 | 7/2/08 |
| Radio Station Authorization | Chapman General Hospitals, Inc. | Federal Communications Commission | WPTV461 | 12/21/11 |
| Radioactive Material License | Chapman Medical Center | State of California Health and Welfare Agency | 1946-30 | 11/4/11 |
| Seller's Permit | Chapman Medical Center, Inc. | California State of Equalization | 100-546210 | Ongoing |

SCHEDULE 3.20 - 7

**JAE 0604**

SPCP_0000004907

## COASTAL COMMUNITIES HOSPITAL LIST OF LICENSES AND PERMITS
### [As of the Closing Date]

| Type of Permit/License | Entity name | Licensing Agency | Permit/ License No. | Term | | |
|---|---|---|---|---|---|---|
| **FEDERAL** | | | | | | |
| Certificate of Accreditation | Coastal Comm Hosp Cardiopulmonary Dept. | Centers for Medicare & Medicaid Services | CLIA ID #05D0687344 | 1/3/2007-1/2/2008 | | |
| Certificate of Accreditation | Coastal Communities Hospital (Lab) | Centers for Medicare & Medicaid Services | CLIA ID #05D0581023 | 1/3/2007-1/2/2009 | | |
| Controlled Substances Registration Certificate | Coastal Communities Hospital | US Dept. of Justice Drug Enforcement Administration | BC9321225 | 7/6/2005-8/31/2008 | | |
| Certified Mammography Facility | Coastal Communities Hospital | US Dept. of Health & Human Services, Food and Drug Administration | ID #168443 | 7/7/2008 | | |
| Radio Station Authorization | Coastal Communities Hospital | Federal Communications Commission | Call Sign KVP665 | 6/5/03-5/27/2013 | | |
| Radio Station Authorization | Coastal Communities Hospital | Federal Communications Commission | Call Sign WPZF286 | 1/6/2004-1/6/2014 | | |
| **STATE** | | | | | | |
| Hospital License | Health Resources Corp. of America - California | State of California Department of Health Services | 60000143 | 3/8/2007-3/7/2008 | | |
| Clinical laboratory License - Cardio Pulmonary Dept. | Coastal Communities Hospital | State of California Department of Health Services | CLIA #05D0687344 Lab ID #CLF2421 | 4/8/2007-4/6/2008 | | |
| Clinical Laboratory License | Coastal Communities Hospital LP | State of California Department of Health Services | CLIA #05D051023 Lab ID #CLF2421 | 4/6/2008 | | |
| Hospital Inpatient Pharmacy Permit | Coastal Communities Hospital LP | State of California Department of Health Services | HSP 46985 | Expires 7/1/2008 | | |

SCHEDULE 3.20 - 8

**JAE 0605**

CONFIDENTIAL

SPCP_0000004908

| Type of Permit/License | Entity name | Licensing Agency | Permit/ License No. | Term | | |
|---|---|---|---|---|---|---|
| Mammography X-Ray Equipment and Facility Accreditation Certificate | Coastal Communities Hospital LP | State of California Department of Health Services | 6529 | 7/7/2005-7/7/2008 | | |
| Radiation Machine(s) (Tubes) Registration (X-Ray) | Coastal Communities Hospital LP | State of California Department of Health Services | Clearance #C0035844 | Unknown | | |
| Permit to Operate Steam Boiler (16131-02;NB43707) | Coastal Communities Hospital LP | State of California Department of Industrial Relations | 52556 | 6/12/2006-6/12/2007 | Insurance inspection scheduled for 10/10/07 | |
| Permit to Operate Steam Boiler (21837-95;NB45570) | Coastal Communities Hospital LP | State of California Department of Industrial Relations | 52557 | 6/5/2005-6/5/2007 | | |
| Radioactive Material License | Coastal Communities Hospital LP | State of California Department of Health Services | 2530-30 Docket #050704-2530 Unexpires | Open - Approval Pending | | |
| **REGIONAL** | | | | | | |
| Internal Combustion Engine - Em Elec. Gen. Diesel Permit | Coastal Communities Hospital LP | South Coast Air Quality Management District | D66934 | Exp. 5/16/07 - new certificate not yet received | | |
| **COUNTY** | | | | | | |
| Hazardous Materials Permit | Coastal Communities Hospital | County of Orange Health Care Agency, Environmental Health Division | PR0058065 PR0052836 | Termination 6/30/2008 | | |
| Food Facility Inspection | Coastal Communities Hospital | County of Orange Environmental Health Food Protection Program | F042-16.1258 | Effective 3/28/05 | | |
| Health Permit | Coastal Communities Hospital | Orange County Health Care Agency, Public Health | PR0002455 | Effective 7/26/2007 | | |
| **CITY/LOCAL** | | | | | | |
| Business License | Coastal Communities Hospital | City of Santa Ana | #311810 | Expires 3/31/2008 | | |

SCHEDULE 3.20 - 9

**JAE 0606**

CONFIDENTIAL

| Type of Permit/License | Entity name | Licensing Agency | Permit/ License No. | Term | | |
|---|---|---|---|---|---|---|
| Underground Storage Tank Facility Upgrade Compliance Certificate | Coastal Communities Hospital | Santa Ana Fire Department Underground Tank Division | #10243 | 12/31/2007 | | |
| Blood Gas Proficiency Testing Program | Coastal Communities Hospital LP | California Thoracic Society | N/A | N/A | | |
| Pathology and Clinical Laboratory Services | Coastal Communities Hospital LP | JCAHO | CLIA Cert. #05D05/1023 | 3/23/2008 | | |
| Mammographic Imaging Services Accreditation | Coastal Communities Hospital LP | American College of Radiology | MAP ID #11291-02 | 7/7/2008 | | |
| Certificate of Accreditation | Coastal Communities Hospital LP | JCAHO | None | 8/11/2005; 3 years | | |
| Certificate of Accreditation | Coastal Communities Hospital LP - Long Term Care | JCAHO | None | 8/11/2005; 3 years | | |
| Certificate of Accreditation | Coastal Communities Hospital LP - Laboratory | JCAHO | None | 3/23/06; 2 years | | |

## WMC-SA LIST OF LICENSES AND PERMITS
### [As of the Closing Date]

| | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| items in Blue: waiting on updated license to be received; | | | | | | |
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Armored Car | AT Systems, Inc. | Fireman's Fund McGee | MXI 98301323 | 10/1/06-10/1/07 | Admitting | Armored Transport |
| Articles of Incorporation | WMCA | Secretary of State | n/a | issued: 10/5/04 | Admin | Articles of Incorporation |
| Business Tax Receipt & Certification Form | WMCA | City of Anaheim, Business License Division | BUS2005-00805 | 4/6/05-3/8/08 | Admin | Bus Tax Cert |

SCHEDULE 3.20 - 10

**JAE 0607**

SPCP_0000004910

| items in Blue: waiting on updated license to be received; | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Certificate of Accreditation | Respiratory Therapy | State of California | 05D0665455 | 2/28/05-2/27/08 | Respiratory | CLIA |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Children & Families Commission of Orange County | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: County of Orange Healthcare (EMS) | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: David L. & Grace E. Arnold | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Kaiser Permanente | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Regional Center of Orange County | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Liability | WMCA | Haake Companies | Certificate Holder: Shaw Properties | 3/8/07-3/8/08 | Admin | Insurance |
| Certificate of Registration (Sealer of Weights & Measures) | WMCA | County of Orange; Public Facilities & Resources Dept. | WO-04009.5 | Current | Nutritional Svs | Weights and Measures |
| Clinical Laboratory Registration | WMCA | State of California; Dept of Health Services | 05D0665674 | 4/8/05-4/7/08 | Lab | CLIA |
| Controlled Substance Registration Certificate | WMCA | US Department of Justice; Drug Enforcement Admin | BW9913509 | 8/4/06-5/31/09 | Pharmacy | DEA |
| Conveyance Permit (#2REAR) | WMCA | State of California, Dept of Industrial Relations | 055945 | 8/10/05-8/10/06 | Eng | Conveyance Permit |
| Conveyance Permit (D/W) | WMCA | State of California, Dept of Industrial Relations | 055945 | 8/10/05-8/10/06 | Eng | Conveyance Permit |

SCHEDULE 3.20 - 11

**JAE 0608**

CONFIDENTIAL

| items in Blue: waiting on updated license to be received: | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Conveyance Permit (Pass) | WMCA | State of California, Dept of Industrial Relations | 095849 | 8/10/05-8/10/06 | Eng | Conveyance Permit |
| CUPA Consolidated Permit | WMCA | Anaheim Fire Prevention Division | Facility Case #FEB-0000014 | None Listed | Eng. | Anaheim Fire Department |
| Fire Alarm and Life Safety System Inspection | WMCA | CalProtection Inc. | | Certificate Inspection: 9/27/07 | Eng. | Fire |
| Fire Code Permit | WMCA | Anaheim Fire Prevention Division | Case No. FIS-0000248 | Expires 10/31/08 | | Anaheim Fire Department |
| Health Certificate | WMCA | Orange County Health Care Agency | PR0002433 (issued 4/5/04) | last inspection: 1/8/07 | Nutritional Svs | County of Orange, Food Safety |
| Hospital Pharmacy Permit | WMCA | State of California, Board of Pharmacy | HSP 46983 | expires: 6/1/08 | Pharmacy | DEA |
| Internal Combustion Engine and Storage Tank Fuel Oil Permit Renewals | WMCA | South Coast Air Quality Management District | D25594; D51240; D54936; D61143 | 5/16/2003-6/1/2004 | Eng | |
| JCAHO | WMCA | Joint Commission | n/a | 2005-2008 | Admin | JCAHO Certificate |
| Liability Insurance | WMCA | Haake Companies | Gen Liab - HCF4000877; Excessive Liab - HCF4000878; MalPractice HCF4000877 | 3/8/07-3/8/08 | Admin | Insurance |
| License, Hospital | WMCA | State of California; Dept of Health Services | 060000117 | 3/08/07-3/07/08 | Admin | DHS License |
| Medical Waste Generator Registration | WMCA | County of Orange Health Care Agency, Environmental Health Medical Waste Management Program | PR0052531; Record ID FA0044738 | expires 6/30/08 | Eng | Permit for Medical Waste |

SCHEDULE 3.20 - 12

**JAE 0609**

SPCP_0000004912

| items in Blue: waiting on updated license to be received: | | | | | **updated:** | **10/11/07-kp** |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Medical Waste Generator Registration | WMCA | State of California | | | EVS | Permit for Medical Waste |
| Medicare/Medicaid | WMCA | Dept of Health & Human Services | 05-0744 - Medicare; '05-S744 - Psych | effective 3/8/05 | Admin | Medicare - Medicaid |
| MSERC | WMCA | South Coast Air Quality Management District | n/a | STERC - expires 12/31/06; R1612 - expires 12/20/07 | Eng. | SC Air Quality Management |
| Permit to Operate Air Pressure Tank (Compression Room) | WMCA | State of California | Serial #A021849-91 N.B#/SER#893998 | 12/19/05-12/18/10 | Eng. | Air Pressure Tank |
| Permit to Operate Air Pressure Tank (DX Room) | WMCA | State of California | Serial #A020310-96, N.B#/SER#42032; | 12/19/05-12/18/10 | Eng. | Air Pressure Tank |
| Permit to Operate Air Pressure Tank (DX Room) | WMCA | State of California | Serial #A020309-96 N.B#/SER#93797F | 12/19/05-12/18/10 | Eng. | Air Pressure Tank |
| Permit to Operate an Elevator | WMCA | State of California, Dept of Industrial Relations | 55944 | expires 8/10/06 | Eng | Conveyance Permit |
| Permit to Operate an Elevator | WMCA | State of California, Dept of Industrial Relations | 55945 | expires 8/10/06 | Eng | Conveyance Permit |
| Permit to Operate an Elevator | WMCA | State of California, Dept of Industrial Relations | 55946 | expires 8/10/06 | Eng | Conveyance Permit |
| Permit to Operate Underground Storage Tank | WMCA | Anaheim Fire Dept | Permit #248 | 9/8/03-9/7/08 | Eng. | Anaheim Fire Department |
| Radiation Machine(S) (Tubes) Registration | WMCA | Dept of Health & Human Services | | due 5/29/04 | Radiology | Radiation Machine Registration |

SCHEDULE 3.20 - 13

**JAE 0610**

CONFIDENTIAL

| items in Blue: waiting on updated license to be received: | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Radio Station Authorization | WMCA | Federal Communications Commission | WPJJ629; File #0000448947 | 5/4/01-6/29/01 | Eng. | Radio |
| Radio Station License | WMCA | Federal Communications Commission | WNYJ717, File #9701R187068 | 1/17/97-1/30/02 | Eng. | Radio |
| Radioactive Materials License | WMCA | State of California - Dept of Health & Human Services | 2431-30 | 12/1/04-11/30/05* | Radiology | Radioactive Materials License Unit |
| Recycle - Four Ft. Fluorescent Lamps | Veolia Environmental Services (Grainger/Recycle Paks) Serial #081988500597112 | Veolia Environmental Services | AZ0000337360 | date: 6/26/06 | Eng | Engineering |
| Recycle - Four Ft. Fluorescent Lamps | Veolia Environmental Services (Grainger/Onyx Paks) Serial #081988500596467 | Veolia Environmental Services | AZ0000337360 | date: 5/18/06 | Eng | Engineering |
| Sellers permit | WMCA | California State Board of Equalization | 100-542563 | issued 3/1/05 (doesn't expire) | | Seller's Permit |
| Services Inventory | WMCA | informational only | | | | Service Inventory |
| South Coast Air Quality Permit | WMCA | South Coast Air Quality Mgnt District | I.C.E. - D25594, D54936, D51143; Storage Tank Fuel Oil D51240 | exp 5/30/07 | Eng | SC Air Quality Management |

SCHEDULE 3.20 - 14

**JAE 0611**

SPCP_0000004914

| items in Blue: waiting on updated license to be received: | | | | | updated: | 10/11/07-kp |
|---|---|---|---|---|---|---|
| **Type of Permit/License** | **Entity Name** | **Licensing Agency** | **Permit/License No.** | **Term** | **Dept** | **TAB** |
| Vehicle Registration | WMCA | Hartford Fire Insurance | 1994 Chevy Cavalier VIN1G1JC5444R7172003 | 3/8/07-3/8/08 | Eng. | Insurance |
| Vehicle Registration | WMCA | DMV | 1994 Chevy Cavalier VIN 1G1JC5444R7172003 | 4/8/07-4/8/08 | Eng | Insurance |
| Vehicle Registration | WMCA | Hartford Fire Insurance | 1997 Ford   VIN 1FTHE24L4VHA73594 | 3/8/07-3/8/08 | Eng | Insurance |
| Vehicle Registration | WMCA | DMV | 1997 Ford   VIN 1FTHE24L4VHA73594 | 1/31/07-1/31/08 | Eng | Insurance |
| Weighmaster License | Stericycle | Dept of Food and Agriculture | 009533 | expires 8/24/07 | EVS | CDFA, Weighmaster License |

SCHEDULE 3.20 - 15

**JAE 0612**

CONFIDENTIAL

SPCP_0000004915

## SCHEDULE 6.3

## [As of the Closing Date]

## INDEBTEDNESS

Revolving Credit Agreement ($50,000,000 Facility) dated October 9, 2007 by and among
Medical Provider Financial Corporation I and the Credit Parties.

Credit Agreement ($10,700,000 Facility) dated October 9, 2007 by and among Medical Provider
Financial Corporation III and the Credit Parties.

Credit Agreement ($80,000,000 Facility dated October 9, 2007 by and among Medical Provider
Financial Corporation II and the Credit Parties.

Account Purchase Agreement dated March 9, 2005 by and between Medical Provider Financial
Corporation I and WMC-SA, Inc., WMC-A, Inc., Coastal Communities Hospital, Inc. and
Chapman Medical Center, Inc.

Additional PCHI Indebtedness: None

Additional OC-PIN Indebtedness:

> Loan to Dr. Surinder Dang, a member of OC-PIN, in the amount of $25,000

> Loan to Dr. Yasser Salem, a member of OC-PIN, in the amount of $200,000

> Loan to Dr. Syed Naqvi, a member of OC-PIN, in the amount of $200,000

Additional West Coast Holdings, LLC Indebtedness: None

CONFIDENTIAL                                                                                  SPCP_0000004916

## SCHEDULE 6.4

### [As of the Restatement Effective Date]

### TRANSACTIONS WITH AFFILIATES AND EMPLOYEES

Rescission, Restructuring and Assignment Agreement dated January 27, 2005 by and among IHHI, Kali P. Chaudhuri, M.D., William E. Thomas, and Dr. Anil V. Shah, M.D.

Amendment to Amended and Restated Triple Net Hospital Building Lease between Pacific Coast Holdings Investment, LLC and Integrated Healthcare Holdings, Inc. dated March 27, 2009.

IHHI (as Sublessor) subleases portions of the Premises (as such term is defined in the Triple Net Lease) known as Western Medical Center-Anaheim to WMC-A, Inc. (as Sublessee), WMC-SA, Inc., and Coastal Communities Hospital, Inc. pursuant to Subleases with those entities.

Settlement Agreement, General Release and Covenant Not to Sue dated April 2, 2009 by and among IHHI, Orange County Physicians Investment Network LLC, Anil V. Shah, M.D., Bruce Mogel, Pacific Coast Holdings Investment, LLC, West Coast Holdings LLC, Kali P. Chaudhuri, M.D., Ganesha Realty LLC, William E. Thomas, and Medical Capital Corporation and related entities.

Stock Purchase Agreement dated April 2, 2009 by and among IHHI, Kali P. Chaudhuir, M.D., Anil V. Shah, M.D., and Orange County Physicians Investment Network LLC.

Acknowledgement, Waiver and Consent and Amendment to Credit Agreements dated April 2, 2009 by and among IHHI and its subsidiaries, Pacific Coast Holdings Investment LLC, Orange County Physicians Investment Network LLC, Ganesha Realty LLC, West Coast Holdings LLC, and Medical Capital Corporation and related entities.

Amended and Restated Memorandum of Understanding dated January 13, 2010 by and among IHHI, Dr. Chaudhuri and KPC Resolution Company LLC, an affiliate of Dr. Chaudhuri.

Omnibus Credit Agreement Amendment dated April 13, 2010 by and among the Company, SPCP Group IV, LLC and SPCP Group, LLC, Silver Point Finance, LLC, PCHI, Ganesha, Dr. Kali P. Chaudhuri and KPC Resolution Company.

The Amendment and Restatement Agreement, this Agreement and all other Loan Documents, dated as of the Restatement Effective Date, by and among IHHI, WMC-A, Inc., WMC-SA, Inc., Coastal Communities Hospital, Inc., Chapman Medical Center, Inc., Pacific Coast Holdings Investment, LLC, Ganesha Realty, LLC, SPCP Group IV, LLC, SPCP Group, LLC and Silver Point Finance, LLC.

JAE 0614

CONFIDENTIAL

SPCP_0000004917

## SCHEDULE 6.7

## EXISTING LIENS

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|------|--------------|---------|------------------|
| **INTEGRATED HEALTHCARE HOLDINGS, INC.** | NEVADA | UCC-1 # 2007033418-0<br>Filed:  10-9-07<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 20120224607<br>Filed: 8-21-12<br>Continuation | 3150M-U Magnitude MRI System |
| | | UCC-1 2007039734-6<br>Filed: 12-3-07<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Hespironics Hospital Capital Services<br><br>UCC-3 # 2012029331-1<br>Filed:  11-6-12<br>Continuation | Espirit Ventilators |
| | | UCC-1 # 2008001595-8<br>Filed:  1-16-08<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 2012029383-0<br>Filed:  11-7-12<br>Continuation | Servo I Adult Ventilation Systems;<br>Servo I Universal Ventilation Systems |

SCHEDULE 6.7 - 1

**JAE 0615**

CONFIDENTIAL

SPCP_0000004918

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 2008023016-8<br>Filed: 7-24-08<br>Secured Party: National City Commercial Capital Company, LLC | Rental Schedule 112553000 to Master Lease Agreement dtd 3-15-2008 |
| | | UCC-1 # 2008026858-5<br>Filed: 8-28-08<br>Secured Party: National City Commercial Capital Company, LLC | Rental Schedule 109977000 to Master Lease Agreement dtd 3-15-2008 |
| | | UCC-1 # 2008028454-1<br>Filed:         9-15-08<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P. | Battery drive set |
| | | UCC-1 # 2010019980-0<br>Filed 8-10-10<br>Secured Party:  Midcap Financial LLC, as Agent | All assets |
| | | UCC-1 # 2010020384-9<br>Filed 8-12-10<br>Secured Party:  Midcap Financial LLC, as Agent | All Assets |
| | | UCC-1 #2010020385-1<br>Filed 8-12-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 2010021225-4<br>Filed 8-25-10<br>Termination<br><br>UCC-3 #2010021378-7<br>Filed 8-26-10<br>Correction | All Assets |

SCHEDULE 6.7 - 2

**JAE 0616**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 #2010021817-9<br>Filed 8-31-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 2011012952-6<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All Assets |
| | | UCC-1 #2010021948-6<br>Filed 8-31-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 2011012950-2<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All Assets |
| | | UCC-1 # 2011034549-7<br>Filed 12-22-11<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P. | Steris Scope System |
| | | UCC-1 # 2012005407-4<br>Filed: 2-29-12<br>Secured Party: ConMed Linvatec Finance<br><br>UCC-3 # 2012015787-0<br>Filed 6-11-12<br>Assignment to Optumhealth Bank, Inc. (all Equipment under Schedule No. 001 only)<br><br>UCC-3 # 2012027051-5<br>Filed 10-11-12<br>Assignment to BMO Harris Bank National Association (all Equipment under Schedule No. 002 only) | Equipment under Master Agreement No. 1111201 |

SCHEDULE 6.7 - 3

**JAE 0617**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 2012022725-9<br>Filed 8-24-12<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC<br><br>UCC-3 # 2012025297-3<br>Filed 9-24-12<br>Assignment to Transportation Alliance Bank | Equipment per Contract # 19PW0G; recurring fees per Contract # 19PW0G |
| | | UCC-1 # 2012023259-1<br>Filed 8-29-12<br>Secured Party:  Olympus America Inc. | LCD monitors, LCD roll stand tall fixed height, workstation SI/CO2 standard set, lockable drawer unit, multi remote cable, VCR remote control cable, BNC cable, Olympus printer, serial digital video BNC, flexi-lte tray container, tray, and lid, Olympus HD recorder, Evis exera II gastrovideoscope, endoeye lapard thoraco videoscope, Evis Exera II video processor, Evis Exera II light source. |
| | | UCC-1 # 2012023334-1<br>Filed 8-30-12<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party:  Med One Capital Funding – California, L.P.<br><br>UCC-3 # 2012027598-3<br>Filed 10-17-12<br>Assignment to Prime Alliance Bank | R710 PowerEdge, Backup Exec 2012 Server |
| | | UCC-1 # 2012027315-5<br>Filed 10-15-12<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party:  Med One Capital Funding – California, L.P. | Rubbermaid Medication Cart, Wyse Winterm S30 Thin Client 64 MB Ram; Honeywell Barcode Scanner (all reconditioned) |

SCHEDULE 6.7 - 4

**JAE 0618**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 2013000244-5<br>Filed 1-3-2013<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding, LLC | McKesson Enterprise Solution, as detailed in McKesson Contract Number 1-1CSTGP |
| **INTEGRATED HEALTHCARE HOLDINGS, INC.**<br><br>**and**<br><br>**WMC-SA, INC.** | CALIFORNIA | UCC-1 # 07-7141948920<br>Filed:          12-28-07<br>Secured Party:  FPC Funding II, LLC | Equipment pursuant to certain Lease Agreement (number is redacted on financing statement) – medical office equipment related |
| | | UCC-1 # 08-7142019800<br>Filed:          12-28-07<br>Secured Party:  FPC Funding II, LLC | Equipment pursuant to certain Lease Agreement (number is redacted on financing statement) – medical office equipment related |
| **CHAPMAN MEDICAL CENTER, INC.** | CALIFORNIA | UCC-1 #107241563100<br>Filed 8-10-10<br>Secured Party:  Midcap Financial LLC, as Agent | All Assets |
| | | UCC-1 # 10-7243844144<br>Filed 8-30-10<br>Secured Party: Midcap Financial, LLC, as Agent<br><br>UCC-3 #1172700640<br>Filed 5-18-2011<br>Assignment to Midcap Funding IV, LLC, as Agent | All Assets |
| | | UCC-1 # 117295411869<br>Filed 12-27-11<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Equipment – One Staris Scope System |

SCHEDULE 6.7 - 5

**JAE 0619**

SPCP_0000004922

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | | |
| | | UCC-1 #127301427794<br>Filed 2-8-12<br>Secured Party:  Stryker Finance, a Division of Stryker Sales Corporation | Equipment listed on Rental Agreement # MR26485334 – dual trigger rotary, AO small attachment, Adj pin collet 2.0-3.2mm, ¼" chuck w/key, Hudson/modified trinkle attach, sys 6 recip, system 6 sagittal saw, system 6 charger, system 6 aseptic battery kit, sys 6 large sterilization case, revolution cement gun, T's surgical helmet, automatic high vacuum foot pump, cordless driver 3, adjustable pin collet, ¼ inch drill with Jacobs Chuck |
| | | UCC-1 #127324073796<br>Filed 8-8-12<br>Secured Party:  General Electric Capital Corporation | Equipment - One GE Healthcare lightspeed 16 CT System and One Mobile Interim Solutions Landoil Corp Trailer 2001 VIN # ILH142UH411011601 |
| | | UCC-1 # 127324073817<br>Filed 8-8-12<br>Secured Party:  General Electric Capital Corporation | Equipment - One STERIS Corporation V-Pro Max single Door Sterilizer System |

SCHEDULE 6.7 - 6

**JAE 0620**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| **COASTAL COMMUNITIES HOSPITAL, INC.** | CALIFORNIA | UCC-1 # 09-7205562844<br>Filed:        8-13-09<br>Secured Party: Beckman Coulter Inc. | Access 2 Immunoassay Analyzer |
| | | UCC-1 # 09-7207051546<br>Filed:        8-31-09<br>Secured Party: Beckman Coulter Inc. | Access 2 Immunoassay Analyzer |
| | | UCC-1 # 107241562573<br>Filed: 8-10-10<br>Secured Party:  Midcap Financial LLC, as Agent | All assets |
| | | UCC-1 # 107243844407<br>Filed 8-30-10<br>Secured Party:  Midcap Financial LLC, as Agent<br><br>UCC-3 # 1172700639<br>Filed 5-18-11<br>Assignment to  Midcap Funding IV, LLC, as Agent | All assets |
| | | UCC-1 # 107243505148<br>Filed 8-31-10<br>Secured Part:  Alcon Laboratories, Inc. | One demo Infiniti Vision w/o VO |
| | | UCC-1 # 117287316450<br>Filed: 10-10-11<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Equipment listed in Schedule A - Patient monitor, option module, gas module, wire lead wire set, wire trunk cable with ESIS, NIBP cuff kit adult, NIBP hose 3.5 meter, paper thermal recorder, interface cable, special trade-in discount |

SCHEDULE 6.7 - 7

**JAE 0621**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
|  |  | UCC-1 # 117294567799<br>Filed 12-16-11<br>Secured Party:  Republic Bank<br>Secured Party:  Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Steris Scope System |
|  |  | UCC-1 # 12-7323293476<br>Filed 8-2-12<br>Secured Party:  General Electric Capital Corporation | Johnson & Johnson Sterrad Sterilizer System |
| **WMC-A, INC.** | CALIFORNIA | UCC-1 # 107241562694<br>Filed: 8-10-10<br>Secured Party: Midcap Financial LLC, as Agent | All assets |
|  |  | UCC-1 # 107243843759<br>Filed: 8-30-10<br>Secured Party: Midcap Financial LLC, as Agent<br><br>UCC-3 # 1172700642<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All assets |
|  |  | UCC-1 # 107249947467<br>Filed 10-29-10<br>Secured Party:  Americorp Financial, LLC | Equipment per Agreement No. 1755101.  Two of each: Demo, bipap vision US can W 02-B, universal stand, basic; adapter plate, universal stand; circuit support arm; bracker, mounting arm; high pressure hose, diss. |
|  |  | UCC-1 # 127314854590<br>Filed 5-25-12<br>Secured Party: Creekridge Capital LLC<br><br>UCC-3 # 12-73200045 | Equipment under Agreement No 1171600-001 |

SCHEDULE 6.7 - 8

**JAE 0622**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Filed 7-9-12<br>Assignment to BMO Harris Bank National Association | |
| | | UCC-1 # 12-7325343545<br>Filed 8-16-12<br>Secured Party:  General Electric Capital Corporation | One GE Healthcare GE Lightspeed 16 CT System and one Landholl 2001 Landholl Corp Semi Trailer |
| **WMC-SA, INC.** | CALIFORNIA | UCC-1 # 06-7090887479<br>Filed: 11/03/2006<br>Expires: 11/03/2011<br>Secured Party: General Electric Capital Corporation<br><br>UCC-3 #  1172784579<br>Filed:        7/27/2011<br>Continuation | Collateral: Lease for 1 GE Healthcare Technologies Infinia II Hawkeye Nuclear Camera System. |
| | | UCC-1 #077141978920<br>Filed 12-28-07<br>Secured Party: FPC Funding II, LLC | Equipment listed in Exhibit A to Lease Schedule No. 001 to Master Lease Agreement No. 801146.  MP 161 SPF, MP 2510 SPF, MP 3010 SPF, MP 4500 SPF+Fin+P, MP 3010 SPF+Fin, 1 ecopy workstations w/50 user seats, etc. |
| | | UCC-1 # 08-7143909031<br>Filed:        1-16-08<br>Secured Party: Dade Behring, Inc. | Equipment – RMS & TXL MAX & Easylink |
| | | UCC-1 # 08-7143909273<br>Filed:        1-16-08<br>Secured Party:  Dade Behring, Inc. | Equipment – RMS & TXL MAX |

SCHEDULE 6.7 - 9

**JAE 0623**

CONFIDENTIAL

SPCP_0000004926

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 107226266446<br>Filed: 3-22-10<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | GemStar Pain Management Pumps with power supply, pole clamps and 150cc lockbox |
| | | UCC-1 # 107234379117<br>Filed 6-9-10<br>Secured Party: Olympus America Inc. | LF-V Tracheal Incub Video, Visera Cam Head Angl, CLV S-40 Light Source; LCD monitor; Visera Digital Camera; Single Piece E Adapt |
| | | UCC-1 # 107234380260<br>Filed 6-9-10<br>Secured Party: Olympus America Inc. | Evis Exera I; Evis Exera II; BNC Cable, Remote Control Cable; Cable Adapter for Mavigraph; RGB Printer Cable for C |
| | | UCC-1 # 107241562715<br>Filed 8-10-10<br>Secured Party:  Midcap Financial, LLC, as Agent | All assets |
| | | UCC-1 # 107243843870<br>Filed 8-30-10<br>Secured Party:  Midcap Financial, LLC, as Agent<br><br>UCC-3 # 1172700641<br>Filed 5-18-11<br>Assignment to Midcap Funding IV, LLC, as Agent | All assets |
| | | UCC-1 # 107246110870<br>Filed 9-27-10<br>Secured Party:  Toshiba America Medical Systems, Inc. | Toshiba Infinix Vascular System; Vital Images Enterprise Workstation System |

SCHEDULE 6.7 - 10

**JAE 0624**

CONFIDENTIAL

SPCP_0000004927

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 107252114720<br>Filed 11-19-10<br>Secured Party:  Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc. | Toshiba Infinix Vascular System, Type S; Vital Images Enterprise Workstation System |
| | | UCC-1 # 107252313599<br>Filed 11-22-10<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Philips iU22 Refurbished and Upgraded |
| | | UCC-1 # 117261555386<br>Filed 2-23-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | ATLAS 37 CM Handswitching; Generator Forectriad, Ligasure 5MM Blunt Tip LAP Sealerdivider; Tissue Fusion Open Instrument 13.5M |
| | | UCC-1 # 117266047953<br>Filed 4-11-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | CMC-V System |
| | | UCC-1 # 117272889964<br>Filed 6-13-11<br>Secured Party:  David Holden | Equipment included in Schedule 001 of Master Lease Agreement #801146 |
| | | UCC-1 # 117272893666<br>Filed 6-13-11<br>Secured Party:  Silent Partners FBO Jack Whittington Trust | Equipment included in Schedule 002 of Master Lease Agreement #801146 |

SCHEDULE 6.7 - 11

**JAE 0625**

CONFIDENTIAL

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 117288419152<br>Filed 10-19-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | West-Com Nurse Call System |
| | | UCC-1 # 117288552554<br>Filed 10-22-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: OptumHealth Bank, Inc. | Alaris System Point of Care Units; Alaris System LVP Pumping Modules |
| | | UCC-1 # 117288888364<br>Filed 10-25-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank<br><br>UCC-3 # 1172900033<br>Filed 11-3-11<br>Amendment to add Secured Party: Med One Capital Funding – California, L.P. and Secured Party: Med One Capital Funding, LLC | Hemodynamic System |
| | | UCC-1 # 117291423323<br>Filed 11-14-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | OSI Imaging Table System |
| | | UCC-1 # 117293260910<br>Filed 12-5-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | IV Solution Warming Cabinets |

SCHEDULE 6.7 - 12

**JAE 0626**

SPCP_0000004929

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 117293391874<br>Filed 12-5-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Olympus BiPolar Resection |
| | | UCC-1 # 117293958328<br>Filed 12-13-11<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Steris Scope System |
| | | UCC-1 # 127302407894<br>Filed 2-24-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: OptumHealth Bank, Inc.<br><br>UCC-3 # 1273035413<br>Filed 3/6/12<br>Amendment of Secured Party from OptumHealth Bank, Inc. to Republic Bank | Constellation LXT, PurePoint LIO; Fragmentation Handpiece |
| | | UCC-1 # 127303820187<br>Filed 2-24-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Alaris System Point of Care Units; Alaris System LVP Pumping Modules; Alaris System Syringe Module |
| | | UCC-1 # 127303206882<br>Filed 3-2-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Alaris System Point of Care Units; Alaris System LVP Pumping Modules; Alaris System Syringe Module |

SCHEDULE 6.7 - 13

**JAE 0627**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 127316451828<br>Filed 6-7-12<br>Secured Party:  Prime Alliance Bank<br>Secured Party:  Med One Capital Funding, LLC<br><br>UCC-3 # 1273184066<br>Filed 6-26-12<br>Amendment to Collateral<br><br>UCC-3 #1273185297<br>Filed 6-27-12<br>Amendment to change Secured Party from Prime Alliance Bank to Republic Bank | Artic Sun 5000 – Therapeutic Hypothermia Cooling System |
| | | UCC-1 # 127317191779<br>Filed 6-14-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Horizon Cardiology CPACS System |
| | | UCC-1 # 127321146077<br>Filed 7-17-12<br>Secured Party: Creekridge Capital LLC | Equipment included in Agreement No. 0605600-001 |
| | | UCC-1 # 127321299753<br>Filed 7-18-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | West-Com Nurse Call System |
| | | UCC-1 # 127325868961<br>Filed 8-21-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank | Ultra Sound Equipment |

SCHEDULE 6.7 - 14

**JAE 0628**

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 127327789440<br>Filed 9-5-12<br>Secured Party:  Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br><br>UCC-3 # 1273319799<br>Filed 10-8-12<br>Amendment to change collateral | Mizuho OSI Orthopedic Table System |

SCHEDULE 6.7 - 15

**JAE 0629**

CONFIDENTIAL

SPCP_0000004932

# EXHIBIT 3

Execution Version

PAYOFF LETTER

February 14, 2014

INTEGRATED HEALTHCARE HOLDINGS, INC.("IHHI"),
WMC-SA, INC. ("WMC-SA"), WMC-A, INC. ("WMC-A"),
CHAPMAN MEDICAL CENTER, INC. ("Chapman"), and
COASTAL COMMUNITIES HOSPITAL, INC. ("Coastal" and
together with IHHI, WMC-SA, WMC-A and Chapman, the "Borrowers")
1301 North Tustin Avenue
Santa Ana, California 92705
Attention: Kenneth Westbrook, President and CEO and Steven Blake, CFO

Gentlemen:

Reference is made to that certain Amended and Restated Credit Agreement dated as of February 7, 2013 (as modified and supplemented and in effect on the date hereof, the "Credit Agreement"; together with the various instruments, documents and other agreements executed in connection therewith, including without limitation those instruments, documents and other agreements as set forth on Schedule 1 hereto, collectively, the "Loan Documents"), among the Borrowers, certain Credit Parties signatory thereto, certain Guarantors signatory thereto, SPCP Group LLC, as Lender and Silver Point Finance, LLC ("Silver Point"), as Lender Agent (in such capacity, the "Lender Agent"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

The Borrowers have advised the Lender Agent that the Borrowers intend to repay in full all amounts outstanding under the Credit Agreement on February 14, 2014 (the "Payoff Date") in connection with the execution and delivery of a new credit agreement among the Borrowers, certain lenders party thereto and MidCap Financial, LLC as agent for such lenders.

1.      This letter confirms that the aggregate amount (the "Payoff Amount") as of the Payoff Date necessary to pay all amounts owing by the Borrowers to the Lender Agent and the Lenders under the Credit Agreement and the other Loan Documents is specified on Schedule 2 hereto, subject to the same being paid by wire (together with notification to the Lender Agent of the applicable federal funds wire reference number(s)) to, and confirmed received not later than 2:00 p.m. (New York time) on the Payoff Date by, the Lender Agent in U.S. Dollars in immediately available funds to the account of the Lender Agent as specified on Schedule 3 hereto (except for payment of fees and expenses of the Lender Agent's legal counsel, which shall be remitted by wire to such counsel, as specified in such schedule). Please note that such amounts which comprise the Payoff Amount assume that no further repayment of the Loans will be made under the Credit Agreement after the date of this letter. In the event the Payoff Amount is not received by the time specified above on the Payoff Date in accordance with the terms of this letter the Payoff Amount will be subject to adjustment.

#4819-3288-3736v4

**JAE 0631**

CONFIDENTIAL

SPCP_0000003147

2.      The Borrowers and each other Credit Party:

(a)      acknowledges and agrees that:

(i)      the amounts referred to in Schedule 2 hereto are enforceable obligations of the Credit Parties payable to the Lender Agent and the Lenders pursuant to the provisions of the Credit Agreement and the other Loan Documents without any deduction, offset, defense or counterclaim;

(ii)      prior to the Effective Time, nothing contained herein shall constitute a waiver of any Default or Event of Default of the Lender Agent's and the Lenders' rights and remedies under the Credit Agreement or any other Loan Document;

(iii)      as of the Effective Time, the Lender Agent, the Lenders and their respective participants, if any, shall have no further obligation, duty, liability or responsibility under the Credit Agreement, any other Loan Document or any other document or agreement executed and/or delivered in connection therewith (except as otherwise expressly provided herein);

(iv)  if any payment at any time made to the Lender Agent or any Lender on account of any amount owing under the Credit Agreement (including, without limitation, the Payoff Amount) is ever avoided, rescinded, set aside or must otherwise be returned or repaid by the Lender Agent or such Lender, whether in bankruptcy, reorganization, insolvency or similar proceedings involving the Borrower or any other Credit Party or otherwise, then such amount and the obligations and liability of the Borrower and the Credit Parties under the Credit Agreement and the other Loan Documents shall immediately be reinstated with full force and effect, without need for any action by any Person, and shall be enforceable against the Borrower and the other Credit Parties and their successors and assigns as if such payment had never been made; and

(b)      forever releases and discharges the Lender Agent and each Lender, and their respective successors, assignees, participants, agents, officers, directors, members, affiliates, advisors, attorneys and employees from any and all claims, suits, demands, accounts or causes of action the Borrowers and the other Credit Parties may have against the Lender Agent or any Lender or their respective agents, officers and directors, to the extent arising out of, in connection with or otherwise relating to, directly or indirectly, the Loan Documents.

3.      As of the Effective Date, the Lender Agent and each Lender forever release and discharge each Borrower and each other Credit Party, and their respective successors, assignees, participants, agents, officers, directors, members, affiliates, advisors, attorneys and employees from any and all claims, suits, demands, accounts or causes of action the Lender Agent and the Lenders may have against any Borrower or any other Credit Party or their respective agents, officers and directors, to the extent arising out of, in connection with or otherwise relating to, directly or indirectly, the Loan Documents.

4.      This letter confirms that effective as of the time of receipt by the Lender Agent of the Payoff Amount in the manner described above (such time being referred to as the "Effective Time"):

(a)      all indebtedness of the Borrowers and the other Credit Parties to the Lender Agent and the Lenders under the Credit Agreement and each other Loan Document shall be fully paid and discharged;

CONFIDENTIAL

**JAE 0632**

SPCP_0000003148

(b)     all security interests, mortgages, deeds of trust and other liens granted to or held by the Lender Agent for the benefit of the Lenders and any other secured parties under the Loan Documents shall be forever satisfied, released and discharged without further action; and

(c)     all other obligations of the Borrower and the other Credit Parties to the Lender Agent and the Lenders under the Credit Agreement and each other Loan Document shall be released and discharged, except any such obligations that are otherwise expressly stated in the Credit Agreement or any other Loan Document as surviving that respective agreement's termination, which in any such case shall, as so specified, survive without prejudice and remain in full force and effect.

5.     From and after the Effective Date, the Lender Agent hereby authorizes each of the Borrowers and/or their designees to file Uniform Commercial Code termination statements effecting the security interest and lien releases referred to in the foregoing Section 4(c). Prior to the Effective Date, the Lender Agent shall deliver in escrow to Borrowers' counsel, Loeb & Loeb LLP (or, in the case of mortgage and deed of trust lien releases, such title company as Borrowers and/or their designees shall designate) all collateral in Lender Agent's possession together with all such lien release documents, intellectual property release documents and such other instruments of release and discharge pertaining to the security interests, mortgages and other liens described above of the Lender Agent in any of the property, real or personal, of the Borrowers and the other Credit Parties as the Borrowers and/or their designees may reasonably request to effectuate, or reflect of public record, the release and discharge of all such security interests, mortgages and liens (collectively, the "Lien Release Documents"), which such Lien Release Documents shall only be released from escrow at such time as the Lender Agent shall have confirmed receipt of the Payoff Amount in the manner described in Section 1 above.  In addition, the Lender Agent will, from and after the Effective Time, to the extent not previously delivered,  promptly deliver to Borrowers or their designees all collateral in Lender Agent's possession and such other termination statements and/or documents as the Borrowers and/or their designees may from time to time reasonably request to effectuate, or reflect of public record, the release and discharge of such security interests and liens.  All of the foregoing deliveries shall be at the expense of the Borrowers, with no liability to the Lender Agent or any Lender, and with no representation or warranty by or recourse to the Lender Agent or any Lender.

6.     This letter and any right, remedy, obligation, claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this letter shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada applicable to contracts made and performed in that state and any applicable laws of the United States of America.

**JAE 0633**

CONFIDENTIAL                    SPCP_0000003149

7.     This letter may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute but one and the same letter.  Delivery of an executed signature page of this letter by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Sincerely,

SILVER POINT FINANCE, LLC, in its capacity as Lender Agent under the Credit Agreement

By: _____

Name:

Title:   Michael A. Gatto
         Authorized Signatory

SPCP GROUP LLC

By: _____

Name:

Title:   Michael A. Gatto
         Authorized Signatory

CONFIDENTIAL

**JAE 0634**

SPCP_0000003150

Acknowledged and Agreed
this 14 day of February, 2014:

**BORROWERS:**

INTEGRATED HEALTHCARE HOLDINGS, INC., a Nevada corporation

By: _____
Name: Kenneth Westbrook
Title:   CEO

WMC-A, INC., a California corporation

By: _____
Name: Kenneth Westbrook
Title:   CEO

WMC-SA, INC., a California corporation

By: _____
Name: Kenneth Westbrook
Title:   CEO

COASTAL COMMUNITIES HOSPITAL, INC., a California corporation

By: _____
Name: Kenneth Westbrook
Title:   CEO

CHAPMAN MEDICAL CENTER, INC., a California corporation

By: _____
Name: Kenneth Westbrook
Title:   CEO

#4819-3288-3736v4

CONFIDENTIAL

SPCP_0000003151

## SCHEDULE 1

### Loan Documents[1]

(1) Security Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II, the Borrowers party thereto and Pacific Coast Holdings Investment, LLC ("PCHI").

(2) Guaranty Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II, PCHI and OC-PIN.

(3) Pledge Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Integrated Healthcare Holdings, Inc. ("IHHI"), Ganesha Realty, LLC ("Ganesha") and Medical Provider Financial Corporation II.

(4) Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Western Medical Center – Anaheim dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI and Medical Provider Financial Corporation II.

(5) Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Western Medical Center – Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI and Medical Provider Financial Corporation II.

(6) Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Coastal Communities Hospital, Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI and Medical Provider Financial Corporation II.

(7) Leasehold Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Leasehold Interest: Chapman Medical Center – Medical Office Building Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI and Medical Provider Financial Corporation II.

(8) Leasehold Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents re Leasehold Interest: Chapman Medical Center – Hospital Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI and Medical Provider Financial Corporation II.

(9) Absolute Assignment of Leases and Rents with License Back re Western Medical Center – Anaheim dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI, IHHI, WMC-A, Inc. ("WMC-A") and Medical Provider Financial Corporation II.

(10) Absolute Assignment of Leases and Rents with License Back re Western Medical Center – Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI, IHHI, WMC-SA, Inc. ("WMC-SA") and Medical Provider Financial Corporation II.

(11) Absolute Assignment of Leases and Rents with License Back re Coastal Communities Hospital dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among PCHI, IHHI, Coastal Communities Hospital, Inc. ("Coastal") and Medical Provider Financial Corporation II.

---

[1]    As of the date hereof, SPCP Group, LLC and Lender Agent are successors in interest to Medical Provider Financial Corporation II under each of the Loan Documents.

#4819-3288-3736v4

CONFIDENTIAL

SPCP_0000003152

(12) Absolute Assignment of Leases and Rents with License Back re Leasehold Interest: Chapman Medical Center – Medical Office Building Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman Medical Center, Inc. ("Chapman") and Medical Provider Financial Corporation II.

(13) Absolute Assignment of Leases and Rents with License Back re Leasehold Interest: Chapman Medical Center – Hospital Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman and Medical Provider Financial Corporation II.

(14) Collateral Assignment of Contracts re Western Medical Center – Anaheim dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, WMC-A and Medical Provider Financial Corporation II.

(15) Collateral Assignment of Contracts re Western Medical Center – Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, WMC-SA and Medical Provider Financial Corporation II.

(16) Collateral Assignment of Contracts re Coastal Communities Hospital, Santa Ana dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Coastal and Medical Provider Financial Corporation II.

(17) Collateral Assignment of Contracts re Leasehold: Chapman Medical Center – Medical Office Building, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman and Medical Provider Financial Corporation II.

(18) Collateral Assignment of Contracts re Leasehold: Chapman Medical Center – Hospital Premises, Orange dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among IHHI, Chapman and Medical Provider Financial Corporation II.

(19) Intellectual Property Security Agreement dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II and the Borrowers party thereto.

(20) Environmental Indemnity Agreement, dated as of October 9, 2007 (as amended, supplemented or otherwise modified as of the date hereof) among Medical Provider Financial Corporation II, the Borrowers, PCHI and OC-PIN.

(21) Intercreditor Agreement, dated as of August 30, 2010 (as amended, supplemented or otherwise modified as of the date hereof) among MidCap Financial, LLC, Lender Agent, the Borrowers and the Amendment Parties.

(22) Amended and Restated Credit Agreement, dated as of February 7, 2013 (as amended, supplemented or otherwise modified as of the date hereof) by and among IHHI, WMC-A, WMC-SA, Chapman, Coastal, PCHI, OC-PIN, Ganesha, SPCP Group, LLC and Lender Agent.

For the avoidance of doubt, "Loan Documents" excludes each of the Common Stock Warrants issued by IHHI, together with the various amendments, documents and other agreements executed in connection therewith.

#4819-3288-3736v4

**JAE 0637**

## SCHEDULE 2

### PAYOFF AMOUNT
### (Amounts Determined as of the Payoff Date)

Payoff Calculation as of 2/14/2014

| | |
|---|---|
| Principal | $47,277,000.00 |
| Interest | 173,349.00 |
| Prepayment Penalty (2%) | 945,540.00 |
| **Total To Lender Agent** | **$48,395,889.00** |
| Unpaid Legal Fees and Expenses | 56,502.46 |

**Total Payoff Amount**  $48,452,391.46

*Per Diem Interest (if any)    $15,759.00

#4819-3288-3736v4

**JAE 0638**

CONFIDENTIAL

SPCP_0000003154

<u>**SCHEDULE 3**</u>

**WIRE TRANSFER INSTRUCTIONS**

Except for payment of the legal fees and expenses, all amounts shall be paid to Silver Point, as Lender Agent, to the following account:

> Bank Name: Deutsche Bank Trust Company Americas
> ABA: 021001033
> Account Number: ▮▮▮▮▮▮
> Account Name: Global Loan Services
> Ref: IHHI Payoff

Payment of legal fees and expense specified above shall be paid to Milbank, Tweed, Hadley & McCloy LLP to the following account:

> Bank:          JPMorgan Chase Bank, N.A.
> Location:      1 Chase Manhattan Plaza
>                New York, New York 10081
> ABA No.:       021-000-021
> Acct. No.:     ▮▮▮▮▮▮
> Payee Name:    Milbank, Tweed, Hadley & McCloy LLP
> Reference:     304146

#4819-3288-3736v4

**JAE 0639**

# EXHIBIT 4

**From**: Bill Thomas [bthomas@GlobalMSO.com]
**Sent**: 2/19/2015 9:16:22 AM
**To**: Thomas Banks [tbanks@silverpointcapital.com]
**CC**: kpcglobal@gmail.com
**Subject**: IHHI ESOP proposal
**Attachments**: Project Solus_Confidential Business Profile_02172015.pdf

Hello Tom

IHHI is giving serious consideration to an ESOP transaction.   It has retained Eureka Capital, an ESOP industry leader, to advise it.

Please find enclosed Eureka's presentation to the lending community

Given Silverpoint's background on the company, SP may be a natural fit.

As you can see from the charts, we've been busy.   We've wrestled the operating loss to breakeven and actually now are generating positive EBITDA without QAF.  I'd like to say it's pure genius but actually there was lots of low hanging fruit once we cleared out the Westbrook team.

Please let me know when I can schedule some time with you to go over the potential transaction and how SP can benefit from it.

Best regards

Bill


William E. Thomas
Executive Vice President and General Counsel
Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
(951) 782-8812 (phone)
(951) 782-8850 (fax)
bthomas@globalmso.com  PLEASE NOTE THE CHANGE IN EMAIL ADDRESS

**JAE 0641**

CONFIDENTIAL

Case 1:20-cv-06754 Document 1 Filed 09/09/20 Page 649 of 804 Page ID #:8448

# EXHIBIT 5

# Project Solus

## *Confidential Business Profile*

**February 2015**

# ⌘ EUREKA

**Michael Harden**
**Managing Director**
michael.harden@eurekacap.com
*(P) 949.719.2267*
*(F) 949.719.2314*

**Mark O'Keefe**
**Managing Director**
mark.okeefe@eurekacap.com
*(P) 949.719.2263*
*(F) 949.719.2314*

**Phillip Chou**
**Executive Director**
phillip.chou@eurekacap.com
*(P) 949.719.2268*
*(F) 949.719.2314*

*Confidential Business Profile*

---

**Financing Request**▆▆▆▆▆▆ **of term debt, in addition to an asset-based revolver, supported by approximately**▆▆▆▆▆▆ **of Hospital Quality Assurance Fee (QAF) over the next three years to facilitate an ESOP buyout transaction. Management will remain unchanged and the Company will become 100% ESOP-owned, with minimal corporate income tax obligations post-transaction.**

---

Project Solus ("Solus" or the "Company") is a leading operator of four community-based hospitals located in Southern California (the "Hospitals"). In aggregate, the Hospitals account for approximately 12% market share of the county that the Hospitals reside in within Southern California. The Hospitals are accredited by the Joint Commission on Accreditation of Healthcare Organizations, the College of American Pathologists, American College of Surgeons (Trauma Program) and other appropriate accreditation agencies. As of December 31, 2014, Solus generated steadily improving EBITDA that exceeded▆▆▆▆▆▆ per month before consideration of the QAF described above, which is in addition to the underlying EBITDA of the Hospitals.

**Business & Market Overview**

The Hospitals are highly rated in Southern California. They provide tertiary and secondary services and operate one of only three trauma centers in the region. Services include neurosurgical care, cardiac services, burn center care, medical services, surgical services, pediatric intensive unit, neonatal intensive care unit, obstetrical, subacute, geropsychiatric, adult psychiatric, and chemical dependency. Further, Solus is developing a new Acute Rehabilitation Care unit.

The Hospitals are located in a region where median household income is below▆▆▆▆▆▆ per year and roughly 20% of the Hospitals' potential constituents are below the Federal poverty line (2010 U.S. Census), as a result, the Company is a primary beneficiary of Medicare and Medicaid (MediCal) reimbursements including supplement income from the Quality Assurance Fee (to be discussed below).

**Revenue by Reimbursement Source ($ in Millions)**



☒ Medicare  ☒ Medicaid  ☒ Managed Care  ☒ Indeminity, Self-Pay and Other

**Market Landscape**

As a primary provider of healthcare in the United States, hospitals are expected to generate▆▆▆▆▆▆ in revenue in 2014 and▆▆▆▆▆▆ in 2015. Hospital operations are generally impacted by a number of issues, including healthcare reform, reimbursement trends, electronic medical records and professional personnel shortages. Healthcare reform will likely continue to increase the number of insured patients,

---

CONFIDENTIAL                                    **JAE 0644**                                    SPCP_0000027770_1

which can potentially boost revenue. Other factors such as the aging population will also support revenue growth.

### Medicare & Medicaid

In 1965, Lyndon B. Johnson signed the Medicare and Medicaid programs into laws. Medicare was designed to provide health insurance for those aged 65 and older, including certain disabled people and Medicaid was established to serve the health needs of the indigent. Though both programs are reliant on Federal reimbursements, Medicaid is jointly funded by the state and is administered on a state level. In the past, both programs operated on a retrospective reimbursement methodology.

Currently, MediCal (Medicaid program in California) reimburses based on a fee for service and a managed care component. Managed care is a health care delivery system organized to manage cost, utilization, and quality. Medicaid managed care provides for the delivery of Medicaid health benefits and additional services through contracted arrangements between state Medicaid agencies and managed care organizations that accept a set per member per month (capitation) payment for these services.

### Quality Assurance Fee (QAF)

In October 2009, the Governor of California signed legislation supported by the hospital industry to impose a provider fee on general acute care hospitals that, combined with Federal matching funds, would be used to provide supplemental MediCal payments to hospitals with disproportional exposure to indigent patients. This is known as the Hospital Quality Assurance Fee ("QAF"). Since its inception, the QAF program has garnered strong support at both the state and Federal levels and has been extended and renewed three times since the program's inception in 2009. The initial QAF program provided payments for up to *21* months retroactive to April 2009 and expiring on December 31, 2010 ("2010 QAF"). In December 2011, the Centers for Medicare and Medicaid Services ("CMS") gave final approval for the extension of the QAF for the *6* months period ending June 30, 2011 ("2011 QAF"). In June 2012, the QAF program was approved by CMS for another *30* months retroactive to July 1, 2011 through December 31, 2013 ("2013 QAF"). Historical QAF receipts, net of the provider fee paid by Solus, are summarized in the chart below.

#### Historical Net Reimbursement from QAF ($ in Millions)



In 2013, the Governor of California signed legislation (Senate Bill 239) that would continue the QAF program for *36* months from January 1, 2014 through December 31, 2016 ("2016 QAF"), which covers the 2nd half of state fiscal year 2014 ("SFY 2014), SFY 2015 & SFY 2016 and 1st half of SFY 2017. The amount of

CONFIDENTIAL

**JAE 0645**

SPCP_0000027770_2

the 2016 QAF for each hospital is calculated by California Hospital Association ("CHA"), an industry trade organization, based on each hospital's MediCal patient census in 2010. CHA publishes these reimbursement estimates to all hospitals in California. Based on the analyses prepared by the CHA, the Company's total net reimbursement under this program for services performed from January 1, 2014 through December 31, 2016 is estimated to be ▮▮▮▮▮▮.

### Timing of QAF Approval and Disbursements

The QAF reimbursements can be segregated into 2 portions: (i) Fee-For-Service ("FFS") and (ii) Managed Care. During December 2014, California Department of Healthcare Services received approval on the entire 2016 QAF program under Senate Bill 239 from Department of Health and Human Services of the Federal Government as well as the approvals on the inpatient and outpatient fee for service payments. With these approvals, the state will start disbursing the FFS portion of the 2016 QAF. First FFS reimbursement is expected in Q1 of calendar 2015. The Managed Care portion is subject to annual approval retroactively. Anticipated approval and receipt of Managed Care portion of the QAF funding is typically within 12 months after the end of the corresponding state fiscal year (i.e. by June 30, 2015 for funding related to SFY 2014).

### Management Projected 2016 QAF Reimbursements ($ in Millions)



### Restructuring

Though the Hospitals benefit from operating in densely populated areas, they were poorly managed, decentralized, and operated at a loss (excluding supplemental payments from the state and Federal governments) under prior management. Prior to the end of fiscal year ended March 31, 2014, the then majority shareholder, a seasoned physician and hospital operator, acquired operational control through a buyout of all other shareholders and became the sole shareholder of Solus.

The sole shareholder has since put in place a team of seasoned executives with strong success in turning around numerous underperforming hospitals in Southern California. The new team's primary strategy is to create an integrated service platform for the community, and reduce revenue leakage to competing hospitals or stand-alone outpatient surgery centers. Solus has made a concerted effort to bring in community doctors to perform their procedures at Solus Hospitals. They now encourage employees to join local physician's group networks in return for those physician's groups referring patients back to the

Hospitals. They centralized purchases to improve buying power. They are increasing local marketing efforts. With a more efficient cost structure, Solus is able to provide facilities to these community doctors at more competitive rates. An example of this team of executives' most recent success is the transformation of a Southern California based hospital that operated at a loss of $6.0 million per annum to a hospital that now generates roughly ▮▮▮▮▮▮ EBITDA (after a 12 month turnaround period) per annum and is recognized as one of the leading maternity wards in the country.

Since April 2014 (the first month after new management took over), a few initiatives that were implemented to improve the Hospitals' operations were as follows:

1. Consolidation of management and overhead – The Hospitals are now operated by a centralized and consolidated executive management team supported by a streamlined administrative staff. The change eliminated a number of redundant corporate jobs, leading to savings in overhead and reduced corporate overhead from 88 FTEs to 40 FTEs. Further, Solus has streamlined hospital staff in general based on industry "best practice" benchmarks. Savings from these initiatives is estimated to be ▮▮▮▮▮ per quarter.

2. Elimination of outdated hardware and software systems – Management expects to realize up to ▮▮▮▮▮ in savings per year from eliminating old software systems, payroll software, and miscellaneous hardware.

3. Consolidation of vendor agreements – Solus performed a rigorous review and evaluation of all costs including linen, security, BioMed, consulting, legal, etc. across all four hospitals. Purchasing from suppliers are consolidated and standardized to reach rebate levels. By re-negotiating vendor agreements and streamlining the usage of outside professionals, the Company expects to save approximately ▮▮▮▮▮ per year.

4. Improvement on quality of documentation – Solus brought in a leading physician speaker to educate physicians on proper documentation and hired additional clinical documentation improvement professionals (CDI) to ensure physicians are reporting cases accurately and reducing the number of reimbursement rejections. The Company is also in the process of implementing an intelligent coding system and mandatory fill-in screens are being programmed into the electronic medical record to assure all documentation is properly captured. The incremental revenue anticipated with a lower rejection rate is approximately ▮▮▮▮▮▮▮

5. Focus on internal referrals – Outside referrals have largely been eliminated in favor of referrals within the Hospitals in order to retain revenue and create centers of excellence at each hospital. An example of this is **Hospital 1** now treats chronic spinal issues, while **Hospital 2** treats spinal trauma, thus eliminating the Hospitals from competing amongst themselves.

6. Cancellation of certain outside referral contracts – Management identified outside referral sources, such as managed care organizations, that historically only sent trauma (non-elective) patients to Solus. Servicing patients with non-elective procedures typically results in a lower profit margin. The Hospitals have cancelled contracts with these referral sources and only renewed the

CONFIDENTIAL

**JAE 0647**

SPCP_0000027770_4

contracts with referral sources that have a track record of referring patients to Solus that require elective procedures.

7. Hospital rebranding – All of the Company's hospitals are currently being rebranded under a single name, mark and logo to create greater brand recognition and facilitate future marketing efforts.

8. Nurse repositioning – Historically, nurses only operated in one facility and were not considered a shared resource. Through better central planning, nurses are staffed at different hospitals within the system in order to maximize productivity and reduce nurse downtime.

In addition to the above initiatives, several other smaller initiatives, are in process to further eliminate waste and increase synergies and hence earnings within the Hospitals.  Pro Forma improvement in profitability is estimated at approximately ▮▮▮▮▮▮ per year including all initiatives. Overall, the restructuring effort has proven effective in a very short time, monthly adjusted EBITDA, excluding reimbursements from QAF, increased from a deficit of ▮▮▮▮▮▮ to a positive EBITDA of ▮▮▮▮▮▮ between April 2014 and December 2014.

### Monthly Adjusted EBITDA Excl. QAF Reimbursements ($ in Thousands)



### Balance Sheet Snapshot (FYE 3/31, ▮▮▮▮▮ )



*Confidential Business Profile*



### Normalized P&L Summary Incl. QAF Reimbursements (FYE 3/31; $ in Millions)



### Transaction Summary

The sole shareholder of Solus ("Selling Shareholder") is exploring a potential sale of 100% of the Company's stock to a newly created Employee Stock Ownership Plan ("ESOP"). The Selling Shareholder's primary motivation is to create a long-term, stable and sustainable operation and ownership structure, while creating an additional tool to improve labor relations and retain skilled employees. Selling Shareholder will receive part of the consideration in cash and the balance in a deeply subordinated seller note ("Seller Note"). The Seller Note will be unsecured, carry a nominal cash coupon rate, and remain interest only while outside transaction term debt is outstanding.

The contemplated ESOP transaction is a powerful vehicle that will generate near-term partial shareholder liquidity, continue to entrench the Selling Shareholder with Solus economically, retain the executive team, reward loyal employees and potentially improve union relationships. Further, Solus will convert from a C-corporation to an S-corporation shortly after closing. Since the ESOP Trust, which is exempt from all Federal and State taxes, will be the sole shareholder of the Company going forward, Solus will become a virtually tax exempt entity[1] and will not need to make any distributions to the ESOP Trust for income taxes, which materially improve the Company's cash flow for debt service.  Hence, Solus will amortize all of its debt using its pre-tax cash flow indefinitely.

---

[1] The only tax that will apply post-transaction will be the 1.5% California state tax levied on the pre-tax income of California S-corporations, all other Federal and State income taxes will not apply to Solus or the ESOP Trust (its sole shareholder).

CONFIDENTIAL                                          **JAE 0649**                              SPCP_0000027770_6

**Financing Request**

To complete the Transaction, the Company engaged Eureka Capital Partners ("Eureka") to assist in sourcing a total credit facility of approximately ▮▮▮▮▮▮, as follows: (i) up to ▮▮▮▮▮▮ of revolving line of credit to be secured by the outstanding accounts receivable and to be used for operations; and (ii) up to ▮▮▮▮▮▮ term loan financing to partially fund the ESOP buyout transaction. *Anticipated closing of transaction is May 31, 2015*.

*Facility 1 – Revolving Line of Credit*

| | |
|---|---|
| Borrower: | Solus and each of the 4 hospitals that it operates |
| Amount: | Up to ▮▮▮▮▮; actual advance is subject to an agreed-upon borrowing base |
| Security: | UCC-1 on all business assets, excluding receipts of QAF reimbursements |
| Recourse: | None |
| Maturity: | Multi-year term |
| Pricing: | Competitive |

*Facility 2 – Term Loan (either as a unitranche facility of a combination of senior and mezz term loans)*

| | |
|---|---|
| Borrower: | Solus and the Hospitals it operates |
| Amount: | Up to ▮▮▮▮▮ funding subject to approval of QAF payments |
| Security: | Lien on the QAF reimbursements plus pledge of unallocated shares held by the ESOP |
| Recourse: | None |
| Maturity: | 5 years |
| Amortization: | Principal amortization will match the QAF reimbursements when they are received |
| Cash Flow Recapture: | TBD amount of excess cash flow after debt service, working capital and CAPEX, will be used to prepay the Term Loan |
| Pricing: | Competitive |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEALED

# EXHIBIT 6

**From:**       Bill Thomas [bthomas@GlobalMSO.com]
**Sent:**       8/5/2015 2:43:01 PM
**To:**         Thomas Banks [tbanks@silverpointcapital.com]
**CC:**         'Dr. Kali P. Chaudhuri' (kpcglobal@gmail.com) [kpcglobal@gmail.com]
**Subject:**    Signed Non binding term sheet with ESOP trustee
**Attachments:** Document (112).pdf; Document (111).pdf

Hello Tom

I'm pleased to provide you with the results of our negotiations with Alerus Financial, NA and its financial advisor RSS

The agreed value of the company is ▮▮▮▮▮. That's ▮▮▮▮ shy of what I told you our target was in my last email.

However, we were able to significantly increase our percentage of Future QAF beyond the current 2016 program. The trustee has agreed to pay ▮▮ of all QAF attributable to years 2017 through 2024- ▮▮▮▮▮ That's a substantial improvement over the trustee's previous offer of a 50/50 split of QAF over three years

The trustee also agreed to a ▮▮ (rather than ▮▮) rate of return. Since our seller notes carry at ▮▮ coupon, the ▮▮ return will be represented by a pool of warrants equal to approximately ▮▮ of the company's equity (versus around ▮▮ in the previous offer)

We are finishing up with Credit Suisse so I don't have final figures but we are estimating ▮▮▮▮▮ in available cash at close. Silverpoint's share is 17%. The balance would be a subordinated seller note at ▮▮ plus the warrants mentioned above.

We would like to close as soon as possible next week so would ask you to gear up your team to review. As always, if you have any questions please give me a call.

Bill




William E. Thomas
Executive Vice President and General Counsel
Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
(951) 782-8812 (phone)
(951) 782-8850 (fax)
bthomas@globalmso.com   PLEASE NOTE THE CHANGE IN EMAIL ADDRESS

CONFIDENTIAL                                   SPCP_0000018837

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 7

August 3, 2015

## LETTER OF INTENT & SUMMARY TERM SHEET

**PERSONAL & CONFIDENTIAL**
**Via e-mail: erin.turley@klgates.com**

KPC Healthcare, Inc. Employee Stock Ownership Trust
Alerus Financial, N.A., Trustee
c/o K&L Gates LLP
Attention: Erin Turley, Partner
1717 Main Street, Suite 2800
Dallas, TX 75201

> RE: Redemption of all warrant shares of KPC Healthcare, Inc. from William E. Thomas, SPCP Group, LLC and SPCP Group IV, LLC by KPC Healthcare, Inc.; Cancellation of all warrant shares of KPC Healthcare, Inc. held by Dr. Kali Pradip Chaudhuri and KPC Resolution Company, LLC; Acquisition of ▮▮▮ shares of common stock of KPC Healthcare Holdings, Inc. from Dr. Kali Pradip Chaudhuri by Alerus Financial N.A., not in its individual or corporate capacity, but solely in its capacity as trustee of the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Trust

Dear Ms. Turley:

This letter (this "**Letter**") summarizes the principal terms of a proposal being evaluated by the Board of Directors (the "**Board**") of KPC Healthcare Holdings, Inc., a California corporation (the "**Company**"), the board of directors of KPC Healthcare, Inc., a Nevada corporation (the "**Subsidiary**"), Alerus Financial N.A., not in its individual or corporate capacity, but solely in its capacity as trustee (the "**Trustee**") of the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Trust (the "**Trust**"), which would be maintained pursuant to the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Plan (the "**Plan**," and together with the Trust, the "**ESOP**"), William E. Thomas, SPCP Group, LLC, SPCP Group IV, LLC, (each a "**Redeemed Warrantholder**," and collectively, the "**Redeemed Warrantholders**"), Dr. Kali Pradip Chaudhuri, KPC Resolution Company, LLC (each a "**Cancelled Warrantholder**," and collectively, the "**Cancelled Warrantholders**"), and Dr. Kali Pradip Chaudhuri ("**Shareholder**").

The parties are evaluating proposed <u>simultaneous</u> transactions whereby: (i) the Subsidiary would redeem all of the ▮▮▮ outstanding warrant shares owned by William E. Thomas, SPCP Group, LLC and SPCP Group IV, LLC (the "**Warrant Redemption Transaction**"); (ii) the Subsidiary would cancel all of the ▮▮▮ outstanding warrant shares owned by Dr. Kali Pradip Chaudhuri and KPC Resolution Company, LLC (the "**Warrant Cancellation Transaction**"); and (iv) Dr. Kali Pradip Chaudhuri would sell ▮▮▮ shares of outstanding Common Stock of the Company to the ESOP (the "**Stock Purchase Transaction**," and together with the Warrant Redemption Transaction and the Warrant Cancellation Transaction the "**Transactions**"). The Transactions will occur under the following principal terms and conditions:

DA-33815056DA-3381505 v7

**JAE 0654**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 2 of 18

**Issuers:**  KPC Healthcare Holdings, Inc., a California corporation and its wholly-owned subsidiary, KPC Healthcare, Inc., a Nevada corporation.

**Redeemed Warrant
Holders:**  William E. Thomas
SCPC Group, LLC
SCPC Group IV, LLC
*Note: %'s show as a % of total value, net of exercise*

**Shareholder:**  Dr. Kali Pradip Chaudhuri ▮▮▮▮ of total value of the Transactions; 100% of the equity ownership of the Company)

*Note: All warrants held by Dr. Kali P. Chaudhuri and KPC Resolution Company, LLC will be cancelled in the Warrant Cancellation Transaction as part of the Transactions.*

**Buyer:**  Alerus Financial, N.A., not its individual or corporate capacity, but solely in its capacity as trustee of the Trust.

**Closing & Closing Date:**  The consummation (the **"Closing"**) of the Transactions described in this Letter would occur on or before August 7, 2015 (the **"Closing Date"**) and would be structured as a simultaneous sign-and-close transaction.  However, the parties will endeavor to close sooner if possible.

**Share Count:**  The Warrant Redemption Transaction would involve ▮▮▮▮ Redeemed Warrantholder shares, the Warrant Cancellation Transaction would involve ▮▮▮▮ Cancelled Warrantholder shares and the Stock Purchase Transaction would involve ▮▮▮▮ shares of the Company's common stock.

**Valuation:**  The total value to the Redeemed Warrantholders and Shareholder for the Transactions contemplated herein is ▮▮▮▮ (note that this price assumes ▮▮▮▮ of net debt and ▮▮▮▮ of net shareholder receivables), which assumes a "net-debt" approach whereby balance sheet cash is netted against any outstanding debt.  The value of the Transactions will be adjusted upwards or downwards, on a dollar for dollar basis, based on the actual net debt of the Subsidiary on the Closing Date (to be determined post-closing via a closing balance sheet).  The valuation of the Transactions includes the value of the Company and its direct and indirect subsidiaries, plus the present value of all Quality Assurance Fund ("**QAF**") payments to be received under the 2016 QAF Program that

**JAE 0655**

SPCP_0000018839

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 3 of 18

are anticipated to be received from the Closing Date through 2018 ("**2016 QAF Payments**"), as it will take time for the Company and its direct and indirect Subsidiaries to receive all of the 2016 QAF Payments that it is due under the 2016 QAF Program.

**The valuation of the Transactions <u>does not</u> include the value of any QAF payments attributable to QAF programs established after the 2016 QAF Program ("Future QAF Payments").**

**Earn-out:**    The 2016 QAF Program pays for services rendered during the calendar years 2014, 2015 and 2016 based on OSHPD data for 2010. Payments will be received by the Company and its direct and indirect subsidiaries for the 2016 QAF Program through 2018. In the event a QAF or similar Federal matching program is enacted, established or continued covering any of the periods from January 1, 2017 through December 31, 2024 ("**Future QAF**"), regardless of the actual OSHPD year used for the calculation of the payment due to the Company and its direct and indirect subsidiaries or the actual year that payment is received by the Company or its direct and indirect subsidiaries, then the Company or the Subsidiary (as applicable) shall pay an earn-out to the Shareholder & Redeemed Warrantholders based on the following formula: ███ of any and all Future QAF payments (excluding all 2016 QAF Payments received by the Company or its direct or indirect subsidiaries between January 1, 2017 through December 31, 2024 regardless of when paid since the present value of these payments were already included in the valuation assumed herein), within 30 days of the Company's or direct or indirect subsidiary's receipt of the actual payment by the applicable governmental payor. Any earn-out payments earned by and payable to the Shareholder and Redeemed Warrant Holders is subordinated to any outstanding senior loan facilities and covenant compliance.

**Form of Transactions (to occur simultaneous):**

1.    *Warrant Redemption Transaction.* The Subsidiary would redeem 8.5502 Redeemed Warrant shares owned by the Redeemed Warrantholders;

2.    *Warrant Cancellation Transaction.* The Subsidiary would cancel ███ Cancelled Warrant shares owned by the Cancelled Warrantholder; and

**JAE 0656**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 4 of 8

4.  *Stock Purchase Transaction*. The Trustee, on behalf of the Trust, would acquire ▇▇▇ shares of Common Stock of the Company (the "**ESOP Shares**") owned by the Shareholder.

*The Warrant Redemption Transaction, Warrant Cancellation Transaction, and Stock Purchase Transaction will occur simultaneously.*

The Shareholder would elect IRC 1042 treatment to defer recognition of the long-term capital gains taxes realized from the sale of the ESOP Shares and the Company would consent to application of the requisite excise taxes under Code section 4978 and 4979A.

**Warrant Redemption Transaction:** The Subsidiary would complete the Warrant Redemption Transaction for ▇▇▇ (net of exercise price of these warrants of approximately ▇▇▇ by paying ▇▇▇ in cash plus ▇▇▇ via the issuance of subordinated promissory notes. The Company would assume the Subsidiary's obligations under such subordinated promissory notes. The terms of the subordinated promissory notes shall be as set forth in that certain Subordinate Debt Offering & Detachable Warrants Term Sheet ("Debt Term Sheet") and will include the issuance of certain detachable warrants as provided therein.

**Warrant Cancellation Transaction:** The Subsidiary would complete the Warrant Cancellation Transaction by cancelling 22.8889 warrant shares owned by the Cancelled Warrantholder.

**Stock Purchase Transaction:** The ESOP would complete the Stock Purchase Transaction for $217,574,000. The Stock Purchase Transaction would be financed by the Inside Loan (as herein defined) and the issuance of the ESOP Note (as herein defined) to the Shareholder.

**Inside Loan & ESOP Note:** In order to finance the Stock Purchase Transaction, the Company would loan cash to the ESOP in the amount ▇▇▇ (the "**Inside Loan**"), and the Trustee, on behalf of the Trust, would issue a non-recourse promissory note to the Shareholder in the amount of ▇▇▇ (the "**ESOP Note**"). The term of the Inside Loan would be 30 years and would carry an annual interest rate equal to long-term, annual Applicable Federal Rate in effect as of the Closing Date ▇▇▇ for August 2015). The Inside Loan would have fixed payments of principal and interest structured as "mortgage-style" payments. The Inside Loan would be pre-payable without

**JAE 0657**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 5 of 18

penalty at any time and any pre-payment would be applied in the inverse order of maturity.

The term of the ESOP Note would be ▮ years and would carry an annual interest rate equal to ▮ for six months and an escalated interest rate equal to ▮ after six months assuming that the ESOP Note was not assumed by the Company as contractually provided for in the Stock Purchase Transaction. The ESOP Note will pay fixed payments of principal and interest structured as "mortgage-style" payments over the term of the loan. The ESOP Note would be pre-payable without penalty at any time and any pre-payment would be applied in the inverse order of maturity

**Note Exchange:**        Within the 6 month anniversary of the Closing Date the ESOP Note would be assumed by the Company pursuant to the terms of the Stock Purchase Transaction. The Trustee, on behalf of the Trust, would assign its rights and obligations under the ESOP Note to the Company, and the Company would assume such rights and obligations, and issue subordinated promissory note to the Shareholder in the original principal amount of ▮ and having all other terms identical to the Subordinated Notes (as herein defined). In exchange for the Company's assumption of the ESOP Note, the Trustee, on behalf of the Trust, shall enter into the "**Assumption ESOP Loan**" agreement with the Company in an amount equal to ▮ with terms identical to those of the ESOP Note.

**Outside Financing &**
**Seller Financing:**       In order to (a) pay transaction fees, (b) refinance part of its existing line of credit, and (c) facilitate the issuance of the Inside Loan in connection with the Stock Purchase Transaction, the Company contemplates outside financing in the form of a term loan in the original principal amount of ▮ from Credit Suisse to the Subsidiary with ▮ funded at the Closing (the "**Term Loan**").

The Redeemed Warrantholders would receive Subordinated Notes of ▮ as a portion of the proceeds they receive in the Warrant Redemption Transaction, and the Shareholder would (following the Company's assumption of the ESOP Note) receive a ▮ Subordinated Note of as a portion of his proceeds he receives in connection with the Stock Purchase Transaction. The following is a summary of the sources and uses for the Transactions:

CONFIDENTIAL

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 6 of 18

| Sources: | Amounts | Uses: | Amounts |
|---|---|---|---|
| QAF Term Loan (Funded) | ▮▮▮▮ | Warrant Redemption - Cash (BT) | ▮▮▮▮ |
| Bridge Loan | ▮▮▮▮ | Warrant Redemption - Note (BT) | |
| | | Warrant Redemption - Cash (SPCP LLC) | |
| | | Warrant Redemption - Note (SPCP LLC) | |
| | | Warrant Redemption - Cash (SPCP IV LLC) | |
| | | Warrant Redemption - Note (SPCP IV LLC) | |
| | | Transaction Funding - Cash (Dr. C) | |
| | | Transaction Funding - Note (Dr. C) | |
| | | Est. Fees | |
| | | Reserve for P&I | |
| | | Est. Revolver Pay-Down | |
| **Total** | ▮▮▮▮ | **Total** | |

The Term Loan, ESOP Note and the Subordinated Notes would be at commercially reasonable rates acceptable to the Company and shall collectively be referred to as the **"Acquisition Indebtedness."** The terms of the Subordinated Notes are summarized in the Debt Term Sheet enclosed with this Letter.

**Change of FYE:** The Company plans to change its FYE from March 31, to August 31 in connection with the Transactions contemplated herein.

**Corporate Governance:** Effective on the Closing, the Company would agree to increase the authorized number of directors of its Board to five. The Company would agree that this five-person Board would consist of one independent director within six months and a second independent director within twelve months, of the Closing Date.

Independent directors would exclude (a) all current and former shareholders, directors, executive officers and employees of the Company that performed services for the Company within twelve months of their appointment date as a director, (b) as well as family members of these

CONFIDENTIAL

SPCP_0000018843

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 7 of 18

individuals, and (c) any professionals who have received fees from the
Company within twelve months of their appointment date as a director.

Independent directors would be entitled to receive fair market value
compensation for their services as directors, as determined in the sole
discretion of the Board. Non-independent directors shall not be paid for
their services as directors or committee members. All directors shall be
covered by directors' and officers' liability insurance coverage.

**Committees:**     Within three months following the Closing Date, the Board would establish
the following subcommittees: Audit, Compensation, Corporate
Governance, ESOP and Nomination. Within twelve months of the Closing
Date, an independent director would chair each of the Audit, Compensation
and Corporate Governance committees.

**Management
Contract:**          A separate management contract will be entered into with KPC Global
Management ("**KPCGM**"); and the identified individuals will cease to be
W-2 employees or 1099 contractors of the Company but would instead
become part of KPCGM:

Key management contract terms are outlined as follows:

- Contract Term

    o  Management contract terms shall be 10 years, commencing
       on August 10, 2015, and with the consent of both the
       Company and KPCGM, it may renew on a year-to-year basis
       thereafter. After the initial 10 year term, the management
       contract may be cancelled by either the Company or
       KPCGM upon 90 days prior written notice.

- Management Fees (September 1 through August 31):

    **Management Fee**

    | 2016  | |
    | 2017  | |
    | 2018  | |
    | 2019  | |
    | 2020* | |

\*      Management Fees beyond 2020 will be established by the
       Board of Directors and will be consistent with historical
       practices and supported by market levels.

CONFIDENTIAL                                               SPCP_0000018844

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 8 of 18

- Performance Bonus:

  o Beginning at the end of FYE August 31, 2016, KPCGM would receive a performance bonus each year (to be split among the management members of KPCGM based on their own assessment of individual contributions to the Company's profitability for each year) that shall equal 30% of the actual adjusted EBITDA before QAF above the Company's annual EBITDA targets before QAF (below) for each year, established by the Company's management team and used by the qualified independent appraiser for the Trustee in valuing the Company for purposes of the Transactions.

  The proposed Performance Bonus would be available for five fiscal years, after which time a subsequent arrangement may be adopted, with Trustee approval. The EBITDA analysis for purposes of the Performance Bonus shall be limited to a comparison of the EBITDA generated by the hospitals purchased at Closing (e.g., EBITDA generated solely by acquisition shall not be considered for purposes of determining the appropriate bonus amounts).

  **Adjusted**
  **EBITDA Target**
  **Before QAF\***
  **\*\*\***

  |        |   |
  |--------|---|
  | 2016   |   |
  | 2017   |   |
  | 2018   |   |
  | 2019   |   |
  | 2020\*\* |   |

  (\*)  Adjusted EBITDA will exclude all one-time/nonrecurring ESOP transaction fees, non-cash ESOP contribution expense, non-cash warrant expenses, and expenses related to the stock appreciation rights plan (defined in this Letter);

  (\*\*) If applicable, targets beyond fiscal year 2020 will be established by the Board at the beginning of each fiscal year and shall match the same targets provided to the Trustee's independent appraiser, for that particular fiscal year, in connection with the valuation update completed for the year prior to that particular fiscal year; and

CONFIDENTIAL

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 9 of 18

(***) Targets are based on current 3/31 FYE projections. Note that the FYE will change to 8/31 post-transaction but the Targets have been kept the same.

- Non-exclusive License of KPC Healthcare Name. So long as the management agreement between KPCGM and the Company is in place, the Company will be permitted to use the KPC name at no charge and Dr. Chaudhuri is permitted to use the KPC name with other ventures outside the competitive geographical footprint of the hospitals within KPC Healthcare, Inc. Upon termination of the management agreement, the Company must change its name within six months of the termination.

- Non-Competition:

  o Dr. Chaudhuri and Mr. Thomas would be subject to restrictive covenants relating to noncompetition, non-solicitation (employees and customers) and confidentiality that would expire 1 year after termination of the management agreement between KPCGM and the Company. The non-competition restrictive covenant shall be limited to the operation of hospitals within a 10 mile radius of any of the Company's hospital facilities. *Note that hospitals outside of the 10 mile radius will be excluded from the non-compete.*

**Key Person Insurance:**

The Company would use commercially reasonable efforts to obtain term key person life insurance policies on Dr. Kali Pradip Chaudhuri and Suzanne Richards. The Company would pay all premiums and own the following policies:

- New 5 to 10 year term insurance policy on the life of Dr. Chaudhuri for coverage of ▮▮▮ with the Company listed as the beneficiary; and

- New 5 to 10 year term insurance policy on the life of Suzanne Richards for coverage of ▮▮▮ with the Company listed as the beneficiary.

**Mgmt Incentive Plan:**

Simultaneous with the Transactions, the Board would adopt a management incentive plan in the form of stock appreciation rights ("**SARs**"). The management incentive plan (the "**MIP**") would be capped at ▮ of the

**JAE 0662**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 10 of 18

equity of the Company on a fully diluted basis. **All grants will be issued at fair market value** according to the following terms:

Up to ▮ of the Company's equity to be issued to KPCGM, (actual participants within KPCGM to be identified by the Board, subject to the recommendation of the Compensation Committee), excluding Dr. Kali Pradip Chaudhuri as follows:

a.  Retention SARs: ▮ of the Company's equity may be issued to KPCGM immediately following the Closing;

b.  Performance SARs: Beginning at the end of FYE July 31, 2016, up to ▮ of the Company's equity may be issued to KPCGM, subject to a maximum of ▮ of the Company's equity being issued in any year it is earned and the grant is to be split between KPCGM managers, excluding Dr. Kali Pradip Chaudhuri, upon achieving at least ▮ of the Company's annual EBITDA targets before QAF (below) for each year, established by the Company's management team and used by the qualified independent appraiser for the Trustee in valuing the Company for purposes of the Transactions. If the ▮ test is not met in a particular year, then the performance SARs for that particular year can still be issued if the cumulative (total) adjusted EBITDA before QAF for the particular year in question plus the actual adjusted EBITDA before QAF for the year immediately preceding the year in question exceeds the sum of the 2 year annual EBITDA before QAF targets (below) for those 2 years. For example, performance SARs for 2017 can be issued if either (i) actual EBITDA before QAF for 2017 exceeds ▮ or (ii) actual EBITDA for 2016 and 2017 combined exceeds ▮

|  | Adjusted EBITDA Target Before QAF* *** |
| --- | --- |
| 2016 | ▮ |
| 2017 | |
| 2018 | |
| 2019 | |
| 2020** | |

(*)   Adjusted EBITDA will exclude all one-time/nonrecurring ESOP transaction fees, non-cash ESOP contribution

CONFIDENTIAL

SPCP_0000018847

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 11 of 18

expense, non-cash warrant expenses, and expenses related to the stock appreciation rights plan (defined in this Letter);

(**)   If applicable, targets beyond fiscal year 2020 will be established by the Board at the beginning of each fiscal year and shall match the same targets provided to the Trustee's independent appraiser for that particular fiscal year, in connection with the valuation update completed for the year prior to that particular fiscal year

(***)   Targets are based on current 3/31 FYE projections. Note that the FYE will change to 8/31 post-transaction but the Targets have been kept the same.

c.   5-year rolling, cliff-vesting schedule for both (a) and (b) above. Management contract must in place at the time of vesting or those units are forfeited.

The MIP will be designed to be exempt from IRC Section 409A. [To be reviewed as discussed with Company ESOP Counsel]

**Definitive Agreements:**

The parties intend to enter into Definitive Agreements on or before August 7, 2015 (although the parties intend to close sooner). The parties intend to consummate the Transactions and authenticate each of the Definitive Agreements through the use of electronic signatures. In the event a Definitive Agreement has not been signed before August 15, 2015, neither the Company nor the Shareholders shall be under any obligation to continue negotiations.

**Conditions Precedent:**

The parties' obligations to consummate the Stock Purchase Transaction would be subject to the satisfaction of the following conditions precedent:

(i)   Satisfactory completion by the Trustee and its advisors of a due diligence review of the Company and its operations;

(ii)   The Funding of the Term Loan;

(iii)   The obtaining of all necessary approvals such as, but not limited to, those of state health department agencies, landlords and corporate approvals;

(iv)   Due execution and delivery by the parties of mutually acceptable Definitive Agreements and other documents;

CONFIDENTIAL

**JAE 0664**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 12 of 18

(v) receipt of all other necessary or appropriate shareholder, governmental, or third party approvals, consents, registrations or non-objections, if any;

(vi) The adoption amended and restated Bylaws effecting, among other things, the increase of the number of authorized directors to five;

(vii) Cancellation of the Cancelled Warrant shares;

(viii) The adoption of management contract with KPCGM in form and substance reasonably satisfactory to the Company and its legal counsel;

(ix) The closing of the Warrant Cancellation Transaction and Warrant Redemption Transaction;

(x) No order, decree or injunction of a court or other governmental entity that prevents the consummation of the Transactions or that threatens to prevent the Transactions, and no notice received by any party from any governmental authority of any pending or threatened investigation concerning the Transactions;

(xi) The Trustee receiving an adequate consideration opinion and a fairness opinion from a qualified independent appraiser in form and substance reasonably satisfactory to the Trustee;

(xii) Obtaining evidence that the Company has secured an ERISA fidelity bond for the ESOP;

(xiii) The Company obtaining a favorable 409(p) test from a qualified administration firm reasonably acceptable to the Trustee;

(xiv) Funding of the Inside Loan; and

(xv) The Stock Purchase Transaction closing no later than August 15, 2015.

**Post-Closing Covenants:** The parties would agree to the following post-Closing covenants:

(i) The Company would conduct regular and annual meetings of the Board, the annual meeting of the shareholder, and all regular meetings of the governance committees in accordance with the Company's bylaws and applicable state law;

CONFIDENTIAL

SPCP_0000018849

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 13 of 18

(ii)   The Company would make contributions to the ESOP and/or declare and pay distributions and/or dividends on the shares of common stock owned by the ESOP in an amount sufficient to enable the ESOP to meet the obligations under the Inside Loan;

(iii)   Commencing August 31, 2017, the Company would obtain a repurchase liability study from a qualified administration firm reasonably acceptable to the Trustee every other year to quantify the Company's repurchase liability;

(iv)   The Board would qualify and appoint two candidates to serve as independent directors on the Board until the next annual meeting of the shareholder;

(v)   The Company would agree to use commercially reasonable efforts to obtain new term life insurance policies on the lives of Dr. Kali Pradip Chaudhuri and Suzanne Richards; and

(vi)   The Company would elect S corporation status effective September 1, 2015;

**Representations & Warranties:**   *Company & Shareholder.*   In connection with the Stock Purchase Transaction, the Company would make customary representations and warranties to the Trustee regarding organization, capitalization, enforceability, consents and conflicts, and no brokers (each of the foregoing, a **"Company Fundamental Representation and Warranty"**), financial information, leased property, litigation, environmental, health, safety, brokerage, compensation, assets, compliance with laws and permits, tax matters, material contracts, accounts receivable, insurance coverage, employee matters, intellectual property, suppliers, agreements with affiliates, no public offering, cooperation with independent appraiser, cooperation with trustee, and full disclosure and other generally customary representations and warranties determined appropriate or necessary following completion of the Trustee's due diligence investigation.

*Shareholder & Redeemed Warrantholders.*   In connection with the Warrant Redemption Transaction and the Stock Purchase Transaction, the Shareholders and Redeemed Warrantholders would make customary representations and warranties to the Company regarding enforceability, no conflicts, ownership of common stock shares and Redeemed Warrant shares, capacity, title (each of the foregoing, a **"Seller Fundamental Representation and Warranty"**) litigation, representations and warranties, and full disclosure.

CONFIDENTIAL

**JAE 0666**

SPCP_0000018850

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 14 of 18

*Trustee.* In connection with the Stock Purchase Transaction, the Trustee would make customary representations and warranties to the Company regarding authority, enforceability, consents, no brokers, adequate consideration and fairness opinion, exclusive benefit, purchase for own account, permitted consideration and full disclosure.

**Remedies:**   *Obligations to Defend, Indemnify and Hold Harmless.* Subject to the limitations set forth herein, the parties would assume commercially reasonable defense, indemnification and release obligations as follows:

*Several Obligations of each Redeemed Warrantholder and Shareholder.* Each Warrantholder and Shareholder would agree to defend, indemnify and hold harmless the Company for losses arising out of (a) a breach of a representation or warranty made by such Redeemed Warrantholder or Shareholder, and (b) third-party claims based upon the foregoing. The obligations of each Warrantholder and the Shareholder for the aforementioned losses would be several and not joint and several.

*Joint and Several Obligations of the Warrantholders and Shareholder.* The Redeemed Warrantholder and Shareholder would agree to defend, indemnify and hold harmless the Trust for losses arising out of (a) a breach of a representation or warranty made by the Company, (b) a failure to perform any obligation or covenant to-be-performed by the Company and (c) third-party claims based upon the foregoing. The obligations of each Warrantholders and the Shareholder for the aforementioned losses would be joint and several.

*Trustee Obligations.* The Trustee would agree to defend, indemnify and hold harmless the Company for losses arising out of (a) a breach of a representation or warranty made by the Trustee, (b) a failure to perform any obligation or covenant to-be-performed by the Trustee, and (c) third-party claims based upon the foregoing.

*Limitations.* The parties' indemnification obligations would be subject to the following principal limitations:

*Survival.* Representations and warranties regarding tax matters, benefit plans and employee matters would survive the Closing until the expiration of ninety (90) calendar days following the applicable limitations period. Seller Fundamental Representations and Warranties and Company Fundamental Representations and Warranties would survive the Closing and continue into perpetuity. All other representations and warranties made by the parties would survive the Closing and continue until the later of (i) twenty-four (24) months from anniversary of the Closing or (ii) 30 calendar

CONFIDENTIAL

SPCP_0000018851

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 15 of 18

days from the Trustee's receipt of the audited financial statements covering a full fiscal year post-transaction.

Notwithstanding the preceding, a special indemnification classification shall be established to indemnify for losses generated by a loss of a required license if such loss is due to the change in control represented by the ESOP purchase ("License Indemnification"). The License Indemnification shall survive for the shorter of (i) the end of the first renewal period for the applicable license following closing, and (ii) four years from Closing.

*Indemnification Caps.* The maximum indemnification to which any indemnified party would be entitled would be 30% of the applicable purchase price received by that party; provided, however, that indemnification attributable to claims based on breaches of Seller Fundamental Representations and Warranties and Company Fundamental Representations and Warranties would be limited to the applicable purchase price received by that party. The indemnification cap would not apply to indemnification in respect of claims sounding in statutory or common law fraud. The cap shall not apply to the License Indemnification.

*Deductibles.* An indemnified party would not be eligible for indemnification from an indemnifying party until losses are ▮▮▮▮▮ (on a cumulative basis) (the "**Deductible**"), and indemnification would be only for losses in excess of the Deductible, provided, that losses applicable to the License Indemnification shall not be subject to the Deductible. .

*Setoff.* An indemnifying party's obligation to indemnify would first be satisfied by setoff against any debt obligation owed by the indemnified party to the indemnifying party.

*Equitable Remedies.* The Company would be entitled to seek equitable relief for any breach or threatened breach of a restrictive covenants relating to non-competition, non-solicitation (customers and employees) and confidentiality.

**Due Diligence
Review:**
The Trustee team's Due Diligence Review began on or about April 10, 2015. The Shareholder and the Company have or shall permit the Trustee and its counsel, accountants and other representatives full access during normal business hours to all the properties, assets, books, records, agreements and other documents of each related to the business of the Company or the Transactions. During the Due Diligence Review, the Shareholder and the Company has or shall furnish to the Trustee and its representatives all information concerning the Company's business and the

**JAE 0668**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 16 of 18

Shareholder as related to the Transactions as requested.  As part of the Due Diligence Review, the Company has or shall provide financial statements, customer and contract information, and all other such business information as may be reasonably requested.

**Miscellaneous:**     The Definitive Agreements for the Warrant Redemption Transaction and the Stock Purchase Transaction and related matters will contain other terms and conditions (i) as negotiated by the parties on the basis of the Due Diligence Review or otherwise, and (ii) as are customary for a transaction of this kind.

In the definition of "EBITDA Targets" for purposes of determining (a) SAR grants under the MIP Plan and (b) any annual performance bonuses, non-recurring ESOP set-up costs, transaction fees and expenses for payments to retire SARs, and payments of performance bonuses to KPCGM, ESOP contributions and any expenses associated with the warrants shall not be included in the calculation of EBITDA for purposes of determining SAR grants and any bonuses discussed above.

**Non-Binding Intent:** This Letter reflects the intention of the parties, but for the avoidance of doubt neither this Letter nor its acceptance shall give rise to any legally binding or enforceable obligation on any party.  No contract or agreement providing for any transaction involving the Company shall be deemed to exist between the parties unless and until the Definitive Agreements have been executed and delivered.



CONFIDENTIAL

SPCP_0000018853

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 17 of 18

Acknowledged this 7ᵗʰ day of AUGUST 2015

On behalf of the Shareholder

By: _____,
Dr. Kali P. Chaudhuri
Shareholder

Acknowledged this 4ᵗʰ day of AUGUST 2015

On behalf of the Redeemed Warrantholders

By: _____
William E. Thomas

Acknowledged this 4ᵗʰ day of AUGUST 2015

On behalf of the Cancelled Warrantholder

By: _____
Dr. Kali P. Chaudhuri

Acknowledged this 4ᵗʰ day of AUGUST 2015

On behalf of KPC Healthcare, Inc. and KPC Healthcare Holdings, Inc.

By: _____
William E. Thomas
General Counsel

CONFIDENTIAL                                                    SPCP_0000018854

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 18 of 18

Acknowledged this 3rd day of August 2015

On behalf of Alerus Financial N.A., not in its individual or corporate capacities, but solely in its
capacity as trustee of the KPC Healthcare, Inc. Employee Stock Ownership Trust

By: _____
Nels Carlson
Managing Director

CONFIDENTIAL

**JAE 0671**

SPCP_0000018855

# EXHIBIT 8

August 3, 2015

## SUBORDINATED DEBT OFFERING & DETACHABLE WARRANTS TERM SHEET

**PERSONAL & CONFIDENTIAL**
**Via e-mail: erin.turley@klgates.com**

KPC Healthcare, Inc. Employee Stock Ownership Trust
Alerus Financial, N.A., Trustee
c/o K&L Gates LLP
Attention: Erin Turley, Partner
1717 Main Street, Suite 2800
Dallas, TX 75201

RE:   Subordinated Debt Offering; Detachable Warrants

Dear Ms. Turley:

This letter (this "**Letter**") summarizes the principal terms of a proposal being evaluated by the Board of Directors (the "**Board**") of KPC Healthcare Holdings, Inc., a California corporation (the "**Company**"), the board of directors of KPC Healthcare, Inc., a Nevada corporation (the "**Subsidiary**"), Alerus Financial N.A., not in its individual or corporate capacity, but solely in its capacity as trustee (the "**Trustee**") of the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Trust (the "**Trust**"), which would be maintained pursuant to the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Plan (the "**Plan**," and together with the Trust, the "**ESOP**"), William E. Thomas, SPCP Group, LLC, SPCP Group IV, LLC, (each a "**Redeemed Warrantholder**," and collectively, the "**Redeemed Warrantholders**"), and Dr. Kali Pradip Chaudhuri ("**Shareholder**"). Capitalized terms used in this Letter and not otherwise defined have the meaning ascribed to them in the Letter of Intent & Summary Term Sheet of even date herewith.

This Letter summarizes the principal terms of the Company's offer to issue subordinated promissory notes and detachable warrants to redeem warrants from the Redeemed Warrantholders and to refinance the ESOP Note (defined in the ESOP Summary Term Sheet).

This Letter is not intended to create any binding legal or contractual obligation on the part of the parties, but is intended to solely reflect the intention of those parties to negotiate in for the preparation, execution and delivery of definitive agreements containing the principal terms described herein.

**Subordinated Notes:**

| | |
|---|---|
| **Issuer:** | KPC Healthcare Holdings, Inc. |
| **Creditors:** | Dr. Kali Pradip Chaudhuri<br>SCPC Group, LLC |

DA-3381488 v1

**JAE 0673**

SPCP_0000018856

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 2 of 6

SCPC Group IV, LLC
William E. Thomas

**Purpose:** The Subordinated Notes will be issued to the Redeemed Warrantholders in connection with the Subsidiary's redemption of all outstanding warrants held by such parties and will be issued to the Shareholder in connection with the Company's assumption of the ESOP Note (as defined in the ESOP Summary Term Sheet).

**Amount of Offering:**

| | |
|---|---|
| Dr. Kali Pradip Chaudhuri | $ |
| SCPC Group, LLC | $ |
| SCPC Group IV, LLC | $ |
| William E. Thomas | $ |
| TOTAL | $ |

**Interest Rate:** Three percent (3%) per annum payable in cash on a monthly basis.

Any cash interest earned but not paid on the Subordinated Notes would be added to the then-outstanding principal balance of the Subordinated Notes as payment-in-kind interest.

**Term/Amortization:** **Subject to the approval of Credit Suisse,** interest only payments, on a monthly basis, while the outstanding senior indebtedness incurred in connection with the Transactions is outstanding. Principal and interest to be amortized quarterly over a five-year period commencing after full repayment of any outstanding senior indebtedness incurred in connection with the Transactions. Total balance is due ten years from the date of issuance.

**Security:** The Company's obligations under the Subordinated Notes would be unsecured.

**Subordination:** The Company's obligations under the Subordinated Notes would be subordinated to all of its obligations to Credit Suisse.

**Structure:** ██████ internal rate of return per annum, consisting of (i) a monthly cash payment of ██ per month ██ per annum) on the outstanding principal balance; plus (ii) *a to-be calculated number* of detachable warrant shares (the **"Warrants"**) representing a ██ compounded rate of return per annum.

**Prepayment Penalty:** None.

**JAE 0674**

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 3 of 6

**Creditors' Rights:**

*Customary Rights.* The holders of the Subordinated Notes would be entitled to creditor rights customary for a transaction similar to the Transactions, including:

*Information Rights.* For so long as any portion of principal or interest remains outstanding under the Subordinated Notes, the Creditors' Representative shall be entitled to all information (whether written or oral) regarding the Company, its business, financial performance and operations to which the Board is entitled. The Board shall reasonably cooperate in making such information available to the Creditors' Representative.

*Inspection Rights.* The Company shall permit the Creditors' Representative to inspect the Company's books of account and records and discuss the Company's affairs, finances, and accounts with its directors and executive officers.

*Observance Rights.* For so long as any portion of the principal or interest remains outstanding under the Subordinated Notes, the Creditors' Representative (or his, her or its representative) shall be entitled to notice of and attendance at each regular, special and annual, regular and special meeting of the Board and each special and annual meeting of the shareholders.

*Organizational Documents.* Neither the Board nor the shareholder(s) of the Company can amend the articles of incorporations or bylaws of the Company without the prior, written consent of the Creditors' Representative, which consent shall not be unreasonably withheld or conditioned.

*Consent Rights.* Upon a default under the Subordinated Notes that remains uncured for a period of sixty (60) calendar days, the Creditors' Representative would have certain consent rights relating to fundamental operations of the Company. Such consent rights would remain in full force and effect until the Company has timely satisfied all of its obligations under each of the Subordinated Notes held by the Creditors (or their successor transferees) for a consecutive six (6) month period.

*Creditors' Representative.* The initial Creditors' Representative shall be Dr. Chaudhuri.

**Detachable Warrants:**

The Creditors would receive Warrants for the purchase of *a to-be calculated amount* of the Company's common equity on a gross

CONFIDENTIAL

SPCP_0000018858

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 4 of 6

basis (and would be issued at an exercise price equal to the fair market value of the Company stock on the date of issuance, subsequent to the Transactions), on a fully-diluted basis. The exercise price of the Warrants would be at fair market value as of the date of issuance consistent with the methodology and discounts used in the Company's annual ESOP appraisal prepared by an independent appraiser.

The Warrants would be designed to expire on December 31, 2027 (the "Maturity Date"). The Warrants would be exercisable, partially or fully, on the earlier of (i) the repayment in full of the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes; or (ii) on the Maturity Date. The Warrants would be exercisable upon a change in control (including an IPO); provided that the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes has been paid off in full, or with the consent of the senior lender. Exercise of the Warrants would require 30 days advance written notice to the Company.

Full anti-dilution provisions would be established to adjust the number of Warrants for stock splits, stock dividends and issuance of additional stock at a below market price.

The Warrant holder can put the Warrant to the Company (i) for cash, (ii) a 5-year subordinated note with a to be agreed-upon market-level of interest, or (iii) any combination (in whole or in part) thereof at the option of the Company. The Warrant holders can put the Warrant to the Company for repurchase immediately following (i) the date on which the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes have been repaid in full; (ii) the Maturity Date; (iii) once exercisable, upon delivery of written notice by the Warrant holder assuming the Company has not called the Warrant (described below); (iv) upon a change in control (including an IPO); and (v) in the event the Company does not exercise its call right after notice of exercise. The put price shall be the value of the Warrant set by the Company based on the same value as the annual ESOP appraisal (net of the exercise price of the Warrants).

The Company also shall have the right to call the Warrant if the Warrant holder (i) exercises the Warrant; (ii) upon a change in control (including an IPO); (iii) if after closing (or any time during which the Company, or its shareholder makes an election, or intends

CONFIDENTIAL

**JAE 0676**

SPCP_0000018859

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 5 of 6

to make an election to be treated as an S corporation for Federal income tax purposes), the Warrant holder is or becomes ineligible to hold S corporation stock; and (iv) on the date which the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes have been repaid in full, *provided however, that subject to (iv) above, the Company cannot call the Warrant prior to December 31, 2022*. The Company further has the right to pay the Warrant holder (a) in cash, (b) with a 5-year subordinated note with a to be agreed upon market level of interest (if the call is triggered for reasons other than a change in control), or (c) any combination (in whole or in part) thereof (if the call is triggered for reasons other than a change in control). The call price shall be the value of the Warrant set by the Company based on the same value as the annual ESOP appraisal, or the change in control price (net of the exercise price of the Warrants).

**Non-Binding Intent:**   This Letter reflects the intention of the parties, but for the avoidance of doubt neither this Letter nor its acceptance shall give rise to any legally binding or enforceable obligation on any party. No contract or agreement providing for any transaction involving the Company shall be deemed to exist between the parties unless and until the Definitive Agreements have been executed and delivered.

**JAE 0677**

CONFIDENTIAL

Alerus Financial, N.A.
c/o K&L Gates LLP
August 3, 2015
Page 6 of 6

Acknowledged this ____ day of _____ 2015

On behalf of the Creditors

By: _____
     Dr. Kali P. Chaudhuri

Acknowledged this ____ day of _____ 2015

On behalf of KPC Healthcare, Inc. and KPC Holdings, Inc.

By: _____
     William E. Thomas, General Counsel

Acknowledged this _3rd_ day of _August_ 2015

On behalf of Alerus Financial N.A., not in its individual or corporate capacities, but solely in its capacity as trustee of the KPC Healthcare, Inc. Employee Stock Ownership Trust

By: _____
     Nels Carlson
     Managing Director

CONFIDENTIAL

SPCP_0000018861

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 9

**From:** Thomas Banks [tbanks@silverpointcapital.com]
**Sent:** 8/13/2015 2:16:05 PM
**To:** Bill Marcus [wmarcus@silverpointcapital.com]
**Subject:** FW: Question on ESOP

---

**From:** Bill Thomas [mailto:bthomas@GlobalMSO.com]
**Sent:** Thursday, August 06, 2015 3:52 PM
**To:** Thomas Banks
**Cc:** 'Phillip Chou'
**Subject:** FW: Question on ESOP

Here's what our financial advisor sent me in response to your question on the model

William E. Thomas
Executive Vice President and General Counsel
Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
(951) 782-8812 (phone)
(951) 782-8850 (fax)
bthomas@globalmso.com   PLEASE NOTE THE CHANGE IN EMAIL ADDRESS

---

**From:** Phillip Chou [mailto:phillip.chou@eurekacap.com]
**Sent:** Thursday, August 06, 2015 12:43 PM
**To:** Bill Thomas
**Subject:** RE: Question on ESOP

Bill,

Here is what CS and Trustee appraiser have. Our understanding is Trustee is using a run-rate EBITDA of ▮▮▮▮ based on info provided. Our estimate of LTM normalized EBITDA through 6/30/2015 (not shown below) is about ▮▮▮▮ (up from ▮▮▮▮ for FYE 3/31/2015).

CONFIDENTIAL

*(Dollars in Thousands)*



CONFIDENTIAL

# EXHIBIT 10

Confidential
As of 9.16.15



**KPC Healthcare, Inc.** – Silver Point provided $10 million of a ▮▮▮▮ loan to facilitate the sale of the Company to an employee stock ownership program ("ESOP"). The loan funded the cash component of the sale price, funded a six-month debt service reserve account, and paid fees and expenses associated with the transaction. KPC Healthcare owns and operates four acute care hospitals in Orange County, CA that comprise 762 beds or approximately 12% of the available beds in the market. The loan is secured by a first lien on all Company cash flows resulting from the Qualified Assurance Fee Program ("QAF"), a first lien on all non-ABL assets, and a second lien on all ABL assets. The loan was priced at ▮▮▮▮ with a ▮▮▮▮ floor and ▮▮▮ OID. The loan matures in ▮▮▮▮ and has a non-call period of ▮▮▮▮, with subsequent call protection of ▮▮▮▮▮▮▮▮▮▮▮▮ respectively. This results in an IRR to maturity of ▮▮

We expect that the loan will be repaid through cash received from the QAF Program, which we expect to be ▮▮ ▮▮ by January 2018. Even if the QAF proceeds were eliminated, we believe our loan is covered through the underlying value of the hospitals. From a valuation perspective, we underwrote the loan on an LTV start to end of ▮▮▮▮ We feel this is appropriate given our first lien status on two independent and uncorrelated cash flow steams in the QAF Program and existing operating business.

| Borrower | KPC Healthcare, Inc. (f/k/a Integrated Healthcare Holdings, Inc.) |
|---|---|
| Amount | $10 million |
| Closing Date | 8/28/15 |
| Interest Rate | ▮▮▮▮ |
| Fees | ▮▮▮▮ |
| Maturity | ▮▮ |
| Make-Whole | ▮▮▮▮ |
| Use of Proceeds | Fund cash portion of Company sale to an employee stock ownership program ("ESOP"), provide upfront portion of six-month debt service reserve account, and pay fees and expenses |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 11

**EXECUTION VERSION**

CREDIT AGREEMENT

dated as of

August 28, 2015,

among

KPC HEALTHCARE HOLDINGS, INC.,
as Holdings,

KPC HEALTHCARE, INC.,
as Borrower,

THE LENDERS PARTY HERETO,

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and Collateral Agent,

and

CREDIT SUISSE PARK VIEW BDC, INC.,
as Sole Bookrunner, Sole Lead Arranger and Arranger Agent

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000433

Table Of Contents

Page

Article I        Definitions..................................................................................... 1

Section 1.01.  Defined Terms ............................................................. 1

Section 1.02.  Terms Generally ....................................................... 29

Section 1.03.  Pro Forma Calculations ........................................... 30

Section 1.04.  Classification of Loans and Borrowings.................. 30

Section 1.05.  Designation as Senior Debt ..................................... 30

Article II        The Credits .................................................................................. 30

Section 2.01.  Commitments ............................................................ 30

Section 2.02.  Loans ......................................................................... 30

Section 2.03.  Borrowing Procedure ............................................... 31

Section 2.04.  Evidence of Debt; Repayment of Loans .................. 32

Section 2.05.  Fees ........................................................................... 33

Section 2.06.  Interest on Loans ...................................................... 33

Section 2.07.  Default Interest ......................................................... 33

Section 2.08.  Alternate Rate of Interest ......................................... 34

Section 2.09.  Termination and Reduction of Commitments........... 34

Section 2.10.  Conversion and Continuation of Borrowings .......... 34

Section 2.11.  Repayment of Borrowings ........................................ 36

Section 2.12.  Voluntary Prepayment .............................................. 36

Section 2.13.  Mandatory Prepayments ........................................... 37

Section 2.14.  Reserve Requirements; Change in Circumstances ................... 38

Section 2.15.  Change in Legality.................................................... 39

Section 2.16.  Breakage ................................................................... 40

Section 2.17.  Pro Rata Treatment ................................................... 40

Section 2.18.  Sharing of Setoffs ..................................................... 41

Section 2.19.  Payments ................................................................... 41

Section 2.20.  Taxes ......................................................................... 42

Section 2.21.  Assignment of Commitments Under Certain Circumstances; Duty
to Mitigate........................................................... 45

Section 2.22.  Defaulting Lenders.................................................... 47

-i-

OHSUSA:762548252

CONFIDENTIAL                                                                                                    KPCDEF_000434

Article III        Representations and Warranties.......................................................................... 48

    Section 3.01.   Organization; Powers............................................................................ 48

    Section 3.02.   Authorization ...................................................................................... 48

    Section 3.03.   Enforceability...................................................................................... 48

    Section 3.04.   Governmental Approvals .................................................................... 48

    Section 3.05.   Financial Statements ........................................................................... 49

    Section 3.06.   No Material Adverse Change............................................................... 49

    Section 3.07.   Title to Properties; Possession Under Leases ........................................... 49

    Section 3.08.   Subsidiaries ........................................................................................ 50

    Section 3.09.   Litigation; Compliance with Laws....................................................... 50

    Section 3.10.   Agreements ......................................................................................... 50

    Section 3.11.   Federal Reserve Regulations............................................................... 51

    Section 3.12.   Investment Company Act .................................................................... 51

    Section 3.13.   Use of Proceeds................................................................................... 51

    Section 3.14.   Tax Returns ......................................................................................... 51

    Section 3.15.   No Material Misstatements .................................................................. 51

    Section 3.16.   Employee Benefit Plans; ESOP ........................................................... 52

    Section 3.17.   Environmental Matters........................................................................ 53

    Section 3.18.   Insurance ............................................................................................ 53

    Section 3.19.   Security Documents............................................................................. 53

    Section 3.20.   Location of Real Property and Leased Premises ..................................... 54

    Section 3.21.   Labor Matters...................................................................................... 54

    Section 3.22.   Solvency.............................................................................................. 55

    Section 3.23.   Senior Indebtedness ............................................................................ 55

    Section 3.24.   Sanctioned Persons ............................................................................. 55

    Section 3.25.   Foreign Corrupt Practices Act ............................................................. 55

    Section 3.26.   Reimbursement; Investigations; Certifications..................................... 55

    Section 3.27.   Providers ............................................................................................. 56

    Section 3.28.   Quality Assurance Fee Program .......................................................... 56

Article IV        Conditions of Lending .......................................................................... 56

Article V         Affirmative Covenants .......................................................................... 60

    Section 5.01.   Existence; Compliance with Laws; Businesses and Properties.............. 60

    Section 5.02.   Insurance ............................................................................................ 61

-ii-

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000435

Section 5.03.   Obligations and Taxes.............................................................................. 62

Section 5.04.   Financial Statements, Reports, Etc ............................................................ 62

Section 5.05.   Litigation and Other Notices ..................................................................... 64

Section 5.06.   Information Regarding Collateral ............................................................... 65

Section 5.07.   Maintaining Records; Access to Properties and Inspections;
                Maintenance of Ratings ............................................................................ 65

Section 5.08.   Use of Proceeds........................................................................................ 66

Section 5.09.   Employee Benefits .................................................................................... 66

Section 5.10.   Compliance with Environmental Laws....................................................... 66

Section 5.11.   Preparation of Environmental Reports....................................................... 66

Section 5.12.   Further Assurances ................................................................................... 67

Section 5.13.   [Reserved] ................................................................................................ 67

Section 5.14.   Lender Meetings ....................................................................................... 67

Section 5.15.   S Corporation Status ................................................................................ 67

Section 5.16.   Quality Assurance Fee Program; Quality Assurance Fees ....................... 68

Section 5.17.   Post-Closing ............................................................................................. 68

Article VI       Negative Covenants ................................................................................. 68

Section 6.01.   Indebtedness............................................................................................ 68

Section 6.02.   Liens ........................................................................................................ 70

Section 6.03.   Sale and Lease-Back Transactions........................................................... 71

Section 6.04.   Investments, Loans and Advances ........................................................... 71

Section 6.05.   Mergers, Consolidations, Sales of Assets and Acquisitions..................... 73

Section 6.06.   Restricted Payments; Restrictive Agreements ......................................... 73

Section 6.07.   Transactions with Affiliates ...................................................................... 75

Section 6.08.   Business of Holdings, Borrower and Subsidiaries..................................... 75

Section 6.09.   Other Indebtedness and Agreements ....................................................... 75

Section 6.10.   Capital Expenditures................................................................................. 76

Section 6.11.   Minimum Coverage Ratios ....................................................................... 76

Section 6.12.   Maximum Senior Leverage Ratio .............................................................. 77

Section 6.13.   Revolver Availability.................................................................................. 78

Section 6.14.   Fiscal Year; Fiscal Quarters ..................................................................... 78

Section 6.15.   Certain Equity Securities .......................................................................... 78

Section 6.16.   Debt Service Reserve Account ................................................................. 78

-iii-

CONFIDENTIAL

Section 6.17.   Litigation Reserve Account ..................................................... 78

Article VII    Events of Default .................................................................... 79

Article VIII   The Administrative Agent, the Collateral Agent and the Arranger Agent; Etc .......................................................................................... 83

Article IX     Miscellaneous ......................................................................... 86

Section 9.01.   Notices; Electronic Communications ...................................... 86

Section 9.02.   Survival of Agreement ............................................................ 88

Section 9.03.   Binding Effect ....................................................................... 88

Section 9.04.   Successors and Assigns........................................................... 88

Section 9.05.   Expenses; Indemnity .............................................................. 94

Section 9.06.   Right of Setoff........................................................................ 95

Section 9.07.   Applicable Law ...................................................................... 96

Section 9.08.   Waivers; Amendment .............................................................. 96

Section 9.09.   Interest Rate Limitation .......................................................... 97

Section 9.10.   Entire Agreement ................................................................... 97

Section 9.11.   WAIVER OF JURY TRIAL.................................................... 97

Section 9.12.   Severability ........................................................................... 98

Section 9.13.   Counterparts .......................................................................... 98

Section 9.14.   Headings ............................................................................... 98

Section 9.15.   Jurisdiction; Consent to Service of Process ............................. 98

Section 9.16.   Confidentiality ...................................................................... 99

Section 9.17.   Lender Action ........................................................................ 99

Section 9.18.   USA PATRIOT Act Notice .................................................... 100

OHSUSA:762548252

-iv-

CONFIDENTIAL

KPCDEF_000437

SCHEDULES

| Schedule 1.01(b) | Subsidiary Guarantors |
| Schedule 2.01 | Lenders and Commitments |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.08 | Subsidiaries |
| Schedule 3.09(a) | Litigation |
| Schedule 3.09(d) | Seismic Compliance |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.18 | Insurance |
| Schedule 3.19(a) | UCC Filing Offices |
| Schedule 3.20(a) | Owned Real Property |
| Schedule 3.20(b) | Leased Real Property |
| Schedule 5.17 | Post-Closing Matters |
| Schedule 6.01 | Existing Indebtedness |
| Schedule 6.02 | Existing Liens |

## EXHIBITS

| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Guarantee and Collateral Agreement |
| Exhibit E | Form of Affiliate Subordination Agreement |
| Exhibit F | Form of Compliance Certificate |
| Exhibit G | Forms of U.S. Tax Compliance Certificates |
| Exhibit H | Form of Notice of Conversion and Continuation |
| Exhibit I | Form of Note |

-v-

OHSUSA:762548252

**JAE 0690**

CONFIDENTIAL

KPCDEF_000438

CREDIT AGREEMENT (this "*Agreement*") dated as of August 28, 2015, among KPC HEALTHCARE, INC., a Nevada corporation (the "*Borrower*"), KPC HEALTHCARE HOLDINGS, INC., a California corporation ("*Holdings*"), the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article I), WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent (in such capacity, including any successor thereto, the "*Administrative Agent*") and as collateral agent (in such capacity, including any successor thereto, the "*Collateral Agent*") for the Lenders and CREDIT SUISSE PARK VIEW BDC, INC., as arranger agent (in such capacity, including any successor thereto, the "*Arranger Agent*").

The Borrower has requested the Lenders to extend Loans on the Closing Date, in an aggregate principal amount not in excess of ███. The proceeds of the Loans are to be used solely to (i) fund a portion of the ESOP Transaction, (ii) fund the Debt Service Reserve Account, (iii) repay a portion of the Revolver Debt, (iv) fund the Litigation Reserve Account in the amount of $5,700,000 for use solely in connection with the Fitzgibbons Matter, (v) pay fees, costs and expenses incurred in connection with the foregoing and (vi) provide for working capital needs and general corporate purposes of the Borrower and its Subsidiaries.

The Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

## ARTICLE I

### *Definitions*

SECTION 1.01.  **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"*ABR*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"*Acquired Entity*" shall have the meaning assigned to such term in Section 6.04(g).

"*Adjusted LIBO Rate*" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the greater of (a) 1.00% per annum and (b) the product of (i) the LIBO Rate in effect for such Interest Period and (ii) Statutory Reserves.

"*Administrative Agent*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Administrative Agent Fees*" shall have the meaning assigned to such term in Section 2.05(a).

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

OHSUSA:762548252

**JAE 0691**

"*Affiliate*" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided, however,* that, for purposes of the definition of "Eligible Assignee" and Section 6.07 the term "Affiliate" shall also include any Person that directly or indirectly owns 5.00% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified.  For purposes of this Agreement, Dr. KPC and Persons he Controls are deemed to be Affiliates of the Loan Parties.

"*Affiliated SPCP Lender*" shall mean SPCP Group, LLC or any Affiliate thereof that is or proposes to be a Lender hereunder; *provided* that any such Lender shall not constitute an Affiliated SPCP Lender on any date of determination if on such date, neither SPCP Group, LLC nor any of its Affiliates owns, directly or indirectly, any Equity Interest in any Loan Party or any interest in the Subordinated Notes.

"*Affiliate Subordination Agreement*" shall mean an Affiliate Subordination Agreement in the form of Exhibit E pursuant to which intercompany obligations and advances owed by any Loan Party are subordinated to the Obligations.

"*Agents*" shall have the meaning assigned to such term in Article VIII.

"*Agreement*" shall have the meaning assigned to such term in the introductory statement hereto.

"*Agreement Value*" shall mean, for each Hedging Agreement, on any date of determination, the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower or such Subsidiary would be required to pay if such Hedging Agreement were terminated on such date.

"*Alternate Base Rate*" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day *plus* ½ of 1.00% and (c) the Adjusted LIBO Rate applicable for an Interest Period of one month determined on such day (or if such day is not a Business Day, the immediately preceding Business Day) *plus* 1.00%; *provided* that, solely for purposes of determining the Adjusted LIBO Rate for purposes of the foregoing, the LIBO Rate for any day shall be determined using the LIBO Rate as otherwise determined by the Administrative Agent in accordance with the definition of LIBO Rate, except that (x) if a given day is a Business Day, such determination shall be made on such day (rather than two Business Days prior to the commencement of an Interest Period) or (y) if a given day is not a Business Day, the LIBO Rate for such day shall be the rate determined by the Administrative Agent pursuant to preceding clause (x) for the most recent Business Day preceding such day.

If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be, for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations or offers in accordance with the terms of the respective definitions thereof, the Alternate Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the preceding sentence until the circumstances giving rise to

2

CONFIDENTIAL

such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"*Applicable Margin*" shall mean, for any day (a) with respect to any Eurodollar Loan, 9.25% per annum and (b) with respect to any ABR Loan, 8.25% per annum.  This paragraph shall not limit the rights of the Administrative Agent or the Lenders with respect to Section 2.07 and Article VII hereof, and shall survive the termination of this Agreement.

"*Arranger Agent*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Asset Sale*" shall mean the sale, transfer or other disposition (by way of merger, casualty, condemnation or otherwise) by the Borrower or any of the Subsidiaries (other than to the Borrower or any Subsidiary Guarantor) of (a) any Equity Interests of any of the Subsidiaries (other than directors' qualifying shares) or (b) any other assets of the Borrower or any of the Subsidiaries (other than (i) inventory, damaged, obsolete or worn out assets, scrap and Permitted Investments, in each case disposed of in the ordinary course of business and (ii) any sale, transfer or other disposition or series of related sales, transfers or other dispositions having a value not in excess of $1,000,000).

"*Assignment and Acceptance*" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party required under Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"*Board*" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"*Borrower*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Borrowing*" shall mean Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"*Borrowing Request*" shall mean a written request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C.

"*Breakage Event*" shall have the meaning assigned to such term in Section 2.16.

"*Business Day*" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided* that, when used in connection with a Eurodollar Loan or an ABR Loan based on the Adjusted LIBO Rate, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

3

**JAE 0693**

CONFIDENTIAL

KPCDEF_000441

"*Capital Expenditures*" shall mean, for any period, the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP, but excluding any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with insurance proceeds, condemnation awards or damage recovery proceeds relating to any such damage, loss, destruction or condemnation.

"*Capital Lease Obligations*" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

A "*Change in Control*" shall be deemed to have occurred if (a) the ESOP, the employees of the Loan Parties and the participants and beneficiaries of the ESOP, collectively, shall cease to directly own, beneficially and of record, 100% of the issued and outstanding capital stock of Holdings (other than treasury stock of Holdings, which may be issued), (b) Holdings shall cease to directly own, beneficially and of record, 100% of the issued and outstanding Equity Interests of the Borrower (other than treasury stock of Borrower, which may be issued), (c) the Borrower shall cease to directly own, beneficially and of record, 100% of the issued and outstanding Equity Interests of any Loan Party, (d) any Person other than an independent institutional ESOP trustee whose appointment complies with ERISA, the Code and the ESOP Documents is appointed, chosen or otherwise serves as an ESOP Trustee or (e) any change in control (or similar event, however denominated) with respect to Holdings, the Borrower or any Subsidiary shall occur under and as defined in any indenture or agreement in respect of Material Indebtedness to which Holdings, the Borrower or any Subsidiary is a party.

"*Change in Law*" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Chapman Lease*" shall mean, collectively, the lease agreements dated December 31, 1984 by and between Chapman Medical L.P. and the Borrower with respect to the

4

OHSUSA:762548252

CONFIDENTIAL

Chapman Global Medical Center and medical office building, and each sublease entered into from time to time thereunder between the Borrower and any of its Affiliates.

"***Charges***" shall have the meaning assigned to such term in Section 9.09.

"***Closing Date***" shall mean August 28, 2015.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" shall mean all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties.

"***Collateral Agent***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Commitment***" shall mean, with respect to any Lender, the commitment of such Lender to make Loans hereunder as set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment.

"***Communications***" shall have the meaning assigned to such term in Section 9.01.

"***Company ESOP Loan***" shall mean the loan in an initial aggregate principal amount of $79,448,000 from Holdings to the ESOP Trust pursuant to the ESOP Loan Documents.

"***Company ESOP Loan Documents***" shall mean that certain promissory note issued by the ESOP Trust in favor of Holdings dated August 28, 2015 evidencing the ESOP Loan, that certain ESOP credit agreement dated August 28, 2015 by and between the ESOP Trust and Holdings, and that certain ESOP stock pledge agreement dated August 28, 2015, by and among the ESOP Trust and Holdings.

"***Connection Income Taxes***" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"***Consolidated EBITDA***" shall mean, for any period, Consolidated Net Income for such period *plus* (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) consolidated interest expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any non-cash charges (other than the write-down of current assets) for such period, (v) expense associated with cash contributions to the ESOP permitted by Section 6.06(a)(iii) and the application of such contributions to repay the ESOP Loan for such period and (vi) all fees, costs and expenses payable or otherwise incurred in connection with the Transactions or any Loan Document in an aggregate amount not to exceed ▮▮▮▮▮, and *minus* (b) without duplication (i) all cash payments made during such period on account of reserves, restructuring charges and other non-cash charges added to Consolidated Net Income pursuant to clause (a)(iv) above in a previous period, (ii) any net after tax gain or income from the early extinguishment of Indebtedness, (iii) to the extent included in determining such Consolidated Net Income, all income and gains associated with the ESOP Loan for such period

OHSUSA:762548252

5

**JAE 0695**

and (iv) to the extent included in determining such Consolidated Net Income, any extraordinary gains and all non-cash items of income for such period, all determined on a consolidated basis in accordance with GAAP; *provided* that (A) the Consolidated EBITDA of any Acquired Entity acquired by the Borrower or any Subsidiary pursuant to a Permitted Acquisition during such period shall be included on a pro forma basis for such period (assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith occurred as of the first day of such period), (B) the Consolidated EBITDA of any Person or line of business sold or otherwise disposed of by the Borrower or any Subsidiary during such period shall be excluded for such period (assuming the consummation of such sale or other disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such period), (C) the net amount of fees paid and/or received by the Loan Parties in connection with the QAF Program shall be excluded from Consolidated EBITDA (and to the extent included as a component in the calculation of Consolidated Net Income, shall be reversed for such purposes) and (D) all fees, costs and expenses payable or otherwise incurred in connection with the Fitzgibbons Matter shall be excluded from Consolidated EBITDA (and to the extent included as a component in the calculation of Consolidated Net Income, shall be reversed for such purposes). For purposes of determining the Fixed Charge Coverage Ratio, the Interest Coverage Ratio and the Senior Leverage Ratio as of or for the period of four consecutive fiscal quarters ending November 30, 2015, February 29, 2016 and May 31, 2016, Consolidated EBITDA shall be deemed to be the amount set opposite each applicable month listed below:

| **Month** | **Consolidated EBITDA** |
|---|---|
| December, 2014 | |
| January, 2015 | |
| February, 2015 | |
| March, 2015 | |
| April, 2015 | |
| May, 2015 | |
| June, 2015 | |

"*Consolidated Fixed Charges*" shall mean, for any period, the sum of (a) Consolidated Interest Expense (without giving effect to the final sentence thereof) paid in cash for such period, (b) the aggregate amount of scheduled principal payments made during such period in respect of Indebtedness of the Borrower and the Subsidiaries (other than payments made by the Borrower or any Subsidiary to the Borrower or a Subsidiary) and (c) Restricted Payments paid in cash during such period (excluding Restricted Payments permitted by Section 6.06(a)(i), Section 6.06(a)(iii), Section 6.06(a)(iv) and Section 6.06(a)(vii)). For purposes of determining the Fixed Charge Coverage Ratio for the period of four consecutive fiscal quarters ending

6

OHSUSA:762548252

CONFIDENTIAL

**JAE 0696**

KPCDEF_000444

November 30, 2015, February 29, 2016 and May 31, 2016, Consolidated Fixed Charges shall be deemed to be equal to (a) the Consolidated Fixed Charges for the fiscal quarter ending November 30, 2015, *multiplied by* 4, (b) the Consolidated Fixed Charges for the two consecutive fiscal quarters ending February 29, 2016, *multiplied by* 2 and (c) the Consolidated Fixed Charges for the three consecutive fiscal quarters ending May 31, 2016, *multiplied by* 4/3, respectively.

"*Consolidated Interest Expense*" shall mean, for any period, the interest expense (including imputed interest expense in respect of Capital Lease Obligations of the Borrower and the Subsidiaries) for such period, determined on a consolidated basis in accordance with GAAP. For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by the Borrower or any Subsidiary with respect to interest rate Hedging Agreements.  For purposes of determining the Interest Coverage Ratio for the period of four consecutive fiscal quarters ending November 30, 2015, February 29, 2016 and May 31 2016, Consolidated Interest Expense shall be deemed to be equal to (a) the Consolidated Interest Expense for the fiscal quarter ending November 30, 2015, *multiplied by* 4, (b) the Consolidated Interest Expense for the two consecutive fiscal quarters ending February 29, 2016, *multiplied by* 2 and (c) the Consolidated Interest Expense for the three consecutive fiscal quarters ending May 31, 2016, *multiplied by* 4/3, respectively.

"*Consolidated Net Income*" shall mean, for any period, the net income or loss of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP (adjusted to reflect any charge, tax or expense incurred or accrued by Holdings during such period as though such charge, tax or expense had been incurred by the Borrower, to the extent that the Borrower has made or would be entitled under the Loan Documents to make any payment to or for the account of Holdings in respect thereof); *provided* that there shall be excluded (a) the income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by the Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such Subsidiary, (b) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary, (c) the income of any Person in which any other Person (other than the Borrower or a Wholly Owned Subsidiary or any director holding qualifying shares in accordance with applicable law) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or a Wholly Owned Subsidiary by such Person during such period, and (d) any gains attributable to sales of assets out of the ordinary course of business.

"*Contractual Obligation*" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its assets or properties is bound.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "*Controlling*" and "*Controlled*" shall have meanings correlative thereto.

7

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000445

"*Control Agreement*" shall mean each deposit account control agreement in form and substance satisfactory to the Collateral Agent and the Arranger Agent among the Collateral Agent and one or more Loan Parties corresponding to any reserve account or other controlled account provided for herein or in the other Loan Documents.

"*Credit Facility*" shall mean the term loan facility provided for by this Agreement.

"*Current Assets*" shall mean, at any time, the consolidated current assets (other than cash and Permitted Investments) of the Borrower and the Subsidiaries.

"*Current Liabilities*" shall mean, at any time, the consolidated current liabilities of the Borrower and the Subsidiaries at such time, but excluding, without duplication, the current portion of any long-term Indebtedness.

"*Debt Service Reserve Account*" shall mean a blocked deposit account of the Borrower at Wells Fargo Bank, National Association corresponding to account number 4959898560 subject to a Control Agreement (or any successor account thereto approved by the Arranger Agent and subject to a Control Agreement).

"*Debtor Relief Laws*" shall mean the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"*Default*" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"*Defaulting Lender*" shall mean, subject to Section 2.22(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent, the Arranger Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the Arranger Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower, the Arranger Agent or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent, the Arranger Agent or the Borrower, to confirm in writing to the Administrative Agent, the Arranger Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent, the Arranger Agent and the Borrower), or (d) has, or has a direct or

8

CONFIDENTIAL

indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or Federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Arranger Agent or the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.22(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"***Disqualified Stock***" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the Maturity Date, or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the Maturity Date.

"***Dollars***" or "***$***" shall mean lawful money of the United States of America.

"***Dr. KPC***" shall mean Dr. Kali Pradip Chaudhuri, M.D.

"***Early Prepayment Fee***" shall mean a fee in an amount equal to (a) the applicable Make-Whole Amount, if such prepayment, repayment or assignment occurs on or prior to the first anniversary of the Closing Date, (b) 4.00% of the amount of the Loans prepaid, repaid or assigned, if such prepayment, repayment or assignment occurs after the first anniversary of the Closing Date to and including the date that is the second anniversary of the Closing Date, (b) 3.00% of the amount of the Loans prepaid, repaid or assigned, if such prepayment, repayment or assignment occurs after the second anniversary of the Closing Date to and including the date that is the third anniversary of the Closing Date and (c) 1.00% of the amount of the Loans prepaid, repaid or assigned, if such prepayment, repayment or assignment occurs after the third anniversary of the Closing Date to and including the date that is the fourth anniversary of the Closing Date; *provided* that, in the event of any such prepayment, repayment or assignment of Loans after the fourth anniversary of the Closing Date, the amount of the Early Prepayment Fee shall be zero.

"***Eligible Assignee***" shall mean (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender and (iv) any other Person (other than a natural person) approved in writing by

9

CONFIDENTIAL

the Arranger Agent and the Administrative Agent (each such approval not to be unreasonably withheld or delayed); *provided* that "Eligible Assignee" shall not include the Borrower or any of the Borrower's Affiliates.

"*Environmental Laws*" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"*Environmental Liability*" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Interests*" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"*Equity Issuance*" shall mean any issuance or sale by Holdings, the Borrower or any of their respective subsidiaries of any Equity Interests of Holdings, the Borrower or any such subsidiary, as applicable, except in each case for (a) any issuance or sale to Holdings, the Borrower or any Subsidiary, (b) any issuance of directors' qualifying shares, and (c) sales or issuances of common stock of Holdings to management or employees of Holdings, the Borrower or any Subsidiary under any employee stock option or stock purchase plan or employee benefit plan in existence from time to time.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"*ERISA Affiliate*" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" shall mean (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000448

make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by Borrower or any of its ERISA Affiliates from any Plan with two or more contributing sponsors or the termination of any such Plan resulting in liability to Borrower or any of its Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (f) the imposition of liability on Borrower or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of Borrower or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential material liability therefore, or the receipt by Borrower or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA;  (h) the imposition of a lien pursuant to Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code; (i) the determination that a Plan or Multiemployer Plan is considered an at-risk plan or in endangered or critical status within the meaning of Section 430, 431 or 432 of the Code or Section 303, 304 or 305 of ERISA or (j) a Foreign Benefit Event.

"*ESOP*" shall mean the KPC Healthcare, Inc. Employee Stock Ownership Plan effective as of April 1, 2015.

"*ESOP Acquisition Agreement*" shall mean that certain Stock Purchase Agreement dated August 28, 2015, by and among Holdings, Dr. KPC and the ESOP Trustee.

"*ESOP Assignment Agreement*" shall mean, collectively, (i) an assignment and assumption agreement by and among Holdings, Dr. KPC and the ESOP Trustee and (ii) an exchange agreement by and between Holdings and Dr. KPC, in each case to be executed within two Business Days after the Closing Date, assigning all of Dr. KPC's right, title and interest in and to each of the Seller ESOP Loan Documents to Holdings in exchange for the Seller Subordinated Note and a warrant to purchase certain shares of common stock of Holdings, in each case in form and substance reasonably satisfactory to the Arranger Agent.

"*ESOP Assignment Effective Date*" shall mean the date the ESOP Assignment Agreement is effective and the ESOP Assignment Transaction is consummated.

"*ESOP Assignment Transaction*" shall mean the assignment and exchange transaction contemplated by the ESOP Assignment Agreement.

"*ESOP Documents*" shall mean collectively, (a) the ESOP Acquisition Agreement, (b) the Company ESOP Loan Documents, (c) the ESOP Assignment Agreement, (d) the Seller ESOP Loan Documents, (e) the ESOP Loan Documents and (f) all of the documents material to the creation of the ESOP and the ESOP Trust and the transactions between Holdings and the ESOP, the ESOP Trustee or the ESOP Trust.

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000449

"***ESOP Loan***" shall mean the loan in an initial aggregate principal amount of $207,574,000 from Holdings to the ESOP Trust pursuant to the ESOP Loan Documents on the ESOP Assignment Effective Date, which loan shall amend, restate and replace the Company ESOP Loan and Seller ESOP Loan.

"***ESOP Loan Documents***" shall mean that certain amended and restated promissory note issued by the ESOP Trust in favor of Holdings, evidencing the ESOP Loan, that certain amended and restated ESOP credit agreement by and between the ESOP Trust and Holdings, and that certain amended and restated ESOP stock pledge agreement, by and among the ESOP Trust and Holdings, in each case dated the ESOP Assignment Effective Date and amending, restating and replacing the Company ESOP Loan Documents and Seller ESOP Loan Documents.

"***ESOP Stock***" shall mean the capital stock of Holdings acquired by the ESOP Trust pursuant to the ESOP Acquisition Agreement.

"***ESOP Transaction***" shall mean, collectively, (a) the sale to Holdings of all warrants of KPC Healthcare, Inc. owned by William E. Thomas and SPCP Group, LLC; (b) the cancellation of all warrants of KPC Healthcare, Inc. held by Holdings, Dr. KPC and KPC Resolution Company, LLC; (c) the acquisition of all shares of common stock of Holdings from Dr. KPC by the ESOP Trust, (d) the issuance of the Subordinated Notes (other than the Seller Subordinated Note), (e) the issuance of warrants to William E. Thomas and SPCP Group, LLC to purchase certain shares of common stock of Holdings; (f) the borrowing of the Company ESOP Loan by the ESOP Trust from Holdings pursuant to the terms of the Company ESOP Loan Documents, (g) the borrowing of the Seller ESOP Loan by the ESOP Trust from Dr. KPC pursuant to the terms of the Seller ESOP Loan Documents, (h) the One-Time Distribution, (i) a cash pension contribution in the amount of $10,000,000 by the Borrower to the ESOP, (j) the contribution by Dr. KPC of all common stock of the Borrower to Holdings in exchange for all common stock of Holdings and (k) the ESOP Assignment Transaction.

"***ESOP Trust***" shall mean the trust related and maintained pursuant to the ESOP.

"***ESOP Trustee***" shall mean, collectively, the Person or Persons from time to time appointed, chosen or otherwise serving as the trustee with respect to the ESOP.

"***Eurodollar***", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"***Events of Default***" shall have the meaning assigned to such term in Article VII.

"***Excess Cash Flow***" shall mean, for any fiscal year of the Borrower, (a) the sum, without duplication, of (i) Consolidated EBITDA for such fiscal year, and (ii) reductions to noncash working capital of the Borrower and the Subsidiaries for such fiscal year (*i.e.*, the decrease, if any, in Current Assets *minus* Current Liabilities from the beginning to the end of such fiscal year), *minus* (b) the sum, without duplication, of (i) the amount of any Taxes payable in cash by the Borrower and the Subsidiaries with respect to such fiscal year, (ii) Consolidated Interest Expense for such fiscal year paid in cash, (iii) Capital Expenditures made in cash in accordance with Section 6.10 during such fiscal year, except to the extent financed with the proceeds of

12

**JAE 0702**

Indebtedness, equity issuances, casualty proceeds, condemnation proceeds or other proceeds that would not be included in Consolidated EBITDA, (iv) permanent repayments of Indebtedness (other than mandatory prepayments of Loans under Section 2.13) made in cash by the Borrower and the Subsidiaries during such fiscal year, but only to the extent that the Indebtedness so prepaid by its terms cannot be reborrowed or redrawn and such prepayments do not occur in connection with a refinancing of all or any portion of such Indebtedness and (v) additions to noncash working capital for such fiscal year (*i.e.*, the increase, if any, in Current Assets minus Current Liabilities from the beginning to the end of such fiscal year).

"*Excluded Taxes*" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.21(a)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(f) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"*Extraordinary Receipt*" shall mean any cash received by or paid to or for the account of any Loan Party not in the ordinary course of business, including purchase price adjustments, tax refunds, judgments and litigation settlements, pension plan reversions, proceeds of insurance (excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof) and indemnity payments.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"*FCPA*" shall have the meaning assigned to such term in Section 3.25.

"*Federal Funds Effective Rate*" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

13

CONFIDENTIAL

KPCDEF_000451

"*Fee Letter*" shall mean the Fee Letter dated 28, 2015, between the Borrower and the Administrative Agent.

"*Fees*" shall mean the Administrative Agent Fees and the fees set forth in Section 2.05(c).

"*Financial Officer*" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person or any other natural person who fulfills or is responsible for any similar role for such Person.

"*Fitzgibbons Matter*" shall mean Fitzgibbons v. IHHI, et al. (Case No.: 30 2008 00108081) and actions and proceedings related thereto.

"*Fixed Charge Coverage Ratio*" shall mean, for any period, the ratio of (a) (i) Consolidated EBITDA for such period *minus* (ii) Capital Expenditures made by the Borrower and the Subsidiaries during such period *minus* (iii) the aggregate amount of Taxes paid in cash by the Borrower and the Subsidiaries during such period to (b) Consolidated Fixed Charges for such period.

"*Foreign Benefit Event*" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Foreign Pension Plan or to appoint a trustee or similar official to administer any such Foreign Pension Plan, or alleging the insolvency of any such Foreign Pension Plan, (d) the incurrence of any liability in excess of $2,500,000 by Holdings, the Borrower or any Subsidiary under applicable law on account of the complete or partial termination of such Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by Holdings, the Borrower or any of the Subsidiaries, or the imposition on Holdings, the Borrower or any of the Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of $2,500,000.

"*Foreign Lender*" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"*Foreign Pension Plan*" shall mean any benefit plan that under applicable law is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"*GAAP*" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements delivered pursuant to clause (s) of Article IV.

14

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000452

"*Governmental Authority*" shall mean any Federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"*Government Official*" shall mean (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or -controlled company or business, (c) a political party or official thereof, or candidate for political office or (d) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank).

"*Government Reimbursement Program*" shall mean (to the extent that any Loan Party participates in one or more of the following): (a) Medicare, the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., the TRICARE program established by the Department of Defense under 10 U.S.C. §§ 1071 et seq. or the Civilian Health and Medical Program of the Uniformed Services under 10 U.S.C. §§ 1079 and 1086, (b) Medicaid, (c) any other similar Federal, state or local governmental health care programs or (d) any agent, administrator, intermediary or carrier for any of the foregoing.

"*Granting Lender*" shall have the meaning assigned to such term in Section 9.04(i).

"*Guarantee*" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"*Guarantee and Collateral Agreement*" shall mean the Guarantee and Collateral Agreement, substantially in the form of Exhibit D, among the Borrower, Holdings, the Subsidiaries party thereto and the Collateral Agent for the benefit of the Secured Parties.

"*Guarantors*" shall mean Holdings and the Subsidiary Guarantors.

"*Hazardous Materials*" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"*Healthcare Laws*" shall mean, collectively, any and all Federal, state or local laws, rules, regulations, administrative manuals, orders, guidelines and requirements issued under or in

15

CONFIDENTIAL

connection with Medicare, Medicaid or any other Government Reimbursement Program and any other law governing the licensure or regulation of healthcare providers, professionals, facilities or payors or otherwise governing or regulating the provision of, or payment for, medical services, and any other medical, nursing or other patient-related services now or hereafter provided by the Loan Parties, including the Social Security Act, the Social Security Amendments of 1972, the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, the Medicare and Medicaid Patient and Program Protection Act of 1987 and HIPAA.

"*Hedging Agreement*" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"*HIPAA*" shall mean the Health Insurance Portability and Accountability Act of 1996.

"*HIPAA Privacy Standards*" shall mean the Standards for Privacy of Individually Identifiable Health Information set forth in 45 C.F.R. Parts 160 and 164.

"*Holdings*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Hospital Seismic Safety Act*" shall mean the Alfred E. Alquist Hospital Facilities Seismic Safety Act of 1973, as amended from time to time.

"*Indebtedness*" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all Synthetic Lease Obligations of such Person, (j) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (k) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (l) all obligations of such Person as an account party in respect of letters of credit and (m) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

16

**JAE 0706**

KPCDEF_000454

"*Indemnified Taxes*" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"*Indemnitee*" shall have the meaning assigned to such term in Section 9.05(b).

"*Information*" shall have the meaning assigned to such term in Section 9.16.

"*Intercreditor Agreement*" shall mean the intercreditor agreement of even date herewith, by and between the Administrative Agent and the Revolver Agent, and acknowledged by the Loan Parties.

"*Interest Coverage Ratio*" shall mean, for any period, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Interest Expense paid in cash for such period.

"*Interest Payment Date*" shall mean (a) with respect to any ABR Loan, the last Business Day of each fiscal quarter of the Borrower (commencing November 30, 2015) and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"*Interest Period*" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; *provided*, *however*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Loan shall extend beyond the maturity date of such Loan.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"*IRS*" shall mean the United States Internal Revenue Service.

"*Lenders*" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"*LIBO Rate*" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum equal to the London interbank offered  rate, as  published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may  be  designated  by  the  Administrative  Agent  from  time  to  time,  at

17

CONFIDENTIAL

**JAE 0707**

KPCDEF_000455

approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum determined by the Administrative Agent, in accordance with its customary practices (including by reference to any applicable published market data), to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by major banks at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"*Lien*" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"*Litigation Reserve Account*" shall mean a blocked deposit account of the Borrower at Wells Fargo Bank, National Association corresponding to account number 4959898578 subject to a Control Agreement (or any successor account thereto approved by the Arranger Agent and subject to a Control Agreement).

"*Loan Documents*" shall mean this Agreement, the Security Documents, the Fee Letter, the Intercreditor Agreement, the Subordination Agreement, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e) and any other document executed in connection with the foregoing.

"*Loan Parties*" shall mean Holdings, the Borrower and the Subsidiary Guarantors.

"*Loans*" shall mean the term loans made by the Lenders to the Borrower pursuant to Section 2.01.

"*Make-Whole Amount*" shall mean, on the date of the applicable prepayment, repayment or assignment, an amount determined by the Arranger Agent equal to:

(a)     4.00% multiplied by the principal amount of the Loans repaid or assigned; plus

(b)     the present value at such date of each interest payment due on such Loans on each Interest Payment Date (assuming all such Loans to be Eurodollar Loans and assuming monthly Interest Periods for any period following the expiration of any then current Interest Period) during the period from such date through (and including) the first anniversary of the Closing Date (excluding accrued but unpaid interest as of such date of prepayment, repayment or assignment), discounted to the date of the prepayment at a rate equal to the Treasury Rate *plus* 0.50%; *provided* that, for purposes of calculating the Adjusted LIBO Rate that would be due with respect to each applicable future Interest Period (as determined by the Arranger Agent), the Arranger Agent shall use (i)(1) the interest rate per annum equal to the offered quotation rate to first class banks in the London interbank market which appears on the Bloomberg Screen when

18

OHSUSA:762548252

CONFIDENTIAL                                                                          KPCDEF_000456

the command FWCV->Go is entered for deposits, determined as of approximately 11:00 a.m. (New York City time) on the date notice is provided by the Borrower to the Administrative Agent (which shall promptly deliver such notice to the Arranger Agent) of the applicable prepayment, repayment or assignment or (2) in the event the rate referenced in the preceding clause (1) does not appear on such page or service or if such page or service shall cease to be available, the interest rate per annum shall be equal to the interest rate determined by the Arranger Agent to be the offered rate on such other page or other service as reasonably determined by the Arranger Agent to be comparable to the page or service referenced in the preceding clause (1) (in each case for delivery on the first day of the relevant Interest Period in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loans with a term equivalent to one month) *plus* (ii) the Applicable Margin for Eurodollar Loans.  For purposes hereof, "***Treasury Rate***" shall mean, as of any date, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days (but no more than five Business Days) prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data selected by the Arranger Agent)).

"***Management Agreement***" shall mean the Management Services Agreement between the Loan Parties and the Management Company dated as of August 28, 2015, as in effect on the Closing Date and as amended or otherwise modified in accordance with Section 6.09(a).

"***Management Company***" shall mean KPC Global Management, LLC.

"***Management Company Bonus***" shall mean the "Bonus" (as defined in the Management Agreement) and any other performance bonus payable in cash to the Management Company pursuant to the Management Agreement.

"***Margin Stock***" shall have the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" shall mean (a) a materially adverse effect on the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Borrower and the Subsidiaries taken as a whole, (b) a material impairment of the ability of the Borrower or any other Loan Party to perform any of its obligations under any Loan Document to which it is or will be a party or (c) a material impairment of the rights and remedies of or benefits available to the Lenders under any Loan Document.

"***Material Contracts***" shall mean, collectively, (a) the Amended and Restated Hospital Services Contract, effective October 1, 2010, by and among Anaheim Global Medical Center, Inc. dba Anaheim Global Medical Center (f/k/a WMC-A, Inc. dba Western Medical Center – Anaheim), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (b) Medicare Advantage Hospital Service Agreement, effective January 1, 2006 by and among Anaheim Global Medical Center, Inc. dba Anaheim Global Medical Center (f/k/a WMC-A, Inc. dba Western Medical Center – Anaheim), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (c) Hospital Services Contract, by and among Chapman Global Medical Center, Inc. dba Chapman Global Medical Center (f/k/a Chapman Medical Center, Inc.),

19

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000457

and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (d) Medicare Advantage Hospital Service Agreement, effective January 1, 2006 by and among Chapman Global Medical Center, Inc. dba Chapman Global Medical Center (f/k/a Chapman Medical Center, Inc.), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (e) Hospital Services Contract, by and among Orange County Global Medical Center, Inc. dba Orange County Global Medical Center (f/k/a WMC-SA, Inc. dba Western Medical Center – Santa Ana), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (f) Medicare Advantage Hospital Service Agreement, effective January 1, 2006 by and among Orange County Global Medical Center, Inc. dba Orange County Global Medical Center (f/k/a WMC-SA, Inc. dba Western Medical Center – Santa Ana), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (g) Hospital Services Contract, by and among South Coast Global Medical Center, Inc. dba South Coast Global Medical Center (f/k/a Coastal Communities Hospital, Inc.), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (h) Medicare Advantage Hospital Service Agreement, effective January 1, 2006 by and among South Coast Global Medical Center, Inc. dba South Coast Global Medical Center (f/k/a Coastal Communities Hospital, Inc.), and Orange County Health Authority, dba Orange Prevention and Treatment Integrated Medical Assistance, dba CalOptima, (i) the PCHI Lease and (j) the Chapman Lease.

"*Material Indebtedness*" shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of Holdings, the Borrower or any Subsidiary in an aggregate principal amount exceeding       For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Holdings, the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the Agreement Value of such Hedging Agreement at such time.

"*Maturity Date*" shall mean the fifth anniversary of the Closing Date.

"*Maximum Rate*" shall have the meaning assigned to such term in Section 9.09.

"*Medicaid*" shall mean the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and any statutes succeeding thereto (including Medi-Cal and each other state Medicaid program).

"*Medicare*" shall mean the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq.) and any statutes succeeding thereto.

"*Moody's*" shall mean Moody's Investors Service, Inc., or any successor thereto.

"*Mortgaged Properties*" shall mean, collectively, the owned real properties and leasehold and subleasehold interests of the Loan Parties, and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.12.

20

OHSUSA:762548252

CONFIDENTIAL **JAE 0710** KPCDEF_000458

"*Mortgages*" shall mean the mortgages, deeds of trust, leasehold mortgages, assignments of leases and rents, modifications and other security documents delivered pursuant to Section 5.12, each in form and substance reasonably satisfactory to the Arranger Agent.

"*Multiemployer Plan*" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"*Net Cash Proceeds*" shall mean (a) with respect to any Asset Sale, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable broker's fees or commissions, legal fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset) and (iv) for any Asset Sale of Revolver Priority Collateral, the amount of such proceeds required to be used by the Loan Parties to prepay the Revolver Debt in accordance with the terms of the Revolver Credit Agreement; *provided*, *however*, that, if (x) the Borrower shall deliver a certificate of a Financial Officer to the Administrative Agent at the time of receipt thereof setting forth the Borrower's intent to reinvest such proceeds (in connection with casualty and condemnation proceeds only) in productive assets of a kind then used or usable in the business of the Borrower and its Subsidiaries within 180 days of receipt of such casualty and condemnation proceeds and (y) no Default or Event of Default shall have occurred and shall be continuing at the time of such certificate or at the proposed time of the application of such casualty and condemnation proceeds, such casualty and condemnation proceeds shall not constitute Net Cash Proceeds except to the extent not so used at the end of such 180-day period, at which time such casualty and condemnation proceeds shall be deemed to be Net Cash Proceeds; (b) with respect to any issuance or incurrence of Indebtedness or any Equity Issuance, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses incurred in connection therewith; and (c) with respect to any Extraordinary Receipt, the cash proceeds received by or paid to or for the account of any Loan Party, net of, for any Extraordinary Receipt with respect to Revolver Priority Collateral, the amount of such proceeds required to be used by the Loan Parties to prepay the Revolver Debt in accordance with the terms of the Revolver Credit Agreement.

"*Non-Defaulting Lender*" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"*Obligations*" shall mean all obligations defined as "Obligations" in the Guarantee and Collateral Agreement and the other Security Documents.

"*OFAC*" shall have the meaning assigned to such term in Section 3.23.

21

CONFIDENTIAL

"*One-Time Distribution*" shall mean a one-time distribution on the Closing Date in an aggregate amount not to exceed [                ] by the Borrower to Holdings for the purpose of funding a portion of the ESOP Transaction.

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21(a)).

"*Participant Register*" shall have the meaning assigned to such term in Section 9.04(f).

"*Payment Account*" shall mean the account designated from time to time in writing as the "Payment Account" by Administrative Agent to the other parties hereto.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"*PCHI Lease*" shall mean, collectively, the Amended and Restated Triple Net Hospital Building Lease dated as of October 1, 2007, by and between the Borrower and Pacific Coast Holdings Investment, LLC, and each sublease entered into from time to time thereunder between the Borrower and any of its Affiliates.

"*Perfection Certificate*" shall mean the Perfection Certificate substantially in the form of Exhibit B to the Guarantee and Collateral Agreement.

"*Permitted Acquisition*" shall have the meaning assigned to such term in Section 6.04(g).

"*Permitted Investments*" shall mean:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(b) investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

22

CONFIDENTIAL **JAE 0712** KPCDEF_000460

(c) investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above; and

(e) investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above.

"*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"*Plan*" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.  For the avoidance of doubt, the ESOP shall not constitute a Plan for purposes of this Agreement.

"*Platform*" shall have the meaning assigned to such term in Section 9.01.

"*Prime Rate*" shall mean the rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates section of *The Wall Street Journal* (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as the Administrative Agent may select); each change in the Prime Rate shall be effective from and including the date such change is announced as being effective.

"*Provider*" shall mean any hospitalist, physician, nurse practitioner, physician assistant or related professional employed by a Loan Party.

"*QAF Account*" shall mean a deposit account at Wells Fargo Bank, National Association corresponding to account number 4959898586 subject to a Control Agreement (or any successor account thereto approved by the Arranger Agent and subject to a Control Agreement).

"*QAF Program*" shall mean the hospital quality assurance fee program established by (a) California Assembly Bill 1383 (Chapter 627, Statues of 2009), (b) California Senate Bill 90 (Chapter 19, Statutes of 2011), (c) California Senate Bill 335 (Chapter 286, Statutes of 2011), (d) California Senate Bill 239 (Chapter 657, Statutes of 2013), (e) any other legislation previously enacted relating to the hospital quality assurance fee program, and (f) any

23

CONFIDENTIAL

amendments to the foregoing and any similar, follow-on or successor quality assurance or rate
stabilization legislation.

"*QAF Prepayment Fee*" shall mean a fee in an amount equal to (a) ▮ of the amount
of the Loans prepaid, repaid or assigned plus (b) if the Borrower elects to retain any amounts
pursuant to the second proviso in Section 2.13(f), an additional ▮ of the initial Loans
prepaid, repaid or assigned during the calendar year ending December 31, 2017 up to an amount
of Loans matching the amount so retained in the calendar year ending December 31, 2016 (*e.g.* if
▮ in the aggregate is retained pursuant to the second proviso in Section 2.13(f), the
initial ▮ of the Loans prepaid in the calendar year ending December 31, 2017 shall be
accompanied by an additional ▮ prepayment fee).

"*QSub Elections*" shall have the meaning assigned to such term in Section 5.15.

"*Qualified Capital Stock*" of any Person shall mean any Equity Interest of such Person
that is not Disqualified Stock.

"*Qualified Cash*" shall mean, as of any date of determination, the sum of the
(a) Revolver Availability and (b) cash and cash equivalents of Borrower and the Subsidiaries
which are not identified on the most recent consolidated balance sheet of Borrower and its
Subsidiaries delivered pursuant to Section 5.04 as "restricted" (other than cash restricted in favor
of the Secured Parties).

"*Quality Assurance Fee*" shall mean, collectively, any payments made or received by
any Loan Party pursuant to the QAF Program.

"*Quality of Earnings Report*" shall mean the quality of earnings and clinical compliance
report prepared by FTI Consulting, Inc. concerning the Loan Parties.

"*Recipient*" shall mean (a) the Administrative Agent, (b) any Lender or (c) any other
recipient of any payment to be made by or on account of any obligation of the Borrower
hereunder.

"*Refinance*" shall mean, with respect to any Indebtedness of any Person, to extend,
refinance, renew, replace, defease or refund such Indebtedness. "*Refinancing*" and
"*Refinanced*" have meanings correlative thereto.

"*Register*" shall have the meaning assigned to such term in Section 9.04(d).

"*Regulation T*" shall mean Regulation T of the Board as from time to time in effect and
all official rulings and interpretations thereunder or thereof.

"*Regulation U*" shall mean Regulation U of the Board as from time to time in effect and
all official rulings and interpretations thereunder or thereof.

"*Regulation X*" shall mean Regulation X of the Board as from time to time in effect and
all official rulings and interpretations thereunder or thereof.

24

OHSUSA:762548252

"*Related Fund*" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"*Related Parties*" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"*Remainder QAF Proceeds*" shall mean any managed care related Quality Assurance Fee received in cash by the Loan Parties that are not required to prepay Loans pursuant to Section 2.13(f).

"*Removal Effective Date*" shall have the meaning given such term in Article VIII.

"*Repayment Date*" shall have the meaning given such term in Section 2.11(a).

"*Required Lenders*" shall mean, at any time, Lenders having Loans and Commitments representing more than 50% of the sum of all Loans outstanding and Commitments at such time; *provided* that the Loans and Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time. Notwithstanding the foregoing, Required Lenders shall comprise no less than two such Non-Defaulting Lenders that are not Affiliates of one another, unless (x) all Lenders are Affiliates of one another or (y) there is only one Lender at such time.

"*Requirement of Law*" shall mean, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its assets or property or to which such Person or any of its assets or property is subject.

"*Responsible Officer*" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement or any other natural person who fulfills or is responsible for any similar role for such Person.

"*Restricted Indebtedness*" shall mean Indebtedness of Holdings, the Borrower or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(b).

"*Restricted Payment*" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition,

25

CONFIDENTIAL

cancellation or termination of any Equity Interests in Holdings, the Borrower or any Subsidiary. Payments to (x) Dr. KPC or Persons he Controls (excluding payments under the PCHI Lease, which shall not be considered Restricted Payments), (y) the Management Company and (z) the ESOP shall in each case constitute Restricted Payments.

"***Revolver Agent***" shall mean MidCap Funding IV Trust, in its capacity as administrative agent for the Revolver Credit Agreement, and any successor thereto.

"***Revolver Availability***" shall mean, at any time, (a) the Revolving Loan Limit (as defined in the Revolver Credit Agreement) <u>minus</u> (b) Revolving Loan Outstandings (as defined in the Revolver Credit Agreement).

"***Revolver Credit Agreement***" shall mean that certain Amended and Restated Credit and Security Agreement, dated as of February 14, 2014, by and among KPC Healthcare, Inc., as Borrower, each other Borrower from time to time party thereto, the lenders from time to time party thereto and the Revolver Agent, as in effect on the Closing Date and as amended, restated or otherwise modified in accordance with Section 6.09(a).

"***Revolver Debt***" shall mean the Indebtedness from time to time outstanding under the Revolver Credit Agreement.

"***Revolver Loan Documents***" shall mean the "Loan Documents" (or any other similar term) as defined in the Revolver Credit Agreement.

"***Revolver Priority Collateral***" shall have the meaning assigned thereto in the Intercreditor Agreement.

"***S Corporation Elections***" shall have the meaning assigned to such term in Section 5.15.

"***S&P***" shall mean Standard & Poor's Financial Services LLC, a division of McGraw-Hill Financial, Inc., or any successor thereto.

"***Secured Parties***" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"***Security Documents***" shall mean the Mortgages, the Guarantee and Collateral Agreement, the Control Agreements and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.12.

"***Seller ESOP Loan***" shall mean the loan in an initial aggregate principal amount of $128,126,000 from Dr. KPC to the ESOP Trust pursuant to the Seller ESOP Loan Documents.

"***Seller ESOP Loan Documents***" shall mean that certain promissory note issued by the ESOP Trust in favor of Dr. KPC dated August 28, 2015 evidencing the Seller ESOP Loan, that certain ESOP credit agreement dated August 28, 2015 by and between the ESOP Trust and Dr. KPC, and that certain ESOP pledge agreement dated August 28, 2015, by and among the ESOP Trust and Holdings.

26

CONFIDENTIAL

"*Seller Subordinated Note*" shall mean that certain promissory note in the initial aggregate principal amount of $128,126,000, issued by Holdings to Dr. KPC in connection with the ESOP Assignment Agreement.

"*Senior Debt*" shall mean, at any time, the total Indebtedness of the Borrower and the Subsidiaries at such time; *provided* that if during the calendar month ending as of the applicable date of determination, any loans were made under the Revolving Credit Facility the proceeds of which were solely used by the Loan Parties to make required payments under the QAF Program (and no fee-for-service Quality Assurance Fee was received by any Loan Party thereafter), such loans shall be disregarded for purposes of calculating Senior Debt on such date of determination; *provided, further* that to the extent on any date of determination the aggregate net credit balances for the Loan Parties' payors exceed $4,000,000 by any amount, such excess amount shall be deemed to constitute Indebtedness solely for purposes of calculating Senior Debt (and not for purposes of Section 6.01).

"*Senior Leverage Ratio*" shall mean, on any date, the ratio of Senior Debt on such date to Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended on or prior to such date.

"*SPV*" shall have the meaning assigned to such term in Section 9.04(i).

"*Statutory Reserves*" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one *minus* the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal (carried out to five decimal places) as in effect on such day and whether or not applicable to any Lender established by the Board with respect to Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to the Administrative Agent or any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"*Subordinated Debt*" shall mean the Indebtedness evidenced by the Subordinated Note Documents.

"*Subordinated Notes*" shall mean, collectively, (i) the Seller Subordinated Note and (ii) that certain promissory note in the initial aggregate principal amount of ▮▮▮▮ issued by Holdings to SPCP Group, LLC and (iii) that certain promissory note in the initial aggregate principal amount of ▮▮▮▮ issued by Holdings to William E. Thomas.

"*Subordinated Note Documents*" shall mean the Subordinated Notes, the ESOP Acquisition Agreement, the Warrant Purchase Agreement by and between Holdings and SPCP Group, LLC, the Warrant Purchase Agreement by and between Holdings and William E. Thomas and all other instruments, agreements and other documents evidencing or governing the Subordinated Notes or providing for any right in respect thereof.

27

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000465

"***Subordination Agreement***" shall mean that certain Subordination Agreement, dated as of the Closing Date, by and among Dr. KPC, William E. Thomas and SPCP Group, LLC in favor of the Administrative Agent and the Revolver Agent.

"***subsidiary***" shall mean, with respect to any Person (herein referred to as the "***parent***"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"***Subsidiary***" shall mean any subsidiary of the Borrower.

"***Subsidiary Guarantor***" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to the Guarantee and Collateral Agreement.

"***Synthetic Lease***" shall mean, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. Federal income tax purposes, other than any such lease under which such Person is the lessor.

"***Synthetic Lease Obligations***" shall mean, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Capital Lease Obligations.

"***Synthetic Purchase Agreement***" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which Holdings, the Borrower or any Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than Holdings, the Borrower or any Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers or employees of Holdings, the Borrower or the Subsidiaries (or to their heirs or estates) shall be deemed to be a Synthetic Purchase Agreement.

"***Taxes***" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"***Third Party Payor Arrangements***" shall mean any and all arrangements with Medicare, Medicaid, TRICARE/CHAMPVA and any other Governmental Authority or quasi-public agency, Blue Cross, Blue Shield, any managed care plans and organizations, including health maintenance organizations and preferred provider organizations, private commercial insurance

OHSUSA:762548252

CONFIDENTIAL

companies and any similar third party arrangements, plans or programs for payment or reimbursement in connection with health care services, products or supplies by the Borrower, any Subsidiary or their respective Providers.

"*Transactions*" shall mean, collectively, (a) the ESOP Transaction, (b) the execution, delivery and performance of the Revolver Loan Documents and the consummation of the transactions contemplated thereby and the makings of the initial loans thereunder, (c) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (d) the funding of the Debt Service Reserve Account and Litigation Reserve Account, (e) the repayment of a portion of the Revolver Debt and (f) the payment of related fees and expenses.

"*Transition Agreement*" shall mean that certain Transition Agreement, dated August 28, 2015, by and among Holdings, the Borrower and the Management Company.

"*Type*", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "*Rate*" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"*U.S. Person*" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Tax Compliance Certificate*" shall have the meaning assigned to such term in Section 2.20(f)(ii)(B)(iii).

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"*Wholly Owned Subsidiary*" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly owned Subsidiaries of such Person or by such Person and one or more wholly owned Subsidiaries of such Person.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" shall mean the Borrower and the Administrative Agent.

SECTION 1.02.     **Terms Generally**.   The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."   The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same

29

CONFIDENTIAL

meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of this Agreement, and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent in writing that the Borrower wishes to amend any covenant in Article VI or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI or any related definition for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders.

SECTION 1.03.    *Pro Forma Calculations*.   All pro forma calculations permitted or required to be made by the Borrower or any Subsidiary pursuant to this Agreement shall include only those adjustments that would be (a) permitted or required by Regulation S-X under the Securities Act of 1933, as amended, together with those adjustments that (i) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon reasonable assumptions and (ii) are based on reasonably detailed written assumptions reasonably acceptable to the Arranger Agent and (b) required by the definition Consolidated EBITDA.

SECTION 1.04.    *Classification of Loans and Borrowings*.   For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan"). Borrowings also may be classified and referred to by Type (*e.g.,* a "Eurodollar Borrowing").

SECTION 1.05.    *Designation as Senior Debt*.   The Loans and other Obligations are hereby designated as senior obligations for all purposes of the Subordinated Note Documents.

ARTICLE II

*The Credits*

SECTION 2.01.    *Commitments*.   Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make a Loan to the Borrower on the Closing Date in a principal amount not to exceed its Commitment.  Amounts paid or prepaid in respect of the Loans may not be reborrowed.

SECTION 2.02.    *Loans*.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend

30

CONFIDENTIAL

hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)     Subject to Sections 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03.  Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.  Borrowings of more than one Type may be outstanding at the same time; *provided, however*, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than five Eurodollar Borrowings outstanding hereunder at any time.  For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account as the Administrative Agent may designate not later than 1:00 p.m., New York City time, and the Administrative Agent shall promptly disburse the amounts so received to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders by no later than the next succeeding Business Day.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

SECTION 2.03.     ***Borrowing Procedure***.   In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing by delivery of a Borrowing Request executed by a Responsible Officer of Borrower (a) in the case of a Eurodollar Borrowing, not later than 12:00 (noon), New York City time, three Business Days before a proposed Borrowing, and (b) in the case of an ABR Borrowing, not later than

31

OHSUSA:762548252

CONFIDENTIAL                                                                                      KPCDEF_000469

12:00 (noon), New York City time, one Business Day before a proposed Borrowing.  Each such Borrowing Request shall be irrevocable, and shall be delivered by fax or e-mail to the Administrative Agent and shall specify the following information:  (i) whether such Borrowing is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; *provided*, *however*, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02.  If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

SECTION 2.04.     ***Evidence of Debt; Repayment of Loans***.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Loan of such Lender as provided in Section 2.11.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)     Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in the form of Exhibit I. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be

OHSUSA:762548252

CONFIDENTIAL                                                                                          KPCDEF_000470

represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05. *Fees*.

(a) The Borrower agrees to pay to the Administrative Agent, for its and the Collateral Agent's own account, the fees set forth in the Fee Letter (the "*Administrative Agent Fees*") in the amounts and at the times specified in the Fee Letter. The Administrative Agent Fees will be in addition to reimbursement of each of the Administrative Agent's and the Collateral Agent's out-of-pocket costs and expenses in accordance with Section 9.05(a). The Administrative Agent Fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b) All Fees payable pursuant to Section 2.05(c) shall be paid on the dates due, in immediately available funds to the Administrative Agent for distribution among the Lenders. Once paid, none of the Fees payable pursuant to Section 2.05(c) shall be refundable under any circumstances.

(c) The Borrower agrees to pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for the funding of such Lender's Loan, an up-front fee in an amount equal to 2.25% of the stated principal amount of such Lender's Loan. Such up-front fee will be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter. The full amount of the up-front fee may, at the option of each Lender, be taken in the form of original issue discount and off-set against the amount to be funded on the Closing Date by such Lender in respect of its Loans; *provided* that any such off-set shall not reduce the principal amount of any such Loans outstanding hereunder.

SECTION 2.06. *Interest on Loans*.

(a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing, shall bear interest (computed on the basis of the actual number of days elapsed over a year of ▮ days and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate *plus* the Applicable Margin.

(b) Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of ▮ days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Margin.

(c) Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07. *Default Interest*. If (i) the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other

33

OHSUSA:762548252

**JAE 0723**

Loan Document, by acceleration or otherwise, or (ii) if any Event of Default under Article VII (other than paragraphs (b), (c), (g) or (h) thereunder) has occurred and is continuing and the Required Lenders so vote, then, in the case of clause (i) above, until such defaulted amount shall have been paid in full or, in the case of clause (ii) above, from the date such vote has been exercised by the Required Lenders and for so long as such Event of Default is continuing, to the extent permitted by law, all amounts outstanding under this Agreement and the other Loan Documents shall bear interest (after as well as before judgment), payable on demand, (a) in the case of principal, at the rate otherwise applicable to such Loan pursuant to Section 2.06 *plus* ▮▮▮ per annum and (b) in all other cases, at a rate per annum (computed on the basis of the actual number of days elapsed over a year of ▮▮ or ▮▮ days, as the case may be, when determined by reference to the Prime Rate and over a year of ▮▮ days at all other times) equal to the rate that would be applicable to an ABR Loan *plus* ▮▮ per annum.

SECTION 2.08. *Alternate Rate of Interest*. In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing (a) the Administrative Agent shall have determined that (i) Dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market or (ii) that reasonable means do not exist for ascertaining the Adjusted LIBO Rate or (b) the Required Lenders have notified the Administrative Agent in writing that the rates at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to such Lenders of making or maintaining Eurodollar Loans during such Interest Period, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until the Administrative Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (x) any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or 2.10 shall be deemed to be a request for an ABR Borrowing and (y) the utilization of the Adjusted LIBO Rate component in determining the Alternative Base Rate shall be suspended. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

SECTION 2.09. *Termination and Reduction of Commitments*. The Commitments shall automatically terminate upon the making of the Loans on the Closing Date.

SECTION 2.10. *Conversion and Continuation of Borrowings*. The Borrower shall have the right at any time on or after September 4, 2015 upon prior irrevocable written notice (which notice shall be substantially in the form of Exhibit H hereto) to the Administrative Agent (a) not later than 12:00 (noon), New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 12:00 (noon), New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period, and (c) not later than 12:00 (noon), New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

34

OHSUSA:762548252

CONFIDENTIAL

**JAE 0724**

KPCDEF_000472

(i)      each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)     if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and shall satisfy the limitations specified in Section 2.02(b) regarding the maximum number of Borrowings of the relevant Type;

(iii)    each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)     if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)      any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(vi)     any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(vii)    no Interest Period may be selected for any Eurodollar Borrowing that would end later than a Repayment Date occurring on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (A) the Eurodollar Borrowings with Interest Periods ending on or prior to such Repayment Date and (B) the ABR Borrowings, would not be at least equal to the principal amount of Borrowings to be paid on such Repayment Date; and

(viii)   upon notice to the Borrower from the Administrative Agent given at the written request of the Required Lenders, after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto.  If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000473

month's duration. The Administrative Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted to an ABR Borrowing.

SECTION 2.11.    ***Repayment of Borrowings***.

(a)    The Borrower shall repay to the Administrative Agent, for the account of the Lenders, on the last day of each fiscal quarter (commencing November 30, 2015), or if any such date is not a Business Day, on the next preceding Business Day (each such date being called a "***Repayment Date***"), a principal amount of the Loans (as adjusted from time to time pursuant to Sections 2.12 and 2.13(g)) equal to          , together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment.

(b)    To the extent not previously paid, all Loans shall be due and payable on the Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)    All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

SECTION 2.12.    ***Voluntary Prepayment***.

(a)    The Borrower shall have the right at any time and from time to time on or after September 4, 2015 to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written notice in the case of Eurodollar Loans, or written notice at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 (noon), New York City time; *provided, however*, that (i) any prepayment of the Loans under this Section must be accompanied by payment of the Early Prepayment Fee and (ii) each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000.

(b)    Voluntary prepayments of Loans shall be applied in inverse order of maturity against the remaining scheduled installments of principal due in respect of the Loans under Section 2.11.

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; *provided* that if such prepayment is for all of the then outstanding Loans, then the Borrower may revoke such notice and/or extend the prepayment date by not more than five Business Days; *provided, however*, that the provisions of Section 2.16 shall apply with respect to any such revocation or extension. All prepayments under this Section 2.12 shall be subject to Section 2.16 and the Early Prepayment Fee, as applicable, but otherwise without premium or

36

OHSUSA:762548252

CONFIDENTIAL                                                                                    KPCDEF_000474

penalty.  All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13.      ***Mandatory Prepayments***.

(a)      Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Asset Sale, the Borrower shall apply 100% of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.13(g).

(b)      In the event and on each occasion that an Equity Issuance occurs, the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the occurrence of such Equity Issuance, apply 100% of the Net Cash Proceeds therefrom to prepay outstanding Loans in accordance with Section 2.13(g).

(c)      No later than the earlier of (i) 120 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending on August 31, 2016, and (ii) the date on which the financial statements with respect to such period are delivered pursuant to Section 5.04(a), the Borrower shall prepay outstanding Loans in accordance with Section 2.13(g) in an aggregate principal amount equal to (x) 50% of Excess Cash Flow for the fiscal year then ended *minus* (y) voluntary prepayments of Loans under Section 2.12 during such fiscal year.

(d)      In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance or incurrence of Indebtedness for money borrowed of any Loan Party or any subsidiary of a Loan Party (other than any cash proceeds from the issuance of Indebtedness for money borrowed permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.13(g).

(e)      In the event that any Loan Party shall receive Net Cash Proceeds from any Extraordinary Receipt, such Loan Party shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.13(g).

(f)      In the event any Loan Party shall receive any managed care related Quality Assurance Fee, such Loan Party shall, not later than the third Business Day following the receipt of such payments by such Loan Party, apply an amount equal to, when the Senior Leverage Ratio is (i) greater than or equal to 1.75:1.00, 100% and (ii) less than 1.75:1.00, 75%, in each case of such payments to prepay the outstanding Loans in accordance with Section 2.13(g); *provided* that with respect to any such managed care related Quality Assurance Fees received during the calendar year ending December 31, 2015, the Loan Parties shall be required to prepay the Loans pursuant to this Section with the first $20,000,000 in payments received (and payments in excess of such $20,000,000 threshold may be used to prepay the Subordinated Debt to the extent permitted by Section 6.06(a)(v)); *provided, further* that with respect to any such managed care related Quality Assurance Fees received during the calendar year ending December 31, 2016, the

37

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000475

Borrower may, at its option, elect by written notice to the Administrative Agent and Arranger Agent on or prior to the required prepayment date to retain an amount up to $12,500,000 in the aggregate (and not use such retained amount to prepay the outstanding Loans) so long as such retained amount is used in full to reduce Revolving Loan Outstandings (as defined in the Revolver Credit Agreement).

(g)     Mandatory prepayments of outstanding Loans under this Agreement shall be applied in inverse order of maturity against the remaining scheduled installments of principal due in respect of the Loans under Section 2.11(a) and Section 2.11(b).

(h)     The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least three days' prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments and repayments of Borrowings under this Section 2.13 shall be subject to Section 2.16 and, except for prepayments pursuant to clause (a) (in connection with casualty and condemnation proceeds only), clause (c) and clause (f) above, such prepayments shall be accompanied by the Early Prepayment Fee, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment; *provided* that, for prepayments pursuant to clause (f) above (excluding prepayments attributable to managed care related Quality Assurance Fees received during the calendar year ending December 31, 2015), such prepayments shall be accompanied by the QAF Prepayment Fee, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.14.     *Reserve Requirements; Change in Circumstances*.

(a)     Notwithstanding any other provision of this Agreement, if any Change in Law shall (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate); (ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (iii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any participation therein; and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender,  or to reduce the amount of any sum received or receivable by such Lender or other Recipient, as the case may be, then the Borrower will pay to such Lender or other Recipient, as the case may be, upon demand such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

38

OHSUSA:762548252

CONFIDENTIAL                                                                                               KPCDEF_000476

(b)     If any Lender shall have determined that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's  capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within ten days after its receipt of the same.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender under paragraph (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 270 days prior to such request if such Lender knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; *provided further* that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 270-day period.  The protection of this Section shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.15.     *Change in Legality*.

(a)     Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)     such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

CONFIDENTIAL

(ii)     such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)     For purposes of this Section 2.15, a written notice to the Borrower and the Administrative Agent by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower and the Administrative Agent.

SECTION 2.16.     *Breakage*.  The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor, or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "*Breakage Event*") or (b) any default in the making of any payment or prepayment required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17.     *Pro Rata Treatment*.  Subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders, and as required under Section 2.15, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans).  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the

40

CONFIDENTIAL

JAE 0730

KPCDEF_000478

Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.18.     *Sharing of Setoffs*.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided*, *however*, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.18 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender).  The Borrower and Holdings expressly consent to the foregoing arrangements and agree that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower and Holdings to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19.     *Payments*.

(a)     The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder and under any other Loan Document not later than 12:00 (noon) New York City time on the date when due in immediately available Dollars, without setoff, defense or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day.  Each such payment shall be made to the Administrative Agent to the Payment Account.  The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)     Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

41

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000479

SECTION 2.20.        *Taxes*.

(a)        Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)        In addition, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)        The Borrower shall indemnify each Recipient within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on behalf of itself or another Recipient, shall be conclusive absent manifest error.

(d)        Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)        As soon as practicable after any payment of Taxes by the Borrower or any other Loan Party to a Governmental Authority pursuant to this Section, the Borrower shall deliver to

42

CONFIDENTIAL

the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     (i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.20(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or

43

CONFIDENTIAL

reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)     executed originals of IRS Form W-8ECI;

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*") and (y) executed originals of IRS Form W-8BEN; or

(iv)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and

44

OHSUSA:762548252

CONFIDENTIAL

the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.21.     *Assignment of Commitments Under Certain Circumstances; Duty to Mitigate*.

(a)     In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, (iv) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders and such amendment, waiver or other modification is consented to by the Required Lenders, or (v) any Lender is a

45

CONFIDENTIAL

**JAE 0735**

KPCDEF_000483

Defaulting Lender, then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender, as the case may be, and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Documents (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Arranger Agent, which consent shall not unreasonably be withheld or delayed, and (z) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender, *plus* all Fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under Section 2.14 and 2.16) and, in the case of clause (iv) above, the Early Prepayment Fee; *provided further* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14, notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification or shall cease to be a Defaulting Lender, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender  hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as the case may be, as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(a).

(b)     If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender , pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

46

OHSUSA:762548252

**JAE 0736**

SECTION 2.22.      *Defaulting Lenders*.

(a)      Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)      Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)      Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.05 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent and the Arranger Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fourth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *fifth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.   Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)      If the Borrower, the Administrative Agent and the Arranger Agent agree in writing that a Lender is no longer a Defaulting Lender, the Arranger Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent (in consultation with the Arranger Agent) may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the applicable Commitments, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

OHSUSA:762548252

CONFIDENTIAL                                                                                      KPCDEF_000485

ARTICLE III

*Representations and Warranties*

Each of Holdings and the Borrower represents and warrants to the Administrative Agent, the Collateral Agent, the Arranger Agent and each of the Lenders that:

SECTION 3.01.   ***Organization; Powers***.   Holdings, the Borrower and each of the Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

SECTION 3.02.   ***Authorization***.   The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdings, the Borrower or any Subsidiary, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which Holdings, the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any Subsidiary (other than any Lien created hereunder or under the Security Documents).

SECTION 3.03.   ***Enforceability***.   This Agreement has been duly executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms.

SECTION 3.04.   ***Governmental Approvals***.   Except as set forth on Schedule 3.04, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions, other than (a) the filing of Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and the United States Copyright Office and (b) such as have been made or obtained and are in full force and effect.   No Medicare or Medicaid certifications are required for the operation of the business of any Loan Party except for those that have previously been obtained or the absence of which could not reasonably be expected to result in a Material Adverse Effect.   Each Loan Party that participates in Medicare or Medicaid is in good

48

CONFIDENTIAL

standing with respect to such participation and its provider agreement in each case is in full force and effect. Each Loan Party has all Medicare and Medicaid and related agency supplier billing number(s) and related documentation necessary for it to receive reimbursement claims under all applicable Government Reimbursement Programs for any medical services or supplies furnished by such Loan Party in any jurisdiction where it conducts business. Each Loan Party has such permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authorities as are necessary under applicable law to own its properties and to conduct its business (including such permits as are required under such Federal, state and other health care laws, managed care and similar licensure laws and insurance laws and regulations as are applicable thereto) and, with respect to those facilities and other businesses that participate in Medicare and/or Medicaid, to receive reimbursement under Medicare and Medicaid.

SECTION 3.05.   *Financial Statements*.

(a)   The Borrower has heretofore furnished to the Lenders its consolidated balance sheets and related statements of income, stockholder's equity and cash flows (i) as of and for the fiscal year ended March 31, 2015, audited by and accompanied by the opinion of BDO USA, LLP, independent public accountants and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended June 30, 2015, certified by its chief financial officer. Such financial statements present fairly the financial condition and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of the Borrower and the consolidated Subsidiaries as of the dates thereof. Such financial statements were prepared in accordance with GAAP applied on a consistent basis, subject, in the case of unaudited financial statements, to year-end audit adjustments and the absence of footnotes.

(b)   The Borrower has heretofore delivered to the Lenders its unaudited pro forma consolidated balance sheet and related pro forma statements of income, stockholder's equity and cash flows as of and for the period ended June 30, 2015, prepared giving effect to the Transactions as if they had occurred, with respect to such balance sheet, on such date and, with respect to such other financial statements, on the first day of the 12-month period ending on such date. Such pro forma financial statements have been prepared in good faith by the Borrower, based on assumptions believed by the Borrower on the Closing Date to be reasonable and are based on the best information available to the Borrower as of the date of delivery thereof, accurately reflect all adjustments required to be made to give effect to the Transactions and present fairly on a pro forma basis the estimated consolidated financial position of the Borrower and its consolidated Subsidiaries as of such date and for such period, assuming that the Transactions had actually occurred at such date or at the beginning of such period, as the case may be.

SECTION 3.06.   *No Material Adverse Change*. No event, change or condition has occurred that has had, or could reasonably be expected to have, a material adverse effect on the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of Holdings, the Borrower and the Subsidiaries, taken as a whole, since March 31, 2015.

SECTION 3.07.   *Title to Properties; Possession Under Leases*.

49

CONFIDENTIAL

(a)     Each of Holdings, the Borrower and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.  All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b)     Each of Holdings, the Borrower and the Subsidiaries has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect.  Each of Holdings, the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

SECTION 3.08.     *Subsidiaries*.  Schedule 3.08 sets forth as of the Closing Date a list of all Subsidiaries and the percentage ownership interest of Holdings or the Borrower therein. The shares of capital stock or other ownership interests so indicated on Schedule 3.08 are fully paid and non-assessable and are owned by Holdings or the Borrower, directly or indirectly, free and clear of all Liens (other than Liens created under the Security Documents).

SECTION 3.09.     *Litigation; Compliance with Laws*.

(a)     Except as set forth on Schedule 3.09, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Holdings or the Borrower, threatened against or affecting Holdings or the Borrower or any Subsidiary or any business, property or rights of any such Person (i) that involve any Loan Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)     None of Holdings, the Borrower or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.  Each Loan Party is in material compliance with all material requirements of HIPAA and the HIPAA Privacy Standards (including, as applicable, the requirements of being a "Business Associate" (as defined in the HIPAA Privacy Standards) or a "Covered Entity" (as defined in the HIPAA Privacy Standards)).

(d)     Except as set forth on Schedule 3.09(d), each of the Loan Party's acute care hospitals complies with the provisions of the Hospital Seismic Safety Act currently in effect, without regard to any extensions or exemptions.

SECTION 3.10.     *Agreements*.

50

OHSUSA:762548252

CONFIDENTIAL

**JAE 0740**

KPCDEF_000488

(a)     None of Holdings, the Borrower or any of the Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)     None of Holdings, the Borrower or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.11.     *Federal Reserve Regulations*.

(a)     None of Holdings, the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.12.     *Investment Company Act*.  None of Holdings, the Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.13.     *Use of Proceeds*.  The Borrower will use the proceeds of the Loans only for the purposes specified in the introductory statement to this Agreement.

SECTION 3.14.     *Tax Returns*.  Each of Holdings, the Borrower and the Subsidiaries has filed or caused to be filed all Federal, state, local and foreign Tax returns or materials required to have been filed by it and has paid or caused to be paid all taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

SECTION 3.15.     *No Material Misstatements*.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of Holdings or the Borrower to the Administrative Agent, the Arranger Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each of Holdings and the Borrower represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of the Borrower) and due care in the preparation of such information, report, financial statement, exhibit or schedule.

51

**JAE 0741**

SECTION 3.16.    ***Employee Benefit Plans; ESOP***.

(a)    Each of the Borrower and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in material liability of the Borrower or any of its ERISA Affiliates.  The present value of all benefit liabilities under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation date applicable thereto, exceed by more than $2,500,000 the fair market value of the assets of such Plan, and the present value of all benefit liabilities of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation dates applicable thereto, exceed by more than $2,500,000 the fair market value of the assets of all such underfunded Plans.

(b)    Each Foreign Pension Plan is in compliance in all material respects with all requirements of law applicable thereto and the respective requirements of the governing documents for such plan.  With respect to each Foreign Pension Plan, none of Holdings, its Affiliates or any of their respective directors, officers, employees or agents has engaged in a transaction which would subject Holdings, the Borrower or any Subsidiary, directly or indirectly, to a tax or civil penalty which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  With respect to each Foreign Pension Plan, reserves have been established in the financial statements furnished to Lenders in respect of any unfunded liabilities in accordance with applicable law and prudent business practice or, where required, in accordance with ordinary accounting practices in the jurisdiction in which such Foreign Pension Plan is maintained.  The aggregate unfunded liabilities with respect to such Foreign Pension Plans could not reasonably be expected to result in a Material Adverse Effect; the present value of the aggregate accumulated benefit liabilities of all such Foreign Pension Plans (based on those assumptions used to fund each such Foreign Pension Plan) did not, as of the last annual valuation date applicable thereto, exceed by more than $2,500,000 the fair market value of the assets of all such Foreign Pension Plans.

(c)    The ESOP is a duly organized and existing employee stock ownership plan and trust as defined in Sections 4975(e)(7), 401(a) and 501(a) of the Code, and the ESOP Trustee has been properly appointed, in accordance with applicable ERISA requirements, to serve in its capacity as trustee of the ESOP, and the ESOP Trustee has the authority on behalf of the ESOP to enter into the transactions described in the ESOP Documents.  Neither Holdings, the Borrower nor the ESOP has, within the three year period immediately preceding the date of this Agreement, received any inquiry or notice from the IRS, or any other governmental agency the effect of which is to question the qualification or status of the ESOP or any transaction entered into by the ESOP or Holdings.  The ESOP and the Loan Parties have filed all reports, returns or other documents in respect of the ESOP which are required to be filed pursuant to the Code, ERISA or any other law or regulation.  The ESOP is in material compliance with all applicable provisions of the Code and ERISA and the regulations thereunder or will be in material compliance therewith after Holdings adopts any amendments requested by the IRS as a condition to issuing a favorable determination letter and the ESOP makes any necessary operational corrections related to such amendments.

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000490

(d)     Each of the Company ESOP Loan, Seller ESOP Loan and the ESOP Loan is not a non-exempt prohibited transaction under Section 4975 of the Code, Section 406 or 407 of ERISA, or the regulations thereunder.  Each of the Company ESOP Loan, Seller ESOP Loan and the ESOP Loan will constitute an "exempt loan" under Treasury Regulation Section 54.4975-7(b)(1)(iii).

(e)     Neither the execution and delivery of this Agreement or the other Loan Documents, or the ESOP Acquisition Agreement or the other ESOP Documents, nor the consummation of the transactions described herein or in such other documents (including the Transactions), or the performance of the terms hereof or thereof, will conflict with, violate or result in a material breach of the ESOP or any agreement or other instrument by which Holdings, the Borrower or the ESOP may be bound and will not constitute a material breach by any Person acting as a fiduciary, within the meaning of ERISA, with respect to the ESOP of any fiduciary responsibility or similar duty or obligation owed by such Person to the participants of the ESOP under ERISA or otherwise.

(f)     The ESOP Stock constitutes "employer securities" under ERISA Section 407(d)(1) and Section 409(l) of the Code, and "qualifying employer securities" under ERISA Section 407(d)(5) and Section 4975(e)(8) of the Code.

(g)     All representations and warranties made by Holdings to the ESOP and all representations and warranties made by the ESOP to Holdings in each case in the ESOP Documents and any related documents or in any document executed in connection therewith are incorporated herein by this reference as though fully set forth herein as representations and warranties of the Loan Parties to the Administrative Agent, the Arranger Agent and the Lenders.

SECTION 3.17.     *Environmental Matters*.  Except as set forth in Schedule 3.17 and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.18.     *Insurance*.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by Holdings, the Borrower or by the Borrower for its Subsidiaries as of the Closing Date.  As of each such date, such insurance is in full force and effect and all premiums have been duly paid.  The Borrower and its Subsidiaries have insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.

SECTION 3.19.     *Security Documents*.

(a)     The Guarantee and Collateral Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in the

53

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000491

Guarantee and Collateral Agreement) and the proceeds thereof and (i) when the Pledged Collateral (as defined in the Guarantee and Collateral Agreement) is delivered to the Collateral Agent, the Lien created under Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Pledged Collateral, in each case prior and superior in right to any other Person, and (ii) when financing statements in appropriate form are filed in the offices specified on Schedule 3.19(a), the Lien created under the Guarantee and Collateral Agreement will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (other than Intellectual Property, as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person, other than with respect to Liens expressly permitted by Section 6.02.

(b)     Upon the recordation of the Guarantee and Collateral Agreement (or a short-form security agreement in form and substance reasonably satisfactory to the Borrower and the Arranger Agent) with the United States Patent and Trademark Office and the United States Copyright Office, together with the financing statements in appropriate form filed in the offices specified on Schedule 3.19(a), the Lien created under the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Intellectual Property (as defined in the Guarantee and Collateral Agreement) in which a security interest may be perfected by filing in the United States and its territories and possessions, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the Loan Parties after the date hereof).

SECTION 3.20.     *Location of Real Property and Leased Premises*.

(a)     Schedule 3.20(a) lists completely and correctly as of the Closing Date all real property owned by the Borrower and the Subsidiaries and the addresses thereof.  The Borrower and the Subsidiaries own in fee all the real property set forth on Schedule 3.20(a).

(b)     Schedule 3.20(b) lists completely and correctly as of the Closing Date all real property leased by the Borrower and the Subsidiaries and the addresses thereof.  The Borrower and the Subsidiaries have valid leases in all the real property set forth on Schedule 3.20(b).

SECTION 3.21.     *Labor Matters*.  As of the date hereof and the Closing Date, there are no strikes, lockouts or slowdowns against Holdings, the Borrower or any Subsidiary pending or, to the knowledge of Holdings or the Borrower, threatened.   The hours worked by and payments made to employees of Holdings, the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.    All payments due from Holdings, the Borrower or any Subsidiary, or for which any claim may be made against Holdings, the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such Subsidiary.  The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to

OHSUSA:762548252

CONFIDENTIAL

which Holdings, the Borrower or any Subsidiary is bound and no Loan Party has knowledge of any objection from a union as to any element of the Transactions.

SECTION 3.22.     *Solvency*.     Immediately after the consummation of the Transactions to occur on the Closing Date, immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan and immediately following consummation of the ESOP Assignment Transaction on the ESOP Assignment Effective Date, (a) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) each Loan Party will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

SECTION 3.23.     *Senior Indebtedness*.   The Obligations rank and shall continue to rank at least senior in priority of payments to the Subordinated Debt and are designated as senior obligations under the Subordinated Note Documents.

SECTION 3.24.     *Sanctioned Persons*.   None of Holdings, the Borrower or any Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("*OFAC*"); and the Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

SECTION 3.25.     *Foreign Corrupt Practices Act*.   Each of Holdings, the Borrower, the Subsidiaries and their respective directors, officers, agents, employees and any Person acting for or on behalf of Holdings, the Borrower or any Subsidiary, has complied with, and will comply with, the U.S. Foreign Corrupt Practices Act, as amended from time to time (the "*FCPA*"), or any other applicable anti-bribery or anti-corruption law, and it and they have not made, offered, promised or authorized, and will not make, offer, promise or authorize, whether directly or indirectly, any payment, of anything of value to a Government Official while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (a) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (b) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity or (c) securing an improper advantage, in each case in order to obtain, retain or direct business.

SECTION 3.26.     *Reimbursement; Investigations; Certifications*.   The accounts receivable of the Loan Parties have been properly adjusted in all material respects to reflect the reimbursement policies under all applicable laws and Third Party Payor Arrangements to which each such Loan Party is subject, and do not exceed in any material respect amounts such Loan Party is entitled to receive under any capitation arrangement, fee schedule, discount formula,

55

CONFIDENTIAL

cost-based reimbursement or other adjustment or limitation to usual charges.  All billings by each of the Loan Parties pursuant to Third Party Payor Arrangements have been made in compliance with all applicable laws, except where the failure to comply could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  There has been no intentional or material overbilling or over-collection pursuant to any Third Party Payor Arrangement by any Loan Party, other than as created by routine adjustments and disallowances made in the ordinary course of business by the payors with respect to such billings.  No Loan Party is currently subject to any Federal, state, local governmental or private payor civil or criminal inspections, investigations, inquiries or audits involving and/or related to its activities or compliance with Healthcare Laws, except for audits and inspections that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No Loan Party is currently subject to suspension, revocation, renewal or denial of any applicable certification, provider or supplier billing number(s) or any participation agreement(s) under any applicable Government Reimbursement Program.   There currently exists no restrictions, deficiencies, required plans of corrective action or other remedial measures with respect to any certifications, accreditations or licensures (whether under any Government Reimbursement Program or Healthcare Law) other than restrictions, deficiencies, required plans of corrective action or other remedial measures that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.27.    *Providers*.  No Loan Party has knowledge that any Provider is in violation of any Healthcare Law other than violations that could not, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect.

SECTION 3.28.    *Quality Assurance Fee Program*.  Each Loan Party has paid in full and in a timely manner (taking into account any applicable extensions for payment) any and all payments required to be made by it pursuant to the QAF Program, on and prior to the Closing Date.  With respect to the Loan Parties, there has been no adverse change to the schedule of estimated Quality Assurance Fee payments and pledges prepared by the California Hospital Association delivered to the Lenders prior to the Closing Date.

ARTICLE IV

*Conditions of Lending*

The obligations of the Lenders to make Loans hereunder are subject to the satisfaction of the following conditions:

(a)    The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03.

(b)    The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

56

CONFIDENTIAL

(c)      At the time of and immediately after such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(d)      The Administrative Agent shall have received, on behalf of itself, the Arranger Agent and the Lenders, a favorable written opinion of (i) Loeb & Loeb LLP, counsel for Holdings and the Borrower, (ii) Holzman Horner PLLC, ESOP counsel for Holdings and the Borrower and (iii) Fennemore Craig, P.C., Nevada counsel for the Borrower, in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent, the Arranger Agent and the Lenders, and (C) covering such other matters relating to the Loan Documents and the Transactions as the Arranger Agent shall reasonably request and otherwise in form and substance acceptable to the Arranger Agent, and Holdings and the Borrower hereby request such counsel to deliver such opinions.

(e)      All legal matters incident to this Agreement, the Borrowings and extensions of credit hereunder and the other Loan Documents shall be satisfactory to the Lenders and to the Arranger Agent.

(f)      The Administrative Agent and the Arranger Agent shall have received (i) a copy of the certificate or articles of incorporation, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; and (iv) such other documents as the Lenders or the Arranger Agent may reasonably request.

(g)      The Administrative Agent and the Arranger Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of this Article IV.

(h)      The Administrative Agent shall have received a fully executed copy of the Fee Letter and the Administrative Agent and the Arranger Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

57

CONFIDENTIAL

(i)      The Intercreditor Agreement shall have been duly executed by each party thereto and shall be in full force and effect on the Closing Date.

(j)      The Security Documents shall have been duly executed by each Loan Party that is to be a party thereto and shall be in full force and effect on the Closing Date.  The Collateral Agent on behalf of the Secured Parties shall have a security interest in the Collateral of the type and priority described in each Security Document.  The Debt Service Reserve Account shall have been established and funded on the Closing Date with the proceeds of the Loans in accordance with Section 6.16.  The Litigation Reserve Account shall have been established and funded on the Closing Date with the proceeds of the Loans in the amount of $5,700,000 for use solely for payments required in connection with the Fitzgibbons Matter (until such matter is resolved with no further exposure for the Loan Parties), as further described in Section 6.17.  The QAF Account shall have been established on the Closing Date.

(k)      The Collateral Agent shall have received a Perfection Certificate with respect to the Loan Parties dated the Closing Date and duly executed by a Responsible Officer of Holdings and the Borrower, and shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such Persons, in which the chief executive office of each such Person is located and in the other jurisdictions in which such Persons maintain property, in each case as indicated on such Perfection Certificate, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Arranger Agent that the Liens indicated in any such financing statement (or similar document) would be permitted under Section 6.02 or have been or will be contemporaneously released or terminated.

(l)      The Administrative Agent and the Arranger Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02 and the applicable provisions of the Security Documents.

(m)      The ESOP Transaction (other than the ESOP Assignment Transaction) shall have been, or substantially simultaneously with the initial funding of Loans on the Closing Date shall be, consummated in accordance with the ESOP Documents and applicable law.  The Arranger Agent shall have received copies of the ESOP Documents, in form and substance satisfactory to the Arranger Agent, certified by a Financial Officer as being complete and correct.

(n)      The terms and conditions of the Subordinated Notes and the provisions of the Subordinated Note Documents shall be satisfactory to the Lenders and the ESOP Trustee.  The Arranger Agent shall have received copies of the Subordinated Note Documents and evidence that the conditions to closing thereunder have been satisfied and the closing thereof will occur concurrently with the closing of this Agreement, as certified by a Financial Officer.

(o)      The terms and conditions of the Revolver Loan Documents shall be satisfactory to the Lenders.  The Arranger Agent shall have received satisfactory evidence that, after giving effect to the Transactions, no more than $20,000,000 of Revolving Loan Outstandings (as defined in the Revolver Credit Agreement) are outstanding under the Revolver Credit Agreement on the Closing Date.

58

**JAE 0748**

CONFIDENTIAL                                                                                KPCDEF_000496

(p)     The ESOP Trustee shall have approved the ESOP Transaction and provided the opinion of its financial advisor that the ESOP is not paying more than adequate consideration.

(q)     Immediately after giving effect to the Transactions and the other transactions contemplated hereby, Holdings, the Borrower and the Subsidiaries shall have outstanding no Indebtedness or preferred stock other than (a) Indebtedness outstanding under this Agreement, and (b) Indebtedness set forth on Schedule 6.01.

(r)     The Lenders shall have received the financial statements and opinion referred to in Section 3.05, none of which shall demonstrate a material adverse change in the financial condition of the Loan Parties from (and shall not otherwise be materially inconsistent with) the financial statements or forecasts previously provided to the Lenders.

(s)     The *pro forma* capital and ownership structure and equity holding arrangements of Holdings and its Subsidiaries (and all agreements relating thereto) will be satisfactory to the Arranger Agent.

(t)     Each of Dr. KPC and William E. Thomas shall have executed a non-competition and non-solicitation agreement with Holdings and the ESOP in form and substance satisfactory to the Arranger Agent.

(u)     The Administrative Agent and the Arranger Agent shall have received (x) a certificate from the chief financial officer of the Borrower certifying that each of the Loan Parties, after giving effect to the Transactions to occur on the Closing Date, is solvent and (y) a copy of the opinion of an independent third party valuation firm reasonably acceptable to the Arranger Agent with respect to the solvency of the Borrower and its Subsidiaries after giving effect to the Transactions, in form and substance reasonably satisfactory to the Arranger Agent.

(v)     All requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required as of the Closing Date, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(w)     The Administrative Agent and the Lenders shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(x)     The Administrative Agent, the Arranger Agent and Lenders shall have received the Quality of Earnings Report.

(y)     The Arranger Agent shall have received a copy of the Management Agreement and the terms and conditions therein shall be satisfactory to the Arranger Agent.

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000497

ARTICLE V

*Affirmative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, each of Holdings and the Borrower will, and will cause each of the Subsidiaries to:

SECTION 5.01.     *Existence; Compliance with Laws; Businesses and Properties*.

(a)     Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b)     Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

(c)     Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect its permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authorities as are necessary under applicable law to own its properties and to conduct its business (including such permits as are required under such Federal, state and other health care laws, managed care and similar licensure laws and insurance laws and regulations as are applicable thereto) and, with respect to those facilities and other businesses that participate in Medicare and/or Medicaid, to receive reimbursement under Medicare and Medicaid.

(d)     Comply with all Contractual Obligations and Requirements of Law (including ERISA, the USA PATRIOT Act, the FCPA and all applicable Environmental Laws and Healthcare Laws), except to the extent that failure to comply therewith (other than in the case of the USA PATRIOT Act or the FCPA) could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)     Implement and maintain policies that are consistent and in compliance with HIPAA Privacy Standards.

60

OHSUSA:762548252

CONFIDENTIAL                                                                                    KPCDEF_000498

SECTION 5.02.     *Insurance*.

(a)     Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it and insurance for claims in connection with the provision of medical services and ancillary services by Providers; and maintain such other insurance as may be required by law.

(b)     Cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement, in form and substance satisfactory to the Arranger Agent, which endorsement shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Administrative Agent or the Collateral Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent or the Revolver Agent, as their interests may appear; cause all such policies to provide that neither the Borrower, the Administrative Agent, the Collateral Agent nor any other party shall be a coinsurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Administrative Agent or the Collateral Agent may reasonably require from time to time to protect its interests; deliver original or certified copies of all such policies to the Collateral Agent; cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon less than ten days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent; deliver to the Administrative Agent and the Collateral Agent, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent and the Collateral Agent) together with evidence satisfactory to the Arranger Agent of payment of the premium therefor.

(c)     If at any time the area in which the Premises (as defined in the Mortgages) are located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Administrative Agent, the Collateral Agent, the Arranger Agent or the Required Lenders may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as the Administrative Agent, the Collateral Agent, the Arranger Agent or the Required Lenders may from time to time require.

(d)     With respect to any Mortgaged Property, carry and maintain comprehensive general liability insurance including the "broad form CGL endorsement" and coverage on an

61

CONFIDENTIAL

occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in no event for a combined single limit of less than that which is customary for companies in the same or similar businesses operating in the same or similar locations, naming the Collateral Agent as an additional insured, on forms satisfactory to the Arranger Agent.

(e)     Notify the Arranger Agent, the Administrative Agent and the Collateral Agent promptly whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.02 is taken out by any Loan Party; and promptly deliver to the Arranger Agent, the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

SECTION 5.03.     *Obligations and Taxes*.  Pay its Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; *provided, however*, that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, tax, assessment or charge and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property.

SECTION 5.04.     *Financial Statements, Reports, Etc*.  In the case of the Borrower, furnish to the Administrative Agent, which shall furnish to the Arranger Agent and each Lender:

(a)     within 120 days after the end of each fiscal year (commencing with the fiscal year ending August 31, 2016), its consolidated and consolidating balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by BDO USA, LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall not include (i) an explanatory paragraph expressing substantial doubt about the ability of the Borrower and its consolidated Subsidiaries to continue as a going concern or (ii) any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements fairly present the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, together with a customary "management discussion and analysis" provision;

(b)     within 45 days after the end of each fiscal quarter of each fiscal year, its consolidated and consolidating balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the

62

CONFIDENTIAL

operations of such Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments, together with a customary "management discussion and analysis" provision;

(c)      within 30 days after the end of each fiscal month, its consolidated and consolidating balance sheet and related statements of income and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries during such fiscal month and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of the Borrower's Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments;

(d)      concurrently with any delivery of financial statements under paragraph (a) or (b) above, (i) a certificate of a Financial Officer in the form of Exhibit F (A) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (B) setting forth computations in reasonable detail satisfactory to the Arranger Agent demonstrating compliance with the covenants contained in Sections 6.10, 6.11, 6.12 and 6.13, (ii) in the case of a certificate delivered with the financial statements required by paragraph (b) above, setting forth the Borrower's calculation of Excess Cash Flow, (iii) (x) cash waterfall analysis beginning six months prior to the applicable reporting date, with total patient cash collections by month and an estimated remaining collections for the 12 prior months, and comparing the total balance by month of service to total net patient service revenue (excluding Quality Assurance Fee receipts) by month of service or otherwise in a form reasonably satisfactory to the Arranger Agent and (y) cash lag analysis with a comparison of the trailing 12 months of cash collections (lagged by 60 days) revenue (excluding Quality Assurance Fee receipts) to the trailing 12 months recorded net patient service revenue (excluding Quality Assurance Fee receipts) or otherwise in a form reasonably satisfactory to the Arranger Agent and (iv) a schedule setting forth the net credit balance by payor in a form substantially the same as the documents delivered to the Arranger Agent prior to the Closing Date or otherwise in form and substance reasonably satisfactory to the Arranger Agent;

(e)      within 30 days after the beginning of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flows as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any significant revisions of such budget;

(f)      promptly after the receipt thereof by Holdings, the Borrower or any of their respective subsidiaries, a copy of any "management letter" received by any such Person from its certified public accountants and the management's response thereto;

63

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000501

(g)      promptly after the furnishing thereof, copies of any statement or report furnished to any holder of the Revolver Debt pursuant to the terms of Revolver Loan Documents;

(h)      on the first Business Day of every other week, copies of the statement or report reflecting the account balance and other account details concerning the Debt Service Reserve Account as of the close of the prior Business Day;

(i)      on the first Business Day of every other week (or, to the extent there has been no change in account balance and details since the last statement or report delivered, the first Business Day of the first week of each calendar month), copies of the statement or report reflecting the account balance and other account details concerning the Litigation Reserve Account as of the close of the prior Business Day;

(j)      within one Business Day after a Responsible Officer of any Loan Party or the Management Company obtains knowledge thereof (or otherwise receives a notice with respect thereto), a description of any managed care related Quality Assurance Fee that has been paid or will be paid or otherwise transferred to any Loan Party;

(k)      promptly after the request by the Administrative Agent or any Lender, all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; and

(l)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent, the Arranger Agent or any Lender may reasonably request.

SECTION 5.05.      *Litigation and Other Notices*.   Furnish to the Administrative Agent, the Arranger Agent and each Lender prompt written notice of the following:

(a)      any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority (including any civil investigative demand and any action to revoke the license of any Loan Party), against the Borrower or any Affiliate thereof or the ESOP that could reasonably be expected to result in a Material Adverse Effect;

(c)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and the Subsidiaries in an aggregate amount exceeding $2,500,000, or the occurrence of any circumstances which could reasonably be expected to result in the ESOP Loan failing to constitute an "exempt loan" under Treasury Regulation Section 54.4975-7(b)(1)(iii);

64

CONFIDENTIAL

(d)     receipt of any notice, through letter or otherwise, of a potential investigation relating to any Loan Party's submission of claims to Government Reimbursement Programs, which could reasonably be expected to result in a Material Adverse Effect;

(e)     the voluntary disclosure by any Loan Party to the Office of the Inspector General of the United States Department of Health and Human Services, a Medicare fiscal intermediary or any state's Medicaid program of potential overpayment matters involving the submission of claims to such payor in an amount exceeding $2,500,000;

(f)     receipt of any notice from a Governmental Authority initiating any action that could reasonably be expected to result in the loss or cancellation of any license, permit, authorization or other right related to any Healthcare Law held by a Loan Party;

(g)     receipt of notice of any default under the PCHI Lease or Chapman Lease or any other material notice received thereunder;

(h)     any default or event of default under the Revolver Loan Documents or Subordinated Note Documents; and

(i)     any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

SECTION 5.06.     *Information Regarding Collateral*.

(a)     Furnish to the Administrative Agent prompt written notice of any change (i) in any Loan Party's corporate name, (ii) in the jurisdiction of organization or formation of any Loan Party, (iii) in any Loan Party's identity or corporate structure or (iv) in any Loan Party's Federal Taxpayer Identification Number.  Holdings and the Borrower agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.  Holdings and the Borrower also agree promptly to notify the Administrative Agent in writing if any material portion of the Collateral is damaged or destroyed.

(b)     In the case of the Borrower, each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year pursuant to Section 5.04(a), deliver to the Administrative Agent a certificate of a Financial Officer setting forth the information required pursuant to Section 2 of the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section 5.06.

SECTION 5.07.     *Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings*.  Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all requirements of law are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will, and will cause each of its subsidiaries to, permit any representatives designated by the Administrative Agent, the Arranger Agent or any Lender to visit and inspect the financial records and the properties of such Person at reasonable times and as often as reasonably requested and to make extracts from

65

CONFIDENTIAL

and copies of such financial records, and permit any representatives designated by the Administrative Agent, the Arranger Agent or any Lender to discuss the affairs, finances and condition of such Person with the officers thereof and independent accountants therefor. Notwithstanding the foregoing, during the course of any visits and inspections, representatives of the Administrative Agent, the Arranger Agent and the Lenders may encounter individually identifiable healthcare information as defined under the Administrative Simplification regulations promulgated pursuant to HIPAA or other confidential information relating to healthcare patients; the Loan Parties, shall, consistent with HIPAA's "minimum necessary" provisions, permit disclosure of such confidential information to the Administrative Agent, the Arranger Agent and the Lenders only to the extent permissible under applicable law.

SECTION 5.08.   *Use of Proceeds*.   Use the proceeds of the Loans only for the purposes specified in the introductory statement to this Agreement.

SECTION 5.09.   *Employee Benefits*.

(a)   Comply in all material respects with the applicable provisions of ERISA and the Code and the laws applicable to any Foreign Pension Plan.

(b)   Furnish to the Administrative Agent as soon as possible after, and in any event within ten days after any Responsible Officer of Holdings, the Borrower, the Management Company or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in liability of Holdings, the Borrower or any ERISA Affiliate in an aggregate amount exceeding $2,500,000, a statement of a Financial Officer of Holdings or the Borrower setting forth details as to such ERISA Event and the action, if any, that Holdings or the Borrower proposes to take with respect thereto.

SECTION 5.10.   *Compliance with Environmental Laws*.   Comply, and cause all lessees and other Person occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action in accordance with Environmental Laws; *provided*, *however*, that none of Holdings, the Borrower or any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

SECTION 5.11.   *Preparation of Environmental Reports*.   If a Default caused by reason of a breach of Section 3.17 or Section 5.10 shall have occurred and be continuing for more than 20 days without Holdings, the Borrower or any Subsidiary commencing activities reasonably likely to cure such Default, at the written request of the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of the Loan Parties, an environmental site assessment report regarding the matters which are the subject of such Default prepared by an environmental consulting firm reasonably acceptable to the Arranger Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Default.

66

CONFIDENTIAL

SECTION 5.12.     *Further Assurances*.   Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable law, or that the Required Lenders, the Arranger Agent, the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.   The Borrower will cause any subsequently acquired or organized Subsidiary to become a Loan Party by executing the Guarantee and Collateral Agreement and each applicable Security Document in favor of the Collateral Agent.   In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to such of its assets and properties as the Administrative Agent, the Arranger Agent or the Required Lenders shall designate (it being understood that it is the intent of the parties that the Obligations shall be secured by substantially all the assets of Holdings and its Subsidiaries (including real and other properties acquired subsequent to the Closing Date)).   Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance satisfactory to the Arranger Agent, and the Borrower shall deliver or cause to be delivered to the Lenders all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Arranger Agent shall reasonably request to evidence compliance with this Section.   The Borrower agrees to provide such evidence as the Arranger Agent shall reasonably request as to the perfection and priority status of each such security interest and Lien.   In furtherance of the foregoing, the Borrower will give prompt notice to the Administrative Agent and the Arranger Agent of the acquisition by it or any of the Subsidiaries of any real property (or any interest in real property) having a value in excess of $2,500,000.

SECTION 5.13.     *[Reserved]*.

SECTION 5.14.     *Lender Meetings*.   The Borrower will, upon the request of the Administrative Agent, the Arranger Agent or the Required Lenders, participate in a meeting with the Administrative Agent, the Arranger Agent and the Lenders once during each fiscal quarter, which meeting shall be held at the Borrower's corporate offices (or at such other location as may be agreed to by the Borrower and the Arranger Agent, including teleconference) at such time as may be agreed to by the Borrower and the Arranger Agent.

SECTION 5.15.     *S Corporation Status*.

(a)     In the case of Holdings, on or prior to September 1, 2015, make a valid election under Section 1362 of the Code (and the corresponding provisions of any applicable state or local tax laws, rules or regulations) to be treated as an S corporation (such elections, the "*S Corporation Elections*").

(b)     In the case of the Borrower and each of the Subsidiaries, on or prior to September 1, 2015, make, or cause to be made, valid elections under U.S. Treasury Regulations Section 1.1361-3 (and the corresponding provisions of any applicable state or local tax laws, rules or

67

CONFIDENTIAL

regulations) to be treated as qualified subchapter S subsidiaries (such elections, the
"**QSub Elections**").

(c)     Subsequent to the S Corporation Elections, take all actions necessary to maintain
the status of Holdings as an S corporation for U.S. Federal and applicable state and local income
and franchise tax purposes.

(d)     Subsequent to the QSub Elections, take all actions necessary to maintain the
status of the Borrower and each of the Subsidiaries as qualified subchapter S subsidiaries for
U.S. Federal and applicable state and local income and franchise tax purposes.

SECTION 5.16.     *Quality Assurance Fee Program; Quality Assurance Fees*.

(a)     Each Loan Party shall pay in full and in a timely manner any and all payments
required to be made by it pursuant to the QAF Program (after giving effect to extensions
permitted thereunder) and shall otherwise comply with the QAF Program in all material respects.

(b)     Each Loan Party shall cause any managed care related Quality Assurance Fee
received by it to be immediately (and in any event, within one Business Day after receipt
thereof) transferred to or deposited in the QAF Account.  Each Loan Party shall concurrently
provide reasonable detail with respect to any such receipt and transfer to the Administrative
Agent and the Arranger Agent.

SECTION 5.17.     *Post-Closing*.  Execute and deliver the documents and complete
the tasks set forth on Schedule 5.17, in each case within the time limits specified on such
schedule.

ARTICLE VI

***Negative Covenants***

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long
as this Agreement shall remain in effect and until the Commitments have been terminated and
the principal of and interest on each Loan, all Fees and all other expenses or amounts payable
under any Loan Document have been paid in full, unless the Required Lenders shall otherwise
consent in writing, neither Holdings nor the Borrower will, nor will they cause or permit any of
the Subsidiaries to:

SECTION 6.01.     *Indebtedness*.  Incur, create, assume or permit to exist any
Indebtedness, except:

(a)     Indebtedness existing on the date hereof and set forth in Schedule 6.01, but not
any extensions, renewals or replacements of such Indebtedness;

(b)     Indebtedness created hereunder and under the other Loan Documents;

68

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000506

(c)    intercompany Indebtedness of the Borrower and the Subsidiaries to the extent permitted by Section 6.04(c) so long as such Indebtedness is subordinated to the Obligations pursuant to an Affiliate Subordination Agreement;

(d)    Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof; *provided* that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this Section 6.01(d), when combined with the aggregate principal amount of all Capital Lease Obligations (based on GAAP in effect on the Closing Date) incurred pursuant to Section 6.01(e) shall not exceed          at any time outstanding;

(e)    Capital Lease Obligations (based on GAAP in effect on the Closing Date) in an aggregate principal amount, when combined with the aggregate principal amount of all Indebtedness incurred pursuant to Section 6.01(d), not in excess of          at any time outstanding;

(f)    Indebtedness under performance bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business;

(g)    Indebtedness of any Person that becomes a Subsidiary after the date hereof; *provided* that (i) such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary, (ii) immediately before and after such Person becomes a Subsidiary, no Default or Event of Default shall have occurred and be continuing and (iii) the aggregate principal amount of Indebtedness permitted by this Section 6.01(g) shall not exceed          at any time outstanding;

(h)    the Revolver Debt (and any Refinancing thereof) in an aggregate principal amount not to exceed at any time outstanding          , *provided* that (x) the Indebtedness for any such Refinancing is incurred and Guaranteed only by the obligor or obligors in respect of the Indebtedness so Refinanced and (y) the Indebtedness for any such Refinancing is subject to the Intercreditor Agreement;

(i)    so long as the Subordination Agreement is in full force and effect, the Subordinated Debt in an aggregate principal amount not to exceed          (plus the amount of any interest paid in kind) at any time outstanding;

(j)    Indebtedness in respect of those Hedging Agreements incurred in the ordinary course of business and consistent with prudent business practice in an aggregate notional amount not to exceed          at any time outstanding; and

(k)    other unsecured Indebtedness of the Borrower or the Subsidiaries in an aggregate principal amount not exceeding          at any time outstanding.

69

CONFIDENTIAL

**JAE 0759**

KPCDEF_000507

SECTION 6.02.    *Liens*.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including the Borrower or any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)    Liens on property or assets of the Borrower and its Subsidiaries existing on the date hereof and set forth in Schedule 6.02; *provided* that such Liens shall secure only those obligations which they secure on the date hereof;

(b)    any Lien created under the Loan Documents;

(c)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or assets of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary, as the case may be; *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not apply to any other property or assets of Holdings, the Borrower or any Subsidiary and (iii) such Lien secures only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be;

(d)    Liens for taxes not yet due or which are being contested in compliance with Section 5.03;

(e)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or which are being contested in compliance with Section 5.03;

(f)    pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations;

(g)    deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h)    zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(i)    purchase money security interests in real property, improvements thereto or equipment hereafter acquired (or, in the case of improvements, constructed) by the Borrower or any Subsidiary; *provided* that (i) such security interests secure Indebtedness permitted by Section 6.01, (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 90 days after such acquisition (or construction), (iii) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of such real property,

70

**JAE 0760**

CONFIDENTIAL

KPCDEF_000508

improvements or equipment at the time of such acquisition (or construction) and (iv) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary;

(j)      so long as the same is subject to the Intercreditor Agreement or another intercreditor agreement in form and substance satisfactory to the Arranger Agent, Liens on Collateral securing the Revolver Debt;

(k)      judgment Liens securing judgments not constituting an Event of Default under Article VII; and

(l)      other Liens securing liabilities hereunder in an aggregate amount not to exceed $2,500,000 at any time outstanding.

SECTION 6.03.      *Sale and Lease-Back Transactions*.  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred unless (a) the sale or transfer of such property is permitted by Section 6.05 and (b) any Capital Lease Obligations or Liens arising in connection therewith are permitted by Section 6.01 and Section 6.02, as the case may be.

SECTION 6.04.      *Investments, Loans and Advances*.  Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other Person, except:

(a)      (i) investments by Holdings, the Borrower and the Subsidiaries existing on the date hereof in the Equity Interests of the Borrower and the Subsidiaries and (ii) additional investments by Holdings, the Borrower and the Subsidiaries in the Equity Interests of the Borrower and the Subsidiaries; *provided* that any such Equity Interests held by a Loan Party shall be pledged pursuant to the Guarantee and Collateral Agreement;

(b)      Permitted Investments;

(c)      loans or advances made by the Borrower to any Subsidiary and made by any Subsidiary to the Borrower or any other Subsidiary; *provided* that (i) any such loans and advances made by a Loan Party shall be evidenced by a promissory note pledged to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement and (ii) such loans and advances shall be unsecured and subordinated to the Obligations pursuant to an Affiliate Subordination Agreement;

(d)      investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(e)      the Borrower and the Subsidiaries may make loans and advances in the ordinary course of business to their respective employees so long as the aggregate principal amount

71

CONFIDENTIAL

KPCDEF_000509

thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed ▌;

(f)     the Borrower and the Subsidiaries may enter into Hedging Agreements that are not speculative in nature and are related to purchases from foreign suppliers;

(g)     the Borrower or any Subsidiary may acquire all or substantially all the assets of a Person or line of business of such Person, or not less than ▌ of the Equity Interests (other than directors' qualifying shares) of a Person (referred to herein as the "*Acquired Entity*"); *provided* that (i) such acquisition was not preceded by an unsolicited tender offer for such Equity Interests by, or proxy contest initiated by, Holdings, the Borrower or any Subsidiary; (ii) the Acquired Entity shall be in a similar line of business as that of the Borrower and the Subsidiaries as conducted during the current and most recent calendar year; and (iii) at the time of such transaction (A) both before and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; (B) the Borrower would be in compliance with the covenants set forth in Sections 6.10, 6.11, 6.12 and 6.13 as of the most recently completed period of four consecutive fiscal quarters ending prior to such transaction for which the financial statements and certificates required by Sections 5.04(a) or 5.04(b), as the case may be, and Section 5.04(b) have been delivered, after giving pro forma effect to such transaction and to any other event occurring after such period as to which pro forma recalculation is appropriate (including any other transaction described in this Section 6.04(g) occurring after such period) as if such transaction had occurred as of the first day of such period (assuming, for purposes of pro forma compliance with Section 6.13, that the maximum Senior Leverage Ratio permitted at the time by such Section was in fact 0.25 to 1.00 less than the ratio actually provided for in such Section at such time); (C) the total consideration paid in connection with such acquisition and any other acquisitions pursuant to this Section 6.04(g) (including any Indebtedness of the Acquired Entity that is assumed by the Borrower or any Subsidiary following such acquisition and any payments following such acquisition pursuant to earn-out provisions or similar obligations) shall not in the aggregate exceed ▌ (D) the Borrower shall have delivered a certificate of a Financial Officer, certifying as to the foregoing and containing reasonably detailed calculations in support thereof, in form and substance satisfactory to the Arranger Agent and (E) the Borrower shall comply, and shall cause the Acquired Entity to comply, with the applicable provisions of Section 5.12 and the Security Documents (any acquisition of an Acquired Entity meeting all the criteria of this Section 6.04(g) being referred to herein as a "*Permitted Acquisition*");

(h)     Investments contemplated in connection with the ESOP Loan and Company ESOP Loan;

(i)     any purchase by Holdings of Equity Interests owned by the ESOP Trust or by a current or former ESOP participant expressly permitted by Section 6.06;

(j)     Investments by the Borrower in Hedging Agreements permitted under Section 6.01(k); and

(k)     in addition to investments permitted by paragraphs (a) through (j) above, additional investments, loans and advances by the Borrower and the Subsidiaries so long as the aggregate amount invested, loaned or advanced pursuant to this paragraph (k) (determined

72

OHSUSA:762548252

CONFIDENTIAL

**JAE 0762**

KPCDEF_000510

without regard to any write-downs or write-offs of such investments, loans and advances) does not exceed▮▮▮▮▮ in the aggregate.

SECTION 6.05.    ***Mergers, Consolidations, Sales of Assets and Acquisitions***.

(a)    Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all the assets (whether now owned or hereafter acquired) of the Borrower or less than all the Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, except that (i) the Borrower and any Subsidiary may purchase and sell inventory in the ordinary course of business and (ii) if at the time thereof and immediately after giving effect thereto no Event of Default or Default shall have occurred and be continuing (x) any Wholly Owned Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving corporation, (y) any Wholly Owned Subsidiary may merge into or consolidate with any other Wholly Owned Subsidiary in a transaction in which the surviving entity is a Wholly Owned Subsidiary and no Person other than the Borrower or a Wholly Owned Subsidiary receives any consideration (*provided* that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be a Loan Party) and (z) the Borrower and the Subsidiaries may make Permitted Acquisitions.

(b)    Make any Asset Sale otherwise permitted under paragraph (a) above unless (i) such Asset Sale is for consideration at leas▮▮▮▮▮ of which is cash, (ii) such consideration is at least equal to the fair market value of the assets being sold, transferred, leased or disposed of and (iii) the fair market value of all assets sold, transferred, leased or disposed of pursuant to this paragraph (b) shall not exceed (i)▮▮▮▮▮ in any fiscal year or (ii)▮▮▮▮▮ in the aggregate.

SECTION 6.06.    ***Restricted Payments; Restrictive Agreements***.

(a)    Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so; *provided* that (i) any Subsidiary may declare and pay dividends or make other distributions ratably to its equity holders, (ii) so long as no Event of Default or Default shall have occurred and be continuing or would result therefrom, the Borrower may, or the Borrower may make distributions to Holdings so that Holdings may, repurchase ESOP Stock of Holdings' ESOP participants, the Borrower or the Subsidiaries participating in the ESOP upon a distribution event involving the respective employees to the extent required by the Code and as set forth in the ESOP Documents, (iii) the Borrower may make distributions to Holdings (and Holdings may make contributions or distributions to the ESOP in a like amount) which (x) do not exceed the amount required to pay principal and interest on the ESOP Loan and (y) with respect to any such contributions, are tax deductible to the taxpayer group that includes the Borrower, *provided* that substantially concurrently with each such contribution or distribution by Holdings, Holdings receives payment from the ESOP for such principal and interest in at least an equivalent amount and subsequently contributes such payment back to the Borrower, (iv) the ESOP Transaction (including the One-Time Distribution) may be consummated, (v) so long as no Event of Default or Default shall have occurred and be

OHSUSA:762548252

73

**JAE 0763**

continuing or would result therefrom and the aggregate amount of Qualified Cash of the Loan Parties is not less than ▊▊▊▊ after giving effect thereto, the Borrower may, or the Borrower may make distributions to Holdings so that Holdings may, apply Remainder QAF Proceeds to prepay the Subordinated Debt, (vi) so long as no Event of Default or Default shall have occurred and be continuing or would result therefrom and Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended for which financial statements have been delivered pursuant to Section 5.04 is greater than or equal to ▊▊▊▊, the Borrower may, or the Borrower may make distributions to Holdings so that Holdings may, make scheduled interest payments with respect to the Subordinated Debt, (vii) the Borrower may pay fees, costs and expenses payable or otherwise incurred in connection with the Management Agreement (excluding any Management Company Bonus) in an amount not to exceed the payments provided for under the Management Agreement in effect on the Closing Date or subsequently consented to by the Required Lenders, (viii) so long as no Event of Default or Default shall have occurred and be continuing or would result therefrom and the Borrower would be in compliance with Section 6.11 and Section 6.12 after giving pro forma effect to the proposed payment, the Borrower may pay the Management Company Bonus in an amount not to exceed the payments provided for under the Management Agreement in effect on the Closing Date or subsequently consented to by the Required Lenders; (ix) so long as no Event of Default or Default shall have occurred and be continuing or would result therefrom, the Borrower may, or the Borrower may make distributions to Holdings so that Holdings may, use excess amounts released to the Borrower from the Debt Service Reserve Account (pursuant to the last sentence of Section 6.16) or from the Litigation Reserve Account (pursuant to the last sentence of Section 6.17) to prepay the Subordinated Debt, in each case so long as such excess amounts were deposited in the Debt Service Reserve Account or the Litigation Reserve Account in good faith (as determined by the Arranger Agent) to comply with Section 6.16 or Section 6.17, respectively and (x) the Borrower may make Restricted Payments to Holdings (1) in an amount not to exceed ▊▊▊▊ in any fiscal year, to the extent necessary to pay general corporate and overhead expenses incurred by Holdings in the ordinary course of business and (2) in an amount necessary to pay the Tax liabilities of Holdings directly attributable to (or arising as a result of) the operations of the Borrower and the Subsidiaries; *provided, however*, that (A) the amount of such dividends shall not exceed the amount that the Borrower and the Subsidiaries would be required to pay in respect of Federal, state and local taxes were the Borrower and the Subsidiaries to pay such taxes as stand-alone taxpayers and (B) all Restricted Payments made to Holdings pursuant to this clause (x) are used by Holdings for the purposes specified herein within 20 days of the receipt thereof. Notwithstanding anything herein to the contrary, no Loan Party shall make any contribution to the ESOP except as expressly permitted by this Section 6.06(a).

(b)  Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Holdings, the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; *provided* that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or the Revolver Loan Documents, (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold

74

OHSUSA:762548252

**JAE 0764**

and such sale is permitted hereunder, (C) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (D) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.07. *Transactions with Affiliates*. Except for transactions between or among Loan Parties or with the ESOP (to the extent expressly permitted by Section 6.06), sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that the Borrower or any Subsidiary may (x) engage in any of the foregoing transactions in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties (*provided* that any such transaction or series of related transactions entered into after the Closing Date that involves property and assets with a value in excess of ▮▮▮▮ shall require the prior written consent of the Arranger Agent, such consent not to be unreasonably withheld or delayed) and (y) pay fees, costs and expenses in connection with the Management Agreement to the extent permitted by Section 6.06(a).

SECTION 6.08. *Business of Holdings, Borrower and Subsidiaries*.

(a) With respect to Holdings, engage in any business activities or have any assets or liabilities other than its ownership of the Equity Interests of the Borrower and liabilities incidental thereto, including its liabilities pursuant to the Guarantee and Collateral Agreement.

(b) With respect to the Borrower and its Subsidiaries, engage at any time in any business or business activity other than the business currently conducted by it and business activities reasonably incidental thereto.

SECTION 6.09. *Other Indebtedness and Agreements*.

(a) Permit (i) any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Material Indebtedness of Holdings, the Borrower or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to Holdings, the Borrower, any of the Subsidiaries or the Lenders, (ii) any waiver, supplement, modification or amendment of its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents, to the extent any such waiver, supplement, modification or amendment would be adverse to the Lenders in any material respect or (iii) any waiver, supplement, modification or amendment of (x) the Revolver Loan Documents, the Subordinated Note Documents, the Management Agreement or the Chapman Lease that could adversely affect the rights or interests of the Lenders (other than, with respect to the Revolver Debt, as permitted by the Intercreditor Agreement) or (y) the PCHI Lease.

75

OHSUSA:762548252

(b)     (i) Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay, or commit to pay, or directly or indirectly (including pursuant to any Synthetic Purchase Agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness except (A) the payment of the Indebtedness created hereunder and the Revolver Debt, (B) Refinancings of Indebtedness permitted by Section 6.01 and (C) the payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (ii) pay in cash any amount in respect of any Indebtedness or preferred Equity Interests that may at the obligor's option be paid in kind or in other securities or (iii) pay in cash any amount in respect of the Subordinated Debt except to the extent expressly permitted by Section 6.06(a)(v), Section 6.06(a)(vi) or Section 6.06(a)(ix).

SECTION 6.10.     *Capital Expenditures*.  Permit the aggregate amount of Capital Expenditures made by the Borrower and the Subsidiaries in any fiscal year to exceed the amount set forth below opposite such fiscal year:

| **Fiscal Year Ending** | **Maximum Capital Expenditures Amount** |
|---|---|
| August 31, 2016 | |
| August 31, 2017 | |
| August 31, 2018 | |
| August 31, 2019 | |
| August 31, 2020 | |

provided that any unused amount in a fiscal year may be carried over and expended only in the immediately succeeding fiscal year; provided, further that if any such amount is so carried over, it will be deemed used in the succeeding fiscal year after the applicable Maximum Capital Expenditures amount for such fiscal year.

SECTION 6.11.     *Minimum Coverage Ratios*.

(a)     Permit the Fixed Charge Coverage Ratio for any period of four consecutive fiscal quarters, in each case taken as one accounting period, ending on a date or during any period set forth below to be less than the ratio set forth opposite such date or period below:

| **Period/Date** | **Ratio** |
|---|---|
| November 30, 2015 | |

76

OHSUSA:762548252

February 29, 2016

May 31, 2016

August 31, 2016

November 30, 2016 and thereafter



(b)     Permit the Interest Coverage Ratio for any period of four consecutive fiscal quarters, in each case taken as one accounting period, ending on a date or during any period set forth below to be less than the ratio set forth opposite such date or period below:

**Period/Date**                                                    **Ratio**

November 30, 2015

February 29, 2016

May 31, 2016

August 31, 2016

November 30, 2016

February 28, 2017 and thereafter



SECTION 6.12.     *Maximum Senior Leverage Ratio*.   Permit the Senior Leverage Ratio at any time during a period set forth below to be greater than the ratio set forth opposite such period below:

**Period**                                                         **Ratio**

Closing Date through November 30, 2015

December 1, 2015 through February 29, 2016

March 1, 2016 through May 31, 2016

June 1, 2016 through August 31, 2016

September 1, 2016 through November 30, 2016

December 1, 2016 through February 28, 2017



77

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000515

March 1, 2017 through May 30, 2017

June 1, 2017 and thereafter



SECTION 6.13.    *Revolver Availability*. During the 15 month period commencing on the Closing Date, permit Revolver Availability to be less than (x)          at any time or (y)          for any period of 15 consecutive Business Days.

SECTION 6.14.    *Fiscal Year; Fiscal Quarters*. With respect to any Loan Party, commencing September 1, 2015, maintain a fiscal year-end date other than August 31 or fiscal quarter-end dates other than February 28 (or February 29, as applicable), May 31, August 31 and November 30.

SECTION 6.15.    ***Certain Equity Securities.*** Issue any Equity Interest that is not Qualified Capital Stock.

SECTION 6.16.    ***Debt Service Reserve Account***. At any time permit the aggregate amount of unrestricted cash on deposit in the Debt Service Reserve Account to be less than an amount sufficient to pay interest and scheduled principal payments with respect to the Loans for the immediately succeeding six month period (assuming all Loans to be Eurodollar Loans and assuming monthly Interest Periods for any period following the expiration of any then current Interest Period); *provided* that, for purposes of calculating the Adjusted LIBO Rate that would be due with respect to each applicable future Interest Period (as determined by the Arranger Agent), the Arranger Agent shall use (i)(1) the interest rate per annum equal to the offered quotation rate to first class banks in the London interbank market which appears on the Bloomberg Screen when the command FWCV->Go is entered for deposits, determined as of approximately 11:00 a.m. (New York City time) on the first day of each new Interest Period or (2) in the event the rate referenced in the preceding clause (1) does not appear on such page or service or if such page or service shall cease to be available, the interest rate per annum shall be equal to the interest rate determined by the Arranger Agent to be the offered rate on such other page or other service as reasonably determined by the Arranger Agent to be comparable to the page or service referenced in the preceding clause (1) (in each case for delivery on the first day of the relevant Interest Period in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loans with a term equivalent to one month) *plus* (ii) the Applicable Margin for Eurodollar Loans. So long as no Default or Event of Default has occurred and is continuing, if the cash then on deposit in the Debt Service Reserve Account exceeds the amount required to be maintained in the Debt Service Reserve Account as described in the preceding sentence, upon written request of the Borrower to the Arranger Agent, the Arranger Agent shall direct the Administrative Agent in writing to release to the Borrower cash in an amount equal to such excess as specified in such written notice to the Administrative Agent (and the Administrative Agent shall follow such written direction from the Arranger Agent).

SECTION 6.17.    ***Litigation Reserve Account***. At any time permit the aggregate amount of unrestricted cash on deposit in the Litigation Reserve Account to be less than an amount sufficient to pay all liability of the Loan Parties with respect to the Fitzgibbons Matter due and payable (without giving effect to any appeal, stay or injunction) within the immediately

78

OHSUSA:762548252

succeeding 24 month period.  So long as no Default or Event of Default has occurred and is continuing, at the Borrower's written request (together with reasonable detail with respect thereto), the Collateral Agent shall (at the Arranger Agent's written direction) from time to time release to the Borrower cash from the Litigation Reserve Account; *provided* that such cash is used to repay liability of the Loan Parties with respect to the Fitzgibbons Matter.  If the Arranger Agent has received evidence satisfactory to it that that the amount on deposit in the Litigation Reserve Account exceeds the amount required to be on deposit therein pursuant to the first sentence of this Section 6.17, the Collateral Agent shall (at the Arranger Agent's written direction) release to the Borrower cash in an amount equal to such excess.

ARTICLE VII

***Events of Default***

In case of the happening of any of the following events ("***Events of Default***"):

(a)     any representation or warranty made or deemed made in or in connection with any Loan Document hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)     default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)     default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in Section 5.01(a), 5.02, 5.05, 5.08, 5.15, 5.16 or 5.17 or in Article VI;

(e)     default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after the earlier of (i) notice thereof from the Administrative Agent to the Borrower (which notice shall also be given at the request of any Lender) or (ii) knowledge thereof of Holdings or the Borrower;

(f)     (i) Holdings, the Borrower or any Subsidiary shall fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable, or (ii) any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material

79

OHSUSA:762548252

CONFIDENTIAL

Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; *provided* that this clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Borrower or any Subsidiary, or of a substantial part of the property or assets of Holdings, the Borrower or a Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or a Subsidiary or (iii) the winding-up or liquidation of Holdings, the Borrower or any Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)     Holdings, the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

(i)     one or more judgments, orders, writs, tax liens, decrees, arbitration awards, assessments, determinations of overpayment or demands (or requests that are the equivalent to demands) for return of overpayment shall be rendered against Holdings, the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $2,500,000 or (ii) is for injunctive relief and could reasonably be expected to result in a Material Adverse Effect;

(j)     an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $2,500,000;

(k)     any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny in writing that it has any further liability under the Guarantee and Collateral

80

OHSUSA:762548252

CONFIDENTIAL

Agreement (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(l)     any security interest purported to be created by any Security Document shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Document or the Intercreditor Agreement) security interest in the securities, assets or properties covered thereby; or

(m)     the subordination provisions of the Subordination Agreement or other documents evidencing or governing any subordinated Indebtedness, or provisions of the Intercreditor Agreement (or any other intercreditor agreement entered into by Agent after the date hereof, any such provisions being referred to as the "*Subordinated Provisions*") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable subordinated Indebtedness or Revolver Debt;

(n)     there shall occur any amendment or modification to any ESOP Document without the prior written consent of the Arranger Agent that adversely affects the Lenders in any material respect; or

(o)     Holdings shall fail to enforce any of its rights and remedies under the ESOP Loan Documents so as to avoid any waiver or other loss of any right or remedy of Holdings thereunder; or

(p)     the ESOP Loan ceases for any reason to constitute an "exempt loan" under Treasury Regulation Section 54.4975-7(b)(1)(iii), including as a result of a default by the ESOP on the ESOP Loan; or

(q)     the ESOP or any Loan Party receives a notice of deficiency or unfavorable determination letter from any Governmental Authority with respect to the qualified status of the ESOP or that the ESOP is no longer tax exempt under Section 501(a) of the Code; or

(r)     the ESOP shall have failed to request a favorable determination letter from the IRS within six months after the Closing Date or Holdings fails to timely adopt amendments requested by the IRS as a condition to issuance of a favorable determination letter (it being understood that as referenced in clause (o) above, certain amendments or modifications to the ESOP Documents, if adopted, shall constitute an Event of Default without the prior written consent of the Arranger Agent); or

(s)     a state or Federal regulatory agency or other Governmental Authority shall have revoked, cancelled, failed to renew or adversely modified any license, permit, certificate, authorization or Government Reimbursement Program qualification pertaining to the business of any Loan Party, regardless of whether such license, permit, certificate, authorization qualification was held by or originally issued for the benefit of such Loan Party, a tenant or any other Person, except where such revocation could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; or

81

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000519

(t)      any of the Loan Parties or their respective officers, employees or agents engage in activities which are prohibited by the Anti-Kickback Amendments of the Social Security Act (presently codified in Section 1128(B)(b) of the Social Security Act), the regulations promulgated thereunder, or related state or local statutes or regulations or which are prohibited by rules of professional conduct, except where any such activities could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; or

(u)      at any time the QAF Program shall fail to be renewed, or shall be amended in a manner deemed by the Required Lenders to be materially adverse to the Lenders; or

(v)      (i) Dr. KPC is no longer employed full-time as Chief Executive Officer of the Borrower (or, after giving effect to the transition contemplated by the Transition Agreement, the Management Company) or no longer fulfills the functions associated with such position on the Closing Date, unless in either case Dr. KPC is replaced within 60 days (as such period may be extended by up to 30 days by the Arranger Agent in its sole discretion) by another natural person reasonably satisfactory to the Arranger Agent, (ii) Suzanne Richards is no longer employed full-time as Chief Executive Officer of Hospital Operations of the Borrower (or, after giving effect to the transition contemplated by the Transition Agreement, the Management Company) or no longer fulfills the functions associated with such position on the Closing Date, unless in either case Suzanne Richards is replaced within 60 days (as such period may be extended by up to 30 days by the Arranger Agent in its sole discretion) by another natural person reasonably satisfactory to the Arranger Agent or (iii) the Management Agreement is terminated; or

(w)      the occurrence of any material breach of any Material Contract or the termination of any Material Contract; or

(x)      the ESOP Assignment Effective Date shall fail to occur within two Business Days after the Closing Date; or

(y)      there shall have occurred a Change in Control;

then, and in every such event (other than an event with respect to Holdings or the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the written request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:   (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with the Early Prepayment Fee and accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to Holdings or the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other

82

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000520

notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

ARTICLE VIII

*The Administrative Agent, the Collateral Agent and the Arranger Agent; Etc.*

Each Lender hereby irrevocably appoints the Administrative Agent, the Collateral Agent and the Arranger Agent (for purposes of this Article VIII, the Administrative Agent, the Collateral Agent and the Arranger Agent are referred to collectively as the "*Agents*") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

Each institution serving as the Administrative Agent, the Collateral Agent and/or the Arranger Agent hereunder shall, if applicable, have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08); *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or Requirement of Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of the Subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent, Collateral Agent and/or Arranger Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of

83

OHSUSA:762548252

CONFIDENTIAL

any Default unless and until written notice thereof is given to such Agent by Holdings, the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) compliance by any Affiliate SPCP Lender with the terms hereof relating to Affiliated SPCP Lenders or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facility as well as activities as Agent.

Any Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a financial institution with an office in New York, New York, or an Affiliate of any such financial institution; *provided* that in no event shall any such successor Agent be a Defaulting Lender or an Affiliated SPCP Lender. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent, Collateral Agent and/or Arranger Agent, as the case may be. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation

84

OHSUSA:762548252

CONFIDENTIAL

hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

If the Person serving as Administrative Agent or the Arranger Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof or if the Arranger Agent has assigned or sold participations in its Loans in an amount greater than 75% of its initial Commitment hereunder (other than any assignment or participation to a Related Fund or Affiliate thereof), the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent or Arranger Agent, as applicable, and, in consultation with the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "***Removal Effective Date***"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Each of the Lenders from time to time party to this Agreement hereby confirms and reaffirms the irrevocable authority of the Administrative Agent and/or the Collateral Agent, as applicable, to execute, deliver and act on its behalf in respect of the Intercreditor Agreement, the Subordination Agreement and each other intercreditor agreement and subordination agreement and each supplement, modification, amendment, restatement or extension thereto, in connection with the incurrence by any Loan Party of the Revolver Debt or the Subordinated Debt or any other subordinated Indebtedness. Each Lender agrees to be bound by the terms and provisions of the Intercreditor Agreement, the Subordination Agreement and any such other intercreditor or subordination agreement. Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Lender hereby agree that no Lender shall have any right individually to enforce any intercreditor agreement, subordination agreement or guarantee, it being understood and agreed that all powers, rights and remedies under any intercreditor agreement, any subordination agreement and any guarantee may be exercised solely by the Administrative Agent and/or the Collateral Agent, as applicable, for the benefit of the Lenders in accordance with the terms thereof.

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, the Lead Arranger is named as such for recognition purposes only, and in its capacity as such shall have no duties, responsibilities or liabilities with respect to this Agreement or any other Loan Document; it being understood and agreed that the Lead Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Agents provided herein and in the other Loan Documents. Without limitation of the foregoing, the Lead Arranger in its

85

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000523

capacity as such shall not, by reason of this Agreement or any other Loan Document, have any fiduciary relationship in respect of any Lender, Loan Party or any other Person.

For the avoidance of doubt, the Arranger Agent shall be entitled to all indemnification and reimbursement rights in favor of the Agents provided herein and in the other Loan Documents. Without limitation of the foregoing, the Arranger Agent, in its capacity as such shall not, by reason of this Agreement or any other Loan Document, have any fiduciary relationship in respect of any Lender, Loan Party or any other Person.

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, each of the Administrative Agent and the Collateral Agent agrees that it shall act at the written direction of the Arranger Agent (or the Required Lenders, as applicable) under each intercreditor agreement, subordination agreement, guarantee or any of the Security Documents entered into in connection herewith.

ARTICLE IX

*Miscellaneous*

SECTION 9.01.      ***Notices; Electronic Communications***.      Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or e-mail, as follows:

(a)      if to the Borrower or Holdings, to it at 1301 N. Tustin Ave, Attention of John Collins, Chief Financial Officer (Fax No.: 714-953-3384, Email: john.collins@ihhioc.com);

(b)      if to Administrative Agent or Collateral Agent, to Wilmington Trust, National Association, 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, attention of Meghan McCauley (Telecopy No. (612) 217-5651, E-mail: MMcCauley@WilmingtonTrust.com), and with copies for information purposes only to Alan Glantz, Kaye Scholer LLP, 250 West 55th Street, New York, NY 10019 (Telephone No. 212-836-7253 and Telecopy No. 212-836-6763; E-mail: alan.glantz@kayescholer.com);

(c)      if to the Arranger Agent, to Credit Suisse Park View BDC, Inc., One Madison Avenue, New York, New York 10010, Attention of Jens Ernberg (Email: jens.ernberg@credit-suisse.com); and

(d)      if to a Lender, to it at its address (or fax number or e-mail address) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or e-mail or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

86

OHSUSA:762548252

CONFIDENTIAL    KPCDEF_000524

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or the Arranger Agent that it will, or will cause its Subsidiaries to, provide to the Administrative Agent or the Arranger Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent or the Arranger Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Borrowing Request or a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "*Communications*"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent or the Arranger Agent, as applicable, to the electronic mail address of the Administrative Agent or the Arranger Agent, as applicable set forth above.  In addition, each Loan Party agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent, the Arranger Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent or the Arranger Agent.

The Borrower hereby acknowledges that the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder by posting such materials and/or information on Intralinks or another similar electronic system (the "*Platform*").

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

OHSUSA:762548252

**JAE 0777**

CONFIDENTIAL

KPCDEF_000525

Each of the Administrative Agent and the Arranger Agent agrees that the receipt of the Communications by the Administrative Agent or the Arranger Agent, as applicable, at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent or the Arranger Agent, as applicable, for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent and the Arranger Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent, the Arranger Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02.   ***Survival of Agreement***.   All covenants, agreements, representations and warranties made by the Borrower or Holdings herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid.  The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender.

SECTION 9.03.   ***Binding Effect***.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings, the Administrative Agent and the Arranger Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04.   ***Successors and Assigns***.

(a)   Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, Holdings, the Administrative Agent, the Collateral Agent, the Arranger Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)   Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), with notice to the Borrower (failure to provide or delay in providing such notice shall not invalidate such assignment); *provided* that

88

CONFIDENTIAL   KPCDEF_000526

(i) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans); *provided further* that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws) and all applicable tax forms.  Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid); *provided* that, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  No assignment shall be made to any Defaulting Lender or any of its subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or one of its subsidiaries.

(c)      By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitment, and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and

89

CONFIDENTIAL

warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05 or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, the Arranger Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent, the Collateral Agent and the Arranger Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent, the Collateral Agent and the Arranger Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive and the Borrower, the Administrative Agent, the Collateral Agent, the Arranger Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower, to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrower, the Administrative Agent or the Arranger Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in Sections 2.14, 2.16 and 2.20 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant except to the extent that such entitlement to receive a greater payment results from a Change in Law that occurs after the participating bank or other Person acquired the applicable participation) and

90

OHSUSA:762548252

CONFIDENTIAL

(iv) the Borrower, the Administrative Agent, the Arranger Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Commitments in which such participating bank or Person has an interest or releasing any Guarantor (other than in connection with the sale of such Guarantor in a transaction permitted by Section 6.05) or all or substantially all of the Collateral).  To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06 as though it were a Lender, *provided* such participating bank or other Person agrees to be subject to Section 2.18 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPV***"), identified as

91

OHSUSA:762548252

**JAE 0781**

CONFIDENTIAL

such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)      Neither Holdings nor the Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent, the Arranger Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(k)      In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

92

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000530

(l)      ***Assignments to Affiliated SPCP Lenders***.   Notwithstanding anything in this Agreement to the contrary, any Affiliated SPCP Lender may be an initial Lender and any Lender may assign all or a portion of its Loans to an Affiliated SPCP Lender, subject to the following limitations:

(i)      in connection with an assignment to an Affiliated SPCP Lender, (A) the Affiliated SPCP Lender shall have identified itself in writing as an Affiliated SPCP Lender to the assigning Lender, the Arranger Agent and the Administrative Agent prior to the execution of such assignment and (B) the Arranger Agent and the Administrative Agent shall have given their prior written approval to such assignment (each such approval not to be unreasonably withheld or delayed);

(ii)      Affiliated SPCP Lenders will not (A) have the right to receive information, reports or other materials provided solely to Lenders by any Agent or Lender, except to the extent made available to the Borrower, (B) attend or participate in meetings attended solely by the Lenders and the Agents, or (C) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of any Agent or the Lenders;

(iii)      for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to any Agent or any Lender to undertake any action (or refrain from taking any action) under, this Agreement or any other Loan Document, each Affiliated SPCP Lender will be deemed to have consented in the same proportion as the Lenders that are not Affiliated SPCP Lenders consented to such matter, unless such matter requires the consent of all or all affected Lenders and adversely affects such Affiliated SPCP Lender more, in its capacity as Lender, than other Lenders in any material respect, (B) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws (a "Specified Plan"), each Affiliated SPCP Lender hereby agrees (x) that it will be deemed to have voted in the same proportion as the Lenders that are not Affiliated SPCP Lenders voted on such Specified Plan, (y) if for any reason, its vote to accept or reject any Specified Plan is not deemed to have been so voted, then such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Specified Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (z) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (y), in each case under this clause (iii)(B) unless such Specified Plan adversely affects such Affiliated SPCP Lender more, in its capacity as Lender, than other Lenders in any material respect, and (C) each Affiliated SPCP Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Affiliated SPCP Lender's attorney-in-fact, with full authority in the place and stead of such Affiliated SPCP Lender and in the name of such Affiliated SPCP Lender (solely in respect of Loans and not in respect of any other claim or status such Affiliated SPCP Lender may otherwise have), from time to time in the Administrative Agent's discretion to take any action and to execute any instrument

93

CONFIDENTIAL

**JAE 0783**

KPCDEF_000531

that the Administrative Agent or the Arranger Agent may deem reasonably necessary or appropriate to carry out the provisions of this clause (iii), including to ensure that any vote of such Affiliated SPCP Lender on any Specified Plan is withdrawn or otherwise not counted; and

(iv)     the Affiliated SPCP Lender will not be entitled to bring actions against any Agent, in its role as such, or receive advice of counsel or other advisors to any Agent or any other Lenders or challenge the attorney client privilege of their respective counsel; and

Each Affiliated SPCP Lender agrees to comply with the terms of this paragraph (l) (notwithstanding that it may be granted access to the Platform or any other electronic site established for the Lenders by the Administrative Agent), and agrees that in any subsequent assignment of all or any portion of its Loans it shall identify itself in writing to the assignee as an Affiliated SPCP Lender prior to the execution of such assignment.

SECTION 9.05.     *Expenses; Indemnity*.

(a)     The Borrower and Holdings agree, jointly and severally, to pay all out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent and the Arranger Agent in connection with the syndication of the Credit Facility and the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) or incurred by the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made issued hereunder, including the reasonable fees, charges and disbursements of Kaye Scholer LLP, counsel for the Administrative Agent and the Collateral Agent, and Orrick, Herrington & Sutcliffe LLP, counsel for the Arranger Agent, and the fees of any valuation or restructuring consultant that may be retained by the Arranger Agent in connection with this Agreement, and, in connection with any such enforcement or protection, the fees, charges and disbursements of any other counsel for the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender.

(b)     The Borrower and Holdings agree, jointly and severally, to indemnify the Administrative Agent, the Collateral Agent, the Arranger Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby (including the syndication of the Credit Facility), (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by any Loan Party or any of their respective Affiliates), or

94

**JAE 0784**

(iv) any actual or alleged presence or Release of Hazardous Materials on any property currently or formerly owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or the Subsidiaries; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.

(c)     To the extent that Holdings and the Borrower fail to pay any amount required to be paid by them to the Administrative Agent, the Collateral Agent, the Arranger Agent or any Related Party of any of the foregoing under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent, the Collateral Agent, the Arranger Agent or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's outstanding Loans and Commitments at such time (or, if indemnification is sought after the date upon which the Loans have been paid in full and the Commitments have terminated, in accordance with its pro rata share determined immediately prior to such date)) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Agent or the Arranger Agent in its capacity as such or against any Related Party acting for the Administrative Agent, the Collateral Agent or the Arranger Agent in connection with such capacity.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Loans and Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender).

(d)     To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loans or the use of the proceeds thereof.

(e)     The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender.  All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06.     ***Right of Setoff***.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower or Holdings against any of and all the obligations of the Borrower or Holdings now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such

95

OHSUSA:762548252

CONFIDENTIAL

obligations may be unmatured; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have.  Each Lender agrees to notify the Borrower, the Administrative Agent and the Arranger Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 9.07.     *Applicable Law*.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08.     *Waivers; Amendment*.

(a)     No failure or delay of the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent, the Arranger Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement (or any provision hereof) nor any other Loan Document (or any provision thereof) may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower, Holdings and the Required Lenders (or the Administrative Agent, with the consent of the Required Lenders); *provided, however*, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of Section 2.17, the provisions of Section 9.04(j) or the provisions of this Section or release any Guarantor (other than in connection with the sale of such Guarantor in a transaction permitted by

96

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000534

Section 6.05) or all or substantially all of the Collateral, without the prior written consent of each Lender, (iv) reduce the amount of any fees or other amounts payable hereunder (including any Make-Whole Amount or QAF Prepayment Fee), without the prior written consent of each Lender directly adversely affected thereby, (v) reduce the amount of or otherwise waive or excuse, or extend the scheduled date for, any mandatory prepayment due pursuant to Section 2.13(f), (vi) modify the protections afforded to an SPV pursuant to the provisions of Section 9.04(i) without the written consent of such SPV or (vii) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent or the Arranger Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, the Collateral Agent or the Arranger Agent, as the case may be. The Fee Letter may be not be amended, nor may any provision, rights or privileges thereunder be waived, except in a writing executed only by the parties thereto.

(c)     The Arranger Agent and the Borrower may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

SECTION 9.09.     *Interest Rate Limitation*.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall exceed the maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10.     *Entire Agreement*.  This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Arranger Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11.     *WAIVER OF JURY TRIAL*.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT

97

OHSUSA:762548252

**JAE 0787**

CONFIDENTIAL

IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.12.     *Severability*.   In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13.     *Counterparts*.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03.   Delivery of an executed signature page to this Agreement by facsimile, "pdf" or similar electronic copy of an executed counterpart shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14.     *Headings*.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15.     *Jurisdiction; Consent to Service of Process*.

(a)     Each of Holdings and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender may otherwise have to bring any action or

98

OHSUSA:762548252

**JAE 0788**

KPCDEF_000536

proceeding relating to this Agreement or the other Loan Documents against the Borrower, Holdings or their respective properties in the courts of any jurisdiction.

(b)     Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.16.     *Confidentiality*.  Each of the Administrative Agent, the Collateral Agent, the Arranger Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section, "*Information*" shall mean all information received from the Borrower or Holdings and related to the Borrower or Holdings or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent, the Arranger Agent or any Lender on a non-confidential basis prior to its disclosure by the Borrower or Holdings; *provided* that, in the case of Information received from the Borrower or Holdings after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 9.17.     *Lender Action*.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-

99

OHSUSA:762548252

CONFIDENTIAL

KPCDEF_000537

help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent (acting at the written direction of the Required Lenders).  The provisions of this Section 9.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 9.18.     ***USA PATRIOT Act Notice***.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Holdings and the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies Holdings and the Borrower, which information includes the name and address of Holdings and the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify Holdings and the Borrower in accordance with the USA PATRIOT Act.

[Signature pages follow.]

100

OHSUSA:762548252

CONFIDENTIAL   KPCDEF_000538

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

KPC HEALTHCARE, INC.

By: _____

Name: *Kali Chaudhuri*

Title: *CEO*

KPC HEALTHCARE HOLDINGS, INC.

By: _____

Name: *Kali Chaudhuri*

Title: *CEO*

[Signature Page – Credit Agreement – KPC]

**JAE 0791**

CONFIDENTIAL

KPCDEF_000539

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Administrative Agent and as
Collateral Agent

By: _____

    Name:  Meghan H. McCauley
    Title:   Assistant Vice President

CREDIT SUISSE PARK VIEW BDC, INC., as a
Lender and as Arranger Agent

By: _____

    Name:
    Title:

[Signature Page – Credit Agreement – KPC]

**JAE 0792**

CONFIDENTIAL

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Administrative Agent and as
Collateral Agent

By: _____
     Name:
     Title:

CREDIT SUISSE PARK VIEW BDC, INC., as a
Lender and as Arranger Agent

By: _____
     Name: Jens J. Ernberg
     Title:  Managing Director

[Signature Page – Credit Agreement – KPC]

CONFIDENTIAL

KPCDEF_000541

SAFETY NATIONAL CASUALTY
CORPORATION, as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By: _____
Name:
Title:   MARCUS COLWELL
         MANAGING DIRECTOR

RELIANCE STANDARD LIFE INSURANCE
COMPANY, as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By: _____
Name:
Title:   MARCUS COLWELL
         MANAGING DIRECTOR

AMERICAN UNITED LIFE INSURANCE
COMPANY, as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By: _____
Name:
Title:   MARCUS COLWELL
         MANAGING DIRECTOR

LINCOLN INVESTMENT SOLUTIONS,
INC., as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By: _____
Name:
Title:   MARCUS COLWELL
         MANAGING DIRECTOR

HPS SPECIALTY LOAN AH SUBSIDIARY
II, L.P., as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By: _____
Name:
Title:   MARCUS COLWELL
         MANAGING DIRECTOR

[Signature Page – Credit Agreement   KPC]

CONFIDENTIAL

HPS AIGUILLES ROUGES SECTOR D
INVESTMENT FUND, L.P., as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By:

Name:
Title:  MARCUS COLWELL
        MANAGING DIRECTOR

HPS SPECIALTY LOAN AH SUBSIDIARY I,
L.P., as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By:

Name:
Title:  MARCUS COLWELL
        MANAGING DIRECTOR

HPS SPECIALTY LOAN PHM SUBSIDIARY
II, L.P., as Lender
By: Highbridge Principal Strategies, LLC, as
Investment Manager

By:

Name:
Title:  MARCUS COLWELL
        MANAGING DIRECTOR

[Signature Page – Credit Agreement – KPC]

CONFIDENTIAL

KPCDEF_000543

**SPECIAL VALUE CONTINUATION PARTNERS, LP**
**TCPC FUNDING I, LLC**
**TENNENBAUM SENIOR LOAN SPV, LLC**
**TENNENBAUM SENIOR LOAN FUND II, LP**
**TENNENBAUM SENIOR LOAN OPERATING III, LLC**
**TENNENBAUM SENIOR LOAN SPV IV-A, LLC**
**TENNENBAUM SENIOR LOAN FUND IV-B, LP**
**TENNENBAUM SENIOR LOAN FUND V, LLC**
**TENNENBAUM ENHANCED YIELD OPERATING I, LLC**

On behalf of each of the above lenders:

By: TENNENBAUM CAPITAL PARTNERS, LLC
Its:  Investment Manager

By:

Name:   Howard M. Levkowitz

Authorized Signatory

[Signature Page – Credit Agreement - KPC]

SILVER POINT SPECIALTY CREDIT FUND, L.P., as a Lender

By: Silver Point Specialty Credit Fund Management, LLC, its Investment Manager

By: _____

Name:
Title:     Michael A. Gatto
           Authorized Signatory

[Signature Page – Credit Agreement - KPC]

CONFIDENTIAL

**JAE 0797**

KPCDEF_000545