MORGAN, LEWIS & BOCKIUS LLP
Aimee Mackay, Bar No. 221690
aimee.mackay@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: +1.213.612.2500
Fax: +1.213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
Sari Alamuddin (admitted *pro hac vice*)
sari.alamuddin@morganlewis.com
Deborah Davidson (admitted *pro hac vice*)
deborah.davidson@morganlewis.com
110 N. Wacker Drive
Chicago, IL 60606-1511
Tel: +1.312.324.1000
Fax: +1.312.324.1001

Attorneys for Defendant
SPCP GROUP, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DANIELLE GAMINO, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

SPCP GROUP, LLC,

Defendant.

and

KPC HEALTHCARE INC. EMPLOYEE STOCK OWNERSHIP PLAN,

Nominal Defendant.

Case No. 5:20-cv-01126-SB-SHK
[Consolidated Case Number]

**EXHIBITS TO JOINT APPENDIX OF EVIDENCE RE: MOTION FOR SUMMARY JUDGMENT**

Hearing Date: August 5, 2022
Time: 8:30 am
Judge: Hon. Stanley Blumenfeld, Jr.
Ctrm: 6C

# JAE PART 2 OF 5
# EXHIBITS 12-15

# EXHIBIT 12

Schedule 1.01(b)
Subsidiary Guarantors

Orange County Global Medical Center, Inc.
Anaheim Global Medical Center, Inc.
Chapman Global Medical Center, Inc.
South Coast Global Medical Center, Inc.

Schedule 2.01
Lenders and Commitments

| Lender | Loan Commitment |
| --- | --- |
| Credit Suisse Park View BDC, Inc. | |
| American United Life Insurance Company | |
| HPS Aiguilles Rouges Sector D Investment Fund, L.P. | |
| HPS Specialty Loan AH Subsidiary I, L.P. | |
| HPS Specialty Loan AH Subsidiary II, L.P. | |
| HPS Specialty Loan PHM Subsidiary II, L.P. | |
| Lincoln Investment Solutions, Inc. | |
| Reliance Standard Life Insurance Company | |
| Safety National Casualty Corporation | |
| Special Value Continuation Partners, LP | |
| TCPC Funding I, LLC | |
| Tennenbaum Senior Loan SPV, LLC | |
| Tennenbaum Senior Loan Fund II, LP | |
| Tennenbaum Senior Loan Operating III, LLC | |
| Tennenbaum Senior Loan SPV IV-A, LLC | |
| Tennenbaum Senior Loan Fund IV-B, LP | |
| Tennenbaum Senior Loan V, LLC | |
| Tennenbaum Enhanced Yield Operating I, LLC | |
| Silver Point Specialty Credit Fund, L.P. | |
| Total | |

Schedule 3.04
Governmental Approvals

The Company is in the process of receiving approval and updated pharmacy permits from the California Pharmacy Board. Notifications to California Department of Public Health and related agencies will be completed post-Closing.

Schedule 3.08
Subsidiaries

| **Subsidiary** | **Authorized Shares** | **Outstanding Shares** | **Holder(s) of the Equity Securities** | **Percentage of such Ownership or Equity Interest** |
|---|---|---|---|---|
| Orange County Global Medical Center, Inc. | 10,000 | 1,000 | KPC Healthcare, Inc. | 100 % |
| Chapman Global Medical Center, Inc. | 1,000 | 100 | KPC Healthcare, Inc. | 100 % |
| Anaheim Global Medical Center, Inc. | 10,000 | 1,000 | KPC Healthcare, Inc. | 100 % |
| South Coast Global Medical Center, Inc. | 10,000 | 1,000 | KPC Healthcare, Inc. | 100 % |

Schedule 3.09(a)
Litigation

| Case Name | Date Filed | Cause of Action | Potential liability |
|---|---|---|---|
| Huddleston v. Western Medical Center Santa Ana | 6/25/13 | Professional negligence - birth related injury | Claimed damages unknown. Defense counsel estimates that should plaintiffs prevail, verdict value could exceed $10,000,000, consisting of up to $500,000 (for general damages for the minor Plaintiff and the NIED claims of the mother), plus the minor's lost earning capacity, past and future medical expenses, and possible attendant care expenses (assuming that the minor did suffer significant neurologic injury). Hospital is self-insured with respect to the first $2 million in liability. Current reserve on the matter has been set at $1 million. |
| Fitzgibbons v. Integrated Healthcare Holdings Inc. | 6/16/08 | Intentional infliction of emotional distress | Defendant negotiating payment of $5.7 million judgment |

Schedule 3.09(d)
Seismic Compliance

All structures on the four hospital sites, with the exception of the administrative building at Orange County Global Medical Center, have been deemed compliant with the Hospital Seismic Safety Act until January 1, 2030 for both structural and nonstructural retrofit.

On November 13, 2013, the hospital was granted an extension until July 1, 2018 for seismic remediation as it relates to the administrative building at Orange County Global Medical Center.

INDEX

Schedule 3.17
Environmental Matters

None.

JAE 0805
CONFIDENTIAL KPCDEF_000552

INDEX

Schedule 3.18
Insurance

See attached.

CONFIDENTIAL
JAE 0806
KPCDEF_000553

Schedule 3.19(a)
UCC Filing Offices

| GRANTOR | FILING OFFICE |
|---|---|
| KPC Healthcare Holdings, Inc. | California Secretary of State |
| KPC Healthcare, Inc. | Nevada Secretary of State |
| Orange County Global Medical Center, Inc. | California Secretary of State |
| Chapman Global Medical Center, Inc. | California Secretary of State |
| Anaheim Global Medical Center, Inc. | California Secretary of State |
| South Coast Global Medical Center, Inc. | California Secretary of State |

Schedule 3.20(a)
Owned Real Property

None.

CONFIDENTIAL

Schedule 3.20(b)
Leased Real Property

| Address | Lessee |
| --- | --- |
| 1001 & 1301 N. Tustin Avenue, Santa Ana, CA 92705 | KPC Healthcare, Inc. (subleased to Orange County Global Medical Center, Inc.) |
| 1025 S. Anaheim Boulevard, Anaheim, CA 92805 and parking lot located at 979 S. Anaheim Blvd, Anaheim, CA 92805 | KPC Healthcare, Inc. (subleased to Anaheim Global Medical Center, Inc.) |
| 2601 & 2617 E. Chapman Avenue, Orange, CA 92869 | KPC Healthcare, Inc. (subleased to Chapman Global Medical Center, Inc.) |
| 2701 S. Bristol Street, Santa Ana, CA 92704 | KPC Healthcare, Inc. (subleased to South Coast Global Medical Center, Inc.) |
| 999 N. Tustin Ave, Suites 105-10 and 205-10, Santa Ana, CA 92705 | Orange County Global Medical Center, Inc. |
| 100 N. Harbor Blvd., Anaheim, CA 92805 | Anaheim Global Medical Center, Inc. |

Schedule 5.17

Post-Closing Matters

| Covenant | Post-Closing Time Period |
| --- | --- |
| 1. Terminate employees and independent contractors on Exhibit A attached hereto and cause such employees and contractors to be engaged or employed by the Management Company (and provide evidence in form and substance reasonable acceptable to the Arranger Agent with respect to the same). | 30 days (as such period may be extended by the Arranger Agent in its sole discretion). |
| 2. Obtain and deliver endorsements reasonably acceptable to the Administrative Agent and Arranger Agent with respect to the Credit Parties' insurance policies, naming the Collateral Agent as loss payee and additional insured. | 30 days (as such period may be extended by the Arranger Agent in its sole discretion). |
| 3. Obtain a collateral assignment of the Management Agreement and subordination agreement with respect to the Management Company Bonus from the Management Company (which agreement shall provide that the Management Company Bonus may not be paid if an Event of Default has occurred under either the Revolver Credit Agreement or this Agreement or would result from such payment) in favor of the Revolver Agent and Administrative Agent, in form and substance reasonably satisfactory to the Revolver Agent and Administrative Agent. | 30 days (as such period may be extended by the mutual agreement of the Revolver Agent and Administrative Agent). |

Exhibit A

**Employees**

Alkrisat, Muder
Andrews, Jeff
Black, Anne
Cairney, John
Campbell, Fritz
Chan, Gilbert
Cotter, Brian
Dawson, Lee
De Ramos, Gina
Diaz, Ana
Fleury, Denise
Garrett, Angela
German, Denise
Herrera, Rochelle
Krietz, Don
Martinez, Gabriel
Medina, Michelle
Meza, Abidan
Nolten, Saskia
Ogata, Tim
Okiyefa, Ebi
Ospina, Angie
Pfeffer, Dave
Poon, Chun
Pratt, Lucy
Antunes, Alex
Aparicio, Kevin
Atuatasi, Vivian
Pryor, April
Rangel, Guillermo
Ransbury, Mary
Richards, Suzanne
Rodelo, Randy
Royal, Eric
Sullivan, Lovella
Torres, Romeo
Troung, Celia
Valazquez, Naya
Vu, Simon

**Independent Contractors**

Blake, Steve
Chaudhuri, Kali Pradip
Chaudhuri, Kali Priyo
Collins, John
Flack, Charlie
Lowrey, Lance
Okamoto, Helen
Thomas, William
Thomas, Kelly
Yarramsetti, Sri

Schedule 6.01
Existing Indebtedness

Promissory Note, effective as of March 28, 2014, in the original principal amount of $1,250,000 in connection with certain indebtedness of Borrower owed to Anil V. Shah.

Utility Bond executed by Integrated Healthcare Holdings, Inc., as Principal, the Hartford Fire Insurance Company as Surety, in favor of Southern California Edison Company as Obligee, dated effective April 10, 2006, as extended from time to time.

Schedule 6.02
Existing Liens

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| KPC HEALTHCARE, INC. f/k/a INTEGRATED HEALTHCARE HOLDINGS, INC. | NEVADA | UCC-1 # 2008001595-8<br>Filed: 1-16-08<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding - California, L.P.<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 2012029383-0<br>Filed: 11-7-12<br>Continuation | Servo I Adult Ventilation Systems; Servo I Universal Ventilation Systems |
| | | UCC-1 # 2011034549-7<br>Filed 12-22-11<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Co-debtor: Chapman | Steris Scope System |
| | | UCC-1 # 2012005407-4<br>Filed: 2-29-12<br>Secured Party: ConMed Linvatec Finance<br><br>UCC-3 # 2012015787-0<br>Filed 6-11-12<br>Assignment to Optumhealth Bank, Inc. (all Equipment under Schedule No. 001 only)<br><br>UCC-3 # 2012027051-5<br>Filed 10-11-12<br>Assignment to BMO Harris Bank National Association (all Equipment under Schedule No. 002 only) | Equipment under Master Agreement No. 1111201 |
| | | UCC-1 # 2012022725-9<br>Filed 8-24-12<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC | Equipment per Contract # 19PW0G; recurring fees per Contract # 19PW0G |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-3 # 2012025297-3 Filed 9-24-12 Assignment to Transportation Alliance Bank<br><br>UCC-3 # 2013002637-0 Filed: 1/29/2013 Amendment to Secured Party's Name<br><br>UCC-3 # 2013006158-8 Filed 3/8/2013 Amendment to add debtor (Chapman Medical Center, Inc.)<br><br>UCC-3 # 2013006235-2 Filed 3/11/2013 Amendment to add debtor (Coastal Communities Hospital, Inc.)<br><br>UCC-3 # 2013006801-3 Filed 3/15/2013 Amendment to add debtor (WMC-SA, Inc.)<br><br>UCC-3 # 2013007168-0 Filed 3/21/2013 Amendment to change debtor (from WMC-SA, Inc. to WMC-A, Inc.)<br><br>UCC-3 # 2013007626-2 filed 3/27/2013 Amendment to add debtor (Chapman Medical Center, Inc.) | |
| | | UCC-1 # 2012023259-1 Filed 8-29-12 Secured Party: Olympus America Inc. | LCD monitors, LCD roll stand tall fixed height, workstation SI/CO2 standard set, lockable drawer unit, multi remote cable, VCR remote control cable, BNC cable, Olympus printer, serial digital video BNC, flexi-lte tray container, tray, and lid, Olympus HD recorder, Evis exera II gastrovideoscope, endoeye |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | | lapard thoraco videoscope, Evis Exera II video processor, Evis Exera II light source. |
| | | UCC-1 # 2012023334-1<br>Filed 8-30-12<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br><br>UCC-3 # 2012027598-3<br>Filed 10-17-12<br>Assignment to Prime Alliance Bank<br><br>UCC-3 # 2013000990-6<br>Filed 1/10/2013<br>Amendment to add collateral | R710 PowerEdge, Backup Exec 2012 Server<br><br>Equipment described in Dell Invoice #XFX1TJ758, XFXF14481, Nth Generation Computing Inc., Invoice # 22579H, McKesson Invoice # 26-MO-22 |
| | | UCC-1 # 2012027315-5<br>Filed 10-15-12<br>Secured Party: Prime Alliance Bank<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br><br>UCC-3 # 2013000988-1<br>Filed 1-10-2013<br>Amendment to add collateral<br><br>UCC-3 # 2013012768-9<br>File: 5/17/2013<br>Amendment to add collateral<br><br>UCC-3 # 2013013728-6<br>Filed: 5/29/2013<br>Amendment to add debtor (Chapman Medical Center, Inc.) | Rubbermaid Medication Cart, Wyse Winterm S30 Thin Client 64 MB Ram; Honeywell Barcode Scanner (all reconditioned)<br><br>Reconditioned Rubbermaid Medication Cart, Reconditioned Wyse Winterm X30 Thin Client – 64 MB Ram, Wyse VT6656 802.11 h/g Wireless USB LAN Network Adapter; Reconditioned Honeywell Barcode Scanner; Base for Cordless Imaging Scanner<br><br>Equipment described in Add-On Data Invoice #117271, 117361, 117440, 117692, 118177 |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-3 # 2013014829-1<br>Filed: 6/10/2013<br>Amendment to add debtor (Coastal Communities Hospital, Inc.)<br><br>UCC-3 # 2013015418-1<br>Filed: 6/17/2013<br>Amendment to add collateral<br><br>UCC-3 # 2013015756-7<br>Filed: 6/20/2013<br>Amendment to add debtor (WMC-A, Inc.)<br><br>UCC-3 # 2013016029-7<br>Filed: 6/24/2013<br>Amendment to add debtor (WMC-SA, Inc.) | Equipment described in Data Invoices #118117, 117692, 117440, 117361, 117271 |
| | | UCC-1 # 2013000244-5<br>Filed: 1-3-2013<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC | McKesson Enterprise Solution, as detailed in McKesson Contract Number 1-1CSTGP |
| | | | |
| | | UCC-1 #2014026815-8<br>Filed: 10/17/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Anaheim Global Medical Center, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc. | All equipment referenced in Equipment Schedule No. 10362-001 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br><br>UCC-3 #2015011950-9<br>Filed: 5/07/15<br>Amendment changing debtor's name (KPC Healthcare, Inc.)<br><br>UCC-3 #2015011955-9<br>Filed: 5/07/15<br>Amendment changing co-debtor's name (Chapman Global Medical Center, Inc.)<br><br>UCC-3 #2015011960-0<br>Filed: 5/07/15<br>Amendment changing co-debtor's name (South Coast Global Medical Center, Inc.)<br><br>UCC-3 #2015011961-2<br>Filed: 5/08/15<br>Amendment changing co-debtor's name (Orange County Global Medical Center, Inc.)<br><br>UCC-3 #2015011971-3<br>Filed: 5/08/15<br>Amendment changing co-debtor's name (Anaheim Global Medical Center, Inc.) | |
| | | UCC-1 #2015015381-6<br>Filed: 06/11/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Anaheim Global Medical Center, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, | All equipment referenced in Equipment Schedule No. 10362-009 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Inc. | |
| | | | |
| | | | |
| | | UCC-1 #11-7272889964<br>Filed: 6/13/2011<br>Secured Party: David Holden<br>Co-debtor: WMC-SA, Inc. | Equipment included in Schedule 001 of Master Lease Agreement #801146 dated 11/29/07 and amended 3/5/08 |
| | | UCC-1 # 117272893666<br>Filed 6/13/11<br>Secured Party: Silent Partners FBO Jack Whittington Trust<br>Co-debtor: WMC-SA, Inc. | Equipment included in Schedule 002 of Master Lease Agreement #801146 dated 11/29/07 and amended 3/5/08 |
| | | UCC-1 #117295411869<br>Filed 12/27/11<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC<br>Co-debtor: Chapman Medical Center, Inc. | Equipment – One Steris Scope System |
| | | UCC- 1 #147432855786<br>Filed 10/17/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Anaheim Global Medical Center, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: KPC | All equipment referenced in Equipment Schedule No. 10362-001 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Healthcare, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br><br>UCC-1 #1574636277<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636300<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636358<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636375<br>Filed 5/07/15<br>Amendment<br><br>UCC- 1 #1574636407<br>Filed 5/07/15<br>Amendment | |
| | | UCC-1 # 147435167199<br>Filed 11/03/14<br>Secured Party: First Financial Corporate Leasing LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC- SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-002 to Master Lease Agreement |
| | | UCC-1 #147438213629<br>Filed 11/26/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc. | All equipment referenced in Equipment Schedule No. 10362-003 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Co-debtor: WMC-SA, Inc. | |
| | | UCC-1 #157445628961 Filed 01/16/15 Secured Party: First Financial Corporate Leasing, LLC Co-debtor: Chapman Medical Center, Inc. Co-debtor: Coastal Communities Hospital, Inc. Co-debtor: WMC-A, Inc. Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-004 to Master Lease Agreement |
| | | UCC-1 #157446825113 Filed 01/23/15 Secured Party: First Financial Corporate Leasing, LLC Co-debtor: Chapman Medical Center, Inc. Co-debtor: Coastal Communities Hospital, Inc. Co-debtor: WMC-A, Inc. Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-005 to Master Lease Agreement |
| | | UCC-1 #157455288075 Filed 03/18/15 Secured Party: First Financial Corporate Leasing, LLC Co-debtor: Chapman Medical Center, Inc. Co-debtor: Coastal Communities Hospital, Inc. Co-debtor: WMC-A, Inc. Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-006 to Master Lease Agreement |
| | | UCC-1 #157455288570 Filed 03/18/15 Secured Party: First Financial Corporate Leasing, LLC Co-debtor: Chapman Medical Center, Inc. Co-debtor: Coastal | All equipment referenced in Equipment Schedule No. 10362-007 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | |
| | | UCC-1 #157461490320<br>Filed: 04/24/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-008 to Master Lease Agreement |
| | | UCC- 1 #157469349866<br>Filed: 06/11/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Anaheim Global Medical Center, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc. | All equipment referenced in Equipment Schedule No. 10362-009 to Master Lease Agreement |
| CHAPMAN GLOBAL MEDICAL CENTER, INC. f/k/a CHAPMAN MEDICAL CENTER, INC. | CALIFORNIA | UCC-1 # 117295411869<br>Filed 12/27/2011<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC<br>Co-debtor: IHHI | Equipment – One Steris Scope System |
| | | UCC-1 # 12-7301427794<br>Filed: 2/8/2012<br>Secured Party: Stryker Finance, a division of Stryker Sales Corporation | Equipment listed on Rental Agreement # MR26485334 – dual trigger rotary, AO small attachment, Adj pin collet 2.0-3.2mm, ¼" chuck |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | | w/key, Hudson/modified trinkle attach, sys 6 recip, system 6 sagittal saw, system 6 charger, system 6 aseptic battery kit, sys 6 large sterilization case, revolution cement gun, T's surgical helmet, automatic high vacuum foot pump, cordless driver 3, adjustable pin collet, ¼ inch drill with Jacobs Chuck |
| | | UCC-1 #127324073796<br>Filed 8/8/2012<br>Secured Party: General Electric Capital Corporation | Equipment - One GE Healthcare lightspeed 16 CT System and One Mobile Interim Solutions Landoil Corp Trailer 2001 VIN # ILH142UH411011601 |
| | | UCC-1 # 127324073817<br>Filed 8/8/2/12<br>Secured Party: General Electric Capital Corporation | Equipment - One STERIS Corporation V-Pro Max single Door Sterilizer System |
| | | UCC-1 # 13-7354916009<br>Filed: 4/5/2013<br>Secured Party: Transportation Alliance Bank Inc.; Med One Capital Funding, LLC, Co-Debtors: WMC, SA, Inc., WMC-A, Inc., Coastal Communities Hospital, Inc.<br><br>UCC-3 # 13-73692208<br>Filed: 7/12/2013<br>Amendment to debtor's address | Equipment |
| | | UCC-1 #13-7389594039<br>Filed: 12/06/2013<br>Secured Party: Freedom Imaging Inc. | Pre-owned equipment |
| | | UCC-1 #147432855786<br>Filed: 10/17/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Anaheim Global Medical Center, | All equipment referenced in Equipment Schedule No. 10362-001 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br><br>UCC-1 #1574636277<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636300<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636358<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636375<br>Filed 5/07/15<br>Amendment<br><br>UCC- 1 #1574636407<br>Filed 5/07/15<br>Amendment | |
| | | | |
| | | UCC-1 #157469349866<br>Filed: 06/11/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Anaheim Global Medical Center, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Orange | All equipment referenced in Equipment Schedule No. 10362-009 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc. | |
| | | UCC-1 #127301427794<br>Filed: 02/08/12<br>Secured Party: Stryker Finance, a division of Stryker Sales Corporation | Equipment described in Rental Agreement #MR26485334 |
| | | UCC-1 #127324073796<br>Filed: 08/08/12<br>Secured Party: General Electric Capital Corporation | One GE Healthcare Lightspeed 16 CT System and One Mobile Interim Solutions Landoll Corp Trailer 2001 VIN #ILH142UH411011601 |
| | | UCC-1 #137354916009<br>Filed: 04/05/13<br>Secured Party: Transportation Alliance Bank Inc.<br>Secured Party: Med One Capital Funding, LLC<br><br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br>UCC-3 #1373692208<br>Filed: 07/12/13<br>Amendment to debtor's name (Coastal Communities Hospital, Inc.) | Equipment per contract #1-19PW0G and recurring fees per contract #1-19PW0G |
| | | UCC-1 #137389594039<br>Filed: 12/06/13<br>Secured Party: Freedom Imaging Inc | Quote #S132099-9<br>Date: 10/29/13 |
| | | UCC-1 #147434787792<br>Filed: 10/30/14<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P. | CV – 180 Olympus Video Processor with accessories per Quote #24347 Surgical Direct |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 147435167199<br>Filed 11/03/14<br>Secured Party: First Financial Corporate Leasing LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC- SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-002 to Master Lease Agreement |
| | | UCC-1 #147438213629<br>Filed 11/26/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-003 to Master Lease Agreement |
| | | UCC-1 #157445628961<br>Filed 01/16/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-004 to Master Lease Agreement |
| | | UCC-1 #157446825113<br>Filed 01/23/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-005 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 #157455288075<br>Filed 03/18/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-006 to Master Lease Agreement |
| | | UCC-1 #157455288570<br>Filed 03/18/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-007 to Master Lease Agreement |
| | | UCC-1 #157461490320<br>Filed: 04/24/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-008 to Master Lease Agreement |
| | | | |
| SOUTH COAST GLOBAL MEDICAL CENTER, INC. f/k/a COASTAL COMMUNITIES HOSPITAL, | CALIFORNIA | UCC-1 # 09-7205562844<br>Filed: 8-13-09<br>Secured Party: Beckman Coulter Inc | Access 2 Immunoassay Analyzer |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| INC. | | | |
| | | UCC-1 # 09-7207051546<br>Filed: 8-31-09<br>Secured Party: Beckman Coulter Inc | Access 2 Immunoassay Analyzer |
| | | UCC-1 # 107243505148<br>Filed 8-31-10<br>Secured Part: Alcon Laboratories, Inc. | One demo Infiniti Vision w/o VO |
| | | UCC-1 # 117287316450<br>Filed: 10-10-11<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Equipment listed in Schedule A - Patient monitor, option module, gas module, wire lead wire set, wire trunk cable with ESIS, NIBP cuff kit adult, NIBP hose 3.5 meter, paper thermal recorder, interface cable, special trade-in discount |
| | | UCC-1 # 117294567799<br>Filed 12-16-11<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 13-73605701<br>Filed: 5/15/2013<br>Amendment to delete Republic Bank | Steris Scope System |
| | | UCC-1 # 12-7323293476<br>Filed 8-2-12<br>Secured Party: General Electric Capital Corporation | Johnson & Johnson Sterrad Sterilizer System |
| | | UCC-1 # 13-7354916009<br>Filed: 4/5/2013<br>Secured Party: Transportation Alliance Bank Inc., Med One Capital Funding, LLC,<br>Co-Debtors: WMC, SA, Inc., WMC-A, Inc., Chapman Medical Center, | Equipment |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Inc.<br><br>UCC-3 # 13-73692208<br>Filed: 7/12/2013<br>Amendment to debtor's address | |
| | | UCC-1 #147432855786<br>Filed: 10/17/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br><br>UCC-1 #1574636277<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636300<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636358<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636375<br>Filed 5/07/15<br>Amendment<br><br>UCC- 1 #1574636407<br>Filed 5/07/15<br>Amendment | All equipment referenced in Equipment Schedule No. 10362-001 to Master Lease Agreement |
| | | UCC-1 #157469349866<br>Filed: 06/11/15<br>Secured Party: First Financial Corporate Leasing, LLC | All equipment referenced in Equipment Schedule No. 10362-009 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc. | |
| | | | |
| | | | |
| ORANGE COUNTY GLOBAL MEDICAL CENTER, INC. f/k/a WMC-SA, INC. | CALIFORNIA | UCC-1 # 06-7090887479<br>Filed: 11/03/2006<br>Secured Party: General Electric Capital Corporation<br><br>UCC-3 # 11-72784579<br>Filed: 7/27/2011<br>Continuation | Collateral: Lease for 1 GE Healthcare Technologies Infinia II Hawkeye Nuclear Camera System. |
| | | UCC-1 # 10-7226266446<br>Filed: 3-22-10<br>Secured Party: Med One Capital Funding, LLC<br>Add'l Secured Party: Med One Capital Funding – California, L.P.<br>Add'l Secured Party: Republic Bank | Equipment – GemStar pain management pumps with power supply, pole clamps and 150cc lockbox |
| | | UCC-1 # 107234379117<br>Filed: 6-9-10<br>Secured Party: Olympus America Inc. | Collateral: Specific Electronic Equipment, all substitutions, additions, attachments & accessories. Proceeds, thereof, now owned or acquired. |
| | | UCC-1 # 107234380260<br>Filed: 6-9-10<br>Secured Party: Olympus America Inc. | Collateral: Specific Electronic Equipment, all substitutions, additions, attachments & accessories. Proceeds, thereof, now owned or acquired. |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 107246110870<br>Filed 9-27-10<br>Secured Party: Toshiba America Medical Systems, Inc. | Toshiba Infinix Vascular System; Vital Images Enterprise Workstation System |
| | | UCC-1 # 107252114720<br>Filed 11-19-10<br>Secured Party: Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc. | Toshiba Infinix Vascular System, Type S; Vital Images Enterprise Workstation System |
| | | UCC-1 # 107252313599<br>Filed 11-22-10<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Philips iU22 Refurbished and Upgraded |
| | | UCC-1 # 117261555386<br>Filed 2-23-11<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | ATLAS 37 CM Handswitching; Generator Forectriad, Ligasure 5MM Blunt Tip LAP Sealerdivider; Tissue Fusion Open Instrument 13.5M |
| | | UCC-1 # 117266047953<br>Filed 4-11-11<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | CMC-V System |
| | | UCC-1 # 117272889964<br>Filed 6-13-11<br>Secured Party: David Holden<br>Co-debtor: IHHI | Equipment included in Schedule 001 of Master Lease Agreement #801146 |
| | | UCC-1 # 117272893666<br>Filed 6-13-11<br>Secured Party: Silent Partners FBO Jack Whittington Trust<br>Co-debtor: IHHI | Equipment included in Schedule 002 of Master Lease Agreement #801146 |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 117288419152 Filed 10-19-11 Secured Party: Med One Capital Funding, LLC Secured Party: Med One Capital Funding – California, L.P. Secured Party: Republic Bank | West-Com Nurse Call System |
| | | UCC-1 # 117288552554 Filed 10-22-11 Secured Party: Med One Capital Funding, LLC Secured Party: Med One Capital Funding – California, L.P. Secured Party: OptumHealth Bank, Inc. | Alaris System Point of Care Units; Alaris System LVP Pumping Modules |
| | | UCC-1 # 117288888364 Filed 10-25-11 Secured Party: Med One Capital Funding, LLC Secured Party: Med One Capital Funding – California, L.P. Secured Party: Republic Bank<br><br>UCC-3 # 1172900033 Filed 11-3-11 Amendment to add Secured Party: Med One Capital Funding – California, L.P. and Secured Party: Med One Capital Funding, LLC | Hemodynamic System |
| | | UCC-1 # 117291423323 Filed 11-14-11 Secured Party: Med One Capital Funding, LLC Secured Party: Med One Capital Funding – California, L.P. Secured Party: Republic Bank | OSI Imaging Table System |
| | | UCC-1 # 117293260910 Filed 12-5-11 Secured Party: Med One Capital Funding, LLC Secured Party: Med One Capital Funding – California, L.P. Secured Party: Republic Bank | IV Solution Warming Cabinets |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 117293391874<br>Filed 12-5-11<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Olympus BiPolar Resection |
| | | UCC-1 # 117293958328<br>Filed 12-13-11<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Steris Scope System |
| | | UCC-1 # 127302407894<br>Filed 2-24-12<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: OptumHealth Bank, Inc.<br><br>UCC-3 # 1273035413<br>Filed 3/6/12<br>Amendment of Secured Party from OptumHealth Bank, Inc. to Republic Bank | Constellation LXT, PurePoint LIO; Fragmentation Handpiece |
| | | UCC-1 # 127303820187<br>Filed 2-24-12<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Alaris System Point of Care Units; Alaris System LVP Pumping Modules; Alaris System Syringe Module |
| | | UCC-1 # 127303206882<br>Filed 3-2-12<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Alaris System Point of Care Units; Alaris System LVP Pumping Modules; Alaris System Syringe Module |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 127316451828<br>Filed 6-7-12<br>Secured Party: Prime Alliance Bank<br>Secured Party: Med One Capital Funding, LLC<br><br>UCC-3 # 1273184066<br>Filed 6-26-12<br>Amendment to Collateral<br><br>UCC-3 #1273185297<br>Filed 6-27-12<br>Amendment to change Secured Party from Prime Alliance Bank to Republic Bank | Artic Sun 5000 – Therapeutic Hypothermia Cooling System |
| | | UCC-1 # 127317191779<br>Filed 6-14-12<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | Horizon Cardiology CPACS System |
| | | UCC-1 # 127321146077<br>Filed 7-17-12<br>Secured Party: Creekridge Capital LLC | Equipment included in Agreement No. 0605600-001 |
| | | UCC-1 # 127321299753<br>Filed 7-18-12<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank | West-Com Nurse Call System |
| | | UCC-1 # 127325868961<br>Filed 8-21-12<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank | Ultra Sound Equipment |
| | | UCC-1 # 127327789440<br>Filed 9-5-12<br>Secured Party: Med One Capital Funding, LLC | Mizuho OSI Orthopedic Table System |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br><br>UCC-3 # 1273319799<br>Filed 10-8-12<br>Amendment to change collateral | |
| | | UCC-1 # 13-7349003434<br>Filed 2/19/2013<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br><br>UCC-3 # 13-73502561<br>Filed 2/28/2013<br>Amendment to add debtor (WMC-SA)<br><br>UCC-3 # 13-73507230<br>Filed 3/5/2013<br>Amendment to add collateral | Arctic San 5000 Therapeutic Hypothermia Cooling System<br><br>Arctic Sun 5000 115V |
| | | UCC-1 # 13-7354916009<br>Filed: 04/05/2013<br>Secured Party: Transportation Alliance Bank Inc.<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Co-debtor: WMC-A, Inc., Chapman Medical Center, Inc., Coastal Communities Hospital, Inc.,<br><br>UCC-3 # 13-73692208<br>Filed 7/12/2013<br>Amendment to debtor's name and address | Equipment By McKesson Information Solutions |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 # 13-7356333115<br>Filed: 4/16/2013<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br>Co-debtors: WMC-SA, Inc.<br><br>UCC-3 # 13-73685908<br>Filed 7/9/2013<br>Amendment to add collateral | Equipment by Covidien |
| | | UCC-1 # 13-7360032803<br>Filed 5/10/2013<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br><br>UCC-3 # 13-73629434<br>Filed 5/30/2013<br>Amendment to add collateral<br><br>UCC-3 # 13-73641566<br>Filed 6/7/2013<br>Amendment to add debtor: Western Medical Center, Santa Ana | Thermoguard XP Advanced Temperature Management System |
| | | UCC-1 # 137363178938<br>Filed 5/31/2013<br>Secured Party: Toshiba America Medical Credit, a Program of Toshiba America Medical Systems, Inc. | Ultrasound Imaging System |
| | | UCC-1 # 13-7386085374<br>Filed 11/11/2013<br>Secured Party: Prime Alliance Bank; Med One Capital Funding – California, L.P.; Med One Capital Funding, LLC<br><br>UCC-3 # 13-73886075<br>Filed: 11/27/2013 | Equipment |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Amendment | |
| | | UCC-1 # 13-7388580932<br>Filed 11/27/2013<br>Secured Party: Med One Capital Funding, LLC; Med One Capital Funding – California, L.P. | Equipment |
| | | | |
| | | UCC-1 #147432855786<br>Filed: 10/17/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br><br>UCC-1 #1574636277<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636300<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636358<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636375 | All equipment referenced in Equipment Schedule No. 10362-001 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | Filed 5/07/15<br>Amendment<br><br>UCC- 1 #1574636407<br>Filed 5/07/15<br>Amendment | |
| | | UCC-1 #157469349866<br>Filed: 06/11/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc. | All equipment referenced in Equipment Schedule No. 10362-009 to Master Lease Agreement |
| | | UCC-1 #147404166376<br>Filed: 03/21/14<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Med One Capital Funding, LLC | Insight2 mini C-arm Fluroscopic System |
| | | UCC-1 #147416430575<br>Filed: 06/18/14<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Prime Alliance Bank<br>Co-debtor: Western Medical Center – Santa Ana<br><br>UCC-3 #1474258662<br>Filed: 08/26/14<br>Amendment | VAS15 – OEC 9800 Plus Digital Mobile Standard C-Arm; 12" Laser Aimer – 1.1 Localizer $ Supplement per GE OEC Proposal #223202 dated 3-6-14 |
| | | File #147423658565<br>Filed: 08/08/14<br>State Tax Lien for $117.68 filed against WMC-SA, Inc. by State of California Employment Development Department. | |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | | |
| ANAHEIM GLOBAL MEDICAL CENTER, INC. f/k/a WMC-A, INC. | CALIFORNIA | UCC-1 # 107249947467<br>Filed 10-29-10<br>Secured Party: Americorp Financial, LLC | Equipment per Agreement No. 1755101. Two of each: Demo, bipap vision US can W 02-B, universal stand, basic; adapter plate, universal stand; circuit support arm; bracker, mounting arm; high pressure hose, diss. |
| | | UCC-1 # 127314854590<br>Filed 5-25-12<br>Secured Party: Creekridge Capital LLC<br><br>UCC-3 # 12-73200045<br>Filed 7-9-12<br>Assignment to BMO Harris Bank National Association<br><br>UCC-3 # 13-73648831<br>Filed 6/12/2013<br>Assignment to Optum Bank, Inc. | Equipment under Agreement No 1171600-001 |
| | | UCC-1 # 12-7325343545<br>Filed 8-16-12<br>Secured Party: General Electric Capital Corporation | One GE Healthcare GE Lightspeed 16 CT System and one Landholl 2001 Landholl Corp Semi Trailer |
| | | UCC-1 # 13-7354916009<br>Filed: 04/05/2013<br>Secured Party: Transportation Alliance Bank Inc.<br>Secured Party: Med One Capital Funding, LLC<br>Secured Party: Med One Capital Funding – California, L.P.<br>Co-debtor: WMC-A, Inc., Chapman Medical Center, Inc., Coastal Communities Hospital, Inc., WMC-SA, Inc.<br><br>UCC-3 # 13-73692208<br>Filed 7/12/2013<br>Amendment to debtor's | Equipment |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | name and address. | |
| | | | |
| | | UCC-1 #147432855786<br>Filed: 10/17/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc.<br>Co-debtor: WMC-A, Inc.<br>Co-debtor: WMC-SA, Inc.<br><br>UCC-1 #1574636277<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636300<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636358<br>Filed 5/07/15<br>Amendment<br><br>UCC-1 #1574636375<br>Filed 5/07/15<br>Amendment | All equipment referenced in Equipment Schedule No. 10362-001 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC- 1 #1574636407<br>Filed 5/07/15<br>Amendment | |
| | | UCC-1 # 147435167199<br>Filed 11/03/14<br>Secured Party: First Financial Corporate Leasing LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: WMC- SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-002 to Master Lease Agreement |
| | | UCC-1 #147438213629<br>Filed 11/26/14<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-003 to Master Lease Agreement |
| | | UCC-1 #157445628961<br>Filed 01/16/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-004 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
|---|---|---|---|
| | | UCC-1 #157446825113<br>Filed 01/23/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: WMC-SA, Inc | All equipment referenced in Equipment Schedule No. 10362-005 to Master Lease Agreement |
| | | UCC-1 #157455288075<br>Filed 03/18/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-006 to Master Lease Agreement |
| | | UCC-1 #157455288570<br>Filed 03/18/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: WMC-SA, Inc. | All equipment referenced in Equipment Schedule No. 10362-007 to Master Lease Agreement |
| | | UCC-1 #157461490320<br>Filed: 04/24/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: Integrated Healthcare Holdings, Inc.<br>Co-debtor: Coastal Communities Hospital, Inc.<br>Co-debtor: Chapman Medical Center, Inc.<br>Co-debtor: WMC-SA, | All equipment referenced in Equipment Schedule No. 10362-008 to Master Lease Agreement |

| NAME | JURISDICTION | RESULTS | COLLATERAL/OTHER |
| --- | --- | --- | --- |
| | | Inc. | |
| | | UCC-1 #157469349866<br>Filed: 06/11/15<br>Secured Party: First Financial Corporate Leasing, LLC<br>Co-debtor: KPC Healthcare, Inc.<br>Co-debtor: Chapman Global Medical Center, Inc.<br>Co-debtor: Orange County Global Medical Center, Inc.<br>Co-debtor: South Coast Global Medical Center, Inc. | All equipment referenced in Equipment Schedule No. 10362-009 to Master Lease Agreement |
| | | | |
| | | UCC-1 #117293972920<br>Filed: 12/13/11<br>Secured Party: Med One Capital Funding – California, L.P.<br>Secured Party: Republic Bank<br>Secured Party: Med One Capital Funding, LLC | Steris Scope System |
| | ORANGE COUNTY, CALIFORNIA, COUNTY RECORDER | Filed # 2011000178728<br>Filed: 4/8/2011<br>State Tax Lien for $160.43 filed against WMC-A, Inc. by State of California Employment Development Department. | |
| | | File # 2013000481569<br>Filed: 8/14/2013<br>State Tax Lien for $91.18 filed against WMC-A, Inc. by State of California Employment Development Department. | |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 13

JAE 0843

# STOCK PURCHASE AGREEMENT

AMONG

KPC HEALTHCARE, INC.
EMPLOYEE STOCK OWNERSHIP TRUST,
AS THE BUYER

AND

DR. KALI PRADIP CHAUDHURI,
AS THE SELLER

AND

KPC HEALTHCARE HOLDINGS, INC.,
A CALIFORNIA CORPORATION

AUGUST 28, 2015

{00009963.DOCX}

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS. .... 4
Section 1.1. Definitions .... 4
Section 1.2. Interpretation .... 12

ARTICLE II. PURCHASE AND SALE. .... 12
Section 2.1. Agreement to Purchase and to Sell .... 12
Section 2.2. Purchase Price .... 12
Section 2.3. Closing Adjustment .... 13
Section 2.4. Time and Place of Closing .... 13

ARTICLE III. REPRESENTATIONS AND WARRANTIES .... 13
Section 3.1. General Statement .... 13
Section 3.2. Representations and Warranties of the Seller .... 14
Section 3.3. Representations and Warranties of the Company .... 16
Section 3.4. Representations and Warranties of the Trustee .... 28

ARTICLE IV. CONDITIONS PRECEDENT. .... 30
Section 4.1. Conditions Precedent to the Obligations of the Seller .... 30
Section 4.2. Conditions Precedent to the Obligations of the Company .... 31
Section 4.3. Conditions Precedent to the Obligations of the Trustee .... 32

ARTICLE V. CLOSING DELIVERIES. .... 33
Section 5.1. Form of Documents .... 33
Section 5.2. Deliveries of the Seller .... 33
Section 5.3. Deliveries of the Company .... 34
Section 5.4. Deliveries of the Trustee .... 35

ARTICLE VI. COVENANTS. .... 36
Section 6.1. Covenants of the Seller .... 36
Section 6.2. Covenants of the Company .... 39
Section 6.3. Amendment to PCHI Lease .... 42
Section 6.4. Covenants of the Trustee and the Trust .... 42

ARTICLE VII. INDEMNIFICATION. .... 43
Section 7.1. General Statement .... 43
Section 7.2. Indemnification Obligations of the Seller .... 43
Section 7.3. Indemnification Obligations of the Company .... 44
Section 7.4. Indemnification Obligations of the Trustee .... 44
Section 7.5. Claims .... 44
Section 7.6. Limitation on Rights to Indemnification .... 45
Section 7.7. Procedures .... 47
Section 7.8. Assignment of Claims .... 48
Section 7.9. Materiality .... 48
Section 7.10. Sole Remedies; Right of Setoff .... 48
Section 7.11. Equitable Remedies .... 49
Section 7.12. Tax Treatment of Indemnification Payments .... 50

ARTICLE VIII. MISCELLANEOUS. .... 50

Section 8.1. Expenses ..... 50
Section 8.2. Further Assurances ..... 50
Section 8.3. Notices ..... 50
Section 8.4. Severability ..... 51
Section 8.5. Entire Agreement ..... 52
Section 8.6. Amendment and Modification ..... 52
Section 8.7. Waiver ..... 52
Section 8.8. Cumulative Remedies ..... 52
Section 8.9. Assignment ..... 52
Section 8.10. Successors and Assigns ..... 52
Section 8.11. Third-Party Beneficiaries ..... 52
Section 8.12. Counterparts; Electronic Signatures ..... 53
Section 8.13. Relationship of the Parties ..... 53
Section 8.14. Representations as to Compliance with Law ..... 53
Section 8.15. Action Taken as Trustee ..... 53
Section 8.16. Financing Sources ..... 53
Section 8.17. Representation by Independent Counsel ..... 54
Section 8.18. Dispute Resolution ..... 54

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of the 28th day of August, 2015, by and among KPC HEALTHCARE HOLDINGS, INC., a corporation incorporated under the laws of the State of California, and it successors and permitted assigns (the "**Company**"), ALERUS FINANCIAL, N.A., not in its corporate capacity, but solely in its capacity as trustee (the "**Trustee**") of the KPC Healthcare, Inc. Employee Stock Ownership Trust, as amended from time to time (the "**Trust**"), which implements and forms a part of the KPC Healthcare, Inc. Employee Stock Ownership Plan, as amended from time to time (the "**Plan**," and together with the Trust, the "**ESOP**"), and DR. KALI PRADIP CHAUDHURI, an individual domiciled in the State of California (the "**Seller**").

## RECITALS

**WHEREAS**, on August 28, 2015, the Company established the ESOP effective April 1, 2015, for the benefit of its eligible employees and their beneficiaries;

**WHEREAS**, the Seller is the legal owner of all of the issued and outstanding shares of Common Stock of the Company (the "**ESOP Shares**") set forth on **Exhibit A**;

**WHEREAS**, the Company desires to cause its wholly-owned subsidiary, KPC Healthcare, Inc., a Nevada corporation, to cancel and terminate those certain Common Stock Warrants held of record by the Seller and KPC Resolution Company, LLC, a California limited liability company, pursuant to the terms of that certain warrant cancellation and release agreement (the "**Warrant Cancellation and Release Agreement**"), dated as of even date herewith, by and among the Company, KPC Healthcare, Inc., the Seller, and KPC Resolution Company, LLC, as may be amended from time to time (the "**Warrant Cancellation Transaction**");

**WHEREAS**, simultaneously with and coincident to the Warrant Cancellation Transaction, the Company desires to redeem those certain Common Stock Warrants held of record by William E. Thomas ("**Mr. Thomas**") and SPCP Group, LLC, a Delaware limited liability company ("**SPCP Group**"), pursuant to the terms of those certain warrant purchase agreements (collectively, the "**Warrant Purchase Agreements**"), dated as of even date herewith, by and between the Company and each of Mr. Thomas and SPCP Group, as may be amended from time to time (collectively, the "**Warrant Redemption Transaction**");

**WHEREAS**, simultaneously with and coincident to the Warrant Cancellation Transaction and the Warrant Redemption Transaction, the Seller desires to sell to the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, desires to purchase from the Seller, the ESOP Shares pursuant to the terms of this Agreement (the "**Stock Purchase Transaction**");

**WHEREAS**, to finance the Warrant Redemption Transaction, the Company (a) will pay cash to Mr. Thomas and SPCP Group in the aggregate amount of [REDACTED] [REDACTED], (b) will issue subordinated promissory notes in the aggregate original principal amount of [REDACTED] [REDACTED] [REDACTED]

[REDACTED]) payable to the order of Mr. Thomas and SPCP Group (the "**Warrantholder Subordinated Promissory Notes**") and (c) will issue those certain warrants to purchase a specified number of shares of Common Stock of the Company to Mr. Thomas and SPCP Group (the "**Warrantholder Warrants**");

**WHEREAS**, to finance a portion of the Stock Purchase Transaction, the Company's wholly-owned subsidiary, KPC Healthcare, Inc., a Nevada corporation, will make a cash contribution to the ESOP in the amount of [REDACTED] simultaneously with and coincident to the Stock Purchase Transaction and the Trustee, on behalf of the Trust, will use these contributed funds to purchase a portion of the ESOP Shares;

**WHEREAS**, to finance partially the Stock Purchase Transaction, the Company will loan (the "**Company ESOP Loan**") to the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, will borrow from the Company, [REDACTED]), pursuant to the terms of that certain credit agreement (the "**Company ESOP Credit Agreement**") between the Company and the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, will issue a promissory note (the "**Company ESOP Note**") payable to the order of the Company, which shall be secured by a pledge by the Trustee, acting on behalf of the Trust, to the Company of the portion of the ESOP Shares acquired with the proceeds of the Company ESOP Loan pursuant to the terms of that certain pledge agreement (the "**Company ESOP Pledge Agreement**," and together with the Company ESOP Credit Agreement and the Company ESOP Note, the "**Company ESOP Loan Documents**");

**WHEREAS**, to finance partially the Stock Purchase Transaction, the Trustee, on behalf of the Trust, (a) will pay cash to the Seller in the amount of [REDACTED]), and (b) will issue a non-recourse promissory note (the "**Seller ESOP Note**") in the original principal amount of [REDACTED]) payable to the order of the Seller, which will be made pursuant to the terms of that certain credit agreement between the Trustee, on behalf of the Trust, as the borrower, and the Seller, as the lender, dated as of even date herewith, as may be amended from time to time (the "**Seller ESOP Credit Agreement**"), and which will be secured by a pledge of the portion of the ESOP Shares acquired with the Seller ESOP Note pursuant to the terms of that certain pledge agreement (the "**Seller ESOP Pledge Agreement**," and together with the Seller ESOP Note and the Seller ESOP Credit Agreement, the "**Seller ESOP Loan Documents**") between the Trustee, acting on behalf of the Trust, as the pledgor, and the Seller, as the pledgee, dated as of even date herewith, as may be amended from time to time;

**WHEREAS**, immediately following the Stock Purchase Transaction, the Seller desires to assign, transfer and set over unto the Company, and the Company desires to accept and assume, all of the Seller's right, title and interest in and to the Seller ESOP Loan Documents pursuant to the terms of that certain assignment and assumption agreement (the "**Assignment and Assumption Agreement**") dated as of even date herewith, among the Seller, as assignor, and the Company, as assignee, and the Trustee, on behalf of the Trust, as may be amended from time to time (the "**Assignment and Assumption Transaction**");

**WHEREAS**, simultaneously with and coincident to the Assignment and Assumption Transaction, the Company desires to issue a subordinated promissory note (the "**Seller Subordinated Promissory Note**," and together with the Warrantholder Subordinated Promissory Notes, the "**Subordinated Promissory Notes**") in the original principal amount of [redacted] payable to the order of the Seller, and to issue that certain warrant to purchase a specified number of shares of Common Stock of the Company to the Seller (the "**Seller Warrant**," and together with the Warrantholder Warrants, the "**Warrants**"), pursuant to the terms of that certain exchange agreement (the "**Exchange Agreement**") dated as of even date herewith, between the Seller and the Company, as may be amended from time to time (the "**Exchange Transaction**");

**WHEREAS**, it is further anticipated that immediately following the Stock Purchase Transaction and in connection with the Assignment and Assumption Transaction, the Trustee, acting on behalf of the Trust, shall issue that certain Amended and Restated ESOP Note (the "**Amended and Restated ESOP Note**") in the original principal amount of [redacted] payable to the order of the Company which will be made pursuant to the terms of that certain Amended and Restated ESOP Credit Agreement (the "**Amended and Restated ESOP Credit Agreement**") between the Company and the Trustee, on behalf of the Trust, dated as of the first business day following the date hereof and secured by a pledge of [redacted] shares of Common Stock of the Company pursuant to the terms of that certain Amended and Restated ESOP Pledge Agreement (the "**Amended and Restated ESOP Pledge Agreement**," and together with the Amended and Restated ESOP Note and the Amended and Restated ESOP Pledge Agreement, the "**Amended and Restated ESOP Loan Documents**") between the Company and the Trustee, on behalf of the Trust, dated as of even date herewith. For clarification purposes, the Amended and Restated ESOP Loan Documents shall represent all indebtedness incurred by the Trustee, on behalf of the Trust, to finance the Stock Purchase Transaction;

**WHEREAS**, the parties intend for the obligations of the Trustee, acting on behalf of the Trust, as set forth in this Agreement to be consistent with the "primary benefits" requirement contained in section 4975(d) of the Internal Revenue Code of 1986, as amended (the "**Code**") and Section 54.4975-7(b)(3) of the Treasury Regulations; and

**WHEREAS**, the parties intend for the purchase of the ESOP Shares by the Trustee, acting on behalf of the Trust, to be exempt from the prohibited transaction rules for purchases of qualifying employer securities pursuant to Section 4975 of the Code and Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the Premises and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows.

# ARTICLE I.
# DEFINITIONS.

Section 1.1. Definitions. As used in this Agreement, the following terms have the respective meanings set forth below.

"**Adequate Consideration and Fairness Opinion**" means the opinion prepared by the Qualified Independent Appraiser, dated as of the date hereof, and delivered to the Trustee.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition, the terms "controls," "is controlled by" and "under common control with" mean the possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Stock Purchase Agreement, as may be amended from time to time.

"**Amended and Restated ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Articles of Incorporation**" means the articles of incorporation of the Company, including any amendments thereto, in effect on the Closing Date.

"**Assignment and Assumption Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Assignment and Assumption Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Benefit Plan**" means any bonus, severance, change in control, "parachute," severance, deferred compensation, hospitalization, or other medical, stock option, stock purchase, pension, thrift, vacation, life or other insurance, profit-sharing or retirement plan, program, policy, or arrangement and each other employee benefit plan, program, policy, or arrangement of the Company with respect to which the Company reasonably expects to incur any direct or indirect material liability, whether contingent or otherwise.

"**Business**" means the Company's business of operating acute care hospitals.

"**Bylaws**" means the bylaws of the Company, including any amendments thereto, in effect on the Closing Date.

"**Closing**" means the actual transfer of the ESOP Shares and delivery of this Agreement.

"**Closing Date**" has the meaning set forth in Section 2.4 of this Agreement.

"**Code**" has the meaning set forth in the Recitals of this Agreement.

"**Company**" has the meaning set forth in the Premises of this Agreement.

"**Company ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Loan**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Company Fundamental Representation and Warranty**" has the meaning set forth in Section 7.6(a) of this Agreement.

"**Company Indemnified Parties**" has the meaning set forth in Section 7.2(a) of this Agreement.

"**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company or its businesses or any existing or prospective customer, supplier, investor or other

associated third party, or of any other Person that has entrusted information to the Company in confidence. The parties understand that the aforementioned list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Seller understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Seller in the first instance. Confidential Information shall not include information that is (i) generally available to and known by the public at the time of disclosure to the Seller, provided that such disclosure is through no direct or indirect fault of the Seller or Person(s) acting on the Seller's behalf (ii) the Seller can establish is already in its possession (other than information furnished by or on behalf of the Company), provided that such information is not, to the Seller's knowledge after reasonable inquiry, subject to another confidentiality obligation with or other obligation of secrecy to the Company or another party, or (iii) was available to the Seller on a non-confidential basis form a source (other than the Company and its representatives) that is not and was not prohibited from disclosing such information to the Seller by a contractual, legal or fiduciary obligation of confidentiality to the Company

"**Damages**" means all demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid in settlement, including, without limitation, reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense or investigation of any claim.

"**Deductible**" has the meaning set forth in Section 7.6(b) of this Agreement.

"**Development Parcel**" has the meaning set forth in Section 6.3 of this Agreement.

"**Disclosure Schedule**" has the meaning set forth in Section 3.1 of this Agreement.

"**Employment and Labor Laws**" means any Federal, state, or local laws, statutes, regulations, ordinances, rules, standards, or common law, or any judgment, order, writ, notice, decree, permit, license, approval, or injunction relating to employment, terms, and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing, including, without limitation, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act of 1967, Title II of the Civil Rights Act of 1964, the Equal Pay Act, the Americans with Disabilities Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the National Labor Relations Act, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, and their applicable state law counterparts, each as they have been amended from time to time prior to Closing.

"**Environment**" means any environmental medium, including soil, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, land, stream sediments, land surface or subsurface strata, and ambient air.

"**Environmental Laws**" means any Federal, state, or local laws, statutes, regulations, ordinances, rules, common law, or standards, currently in effect, or any judgment, order, writ, notice, decree, permit, license, approval, or injunction relating to pollution or to protection of human health or to the Environment and including, without limitation, to the Release of Hazardous Substances into the Environment, as well as to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of Hazardous Substances, releases, or threatened releases of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes into the Environment as well as, without limitation, the Clean Air Act, the Toxic Substance Control Act, the Clean Water Act, the Oil Pollution Act of 1990, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, and the Occupational Safety and Health Act of 1970, and their applicable state law counterparts, each as they have been amended from time to time prior to Closing.

"**ERISA**" has the meaning set forth in the Recitals of this Agreement.

"**ESOP**" and "**Plan**" have the meaning set forth in the Premises of this Agreement.

"**ESOP Shares**" has the meaning set forth in the Recitals of this Agreement.

"**Exchange Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Exchange Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Fiduciary Process Agreement**" has the meaning set forth in Section 5.4(d)(ix) of this Agreement.

"**Financial Statements**" means the audited financial statements of the Company for the fiscal years ended March 31, 2012, March 31, 2013 March 31, 2014, and March 31, 2015.

"**Financing Sources**" shall mean Credit Suisse Park View BDC, Inc., as arranger agent, Wilmington Trust, National Association, as administrative and collateral agent and each of the lenders party to the Credit Agreement dated on or about the date hereof with the Company and KPC Healthcare, Inc., as borrower, and their respective successors and assigns.

"**GAAP**" means generally accepted accounting principles in effect from time to time within the United States, consistently applied.

"**Governance Committee**" has the meaning set forth in Section 6.2(u) of this Agreement.

"**Governmental Entity**" means the government of the United States, the government of any state or territory of the United States, District of Columbia, or political subdivision thereof, or any agency or instrumentality of any of the foregoing, including without limitation school districts.

"**Hazardous Substances**" means any substances defined, regulated, or listed as hazardous, dangerous, or toxic, or potentially hazardous, dangerous, or toxic, or defined as waste, pollutants, or contaminants under the Environmental Laws, including, without limitation,

any substance within the meaning of Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA"), or defined or listed as "waste," "hazardous substances," "hazardous materials," "toxic substances," "oil," "contaminant," or "pollutant" under any other Environmental Laws.

"**Indemnification Cap**" has the meaning set forth in Section 7.6(c) of this Agreement.

"**Indemnified Party**" has the meaning set forth in Section 7.7(a) of this Agreement.

"**Indemnifying Party**" has the meaning set forth in Section 7.7(a) of this Agreement.

"**Independent Director**" has the meaning set forth in Section 6.4(c) of this Agreement.

"**Insurance Policies**" has the meaning set forth in Section 3.3(t) of this Agreement.

"**Intellectual Property**" has the meaning set forth in Section 3.3(w) of this Agreement.

"**Interim Financial Statements**" means the internally prepared financial statements of the Company for the interim period ended June 30, 2015.

"**Investor Rights Agreement**" means that certain investor rights agreement dated as of even date herewith entered into among the Company, the Trustee, on behalf of the Trust, the Investors (as therein defined), and the Representative (as therein defined), as may be amended from time to time.

"**Knowledge**" means (a) with respect to the Company, the actual knowledge, after reasonable and due inquiry, of its directors, officers or other senior management, and (b) with respect to the Seller, the actual knowledge of the Seller, after reasonable and due inquiry, as well as, such information as the Seller would reasonably be expected to know by virtue of such position and relationship with the Company.

"**Laws**" means any Federal, state, local, county, city, municipal, or other administrative order, constitution, law, ordinance, principle of common law, regulation, rule, restriction, statute, or treaty.

"**Leased Properties**" means all real property which the Company currently leases (including subleases) or has a possessory interest in and all real property which the Company at any time leased (including subleased) or had a possessory interest in.

"**Licenses and Permits**" means licenses, permits, franchises, authorizations, registrations, approvals, and certificates of occupancy (or their equivalent) issued or granted to the Company with respect to its business by the government of the United States or of any state, city, municipality, county, or town thereof, or of any foreign jurisdiction, or any department, agency, board division, subdivision, audit group or procuring office, commission, bureau, or instrumentality of any of the foregoing, and all pending applications therefore.

"**Lien**" means any mortgage or deed of trust, pledge, hypothecation, assignment, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other

security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"**Net-Debt**" means the amount by which the Company's interest bearing debt exceeds the Company's balance sheet cash (without giving effect to the transactions contemplated herein) on the Closing Date.

"**Net-Debt Target**" means

"**Net-Debt Statement**" has the meaning set forth in Section 2.3(a)(ii) of this Agreement.

"**Management Company**" means KPC Global Management, LLC, a California limited liability, or such other entity that may be appointed to manage the Company under the Management Services Agreement or similar agreement.

"**Management Incentive Plan**" means the to-be-adopted KPC Healthcare Holdings, Inc. Management Incentive Plan, as the same may be amended or restated from time to time.

"**Management Representation Letter**" means that certain letter duly executed by an authorized officer of the Company and delivered to the Qualified Independent Appraiser on the Closing Date.

"**Management Services Agreement**" means that certain management services agreement dated August 28, 2015 by and between the KPC Healthcare, Inc. and the Management Company as may be amended from time to time.

"**Market Area**" means the ten mile radius of any hospital facility operated by the Company or any of its Subsidiaries.

"**Material Adverse Effect**" means any event, matter, occurrence, or action which has or reasonably could be expected to have a material adverse impact equal to or greater than Five Hundred Thousand and 00/100 Dollars ($500,000) on the operations, business, assets, financial condition, or results of operation of the Company or any of its Subsidiaries.

"**Mr. Thomas**" has the meaning set forth in the Recitals of this Agreement.

"**Net-Debt Statement**" has the meaning set forth in Section 2.3(a)(i) of this Agreement.

"**OCGMC**" has the meaning set forth in Section 6.3 of this Agreement.

"**PCHI**" has the meaning set forth in Section 6.3 of this Agreement.

"**PCHI Lease**" has the meaning set forth in Section 6.3 of this Agreement.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization of any kind or character, including a governmental department, authority or agency or subdivision thereof.

"**Potential Contributor**" has the meaning set forth in Section 7.8 of this Agreement.

"**Purchase Price**" means the amount paid by the Trustee, acting on behalf of the Trust, to the Seller for the ESOP Shares as set forth in Section 2.2 of this Agreement.

"**Qualified Independent Appraiser**" means Stout Risius Ross, Inc., or such other qualified independent appraiser as may be engaged by the Trustee.

"**Related Party Transaction Policy**" has the meaning set forth in Section 6.2(a) of this Agreement.

"**Release**" means the release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injection, pumping, pouring, emptying, escaping, dumping, disposing, or other movement of any Hazardous Substance into the Environment.

"**Representative**" have the meaning set forth in Section 6.1(d)(i).

"**Restricted Party**" or "**Restricted Parties**" means the Seller and his Affiliates and their respective representatives.

"**Restricted Period**" means the term (including any extension, renewals or modifications thereof) of the Management Services Agreement plus the period of one (1) year, to run consecutively, beginning on the last day of the term (including any extension, renewals or modifications thereof) of such management services agreement.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the Securities Exchange Commission promulgated thereunder.

"**Seller**" has the meaning set forth in the Premises of this Agreement.

"**Seller ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Seller Fundamental Representation and Warranty**" has the meaning set forth in Section 7.6(a) of this Agreement.

"**Seller Subordinated Promissory Note**" has the meaning set forth in the Recitals of this Agreement.

"**Seller Warrant**" has the meaning set forth in the Recitals of this Agreement.

"**SPCP Group**" has the meaning set forth in the Recitals of this Agreement.

"**Subordinated Promissory Notes**" has the meaning set forth in the Recitals of this Agreement.

"**Subsidiary**" means any entity wholly- or partially-owned, directly or indirectly, by the Company, including, KPC Healthcare, Inc., a California corporation, Chapman Global Medical Center, Inc., a California corporation; South Coast Global Medical Center, Inc., a California corporation; Orange County Global Medical Center, Inc., a California corporation; Anaheim Global Medical Center, Inc., a California corporation.

"**Substitution ESOP Loan**" has the meaning set forth in Section 6.2(h) of this Agreement.

"**Synthetic Equity**" means any stock options, warrants, stock appreciation rights, phantom stock units, restricted stock, deferred issuance stock rights or similar interests or rights that give the holder (other than an employee participating under the Plan) the right to acquire or receive stock of the Company, or similar rights to future cash payments based on the value or appreciation in the value of the stock of the Company.

"**Term Sheet**" has the meaning set forth in Section 6.2(d) of this Agreement.

"**Trademarks**" has the meaning set forth in Section 3.3(w) of this Agreement.

"**Transaction Documents**" means: (a) the Plan, (b) Trust, (c) Company ESOP Loan Documents, (d) Seller ESOP Loan Documents (d) Management Services Agreement, (e) Seller Subordinated Promissory Note, (f) Investor Rights Agreement, (g) Seller Warrant, and (h) Warrant Cancellation and Release Agreement, (i) Assignment and Assumption Agreement, (j) Exchange Agreement, (k) Amended and Restated ESOP Loan Documents, (k) Warrant Purchase Agreements, (m) this Agreement, and (n) any certificate delivered by a party to any other party pursuant to the terms of any of the foregoing documents.

"**Transactions**" means, collectively, the Warrant Cancellation Transaction, Warrant Redemption Transaction, Stock Purchase Transaction, the transactions contemplated by the ESOP Loan Documents, Seller ESOP Loan Documents, the Assignment and Assumption Transaction, and the Exchange Transaction.

"**Trust**" shall have the meaning set forth in the Premises of this Agreement.

"**Trustee**" shall have the meaning set forth in the Premises of this Agreement.

"**Valuation Report**" means the valuation report prepared by the Qualified Independent Appraiser on behalf of the Trustee, setting forth the estimated range of fair market equity values of the ESOP Shares.

"**Warrants**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Cancellation and Release Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Cancellation Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Warrantholder Subordinated Promissory Notes**" has the meaning set forth in the Recitals of this Agreement.

"**Warrantholder Warrants**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Purchase Agreements**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Redemption Transaction**" has the meaning set forth in the Recitals of this Agreement.

Section 1.2. Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II.
## PURCHASE AND SALE.

Section 2.1. Agreement to Purchase and to Sell. Upon the terms and subject to the conditions of this Agreement, the Seller hereby sells and delivers to the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, hereby purchases from the Seller, the ESOP Shares.

Section 2.2. Purchase Price. The Trustee, acting on behalf of the Trust, (a) hereby agrees to pay to the Seller for the ESOP Shares cash in the amount of [REDACTED]

[REDACTED] on the Closing Date payable via wire transfer of immediately available funds, and (b) hereby agrees to issue and deliver the Seller ESOP Note in the original principal amount of [REDACTED] payable to the order of the Seller, which will be made pursuant to the terms of the Seller ESOP Credit Agreement, and secured by a pledge of the portion of the ESOP Shares acquired with the Seller ESOP Note pursuant to the terms of the Seller ESOP Pledge Agreement.

Section 2.3. Closing Adjustment.

(a) Post-Closing Adjustment.

(i) Within sixty (60) calendar days after the Closing Date, the Company shall prepare and deliver to the Seller a statement setting forth its calculation of Net-Debt (the "**Net-Debt Statement**") and a certificate of the Chief Financial Officer of the Company that the Net-Debt Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements for the most recent fiscal year end.

(ii) The post-closing adjustment shall be an amount equal to the amount by which Net-Debt is greater than or less than, as the case may be, the Net-Debt Target. If Net-Debt is greater than the Net-Debt Target, then pursuant to Section 2.6 of the Seller Subordinated Promissory Note, the then-existing principal balance of the Seller Subordinated Promissory Note shall be decreased in an amount equal to the product of (A) the amount by which Net-Debt exceeds the Net-Debt Target multiplied by (B) 80.5%. If Net-Debt is less than the Net-Debt Target, then pursuant to Section 2.6 of the Seller Subordinated Promissory Note, the then-existing principal balance of the Seller Subordinated Promissory Note shall be increased in an amount equal to the product of (A) the amount by which Net-Debt is less than the Net-Debt Target multiplied by (B) 80.5%.

(b) Adjustments for Tax Purposes. Any payments made pursuant to this Section 2.3 shall be treated as an adjustment to the Purchase Price by the parties for Federal and state income tax purposes, unless otherwise required by Law.

Section 2.4. Time and Place of Closing. The Closing of the Transactions contemplated by this Agreement shall take place at 9:00 a.m., at the principal executive office of the Company on August 28, 2015 (the "**Closing Date**").

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES.

Section 3.1. General Statement. The parties make the representations and warranties to each other which are set forth in this ARTICLE III. All representations and warranties are made subject to the exceptions noted in the schedule attached to this Agreement (the "**Disclosure Schedule**"), and are made as of the Closing Date, and shall survive the Closing for the periods described in Section 7.6. The Disclosure Schedule shall be arranged in paragraphs corresponding

to the lettered and the numbered paragraphs contained in this ARTICLE III to which the exception applies, and no disclosure shall be deemed to apply with respect to any other paragraph to which it does not expressly apply. The Disclosure Schedule shall in all respects constitute a part of the representations and warranties of the Seller, the Company and the Trustee, and are expressly made a part of this Agreement.

Section 3.2. Representations and Warranties of the Seller. The Seller represents and warrants to the Trust, as of the Closing Date, as follows:

(a) Enforceability. This Agreement has been duly executed and delivered by the Seller and constitutes the Seller's legal, valid, and binding obligation, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(b) Notices and Consents. The Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any court, government, or governmental agency, or third person in order to consummate the Transactions contemplated by this Agreement.

(c) No Conflicts. The execution, delivery, and performance of this Agreement and the consummation of the Transactions contemplated hereby do not and will not (i) violate any Laws to which the Seller is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which the Seller is bound or to which any of the ESOP Shares are subject or result in the imposition of any security interest upon the ESOP Shares, other than the Lien securing the Trust's obligations under the ESOP Loan.

(d) Ownership of ESOP Shares. The Seller is the record owner of the ESOP Shares free and clear of any restrictions on transfer and have complied with all securities laws, taxes, security interests, options, warrants, purchase rights, contracts, commitments, equities, Liens or other restrictions whatsoever in law or in equity. Except as set forth on the Disclosure Schedule, the Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, pledge or otherwise dispose of the ESOP Shares or any other capital stock of the Company. The ESOP Shares represent all of the issued and outstanding shares of the capital stock of the Company. Except as set forth on the Disclosure Schedule, as of the Closing Date, (i) there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue or to sell any of the capital stock of the Company, (ii) there are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Company, and (iii) there are no voting trusts, proxies or other agreements or understandings with respect to the voting of the capital stock of the Company.

(e) Capacity. The Seller has full power, right and authority and all authorizations and approvals required by law to enter into and perform this Agreement and to sell, transfer, and deliver good, valid, and marketable title to the ESOP Shares free and clear of any and all Liens or rights of third parties whatsoever in accordance with the terms of this Agreement.

(f) Title. Upon consummation of the Transactions contemplated by this Agreement and in accordance with the terms hereof, the Trust will acquire marketable title to the ESOP Shares free and clear of all Liens or rights of third parties whatsoever, except for Liens or rights of third-parties created by the Trustee, acting on behalf of the Trust.

(g) No Commission. The Seller has no liability to any broker, finder, investment bank, financial advisor, accountant, lawyer, or other similar person arising from or related to the transactions contemplated by this Agreement for which the Seller could be or become liable or obligated.

(h) Community Property. The ESOP Shares are owned as community property with the Seller's spouse, and the sale of such ESOP Shares under this Agreement includes the Seller's interest and the community property interest of the Seller's spouse.

(i) Litigation. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the Transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

(j) No Material Omission of Company. The representations and warranties of the Company in this Agreement, and all representations, warranties and statements of the Company contained in any schedule, financial statement, exhibit, list or document delivered pursuant to this Agreement do not contain any untrue statement of material fact or omit to state a material fact necessary in order to make such representations, warranties, and statements not misleading.

(k) Reserved.

(l) No Other Representations or Warranties; Non-Reliance. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THE TRANSACTION DOCUMENTS, NEITHER THE SELLER NOR ANY OF HIS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE SELLER, OR ANY OF HIS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, EXCEPT AS SPECIFICALLY PROVIDED IN THIS

SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

Section 3.3. Representations and Warranties of the Company. The Company represents and warrants to the Trust, as of the Closing Date, as follows. For purposes of this Section 3.3, except where context dictates otherwise, all representations and warranties of the Company are representations and warranties of the Company and all of its Subsidiaries.

(a) Organization.

(i) The Company (A) is a corporation duly organized, validly existing and in good standing under the laws of the State of California, (B) is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where failure to qualify would not result in a Material Adverse Effect; and (C) has full corporate power and authority and all material licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. The Company has delivered to the Trustee or its advisors copies of the Articles of Incorporation of the Company, together with copies of the Bylaws, including all amendments thereto. The Company is not in default under or in violation of any provision of its Articles of Incorporation or Bylaws.

(ii) Each Subsidiary (A) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (B) is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where failure to qualify would not result in a Material Adverse Effect; and (C) has full corporate power and authority and all material licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. The Company has delivered to the Trustee or its advisors copies of the articles of incorporation of each Subsidiary, including all amendments thereto, together with copies of the bylaws of each Subsidiary, including all amendments thereto. No Subsidiary is in default under or in violation of any provision of its articles of incorporation, including all amendments thereto, or bylaws, including all amendments thereto.

(b) Capitalization; Subsidiaries.

(i) The authorized capital stock of the Company consists solely of 20,000,000 shares of common stock, of which 10,000,000 shares are issued and outstanding on the Closing Date. All such issued and outstanding shares of capital stock of the Company are duly authorized validly issued and outstanding and non-assessable and, except for such outstanding shares, there are no shares of capital stock of the Company issued and outstanding. Except as set forth on the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue or to sell any of its capital stock. Except as set forth on the Disclosure Schedule, there are no outstanding or authorized stock appreciation, phantom stock, profit participation, Synthetic Equity, or similar rights with respect to the Company, and there are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of the Company.

(ii) Except as set forth on the Disclosure Schedule, the Company does not own, directly or indirectly, any interest in any corporation, business trust, joint stock company, partnership, limited liability company, or other business organization or association. Except as set forth on the Disclosure Schedule, for each Subsidiary owned directly or indirectly by the Company, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require each Subsidiary to issue or to sell any of its capital stock. Except as set forth on the Disclosure Schedule, there are no outstanding or authorized stock appreciation, phantom stock, profit participation, Synthetic Equity, or similar rights with respect to the Subsidiary.

(c) Enforceability. The execution, delivery, and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by the Company, and this Agreement constitutes a legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by applicable Bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(d) No Conflicts. The execution, delivery and performance of this Agreement and the consummation of the Transaction contemplated hereby do not and will not (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Company is subject or any provision of the Articles of Incorporation or of the Bylaws, or (ii) conflict with, or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license, instrument, or other arrangement to which the Company is a party or by which it is bound or to which any of its assets is subject, or result in the imposition of any security interest or Lien upon any of its assets, other than such breaches or violations as have been cured or will be cured, without causing a Material Adverse Effect, within ninety (90) calendar days following the Closing Date or otherwise waived by the counterparty thereto and the Company released from liability for such breaches and other violations or such breaches or violations which would not, individually or in the aggregate, have a Material Adverse Effect; provided, however, that disclosure of such conflict, breach, default, acceleration or right in the Disclosure Schedule shall not absolve the Company from potential liability under this Section 3.3(d). The Company is not required to give notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the parties to consummate the Transactions contemplated by this Agreement.

(e) Undisclosed Liabilities. To the Knowledge of the Company, the Company has no liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, except (a) those which are adequately reflected or reserved against in the Financial Statements or Interim Financial Statements, and (b) those which have been incurred in the ordinary course of business since the date of the most recent Interim Financial Statements and which would not, in the aggregate, have a Material Adverse Effect.

(f) Financial Information.

(i) The Financial Statements of the Company: (A) have been provided by the Company to the Trustee and the Qualified Independent Appraiser; (B) have been prepared in accordance with GAAP applied on a consistent basis; (C) present fairly the financial position of the Company as of such date and the results of operations of the Company for such period; (D) contain no untrue statements of material fact, do not omit any material fact necessary to make such Financial Statements not misleading; and (E) are consistent with the books and records of the Company. The Interim Financial Statements of the Company have been provided by the Company to the Trustee and the Qualified Independent Appraiser, have been prepared on a GAAP basis, have been prepared on a basis consistent with the Company's Financial Statements and present fairly the financial position of the Company and the results of operations of the Company as of such date, provided; however, that such Interim Financial Statements are subject to normal year-end adjustments, which will not individually or in the aggregate have a Material Adverse Effect.

(ii) Since the date of the most recent year-end Financial Statements, the business operations of the Company have been conducted in the ordinary course of business and consistent with past practices. Without limiting the generality of the foregoing, and except as set forth on the Disclosure Schedule, since the most-recent year-end Financial Statements:

(A) The Company has not sold, leased, transferred, or assigned any of its assets, tangible, or intangible, other than for a fair consideration in the ordinary course of business;

(B) The Company has not entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) outside the ordinary course of business, requiring aggregate payments by the Company in excess of Five Hundred Thousand and 00/100 Dollars ($500,000);

(C) The Company has not made any capital expenditure (or series of related capital expenditures) outside the ordinary course of business, requiring aggregate payments by the Company in excess of Five Hundred Thousand and 00/100 Dollars ($500,000);

(D) The Company has not made any capital investments in, any loan to, or any acquisition of the securities or assets of, any other person (or series of related capital investments, loans, and acquisitions) outside the ordinary course of business;

(E) The Company has not delayed or postponed the payment of accounts payable and other liabilities in an amount outside the ordinary course of business;

(F) The Company has not issued, sold, or otherwise disposed of any of its capital stock, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock;

(G) The Company has not declared, set aside, or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind) or

redeemed, purchased, or otherwise acquired any of its capital stock requiring payment by the Company;

(H) The Company has not made any loan to, or entered into any other transaction with, any of its shareholders directors, officers, and employees outside the ordinary course of business;

(I) The Company has not entered into any employment contract or agreement or modified the terms of any existing written employment contract or agreement requiring payment by the company of an annual salary of more than Two Hundred Thousand and 00/100 Dollars ($200,000);

(J) The Company has not, outside the ordinary course of business, granted any increase in the base compensation of any of its directors, officers, or employees that is inconsistent with the Company's prior practices;

(K) Except for compensation changes in the ordinary course of business, the Company has not adopted, amended, modified, or terminated any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees;

(L) The Company has not sold or disposed of any inventory except in the ordinary course of business, and there has been no material write-up or write-down in the value of inventory;

(M) The Company has not made or pledged to make any charitable or other capital contribution greater than Ten Thousand and 00/100 Dollars ($10,000);

(N) The Company has not incurred any debt, liability, or obligation of any nature, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, that is not included in the Interim Financial Statements, except for ordinary trade obligations that may have been incurred after the date of the Interim Financial Statements in the normal course of business. All debts, liabilities, and obligations incurred after the date of the Interim Financial Statements were incurred in the ordinary course of business; and

(O) The Company has not experienced any material damage, destruction or loss (whether or not covered by insurance) to its property.

(iii) The Company does not have any debt, liability, or obligation of any nature, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, that is not included in the Financial Statements except for ordinary trade obligations that may have been incurred after the date of such balance sheet in the normal course of business. All debts, liabilities, and obligations incurred after the date of such Financial Statements were incurred in the ordinary course of business and are usual and normal in amount, both individually, and in the aggregate.

(g) Real Property. The Company owns no Real Property. The Disclosure Schedule sets forth all Leased Properties. The Company has made available to the Trustee or its

advisors true and complete copies of all leases for the Leased Properties. With respect to all properties listed on the Disclosure Schedule, except as contemplated in Section 6.3:

(i) There are no pending or, to the Knowledge of the Company, threatened condemnation proceedings, lawsuits, or administrative actions relating to the properties or other matters adversely affecting, in a material respect, the current use, occupancy, or value thereof.

(ii) All Company facilities located on the properties have received all approvals of governmental authorities (including Licenses and Permits) required in connection with the ownership or the operation thereof and have been operated and maintained in accordance with applicable laws, rules, and regulations.

(iii) To the Knowledge of the Company, the buildings and the improvements are located within the boundary lines of the Leased Properties and are not in violation of applicable setback requirements, zoning laws, and ordinances (and none of the properties, the buildings, or the improvements thereon are subject to "permitted non-conforming use" or "permitted non-conforming structure" classifications), the land does not serve any adjoining property for any purpose inconsistent with the use of the land and the property is not located within any flood plain or subject to any similar type of restriction for which material Licenses and Permits necessary to the use thereof have not been obtained.

(iv) There are no leases, subleases, licenses, concessions, or other agreements, written or oral, to which the Company is a party, granting to any party or parties the right of use of occupancy of any portion of the Leased Properties.

(v) All facilities located on the Leased Properties are supplied with utilities and other services necessary for the operation of such facilities, including gas, electricity, water, telephone, sanitary sewer, and storm sewer.

(h) Litigation. Except as set forth on the Disclosure Schedule, the Company (i) is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge, and (ii) is not a party or, to the Knowledge of the Company, is not threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. None of the directors, officers, or senior management personnel responsible for overseeing litigation matters of the Company has any reason to believe that any such action, suit, proceeding, hearing or investigation may be brought or threatened against the Company.

(i) Environment, Health and Safety.

(i) The Company is in compliance with all applicable Environmental Laws, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against the Company alleging any failure to comply with any Environmental Laws.

(ii) The Company has obtained and been in compliance with the terms and the conditions of all permits, licenses, and other authorizations which are required under the

Environmental Laws and which are material in the conduct of the business of the Company and has substantially complied with all other limitations, conditions, standards, and prohibitions, and timetables in the Environmental Laws.

(iii) The Company has not received a written notice of any past or present circumstances that, if continued, would interfere with or prevent compliance or continued compliance in the conduct of the business with any applicable Environmental Laws or with any plan required by law, order, decree, judgment, or injunction entered, promulgated, or approved thereunder, or which may otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study, or investigation, based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling, or the emission, discharge, Release, or threatened Release into the Environment, of any Hazardous Substance.

(iv) The Company is not a party to any civil, criminal, or administrative action, suit, order, demand, claim, hearing, notice or demand letter, notice of violation, or proceeding, pending or, to the Knowledge of the Company, threatened against the Company relating to any Environmental Laws.

(v) The Company has not handled or disposed of any Hazardous Substance in violation of Environmental Laws, arranged for the disposal of any Hazardous Substance in violation of Environmental Laws, exposed any employee or other individual to any Hazardous Substance or condition in violation of Environmental Laws, that could form the basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand for damage to, or for investigation and remediation of, any site, location, or body of water (surface or subsurface), or any illness of or personal injury to any employee or other individual.

(vi) The Company is not a party to any oral or written agreements, including, but not limited to, indemnity or cleanup agreements, relating to Environmental Laws with any third parties.

(vii) True, correct, and complete copies of all environmental studies in the possession or control of the Company, or to which the Company has access relating to any property with respect to which the Company may have incurred liability or for which liability may be asserted against the Company have been delivered to the Trustee or its advisors.

(j) No Commission. Except as set forth on the Disclosure Schedule, the Company does not have any liability to any broker, finder, investment banker, financial advisor, accountant, lawyer or other similar person arising from or related to the Transactions contemplated by this Agreement for which the Company could be or become liable or obligated.

(k) Compensation. Except as set forth on the Disclosure Schedule, there are no written or oral agreements to make any bonus payments or other compensation amounts to any director, officer, or employee of the Company in connection with or as a result of the Transactions contemplated by this Agreement.

(l) Assets Sufficient for Operation. The Company owns, leases, or has use of all of the assets, properties, and rights of every type and description, real, personal, tangible and intangible, necessary for the continued conduct of the business of the Company as currently conducted. The Company has good and marketable title to the properties and assets used by it, located on its premises, reflected on the Financial Statements or acquired after the date thereof and prior to the Closing, in each case free and clear of all material liens.

(m) Condition of Assets. Other than material, machinery, tools, equipment, or other personal property disposed of or replaced in the ordinary course of business, all material, machinery, tools, equipment and other tangible personal property included in the Financial Statements, currently are used by or useful to the Company in the ordinary course of business and are in operating condition and in a state of reasonable maintenance and repair and are reasonably adequate for the uses to which they are being put.

(n) Compliance with Laws. The Company is in compliance with all applicable Laws except where the failure to comply would not have a Material Adverse Effect. The Company has not received notice of nor, to the Knowledge of the Company, is there any action, suit, proceeding, hearing, investigation, complaint, or demand pending by any governmental entity against the Company alleging any failure to comply where such failure would have a Material Adverse Effect.

(o) Licenses and Permits. All Licenses and Permits issued to the Company necessary to carry on its business as it is now being conducted are in full force and effect, except where the failure to do so would not have a Material Adverse Effect. The Company has not received any notice that any such Licenses or Permits will not be renewed, or will be revoked, suspended or withdrawn or that any other license, approval or accreditation is necessary for the conduct of the Company's business as it is now being conducted. The Transactions contemplated by this Agreement will not cause the forfeiture or renewal of any Licenses or Permits legally required to operate the Business.

(p) Tax Matters.

(i) The Company has filed (or caused to be filed) all tax returns that it is required to file. All the tax returns were correct and complete in all material respects. All taxes owed by the Company (whether or not shown on any tax return) have been paid or properly accrued. No claim has been made within the applicable statute of limitations period by an authority in a jurisdiction where the Company does not file tax returns that it is or may be subject to taxation by that jurisdiction. There are no current security interests on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any tax.

(ii) The Company has withheld and paid or accrued all taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or any third party.

(iii) The Company has not received notice of any assessment of any additional taxes for any period for which tax returns have been filed.

(iv) There is no dispute or claim concerning any tax liability of the Company either: (A) claimed or raised by any authority in writing; or (B) as to which the Company has Knowledge based upon personal contact with any agent of such authority.

(v) The Company has not waived any statute of limitations period with respect to a tax assessment or deficiency that has not been resolved.

(vi) The Company has not filed a consent under Code Section 341(f) concerning collapsible corporations. The Company has not made any payments, nor is it obligated to make any payments, nor is it a party to any agreement that under certain circumstances could obligate it to make any payments that will not be deductible under Code Section 280G. The Company is not nor has it been a United States real property holding corporation within the meaning of Code section 897(c)(2) during the applicable period specified in Code section 897(c)(1)(A)(ii). The Company has disclosed on its federal income tax returns all positions taken therein that could give rise to a substantial understatement of Federal income tax within the meaning of Code section 6662. The Company is not a party to any tax allocation or sharing agreement. The Company is not a member of an affiliated group filing a consolidated Federal income tax return, or has had any liability for the taxes of any person under Treasury Regulation section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(vii) The unpaid taxes of the Company: (A) did not, as of the date of the Interim Financial Statements, exceed the reserve for tax liability (other than any reserve for deferred taxes established to reflect timing differences between book and tax income) set forth on the face of the balance sheet (rather than in any notes thereto) included with the Interim Financial Statements; and (B) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing its tax returns.

(viii) All monies required to be withheld by the Company for income taxes, social security, and other payroll taxes have been collected or withheld, and either paid to the respective governmental agencies, set aside in accounts for such purpose, or accrued, reserved against, and entered upon its books. The Company has not received notice of nor, to the Company's Knowledge, is the Company liable for any taxes or penalties for failure to comply with any of the foregoing. No deficiencies for taxes have been claimed, proposed, or assessed. There is no audit, investigation, claim, or assessment pending or, to the Company's Knowledge, threatened against the Company for any alleged deficiency in any tax.

(q) Material Contracts. The Disclosure Schedule lists each contract, agreement, lease, mortgage, note, and any other obligation or commitment of the Company, other than this Agreement and any agreements, obligations, and commitments relating to the transactions contemplated hereby, to the extent the value of the contract exceeds Five Million and 00/100 Dollars ($5,000,000), including the following:

(i) Any severance agreements, non-competition agreements with former employees and similar agreements;

(ii) Any lease agreements and lease arrangements;

(iii) Any guaranty of any individual or entity; and

(iv) Any loan agreements or loan documents other than accounts receivable in the ordinary course of business.

The Company has made available to the Trustee or its advisors a correct and complete copy of each written agreement (as amended to date) listed in the Disclosure Schedule and a written summary setting forth the terms and conditions of each oral agreement referred to in the Disclosure Schedule. With respect to each agreement, whether oral or written: (i) the agreement is legal, valid, binding, enforceable, and in full force and effect against the Company; (ii) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement; (iii) The Company, nor, to Company's Knowledge, any other party is in breach or default under the agreement, and no event has occurred which, with notice or lapse of time, would constitute a breach or default, or permit termination, modification, or acceleration under the agreement; and (iv) to the Knowledge of the Company, no party has repudiated any material provision of the agreement.

(r) Accounts Receivable. All accounts receivable (billed and unbilled) of the Company reflected on the Company's books and records are valid receivables, arose from bona fide transactions in the ordinary course of business and are not subject to any setoffs or counterclaims (except as and to the extent recorded as accounts payable), are to the Company's Knowledge, collectible, except as reflected in the reserve or allowance for bad debts in the Financial Statements as adjusted for the passage of time in accordance with past practice and custom of the Company. The Disclosure Schedule contains a true and correct list of all receivables as of the date of the Interim Financial Statements greater than Two Hundred Thousand and 00/100 Dollars ($200,000) in amount or that are more than one hundred twenty (120) days past due or that have been deemed uncollectible. The Disclosure Schedule also sets forth a true and correct list of all receivables accrued since the date of the Interim Financial Statements.

(s) Accounts Payable. The aggregate amount of all accounts payable, billings in excess of costs, estimated earnings on uncompleted contracts and accrued expenses of the Company that are not reflected properly on the Company's books and records in accordance with GAAP does not exceed Five Hundred Thousand and 00/100 Dollars ($500,000). The aggregate amount of all accounts payable of the Company that are not current as of the Closing Date does not exceed Five Hundred Thousand and 00/100 Dollars ($500,000).

(t) Insurance Coverage. The Disclosure Schedule sets forth a list of all insurance coverage maintained by the Company (indicating the type, name of the insurer, coverage amounts, period of coverage, premiums and deductibles). The Company is covered by valid, outstanding and enforceable policies of insurance covering its properties, assets and businesses against risks of the nature normally insured against by companies in the same or similar lines of business and in commercially reasonable coverage amounts (the "**Insurance Policies**"). Such Insurance Policies are in full force and effect, and all premiums due thereon

have been paid. As of the Closing Date, each of the Insurance Policies will be in full force and effect. With respect to the Insurance Policies (i) the transactions contemplated by this Agreement will not cause a default under the Insurance Policies (ii) to the Knowledge of the Company, no other party to the Insurance Policies is in breach or default (including with respect to the payment of premiums or the giving of notices), and no default has occurred which, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the Insurance Policies.

(u) Employee Matters.

(i) The Company has complied with all applicable Employment and Labor Laws, except where non-compliance would not result in a Material Adverse Effect.

(ii) No action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice has been filed or commenced against the Company and the Company has not received any notice alleging any failure to comply with any Employment and Labor Laws. There is no unfair labor practice complaint or charge of employment discrimination pending against the Company, or to the Company's Knowledge, threatened with respect to any current or former employee before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Fair Employment and Housing or any other Federal, state, local or foreign court or governmental entity. There is no employee grievance process, strike, labor dispute, work slowdown or work stoppage pending or, to the Company's Knowledge, threatened against or involving the Company. There is no lockout of any employees by the Company, and no such action is currently contemplated by the Company. The Company has not experienced any material labor difficulty during the last three (3) years.

(v) Benefit Plans.

(i) The Disclosure Schedule lists each Benefit Plan. On or before the date hereof, the Company has made available to the Trustee and its advisors true and complete copies of each of the following, to the extent applicable, with respect to each Benefit Plan: (A) the three most recent annual or other reports filed with each Governmental Authority, (B) the plan document (including all amendments thereto), (C) the trust agreement (including all amendments thereto), (D) the most recent summary plan description (and all modifications thereto), (E) the most recent audited financial statements and actuarial report or valuation required to be prepared under applicable Law, (F) and the most recent determination letter or opinion letter, if any, issued by the Internal Revenue Service.

(ii) Except with respect to the Benefit Plans, the Company does not contribute to, or have any obligation to contribute to, or has at any time within the three years prior to the date hereof contributed to or had an obligation to contribute to, and no Benefit Plan is, a multiemployer plan (within the meaning of Section 3(37) of ERISA) or a plan subject to Title IV of ERISA, Section 302 of ERISA or Code Section 412. No Benefit Plan is funded by a trust that is intended to be exempt from federal income taxation pursuant to Code Section 501(c)(9). Except to the extent required pursuant to Code Section 4980B(f) and the corresponding provisions of ERISA, no Benefit Plan or contract listed on the Disclosure

Schedule provides or promises to provide retiree medical, dental or life insurance benefits to any current or former employee of the Company.

(iii) Each of the Benefit Plans has been administered to comply with its terms and all filing, reporting, disclosures and other requirements of ERISA and other applicable laws and all applicable regulations thereunder except where a failure to do so would not have a Material Adverse Effect. The Company does not currently, nor has it ever, maintained or contributed to a "multiemployer plan" as that term is defined in section 3(37) of ERISA. With respect to any Benefit Plan subject to Title IV of ERISA, the assets of each such plan are at least equal in value to the present value of the accrued benefits (vested and unvested) of the participants in such plan on a termination and projected benefit obligation basis, based on the actuarial methods and assumptions indicated in the most recent actuarial valuation report for the plan.

(iv) Each of the Benefit Plans and any trusts under the Benefit Plans that are intended to be qualified under Code Section 401(a) are qualified and thus exempt from taxation under Code Section 501(a) or will be qualified by a submission of the Benefit Plan for an Internal Revenue Service determination in a timely fashion, and any amendments that may be required as a condition of a favorable determination will be timely made.

(v) The Company has duly established the Plan and the Trust. The Plan is a leveraged employee stock ownership plan, within the meaning of ERISA Sections 408(b)(3) and 407(d)(6), Code Sections 4975(d)(3) and (e)(7), and Treasury Regulations Sections 54.4975-7 and 54.4975-11. The Plan and the Trust documents contain such provisions as are necessary to comply with Part 4 of Title 1 of ERISA given the nature of the Plan and the transactions herein described. The Trust has been duly established and in combination with the Plan, shall be an exempt trust pursuant to Code Section 501(a). The Trustee has been duly appointed and granted full authority to act as Trustee of the Trust and exercise trust powers thereunder. The ESOP Shares meet the requirements for "employer securities" under Section 409(l) of the Code.

(w) Intellectual Property.

(i) The Disclosure Schedule identifies all of the following which are used in the business of the Company or any of its Subsidiaries or in which the Company or any of its Subsidiaries claims any ownership rights: (A) all trademarks, service marks, slogans, trade names, trade dress, and the like (collectively with the associated goodwill of each, "**Trademarks**") that have been registered, together with information regarding all registrations and pending applications to register any such rights; (B) all common law Trademarks material to the business of the Company; (C) all proprietary formulations, manufacturing methods, know how, and trade secrets which are material to the Company's business; (D) all patents on and pending applications to patents on any technology or design; (E) all registrations of and applications to register copyrights; and (F) all licenses of rights in computer software (other than standardized software routinely available for license to all persons), Trademarks, patents, copyrights, unpatented formulations, manufacturing methods, and other know-how, whether to or by the Company which are material to the business of the Company. The rights required to be so identified are referred to in this Agreement, collectively, as the "**Intellectual Property**."

(ii) With respect to the Intellectual Property: (A) the Company is the owner of or duly licensed to use each Trademark and its associated goodwill; (B) each Trademark registration included in the Intellectual Property exists and has been maintained in good standing; (C) each patent and pending application to patent included in the Intellectual Property exists, is owned by or licensed to the Company and has been maintained in good standing; and (D) each copyright registration included in the Intellectual Property exists and is owned by the Company.

(iii) To the Knowledge of the Company: (A) no other firm, corporation, association, or person is claiming the right to use in connection with similar or closely related goods and in the same geographic area, any mark which is identical or confusingly similar to any of the Trademarks; (B) no third party is asserting ownership rights in any of the Intellectual Property; no third party is claiming that the use of the Company of any Intellectual Property infringes on any right of such third party; and (C) no third party is infringing on any of the rights of the Company in any of the Intellectual Property.

(x) Suppliers. Outside the ordinary course of business: (i) none of the Company's five (5) largest suppliers during the time period ending the date of the Interim Financial Statements have notified or otherwise indicated to the Company that it will stop, or decrease the rate of, or increase the cost of, other than publicly announced generally applicable price increases, its supply of materials, products, or services used by the Company and no supplier has, since the date of the Interim Financial Statements, ceased, decreased the rate of, or raised the cost of, any materials, products, or services in a material amount.

(y) Agreements with Affiliates. Except as set forth on the Disclosure Schedule, the Company is not a party to or bound by any contract, commitment or understanding which imposes an obligation on the Company greater than One Million and 00/100 ($1,000,000) in any calendar year with any of its stockholders or directors or officers of the Company or any Affiliates of the foregoing, and none of such stockholders or directors or officers, or other person owns or otherwise has any rights to or interests in any asset, tangible or intangible, which constitutes a part of the assets used in or related to the business of the Company.

(z) No Public Offering. No form of general solicitation or general advertising was used by the Company or by its representatives in connection with the offering or the sale of the ESOP Shares. No registration of such shares pursuant to the provisions of the Securities Act or any state securities or "blue sky" laws is required in connection with the offer, sale or issuance of the ESOP Shares. After giving effect to the transactions contemplated by this Agreement, the Company will not be an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(aa) Cooperation With Qualified Independent Appraiser. The Company (i) has provided to the Qualified Independent Appraiser all information requested by the Qualified Independent Appraiser in writing in connection with its appraisal of the fair market value of the ESOP Shares, (ii) has not withheld any information requested by the Qualified Independent Appraiser in writing that might be material (in the sole and absolute judgment of the Company) to the appraisal performed by the Qualified Independent Appraiser, and (iii) all written

information that has been provided to the Qualified Independent Appraiser by the Company is accurate and complete in all material respects as of the Closing Date.

(bb) Cooperation With Trustee. The Company (i) has provided to the Trustee all information requested by the Trustee in writing in connection with the Qualified Independent Appraiser's appraisal of the fair market value of the ESOP Shares, (ii) has not withheld any information requested by the Trustee in writing that might be material (in the sole and absolute judgment of the Company) to the Trustee in evaluating the appraisal performed by the Qualified Independent Appraiser, and (iii) all written information that has been provided to the Trustee by the Company is accurate and complete in all material respects as of the Closing Date.

(cc) Full Disclosure. No representation or warranty made by the Company in this Agreement or the Transaction Documents and no statement contained in any certificate or other document furnished or to be furnished by the Company to the parties pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

(dd) No Other Representations or Warranties; Non-Reliance. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN THIS SECTION 3.3 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN THE TRANSACTION DOCUMENTS, NEITHER THE COMPANY NOR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE COMPANY, OR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 3.3 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

Section 3.4. Representations and Warranties of the Trustee. The Trustee, acting on behalf of the Trust, represents and warrants to the Seller and the Company, as of the Closing Date, as follows:

(a) Authority. Subject to the Company's representation in Section 3.3(v)(v), the Trustee has full power and authority to execute and to deliver this Agreement and to consummate the transactions contemplated hereby.

(b) Enforceability. This Agreement has been duly executed and delivered by the Trustee and constitutes a legal, valid, and binding obligation of the Trustee, enforceable against the Trust in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, as now or hereafter in effect and general principles of equity.

(c) Consents. Any authorization, consent, approval, permit, or license of, or filing with, any governmental or public body or authority, any lender or lessor, or any other person or entity required to authorize, or required in connection with, the execution, delivery, and performance of this Agreement by the Trustee, acting on behalf of the Trust, has been obtained.

(d) No Commission. Neither the Trustee nor the Trust has received a commission as a result of the Stock Purchase Transaction.

(e) Adequate Consideration and Fairness Opinion and Valuation Report. The Trustee, acting on behalf of the Trust, has entered into this Agreement after analyzing, reviewing, and approving the Adequate Consideration and Fairness Opinion and the Valuation Report prepared by the Qualified Independent Appraiser.

(f) Exclusive Benefit. The Trustee is purchasing the ESOP Shares exclusively for the benefit of the participants and beneficiaries of the ESOP and is using the ESOP Loan as a means of financing the purchase of the ESOP Shares.

(g) Purchase for Own Account. The ESOP Shares to be acquired by the Trustee, acting on behalf of the Trust, pursuant to this Agreement are being or shall be acquired for its own account and with no intention of distributing or reselling such ESOP Shares or any part thereof in any transaction that would be in violation of the securities laws of the United States of America, or any state, without prejudice, however, to its right at all times to sell or otherwise dispose of all or any part of its ESOP Shares under an effective registration statement under the Securities Act, or under an exemption from such registration available under the Securities Act, and subject, nevertheless, to the disposition of its property being at all times within its control. If the Trust should in the future decide to dispose of any of its ESOP Shares, the Trust understands and agrees that it may do so only in compliance with the Securities Act and applicable state securities laws, each as then in effect.

(h) Permitted Consideration. The Trustee has not received, and will not receive for the transactions contemplated herein, any consideration of the type described in ERISA Section 406(b)(3) or Code Section 4975(c)(1)(F), except consideration expressly permitted to be received by ERISA Section 408(c)(2) and Code Section 4975(d)(10).

(i) Full Disclosure. No representation or warranty by the Trustee, on behalf of the Trust, in this Agreement or the Transaction Documents and no statement contained in any certificate or other document furnished or to be furnished by the Trustee, on behalf of the Trust, to the parties pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

(j) No Other Representations or Warranties; Non-Reliance. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE TRUSTEE, ON BEHALF OF THE TRUST, IN THIS SECTION 3.4 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE TRUSTEE, ON BEHALF OF THE TRUST IN THE TRANSACTION DOCUMENTS, NEITHER THE TRUSTEE, ON

BEHALF OF THE TRUST, NOR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE TRUSTEE, ON BEHALF OF THE TRUST, OR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 3.4 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE TRUSTEE, ON BEHALF OF THE TRUST, TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

## ARTICLE IV.
## CONDITIONS PRECEDENT.

Section 4.1. Conditions Precedent to the Obligations of the Seller. The obligation of the Seller to effect the transactions contemplated under this Agreement is subject to the satisfaction or the fulfillment of all of the following conditions precedent on or prior to the Closing Date:

(a) Each representation and warranty made by the Company in this Agreement and the Transaction Documents shall be true and correct on the Closing Date;

(b) Each representation and warranty made by the Trustee, acting on behalf of the Trust, in this Agreement and the Transaction Documents shall be true and correct on the Closing Date;

(c) All obligations of the Company to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Company would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(d) All obligations of the Trustee, acting on behalf of the Trust, to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Trustee, acting on behalf of the Trust, would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(e) No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(f) No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement;

(g) Reserved;

(h) The Seller shall have received each of the deliveries identified in Section 5.4 and Section 5.3 of this Agreement in form and substance reasonably satisfactory to the Seller.

Section 4.2. Conditions Precedent to the Obligations of the Company. The obligation of the Company to effect the transactions contemplated under this Agreement is subject to the satisfaction or the fulfillment of all of the following conditions precedent on or prior to the Closing Date:

(a) Each representation and warranty made by the Seller in this Agreement and the Transaction Documents shall be true and correct on the Closing Date;

(b) Each representation and warranty made by the Trustee, acting on behalf of the Trust, in this Agreement and the Transaction Documents shall be true and correct on the Closing Date;

(c) All obligations of the Seller to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Seller would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(d) All obligations of the Trustee, acting on behalf of the Trust, to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Trustee, acting on behalf of the Trust, would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(e) No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(f) No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement;

(g) Reserved; and

(h) The Company shall have received each of the deliveries identified in Section 5.4 and Section 5.2 of this Agreement in form and substance reasonably satisfactory to the Company and its legal counsel.

Section 4.3. Conditions Precedent to the Obligations of the Trustee. The obligation of the Trustee to affect the transactions contemplated under this Agreement is subject to the satisfaction of the following conditions precedent:

(a) Each representation and warranty made by the Seller in this Agreement and the Transaction Documents shall be true and correct on the Closing Date;

(b) Each representation and warranty made by the Company in this Agreement and the Transaction Documents shall be true and correct on the Closing Date;

(c) All obligations of the Seller to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Seller would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(d) All obligations of the Company to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Company would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(e) No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(f) No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement;

(g) Reserved;

(h) The Trustee, acting on behalf of the Trust, shall have received each of the deliveries identified in Section 5.2 and Section 5.3 of this Agreement in form and substance reasonably satisfactory to the Trustee;

(i) Since the date of the Interim Financial Statement and up to and including the Closing Date, there shall have been no material adverse event affecting the business or operations of the Company;

(j) The Trustee shall have determined, in its sole discretion, that its decision to consummate the Stock Purchase Transaction is consistent with its fiduciary duties under ERISA; and

(k) The Trustee shall have received the Adequate Consideration and Fairness Opinion from the Qualified Independent Appraiser opining that:

(i) The consideration paid by the Trustee, acting on behalf of the Trust, for the ESOP Shares pursuant to this Agreement, is not greater than the fair market value (as such term is defined in Section 3(18)(B) of ERISA) of such shares;

(ii) The terms of each of the Seller ESOP Loan and the Company ESOP Loan, at the time each of the Seller ESOP Loan and Company ESOP Loan was made, are at least as favorable to the ESOP as the terms of a comparable loan resulting from arm's-length negotiations between independent parties;

(iii) The interest rate of each of the Seller ESOP Loan and Company ESOP Loan is not in excess of a reasonable rate of interest;

(iv) The strike price of the Warrants, on a per share basis, is at least equal to ninety percent (90%) of the fair market value of one share of the underlying common stock of the Company on the date the Warrant is issued; and

(v) The terms of the Transactions, taken as a whole, are fair to the ESOP from a financial point of view.

## ARTICLE V.
## CLOSING DELIVERIES.

Section 5.1. <u>Form of Documents</u>. At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this ARTICLE V. All documents to be delivered shall be in form and substance reasonably satisfactory to the party to whom the documents are to be delivered and its legal counsel (if any).

Section 5.2. <u>Deliveries of the Seller</u>. On the Closing Date, the Seller shall execute and deliver to the Trustee, acting on behalf of the Trust, and the Company all of the following:

(a) Original stock certificates evidencing the ESOP Shares registered in the names of the Seller, and stock powers and assignments duly endorsed by the Seller to the Trust, in proper form for transfer;

(b) A copy of this Agreement, duly executed by the Seller;

(c) Copies of each of the Transaction Documents to which the Seller is a party, duly executed by the Seller;

(d) Any and all consents and approvals required by the Seller in order for the Seller to transfer the ESOP Shares to the Trustee, on behalf of the Trust, and to consummate the transactions contemplated by this Agreement;

(e) The cash portion of the Purchase Price paid for the ESOP Shares;

(f) Any other instruments that the Trustee may reasonably deem necessary or desirable to affect or evidence the transactions contemplated by this Agreement; and

(g) Any other instruments that the Company may reasonably deem necessary or desirable to affect or evidence the transactions contemplated by this Agreement.

Section 5.3. Deliveries of the Company

. On the Closing Date, the Company shall execute and deliver to the Trustee, acting on behalf of the Trust, and the Seller all of the following:

(a) A copy of this Agreement, duly executed by an authorized officer of the Company;

(b) Copies of the Transaction Documents to which the Company is a party, duly executed by an authorized agent of the Company;

(c) A certificate duly executed by an authorized officer of the Company, in form and substance reasonably satisfactory to the Trustee and its legal counsel, certifying the following matters of fact and attaching the following documents or instruments:

(i) The incumbency of each director and executive officer of the Company and a specimen signature of each such director and executive officer;

(ii) A true and correct copy of the Articles of Incorporation, certified by the Secretary of the State of the California;

(iii) A true and correct copy of the Bylaws, in effect as of the Closing Date; and

(iv) A true and correct copy of the resolutions of the Board of Directors of the Company authorizing the execution, delivery and performance of this Agreement, the Transaction Documents and all agreements, documents and instruments to be executed, delivered and performed by the Company in connection therewith;

(v) A certificate of good standing for the Company and each of its Subsidiaries from the Secretary of the State of California;

(d) A written, verified, notarized statement consenting to the application of Code Sections 4978 and 4979A with respect to the Company;

(e) The 409(p) test and certification prepared by a qualified third party ESOP administration firm;

(f) Reserved;

(g) The Management Representation Letter;

(h) The original stock ledger and minute book of the Company;

(i) Any other instruments that the Seller may reasonably deem necessary or desirable to affect or evidence the Transactions contemplated by this Agreement;

(j) The "Related Party Transaction Policy" referenced in Section 6.2(a), acknowledged by the Company; and

(k) Any other instruments that the Trustee may reasonably deem necessary or desirable to affect or evidence the Transactions contemplated by this Agreement.

Section 5.4. Deliveries of the Trustee. On the Closing Date, the Trustee, acting on behalf of the Trust, shall execute and deliver to each of the Sellers and to the Company all of the following:

(a) A copy of this Agreement, duly executed by an authorized agent of the Trustee;

(b) A copy of each of the Transaction Documents to which the Trustee is a party, duly executed by an authorized agent of the Trustee;

(c) A stock power and assignment, duly executed by the Trustee in blank;

(d) A certificate duly executed by an authorized agent of the Trustee, in form and substance reasonably satisfactory to the Company and its counsel, certifying the following matters of fact:

(i) The appointment and status of the Trustee as a fiduciary (as that term is defined in Section 3(21)(A) of the ERISA with respect to the ESOP;

(ii) The receipt by the Trustee of the Valuation Report from the Qualified Independent Appraiser, the form and substance of which satisfies the requirements of United States Department of Labor Proposed Regulation 29 C.F.R. 2510.3-18(b);

(iii) The Trustee has conducted his own evaluation of the fair market value (as that term is used in Section 3(18)(B) of ERISA) of the ESOP Shares independent from the appraisal conducted by the Qualified Independent Appraiser;

(iv) The receipt by the Trustee of the Adequate Consideration and Fairness Opinion from the Qualified Independent Appraiser;

(v) The determination made by the Trustee that consummating the transactions contemplated by this Agreement and the Transaction Documents is in the interest of the participants and beneficiaries of the ESOP and being undertaken (i) for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and (ii) with the care, skill, prudence and diligence under the circumstances prevailing that a prudent man, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims;

(vi) The Trustee possesses the requisite power and authority to (A) execute and deliver this Agreement and the Transaction Documents and (B) fully perform all of the obligations of the Trust and the Trustee thereunder;

(vii) The Trustee has taken all necessary action to execute and deliver this Agreement and the Transaction Documents and to perform the obligations of the Trust and the Trustee thereunder;

(viii) The specimen signature of an agent authorized to execute and deliver this Agreement and the Transaction Document of behalf of the Trustee;

(ix) The Trustee has read and is familiar with the *Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions* between the Secretary of the United States Department of Labor and GreatBanc Trust Company (the "**Fiduciary Process Agreement**"), and has considered the requirements of the Fiduciary Process Agreement in connection with its review of the Transactions contemplated by this Agreement.

(e) Resolutions of the Board of Directors, or subcommittee thereof, of the Trustee authorizing the execution, delivery and performance of this agreement, the Transaction Documents and all agreements, documents and instruments to be executed, delivered and performed by the Trustee in connection therewith;

(f) A copy of the Adequate Consideration and Fairness Opinion;

(g) Any other instruments that the Seller may reasonably deem necessary or desirable to effect or evidence the Transactions contemplated by this Agreement; and

(h) Any other instruments that the Company may reasonably deem necessary or desirable to affect or evidence the Transactions contemplated by this Agreement.

## ARTICLE VI.
## COVENANTS.

Section 6.1. <u>Covenants of the Seller</u>. As additional and material consideration to the Trustee and to the Company to enter into this Agreement and consummate the transactions contemplated by this Agreement, the parties covenant and agree as follows:

(a) Non-Competition.

(i) During the Restricted Period, the Restricted Parties shall not (either on his, her or its own behalf or on behalf of any other Person), without the prior, written consent of the Company, directly or indirectly, personally or through others (whether as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, representative, agent, consultant, contractor, or any other capacity) own or operate any acute care hospital located in the Market Area.

(ii) The Restricted Parties hereby acknowledge that (A) the foregoing covenant is unique, substantial, and of immeasurable value to the Company; and (B) such covenant is reasonably limited in scope and/or geography to protect the Company's legitimate business interests, including its property, and Business relationships, goodwill and economic advantage.

(iii) The parties have attempted by this Section 6.1(a) to limit the ability to compete to the fullest extent possible to protect the Company's legitimate business interests and to protect the Company from unfair business practices and/or unfair competition, including loss of goodwill. Consequently, the parties agree that, if the foregoing covenant is in any way adjudged by a court of competent jurisdiction to be invalid or unenforceable, as to scope, territory or otherwise, a court or other trier of fact may modify and enforce the covenant to the extent that it believes to be reasonable and fair under the circumstances existing at that time, and as necessary to protect the Company's legitimate business interests.

(iv) Nothing herein shall prohibit a Restricted Party from purchasing or owning less than five percent (5%) of the securities of any publicly-traded corporation, provided that such ownership represents a passive investment and that the Restricted Party is not a controlling person of, or a member of a group that controls, such corporation.

(b) Non-Solicitation of Employees. During the Restricted Period, except as otherwise provided herein, the Restricted Parties shall not, without the prior, written consent of the Company, which shall not be unreasonably withheld (taking into account the desires of employees, including for geographic relocation) directly or indirectly solicit for employment, offer to hire, or hire any individual who is then an employee of the Company, or who has terminated such employment within one (1) year of such solicitation or offer. The foregoing restriction in this Section 6.1(b) shall not apply to: (i) individuals responding to general solicitations (such as advertising) not specifically targeted at employees of the Company or any of its Affiliates; (ii) individuals not solicited for employment by a Restricted Party who have voluntarily expressed a desire for geographic location for personal reasons; (iii) individuals who are hired for a position by the Management Company; and (iv) such other individuals who the Trustee and the Company may agree from time to time.

(c) Reserved.

(d) Non-Disclosure of Confidential Information and Trade Secrets of the Company.

(i) The Restricted Parties understand and agree that the Confidential Information and each of the Company's trade secrets constitute valuable assets and may not be converted to any Restricted Party's own use on or after the Closing Date. Accordingly, each Restricted Party hereby agrees that he, she or it shall not, directly or indirectly, except as otherwise provided herein, reveal, divulge, or disclose to any Person not expressly authorized in writing by the Company any Confidential Information, and he, she or it shall not, directly or indirectly, at any time, use or make use of any Confidential Information in connection with any business activity, except that a Restricted Party may disclose the Confidential Information or portions thereof to those of its directors, officers, employees, advisors, attorneys accountants, consultants, agents, representatives or Affiliates (A) who are informed by such Restricted Party of the confidential nature of the Confidential Information and (B) who agree to comply with the confidentiality term of this Agreement (collectively, the "**Representatives**") and, in any event, such Restricted Party shall be responsible for any disclosure of Confidential Information by its Representatives that would constitute a breach of this Agreement. Throughout the period during which any information remains a trade secret of the Company under applicable law, the Restricted Parties shall not, directly or indirectly, transmit or disclose any such trade secret to any Person, and shall not make use of any such trade secret, directly or indirectly, for himself, herself, itself or for others, without the prior, written consent of the Company. Each party acknowledges and agrees that this Agreement is not intended to, and does not, alter either the Company's rights or the Restricted Parties' obligations under any State or federal statutory or common law regarding trade secrets and unfair trade practices. . Notwithstanding anything in this Agreement to the contrary, the Restricted Parties may disclose the fact that the Management Company provides management services to the Company.

(ii) Anything herein to the contrary notwithstanding, the Restricted Parties shall not be restricted from disclosing or using Confidential Information or any trade secret of the Company (A) that is required to be disclosed by Law; provided, however, that in the event disclosure is required by law, the disclosing Restricted Party shall provide the Company with prompt written notice of such requirement so that the Company may seek an appropriate protective order prior to any such required disclosure by such Restricted Party, (B) to the extent reasonably necessary for the Management Company to perform under the Management Services Agreement, and (C) to their respective directors, officers, employees, managers, agents, attorneys and advisors in connection with the Management Company's performance under the Management Services Agreement, provided that such individuals are bound by confidentiality obligations applicable to such Confidential Information and trade secrets.

(iii) The Restricted Parties acknowledge that any and all Confidential Information will be, as of the Closing Date, the exclusive property of the Company and agree to deliver to the Company, at any time the Company may request, any and all Confidential Information which they may then possess or have under their control in whatever form the same may exist, including hard copy files, soft copy files, computer disks, and all copies thereof.

(e) Notification of Section 1042 Election. If the Seller makes an election under Section 1042(a)(1) of the Code with respect to the ESOP Shares, then the Seller shall notify the Company and the Trustee of such election within thirty (30) calendar days of making such election.

Section 6.2. Covenants of the Company.

(a) Related Party Transaction Policy. At or prior to the Closing, the Company shall adopt a "**Related Party Transaction Policy**" in form and substance mutually acceptable to the Company, Trustee and Seller, dealing with actual and potential transactions involving Restricted Parties or their Affiliates as: (i) creditor to the Company, (ii) landlord of the Company's facilities and (iii) owner/operator of other health care facilities and businesses in Southern California (ii) manager of the landlord of the Company's facilities and (iii) owner/operator of other health care facilities and businesses in Southern California. The Company shall acknowledge such Related Party Transaction Policy and the Company may not alter, amend or terminate such Related Party Transaction Policy without the prior written consent of Seller.

(b) Subchapter S Elections. The Company covenants and agrees to make and maintain (i) a valid election under Section 1362(a) of the Code to be taxable under Subchapter S of Chapter 1 of the Code effective September 1, 2015 and (ii) a valid election under Section 1361(b)(3)(B)(ii) of the Code to treat KPC Healthcare, Inc. as a qualified subchapter S subsidiary effective September 1, 2015. The Company covenants and agrees to (I) promptly notify the Seller in writing of any tax audit, investigation, examination, request for information or other proceeding relating to, or that may affect (1) the Company's election under section 1362(a) of the Code to be taxable under Subchapter S of Chapter 1 of the Code or, otherwise, the Company's qualification as an S corporation within the meaning of Section 1361 of the Code or (2) KPC Healthcare, Inc.'s qualification as a qualified subchapter S subsidiary within the meaning of Section 1361 of the Code, in each case for any taxable period, or portion thereof, during which the Seller owned the Seller Warrant or any share of the Common Stock of the Company, and (II) explain the general nature of such audit, investigation, examination, request for information or other proceeding. Such notification shall be in addition to the requirements of Section 6.2(n) and ARTICLE VII regarding the provision of notice of governmental audits or claims as therein described respectively.

(c) Maintenance of the ESOP's Tax Qualified Status. The Company covenants and agrees to take any action as may be necessary to maintain the tax-qualified status of the Plan and the tax-exempt status of the Trust under ERISA and the Code and will timely submit the Plan and Trust to the Internal Revenue Service requesting a favorable determination letter stating that the Plan constitutes a qualified plan under Section 401(a) of the Code, the Trust is an exempt trust under Section 501(a) of the Code and the Plan is a qualified employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and the Company will make such amendments to the Plan as may be required as a condition of the issuance of a favorable determination letter. The Company shall take any action as may be necessary to maintain the tax-qualified status of the Plan, to make sure that the Plan at all times satisfies the requirements of Code section 4975(e)(7), and to maintain the tax-exempt status of the Trust under ERISA and the Code. Notwithstanding the foregoing, the Company may terminate the Plan in its sole discretion at any time.

(d) Management Incentive Plan. The Company covenants and agrees that within ninety (90) days of the Closing Date the Company shall adopt the Management Incentive Plan, which will provide for the granting of Synthetic Equity (subject to specific performance

levels) of up to ten (10%) percent of the total equity value of the Company on a fully diluted basis, pursuant to the terms of the Management Incentive Plan and related award agreements. The Management Incentive Plan shall reflect the terms of that certain nonbinding term sheet executed by the Company, the Seller and the Trustee, on behalf of the Trust, on or about August 3, 2015 (the "**Term Sheet**"). The Management Incentive Plan shall be subject to the review of the Trustee; provided, however, that such review is restricted to ensuring compliance with the negotiated terms of the Term Sheet.

(e) Reporting and Disclosure. The Company covenants and agrees to timely satisfy all reporting and disclosure requirements under ERISA and the Code relating to the establishment of the Plan, the Trust, and the Transactions described in this Agreement.

(f) Change of Legal Name. The Company agrees not to change its name "KPC Healthcare, Inc." without Dr. Chaudhuri's prior written consent.

(g) 409(p) Test. The Company covenants and agrees to obtain a 409(p) test from a qualified third party ESOP administration firm acceptable to the Trustee (i) immediately prior to the Closing, (ii) for each plan year of the Plan, and (iii) immediately prior any award of Synthetic Equity.

(h) Subordinated Debt. The Company covenants and agrees to substitute the Company as the obligator on the debt evidenced by the Seller ESOP Loan Documents in exchange for entering into that certain loan with the Trustee, on behalf of the Trust (the "**Substitution ESOP Loan**" in the amount of Two Hundred Seven Million Five Hundred Seventy-Four Thousand and 00/100 Dollars ($207,574,000).

(i) ESOP Contributions. The Company shall contribute or declare and pay dividends or distributions to the Plan each year in an amount which is at least equal to the amount required to discharge the current obligations under the ESOP Loan. The Company acknowledges that any failure of the ESOP to repay indebtedness pursuant to the ESOP Loan as the result of the Company's failure to contribute, declare or[ otherwise pay amounts sufficient for the ESOP to repay the ESOP Loan shall not be cause for the Company to declare a default under the ESOP Loan Documents.

(j) Repurchase Liability Study. Commencing August 31, 2017, the Company shall obtain a repurchase liability study from a qualified administration firm acceptable to the Trustee every other year to quantify the ESOP's repurchase liability.

(k) Financial Information. The Company shall deliver annual financial statements to the Trustee no later than one hundred and twenty (120) days after each fiscal year end.

(l) QAF Calculations. The Company shall deliver to the Trustee each QAF Calculation Statement prepared and submitted in connection with the requirements under the Warrant Purchase Agreement and the Warrant Cancellation Agreement. Such QAF Calculations Statements shall be provided at the same time and in the same form as provided to the warrantholders.

(m) Restriction on Payment of Dividends and Distributions. The Company covenants and agrees not to declare and pay dividends or distributions, as the case may be, on its shares of capital stock; provided, however, that the Company shall be entitled to declare and pay any "applicable dividend," as such term is defined in Section 404(k)(2)(A) of the Code, on its shares of capital stock at any time and from time to time in the discretion of the Company's Board of Directors. In addition, the Company shall be entitled to declare and pay distributions which, if declared and paid by a corporation taxable under Subchapter C of the Code, would constitute an "applicable dividend" on its shares of capital stock at any time and from time to time in the discretion of the Company's Board of Directors. .

(n) Company Notification of Governmental Audit. The Company covenants and agrees to timely notify the Seller and the Trustee in writing of any governmental or other third party audit, investigation, or request for information (other than routine claims for benefits by participants under the Plan) relating to the Plan, or the Transactions herein describedand explain the general nature of such audit, investigation or claim for information. Such notification shall be in addition to the requirements of ARTICLE VII regarding the provision of the notice of claims as therein described.

(o) Recovery Under Insurance. The Company covenants and agrees that, with respect to any matter for which indemnification would otherwise be provided to the Trust pursuant to ARTICLE VII, it shall use commercially reasonable efforts to collect amounts payable to the Company under any applicable insurance policy of the Company, and to the extent any such amounts are collected there will be no Damages suffered by the Trust, as the case may be.

(p) Directors & Officers and Fiduciary Liability Insurance Coverage. Within the twelve (12) month anniversary of the Closing, the Company will use reasonable commercial efforts to obtain directors' and officers' liability insurance coverage and ERISA fiduciary liability insurance coverage naming the ESOP as an insured, each on terms that are commercially reasonable.

(q) Key Person Insurance. The Company shall use commercially reasonable efforts to obtain term key person life insurance policies on Dr. Kali P. Chaudhuri and Suzanne Richards with the proceeds of such insurance payable to the Company in the event of the death of Dr. Kali P. Chaudhuri or Suzanne Richards. The Company would pay all premiums and own the following policies:

(i) Five to ten year term insurance policy on the life of Dr. Chaudhuri for a coverage of $25.0 million with the Company listed as the beneficiary; and

(ii) Five to ten year term insurance policy on the life of Suzanne Richards for a coverage of $10.0 million with the Company listed as the beneficiary.

(r) Corporate Governance. The Company shall conduct all annual, regular and special meetings of its shareholder(s), Board of Directors and committee in accordance with the Bylaws, including providing timely notice of all annual, and special meetings of the shareholder(s).

(s) Code Section 1042 Election. In the event that the Seller makes an election under Section 1042(a)(1) of the Code, the Company shall agree to be subject to certain excise taxes under Code Section 4978 and 4979(A) and shall file, or cause to be filed a written consent to the application of such excises taxes with the Internal Revenue Service.

(t) Post-Closing Approvals, Authorizations and Consents. Within ninety (90) calendar days of the Closing Date, the Company shall deliver to the Seller and the Trustee, on behalf of the Trust, all permits, approvals, authorizations and consents of third parties necessary for the consummation of the transactions contemplated in this Agreement.

(u) Board Committees. Within six (6) months of the Closing Date, the Board of Directors of the Company shall form and staff the following committees of the Board: Audit, Corporate Governance, Compensation, ESOP and Nomination (each, a "**Governance Committee**").

Section 6.3. Amendment to PCHI Lease. The Company and Trustee are aware and have been advised that (i) an affiliate of Seller, Pacific Coast Holdings Investment, LLC ("**PCHI**"), is landlord of the Leased Properties under that certain Amended and Restated Triple Net Hospital Building Lease dated as of October 1, 2007 (the "**PCHI Lease**"), and (ii) PCHI is currently processing with the City of Santa Ana a legal split of a parcel of land currently in use as a surplus parking lot on the campus of the Orange County Global Medical Center ("**OCGMC**"), identified in **Exhibit 6.3** attached hereto (the "**Development Parcel**"). The Company covenants and agrees that, upon request by PCHI, it shall amend the PCHI Lease to release the Development Parcel, provided that (x) commercially reasonable provisions are made for reciprocal parking such that OCGMC shall continue to comply with municipal parking requirements of the City of Santa, and (y) the rent charged under the PCHI Lease is adjusted downward by a fair market value amount if OCGMC experiences a material diminution of its use and enjoyment of a leased property as a result of such arrangements.

Section 6.4. Covenants of the Trustee and the Trust.

(a) Size of the Board of Directors. The Trustee, on behalf of the Trust, shall vote, or cause to be voted, all ESOP Shares over which the Trustee has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board of Directors shall initially be set and remain at three (3) directors and then may be increased only to accommodate the new directors referenced in Section 6.4(b).

(b) Board Composition. The Trustee, on behalf of the Trust, shall vote, or cause to be voted, all Shares over which the Trustee has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Board:

(i) three (3) persons, who need not be Independent Directors;

(ii) within six (6) months of the Closing Date, one Independent Director; and

(iii) within twelve (12) months of the Closing Date, one additional Independent Director.

(c) For purposes of this Section 6.4, the term "**Independent Director**" shall mean a director who:

(i) is not a current or former shareholder, director, executive officer or employee of the Company who has performed services for the Company within twelve (12) months of his or her appointment date as a director;

(ii) a family members of any person described in Section 6.4(c)(i);

(iii) is not a professional who has received professional fees from the Company within twelve months of his or her appointment date as a director; and

(iv) does not have any relationship with the Company either personally or through his or her Affiliate which in the opinion of the Board of Directors would adversely affect the individual's ability to exercise his or her judgment as a member of the Board of Directors or any Governance Committee.

(d) The Trustee shall provide at least 30 calendar days' prior written notice to the Board of Directors in the event it takes action to (i) vote (or cause to be voted) any ESOP Shares to remove any sitting directors or (ii) withhold its vote for the re-election of any sitting directors at an annual or special meeting of stockholders or written consent in lieu of a meeting of stockholders.

## ARTICLE VII.
## INDEMNIFICATION.

Section 7.1. General Statement. From and after the Closing Date, the parties shall indemnify each other as provided in this ARTICLE VII.

Section 7.2. Indemnification Obligations of the Seller.

(a) The Seller shall severally (and not jointly and severally) defend, indemnify, save and keep harmless the Trust and the Company, and its past, present and future shareholders, directors, officers, employees, and agents and their respective Affiliates and representatives, and their successors and permitted assigns (the "**Company Indemnified Parties**") against and from all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (i) any inaccuracy in or breach of any representation and warranty made by the Seller in Section 3.2 of this Agreement, or the Transaction Documents, (ii) any breach or failure by the Seller to comply with any of the covenants or obligations to be performed by the Seller pursuant to this Agreement, (including, without limitation, the Seller's obligations under this ARTICLE VII), or the Transaction Documents, and (iii) any Third-Party Claim resulting from or arising out of or by virtue of the foregoing.

(b) The Seller shall severally (and not jointly and severally) defend, indemnify, save and keep harmless the Trust against and from 80.5% all Damages which may be sustained or suffered by it resulting from or arising out of or by virtue of (i) any inaccuracy in or breach of any representation and warranty made by the Company in Section 3.3 of this Agreement, any certificate delivered by the Company pursuant to this Agreement, or the Transaction Documents, , and (ii) any Third-Party Claim resulting from or arising out of or by virtue of the foregoing.

Section 7.3. Indemnification Obligations of the Company. The Company shall indemnify, save and keep harmless the Trust against and from all Damages which may be sustained or suffered by it resulting from or arising out of or by virtue of (a) any inaccuracy in or breach of any representation and warranty made by the Company set forth in Section 3.3 of this Agreement, or any certificate to be delivered by the Company pursuant to this Agreement, or the Transaction Documents, and (b) any breach by the Company, or failure of the Company to comply with, any of its covenants or obligations under this Agreement (including, without limitation, its obligations under this ARTICLE VII), or the Transaction Documents, and (c) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing. Any Damages resulting from any breach of any representation or warranty made by the Company shall be allocated first to the Seller until fully satisfied in accordance with the limitation of Section 7.6 hereof, and only if not fulfilled, then to the Company in accordance with the provisions of this Section 7.3.

Section 7.4. Indemnification Obligations of the Trustee. The Trustee shall defend, indemnify, save and keep harmless each of the Seller and the Company Indemnified Parties against and from all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (a) any inaccuracy in or breach of any representation and warranty made by the Trustee in Section 3.4 of this Agreement, or any certificate to be delivered by the Trustee pursuant to this Agreement, or the Transaction Documents, (b) any breach by the Trustee, acting on behalf of the Trust, or failure of the Trustee, acting on behalf of the Trust, to comply with, any of its covenants or obligations under this Agreement (including, without limitation, its obligations under this ARTICLE VII), or the Transaction Documents, and (c) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing.

Section 7.5. Claims. The parties intend that all indemnification claims be made as promptly as practicable by the indemnified party. Whenever any claim shall arise for indemnification hereunder, the indemnified party shall promptly notify the indemnifying party of the claim and, when known, the facts constituting the basis for such claim. With respect to claims made by third parties, the indemnifying party shall be entitled to assume control of the defense of such action or claim with counsel satisfactory to the indemnified party; provided, however, that: (a) the indemnified party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; (b) the indemnifying party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to the indemnified party a release from all liability in respect of such claim if, pursuant to or as a result of such consent or settlement, injunctive or other equitable relief would be imposed against the indemnified party or such judgment or settlement could materially interfere with the business, operations or assets of the indemnified party; and (c) if the indemnifying party does not

assume control of the defense of such claim in accordance with the foregoing provisions within fifteen (15) days after receipt of notice of the claim, the indemnified party shall have the right to defend such claim in good faith in such manner as it may deem appropriate at the cost and expense of the indemnifying party, and the indemnifying party will promptly reimburse the indemnified party for such cost and expense.

Section 7.6. Limitation on Rights to Indemnification. The obligations to indemnify pursuant to this ARTICLE VII are subject to the following limitations:

(a) Survival.

(i) Each representation and warranty set forth in Section 3.2(a) (Enforceability), Section 3.2(b) (Notices and Consents), Section 3.2(c) (No Conflicts), Section 3.2(d) (Ownership of Shares), Section 3.2(e) (Capacity), Section 3.2(f) (Title) (each a "**Seller Fundamental Representation and Warranty**"); each representation and warranty set forth in Section 3.3(a) (Organization), Section 3.3(b) (Capitalization), Section 3.3(c) (Enforceability), and Section 3.3(d) (No Conflicts), (each a "**Company Fundamental Representation and Warranty**"); and any statutory or common law claims for fraud shall survive Closing and continue forever.

(ii) Each representation and warranty set forth in Section 3.3(p) (Tax Matters), Section 3.3(u) (Employee Matters), and Section 3.3(v) (Benefit Plans) shall survive Closing until, and will be of no further force and effect on, the conclusion of ninety (90) days after the end of the applicable limitations period.

(iii) Each representation and warranty set forth in Section 3.3(o) (Licenses and Permits) shall survive the Closing until, and will be of no further force and effect on, the shorter of (A) the first renewal period for the applicable license following Closing (provided that such license is successfully renewed at such time), and (B) four (4) years from the Closing Date.

(iv) Each other representation and warranty made under this Agreement shall survive Closing and will expire and be of no further force and effect upon the later of (A) the twenty-four month anniversary of the Closing Date, and (B) thirty (30) calendar days following the delivery by the Company to the Trustee of the audited financial statements for fiscal year ended 2017.

(v) Each covenant set forth in this Agreement will survive until it is fully performed, unless a shorter period of survival is specifically set forth in this Agreement.

(vi) Any claim for indemnification based on a breach of any representation, warranty, or covenant must be made prior to the expiration of any such representation, warranty, or covenant and any claim not made within such period shall be of no force or effect.

(b) Deductible. No indemnifying party shall be liable to an indemnified party for indemnification until the aggregate amount of all Damages in respect of indemnification of such indemnified party hereunder exceeds Two Million and 00/100 Dollars ($2,000,000), in

which event the indemnifying party shall be required to pay or be liable for all such Damages, but only to the extent such Damages exceed the Deductible. This Section 7.6(b) shall not apply to the indemnification obligations of the Seller for any inaccuracy in or breach of any Seller Fundamental Representation and Warranty, to the indemnification obligations of the Company for any inaccuracy in or breach of any Company Fundamental Representation and Warranty, the indemnification obligations of the Company for a breach of the representation and warrant made in Section 3.3(o) (Licenses and Permits), or the indemnification obligations of an indemnifying party to an indemnified party for any statutory or common law claims for fraud, which shall be unlimited, subject to Section 7.6(c).

(c) Indemnification Cap. The aggregate amount of all Damages for which an Indemnifying Party shall be liable with respect to any single Indemnified Party shall not exceed Sixty-Five Million Two Hundred Five Thousand and 00/100 Dollars ($65,205,000) (the "**Indemnification Cap**"); provided, however, that the indemnification obligations of the Seller for any inaccuracy in or breach of any Seller Fundamental Representation and Warranty, the indemnification obligations of the Company for any inaccuracy in or breach of any Company Fundamental Representation and Warranty, and the indemnification obligations of the Company for any inaccuracy in or breach of the representation and warranty made in Section 3.3(o) (Licenses and Permits) shall not exceed the sum of (i) the cash consideration portion of the Purchase Price, plus (ii) the original principal balance of the Seller Subordinated Promissory Note. The indemnification obligations of an indemnifying party to an indemnified party for any statutory or common law claims for fraud shall be unlimited.

(d) Notice. The indemnification obligation of an indemnifying party in this ARTICLE VII shall not be affected by the failure of the indemnified party to give notice in accordance herewith unless the indemnifying party is materially prejudiced thereby; provided however, that the amount that the indemnifying party's liability shall be reduced or limited by is the extent of any actual prejudice; and further provided, that in no event will a notice of a claim of indemnification delivered after the termination, expiration or satisfaction of the representation, warranty or covenant on which such claim is based be effective for any purpose under this ARTICLE VII.

(e) Insurance Proceeds. Any payment made by the indemnifying party to an indemnified party pursuant to this ARTICLE VII in respect of any indemnifiable event shall be net of any insurance proceeds realized by and paid to such indemnified party in respect of such indemnifiable event. Such indemnified party shall use reasonable commercial efforts to make insurance claims relating to any indemnifiable event for which it is seeking indemnification pursuant to this ARTICLE VII; provided that such indemnified party shall not be obligated to make such an insurance claim if such indemnified party in its reasonable judgment believes the cost of pursuing such an insurance claim together with any corresponding increase in insurance premiums or other chargebacks to such indemnified party, as the case may be, would exceed the value of the claim for which such indemnified party is seeking indemnification. In the event that an insurance recovery is made by a indemnified party with respect to any Damages for which a indemnified party has previously been indemnified hereunder, then such indemnified party shall promptly make a refund to the payor(s) under this ARTICLE VII in an amount equal to the lesser of (i) the amount of such insurance recovery (net of collection expenses) and (ii) the amount previously paid by the payor(s) under this ARTICLE VII as indemnification for such Damages.

(f) Mitigation of Damages. In the event that any indemnified party fails to use its commercially reasonable efforts to mitigate any Damages to the extent required hereunder or by applicable Laws, then notwithstanding anything else to the contrary contained herein, the indemnifying party shall not be required to indemnify the indemnified party for any Damages that could reasonably be expected to have been avoided or reduced if the indemnified party had made such commercially reasonable efforts.

(g) Reserved.

Section 7.7. Procedures.

(a) If a party hereto seeks indemnification under this ARTICLE VII, such party (the "**Indemnified Party**") shall promptly give written notice to the other party (the "**Indemnifying Party**") after receiving written notice of any action, lawsuit, proceeding, investigation (including the commencement of a tax audit or examination) or other claim against it (if by a third party) or discovering the liability, obligation, or facts giving rise to such claim for indemnification, describing the claim, the amount thereof (if known and quantifiable), and the basis thereof; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have prejudiced the Indemnifying Party. In that regard, if any action, lawsuit, proceeding, investigation (including the commencement of a tax audit or examination), or other claim shall be brought or asserted by any third party which, if adversely determined, would entitle the Indemnified Party to indemnity pursuant to this ARTICLE VII, the Indemnified Party shall promptly notify the Indemnifying Party of the same in writing, specifying in detail the basis of such claim and the facts pertaining thereto and the Indemnifying Party shall be entitled to participate in the defense of such action, lawsuit, proceeding, investigation, or other claim giving rise to the Indemnified Party's claim for indemnification at its expense, and at its option (subject to the limitations set forth below) shall be entitled at any time to elect to control and appoint lead counsel of such defense with reputable counsel reasonably acceptable to the Indemnified Party; provided that, as a condition precedent to the Indemnifying Party's right to assume control of such defense, it must first agree in writing to be fully responsible for all Damages relating to such claims and to provide full indemnification to the Indemnified Party for all Damages relating to such claim; and provided further that the Indemnifying Party shall not have the right to assume control of such defense, and, if the claim is one for which indemnification is due under this Agreement, shall pay the reasonable fees and expenses of reputable counsel retained by the Indemnified Party and reasonably acceptable to the Indemnifying Party, if the claim which the Indemnifying Party seeks to assume control (i) seeks non-monetary relief, provided that the Indemnified Party has determined in good faith that the grant of such non-monetary relief would be reasonably likely to have a significant adverse effect on the Indemnified Party, (ii) involves criminal allegations against an Indemnified Party, or (iii) involves a claim which, upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to vigorously prosecute or defend; provided further that the Indemnifying Party shall have one (1) opportunity to elect to assume control of the defense of any such action, lawsuit, proceeding or investigation within thirty (30) days following its receipt of notice from the Indemnified Party.

(b) If the Indemnifying Party is permitted to assume and control the defense and elects to do so, the Indemnified Party shall have the right to employ counsel separate from counsel employed by the Indemnifying Party in any such action and to participate in (but not control) the defense thereof, but the fees and expenses of such counsel employed by the Indemnified Party shall be at the expense of the Indemnifying Party.

(c) If the Indemnifying Party shall control the defense of any such claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim or ceasing to defend such claim, if pursuant to or as a result of such settlement or cessation, injunction, or other equitable relief will be imposed against the Indemnified Party or if such settlement does not expressly unconditionally release the Indemnified Party from all liabilities and obligations with respect to such claim. If, in accordance with the provisions of Section 7.7(a), the Indemnified Party shall control the defense of any such claim, the Indemnified Party shall obtain the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim that would result in monetary or similar damages for which the Indemnified Party would be entitled to indemnification hereunder.

(d) If the Seller is the Indemnifying Party and is permitted to assume and control the defense and elects to do so, then the Seller may reasonably cooperate with SPCP Group, LLC, a Delaware limited liability company, and William E. Thomas in assuming and controlling the defense; provided that nothing in this Section 7.7(d) shall obligate the Indemnifying Party to so reasonably cooperate, and nothing in this Section 7.7(d) shall obligate SPCP Group, LLC or Mr. Thomas to so reasonably cooperate.

Section 7.8. Assignment of Claims. If the Indemnified Party receives any payment from any Indemnifying Party in respect of any Damages pursuant to this ARTICLE VII and the Indemnified Party could have recovered all or a part of such Damages from a third party (the "**Potential Contributor**") based on the underlying claim asserted against the Indemnifying Party, the Indemnified Party shall assign, on a non-recourse basis and without any representation or warranty, such of its rights to proceed against the Potential Contributor as are necessary to permit the Indemnifying Party to recover from the Potential Contributor the amount of such payment. Any payment received in respect of such claim shall be distributed, (a) first to the Indemnified Party in the amount of any deductible or similar amount required to be paid by the Indemnified Party prior to the Indemnifying Party being required to make any payment to the Indemnified Party, (b) second to such Indemnifying Part(ies) in an amount equal to the aggregate payments made to the Indemnified Party, in respect of such claim, plus costs and expenses incurred in investigating, defending or otherwise incurred in connection with addressing such claim and (c) the balance, if any, to the Indemnified Party.

Section 7.9. Materiality. For purposes of calculating Damages hereunder, any Material Adverse Effect qualification in such representations and warranties shall be disregarded to the extent the application of all Material Adverse Effect qualifications exceed One Million and 00/100 Dollars ($1,000,000).

Section 7.10. Sole Remedies; Right of Setoff.

(a) Except for statutory and common law claims for fraud which shall not be subject to any of the provisions of this ARTICLE VII, and except as set forth in Section 7.11, this ARTICLE VII shall be the sole and exclusive remedy for (i) any inaccuracy in or breach of any representation and warranty under this Agreement, any certificate delivered pursuant to this Agreement, or the Transaction Documents and (ii) any breach or failure by a party to comply with any of the covenants or obligations to be performed by the party pursuant to this Agreement, (including, without limitation, the party's obligations under this ARTICLE VII), or the Transaction Documents and (iii) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing.

(b) To the extent permitted by ERISA, the Trustee, acting on behalf of the Trust, shall be entitled to reduce the remaining principal balance of the Company ESOP Note, Seller ESOP Note, and/or Amended and Restated ESOP Note equal to one hundred percent (100%) of any indemnification amount owed by the Company or the Seller, as the case may be, to the Trust under this ARTICLE VII. Any setoff permitted hereunder may be affected (i) upon written consent of the indemnifying party, or (ii) once a claim for indemnification under this ARTICLE VII is settled between the indemnifying party and the Trustee, acting on behalf of the Trust, as may be finally determined by a court of competent jurisdiction (or other arbitral body).

(c) Should the Trustee, acting on behalf of the Trust, exercise its right of setoff under the Company ESOP Note or Amended and Restated ESOP Note under Section 7.10(b), then the Company shall automatically setoff an amount equal to the product of one hundred percent (100%) of such amount setoff under Section 7.10(b) multiplied by 80.5% against the Company obligations to the Seller (and his successor transferees) under the Seller Subordinated Promissory Note. Any setoff permitted hereunder with respect to the Seller Subordinated Promissory Note may be affected (i) upon written agreement between the Seller and the Company; or (ii) once a claim for indemnification under this ARTICLE VII is settled between any Indemnifying Party and the Indemnified Party, as may be finally determined by a court of competent jurisdiction (or other arbitral body). For the avoidance of doubt, nothing in Section 7.2(b) shall limit in any manner the Company's right to automatically setoff an amount equal to the product of one hundred percent (100%) of such amount setoff under Section 7.10(b) multiplied by 80.5% against the Company's obligations to the Seller (and its successor transferees) under the Seller Subordinated Promissory Note.

(d) Reserved.

(e) Notwithstanding anything in this Agreement to the contrary, any amounts payable to the Trust or the Company by the Seller in satisfaction of an indemnification claim shall be satisfied (i) first, by the setoff procedures set forth in Section 7.10(b) and Section 7.10(c), and (ii) second, by any other remedy available to the Trust or the Company (as the case may be), subject to the limitations in Section 7.6. For the avoidance of doubt and notwithstanding anything to the foregoing, neither the Indemnification Cap nor the Deductible nor any materiality qualifier in this Agreement shall apply to a claim for a breach of a restrictive covenant set forth in Section 6.1 of this Agreement.

Section 7.11. Equitable Remedies. The parties to this Agreement agree that (a) if a Restricted Party breaches or threatens to breach any covenant or threatens not to perform or fails

to perform any obligation set forth in Section 6.1, the damage to the Company may be substantial, although difficult to ascertain, and money damages will not afford the Company an adequate remedy, and (b) if the Restricted Party breaches any covenant or fails to perform any obligation set forth in Section 6.1, or threatens a breach or any covenant or threatens not to perform any obligation set forth in Section 6.1, then the Company shall be entitled, in addition to all other rights and remedies as may be provided by law, to seek specific performance and injunctive and other equitable relief to prevent or restrain a breach of any covenant or failure to perform any obligation set forth in Section 6.1.

Section 7.12. Tax Treatment of Indemnification Payments. All indemnification payments made under this ARTICLE VII shall be treated by the parties as an adjustment to the Purchase Price for Federal, state and local tax purposes, including an election made under Section 1042 of the Code by the Seller, unless otherwise required by Law.

## ARTICLE VIII.
## MISCELLANEOUS.

Section 8.1. Expenses. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred; provided, however, that the Company shall be responsible for the prompt payments of all professional fees and disbursements of the Trustee and all professional fees and disbursements incurred by the Trustee in connection with this Agreement and the Transactions contemplated hereby.

Section 8.2. Further Assurances. Each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and each of the other Transaction Documents and give effect to the Transactions contemplated hereby.

Section 8.3. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; provided that a copy is also sent by certified or registered mail (in each case, return receipt requested, postage pre-paid). Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.3):

To the Trustee: KPC Healthcare, Inc.
Employee Stock Ownership Trust
c/o Alerus Financial, N.A., Trustee
Attention: Nels Carlson, Managing Director
10900 Wayzata Blvd., Suite 120
Minnetonka, MN 55305

Facsimile: (952) 417-3839
E-mail: nels.carlson@alerus.com

With a copy to: K&L Gates LLP
Attention: Erin Turley, Partner
1717 Main Street, Suite 2800
Dallas, TX 75201
Facsimile: (214) 939-5849
E-mail: erin.turley@klgates.com

To the Company: KPC Healthcare Holdings, Inc.
c/o Strategic Global Management, Inc.
Attention: General Counsel
6800 Indiana Avenue, Suite 130
Riverside, CA 92506
Facsimile: (951) 782-8812
E-mail: bthomas@globalmso.com

With a copy to: Holzman Horner PLLC
Attention: Michael R. Holzman, Member
1875 Eye Street, N.W., Suite 500
Washington, D.C. 20006
Facsimile: (202) 905-2156
E-mail: mholzman@holzmanhorner.com

With a copy to: Loeb & Loeb LLP
Attention: Allen Z. Sussman, Partner
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
Facsimile: (310) 919-3934

To the Seller: To the address on the Seller's counterpart to this Agreement\

With a copy to: Loeb & Loeb LLP
Attention: Allen Z. Sussman, Partner
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
Facsimile: (310) 919-3934

Section 8.4. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.5. Entire Agreement. This Agreement, the Transaction Documents, and all related exhibits and schedules constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 8.6. Amendment and Modification. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

Section 8.7. Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 8.8. Cumulative Remedies. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in ARTICLE VII to the contrary.

Section 8.9. Assignment. Neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed. Any purported assignment or delegation in violation of this Section 8.9 shall be null and void. No assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder.

Section 8.10. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and permitted assigns.

Section 8.11. Third-Party Beneficiaries.

(a) This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, except as otherwise provided in this Section 8.11, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(b) Notwithstanding the foregoing, the parties designate all non-party Persons eligible for indemnification under ARTICLE VII of this Agreement as express, intended third-party beneficiaries of the indemnification provisions of this Agreement and delegate to such non-party Persons the right to enforce the indemnification provisions of this Agreement.

(c) Notwithstanding the foregoing, the parties designate the Financing Sources as express, intended third-party beneficiaries of Section 8.16 of this Agreement. And delegate to such Financing sources the right to enforce Section 8.16 of this Agreement.

Section 8.12. Counterparts; Electronic Signatures.

(a) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail of a PDF document shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(b) Each party hereto agrees that the electronic signatures, whether digital or encrypted, of the undersigned included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or e-mail electronic signatures.

Section 8.13. Relationship of the Parties. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

Section 8.14. Representations as to Compliance with Law. Whenever a representation or warranty is made in this Agreement with respect to compliance with any law, that representation means the applicable subject matter is in compliance with applicable statutes, regulations, and ordinances as in existence on the date hereof and on the Closing Date and does not extend to any amendments or revisions of such laws adopted subsequent to such dates.

Section 8.15. Action Taken as Trustee. The Trustee has executed and delivered this Agreement, the Transaction Documents and related documents, not in its corporate capacity, but solely in its capacity as trustee of the Trust. The performance of this Agreement, the Transaction Documents and the related documents by the Trustee and any and all duties, obligations and liabilities of the Trustee hereunder will be affected by it only as trustee and not in its corporate capacity. The Trustee does not undertake nor shall it have any personal liability or obligation of any nature whatsoever by virtue of the execution and delivery of this Agreement, the Transaction Documents and the related documents or the representations, covenants or warranties contained herein.

Section 8.16. Financing Sources. The Trustee, on behalf of the Trust, the Seller and their respective subsidiaries, Affiliates, directors, officers, employees, agents, partners, managers, members or stockholders shall not have any rights or claims against the Financing Sources in any way relating to this Agreement or any of the transactions contemplated by this Agreement, whether at law or equity, in contract, in tort or otherwise. No Financing Source shall have any liability (whether at law or equity, in contract or in tort or otherwise) to the Trustee, the Trust, the Seller or any of their respective subsidiaries, Affiliates, directors, officers, employees, agents,

partners, managers, members or stockholders for any obligations or liabilities of any party hereto under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Without prejudice to the preceding sentences in this Section 8.16, notwithstanding anything herein to the contrary, (x) each of the parties hereto hereby agrees that it will not bring any action, cause of action, claim, cross-claim, third-party claim or other proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Financing Source in any way relating to this Agreement or any of the transactions contemplated by this Agreement, in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law jurisdiction is vested in Federal courts, the United States District Court for the Southern District of New York (or appellate courts thereof) and each such action, cause of action, claim, cross-claim, third-party claim or proceeding shall be governed by the law of the State of New York and (y) each of the parties hereto hereby irrevocably waives all right to trial by jury in any such action, cause of action, claim, cross-claim, third-party claim or proceeding described in the preceding clause (x).

Section 8.17. Representation by Independent Counsel. Each party acknowledges and represents that such party (a) has either (i) been represented by counsel of such party's own choosing, or (ii) has been advised to seek, and offered the opportunity to obtain, counsel of such party's choosing, and has elected not to so obtain the services of an attorney, to review this Agreement and advise the party about all of the terms, conditions and legal effect of entering into, and being bound by, this Agreement and all terms and conditions set forth herein, (b) has fully and carefully read this Agreement prior to its execution, (c) has been, or has had the opportunity to be, fully appraised by such party's attorneys, if any, of the legal effect and meaning of this Agreement and all terms and conditions hereof, (d) has had the opportunity to make whatever investigation or inquiry such party, deemed necessary or appropriate in connection with the subject matter of this Agreement, (e) has been afforded the opportunity to negotiate as to any and all terms hereof, and (f) is executing this Agreement voluntarily, free from any undue influence, coercion, duress, menace, or fraud of any kind. Each party acknowledges that Holzman Horner PLLC represents the Company and no other party, Loeb & Loeb LLP represents the Seller and the Company and no other party and that K&L Gates LLP represents the Trustee and no other party.

Section 8.18. Dispute Resolution.

(a) Governing Law. ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF CALIFORNIA OR ANY OTHER JURISDICTION).

(b) Submission to Jurisdiction. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND WHATSOEVER AGAINST THE OTHER PARTY IN ANY WAY ARISING FROM OR RELATING TO THIS AGREEMENT, AND EXHIBITS AND SCHEDULES ATTACHED HERETO AND THERETO, AND ALL CONTEMPLATED TRANSACTIONS, INCLUDING, BUT NOT LIMITED TO, CONTRACT, EQUITY, TORT, FRAUD AND STATUTORY CLAIMS, IN ANY FORUM OTHER THAN

THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY, CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND AGREES TO BRING ANY SUCH ACTION, LITIGATION OR PROCEEDING ONLY IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY, CALIFORNIA. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING IS CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(c) Service of Process. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY CERTIFIED MAIL IN ACCORDANCE WITH SECTION 8.3 SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.

(d) Venue. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(e) Attorneys' Fees. IN THE EVENT THAT ANY PARTY INSTITUTES ANY LEGAL SUIT, ACTION OR PROCEEDING, INCLUDING ARBITRATION, AGAINST THE OTHER PARTY TO OBTAIN ANY REMEDY IN RESPECT OF ANY BREACH OF THIS AGREEMENT, THE PREVAILING PARTY IN THE SUIT, ACTION OR PROCEEDING SHALL BE ENTITLED TO RECEIVE IN ADDITION TO ALL OTHER DAMAGES TO WHICH IT MAY BE ENTITLED, THE COSTS INCURRED BY SUCH PARTY IN CONDUCTING THE SUIT, ACTION OR PROCEEDING, INCLUDING ACTUAL ATTORNEYS' FEES AND EXPENSES AND COURT COSTS.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the undersigned executes this Agreement as of the date first written above.

KPC HEALTHCARE HOLDINGS, INC.,
a California corporation

By: ______________________
Name:
Title:

Stock Purchase Agreement
Signature Page 1 of 3

{00009963.DOCX}

**IN WITNESS WHEREOF**, the undersigned executes this Agreement as of the date first written above.

ALERUS FINANCIAL, N.A., NOT IN ITS CORPORATE CAPACITY, BUT SOLELY IN ITS CAPACITY AS TRUSTEE OF THE KPC HEALTHCARE, INC. EMPLOYEE STOCK OWNERSHIP TRUST

Nels Carlson
Managing Director

**IN WITNESS WHEREOF**, the undersigned executes this Agreement as of the date first written above.

SELLER

[signature]

Dr. Kali Pradip Chaudhuri

42830 CHAUDHURI CIRCLE

Mailing Address

HEMET CA 92544

City State ZIP

951-7828850

Facsimile

KPCglobal@Gmail.Com

E-mail Address

Stock Purchase Agreement
Signature Page 3 of 3

{00009963.DOCX}

CONFIDENTIAL JAE 0904 MCD00000204

**EXHIBIT A**
**ESOP SHARES SOLD AND PURCHASE PRICE**

{00009963.DOCX}

JAE 0905

CONFIDENTIAL MCD00000205

| Seller | Number of ESOP Shares | Cash Proceeds | Original Principal Amount of Seller ESOP Note | Total Purchase Price |
|---|---|---|---|---|
| Dr. Kali Pradip Chaudhuri | [redacted] | [redacted] | [redacted] | [redacted] |

**EXHIBIT B**
**CONSENT OF SPOUSE**

{00009963.DOCX}

JAE 0907

CONFIDENTIAL MCD00000207

**EXHIBIT B**
**CONSENT OF SPOUSE**

{00009963.DOCX}

JAE 0908

CONFIDENTIAL MCD00000208

**CONSENT OF SPOUSE**

I, Sunanda Chaudhuri, spouse of Dr. Kali Pradip Chaudhuri, a natural person domiciled in the State of California (the "**Seller**"), acknowledge that I have read the Stock Purchase Agreement dated as of August 27, 2015, among KPC HEALTHCARE HOLDINGS, INC., a corporation incorporated under the laws of the State of California, and its successors and permitted assigns (the "**Company**"), Alerus Financial, N.A. not in its corporate capacity, but solely in its capacity as trustee of the KPC Healthcare, Inc. Employee Stock Ownership Trust, as amended from time to time (the "Trust"), which forms a part of the KPC Healthcare, Inc. Employee Stock Ownership Plan, as amended from time to time (the "Plan," and together with the Trust, the "ESOP") and the Seller, to which this Consent is attached as **Exhibit B** (as the same may be amended or amended and restated from time to time, the "**Agreement**"), and that I understand the contents of the Agreement. I am aware that my spouse is a party to the Agreement and the Agreement contains provisions regarding the transfer of the ESOP Shares (as defined in the Agreement), which my spouse may own, including any interest I might have therein.

I hereby agree that I and any interest, including any community property interest, that I may have in the ESOP Shares is subject to the Agreement shall be irrevocably bound by the Agreement. I hereby appoint my spouse as my attorney-in-fact with respect to the exercise of any rights and obligations under the Agreement.

This Consent shall be binding on my executors, administrators, heirs and assigns. I agree to execute and deliver such documents as may be necessary to carry out the intent of the Agreement and this Consent.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right. I am under no disability or impairment that affects my decision to sign this Consent and I knowingly and voluntarily intend to be legally bound by this Consent.

Signature Schaudhuri

Printed Name
SUNANDA CHAUDHURI

Date 8/26/2015

{00009983.DOCX}

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 14

JAE 0910

**WARRANT PURCHASE AGREEMENT**

**BETWEEN**

**KPC HEALTHCARE HOLDINGS, INC.,**
**A CALIFORNIA CORPORATION**

**AND**

**WILLIAM E. THOMAS,**
**AN INDIVIDUAL DOMICILED IN THE STATE OF CALIFORNIA,**
**AS THE SELLER**

**AUGUST 28, 2015**

{00009884.DOCX 4}

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS. .......... 4
- Section 1.1. Definitions .......... 4
- Section 1.2. Interpretation .......... 10

ARTICLE II. PURCHASE AND SALE. .......... 11
- Section 2.1. Agreement to Purchase and to Sell .......... 11
- Section 2.2. Purchase Price .......... 11
- Section 2.3. Closing Adjustment. .......... 11
- Section 2.4. Time and Place of Closing .......... 11
- Section 2.5. Additional Consideration .......... 12

ARTICLE III. REPRESENTATIONS AND WARRANTIES. .......... 14
- Section 3.1. General Statement .......... 14
- Section 3.2. Representations and Warranties of the Seller .......... 15
- Section 3.3. Representations and Warranties of the Company .......... 17

ARTICLE IV. CONDITIONS PRECEDENT. .......... 18
- Section 4.1. Conditions Precedent to the Obligations of the Seller .......... 18
- Section 4.2. Conditions Precedent to the Obligations of the Company .......... 19

ARTICLE V. CLOSING DELIVERIES. .......... 19
- Section 5.1. Form of Documents .......... 19
- Section 5.2. Deliveries of the Sellers .......... 20
- Section 5.3. Deliveries of the Company .......... 20

ARTICLE VI. COVENANTS. .......... 20
- Section 6.1. Covenants of the Seller .......... 20
- Section 6.2. Covenants of the Company .......... 22

ARTICLE VII. INDEMNIFICATION. .......... 24
- Section 7.1. General Statement .......... 24
- Section 7.2. Indemnification Obligations of the Seller .......... 25
- Section 7.3. Indemnification Obligations of the Company .......... 25
- Section 7.4. Claims .......... 25
- Section 7.5. Limitation on Rights to Indemnification .......... 26
- Section 7.6. Procedures .......... 28
- Section 7.7. Assignment of Claims .......... 29
- Section 7.8. Materiality .......... 29
- Section 7.9. Sole Remedies; Right of Setoff .......... 30
- Section 7.10. Equitable Remedies .......... 31
- Section 7.11. Tax Treatment of Indemnification Payments .......... 31

ARTICLE VIII. MISCELLANEOUS. .......... 31
- Section 8.1. Expenses .......... 31
- Section 8.2. Further Assurances .......... 31
- Section 8.3. Notices .......... 31
- Section 8.4. Severability .......... 32
- Section 8.5. Entire Agreement .......... 32

Section 8.6. Amendment and Modification ..... 32
Section 8.7. Waiver ..... 32
Section 8.8. Cumulative Remedies ..... 33
Section 8.9. Assignment ..... 33
Section 8.10. Successors and Assigns ..... 33
Section 8.11. Third-Party Beneficiaries ..... 33
Section 8.12. Counterparts; Electronic Signatures ..... 33
Section 8.13. Relationship of the Parties ..... 33
Section 8.14. Representations as to Compliance with Law ..... 34
Section 8.15. Representation by Independent Counsel ..... 34
Section 8.16. Dispute Resolution ..... 34

## WARRANT PURCHASE AGREEMENT

**THIS WARRANT PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of the 28th day of August, 2015, by and between KPC HEALTHCARE HOLDINGS, INC., a California corporation, and it successors and permitted assigns (the "**Company**"), and WILLIAM E. THOMAS, an individual domiciled in the State of California (the "**Seller**").

## RECITALS

**WHEREAS**, on April 29, 2014, the Company issued that certain Common Stock Warrant to Mr. Thomas, which entitled the holder thereof to acquire [REDACTED] shares of Common Stock of Integrated Healthcare Holdings, Inc., a Nevada corporation, at a purchase price of [REDACTED] per warrant share (prior to the reverse stock split implemented on May 20, 2014), a copy of which is attached hereto as **Exhibit A** (the "**Existing Warrant**");

**WHEREAS**, on or about February 9, 2015, Integrated Healthcare Holdings, Inc. changed its legal name to "KPC Healthcare, Inc.";

**WHEREAS**, the Company desires to cause its wholly-owned subsidiary, KPC Healthcare, Inc., to cancel and terminate those certain Common Stock Warrants held of record by the Dr. Kali Pradip Chaudhuri and KPC Resolution Company, LLC, a California limited liability company, pursuant to the terms of that certain warrant cancellation and release agreement (the "**Warrant Cancellation and Release Agreement**"), dated as of even date herewith, by and among the Company, KPC Healthcare, Inc., Dr. Kali Pradip Chaudhuri, and KPC Resolution Company, LLC, as may be amended from time to time (the "**Warrant Cancellation Transaction**");

**WHEREAS**, simultaneously with and coincident to the Warrant Cancellation Transaction, the Company desires to (i) purchase the Existing Warrant pursuant to the terms of this Agreement, (ii) purchase that certain Common Stock Warrant held of record by SPCP Group, LLC, a Delaware limited liability company, which entitles the holder thereof to acquire [REDACTED] shares of Common Stock of KPC Healthcare, Inc., at a purchase price of [REDACTED] per warrant share (prior to the reverse stock split implemented on May 20, 2015, (iii) purchase that certain Common Stock Warrant held of record by SPCP Group, LLC, which entitles the holder thereof to acquire [REDACTED] shares of Common Stock of KPC Healthcare, Inc., at a purchase price of [REDACTED] per warrant share (prior to the reverse stock split implemented on May 20, 2015) (collectively, the "**Warrant Redemption Transaction**");

**WHEREAS**, simultaneously with and coincident to the Warrant Cancellation Transaction and the Warrant Redemption Transaction, Dr. Kali Pradip Chaudhuri (the "**Shareholder**") desires to sell [REDACTED] shares of the Common Stock of the Company (the "**ESOP Shares**") to Alerus Financial, N.A. not in its corporate capacity, but solely in its capacity as trustee of the KPC Healthcare, Inc. Employee Stock Ownership Trust, as amended from time to time, the "**Trust**"), which forms a part of the KPC Healthcare, Inc. Employee Stock Ownership Plan, as amended from time to time (the "**Plan**," and together with the Trust, the

**"ESOP"**), pursuant to the terms of that certain stock purchase agreement (the "**Stock Purchase Agreement**") dated as of even date herewith among the Company, the Trustee, acting on behalf of the Trust, and the Shareholder, as amended from time to time (the "**Stock Purchase Transaction**");

**WHEREAS**, to finance partially the Warrant Redemption Transaction, the Company (a) will pay cash to the Seller in the aggregate amount of ), (b) will issue a subordinated promissory note in the aggregate original principal amount of ) payable to the order of the Seller (the "**Thomas Subordinated Promissory Note**") and (c) will issue that certain warrant to purchase a specified number of shares of Common Stock of the Company to the Seller (the "**Thomas Warrant**");

**WHEREAS**, to finance a portion of the purchase of the ESOP Shares by the Trust pursuant to the Stock Purchase Transaction, the Company's wholly-owned subsidiary, KPC Healthcare, Inc., a Nevada corporation, will make a cash contribution to the ESOP in the amount of simultaneously with and coincident to the Stock Purchase Transaction and these contributed funds will be used by the Trustee, acting on behalf of the Trust, to purchase a portion of the ESOP Shares (the "**Unleveraged ESOP Shares**");

**WHEREAS**, to finance partially the Stock Purchase Transaction, the Company will loan (the "**Company ESOP Loan**") to the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, will borrow from the Company, ), pursuant to the terms of that certain credit agreement (the "**Company ESOP Credit Agreement**") between the Company and the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, will issue a promissory note (the "**Company ESOP Note**") payable to the order of the Company, which shall be secured by a pledge by the Trustee, acting on behalf of the Trust, to the Company of the portion of the ESOP Shares acquired with the proceeds of the Company ESOP Loan pursuant to the terms of that certain pledge agreement (the "**Company ESOP Pledge Agreement**," and together with the ESOP Credit Agreement and ESOP Note, the "**Company ESOP Loan Documents**");

**WHEREAS**, the Trustee, on behalf of the Trust, (a) will pay cash to the Shareholder in the amount of , and (b) will issue a non-recourse promissory note (the "**Seller ESOP Note**") in the original principal amount of payable to the order of the Shareholder, which will be made pursuant to the terms of that certain credit agreement between the Trustee, on behalf of the Trust, as the borrower, and the Shareholder, as the lender, dated as of even date herewith, as may be amended from time to time (the "**Seller ESOP Credit Agreement**"), and which will be secured by a pledge of the portion of the ESOP Shares acquired with the Seller ESOP Note pursuant to the terms of that certain pledge agreement (the "**Seller ESOP Pledge Agreement**," and together with the Seller ESOP Note and the Seller ESOP Credit Agreement, the "**Seller ESOP Loan Documents**") between the Trustee, acting on behalf of the Trust, as the pledgor,

and the Shareholder, as the pledgee, dated as of even date herewith, as may be amended from time to time;

**WHEREAS**, immediately following the Stock Purchase Transaction, the Shareholder desires to assign, transfer and set over unto the Company, and the Company desires to accept and assume, all of the Shareholder's right, title and interest in and to the Seller ESOP Loan Documents pursuant to the terms of that certain assignment and assumption agreement (the "**Assignment and Assumption Agreement**") dated as of even date herewith, among the Shareholder, as assignor, and the Company, as assignee, and the Trustee, on behalf of the Trust, as may be amended from time to time (the "**Assignment and Assumption Transaction**");

**WHEREAS**, simultaneously with and coincident to the Assignment and Assumption Transaction, the Company desires to issue a subordinated promissory note (the "**Seller Subordinated Promissory Note**") in the original principal amount of [REDACTED] ) payable to the order of the Shareholder, and to issue that certain warrant to purchase a specified number of shares of Common Stock of the Company to the Shareholder (the "**Seller Warrant**"), pursuant to the terms of that certain exchange agreement (the "**Exchange Agreement**") dated as of the first business day following the date hereof, between the Shareholder and the Company, as may be amended from time to time (the "**Exchange Transaction**");

**WHEREAS**, it is further anticipated that immediately following the Stock Purchase Transaction and in connection with the Assignment and Assumption Transaction, the Trustee, acting on behalf of the Trust, shall issue that certain Amended and Restated ESOP Note (the "**Amended and Restated ESOP Note**") in the original principal amount of [REDACTED] payable to the order of the Company which will be made pursuant to the terms of that certain Amended and Restated ESOP Credit Agreement (the "**Amended and Restated ESOP Credit Agreement**") between the Company and the Trustee, on behalf of the Trust, dated as of the first business day following the date hereof and secured by a pledge of [REDACTED] shares of Common Stock of the Company pursuant to the terms of that certain Amended and Restated ESOP Pledge Agreement (the "**Amended and Restated ESOP Pledge Agreement**," and together with the Amended and Restated ESOP Note and the Amended and Restated ESOP Pledge Agreement, the "**Amended and Restated ESOP Loan Documents**") between the Company and the Trustee, on behalf of the Trust, dated as of even date herewith. For clarification purposes, the Amended and Restated ESOP Loan Documents shall represent all indebtedness amounts incurred by the Trustee, on behalf of the Trust, to finance the Stock Purchase Transaction and the terms of the debt under such documents shall be identical to that originally provided under each of the Company ESOP Loan Documents and the Seller ESOP Loan Documents; and

**WHEREAS**, the Seller desires to sell to the Company, and the Company desires to purchase from the Seller, the Existing Warrant (as herein defined) on the terms and subject to the conditions set forth herein.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the Premises and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows.

## ARTICLE I.
## DEFINITIONS.

Section 1.1. Definitions. As used in this Agreement, the following terms have the respective meanings set forth below.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition, the terms "controls," "is controlled by" and "under common control with" mean the possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Warrant Purchase Agreement, as amended from time to time.

"**Amended and Restated ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Articles of Incorporation**" means the articles of incorporation, including any amendments thereto, of the Company in effect on the Closing Date.

"**Assignment and Assumption Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Assignment and Assumption Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Business**" means the Company's business of operating hospitals.

"**Bylaws**" means the bylaws, including any amendments thereto, of the Company in effect on the Closing Date.

"**Calculation Periods**" means each of the fiscal years ending August 31, 2017 and August 31, 2018, August 31, 2019, August 31, 2020, August 31, 2021, August 31, 2022, August 31, 2023, August 31, 2024, and August 31 2025 respectively.

"**Closing**" means the actual transfer of the Existing Warrant and delivery of this Agreement.

"**Closing Date**" has the meaning set forth in Section 2.4 of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Premises of this Agreement.

"**Company ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Loan**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Company Fundamental Representation and Warranty**" has the meaning set forth in Section 7.5(a) of this Agreement.

"**Company Indemnified Parties**" has the meaning set forth in Section 7.2.

"**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the

Company or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other Person that has entrusted information to the Company in confidence. The parties understand that the aforementioned list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Seller understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Seller in the first instance. Confidential Information shall not include information that is (i) generally available to and known by the public at the time of disclosure to the Seller, provided that such disclosure is through no direct or indirect fault of the Seller or Person(s) acting on the Seller's behalf (ii) the Seller can establish is already in its possession (other than information furnished by or on behalf of the Company), provided that such information is not, to the Seller's knowledge after reasonably inquiry, subject to another confidentiality obligation with or other obligation of secrecy to the Company or another party, or (iii) was available to the Seller on a non-confidential basis from a source (other than the Company or its representatives) that is not and was not prohibited from disclosing such information to the Seller by a contractual, legal or fiduciary obligation of confidentiality to the Company..

"**Damages**" means all demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid in settlement, including, without limitation, reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense or investigation of any claim.

"**Deductible**" has the meaning set forth in Section 7.5(b) of this Agreement.

"**Disclosure Schedule**" has the meaning set forth in Section 3.1 of this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended in effect as of the Closing Date.

"**ESOP**" and "**Plan**" have the meaning set forth in the Recitals of this Agreement.

"**ESOP Shares**" has the meaning set forth in the Recitals of this Agreement.

"**Exchange Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Exchange Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Existing Warrant**" has the meaning set forth in the Recitals of this Agreement.

"**Governmental Entity**" means the government of the United States, the government of any state or territory of the United States, District of Columbia, or political subdivision thereof, or any agency or instrumentality of any of the foregoing, including without limitation school districts.

"**Independent Accountant**" has the meaning set forth in Section 2.5(b)(ii).

"**Indemnification Cap**" has the meaning set forth in Section 7.5(c).

"**Indemnified Party**" has the meaning set forth in Section 7.6(a).

"**Indemnifying Party**" has the meaning set forth in Section 7.6(a).

"**Investor Rights Agreement**" means that certain investor rights agreement dated as of even date herewith entered into among the Company, the Trustee, on behalf of the Trust, the Investors (as therein defined), and the Representative (as therein defined), as may be amended from time to time.

"**Knowledge**" means (a) with respect to the Company, the actual knowledge, after reasonable and due inquiry, of its directors, officers or other senior management, and (b) with respect to the Seller, the actual knowledge, after reasonable and due inquiry, of the Seller, as well as, such information as the Seller would reasonably be expected to know by virtue of his position and relationship with Company.

"**Laws**" means any Federal, state, local, county, city, municipal, or other administrative order, constitution, law, ordinance, principle of common law, regulation, rule, restriction, statute, or treaty.

"**Lien**" means any mortgage or deed of trust, pledge, hypothecation, assignment, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"**Management Company**" means KPC Global Management, LLC, a California limited liability company, or such other entity that may be appointed to management the Company under the Management Services Agreement or similar agreement.

"**Management Services Agreement**" means that certain management services agreement dated August 28, 2015 by and between the Company and the Management Company as may be amended from time to time.

"**Market Area**" means the ten mile radius of any hospital facility operated by the Company or any of its Subsidiaries.

"**Material Adverse Effect**" means any event, matter, occurrence, or action which has or reasonably could be expected to have a material adverse impact equal to or greater than Five Hundred Thousand and 00/100 Dollars ($500,000) on the operations, business, assets, financial condition, or results of operation of the Company or any of its Subsidiaries.

"**Mr. Thomas**" has the meaning set forth in the Premises of this Agreement.

"**Net-Debt**" means the amount by which the Company's interest bearing debt exceeds the Company's balance sheet cash (without giving effect to the transactions contemplated herein) on the Closing Date.

"**Net-Debt Target**" means [redacted]

"**Net-Debt Statement**" has the meaning set forth in Section 2.3(a)(i) of this Agreement.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization of any kind or character, including a governmental department, authority or agency or subdivision thereof.

"**Potential Contributor**" has the meaning set forth in Section 7.7.

"**Purchase Price**" means the amount paid by the Company to the Seller for the Existing Warrant as set forth in Section 2.2 of this Agreement.

"**QAF Calculation**" has the meaning set forth in Section 2.5(b)(i).

"**QAF Calculation Delivery Date**" has the meaning set forth in Section 2.5(b)(i).

"**QAF Calculation Objection Notice**" has the meaning set forth in Section 2.5(b)(ii).

"**QAF Calculation Statement**" has the meaning set forth in Section 2.5(b)(i).

"**QAF Payment**" has the meaning set forth in Section 2.5(a).

"**QAF Period**" means any time during which the Company or its Subsidiaries are eligible to receive Qualifying QAF Payments.

"**QAF Program**" means the hospital quality assurance fee program established by (a) California Assembly Bill 1383 (Chapter 627, Statutes of 2009), (b) California Senate Bill 90 (Chapter 19, Statutes of 2011), (c) California Senate Bill 335 (Chapter 286, Statutes of 2011), (d) California Senate Bill 239 (Chapter 657, Statutes of 2013), (e) any other legislation previously enacted relating to the hospital quality assurance fee program, and (f) any amendments to the foregoing and any similar follow-on or successor quality assurance, rate stabilization or safety net legislation.

"**Qualifying QAF Payment**" means (except as otherwise provided herein) any payment received by the Company or its Subsidiaries pursuant to (a) the quality assurance fee program established or which may be later enacted, established or continued under the QAF Program, and (b) any similar Federal matching program enacted, established or continued after the Closing Date; provided, however, the term "Qualifying QAF Payment" shall not include any payment received by the Company or its Subsidiaries (regardless of when it is paid to the Company or its Subsidiaries) pursuant to the QAF Program on account of services rendered by the Company or any of its Subsidiaries during the calendar years 2014, 2015 and 2016 and using the State of California Office of Statewide Health Planning and Development ("OSHPD") data for calendar year 2010. Notwithstanding anything to the contrary herein, the Qualifying QAF Payment shall

include only those amounts under the QAF Program or under any similar Federal or State matching program enacted, established or continued after the Closing Date attributable to services rendered by the Company or any of its Subsidiaries for the period January 1, 2017 to December 31, 2024 regardless of the OSHPD year used for the calculation and regardless of when such payment is actually received. Furthermore, a Qualifying QAF Payment shall be calculated by subtracting any amounts the Company or its Subsidiaries must pay under the QAF Program (including pledge payments) in order to receive the amounts provided for under the QAF Program.

"**Qualifying QAF Payment Multiple**" means sixty percent (60%).

"**Representative**" has the meaning set forth in Section 6.1(d)(i).

"**Restricted Party**" or "**Restricted Parties**" means Mr. Thomas and his Affiliates and their respective representatives.

"**Restricted Period**" means the term (including any extension, renewals or modifications thereof) of the Management Services Agreement, plus the period of one (1) year, to run consecutively, beginning on the last day of the term (including any extension, renewals or modifications thereof) of such management services agreement.

"**Review Period**" has the meaning set forth in Section 2.5(b)(ii).

"**Seller**" has the meaning set forth in the Premises of this Agreement.

"**Seller ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Loan**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Seller ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Seller Fundamental Representation and Warranty**" has the meaning set forth in Section 7.5(a) of this Agreement.

"**Seller Indemnified Parties**" has the meaning set forth in Section 7.3.

"**Shareholder**" has the meaning set forth in the Recitals of this Agreement.

"**Stock Purchase Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Stock Purchase Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Subsidiary**" means any entity wholly- or partially-owned, directly or indirectly, by the Company, including, KPC Healthcare, Inc., a Nevada corporation, Chapman Global Medical Center, Inc., a California corporation; South Coast Global Medical Center, Inc., a California corporation; Orange County Global Medical Center, Inc., a California corporation; Anaheim Global Medical Center, Inc., a California corporation.

"**Thomas Subordinated Promissory Note**" has the meaning set forth in the Recitals of this Agreement.

"**Thomas Warrant**" has the meaning set forth in the Recitals of this Agreement.

"**Transaction Documents**" means: (a) the Thomas Subordinated Promissory Note, (b) the Investor Rights Agreement, (c) Thomas Warrant, and (d) any certificate delivered by a party to any other party pursuant to the terms of any of the foregoing documents.

"**Trust**" shall have the meaning set forth in the Recitals of this Agreement.

"**Trustee**" shall have the meaning set forth in the Recitals of this Agreement.

"**Unleveraged ESOP Shares**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Cancellation Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Cancellation and Release Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Redemption Transaction**" has the meaning set forth in Section 2.1.

Section 1.2. Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II.
## PURCHASE AND SALE.

Section 2.1. Agreement to Purchase and to Sell. Upon the terms and subject to the conditions of this Agreement, the Seller hereby sells and delivers to the Company, and the Company hereby purchases from the Seller, the Existing Warrant as described on **Exhibit B**.

Section 2.2. Purchase Price. In consideration of the Existing Warrant, the Company hereby agrees (a) to pay to the Seller cash in the aggregate amount of [REDACTED] on the Closing Date payable via wire transfer of immediately available funds; (b) to issue and deliver the Thomas Subordinated Promissory Note in the original principal amount of [REDACTED] and payable to the order of the Seller to the Seller; (c) to issue the Thomas Warrant to the Seller; and (d) the contingent consideration, if any, payable under Section 2.3 (Closing Adjustment) and Section 2.5 (Additional Consideration).

Section 2.3. Closing Adjustment.

(a) Post-Closing Adjustment.

(i) Within sixty (60) calendar days after the Closing Date, the Company shall prepare and deliver to the Seller a statement setting forth its calculation of Net-Debt (the "**Net-Debt Statement**"), and a certificate of the Chief Financial Officer of the Company that the Net-Debt Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the audited financial statements for the most recent fiscal year end.

(ii) The post-closing adjustment shall be an amount equal to the amount by which Net-Debt is greater than or less than, as the case may be, the Net-Debt Target. If Net-Debt is greater than the Net-Debt Target, then pursuant to Section 2.6 of the Thomas Subordinated Promissory Note, the then-existing principal balance of the Thomas Subordinated Promissory Note shall be decreased in an amount equal to the product of (A) the amount by which Net-Debt exceeds the Net-Debt Target multiplied by (B) 2.5%. If Net-Debt is less than the Net-Debt Target, then pursuant to Section 2.6 of the Thomas Subordinated Promissory Note, the then-existing principal balance of the Thomas Subordinated Promissory Note shall be increased in an amount equal to the product of (A) the amount by which Net-Debt is less than the Net-Debt Target multiplied by (B) 2.5%.

(b) Adjustments for Tax Purposes. Any payments made pursuant to this Section 2.3 shall be treated as an adjustment to the purchase price by the parties for Federal and state income tax purposes, unless otherwise required by Law.

Section 2.4. Time and Place of Closing. The Closing of the transactions contemplated by this Agreement shall take place at 9:00 a.m., at the principal executive office of the Company on August 28, 2015 (the "**Closing Date**").

Section 2.5. Additional Consideration.

(a) Quality Assurance Fee Payments. As additional consideration for the Existing Warrant, subject to Section 2.5(h), and at such times as provided in Section 2.5(d), the Company shall pay to the Seller with respect to each Calculation Period within the QAF Period an amount, if any (each, a "**QAF Payment**"), equal to the product of (i) an amount equal to (A) the Qualifying QAF Payment received by the Company with respect to such Calculation Period, multiplied by (ii) the Qualifying QAF Payment Multiple, multiplied by (iii) 2.5%. If no Qualifying QAF Payment is received by the Company with respect to such Calculation Period, then no QAF Payment shall be due with respect to such Calculation Period.

(b) Procedures Applicable to Determination of the QAF Payments.

(i) On or before the date which is 30 calendar days after receipt by the Company or its Subsidiaries of a Qualifying QAF Payment (each such date, an "**QAF Calculation Delivery Date**"), the Company shall prepare and deliver to the Seller a written statement (in each case, a "**QAF Calculation Statement**") setting forth in reasonable detail its determination of Qualifying QAF Payments received by the Company or its Subsidiaries with respect to the applicable Calculation Period(s) and its calculation of the resulting QAF Payment (in each case, a "**QAF Calculation**"). The Company acknowledges that Qualifying QAF Payments may be received by the Company and its Subsidiaries after each respective Calculation Period and shall provide a QAF Calculation Statement to the Seller until all Qualifying QAF Payments are accounted for.

(ii) The Seller shall have 30 calendar days after receipt of the QAF Calculation Statement for each Calculation Period (in each case, the "**Review Period**") to review the QAF Calculation Statement and the QAF Calculation set forth therein. During the Review Period, the Seller and its representatives shall have the right to inspect the Company's books and records during normal business hours at the Company's offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of Qualifying QAF Payments and the resulting QAF Payment. Prior to the expiration of the Review Period, the Seller may object to the QAF Calculation set forth in the QAF Calculation Statement with respect to the applicable Calculation Period by delivering a written notice of objection (a "**QAF Calculation Objection Notice**") to the Trustee, on behalf of the Trust and the Company. Any QAF Calculation Objection Notice shall specify the items in the applicable QAF Calculation disputed by the Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If the Seller fails to deliver a QAF Calculation Objection Notice to the Company prior to the expiration of the Review Period, then the QAF Calculation set forth in the QAF Calculation Statement shall be final and binding on the Seller and the Company. If the Seller timely delivers a QAF Calculation Objection Notice, the Seller and the Company shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the Qualifying QAF Payment and the QAF Payment with respect to the applicable Calculation Period. If the Seller and the Company are unable to reach written agreement within 30 calendar days after such a QAF Calculation Objection Notice has been received by the Trustee, on behalf of the Trust, and the Company, all unresolved disputed items shall be promptly referred to an impartial nationally recognized firm of independent certified public accountants appointed by mutual, written agreement of the Seller and the Company (the "**Independent Accountant**"). The Independent

Accountant shall be directed to render a written report on the unresolved disputed items with respect to the applicable QAF Calculation as promptly as practicable, but in no event greater than 90 calendar days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the QAF Calculation Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, the Seller and the Company shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Seller and the Company, and not by independent review. The resolution of the dispute and the calculation of Qualifying QAF Payment that is the subject of the applicable QAF Calculation Objection Notice by the Independent Accountant shall be final and binding on the Seller. The fees and expenses of the Independent Accountant shall be borne by the Seller and the Company in proportion to the amounts by which their respective calculations of QAF Payments differ from QAF Payments as finally determined by the Independent Accountant.

(c) Independence of QAF Payments. The obligation of the Company to pay each of the QAF Payments to the Seller in accordance with Section 2.5(a) is an independent obligation of the Company and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent QAF Payment and the obligation to pay a QAF Payment to the Seller shall not obligate the Company to pay any preceding or subsequent QAF Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the QAF Payment with respect to the first Calculation Period are not satisfied, but the conditions precedent to the payment of the QAF Payment with respect to the second Calculation Period are satisfied, then the Company would be obligated to pay such QAF Payment with respect to the second Calculation Period for which the corresponding conditions precedent have been satisfied, and not the QAF with respect to the first Calculation Period.

(d) Timing of Payment of QAF Payments. Subject to Section 2.5(f), any QAF Payment that the Company is required to pay pursuant to Section 2.5(a) hereof shall be paid in full no later than 30 calendar days following the date upon which the determination of Qualifying QAF Payments with respect to the applicable Calculation Period becomes final and binding upon the parties as provided in Section 2.5(b)(ii) (including any final resolution of any dispute raised by the Seller in a QAF Calculation Objection Notice). The Company shall pay to the Seller the applicable QAF Payment in cash by wire transfer of immediately available funds to the bank account designed in writing by the Seller. Notwithstanding the preceding, if at any point such amounts that may be owed by the Company or its Subsidiaries as amounts paid into the QAF Program in order to receive the amounts provided for under the QAF Program become due after the date on which a QAF Payment would be calculated as payable under this Section 2.5, the parties shall negotiate in good faith to identify a payment date that allows the Company to properly calculate the owed Qualifying QAF Payment amount (less any payments to be made by the Company) .

(e) Post-Closing Operation of the Company. The Company shall not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing any of the QAF Payments hereunder. Notwithstanding the foregoing, but subject to Section

6.2(c), the Company has no obligation to operate the Company in order to achieve any Qualifying QAF Payment or to maximize the amount of any QAF Payment.

(f) Right of Set Off. The Company shall have the right to withhold and set off against any amount otherwise due to be paid pursuant to this Section 2.5 the amount of any Damages to which it may be entitled under ARTICLE VII of this Agreement or any other Transaction Document from the Seller.

(g) No Security. The parties hereto understand and agree that (i) the contingent rights to receive any QAF Payment shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of Laws relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in the Company, (ii) the Seller shall not have any rights as a securityholder of the Company as a result of Seller's contingent right to receive any QAF Payment hereunder, and (iii) no interest is payable with respect to any QAF Payment.

(h) Subordination of Obligations. Each of the parties hereto acknowledges and agrees that each of the obligations of the Company under this Section 2.5 is subject to the terms of the subordination agreement dated as of August 28, 2015 among Wilmington Trust, National Association, as Term Administrative Agent, MidCap Funding IV Trust, as Revolver Administrative Agent (each on behalf of certain lender parties) and the Subordinated Creditors named therein; provided, that such obligations shall not be subordinated to the Company's obligations under any amendments to or refinancings or restatements of that certain credit agreement dated as of August 28, 2015 among the Company and KPC Healthcare, Inc., as borrowers, Credit Suisse Park View BDC, Inc., as sole bookrunner, sole lead arranger and arranger agents, the Lenders (as therein defined) and the other parties thereto to the extent that there is an increase in the principal amount of obligations thereunder.

(i) Seller's Right to Transfer QAF Payments. Notwithstanding anything in this Agreement to the contrary, the Seller and any Permitted Transferee shall be entitled to transfer its legal right to receive QAF Payments to a Permitted Transferee (as such term is defined in the Investor Rights Agreement) upon 10 calendar days' prior written notice to the Company; provided, however, that any such Permitted Transferee must acknowledge in writing that it holds no greater rights under this Section 2.5 than the transferor of such rights. The rights under this Section 2.5 shall be transferable separate and apart of any and all other rights under this Agreement.

(j) Acknowledgement. The parties acknowledge and agree that any QAF Payment made under this Section 2.5 shall be treated as additional consideration paid in consideration of the Existing Warrant for Federal and state income tax purposes.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES.

Section 3.1. General Statement. The parties make the representations and warranties to each other which are set forth in this ARTICLE III. All representations and warranties are made subject to the exceptions noted in the schedule attached to this Agreement (the "**Disclosure**

**Schedule**"), and are made as of the Closing Date, and shall survive the Closing for the periods described in Section 7.5. The Disclosure Schedule shall be arranged in paragraphs corresponding to the lettered and the numbered paragraphs contained in this ARTICLE III to which the exception applies, and no disclosure shall be deemed to apply with respect to any other paragraph to which it does not expressly apply. The Disclosure Schedule shall in all respects constitute a part of the representations and warranties of the Seller, the Company and the Trustee, and are expressly made a part of this Agreement.

Section 3.2. Representations and Warranties of the Seller. The Seller represents and warrants to the Company, as of the Closing Date, as follows:

(a) Capacity. The Seller has full power, right and authority to enter into and perform this Agreement and to sell, transfer, and deliver good, valid, and marketable title to the Existing Warrant free and clear of any and all Liens or rights of third parties whatsoever in accordance with the terms of this Agreement.

(b) Enforceability. This Agreement has been duly executed and delivered by the Seller and constitutes the Seller's legal, valid, and binding obligation, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(c) Notices and Consents. The Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any court, government, or governmental agency, or third person in order to consummate the transactions contemplated by this Agreement.

(d) No Conflicts. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate any Laws to which the Seller is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which the Seller is bound or to which any of the Existing Warrant is subject or result in the imposition of any security interest upon the Existing Warrant.

(e) Ownership of Existing Warrant. The Seller is the record owner of the Existing Warrant free and clear of any restrictions on transfer and have complied with all securities laws, taxes, security interests, options, warrants, purchase rights, contracts, commitments, equities, Liens or other restrictions whatsoever in law or in equity. Except as set forth on the Disclosure Schedule, the Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, pledge or otherwise dispose of the Existing Warrant or any other capital stock of the Company. Except as set forth on the Disclosure Schedule, as of the Closing Date, (i) there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue or to sell any of the capital stock of the Company, (ii) there are no outstanding or authorized stock appreciation,

phantom stock, profit participation, or similar rights with respect to the Company, and (iii) there are no voting trusts, proxies or other agreements or understandings with respect to the voting of the capital stock of the Company.

(f) Title. Upon consummation of the transactions contemplated by this Agreement and in accordance with the terms hereof, the Company will acquire marketable title to the Existing Warrant free and clear of all Liens or rights of third parties whatsoever.

(g) No Commission. The Seller has no liability to any broker, finder, investment bank, financial advisor, accountant, lawyer, or other similar person arising from or related to the transactions contemplated by this Agreement for which the Seller could be or become liable or obligated.

(h) Community Property. The Existing Warrant which is owned as community property with the Seller's spouse, and the sale of such Existing Warrant under this Agreement includes the Seller's interest and the community property interest of the Seller's spouse.

(i) Litigation. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

(j) Reserved.

(k) Representations and Warranties of the Company. Each of the representations and warranties made by the Company in Section 3.3 of the Stock Purchase Agreement, including any and all qualifications to such representations and warranties, are hereby incorporated into this Agreement by this reference. As an inducement to the Company to enter into and perform its obligations under the terms of this Agreement and the Stock Purchase Agreement, the Seller represents and warrants to the Company, as of the Closing Date, that each of the representations and warranties made by the Company in Section 3.3 of the Stock Purchase Agreement are true and complete in all respects, subject to any and all qualifications of such representations and warranties expressly made within the Stock Purchase Agreement, including, without limitation, the survival period for each representation and warranty as specified in Section 7.6 of the Stock Purchase Agreement and any disclosures set forth on the disclosure schedule to the Stock Purchase Agreement.

(l) <u>No Other Representations or Warranties; Non-Reliance</u>. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THE TRANSACTION DOCUMENTS, NEITHER THE SELLER NOR ANY OF HIS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO

ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE SELLER, OR ANY OF HIS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

Section 3.3. Representations and Warranties of the Company. The Company represents and warrants to the Seller, as of the Closing Date, as follows.

(a) Organization; Authority. The Company (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of California, (ii) has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Company is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(b) Enforceability. The execution and delivery by the Company of this Agreement and any other Transaction Document to which Company is a party, the performance by the Company of its obligations hereunder and thereunder and the consummation by Company of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Company. This Agreement has been duly executed and delivered by Company, and (assuming due authorization, execution and delivery by the Seller) this Agreement constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(c) No Conflicts; Consents. The execution, delivery and performance by Company of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (i) conflict with or result in a violation or breach of, or default under, any provision of the Articles of Incorporation or Bylaws of the Company; (ii) conflict with or result in a violation or breach of any provision of any Law or order applicable to Company; or (iii) except as set forth on the Disclosure Schedule, require the consent, notice or other action by any Person under any material contract to which Company is a party that will not be cured within ninety (90) calendar days following the Closing Date. Except as set forth on the Disclosure Schedule, no consent, approval, permit, order, declaration or filing with, or notice to, any Governmental Entity is required by or with respect to the Company in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

(d) Litigation. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Company, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Company does not know of any reason for, nor have any reason to be aware of, any basis for the same.

(e) Sufficiency of Funds. The Company has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

(a) No Other Representations or Warranties; Non-Reliance. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN THIS SECTION 3.3 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN THE TRANSACTION DOCUMENTS, NEITHER THE COMPANY NOR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE COMPANY, OR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 3.3 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

## ARTICLE IV.
## CONDITIONS PRECEDENT.

Section 4.1. Conditions Precedent to the Obligations of the Seller. The obligation of the Seller to effect the transactions contemplated under this Agreement is subject to the satisfaction or the fulfillment of all of the following conditions precedent on or prior to the Closing Date:

(a) Each representation and warranty made by the Company in this Agreement and the Transaction Documents to which the Seller is a party shall be true and correct on the Closing Date;

(b) All obligations of the Company to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Company would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(c) No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(d) No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or

restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement.

(e) Reserved;

(f) The Seller shall have received each of the deliveries identified in Section 5.3 of this Agreement in form and substance reasonably satisfactory to the Seller.

Section 4.2. Conditions Precedent to the Obligations of the Company

. The obligation of the Company to effect the transactions contemplated under this Agreement is subject to the satisfaction or the fulfillment of all of the following conditions precedent on or prior to the Closing Date:

(a) Each representation and warranty made by the Seller in this Agreement and the Transaction Documents to which each the Seller is a party shall be true and correct on the Closing Date;

(b) All obligations of each Seller to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which such Seller would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(c) No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(d) No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement;

(e) Reserved;

(f) The Company shall have received each of the deliveries identified in Section 5.2 of this Agreement in form and substance reasonably satisfactory to the Company and its legal counsel.

## ARTICLE V.
## CLOSING DELIVERIES.

Section 5.1. Form of Documents. At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this ARTICLE V. All documents to

be delivered shall be in form and substance reasonably satisfactory to the party to whom the documents are to be delivered and its legal counsel (if any).

Section 5.2. Deliveries of the Sellers. On the Closing Date, the Seller shall execute and deliver to the Company all of the following:

(a) A copy of this Agreement, duly executed by the Seller;

(b) Copies of each of the Transaction Documents to which the Seller is a party, duly executed by the Seller or its authorized agent;

(c) Any and all consents and approvals required by the Seller in order for the Seller to transfer the Existing Warrant to the Company and to consummate the transactions contemplated by this Agreement;

(d) An executed instrument of assignment pursuant to which the Seller shall sell, assign and transfer to the Company all of its rights, title and interest to and in the Existing Warrant of which the Seller is the record owner;

(e) Any other instruments that the Company may reasonably deem necessary or desirable to affect or evidence the transactions contemplated by this Agreement.

Section 5.3. Deliveries of the Company. On the Closing Date, the Company shall execute and deliver to each Seller all of the following:

(a) A copy of this Agreement, duly executed by an authorized officer of the Company;

(b) Copies of the Transaction Documents to which the Company is a party, duly executed by an authorized agent of the Company;

(c) Reserved; and

(d) Any other instruments that a Seller may reasonably deem necessary or desirable to affect or evidence the transactions contemplated by this Agreement.

**ARTICLE VI.**
**COVENANTS.**

Section 6.1. Covenants of the Seller. As additional and material consideration to the Company to enter into this Agreement and consummate the transactions contemplated by this Agreement, Mr. Thomas covenants and agrees as follows:

(a) Non-Competition.

(i) During the Restricted Period, the Restricted Parties shall not (either on his, her or its own behalf or on behalf of any other Person), without the prior, written consent of the Company, directly or indirectly, personally or through others (whether as a sole proprietor,

owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, representative, agent, consultant, contractor, or any other capacity) operate any acute care hospital located in the Market Area.

(ii) The Restricted Parties hereby acknowledge that (A) the foregoing covenant is unique, substantial, and of immeasurable value to the Company; and (B) such covenant is reasonably limited in scope and/or geography to protect the Company's legitimate business interests, including its property, and Business relationships, goodwill and economic advantage.

(iii) The parties have attempted by this Section 6.1(a) to limit the ability to compete to the fullest extent possible to protect the Company's legitimate business interests and to protect the Company from unfair business practices and/or unfair competition, including loss of goodwill. Consequently, the parties agree that, if the foregoing covenant is in any way adjudged by a court of competent jurisdiction to be invalid or unenforceable, as to scope, territory or otherwise, a court or other trier of fact may modify and enforce the covenant to the extent that it believes to be reasonable and fair under the circumstances existing at that time, and as necessary to protect the Company's legitimate business interests.

(iv) Nothing herein shall prohibit a Restricted Party from purchasing or owning less than five percent (5%) of the securities of any publicly-traded corporation, provided that such ownership represents a passive investment and that the Restricted Party is not a controlling person of, or a member of a group that controls, such corporation.

(b) Non-Solicitation of Employees. During the Restricted Period, except as otherwise provided herein, the Restricted Parties shall not, without the prior, written consent of the Company, which shall not be unreasonably withheld (taking into account the desires of employees for geographic relocation) directly or indirectly solicit for employment, offer to hire, or hire any individual who is then an employee of the Company, or who has terminated such employment within one (1) year of such solicitation or offer. The foregoing restriction in this Section 6.1(b) shall not apply to: (i) individuals responding to general solicitations (such as advertising) not specifically targeted as employees of the Company or any of its Affiliates; (ii) individual not solicited for employment by a Restricted Party who have voluntarily expressed a desire for geographic relocation for personal reasons; (ii) individuals who are hired for a position by the Management Company, and (iv) such other individuals who the Trustee and the Company may agree from time to time.

(c) Reserved.

(d) Non-Disclosure of Confidential Information and Trade Secrets of the Company.

(i) The Restricted Parties understand and agree that the Confidential Information and each of the Company's trade secrets constitute valuable assets and may not be converted to any Restricted Party's own use on or after the Closing Date. Accordingly, each Restricted Party hereby agrees that he, she or it shall not, directly or indirectly, except as otherwise provide herein, reveal, divulge, or disclose to any Person not expressly authorized in

writing by the Company any Confidential Information, and he, she or it shall not, directly or indirectly, at any time, use or make use of any Confidential Information in connection with any business activity, except that a Restricted Party may disclose the Confidential Information or portions thereof to those of its directors, officers, employees, advisors, attorneys accountants, consultants, agents, representatives or Affiliates (A) who are informed by such Restricted Party of the confidential nature of the Confidential Information and (B) who agree to comply with the confidentiality term of this Agreement (collectively, the "**Representatives**") and, in any event, such Restricted Party shall be responsible for any disclosure of Confidential Information by its Representatives that would constitute a breach of this Agreement. Throughout the period during which any information remains a trade secret of the Company under applicable law, the Restricted Parties shall not, directly or indirectly, transmit or disclose any such trade secret to any Person, and shall not make use of any such trade secret, directly or indirectly, for himself, herself, itself or for others, without the prior, written consent of the Company. Each party acknowledges and agrees that this Agreement is not intended to, and does not, alter either the Company's rights or the Restricted Parties' obligations under any State or federal statutory or common law regarding trade secrets and unfair trade practices.

(ii) Anything herein to the contrary notwithstanding, the Restricted Parties shall not be restricted from disclosing or using Confidential Information or any trade secret of the Company (A) that is required to be disclosed by Law; provided, however, that in the event disclosure is required by law, the disclosing Restricted Party shall provide the Company with prompt written notice of such requirement so that the Company may seek an appropriate protective order prior to any such required disclosure by such Restricted Party, (B) to the extent reasonably necessary for the Management Company to perform under the Management Services Agreement, and (C) to their respective directors, officers, employees, managers, agents, attorneys and advisors in connection with the Management Company's performance under the Management Services Agreement, provided that such individuals are bound by confidentiality obligations applicable to such Confidential Information and trade secrets. Notwithstanding anything in this Agreement to the contrary, the Restricted Parties may disclose the fact that the Management Company provides management services to the Company.

(iii) The Restricted Parties acknowledge that any and all Confidential Information will be, as of the Closing Date, the exclusive property of the Company and agree to deliver to the Company, at any time the Company may request, any and all Confidential Information which they may then possess or have under their control in whatever form the same may exist, including hard copy files, soft copy files, computer disks, and all copies thereof.

Section 6.2. Covenants of the Company.

(a) Maintenance of the ESOP's Tax Qualified Status. The Company covenants and agrees to take any action as may be necessary to maintain the tax-qualified status of the Plan and the tax-exempt status of the Trust under ERISA and the Code and will timely submit the Plan and Trust to the Internal Revenue Service requesting a favorable determination letter stating that the Plan constitutes a qualified plan under Section 401(a) of the Code, the Trust is an exempt trust under Section 501(a) of the Code and the Plan is a qualified employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and the Company will make such amendments to the Plan as may be required as a condition of the issuance of a

favorable determination letter. The Company shall take any action as may be necessary to maintain the tax-qualified status of the Plan, to make sure that the Plan at all times satisfies the requirements of Code section 4975(e)(7), and to maintain the tax-exempt status of the Trust under ERISA and the Code. Notwithstanding the foregoing, the Company may terminate the Plan in its sole discretion at any time.

(b) Subchapter S Elections. The Company covenants and agrees to make and maintain (i) a valid election under Section 1362(a) of the Code to be taxable under Subchapter S of Chapter 1 of the Code effective September 1, 2015 and (ii) a valid election under Section 1361(b)(3)(B)(ii) of the Code to treat KPC Healthcare, Inc. as a qualified subchapter S subsidiary effective September 1, 2015. The Company covenants and agrees to (I) promptly notify the Seller in writing of any tax audit, investigation, examination, request for information or other proceeding relating to, or that may affect (1) the Company's election under section 1362(a) of the Code to be taxable under Subchapter S of Chapter 1 of the Code or, otherwise, the Company's qualification as an S corporation within the meaning of Section 1361 of the Code or (2) KPC Healthcare, Inc.'s qualification as a qualified subchapter S subsidiary within the meaning of Section 1361 of the Code, in each case for any taxable period, or portion thereof, during which the Seller owned the Thomas Warrant or any share of the Common Stock of the Company, and (II) explain the general nature of such audit, investigation, examination, request for information or other proceeding. Such notification shall be in addition to the requirements of Section 6.2(d) and ARTICLE VII regarding the provision of notice of governmental audits or claims as therein described respectively..

(c) QAF Program. The Company shall take such actions and make such payments on a timely basis as may be required from time to time to maintain the Company in good standing and eligible to receive the maximum amount of reimbursement under the QAF Program; provided, however, that, subject to applicable law, the Company shall not be obligated to take action and make payments required to maintain the Company in good standing and eligible to receive the maximum amount of reimbursement under the QAF Program if the economic benefits of participating in the QAF Program do not equal or exceed the economic costs participating in the QAF Program as determined by the Board of Directors.

(d) Company Notification of Governmental Audit. The Company covenants and agrees to timely notify the Sellers in writing of any governmental or other third party audit, investigation, or request for information (other than routine claims for benefits by participants under the Plan) relating to the Plan, the transactions herein described and explain the general nature of such audit, investigation or claim for information. Such notification shall be in addition to the requirements of ARTICLE VII regarding the provision of the notice of claims as therein described.

(e) Recovery Under Insurance. The Company covenants and agrees that, with respect to any matter for which indemnification would otherwise be provided to the Trust pursuant to ARTICLE VII, it shall use commercially reasonable efforts to collect amounts payable to the Company under any applicable insurance policy of the Company, and to the extent any such amounts are collected there will be no Damages suffered by the Trust, as the case may be.

(f) Corporate Governance. The Company shall conduct all annual, regular and special meetings of its shareholder(s), Board of Directors and committees in accordance with the Bylaws, including providing timely notice of all annual, and special meetings of the shareholder(s).

(g) Post-Closing Approvals, Authorizations and Consents. Within ninety (90) calendar days of the Closing Date, the Company shall deliver to each Seller all permits, approvals, authorizations and consents of third parties necessary for the consummation of the transactions contemplated in this Agreement.

(h) QAF Payment Transfer Restriction. The Company covenants and agrees not to sell, assign, transfer, pledge, encumber or otherwise alienate, hypothecate or dispose of its or its Subsidiaries' legal rights to Qualifying QAF Payments under the QAF Program.

(i) Restriction on Payment of Dividends and Distributions. The Company covenants and agrees not to declare and pay dividends or distributions, as the case may be, on its shares of capital stock; provided, however, that the Company shall be entitled to declare and pay any "applicable dividend," as such term is defined in Section 404(k)(2)(A) of the Code, on its shares of capital stock at any time and from time to time in the discretion of the Company's Board of Directors. In addition, the Company shall be entitled to declare and pay distributions which, if declared and paid by a corporation taxable under Subchapter C of the Code, would constitute an "applicable dividend" on its shares of capital stock at any time and from time to time in the discretion of the Company's Board of Directors.

(j) QAF Calculations. The Company shall deliver to the Trustee each QAF Calculation Statement prepared and submitted in connection with this Agreement. Such QAF Calculation Statement shall be provided as the same time and in the same form as provided to the Seller.

(k) Tax Treatment. The Company covenants and agrees (i) that for U.S. federal income tax purposes, the purchase of the Existing Warrant from the Seller in exchange for the purchase price set forth in Section 2.2 pursuant to the Warrant Redemption Transaction shall be treated by the Company as an exchange that does not have the effect of, nor is essentially equivalent to, a dividend and (ii) not to take (and cause its Affiliates not to take) any action or fail to take (and cause its Affiliates not to fail to take) any action, which action or failure to take action is inconsistent with the tax treatment described in clause (i) above (including, without limitation) in taking any position on an applicable tax return), unless and to the extent otherwise required by a determination (within the meaning of Section 1313(a) of the Code (or any corresponding or similar provision of state or local tax Laws).

## ARTICLE VII.
## INDEMNIFICATION.

Section 7.1. General Statement. From and after the Closing Date, the parties shall indemnify each other as provided in this ARTICLE VII.

Section 7.2. Indemnification Obligations of the Seller. The Seller severally (and not jointly and severally) shall defend, indemnify, save and keep harmless the Company, and its past, present and future shareholders, directors, officers, employees, and agents and their respective Affiliates and representatives, and their successors and permitted assigns (collectively, the "**Company Indemnified Parties**") against and from all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (a) any inaccuracy in or breach of any representation and warranty made by the Seller in Section 3.2 of this Agreement (except Section 3.2(l), which is addressed separately in this Section 7.2(a), or the Transaction Documents to which the Seller is a party, (ii) any breach or failure by the Seller to comply with any of the covenants or obligations to be performed by the Seller pursuant to this Agreement, (including, without limitation, the Seller's obligations under this ARTICLE VII), or the Transaction Documents to which the Seller is a party, and (iii) any Third-Party Claim resulting from or arising out of or by virtue of the foregoing. In addition, the Seller severally (and not jointly and severally) shall defend, indemnify, save and keep harmless the Company Indemnified Parties against and from 2.5% of all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (i) any inaccuracy in or breach of the representation and warranty made in Section 3.2(l) and (ii) any Third-Party Claim resulting from or arising out of or by virtue of the foregoing.

Section 7.3. Indemnification Obligations of the Company. The Company shall indemnify, save and keep harmless the Seller, and his Affiliates and representatives, and their respective successors and permitted assigns (collectively, the "**Seller Indemnified Parties**") against and from all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (a) any inaccuracy in or breach of any representation and warranty made by the Company set forth in Section 3.3 of this Agreement, or any certificate to be delivered by the Company pursuant to this Agreement, or the Transaction Documents to which the Company is a party, and (b) any breach by the Company, or failure of the Company to comply with, any of its covenants or obligations under this Agreement (including, without limitation, its obligations under this ARTICLE VII), or the Transaction Documents to which the Company is a party, and (c) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing.

Section 7.4. Claims. The parties intend that all indemnification claims be made as promptly as practicable by the indemnified party. Whenever any claim shall arise for indemnification hereunder, the indemnified party shall promptly notify the indemnifying party of the claim and, when known, the facts constituting the basis for such claim. With respect to claims made by third parties, the indemnifying party shall be entitled to assume control of the defense of such action or claim with counsel satisfactory to the indemnified party; provided, however, that: (a) the indemnified party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; (b) the indemnifying party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to the indemnified party a release from all liability in respect of such claim if, pursuant to or as a result of such consent or settlement, injunctive or other equitable relief would be imposed against the indemnified party or such judgment or settlement could materially interfere with the business, operations or assets of the indemnified party; and (c) if the indemnifying party does not assume control of the defense of such claim in accordance with the foregoing provisions within

fifteen (15) days after receipt of notice of the claim, the indemnified party shall have the right to defend such claim in good faith in such manner as it may deem appropriate at the cost and expense of the indemnifying party, and the indemnifying party will promptly reimburse the indemnified party for such cost and expense.

Section 7.5. Limitation on Rights to Indemnification. The obligations to indemnify pursuant to this ARTICLE VII are subject to the following limitations:

(a) Survival.

(i) Each representation and warranty set forth in Section 3.2(a) (Capacity), Section 3.2(b) (Enforceability), Section 3.2(c) (Notices and Consents), Section 3.2(d) (No Conflicts), Section 3.2(e) (Ownership of Existing Warrant), and **Error! Reference source not found.** (Title) (each a "**Seller Fundamental Representation and Warranty**"); each representation and warranty set forth in Section 3.3(a) (Organization), Section 3.3(b) (Enforceability), and Section 3.3(c) (No Conflicts; Consents), (each a "**Company Fundamental Representation and Warranty**"); and any statutory or common law claims for fraud shall survive Closing and continue forever.

(ii) Each specific representation and warranty incorporated by reference in Section 3.2(k) (Representations and Warranties of the Company), shall survive Closing and will expire and be of no further force and effect upon the time specified in Section 7.6(a) of the Stock Purchase Agreement for that specific representation and warranty.

(iii) Each other representation and warranty made under this Agreement shall survive Closing and will expire and be of no further force and effect upon the later of (A) the twenty-four month anniversary of the Closing Date, and (B) thirty (30) calendar days following the delivery by the Company to the Trustee of the audited financial statements for fiscal year ended 2017.

(iv) Each covenant set forth in this Agreement will survive until it is fully performed, unless a shorter period of survival is specifically set forth in this Agreement.

(v) Any claim for indemnification based on a breach of any representation, warranty, or covenant must be made prior to the expiration of any such representation, warranty, or covenant and any claim not made within such period shall be of no force or effect.

(b) Deductible. No indemnifying party shall be liable to an indemnified party for indemnification until the aggregate amount of all Damages in respect of indemnification of such indemnified party hereunder exceeds Two Million and 00/100 Dollars ($2,000,000), in which event the indemnifying party shall be required to pay or be liable for all such Damages, but only to the extent such Damages exceed the Deductible. This Section 7.5(b) shall not apply to the indemnification obligations of the Seller for any inaccuracy in or breach of any Seller Fundamental Representation and Warranty, to the indemnification obligations of the Company for any inaccuracy in or breach of any Company Fundamental Representation and Warranty or the indemnification obligations of an indemnifying party to an indemnified party for any

statutory or common law claims for fraud, which shall be unlimited. This Section 7.6(b) shall not apply to (i) the indemnification obligations of the Seller for any inaccuracy in or breach of a representation and warranty incorporated by reference in Section 3.2(k) (Representations and Warranties of the Company) and constituting a "Company Fundamental Representation and Warranty" under the terms of the Stock Purchase Agreement, and (ii) the indemnification obligations of the Seller for any inaccuracy in or breach of the representation and warranty made by the Company in Section 3.3(o) (Licensed and Permits) of the Stock Purchase Agreement, which shall be unlimited, subject to Section 7.5(c)

(c) Indemnification Cap. The aggregate amount of all Damages for which an Indemnifying Party shall be liable with respect to any single Indemnified Party shall not exceed [REDACTED] (the "**Indemnification Cap**"); provided, however, that the indemnification obligations of the Seller for any inaccuracy in or breach of any Seller Fundamental Representation and Warranty and the indemnification obligations of the Company for any inaccuracy in or breach of any Company Fundamental Representation and Warranty shall not exceed the sum of (i) the cash consideration portion of the Purchase Price, plus (ii) the original principal balance of the Thomas Subordinated Promissory Note. The indemnification obligations of an indemnifying party to an indemnified party for any statutory or common law claims for fraud shall be unlimited. The indemnification obligations of the Seller for any inaccuracy in or breach of any "Company Fundamental Representation and Warranty" under the terms of the Stock Purchase Agreement and incorporated by reference in Section 3.2(k) (Representations and Warranties of the Company), and the indemnification obligations of the Seller for any inaccuracy in or breach of the representation and warranty made by the Company in Section 3.3(o) (Licenses and Permits) of the Stock Purchase Agreement, shall not exceed the sum of (i) the cash consideration portion of the Purchase Price, plus (ii) the original principal amount of the Thomas Subordinated Promissory Note.

(d) Notice. The indemnification obligation of an indemnifying party in this ARTICLE VII shall not be affected by the failure of the indemnified party to give notice in accordance herewith unless the indemnifying party is materially prejudiced thereby; provided however, that the amount that the indemnifying party's liability shall be reduced or limited by is the extent of any actual prejudice; and further provided, that in no event will a notice of a claim of indemnification delivered after the termination, expiration or satisfaction of the representation, warranty or covenant on which such claim is based be effective for any purpose under this ARTICLE VII.

(e) Insurance Proceeds. Any payment made by the indemnifying party to an indemnified party pursuant to this ARTICLE VII in respect of any indemnifiable event shall be net of any insurance proceeds realized by and paid to such indemnified party in respect of such indemnifiable event. Such indemnified party shall use reasonable commercial efforts to make insurance claims relating to any indemnifiable event for which it is seeking indemnification pursuant to this ARTICLE VII; provided that such indemnified party shall not be obligated to make such an insurance claim if such indemnified party in its reasonable judgment believes the cost of pursuing such an insurance claim together with any corresponding increase in insurance premiums or other chargebacks to such indemnified party, as the case may be, would exceed the value of the claim for which such indemnified party is seeking indemnification. In the event that an insurance recovery is made by a indemnified party with respect to any Damages for which a

indemnified party has previously been indemnified hereunder, then such indemnified party shall promptly make a refund to the payor(s) under this ARTICLE VII in an amount equal to the lesser of (i) the amount of such insurance recovery (net of collection expenses) and (ii) the amount previously paid by the payor(s) under this ARTICLE VII as indemnification for such Damages.

(f) Mitigation of Damages. In the event that any indemnified party fails to use its commercially reasonable efforts to mitigate any Damages to the extent required hereunder or by applicable Laws, then notwithstanding anything else to the contrary contained herein, the indemnifying party shall not be required to indemnify the indemnified party for any Damages that could reasonably be expected to have been avoided or reduced if the indemnified party had made such commercially reasonable efforts.

Section 7.6. Procedures.

(a) If a party hereto seeks indemnification under this ARTICLE VII, such party (the "**Indemnified Party**") shall promptly give written notice to the other party (the "**Indemnifying Party**") after receiving written notice of any action, lawsuit, proceeding, investigation (including the commencement of a tax audit or examination) or other claim against it (if by a third party) or discovering the liability, obligation, or facts giving rise to such claim for indemnification, describing the claim, the amount thereof (if known and quantifiable), and the basis thereof; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have prejudiced the Indemnifying Party. In that regard, if any action, lawsuit, proceeding, investigation (including the commencement of a tax audit or examination), or other claim shall be brought or asserted by any third party which, if adversely determined, would entitle the Indemnified Party to indemnity pursuant to this ARTICLE VII, the Indemnified Party shall promptly notify the Indemnifying Party of the same in writing, specifying in detail the basis of such claim and the facts pertaining thereto and the Indemnifying Party shall be entitled to participate in the defense of such action, lawsuit, proceeding, investigation, or other claim giving rise to the Indemnified Party's claim for indemnification at its expense, and at its option (subject to the limitations set forth below) shall be entitled at any time to elect to control and appoint lead counsel of such defense with reputable counsel reasonably acceptable to the Indemnified Party; provided that, as a condition precedent to the Indemnifying Party's right to assume control of such defense, it must first agree in writing to be fully responsible for all Damages relating to such claims and to provide full indemnification to the Indemnified Party for all Damages relating to such claim; and provided further that the Indemnifying Party shall not have the right to assume control of such defense, and, if the claim is one for which indemnification is due under this Agreement, shall pay the reasonable fees and expenses of reputable counsel retained by the Indemnified Party and reasonably acceptable to the Indemnifying Party, if the claim which the Indemnifying Party seeks to assume control (i) seeks non-monetary relief, provided that the Indemnified Party has determined in good faith that the grant of such non-monetary relief would be reasonably likely to have a significant adverse effect on the Indemnified Party, (ii) involves criminal allegations against an Indemnified Party, or (iii) involves a claim which, upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to vigorously prosecute or defend; provided further that the Indemnifying Party shall have one (1) opportunity to elect to assume control of the defense of any such action, lawsuit,

proceeding or investigation within thirty (30) days following its receipt of notice from the Indemnified Party.

(b) If the Indemnifying Party is permitted to assume and control the defense and elects to do so, the Indemnified Party shall have the right to employ counsel separate from counsel employed by the Indemnifying Party in any such action and to participate in (but not control) the defense thereof, but the fees and expenses of such counsel employed by the Indemnified Party shall be at the expense of the Indemnifying Party.

(c) If the Indemnifying Party shall control the defense of any such claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim or ceasing to defend such claim, if pursuant to or as a result of such settlement or cessation, injunction, or other equitable relief will be imposed against the Indemnified Party or if such settlement does not expressly unconditionally release the Indemnified Party from all liabilities and obligations with respect to such claim. If, in accordance with the provisions of Section 7.6(a), the Indemnified Party shall control the defense of any such claim, the Indemnified Party shall obtain the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim that would result in monetary or similar damages for which the Indemnified Party would be entitled to indemnification hereunder.

(d) If the Seller is the Indemnifying Party and is permitted to assume and control the defense and elects to do so, then the Seller may reasonably cooperate with Dr. Kali P. Chaudhuri and SPCP Group, LLC, a Delaware limited liability company, in assuming and controlling the defense; provided that nothing in this Section 7.6(d) shall obligate the Indemnifying Party to so reasonably cooperate, and nothing in this Section 7.6(d) shall obligate Dr. Chaudhuri and SPCP Group, LLC to so reasonably cooperate.

Section 7.7. Assignment of Claims. If the Indemnified Party receives any payment from any Indemnifying Party in respect of any Damages pursuant to this ARTICLE VII and the Indemnified Party could have recovered all or a part of such Damages from a third party (the "**Potential Contributor**") based on the underlying claim asserted against the Indemnifying Party, the Indemnified Party shall assign, on a non-recourse basis and without any representation or warranty, such of its rights to proceed against the Potential Contributor as are necessary to permit the Indemnifying Party to recover from the Potential Contributor the amount of such payment. Any payment received in respect of such claim shall be distributed, (a) first to the Indemnified Party in the amount of any deductible or similar amount required to be paid by the Indemnified Party prior to the Indemnifying Party being required to make any payment to the Indemnified Party, (b) second to such Indemnifying Part(ies) in an amount equal to the aggregate payments made to the Indemnified Party, in respect of such claim, plus costs and expenses incurred in investigating, defending or otherwise incurred in connection with addressing such claim and (c) the balance, if any, to the Indemnified Party.

Section 7.8. Materiality. For purposes of calculating Damages hereunder, any Material Adverse Effect qualification in such representations and warranties (including those incorporated

by reference) shall be disregarded to the extent the application of all Material Adverse Effect qualifications exceed One Million and 00/100 Dollars ($1,000,000).

Section 7.9. Sole Remedies; Right of Setoff.

(a) Except for statutory and common law claims for fraud which shall not be subject to any of the provisions of this ARTICLE VII, and except as set forth in Section 7.10, this ARTICLE VII shall be the sole and exclusive remedy for (i) any inaccuracy in or breach of any representation and warranty under this Agreement, or the Transaction Documents and (ii) any breach or failure by a party to comply with any of the covenants or obligations to be performed by the party pursuant to this Agreement, (including, without limitation, the party's obligations under this ARTICLE VII), or the Transaction Documents and (iii) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing.

(b) Should the Trustee, acting on behalf of the Trust, exercise its right of setoff under Section 7.10(b) of the Stock Purchase Agreement, the Company shall automatically setoff an amount equal to the product of one hundred percent (100%) of such amount setoff under Section 7.10(b) of the Stock Purchase Agreement multiplied by 2.5% against the Company's obligations to the Seller (and his respective successor transferees) under the Thomas Subordinated Promissory Note. Any setoff permitted hereunder with respect to the Thomas Subordinated Promissory Note may be effected (i) upon written agreement between the Seller and the Company; or (ii) once a claim for indemnification under this ARTICLE VII is settled between any Indemnifying Party and the Indemnified Party, as may be finally determined by a court of competent jurisdiction (or other arbitral body). For the avoidance of doubt, the second sentence of Section 7.2(a) shall not limit in any manner the Company's right to automatically setoff an amount equal to the product of one hundred percent (100%) of such amount setoff under Section 7.10(b) of the Stock Purchase Agreement multiplied by 2.5% against the Company's obligations to the Seller (and its successor transferees) under the Thomas Subordinated Promissory Note.

(c) The Company shall be entitled to reduce the remaining principal balance of the Thomas Subordinated Promissory Note in an amount equal to one hundred percent (100%) of any indemnification amount owed to the Company under this ARTICLE VII. Any setoff permitted hereunder may be affected (i) upon written consent of the Company and the Seller, or (ii) once a claim for indemnification under this ARTICLE VII is settled between the Company and the Seller, as may be finally determined by a court of competent jurisdiction (or other arbitral body).

(d) Reserved.

(e) Notwithstanding anything in this Agreement to the contrary, any amounts payable by the Seller to the Company in satisfaction of an indemnification claim shall be satisfied (i) first, by the setoff procedures set forth in Section 7.9(b) and Section 7.9(c), and (ii) second, by any other remedy available to the Company, subject to the limitations in Section 7.5. For the avoidance of doubt and notwithstanding anything to the foregoing, neither the Indemnification Cap nor the Deductible nor any materiality qualifier in this Agreement shall apply to a claim for a breach of a restrictive covenant set forth in Section 6.1 of this Agreement.

Section 7.10. Equitable Remedies. The parties to this Agreement agree that (a) if a Restricted Party breaches or threatens to breach any covenant or threatens not to perform or fails to perform any obligation set forth in Section 6.1, the damage to the Company may be substantial, although difficult to ascertain, and money damages will not afford the Company an adequate remedy, and (b) if the Restricted Party breaches any covenant or fails to perform any obligation set forth in Section 6.1, or threatens a breach or any covenant or threatens not to perform any obligation set forth in Section 6.1, then the Company shall be entitled, in addition to all other rights and remedies as may be provided by law, to seek specific performance and injunctive and other equitable relief to prevent or restrain a breach of any covenant or failure to perform any obligation set forth in Section 6.1.

Section 7.11. Tax Treatment of Indemnification Payments. All indemnification payments made under this ARTICLE VII shall be treated by the parties as an adjustment to the Purchase Price for Federal, state and local tax purposes, unless otherwise required by Law.

## ARTICLE VIII.
## MISCELLANEOUS.

Section 8.1. Expenses. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

Section 8.2. Further Assurances. Each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and each of the other Transaction Documents and give effect to the transactions contemplated hereby.

Section 8.3. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; provided that a copy is also sent by certified or registered mail (in each case, return receipt requested, postage pre-paid). Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.3):

To the Company: KPC Healthcare, Inc.
c/o Strategic Global Management, Inc.
Attention: Chief Executive Officer
6800 Indiana Avenue, Suite 130
Riverside, CA 92506
Facsimile: (951) 782-8812
E-mail: bthomas@globalmso.com

With a copy to: Holzman Horner PLLC
Attention: Michael R. Holzman, Member
1875 Eye Street, N.W., Suite 500
Washington, D.C. 20006
Facsimile: (202) 905-2156
E-mail: mholzman@holzmanhorner.com

With a copy to: Loeb & Loeb LLP
Attention: Allen Z. Sussman, Partner
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
Facsimile: (310) 919-3934
E-mail: asussman@loeb.com

To the Seller: William E. Thomas
2023 Arroyo Drive
Riverside CA 92506
Facsimile: (951) 782-8812
E-mail: bthomas@globalmso.com

Section 8.4. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.5. Entire Agreement. This Agreement, the Transaction Documents, and all related exhibits and schedules constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 8.6. Amendment and Modification. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

Section 8.7. Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 8.8. Cumulative Remedies. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in ARTICLE VII to the contrary.

Section 8.9. Assignment. Neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed. Any purported assignment or delegation in violation of this Section 8.9 shall be null and void. No assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder.

Section 8.10. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and permitted assigns.

Section 8.11. Third-Party Beneficiaries.

(a) This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(b) Notwithstanding the foregoing, the parties designate all non-party Persons eligible for indemnification under ARTICLE VII of this Agreement as express, intended third-party beneficiaries of the indemnification provisions of this Agreement and delegate to such non-party Persons the right to enforce the indemnification provisions of this Agreement.

(c) Notwithstanding the foregoing, the parties designate the Trustee and the Trust as express, intended third-party beneficiaries of Section 6.2(j) of this Agreement and delegate such non-parties the right to enforce Section 6.2(j) of this Agreement.

Section 8.12. Counterparts; Electronic Signatures.

(a) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail of a PDF document shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(b) Each party hereto agrees that the electronic signatures, whether digital or encrypted, of the undersigned included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or e-mail electronic signatures.

Section 8.13. Relationship of the Parties. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. Neither party hereto shall have any express or implied right or authority to assume or create any

obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

Section 8.14. Representations as to Compliance with Law. Whenever a representation or warranty is made in this Agreement with respect to compliance with any law, that representation means the applicable subject matter is in compliance with applicable statutes, regulations, and ordinances as in existence on the date hereof and on the Closing Date and does not extend to any amendments or revisions of such laws adopted subsequent to such dates.

Section 8.15. Representation by Independent Counsel. Each party acknowledges and represents that such party (a) has either (i) been represented by counsel of such party's own choosing, or (ii) has been advised to seek, and offered the opportunity to obtain, counsel of such party's choosing, and has elected not to so obtain the services of an attorney, to review this Agreement and advise the party about all of the terms, conditions and legal effect of entering into, and being bound by, this Agreement and all terms and conditions set forth herein, (b) has fully and carefully read this Agreement prior to its execution, (c) has been, or has had the opportunity to be, fully appraised by such party's attorneys, if any, of the legal effect and meaning of this Agreement and all terms and conditions hereof, (d) has had the opportunity to make whatever investigation or inquiry such party, deemed necessary or appropriate in connection with the subject matter of this Agreement, (e) has been afforded the opportunity to negotiate as to any and all terms hereof, and (f) is executing this Agreement voluntarily, free from any undue influence, coercion, duress, menace, or fraud of any kind. Each party acknowledges that Holzman Horner PLLC and Loeb & Loeb LLP represent the Company and no other party. The parties acknowledge that the Seller has not represented the Company in connection with the transaction contemplated by this Agreement and has represented himself only.

Section 8.16. Dispute Resolution.

(a) Governing Law. ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF CALIFORNIA OR ANY OTHER JURISDICTION).

(b) Submission to Jurisdiction. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND WHATSOEVER AGAINST THE OTHER PARTY IN ANY WAY ARISING FROM OR RELATING TO THIS AGREEMENT, AND EXHIBITS AND SCHEDULES ATTACHED HERETO AND THERETO, AND ALL CONTEMPLATED TRANSACTIONS, INCLUDING, BUT NOT LIMITED TO, CONTRACT, EQUITY, TORT, FRAUD AND STATUTORY CLAIMS, IN ANY FORUM OTHER THAN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY, CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO

THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND AGREES TO BRING ANY SUCH ACTION, LITIGATION OR PROCEEDING ONLY IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY, CALIFORNIA. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING IS CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(c) Service of Process. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY CERTIFIED MAIL IN ACCORDANCE WITH SECTION 8.3 SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.

(d) Venue. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(e) Attorneys' Fees. IN THE EVENT THAT ANY PARTY INSTITUTES ANY LEGAL SUIT, ACTION OR PROCEEDING, INCLUDING ARBITRATION, AGAINST THE OTHER PARTY TO OBTAIN ANY REMEDY IN RESPECT OF ANY BREACH OF THIS AGREEMENT, THE PREVAILING PARTY IN THE SUIT, ACTION OR PROCEEDING SHALL BE ENTITLED TO RECEIVE IN ADDITION TO ALL OTHER DAMAGES TO WHICH IT MAY BE ENTITLED, THE COSTS INCURRED BY SUCH PARTY IN CONDUCTING THE SUIT, ACTION OR PROCEEDING, INCLUDING ACTUAL ATTORNEYS' FEES AND EXPENSES AND COURT COSTS.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the undersigned executes this Agreement as of the date first written above.

KPC HEALTHCARE HOLDINGS, INC.,
a California corporation

Dr. Kali Pradip Chaudhuri
Chief Executive Officer

Warrant Purchase Agreement
Signature Page 1 of 2

{00009884.DOCX 4}

**IN WITNESS WHEREOF,** the undersigned executes this Agreement as of the date first written above.

WILLIAM E. THOMAS

William E. Thomas

Warrant Purchase Agreement
Signature Page 2 of 2

{00009884.DOCX 4}

# EXHIBIT A
# COMMON STOCK WARRANT

{00009884.DOCX 4}

**EXHIBIT B**
**WARRANTS SOLD AND PURCHASE PRICE ALLOCATION**

| Seller | Existing Warrant | | Cash Proceeds | Principal Balance of Thomas Subordinated Promissory Note | Aggregate Purchase Price | Thomas Warrant | |
|---|---|---|---|---|---|---|---|
| | Warrant Shares (Post-Stock Split) | Exercise Price Per Warrant Share (Post-Stock Split) | | | | Warrant Shares | Exercise Price Per Warrant Share |
| William E. Thomas | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

{00009884.DOCX 4}

# EXHIBIT C
# CONSENT OF SPOUSE

**CONSENT OF SPOUSE**

I, Terre Thomas, spouse of William E. Thomas, a natural person domiciled in the State of California (the "**Seller**"), acknowledge that I have read the Warrant Purchase Agreement dated as of August 28, 2015, by and among KPC HEALTHCARE HOLDINGS, INC., a corporation incorporated under the laws of the State of California, and it successors and permitted assigns (the "**Company**"), and the Seller, to which this Consent is attached as **Exhibit C** (as the same may be amended or amended and restated from time to time, the "**Agreement**"), and that I understand the contents of the Agreement. I am aware that my spouse is a party to the Agreement and the Agreement contains provisions regarding the transfer of the Existing Warrant (as defined in the Agreement), which my spouse may own, including any interest I might have therein.

I hereby agree that I and any interest, including any community property interest, that I may have in the Existing Warrant subject to the Agreement shall be irrevocably bound by the Agreement. I hereby appoint my spouse as my attorney-in-fact with respect to the exercise of any rights and obligations under the Agreement.

This Consent shall be binding on my executors, administrators, heirs and assigns. I agree to execute and deliver such documents as may be necessary to carry out the intent of the Agreement and this Consent.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right. I am under no disability or impairment that affects my decision to sign this Consent and I knowingly and voluntarily intend to be legally bound by this Consent.

[signature]
Signature

TERRE THOMAS
Printed Name

AUGUST 28, 2015
Date

{00009884.DOCX 4}

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 15

JAE 0956



KPC
Healthcare, Inc.

# KPC HEALTHCARE HOLDINGS, INC.

## Analysis of Transaction Fairness

**Issued: August 28, 2015**

Investment Banking
Valuation & Financial Opinions
Dispute Advisory & Forensic Services
SRR
STOUT | RISIUS | ROSS

CONFIDENTIAL

JAE 0957

STOUT_0000016



*For more information, please contact one of the following members of the engagement team:*

Mark R. Fournier, CFA
Managing Director
(703) 848-4946
mfournier@srr.com

Joseph D. Demetrius, CFA
Vice President
(703) 848-4956
jdemetrius@srr.com

Vikram Sinnathamby
Associate
(703) 848-4948
vsinnathamby@srr.com

SRR
STOUT | RISIUS | ROSS

Atlanta | Baltimore | Chicago | Cleveland | Dallas | Denver | Detroit | Houston | Los Angeles | New York | Tysons Corner | Washington, D.C.

**www.srr.com**

# TABLE OF CONTENTS

I. Introduction ..... 1
II. Transaction Overview ..... 6
III. Company Overview ..... 15
IV. Economic and Industry Outlook ..... 25
V. Financial Statement Analysis ..... 36
VI. Valuation Methodology ..... 49
VII. Guideline Company Method ..... 53
VIII. Transaction Method ..... 60
IX. Discounted Cash Flow Method ..... 65
X. Valuation Reconciliation and Conclusion ..... 72
XI. Fairness Analysis ..... 76
XII. Opinion ..... 85

# APPENDICES

**Appendix A**........Valuation Exhibits

**Appendix B**........IRR Exhibits

**Appendix C**........Guideline Company Descriptions

**Appendix D**........Guideline Transaction Descriptions

**Appendix E**........Control Premium

**Appendix F**........Discount for Limited Marketability

**Appendix G**........Assumptions and Limiting Conditions

**Appendix H**........Statement of Qualifications

# Section I

# Introduction

- 1 -

KPC
Healthcare, Inc.

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

JAE 0961

CONFIDENTIAL

STOUT_0000021

# I. INTRODUCTION

## Description of the Engagement

- Stout Risius Ross, Inc. ("SRR") has been retained by Alerus Financial, N.A., not in its corporate capacity, but solely in its capacity as the trustee (the "Trustee") of the KPC Healthcare, Inc. Employee Stock Ownership Trust (the "Trust"), which forms a part of the KPC Healthcare, Inc. Employee Stock Ownership Plan (the "Plan," together with the Trust are collectively referred to herein as the "ESOP"), to evaluate the opinions set forth below.
- Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Stock Purchase Agreement (the "Stock Purchase Agreement") by and among KPC Healthcare Holdings, Inc., a California corporation ("KPC" or the "Company"), the Trustee, on behalf of the Trust, and Dr. Kali Pradip Chaudhuri (the "Seller"), dated as of August 28, 2015 (the "Transaction Date").

In our capacity as the Trustee's independent financial advisor, the Trustee has specifically asked us to render a written opinion (the "Opinion") as to whether:

- the consideration to be paid by the ESOP for the shares of KPC common stock pursuant to the terms of the Stock Purchase Transaction (defined herein) is not greater than the Fair Market Value of such shares;
- the interest rates on each of the ESOP Loans (defined herein) are not in excess of reasonable rates;
- the financial terms of each of the ESOP Loans (defined herein) are at least as favorable to the ESOP as would be the terms of comparable loans resulting from arm's-length negotiations between independent parties;
- The strike price of the Warrants (defined herein), on a per share basis, is equal to at least 90% of the Fair Market Value of one share of the underlying common stock of the Company on the date the Warrant (defined herein) is issued; and
- the terms and conditions of the Transactions (defined herein), taken as a whole, are fair to the ESOP from a financial point of view.

## Standard of Value

- In accordance with Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i)) (the "Proposed Regulation"), the term "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties being able, as well as willing, to trade and being well-informed about the asset and the market for the asset.

# I. INTRODUCTION

## Factors Considered

We considered the following factors in performing our analysis:

- The nature of the business and the history of the Company from its inception;
- The economic outlook in general and the condition and outlook of the industry in which the Company operates;
- The book value of the stock and the financial condition of the Company;
- The earning capacity of the Company;
- The dividend-paying capacity of the Company;
- Whether goodwill or other intangible value exists within the Company;
- Previous sales of the Company's stock and the size of the block of stock to be valued; and
- The market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Sources of Information

In connection with this analysis, we made such reviews, analyses, and inquiries as we deemed necessary and appropriate under the circumstances. The principal sources of information used in performing our analysis included, but were not limited to:

- KPC Healthcare, Inc.'s internally prepared financial statements for the fiscal years ended March 31, 2010 through March 31, 2013;
- Integrated Healthcare Holdings, Inc.'s (a predecessor of KPC Healthcare, Inc.) 10-K filings with the U.S. Securities and Exchange Commission for the fiscal years ended March 31, 2010 through March 31, 2013;
- KPC Healthcare, Inc.'s financial statements for the fiscal years ended March 31, 2014 and March 31, 2015, audited by BDO USA, LLP;
- KPC Healthcare, Inc.'s internally prepared interim financial statements for the three-month periods ended June 30, 2014 and June 30, 2015;
- KPC Healthcare, Inc.'s projected financial statements for the fiscal years ending March 31, 2016 through March 31, 2019, prepared by Company management;
- certain schedules detailing net payments receivable by the Company pursuant to the 2016 QAF Program (defined herein);

# I. INTRODUCTION

- a document titled "Future of the Quality Assurance Program", prepared by Company management;
- the ESOP Transaction Profile, prepared by Eureka Capital Markets, LLC ("Eureka"), dated April 2015;
- certain amendments related to the ESOP Transaction Profile, prepared by Eureka;
- the Project Solus Revised Summary of Terms, prepared by Credit Suisse, dated May 7, 2015;
- the Project Solus Medicare and Medicaid Analysis for Hospital Provider in California, prepared by Marwood Group Advisory, LLC, dated July 8, 2015;
- the Letter of Intent & Summary Term Sheet, dated August 3, 2015;
- the Subordinated Debt Offering & Detachable Warrants Term Sheet, dated August 3, 2015;
- the Stock Purchase Agreement;
- a draft of the Credit Agreement among KPC, KPC Healthcare, Inc., the Lenders, Wilmington Trust, N.A., and Credit Suisse Park View BDC, Inc., dated August 24, 2015;
- a draft of Amendment No. 2 to the Amended and Restated Credit and Security Agreement, dated August 26, 2015;
- the Warrant Purchase Agreement among the Company and SPCP Group, LLC, dated August 28, 2015;
- the Warrant Purchase Agreement among the Company and William E. Thomas, dated August 28, 2015;
- the Warrant Cancellation and Release Agreement, among the Seller, KPC Resolution Company, LLC, KPC, and the Subsidiary, dated August 28, 2015;
- the KPC Healthcare Holdings, Inc. Subscription Agreement, by and between KPC, the Seller, and Redeemed Warrantholders;
- the forms of the Subordinated Promissory Note;
- the forms of the Warrant to Purchase Shares of Common Stock;
- the Investor Rights Agreement among the Trust, the Seller, the Redeemed Warrantholders, and KPC Healthcare, Inc., dated August 28, 2015;
- the Company ESOP Credit Agreement by and between the ESOP and KPC, dated August 28, 2015;
- the Company ESOP Loan ESOP Non-Recourse Promissory Note by and between the ESOP and KPC, dated August 28, 2015;
- the Company ESOP Pledge Agreement by and between the ESOP and KPC, dated August 28, 2015;
- the Seller ESOP Credit Agreement by and between the ESOP and the Seller, dated August 28, 2015;
- the Seller ESOP Loan Non-Recourse Promissory Note by and between the ESOP and the Seller, dated August 28, 2015;
- the Seller ESOP Pledge Agreement by and between the ESOP and the Seller, dated August 28, 2015;

# I. INTRODUCTION

- the Amended and Restated ESOP Credit Agreement by and between the ESOP and KPC, dated August 28, 2015;
- the Amended and Restated ESOP Loan ESOP Non-Recourse Promissory Note by and between the ESOP and KPC, dated August 28, 2015;
- the Amended and Restated ESOP Pledge Agreement by and between the ESOP and KPC, dated August 28, 2015;
- the Assignment and Assumption Agreement by and between KPC, the Seller, and the ESOP, dated August 28, 2015;
- the Exchange Agreement by and between KPC and the Seller, dated August 28, 2015;
- the Statement of Representation prepared by Company management, dated August 27, 2015;
- site visits at the four Hospitals located in Orange County, California and discussions with certain members of the senior management of KPC and Eureka regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;
- publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and
- other information, studies, and investigations that we deemed appropriate.

## Assumptions and Limiting Conditions

- This report and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and should not be referred to or distributed, in whole or in part, without our prior written consent. Reference should be made to Appendix G, as well as our engagement letter dated May 6, 2015, for certain assumptions and limiting conditions that are applicable to our analysis and report.

# Section II

## Transaction Overview

KPC
Healthcare, Inc.

- 6 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 0966

CONFIDENTIAL STOUT_0000026

# II. TRANSACTION OVERVIEW

## Description of Transaction

On the Transaction Date, a series of simultaneous transactions will occur, including:

### Warrant Redemption and Cancellation Transactions

- The Company will enter into a separate Warrant Purchase Agreement with each of William E. Thomas and SPCP Group, LLC, a Delaware limited liability company (collectively the "Redeemed Warrantholders"), both of which will be dated as of August 28, 2015 (each a "Warrant Purchase Agreement"). Pursuant to the terms of the Warrant Purchase Agreements, the Company will purchase all of the [redacted] outstanding warrants held by the Redeemed Warrantholders for an aggregate consideration amount of [redacted] net of exercise price of these warrants of [redacted]), (the "Warrant Redemption Transaction"), which will consist of cash consideration in the amount of [redacted] to be paid at Closing and the issuance of subordinated promissory notes to the Redeemed Warrantholders in the amount of [redacted] (the "Warrant Redemption Notes").
  - Each Redeemed Warrantholder will also receive detachable warrants in connection with the issuance of the Warrant Redemption Notes.
  - As further consideration for the Warrant Redemption Transaction, the Company has contractually agreed to pay to the Redeemed Warrantholders: (i) the product of 60% of any and all future Qualifying QAF Payments (as defined in the Warrant Purchase Agreement) received by the Company or its direct or indirect subsidiaries for services rendered between January 1, 2017 through December 31, 2024 regardless of when paid; multiplied by (ii) 19.5%. If no Qualifying QAF Payments are received by the Company or its direct or indirect subsidiaries, no amounts will be owed to the Redeemed Warrantholders, and the "earn out" specifically excludes all payments received under a QAF Program (as defined in the Warrant Purchase Agreement) for services rendered on or before December 31, 2016.
- KPC Healthcare, Inc. (the "Subsidiary") will enter into that certain Warrant Cancellation and Release Agreement with each of the Seller and KPC Resolution Company, LLC, a California limited liability company, dated as of August 28, 2015 (the "Warrant Cancellation and Release Agreement") pursuant to which all 22.8889 outstanding warrants collectively held by the Seller and KPC Resolution Company, LLC will be cancelled (the "Warrant Cancellation Transaction") in exchange for a contractual right to receive consideration of (i) the product of 60% of any and all future Qualifying QAF Payments (as defined in the Warrant Cancellation Agreement) received by the Company or its direct or indirect subsidiaries for services rendered between January 1, 2017 through December 31, 2024 regardless of when paid; multiplied by (ii) 80.5%. If no Qualifying QAF Payments are received by the Company or its direct or indirect subsidiaries, no amounts will be owed under the Warrant Cancellation and Release Agreement and the "earn out" specifically excludes all payments received under a QAF Program (as defined in the Warrant Cancellation and Release Agreement) for services rendered on or before December 31, 2016.

# II. TRANSACTION OVERVIEW

## Stock Purchase Transaction

- The Trustee, on behalf of the Trust, will acquire 10,000,000 shares of KPC common stock, representing 100% of the Company's common equity (the "Stock Purchase Transaction"), from the Seller for consideration of [redacted] (the "Consideration"). The Consideration will consist of [redacted] of cash paid at Closing and a [redacted] non-recourse promissory note issued by the ESOP to the Seller (the "Seller ESOP Loan").
  - The ESOP will finance the cash portion of the purchase price with a $79,448,000 loan from the Company to the ESOP (the "Company ESOP Loan") and a $10,000,000 cash contribution from the Subsidiary to the ESOP. The Company ESOP Loan will have a term of 30 years and will bear interest at an annual rate equal to 2.82% per annum. The Company ESOP Loan is pre-payable without penalty. The Company ESOP Loan and the Seller ESOP Loan are collectively referred to herein as the "ESOP Loans".
  - The Seller ESOP Loan will have a term of 30 years and will bear interest at an annual rate equal to 2.82% for the first six months. In the event the Seller ESOP Loan is not assumed by the Company from the ESOP within six months of Closing (as it is contractually obligated to do under the terms of that certain Assignment and Assumption Agreement dated as of August 28, 2015 and entered into among the Company, the Trustee, on behalf of the Trust, and the Seller (the "Assignment and Assumption Agreement")), the interest rate on the Seller ESOP Loan will increase to 13%. The Seller ESOP Loan will be pre-payable without penalty.
- The Company will also approve the adoption of a management incentive plan ("MIP") that will provide Company management with stock appreciation right ("SAR") units in an aggregate amount of up to 10.0% of fully-diluted equity of the Company. The SAR plan will consist of retention SARs (the "Retention SARs") and performance SARs (the "Performance SARs").
  - Up to 5.0% of the Company's fully diluted equity may be granted in the form of Retention SARs immediately following the Closing Date (as defined in the Stock Purchase Agreement).
  - Annual grants of the Performance SARs are contingent upon the Company achieving at least 105% of projected adjusted EBITDA for each respective fiscal year. However, the Company may grant SARs "allocated" to prior years if the Company is able to achieve cumulative adjusted EBITDA equal to at least 105% of adjusted EBITDA for that cumulative period.
- On the date following the Transaction Date, or as soon as otherwise possible thereafter, the Company will assume from the ESOP all rights and obligations under the Seller ESOP Loan (the "Assignment and Assumption Transaction"). Simultaneous with the Assignment and Assumption Transaction, the Company will issue a subordinated promissory note in favor of the Seller (the "Exchange Transaction") in the original principal amount of $128,126,000 (the "Seller Note"). The Seller Note will include certain detachable warrants. Following the Stock Purchase Transaction and in connection with the Assignment and Assumption Transaction, the ESOP will issue an amended and restated promissory note to the Company (the "Amended and Restated ESOP Loan") in the amount of $207,574,000 to evidence its total indebtedness to the Company.
  - The Amended and Restated ESOP Loan will bear interest at the then-long-term annual Applicable Federal Rate and will amortize with 30 equal annual fixed payments of principal and interest.

# II. Transaction Overview

- For clarification purposes, as used herein, the term "Transactions" will include, but not be limited to, each transaction contemplated by the following: (1) the Warrant Redemption Agreement, (2) the Warrant Cancellation and Release Agreement, (3) the Stock Purchase Agreement, (4) the Seller ESOP Loan, (5) the Company ESOP Loan, (6) each of the Subordinated Notes (as herein defined), (7) each of the Warrants (as herein defined), (8) the Assignment and Assumption Agreement, (9) the Exchange Agreement, (10) the Amended and Restated ESOP Loan, and (11) the adoption of the MIP.
- The total value of the Transactions is [REDACTED] which assumes [REDACTED] of net debt and [REDACTED] of net shareholder receivables. "Net debt" is defined as outstanding debt less balance sheet cash. The value of the Transactions will be adjusted upwards or downwards, on a dollar for dollar basis, based on the actual net debt of the Subsidiary on the Closing Date, to be determined post-Closing via a Closing Date balance sheet, which will be prepared to reflect net debt prior to the funding of the Transactions.
- Aggregate cash consideration paid to the Seller and Redeemed Warrantholders in connection with the Warrant Redemption Transaction and Stock Purchase Transaction of [REDACTED] will be financed via a [REDACTED] term loan with Credit Suisse (the "Term Loan"). Remaining cash proceeds related to the Term Loan will be used to (i) repay existing debt; (ii) pay transaction fees and expenses; (iii) set aside a reserve for a litigation settlement; (iv) set aside a principal and interest reserve for the Term Loan; and (v) finance ongoing working capital needs of the Company.
  - The Term Loan has [REDACTED] term and bears interest at a floating rate of [REDACTED] (with a [REDACTED] floor) with quarterly principal payments of [REDACTED] and an excess cash flow provision.
- The Warrant Redemption Notes and the Seller Note are referred to herein as the "Subordinated Notes".
  - The Subordinated Notes will have a [REDACTED] term and bear interest at [REDACTED] per annum. Principal will be amortized quarterly over a [REDACTED] period commencing after full repayment of outstanding senior debt.
  - The Subordinated Notes will each have a detachable warrant to purchase an aggregate of [REDACTED] shares of KPC common stock at an exercise price of [REDACTED] per warrant (the "Warrants"). The Seller will receive [REDACTED] Warrants, William Thomas will receive [REDACTED] Warrants, and SPCP Group will receive [REDACTED] Warrants.
  - The Warrants will expire on December 31, 2027 (the "Maturity Date"). The Warrants will be exercisable, partially or fully, on the earlier of (i) the repayment in full of the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes; or (ii) on the Maturity Date.
- In connection with the Transactions, the Company expects to amend its fiscal year end to August 31, 2016 and elect S corporation status effective September 1, 2015. In addition, a separate management contract will be entered into with KPC Global Management, LLC, a California limited liability company ("KPCGM"), and certain identified individuals will cease to be W-2 employees or 1099 contractors of the Subsidiary but will instead become part of KPCGM. The management contract will have a 10-year term, which thereafter may be renewed on a year-to-year basis with the consent of both the Company and KPCGM. Pursuant to the management contract, for each of the fiscal years ending August 31, 2016, through August 31, 2020, KPCGM will be eligible to receive a performance bonus equal to 30% of adjusted EBITDA before receipt of payments under the QAF Program

# II. TRANSACTION OVERVIEW

(as defined in the Stock Purchase Agreement) in excess of the Company's current forecasted adjusted EBITDA before receipt of payments under the QAF Program (as defined in the Stock Purchase Agreement). After the fiscal year ending August 31, 2020, a subsequent arrangement may be adopted by the Company or Subsidiary, with Trustee approval.

## Financing

| Term Loan | |
|---|---|
| Lender: | Credit Suisse AG |
| Amount: | [redacted] |
| Term: | [redacted] |
| Rate: | [redacted] + [redacted] (Floor of [redacted] |
| Covenants: | Minimum fixed charge coverage ratio, minimum interest coverage ratio, maximum senior leverage ratio |
| Collateral: | First priority perfected lien on the Company's QAF receivables and tangible and intangible assets, including all outstanding capital stock of the Company and each of its current and future subsidiaries, to the extent legally and commercially reasonable |
| Amortization: | Quarterly principal payments of [redacted] Mandatory prepayments of managed care-related QAF payments dependent on the Company's senior leverage ratio, provided that for any managed care QAF payments received in calendar year 2015, the first [redacted] will be used to prepay the Term Loan. Additionally, mandatory annual prepayments of [redacted] of excess cash flow. |
| Prepayment Penalties: | Prepayment penalty of [redacted] on prepayments funded by managed care-related QAF payments subsequent to the end of calendar year 2015.<br>For voluntary prepayments (i.e. payments in excess of the excess cash flow provision):<br>(a) Prior to the first anniversary of the Closing Date, prepayment penalties of [redacted] of the prepayment amount plus the present value of interest that would have been required on the amount of principal prepaid between the date of the prepayment and the first anniversary of the Closing Date.<br>(b) Between the first and the second anniversary of the Closing Date, prepayment penalties of [redacted] of the prepayment amount.<br>(c) Between the second and the third anniversary of the Closing Date, prepayment penalties of [redacted] of the prepayment amount.<br>(d) Between the third and the fourth anniversary of the Closing Date, prepayment penalties of [redacted] of the prepayment amount.<br>(e) No prepayment penalties subsequent to the fourth anniversary of the Closing Date. |

# II. TRANSACTION OVERVIEW

| Subordinated Notes | |
|---|---|
| Lender: | The Seller and the Redeemed Warrantholders |
| Amount: | [redacted] |
| Term: | [redacted] |
| Rate: | [redacted] PIK interest while LTM EBITDA is below [redacted] million; thereafter [redacted] cash interest |
| Amortization: | Quarterly principal installments [redacted] subsequent to the repayment of the Term Loan, with the balance of the Subordinated Notes due at maturity |
| Warrant: | |
| Ownership: | [redacted] warrants or [redacted] of common equity on a fully-diluted basis |
| Strike Price: | [redacted] per underlying common share |
| Expiration: | December 31, 2027 |
| Exercisable: | The Warrant will be exercisable, partially or fully, on the earlier of (i) the repayment in full of the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes; or (ii) on the expiration date. |
| Put/Call Provisions: | Upon a change in control. Additionally, the Company may call the Warrant after the full repayment of the Subordinated Notes, or if a warrantholder becomes ineligible to own S Corporation stock. |

| Amended and Restated ESOP Loan | |
|---|---|
| Lender: | KPC Healthcare, Inc. |
| Amount: | $207,574,000 |
| Term: | 30 years |
| Rate: | 2.82% |
| Amortization: | Equal annual payments of principal and interest |

# II. TRANSACTION OVERVIEW

## Sources and Uses

The following chart illustrates the sources and uses for KPC in the Transaction:

| Sources of Cash | | Uses of Cash | |
|---|---|---|---|
| *In Thousands of U.S. Dollars* | | | |
| Term Loan | [redacted] | Repay Existing Debt | $ [redacted] |
| Thomas Subordinated Notes | [redacted] | Purchase of Common Stock | 217,574 |
| Chaudhuri & SPCP Subordinated Notes | [redacted] | Warrant Redemption | [redacted] |
| | | Transaction Fees | [redacted] |
| | | Senior Term Debt Reserve | [redacted] |
| **Total Sources of Cash** | **$ [redacted]** | **Total Uses of Cash** | **$ [redacted]** |

# II. TRANSACTION OVERVIEW

## Pre- & Post-Transaction Ownership and Capitalization

**Pre-Transaction Ownership Schedule**

| Shareholder | Common Stock | Warrants | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|
| Kali P. Chaudhuri, M.D. | [redacted] | [redacted] | [redacted] | [redacted] |
| KPC Resolution Company, LLC | [redacted] | [redacted] | [redacted] | [redacted] |
| William E. Thomas | [redacted] | [redacted] | [redacted] | [redacted] |
| SPCP Group, LLC | [redacted] | [redacted] | [redacted] | [redacted] |
| SPCP Group IV, LLC | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] |

**Ownership Schedule - Immediately Post-Transaction**

*In Thousands*

| Shareholder | Common Stock | SARs | Warrants | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|
| ESOP | 10,000.0 | [redacted] | 0.0 | 10,000.0 | [redacted] |
| Management | 0.0 | [redacted] | [redacted] | [redacted] | [redacted] |
| Holders of Thomas Subordinated Notes | 0.0 | [redacted] | [redacted] | [redacted] | [redacted] |
| Holders of Chaudhuri & SPCP Subordinated Notes | 0.0 | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | **10,000.0** | [redacted] | [redacted] | [redacted] | **100.0%** |

**Fully-Diluted Post-Transaction Ownership Schedule**

*In Thousands*

| Shareholder | Common Stock | SARs | Warrants | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|
| ESOP | 10,000.0 | [redacted] | [redacted] | 10,000.0 | [redacted] |
| Management [a] | 0.0 | [redacted] | [redacted] | [redacted] | [redacted] |
| Holders of Thomas Subordinated Notes | 0.0 | [redacted] | [redacted] | [redacted] | [redacted] |
| Holders of Chaudhuri & SPCP Subordinated Notes | 0.0 | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | **10,000.0** | [redacted] | [redacted] | [redacted] | **100.0%** |

[a] Company management will be granted performance SARs of up to [redacted] of fully-diluted equity if the Company exceeds the adjusted EBITDA projections provided by Company management, which would result in SARs comprising [redacted] of fully-diluted equity. For purposes of our analysis, we have assumed the performance SARs will not be issued.

# II. TRANSACTION OVERVIEW

## QAF Program

- The ESOP will be entitled to 100% of the proceeds related to the 2016 QAF Program (defined herein) – which involves the stream of payments expected to be received through January 2018, as illustrated in Exhibit K.
- In the event a subsequent QAF or similar Federal matching program is established, the Company has contractually agreed to pay to the Redeemed Warrantholders: 60% of any and all future Qualifying QAF Payments received by the Company or its direct or indirect subsidiaries for services rendered between January 1, 2017 through December 31, 2024 regardless of when paid (the "Future QAF"). If no Qualifying QAF Payments are received by the Company or its direct or indirect subsidiaries, no amounts will be owed to the Redeemed Warrantholders, and the "earn out" specifically excludes all payments received under a QAF Program for services rendered on or before December 31, 2016.
  - It is important to note that given the uncertainty related to the amount or timing of Future QAF payments, we did not explicitly incorporate or assign any value to the Future QAF payments that may be received by the Company in our analysis.
- The Future QAF payments will exclude payments made in connection with the 2016 QAF Program (defined herein) received by the Company during calendar years 2017 and 2018 which will be 100% payable to the Company. Additionally, the Company is entitled to 100% of all QAF payments for calendar years 2025 and beyond.

# Section III

# Company Overview

KPC
Healthcare, Inc.

- 15 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 0975

CONFIDENTIAL

STOUT_0000035

# III. Company Overview

## Company Synopsis

- KPC consists of a group of four community based hospitals, Western Medical Center Santa Ana, Western Medical Center Anaheim, Coastal Communities Hospital, and Chapman Medical Center (collectively, the "Hospitals"), located in Orange County, California. The Hospitals have approximately 760 beds and have 2,240 employees in total, and collectively represent approximately 12% of the market share of Orange County.

## Company History

- In 2004, Integrated Healthcare Holdings, Inc. ("IHHI"), a publicly-traded holding company in which Dr. Chaudhuri was a minority shareholder, acquired the Hospitals from Tenet Healthcare Corporation. The transaction included the real property underlying three of the four hospital campuses, with the fourth remaining under lease from an unaffiliated landlord. The three campuses were placed in a separate entity, known as Pacific Coast Holdings Investment LLC, owned 49% by Dr. Chaudhuri and 51% by a group of physicians, the Orange County Physicians Investment Network ("OCPIN"). In exchange for providing a $10.0 million deposit for the acquisition (which was subsequently refunded), Dr. Chaudhuri received warrants to acquire 24.9% of the fully-diluted equity of IHHI.
- OCPIN defaulted on an obligation to invest more capital into IHHI, resulting in litigation between IHHI and OCPIN. During 2007 and 2008, Dr. Chaudhuri provided an equity investment in IHHI and exercised his warrants, resulting in Dr. Chaudhuri owning 50.1% of the equity of IHHI.
- In late 2009, IHHI's secure lender was seized by the Securities and Exchange Commission for various securities-related violations. Dr. Chaudhuri arranged a restructuring of IHHI's debt, for which he received additional warrants.
- On March 28, 2014, IHHI commenced a going-private transaction, and repurchased common shares from OCPIN and other minority shareholders at an implied Enterprise Value of approximately $170.0 million. As a result, Dr. Chaudhuri became the sole owner of the common stock of IHHI. IHHI then brought in a new management team and initiated turnaround efforts to improve operations, regain lost certifications, and reduce costs.
- In February 2015, IHHI was renamed KPC Healthcare, Inc.

## Facilities and Services

- The Company's facilities are accredited by a variety of organizations, including the Joint Commission on Accreditation of Healthcare Organizations, the College of American Pathologists, and the American College of Surgeons (Trauma Program).
- The facilities include one of only three trauma centers in the region. Services include neurosurgical care, cardiac services, burn center care, medical services, surgical services, pediatric intensive unit, neonatal intensive care unit, obstetrical, subacute,

# III. COMPANY OVERVIEW

geropsychiatric, adult psychiatric, and chemical dependency. The Company is also in the process of developing a new acute rehabilitation care unit.

## KPC Hospitals – Key Statistics and Overview

| Facility | Beds | Size (sq. ft.) | Physicians | Nurses and Hospital Staff | Other Characteristics |
|---|---|---|---|---|---|
| Western Medical Center - Santa Ana, CA | 282 | 316,488 | 115 | 415 | Level II trauma center draws patients from surrounding areas<br>One of two burn centers in Orange County<br>One of five hospitals in Southern California specializing in replantation<br>Opening acute rehabilitation center to serve the large volume of patients injured in car accidents |
| Western Medical Center - Anaheim, CA | 188 | 132,554 | 88 | 221 | Only acute psychiatric program in all of Orange County<br>One of the largest psychiatric wards in Orange County<br>Open-heart surgery center |
| Coastal Communities Hospital - Santa Ana, CA | 178 | 116,268 | 62 | 182 | Minimally-invasive treatment for gastro-esophageal reflux disease<br>Generates significant QAF payments due to high portion of MediCal patients |
| Chapman Medical Center - Orange, CA | 114 | 140,000 | 113 | 113 | Leader in orthopedic and neurosurgical spine programs<br>Specialization in bariatric surgery attracts patients from around the United States |
| Total | 762 | 705,310 | 378 | 931 | |

- The Company is in the process of rebranding its hospitals as part of the Company's efforts to improve brand recognition and reputation:

| Old Name | New Name |
|---|---|
| Western Medical Center Santa Ana | Orange County Global Medical Center |
| Western Medical Center Anaheim | Anaheim Global Medical Center |
| Chapman Medical Center | Chapman Global Medical Center |
| Coastal Communities Hospital | South Coast Global Medical Center |

# III. Company Overview

## Payor Mix

- The Company is a primary beneficiary of Medicare and Medicaid reimbursements, including supplemental income from the Quality Assurance Fee (discussed herein).

Source: Company records.

## Employees

- The Company had approximately 2,240 employees as of February 2015. Of these employees, a total of approximately 792 are represented by two labor unions, the California Nurses Association and the Service Employee International Union – United Healthcare Workers, which are covered by collective bargaining agreements. The Company has never experienced a work stoppage with either union, and considers relations with both unions to be good. Approximately 100 of KPC's employees work out of the Company's corporate office.

# III. COMPANY OVERVIEW

## Competition

- The Company competes primarily with approximately 30 other acute care hospitals in Orange County, including University of California Irvine, Hoag Memorial Hospital, St. Joseph Hospital, Orange Coast Memorial Hospital, and Fountain Valley Regional Hospital. Additionally, the Company faces competition from outpatient care facilities in the region. Company management believes the Company differentiates itself through its quality of care, reputation, and specialties. However, the Company specializes in high acuity procedures (for example, the Level II Trauma Center) that generally experience less competition from outpatient facilities.

## Quality Assurance Fee Program

- The Hospital Quality Assurance Fee Program ("QAF") is a long standing federal matching program for Medicaid used by 49 states as well as the District of Columbia. The California Department of Health Care Services implemented its first QAF program in 2009 when the Governor of California signed legislation to impose a provider fee on general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental Medicaid payments to hospitals with disproportional exposure to indigent patients via MediCal, California's Medicaid program. Revenue from the QAF also provides funding for children's healthcare coverage, pays direct grants to public hospitals, and reimburses the costs of administering the program.
- All private acute care hospitals in California are assessed a provider fee based on patient days and payor mixes. The QAF payments are based only on MediCal patient days. FFS hospital providers are reimbursed directly by California. California pays MediCal health plans and the health plans pay hospitals additional capitation.
- In 2013, the Governor of California signed legislation (Senate Bill 239) that would continue the QAF program for 36 months from January 1, 2014 through December 31, 2016 (as it pertains to the Company, the "2016 QAF Program"). The amount of this most recent QAF for each hospital is calculated by the California Hospital Association based on each hospital's MediCal patient census in 2010. The California Hospital Association has sponsored a ballot initiative on the 2016 ballot to make the QAF permanent and to limit the percentage that the State can take for its purposes from fees levied.
- Since its inception, the QAF program has garnered strong support at both the state and federal levels, providing billions of dollars in supplemental payments to California hospitals, and has been extended and renewed three times since the program's inception in 2009. Although the federal matching percentage could change, the California Hospital Association has stated that they expect the QAF program will continue beyond its current round of funding. Further, industry analysts expect the QAF program will continue for several reasons, such as the consistent growth of the QAF program since 2010; expanded MediCal eligibility and a decrease in charity care as a result of the ACA; and the fact that California has frozen the base rate for reimbursing MediCal claims with the understanding that normal inflationary increases in payment rates will be reimbursed through QAF.

# III. Company Overview

- The Company has historically realized both revenue and expenses related to the QAF program. Given the volatile nature of the Company's historical and projected QAF revenue and expenses, we removed the financial impact of QAF revenue and expenses from the Company's "core" operations and valued the QAF payments separately.
- Pursuant to the Transaction, Credit Suisse commissioned an analysis by Marwood Group Advisory, LLC (the "Marwood Report"), a healthcare-focused advisory and consulting firm, regarding the outlook of Medicare and California's Medicaid programs for California hospitals. The Marwood Report concluded that California's QAF program would likely continue beyond 2016 due to strong support from a variety of stakeholders in the state. Additionally, the Company's hospitals are expected to benefit from Medicaid expansion resulting in increased enrollment, as well as increased fee-for-service rates as part of changes in reimbursement methodologies.

# III. COMPANY OVERVIEW

## Key Risks and Opportunities

- Key risk factors faced by the Company include the following:
  - The Company generated operating losses in fiscal years 2013 and 2015. Removing the financial impact of QAF, the Company generated negative adjusted EBITDA in fiscal years 2012 through 2014.
    - However, this risk is mitigated by changes more recently implemented by the Company's new management team, resulting in a significant improvement in operating performance over the past 12 months (as further discussed in Section V).
  - Given the Company's limited track record of operating profitably, there is a high degree of risk with regards to the Company's ability to achieve Company management's projections.
    - The Company's management team has significant experience in turning around distressed hospitals. The Company's CEO of Healthcare Operations, Suzanne Richards, has managed the turnaround of 18 hospitals and was previously the Chief Clinical Officer of Prime Healthcare Services, which operates acute care hospitals in California, Kansas, Nevada, Pennsylvania, Rhode Island, and Texas.
    - This risk is somewhat mitigated by the fact that for purposes of our valuation analysis, we placed primary emphasis on the Company's representative level of LTM EBITDA and placed less emphasis on the Company's projected long-term performance. Accordingly, in order to better account for risks inherent in a turnaround situation and to substantially discount growth as projected by Company management, we assumed no EBITDA growth in fiscal years 2017 through 2019 for purposes of our Discounted Cash Flow analysis. Furthermore, the selected market multiples utilized in the Market Approaches account for risks inherent in a turnaround situation and substantially discount growth as projected by Company management.
  - The Company exhibits geographic concentration as the four Hospitals are located in Orange County, California.
    - Personal income and employment conditions in Orange County, California are generally above state and national averages. Furthermore, given its significant elderly population, Orange County has favorable patient demographics relative to other parts of the United States.
  - Despite decreasing deficits in recent years, the State of California faces a continued deficit, which may put pressure on future QAF payments.
    - On June 15, 2015, the California legislature approved a $117.5 billion General Fund budget.
    - Recent state and federal legislation suggests stable QAF funding conditions, with some optimism regarding a 2015 ballot initiative to make the QAF permanent (beyond the 2016 QAF Program).

# III. COMPANY OVERVIEW

- ➢ The Company faces pressure on reimbursement rates from private insurers. Additionally, the Company is exposed to risk regarding funding for Medicare and Medicaid, particularly in light of recent pressure on U.S. government spending.
  - These risks are common across the U.S. hospital industry.
  - Recent budget surpluses in California are generally positive for Medicaid funding in the state.
- ➢ Hospitals are facing increasing competition from outpatient facilities.
  - However, this is not expected to significantly impact KPC due to the high acuity nature of the inpatient procedures in which the Company's hospitals specialize.
  - This risk is common across the U.S. hospital industry.
- ➢ The Company is exposed to risk of recruiting and retaining top-performing physicians.
  - ➢ In recent years, the Company has made substantial investments in medical equipment, clinical spaces, EHR systems, and has completed or is in the process of completing substantial renovations of the Hospitals in order to facilitate the Company's recruitment of high-performing physicians. According to Company management, these investments have largely been successful in aiding the Company's recruitment efforts.
  - This risk is common across the U.S. hospital industry.

■ Key opportunities for the Company include the following:

- ➢ While industry analysts generally expect California's QAF program to continue beyond the 2016 QAF Program, we have not attributed any value to subsequent QAF programs in our analysis. The Company has averaged approximately $38.8 million per year in QAF income over the past five years.
- ➢ Company management has a track record of turning around distressed hospitals.
- ➢ The Affordable Care Act ("ACA") and Medicaid expansion have generally resulted in a larger patient base for healthcare providers – adding an estimated 9.9 million and 9.0 million newly-enrolled patients into the healthcare base in 2015 while generally lowering uncompensated care rates.
- ➢ Personal income and employment conditions in Orange County, California are generally above state and national averages. Furthermore, given its significant elderly population, Orange County has favorable patient demographics relative to the United States.

# III. Company Overview

## Management

- The majority of the Company's current management team began with KPC in July 2014. However, the management team has significant experience in hospital management.
- The current Chief Executive Officer of Healthcare Operations, Suzanne Richards, has managed the turnaround of 18 hospitals and was previously the Chief Clinical Officer of Prime Healthcare Services, which operates acute care hospitals in California, Kansas, Nevada, Pennsylvania, Rhode Island, and Texas.
- The Company's Chief Financial Officer, John Collins, has over 20 years of experience in healthcare finance and was previously the former Chief Financial Officer of Vanguard Health Systems, an operator of 26 hospitals and medical facilities in Arizona, Illinois, Massachusetts, Michigan, and Texas.

**Management Team**

| Individual | Position |
|---|---|
| Kali P. Chaudhuri, M.D. | Chairman and Chief Executive Officer |
| Bill Thomas | Senior Vice President and General Counsel |
| Suzanne Richards | Chief Executive Officer of Healthcare Operations |
| Kali P. Chaudhuri | Executive Vice President, Finance Affairs |
| Kelly Thomas | Executive Vice President, Legal Affairs |
| Sri Yarramsetti | Chief Information Officer |
| John Collins | Chief Financial Officer |
| Eric Royal | Chief Compliance Officer |

# III. Company Overview

## Board of Directors

- The sole member of the board of directors of KPC is Dr. Chaudhuri. Subsequent to the Transaction, the Company will increase the size of its Board of Directors to five members within 12 months of the closing date, including two independent directors.

## Litigation

- In July 2013, the Company settled a class action lawsuit regarding the incorrect payment of overtime wages for $14.5 million. Pursuant to the settlement, the Company does not anticipate further legal actions related to this issue.
- As of the Transaction Date, the Company had booked a contingent reserve of $5.7 million due to a May 2015 court decision related to litigation filed by a former employee of the Company. As of the Transaction Date, the Company is appealing the decision to the Supreme Court of California.

# Section IV

## Economic and Industry Outlook

KPC
Healthcare, Inc.

- 25 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 0985

CONFIDENTIAL

STOUT_0000045

# IV. Economic and Industry Outlook

## Economic Outlook

### Gross Domestic Product

- Real (i.e., inflation adjusted) GDP growth of 2.0% to 2.5% is generally considered optimal when the economy is operating at full employment.
- GDP increased at an annual rate of 3.7% in the second quarter of 2015, following an increase of 0.6% in the first quarter of 2015. Relative to the first quarter of 2015, the increased growth rate is primarily the result of increases in consumer spending, exports, and government spending.
- GDP is forecasted to increase at an annual rate of 2.3% in 2015 and 2.8% in 2016

### Employment Situation

- Typically, economists consider the economy to be operating at full employment when the unemployment rate is between 5.5% and 6.0%.
- In July 2015, 215,000 jobs were added, and the unemployment rate remained stable at 5.3% relative to June 2015.
- The unemployment rate is forecasted to average 5.3% in 2015 and 5.0% in 2016.

Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia

Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia

# IV. ECONOMIC AND INDUSTRY OUTLOOK

## Consumer Price Index

- The CPI has increased at an average rate of 2.4% over the past 20 years.
- The CPI increased 0.1% in July 2015 and has increased 0.2% over the past 12 months.
- The core index, excluding food and energy prices, increased 0.1% in July 2015, and has increased 1.8% over the past 12 months.
- The CPI is projected to increase 0.1% in 2015 and 2.1% in 2016.

## Equity Markets

- Over the past 20 years, the S&P 500 and Russell 2000 have increased 6.8% and 7.4% per annum, respectively.
- For the month ended July 31, 2015, the S&P 500 increased 2.0% and the Russell 2000 decreased 1.2%.
- For the year ended July 31, 2015, the S&P 500 increased 9.0% and the Russell 2000 increased 10.6%.

**U.S. Consumer Price Index**

Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia

**One-Year Stock Index Performance**

Source: Capital IQ, Inc.

# IV. Economic and Industry Outlook

## Healthcare and Hospital Industry

- Companies in the healthcare industry provide a wide range of healthcare and social services through hospitals, doctors' offices, nursing homes, outpatient surgery centers, and other facilities. Major companies include Ascension Health, HCA, Kaiser Permanente, and Tenet Healthcare. The U.S. healthcare sector includes more than 830,000 establishments with combined annual revenue of about $2.2 trillion, according to First Research.
- The profitability of individual healthcare companies depends on efficient operations and, in the case of many nonprofit healthcare providers, obtaining grants and federal funds. The U.S. healthcare sector is highly fragmented with the top 50 organizations generating approximately 15.0% of total revenue.
- Major services include hospital medical care (45% of industry revenue) and outpatient care provided by physicians (20%). Other services include dental work, urgent care, elderly and hospice care, medical labs, home health, rehabilitation, and social assistance. Of the approximately 6,500 U.S. hospitals, around 75% are not-for-profit. Hospitals can be operated by the government, charitable organizations, or for-profit corporations. Hospitals typically have between 50-1,000 beds and provide both inpatient and outpatient services, with larger facilities providing more complex care. Many hospitals are part of multi-facility health systems.
- Federal and state governments are heavily involved in the U.S. healthcare sector, as a direct-care provider, an operator of health insurance programs, and as providers of various social services programs. According to First Research, approximately 87% of Americans are covered by some form of private or government health insurance, while approximately 13% of Americans are uninsured. Many are covered by combinations of private and government policies. About 55% of Americans are covered by employer-sponsored health insurance, about 15% by Medicaid, and about 15% by Medicare.
- Medicare was designed to provide health insurance for those aged 65 and older, including certain disabled peoples, and Medicaid was established to serve the health needs of the indigent. Medicaid is managed by each individual state and jointly funded by the state and the federal government. The California Medical Assistance Program ("MediCal") is California's Medicaid program.
- U.S. healthcare expenditures were approximately $3 trillion, or about 18% of GDP in 2014, the highest among industrialized nations, and are expected to increase to almost 20% of GDP by 2023, according to the Centers for Medicare and Medicaid Services ("CMS").





# IV. Economic and Industry Outlook

- On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act (H.R. 3590) ("ACA"), a federal statute designed to extend health coverage to millions of uninsured legal residents through a combination of public program expansion and private sector health insurance reform. This comprehensive reform legislation was then amended by the Health Care and Education Reconciliation Act on March 30, 2010. The ACA is expected to extend healthcare coverage to approximately 31 million people in the United States. The law requires insurance companies to cover all applicants within new minimum standards and offer the same rates regardless of pre-existing conditions or sex. Several provisions of the law went into effect during 2014, including health insurance exchanges and expansion of Medicaid and the State Children's Health Insurance Program. In an effort to cut Medicare costs, the ACA encourages hospitals to reduce their readmission rates through the reduction of payments to hospitals with excess hospital readmissions, a key factor in high hospital bills. Other provisions of the law call for more medical training and the establishment of healthcare technologies, such as electronic health records, that are expected to cut costs through efficiency.
- The ACA is expected to decrease the number of uninsured individuals through employer mandates and individual requirements. The ACA requires individuals to maintain minimum coverage through the new health insurance marketplace or be subject to a tax penalty starting in 2014. As more of the U.S. population is covered by private health insurance, demand and spending on health services is expected to increase, positively affecting the industry.
- Healthcare providers have begun to adapt to new regulations introduced by the ACA. The ACA has brought in new patients and revenue, a trend that will likely continue as the law is fully implemented. However, healthcare facilities still face the challenge of adapting to a new reimbursement system as the new payment models seek to emphasize results rather than number of procedures. Many employers are switching to high-deductible plans for employees in order to comply with the ACA and reduce costs. This has led many employees to further scrutinize costs, potentially putting pressure on industry margins. Because of higher healthcare costs and expanded coverage for uninsured patients, the healthcare and hospital industries must face the risk that higher deductibles and co-payment requirements for insured patients will increase, resulting in the potential for greater write-offs of uncollectible amounts from those patients.
- In the King v. Burwell decision in June 2015, the Supreme Court ruled that the ACA allows for the federal government to provide nationwide tax subsidies to help poor and middle-class people buy health insurance.
- The industry is currently making a shift towards electronic health records ("EHRs"), as evidenced by the 2009 American Recovery and Reinvestment Act, which provides stimulus money for hospitals and physicians and imposes penalties on providers who are not using EHRs by the end of 2015.
- According to Mercer Capital's Healthcare Facilities Industry Newsletter, healthcare companies outperformed the broader market during 2014, and are poised for strong gains in 2015. An improving economy and rising consumer spending, coupled with favorable healthcare dynamics, have benefited the sector. Transaction activity remains healthy, as industry participants aim to vertically integrate multiple steps of the patient experience. Integration has allowed healthcare facility companies to capture revenue from multiple sources, increasing industry performance while reducing costs. Risks facing the industry include a decreasing supply of doctors and healthcare professionals, and cuts to federal outlays to Medicare and Medicaid.

# IV. Economic and Industry Outlook

- In 2014, the U.S. Congressional Budget Office ("CBO") lowered its projections for Medicare funding, consistent with pressure on government spending over the last few years. The CBO projects actual spending per Medicare beneficiary after accounting for inflation will increase at an average annual rate of approximately 1.0% through 2025, slower than the 4.0% real growth realized from 1985 to 2007. Overall, the CBO estimates Medicare will remain around 13.0% to 15.0% of federal spending and 3.0% of GDP through 2023.
- The U.S. hospital industry is broadly defined to include acute care, rehabilitation, and psychiatric facilities that are either public (government owned and operated), not-for-profit private (religious or secular), or for-profit institutions (investor owned). These facilities offer a broad range of healthcare services, including internal medicine, general surgery, cardiology, oncology, orthopedics, obstetrics/gynecology, and emergency services. In addition, hospitals offer other ancillary services, including psychiatric, diagnostic, rehabilitation, home care and outpatient surgery services.
- Factors that can influence a hospital's financial and operating performance include facility size and location, facility ownership structure, a facility's ability to participate in group purchasing organizations, and facility payor mix. Due to the costs associated with healthcare reform, the hospital industry has begun consolidating in order to take advantage of economies of scale to offset the effects of increased IT expenses related to the EHR incentive program, recruiting and retaining qualified personnel, and competition from new facilities that deliver physician-run outpatient surgery centers, specialty hospitals, and diagnostic centers.
- S&P Capital IQ analysts project that federal and state budget deficits may negatively impact reimbursement rates for Medicare and Medicaid, and rising enrollment in these programs may result in a less favorable patient mix for most providers. Incentive payments for implementing health care IT initiatives are expected to moderately benefit the industry in 2015. Uncompensated care levels, consisting largely of bad debt expense and charity care, have remained above historical levels, but have improved due to the impact of health care reform and are expected to continue to improve over time.
- Hospitals in Medicaid expansion states (with California among those states) benefited from a 13% decline in unpaid bills compared to an increase in bad debt in non-expansion states, according to a recent study from Moody's Investors Service. The study found that hospitals in expansion states have not comprehensively shifted this lessened exposure to bad debt into higher cash flow or better financial results. This may be because some hospitals were negatively impacted by lower Medicaid reimbursement rates and an influx of newly covered Medicaid patients needing expensive care, according to *The Wall Street Journal*. Hospitals may also be using the windfalls from reduced bad debt to restore programs that were cut during leaner years instead of applying them to the bottom line.
- Because of the growing availability of stand-alone outpatient healthcare facilities and the increase in the services that are able to be provided at these locations, many individuals are seeking a broader range of services at outpatient facilities. This trend has contributed to an increase in outpatient services while slowing the growth of inpatient hospital admissions.
- Over the next five years, challenges facing the hospital industry include ongoing healthcare reform changes, reimbursement volatility, electronic record implementation, and continued personnel shortages, according to IBISWorld. Healthcare reform and an aging population are expected to increase industry demand. Rising labor costs will continue to pressure industry profitability.

According to INFORUM, U.S. personal consumption expenditures at hospitals are forecasted to increase at an annual compounded rate of 6.0% between 2015 and 2016.

## MediCal and the QAF Program

- MediCal is the California Medicaid welfare program serving low-income individuals, as well as some families, seniors, persons with disabilities, children in foster care, pregnant women, and childless adults with incomes below 138% of the federal poverty level. MediCal is jointly administered by the California Department of Health Care Services and the federal Centers for Medicare and Medicaid Services, with many services implemented at the local level by the counties of California.
- California, one of 29 states that has expanded its Medicaid program under the ACA, has approximately 12.2 million beneficiaries, slightly under one-third of California's population. Before the ACA, MediCal had an average of 9.2 million beneficiaries. MediCal enrollment has increased by approximately 34.0% since the ACA went into effect, and is the largest Medicaid program in the country in terms of total beneficiaries, according to data from the Kaiser Family Foundation. Industry analysts expect healthcare facilities companies to benefit from increased patient volumes and lower uncompensated care rates in connection with increased enrollment in healthcare exchanges under the ACA as well as incremental enrollment under the Medicaid expansion.
- In June 2015, the U.S. Supreme Court upheld subsidies for federally run exchanges, a key provision of the ACA. As a result of the decision, health insurance was kept in place for millions of individuals across a number of states. Hospital and managed-care stocks increased subsequent to the ruling, as reflected in the 19.4% average increase in stock prices for KPC's guideline companies between December 31, 2014 and August 3, 2015.
- Planned cuts to Medicare Disproportionate Share Hospital payments, which provide compensation to providers who treat a disproportionate number of uninsured patients, have been replaced by QAF programs at the state level, matched by federal funding.
- The California Department of Health Care Services implemented its first QAF program in 2009 when the Governor of California signed legislation to impose a provider fee on general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental MediCal payments to hospitals with disproportional exposure to indigent patients. Revenue from the QAF also provides funding for children's healthcare coverage, pays direct grants to public hospitals, and reimburses the costs of administering the program. The QAF reimbursements can be segregated into two portions: (i) fee-for-service ("FFS") and (ii) managed care.
- Since its inception, the QAF program has garnered strong support at both the state and federal levels, providing billions of dollars in supplemental payments to California hospitals, and has been extended and renewed three times since the program's inception in 2009. Although the federal matching percentage could change, the California Hospital Association has stated that they expect the QAF program will continue beyond its current round of funding. Further, industry analysts expect the QAF program will continue for several reasons, such as the consistent growth of the QAF program since 2010; expanded MediCal

IV. ECONOMIC AND INDUSTRY OUTLOOK

eligibility and a decrease in charity care as a result of the ACA; and the fact that California has frozen the base rate for reimbursing MediCal claims with the understanding that normal inflationary increases in payment rates will be reimbursed through QAF.

## Orange County Economy

Orange County, California and
U.S. Population Growth Comparison
30%
25%
20%
15%
10%
5%
0%
1990
2000
2010
Orange County
California
United States
Source: U.S. Census Bureau, 2010 Census

- Orange County, California's current population is over 3.1 million, with an average age of just over 36 years, according to the U.S. Census Bureau's 2014 estimate. Additionally, 26.1% of the population is under the age of 19 years old, 61.2% is between the ages of 20 and 64, and 12.8% is age 65 or above. Compared to state averages, Orange County has a slightly older population. Projections over the next several decades show both a dramatic rise in the county's concentration of residents over the age of 65 and an associated decrease in the relative proportion of all other age groups as a percentage of the total population.
- According to the U.S. Census Bureau, Orange County has traditionally exceeded state and national population growth rates since 1950, but the population growth rate from 2000 to 2010 was just above 5%, a significantly slower rate than the prior 50 years. From April 2010 to July 2014, however, the total population grew by an estimated 4.5%, once again placing it back above the state level of 4.2%.
- The median household income of Orange County residents is roughly $72,000, nearly $15,000 greater than the California state median wage and more than $20,000 higher than the United States median wage, according to the State of California Department of Finance. However, the year-over-year increase in earning power grew more gradually in Orange County, improving by only 1.6% in the last two years compared to growth of 5% at the state level and 3.5% at the national level. The slower growth is likely due to the large number of part-time and lower-paying service sector jobs.

Projected Components of Population
by Age in Orange County, 2010-2060
65+
55-64
45-54
35-44
25-34
15-24
5-14
0-4
Age
2060
2010
0%
5%
10%
15%
20%
25%
Percent of Population
Source: State of California, Department of Finance

KPC
Healthcare, Inc.

- 32 -

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

JAE 0992

CONFIDENTIAL

STOUT_0000052

# IV. ECONOMIC AND INDUSTRY OUTLOOK

- The California Poverty Measure ("CPM"), which was recently developed by the Public Policy Institute of California and Stanford University, is a method of estimating poverty rates in California counties with greater precision regarding regional differences in terms of overall cost of living, especially housing, and other factors unique to California. With a CPM estimated poverty rate of 24.3%, Orange County has the fourth-highest poverty rate of 41 California counties.

Median Household Income Comparisons
$80,000
$70,000
$60,000
$50,000
$40,000
$30,000
$20,000
$10,000
$0
1990
2000
2010
2012
Orange County
California
United States
Source: State of California, Department of Finance

- 33 -

KPC
Healthcare, Inc.

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

JAE 0993

CONFIDENTIAL

STOUT_0000053

# IV. Economic and Industry Outlook

- The unemployment rate in Orange County, California was 4.2% in May 2015, up slightly from 4.1% in the prior month but down from 5.2% in May 2014.

**Unemployment in Orange County relative to the state of California and the United States:**

13%
12%
11%
10%
9%
8%
7%
6%
5%
4%
3%
2%
1%
0%

2009 Apr Jul Oct 2010 Apr Jul Oct 2011 Apr Jul Oct 2012 Apr Jul Oct 2013 Apr Jul Oct 2014 Apr Jul Oct 2015 Apr

California
United States
Orange County, CA

# IV. ECONOMIC AND INDUSTRY OUTLOOK

## Applicability to the Company

- Recent healthcare reforms have led to uncertainty in the healthcare market, reimbursement volatility, and challenges adapting to new regulation. However, the ACA and Medicaid expansion have materially increased the supply of insured patients, which is expected to increase industry revenue. Demand is expected to continue to benefit in the long term from an aging population, as well as an improving economy and rising consumer spending. Risks facing the industry include further cuts to federal and state outlays to Medicare and Medicaid as government agencies attempt to further reduce costs. While the Company is generally exposed to risks and opportunities of the broader U.S. healthcare industry, the Company expects to benefit from continued stable funding conditions for the QAF program.

Section V

# Financial Statement Analysis

- 36 -

KPC
Healthcare, Inc.

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 0996

CONFIDENTIAL STOUT_0000056

# V. Financial Statement Analysis

## Historical Trends Analysis

### Net Working Capital

### Hospital Quality Assurance Fee Receivable

### Net Property and Equipment

KPC
Healthcare, Inc.

- 37 -

Valuation & Financial Opinions SRR STOUT | RISIUS | ROSS

JAE 0997

CONFIDENTIAL STOUT_0000057

# V. Financial Statement Analysis

### Interest Bearing Debt

- [redacted]

### Stockholders' Equity

- [redacted]

### Adjusted Revenue

- [redacted]
- [redacted]
- [redacted]

KPC
Healthcare, Inc.

- 38 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 0998

CONFIDENTIAL

STOUT_0000058

# V. FINANCIAL STATEMENT ANALYSIS

## Adjustments to Historical Income Statements

- A number of adjustments were made to the Company's reported financial results to more accurately reflect KPC's normalized ongoing operating performance.
  - Investment Income – We removed the financial impact of the Company's investment income during the historical period, as we consider the value of the Company's investments separately in our analysis.
  - Warrant-Related Expense – We removed the financial impact of noncash income and expense related to changes in the value of the Company's outstanding warrants.
  - Litigation Expenses – The Company incurred nonrecurring litigation and settlement expenses in fiscal 2014 in connection with a lawsuit related to the payment of overtime expense. Accordingly, we removed the impact of these nonrecurring expenses from the Company's historical results.
  - Severance Expense – The Company implemented headcount reductions in fiscal 2015 as part of operational improvements to increase profitability. Accordingly, we removed the financial impact of nonrecurring severance expense from the Company's historical results.
  - Transaction Expenses and Bank Fees – We removed the financial impact of nonrecurring expenses related to the Transaction.
  - QAF Income – Given the volatile nature of the Company's historical and projected QAF revenue and expenses, we removed the financial impact of QAF revenue and expenses from the Company's "core" operations and valued the QAF payments separately.
  - Consulting Fees – In fiscal 2015 the Company paid one-time consulting fees to an affiliated company in connection with the Company's reorganization. Accordingly, we removed the financial impact of these nonrecurring fees.
  - Appeal Contingency – In fiscal 2015 the Company reserved $5.7 million as a result of litigation filed by a former employee of the Company. We removed the impact of this nonrecurring expense.

# V. Financial Statement Analysis

**Historical Adjusted Earnings**

| *U.S. Dollars in Thousands* | For the Fiscal Year Ended | | | | | | | | | | 12 Months Ended | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/31/2011 | % | 3/31/2012 | % | 3/31/2013 | % | 3/31/2014 | % | 3/31/2015 | % | 6/30/2015 | % | 5-Year Average [a] | % |
| **Net Revenue** | | | | | | | | | | | | | | |
| Less: Recognized QAF Income | | | | | | | | | | | | | | |
| **Adjusted Revenue** | | | | | | | | | | | | | | |
| *Growth Rate* | | | | | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | | | | | |
| Investment Income | | | | | | | | | | | | | | |
| Warrant-Related Expense | | | | | | | | | | | | | | |
| Litigation Expenses | | | | | | | | | | | | | | |
| Severance Expense | | | | | | | | | | | | | | |
| Transaction Expenses | | | | | | | | | | | | | | |
| QAF Income, Net | | | | | | | | | | | | | | |
| Consulting Fees | | | | | | | | | | | | | | |
| Appeal Contingency | | | | | | | | | | | | | | |
| Bank Fees | | | | | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | | | | | |
| Adjusted Earnings Before Taxes | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | | | | | |
| **Adjusted EBIT** | | | | | | | | | | | | | | |
| **Adjusted EBITDA** | | | | | | | | | | | | | | |

[a] Based on fiscal years 2011 through 2015.

# V. Financial Statement Analysis

## Adjusted EBITDA

- Adjusted EBITDA increased from negative [redacted] in fiscal 2014 [redacted] or [redacted] of adjusted revenue in the LTM period.
- The improvements in profitability in fiscal 2015 and the LTM period are attributable to changes implemented by the Company's management team, which was hired in July of 2014. These operational improvements are expected to result in over [redacted] of increased profitability on an annual basis once fully implemented, and include:
  - headcount reductions of both the Company's nursing and corporate staff;
  - benefits stemming from recent investments in information technology systems that facilitate accurate billing leading to improved billing of reimbursable expenses;
  - restructuring financial systems and practices;
  - savings on supplies;
  - the recruitment of specialists in certain high-demand, more profitable practice areas;
  - the establishment of medical and geriatric psychiatry units, which generate higher revenue and profits relative to traditional psychiatric services.

## Representative Level EBITDA

- As a result of the recently implemented changes, profitability during the six months ended June 30, 2015 is higher than profitability during the first six months of the LTM period and is more indicative of the Company's future profitability. It is important to note that the Company's new management team was brought in in July 2014 and gradually began to implement operational improvements at that time. We calculated a representative level of adjusted EBITDA for the Company by annualizing the last six months of the LTM period, as presented in the following chart.

# V. Financial Statement Analysis

**Historical Adjusted Monthly Earnings**

| *U.S. Dollars in Thousands* | 6 Months Ended 6/30/2015 | % | Annualized 6 Months Ended 6/30/2015 | % |
|---|---|---|---|---|
| **Net Revenue** | | | | |
| Less: Recognized QAF Income | | | | |
| **Adjusted Revenue** | | | | |
| **Earnings Before Taxes** | | | | |
| Investment Income | | | | |
| Warrant-Related Expense | | | | |
| Severance Expense | | | | |
| Transaction Expenses | | | | |
| QAF Income, Net | | | | |
| Consulting Fees | | | | |
| Appeal Contingency | | | | |
| **Total Adjustments** | | | | |
| Adjusted Earnings Before Taxes | | | | |
| Interest Expense | | | | |
| Depreciation and Amortization | | | | |
| **Adjusted EBIT** | | | | |
| **Adjusted EBITDA** | | | | |

# V. Financial Statement Analysis

## Projected Trends Analysis

- [redacted]

## Adjusted Revenue

- [redacted]

**Adjusted Revenue**

[redacted]

Source: Exhibits C and F



# V. FINANCIAL STATEMENT ANALYSIS

## Adjustments to Projected Income Statements

- As discussed below, two adjustments were made to management's projected income statements to reflect KPC's normalized earnings. Incorporating these adjustments into management's projected income statements yields the adjusted projected income statements presented in Exhibit F.
  - QAF Income – Given the volatile nature of the Company's historical and projected QAF revenue and expenses, we removed the financial impact of QAF revenue and expenses from the Company's "core" operations and valued the QAF payments separately.
  - Increase in Management Fee – The projections provided to us as part of this analysis did not include cost of living increases for compensation payable to certain members of the management team. We adjusted the Company's projected financials to reflect annual increases in Company management compensation pursuant to the terms of the Transaction.

# V. FINANCIAL STATEMENT ANALYSIS

**Projected Adjusted Earnings**

| *U.S. Dollars in Thousands* | Annualized 6 Months Ended 6/30/2015 [a] | % | For the Fiscal Year Ending 3/31/2016 | % | 3/31/2017 | % | 3/31/2018 | % | 3/31/2019 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Revenue** | | | | | | | | | | |
| Less: Recognized QAF Income | | | | | | | | | | |
| **Adjusted Revenue** | | | | | | | | | | |
| *Growth Rate* | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | |
| Recognized QAF Income | | | | | | | | | | |
| Increase in Management Fee | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | |
| Adjusted Earnings Before Taxes | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | |
| **Adjusted EBIT** | | | | | | | | | | |
| **Adjusted EBITDA** | | | | | | | | | | |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.

# V. Financial Statement Analysis

## Adjusted EBITDA

Adjusted EBITDA
U.S. Dollars in Millions
as a % of Adjusted Revenue

Source: Exhibits C and F

KPC
Healthcare, Inc.

- 46 -

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

JAE 1006

CONFIDENTIAL

STOUT_0000066

# V. Financial Statement Analysis

### Select Historical and Projected Ratios

**Select Historical and Projected Metrics**

| | KPC Healthcare, Inc. Select Ratios | | | | Guideline Public Company Historical | |
|---|---|---|---|---|---|---|
| | 5-Year Historical Average | 5-Year Historical Median | 4-Year Projected Average | 4-Year Projected Median | 5-Year Average Low | 5-Year Average High |
| Return on Assets | | | | | 0.7% | 7.5% |
| Return on Equity | | | | | -29.5% | 29.7% |
| EBIT Margin | | | | | 3.6% | 20.0% |
| EBITDA Margin | | | | | 6.7% | 24.2% |
| Net Capital Expenditures to Sales | | | | | 2.9% | 6.4% |
| Unlevered Free Cash Flow to Sales | | | | | 2.1% | 8.3% |
| | | | 4-Year Historical CAGR [a] | 4-Year Projected CAGR [a] | 4-Year Historical Low CAGR | 4-Year Historical High CAGR |
| Revenue Growth Rate | | | | | 7.0% | 22.4% |
| Adjusted EBITDA Growth Rate | | | | | 5.0% | 21.4% |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.

- As a result of the Company's historical lack of profitability, the Company's historical return on assets and EBIT and EBITDA margins are below the levels of the guideline companies. Due to operational improvements instituted by the Company's new management team, profitability is expected to increase in the projection period, and return on assets, return on equity, and EBIT and EBITDA margins are projected to increase to within the range of the guideline companies.
- Due to the Company's negative equity balance in the historical period, average historical return on equity is not meaningful.
- We were not provided with cash flow statements for KPC as a standalone entity for fiscal years 2011 through 2013, and accordingly were unable to calculate average net capital expenditures to sales and unlevered free cash flow to sales for the historical period. Net capital expenditures are projected to be below the low end of the range of the guideline companies due largely to the Company's lower level of real estate holdings relative to the guideline companies.

# V. FINANCIAL STATEMENT ANALYSIS

- The Company's historical revenue growth rate is below the low end of the range of the guideline companies, while the historical adjusted EBITDA growth rate is not meaningful due to negative adjusted EBITDA during the historical period. Revenue is projected to increase at a rate near the low end of the range of the guideline companies, while adjusted EBITDA is projected to increase at a higher rate due to the expected benefits of recent operational improvements.



Section VI

# Valuation Methodology

KPC
Healthcare, Inc.

- 49 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1009

CONFIDENTIAL STOUT_0000069

# VI. VALUATION METHODOLOGY

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our estimation of value. A description of each approach is discussed below.

## Market Approach – Guideline Company Method

- The Guideline Company Method is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.
- Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (i.e., equity plus net interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

**Applicability to the Company – Guideline Company Method**

- In our application of the Guideline Company Method, we were able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value. A description of each company is presented in Appendix C and the assumptions behind our analysis are presented in Section VII of this report.

## Market Approach – Transaction Method

- The primary focus of the Transaction Method is to examine the terms, prices, and conditions found in either actual sales of the subject company's stock or sales of companies in the industry. After the relevant transactions are identified, transaction multiples (e.g., total capital to earnings before interest and taxes) are derived and applied to the corresponding operating results of the subject company to estimate its implied value.

**Applicability to the Company – Transaction Method**

- Transactions involving similar companies in KPC's industry have also taken place in the recent past. As such, we researched these transactions and were able to draw meaningful conclusions from them. Our application of this form of the Transaction Method is presented in Section VIII of this report.

# VI. VALUATION METHODOLOGY

## Income Approach – Discounted Cash Flow Method

- The Income Approach is a valuation technique in which the value of a company is estimated based on the earning capacity of that company.
- The Discounted Cash Flow Method is a valuation technique in which the value of a company is estimated based on the present value of its expected future economic benefits. The level of benefit we chose to utilize is distributable cash flow. Distributable cash flow is a preferred measure of a company's earning and dividend-paying capacity because it represents the earnings available for distribution to investors after considering the reinvestment required for a company's future growth. Distributable cash flow is the amount that could be paid to owners of a business without impairing its operations.
- To perform a Discounted Cash Flow analysis, the available cash flow that a business can generate is projected into the future. Each year's cash flow is then discounted to the valuation date at a rate of return commensurate with the risk involved in realizing those cash flows. An investor would accept a rate of return no lower than that available from other investments with equivalent risk, and would value the investment accordingly. Each element of this computed rate is expressed in terms of current market yields as of the valuation date.

**Applicability to the Company – Discounted Cash Flow Method**

- The application of the Discounted Cash Flow Method is meaningful with respect to the valuation of KPC. KPC is an operating entity which is expected to produce positive cash flows in the future. Moreover, a potential buyer of the Company would likely place a great deal of weight upon the future cash flows generated by the Company in determining its value.

# VI. VALUATION METHODOLOGY

## Asset Approach

- The Asset Approach provides an indication of Enterprise Value by developing a Fair Market Value balance sheet. All of the business' assets are identified and listed on the Fair Market Value balance sheet, with intangible assets being determined either collectively or discretely. Restating all liabilities to Fair Market Value and subtracting this amount from the Fair Market Value of assets yields the Fair Market Value of equity.

**Applicability to the Company – Asset Approach**

- KPC is an operating entity that is producing a return on its assets that indicates value exists over-and-above the value of its tangible underlying assets; that is, it possesses intangible asset value. A significant portion of this intangible asset value does not readily lend itself to discrete valuation and is therefore more appropriately valued collectively as a part of the Company's "goodwill." Since the calculation of the Company's goodwill would largely require using a valuation method that shares numerous underlying assumptions with the Discounted Cash Flow Method, its use would render a duplicative, and not independent, indication of value. Accordingly, we considered but did not employ the Asset Approach in our determination of the Company's value.

# Section VII

## Guideline Company Method

KPC
Healthcare, Inc.

- 53 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1013

CONFIDENTIAL STOUT_0000073

# VII. GUIDELINE COMPANY METHOD

## Selection of Guideline Companies

- We searched several sources and held discussions with Company management to identify guideline public companies that are sufficiently similar to the Company to render the Guideline Company Method relevant for application in our analysis. Specifically, we started with a broad group of publicly traded companies that operate in the healthcare services industry. To further refine our search, we removed companies that (1) do not have common stock actively traded on a major U.S-based exchange, (2) are financially insolvent, and/or (3) derive more than 50% of their sales internationally.
- Although there are few public companies directly comparable to KPC in terms of underlying relevant investment characteristics, such as markets, products/services, growth, cyclical variability, or other pertinent factors, we were able to identify a group of public companies we deem similar from a risk and return perspective. While these companies differ from KPC in terms of specific markets served, exact comparability is not required under this valuation method. Furthermore, the guideline public company group, as a whole, reflects economic conditions and business risks for the Company's industry in general. A summary description of each of the guideline public companies considered relevant for purposes of our analysis is presented in Appendix C. The following is a list of the companies we identified as similar to KPC for purposes of our analysis:
  - Community Health Systems, Inc.
  - HCA Holdings, Inc.
  - LifePoint Health, Inc.
  - SunLink Health Systems Inc.
  - Tenet Healthcare Corp.
  - Universal Health Services Inc.
  - HealthSouth Corp.
  - Kindred Healthcare Inc.

## Analysis

### Methods of Comparison

- The market multiple considered in our analysis includes EV / EBITDA.
- We considered this market multiple over two distinct time periods:
  - Next fiscal year ("NFY"); and
  - Latest twelve months ("LTM").

# VII. GUIDELINE COMPANY METHOD

## Calculation of Multiples

**Implied Pricing Multiples [a]**

*Multiples as of August 28, 2015*

| | EV / NFY EBITDA | EV / LTM EBITDA |
|---|---|---|
| Community Health Systems, Inc. | 7.9x | 8.2x |
| HCA Holdings, Inc. | 9.1x | 9.2x |
| LifePoint Health, Inc. | 8.3x | 9.3x |
| Tenet Healthcare Corp. | 9.5x | 10.0x |
| Universal Health Services Inc. | 11.2x | 11.8x |
| HEALTHSOUTH Corp. | 10.0x | 10.8x |
| Kindred Healthcare Inc. | 8.5x | n/m |
| Low | 7.9x | 8.2x |
| High | 11.2x | 11.8x |
| Mean | 9.2x | 9.9x |
| Median | 9.1x | 9.7x |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.

# VII. GUIDELINE COMPANY METHOD

## Selection of Multiples

- To arrive at concluded multiples, we considered differences between the risk and return characteristics of KPC and the guideline companies. The comparative analysis of the guideline companies to KPC is based on the performance and characteristics of the sample as a whole rather than on any individual company selected.

**Selected Financial Information [a]**

*In Millions of U.S. Dollars*

| Size (LTM Net Sales) | |
|---|---|
| HCA Holdings, Inc. | $38,429.0 |
| Community Health Systems, Inc. | 19,491.0 |
| Tenet Healthcare Corp. | 17,568.0 |
| Universal Health Services Inc. | 8,575.8 |
| Kindred Healthcare Inc. | 6,003.0 |
| LifePoint Health, Inc. | 4,963.0 |
| HEALTHSOUTH Corp. | 2,678.0 |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **$8,575.8** |

| Size (LTM EBITDA) | |
|---|---|
| HCA Holdings, Inc. | $7,753.0 |
| Community Health Systems, Inc. | 2,982.0 |
| Tenet Healthcare Corp. | 2,202.0 |
| Universal Health Services Inc. | 1,585.3 |
| HEALTHSOUTH Corp. | 629.3 |
| LifePoint Health, Inc. | 627.5 |
| Kindred Healthcare Inc. | 444.2 |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **$1,585.3** |

| Growth (4-Year Revenue CAGR) | |
|---|---|
| Tenet Healthcare Corp. | 22.4% |
| LifePoint Health, Inc. | 15.2% |
| Community Health Systems, Inc. | 15.1% |
| Kindred Healthcare Inc. | 10.6% |
| HEALTHSOUTH Corp. | 8.6% |
| HCA Holdings, Inc. | 7.7% |
| Universal Health Services Inc. | 7.0% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **10.6%** |

| Growth (1-Year Revenue) | |
|---|---|
| Kindred Healthcare Inc. | 42.6% |
| HEALTHSOUTH Corp. | 27.2% |
| LifePoint Health, Inc. | 22.6% |
| Universal Health Services Inc. | 13.1% |
| Tenet Healthcare Corp. | 11.8% |
| Community Health Systems, Inc. | 9.4% |
| HCA Holdings, Inc. | 8.4% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **13.1%** |

| Growth (4-Year EBITDA CAGR) | |
|---|---|
| Tenet Healthcare Corp. | 21.4% |
| Kindred Healthcare Inc. | 19.0% |
| Community Health Systems, Inc. | 14.6% |
| HEALTHSOUTH Corp. | 8.8% |
| Universal Health Services Inc. | 8.5% |
| HCA Holdings, Inc. | 7.3% |
| LifePoint Health, Inc. | 5.0% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **8.8%** |

| Growth (1-Year EBITDA) | |
|---|---|
| Kindred Healthcare Inc. | 67.9% |
| Tenet Healthcare Corp. | 27.3% |
| LifePoint Health, Inc. | 18.3% |
| Universal Health Services Inc. | 15.5% |
| Community Health Systems, Inc. | 14.6% |
| HEALTHSOUTH Corp. | 12.5% |
| HCA Holdings, Inc. | 8.9% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **15.5%** |

| Growth (NFY Revenue) | |
|---|---|
| Kindred Healthcare Inc. | 44.2% |
| HEALTHSOUTH Corp. | 29.2% |
| Universal Health Services Inc. | 26.4% |
| LifePoint Health, Inc. | 9.9% |
| Tenet Healthcare Corp. | 8.7% |
| HCA Holdings, Inc. | 6.3% |
| **KPC Healthcare, Inc.** | |
| Community Health Systems, Inc. | 5.2% |
| **Guideline Company Median** | **9.9%** |

| Growth (NFY EBITDA) | |
|---|---|
| Kindred Healthcare Inc. | 89.3% |
| **KPC Healthcare, Inc.** | |
| LifePoint Health, Inc. | 27.4% |
| HEALTHSOUTH Corp. | 16.4% |
| Universal Health Services Inc. | 12.3% |
| Tenet Healthcare Corp. | 9.6% |
| Community Health Systems, Inc. | 5.5% |
| HCA Holdings, Inc. | 2.7% |
| **Guideline Company Median** | **12.3%** |

| Growth (Long-Term Earnings) | |
|---|---|
| **KPC Healthcare, Inc.** | |
| Kindred Healthcare Inc. | 14.0% |
| Community Health Systems, Inc. | 13.3% |
| HCA Holdings, Inc. | 12.1% |
| Tenet Healthcare Corp. | 12.0% |
| HEALTHSOUTH Corp. | 11.3% |
| Universal Health Services Inc. | 10.1% |
| LifePoint Health, Inc. | 7.5% |
| **Guideline Company Median** | **12.0%** |

| Profitability (LTM EBITDA Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 23.5% |
| HCA Holdings, Inc. | 20.2% |
| Universal Health Services Inc. | 18.5% |
| Community Health Systems, Inc. | 15.3% |
| LifePoint Health, Inc. | 12.6% |
| Tenet Healthcare Corp. | 12.5% |
| Kindred Healthcare Inc. | 7.4% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **15.3%** |

| Profitability (5-Year Average EBITDA Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 24.2% |
| HCA Holdings, Inc. | 19.9% |
| Universal Health Services Inc. | 18.3% |
| Community Health Systems, Inc. | 15.2% |
| LifePoint Health, Inc. | 14.4% |
| Tenet Healthcare Corp. | 12.5% |
| Kindred Healthcare Inc. | 6.7% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **15.2%** |

| Profitability (LTM EBIT Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 19.0% |
| HCA Holdings, Inc. | 15.3% |
| Universal Health Services Inc. | 14.0% |
| Community Health Systems, Inc. | 9.5% |
| Tenet Healthcare Corp. | 7.7% |
| LifePoint Health, Inc. | 7.1% |
| Kindred Healthcare Inc. | 4.8% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **9.5%** |

Source: Capital IQ, Inc. and KPC Healthcare, Inc. financials.
[a] LTM financial results based on the Company's annualized financial results for the six months ended June 30, 2015.

# VII. Guideline Company Method

## Selected Financial Information

*In Millions of U.S. Dollars*

| Profitability (5-Year Average EBIT Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 20.0% |
| HCA Holdings, Inc. | 15.0% |
| Universal Health Services Inc. | 13.8% |
| Community Health Systems, Inc. | 9.4% |
| LifePoint Health, Inc. | 8.3% |
| Tenet Healthcare Corp. | 7.7% |
| Kindred Healthcare Inc. | 3.6% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **9.4%** |

| Cash Flow (LTM Net Working Capital / Sales) | |
|---|---|
| HEALTHSOUTH Corp. | 11.8% |
| Tenet Healthcare Corp. | 11.7% |
| Community Health Systems, Inc. | 11.0% |
| HCA Holdings, Inc. | 9.4% |
| LifePoint Health, Inc. | 9.0% |
| Universal Health Services Inc. | 6.4% |
| Kindred Healthcare Inc. | 6.1% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **9.4%** |

| Cash Flow (5-Year Average Net Working Capital / Sales) | |
|---|---|
| LifePoint Health, Inc. | 11.5% |
| HEALTHSOUTH Corp. | 10.3% |
| Community Health Systems, Inc. | 8.7% |
| HCA Holdings, Inc. | 8.3% |
| Tenet Healthcare Corp. | 7.3% |
| Universal Health Services Inc. | 6.5% |
| Kindred Healthcare Inc. | 6.2% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **8.3%** |

| Cash Flow (LTM Current Ratio) | |
|---|---|
| LifePoint Health, Inc. | 2.4 |
| HEALTHSOUTH Corp. | 2.0 |
| Community Health Systems, Inc. | 1.7 |
| Tenet Healthcare Corp. | 1.6 |
| Kindred Healthcare Inc. | 1.5 |
| HCA Holdings, Inc. | 1.5 |
| Universal Health Services Inc. | 1.4 |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **1.6** |

| Cash Flow (LTM Receivables Turnover) | |
|---|---|
| HEALTHSOUTH Corp. | 7.6 |
| Tenet Healthcare Corp. | 7.0 |
| LifePoint Health, Inc. | 6.9 |
| HCA Holdings, Inc. | 6.6 |
| Universal Health Services Inc. | 6.3 |
| Community Health Systems, Inc. | 5.6 |
| **KPC Healthcare, Inc.** | |
| Kindred Healthcare Inc. | 4.8 |
| **Guideline Company Median** | **6.6** |

| Cash Flow (5-Year Average Capital Expenditure / Sales) | |
|---|---|
| HEALTHSOUTH Corp. | 6.4% |
| HCA Holdings, Inc. | 5.8% |
| LifePoint Health, Inc. | 5.7% |
| Tenet Healthcare Corp. | 5.4% |
| Community Health Systems, Inc. | 5.4% |
| Universal Health Services Inc. | 4.9% |
| Kindred Healthcare Inc. | 2.9% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **5.4%** |

| Leverage (LTM Total Debt to EBITDA) | |
|---|---|
| Kindred Healthcare Inc. | 7.3 |
| Tenet Healthcare Corp. | 6.7 |
| Community Health Systems, Inc. | 5.7 |
| HCA Holdings, Inc. | 3.9 |
| LifePoint Health, Inc. | 3.5 |
| HEALTHSOUTH Corp. | 3.4 |
| **KPC Healthcare, Inc.** | |
| Universal Health Services Inc. | 1.9 |
| **Guideline Company Median** | **3.9** |

| Leverage (Debt / EV) | |
|---|---|
| Community Health Systems, Inc. | 69.6% |
| Tenet Healthcare Corp. | 67.3% |
| Kindred Healthcare Inc. | 62.7% |
| HCA Holdings, Inc. | 41.7% |
| LifePoint Health, Inc. | 37.8% |
| HEALTHSOUTH Corp. | 31.4% |
| Universal Health Services Inc. | 16.2% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **41.7%** |

Source: Capital IQ, Inc. and KPC Healthcare, Inc. financials.

# VII. GUIDELINE COMPANY METHOD

### Size

- All else held constant, investors are willing to pay a higher price for shares in a larger company vis-à-vis a smaller company. Various studies have documented the fact that companies' price to earnings ratios are directly correlated with size, where size is measured by a number of financial indicators (e.g., revenue, equity market capitalization, and total assets). In this case, the Company is smaller than all of the guideline companies in terms of total revenue and EBITDA. In particular, the median revenue level generated by the guideline companies was $8.6 billion compared with [redacted] for KPKC. The relative size of the Company indicates a pricing multiple near or below the range of indicated market multiples for the guideline companies.

### Growth

- Everything else held constant, the higher the expected growth rate for a company, the higher the applicable multiple. Thus, to the extent that the Company and the guideline companies have different growth expectations, adjustments to the calculated market multiple are required. The Company's historical and projected revenue growth rates are below the medians of the guideline companies. However, the Company's projected NFY and long-term adjusted EBITDA growth rates are above the medians of the available analyst forecasts for the guideline companies. Still, given the Company's relative lack of a profitable track record, we placed less emphasis on the Company's projected long-term performance. The historical and projected growth rates of the Company indicate a pricing multiple near or below the range of indicated market multiples for the guideline companies.

### Additional Risk

- The higher the expected risk of a company, the lower the applicable multiple.
  - The Company has a limited track record of generating positive adjusted EBITDA.
  - The Company primarily serves Orange County, California, whereas the guideline companies operate in a variety of locations. The geographical concentration of KPC relative to the guideline companies increases its investment risk.
  - The Company generally has less management depth than the guideline companies.
  - As a privately-held entity, the Company lacks the same access to the public capital markets as the guideline companies, which may hinder future growth opportunities. Additionally, the Company does not own significant real estate assets, limiting the Company's borrowing capacity.
- These combined factors increase the risk associated with holding an investment in the Company relative to the guideline companies and suggest a multiple near the low end of the range.

# VII. GUIDELINE COMPANY METHOD

## Conclusion

- Given the Company's relative lack of consistent historical profitability (when QAF payments are excluded), we selected market multiples significantly lower than the median of the range to account for risks inherent in the Company's ability to maintain or grow current representative level EBITDA. These selected multiples implicitly give little value to the Company's forecasted results. Absent these risks and uncertainties, we would have selected higher multiples.
- Given the factors outlined above, we selected EBIT and EBITDA pricing multiples below the low end of the range of the guideline companies. Applying the selected market multiples to the financial fundamentals of the Company yields a range of Enterprise Value, as presented in the following chart.
- It is important to note that for purposes of our analysis, we applied multiples to the Company's annualized results for the six months ended June 30, 2015 as opposed to the Company's LTM results, due to the annualized results being more representative of the Company's prospective operating performance as of the date hereof.

**Guideline Company Method**

*U.S. Dollars in Thousands*

| | KPC Healthcare, Inc. Results | Indicated Pricing Multiples[a] | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| Next Fiscal Year: EBITDA | $ [redacted] | 7.9x | 11.2x | 9.2x | 9.1x | [redacted] - [redacted] | $ [redacted] - $ [redacted] |
| Representative Level [b]: EBITDA | [redacted] | 8.2x | 11.8x | 9.9x | 9.7x | [redacted] - [redacted] | [redacted] - [redacted] |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | | | | | | | **$ [redacted] - $ [redacted]0** |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.
[b] Based on the Company's annualized financial results for the six months ended June 30, 2015.

# Section VIII

## Transaction Method

- 60 -

KPC
Healthcare, Inc.

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1020

CONFIDENTIAL

STOUT_0000080

# VIII. TRANSACTION METHOD

## Guideline Transactions

- We relied on information available from merger and acquisition databases maintained by Irving Levin Associates, Inc. and Capital IQ, Inc.
- In preparing our analysis under the Transaction Method, we considered information available on 11 recent transactions involving the acquisitions of hospitals. In selecting the transactions, we focused primarily on companies that were publicly traded or that were acquired by a publicly traded company. Information on these types of acquisitions is typically available in greater detail through required filings and/or press releases than transactions of privately held entities. We reviewed proxy statements, various filings with the Securities and Exchange Commission ("SEC"), and press releases for operational results, transaction pricing, and other information on the transactions. This information, as well as our understanding of the acquisition and target companies, is the basis for our analysis.

## Analysis

### Calculation of Multiples

- The market multiple considered in our analysis includes EV / EBITDA.
- These indicators were generally calculated based on the information available in the latest financial statements issued prior to the transaction announcement date or the actual closing date. In general, nonrecurring expenses and/or restructuring charges were ignored in our calculations of EBITDA.
- The analysis presented below reflects a summary of the transaction information and the calculation of EBITDA multiples.

# VIII. TRANSACTION METHOD

## Guideline Transactions

*In Millions of U.S. Dollars*

| Close Date | Target | Acquirer | EV | Target LTM Fundamentals: Revenue | EBITDA | EBITDA Margin | Indicated Multiples: EV/LTM Revenue | EV/LTM EBITDA |
|---|---|---|---|---|---|---|---|---|
| 1/29/15 | **Hackettstown Regional Medical Center**<br>Provides medical care services | **Atlantic Health System**<br>Operates a network of hospitals | $54.0 | $89.7 | $7.5 | 8.3% | 0.60x | 7.2x |
| 8/1/14 | **MedWest Haywood**<br>Provides healthcare services | **Duke LifePoint Healthcare (Nasdaq:LPNT)**<br>Operates general acute care hospitals | $36.0 | $105.5 | $4.0 | 3.7% | 0.34x | 9.1x |
| 7/10/14 | **Stanly Health Services**<br>Medical center | **Carolinas HealthCare System**<br>Provides healthcare and wellness services and programs | $70.0 | $105.1 | $14.1 | 13.4% | 0.67x | 5.0x |
| 7/1/14 | **Garden City Hospital, Inc.**<br>Owns and operates healthcare facilities | **Prime Healthcare Services, Inc.**<br>Owns and operates acute care hospitals | $48.8 | $139.7 | $5.3 | 3.8% | 0.35x | 9.2x |
| 6/9/14 | **Casa Grande Regional Medical Center**<br>Non-profit hospital | **Banner Health**<br>Operates acute-care hospitals and healthcare facilities | $87.0 | $135.3 | $8.4 | 6.2% | 0.64x | 10.4x |
| 4/1/14 | **Sharon Regional Health System**<br>Hospital with various satellite centers | **Community Health Systems, Inc. (NYSE:CYH)**<br>Operates general acute care hospitals | $70.0 | $179.5 | $7.6 | 4.2% | 0.39x | 9.2x |
| 1/27/14 | **Health Management Associates, Inc. (NYSE:HMA)**<br>Operates hospitals and other health care facilities | **Community Health Systems, Inc. (NYSE:CYH)**<br>Operates general acute care hospitals | $7,630.0 | $5,868.3 | $880.1 | 15.0% | 1.30x | 8.7x |
| 10/25/13 | **Oak Park Hospital**<br>Hospital and nursing care facility | **Rush University Medical Center**<br>Not-for-profit academic medical center | $21.1 | $107.5 | $2.3 | 2.1% | 0.20x | 9.2x |
| 10/1/13 | **3 IASIS Healthcare Hospitals**<br>Acute care hospitals | **HCA West Florida (NYSE:HCA)**<br>Operates general, acute care hospitals | $146.0 | $231.3 | $15.8 | 6.8% | 0.63x | 9.2x |
| 10/1/13 | **Vanguard Health Systems (NYSE:VHS)**<br>Operates hospitals and outpatient facilities | **Tenet Healthcare Corporation (NYSE:THC)**<br>Healthcare services company | $4,295.6 | $5,936.7 | $523.9 | 8.8% | 0.72x | 8.2x |
| 6/28/13 | **Physicians Specialty Hospital**<br>General acute care hospital | **Carter Validus Mission Critical REIT**<br>Private investment firm | $22.6 | $94.8 | $1.5 | 1.6% | 0.24x | 15.1x |
| Low | | | | $89.7 | $1.5 | 1.6% | 0.20x | 5.0x |
| High | | | | $5,936.7 | $880.1 | 15.0% | 1.30x | 15.1x |
| Mean | | | | $1,181.2 | $133.7 | 6.7% | 0.55x | 9.1x |
| Median | | | | $135.3 | $7.6 | 6.2% | 0.60x | 9.2x |



# VIII. TRANSACTION METHOD

As discussed in the *Guideline Company Method* section of this report, the use of an EBITDA multiple in our analysis focuses on company results before interest expense and taxes in order to eliminate the effects of different capital structures and special tax situations, respectively. Further, the use of financial results prior to the consideration of depreciation adjusts for varying levels of capital investment, amounts of depreciable assets, and differing depreciation methods between the target companies and KPC.

## Selection of Multiples

- Similar to the application of the Guideline Company Method, to arrive at concluded multiples, we considered differences between the risk and return characteristics of KPC and the target companies involved in the transactions. Given the limited historical information available for the target companies, the relative size and profitability of the target companies were the principal characteristic studied in our analysis.

### Size

- As discussed previously in the *Guideline Company Method* section of this report, size is one indication of the perceived investment risk inherent in a company. In the instant case, KPC's size (in terms of revenue and EBITDA) is below the mean but above the median indicated by the target company group. Thus, KPC's comparatively similar size may suggest similar risk in relation to the target company group and, all else held constant, indicate a pricing multiple near the median of the target company group.

### Other Factors

- Additionally, as previously discussed in the *Valuation Methodology* section of this report, it is important to note that the multiples implied by transaction prices may not be representative of Fair Market Value as defined herein. Frequently, the acquiring party is willing to pay a premium for the target company or interest because of such items as revenue enhancement opportunities, economies of scale, the reduction in competition, increased purchasing power, knowledge of the entity, potential to gain control, etc. Thus, all else held constant, the multiple of unadjusted target company earnings may be higher due to the fact that a strategic buyer is paying for synergies (i.e., higher or adjusted earnings), that may not be present in this situation.

# VIII. TRANSACTION METHOD

## Conclusion

- Given the Company's relative lack of consistent historical profitability (when QAF payments are excluded), we selected market multiples significantly lower than the median of the range to account for risks inherent in the Company's ability to maintain or grow current representative level EBITDA. These selected multiples implicitly give little value to the Company's forecasted results. Absent these risks and uncertainties, we would have selected higher multiples.
- Based on the available information, and recognizing the fact that synergistic premiums may be embedded in the indicated pricing multiples, we estimate that the Company's overall risk and return characteristics are sufficient to support EBITDA multiples between the low end and the median of the range established by the guideline transactions.
- Applying the selected market multiples to the financial fundamental of the Company yields a range of Enterprise Value, as presented in the following chart.

**Transaction Method**

*In Millions of U.S. Dollars*

| | KPC Healthcare, Inc. | Indicated Pricing Multiples | | | | Selected | | | Indicated | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Results | Low | High | Mean | Median | Multiples | | | Values | | |
| Representative Level [a]: | | | | | | | | | | | |
| EBITDA | $ [redacted] | 5.0x | 15.1x | 9.1x | 9.2x | [redacted] | - | [redacted] | $ [redacted] | - | $ [redacted] |
| | Enterprise Value, Controlling Interest Basis (Rounded) | | | | | | | | $ [redacted] | - | $ [redacted] |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.

Section IX

# Discounted Cash Flow Method

KPC
Healthcare, Inc.

- 65 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1025

CONFIDENTIAL

STOUT_0000085

# IX. DISCOUNTED CASH FLOW METHOD

The Discounted Cash Flow Method utilizes market data in the derivation of a value estimate through the use of a market-derived discount rate to capitalize anticipated financial performance.

## Distributable Cash Flows

- Given the Company's relative lack of consistent historical profitability (when QAF payments are excluded), we placed primary emphasis on the Company's representative level of LTM EBITDA and placed less emphasis on the Company's projected long-term performance. Accordingly, in order to better account for risks inherent in the Company's ability to grow current representative level EBITDA and to substantially discount growth as projected by Company management, we assumed an EBITDA growth rate of 0.0% in fiscal years 2017 through 2019.
- The following chart summarizes Company management's forecasted EBITDA relative to EBITDA utilized for purposes of our Discounted Cash Flow analysis.

Source: Exhibit F and Exhibit I

# IX. Discounted Cash Flow Method

- The Company's projected distributable cash flows are calculated in the following chart:

**Calculation of Distributable Cash Flow**

| *U.S. Dollars in Thousands* | For the Fiscal Year Ending | | | |
|---|---|---|---|---|
| | Year 1<br>3/31/2016 | Year 2<br>3/31/2017 | Year 3<br>3/31/2018 | Year 4<br>3/31/2019 |
| **Distributable Cash Flows** | | | | |
| EBITDA | | | | |
| Depreciation and Amortization | | | | |
| Income Taxes | | | | |
| **Debt-Free Net Income** | | | | |
| Depreciation and Amortization | | | | |
| Capital Expenditures | | | | |
| Additional Working Capital | | | | |
| **Distributable Cash Flows** | | | | |

- The cash flows expected to be generated by the Company are discounted to their present value equivalent using a rate of return that reflects the relative risk of an investment in KPC, as well as the time value of money. This return is an overall rate based upon the individual rates of return for invested capital (equity and interest-bearing debt). The return, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure.



# IX. DISCOUNTED CASH FLOW METHOD

- The following chart illustrates our concluded WACC:

**Weighted Average Cost of Capital**

| | | |
|---|---|---|
| **Required Return on Equity** | | |
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.6% |
| Market Equity Risk Premium | 6.0% | |
| Selected Equity Beta [b] | 0.95 | 5.7% |
| Small Stock Risk Premium [c] | | 5.8% |
| Company-Specific Risk Premium | | |
| **Required Return on Equity - CAPM** | | |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [d] | | |
| Less: Income Tax Factor | 40.0% | -3.2% |
| **After-tax Cost of Debt** | | |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure [e] | 65.0% | |
| Debt Allocation of Capital Structure [e] | 35.0% | |
| **Weighted Average Cost of Capital (Rounded)** | | |

[a] 20-year U.S. Treasury bond yield as of the Transaction Date.
[b] Based on the selected guideline companies.
[c] Based on Duff & Phelps LLC, *2015 Valuation Handbook – Guide to Cost of Capital.*
[d] Based on the Company's actual cost of debt as of the Transaction Date.
[e] Based on an industry long-term average capital structure.

# IX. DISCOUNTED CASH FLOW METHOD

## Company Specific Risk Premium

- We considered the following factors in selecting the Company Specific Risk Premium:
  - The Company has generated minimal or negative adjusted EBITDA for much of the historical period. While the Company's new management team has largely been successful in improving revenue and profitability, and while we assumed an EBITDA growth rate of 0.0% in fiscal years 2017 through 2019 for purposes of the Discounted Cash Flow analysis, there is still incremental risk associated with the Company's ability to maintain a level of profitability comparable to its current representative level.
  - The Company lacks geographical diversification.
  - The Company generally has less management depth than the guideline companies.

## Residual Cash Flow Value

- The Company can be reasonably expected to generate cash flows beyond year four of the projection period. Therefore, the value of the cash flows in year five and beyond must be determined.
- The residual cash flow value is estimated as the equivalent of the present value of the sum of the cash flows from year five to perpetuity using the Gordon Growth Model. Specifically, the residual cash flow is divided by a capitalization rate to arrive at the value of the residual cash flow as of year four. The capitalization rate is calculated as the WACC less the expected long-term growth of the cash flows.
- Since the residual value represents the value of the future cash flows as of year four, it is necessary to calculate the present value of the residual cash flow as of the Transaction Date.

## Conclusion – Discounted Cash Flow Method

- Adding the present value of the residual cash flow to the present value of the discrete projection period cash flows yields the Enterprise Value of the Company, as presented in the following chart. Varying the WACC and long-term growth rate yields a range of Enterprise Values for the Company.

# IX. Discounted Cash Flow Method

## Discounted Cash Flow Method

*U.S. Dollars in Thousands*

| | Year 1 3/31/2016 | Year 2 3/31/2017 | Year 3 3/31/2018 | Year 4 3/31/2019 | Residual |
|---|---|---|---|---|---|
| | For the Fiscal Year Ending | | | | |
| **Distributable Cash Flows** | | | | | |
| EBITDA [a] | | | | | |
| Depreciation and Amortization | | | | | |
| Income Taxes | | | | | |
| **Debt-Free Net Income** | | | | | |
| Depreciation and Amortization | | | | | |
| Capital Expenditures | | | | | |
| Additional Working Capital [b] | | | | | |
| **Distributable Cash Flows** | | | | | |
| Partial Period Adjustment [c] | | | | | |
| **Distributable Cash Flows Allocated to Projection Period** | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | |
| Weighted Average Cost of Capital | | | | | |
| Discount Period [d] | | | | | |
| **Present Value Factor** | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | |

**Enterprise Value**

| | |
|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | |
| Present Value of Residual Cash Flows | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | |

**Terminal Value**

| | |
|---|---|
| Residual Cash Flow | |
| Weighted Average Cost of Capital | |
| Less: Residual Growth Rate | |
| **Capitalization Rate** | |
| **Residual Cash Flow Value** | |
| Present Value Factor | |
| **Present Value of Residual Cash Flows** | |

[a]
[b]
[c] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Transaction Date and the end of the first projection year.
[d] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.

# IX. Discounted Cash Flow Method

## DCF Sensitivity Analysis

**Present Value of Discrete Cash Flows**

| WACC | For the Fiscal Year Ending Year 1 3/31/2016 | Year 2 3/31/2017 | Year 3 3/31/2018 | Year 4 3/31/2019 | Total |
|---|---|---|---|---|---|
| 12.0% | $ [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 12.5% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 13.0% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 13.5% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 14.0% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**Present Value of Residual Cash Flows**

| WACC | Residual Year Growth Rate 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
|---|---|---|---|---|---|
| 12.0% | $ [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 12.5% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 13.0% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 13.5% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 14.0% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**Concluded Range of Enterprise Value**

| WACC | Residual Year Growth Rate 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
|---|---|---|---|---|---|
| 12.0% | $ [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 12.5% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 13.0% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 13.5% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 14.0% | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Section X

# Valuation Reconciliation and Conclusion

KPC
Healthcare, Inc.

- 72 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1032

CONFIDENTIAL

STOUT_0000092

# X. Valuation Reconciliation and Conclusion

## Conclusion of Enterprise Value

- We considered the appropriateness, accuracy, and quantity of evidence as primary criteria in reconciling the aforementioned valuation approaches. To determine the EV of KPC, we considered the strengths and weaknesses of each of the valuation methods applied in terms of the above three criteria. Based thereon, we estimate KPC's Enterprise Value to range from [REDACTED] [REDACTED]. This estimate of value implicitly incorporates approximately equal weighting of each valuation methodology utilized.

## Adjustments to Enterprise Value

- Enterprise Value incorporates the value of total invested capital, including the value of both debt and equity. Several adjustments are necessary in order to derive the Fair Market Value of equity.

### Net Interest-Bearing Debt

- The Company expects to have interest-bearing debt of [REDACTED] (net of cash) as of the Transaction Date. Accordingly, we subtracted net interest-bearing debt of [REDACTED] from the Company's Enterprise Value.

### Receivable from Shareholder

- The Company has a non-operating asset in the form of a [REDACTED] note receivable from the Seller. We added the value of this non-operating asset to the Company's Enterprise Value.

### Indicated Value of QAF Payments

- The Company expects to collect approximately [REDACTED] of QAF payments through January of 2018. Given the stable to positive outlook for QAF funding conditions, the short "maturity" of the projected 2016 QAF payment stream, the fact that a significant portion of these payments had been "earned" as of the Transaction Date (the 2016 QAF applies to the Company's performance for calendar years 2014 through 2016), and the potential for increases to QAF reimbursement rates based on a more recent census, we discounted the QAF payments at an interest rate of 7.0% based on the current three-year rate on U.S. Treasury securities and a conservative credit spread of approximately 600 basis points. Accordingly, we estimated the indicated value of these payments to be [REDACTED], which we added to the Company's Enterprise Value.

# X. VALUATION RECONCILIATION AND CONCLUSION

### After-Tax Contingent Reserve

- As of the Transaction Date, the Company had booked a contingent reserve of $5.7 million due to a May 2015 court decision related to litigation filed by a former employee of the Company. While Company management believes the lawsuit to be without merit and is appealing the court decision to the California Supreme Court, we subtracted the after-tax value of contingent reserve from the Company's Enterprise Value.

## Adjustments to Equity Value

### Discount for Limited Marketability

- To this point in our analysis, the suggested value reflects a fully marketable security comparable to interests in public companies (i.e., securities whose values are not burdened by limited marketability). KPC is a privately held company whose common stock is not traded on a public exchange. However, unlike typical privately held, non-ESOP companies, KPC will have a repurchase obligation (often referred to as a "put" option) to redeem shares from terminated employees. The effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability. In addition, due to the long-term allocation of shares, the Company's repurchase obligation is not expected to be material in the near-term. We deemed a discount for limited marketability of 5.0% to be appropriate. (See Appendix F for more information regarding the selection of the discount for limited marketability.)

# X. Valuation Reconciliation and Conclusion

## Conclusion of Value

**Conclusion of Value**

| *U.S. Dollars in Thousands* | | | **Indicated Range of Value** | |
|---|---|---|---|---|
| | | | **Low** | **High** |
| Guideline Company Method | | $ | | |
| Transaction Method | | | | |
| Discounted Cash Flow Method | | | | |
| **Concluded Enterprise Value** | | | | |
| Less: Net Interest-Bearing Debt [a] | | | | |
| Add: Receivable from Shareholder [b] | | | | |
| Add: Present Value of QAF Payments | | | | |
| Less: After-Tax Contingent Reserve | | | | |
| **Total Adjustments to Enterprise Value** | | | | |
| **Marketable, Controlling-Interest Value of Equity (Rounded)** | | | | |
| Less: Discount for Limited Marketability | 5.0% | | | |
| **Fair Market Value of Equity (Rounded)** | | $ | | |

[a] Pursuant to the Stock Purchase Agreement.
[b] Based on the Company's balance sheet as of June 30, 2015.



# Section XI

## Fairness Analysis

KPC
Healthcare, Inc.

- 76 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1036

CONFIDENTIAL

STOUT_0000096

# XI. FAIRNESS ANALYSIS

## Adequate Consideration – Stock Purchase Transaction

**Consideration Comparison**

| *U.S. Dollars in Thousands* | Indicated Range of Value | |
|---|---|---|
| | Low | High |
| **Fair Market Value of Common Equity (Rounded)** | $ 208,574 | $ 229,574 |
| **Proposed Purchase Price [a]** | $ 217,574 | |

[a] Based on the proposed purchase price of [redacted] less the Warrant Redemption Transaction price of [redacted]).

# XI. FAIRNESS ANALYSIS

## Consideration Comparison – Overall Transaction

**Consideration Comparison - Overall Transaction**

| *U.S. Dollars in Thousands* | Indicated Range of Value | |
|---|---|---|
| | Low | High |
| **Fair Market Value of Equity (Rounded)** | $ [redacted] | $ [redacted] |
| **Proposed Purchase Price** | $ [redacted] | |
| **Implied Multiples** | | |
| EV / Representative Level EBITDA | [redacted] | |
| EV / NFY EBITDA | [redacted] | |

- 78 -

KPC
Healthcare, Inc.

Valuation & Financial Opinions SRR STOUT | RISIUS | ROSS

CONFIDENTIAL JAE 1038 STOUT_0000098

# XI. Fairness Analysis

## Reasonableness of Interest Rates

**Market Summary of Interest Rates [a]**

| Debt Instrument | Interest Rate |
|---|---|
| Prime Rate | 3.25% |
| 30 day LIBOR | 0.19% |
| 90 day LIBOR | 0.31% |
| 1-Year LIBOR | 0.83% |
| 5-Year Treasury | 1.52% |
| 10-Year Treasury | 2.16% |
| 30-Year Treasury | 2.86% |
| 5-Year Corporate Bonds | |
| A Rating | 2.41% |
| BBB Rating | 2.94% |
| BB Rating | 4.84% |
| 10-Year Corporate Bonds | |
| A Rating | 3.44% |
| BBB Rating | 4.08% |
| BB Rating | 6.20% |
| 30-Year Corporate Bonds | |
| A Rating | 4.31% |
| BBB Rating | 4.92% |
| BB Rating | 6.99% |
| Merrill Lynch High Yield Master II Index | 7.04% |
| CCC and Lower Rated Constrained Index | 13.60% |
| American Capital, Ltd. [b] | |
| Subordinated Debt Investments | 4.4% - 19.0% |
| Median of Subordinated Debt Investments | 15.00% |
| Pepperdine Capital Markets Project [c] | |
| Mezzanine Debt Investments, Cash Interest Rate | 8.0% - 12.0% |
| Mezzanine Debt Investments, PIK Expected Return | 1.0% - 2.0% |
| Mezzanine Debt Investments, Total Return | 8.0% - 20.0% |
| **ESOP Loans [d]** | **2.8%** |
| **Chaudhuri & SPCP Subordinated Notes - IRR** | **11.8%** |
| **Thomas Subordinated Note - IRR** | **13.0%** |

[a] Rates as of August 3, 2015.
[b] From American Capital, Ltd. 10-Q for the period ending March 31, 2015.
[c] From Pepperdine University's Private Capital Markets Project survey report, 2015.
[d] Equal to the long-term AFR for August 2015.



# XI. FAIRNESS ANALYSIS

## Internal Rate of Return for Subordinated Debt

- Private mezzanine debt securities are typically used to fund middle-market companies with total revenue of less than $500 million. These securities include debt with an equity option. The equity option is usually a contingent common equity interest, either by way of warrants or a conversion option to which registration rights are typically attached. Interest payments on private mezzanine debt securities usually involve both a cash pay portion and paid-in-kind ("PIK") portion. The total stated interest rate usually ranges between 12.0% and 19.0%, with the cash portion of interest generally ranging between 10.0% and 15.0%, and the remainder interest portion in PIK. Mezzanine investors are typically looking for a 14.0% to 20.0% all-in return (including the return from the equity component). Private mezzanine debt securities usually have a maturity of between six and eight years. The average transaction size for mezzanine securities typically ranges between $10 million and $30 million.
- For higher risk mezzanine transactions with smaller companies in cyclical industries that have high leverage ratios, mezzanine investors are typically looking for a 20.0% to 25.0% all-in return.
- In connection with the issuance of their respective Subordinated Notes, in exchange for fewer Warrants, the Seller and SPCP received certain rights that require their consent in the event the Company elects to assume additional indebtedness. Accordingly, for purposes of our analysis, we calculated an IRR for each of (i) the Seller and SPCP Subordinated Notes; and (ii) the William Thomas Subordinated Note.

# XI. FAIRNESS ANALYSIS

**Calculation of IRR for Chaudhuri & SPCP Subordinated Notes**

*In Thousands of U.S. Dollars*

| | For the Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| **Internal Rate of Return** | |
|---|---|

[a] Based on cash interest of per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of per share as of August 31, 2020 less the exercise price of multipled by warrants outstanding.

# XI. Fairness Analysis

**Calculation of IRR for Thomas Subordinated Notes**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| **Internal Rate of Return** | |
|---|---|

[a] Based on cash interest of per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of per share as of August 31, 2020 less the exercise price of multiplied by warrants outstanding.

# XI. Fairness Analysis

## Warrant Strike Price

**Post-Transaction Fair Market Value of Common Stock**

*In Thousands of U.S. Dollars*

| | | Indicated Value | |
|---|---|---|---|
| | | Low | High |
| **Enterprise Value** | | | |
| Add: Cash and Cash Equivalents | | | |
| Less: Capital Leases | | | |
| Less: Line of Credit | | | |
| Less: Term Loan | | | |
| Less: Thomas Subordinated Notes | | | |
| Less: Chaudhuri & SPCP Subordinated Notes | | | |
| Less: Fair Market Value of Retention SARs | | | |
| Add: Present Value of QAF Payments | | | |
| Add: Present Value of ESOP Debt Tax Benefit | | | |
| Add: Receivable from Former Shareholder | | | |
| Less: After-Tax Contingent Reserve | | | |
| **Total Adjustments to Enterprise Value** | | | |
| **Marketable, Controlling-Interest Value of Equity** | | | |
| Less: Discount for Limited Marketability | 5.0% | | |
| **Fair Market Value of Equity (Rounded)** | | | |
| Divided by: Common Shares Outstanding (Thousands) | | | |
| **Fair Market Value of Equity Per Share** | | | |
| **90% of Fair Market Value of Equity Per Share** | | | |
| **Proposed Strike Price** | | | | 

# XI. Fairness Analysis

## Additional Considerations

- Our analysis does not ascribe value to Future QAF payments or QAF programs beyond 2024.
  - However, in the event of a Future QAF, the Company is entitled to 40% of all Future QAF payments covering any of the periods from January 1, 2017 to December 31, 2024. The Company is entitled to 100% of all QAF payments in 2025 and beyond.
  - Given the complexity of the regulatory and legislative processes, there is a high degree of uncertainty in accurately forecasting Future QAF payments. Still, industry analysts generally forecast stable QAF funding conditions. Furthermore, the Company has averaged approximately [REDACTED] in QAF income over the past five years.
- Our concluded range of Enterprise Value for the Hospitals is [REDACTED] a representative level of LTM EBITDA of [REDACTED].
  - These implied multiples represent a significant discount to the guideline public company multiples of 9.7x LTM EBITDA and 9.2x LTM EBITDA for the guideline transactions.
  - This discount accounts for risks inherent in the Company's ability to maintain or grow current levels of profitability. Furthermore, our selected multiples implicitly give little value to the Company's forecasted results. Absent these risks and uncertainties (i.e. if the Company had a track record of stable profitability), we would have selected higher multiples.

# Section XII

# Opinion

KPC
Healthcare, Inc.

- 85 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1045

CONFIDENTIAL

STOUT_0000105

# XII. OPINION

## Opinion

Based on all of the foregoing, it is our Opinion, as of the date hereof, that:

- the Consideration to be paid by the ESOP for the shares of KPC common stock pursuant to the terms of the Stock Purchase Transaction is not greater than the Fair Market Value of such shares;
- the interest rates on each of the ESOP Loans and the Amended and Restated ESOP Loan are not in excess of reasonable rates;
- the financial terms of each of the ESOP Loans and the Amended and Restated ESOP Loan are at least as favorable to the ESOP as would be the terms of comparable loans resulting from arm's-length negotiations between independent parties;
- the strike price of the Warrants, on a per share basis, is equal to at least 90% of the Fair Market Value of one share of the underlying common stock of the Company on the date the Warrant is issued; and
- the terms and conditions of the Transactions, taken as a whole, are fair to the ESOP from a financial point of view.

## Assumptions and Limiting Conditions

- This Opinion is solely for the use and benefit of the Trustee, and any summary of or reference to the Opinion or any other reference to SRR by the Company will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld. The Opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.
- Reference should be made to Appendix G, as well as our engagement letter dated May 6, 2015, for assumptions and limiting conditions that are applicable to our conclusions and our financial advisory role.

# Appendix A

## Valuation Exhibits

- 87 -

KPC
Healthcare, Inc.

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1047

CONFIDENTIAL

STOUT_0000107

# A. VALUATION EXHIBITS

**Exhibit A - Conclusion of Value**

| *U.S. Dollars in Thousands* | | | Indicated Range of Value | |
|---|---|---|---|---|
| | | | Low | High |
| Guideline Company Method | | $ | | |
| Transaction Method | | | | |
| Discounted Cash Flow Method | | | | |
| **Concluded Enterprise Value** | | | | |
| Less: Net Interest-Bearing Debt [a] | | | | |
| Add: Receivable from Shareholder [b] | | | | |
| Add: Present Value of QAF Payments | | | | |
| Less: After-Tax Contingent Reserve | | | | |
| **Total Adjustments to Enterprise Value** | | | | |
| **Marketable, Controlling-Interest Value of Equity (Rounded)** | | | | |
| Less: Discount for Limited Marketability | 5.0% | | | |
| **Fair Market Value of Equity (Rounded)** | | $ | | |

[a] Pursuant to the Stock Purchase Agreement.
[b] Based on the Company's balance sheet as of June 30, 2015.

# A. Valuation Exhibits

### Exhibit B - Reported Balance Sheets

| *U.S. Dollars in Thousands* | As of | | | | | |
|---|---|---|---|---|---|---|
| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 |
| Cash and Cash Equivalents | | | | | | |
| Accounts Receivable, Net | | | | | | |
| Inventories | | | | | | |
| Due from Governmental Payers | | | | | | |
| Hospital Quality Assurance Fee Receivable | | | | | | |
| Prepaid Insurance | | | | | | |
| Prepaid Income Taxes | | | | | | |
| Deferred Tax Assets, Net | | | | | | |
| Other Prepaid Expenses and Current Assets | | | | | | |
| **Total Current Assets** | | | | | | |
| | | | | | | |
| **Net Property and Equipment** | | | | | | |
| | | | | | | |
| Other Assets | | | | | | |
| Receivable from Shareholder | | | | | | |
| Deferred Tax Assets, Net | | | | | | |
| **Total Other Assets** | | | | | | |
| | | | | | | |
| **Total Assets** | | | | | | |

Source: Internally-prepared financial statements for fiscal years 2011 through 2013, audited financial statements for fiscal years 2014 and 2015, and internally-prepared financial statements for the latest 12-month period ended June 30, 2015.

# A. Valuation Exhibits

## Exhibit B - Reported Balance Sheets

| *U.S. Dollars in Thousands* | As of | | | | | |
|---|---|---|---|---|---|---|
| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 |
| Revolving Line of Credit | | | | | | |
| Current Portion of Long-Term Debt | | | | | | |
| Accounts Payable | | | | | | |
| Accrued Expenses | | | | | | |
| Accrued Insurance Retentions | | | | | | |
| Hospital Quality Assurance Payable | | | | | | |
| Interest Payable | | | | | | |
| Income Taxes Payable | | | | | | |
| Other Current Liabilities | | | | | | |
| **Total Current Liabilities** | | | | | | |
| | | | | | | |
| Capital Lease Obligations and Long-Term Debt | | | | | | |
| Warrant Liability | | | | | | |
| **Total Long-Term Liabilities** | | | | | | |
| | | | | | | |
| **Total Liabilities** | | | | | | |
| | | | | | | |
| Common Stock and Additional Paid-In Capital | | | | | | |
| Retained Earnings | | | | | | |
| Shareholder Note | | | | | | |
| **Total Stockholders' Equity** | | | | | | |
| | | | | | | |
| **Total Liabilities & Stockholders' Equity** | | | | | | |

Source: Internally-prepared financial statements for fiscal years 2011 through 2013, audited financial statements for fiscal years 2014 and 2015, and internally-prepared financial statements for the latest 12-month period ended June 30, 2015.

# A. Valuation Exhibits

## Exhibit B - Reported Income Statements

| *U.S. Dollars in Thousands* | For the Fiscal Year Ended | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/31/2011 | % | 3/31/2012 | % | 3/31/2013 | % | 3/31/2014 | % | 3/31/2015 | % | 6/30/2015 | % |
| Patient Service Revenues | | | | | | | | | | | | |
| Provision for Bad Debts | | | | | | | | | | | | |
| **Net Revenue** | | | | | | | | | | | | |
| Salaries and Benefits | | | | | | | | | | | | |
| Supplies | | | | | | | | | | | | |
| Other Operating Expenses | | | | | | | | | | | | |
| Depreciation & Amortization | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | |
| **Operating Income** | | | | | | | | | | | | |
| Other Income (Expense) | | | | | | | | | | | | |
| **EBIT** | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | | | |
| Income Taxes | | | | | | | | | | | | |
| **Net Income** | | | | | | | | | | | | |
| **EBIT** | | | | | | | | | | | | |
| **EBITDA** | | | | | | | | | | | | |

Source: Internally-prepared financial statements for fiscal years 2011 through 2013, audited financial statements for fiscal years 2014 and 2015, and internally-prepared financial statements for the latest 12-month period ended June 30, 2015.

# A. Valuation Exhibits

**Exhibit B - Reported Monthly Income Statements**

| *U.S. Dollars in Thousands* | 1/31/2015 | % | 2/28/2015 | % | 3/31/2015 | % | 4/30/2015 | % | 5/31/2015 | % | 6/30/2015 | % | 6 Months Ended 6/30/2015 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Revenue** | | | | | | | | | | | | | | |
| Salaries and Benefits | | | | | | | | | | | | | | |
| Supplies | | | | | | | | | | | | | | |
| Other Operating Expenses | | | | | | | | | | | | | | |
| Depreciation & Amortization | | | | | | | | | | | | | | |
| S,G&A Expenses | | | | | | | | | | | | | | |
| **Operating Income** | | | | | | | | | | | | | | |
| Investment Income | | | | | | | | | | | | | | |
| Warrant Expense | | | | | | | | | | | | | | |
| Change in Fair Value of Warrants | | | | | | | | | | | | | | |
| Other Income (Expense) | | | | | | | | | | | | | | |
| **EBIT** | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | | | | | |
| Income Taxes | | | | | | | | | | | | | | |
| **Net Income** | | | | | | | | | | | | | | |
| **EBIT** | | | | | | | | | | | | | | |
| **EBITDA** | | | | | | | | | | | | | | |

Source: Internally-prepared financial statements.

# A. VALUATION EXHIBITS

**Exhibit C - Historical Adjusted Earnings**

| *U.S. Dollars in Thousands* | For the Fiscal Year Ended | | | | | | | | | | 12 Months | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/31/2011 | % | 3/31/2012 | % | 3/31/2013 | % | 3/31/2014 | % | 3/31/2015 | % | Ended 6/30/2015 | % | 5-Year Average [a] | % |
| **Net Revenue** | | | | | | | | | | | | | | |
| Less: Recognized QAF Income | | | | | | | | | | | | | | |
| **Adjusted Revenue** | | | | | | | | | | | | | | |
| *Growth Rate* | | | | | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | | | | | |
| Investment Income | | | | | | | | | | | | | | |
| Warrant-Related Expense | | | | | | | | | | | | | | |
| Litigation Expenses | | | | | | | | | | | | | | |
| Severance Expense | | | | | | | | | | | | | | |
| Transaction Expenses | | | | | | | | | | | | | | |
| QAF Income, Net | | | | | | | | | | | | | | |
| Consulting Fees | | | | | | | | | | | | | | |
| Appeal Contingency | | | | | | | | | | | | | | |
| Bank Fees | | | | | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | | | | | |
| Adjusted Earnings Before Taxes | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | | | | | |
| **Adjusted EBIT** | | | | | | | | | | | | | | |
| **Adjusted EBITDA** | | | | | | | | | | | | | | |

[a] Based on fiscal years 2011 through 2015.

# A. VALUATION EXHIBITS

**Exhibit C - Historical Adjusted Monthly Earnings**

| *U.S. Dollars in Thousands* | Annualized |
|---|---|
| **Net Revenue** | |
| Less: Recognized QAF Income | |
| **Adjusted Revenue** | |
| **Earnings Before Taxes** | |
| Investment Income | |
| Warrant-Related Expense | |
| Severance Expense | |
| Transaction Expenses | |
| QAF Income, Net | |
| Consulting Fees | |
| Appeal Contingency | |
| **Total Adjustments** | |
| Adjusted Earnings Before Taxes | |
| Interest Expense | |
| Depreciation and Amortization | |
| **Adjusted EBIT** | |
| **Adjusted EBITDA** | |

# A. VALUATION EXHIBITS

## Exhibit D - Ratio Analysis

| | For the Fiscal Year Ended | | | | | 12 Months Ended | 5-Year |
|---|---|---|---|---|---|---|---|
| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 | Average [b] |
| **Activity Ratios** | | | | | | | |
| Receivables Turnover | | | | | | | |
| Asset Turnover | | | | | | | |
| **Liquidity and Working Capital Ratios** | | | | | | | |
| Current Ratio | | | | | | | |
| Current Ratio (Net of Cash, NOAs, & IBD) | | | | | | | |
| Net Working Capital / Net Revenue | | | | | | | |
| Days in Accounts Receivable | | | | | | | |
| - Days in Accounts Payable | | | | | | | |
| **Net Trade Cycle** | | | | | | | |
| **Leverage and Coverage [a]** | | | | | | | |
| Liabilities / Equity | | | | | | | |
| Debt / (Debt + Equity) | | | | | | | |
| Assets / Equity | | | | | | | |
| EBIT / Interest Expense | | | | | | | |
| Total Debt / EBITDA | | | | | | | |
| **Profitability [a]** | | | | | | | |
| EBITDA Margin | | | | | | | |
| EBIT Margin | | | | | | | |
| Net Profit Margin | | | | | | | |
| Return on Assets | | | | | | | |
| Return on Equity | | | | | | | |
| **Other Ratios [a]** | | | | | | | |
| Depreciation and Amortization / Sales | | | | | | | |
| Net Capital Expenditures / Sales | | | | | | | |
| Unlevered Free Cash Flow / Sales | | | | | | | |

[a] Ratios are calculated based on adjusted results.
[b] Based on fiscal years 2011 through 2015.

# A. VALUATION EXHIBITS

**Exhibit E - Projected Income Statements**

| *U.S. Dollars in Thousands* | For the Fiscal Year Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2016 | % | 3/31/2017 | % | 3/31/2018 | % | 3/31/2019 | % |
| **Net Revenue** | | | | | | | | |
| Salaries and Benefits | | | | | | | | |
| Supplies | | | | | | | | |
| Other Operating Expenses | | | | | | | | |
| Depreciation & Amortization | | | | | | | | |
| Operating Expenses | | | | | | | | |
| **Operating Income** | | | | | | | | |
| Other Income (Expense) | | | | | | | | |
| **EBIT** | | | | | | | | |
| Interest Expense | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | |
| Income Taxes | | | | | | | | |
| **Net Income** | | | | | | | | |

Source: Company management prepared projections.



# A. VALUATION EXHIBITS

**Exhibit F - Projected Adjusted Earnings**

| *U.S. Dollars in Thousands* | Annualized 6 Months Ended 6/30/2015 [a] | % | For the Fiscal Year Ending 3/31/2016 | % | 3/31/2017 | % | 3/31/2018 | % | 3/31/2019 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Revenue** | | | | | | | | | | |
| Less: Recognized QAF Income | | | | | | | | | | |
| **Adjusted Revenue** | | | | | | | | | | |
| *Growth Rate* | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | |
| Recognized QAF Income | | | | | | | | | | |
| Increase in Management Fee | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | |
| Adjusted Earnings Before Taxes | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | |
| **Adjusted EBIT** | | | | | | | | | | |
| **Adjusted EBITDA** | | | | | | | | | | |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.

# A. VALUATION EXHIBITS

## Exhibit G - Guideline Company Method

*U.S. Dollars in Thousands*

| | KPC Healthcare, Inc. Results | Indicated Pricing Multiples[a] Low | High | Mean | Median | Selected Multiples | | | Indicated Values | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Next Fiscal Year: EBITDA | $ [redacted] | 7.9x | 11.2x | 9.2x | 9.1x | [redacted] | - | [redacted] | $ [redacted] | - | $ [redacted] |
| Representative Level [b]: EBITDA | [redacted] | 8.2x | 11.8x | 9.9x | 9.7x | [redacted] | - | [redacted] | [redacted] | - | [redacted] |
| | | **Enterprise Value, Controlling Interest Basis (Rounded)** | | | | | | | **$ [redacted]** | - | **$ [redacted]** |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.
[b] Based on the Company's annualized financial results for the six months ended June 30, 2015.

# A. VALUATION EXHIBITS

**Exhibit G - Implied Pricing Multiples [a]**

*Multiples as of August 28, 2015*

| | EV / NFY EBITDA | EV / LTM EBITDA |
|---|---|---|
| Community Health Systems, Inc. | 7.9x | 8.2x |
| HCA Holdings, Inc. | 9.1x | 9.2x |
| LifePoint Health, Inc. | 8.3x | 9.3x |
| Tenet Healthcare Corp. | 9.5x | 10.0x |
| Universal Health Services Inc. | 11.2x | 11.8x |
| HEALTHSOUTH Corp. | 10.0x | 10.8x |
| Kindred Healthcare Inc. | 8.5x | n/m |
| Low | 7.9x | 8.2x |
| High | 11.2x | 11.8x |
| Mean | 9.2x | 9.9x |
| Median | 9.1x | 9.7x |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.



# A. VALUATION EXHIBITS

## Exhibit G - Calculation of Enterprise Value

*In Millions of U.S. Dollars, except per Share Price*

| General Market Information | | Community Health Systems, Inc. | HCA Holdings, Inc. | LifePoint Health, Inc. | Tenet Healthcare Corp. | Universal Health Services Inc. | HEALTHSOUTH Corp. | Kindred Healthcare Inc. |
|---|---|---|---|---|---|---|---|---|
| Ticker Symbol | | CYH | HCA | LPNT | THC | UHS | HLS | KND |
| Stock Exchange | | NYSE | NYSE | NasdaqGS | NYSE | NYSE | NYSE | NYSE |
| Fiscal Year End | | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 |
| Latest Financial Information | | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 |
| Next Fiscal Year | | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 |
| 20-Day Average Common Stock Price (08/28/2015) [a] | | $ 62.21 | $ 98.67 | $ 88.93 | $ 56.88 | $ 155.84 | $ 48.55 | $ 23.58 |
| 20-Day Average Common Stock Price (12/31/2014) [a] | | 57.83 | 81.05 | 78.95 | 55.73 | 119.32 | 42.90 | 20.08 |
| Percent Change | | 7.6% | 21.7% | 12.6% | 2.1% | 30.6% | 13.2% | 17.4% |
| Average Percent Change | 15.0% | | | | | | | |
| Median Percent Change | 13.2% | | | | | | | |
| 52-Week Price Range | | | | | | | | |
| 52-Week High Common Stock Price [a] | | 71.50 | 105.04 | 97.00 | 69.97 | 163.43 | 53.21 | 27.13 |
| 52-Week Low Common Stock Price [a] | | 49.21 | 48.30 | 69.25 | 45.62 | 105.19 | 39.42 | 18.63 |
| **Calculation of Enterprise Value** | | | | | | | | |
| 20-Day Average Stock Price (08/28/2015) | | $ 62.21 | $ 98.67 | $ 88.93 | $ 56.88 | $ 155.84 | $ 48.55 | $ 23.58 |
| Multiplied by: Shares Outstanding | | 115.3 | 416.3 | 44.4 | 99.3 | 99.0 | 91.5 | 83.7 |
| **Market Value of Equity ("MVE")** | | **$ 7,171.0** | **$ 41,080.9** | **$ 3,948.3** | **$ 5,649.0** | **$ 15,432.1** | **$ 4,442.1** | **$ 1,973.6** |
| Add: Total Debt | | 16,937.0 | 29,904.0 | 2,211.1 | 14,754.0 | 3,035.3 | 2,125.8 | 3,259.7 |
| Add: Preferred Stock | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Add: Minority Interest in Subsidiaries | | 607.0 | 1,451.0 | 117.4 | 1,806.0 | 310.6 | 257.3 | 193.3 |
| Less: Cash and Short-Term Investments | | (365.0) | (750.0) | (422.8) | (299.0) | (42.5) | (52.9) | (224.1) |
| **Enterprise Value ("EV")** | | **$ 24,350.0** | **$ 71,685.9** | **$ 5,854.0** | **$ 21,910.0** | **$ 18,735.6** | **$ 6,772.3** | **$ 5,202.5** |

[a] The share prices of the guideline companies incorporate a control premium of 10.0%.

Source: Capital IQ, Inc.

# A. Valuation Exhibits

## Exhibit G - Selected Financial Information [a]

*In Millions of U.S. Dollars*

| Size (LTM Net Sales) | |
|---|---|
| HCA Holdings, Inc. | $38,429.0 |
| Community Health Systems, Inc. | 19,491.0 |
| Tenet Healthcare Corp. | 17,568.0 |
| Universal Health Services Inc. | 8,575.8 |
| Kindred Healthcare Inc. | 6,003.0 |
| LifePoint Health, Inc. | 4,963.0 |
| HEALTHSOUTH Corp. | 2,678.0 |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **$8,575.8** |

| Size (LTM EBITDA) | |
|---|---|
| HCA Holdings, Inc. | $7,753.0 |
| Community Health Systems, Inc. | 2,982.0 |
| Tenet Healthcare Corp. | 2,202.0 |
| Universal Health Services Inc. | 1,585.3 |
| HEALTHSOUTH Corp. | 629.3 |
| LifePoint Health, Inc. | 627.5 |
| Kindred Healthcare Inc. | 444.2 |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **$1,585.3** |

| Growth (4-Year Revenue CAGR) | |
|---|---|
| Tenet Healthcare Corp. | 22.4% |
| LifePoint Health, Inc. | 15.2% |
| Community Health Systems, Inc. | 15.1% |
| Kindred Healthcare Inc. | 10.6% |
| HEALTHSOUTH Corp. | 8.6% |
| HCA Holdings, Inc. | 7.7% |
| Universal Health Services Inc. | 7.0% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **10.6%** |

| Growth (1-Year Revenue) | |
|---|---|
| Kindred Healthcare Inc. | 42.6% |
| HEALTHSOUTH Corp. | 27.2% |
| LifePoint Health, Inc. | 22.6% |
| Universal Health Services Inc. | 13.1% |
| Tenet Healthcare Corp. | 11.8% |
| Community Health Systems, Inc. | 9.4% |
| HCA Holdings, Inc. | 8.4% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **13.1%** |

| Growth (4-Year EBITDA CAGR) | |
|---|---|
| Tenet Healthcare Corp. | 21.4% |
| Kindred Healthcare Inc. | 19.0% |
| Community Health Systems, Inc. | 14.6% |
| HEALTHSOUTH Corp. | 8.8% |
| Universal Health Services Inc. | 8.5% |
| HCA Holdings, Inc. | 7.3% |
| LifePoint Health, Inc. | 5.0% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **8.8%** |

| Growth (1-Year EBITDA) | |
|---|---|
| Kindred Healthcare Inc. | 67.9% |
| Tenet Healthcare Corp. | 27.3% |
| LifePoint Health, Inc. | 18.3% |
| Universal Health Services Inc. | 15.5% |
| Community Health Systems, Inc. | 14.6% |
| HEALTHSOUTH Corp. | 12.5% |
| HCA Holdings, Inc. | 8.9% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **15.5%** |

| Growth (NFY Revenue) | |
|---|---|
| Kindred Healthcare Inc. | 44.2% |
| HEALTHSOUTH Corp. | 29.2% |
| Universal Health Services Inc. | 26.4% |
| LifePoint Health, Inc. | 9.9% |
| Tenet Healthcare Corp. | 8.7% |
| HCA Holdings, Inc. | 6.3% |
| **KPC Healthcare, Inc.** | |
| Community Health Systems, Inc. | 5.2% |
| **Guideline Company Median** | **9.9%** |

| Growth (NFY EBITDA) | |
|---|---|
| Kindred Healthcare Inc. | 89.3% |
| **KPC Healthcare, Inc.** | |
| LifePoint Health, Inc. | 27.4% |
| HEALTHSOUTH Corp. | 16.4% |
| Universal Health Services Inc. | 12.3% |
| Tenet Healthcare Corp. | 9.6% |
| Community Health Systems, Inc. | 5.5% |
| HCA Holdings, Inc. | 2.7% |
| **Guideline Company Median** | **12.3%** |

| Growth (Long-Term Earnings) | |
|---|---|
| **KPC Healthcare, Inc.** | |
| Kindred Healthcare Inc. | 14.0% |
| Community Health Systems, Inc. | 13.3% |
| HCA Holdings, Inc. | 12.1% |
| Tenet Healthcare Corp. | 12.0% |
| HEALTHSOUTH Corp. | 11.3% |
| Universal Health Services Inc. | 10.1% |
| LifePoint Health, Inc. | 7.5% |
| **Guideline Company Median** | **12.0%** |

| Profitability (LTM EBITDA Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 23.5% |
| HCA Holdings, Inc. | 20.2% |
| Universal Health Services Inc. | 18.5% |
| Community Health Systems, Inc. | 15.3% |
| LifePoint Health, Inc. | 12.6% |
| Tenet Healthcare Corp. | 12.5% |
| Kindred Healthcare Inc. | 7.4% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **15.3%** |

| Profitability (5-Year Average EBITDA Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 24.2% |
| HCA Holdings, Inc. | 19.9% |
| Universal Health Services Inc. | 18.3% |
| Community Health Systems, Inc. | 15.2% |
| LifePoint Health, Inc. | 14.4% |
| Tenet Healthcare Corp. | 12.5% |
| Kindred Healthcare Inc. | 6.7% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **15.2%** |

| Profitability (LTM EBIT Margin) | |
|---|---|
| HEALTHSOUTH Corp. | 19.0% |
| HCA Holdings, Inc. | 15.3% |
| Universal Health Services Inc. | 14.0% |
| Community Health Systems, Inc. | 9.5% |
| Tenet Healthcare Corp. | 7.7% |
| LifePoint Health, Inc. | 7.1% |
| Kindred Healthcare Inc. | 4.8% |
| **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **9.5%** |

Source: Capital IQ, Inc. and KPC Healthcare, Inc. financials.
[a] LTM financial results based on the Company's annualized financial results for the six months ended June 30, 2015.

# A. VALUATION EXHIBITS

## Exhibit G - Selected Financial Information

*In Millions of U.S. Dollars*

| Profitability (5-Year Average EBIT Margin) | | Cash Flow (LTM Net Working Capital / Sales) | | Cash Flow (5-Year Average Net Working Capital / Sales) | | Cash Flow (LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| HEALTHSOUTH Corp. | 20.0% | HEALTHSOUTH Corp. | 11.8% | LifePoint Health, Inc. | 11.5% | LifePoint Health, Inc. | 2.4 |
| HCA Holdings, Inc. | 15.0% | Tenet Healthcare Corp. | 11.7% | HEALTHSOUTH Corp. | 10.3% | HEALTHSOUTH Corp. | 2.0 |
| Universal Health Services Inc. | 13.8% | Community Health Systems, Inc. | 11.0% | Community Health Systems, Inc. | 8.7% | Community Health Systems, Inc. | 1.7 |
| Community Health Systems, Inc. | 9.4% | HCA Holdings, Inc. | 9.4% | HCA Holdings, Inc. | 8.3% | Tenet Healthcare Corp. | 1.6 |
| LifePoint Health, Inc. | 8.3% | LifePoint Health, Inc. | 9.0% | Tenet Healthcare Corp. | 7.3% | Kindred Healthcare Inc. | 1.5 |
| Tenet Healthcare Corp. | 7.7% | Universal Health Services Inc. | 6.4% | Universal Health Services Inc. | 6.5% | HCA Holdings, Inc. | 1.5 |
| Kindred Healthcare Inc. | 3.6% | Kindred Healthcare Inc. | 6.1% | Kindred Healthcare Inc. | 6.2% | Universal Health Services Inc. | 1.4 |
| **KPC Healthcare, Inc.** | | **KPC Healthcare, Inc.** | | **KPC Healthcare, Inc.** | | **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **9.4%** | **Guideline Company Median** | **9.4%** | **Guideline Company Median** | **8.3%** | **Guideline Company Median** | **1.6** |

| Cash Flow (LTM Receivables Turnover) | | Cash Flow (5-Year Average Capital Expenditure / Sales) | | Leverage (LTM Total Debt to EBITDA) | | Leverage (Debt / EV) | |
|---|---|---|---|---|---|---|---|
| HEALTHSOUTH Corp. | 7.6 | HEALTHSOUTH Corp. | 6.4% | Kindred Healthcare Inc. | 7.3 | Community Health Systems, Inc. | 69.6% |
| Tenet Healthcare Corp. | 7.0 | HCA Holdings, Inc. | 5.8% | Tenet Healthcare Corp. | 6.7 | Tenet Healthcare Corp. | 67.3% |
| LifePoint Health, Inc. | 6.9 | LifePoint Health, Inc. | 5.7% | Community Health Systems, Inc. | 5.7 | Kindred Healthcare Inc. | 62.7% |
| HCA Holdings, Inc. | 6.6 | Tenet Healthcare Corp. | 5.4% | HCA Holdings, Inc. | 3.9 | HCA Holdings, Inc. | 41.7% |
| Universal Health Services Inc. | 6.3 | Community Health Systems, Inc. | 5.4% | LifePoint Health, Inc. | 3.5 | LifePoint Health, Inc. | 37.8% |
| Community Health Systems, Inc. | 5.6 | Universal Health Services Inc. | 4.9% | HEALTHSOUTH Corp. | 3.4 | HEALTHSOUTH Corp. | 31.4% |
| **KPC Healthcare, Inc.** | | Kindred Healthcare Inc. | 2.9% | **KPC Healthcare, Inc.** | | Universal Health Services Inc. | 16.2% |
| Kindred Healthcare Inc. | 4.8 | **KPC Healthcare, Inc.** | | Universal Health Services Inc. | 1.9 | **KPC Healthcare, Inc.** | |
| **Guideline Company Median** | **6.6** | **Guideline Company Median** | **5.4%** | **Guideline Company Median** | **3.9** | **Guideline Company Median** | **41.7%** |

Source: Capital IQ, Inc. and KPC Healthcare, Inc. financials.

# A. VALUATION EXHIBITS

## Exhibit H - Transaction Method

*In Millions of U.S. Dollars*

| | KPC Healthcare, Inc. | Indicated Pricing Multiples | | | | Selected | | | Indicated | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Results | Low | High | Mean | Median | Multiples | | | Values | | |
| Representative Level [a]: | | | | | | | | | | | |
| EBITDA | $ [redacted] | 5.0x | 15.1x | 9.1x | 9.2x | [redacted] | - | [redacted] | $ [redacted] | - | $ [redacted] |
| | Enterprise Value, Controlling Interest Basis (Rounded) | | | | | | | | $ [redacted] | - | $ [redacted] |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.

# A. VALUATION EXHIBITS

## Exhibit H - Guideline Transactions

*In Millions of U.S. Dollars*

| Close Date | Target | Acquirer | EV | Target LTM Fundamentals: Revenue | EBITDA | EBITDA Margin | Indicated Multiples: EV/LTM Revenue | EV/LTM EBITDA |
|---|---|---|---|---|---|---|---|---|
| 1/29/15 | **Hackettstown Regional Medical Center** Provides medical care services | **Atlantic Health System** Operates a network of hospitals | $54.0 | $89.7 | $7.5 | 8.3% | 0.60x | 7.2x |
| 8/1/14 | **MedWest Haywood** Provides healthcare services | **Duke LifePoint Healthcare (Nasdaq:LPNT)** Operates general acute care hospitals | $36.0 | $105.5 | $4.0 | 3.7% | 0.34x | 9.1x |
| 7/10/14 | **Stanly Health Services** Medical center | **Carolinas HealthCare System** Provides healthcare and wellness services and programs | $70.0 | $105.1 | $14.1 | 13.4% | 0.67x | 5.0x |
| 7/1/14 | **Garden City Hospital, Inc.** Owns and operates healthcare facilities | **Prime Healthcare Services, Inc.** Owns and operates acute care hospitals | $48.8 | $139.7 | $5.3 | 3.8% | 0.35x | 9.2x |
| 6/9/14 | **Casa Grande Regional Medical Center** Non-profit hospital | **Banner Health** Operates acute-care hospitals and healthcare facilities | $87.0 | $135.3 | $8.4 | 6.2% | 0.64x | 10.4x |
| 4/1/14 | **Sharon Regional Health System** Hospital with various satellite centers | **Community Health Systems, Inc. (NYSE:CYH)** Operates general acute care hospitals | $70.0 | $179.5 | $7.6 | 4.2% | 0.39x | 9.2x |
| 1/27/14 | **Health Management Associates, Inc. (NYSE:HMA)** Operates hospitals and other health care facilities | **Community Health Systems, Inc. (NYSE:CYH)** Operates general acute care hospitals | $7,630.0 | $5,868.3 | $880.1 | 15.0% | 1.30x | 8.7x |
| 10/25/13 | **Oak Park Hospital** Hospital and nursing care facility | **Rush University Medical Center** Not-for-profit academic medical center | $21.1 | $107.5 | $2.3 | 2.1% | 0.20x | 9.2x |
| 10/1/13 | **3 IASIS Healthcare Hospitals** Acute care hospitals | **HCA West Florida (NYSE:HCA)** Operates general, acute care hospitals | $146.0 | $231.3 | $15.8 | 6.8% | 0.63x | 9.2x |
| 10/1/13 | **Vanguard Health Systems (NYSE:VHS)** Operates hospitals and outpatient facilities | **Tenet Healthcare Corporation (NYSE:THC)** Healthcare services company | $4,295.6 | $5,936.7 | $523.9 | 8.8% | 0.72x | 8.2x |
| 6/28/13 | **Physicians Specialty Hospital** General acute care hospital | **Carter Validus Mission Critical REIT** Private investment firm | $22.6 | $94.8 | $1.5 | 1.6% | 0.24x | 15.1x |
| Low | | | | $89.7 | $1.5 | 1.6% | 0.20x | 5.0x |
| High | | | | $5,936.7 | $880.1 | 15.0% | 1.30x | 15.1x |
| Mean | | | | $1,181.2 | $133.7 | 6.7% | 0.55x | 9.1x |
| Median | | | | $135.3 | $7.6 | 6.2% | 0.60x | 9.2x |

# A. VALUATION EXHIBITS

## Exhibit I - Discounted Cash Flow Method

*U.S. Dollars in Thousands*

| | For the Fiscal Year Ending | | | | |
|---|---|---|---|---|---|
| | Year 1 3/31/2016 | Year 2 3/31/2017 | Year 3 3/31/2018 | Year 4 3/31/2019 | Residual |
| **Distributable Cash Flows** | | | | | |
| EBITDA [a] | | | | | |
| Depreciation and Amortization | | | | | |
| Income Taxes | | | | | |
| **Debt-Free Net Income** | | | | | |
| Depreciation and Amortization | | | | | |
| Capital Expenditures | | | | | |
| Additional Working Capital [b] | | | | | |
| **Distributable Cash Flows** | | | | | |
| Partial Period Adjustment [c] | | | | | |
| **Distributable Cash Flows Allocated to Projection Period** | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | |
| Weighted Average Cost of Capital | | | | | |
| Discount Period [d] | | | | | |
| **Present Value Factor** | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | |

**Enterprise Value**

| | |
|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | |
| Present Value of Residual Cash Flows | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | $ |

**Terminal Value**

| | |
|---|---|
| Residual Cash Flow | |
| Weighted Average Cost of Capital | |
| Less: Residual Growth Rate | |
| **Capitalization Rate** | |
| **Residual Cash Flow Value** | |
| Present Value Factor | |
| **Present Value of Residual Cash Flows** | |

[a] Assumes no annual EBITDA growth rate for fiscal year 2017 and thereafter.
[b] Assumes net working capital equal to 2.0% of adjusted revenue, consistent with working capital levels as of June 30, 2015.
[c] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Transaction Date and the end of the first projection year.
[d] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.

# A. Valuation Exhibits

## Exhibit I - DCF Sensitivity Analysis

### Present Value of Discrete Cash Flows

| | For the Fiscal Year Ending | | | | |
|---|---|---|---|---|---|
| | Year 1<br>3/31/2016 | Year 2<br>3/31/2017 | Year 3<br>3/31/2018 | Year 4<br>3/31/2019 | Total |
| WACC | [redacted] | | | | |

### Present Value of Residual Cash Flows

| | Residual Year Growth Rate | | | | |
|---|---|---|---|---|---|
| | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
| WACC | [redacted] | | | | |

### Concluded Range of Enterprise Value

| | Residual Year Growth Rate | | | | |
|---|---|---|---|---|---|
| | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
| WACC | [redacted] | | | | |



# A. VALUATION EXHIBITS

## Exhibit I - Weighted Average Cost of Capital

| | | |
|---|---|---|
| **Required Return on Equity** | | |
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.6% |
| Market Equity Risk Premium | 6.0% | |
| Selected Equity Beta [b] | 0.95 | 5.7% |
| Small Stock Risk Premium [c] | | 5.8% |
| Company-Specific Risk Premium | | [redacted] |
| **Required Return on Equity - CAPM** | | [redacted] |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [d] | | [redacted] |
| Less: Income Tax Factor | 40.0% | -3.2% |
| **After-tax Cost of Debt** | | [redacted] |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure [e] | 65.0% | [redacted] |
| Debt Allocation of Capital Structure [e] | 35.0% | [redacted] |
| **Weighted Average Cost of Capital (Rounded)** | | [redacted] |

[a] 20-year U.S. Treasury bond yield as of the Transaction Date.
[b] Based on the selected guideline companies.
[c] Based on Duff & Phelps LLC, *2015 Valuation Handbook – Guide to Cost of Capital.*
[d] Based on the Company's actual cost of debt as of the Transaction Date.
[e] Based on an industry long-term average capital structure.

# A. VALUATION EXHIBITS

## Exhibit J - Analysis of Net Working Capital

*U.S. Dollars in Thousands*

| | As of | | | | | |
|---|---|---|---|---|---|---|
| **Historical Analysis** | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 |
| Accounts Receivable | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Inventories | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Other Prepaid Expenses and Current Assets | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Due from Governmental Payers | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Total Cash-Free Current Assets** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Accounts Payable | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Accrued Expenses | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Other Current Liabilities | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Total Debt-Free Current Liabilities** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Net Working Capital** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Adjusted Revenue | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Net Working Capital / Revenue** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

# A. Valuation Exhibits

## Exhibit K - Present Value of QAF Income

*U.S. Dollars in Thousands*

| Month Ending | QAF Net Payments | Discount Period | Present Value Factor @ 7.0% | Present Value of QAF Payments |
|---|---|---|---|---|
| 9/30/2015 | | 0.09 | 0.9940 | $ |
| 10/31/2015 | | 0.18 | 0.9882 | |
| 11/30/2015 | | 0.26 | 0.9829 | |
| 12/31/2015 | | 0.34 | 0.9771 | |
| 1/31/2016 | | 0.43 | 0.9717 | |
| 2/29/2016 | | 0.50 | 0.9666 | |
| 3/31/2016 | | 0.59 | 0.9608 | |
| 4/30/2016 | | 0.67 | 0.9555 | |
| 5/31/2016 | | 0.76 | 0.9500 | |
| 6/30/2016 | | 0.84 | 0.9448 | |
| 7/31/2016 | | 0.93 | 0.9393 | |
| 8/31/2016 | | 1.01 | 0.9341 | |
| 9/30/2016 | | 1.09 | 0.9290 | |
| 10/31/2016 | | 1.18 | 0.9236 | |
| 11/30/2016 | | 1.26 | 0.9186 | |
| 12/31/2016 | | 1.34 | 0.9132 | |
| 1/31/2017 | | 1.43 | 0.9081 | |
| 2/28/2017 | | 1.50 | 0.9035 | |
| 3/31/2017 | | 1.59 | 0.8979 | |
| 4/30/2017 | | 1.67 | 0.8930 | |
| 5/31/2017 | | 1.76 | 0.8878 | |
| 6/30/2017 | | 1.84 | 0.8830 | |
| 7/31/2017 | | 1.93 | 0.8779 | |
| 8/31/2017 | | 2.01 | 0.8729 | |
| 9/30/2017 | | 2.09 | 0.8682 | |
| 10/31/2017 | | 2.18 | 0.8632 | |
| 11/30/2017 | | 2.26 | 0.8585 | |
| 12/31/2017 | | 2.34 | 0.8535 | |
| 1/31/2018 | | 2.43 | 0.8487 | |
| **Total QAF Payments** | | **Present Value of QAF Payments (Rounded)** | | **$** |

# Appendix B

## IRR Exhibits

KPC
Healthcare, Inc.

- 110 -

Valuation & Financial Opinions

SRR STOUT | RISIUS | ROSS

JAE 1070

CONFIDENTIAL

STOUT_0000130

# B. IRR EXHIBITS

**Exhibit A - Calculation of IRR for Chaudhuri & SPCP Subordinated Notes**

*In Thousands of U.S. Dollars*

| | For the Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | $ [redacted] | | | | | |
| Interest Payments [a] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Principal Payments | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Prepayments | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Payment for Warrants [b] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total Debt Cash Flows** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| **Internal Rate of Return** | [redacted] |
|---|---|

[a] Based on cash interest of [redacted] per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of [redacted] per share as of August 31, 2020 less the exercise price of [redacted] multiplied by [redacted] warrants outstanding.

## B. IRR EXHIBITS

**Exhibit A - Calculation of IRR for Thomas Subordinated Notes**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| **Internal Rate of Return** | [redacted] |
|---|---|

[a] Based on cash interest of [redacted] per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of [redacted] per share as of August 31, 2020 less the exercise price of [redacted] multiplied by [redacted] warrants outstanding. 

# B. IRR Exhibits

**Exhibit A - Debt Schedule - Base Case**

*In Thousands of U.S. Dollars*

**Capital Leases**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| Beginning Balance | | | | | |
| Interest Payment [a] | | | | | |
| Principal Payment | | | | | |
| Additional Principal Payment | | | | | |
| Total Debt Payment | | | | | |
| Ending Balance | | | | | |

[a] Based on cash interest of ███ per annum. Interest calculation is based on quarterly payments.

**Line of Credit**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| Beginning Balance | | | | | |
| Interest Payment [b] | | | | | |
| Principal Draw | | | | | |
| Principal Payment | | | | | |
| Total Debt Payment | | | | | |
| Ending Balance | | | | | |

[b] Based on cash interest of ███ per annum. Interest calculation is based on beginning balance.

**Term Loan**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| Beginning Balance | | | | | |
| Interest Payment [c] | | | | | |
| Principal Payment | | | | | |
| Additional Principal Payment | | | | | |
| Total Debt Payment | | | | | |
| Ending Balance | | | | | |

[c] Based on cash interest of ███ ███% with a ███ floor per annum. Interest calculation is based on quarterly payments.

## B. IRR Exhibits

### Exhibit A - Debt Schedule - Base Case

*In Thousands of U.S. Dollars*

#### Thomas Subordinated Notes

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| [redacted] | | | | | |

[d] Based on cash interest of [redacted] per annum.

#### Chaudhuri & SPCP Subordinated Notes

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| [redacted] | | | | | |

[e] Based on cash interest of [redacted] per annum.

## B. IRR Exhibits

**Exhibit A - Projected Cash Flow Statements - Base Case**

| *In Thousands of U.S. Dollars* | For the Year Ending | | | | |
|---|---|---|---|---|---|
| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| **Adjusted EBIT** | | | | | |
| Less: Interest Expense - Capital Leases | | | | | |
| Less: Interest Expense - Line of Credit | | | | | |
| Less: Interest Expense - Term Loan | | | | | |
| Less: Cash Interest Expense - Thomas Subordinated Notes | | | | | |
| Less: Interest Expense - Chaudhuri & SPCP Subordinated Notes | | | | | |
| Total Interest Expense | | | | | |
| **Adjusted Earnings Before Taxes** | | | | | |
| Less: Income Taxes | | | | | |
| Add: QAF Payments | | | | | |
| Less: Prepayment Fees | | | | | |
| Add: Depreciation and Amortization | | | | | |
| Less: Capital Expenditures | | | | | |
| Less: Additional Working Capital | | | | | |
| **Free Cash Flow ("FCF")** | | | | | |
| Prior Year's Cash Balance | | | | | |
| **Cash Available for Debt Payments** | | | | | |
| Less: Principal Payment - Term Loan | | | | | |
| Less: Principal Payment - Thomas Subordinated Notes | | | | | |
| Less: Principal Payment - Chaudhuri & SPCP Subordinated Notes | | | | | |
| Less: Warrant Repayment / Stock Repurchase | | | | | |
| Total Mandatory Financing Activities | | | | | |
| **FCF After Mandatory Financing Activities** | | | | | |
| Less: Payment / Draw - Line of Credit | | | | | |
| Less: Prepayments - Term Loan | | | | | |
| Less: Prepayments - Thomas Subordinated Notes | | | | | |
| Less: Prepayments - Chaudhuri & SPCP Subordinated Notes | | | | | |
| Total Discretionary Financing Activities | | | | | |
| **FCF After Cash Sweep(s)** | | | | | |

# B. IRR Exhibits

## Exhibit A - Projected Share Price

*In Thousands of U.S. Dollars*

| | For the Year Ending | | | | |
|---|---|---|---|---|---|
| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Adjusted EBITDA | | | | | |
| EBITDA Multiple | | | | | |
| **Enterprise Value** | | | | | |
| Add: Cash | | | | | |
| Add: Receivable from Former Shareholder | | | | | |
| Less: Capital Leases | | | | | |
| Less: Intrinsic Value of Retention SARs [a] | | | | | |
| Less: Intrinsic Value of Thomas Subordinated Notes Warrants [b] | | | | | |
| Less: Intrinsic Value of Chaudhuri & SPCP Subordinated Notes Warrants [ | | | | | |
| Add: ESOP Debt Tax Benefit | | | | | |
| Total Adjustments | | | | | |
| **Marketable, Controlling Interest Equity Value** | | | | | |
| Less: Discount for Limited Marketability | | | | | |
| **Projected Equity Value (Rounded)** | | | | | |
| Common Shares Outstanding (Thousands) | | | | | |
| **Projected Equity Value Per Share** | | | | | |

[a] Calculated based on the 732,316 SARs outstanding, each with an exercise price of $2.50.
[b] Calculated based on the 114,000 warrants outstanding, each with an exercise price of $2.50.
[c] Calculated based on the 3,800,000 warrants outstanding, each with an exercise price of $2.50.

# Appendix C

## Guideline Company Descriptions

KPC
Healthcare, Inc.

- 117 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1077

CONFIDENTIAL

STOUT_0000137

# C. Guideline Company Descriptions

## Community Health Systems, Inc.

Community Health Systems, Inc., together with its subsidiaries, provides general and specialized hospital healthcare services to patients in the United States. The company operates general acute care hospitals that offer a range of inpatient and outpatient medical and surgical services, such as general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric, and rehabilitation services, as well as skilled nursing and home care services based on individual community needs. It also provides outpatient services at urgent care centers, occupational medicine clinics, imaging centers, cancer centers, ambulatory surgery centers, and home health and hospice agencies. In addition, the company offers management and consulting services to non-affiliated general acute care hospitals. As of May 14, 2015, it owned, leased, or operated 199 affiliated hospitals in 29 states with approximately 30,000 licensed beds. Community Health Systems, Inc. was founded in 1985 and is headquartered in Franklin, Tennessee.

## HCA Holdings, Inc.

HCA Holdings, Inc., through its subsidiaries, provides health care services in the United States. It operates general, acute care hospitals that offer medical and surgical services, including inpatient care, intensive care, cardiac care, diagnostic, and emergency services; and outpatient services, such as outpatient surgery, laboratory, radiology, respiratory therapy, cardiology, and physical therapy services. The company also operates psychiatric hospitals, which provide therapeutic programs comprising child, adolescent and adult psychiatric care, adult and adolescent alcohol and drug abuse treatment, and counseling. In addition, it operates outpatient health care facilities consisting of freestanding ambulatory surgery centers, freestanding emergency care facilities, diagnostic and imaging centers, comprehensive outpatient rehabilitation and physical therapy centers, outpatient radiation and oncology therapy centers, and various other facilities. As of December 31, 2014, the company operated 166 hospitals, including 162 general acute care hospitals with 42,860 licensed beds; 3 psychiatric hospitals with 396 licensed beds; and 1 rehabilitation hospital, as well as 113 freestanding surgery centers. HCA Holdings, Inc. was founded in 1968 and is headquartered in Nashville, Tennessee.

## LifePoint Health, Inc.

LifePoint Health, Inc., through its subsidiaries, operates general acute care hospitals primarily in non-urban communities in the United States. Its hospitals offer a range of medical and surgical services, such as general surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, rehabilitation, and pediatric services, as well as specialized services comprising open-heart surgery, skilled nursing,

# C. GUIDELINE COMPANY DESCRIPTIONS

psychiatric care, and neuro-surgery. The company's hospitals also provide various outpatient services, including same-day surgery, laboratory, X-ray, respiratory therapy, imaging, sports medicine, and lithotripsy. In addition, it owns and operates schools of nursing and other allied health professions. As of February 12, 2015, LifePoint Health, Inc. operated 65 hospitals campuses in 21 states. The company was formerly known as LifePoint Hospitals, Inc. and changed its name to LifePoint Health, Inc. in May 2015. LifePoint Health, Inc. was founded in 1997 and is based in Brentwood, Tennessee.

## Tenet Healthcare Corp.

Tenet Healthcare Corporation, a healthcare services company, primarily operates acute care hospitals and related healthcare facilities in the United States. It operates through two segments, Hospital Operations and Other, and Conifer. The company's general hospitals offer acute care services, operating and recovery rooms, radiology services, respiratory therapy services, clinical laboratories, and pharmacies. It also provides intensive care, critical care and/or coronary care units, physical therapy, orthopedic, oncology, and outpatient services; tertiary care services, including open-heart surgery, neonatal intensive care, and neurosciences; quaternary care services in the areas of heart, liver, kidney, and bone marrow transplants; quaternary pediatric and burn services; advanced treatment options for patients; gamma-knife brain surgery; cyberknife radiation therapy for tumors and lesions in the brain, lung, neck, and spine; and outpatient services. In addition, the company offers clinical research programs related to cardiovascular disease, pulmonary disease, musculoskeletal disorders, neurological disorders, genitourinary disease, and various cancers, as well as drug and medical device studies. Further, it provides operational management for patient access, health information management, revenue integrity, and patient financial services; communications and engagement solutions to optimize the relationship between providers and patients; and management services comprising clinical integration, financial risk management, and population health management. As of July 15, 2015, the company operated 81 general acute care hospitals, 18 short-stay surgical hospitals, and approximately 400 outpatient centers in the United States; and 9 facilities in the United Kingdom. Tenet Healthcare Corporation was founded in 1967 and is headquartered in Dallas, Texas.

## Universal Health Services Inc.

Universal Health Services, Inc., through its subsidiaries, owns and operates acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers, and radiation oncology centers. The company's hospitals offer various services, including general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care,

## C. GUIDELINE COMPANY DESCRIPTIONS

coronary care, pediatric services, pharmacy services, and/or behavioral health services. As of February 26, 2015, it owned and/or operated 24 acute care hospitals and 216 behavioral health centers located in 37 states, Washington, D.C.; the United Kingdom; Puerto Rico; and the U.S. Virgin Islands. Universal Health Services, Inc. was founded in 1978 and is headquartered in King of Prussia, Pennsylvania.

### HealthSouth Corp.

HealthSouth Corporation owns and operates inpatient rehabilitation hospitals in the United States. The company provides specialized rehabilitative treatment on an inpatient and outpatient basis. Its inpatient rehabilitation hospitals offer specialized rehabilitative care services to patients in various disabilities or injuries due to medical conditions, such as strokes, hip fractures, and various debilitating neurological conditions. The company also provides facility-based and home-based post-acute services through its network of inpatient rehabilitation hospitals, home health agencies, and hospice agencies. As of December 31, 2014, it operated 107 inpatient rehabilitation hospitals, including 75 owned hospitals and 32 jointly owned hospitals in 29 states and Puerto Rico; and managed 3 inpatient rehabilitation units through management contracts. The company was founded in 1983 and is headquartered in Birmingham, Alabama.

### Kindred Healthcare Inc.

Kindred Healthcare, Inc. provides healthcare services in the United States. It operates in four divisions: Hospital, Nursing Center, Rehabilitation, and Care Management. The Hospital division operates transitional care hospitals that provide services for medically complex patients, including the critically ill, suffering from multiple organ system failures, primarily the cardiovascular, pulmonary, kidney, gastro-intestinal, and cutaneous systems. This division also operates inpatient rehabilitation hospitals, which offer services to patients who require intensive inpatient rehabilitative care. The Nursing Center division operates nursing centers and assisted living facilities that provide short stay patients and long stay residents with a range of medical, nursing, rehabilitative, pharmacy, and routine services, including daily dietary, social, and recreational services. The Rehabilitation division provides rehabilitation services, including physical and occupational therapies, and speech pathology services to residents and patients of nursing centers, acute and long-term acute care hospitals, outpatient clinics, home health agencies, assisted living facilities, school districts, and hospice providers under the RehabCare name. The Care Management division provides home health, hospice, and private duty services to patients in various settings, including homes, skilled nursing facilities, and other residential settings under the Kindred at Home name. As of December 31, 2014, Kindred

## C. GUIDELINE COMPANY DESCRIPTIONS

Healthcare, Inc. provided healthcare services in 2,872 locations, including 97 transitional care hospitals, 16 inpatient rehabilitation hospitals, 90 nursing centers, 22 sub-acute units, and 100 inpatient rehabilitation units; and 634 Kindred at Home hospice, home health, and non-medical home care locations, as well as a contract rehabilitation services business, which served, 1,913 non-affiliated facilities. The company is headquartered in Louisville, Kentucky.

# Appendix D

## Guideline Transaction Descriptions

KPC
Healthcare, Inc.

- 122 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1082

CONFIDENTIAL

STOUT_0000142

# D. Guideline Transaction Descriptions

## Hackettstown Regional Medical Center

Hackettstown Regional Medical Center provides medical care services to patients in New Jersey. It offers emergency care, diagnostic imaging, ambulance and transport, childbirth, lab/pathology, pediatric, sleep disorders, surgical, kids care, therapy, vascular, women's health, and wound healing services; cardiac services, including cardio-pulmonary, stress testing, cardiac echocardiography, electrocardiography, and electroencephalography; and outpatient counseling, consultation, and therapeutic services for adults and adolescents. The company also provides cancer care services, such as infusion therapy, radiation therapy, and PET/CT scanning services; services in the areas of diabetes/endocrinology, gastroenterology, intensive coronary care, mobile intensive care, pneumonia, respiratory therapy, stroke, and urology, as well as ear, nose, and throat; and pulmonary services. In addition, it provides surgical services that comprise in-patient surgery, bariatric surgery, minor procedures/same day surgery, and hip arthoscopy; and kids care services in the areas of apraxia of speech, articulation disorders, auditory processing disorders, autism spectrum disorders, cerebral palsy, developmental coordination disorders, developmental disability, dysarthria, hearing impairment, receptive and expressive language disorders, orthopedic conditions, sensory integration disorders, stuttering, tongue thrust, torticollis, traumatic brain injury, and voice disorders. Further, the company provides pastoral care services, including support, reassurance, and counseling to patients and their families, staff, physicians, and volunteers; and wellness programs. Hackettstown Regional Medical Center was formerly known as Hackettstown Community Hospital and changed its name in 1982. The company was founded in 1973 and is based in Hackettstown, New Jersey. As of January 29, 2015, Hackettstown Regional Medical Center operates as a subsidiary of Atlantic Health System, Inc.

## MedWest Haywood

MedWest Health System, Inc. provides healthcare services in Haywood, Jackson, Swain, Macon, and Graham Counties. It offers services in the areas of behavioral health, cancer, cardiac and invasive radiology, cardiopulmonary, case management, continence services, critical care, emergency department, emergency medical services, endoscopy, health promotion and education, health and fitness center, home care, hospice and palliative care, imaging, laboratory, medical acupuncture, medical records, nutritional, nursing, and occupational services; and a chaplaincy program. The company also provides orthopedic services, osteoporosis center, pain management, patient financial services, pharmacy, progressive care unit, pulmonary, rehabilitation, senior life, sleep, sports medicine, surgery, urgent care, vascular access nurse, women and children, wound care, orthopedics, and women's care

# D. GUIDELINE TRANSACTION DESCRIPTIONS

services, as well as diabetes education. MedWest Health System, Inc. was formerly known as Haywood Regional Medical Center and changed its name to MedWest Health System, Inc. in October 2009. The company was founded in 1927 and is based in Clyde, North Carolina with locations in Harris, Haywood, Swain, and Franklin, North Carolina. MedWest Health System, Inc. operates as a subsidiary of The Charlotte-Mecklenburg Hospital Authority.

## Stanly Health Services

Stanly Health Services, Inc. owns and operates a medical center and includes 119 beds. It also owns Stanly Medical Services, Stanly Manor nursing facility, Home Care of the Carolinas, and Alliance Medical Inc. and provides healthcare services and medical instruments. The company was founded in 1988 and is based in Albemarle, North Carolina. As of July 10, 2014, Stanly Health Services, Inc. operates as a subsidiary of The Charlotte-Mecklenburg Hospital Authority.

## Garden City Hospital, Inc.

Garden City Hospital Inc. owns and operates healthcare facilities. Its services include birth care, breast care, cancer care, cardiology, counseling, diabetes management, emergency, health and wellness, home health care, home medical equipment, hyperbaric treatment, imaging, laboratory services, neurology and neurosurgery, nutrition, orthopedics, outpatient infusion, pain management, pharmacy, prime medical group, pulse EMS, rehabilitation, respiratory/pulmonary, sleep medicine, sports medicine, stroke care, surgery, and wound care. The company also provides services ranging from obstetrics to end-of-life; residency programs; and medical education to students, interns, residents, and others. In addition, it operates deli and convenience stores in its hospitals. The company was founded in 1947 and is based in Garden City, Michigan. As of July 1, 2014, Garden City Hospital Inc. operates as a subsidiary of Prime Healthcare Services, Inc.

## Casa Grande Regional Medical Center

Banner Casa Grande Medical Center is a full-service non-profit hospital that provides health care to the Casa Grande Valley, as well as the surrounding areas. It offers cardiac catheterization laboratory, and obstetrical care unit and Joe Jonas nursery services; imaging services that include CT scanning, digital mammography, ultrasound, bone densitometry, X-rays, and MRI; and rehabilitation services that include physical, occupational, and speech therapy. The company also operates as urgent care facility to treat various illnesses, such as upper respiratory infections, coughs, ear infections, insect bites, nausea, diarrhea, minor burns, sunburns, fever, minor cuts, minor wound checks, pink eye, sore throat, colds and flu, urinary tract infections, vaginitis, STDs, mild abdominal pain, sprains, strains, and IV infusion. In addition, it

## D. Guideline Transaction Descriptions

offers wound center services; and anticoagulation clinic, case management, emergency care, heart care, GI and endoscopy, infection control, occupational health, pediatric, respiratory, sleep laboratory, surgical care, women's health, and outpatient surgery services. Banner Casa Grande Medical Center was formerly known as Casa Grande Regional Medical Center and changed its name to Banner Casa Grande Medical Center in 2014. The company was incorporated in 1981 and is based in Casa Grande, Arizona. As of June 9, 2014, Banner Casa Grande Medical Center operates as a subsidiary of Banner Health.

### Sharon Regional Health System

Sharon Regional Health System Inc. owns and operates a hospital with various satellite centers that provide a range of health and medical services to patients in northwest Pennsylvania and northeast Ohio. It offers services in the areas of wound recovery, bariatric surgery, behavioral health, breast care, cancer care, digestive diseases, corporate health services, diabetes care, diagnostic and imaging, ear/nose/throat care, emergency care, heart and vascular care, home health, hospice and palliative care, diagnostic and specialty care, inpatient and outpatient rehabilitation, interventional pain management, medical imaging, pediatric rehabilitation, sleep medicine, sports medicine, surgical services, travel clinic, therapeutic pool, transitional care, and women's health. The company also operates a nursing school for educating registered professional nurses; and radiography school that provides educational programs in the field of radiography. Sharon Regional Health System Inc. was formerly known as Sharon General Hospital and changed its name to Sharon Regional Health System Inc. in May 1990. The company was founded in 1893 and is based in Sharon, Pennsylvania. As of April 1, 2014, Sharon Regional Health System Inc. operates as a subsidiary of Community Health Systems, Inc.

### Health Management Associates, Inc.

Health Management Associates, Inc., through its subsidiaries, engages in the operation of general acute care hospitals and other health care facilities in non-urban communities in the United States. Its hospitals offer general surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, and pediatric services. The company also provides outpatient services, such as one-day surgery, laboratory, x-ray, respiratory therapy, cardiology, and physical therapy. In addition, its hospitals offer specialty services in cardiology, neuro-surgery, oncology, radiation therapy, computer-assisted tomography scanning, magnetic resonance imaging, lithotripsy, and full-service obstetrics. As of June 13, 2013, the company operated 71 hospitals with a total of 11,100 licensed beds in non-urban communities of Alabama, Arkansas, Florida, Georgia, Kentucky, Mississippi, Missouri, North Carolina, Oklahoma, Pennsylvania, South Carolina,

# D. Guideline Transaction Descriptions

Tennessee, Texas, Washington, and West Virginia. Health Management Associates was founded in 1977 and is based in Naples, Florida. As of January 27, 2014, Health Management Associates Inc. operates as a subsidiary of Community Health Systems, Inc.

## Oak Park Hospital

Rush Oak Park Hospital, Inc. (formerly known as Oak Park Hospital) operates as a general medical and surgical hospital and skilled nursing care facility in Oak Park, Illinois. Rush Oak Park Hospital was acquired by Rush University Medical Center on October 25, 2013.

## Three IASIS Healthcare Hospitals

IASIS Healthcare LLC, a healthcare services company, owns and operates acute care hospitals in urban and suburban markets. It operates through two segments, Acute Care and Health Choice. The company owns or leases 16 acute care hospital facilities and 1 behavioral health hospital facility with a total of 3,800 licensed beds. It operates acute care hospitals in Arizona, Arkansas, Colorado, Louisiana, Texas, and Utah. The company also offers healthcare services to approximately 340,900 members through various health care plans, accountable care networks, third party management and administrative services, and other managed care solutions. IASIS Healthcare LLC was founded in 1998 and is based in Franklin, Tennessee. IASIS Healthcare LLC is a subsidiary of IASIS Healthcare Corporation.

## Vanguard Health Systems

Vanguard Health Systems, Inc. owns and operates general acute care and specialty hospitals, and outpatient facilities in urban and suburban markets in the United States. The company's general acute care and specialty hospitals offer various medical and surgical services, including emergency services, general surgery, internal medicine, cardiology, obstetrics, orthopedics, and neurology, as well as tertiary services, such as open-heart surgery, advanced neurosurgery, children's specialty, level II and III neonatal intensive care, and level 1 trauma. It also provides on-campus and off-campus outpatient and ancillary services comprising outpatient surgery, physical therapy, rehabilitation, radiation therapy, home health, diagnostic imaging, and laboratory services, as well as outpatient services at its imaging centers and ambulatory surgery centers. In addition, it operates health plans, which include Phoenix Health Plan, a Medicaid managed health plan in Arizona; Abrazo Advantage Health Plan, a Medicare and Medicaid dual eligible managed health plan in Arizona; Chicago Health Systems, a contracting entity for outpatient services under multiple contracts and inpatient services for one contract in the Chicago area; ProCare Health Plan, a Medicaid managed health plan operating in

Michigan; and Valley Baptist Insurance Company that offers health maintenance organization products to its members in the form of large group, small group, and individual product offerings in south Texas. The company was founded in 1997 and is headquartered in Nashville, Tennessee. As of October 1, 2013, Vanguard Health Systems Inc. operates as a subsidiary of Tenet Healthcare Corp.

### Physicians Specialty Hospital

Physicians Specialty Hospital comprises an acute care surgical hospital. It includes 20 beads and is spread over an area of 55,740 square feet. The hospital is located in Fayetteville, Arkansas. As of June 28, 2013, Physicians Specialty Hospital in Fayetteville was acquired by Carter Validus Mission Critical REIT.

# Appendix E

## Control Premium

KPC
Healthcare, Inc.

- 128 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1088

CONFIDENTIAL

STOUT_0000148

# E. CONTROL PREMIUM

## Control Premium

The value of a fractional interest in a company may be equal to, more than, or less than a pro rata share of the value of the entire company. That is, certain valuation approaches provide indications of value on a controlling ownership basis, and other approaches provide indications of value on a minority ownership interest basis. The analyst must reconcile these differing value indications to arrive at an indication of value consistent with the purpose and objective of the assignment. The adjustment from a minority ownership interest basis to a controlling ownership interest basis is typically made by applying a premium for control.

In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of KPC, we arrive at an indication of the Fair Market Value of KPC on a minority ownership interest basis. Because our analysis seeks to value KPC on a controlling ownership basis interest, however, it is appropriate to apply a premium to the guideline company multiples to reflect the additional value of control.

With respect to the DCF Method, the indication of value can reflect a minority or a controlling ownership interest, depending on a number of factors. In our analysis, we used a capital structure based on industry averages and KPC's long-term optimal capital structure in estimating the WACC. In addition, based on our discussions with KPC's management and our review of KPC's financial projections, the forecasted results reflect optimal financial performance that a hypothetical financial buyer could not affect materially. Therefore, the indication of value from the DCF method in our analysis represents a controlling ownership interest value.

Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling shareholders' ability to exercise any or all of the various rights typically associated with control. As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in our selection of the appropriate control premium.

The most objective and established evidence of control premiums is the study of cash tender offers. By looking at premiums offered during a tender for control of a company with publicly held shares, we can approximate the difference between a controlling and minority ownership interest value.

# E. CONTROL PREMIUM

## Mergerstat Review

A control premium can be inferred by observing control premiums paid in acquisitions of publicly traded companies. *Mergerstat Review 2015* tracks publicly announced formal transfers of ownership of at least 10% of a company's equity. According to these annual studies, the premium paid for controlling interests relative to noncontrolling interests in publicly traded companies ranged from 23.1% to 41.1% over the past 20 years, with a median premium of 30.9%. The results of these studies are summarized in the table below.

**Percent Premium Paid Over Market Price**

| Year | Number of Transactions | Median Premium Paid | Year | Number of Transactions | Median Premium Paid |
|---|---|---|---|---|---|
| 1995 | 324 | 29.2% | 2005 | 392 | 24.1% |
| 1996 | 381 | 27.3% | 2006 | 454 | 23.1% |
| 1997 | 487 | 27.5% | 2007 | 491 | 24.7% |
| 1998 | 512 | 30.1% | 2008 | 294 | 36.5% |
| 1999 | 723 | 34.6% | 2009 | 239 | 39.8% |
| 2000 | 574 | 41.1% | 2010 | 348 | 34.6% |
| 2001 | 439 | 40.5% | 2011 | 321 | 37.8% |
| 2002 | 326 | 34.4% | 2012 | 323 | 37.1% |
| 2003 | 371 | 31.6% | 2013 | 257 | 29.7% |
| 2004 | 322 | 23.4% | 2014 | 328 | 28.7% |
| | | **20-Year Median Control Premium** | | | **30.9%** |

Source: Factset Mergerstat LLC, *Mergerstat Review 2015*.

In addition, we searched for control premiums paid in transactions within KPC's industry. According to *Mergerstat Review 2015,* there were five transactions in the health services industry in 2014 with an average control premium of 60.4%.

**Applicability to the Subject Company**

There is one important factor to consider when applying the data above to the Company. The transactions of the interests in the companies discussed above represent both financial and strategic acquisitions. Oftentimes, strategic acquisitions include a premium for such items as economies of scale, the reduction in competition, increased purchasing power, etc. Fair Market Value, however, represents a hypothetical buyer, not a specific strategic buyer. Accordingly, the control premium that would apply to an interest in KPC would be lower than that indicated by the study.

Based on the facts and circumstances related specifically to the KPC equity, we applied a 10.0% control premium to the stock prices of the guideline companies used in the Guideline Company Method to account for any enhanced benefits that may be realized by a controlling shareholder of KPC.

# Appendix F

## Discount for Limited Marketability

KPC
Healthcare, Inc.

- 131 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1091

CONFIDENTIAL

STOUT_0000151

# F. Discount for Limited Marketability

## Discount for Limited Marketability

In calculating the Company's market value of equity, it is appropriate to consider a discount for limited marketability. All else being equal, an investment in which the owner is able to achieve liquidity (i.e., convert into cash) quickly is worth more than an investment that is not as liquid. Thus, publicly traded companies, which are readily marketable, are worth more than privately held companies. The diminution in value associated with this factor is referred to as a discount for limited marketability.

There is a significant difference, however, between the stock held by an ESOP and similar, closely held, non-ESOP stock in that there is a mandatory repurchase obligation (often referred to as a "put" option) associated with the ESOP shares. This put option requires the ESOP company to repurchase a participant's shares upon certain events (such as retirement, death, or disability) unless they are purchased by the ESOP. Typically, a put option requires the ESOP company to repurchase the shares at the then prevailing Fair Market Value.

The effect of such a put option is that it greatly improves the marketability of the underlying closely held company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability. The selection of an appropriate discount for limited marketability for ESOP shares subject to a put option depends on several factors, including the payment terms of the put option, the ESOP company's historical record (if any) of redeeming ESOP shares, and the Company's financial ability to redeem the shares. However, the ultimate selection of a discount for limited marketability, if any, is a function of the analyst's professional judgment and experience.

We have analyzed the Company's ability to honor its put obligation. The Company generates sufficient cash flow to finance its repurchase obligation. Based on our analysis, we believe the Company should be able to honor the put obligations when they arise. Therefore, any discount for limited marketability would be minimal and would not exceed 5.0% of the market value of equity.

# Appendix G

## Assumptions and Limiting Conditions

KPC
Healthcare, Inc.

- 133 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1093

CONFIDENTIAL

STOUT_0000153

# G. Assumptions and Limiting Conditions

This report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company. However, we have exercised our independent judgment in evaluating the information that we received from the Company and/or its representatives, and we have not relied on information that we know to be inadequate or incomplete.
- For the purpose of this engagement and report, we have made no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.
- Our analysis assumes the assets and liabilities presented in the Company's June 30, 2015 balance sheet were intact as of that date and were not materially different as of the Transaction Date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.
- Our analysis is applicable for the stated date and purpose only, and may not be appropriate for any other date or purpose.
- Our services, this report, and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent.
- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. The analyses and opinions set forth herein do not constitute and should no way be interpreted to be a "solvency opinion."
- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.
- Stout Risius Ross, Inc. is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the report provided compensation arrangements for such additional services have been made.
- This analysis contemplates facts and conditions that are known or knowable as of the Transaction Date. Events and conditions occurring after the Transaction Date have not been considered, and Stout Risius Ross, Inc. has no obligation to update our report for such events and conditions.
- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

# Appendix H

## Statement of Qualifications

KPC
Healthcare, Inc.

- 135 -

Valuation & Financial Opinions
SRR
STOUT | RISIUS | ROSS

JAE 1095

CONFIDENTIAL

STOUT_0000155

# H. Statement of Qualifications

## Mark R. Fournier, CFA

Mark R. Fournier is a Managing Director in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. Mr. Fournier has nearly 20 years of experience with Employee Stock Ownership Plans including ESOP security formation; transaction analysis; determination of transaction fairness and adequate consideration; and annual valuation updates. He also has extensive experience providing fairness and solvency opinions for corporate acquisitions and divestitures; going-private transactions; leveraged buy-out transactions; leveraged recapitalizations; and related party transfers.

Mr. Fournier has significant experience in performing analyses for a broad array of industries, including, but not limited to advertising, architectural and engineering, aerospace and defense, automotive, banks and thrifts, broadcasting, consulting, construction, consumer goods, craft brewing, distribution, food and beverage, forest products, government contracting, healthcare, homebuilding, insurance, investment companies and partnerships, manufacturing, mining, oil and gas, plastics, printing and publishing, retailing, and trucking and transportation.

Mr. Fournier has lectured and presented at numerous professional conferences and seminars on a variety of ESOP related topics, involving valuation, ESOP transaction structures, and repurchase liability. He has also authored several articles related to the valuation of privately held companies and other ESOP related topics. Mr. Fournier was a contributing author to the chapter entitled "Valuation for Employee Stock Ownership Plans" in Business Valuation, published by the Law Journal Press. Mr. Fournier also was a contributing author to the chapter entitled "Estimating a Required Rate of Return for Use in the Income Approach" in Business Valuation: A Primer for the Legal Professional, published by the Business Law Section of the American Bar Association.

Mr. Fournier is the chair of the Finance Committee of the ESOP Association and former Vice President of the Michigan Chapter of the ESOP Association. Mr. Fournier is a member of the CFA Institute, the National Center for Employee Ownership, and the ESOP Association.

## H. STATEMENT OF QUALIFICATIONS

# Joseph D. Demetrius, CFA

Joseph D. Demetrius is a Vice President in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. He has experience in the valuation of business interests in both private and public corporations for numerous purposes, including providing fairness and solvency opinions in connection with corporate acquisitions and divestitures, financing events, and other corporate transactions. He has extensive experience in the valuation of equity interests in companies owned by Employee Stock Ownership Plans (ESOPs), and has performed analyses related to ESOP security design, determination of ESOP transaction fairness and adequate consideration, and annual ESOP-owned company valuation updates.

Among the many industries that Mr. Demetrius has served are advertising, construction, engineering, financial services, government and defense contracting, healthcare, information technology, paint, oil and gas services, and restaurants, among others. His experience spans a diverse client base, from regional middle-market businesses to large public corporations, private equity funds, law firms, and financial institutions.

Mr. Demetrius graduated from the University of North Carolina at Chapel Hill and has earned the right to use the Chartered Financial Analyst designation.