MORGAN, LEWIS & BOCKIUS LLP
Aimee Mackay, Bar No. 221690
aimee.mackay@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
Tel:   +1.213.612.2500
Fax:   +1.213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
Sari Alamuddin (admitted *pro hac vice*)
sari.alamuddin@morganlewis.com
Deborah Davidson (admitted *pro hac vice*)
deborah.davidson@morganlewis.com
110 N. Wacker Drive
Chicago, IL 60606-1511
Tel: +1.312.324.1000
Fax: +1.312.324.1001

Attorneys for Defendant
SPCP GROUP, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE GAMINO, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>SPCP GROUP, LLC,<br><br>    Defendant.<br><br>    and<br><br>KPC HEALTHCARE INC. EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>    Nominal Defendant. | Case No. 5:20-cv-01126-SB-SHK [Consolidated Case Number]<br><br>**EXHIBITS TO JOINT APPENDIX OF EVIDENCE RE: MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: August 5, 2022<br>Time:  8:30 am<br>Judge:  Hon. Stanley Blumenfeld, Jr.<br>Ctrm:  6C |

**JAE  PART 3 OF 5**

**EXHIBITS 16-24**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

EXHIBITS TO JOINT
APPENDIX OF EVIDENCE

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL**

# EXHIBIT 16

JAE 1098

**WARRANT PURCHASE AGREEMENT**

**AMONG**

**KPC HEALTHCARE HOLDINGS, INC.,
A CALIFORNIA CORPORATION**

**AND**

**SPCP GROUP, LLC,
A DELAWARE LIMITED LIABILITY COMPANY,
AS THE SELLER**

**AUGUST 28, 2015**

{00009793.DOCX 7}

CONFIDENTIAL
MCD00044381

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS. ........................................................................................ 4
    Section 1.1.    Definitions .................................................................................... 4
    Section 1.2.    Interpretation................................................................................ 10

ARTICLE II. PURCHASE AND SALE. ...................................................................... 11
    Section 2.1.    Agreement to Purchase and to Sell ............................................... 11
    Section 2.2.    Purchase Price .............................................................................. 11
    Section 2.3.    Closing Adjustment. ..................................................................... 11
    Section 2.4.    Time and Place of Closing ............................................................ 12
    Section 2.5.    Additional Consideration .............................................................. 12

ARTICLE III. REPRESENTATIONS AND WARRANTIES........................................ 15
    Section 3.1.    General Statement......................................................................... 15
    Section 3.2.    Representations and Warranties of the Seller ................................ 15
    Section 3.3.    Representations and Warranties of the Company........................... 17

ARTICLE IV. CONDITIONS PRECEDENT............................................................... 18
    Section 4.1.    Conditions Precedent to the Obligations of the Seller.................... 18
    Section 4.2.    Conditions Precedent to the Obligations of the Company............... 19

ARTICLE V. CLOSING DELIVERIES. ..................................................................... 20
    Section 5.1.    Form of Documents ...................................................................... 20
    Section 5.2.    Deliveries of the Sellers................................................................ 20
    Section 5.3.    Deliveries of the Company ............................................................ 20

ARTICLE VI. COVENANTS. ..................................................................................... 21
    Section 6.1.    Covenants of the Seller................................................................. 21
    Section 6.2.    Covenants of the Company ............................................................ 22

ARTICLE VII. INDEMNIFICATION. ........................................................................ 24
    Section 7.1.    General Statement......................................................................... 24
    Section 7.2.    Indemnification Obligations of the Seller....................................... 24
    Section 7.3.    Indemnification Obligations of the Company ................................. 24
    Section 7.4.    Claims ......................................................................................... 25
    Section 7.5.    Limitation on Rights to Indemnification ....................................... 25
    Section 7.6.    Procedures................................................................................... 27
    Section 7.7.    Assignment of Claims................................................................... 29
    Section 7.8.    Materiality.................................................................................... 29
    Section 7.9.    Sole Remedies; Right of Setoff ..................................................... 29
    Section 7.10.   Equitable Remedies ...................................................................... 30
    Section 7.11.   Tax Treatment of Indemnification Payments .................................. 30

ARTICLE VIII. MISCELLANEOUS. .......................................................................... 30
    Section 8.1.    Expenses ..................................................................................... 30
    Section 8.2.    Further Assurances ....................................................................... 30
    Section 8.3.    Notices ........................................................................................ 31
    Section 8.4.    Severability .................................................................................. 31
    Section 8.5.    Entire Agreement ......................................................................... 32

{00009793.DOCX 7}                                      i

CONFIDENTIAL                                                                                          MCD00044382

Section 8.6.    Amendment and Modification ........................................................ 32
Section 8.7.    Waiver........................................................................................... 32
Section 8.8.    Cumulative Remedies .................................................................... 32
Section 8.9.    Assignment ................................................................................... 32
Section 8.10.   Successors and Assigns ................................................................. 32
Section 8.11.   Third-Party Beneficiaries.............................................................. 32
Section 8.12.   Counterparts; Electronic Signatures .............................................. 33
Section 8.13.   Relationship of the Parties ............................................................ 33
Section 8.14.   Representations as to Compliance with Law................................... 33
Section 8.15.   Representation by Independent Counsel.......................................... 33
Section 8.16.   Dispute Resolution........................................................................ 34

**JAE 1101**

CONFIDENTIAL                    MCD00044383

# WARRANT PURCHASE AGREEMENT

**THIS WARRANT PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of the 28th day of August, 2015, by and between KPC HEALTHCARE HOLDINGS, INC., a California corporation, and it successors and permitted assigns (the "**Company**"), and SPCP GROUP, LLC, a Delaware limited liability company, and its successor and permitted assigns (the "**Seller**").

## RECITALS

**WHEREAS**, on April 13, 2010, Integrated Healthcare Holdings, Inc., a Nevada corporation, issued that certain Common Stock Warrant to the Seller, which entitles the holder thereof to acquire 79,182,635 shares of Common Stock of Integrated Healthcare Holdings, Inc. (the "**SPCP Group Warrant I**"), a copy of which is attached hereto as **Exhibit A-1**;

**WHEREAS**, on April 13, 2010, Integrated Healthcare Holdings, Inc. issued that certain Common Stock Warrant to SPCP Group IV, LLC, a Delaware limited liability company, which entitled the holder thereof to acquire 16,817,365 shares of Common Stock of Integrated Healthcare Holdings, Inc. (the "**SPCP Group IV Warrant**");

**WHEREAS**, on February 7, 2013, Integrated Healthcare Holdings, Inc. and the Seller entered into that certain Amendment No. 1 to Integrated Healthcare Holdings, Inc. Common Stock Warrant to amend the SPCP Group Warrant I to extend the expiration date of from April 13, 2013 to April 13, 2016;

**WHEREAS**, on or about February 7, 2013, Integrated Healthcare Holdings, Inc. redeemed the SPCP Group IV Warrant pursuant to the terms of that certain Warrant Repurchase Agreement dated as of February 7, 2013 by and between Integrated Healthcare Holdings, Inc., and SPCP Group IV, LLC;

**WHEREAS**, on or about February 7, 2013, Integrated Healthcare Holdings, Inc. issued that certain Common Stock Warrant to the Seller, which entitles the holder thereof to acquire 16,817,365 shares of Common Stock of Integrated Healthcare Holdings, Inc. (the "**SPCP Group Warrant II**," and together with the SPCP Group Warrant I, the "**Existing Warrants**"), a copy of which is attached hereto as **Exhibit A-2**;

**WHEREAS**, on or about February 9, 2015, Integrated Healthcare Holdings, Inc. changed its legal name to "KPC Healthcare, Inc.";

**WHEREAS**, on or about August 4, 2015, Dr. Kali Pradip Chaudhuri, the sole shareholder of KPC Healthcare, Inc. contributed 9.5260 shares of Common Stock of KPC Healthcare, Inc. to the Company in exchange for 10,000,000 shares of common stock of the Company;

**WHEREAS**, the Company desires to cause its wholly-owned subsidiary, KPC Healthcare, Inc., to cancel and terminate those certain Common Stock Warrants held of record by Dr. Kali Pradip Chaudhuri and KPC Resolution Company, LLC, a California limited liability

{00009793.DOCX 7}                                        1

CONFIDENTIAL
MCD00044384

company, pursuant to the terms of that certain warrant cancellation and release agreement (the "**Warrant Cancellation and Release Agreement**"), dated as of even date herewith, by and among KPC Healthcare, Inc., Dr. Kali Pradip Chaudhuri, and KPC Resolution Company, LLC, as may be amended from time to time (the "**Warrant Cancellation Transaction**");

**WHEREAS**, simultaneously with and coincident to the Warrant Cancellation Transaction, the Company desires to (i) purchase the Existing Warrants pursuant to the terms of this Agreement (ii) purchase that certain Common Stock Warrant held of record by William E. Thomas, which entitled the holder thereof to acquire ▮▮▮▮ shares of Common Stock of KPC Healthcare, Inc. (collectively, the "**Warrant Redemption Transaction**");

**WHEREAS**, simultaneously with and coincident to the Warrant Cancellation Transaction and the Warrant Redemption Transaction, Dr. Kali Pradip Chaudhuri (the "**Shareholder**") desires to sell ▮▮▮▮ shares of the Common Stock of the Company (the "**ESOP Shares**") to Alerus Financial, N.A. not in its corporate capacity, but solely in its capacity as trustee of the KPC Healthcare, Inc. Employee Stock Ownership Trust, as amended from time to time, the "**Trust**"), which forms a part of the KPC Healthcare, Inc. Employee Stock Ownership Plan, as amended from time to time (the "**Plan**," and together with the Trust, the "**ESOP**"), pursuant to the terms of that certain stock purchase agreement (the "**Stock Purchase Agreement**") dated of even date herewith among the Company, the Trustee, acting on behalf of the Trust, and the Shareholder, as amended from time to time (the "**Stock Purchase Transaction**");

**WHEREAS**, to finance partially the Warrant Redemption Transaction, the Company (a) will pay cash to the Seller in the aggregate amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) will issue a subordinated promissory note in the aggregate original principal amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "**SPCP Group Subordinated Promissory Note**"), and (c) will issue that certain warrant to purchase a specified number of shares of Common Stock of the Company to the Seller (the "**SPCP Group Warrant**");

**WHEREAS**, to finance a portion of the purchase of the ESOP Shares by the Trust pursuant to the Stock Purchase Transaction, the Company's wholly-owned subsidiary, KPC Healthcare, Inc., a Nevada corporation, will make a cash contribution to the ESOP in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ simultaneously with and coincident to the Stock Purchase Transaction and these contributed funds will be used by the Trustee, acting on behalf of the Trust, to purchase a portion of the ESOP Shares (the "**Unleveraged ESOP Shares**");

**WHEREAS**, to finance partially the Stock Purchase Transaction, the Company will loan (the "**Company ESOP Loan**") to the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, will borrow from the Company, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, pursuant to the terms of that certain credit agreement (the "**Company ESOP Credit Agreement**") between the Company and the Trustee, acting on behalf of the Trust, and the Trustee, acting on behalf of the Trust, will issue a promissory note (the "**Company ESOP Note**") payable to the order of the Company, which shall be secured by a pledge by the Trustee, acting on behalf of the Trust, to the Company

{00009793.DOCX 7}                                            2

CONFIDENTIAL                                            MCD00044385

of the portion of the ESOP Shares acquired with the proceeds of the Company ESOP Loan pursuant to the terms of that certain pledge agreement (the "**Company ESOP Pledge Agreement**," and together with the ESOP Credit Agreement and ESOP Note, the "**Company ESOP Loan Documents**");

**WHEREAS**, the Trustee, on behalf of the Trust, (a) will pay cash to the Shareholder in the amount of ███████████████████████████████████████████, and (b) will issue a non-recourse promissory note (the "**Seller ESOP Note**") in the original principal amount of ████████████████ payable to the order of the Shareholder, which will be made pursuant to the terms of that certain credit agreement between the Trustee, on behalf of the Trust, as the borrower, and the Shareholder, as the lender, dated as of even date herewith, as may be amended from time to time (the "**Seller ESOP Credit Agreement**"), and which will be secured by a pledge of the portion of the ESOP Shares acquired with the Seller ESOP Note pursuant to the terms of that certain pledge agreement (the "**Seller ESOP Pledge Agreement**," and together with the Seller ESOP Note and the Seller ESOP Credit Agreement, the "**Seller ESOP Loan Documents**") between the Trustee, acting on behalf of the Trust, as the pledgor, and the Shareholder, as the pledgee, dated as of even date herewith, as may be amended from time to time;

**WHEREAS**, immediately following the Stock Purchase Transaction, the Shareholder desires to assign, transfer and set over unto the Company, and the Company desires to accept and assume, all of the Shareholder's right, title and interest in and to the Seller ESOP Loan Documents pursuant to the terms of that certain assignment and assumption agreement (the "**Assignment and Assumption Agreement**") dated as of even date herewith, among the Shareholder, as assignor, and the Company, as assignee, and the Trustee, on behalf of the Trust, as may be amended from time to time (the "**Assignment and Assumption Transaction**");

**WHEREAS**, simultaneously with and coincident to the Assignment and Assumption Transaction, the Company desires to issue a subordinated promissory note (the "**Seller Subordinated Promissory Note**") in the original principal amount of ████████████████████████ payable to the order of the Shareholder, and to issue that certain warrant to purchase a specified number of shares of Common Stock of the Company to the Shareholder (the "**Seller Warrant**"), pursuant to the terms of that certain exchange agreement (the "**Exchange Agreement**") dated as of even date herewith, between the Seller and the Company, as may be amended from time to time (the "**Exchange Transaction**");

**WHEREAS**, it is further anticipated that immediately following the Stock Purchase Transaction and in connection with the Assignment and Assumption Transaction, the Trustee, acting on behalf of the Trust, shall issue that certain Amended and Restated ESOP Note (the "**Amended and Restated ESOP Note**") in the original principal amount of ████████████ payable to the order of the Company which will be made pursuant to the terms of that certain Amended and Restated ESOP Credit Agreement (the "**Amended and Restated ESOP Credit Agreement**") between the Company and the Trustee, on behalf of the Trust, dated as of the first business day following the date hereof and secured by a pledge of ██████ shares of Common Stock of the

{00009793.DOCX 7}                    3

CONFIDENTIAL                                                    MCD00044386

Company pursuant to the terms of that certain Amended and Restated ESOP Pledge Agreement (the "**Amended and Restated ESOP Pledge Agreement**," and together with the Amended and Restated ESOP Note and the Amended and Restated ESOP Pledge Agreement, the "**Amended and Restated ESOP Loan Documents**") between the Company and the Trustee, on behalf of the Trust, dated as of even date herewith. For clarification purposes, the Amended and Restated ESOP Loan Documents shall represent all indebtedness amounts incurred by the Trustee, on behalf of the Trust, to finance the Stock Purchase Transaction and the terms of the debt under such documents shall be identical to that originally provided under each of the Company ESOP Loan Documents and the Seller ESOP Loan Documents; and

**WHEREAS**, the Seller desires to sell to the Company, and the Company desires to purchase from the Seller, the Existing Warrants (as herein defined) on the terms and subject to the conditions set forth herein.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the Premises and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows.

## ARTICLE I.
## DEFINITIONS.

Section 1.1.   Definitions. As used in this Agreement, the following terms have the respective meanings set forth below.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition, the terms "controls," "is controlled by" and "under common control with" mean the possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Warrant Purchase Agreement, as amended from time to time.

"**Amended and Restated ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Amended and Restated ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

{00009793.DOCX 7}                                    4

CONFIDENTIAL                                                                                          MCD00044387

"**Articles of Incorporation**" means the articles of incorporation, including any amendments thereto, of the Company in effect on the Closing Date.

"**Assignment and Assumption Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Assignment and Assumption Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Business**" means the Company's business of operating acute care hospitals.

"**Bylaws**" means the bylaws, including any amendments thereto, of the Company in effect on the Closing Date.

"**Calculation Periods**" means each of the fiscal years ending August 31, 2017 and August 31, 2018, August 31, 2019, August 31, 2020, August 31, 2021, August 31, 2022, August 31, 2023, August 31, 2024, and August 31 2025 respectively.

"**Closing**" means the actual transfer of the Existing Warrants and delivery of this Agreement.

"**Closing Date**" has the meaning set forth in Section 2.4 of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Premises of this Agreement.

"**Company ESOP Credit Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Loan**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Loan Documents**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Note**" has the meaning set forth in the Recitals of this Agreement.

"**Company ESOP Pledge Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Company Fundamental Representation and Warranty**" has the meaning set forth in Section 7.5(a) of this Agreement.

"**Company Indemnified Parties**" has the meaning set forth in Section 7.2(a).

"**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements,

{00009793.DOCX 7}                                              5

CONFIDENTIAL                                                                 MCD00044388

transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other Person that has entrusted information to the Company in confidence. The parties understand that the aforementioned list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Seller understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Seller in the first instance. Confidential Information shall not include information that (i) is generally available to and known by the public at the time of disclosure to the Seller, provided that such disclosure is through no direct or indirect fault of the Seller or Person(s) acting on the Seller's behalf (ii) the Seller can establish is already in its possession (other than information furnished by or on behalf of the Company), provided that such information is not, to the Seller's knowledge after reasonable inquiry, subject to another confidentiality obligation with or other obligation of secrecy to the Company or another party, or (iii) was available to the Seller on a non-confidential basis from a source (other than the Company or its representatives) that is not and was not prohibited from disclosing such information to the Seller by a contractual, legal or fiduciary obligation of confidentiality to the Company.

"**Damages**" means all demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid in settlement, including, without limitation, reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense or investigation of any claim.

"**Deductible**" has the meaning set forth in Section 7.5(b) of this Agreement.

"**Disclosure Schedule**" has the meaning set forth in Section 3.1 of this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended in effect as of the Closing Date.

"**ESOP**" and "**Plan**" have the meaning set forth in the Recitals of this Agreement.

{00009793.DOCX 7}                                    6

CONFIDENTIAL                                                                        MCD00044389

"**ESOP Shares**" has the meaning set forth in the Recitals of this Agreement.

"**Exchange Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Exchange Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Existing Warrants**" means those certain Common Stock Warrants issued by the Company to the Seller and attached hereto as **Exhibit A-1** and **Exhibit A-2**.

"**Governmental Entity**" means the government of the United States, the government of any state or territory of the United States, District of Columbia, or political subdivision thereof, or any agency or instrumentality of any of the foregoing, including without limitation school districts.

"**Independent Accountant**" has the meaning set forth in Section 2.5(b)(ii).

"**Indemnification Cap**" has the meaning set forth in Section 7.5(c).

"**Indemnified Party**" has the meaning set forth in Section 7.6(a).

"**Indemnifying Party**" has the meaning set forth in Section 7.6(a).

"**Investor Rights Agreement**" means that certain investor rights agreement dated as of even date herewith entered into among the Company, the Trustee, on behalf of the Trust, the Investors (as therein defined), and the Representative (as therein defined), as may be amended from time to time.

"**Knowledge**" means (a) with respect to the Company, the actual knowledge, after reasonable and due inquiry, of its directors, officers or other senior management, and (b) and with respect to the Seller, the actual knowledge, after reasonable and due inquiry, of its members, managers, control persons officers and other senior management.

"**Laws**" means any Federal, state, local, county, city, municipal, or other administrative order, constitution, law, ordinance, principle of common law, regulation, rule, restriction, statute, or treaty.

"**Lien**" means any mortgage or deed of trust, pledge, hypothecation, assignment, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"**Market Area**" means the ten mile radius of any hospital facility operated by the Company or any of its Subsidiaries.

CONFIDENTIAL

**JAE 1108**

MCD00044390

"**Material Adverse Effect**" means any event, matter, occurrence, or action which has or reasonably could be expected to have a material adverse impact equal to or greater than Five Hundred Thousand and 00/100 Dollars ($500,000) on the operations, business, assets, financial condition, or results of operation of the Company or any of its Subsidiaries.

"**Mr. Thomas**" has the meaning set forth in the Premises of this Agreement.

"**Net-Debt**" means the amount by which the Company's interest bearing debt exceeds the Company's balance sheet cash (without giving effect to the transactions contemplated herein) on the Closing Date.

"**Net-Debt Target**" means ▮▮▮▮▮▮

"**Net-Debt Statement**" has the meaning set forth in Section 2.3(a)(i) of this Agreement.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization of any kind or character, including a governmental department, authority or agency or subdivision thereof.

"**Potential Contributor**" has the meaning set forth in Section 7.7.

"**Purchase Price**" means the amount paid by the Company to the Seller for the Existing Warrants as set forth in Section 2.2 of this Agreement.

"**QAF Calculation**" has the meaning set forth in Section 2.5(b)(i).

"**QAF Calculation Delivery Date**" has the meaning set forth in Section 2.5(b)(i).

"**QAF Calculation Objection Notice**" has the meaning set forth in Section 2.5(b)(ii).

"**QAF Calculation Statement**" has the meaning set forth in Section 2.5(b)(i).

"**QAF Payment**" has the meaning set forth in Section 2.5(a).

"**QAF Period**" means any time during which the Company or its Subsidiaries are eligible to receive Qualifying QAF Payments.

"**QAF Program**" means the hospital quality assurance fee program established by (a) California Assembly Bill 1383 (Chapter 627, Statutes of 2009), (b) California Senate Bill 90 (Chapter 19, Statutes of 2011), (c) California Senate Bill 335 (Chapter 286, Statutes of 2011), (d) California Senate Bill 239 (Chapter 657, Statutes of 2013), (e) any other legislation previously enacted relating to the hospital quality assurance fee program, and (f) any amendments to the foregoing and any similar follow-on or successor quality assurance, rate stabilization or safety net legislation.

"**Qualifying QAF Payment**" means (except as otherwise provided herein) any payment received by the Company or its Subsidiaries pursuant to (a) the quality assurance fee program established or which may be later enacted, established or continued under the QAF Program, and

{00009793.DOCX 7}                                    8

CONFIDENTIAL                                                                    MCD00044391

(b) any similar Federal or State matching program enacted, established or continued after the Closing Date; provided, however, the term "Qualifying QAF Payment" shall not include any payment received by the Company or its Subsidiaries (regardless of when it is paid to the Company or its Subsidiaries) pursuant to the QAF Program on account of services rendered by the Company or any of its Subsidiaries during the calendar years 2014, 2015 and 2016 and using the State of California Office of Statewide Health Planning and Development ("OSHPD") data for calendar year 2010. Notwithstanding anything to the contrary herein, the Qualifying  QAF Payment shall include only those amounts under the QAF Program or under any similar Federal or State matching program enacted, established or continued after the Closing Date attributable to services rendered by the Company or any of its Subsidiaries for the period January 1, 2017 to December 31, 2024 regardless of the OSHPD year used for the calculation and regardless of when such payment is actually received. Furthermore, a Qualifying QAF Payment shall be calculated by subtracting any amounts the Company or its Subsidiaries must pay under the QAF Program (including pledge payments) in order to receive the amounts provided for under the QAF Program.

**"Qualifying QAF Payment Multiple"** means sixty percent (60%).

**"Representative"** have the meaning set forth in Section 6.1(d)(i).

**"Restricted Party"** or **"Restricted Parties"** means the Seller and its Affiliates and their respective representatives.

**"Review Period"** has the meaning set forth in Section 2.5(b)(ii).

**"Seller"** has the meaning set forth in the Premises of this Agreement.

**"Seller ESOP Credit Agreement"** has the meaning set forth in the Recitals of this Agreement.

**"Seller ESOP Loan"** has the meaning set forth in the Recitals of this Agreement.

**"Seller ESOP Loan Documents"** has the meaning set forth in the Recitals of this Agreement.

**"Seller ESOP Note"** has the meaning set forth in the Recitals of this Agreement.

**"Seller ESOP Pledge Agreement"** has the meaning set forth in the Recitals of this Agreement.

**"Seller Fundamental Representation and Warranty"** has the meaning set forth in Section 7.5(a) of this Agreement.

**"Seller Indemnified Parties"** has the meaning set forth in Section 7.3.

**"Shareholder"** has the meaning set forth in the Recitals of this Agreement.

{00009793.DOCX 7}                                        9

CONFIDENTIAL                                                                MCD00044392

"**SPCP Group Subordinated Promissory Note**" has the meaning set forth in the Recitals of this Agreement.

"**SPCP Group IV Warrant**" has the meaning set forth in the Recitals of this Agreement.

"**SPCP Group Warrant I**" has the meaning set forth in the Recitals of this Agreement.

"**SPCP Group Warrant II**" has the meaning set forth in the Recitals of this Agreement.

"**SPCP Group Warrant**" has the meaning set forth in the Recitals of this Agreement.

"**Stock Purchase Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Stock Purchase Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Subsidiary**" means any entity wholly- or partially-owned, directly or indirectly, by the Company, including, KPC Healthcare, Inc., a California corporation, Chapman Global Medical Center, Inc., a California corporation; South Coast Global Medical Center, Inc., a California corporation; Orange County Global Medical Center, Inc., a California corporation; Anaheim Global Medical Center, Inc., a California corporation.

"**Transaction Documents**" means: (a) the SPCP Group Subordinated Promissory Note, (b) the Investor Rights Agreement, (c) SPCP Group Warrant, and (d) any certificate delivered by a party to any other party pursuant to the terms of any of the foregoing documents.

"**Trust**" shall have the meaning set forth in the Recitals of this Agreement.

"**Trustee**" shall have the meaning set forth in the Recitals of this Agreement.

"**Unleveraged ESOP Shares**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Cancellation Transaction**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Cancellation and Release Agreement**" has the meaning set forth in the Recitals of this Agreement.

"**Warrant Redemption Transaction**" has the meaning set forth in Section 2.1.

Section 1.2.   <u>Interpretation</u>. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an

{00009793.DOCX 7}                              10

agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II.
## PURCHASE AND SALE.

Section 2.1. <u>Agreement to Purchase and to Sell</u>. Upon the terms and subject to the conditions of this Agreement, the Seller hereby sells and delivers to the Company, and the Company hereby purchases from the Seller, the Existing Warrants as described on **Exhibit B**.

Section 2.2. <u>Purchase Price</u>. In consideration of the Existing Warrants, the Company hereby agrees (a) to pay to the Seller cash in the aggregate amount of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ on the Closing Date payable via wire transfer of immediately available funds; (b) to issue and deliver the SPCP Group Subordinated Promissory Note in the original principal amount of ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and payable to the order of the Seller to the Seller; (c) to issue the SPCP Group Warrant to the Seller.; and (d) the contingent consideration, if any, payable under Section 2.3 (Closing Adjustment) and Section 2.5 (Additional Consideration).

Section 2.3. <u>Closing Adjustment.</u>

(a) Post-Closing Adjustment.

(i) Within sixty (60) calendar days after the Closing Date, the Company shall prepare and deliver to the Seller a statement setting forth its calculation of Net-Debt (the "**Net-Debt Statement**"), and a certificate of the Chief Financial Officer of the Company that the Net-Debt Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the audited financial statements for the most recent fiscal year end.

(ii) The post-closing adjustment shall be an amount equal to the amount by which Net-Debt is greater than or less than, as the case may be, the Net-Debt Target. If Net-Debt is greater than the Net-Debt Target, then pursuant to Section 2.6 of the SPCP Group Subordinated Promissory Notes, the then-existing principal balance of the SPCP Group Subordinated Promissory Notes shall be decreased in an amount equal to the product of (A) the amount by which Net-Debt exceeds the Net-Debt Target multiplied by (B) 17%. If Net-Debt is less than the Net-Debt Target, then pursuant to Section 2.6 of the SPCP Group Subordinated Promissory Notes, the then-existing principal balance of the SPCP Group Subordinated Promissory Notes shall be increased in an amount equal to the product of (A) the amount by which Net-Debt is less than the Net-Debt Target multiplied by (B) 17%.

{00009793.DOCX 7}                                    11

CONFIDENTIAL                                                                                MCD00044394

(b)      Adjustments for Tax Purposes. Any payments made pursuant to this Section 2.3 shall be treated as an adjustment to the purchase price by the parties for Federal and state income tax purposes, unless otherwise required by Law.

Section 2.4.     Time and Place of Closing.  The Closing of the transactions contemplated by this Agreement shall take place at 9:00 a.m., at the principal executive office of the Company on August 28, 2015 (the "**Closing Date**").

Section 2.5.     Additional Consideration.

(a)      Quality Assurance Fee Payments. As additional consideration for the Existing Warrants, subject to Section 2.5(h), and at such times as provided in Section 2.5(d), the Company shall pay to the Seller with respect to each Calculation Period within the QAF Period an amount, if any (each, a "**QAF Payment**"), equal to the product of (i) an amount equal to (A) the Qualifying QAF Payment received by the Company with respect to such Calculation Period, multiplied by (ii) the Qualifying QAF Payment Multiple, multiplied by (iii) 17%. If no Qualifying QAF Payment is received by the Company with respect to such Calculation Period, then no QAF Payment shall be due with respect to such Calculation Period.

(b)      Procedures Applicable to Determination of the QAF Payments.

(i)      On or before the date which is 30 calendar days after receipt by the Company or its Subsidiaries of a Qualifying QAF Payment (each such date, an "**QAF Calculation Delivery Date**"), the Company shall prepare and deliver to the Seller a written statement (in each case, a "**QAF Calculation Statement**") setting forth in reasonable detail its determination of Qualifying QAF Payments received by the Company or its Subsidiaries with respect to the applicable Calculation Period(s) and its calculation of the resulting QAF Payment (in each case, a "**QAF Calculation**"). The Company acknowledges that Qualifying QAF Payments may be received by the Company and its Subsidiaries after each respective Calculation Period and shall provide a QAF Calculation Statement to the Seller until all Qualifying QAF Payments are accounted for.

(ii)     The Seller shall have 30 calendar days after receipt of the QAF Calculation Statement for each Calculation Period (in each case, the "**Review Period**") to review the QAF Calculation Statement and the QAF Calculation set forth therein. During the Review Period, the Seller and its representatives shall have the right to inspect the Company's books and records during normal business hours at the Company's offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of Qualifying QAF Payments and the resulting QAF Payment. Prior to the expiration of the Review Period, the Seller may object to the QAF Calculation set forth in the QAF Calculation Statement with respect to the applicable Calculation Period by delivering a written notice of objection (a "**QAF Calculation Objection Notice**") to the Trustee, on behalf of the Trust and the Company. Any QAF Calculation Objection Notice shall specify the items in the applicable QAF Calculation disputed by the Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If the Seller fails to deliver a QAF Calculation Objection Notice to the Company prior to the expiration of the Review Period, then the QAF Calculation set forth in the QAF Calculation Statement shall be final and binding on the Seller and the Company. If the Seller timely delivers

{00009793.DOCX 7}                       12

CONFIDENTIAL                                                                        MCD00044395

a QAF Calculation Objection Notice, the Seller and the Company shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the Qualifying QAF Payment and the QAF Payment with respect to the applicable Calculation Period. If the Seller and the Company are unable to reach written agreement within 30 calendar days after such a QAF Calculation Objection Notice has been received by the Trustee, on behalf of the Trust, and the Company, all unresolved disputed items shall be promptly referred to an impartial nationally recognized firm of independent certified public accountants appointed by mutual, written agreement of the Seller and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items with respect to the applicable QAF Calculation as promptly as practicable, but in no event greater than 90 calendar days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the QAF Calculation Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, the Seller and the Company shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Seller and the Company, and not by independent review. The resolution of the dispute and the calculation of Qualifying QAF Payment that is the subject of the applicable QAF Calculation Objection Notice by the Independent Accountant shall be final and binding on the Seller and the Company. The fees and expenses of the Independent Accountant shall be borne by the Seller and the Company in proportion to the amounts by which their respective calculations of QAF Payments differ from QAF Payments as finally determined by the Independent Accountant.

(c)     Independence of QAF Payments. The obligation of the Company to pay each of the QAF Payments to the Seller in accordance with Section 2.5(a) is an independent obligation of the Company and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent QAF Payment and the obligation to pay a QAF Payment to the Seller shall not obligate the Company to pay any preceding or subsequent QAF Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the QAF Payment with respect to the first Calculation Period are not satisfied, but the conditions precedent to the payment of the QAF Payment with respect to the second Calculation Period are satisfied, then the Company would be obligated to pay such QAF Payment with respect to the second Calculation Period for which the corresponding conditions precedent have been satisfied, and not the QAF with respect to the first Calculation Period.

(d)     Timing of Payment of QAF Payments. Subject to Section 2.5(f), any QAF Payment that the Company is required to pay pursuant to Section 2.5(a) hereof shall be paid in full no later than 30 calendar days following the date upon which the determination of Qualifying QAF Payments with respect to the applicable Calculation Period becomes final and binding upon the parties as provided in Section 2.5(b)(ii) (including any final resolution of any dispute raised by the Seller in a QAF Calculation Objection Notice). The Company shall pay to the Seller the applicable QAF Payment in cash by wire transfer of immediately available funds to the bank account designed in writing by the Seller. Notwithstanding the preceding, if at any point such amounts that may be owed by the Company or its Subsidiaries as amounts paid into the QAF Program in order to receive the amounts provided for under the QAF Program become due after the date on which a QAF Payment would be calculated as payable under this Section 2.5,

{00009793.DOCX 7}                              13

CONFIDENTIAL                                                                                   MCD00044396

the parties shall negotiate in good faith to identify a payment date that allows the Company to properly calculate the owed Qualifying QAF Payment amount (less any payments to be made by the Company) .

(e)    Post-Closing Operation of the Company. The Company shall not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing any of the QAF Payments hereunder. Notwithstanding the foregoing, but subject to Section 6.2(c), the Company has no obligation to operate the Company in order to achieve any Qualifying QAF Payment or to maximize the amount of any QAF Payment.

(f)    Right of Set Off. The Company shall have the right to withhold and set off against any amount otherwise due to be paid pursuant to this Section 2.5 the amount of any Damages to which it may be entitled under ARTICLE VII of this Agreement or any other Transaction Document from the Seller.

(g)    No Security. The parties hereto understand and agree that (i) the contingent rights to receive any QAF Payment shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of Laws relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in the Company, (ii) the Seller shall not have any rights as a securityholder of the Company as a result of Seller's contingent right to receive any QAF Payment hereunder, and (iii) no interest is payable with respect to any QAF Payment.

(h)    Subordination of Obligations. Each of the parties hereto acknowledges and agrees that each of the obligations of the Company under this Section 2.4 is subject to the terms of the subordination agreement dated as of August 28, 2015 among Wilmington Trust, National Association, as Term Administrative Agent, MidCap Funding IV Trust, as Revolver Administrative Agent (each on behalf of certain lender parties) and the Subordinated Creditors named therein; provided, that such obligations shall not be subordinated to the Company's obligations under any amendments to or refinancings or restatements of that certain credit agreement dated as of August 28, 2015 among the Company and KPC Healthcare, Inc., as borrowers, Credit Suisse Park View BDC, Inc., as sole bookrunner, sole lead arranger and arranger agents, the Lenders (as therein defined) and the other parties thereto to the extent that there is an increase in the principal amount of obligations thereunder..

(i)    Seller's Right to Transfer QAF Payments. Notwithstanding anything in this Agreement to the contrary, the Seller and any purchaser, assignee, transferee, pledgee or creditor of QAF Payments shall be entitled to sell, assign, transfer, pledge, encumber or otherwise alienate, hypothecate or dispose of its legal right to receive QAF Payments upon 10 calendar days' prior written notice to the Company; provided, however, that any such purchaser, assignee, transferee, pledgee, or creditor acknowledge in writing that it holds no greater rights under this Agreement than the seller, assignor, transferor, pledgor or debtor of such rights.

(j)    Acknowledgement. The parties acknowledge and agree that any QAF Payment made under this Section 2.5 shall be treated as additional consideration paid in consideration of the Existing Warrants for Federal and state income tax purposes.

{00009793.DOCX 7}                    14

# ARTICLE III.
## REPRESENTATIONS AND WARRANTIES.

Section 3.1.    General Statement. The parties make the representations and warranties to each other which are set forth in this ARTICLE III. All representations and warranties are made subject to the exceptions noted in the schedule attached to this Agreement (the "**Disclosure Schedule**"), and are made as of the Closing Date, and shall survive the Closing for the periods described in Section 7.5. The Disclosure Schedule shall be arranged in paragraphs corresponding to the lettered and the numbered paragraphs contained in this ARTICLE III to which the exception applies, and no disclosure shall be deemed to apply with respect to any other paragraph to which it does not expressly apply. The Disclosure Schedule shall in all respects constitute a part of the representations and warranties of the Seller, the Company and the Trustee, and are expressly made a part of this Agreement.

Section 3.2.    Representations and Warranties of the Seller. The Seller represents and warrants to the Company, as of the Closing Date, as follows:

(a)    Organization. The Seller (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which the Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(b)    Enforceability. This Agreement has been duly executed and delivered by the Seller and constitutes the Seller's legal, valid, and binding obligation, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(c)    Notices and Consents. The Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any court, government, or governmental agency, or third person in order to consummate the transactions contemplated by this Agreement.

(d)    No Conflicts.   The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate any Laws to which the Seller is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which the Seller is bound or to which any of the Existing Warrants are subject or result in the imposition of any security interest upon the Existing Warrants.

(e)    Ownership of Existing Warrants.  The Seller is the record owner of the Existing Warrants set forth across from its name on **Exhibit B** hereto free and clear of any restrictions on transfer and have complied with all securities laws, taxes, security interests,

{00009793.DOCX 7}                    15

CONFIDENTIAL                                                                    MCD00044398

options, warrants, purchase rights, contracts, commitments, equities, Liens or other restrictions whatsoever in law or in equity.

     (f)    Reserved;

     (g)    Title.  Upon consummation of the transactions contemplated by this Agreement and in accordance with the terms hereof, the Company will acquire marketable title to the Existing Warrant free and clear of all Liens or rights of third parties whatsoever.

     (h)    No Commission.  The Seller has no liability to any broker, finder, investment bank, financial advisor, accountant, lawyer, or other similar person arising from or related to the transactions contemplated by this Agreement for which the Seller could be or become liable or obligated.

     (i)    Reserved

     (j)    Litigation. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened against the Seller relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

     (k)    Reserved.

     (l)    Representations and Warranties of the Company. Each of the representations and warranties made by the Company in Section 3.3 of the Stock Purchase Agreement, including any and all qualifications to such representations and warranties, are hereby incorporated into this Agreement by this reference.  As an inducement to the Company to enter into and perform its obligations under the terms of this Agreement and the Stock Purchase Agreement, the Seller represents and warrants to the Company, as of the Closing Date, that each of the representations and warranties made by the Company in Section 3.3 of the Stock Purchase Agreement are true and complete in all respects, subject to any and all qualifications of such representations and warranties expressly made within the Stock Purchase Agreement, including, without limitation, the survival period for each representation and warranty as specified in Section 7.6 of the Stock Purchase Agreement and any disclosures set forth on the disclosure schedule to the Stock Purchase Agreement.

     (m)    No Other Representations or Warranties; Non-Reliance. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THE TRANSACTION DOCUMENTS, NEITHER THE SELLER NOR ANY OF ITS DIRECTORS, SHAREHOLDERS, PARTNERS, MEMBERS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS OR FIDUCIARIES NOR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS NOT

{00009793.DOCX 7}          16

CONFIDENTIAL     MCD00044399

RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY ANY SUCH PERSONS, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

Section 3.3.   <u>Representations and Warranties of the Company</u>. The Company represents and warrants to the Seller, as of the Closing Date, as follows.

(a)     Organization; Authority. The Company (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of California, (ii) has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Company is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(b)     Enforceability. The execution and delivery by the Company of this Agreement and any other Transaction Document to which Company is a party, the performance by the Company of its obligations hereunder and thereunder and the consummation by Company of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Company. This Agreement has been duly executed and delivered by Company, and (assuming due authorization, execution and delivery by the Seller) this Agreement constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(c)     No Conflicts; Consents. The execution, delivery and performance by Company of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (i) conflict with or result in a violation or breach of, or default under, any provision of the Articles of Incorporation or Bylaws of the Company; (ii) conflict with or result in a violation or breach of any provision of any Law or order applicable to Company; or (iii) except as set forth on the Disclosure Schedule, require the consent, notice or other action by any Person under any material contract to which Company is a party that will not be cured within ninety (90) calendar days following the Closing Date. Except as set forth on the Disclosure Schedule, no consent, approval, permit, order, declaration or filing with, or notice to, any Governmental Entity is required by or with respect to the Company in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

(d)     Litigation. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Company, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Company does not know of any reason for, nor have any reason to be aware of, any basis for the same.

{00009793.DOCX 7}                          17

CONFIDENTIAL                                                                  MCD00044400

(e)     Sufficiency of Funds. The Company has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

(f)     Affiliate Transactions.  Except as set forth on the Disclosure Schedule, neither the Company nor any of its shareholders, directors, officers, employees or their respective Affiliates or representatives, or any individual related by blood, marriage or adoption to any such individual or any entity in which any such Person or individual owns any beneficial interest, is a party to any written or oral agreement, contract, commitment or transaction with the Company or any of its Subsidiaries or has any interest in any property used by the Company or any of its Subsidiaries, except such agreements, contracts, commitments or transactions represented by the Transaction Documents (as such term is defined in the Stock Purchase Agreement) and such agreements, contracts, commitments or transactions contemplated by this Agreement.

(a)     No Other Representations or Warranties; Non-Reliance. (I) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN THIS SECTION 3.3 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN THE TRANSACTION DOCUMENTS, NEITHER THE COMPANY NOR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (II) EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE COMPANY, OR ANY OF ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 3.3 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY TO SUCH PARTY IN THE TRANSACTION DOCUMENTS.

## ARTICLE IV.
## CONDITIONS PRECEDENT.

Section 4.1.     Conditions Precedent to the Obligations of the Seller. The obligation of the Seller to effect the transactions contemplated under this Agreement is subject to the satisfaction or the fulfillment of all of the following conditions precedent on or prior to the Closing Date:

(a)     Each representation and warranty made by the Company in this Agreement and the Transaction Documents to which the Seller is a party shall be true and correct on the Closing Date;

(b)     All obligations of the Company to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which the Company would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

{00009793.DOCX 7}                    18

CONFIDENTIAL                                                    MCD00044401

(c)     No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(d)     No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement.

(e)     Reserved;

(f)     The Seller shall have received each of the deliveries identified in Section 5.3 of this Agreement in form and substance reasonably satisfactory to the Seller.

Section 4.2.     <u>Conditions Precedent to the Obligations of the Company</u>. The obligation of the Company to effect the transactions contemplated under this Agreement is subject to the satisfaction or the fulfillment of all of the following conditions precedent on or prior to the Closing Date:

(a)     Each representation and warranty made by the Seller in this Agreement and the Transaction Documents to which each the Seller is a party shall be true and correct on the Closing Date;

(b)     All obligations of each Seller to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which such Seller would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed;

(c)     No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which is in effect and which has the effect of making any of the transactions contemplated under this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated under this Agreement and there shall be no suit, action or proceeding by a Governmental Entity seeking to restrain, enjoin or prohibit any of the transactions contemplated under this Agreement;

(d)     No claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment shall have been commenced against any party hereto, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Entity, and be in effect, which restrains or prohibits any transaction contemplated under this Agreement;

(e)     Reserved;

{00009793.DOCX 7}                              19

CONFIDENTIAL                                                                                          MCD00044402

(f)     The Company shall have received each of the deliveries identified in Section 5.2 of this Agreement in form and substance reasonably satisfactory to the Company and its legal counsel.

## ARTICLE V.
## CLOSING DELIVERIES.

Section 5.1.   Form of Documents. At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this ARTICLE V. All documents to be delivered shall be in form and substance reasonably satisfactory to the party to whom the documents are to be delivered and its legal counsel (if any).

Section 5.2.   Deliveries of the Seller. On the Closing Date, the Seller shall execute and deliver to the Company all of the following:

(a)     A copy of this Agreement, duly executed by the Seller;

(b)     Copies of each of the Transaction Documents to which the Seller is a party, duly executed by the Seller or its authorized agent;

(c)     Any and all consents and approvals required by the Seller in order for the Seller to transfer the Existing Warrants to the Company and to consummate the transactions contemplated by this Agreement;

(d)     An executed instrument of assignment pursuant to which the Seller shall sell, assign and transfer to the Company all of its rights, title and interest to and in the Existing Warrants of which the Seller is the record owner;

(e)     Any other instruments that the Company may reasonably deem necessary or desirable to affect or evidence the transactions contemplated by this Agreement.

Section 5.3.   Deliveries of the Company. On the Closing Date, the Company shall execute and deliver to each Seller all of the following:

(a)     A copy of this Agreement, duly executed by an authorized officer of the Company;

(b)     Copies of the Transaction Documents to which the Company is a party, duly executed by an authorized agent of the Company;

(c)     The cash consideration of the Purchase Price;

(d)     Any other instruments that a Seller may reasonably deem necessary or desirable to affect or evidence the transactions contemplated by this Agreement.

{00009793.DOCX 7}                                  20

CONFIDENTIAL                                                                                   MCD00044403

**ARTICLE VI.**
**COVENANTS.**

Section 6.1.    <u>Covenants of the Seller</u>. As additional and material consideration to the Company to enter into this Agreement and consummate the transactions contemplated by this Agreement, Mr. Thomas covenants and agrees as follows:

      (a)     Reserved.

      (b)     Reserved.

      (c)     Reserved.

      (d)     Non-Disclosure of Confidential Information and Trade Secrets of the Company.

      (i)     The Restricted Parties understand and agree that the Confidential Information and each of the Company's trade secrets constitute valuable assets and may not be converted to any Restricted Party's own use on or after the Closing Date. Accordingly, each Restricted Party hereby agrees that he, she or it shall not, directly or indirectly, except as otherwise provide herein, reveal, divulge, or disclose to any Person not expressly authorized in writing by the Company any Confidential Information, and he, she or it shall not, directly or indirectly, at any time, use or make use of any Confidential Information in connection with any business activity, except that a Restricted Party may disclose the Confidential Information or portions thereof to those of its directors, officers, employees, advisors, attorneys accountants, consultants, agents, representatives or Affiliates (A) who are informed by such Restricted Party of the confidential nature of the Confidential Information and (B) who agree to comply with the confidentiality term of this Agreement (collectively, the "**Representatives**") and, in any event, such Restricted Party shall be responsible for any disclosure of Confidential Information by its Representatives that would constitute a breach of this Agreement. Throughout the period during which any information remains a trade secret of the Company under applicable law, the Restricted Parties shall not, directly or indirectly, transmit or disclose any such trade secret to any Person, and shall not make use of any such trade secret, directly or indirectly, for himself, herself, itself or for others, without the prior, written consent of the Company. Each party acknowledges and agrees that this Agreement is not intended to, and does not, alter either the Company's rights or the Restricted Parties' obligations under any State or federal statutory or common law regarding trade secrets and unfair trade practices.

      (ii)     Anything herein to the contrary notwithstanding, the Restricted Parties shall not be restricted from disclosing or using Confidential Information or any trade secret of the Company that is required to be disclosed by Law; provided, however, that in the event disclosure is required by law, the disclosing Restricted Party shall provide the Company with prompt written notice of such requirement so that the Company may seek an appropriate protective order prior to any such required disclosure by such Restricted Party.

      (iii)     The Restricted Parties acknowledge that any and all Confidential Information will be, as of the Closing Date, the exclusive property of the Company and agree to

{00009793.DOCX 7}          21

CONFIDENTIAL          MCD00044404

deliver to the Company, at any time the Company may request, any and all Confidential Information which they may then possess or have under their control in whatever form the same may exist, including hard copy files, soft copy files, computer disks, and all copies thereof.

Section 6.2.    Covenants of the Company.

(a)    Maintenance of the ESOP's Tax Qualified Status. The Company covenants and agrees to take any action as may be necessary to maintain the tax-qualified status of the Plan and the tax-exempt status of the Trust under ERISA and the Code and will timely submit the Plan and Trust to the Internal Revenue Service requesting a favorable determination letter stating that the Plan constitutes a qualified plan under Section 401(a) of the Code, the Trust is an exempt trust under Section 501(a) of the Code and the Plan is a qualified employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and the Company will make such amendments to the Plan as may be required as a condition of the issuance of a favorable determination letter. The Company shall take any action as may be necessary to maintain the tax-qualified status of the Plan, to make sure that the Plan at all times satisfies the requirements of Code section 4975(e)(7), and to maintain the tax-exempt status of the Trust under ERISA and the Code. Notwithstanding the foregoing, the Company may terminate the Plan in its sole discretion at any time.

(b)    Subchapter S Elections. The Company covenants and agrees to make and maintain (i) a valid election under Section 1362(a) of the Code to be taxable under Subchapter S of Chapter 1 of the Code effective September 1, 2015 and (ii) a valid election under Section 1361(b)(3)(B)(ii) of the Code to treat KPC Healthcare, Inc. as a qualified subchapter S subsidiary effective September 1, 2015. The Company covenants and agrees to (I) promptly notify the Seller in writing of any tax audit, investigation, examination, request for information or other proceeding relating to, or that may affect (1) the Company's election under section 1362(a) of the Code to be taxable under Subchapter S of Chapter 1 of the Code or, otherwise, the Company's qualification as an S corporation within the meaning of Section 1361 of the Code or (2) KPC Healthcare, Inc.'s qualification as a qualified subchapter S subsidiary within the meaning of Section 1361 of the Code, in each case for any taxable period, or portion thereof, during which the Seller owned the SPCP Group Warrant or any share of the Common Stock of the Company, and (II) explain the general nature of such audit, investigation, examination, request for information or other proceeding. Such notification shall be in addition to the requirements of Section 6.2(d) and ARTICLE VII regarding the provision of notice of governmental audits or claims as therein described respectively.

(c)    QAF Program. The Company shall take such actions and make such payments on a timely basis as may be required from time to time to maintain the Company in good standing and eligible to receive the maximum amount of reimbursement under the QAF Program; provided, however, that, subject to applicable law, the Company shall not be obligated to take action and make payments required to maintain the Company in good standing and eligible to receive the maximum amount of reimbursement under the QAF Program if the economic benefits of participating in the QAF Program do not equal or exceed the economic costs participating in the QAF Program as determined by the Board of Directors.

{00009793.DOCX 7}                                22

CONFIDENTIAL                                                                      MCD00044405

(d)     Company Notification of Governmental Audit. The Company covenants and agrees to timely notify the Seller in writing of any governmental or other third party audit, investigation, or request for information (other than routine claims for benefits by participants under the Plan) relating to the Plan, or the transactions herein described and explain the general nature of such audit, investigation or claim for information. Such notification shall be in addition to the requirements of ARTICLE VII regarding the provision of the notice of claims as therein described.

(e)     Recovery Under Insurance. The Company covenants and agrees that, with respect to any matter for which indemnification would otherwise be provided to the Trust pursuant to ARTICLE VII, it shall use commercially reasonable efforts to collect amounts payable to the Company under any applicable insurance policy of the Company, and to the extent any such amounts are collected there will be no Damages suffered by the Trust, as the case may be.

(f)     Corporate Governance. The Company shall conduct all annual, regular and special meetings of its shareholder(s), Board of Directors and committees in accordance with the Bylaws, including providing timely notice of all annual, and special meetings of the shareholder(s).

(g)     Post-Closing Approvals, Authorizations and Consents. Within ninety (90) calendar days of the Closing Date, the Company shall deliver to each Seller all permits, approvals, authorizations and consents of third parties necessary for the consummation of the transactions contemplated in this Agreement.

(h)     QAF Payment Transfer Restriction. The Company covenants and agrees not to sell, assign, transfer, pledge, encumber or otherwise alienate, hypothecate or dispose of its or its Subsidiaries' legal rights to Qualifying QAF Payments under the QAF Program.

(i)     Restriction on Payment of Dividends and Distributions. The Company covenants and agrees not to declare and pay dividends or distributions, as the case may be, on its shares of capital stock; provided, however, that the Company shall be entitled to declare and pay any "applicable dividend," as such term is defined in Section 404(k)(2)(A) of the Code, on its shares of capital stock at any time and from time to time in the discretion of the Company's Board of Directors. In addition, the Company shall be entitled to declare and pay distributions which, if declared and paid by a corporation taxable under Subchapter C of the Code, would constitute an "applicable dividend" on its shares of capital stock at any time and from time to time in the discretion of the Company's Board of Directors.

(j)     QAF Calculations. The Company shall deliver to the Trustee each QAF Calculation Statement prepared and submitted in connection with this Agreement. Such QAF Calculations Statements shall be provided at the same time and in the same form as provided to the Seller.

(k)     Tax Treatment. The Company covenants and agrees (i) that for U.S. federal income tax purposes, the purchase of the Existing Warrants from the Seller in exchange for the purchase price set forth in Section 2.2 pursuant to the Warrant Redemption Transaction

{00009793.DOCX 7}                          23

CONFIDENTIAL                                                          MCD00044406

shall be treated by the Company as an exchange that does not have the effect of, nor is essentially equivalent to, a dividend and (ii) not to take (and cause its Affiliates not to take) any action or fail to take (and cause its Affiliates not to fail to take) any action, which action or failure to take action is inconsistent with the tax treatment described in clause (i) above (including, without limitation, in taking any position on any applicable tax return), unless and to the extent otherwise required by a determination (within the meaning of Section 1313(a) of the Code (or any corresponding or similar provision of state or local tax Laws).

## ARTICLE VII.
## INDEMNIFICATION.

Section 7.1.   General Statement. From and after the Closing Date, the parties shall indemnify each other as provided in this ARTICLE VII.

Section 7.2.   Indemnification Obligations of the Seller.

(a)     The Seller severally (and not jointly and severally) shall defend, indemnify, save and keep harmless the Company, and its past, present and future shareholders, directors, officers, employees, and agents and their respective Affiliates and representatives, and their successors and permitted assigns (collectively, the **"Company Indemnified Parties"**) against and from all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (i) any inaccuracy in or breach of any representation and warranty made by the Seller in Section 3.2 of this Agreement (except Section 3.2(l), which is addressed separately in this Section 7.2(a)), or the Transaction Documents to which the Seller is a party, (ii) any breach or failure by the Seller to comply with any of the covenants or obligations to be performed by the Seller pursuant to this Agreement, (including, without limitation, the Seller's obligations under this ARTICLE VII), or the Transaction Documents to which the Seller is a party, and (iii) any Third-Party Claim resulting from or arising out of or by virtue of the foregoing. In addition, the Seller severally (and not jointly and severally) shall defend, indemnify, save and keep harmless the Company Indemnified Parties against and from 17% of all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (i) any inaccuracy in or breach of the representation and warranty made in Section 3.2(l) and (ii) any Third-Party Claim resulting from or arising out of or by virtue of the foregoing.

Section 7.3.   Indemnification Obligations of the Company. The Company shall indemnify, save and keep harmless the Seller and its past, present and future shareholders, directors, officers, employees, and agents and their respective Affiliates and representatives, and their respective successors and permitted assigns (collectively, the **"Seller Indemnified Parties"**) against and from all Damages which may be sustained or suffered by any of them resulting from or arising out of or by virtue of (a) any inaccuracy in or breach of any representation and warranty made by the Company set forth in Section 3.3 of this Agreement, or any certificate to be delivered by the Company pursuant to this Agreement, or the Transaction Documents to which the Company is a party, and (b) any breach by the Company, or failure of the Company to comply with, any of its covenants or obligations under this Agreement (including, without limitation, its obligations under this ARTICLE VII), or the Transaction

{00009793.DOCX 7}                                      24

CONFIDENTIAL                                                                                    MCD00044407

Documents to which the Company is a party, and (c) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing.

Section 7.4.   <u>Claims</u>. The parties intend that all indemnification claims be made as promptly as practicable by the indemnified party. Whenever any claim shall arise for indemnification hereunder, the indemnified party shall promptly notify the indemnifying party of the claim and, when known, the facts constituting the basis for such claim. With respect to claims made by third parties, the indemnifying party shall be entitled to assume control of the defense of such action or claim with counsel satisfactory to the indemnified party; provided, however, that: (a) the indemnified party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; (b) the indemnifying party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to the indemnified party a release from all liability in respect of such claim if, pursuant to or as a result of such consent or settlement, injunctive or other equitable relief would be imposed against the indemnified party or such judgment or settlement could materially interfere with the business, operations or assets of the indemnified party; and (c) if the indemnifying party does not assume control of the defense of such claim in accordance with the foregoing provisions within fifteen (15) days after receipt of notice of the claim, the indemnified party shall, subject to Section 7.6(c), have the right to defend such claim in good faith in such manner as it may deem appropriate at the cost and expense of the indemnifying party, and the indemnifying party will promptly reimburse the indemnified party for such cost and expense.

Section 7.5.   <u>Limitation on Rights to Indemnification</u>. The obligations to indemnify pursuant to this ARTICLE VII are subject to the following limitations:

(a)   Survival.

(i)   Each representation and warranty set forth in Section 3.2(a) (Organization), Section 3.2(b) (Enforceability), Section 3.2(c) (Notices and Consents), Section 3.2(d) (No Conflicts), Section 3.2(e) (Ownership of Existing Warrants), and Section 3.2(g) (Title) (each a "**Seller Fundamental Representation and Warranty**"); each representation and warranty set forth in Section 3.3(a) (Organization), Section 3.3(b) (Enforceability), and Section 3.3(c) (No Conflicts; Consents), (each a "**Company Fundamental Representation and Warranty**"); and any statutory or common law claims for fraud shall survive Closing and continue forever.

(ii)   Each specific representation and warranty incorporated by reference in Section 3.2(l) (Representations and Warranties of the Company), shall survive Closing and will expire and be of no further force and effect upon the time specified in Section 7.6(a) of the Stock Purchase Agreement for that specific representation and warranty.

(iii)   Each other representation and warranty made under this Agreement shall survive Closing and will expire and be of no further force and effect upon the later of (A) the twenty-four month anniversary of the Closing Date, and (B) thirty (30) calendar days following the delivery by the Company to the Trustee of the audited financial statements for fiscal year ended 2017.

{00009793.DOCX 7}                                          25

CONFIDENTIAL                                                                                          MCD00044408

(iv)    Each covenant set forth in this Agreement will survive until it is fully performed, unless a shorter period of survival is specifically set forth in this Agreement.

(v)    Any claim for indemnification based on a breach of any representation, warranty, or covenant must be made prior to the expiration of any such representation, warranty, or covenant and any claim not made within such period shall be of no force or effect.

(b)    Deductible. No indemnifying party shall be liable to an indemnified party for indemnification until the aggregate amount of all Damages in respect of indemnification of such indemnified party hereunder exceeds Two Million and 00/100 Dollars ($2,000,000), in which event the indemnifying party shall be required to pay or be liable for all such Damages, but only to the extent such Damages exceed the Deductible. This Section 7.5(b) shall not apply to the indemnification obligations of the Seller for any inaccuracy in or breach of any Seller Fundamental Representation and Warranty, to the indemnification obligations of the Company for any inaccuracy in or breach of any Company Fundamental Representation and Warranty or the indemnification obligations of an indemnifying party to an indemnified party for any statutory or common law claims for fraud, which shall be unlimited. This Section 7.6(b) shall not apply to (i) the indemnification obligations of the Seller for any inaccuracy in or breach of a representation and warranty incorporated by reference in Section 3.2(l) (Representations and Warranties of the Company) and constituting a "Company Fundamental Representation and Warranty" under the terms of the Stock Purchase Agreement, and (ii) the indemnification obligations of the Seller for any inaccuracy in or breach of the representation and warranty made by the Company in Section 3.3(o) (Licensed and Permits) of the Stock Purchase Agreement, which shall be unlimited, subject to Section 7.5(c).

(c)    Indemnification Cap. The aggregate amount of all Damages for which an Indemnifying Party shall be liable with respect to any single Indemnified Party shall not exceed Thirteen Million Seven Hundred Seventy Thousand and 00/100 Dollars ($13,770,000) (the "**Indemnification Cap**"); provided, however, that the indemnification obligations of the Seller for any inaccuracy in or breach of any Seller Fundamental Representation and Warranty and the indemnification obligations of the Company for any inaccuracy in or breach of any Company Fundamental Representation and Warranty shall not exceed the sum of (i) the cash consideration portion of the Purchase Price, plus (ii) the original principal amount of the SPCP Group Subordinated Promissory Note. The indemnification obligations of an indemnifying party to an indemnified party for any statutory or common law claims for fraud shall be unlimited. The indemnification obligations of the Seller for any inaccuracy in or breach of any "Company Fundamental Representation and Warranty" under the terms of the Stock Purchase Agreement and incorporated by reference in Section 3.2(l) (Representations and Warranties of the Company), and the indemnification obligations of the Seller for any inaccuracy in or breach of the representation and warranty made by the Company in Section 3.3(o) (Licenses and Permits) of the Stock Purchase Agreement, shall not exceed the sum of (i) the cash consideration portion of the Purchase Price, plus (ii) the original principal amount of the SPCP Group Subordinated Promissory Note.

(d)    Notice. The indemnification obligation of an indemnifying party in this ARTICLE VII shall not be affected by the failure of the indemnified party to give notice in

{00009793.DOCX 7}                    26

CONFIDENTIAL                                                                    MCD00044409

accordance herewith unless the indemnifying party is materially prejudiced thereby; provided however, that the amount that the indemnifying party's liability shall be reduced or limited by is the extent of any actual prejudice; and further provided, that in no event will a notice of a claim of indemnification delivered after the termination, expiration or satisfaction of the representation, warranty or covenant on which such claim is based be effective for any purpose under this ARTICLE VII.

(e)     Insurance Proceeds. Any payment made by the indemnifying party to an indemnified party pursuant to this ARTICLE VII in respect of any indemnifiable event shall be net of any insurance proceeds realized by and paid to such indemnified party in respect of such indemnifiable event. Such indemnified party shall use reasonable commercial efforts to make insurance claims relating to any indemnifiable event for which it is seeking indemnification pursuant to this ARTICLE VII; provided that such indemnified party shall not be obligated to make such an insurance claim if such indemnified party in its reasonable judgment believes the cost of pursuing such an insurance claim together with any corresponding increase in insurance premiums or other chargebacks to such indemnified party, as the case may be, would exceed the value of the claim for which such indemnified party is seeking indemnification. In the event that an insurance recovery is made by a indemnified party with respect to any Damages for which a indemnified party has previously been indemnified hereunder, then such indemnified party shall promptly make a refund to the payor(s) under this ARTICLE VII in an amount equal to the lesser of (i) the amount of such insurance recovery (net of collection expenses) and (ii) the amount previously paid by the payor(s) under this ARTICLE VII as indemnification for such Damages.

(f)     Mitigation of Damages. In the event that any indemnified party fails to use its commercially reasonable efforts to mitigate any Damages to the extent required hereunder or by applicable Laws, then notwithstanding anything else to the contrary contained herein, the indemnifying party shall not be required to indemnify the indemnified party for any Damages that could reasonably be expected to have been avoided or reduced if the indemnified party had made such commercially reasonable efforts.

Section 7.6.     Procedures.

(a)     If a party hereto seeks indemnification under this ARTICLE VII, such party (the "**Indemnified Party**") shall promptly give written notice to the other party (the "**Indemnifying Party**") after receiving written notice of any action, lawsuit, proceeding, investigation (including the commencement of a tax audit or examination) or other claim against it (if by a third party) or discovering the liability, obligation, or facts giving rise to such claim for indemnification, describing the claim, the amount thereof (if known and quantifiable), and the basis thereof; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have prejudiced the Indemnifying Party. In that regard, if any action, lawsuit, proceeding, investigation (including the commencement of a tax audit or examination), or other claim shall be brought or asserted by any third party which, if adversely determined, would entitle the Indemnified Party to indemnity pursuant to this ARTICLE VII, the Indemnified Party shall promptly notify the Indemnifying Party of the same in writing, specifying in detail the basis of such claim and the facts pertaining thereto and the Indemnifying Party shall be entitled to participate in the defense of such action, lawsuit, proceeding, investigation, or other claim giving

{00009793.DOCX 7}                          27

CONFIDENTIAL                                                                    MCD00044410

rise to the Indemnified Party's claim for indemnification at its expense, and at its option (subject to the limitations set forth below) shall be entitled at any time to elect to control and appoint lead counsel of such defense with reputable counsel reasonably acceptable to the Indemnified Party; provided that, as a condition precedent to the Indemnifying Party's right to assume control of such defense, it must first agree in writing to be fully responsible for all Damages relating to such claims and to provide full indemnification to the Indemnified Party for all Damages relating to such claim; and provided further that the Indemnifying Party shall not have the right to assume control of such defense, and, if the claim is one for which indemnification is due under this Agreement, shall pay the reasonable fees and expenses of reputable counsel retained by the Indemnified Party and reasonably acceptable to the Indemnifying Party, if the claim which the Indemnifying Party seeks to assume control (i) seeks non-monetary relief, provided that the Indemnified Party has determined in good faith that the grant of such non-monetary relief would be reasonably likely to have a significant adverse effect on the Indemnified Party, (ii) involves criminal allegations against an Indemnified Party, or (iii) involves a claim which, upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to vigorously prosecute or defend; provided further that the Indemnifying Party shall have one (1) opportunity to elect to assume control of the defense of any such action, lawsuit, proceeding or investigation within thirty (30) days following its receipt of notice from the Indemnified Party.

(b)     If the Indemnifying Party is permitted to assume and control the defense and elects to do so, the Indemnified Party shall have the right to employ counsel separate from counsel employed by the Indemnifying Party in any such action and to participate in (but not control) the defense thereof, but the fees and expenses of such counsel employed by the Indemnified Party shall be at the expense of the Indemnifying Party.

(c)     If the Indemnifying Party shall control the defense of any such claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim or ceasing to defend such claim, if pursuant to or as a result of such settlement or cessation, injunction, or other equitable relief will be imposed against the Indemnified Party or if such settlement does not expressly unconditionally release the Indemnified Party from all liabilities and obligations with respect to such claim. If, in accordance with the provisions of Section 7.6(a), the Indemnified Party shall control the defense of any such claim, the Indemnified Party shall obtain the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim that would result in monetary or similar damages for which the Indemnified Party would be entitled to indemnification hereunder.

(d)     If the Seller is the Indemnifying Party and is permitted to assume and control the defense and elects to do so, then the Seller may reasonably cooperate with Dr. Kali P. Chaudhuri and William E. Thomas in assuming and controlling the defense; provided that nothing in this Section 7.6(d) shall obligate the Indemnifying Party to so reasonably cooperate, and nothing in this Section 7.6(d) shall obligate Dr. Chaudhuri or Mr. Thomas to so reasonably cooperate.

{00009793.DOCX 7}                               28

CONFIDENTIAL                                                                    MCD00044411

Section 7.7.    <u>Assignment of Claims</u>. If the Indemnified Party receives any payment from any Indemnifying Party in respect of any Damages pursuant to this ARTICLE VII and the Indemnified Party could have recovered all or a part of such Damages from a third party (the "**Potential Contributor**") based on the underlying claim asserted against the Indemnifying Party, the Indemnified Party shall assign, on a non-recourse basis and without any representation or warranty, such of its rights to proceed against the Potential Contributor as are necessary to permit the Indemnifying Party to recover from the Potential Contributor the amount of such payment. Any payment received in respect of such claim shall be distributed, (a) first to the Indemnified Party in the amount of any deductible or similar amount required to be paid by the Indemnified Party prior to the Indemnifying Party being required to make any payment to the Indemnified Party, (b) second to such Indemnifying Part(ies) in an amount equal to the aggregate payments made to the Indemnified Party, in respect of such claim, plus costs and expenses incurred in investigating, defending or otherwise incurred in connection with addressing such claim and (c) the balance, if any, to the Indemnified Party.

Section 7.8.    <u>Materiality</u>. For purposes of calculating Damages hereunder, any Material Adverse Effect qualification in such representations and warranties (including those incorporated by reference) shall be disregarded to the extent the application of all Material Adverse Effect qualifications exceed One Million and 00/100 Dollars ($1,000,000).

Section 7.9.    <u>Sole Remedies; Right of Setoff</u>.

(a)    Except for statutory and common law claims for fraud which shall not be subject to any of the provisions of this ARTICLE VII, and except as set forth in Section 7.10, this ARTICLE VII shall be the sole and exclusive remedy for (i) any inaccuracy in or breach of any representation and warranty under this Agreement, or the Transaction Documents and (ii) any breach or failure by a party to comply with any of the covenants or obligations to be performed by the party pursuant to this Agreement, (including, without limitation, the party's obligations under this ARTICLE VII), or the Transaction Documents and (iii) any Third-Party Claim resulting from or arising out of or by virtue of any of the foregoing.

(b)    Should the Trustee, acting on behalf of the Trust, exercise its right of setoff under Section 7.10(b) of the Stock Purchase Agreement, the Company shall automatically setoff an amount equal to the product of one hundred percent (100%) of such amount setoff under Section 7.10(b) of the Stock Purchase Agreement multiplied by 17% against the Company's obligations to the Seller (and its successor transferees) under the SPCP Group Subordinated Promissory Note. Any setoff permitted hereunder with respect to the SPCP Group Subordinated Promissory Note may be effected (i) upon written agreement between the Seller and the Company; or (ii) once a claim for indemnification under this ARTICLE VII is settled between any Indemnifying Party and the Indemnified Party, as may be finally determined by a court of competent jurisdiction (or other arbitral body). For the avoidance of doubt, the second sentence of Section 7.2(a) shall not limit in any manner the Company's right to automatically setoff an amount equal to the product of one hundred percent (100%) of such amount setoff under Section 7.10(b) of the Stock Purchase Agreement multiplied by 17% against the Company's obligations to the Seller (and its successor transferees) under the SPCP Group Subordinated Promissory Note.

{00009793.DOCX 7}                                29

CONFIDENTIAL                                                                          MCD00044412

(c)     The Company shall be entitled to reduce the remaining principal balance of the SPCP Group Subordinated Promissory Note in an amount equal to one hundred percent (100%) of any indemnification amount owed to the Company under this ARTICLE VII. Any setoff permitted hereunder may be affected (i) upon written consent of the Company and the Seller, or (ii) once a claim for indemnification under this ARTICLE VII is settled between the Company and the Seller, as may be finally determined by a court of competent jurisdiction (or other arbitral body).

(d)     Reserved.

(e)     Notwithstanding anything in this Agreement to the contrary, any amounts payable by the Seller to the Company in satisfaction of an indemnification claim shall be satisfied (i) first, by the setoff procedures set forth in Section 7.9(b) and Section 7.9(c), and (ii) second, by any other remedy available to the Company, subject to the limitations in Section 7.5. For the avoidance of doubt and notwithstanding anything to the foregoing, neither the Indemnification Cap nor the Deductible nor any materiality qualifier in this Agreement shall apply to a claim for a breach of a restrictive covenant set forth in Section 6.1 of this Agreement.

Section 7.10.   _Equitable Remedies._ The parties to this Agreement agree that (a) if a Restricted Party breaches or threatens to breach any covenant or threatens not to perform or fails to perform any obligation set forth in Section 6.1, the damage to the Company may be substantial, although difficult to ascertain, and money damages will not afford the Company an adequate remedy, and (b) if the Restricted Party breaches any covenant or fails to perform any obligation set forth in Section 6.1, or threatens a breach or any covenant or threatens not to perform any obligation set forth in Section 6.1, then the Company shall be entitled, in addition to all other rights and remedies as may be provided by law, to seek specific performance and injunctive and other equitable relief to prevent or restrain a breach of any covenant or failure to perform any obligation set forth in Section 6.1.

Section 7.11.   _Tax Treatment of Indemnification Payments._ All indemnification payments made under this ARTICLE VII shall be treated by the parties as an adjustment to the Purchase Price for Federal, state and local tax purposes, unless otherwise required by Law.

## ARTICLE VIII.
## MISCELLANEOUS.

Section 8.1.   _Expenses._ Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

Section 8.2.   _Further Assurances._ Each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and each of the other Transaction Documents and give effect to the transactions contemplated hereby.

{00009793.DOCX 7}                               30

CONFIDENTIAL                                          MCD00044413

Section 8.3.   Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; provided that a copy is also sent by certified or registered mail (in each case, return receipt requested, postage pre-paid). Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.3):

| | |
|---|---|
| To the Company: | KPC Healthcare, Inc. |
| | c/o Strategic Global Management, Inc. |
| | Attention: General Counsel |
| | 6800 Indiana Avenue, Suite 130 |
| | Riverside, CA 92506 |
| | Facsimile: (951) 782-8812 |
| | E-mail: bthomas@globalmso.com |
| With a copy to: | Holzman Horner PLLC |
| | Attention: Michael R. Holzman, Member |
| | 1875 Eye Street, N.W., Suite 500 |
| | Washington, D.C. 20006 |
| | Facsimile: (202) 905-2156 |
| | E-mail: mholzman@holzmanhorner.com |
| With a copy to: | Loeb & Loeb LLP |
| | Attention: Allen Z. Sussman, Partner |
| | 10100 Santa Monica Boulevard, Suite 2200 |
| | Los Angeles, California 90067 |
| | Facsimile: (310) 919-3934 |
| | E-mail: asussman@loeb.com |
| To the Seller: | SPCP Group, LLC |
| | Attention: Thomas Banks |
| | Two Greenwich Plaza, |
| | Greenwich, CT 06830 |
| | Facsimile: (203) 542-4376 |
| | E-mail: tbanks@silverpointcapital.com |
| Copy to: | Skadden, Arps, Slate, Meagher & Flom LLP |
| | Attention: Jeffrey H. Cohen, Partner |
| | 300 South Grand Avenue, Suite 3400 |
| | Los Angeles, California 90071 |
| | Facsimile: (213) 621-5288 |
| | E-mail: jeffrey.cohen@skadden.com |

Section 8.4.   Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect

{00009793.DOCX 7}                                          31

CONFIDENTIAL                                                                 MCD00044414

any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.5.   Entire Agreement. This Agreement, the Transaction Documents, and all related exhibits and schedules constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 8.6.   Amendment and Modification. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

Section 8.7.   Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 8.8.   Cumulative Remedies. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in ARTICLE VII to the contrary.

Section 8.9.   Assignment. Neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed. Any purported assignment or delegation in violation of this Section 8.9 shall be null and void. No assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder.

Section 8.10.   Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, the obligations of the Company relating to participation in the QAF Program and the making of QAF Payments shall be binding upon the Company's successors and permitted assigns.

Section 8.11.   Third-Party Beneficiaries.

(a)   This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to

{00009793.DOCX 7}                                32

CONFIDENTIAL                                                                        MCD00044415

or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(b)     Notwithstanding the foregoing, the parties designate all non-party Persons eligible for indemnification under ARTICLE VII of this Agreement as express, intended third-party beneficiaries of the indemnification provisions of this Agreement and delegate to such non-party Persons the right to enforce the indemnification provisions of this Agreement.

(c)     Notwithstanding the foregoing, the parties designate the Trustee and the Trust as express, intended third-party beneficiaries of Section 6.2(j) of this Agreement and delegate such non-parties the right to enforce Section 6.2(j) of this Agreement.

Section 8.12.   Counterparts; Electronic Signatures.

(a)     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail of a PDF document shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(b)     Each party hereto agrees that the electronic signatures, whether digital or encrypted, of the undersigned included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or e-mail electronic signatures.

Section 8.13.   Relationship of the Parties. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

Section 8.14.   Representations as to Compliance with Law. Whenever a representation or warranty is made in this Agreement with respect to compliance with any law, that representation means the applicable subject matter is in compliance with applicable statutes, regulations, and ordinances as in existence on the date hereof and on the Closing Date and does not extend to any amendments or revisions of such laws adopted subsequent to such dates.

Section 8.15.   Representation by Independent Counsel. Each party acknowledges and represents that such party (a) has either (i) been represented by counsel of such party's own choosing, or (ii) has been advised to seek, and offered the opportunity to obtain, counsel of such party's choosing, and has elected not to so obtain the services of an attorney, to review this Agreement and advise the party about all of the terms, conditions and legal effect of entering into, and being bound by, this Agreement and all terms and conditions set forth herein, (b) has fully and carefully read this Agreement prior to its execution, (c) has been, or has had the opportunity to be, fully appraised by such party's attorneys, if any, of the legal effect and meaning of this Agreement and all terms and conditions hereof, (d) has had the opportunity to

{00009793.DOCX 7}                    33

CONFIDENTIAL                                                    MCD00044416

make whatever investigation or inquiry such party, deemed necessary or appropriate in connection with the subject matter of this Agreement, (e) has been afforded the opportunity to negotiate as to any and all terms hereof, and (f) is executing this Agreement voluntarily, free from any undue influence, coercion, duress, menace, or fraud of any kind. Each party acknowledges that Holzman Horner PLLC and Loeb & Loeb LLP represent the Company and no other party and that Skadden, Arps, Slate, Meagher & Flom LLP represents the Seller and no other party.

Section 8.16.   Dispute Resolution.

(a)   Governing Law. ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF CALIFORNIA OR ANY OTHER JURISDICTION).

(b)   Submission to Jurisdiction. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND WHATSOEVER AGAINST THE OTHER PARTY IN ANY WAY ARISING FROM OR RELATING TO THIS AGREEMENT, AND EXHIBITS AND SCHEDULES ATTACHED HERETO AND THERETO, AND ALL CONTEMPLATED TRANSACTIONS, INCLUDING, BUT NOT LIMITED TO, CONTRACT, EQUITY, TORT, FRAUD AND STATUTORY CLAIMS, IN ANY FORUM OTHER THAN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY, CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND AGREES TO BRING ANY SUCH ACTION, LITIGATION OR PROCEEDING ONLY IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA SITTING IN ORANGE COUNTY, CALIFORNIA. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING IS CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(c)   Service of Process. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY CERTIFIED MAIL IN ACCORDANCE WITH SECTION 8.3 SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.

(d)   Venue. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR

{00009793.DOCX 7}                        34

CONFIDENTIAL                                             MCD00044417

PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN
INCONVENIENT FORUM.

      (e)    Attorneys' Fees. IN THE EVENT THAT ANY PARTY INSTITUTES
ANY LEGAL SUIT, ACTION OR PROCEEDING, INCLUDING ARBITRATION, AGAINST
THE OTHER PARTY TO OBTAIN ANY REMEDY IN RESPECT OF ANY BREACH OF
THIS AGREEMENT, THE PREVAILING PARTY IN THE SUIT, ACTION OR
PROCEEDING SHALL BE ENTITLED TO RECEIVE IN ADDITION TO ALL OTHER
DAMAGES TO WHICH IT MAY BE ENTITLED, THE COSTS INCURRED BY SUCH
PARTY IN CONDUCTING THE SUIT, ACTION OR PROCEEDING, INCLUDING ACTUAL
ATTORNEYS' FEES AND EXPENSES AND COURT COSTS.

[Signature Pages Follow]

{00009793.DOCX 7}           35

CONFIDENTIAL    MCD00044418

**IN WITNESS WHEREOF**, the undersigned executes this Agreement as of the date first written above.

KPC HEALTHCARE HOLDINGS, INC.,
a California corporation

_____
Dr. Kali Pradip Chaudhuri
Chief Executive Officer

Warrant Purchase Agreement
Signature Page 1 of 2

{00009793.DOCX 7}

CONFIDENTIAL

MCD00044419

**IN WITNESS WHEREOF**, the undersigned executes this Agreement as of the date first written above.

SPCP GROUP, LLC,
a Delaware limited liability company

_____
Signature

_____
Printed Name        Michael A. Gatto
                    Authorized Signatory

_____
Title

Warrant Purchase Agreement
Signature Page 2 of 2

# EXHIBIT A
## COMMON STOCK WARRANT

{00009793.DOCX 7}

CONFIDENTIAL

MCD00044421

**NEITHER THIS WARRANT NOR THE SECURITIES INTO WHICH THIS WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

## INTEGRATED HEALTHCARE HOLDINGS, INC.
## COMMON STOCK WARRANT

### WARRANT TO PURCHASE SHARES OF COMMON STOCK

THIS COMMON STOCK WARRANT (this "**Warrant**") certifies that, for consideration received, SPCP GROUP, LLC, a Delaware limited liability company, or its successors or assigns (the "**Holder**" or "**Holders**," as applicable), is entitled to subscribe for and purchase SEVENTY NINE MILLION ONE HUNDRED EIGHTY TWO THOUSAND SIX HUNDRED THIRTY FIVE (79,182,635) fully paid and nonassessable shares (as adjusted pursuant to Section 3 hereof, the "**Shares**") of the Common Stock (the "**Common Stock**") of Integrated Healthcare Holdings, Inc., a Nevada corporation (the "**Company**"), at a price per Share equal to seven cents ($0.07) (as adjusted pursuant to Section 3 hereof, the "**Exercise Price**"), subject to the provisions and upon the terms and conditions hereinafter set forth.

1.      Method of Exercise; Payment.

(a)      Exercise. This Warrant shall be exercisable from and after April 13, 2010 (the "**Initial Exercise Date**") through April 13, 2013 (the "**Expiration Date**"). This Warrant shall be exercisable by Holder in whole or in part and from time to time for the Shares (as adjusted pursuant to Section 3 hereof).

(b)      Cash Exercise. The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, by the surrender of this Warrant (with the notice of exercise form attached hereto as Exhibit A duly executed) at the principal office of the Company, and by the payment to the Company, by wire transfer or certified, cashier's or other check acceptable to the Company (or as otherwise provided pursuant to Section 1(c) hereinbelow), of an amount equal to the aggregate Exercise Price of the Shares being purchased.

(c)      Net Issue Exercise. In combination with or in lieu of exercising this Warrant for cash pursuant to Section 1(b), the Holder may elect to receive Shares of

#4819-3181- 9781674/023905-0001
1079527.02 a04/13/10

1

Common Stock equal to the value of this Warrant (or any portion thereof) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where X = the number of the Shares to be issued to the Holder pursuant to this Section 1(c).

Y = the number of the Shares covered by this Warrant in respect of which the net issuance election is made pursuant to this Section 1(c).

A = the fair market value of one Share on the date of election under this Section 1(c), as determined in accordance with Section 3(d).

B = the Exercise Price in effect under this Warrant on the date of election under this Section 1(c).

(d)   Fair Market Value. For purposes of this Warrant, the per share fair market value of the Shares shall mean:

(i)   If the class of Shares is traded on a national securities exchange or other over-the-counter quotation system, the fair market value shall be the last reported sale price of a Share on such exchange or other over-the-counter quotation system on the last business day before the effective date of exercise of the net issuance election or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange.

(ii)   If the class of Shares is not so listed and bid and ask prices are not reported, the fair market value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company, as such price shall be determined by either of the following (in each case, the "Appraiser"), which determination shall be conclusive and binding on the Company and the Holder for purposes of this Warrant: (A) the mutual agreement of the Company and Holder, or (B) alternatively, if in good faith the Company and the Holder are unable to reach such mutual agreement within five (5) business days, a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing selected by the Holder in its sole and absolute discretion and at the Company's sole cost and expense.

(e)   Stock Certificates. Promptly upon receipt of a notice to exercise, the Company will take all necessary actions to authorize the issuance of such Common Stock under this Warrant. In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within three (3) business days, or four (4) Trading Days if the Company's Common Stock is publicly traded and the notice of exercise is received after 1:30 p.m. Pacific Time on a day in

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10

2

CONFIDENTIAL                                                                                      MCD00044423

which the Company's Common Stock is publicly traded (each a "**Trading Day**") and, unless this Warrant has been fully exercised or has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time.

2.    <u>Stock Fully Paid</u>.   All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be duly authorized, validly issued, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issue thereof (except the Holder's income taxes, if any, that are due and payable with respect to the Shares).

3.    <u>Adjustment to the Number of Shares Issuable and/or the Exercise Price</u>.   The number of Shares issuable upon the exercise of this Warrant and the Exercise Price are subject to adjustment from time to time as set forth in this Section 3.  Upon each adjustment pursuant to this Section 3, the Holder shall thereafter prior to the Expiration Date be entitled to purchase the adjusted number of Shares of Common Stock at the Exercise Price as adjusted hereby.

(a)    If the Company, at any time while this Warrant is outstanding, (i) shall pay a stock dividend payable in shares of its capital stock (whether payable in shares of its Common Stock, preferred stock, or securities convertible into, or exchangeable or exercisable for, Common Stock or of other capital stock of any class), (ii) shall subdivide outstanding shares of Common Stock into a larger number of shares, or (iii) combine outstanding shares of Common Stock into a smaller number of shares, then (x) the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased or decreased to reflect such event, and (y) the Exercise Price shall be adjusted to an amount obtained by multiplying the Exercise Price in effect immediately prior to such event by a fraction equal to the number of Shares for which this Warrant is exercisable immediately prior to such event divided by the number of Shares for which this Warrant is exercisable immediately after such event.    Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date of a subdivision, combination or reclassification.

(b)    If the Company, at any time while this Warrant is outstanding, shall distribute to all holders of Common Stock, or holders of any securities convertible into, or exchangeable or exercisable for Common Stock (and not to the Holder), evidences of its indebtedness, assets or any rights or warrants to subscribe for or purchase any security (excluding those referred to in this Section 3), the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased to reflect such event as determined by the Appraiser.  The Company shall promptly provide a statement to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock.  Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

#4819-3181- 9781674/023905-0001<br>1079527 02 a04/13/10

3

CONFIDENTIAL

MCD00044424

(c)      In case of any reclassification of the Common Stock, any consolidation or merger of the Company with or into another person, the sale or transfer of all or substantially all of the assets of the Company or any compulsory share exchange pursuant to which the Common Stock is converted into other securities, cash or property, then, subject to the terms hereof, the Holder shall have the right thereafter to exercise this Warrant into the shares of stock and other securities and property receivable upon or deemed to be held by holders of Common Stock following such reclassification, consolidation, merger, sale, transfer or share exchange, and the Holder shall be entitled upon such event to receive such amount of securities or property as the shares of the Common Stock into which this Warrant could have been exercised immediately prior to such reclassification, consolidation, merger, sale, transfer or share exchange would have been entitled.  The terms of any such reclassification, consolidation, merger, sale, transfer or share exchange shall include such terms so as to continue to give to the Holder the right to receive the securities or property set forth in this Section 3(c) upon any exercise following such reclassification, consolidation, merger, sale, transfer or share exchange. This provision shall similarly apply to successive reclassification, consolidations, mergers, sales, transfers or share exchanges.

(d)      If the Company, at any time while this Warrant is outstanding, shall issue additional shares of Common Stock for a consideration per share less than the Exercise Price (a "**Dilutive Issuance**"), then, the Exercise Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Exercise Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Company for such issue would purchase at such Exercise Price, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such additional shares of Common Stock so issued.  For the purposes of this Section 3(d), all shares of Common Stock issuable upon conversion of any outstanding shares of preferred stock and the exercise and/or conversion of any other outstanding securities or rights exercisable for or convertible into shares of Common Stock shall be deemed to be outstanding.  For the purposes of this Section 3(d), the following paragraphs shall also be applicable:

(i)      If the Company, at any time while this Warrant is outstanding, grants any rights to subscribe for, or any rights or options to purchase, or securities convertible into, shares of Common Stock, whether or not such rights or options or rights to convert or exchange are immediately exercisable, and the price per share associated with such rights or options or rights to convert or exchange is less than the Exercise Price, then the total maximum number of shares issuable upon the exercise of such rights or options or upon conversion or exchange of the total maximum amount of such convertible securities issuable upon the exercise of such rights or options shall (as of the date of grant of such rights or options) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d).

(ii)     If the Company, at any time while this Warrant is outstanding,

CONFIDENTIAL

issues or sells any convertible securities, whether or not the rights to exchange or convert thereunder are immediately exercisable, and the price per share associated with such convertible securities is less than the Exercise Price, then the total maximum number of shares issuable upon conversion or exchange of such convertible securities shall (as of the date of the issue or sale of such convertible securities) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d); provided that if any such issuance or sale of such convertible securities is made upon exercise of any rights to subscribe for or to purchase or any option to purchase any such convertible securities for which adjustments of the Exercise Price have been or are to be made pursuant to Section 3(d)(i), then no further adjustment shall be made pursuant to this Section 3(d)(ii) by reason of such issuance or sale.

(e)     For purposes of any computation respecting consideration received, the following shall apply:

(i)     in the case of the issuance of shares of Common Stock for cash, the consideration shall be the amount of such cash, provided that in no case shall any deduction be made for any commissions, discounts or other expenses incurred by the Company for any underwriting of the issue or otherwise in connection therewith; and

(ii)     in the case of the issuance of shares of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined by the Appraiser, whose determination shall be conclusive.

(f)     For the purposes of this Section 3, the following clauses shall also be applicable:

(i)     <u>Record Date</u>. In case the Company shall promptly take a record of the holders of its Common Stock for the purposes of entitling them (A) to receive a dividend or other distribution payable in Common Stock or in convertible securities, or (B) to subscribe for or purchase Common Stock or securities convertible into, or exchangeable or exercisable for, Common Stock, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(ii)     <u>Treasury Shares</u>. Except for the shares issuable pursuant to the stock purchase agreements entered into by the Company pursuant to the Settlement Agreement, General Release and Covenant Not to Sue on or about April 2, 2009 ("**Purchase Rights**"), the number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock for purposes of this Section 3.

CONFIDENTIAL

**JAE 1144**

MCD00044426

(iii)   <u>Exempt Issuance</u>.   Notwithstanding anything to the contrary contained in this Section 3, no adjustments to the number of Shares issuable upon exercise of this Warrant or the Exercise Price shall be made upon an Exempt Issuance. The term "**Exempt Issuance**" means the issuance of (a) shares of Common Stock in an underwritten public offering with an aggregate gross offering price of at least $50,000,000 and a minimum per share offering price of at least double the then-current Exercise Price, (b) shares of Common Stock or options to employees, officers or directors of the Company primarily for compensatory purposes pursuant to any stock or option plan or arrangement duly adopted by the Board of Directors of the Company, provided that any shares issued to any Affiliate, existing shareholder, or other related party of the Company (the "**Related Parties**") in connection with such plans or arrangements are not materially greater than the shares otherwise issued to non-Related Parties for similar service under such plans or arrangements, (c) shares of common stock or options to third-party consultants to the Company who are not Related Parties pursuant to arrangements duly approved by the Board of Directors of the Company, (d) securities upon the exercise or conversion of this Warrant, the other New Warrants (defined below), the Purchase Rights, or other securities or rights exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the Initial Exercise Date, (e) securities issued as consideration for acquisitions or strategic transactions duly approved by the Board of Directors of the Company in a business synergistic with the business of the Company, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities or (f) Common Stock and/or securities convertible into or exercisable for shares of Common Stock that may be issued to Kali P. Chaudhuri, M.D. or his Affiliates in connection with one or more strategic transactions approved by the Board of Directors of the Company as being fair and reasonable and providing consideration to the Company at least commensurate with the shares or securities being issued, provided that the number of shares issued or shares into which such securities are convertible pursuant to all issuances under this clause (f) shall not exceed 55,000,000 shares in aggregate (as appropriately adjusted for stock splits, combinations and similar events).

(iv)   For purposes of this Warrant, the term "Affiliate" shall have the definition given that term in Rule 12b-2 promulgated by the Securities and Exchange Commission under the Exchange Act.

(g)   The Company shall not, by amendment of its articles of incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Warrant by the Company, but shall at all times in good faith assist in carrying out all the provisions of this Section 3 and in taking all such action as may be necessary or appropriate to protect Holder's rights under this Section 3 against impairment.

4.   <u>Notice of Adjustments</u>. Whenever the number of Shares purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 3 hereof, the Company shall promptly provide notice to the Holder setting forth, in reasonable detail, the event requiring the

CONFIDENTIAL

**JAE 1145**

MCD00044427

adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number and class of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

     5.    <u>Fractional Shares</u>. This Warrant may not be exercised for fractional shares.  In lieu of fractional shares the Company shall promptly make a cash payment therefor based upon the per share fair market value of a Share then in effect.

     6.    <u>Pre-emptive Rights</u>.  The Company hereby grants to the Holder (so long as SPCP Group, LLC or an Affiliate thereof (which term shall include any investment fund managed by SPCP Group, LLC or its Affiliates) is and remains the Holder hereof) pre-emptive rights with respect to issuances, other than Exempt Issuances, after the Initial Exercise Date, by the Company of its equity securities or securities or rights convertible into or exercisable for equity securities, where issuance of those securities or rights would result in dilution of the Holder's beneficial ownership (as calculated by the Holder for purposes of Section 13(d) of the Exchange Act of 1934, as amended (the "**Exchange Act**")) of the Common Stock on a fully-diluted and as converted basis, taking into account all securities of the Company held by the Holder which entitle the Holder to acquire Common Stock at any time, including, without limitation, this Warrant, immediately prior to the consummation of the proposed issuance (the "**Pre-Transaction Percentage**").  Each time the Company proposes to issue or offer any shares of, or securities or rights convertible into or exercisable for any shares of, any class of the Company's equity securities (the "**New Shares**") that would reduce the Holder's Pre-Transaction Percentage, other than in Exempt Issuances, the Company shall first make a written offer to the Holder of its pro rata share of the New Shares based on the Holder's Pre-Transaction Percentage (the "**Offer Notice**").  The Offer Notice shall state (a) the Company's bona fide intention to issue or offer the New Shares, (b) the identity of the person(s) to whom the New shares are to be issued or offered, (c) the number of New Shares to be issued or offered, and (d) the price and terms upon which it proposes to issue or offer the New Shares.  The Holder may, by written notice to the Company delivered within ten (10) days of its receipt of the Offer Notice, elect to purchase, at the price and on the terms specified in the Offer Notice, up to its pro rata share of the New Shares.  The closing of the sale to the Holder shall occur simultaneously with the issuance or sale of the New Shares to the other person(s) identified in the Offer Notice, but no earlier than fifteen (15) days following the Holder's receipt of the Offer Notice (unless a shorter period is mutually agreed between the Company and the Holders).  The Holder's pro rata share of the New Shares shall be priced equal to the lowest price paid by any of the other person(s) identified in the Offer Notice, including any such person who may be receiving or purchasing New Shares by virtue of similar pre-emptive or other purchase rights.  If the Company does not consummate the issuance or sale of the New Shares within sixty (60) days following the Holder's receipt of the Offer Notice, then the New Shares shall not be offered, issued or sold unless again offered to the Holder in accordance with this Section 6.

     7.    <u>Representations, Warranties and Covenants of the Company</u>.

     (a)    The Company represents and warrants to the Holder that all corporate actions on the part of the Company, its officers, directors and stockholders necessary for the sale and issuance of the Shares pursuant hereto and the performance of the Company's obligations hereunder were taken prior to and are effective as of the effective

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10

7

CONFIDENTIAL

MCD00044428

date of this Warrant, except that the Company may need to obtain stockholder approval to increase its authorized capital to ensure there are sufficient shares of Common Stock available for issuance of the Shares pursuant hereto. The Company covenants and agrees to promptly increase the Company's authorized capital as and to the extent necessary to ensure there are sufficient authorized shares of Common Stock reserved and available for issuance under this Warrant, subject to the Holder's cooperation in approving by vote or written consent from time to time resolutions approving such increases in authorized capital. The Company will procure at its sole expense upon each such authorization and reservation of shares the listing thereof (subject to issuance or notice of issuance) on all stock exchanges on which the Common Stock is then listed or inter-dealer trading systems or markets on which the Common Stock is then traded. The Company will take all such actions as may be necessary to assure that such shares of Common Stock may be so issued without violation of any applicable law or regulation, or of any requirements of any national securities exchange upon which the Common Stock may be listed or inter-dealer trading system on which the Common Stock is then traded, free of any pre-emptive rights except as referenced in Section 7(e) hereof. In furtherance, and not in limitation, of the foregoing, the Company covenants and agrees to prepare and file with the Securities and Exchange Commission preliminary and definitive versions of a Schedule 14C Information Statement and make such other filings and mailings to the Company's stockholders as necessary or appropriate to cause an increase in the Company's authorized capital to a number that is sufficient to accommodate exercise of this Warrant, to become effective as soon as practicable after the Initial Exercise Date.

(b) The Company has made available to the Holder true, correct and complete copies of its articles of incorporation and bylaws, as amended. This Warrant is not inconsistent with the Company's articles of incorporation or bylaws, and does not contravene any law or governmental rule, regulation or order applicable to it, does not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract, agreement or other instrument to which it is a party or by which it is bound, and constitutes the legal, valid and binding agreements of the Company, enforceable in accordance with its terms.

(c) No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by the Company of its obligations under this Warrant, except for the filing of notices pursuant to Regulation D under the Securities Act and any filing required by applicable state securities law, which filings will be effective by the time required thereby.

(d) All issued and outstanding shares of Common Stock or any other securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable. All outstanding shares of Common Stock and any other securities were issued in full compliance with all federal and state securities laws. Except as provided in favor of Kali P. Chaudhuri, M.D. and William E. Thomas in that certain Securities Purchase Agreement dated effective as of July 18, 2008, as amended, among the Company, Kali P. Chaudhuri, M.D. and William E. Thomas ("**2008 SPA**"), no

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10

8

stockholder of the Company has preemptive rights to purchase new issuances of the Company's capital stock.

(e)     Except as provided in the 2008 SPA and in warrants (including this Warrant) to purchase up to four hundred five million (405,000,000) shares of Common Stock, which warrants (the "**New Warrants**") were issued by the Company on the Initial Exercise Date, the Company is not, pursuant to the terms of any agreement currently in existence, under any obligation to register under the Securities Act any of its presently outstanding securities or any of its securities which may hereafter be issued.

(f)     Assuming that the Holder is an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (as defined in Section 8 hereof)), the issuance of the Shares upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

(g)     At the written request of the Holder, in the event the Holder proposes to sell Shares issuable upon the exercise of this Warrant in compliance with Rule 144 promulgated under the Securities Act by the Securities and Exchange Commission, the Company shall furnish to the Holder, within three (3) Trading Days after receipt of such request, a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such Rule, as such Rule may be amended from time to time.

8.     <u>Restrictive Legend</u>.  The Shares (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

THESE SHARES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

9.     <u>Transfer of Warrant</u>.

(a)     This Warrant may be sold, transferred, assigned or hypothecated, in whole or in part, by the Holder without the consent of the Company; <u>provided</u>, in each case that any transferee or assignee agrees to be bound by the terms of this Warrant, and such transfer or assignment is in compliance with the Securities Act and the securities law of

CONFIDENTIAL                    **JAE 1148**                    MCD00044430

any applicable jurisdiction.  The Warrant may be divided or combined, upon request to the Company by the Holder, into one or more new warrants representing the same aggregate number of Shares.   For purposes of this Warrant, "**person**" means an individual or a corporation, association, partnership, limited liability company, joint venture, organization, business, trust or any other entity or organization, including a government or any subdivision or agency thereof.  The terms and conditions of this Warrant shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties.

(b)      No opinion of counsel or "no-action" letter shall be necessary for any transfer or assignment by any Holder.

9.      <u>Rights of Stockholders</u>.  No holder of this Warrant shall be entitled, as a Warrant holder, to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company which may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the holder of this Warrant, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until the Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become deliverable, as provided herein.

10.      <u>Information Rights</u>.  The Company shall deliver to the Holder the following (which may be satisfied by Company's delivery of the Company's public filings, if applicable, to Holder):

(a)      as soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Company, a balance sheet and income statement as of the last day of such year and a statement of cash flows for such year, such year end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles, and audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(b)      as soon as practicable, but in any event within forty five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, schedule as to the sources and application of funds for such fiscal quarter, an unaudited balance sheet and a statement of stockholder's equity as of the end of such fiscal quarter; and

(c)      as soon as practicable, but in any event with forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the number of common shares issuable upon conversion or exercise of any outstanding securities convertible or exercisable for common shares and the exchange

CONFIDENTIAL                                        MCD00044431

ratio or exercise price applicable thereto and number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Holder to calculate its percentage equity ownership in the Company and certified by the Chief Financial Officer or Chief Executive Officer of the Company as being true, complete and correct.

11.   Reports Under Exchange Act. With a view to making available to the Holders the benefits of Rule 144 promulgated by the Securities and Exchange Commission (the "**SEC**") under the Securities Act ("**SEC Rule 144**") and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)   make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public so long as the Company is subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act;

(b)   file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(c)   furnish to any Holder, so long as the Holder holds this Warrant or owns any Shares, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144, the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form.

12.   Expiration of Warrant. This Warrant shall expire and shall no longer be exercisable after 5:00 p.m., Pacific Time, on the Expiration Date.

13.   Notices. All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given upon receipt or, if earlier, (a) five (5) days after deposit with the U.S. Postal Service or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one business day after the business day of deposit with Federal Express or similar overnight courier, freight prepaid or (d) one business day after the business day of facsimile transmission, if delivered by facsimile transmission with copy by first class mail, postage prepaid, and shall be addressed (i) if to the Holder, at the Holder's address as set forth on the register maintained by the Company, and (ii) if to the Company, at the address of its principal corporate offices (Attention: President), which on the date hereof is 1301 N. Tustin Avenue, Santa Ana, California 92705, or at such other address as a party may designate by ten (10) days advance written notice to the other party pursuant to the provisions above.

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10

11

CONFIDENTIAL                                                                                          MCD00044432

14.  <u>Warrant Agent</u>.

(a)  The Company shall serve as the initial warrant agent under this Warrant. The Company and the Holder may appoint a new warrant agent as mutually agreed upon by the Company and the Holder.

(b)  Any corporation into which the Company or any new warrant agent may be merged or any corporation resulting from any consolidation to which the Company or any new warrant agent shall be a party or any corporation to which the Company or any new warrant agent transfers substantially all of its corporate trust or stockholders services business shall be a successor warrant agent under this Warrant without any further act. Any such successor warrant agent shall promptly cause notice of its succession as warrant agent to be mailed (by first class mail, postage prepaid) to the Holder at the Holder's last address as shown on the register maintained by the warrant agent pursuant to this Warrant.

15.  <u>Payment of Taxes</u>.  The Company will pay all documentary stamp taxes attributable to the issuance of Shares upon the exercise of the Warrants represented by this Warrant. The Holder shall be responsible for all other tax liability that may arise as a result of holding or transferring the Warrants represented by this Warrant or receiving the Shares under this Warrant.

16.  <u>Replacement of Warrant</u>.  If the certificate evidencing this Warrant is mutilated, lost, stolen or destroyed, the Company shall issue in exchange and substitution for and upon cancellation hereof, or in lieu of and substitution for this Warrant certificate, a new warrant certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and bond or other indemnity, if requested, reasonably satisfactory to it. A Holder of a replacement warrant certificate also shall comply with such other reasonable regulations and pay such other reasonable charges attributable to the replacement of a warrant certificate.

17.  <u>Governing Law</u>. This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Nevada.

18.  <u>Amendments</u>.  This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

19.  <u>Registration Rights</u>.

(a)  The Company shall file a registration statement under the Securities Act covering the resale of all Shares of the Holder as soon as practicable following the Holder's written request to do so, and use its reasonable best efforts to have the registration statement declared effective by the SEC for distribution thereof by means of an underwriting. The underwriter will be selected by the Company and shall be reasonably acceptable to the Holder. The Holder shall (together with the Company as provided herein below) enter into an underwriting agreement in a customary form with

CONFIDENTIAL

**JAE 1151**

MCD00044433

the underwriter or underwriters selected for such underwriting.  Notwithstanding any other provision of this Section 19(a), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of Shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.  The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders as selected by them.

(b)    (i)    The Company covenants and agrees with the Holder (and any subsequent Holders of this Warrant and/or Shares) that, in the event the Company proposes to file a registration statement under the Securities Act (including, without limitation, relating to an initial public offering of Company Common Stock or shall receive a request for registration on Form S-3 from any stockholder) with respect to any class of security which becomes or which the Company believes will become effective on or after the Initial Exercise Date and on or before the Expiration Date, then the Company shall in each case give prompt written notice of such proposed filing to the Holder (and any subsequent Holders of this Warrant and/or Shares) at least sixty (60) days before the proposed filing date and, by such notice, shall offer to such Holders the opportunity to include in such registration statement such number of Shares as they may request in writing.

(ii)    The Company shall permit, or shall cause the managing underwriter of a proposed offering to permit, the Holders from whom such written requests have been received to include such number of Shares (the "**Piggy-back Shares**") in the proposed offering on terms and conditions no less favorable to the Holders as the terms and conditions applicable to securities of the Company included therein or as applicable to securities of any person other than the Company and the Holders of Piggy-back Shares if the securities of any such person are included therein; provided, however, that the Company shall not be required to honor any such request that is received more than sixty (60) days after the proper giving of the Company's notice or after the Expiration Date. Notwithstanding any other provision of this Section 19(b)(ii), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities, other than securities to be registered pursuant to the registration rights granted in the 2008 SPA (the "**Other Shares**") and securities to be offered for the account of the Holders of the New Warrants and the Company, are first entirely excluded from the underwriting, and unless the number of Other Shares, on the one hand, and Piggy-back Shares on the other hand, are cut back on a pro rata basis based on the number of Piggy-back Shares and Other Shares requested to be included in such offering.  The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10

13

CONFIDENTIAL

MCD00044434

fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders selected by them.

(iii)     The Company shall be obligated pursuant to this Section 19(b)(iii) to include in the piggy-back offering Shares that have not yet been purchased by a Holder so long as such Holder submits an undertaking to the Company that such Holder intends to exercise the Warrant for at least the number of Shares to be included in such piggy-back offering prior to the consummation of such piggy-back offering.  The Company shall use its reasonable best efforts to register or qualify the Shares for offer or sale under the state securities or Blue Sky laws of such states which the Holders of such Shares shall designate.

(iv)     If the Company decides not to proceed with the piggy-back offering, the Company will have no obligation to proceed with the offering of the Piggy-back Shares.

(c)     (i)     To the fullest extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, directors and stockholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Violation (as defined herein below) and the Company will pay to each such Holder, underwriter, controlling person or other aforementioned person, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action as such expenses are incurred; provided, however, that the indemnity agreement contained in this Section 19(c)(i) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter, controlling person or other aforementioned person.  The term "**Violation**" means losses, claims, damages, or liabilities (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations:  (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by any other party hereto, of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law.

#4819-3181- 9781674/023905-0001
1079527.02 a04/13/10

14

(ii)     Each Holder of Shares who participates in a registration pursuant to Section 19 shall indemnify and hold harmless the Company, each of its directors, each of its officers who have signed any such registration statement, and each person, if any, who controls the Company within the meaning of the Securities Act, against any losses, claims, damages or liabilities to which the Company, or any such director, officer or controlling person may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of, or are based upon, any untrue or alleged untrue statement of any material fact contained in any such registration statement, or final prospectus, or any amendment or supplement thereto, or arise out of or are based upon the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any such registration statement, or final prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished by such Holder expressly for use in the preparation thereof; and will reimburse any legal or other expenses reasonably incurred by the Company, or any such director, officer or controlling person in connection with investigating or defending against any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this subparagraph (ii) shall not apply to amounts paid to any claimant in settlement of any suit or claim unless such payment is first approved by such Holder; and, provided further, that the aggregate amount payable by a Holder pursuant to this Section 19(c)(ii) shall not exceed the net proceeds received by such Holder in the registered offering out of which its obligations pursuant to this Section 19(c)(ii) arise.

[signature page follows]

CONFIDENTIAL

MCD00044436

Issued this 13th day of April, 2010.

**INTEGRATED HEALTHCARE HOLDINGS, INC.,**
A NEVADA CORPORATION

By: _____

Kenneth K. Westbrook, Chief Executive Officer

**Attachments**

Exhibit A - Notice of Exercise
Exhibit B - Form of Transfer

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10

16

**JAE 1155**

CONFIDENTIAL

MCD00044437

## EXHIBIT A

## NOTICE OF EXERCISE

TO:   **INTEGRATED HEALTHCARE HOLDINGS, INC.**

Attention: President

1.      The undersigned hereby elects to purchase _____ shares of the Common Stock of Integrated Healthcare Holdings, Inc. (the "Company") pursuant to the terms of the attached Warrant.

2.      Method of Exercise (Please initial the applicable blank(s)):

___     The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full of $_____ for the purchase price of _____ Shares being purchased for cash, together with all applicable transfer taxes, if any.

___     The undersigned elects to exercise the attached Warrant by means of the net exercise provisions of Section 1(c) of this Warrant, and accordingly requests delivery of a net of _____ of such Shares and a corresponding reduction in the total number of Shares available for further exercise from _____ Shares to _____ Shares.

3.      Please issue a certificate or certificates representing said Shares in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____

_____
(Address)

4.      The undersigned hereby represents and warrants that the aforesaid shares of Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale, in connection with the distribution thereof.

_____
(Signature)

Title: _____

_____
(Date)

#4819-3181- 9781674/023905-0001
1079527 02 a04/13/10                          -17-

CONFIDENTIAL                                                                           MCD00044438

**NEITHER THIS WARRANT NOR THE SECURITIES INTO WHICH THIS WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

## INTEGRATED HEALTHCARE HOLDINGS, INC.
## COMMON STOCK WARRANT

### WARRANT TO PURCHASE SHARES OF COMMON STOCK

THIS COMMON STOCK WARRANT (this "**Warrant**") certifies that, for consideration received, SPCP GROUP, LLC, a Delaware limited liability company, or its successors or assigns (the "**Holder**" or "**Holders**," as applicable), is entitled to subscribe for and purchase SIXTEEN MILLION EIGHT HUNDRED SEVENTEEN THOUSAND THREE HUNDRED SIXTY FIVE (16,817,365) fully paid and nonassessable shares (as adjusted pursuant to Section 3 hereof, the "**Shares**") of the Common Stock (the "**Common Stock**") of Integrated Healthcare Holdings, Inc., a Nevada corporation (the "**Company**"), at a price per Share equal to seven cents ($0.07) (as adjusted pursuant to Section 3 hereof, the "**Exercise Price**"), subject to the provisions and upon the terms and conditions hereinafter set forth.

1.  Method of Exercise; Payment.

    (a)   Exercise. This Warrant shall be exercisable from and after February 7, 2013 through April 13, 2016 (the "**Expiration Date**"). This Warrant shall be exercisable by Holder in whole or in part and from time to time for the Shares (as adjusted pursuant to Section 3 hereof).

    (b)   Cash Exercise. The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, by the surrender of this Warrant (with the notice of exercise form attached hereto as Exhibit A duly executed) at the principal office of the Company, and by the payment to the Company, by wire transfer or certified, cashier's or other check acceptable to the Company (or as otherwise provided pursuant to Section 1(c) hereinbelow), of an amount equal to the aggregate Exercise Price of the Shares being purchased.

    (c)   Net Issue Exercise. In combination with or in lieu of exercising this Warrant for cash pursuant to Section 1(b), the Holder may elect to receive Shares of

CONFIDENTIAL
MCD00044439

Common Stock equal to the value of this Warrant (or any portion thereof) by surrender of this Warrant at the principal office of the Company together with notice of such election, in which event the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where X = the number of the Shares to be issued to the Holder pursuant to this Section 1(c).

Y = the number of the Shares covered by this Warrant in respect of which the net issuance election is made pursuant to this Section 1(c).

A = the fair market value of one Share on the date of election under this Section 1(c), as determined in accordance with Section 1(d).

B = the Exercise Price in effect under this Warrant on the date of election under this Section 1(c).

(d)     Fair Market Value.  For purposes of this Warrant, the per share fair market value of the Shares shall mean:

(i)     If the class of Shares is traded on a national securities exchange or other over-the-counter quotation system, the fair market value shall be the last reported sale price of a Share on such exchange or other over-the-counter quotation system on the last business day before the effective date of exercise of the net issuance election or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange.

(ii)     If the class of Shares is not so listed and bid and ask prices are not reported, the fair market value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company, as such price shall be determined by either of the following (in each case, the "**Appraiser**"), which determination shall be conclusive and binding on the Company and the Holder for purposes of this Warrant: (A) the mutual agreement of the Company and Holder, or (B) alternatively, if in good faith the Company and the Holder are unable to reach such mutual agreement within five (5) business days, a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing selected by the Holder in its sole and absolute discretion and at the Company's sole cost and expense.

(e)     Stock Certificates.  Promptly upon receipt of a notice to exercise, the Company will take all necessary actions to authorize the issuance of such Common Stock under this Warrant.  In the event of any exercise of the rights represented by this Warrant, certificates for the Shares so purchased shall be delivered to the Holder within three (3) business days, or four (4) Trading Days if the Company's Common Stock is publicly traded and the notice of exercise is received after 1:30 p.m. Pacific Time on a day in

#4835-5047-3746v4                                    2

CONFIDENTIAL                                    MCD00044440

which the Company's Common Stock is publicly traded (each a "**Trading Day**") and, unless this Warrant has been fully exercised or has expired, a new Warrant representing the shares with respect to which this Warrant shall not have been exercised shall also be issued to the Holder within such time.

2.     Stock Fully Paid.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be duly authorized, validly issued, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issue thereof (except the Holder's income taxes, if any, that are due and payable with respect to the Shares).

3.     Adjustment to the Number of Shares Issuable and/or the Exercise Price.  The number of Shares issuable upon the exercise of this Warrant and the Exercise Price are subject to adjustment from time to time as set forth in this Section 3.  Upon each adjustment pursuant to this Section 3, the Holder shall thereafter prior to the Expiration Date be entitled to purchase the adjusted number of Shares of Common Stock at the Exercise Price as adjusted hereby.

(a)     If the Company, at any time while this Warrant is outstanding, (i) shall pay a stock dividend payable in shares of its capital stock (whether payable in shares of its Common Stock, preferred stock, or securities convertible into, or exchangeable or exercisable for, Common Stock or of other capital stock of any class), (ii) shall subdivide outstanding shares of Common Stock into a larger number of shares, or (iii) combine outstanding shares of Common Stock into a smaller number of shares, then (x) the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased or decreased to reflect such event, and (y) the Exercise Price shall be adjusted to an amount obtained by multiplying the Exercise Price in effect immediately prior to such event by a fraction equal to the number of Shares for which this Warrant is exercisable immediately prior to such event divided by the number of Shares for which this Warrant is exercisable immediately after such event.  Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date of a subdivision, combination or reclassification.

(b)     If the Company, at any time while this Warrant is outstanding, shall distribute to all holders of Common Stock, or holders of any securities convertible into, or exchangeable or exercisable for Common Stock (and not to the Holder), evidences of its indebtedness, assets or any rights or warrants to subscribe for or purchase any security (excluding those referred to in this Section 3), the number of shares of Common Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall be proportionally increased to reflect such event as determined by the Appraiser.  The Company shall promptly provide a statement to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock.  Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

#4835-5047-3746v4                                       3

(c)    In case of any reclassification of the Common Stock, any consolidation or merger of the Company with or into another person, the sale or transfer of all or substantially all of the assets of the Company or any compulsory share exchange pursuant to which the Common Stock is converted into other securities, cash or property, then, subject to the terms hereof, the Holder shall have the right thereafter to exercise this Warrant into the shares of stock and other securities and property receivable upon or deemed to be held by holders of Common Stock following such reclassification, consolidation, merger, sale, transfer or share exchange, and the Holder shall be entitled upon such event to receive such amount of securities or property as the shares of the Common Stock into which this Warrant could have been exercised immediately prior to such reclassification, consolidation, merger, sale, transfer or share exchange would have been entitled. The terms of any such reclassification, consolidation, merger, sale, transfer or share exchange shall include such terms so as to continue to give to the Holder the right to receive the securities or property set forth in this Section 3(c) upon any exercise following such reclassification, consolidation, merger, sale, transfer or share exchange. This provision shall similarly apply to successive reclassification, consolidations, mergers, sales, transfers or share exchanges.

(d)    If the Company, at any time while this Warrant is outstanding, shall issue additional shares of Common Stock for a consideration per share less than the Exercise Price (a "**Dilutive Issuance**"), then, the Exercise Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Exercise Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Company for such issue would purchase at such Exercise Price, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such additional shares of Common Stock so issued. For the purposes of this Section 3(d), all shares of Common Stock issuable upon conversion of any outstanding shares of preferred stock and the exercise and/or conversion of any other outstanding securities or rights exercisable for or convertible into shares of Common Stock shall be deemed to be outstanding. For the purposes of this Section 3(d), the following paragraphs shall also be applicable:

(i)    If the Company, at any time while this Warrant is outstanding, grants any rights to subscribe for, or any rights or options to purchase, or securities convertible into, shares of Common Stock, whether or not such rights or options or rights to convert or exchange are immediately exercisable, and the price per share associated with such rights or options or rights to convert or exchange is less than the Exercise Price, then the total maximum number of shares issuable upon the exercise of such rights or options or upon conversion or exchange of the total maximum amount of such convertible securities issuable upon the exercise of such rights or options shall (as of the date of grant of such rights or options) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d).

(ii)    If the Company, at any time while this Warrant is outstanding,

CONFIDENTIAL                      **JAE 1160**                      MCD00044442

issues or sells any convertible securities, whether or not the rights to exchange or convert thereunder are immediately exercisable, and the price per share associated with such convertible securities is less than the Exercise Price, then the total maximum number of shares issuable upon conversion or exchange of such convertible securities shall (as of the date of the issue or sale of such convertible securities) be deemed to have been issued at such time in a Dilutive Issuance, and the Exercise Price shall be adjusted accordingly pursuant to this Section 3(d); provided that if any such issuance or sale of such convertible securities is made upon exercise of any rights to subscribe for or to purchase or any option to purchase any such convertible securities for which adjustments of the Exercise Price have been or are to be made pursuant to Section 3(d)(i), then no further adjustment shall be made pursuant to this Section 3(d)(ii) by reason of such issuance or sale.

(e)     For purposes of any computation respecting consideration received, the following shall apply:

(i)     in the case of the issuance of shares of Common Stock for cash, the consideration shall be the amount of such cash, provided that in no case shall any deduction be made for any commissions, discounts or other expenses incurred by the Company for any underwriting of the issue or otherwise in connection therewith; and

(ii)     in the case of the issuance of shares of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined by the Appraiser, whose determination shall be conclusive.

(f)     For the purposes of this Section 3, the following clauses shall also be applicable:

(i)     <u>Record Date</u>. In case the Company shall promptly take a record of the holders of its Common Stock for the purposes of entitling them (A) to receive a dividend or other distribution payable in Common Stock or in convertible securities, or (B) to subscribe for or purchase Common Stock or securities convertible into, or exchangeable or exercisable for, Common Stock, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(ii)     <u>Treasury Shares</u>. Except for the shares issuable pursuant to the stock purchase agreements entered into by the Company pursuant to the Settlement Agreement, General Release and Covenant Not to Sue on or about April 2, 2009 ("**Purchase Rights**"), the number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock for purposes of this Section 3.

CONFIDENTIAL                                                                                      MCD00044443

(iii)     Exempt Issuance.     Notwithstanding anything to the contrary contained in this Section 3, no adjustments to the number of Shares issuable upon exercise of this Warrant or the Exercise Price shall be made upon an Exempt Issuance. The term **"Exempt Issuance"** means the issuance of (a) shares of Common Stock in an underwritten public offering with an aggregate gross offering price of at least $50,000,000 and a minimum per share offering price of at least double the then-current Exercise Price, (b) shares of Common Stock or options to employees, officers or directors of the Company primarily for compensatory purposes pursuant to any stock or option plan or arrangement duly adopted by the Board of Directors of the Company, provided that any shares issued to any Affiliate, existing shareholder, or other related party of the Company (the **"Related Parties"**) in connection with such plans or arrangements are not materially greater than the shares otherwise issued to non-Related Parties for similar service under such plans or arrangements, (c) shares of common stock or options to third-party consultants to the Company who are not Related Parties pursuant to arrangements duly approved by the Board of Directors of the Company, (d) securities upon the exercise or conversion of this Warrant, the other New Warrants (defined below), the Purchase Rights, or other securities or rights exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on April 13, 2010 (the **"Initial Exercise Date"**), (e) securities issued as consideration for acquisitions or strategic transactions duly approved by the Board of Directors of the Company in a business synergistic with the business of the Company, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities or (f) Common Stock and/or securities convertible into or exercisable for shares of Common Stock that may be issued to Kali P. Chaudhuri, M.D. or his Affiliates in connection with one or more strategic transactions approved by the Board of Directors of the Company as being fair and reasonable and providing consideration to the Company at least commensurate with the shares or securities being issued, provided that the number of shares issued or shares into which such securities are convertible pursuant to all issuances under this clause (f) shall not exceed 55,000,000 shares in aggregate (as appropriately adjusted for stock splits, combinations and similar events).

(iv)     For purposes of this Warrant, the term "Affiliate" shall have the definition given that term in Rule 12b-2 promulgated by the Securities and Exchange Commission under the Exchange Act.

(g)     The Company shall not, by amendment of its articles of incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Warrant by the Company, but shall at all times in good faith assist in carrying out all the provisions of this Section 3 and in taking all such action as may be necessary or appropriate to protect Holder's rights under this Section 3 against impairment.

4.     Notice of Adjustments. Whenever the number of Shares purchasable hereunder or the Exercise Price thereof shall be adjusted pursuant to Section 3 hereof, the Company shall promptly provide notice to the Holder setting forth, in reasonable detail, the event requiring the

#4835-5047-3746v4                                   6

CONFIDENTIAL                                                                                 MCD00044444

adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the number and class of Shares which may be purchased and the Exercise Price therefor after giving effect to such adjustment.

5. <u>Fractional Shares</u>. This Warrant may not be exercised for fractional shares. In lieu of fractional shares the Company shall promptly make a cash payment therefor based upon the per share fair market value of a Share then in effect.

6. <u>Pre-emptive Rights</u>. The Company hereby grants to the Holder (so long as SPCP Group, LLC or an Affiliate thereof (which term shall include any investment fund managed by SPCP Group, LLC or its Affiliates) is and remains the Holder hereof) pre-emptive rights with respect to issuances, other than Exempt Issuances, after the Initial Exercise Date, by the Company of its equity securities or securities or rights convertible into or exercisable for equity securities, where issuance of those securities or rights would result in dilution of the Holder's beneficial ownership (as calculated by the Holder for purposes of Section 13(d) of the Exchange Act of 1934, as amended (the "**Exchange Act**")) of the Common Stock on a fully-diluted and as converted basis, taking into account all securities of the Company held by the Holder which entitle the Holder to acquire Common Stock at any time, including, without limitation, this Warrant, immediately prior to the consummation of the proposed issuance (the "**Pre-Transaction Percentage**"). Each time the Company proposes to issue or offer any shares of, or securities or rights convertible into or exercisable for any shares of, any class of the Company's equity securities (the "**New Shares**") that would reduce the Holder's Pre-Transaction Percentage, other than in Exempt Issuances, the Company shall first make a written offer to the Holder of its pro rata share of the New Shares based on the Holder's Pre-Transaction Percentage (the "**Offer Notice**"). The Offer Notice shall state (a) the Company's bona fide intention to issue or offer the New Shares, (b) the identity of the person(s) to whom the New shares are to be issued or offered, (c) the number of New Shares to be issued or offered, and (d) the price and terms upon which it proposes to issue or offer the New Shares. The Holder may, by written notice to the Company delivered within ten (10) days of its receipt of the Offer Notice, elect to purchase, at the price and on the terms specified in the Offer Notice, up to its pro rata share of the New Shares. The closing of the sale to the Holder shall occur simultaneously with the issuance or sale of the New Shares to the other person(s) identified in the Offer Notice, but no earlier than fifteen (15) days following the Holder's receipt of the Offer Notice (unless a shorter period is mutually agreed between the Company and the Holders). The Holder's pro rata share of the New Shares shall be priced equal to the lowest price paid by any of the other person(s) identified in the Offer Notice, including any such person who may be receiving or purchasing New Shares by virtue of similar pre-emptive or other purchase rights. If the Company does not consummate the issuance or sale of the New Shares within sixty (60) days following the Holder's receipt of the Offer Notice, then the New Shares shall not be offered, issued or sold unless again offered to the Holder in accordance with this Section 6.

7. <u>Representations, Warranties and Covenants of the Company</u>.

(a) The Company represents and warrants to the Holder that all corporate actions on the part of the Company, its officers, directors and stockholders necessary for the sale and issuance of the Shares pursuant hereto and the performance of the Company's obligations hereunder were taken prior to and are effective as of the effective

#4835-5047-3746v4         7

CONFIDENTIAL      MCD00044445

date of this Warrant, except that the Company may need to obtain stockholder approval to increase its authorized capital to ensure there are sufficient shares of Common Stock available for issuance of the Shares pursuant hereto. The Company covenants and agrees to promptly increase the Company's authorized capital as and to the extent necessary to ensure there are sufficient authorized shares of Common Stock reserved and available for issuance under this Warrant, subject to the Holder's cooperation in approving by vote or written consent from time to time resolutions approving such increases in authorized capital. The Company will procure at its sole expense upon each such authorization and reservation of shares the listing thereof (subject to issuance or notice of issuance) on all stock exchanges on which the Common Stock is then listed or inter-dealer trading systems or markets on which the Common Stock is then traded. The Company will take all such actions as may be necessary to assure that such shares of Common Stock may be so issued without violation of any applicable law or regulation, or of any requirements of any national securities exchange upon which the Common Stock may be listed or inter-dealer trading system on which the Common Stock is then traded, free of any preemptive rights except as referenced in Section 7(e) hereof. In furtherance, and not in limitation, of the foregoing, prior to the date hereof, the Company prepared and filed with the Securities and Exchange Commission definitive versions of a Schedule 14C Information Statement and such other filings and mailings to the Company's stockholders as necessary or appropriate to cause an increase in the Company's authorized capital to a number that is sufficient to accommodate exercise of this Warrant.

(b)     The Company has made available to the Holder true, correct and complete copies of its articles of incorporation and bylaws, as amended. This Warrant is not inconsistent with the Company's articles of incorporation or bylaws, and does not contravene any law or governmental rule, regulation or order applicable to it, does not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract, agreement or other instrument to which it is a party or by which it is bound, and constitutes the legal, valid and binding agreements of the Company, enforceable in accordance with its terms.

(c)     No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by the Company of its obligations under this Warrant, except for the filing of notices pursuant to Regulation D under the Securities Act and any filing required by applicable state securities law, which filings will be effective by the time required thereby.

(d)     All issued and outstanding shares of Common Stock or any other securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable. All outstanding shares of Common Stock and any other securities were issued in full compliance with all federal and state securities laws. Except as provided (i) in favor of Kali P. Chaudhuri, M.D. and William E. Thomas in that certain Securities Purchase Agreement dated effective as of July 18, 2008, as amended, among the Company, Kali P. Chaudhuri, M.D. and William E. Thomas ("**2008 SPA**") and (ii) in the New Warrants (as defined below), no stockholder of the Company has preemptive rights to purchase new issuances of the Company's capital stock.

CONFIDENTIAL                                                                      MCD00044446

(e)   Except as provided in the 2008 SPA and in warrants (including this Warrant) to purchase up to four hundred five million (405,000,000) shares of Common Stock, which warrants (the "**New Warrants**") were issued by the Company on the Initial Exercise Date, the Company is not, pursuant to the terms of any agreement currently in existence, under any obligation to register under the Securities Act any of its presently outstanding securities or any of its securities which may hereafter be issued.

(f)   Assuming that the Holder is an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (as defined in Section 8 hereof)), the issuance of the Shares upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

(g)   At the written request of the Holder, in the event the Holder proposes to sell Shares issuable upon the exercise of this Warrant in compliance with Rule 144 promulgated under the Securities Act by the Securities and Exchange Commission, the Company shall furnish to the Holder, within three (3) Trading Days after receipt of such request, a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such Rule, as such Rule may be amended from time to time.

8.   <u>Restrictive Legend</u>.  The Shares (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> THESE SHARES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

9.   <u>Transfer of Warrant</u>.

(a)   This Warrant may be sold, transferred, assigned or hypothecated, in whole or in part, by the Holder without the consent of the Company; <u>provided</u>, in each case that any transferee or assignee agrees to be bound by the terms of this Warrant, and such transfer or assignment is in compliance with the Securities Act and the securities law of any applicable jurisdiction.  The Warrant may be divided or combined, upon request to the Company by the Holder, into one or more new warrants representing the same aggregate number of Shares.  For purposes of this Warrant, "**person**" means an

CONFIDENTIAL

**JAE 1165**

MCD00044447

individual or a corporation, association, partnership, limited liability company, joint venture, organization, business, trust or any other entity or organization, including a government or any subdivision or agency thereof. The terms and conditions of this Warrant shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties.

(b)     No opinion of counsel or "no-action" letter shall be necessary for any transfer or assignment by any Holder.

9.     Rights of Stockholders. No holder of this Warrant shall be entitled, as a Warrant holder, to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company which may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the holder of this Warrant, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until the Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become deliverable, as provided herein.

10.     Information Rights. The Company shall deliver to the Holder the following (which may be satisfied by the Company's delivery of the Company's public filings, if applicable, to Holder):

(a)     as soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Company, a balance sheet and income statement as of the last day of such year and a statement of cash flows for such year, such year end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles, and audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(b)     as soon as practicable, but in any event within forty five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, an unaudited income statement, schedule as to the sources and application of funds for such fiscal quarter, an unaudited balance sheet and a statement of stockholder's equity as of the end of such fiscal quarter; and

(c)     as soon as practicable, but in any event with forty-five (45) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the number of common shares issuable upon conversion or exercise of any outstanding securities convertible or exercisable for common shares and the exchange ratio or exercise price applicable thereto and number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Holder to calculate its percentage equity ownership in the Company and

#4835-5047-3746v4

10

certified by the Chief Financial Officer or Chief Executive Officer of the Company as being true, complete and correct.

11.     <u>Reports Under Exchange Act</u>. With a view to making available to the Holders the benefits of Rule 144 promulgated by the Securities and Exchange Commission (the "**<u>SEC</u>**") under the Securities Act ("**<u>SEC Rule 144</u>**") and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)     make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public so long as the Company is subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act;

(b)     file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(c)     furnish to any Holder, so long as the Holder holds this Warrant or owns any Shares, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144, the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form.

12.     <u>Expiration of Warrant</u>. This Warrant shall expire and shall no longer be exercisable after 5:00 p.m., Pacific Time, on the Expiration Date.

13.     <u>Notices</u>. All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given upon receipt or, if earlier, (a) five (5) days after deposit with the U.S. Postal Service or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one business day after the business day of deposit with Federal Express or similar overnight courier, freight prepaid or (d) one business day after the business day of facsimile transmission, if delivered by facsimile transmission with copy by first class mail, postage prepaid, and shall be addressed (i) if to the Holder, at the Holder's address as set forth on the register maintained by the Company, and (ii) if to the Company, at the address of its principal corporate offices (Attention: President), which on the date hereof is 1301 N. Tustin Avenue, Santa Ana, California 92705, or at such other address as a party may designate by ten (10) days advance written notice to the other party pursuant to the provisions above.

14.     <u>Warrant Agent</u>.

#4835-5047-3746v4                                          11

CONFIDENTIAL                                                                    MCD00044449

(a)     The Company shall serve as the initial warrant agent under this Warrant. The Company and the Holder may appoint a new warrant agent as mutually agreed upon by the Company and the Holder.

(b)     Any corporation into which the Company or any new warrant agent may be merged or any corporation resulting from any consolidation to which the Company or any new warrant agent shall be a party or any corporation to which the Company or any new warrant agent transfers substantially all of its corporate trust or stockholders services business shall be a successor warrant agent under this Warrant without any further act. Any such successor warrant agent shall promptly cause notice of its succession as warrant agent to be mailed (by first class mail, postage prepaid) to the Holder at the Holder's last address as shown on the register maintained by the warrant agent pursuant to this Warrant.

15.     <u>Payment of Taxes</u>.   The Company will pay all documentary stamp taxes attributable to the issuance of Shares upon the exercise of the Warrants represented by this Warrant. The Holder shall be responsible for all other tax liability that may arise as a result of holding or transferring the Warrants represented by this Warrant or receiving the Shares under this Warrant.

16.     <u>Replacement of Warrant</u>.   If the certificate evidencing this Warrant is mutilated, lost, stolen or destroyed, the Company shall issue in exchange and substitution for and upon cancellation hereof, or in lieu of and substitution for this Warrant certificate, a new warrant certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and bond or other indemnity, if requested, reasonably satisfactory to it.  A Holder of a replacement warrant certificate also shall comply with such other reasonable regulations and pay such other reasonable charges attributable to the replacement of a warrant certificate.

17.     <u>Governing Law</u>. This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Nevada.

18.     <u>Amendments</u>.   This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

19.     <u>Registration Rights</u>.

(a)     The Company shall file a registration statement under the Securities Act covering the resale of all Shares of the Holder as soon as practicable following the Holder's written request to do so, and use its reasonable best efforts to have the registration statement declared effective by the SEC for distribution thereof by means of an underwriting.   The underwriter will be selected by the Company and shall be reasonably acceptable to the Holder. The Holder shall (together with the Company as provided herein below) enter into an underwriting agreement in a customary form with the underwriter or underwriters selected for such underwriting.  Notwithstanding any

#4835-5047-3746v4                                          12

CONFIDENTIAL                                                                                      MCD00044450

other provision of this Section 19(a), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of Shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting. The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders as selected by them.

(b)     (i)     The Company covenants and agrees with the Holder (and any subsequent Holders of this Warrant and/or Shares) that, in the event the Company proposes to file a registration statement under the Securities Act (including, without limitation, relating to an initial public offering of Company Common Stock or shall receive a request for registration on Form S-3 from any stockholder) with respect to any class of security which becomes or which the Company believes will become effective on or after the Initial Exercise Date and on or before the Expiration Date, then the Company shall in each case give prompt written notice of such proposed filing to the Holder (and any subsequent Holders of this Warrant and/or Shares) at least sixty (60) days before the proposed filing date and, by such notice, shall offer to such Holders the opportunity to include in such registration statement such number of Shares as they may request in writing.

(ii)     The Company shall permit, or shall cause the managing underwriter of a proposed offering to permit, the Holders from whom such written requests have been received to include such number of Shares (the "**Piggy-back Shares**") in the proposed offering on terms and conditions no less favorable to the Holders as the terms and conditions applicable to securities of the Company included therein or as applicable to securities of any person other than the Company and the Holders of Piggy-back Shares if the securities of any such person are included therein; provided, however, that the Company shall not be required to honor any such request that is received more than sixty (60) days after the proper giving of the Company's notice or after the Expiration Date. Notwithstanding any other provision of this Section 19(b)(ii), if the underwriter advises the Holder in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of Shares held by the Holder to be included in such underwriting shall not be reduced unless all other securities, other than securities to be registered pursuant to the registration rights granted in the 2008 SPA (the "**Other Shares**") and securities to be offered for the account of the Holders of the New Warrants and the Company, are first entirely excluded from the underwriting, and unless the number of Other Shares, on the one hand, and Piggy-back Shares on the other hand, are cut back on a pro rata basis based on the number of Piggy-back Shares and Other Shares requested to be included in such offering. The Company shall bear and pay all expenses incurred in connection with any registration, filing or qualification of the Shares with respect to the registrations pursuant to this Section for each Holder, including (without limitation) all registration, filing, and qualification fees, printers and accounting fees relating or apportionable thereto and the fees and disbursements of one counsel for the selling Holders selected by them.

(iii)      The Company shall be obligated pursuant to this Section 19(b)(iii) to include in the piggy-back offering Shares that have not yet been purchased by a Holder so long as such Holder submits an undertaking to the Company that such Holder intends to exercise the Warrant for at least the number of Shares to be included in such piggy-back offering prior to the consummation of such piggy-back offering.  The Company shall use its reasonable best efforts to register or qualify the Shares for offer or sale under the state securities or Blue Sky laws of such states which the Holders of such Shares shall designate.

(iv)      If the Company decides not to proceed with the piggy-back offering, the Company will have no obligation to proceed with the offering of the Piggy-back Shares.

(c)      (i)      To the fullest extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, directors and stockholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Violation (as defined herein below) and the Company will pay to each such Holder, underwriter, controlling person or other aforementioned person, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action as such expenses are incurred; provided, however, that the indemnity agreement contained in this Section 19(c)(i) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter, controlling person or other aforementioned person.  The term "**Violation**" means losses, claims, damages, or liabilities (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations: (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by any other party hereto, of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law.

(ii)      Each Holder of Shares who participates in a registration pursuant to Section 19 shall indemnify and hold harmless the Company, each of its directors, each of its officers who have signed any such registration statement, and each person, if any, who controls the Company within the meaning of the Securities Act, against any losses,

CONFIDENTIAL                                **JAE 1170**                                MCD00044452

claims, damages or liabilities to which the Company, or any such director, officer or controlling person may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of, or are based upon, any untrue or alleged untrue statement of any material fact contained in any such registration statement, or final prospectus, or any amendment or supplement thereto, or arise out of or are based upon the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any such registration statement, or final prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished by such Holder expressly for use in the preparation thereof; and will reimburse any legal or other expenses reasonably incurred by the Company, or any such director, officer or controlling person in connection with investigating or defending against any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this subparagraph (ii) shall not apply to amounts paid to any claimant in settlement of any suit or claim unless such payment is first approved by such Holder; and, provided further, that the aggregate amount payable by a Holder pursuant to this Section 19(c)(ii) shall not exceed the net proceeds received by such Holder in the registered offering out of which its obligations pursuant to this Section 19(c)(ii) arise.

[signature page follows]

#4835-5047-3746v4

15

CONFIDENTIAL

MCD00044453

Issued this **7th** day of **February**, 2013.

INTEGRATED HEALTHCARE HOLDINGS, INC.,
A NEVADA CORPORATION

By: _____

Kenneth K. Westbrook, Chief Executive Officer

Attachments

Exhibit A - Notice of Exercise
Exhibit B - Form of Transfer

#4835-5047-3746v3

16

CONFIDENTIAL

MCD00044454

**EXHIBIT A**

**NOTICE OF EXERCISE**

TO:   **INTEGRATED HEALTHCARE HOLDINGS, INC.**

Attention: President

1.     The undersigned hereby elects to purchase _____ shares of the Common Stock of Integrated Healthcare Holdings, Inc. (the "**Company**") pursuant to the terms of the attached Warrant.

2.     Method of Exercise (Please initial the applicable blank(s)):

____   The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full of $_____ for the purchase price of _____ Shares being purchased for cash, together with all applicable transfer taxes, if any.

____   The undersigned elects to exercise the attached Warrant by means of the net exercise provisions of Section 1(c) of this Warrant, and accordingly requests delivery of a net of _____ of such Shares and a corresponding reduction in the total number of Shares available for further exercise from _____ Shares to _____ Shares.

3.     Please issue a certificate or certificates representing said Shares in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____

_____
(Address)

4.     The undersigned hereby represents and warrants that the aforesaid shares of Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale, in connection with the distribution thereof.

_____
(Signature)
Title: _____

_____
(Date)

#4835-5047-3746v4                                    -17-

CONFIDENTIAL                                    **JAE 1173**                                    MCD00044455

## EXHIBIT B

### FORM OF TRANSFER
(To be signed only upon transfer of Warrant)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ the right represented by the attached Warrant to purchase _____ shares of the Common Stock of **INTEGRATED HEALTHCARE HOLDINGS, INC.** (the "**Company**"), to which the attached Warrant relates, and appoints _____ as their true and lawful attorney in fact to transfer such right on the books of the Company, with full power of substitution in the premises.

Dated: _____

(Signature must conform in all respects to name of Holder as specified on the face of the Warrant)

_____

_____
(Address)

Signed in the presence of:

_____

#4835-5047-3746v4

CONFIDENTIAL

MCD00044456

## EXHIBIT B

## FORM OF TRANSFER
(To be signed only upon transfer of Warrant)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ the right represented by the attached Warrant to purchase _____ shares of the Common Stock of **INTEGRATED HEALTHCARE HOLDINGS, INC.** (the "**Company**"), to which the attached Warrant relates, and appoints _____ as their true and lawful attorney in fact to transfer such right on the books of the Company, with full power of substitution in the premises.

Dated: _____

(Signature must conform in all respects to name of Holder as specified on the face of the Warrant)

_____

_____

(Address)

Signed in the presence of:

_____

#4819-3181-9781

CONFIDENTIAL

MCD00044457

NEITHER THIS AMENDMENT TO WARRANT NOR THE SECURITIES INTO WHICH THE WARRANT IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION OR EXCLUSION FROM THE REGISTRATION REQUIREMENTS THEREUNDER AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

## AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT (SPCP GROUP, LLC)

This **AMENDMENT NO. 1 TO INTEGRATED HEALTHCARE HOLDINGS, INC. COMMON STOCK WARRANT** (this "Amendment") is made as of February 7, 2013, by and among SPCP GROUP, LLC, a Delaware limited liability company, or its successors or assigns (the "Holder" or "Holders," as applicable), and Integrated Healthcare Holdings, Inc., a Nevada corporation (the "Company").

Holder is entitled to subscribe for and purchase certain fully paid and nonassessable shares (the "Shares") of the Common Stock (the "Common Stock") of the Company pursuant to the terms of the Warrant to Purchase Shares of Common Stock, exercisable from and after April 13, 2010 (as amended, supplemented or otherwise modified and in effect from time to time, the "Warrant"). Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

The Company and the Holder desire to amend the Warrant in certain respects.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Holder hereby agree as follows:

Section 1. Definitions. Except as otherwise defined in this Amendment, terms defined in the Warrant are used herein as defined therein.

Section 2. Amendments. Subject to the satisfaction of the conditions precedent specified in Section 4 below, but effective as of the date of this Amendment, the Warrant shall be amended as follows:

2.1. References Generally. References in the Warrant (including references to the Warrant as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Warrant as amended hereby.

2.2. Exercise. The first sentence of Section 1(a) of the Warrant Agreement is hereby amended by deleting "April 13, 2013" and replacing it with "April 13, 2016".

2.3. Net Issue Exercise. Section 1(c) of the Warrant Agreement is hereby amended by deleting the reference to "Section 3(d)" and replacing it with "Section 1(d)".

Section 3. Representations and Warranties. The Company represents and warrants to the Holder that the representations and warranties set forth in Section 7 of the Warrant are true and complete

Amendment No. 1 to Warrant (SPCP Group, LLC)

#4827-8322-3570v5

CONFIDENTIAL

MCD00044458

on the date of this Amendment as if made on and as of the date of this Amendment (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date) and as if each reference in said Section 7 to "this Agreement" included reference to this Amendment.

Section 4. <u>Conditions Precedent</u>. This Amendment shall become effective as of the date of this Amendment upon the receipt by Holder of counterparts of this Amendment executed by the Company.

Section 5. <u>Effect of this Amendment</u>. Except as expressly provided in this Amendment, the Warrant and each other Loan Document shall remain unchanged and in full force and effect.

Section 6. <u>Miscellaneous</u>. This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Amendment by signing any such counterpart. Delivery of a counterpart by electronic transmission shall be effective as delivery of a manually executed counterpart hereof. This Amendment shall be governed by, and construed in accordance with, the law of the State of Nevada.

[Remainder of page intentionally blank]

#4827-8322-3570v5

CONFIDENTIAL

MCD00044459

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Warrant (SPCP Group, LLC) to be duly executed by their respective authorized representatives as of the day and year first above written.

INTEGRATED HEALTHCARE HOLDINGS, INC.

By: _____

Name: Kenneth K. Westbrook

Title: CEO

[Signature Page to Amendment No. 1 to Warrant (SPCP Group, LLC)]

#4827-8322-3570

CONFIDENTIAL

MCD00044460

SPCP GROUP, LLC

By: _____
Name:   Michael A. Gatto
Title:    Authorized Signatory

[Signature Page to Amendment No. 1 to Warrant (SPCP Group, LLC)]

#4827-8322-3570



CONFIDENTIAL

MCD00044461

**EXHIBIT B**
**WARRANTS SOLD AND PURCHASE PRICE ALLOCATION**

CONFIDENTIAL

MCD00044462

MCD00044463

| | Existing Warrant | | | | | SPCP Group Warrants | |
| Seller | Warrant Shares (Post-Stock Split) | Exercise Price Per Warrant Share (Post-Stock Split) | Cash Proceeds | Principal Balance of SPCP Group Subordinated Promissory Note | Aggregate Purchase Price | Warrant Shares | Exercise Price Per Warrant Share |
|---|---|---|---|---|---|---|---|
| SPCP Group, LLC | ███████████████████████████████████████████████████████████████████████████ | | | | | | |

JAE 1181

CONFIDENTIAL

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL**

# EXHIBIT 17

| Credit Name: | Integrated Healthcare (IHH) |
|---|---|
| Analyst Name: | Banks / Chen |
| Date: | 12/31/13 |

## IHH OVERVIEW

### Overview:

- Integrated Healthcare Holdings, Inc. ("IHH") owns and operates 4 acute care hospitals in Orange County, CA, that comprise 762 beds or approximately 12.6% of the available beds in the market.
  - The Company is publicly traded on the pink sheets with a $20.5MM market cap and a $0.080 per share price.
  - All 4 hospitals are former Tenet facilities.
  - Medicare and Medicaid patients contributed to 58% of patient service revenues in FY 2013, 57% in FY 2012, 66% in FY 2011 and 59% in FY 2010.

### Current Exposure

- Silver Point currently has a $47.3MM Term Loan to IHH and 96MM warrants struck at $0.07/share.
- This loan is secured by a 1st lien on all owned real estate underneath the hospitals and by a 2nd lien on all other assets of the business; the loan matures on 4/13/2016.
- The loan is priced at L+1000 with a 2% floor and has call protection of 105% through 12/31/2013 and 102% through 12/31/2014.
- SP partnered with the majority shareholder of IHH, Dr. Kali Chaudhuri, to purchase the loan and we participated ~12% of the loan to him with a small skim that boosts our return to 12.5%.
- MidCap Partners provides the Company's ABL revolver at a rate of L+425 (2.5% floor)

### Quality Assurance Funds (QAF) Summary:

- While the operating performance of the hospitals has been very poor, the QAF program, which was part of our original thesis, has exceeded all expectations.
- The California QAF or "bed tax" program has been an instrumental part of the Company's cash flow. This program has been implemented through a series of California Assembly bills.
- Under the program, the CA hospital system is effectively taxing itself to receive matching federal funds, which results in increased total funds to be shared.
- To get the matching funds, IHH has to first pay the tax and this causes a short-term working capital drag. IHH funds this with temporary revolver borrowings on the MidCap ABL.
- The current QAF program is for the period 7/1/11 - 12/31/13 and IHH expects to receive  before tax under this program.
- The QAF program for this period is divided into three installments, which require separate approvals:
  - Period 1                                          Received June 2013
  - Period 2                                          Received October 2013
  - Period 3                                          To be received January 2014
    - Monthly fee for service payments             Received in period between April 2013 and January 2014
    - Fee paid by IHH to access QAF program        Paid in period between April 2013 and January 2014
- The next round of QAF funding covering the period of 1/1/14 - 12/31/16 has been approved by the California Assembly and is awaiting sign-off by CMS.

### Recent Updates:

- IHH management recently disclosed to SP and Dr. Chaudhuri 3 major negative issues:
- The Company's cash burn has significantly accelerated between June and September, burning [        ] during this period; this is partially driven by problems with a new AR system, but also by reasons currently unexplainable by management.
- Unrelated to the recent cash burn problem, the Company has also disclosed that it has [        ] in significantly overdue account payables and patient credit balances that need to be addressed.
- The Company faces a serious lawsuit from former employees relating to wage and overtime practices that had not been previously disclosed to SP, with estimated settlement cost c [        ]
- In response, SP has issued a letter to the Company, Board and equity holders reserving its rights to call what it believes to be a default if the Company does not cease payments to unsecured creditors out of the ordinary course, and retain a financial advisor to diligence and address the operational issues at the Company.
- To that end, Management has retained Alvarez & Marsal to assist in an operational turnaround plan.

Page 1 of 8

EXHIBIT 195 5/25/2020

CONFIDENTIAL

SPCP_0000000798

## IIIII CAPITAL STRUCTURE

| Tranche: | Commit. | O/S | Maturity | Cash Rate | LIBOR Floor | Mark | YTM | EBITDA Leverage LTM | Norm. | Leverage at Market LTM | Norm. | LTV Asset Value (4) | 5.00x EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MidCap ABL Revolver (Dec-13) (1) | $35.0 | $10.0 | | | | | | | | | | | |
| SP 1st Lien Term Loan (2) | $47.3 | $47.3 | | | | | | | | | | | |
| Other 1st Lien Debt | $0.0 | $0.0 | | | | | | | | | | | |
| **Total 1st Lien Secured** | **$82.3** | **$57.3** | | | | | | NM | 2.8x | NM | 2.6x | | |
| Other Debt | $0.0 | $0.0 | | | | | | | | | | | |
| **Total Debt O/S** | **$82.3** | **$57.3** | | | | | | NM | 2.8x | NM | 2.6x | | |
| Less: Cash (Dec-13) | ($52.9) | ($52.9) | | | | | | | | | | | |
| Plus: Market Cap | $20.5 | $20.5 | | | | | | | | | | | |
| **Total Enterprise Value** | **$49.8** | **$24.8** | | | | | | NM | 1.2x | NM | 1.2x | | |
| LTM EBITDA | | | | | | | | Share Price | $0.080 | 52-Week High | | | $0.249 |
| Normalized EBITDA | | | | | | | | Shares Out. | 255.307 million | 52-Week Low | | | $0.060 |

----Based on 5.5% EBITDA margin on LTM revenues

### Capital Structure Notes:

(1) The ABL Revolver has a 1st Lien on all non-real estate assets (cash and A/R) and a 2nd Lien on the real estate

(2) The interest rate on the loans is L+1000 with 2% LIBOR Floor; SP skims a portion of KPC's interest, resulting in an effective rate to SP of 12.49% on the loans

(3) The Company is required to pay down and permanently reduce commitments under the MidCap ABL Revolver with 80% of net after tax cash proceeds from the QAF funds up to a minimum of $10.00M outstanding/committed under the ABL Revolver

(4) The Asset Value LTV is based on total value of eligible AR as determined by MidCap borrowing base; as noted above the MidCap ABL Revolver and SP 1st Lien Term Loan have different priorities on the different types of collateral

| | Dec-13 | Dec-14 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Call Protection** | 5.0% | 2.0% | | | | | | | | | | | | |
| **Amortization** | None | None | | | | | | | | | | | | |

| Covenants – 1st Lien | Dec-13 | Mar-14 | Jun-14 | Sep-14 | Dec-14 | Mar-15 | Jun-15 | Sep-15 | Dec-15 | Mar-16 |
|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA including QAF | | | | | | | | | | |
| Min. EBITDA | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 |
| Min. Fixed Charge Coverage | 1.0x | 1.0x | 1.0x | 1.0x | 1.0x | 1.0x | 1.0x | 1.0x | 1.0x | 1.0x |
| EBITDA excluding QAF | | Mar-14 | Jun-14 | Sep-14 | Dec-14 | Mar-15 | Jun-15 | Sep-15 | Dec-15 | Mar-16 |
| Min. EBITDA | | $2.5 | $2.5 | $2.5 | $2.5 | $5.0 | $5.0 | $5.0 | $5.0 | $7.5 |

Category 2 Cap:   92.0%   Given the small size of the business and weak recent operating performance we believe that a price above 0.92 would not be obtainable

CONFIDENTIAL

SPCP_0000000799

JAE 1184

## SILVER POINT EXPOSURE

| Tranche: | Total O/S | SP % | SP $ | Mark | MV | Onshore | Total |
|---|---|---|---|---|---|---|---|
| 1st Lien Term Loan | $47.3 | 87.6% | $41.4 | 92.0% | $38.1 | $41.4 | $41.4 |
| **Total** | **$47.3** | | **$41.4** | | **$38.1** | **$41.4** | **$41.4** |
| | | | | | | | |
| Number of Warrants | | | 96.0 | | | 96.0 | 96.0 |
| Value of Warrants | | | $5.6 | | $5.6 | $5.6 | $5.6 |

## MARK RECOMMENDATION & RATIONALE

| | | Marks | | |
|---|---|---|---|---|
| Tranche: | SP Amount | Current | Recomm. | P&L Impact |
| 1st Lien Term Loan | $41.4 | 92.0% | 92.0% | $0.0 |
| Common Equity Warrants | 96.0 | $0.058 | $0.058 | $0.0 |
| **Total** | | | | **$0.0** |

**Marks Rationale:**
- We use both an EBITDA multiple and a borrowing base approach to value HHH (see Valuation Section on page 7).
- Our borrowing base approach implies that in a liquidation there is ▌▌▌▌ of value to the SP 1st Lien Term Loan from cash and eligible AR beyond the amount currently outstanding on the ABL revolver.
- Our EBITDA multiple approach values the Company at ▌▌▌▌ assuming a 5.00x multiple of ▌▌▌▌ of normalized EBITDA, plus cash on B/S less cash reserve for litigation and overdue payables.
- The loans are 10%-54% LTV based on the borrowing base approach.
- The loans are 9%-45% LTV based on our EBITDA multiple approach.
- We value the SP Term Loan at a price of 92.0%, which corresponds to a yield to maturity of 16.3%.
- The yield reflects the Company's negative operating cash flow and risks around collecting the QAF payments.
- At the midpoint of EBITDA multiple approach, we value the HHH equity at ▌▌▌▌ which implies a price per share of $0.▌▌ and a warrant value per share of ▌▌▌▌

CONFIDENTIAL

SPCP_000000800

**JAE 1185**

## ||||| INCOME STATEMENT

(Fiscal year ends Mar 31)

| | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | LTM | (Year to date) Sep-12 | Sep-13 | |
|---|---|---|---|---|---|---|---|---|---|



**Revenue** — <-- based on latest filed financials from Sep-13
*YoY Growth*

     — <-- revenue excludes QAF payments

Salaries & benefits
Supplies
Provision for doubtful accounts
Other operating expenses — <-- operating expenses exclude QAF fees
**Total Operating Expenses**

QAF revenue recognized
QAF expense recorded
Other addbacks — <-- add back for non-cash expense of wage litigation settlement
**EBITDA**
*EBITDA Margin*

**EBITDA exc. QAF**
*EBITDA Margin*

<u>Cost Analysis (as % of revenue exc. QAF)</u>
Salaries & Benefits
Supplies
Bad Debt
Other Operating Expenses
**Total Operating Expenses**

CONFIDENTIAL

SPCP_000000801

SPCP_0000000802



IIIII FREE CASH FLOW

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | LTM |
|---|---|---|---|---|---|

EBITDA (inc. QAF)
Less: CapEx
**FCF before Int and W/C**

Less: Interest
**FCF before W/C**

Less: Cash Taxes
Change in W/C
**FCF**

Others
Financing Items
**Change in Cash**

**BOP Cash**
**EOP Cash**

<-- includes QAF receivable of £     MM for amount recognized but
not yet received in cash (receipt in Oct-13)

Page 5 of 8

CONFIDENTIAL

**HHH BALANCE SHEET**

(Fiscal year ends Mar 31)

| | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | Sep-13 |
|---|---|---|---|---|---|---|---|---|

**Assets**
Current Assets
Cash and Cash Equivalents
Accounts Receivable
Inventories
Due from Government Payers
Due from Lender
Prepaid Exp - Hospital Quality Assurance Fee
Hospital Quality Assurance Fees Receivable
Deferred Purchase Price Receivable
Prepaid and Other Current Assets
    **Total Current Assets**

PP&E, net
Other Assets
    **Total Assets**

**Liabilities and Stockholders' Equity**
Current Liabilities
    Current Debt
    Accounts Payable
    Accrued Liabilities
    Accrued Insurance Retentions
    Hospital Quality Assurance Fee Payable
    Other Current Liabilities
    **Total Current Liabilities**

Long Term Debt
Capital Lease Obligations
Other Long-Term Liabilities
    **Total Liabilities**

Total Stockholders' Equity
    **Total Liabilities and Equity**

<-- cash balance has subsequently increased to
 December as a result of 2nd QAF
payment in October



CONFIDENTIAL

SPCP_000000803

**JAE 1188**

## HHH VALUATION ANALYSIS

- We value HHH using an EBITDA multiple approach and borrowing base approach.

- In our EBITDA multiple approach we utilize a 5.00x multiple applied to ███ of normalized EBITDA plus cash less litigation and overdue payables reserve to derive a valuation c
- Public hospital operators trade at 6.8x to 8.9x 2012E EBITDA; we believe HHH should be valued at a discount to the lower end of the range given the Company's smaller size and geographic concentration.
- We assume a 5.5% EBITDA margin to determine normalized EBITDA as we believe the current EBITDA performance does not reflect the normalized profitability of these hospital assets.
- Public hospital operators achieve ~15% EBITDA margins and a potential acquirer would likely be able to raise EBITDA margins through more effective management of operations.
- We further assume a ███ cash reserve for the litigation expense recognized in Sep-13 as a potential settlement as well as ███ for overdue payables that management has recently disclosed.
- At the midpoint of EBITDA multiple approach we value the HHH equity at ███ which implies a price per share of ███, above our current value per share of ███
- In our asset valuation approach we calculate the excess value of current assets ███ including A/R (based on the MidCap borrowing base figures) and cash to derive our total collateral value to the ███ M SP Term Loan
- We have ███ k the estimated cash reserve for litigation and overdue payables that were recently disclosed by management as in a liquidation these claims would rank as unsecured

### EBITDA Multiple Approach

| | Low | Mid | High |
|---|---|---|---|
| LTM Revenue | | | |
| Norm. EBITDA Margin | | | |
| HHH EBITDA | | | |
| Multiple | | | |
| HHH EV | | | |
| Plus: Current Cash | | | |
| Less: Cash reserve for litigation | | | |
| Less: Cash reserve for overdue payables | | | |
| Total Value | | | |
| Less: Debt | | | |
| Plus: Cash from Warrant Exercise | | | |
| Equity Value | | | |
| F.D. Shares | | | |
| Price per Share | | | |
| Warrant Strike Price | | | |
| Value per Warrant | | | |
| # of Warrants | | | |
| Total SP Warrant Value | | | |

### Borrowing base analysis (assumes a liquidation)

Latest eligible borrowing base per MidCap
Cash
**ABL Collateral Value**
  less: ABL Revolver
**Excess Value**

**Total Value to SP Term Loan**
  SP 1st Lien Term Loan



Page 7 of 8

CONFIDENTIAL

SPCP_0000000804

**JAE 1189**

## PUBLIC COMPARABLES

($ in millions)

Date: 12/19/2013

| | Median | HCA | IIMA | Hospitals Community | Tenet | Universal | Lifepoint |
|---|---|---|---|---|---|---|---|
| Company Ticker | | HCA | IIMA | CYH | THC | UHS | LPNT |
| **LTM Operating Statistics** | | | | | | | |
| Revenue | | 33,780.0 | 5,842.7 | 13,043.3 | 9,548.0 | 7,247.9 | 3,619.0 |
| EBITDA | | 6,433.0 | 762.6 | 1,627.8 | 1,226.0 | 1,382.8 | 485.1 |
| *% Margin* | | 19.0% | 13.1% | 12.5% | 12.8% | 19.1% | 13.4% |
| Capital Expenditures | | 1,941.0 | 314.1 | 632.2 | 546.0 | 361.8 | 172.5 |
| **2013E Operating Statistics** | | | | | | | |
| Revenue | | 37,933.5 | 6,756.5 | 13,051.8 | 11,642.1 | 8,417.5 | 4,406.9 |
| EBITDA | | 6,432.5 | 795.3 | 1,895.2 | 1,327.5 | 1,273.9 | 539.6 |
| *% Margin* | | 17.0% | 11.8% | 14.5% | 11.4% | 15.1% | 12.2% |
| **Valuation** | | | | | | | |
| Stock Price | | $45.66 | $12.83 | $37.13 | $39.85 | $79.02 | $50.34 |
| Shares Outstanding | | 436.9 | 264.5 | 93.3 | 99.2 | 98.3 | 47.0 |
| Equity Market Capitalization | | 19,949.6 | 3,393.5 | 3,464.7 | 3,954.2 | 7,765.3 | 2,366.8 |
| Plus: Debt | | 28,700.0 | 3,779.9 | 9,655.5 | 5,823.0 | 3,527.9 | 1,764.6 |
| Less: Cash | | 547.0 | 64.3 | 143.6 | 82.0 | 12.1 | 194.8 |
| Total Enterprise Value | | 48,102.6 | 7,109.1 | 12,976.7 | 9,695.2 | 11,281.1 | 3,936.6 |
| **Multiples** | | | | | | | |
| Total Debt / EBITDA | 4.61x | 4.46x | 4.96x | 5.93x | 4.75x | 2.55x | 3.64x |
| TEV / LTM Revenue | 1.15x | 1.42x | 1.22x | 0.99x | 1.02x | 1.56x | 1.09x |
| TEV / LTM EBITDA | 8.04x | 7.48x | 9.32x | 7.97x | 7.91x | 8.16x | 8.11x |
| TEV / LTM EBITDA - CapEx | 12.81x | 10.71x | 15.85x | 13.03x | 14.26x | 11.05x | 12.59x |
| TEV / 2013E Revenue | 1.02x | 1.27x | 1.05x | 0.99x | 0.83x | 1.34x | 0.89x |
| TEV / 2013E EBITDA | 7.39x | 7.48x | 8.94x | 6.85x | 7.30x | 8.86x | 7.29x |
| # of Beds | 16,574 | 41,817 | 10,330 | 19,695 | 13,453 | 25,000 | 6,048 |
| Implied Value Per Bed ($000s) | $674 | $1,150 | $688 | $659 | $721 | $451 | $651 |

Page 8 of 8

CONFIDENTIAL

SPCP_0000000805

JAE 1190

# EXHIBIT 18

**Credit Name:** Integrated Healthcare (IHHI)
**Analyst Name:** Banks / Chen
**Date:** 12/31/14

## IHHI OVERVIEW

### Overview:

- Integrated Healthcare Holdings, Inc. ("IHHI") owns and operates 4 acute care hospitals in Orange County, CA, that comprise 762 beds or approximately 12.6% of the available beds in the market

- The Company effectuated a take-private transaction in May 2014 which resulted in Dr. Kali Chaudhuri and his affiliates owning 100% of the outstanding equity pre-dilution and up to 82.6% on a fully diluted basis

- The take-private was the last in a series of transactions that began with a refinancing led by MidCap Financial to facilitate the buy-out of minority shareholder OCPIN

- Chaudhuri believes that with a consolidated shareholder base, he can bring about a turnaround of the Company's operations by installing a new management team

- Medicare and Medicaid patients contributed to 66% of patient service revenues in FY 2014, 58% in FY 2013, 57% in FY 2012, 66% in FY 2011 and 59% in FY 2010

### Current Exposure

- Our previous term loan position in IHHI was taken out by MidCap Financial in a refinancing in February 2014

- Our current position comprises warrants that convert to up to 17.4% of the equity. The chart below shows all outstanding warrants converted to post-split amounts on May 20, 2014

| Name | Pre-split warrants | Pre-split exercise px | Post-split warrants | Post-split exercise px |
|---|---|---|---|---|
| Kali P. Chaudhuri, M.D. | | | | |
| KPC Resolution Company, LLC | | | | |
| William E. Thomas | | | | |
| Silver Point | | | | |
| Total | | | | |



EXHIBIT
190
SB5-22.90

- Subsequent to May 2014, all outstanding stock options were cancelled and paid out

## IHHI CAPITAL STRUCTURE

### As of September 30, 2014

| Tranche: | Commit. | O/S | Maturity | Cash Rate | LIBOR Floor | Price | YTM | EBITDA Leverage 2014 | Norm. | LTV 4.00x EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|
| MidCap ABL Revolver (1) | $45.0 | $27.7 | 2/14/17 | L+4.25% | 2.50% | | | | | |
| MidCap 1st Lien Term Loan (2) | 49.0 | 49.0 | 2/14/17 | L+9.70% | 2.00% | | | | | |
| Other 1st Lien Debt | – | – | | | | | | | | |
| **Total 1st Lien Secured** | **$94.0** | **$76.7** | | | | | | NM | 4.2x | |
| Capital leases | $4.8 | $4.8 | | | | | | | | |
| Promissory note (3) | 1.3 | 1.3 | 12/31/16 | 8.00% | | | | | | |
| **Total Debt O/S** | **$100.1** | **$82.8** | | | | | | NM | 4.5x | |
| Less: Cash | | ($10.9) | | | | | | | | |
| Plus: Implied Market Cap | | NA | | | | | | | | |
| **Total Enterprise Value** | | NA | | | | | | NM | NM | |

| 2014 EBITDA (ex. QAF) | | → Based on 5.0% EBITDA margin on 2014 revenues |
|---|---|---|
| Normalized 2014 EBITDA | | |

### Capital Structure Notes:

(1) The ABL Revolver has a 1st Lien on all non-real estate assets (cash and A/R) and a 2nd Lien on the real estate. Prepayment free of 5% in year 1 2% thereafter. Beginning in April 2014, Company's availability under revolving line of credit will be reduced by $500k each month until the 1st Lien Term Loan is repaid

(2) Subject to a minimum fixed charge coverage ratio. Includes mandatory prepayment of $14.0MM no later than 30 days after receipt of 2014 QAF

(3) As part of OCPIN take-out, the Company agreed to issue a three year promissory note payable to Dr. Shah of OCPIN

Page 1 of 7

CONFIDENTIAL
SPCP_0000028064

JAE 1192

## SILVER POINT EXPOSURE

| Tranche: | Total O/S | SP % | SP Amount | SP $ | Mark | MV | Onshore | Total |
|---|---|---|---|---|---|---|---|---|
| Number of Warrants | | | 96.0 | | | | 96.0 | 96.0 |
| Value of Warrants | | | | | | $5.6 | $5.6 | $5.6 |

## MARK RECOMMENDATION & RATIONALE

| Tranche: | | | Marks | | Mark | MV | P&L Impact |
|---|---|---|---|---|---|---|---|
| | | | Current | Recomm. | | | |
| Common Equity Warrants | | | $0.058 | $0.055 | | | (0.3) |
| Total | | | $0.058 | | | | ($0.3) |

**Marks Rationale:**
- We use a sum of the parts approach comprising the operating business and QAF to value IIIII (see Valuation Section on page ■)
- Our EBITDA multiple approach on the operating business values the Company at ■ assuming a 4.0x multiple of ■ of normalized EBITDA, plus cash on B/S
- Our present value approach on QAF values this revenue stream at ■ on an after-tax basis, assuming a 20.0% discount rate and probability of receipt from 20-60%
- At the midpoint of the sum of the parts, we value the IIIII equity at ■ which implies a warrant value per share of ■

Page 2 of 7

SPCP_0000028065

CONFIDENTIAL

## IHHI INCOME STATEMENT

- All revenue figures are shown ex. QAF. No QAF payments were recognized in Q1 '15 (Jun-14) or Q2 '15 (Sep-14)
- We have seen a marginal improvement in the performance of the facilities in YTD 2015 as Chandhuri's management team has begun to implement cost reduction and revenue improvement measures
- The company further expects an additional $███████ of net revenue from the current law of QAF. This is expected to be approved and recognized by calendar year-end
- Additionally, the Governor of CA signed legislation in October 2013 that would continue the QAF program for the period from January 1, 2014 through December 31, 2016. This program is still awaiting authorization from CMS, and this is also expected by calendar year-end

| | FY 2010 | Annual (fiscal year ends Mar 31) | | | | | 6 months to | |
| | | FY 2011 | FY 2012 | FY 2013 | FY 2014 | | Sep-13 | Sep-14 |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| *YoY Growth* | | | | | | | | |
| | | | | | | | | |
| Salaries & benefits | | | | | | | | |
| Supplies | | | | | | | | |
| Provision for doubtful accounts | | | | | | | | |
| Other operating expenses | | | | | | | | |
| **Total Operating Expenses** | | | | | | | | |
| | | | | | | | | |
| **EBITDA exc. QAF** | | | | | | | | |
| *EBITDA Margin* | | | | | | | | |
| | | | | | | | | |
| QAF revenue recognized | | | | | | | | |
| QAF expense recorded | | | | | | | | |
| **EBITDA** | | | | | | | | |
| *EBITDA Margin* | | | | | | | | |
| | | | | | | | | |
| Cost Analysis (as % of revenue exc. QAF) | | | | | | | | |
| Salaries & Benefits | | | | | | | | |
| Supplies | | | | | | | | |
| Bad Debt | | | | | | | | |
| Other Operating Expenses | | | | | | | | |
| **Total Operating Expenses** | | | | | | | | |

Page 3 of 7

**JAE 1194**

CONFIDENTIAL

SPCP_0000028066

SPCP_0000028067

## IIHI FREE CASH FLOW



| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | YTD Sep-14 |
|---|---|---|---|---|---|---|
| EBITDA (inc. QAF) | | | | | | |
| Less: CapEx | | | | | | |
| **FCF before Int and W/C** | | | | | | |
| Less: Interest | | | | | | |
| **FCF before W/C** | | | | | | |
| Less: Cash Taxes | | | | | | |
| Change in W/C | | | | | | |
| **FCF** | | | | | | |
| Others | | | | | | |
| Financing Items | | | | | | |
| **Change in Cash** | | | | | | |
| **BOP Cash** | | | | | | |
| **EOP Cash** | | | | | | |

-- includes QAF receivable of [REDACTED] or amount recognized but not yet received in cash (receipt in Oct-13)

-- financing items includes $[REDACTED] share buyout

Page 4 of 7

CONFIDENTIAL



### HHH BALANCE SHEET

(Fiscal year ends Mar 31)

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | Sep-14 |
|---|---|---|---|---|---|---|

**Assets**
Current Assets
  Cash and Cash Equivalents
  Accounts Receivable
  Inventories
  Due from Government Payers
  Due from Lender
  Hospital Quality Assurance Fees Receivable
  Deferred Purchase Price Receivable
  Prepaid and Other Current Assets
    **Total Current Assets**

PP&E, net
Other Assets
    **Total Assets**

**Liabilities and Stockholders' Equity**
Current Liabilities
  Current Debt
  Accounts Payable
  Accrued Liabilities
  Accrued Insurance Retentions
  Hospital Quality Assurance Fee Payable
  Other Current Liabilities
    **Total Current Liabilities**

Long Term Debt
Capital Lease Obligations
Other Long-Term Liabilities
    **Total Liabilities**

Total Stockholders' Equity
    **Total Liabilities and Equity**

includes ... of deferred
tax assets and S... of notes
receivable from affiliate

CONFIDENTIAL

SPCP_0000028068

**JAE 1196**

# IHH VALUATION ANALYSIS

- We value IHH using a sum of the parts valuation to value 1) the operating business via an EBITDA multiple approach and 2) a present value of the probability-weighted after-tax QAF cash flows
- In our EBITDA multiple approach we utilize a 4.00x multiple applied to ██ normalized EBITDA plus cash to derive a valuation of ██
- Public hospital operators trade at 4.1x to 9.5x 2014E EBITDA; we believe IHH should be valued at a discount to the lower end of the range given the Company's smaller size and geographic concentration
- We believe an additional degree of conservativism on the multiple is warranted given the Company has not achieved these normalized EBITDA margins
- We assume ██ EBITDA margin to determine normalized EBITDA as we believe the current EBITDA performance does not reflect the normalized profitability of these hospital assets
- Public hospital operators achieve ~15% EBITDA margins and a potential acquirer would likely be able to raise EBITDA margins through more effective management of operations
- Our QAF valuation is based on a present value of the expected QAF cash flows through 2017. Our probability weighting reflects the uncertainty of CMS approval required for every period
- Of note, we are giving no value to the option that QAF could continue beyond 2017
- Our discount rate reflects the uncertainty of what is essentially an uneconomical subsidy by CMS to hospitals and the possibility of zero recovery as QAF is a binary outcome
- At the midpoint we value IHH and the QAF ██ which implies a price per share of ██ and a warrant value per share o ██
- Expressed in pre-split equivalent warrants, this implies a warrant value per share of ██

| | | Tax Rate |
|---|---|---|
| | | 44.0% |

**Operating business valuation**

| | Low | Mid | High |
|---|---|---|---|
| 2014 Revenue | | | |
| Norm. EBITDA Margin | | | |
| IHH EBITDA | | | |
| Multiple | | | |
| **IHH EV** | | | |
| Plus: Current Cash | | | |
| **Total Value** | | | |
| Less: Debt | | | |
| Plus: Cash from Warrant Exercise | | | |
| **Equity Value** | | | |

**QAF valuation**

| | 03/31/15 | 12/31/15 | 12/31/16 | 06/30/17 |
|---|---|---|---|---|
| 2013 round QAF net revenue (pre tax) | | | | |
| 2013 round QAF net revenue (after tax) | | | | |
| *Probability of receipt* | | | | |
| Probability weighted 2013 QAF net revenue | | | | |
| Date of receipt | | | | |
| Discount rate | | | | |
| **Present value of probability weighted 2013 QAF net revenue** | | | | |
| Date of receipt | | | | |
| 2014 round QAF net revenue (pre tax) | | | | |
| 2014 round QAF net revenue (after tax) | | | | |
| *Probability of receipt* | | | | |
| Probability adjusted QAF payments | | | | |
| *Discount rate (after tax)* | | | | |
| Present value of probability weighted 2014 QAF net revenue | | | | |
| Sum of probability-adjusted discounted cash flows | | | | |

| **Total QAF** | |
|---|---|

**QAF valuation**

| | Low | Mid | High |
|---|---|---|---|
| Operating business | | | |
| QAF | | | |
| **Total value to equity** | | | |
| F.D. Shares | | | |
| Price per Share | | | |
| Warrant Strike Price | | | |
| **Value per Warrant (post-split value)** | | | |
| # of Warrants (MM) | | | |
| Total SP Warrant Value | | | |
| **Value per Warrant (pre-split equivalent)** | | | |

CONFIDENTIAL

SPCP_000028069

**JAE 1197**

## PUBLIC COMPARABLES

($ in millions)

**Date 12/12/2014**

| Company | | | Hospitals | | | | Median |
| Ticker | HCA HCA | Community CYH | Tenet THC | Universal UHS | Lifepoint LPNT | | |
|---|---|---|---|---|---|---|---|
| **LTM Operating Statistics** | | | | | | | |
| Revenue | 36,118.0 | 17,128.7 | 16,032.0 | 7,758.6 | 4,172.8 | | |
| EBITDA | 7,141.0 | 2,240.9 | 1,750.0 | 1,386.0 | 547.1 | | |
| *% Margin* | 19.8% | 13.1% | 10.9% | 17.9% | 13.1% | | |
| **2014E Operating Statistics** | | | | | | | |
| Revenue | 37,072.5 | 18,988.7 | 17,079.4 | 8,580.5 | 4,473.8 | | |
| EBITDA | 7,295.1 | 2,820.4 | 1,939.9 | 1,464.7 | 631.3 | | |
| *% Margin* | 19.7% | 14.9% | 11.3% | 17.1% | 14.1% | | |
| **Valuation** | | | | | | | |
| Stock Price | $72.94 | $50.89 | $50.25 | $106.64 | $70.46 | | |
| Shares Outstanding | 433.6 | 116.3 | 98.3 | 99.0 | 45.3 | | |
| Equity Market Capitalization | 31,624.1 | 5,917.6 | 4,938.6 | 10,554.2 | 3,189.9 | | |
| Plus: Debt | 28,687.0 | 17,069.0 | 11,553.0 | 3,465.8 | 2,222.1 | | |
| Less: Cash | 581.0 | 221.0 | 200.0 | 39.7 | 263.0 | | |
| Total Enterprise Value | 59,730.1 | 22,765.6 | 16,291.6 | 13,980.3 | 5,149.0 | | |
| **Multiples** | | | | | | | **Median** |
| Total Debt / EBITDA | 4.02x | 7.62x | 6.60x | 2.50x | 4.06x | | 4.06x |
| TEV / LTM Revenue | 1.65x | 1.33x | 1.02x | 1.80x | 1.23x | | 1.33x |
| TEV / LTM EBITDA | 8.36x | 10.16x | 9.31x | 10.09x | 9.41x | | 9.41x |
| TEV / 2014E Revenue | 1.61x | 1.20x | 0.95x | 1.63x | 1.15x | | 1.20x |
| TEV / 2014E EBITDA | 8.19x | 8.07x | 8.44x | 9.54x | 8.16x | | 8.19x |
| # of Beds | 41,817 | 19,695 | 13,453 | 25,000 | 6,048 | | 19,695 |
| Implied Value Per Bed ($000s) | $1,428 | $1,156 | $1,211 | $559 | $851 | | $1,156 |

Page 7 of 7

SPCP_0000028070

CONFIDENTIAL

**JAE 1198**

**JAE 1199**

# EXHIBIT 19

| | |
|---|---|
| **From:** | Thomas Banks [tbanks@silverpointcapital.com] |
| **Sent:** | 3/5/2015 12:07:20 PM |
| **To:** | Michael Gatto [mgatto@silverpointcapital.com] |
| **CC:** | Lin Chen [lchen@silverpointcapital.com]; James Kasmarcik [jkasmarcik@silverpointcapital.com] |
| **Subject:** | IHHI Update |

Michael,

IHHI is evaluating an ESOP sale and has hired Eurkea Capital to advise them on it. They are discussing a ███ valuation for the sale with ███ coming from new third party debt and ███ in a seller note. Performance has significantly improved in the past few months and they claim the hospitals did about ███ of EBITDA before QAF in the 4 months from Sept to Dec 2014. Further, they stand to receive ███ of QAF over the next 3 years, which will fully retire the debt. The main benefit of the ESOP is that they would avoid taxes on the QAF and get the full benefit of the money.

Dr. Chaudhuri inquired regarding our interest in providing the debt. I am not that interested because: (a) he shared that he has 26 term sheets already through Eureka's process; and (b) the loan will be much less attractive than what we had previously because they are looking to do the deal without the real estate collateral to finally achieve a true propco/opco split. I will hang around the hoop but this does not feel like a high priority to me today.

I also told them I thought the valuation was low and essentially gave away the option of future QAF payments. I think they should push for a higher number or consider a conversion to an LLC if taxes are their primary concern. They were receptive to both views and said they would come back.

At this point, we only have our warrants, which would be taken out in an ESOP deal. At a $170MM valuation and assuming the opco is no longer liable for the real estate debt, our warrants would be worth $21.5MM vs. a mark of $5.9MM today. Obviously, there is a lot of execution risk to actually achieve this outcome.

Please let me know if you would like to discuss this or approach it differently.

Tom



CONFIDENTIAL

**JAE 1201**

SPCP_0000020617

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 20

| From: | Bill Thomas [bthomas@GlobalMSO.com] |
|---|---|
| Sent: | 7/14/2015 12:25:42 PM |
| To: | Thomas Banks [tbanks@silverpointcapital.com] |
| CC: | Kali Chaudhuri [kpcglobal@gmail.com] |
| Subject: | KPC Healthcare Audit Report |
| Attachments: | KPC Healthcare Inc (IntegratedHealthcareHoldingsInc) March 2015 consolidated financial statements.pdf |

Hello Tom

Hope you're enjoying your summer

I would like to set up a time to talk to you about the ESOP.  We've done considerable analysis and while Dr. Chaudhuri has not made a final decision, he is seriously considering such a transaction.

I'm enclosing a copy of the audit for the period ended March 31, 2015

You'll see net income was a negative ███████ v. positive ███████ ast year. However, last year we received ███████ in QAF v. ███████ this year. Further we think we made a great deal of progress realigning the company last year.

Our analysis would be as follows:

Operating income is ███████ add back depreciation and amortization of ███████ and add electronic health record income of ███████ Result is EBITDA of ███████. Then add back severance cost of ███████ and Fitzgibbons lawsuit of ███████ (you may recall we had an adverse jury verdict, then a judgment for the defense notwithstanding the verdict but most recently an appellate decision reinstating the jury verdict now on appeal to the California Supreme Court) and you have adjusted EBITDA of ███████ or over ███████ without QAF.

Our reorganization plan didn't kick in until July so if you exclude the first quarter of FY 2015 the results are even better.

Our financial advisors, Eureka Capital, believe the company can be valued for the purposes of an ESOP based on a present value for the 2016 three year round of QAF and a multiple of EBITDA without QAF based on trailing twelve months earnings since July 2014.

I should have some values for you to consider end of this week or first of next.  We have engaged a company called Alerus as a potential ESOP trustee and engaged Credit Suisse to provide the ESOP loan.  Both have their financial advisors doing due diligence.

You'll notice we've rebranding the company.  We changed the corporate name from IHHI to KPC Healthcare.  The hospitals are now known as Orange County Global Medical Center, Anaheim Global Medical Center, Chapman Global Medical Center and South Coast Global Medical Center.  Suzanne is doing a great job building her team and energizing the organization.

Please let me know when's a good time to discuss.

Bill

William E. Thomas
Executive Vice President and General Counsel
Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130



CONFIDENTIAL

**JAE 1203**

SPCP_0000024183

Riverside, California 92506
(951) 782-8812 (phone)
(951) 782-8850 (fax)
bthomas@globalmso.com   PLEASE NOTE THE CHANGE IN EMAIL ADDRESS

CONFIDENTIAL

**JAE 1204**

SPCP_0000024184

# EXHIBIT 21

**EXHIBIT**

197
5/25/2020

| | |
|---|---|
| Credit: | IHHI |
| Analyst: | Banks |
| Date: | 8/6/2015 |

## SITUATION OVERVIEW

- Silver Point currently owns ▮ warrants in IHHI with an ▮ strike price and an expiration date of April 13, 2016
  - These warrants represent ~17% of the company and have a marked value of ▮
- Dr. Chaudhuri, the majority shareholder of IHHI, has negotiated a deal to sell IHHI to an ESOP in return for cash, a seller note, warrants in the company, and ▮ of QAF payments for the program years 2017-2024
- The deal has been struck at a ▮ equity valuation or a ▮ enterprise valuation. This value is consistent with our base valuation for the business
  - ▮ of this amount will be paid in cash at close and the remaining consideration will come in the form of a ▮ seller note that carries warrants for ▮% of the company. The warrants are designed to gross up the all-in yield to 13%
    - The note will pay PIK until EBITDA ex. QAF hits ▮ and will amortize in ▮ 5 assuming the senior debt is repaid
  - The primary benefit to the structure is that the ▮ of expected QAF between September 2015 and January 2018 will not be taxable to the ESOP whereas 50% would be lost to taxes in the absence of the deal
  - The primary drawback is the large amount of the seller note and the low coupon
- To finance the cash portion of the purchase price, Credit Suisse is providing a ▮ loan secured by the rights to the QAF proceeds
  - The loan is priced at ▮ with a ▮ floor and ▮ of OID. The loan has been syndicated to Tennenbaum, Highbridge, and the CS BDC
  - The existing Midcap ABL loan will remain in place and IHHI will be released from its guaranty of the property loan
  - We view this loan favorably and recommend trying to get an allocation for the Specialty Credit Fund
- Following the transaction, for as long as the seller note is outstanding, Chaudhuri will control 3 of 5 Board seats and other 2 independents will be nominated by Chaudhuri and subject to the approval of the ESOP trustee
  - This structure will ensure the Board is attempting to refinance the seller note when it is possible
- The deal is being structured as a stock sale and a simultaneous warrant redemption. As there is no shareholder agreement, Chaudhuri cannot force us to sell under this structure. We do believe he could change the structure to a merger and leave us with an appraisal right but this would add lots of complexity and significantly delay his timing
  - Our current review of the structure leads us to believe we are being treated proportionally to Dr. Chaudhuri. As we view the purchase price as acceptable and the overall structure as more attractive than continuing to be a minority equity holder with limited rights, we recommend supporting the deal
- As this is a sale of our warrants without exercise, all proceeds will receive long term capital gains treatment
- We have engaged Skadden to review the deal documents to ensure we are treated proportionally and to evaluate the tax consequences of the deal

## SOURCES AND USES

| Sources: | | Uses: | |
|---|---|---|---|
| QAF Term Loan (Net) | | Cash Purchase of Chaudhuri Shares | |
| Seller Note | | Warrant Redemption - Cash | |
| | | Seller Note | |
| | | Advisor Fees | |
| | | Debt Reserve for P&I | |
| | | Revolver Pay Down | |
| Total: | | Total: | |

JAE 1206

8/13/2015 10:01 AM

1

CONFIDENTIAL

JAE 1207

**ASSESSMENT OF THE DEAL**

- To analyze the deal, we separately valued: (1) the hospitals excluding QAF, (2) the present value of the 2016 QAF program if held by IHHI, and (3) the option value from future QAF
  - For the hospitals, LTM EBITDA has improved significantly under new mgmt is now ▓▓▓▓▓▓. For the low case, we are using the LTM actual EBITDA which is consistent with the 6/30/15 quarterly run rate. For the high case, we are using ▓▓▓▓▓ as we understand this is what the ESOP Trustee is using
    - Mgmt's forecast is for ▓▓▓▓ of EBITDA ex. QAF by 3/31/2016 (end of the fiscal year), though we note they are usually aggressive in their forecasting and the fiscal first quarter EBITDA of ▓▓▓▓ suggests this continues to be the case
  - We would also note that the business has not done better than ^▓▓▓▓ of EBITDA in the 5 years we have been associated with it
- To value the PV of the 2016 QAF program, we used a 10%-12% discount rate based on the WACC derived from the Credit Suisse loan
- For future QAF beyond the 2016 program, we used the current ▓▓▓ per year rate, adjusted for a 50% tax rate and the following probabilities:

| Program Years | Years Paid | Probability |
|---------------|------------|-------------|
| 2017-2019 | 2019-2021 | 50% |
| 2020-2022 | 2022-2024 | 25% |
| 2022-2025 | 2024-2027 | 10% |

- These amounts were then discounted using a 10-12% range of discount rates



**Valuation**

|  | Low | Base | High |  |
|--|-----|------|------|--|
| Transaction EBITDA | | | | |
| EBITDA Value | | | | <-base case is set at 17% discount to large, public comps |
| Hospital Value | | | | |
| PV of 2016 QAF Program | | | | <-after 50% tax rate - see page 4 |
| PV of PW Future QAF post 2016 | | | | per year after tax; assumes 50% tax rate; probability weighted |
| Enterprise Value | | | | |
| Less: Net Debt | | | | |
| Equity Value | | | | |

**Value to Shareholders Under ESOP Deal - SP View**

| Cash | |
|------|--|
| Market Value of Seller Note | <-values the $▓▓▓▓ seller note at 57.7% using a 15.0% discount rate & 5 yr exit |
| PV of 60% of Future QAF Beyond 2016 | <-using pre-tax amount, same probabilities as above, and 13-15% discount rate (no int. shield) |
| PV of Warrants for 29% of Equity | <-uses ▓▓▓ EBITDA, 7x multiple, 5 year exit, and 20% discount rate |
| Total | |

8/13/2015 10:01 AM

CONFIDENTIAL

SPCP_0000029618

- The Silver Point method for valuing the transaction is arguably conservative since we are heavily discounting the value of the warrants, which are designed to deliver a 13% yield on the seller note
- In attempting to replicate Dr. Chaudhuri's view of the transaction, we assumed the warrants increase the yield on the seller note to 13% and then we discounted that by 15%
  - This produces a value of 94.8% for the seller note or a ▮▮▮▮▮▮ equity value

**Value to Shareholders Under ESOP Deal - Chaudhuri View**

| | |
|---|---|
| Cash | |
| Market Value of Seller Note | ◀-values the $▮▮▮▮ seller note at 94.8% using a 15.0% discount rate & 5 yr exit |
| PV of 60% of Future QAF Beyond 2016 | ◀-using pre-tax amount, same probabilities as above, and 13-15% discount rate (no int. shield) |
| Total | |

- As shown above, we believe the deal is slightly better than our base case and meaningfully above our low case
- Further, without this deal, we will be left with a minority equity position in a company controlled by Dr. Chaudhuri, with no ability to force an exit and get liquidity. We would be forced to wait on him to declare dividends to get cash from the position
- For the reasons, we recommend supporting the deal and selling our warrants as part of the transaction

**PnL**

- Proceeds to Silver Point under the structure include:

| | Amount | Price | MV | |
|---|---|---|---|---|
| Cash Proceeds | | | | |
| Warrant Strike | | | | |
| Net Cash Proceeds | | | | |
| Seller Note | | | | |
| Warrants | | | | -based on 29% warrants |
| Future QAF | | | | - based on the analysis above |

- At these marks, IHHI would have produced $72MM of total profit, or a 36.5% IRR and 2.2x MoM since the initial investment in April 2010

- We note that the numbers are not final and may change prior the final deal

JAE 1208

8/13/2015 10:01 AM

CONFIDENTIAL

SPCP_0000029619

| QAF | | | |
| --- | --- | --- | --- |

- California is current in the 2016 QAF program, which pays for services rendered during 2014, 2015, and 2016
- IHHI stands to receive ▓▓▓▓ net from this program, or ▓▓▓ per year, based on the schedule below:

QAF Payment Schedule

| | Already Approved | Awaiting Approval | Total |
| --- | --- | --- | --- |
| 8/10/2015 | | | |
| 9/30/2015 | | | |
| 10/31/2015 | | | |
| 12/31/2015 | | | |
| 1/31/2016 | | | |
| 4/30/2016 | | | |
| 6/30/2016 | | | |
| 7/31/2016 | | | |
| 10/31/2016 | | | |
| 1/31/2017 | | | |
| 6/30/2017 | | | |
| 7/31/2017 | | | |
| 12/31/2017 | | | |
| 1/31/2018 | | | |
| **Total:** | | | |

JAE 1209

- The 2016 QAF program has been passed by the California legislature, signed by the Governor, and CMS has approved the fee for service portion for the entire program
  - In addition, CMS has approved the managed care portion, by far the largest portion for IHHI, for the period of Jan 2014 to June 2014
  - These 2 approvals represent ▓▓▓▓ in approved net QAF funds
- According to our CMS consultant, Matt Absher, it is highly likely that CMS will approve the rest of the managed care program and that the next approval will be for the 12 month period from July 2014 to July 2015
  - Absher sees very little risk to this program and expects it to be fully approved prior to a new administration taking office in January 2017
- Further, he believes it is highly likely that the QAF program will continue beyond the 2016 program as the legislation for continuing it has already been approved by the California legislature and the governor has an incentive to keep it going since the state's charitable trust receives approximately 24% of the proceeds
- He sees 3 key risks to the future of QAF beyond the 2016 program:
  1 A Republican administration and Republican Congress barring these types of programs. The mitigant is that many Republican states, such as Texas, have similar programs
  2 A recent CMS ruling that prevents a prescribed distribution to hospitals of the managed care piece. This will likely not end the program but would given the managed care companies greater leverage to demand a share of the proceeds
  3 Union opposition to the program if further benefits are not shared with labor
- In sum, his base case is that the program continues at a similar size as the current 2016 program
- Per the terms of the deal, Silver Point stands to receive ▓▓% of QAF proceeds for service years between 2017 and 2024. At the current level, this would be closed to $7MM per year
  - This value is highly contingent as the program has not been implemented beyond the 2016 year

8/13/2015 10:01 AM

CONFIDENTIAL

SPCP_0000029620

| FINANCIAL PERFORMANCE |
|---|

- The company has seen a significant turnaround since Dr. Chaudhuri consolidated ownership and replaced management with EBITDA before QAF reaching █████ in at the end of fiscal 2015 in march
- The company did █████ of EBITDA in the quarter ended June 30, 2015 as compared to █ in the prior year. This increase the LTM EBITDA to █████
- We understand the ESPO trustee is valuing the business off of a █████ EBITDA before QAF run rate based on management's █████ forecast for year end
- We are skeptical of this forecast, especially that the business will achieve "█████ of EBITDA that quickly. Further, we believe opportunities for improvement beyond "█████ or an 8-10% margin are limited given the small scale of the system, the small size of 3 of the 4 facilities, and the high operating costs in California

*(Dollars in Thousands)*

|  | | Historical [1] | | | |
|---|---|---|---|---|---|
|  | Mar-11 | Mar-12 | Mar-13 | Mar-14 | Mar-15 |
| Net Revenue | | | | | |
| Less: Recognized QAF Income (rounded) | | | | | |
| Revenue before QAF | | | | | |
| Operating Expenses | | | | | |
| Less: QAF Expenses (rounded) | | | | | |
| Less: Operating Expense Adjustments [2] | | | | | |
| Adjusted EBIT before QAF | | | | | |
| *Margin* | | | | | |
| Depreciation and Amortization | | | | | |
| Adjusted EBITDA before QAF | | | | | |
| *Margin* | | | | | |
| Interest Expense (Income) | | | | | |
| Other Expense (Income) | | | | | |
| Add: Other Expense Adjustments | | | | | |
| Total Other Expenses (Income) | | | | | |
| Adjusted Pre-Tax Income before QAF | | | | | |
| Adjusted EBITDA including QAF* | | | | | |

JAE 1210

5

8/13/2015 10:01 AM

CONFIDENTIAL

## WARRANTS

- The 29% warrants attached to the shareholder loan are intended to be financial instruments and not exercised as the sub chapter S nature of the ESOP would be disrupted if the warrants ever became shares
- The warrants have an expiration date of 12/31/2027 and cannot be exercised until the earlier of full repayment of the seller note or the expiration date
- Following the repayment of the seller note, the warrant holder can put the warrants to the company for cash or for a 5 year subordinated note at a to be agreed market rate of interest or any combination thereof at the option of the company
  - The valuation for the shares will be the valuation used for the annual ESOP appraisal
- The company can call the warrants after 12/31/22 if the seller note has been repaid in full and can pay in cash or a 5 year subordinated note at its option using the annual ESOP appraisal value

## MANAGEMENT FEE AND OPTIONS

- As part of the transaction, Dr. Chaudhuri's management company, KPC Management, will be contracted as the manager of the hospitals
- The initial management fee has been agreed as ▆▆ with annual increases of ▆
  - In conjunction with the management agreement, ▆▆ of personnel costs will be transferred from the hospitals to KPC management
- This management fee represents ▆▆ of net revenues excluding QAF with is below the market rate of ▆▆
- The management company will also receive a bonus of ▆ of EBITDA excluding QAF based on a budget of ▆▆ 2016, ▆▆ in 2017, ▆▆ 2018, ▆▆ in 2019, and ▆▆ in 2020
  - These budgeted levels appear aggressive given the company's current LTM EBITDA of ▆▆
- In addition, ▆▆ of the new equity of the ESOP will be reserved for the management company (excluding Dr. Chaudhuri personally) with the strike prices based on the fair market value of the equity
  ▆▆ will be issued at closing and the ▆▆ will be issued if the company hits ▆ of the aggressive budgets above. subject to an annual limitation of no more than ▆ of the equity in any one year

## CAP TABLE

|  | Common | Warrants | FD % | Strike | Cash Owed |
|---|---|---|---|---|---|
| Chaudhuri |  |  |  |  |  |
| Chaudhuri |  |  |  |  |  |
| KPC Resolution Co. |  |  |  |  |  |
| SPCP Group |  |  |  |  |  |
| Bill Thomas |  |  |  |  |  |
| Other |  |  |  |  |  |
| Total |  |  |  |  |  |

JAE 1211

6

8/13/2015 10:01 AM

CONFIDENTIAL

SPCP_0000029622

| COMPS | | | | | |
|---|---|---|---|---|---|

**($ in millions)**

| | Date | 8/7/2015 | | Hospitals | | | |
|---|---|---|---|---|---|---|---|
| **Company** | | | HCA | Community | Tenet | Universal | Lifepoint |
| Ticker | | | HCA | CYH | THC | UHS | LPNT |

**LTM Operating Statistics**

| | HCA | Community | Tenet | Universal | Lifepoint |
|---|---|---|---|---|---|
| Revenue | 38,429.0 | 19,491.0 | 17,568.0 | 8,575.8 | 4,963.0 |
| EBITDA | 7,699.0 | 2,917.0 | 2,187.0 | 1,585.3 | 627.5 |
| *% Margin* | 20.0% | 15.0% | 12.4% | 18.5% | 12.6% |
| Capital Expenditures | 2,267.0 | 966.0 | 769.0 | 374.9 | 247.6 |

**2015E Operating Statistics**

| | HCA | Community | Tenet | Universal | Lifepoint |
|---|---|---|---|---|---|
| Revenue | 39,611.7 | 20,001.4 | 19,360.9 | 9,641.6 | 5,203.9 |
| EBITDA | 7,858.8 | 3,064.2 | 2,309.9 | 1,685.2 | 708.2 |
| *% Margin* | 19.8% | 15.3% | 11.9% | 17.5% | 13.6% |

**Valuation**

| | HCA | Community | Tenet | Universal | Lifepoint |
|---|---|---|---|---|---|
| Stock Price | $89.71 | $56.15 | $51.72 | $140.37 | $80.28 |
| Shares Outstanding | 415.2 | 118.1 | 99.6 | 99.0 | 44.4 |
| Equity Market Capitalization | 37,246.9 | 6,632.4 | 5,149.5 | 13,899.9 | 3,565.2 |
| | | | | | |
| Plus: Debt | 29,904.0 | 16,937.0 | 14,754.0 | 3,035.3 | 2,211.1 |
| Less: Cash | 750.0 | 365.0 | 299.0 | 42.5 | 422.8 |
| Total Enterprise Value | 66,400.9 | 23,204.4 | 19,604.5 | 16,892.8 | 5,353.5 |

**Multiples**

| | Median | HCA | Community | Tenet | Universal | Lifepoint |
|---|---|---|---|---|---|---|
| Total Debt / EBITDA | 3.88x | 3.88x | 5.81x | 6.75x | 1.91x | 3.52x |
| | | | | | | |
| TEV / LTM Revenue | 1.19x | 1.73x | 1.19x | 1.12x | 1.97x | 1.08x |
| TEV / LTM EBITDA | 8.62x | 8.62x | 7.95x | 8.96x | 10.66x | 8.53x |
| TEV / LTM EBITDA - CapEx | 13.83x | 12.22x | 11.89x | 13.83x | 13.96x | 14.09x |
| | | | | | | |
| TEV / 2015E Revenue | 1.16x | 1.68x | 1.16x | 1.01x | 1.75x | 1.03x |
| TEV / 2015E EBITDA | 8.45x | 8.45x | 7.57x | 8.49x | 10.02x | 7.56x |

JAE 1212

8/13/2015 10:01 AM

CONFIDENTIAL

SPCP_0000029623

| CREDIT SUISSE LOAN |
|---|

- The terms of the Credit Suisse loan are:

Amount:
Lead:
Maturity:
Rate:
LIBOR Floor:
Issue Price:
Call Protection:
Amort:
Security:

Mand. Prepays:

Covenants

- This loan has two potential sources of repayments: the QAF proceeds and the value of the hospitals themselves
  - Note that unlike our prior loan, this deal will not have the real estate underneath the hospitals as collateral
  - ██████ of net QAF funds have been fully approved.  The tax and distribution plan of the remaining ██████ is subject to approval by CMS
  - We spoke to one expert who believes that this is highly likely and we understand Marwood provided similar advice to Credit Suisse
  - We plan to speak to other experts in the next couple of days

- Using the hospital valuation from above, we view the LTV as between 40-50% for this loan and we believe you largely come out whole even if the QAF program is not approved provided the hospitals continue to perform

**LTV Analysis**

|  | Low | Base | High |  |
|---|---|---|---|---|
| Hospitals |  |  |  | <-from page 2 |
| Less: Net Debt |  |  |  | <-represents ABL debt |
| Hospital Value to CS |  |  |  |  |
| Plus: Approved QAF |  |  |  |  |
| Plus: PW Unapproved QAF |  |  |  | <-applies 70%, 75%, and 80% probability to remaining ██████ |
| Total Value to CS |  |  |  |  |
|  |  |  |  |  |
| Loan Amount |  |  |  |  |
| LTV % - Total Value |  |  |  |  |
| LTV % - Ex. Unapproved QAF |  |  |  |  |

- We view this as a good risk/reward and recommend pursuing a $10-$15MM allocation of the loan for the Specialty Credit Fund subject to doing additional work on the QAF program

8

8/13/2015 10:01 AM

CONFIDENTIAL

SPCP_0000029624

JAE 1213

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL (ENTIRE DOC. SEALED)**

# EXHIBIT 22

# EXHIBIT 23



# Project Solus

*Medicare And Medicaid Analysis For Hospital Provider In California*
*July 8, 2015*

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

New York | Washington, D.C.
212.532.3651 | www.marwoodgroup.com

# Table Of Contents

| Section | Topic | Page |
|---|---|---|
| 1 | **Key Takeaways** | **3** |
| 2 | **Executive Summary** | **5** |
| 3 | **Federal Analysis** | **13** |
| | Medicare And Medicaid DSH Payments | 20 |
| | Hospital Quality Incentive/Pay-For-Performance Programs | 26 |
| | Health Information Technology | 30 |
| | Bundled Payments Initiatives And Demonstration Outlook | 34 |
| | Affordable Care Act (ACA) | 39 |
| | Deficit Reduction Outlook | 47 |
| | Medicare Advantage | 51 |
| | Accountable Care Organizations (ACOs) | 54 |
| | Recovery Audit Contractors (RACs) | 59 |
| | Scenario Analysis | 62 |
| 4 | **California State Analysis** | **66** |
| | Budget | 67 |
| | Medicaid Expansion | 71 |
| | Quality Assurance Fee (QAF) | 73 |
| | Reimbursement Methodology | 81 |
| | Other Hospital Supplemental Payments | 89 |
| | Managed Care & Dual Eligibles | 93 |
| | Medicaid Managed Care Plans | 98 |
| | Out-Of-Network Billing | 105 |
| | California Seismic Retrofit | 107 |
| 5 | **Appendix** | **109** |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

2

CONFIDENTIAL

EUREKA_045309

# 1 | Key Takeaways

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

3

**JAE 1329**

EUREKA_045310



# Key Takeaways

## Marwood was engaged to assess the Medicare and California Medicaid program outlook for a hospital provider in California

- Federal Key Takeaways
  - Medicare inpatient hospital reimbursement will be flat to positive in the near term
    - If Congress can enact deficit reduction legislation (unlikely before 2017), it will likely include reductions to Medicare inpatient reimbursement, which would still likely leave an annual net update slightly negative to slightly positive rather than a major negative outcome
    - There is a great deal of uncertainty around the possible outcomes of turning off the sequester (-2%) in future deficit reduction legislation (or other budget deals)
  - Medicare will continue to increase the importance of their value based purchasing programs over the next few years

- State Key Takeaways
  - The California Medicaid Quality Assurance Fee (QAF) program and payments will likely continue beyond 2016, as it has strong support across stakeholders in the state
  - Hospitals will benefit from Medicaid expansion, which increased enrollment
    - As of January 2015, Medi-Cal enrollment was expected to reach 11.9 million by the end of FY15 and 12.2 million by the end of FY16, increasing the number of individuals enrolled in Medi-Cal by 4.3 million individuals since 2013
  - For most of the Company's hospitals, fee-for-service rates will likely increase over the next year as part of the California Medicaid reimbursement methodology transition to an episodic APR-DRG system for inpatient hospital services
  - The California dual eligible demonstration (Cal MediConnect) is likely to place modest pressure on the Company, primarily in the form of increased utilization management from capitated managed care plans for services to dual eligible patients



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

4

**JAE 1330**

EUREKA_045311

# 2 | Executive Summary

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1331**

EUREKA_045312

# Medicare Inpatient Hospital Reimbursement Is Expected To Be Flat To Slightly Positive For The Next Few Years

| Issue | Assessment | Description |
|---|---|---|
| Medicare Hospital Inpatient Prospective Payment System (IPPS) | Slightly Positive | **Marwood believes that the net IPPS payment update will be slightly positive over the next few years, as the inpatient market basket update is offset by the same ACA-mandated reductions**<br>○ Annual market basket updates will be offset by legislatively mandated reductions, leading to flat to slightly positive annual net updates<br>○ Even if offsets are needed, either through potential deficit reduction or other health care legislation, the annual net update would only be slightly negative<br>○ Medicare will continue to increase the importance of their value based purchasing programs with potential reductions reaching -6% by 2018, depending on the hospital<br>　— Hospitals are subject to payment adjustments from hospital readmissions policy, value-based purchasing, and hospital acquired conditions<br>　— Almost all hospitals are meeting electronic health record meaningful use requirements, so there is likely no negative impact on reimbursement |

| Medicare Inpatient Hospital Prospective Payment System (IPPS) Outlook | | | | |
|---|---|---|---|---|
| Update | Projected 2016 | Projected 2017 | Projected 2018 | Projected 2019 |
| Market Basket Update | 2.70% | 3.10% | 3.40% | 3.40% |
| ACA Reduction | -0.20% | -0.75% | -0.75% | -0.75% |
| Productivity Adjustment | -0.60% | -0.50 to -0.70% | -0.50 to -0.70% | -0.50 to -0.70% |
| Retrospective Adjustment | -0.80% | -0.80% | .80% | .80% |
| Future Case-Mix Offset | N/A | N/A | -0.55% | N/A |
| Net Update | 1.10% | 0.85 to 1.05% | 2.20 to 2.40% | 2.75 to 2.95% |
| Additional Potential Offsets | -1.0% to 0.0% | -1.0% to 0.0% | -2.0% to 0.0% | -1.0% to 0.0% |
| Net Update With Additional Offsets | 0.1% to 1.10% | -0.15% to 1.05% | 0.20% to 0.40% | 1.75% to 2.95% |



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

**JAE 1332**

CONFIDENTIAL

EUREKA_045313

# ACA Coverage Expansion Will Have A Positive Effect On Hospital Volume

| Issue | Assessment | Description |
|-------|------------|-------------|
| ACA Coverage Expansion | Positive | **Marwood believes that the increase in insured lives due to ACA will have a significant impact on hospital utilization**<br>◦ The Congressional Budget Office (CBO) previously estimated that in 2015 insurance coverage will increase by approximately 17 million lives, through purchase of private health insurance and expansion of Medicaid<br>◦ HHS, however, recently made more modest projections for 2015 enrollment through the exchanges – 9 million as opposed to the 11 million estimated by CBO<br>◦ Preliminary data indicate that the ACA coverage expansion has been associated with an increase in hospital inpatient stays, consistent with the expected effect of the legislation on hospital utilization |
| ACA Offsets | Pressure | **Marwood believes that even though hospitals will benefit from the coverage expansion provisions in ACA, those gains will be somewhat offset by other provisions reducing payments**<br>◦ In order to pay for ACA, Congress reduced payments for a number of providers within the healthcare industry<br>◦ Hospitals are one of the major contributors from the healthcare industry with payments reduced by an estimated $160 billion over 10 years through a number of policies |
| Complete ACA Repeal | Status Quo | **Marwood believes that ACA is unlikely to be significantly altered without Republican control of the Presidency and Congress**<br>◦ Under an all Republican control scenario following the next election, the President and Congress could reduce or restrict the coverage expansion included in the ACA |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

EUREKA_045314

# Medicare, But Not Medicaid DSH Payments Are Under Pressure; If Deficit Reduction Does Occur, Hospitals Are a Likely Target

| Issue | Assessment | Description |
|-------|------------|-------------|
| Medicare DSH | Pressure | **Marwood believes that hospitals are generally satisfied with how CMS developed the final rule implementing the ACA's reductions in Medicare DSH payments (effective FY 2014)**<br>• ACA included reductions to the Medicare DSH programs, with the changes in Medicare DSH using a complex formula which partially accounts for the coverage expansion<br>• Over time, as the level of uninsured continues to decline, there is likely a continued reduction of DSH levels |
| Medicaid DSH Payments | Potential Further Delay | **Marwood believes that Congress will likely continue to delay the ACA-mandated reductions in Medicaid DSH payments**<br>• Replacing a year on the front end with a year on the back end, when DSH spending would have been higher under prior law, serves as a painless offset<br>    – The Medicare Access and CHIP Reauthorization Act (the SGR repeal legislation), enacted in April, further delayed the Medicaid DSH reductions, to FY 2018 through FY 2025 |
| Deficit Reduction | Potential Pressure | **Marwood believes that if there is major deficit reduction legislation, hospitals will likely face reimbursement cuts**<br>• Unless one side changes its longstanding position (Republican opposition to revenue increases, Democratic opposition to entitlement program cuts not accompanied by revenue increases), a grand bargain will likely prove beyond reach<br>• Hospitals are a likely target in the deficit reduction context, since they comprise a larger share of Medicare expenses than any other provider |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

8

**JAE 1334**

CONFIDENTIAL

EUREKA_045315



# California Budget Environment Is Stabilizing; QAF Payments Will Likely Continue Unabated

| Issue | Assessment | Description |
|---|---|---|
| California Budget | Stabilizing | **Marwood believes that the California budget environment is stabilizing, after several years of significant budget deficits, due to tax increases and the growth in the state economy**<br>• On June 15, 2015, the CA legislature approved a $117.5 billion FY16 General Fund budget, which is $750 million more than the Governor's proposal and intends to pay down debt and increase funding for education, social services and Medicaid<br>• Increases in tax collections resulted in an estimated $8 billion increase in state revenues from FY13-14, which has helped California's budget environment |
| Quality Assurance Fee Supplemental Payments | Stable | **Marwood believes that the current Quality Assurance Fee (QAF) will be approved by CMS and is likely to continue beyond 2016, as it has strong support in the state from advocates, DHCS, the Governor and Legislature; stakeholders are optimistic about a 2016 ballot initiative to make the QAF permanent**<br>• The fee-for-service component of the most recent QAF State Plan Amendment (SPA) was approved by CMS in December 2014 and some of the managed care component was approved July 2015<br>  – Historically, the managed care portion of the payments have been approved approximately six months after fee-for-service (FFS)<br>  – As of July 1, 2015, CMS approved the managed care rates for the 2014-2016 QAF program dating January 2014 through June 2014, and are expected to be paid by Fall 2015; DHCS expects to seek CMS approvals for managed care components in increments that align with plan contract rate periods and consistent with MCO rate/contract approval processes<br>• The QAF is likely to be renewed beyond 2016 due to strong support from the Legislature, particularly because the state has become reliant on its revenue for general funds<br>• The California Hospital Association's (CHA) ballot initiative to make the QAF permanent and allocate a specified amount to hospital payments has been delayed until 2016<br>  – CHA was unable to obtain the required level of certified signatures to add the initiative to the 2014 ballot, however, they expect to be able to reach the number of signatures required for 2016 |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

9

CONFIDENTIAL

EUREKA_045316

# Overall Medi-Cal Reimbursement Is Likely Flat To Positive; A Reimbursement Methodology Transition Is Near Complete

| Issue | Assessment | Description |
|-------|-----------|-------------|
| California Medicaid Hospital Funding | Flat To Positive | **Marwood believes that the Medicaid budget environment is stable to positive for hospitals, but likely positive for most providers overall, as only a limited portion of reimbursement was subject to previously approved state cuts**<br>∘ During negotiations over the hospital provider tax in 2011, hospitals and the state reached an agreement on the Medi-Cal rate cut lawsuits—providers agreed to drop their lawsuit in exchange for the QAF extension and the state agreed not to pursue retroactive rate reductions for most hospital services that were passed in the FY10 budget<br>∘ With an improving budget, providers are optimistic that the Medicaid rate cuts will be eliminated (includes a small component of hospital reimbursement) |
| California Medicaid Reimbursement Methodology | Transition To APR-DRGs Near Complete | **Marwood believes that California will complete its transition to an APR-DRG system over the next fiscal year; no significant changes are expected**<br>∘ Effective July 1, 2013, DHCS implemented a new reimbursement methodology for inpatient hospital services, transitioning from facility-specific contracted rates to an All Patient Refined Diagnosis Related Groups (APR-DRGs) system<br>∘ Stakeholders indicate that hospitals have successfully adjusted to the new methodology during the transition period, and while there may be some adjustments to reimbursement levels for certain services (NICU, Births) there are no other changes being discussed |
| Other Medicaid Supplemental Hospital Payments | Stable | **Marwood believes that supplemental hospital funding for private hospitals will remain stable until federal DSH reductions; however, the payments are minimal compared to QAF funding**<br>∘ The Private DSH Replacement fund is the largest source of non-QAF supplemental payments for private hospitals in California and is likely stable until FY18 when the federal DSH cuts are scheduled to take effect<br>∘ The Company's payments from the Private Hospital Supplemental Fund has been mostly stable over the last few years; the state will continue the available funding |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

10

**JAE 1336**

EUREKA_045317

# Medicaid Dual-Eligible Demonstration Places Modest Pressure On Hospital Providers

| Issue | Assessment | Description |
|---|---|---|
| Dual-Eligible Demonstration And Medicaid Managed Care Expansion | Modest Pressure | **Significant increases in membership from dual-eligible demonstration programs and Medicaid expansion under ACA in California means managed care plans need community hospitals; however, plans will be conduct more aggressive contracting and cost control strategies in the next 2 years**<br>• California recently began enrollment in its dual-eligible demonstration project, but more beneficiaries have opted out than anticipated (44% rather than 33%)<br>  – For beneficiaries remaining in managed care for Medicare and Medicaid, plans will have a greater ability to coordinate/manage utilization<br>  – Volume gains will be moderately offset (by 3%) due to new tactics to assess the medical need for admissions based on a patient's home situation<br>• The state's Medicaid managed care environment, outside of the dual demonstration, is stable for the Company as recent expansions focused on rural areas<br>  – The FY13 budget expanded Medicaid managed care to the 28 remaining fee-for-service-only counties (mostly in rural areas), which was estimated to cover an additional 386,000 individuals under managed care<br>  – Orange County was already under Medicaid managed care, so there is little impact on the Company<br>• Since duals and Medicaid plans need access for expanding membership, the size of networks will be similar to today although two plans surveyed are narrowing networks<br>• Hospitals will benefit if they can prove their value with good outcomes and/or use of EMRs; good outcomes (including "high patient experience scores") will equate to more volume as plans steer patients to top hospitals<br>  – For typical hospitals, rates are generally expected to increase at modest 1-3% levels, due to demand/utilization increases; two plans will, however, lower rates due to funding/need for cost control (3% annual average) |



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

11

**JAE 1337**

# 3 | Federal Analysis

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1338**

EUREKA_045319

# Medicare IPPS Overview

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1339**

EUREKA_045320

# Acute Care Hospitals Are Reimbursed By Medicare For Inpatient Services Through The Inpatient Prospective Payment System

**All acute care hospitals are paid for inpatient services according to the Medicare Acute Care Hospital Inpatient Prospective Payment System (IPPS)**

- CMS releases regulations governing hospital inpatient reimbursement annually
  - A proposed rule is released each spring, followed by a comment period, with the final rule released in the summer
- The IPPS per-discharge payment is based on two national base payment rates for operating expenses and capital expenses
- IPPS reimburses hospitals a predetermined, per-discharge payment amount, starting with a per discharge base rate that is modified to account for several factors:
  - The IPPS per-discharge payment is based on two national base payment rates for operating expenses and capital expenses
  - The base rate is adjusted to reflect wages and other prices in the local market
  - To adjust for severity and type of procedure, Medicare assigns discharges to diagnosis related groups (DRGs), which are each given a weight; the weight is multiplied by the base rate to determine reimbursement for that DRG
  - This DRG payment rate is then adjusted to account for:
    - Extraordinarily costly cases
    - New technology
    - Hospital resident training programs
    - Hospitals serving a disproportionate share of low-income patients
    - Transfer cases
    - Bad debt
  - Rates are increased for facilities that operate an approved resident training program or that treat a disproportionate share of low-income patients, rates are reduced for certain transfer cases, and outlier payments are added for cases that are extraordinarily costly

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

14

**JAE 1340**

# IPPS Rates Can Be Adjusted For Certain Other Factors Including Outliers And New Medical Technologies

**In addition to DRG and wage index adjustments, Medicare inpatient hospital reimbursement can be adjusted by a number of other factors, including outlier payments and for new medical services or technologies**

- Outlier payments are added for cases that are extraordinarily costly, but ultimately are patient-specific
  - Whether an outlier payment applies or not can differ across patient encounters and procedures
    - Length of hospital stay is a critical piece of determining whether outlier payments apply as that is typically a significant part of the total cost of care
  - Outlier payments are made if a hospital's costs for a specific case exceed the standard Medicare payment rate by a significant ratio
    - By statute, total funding for outlier payments must represent between 5-6% of total operating DRG payments plus the outlier payments
    - MedPAC recommended that CMS implement DRG specific outlier thresholds that are financed by each DRG rather than through the current across-the-board adjustment to the standardized amounts
  - For FY 2016, cases qualify for outlier payments if their costs are equal to the inpatient PPS rate for the MS-DRG, including IME, DSH and new technology payments, plus a fixed-loss threshold of $24,485
    - This new threshold is down from $24,758 in FY 2015
    - For FY 2016, CMS estimates that it will pay out 5.1% of inpatient PPS payments for outlier cases, the same as for FY 2015
- The IPPS provides additional payments for cases with relatively high costs involving eligible new medical services or technologies
  - To gain approval for such payments, a technology must be considered new, be inadequately paid otherwise, and represent a substantial clinical improvement over previously available technologies
    - The cost threshold for new technologies to qualify for add-on payments is the lesser of either 75% of the standardized amount (increased to reflect the difference between costs and charges) or 75% of one standard deviation above mean charges for the MS-DRG involved



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

15

**JAE 1341**

# Medicare Inpatient Prospective Payment Formula



Source: MedPAC

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

16

JAE 1342

EUREKA_045323

# Inpatient Hospital Payment Updates Have Been Flat To Slightly Positive Over The Last Few Years

| Medicare Inpatient Hospital Prospective Payment System (IPPS) Updates | | | | | |
|---|---|---|---|---|---|
| Update | Final 2011 | Final 2012 | Final 2013 | Final 2014 | Final 2015 |
| Market Basket Update | 2.60% | 3.00% | 2.60% | 2.50% | 2.90% |
| ACA Reduction | -0.25% | -0.10% | -0.10% | -0.30% | -0.20% |
| Productivity Adjustment | 0% | -1.00% | -0.70% | -0.40% | -0.50% |
| Retrospective Adjustment | -2.90% | 0.00% | 2.90% | -0.80% | -0.80% |
| Prospective Adjustment | N/A | -2.00% | -1.90% | N/A | N/A |
| Inpatient Admissions Adjustment | N/A | N/A | N/A | -0.20% | N/A |
| One-Time Adjustment | N/A | 1.10% | N/A | N/A | N/A |
| Net Update | -0.55% | 1.00% | 2.80% | 0.80% | 1.40% |

*In 2013, CMS implemented a -1.9% prospective adjustment to account for changes in IPPS case mix, based on 2008 and 2009 data, that were associated with improved documentation and coding of patients. CMS anticipated that implementation of the MS-DRG system would result in greater spending for similar patients, since hospitals have a financial incentive to improve documentation and coding as that results in greater reimbursement (e.g., for patients with multiple comorbidities)*

## Over the last few years, the market basket growth rate has been 2 - 3%, which was then offset by a number of legislated reductions, resulting in modestly positive net updates (+0.80% to +1.40%)

- The IPPS 2015 final rule included a 2.9% market basket update offset by a -0.5% productivity adjustment as mandated by ACA, and a number of other previously established reductions
  - As a way to pay for ACA, hospital updates (both inpatient and outpatient) are reduced by the annual average improvement in productivity in the US economy
- As part of a payment recoupment, CMS finalized a 0.8% reduction for FY 2014 through FY 17
  - In the American Taxpayer Relief Act of 2012 (ATRA), Congress directed CMS to recoup $11 billion in overpayments for the period from 2008 through 2013 (i.e., overpayments due to the delay in implementing the prospective adjustment); this recoupment (negative adjustment to rates) will apply to discharges during fiscal years 2014 though 2017
    - CMS noted that additional 0.8% reductions would be needed each year through FY 2017 to recoup all $11 billion



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045324

# Inpatient Hospital Updates Will Be Modestly Positive Over The Next Few Years

| Medicare Inpatient Hospital Prospective Payment System (IPPS) Outlook | | | | |
|---|---|---|---|---|
| Update | Proposed 2016 | Outlook 2017 | Outlook 2018 | Outlook 2019 |
| Market Basket Update | 2.70% | 3.10% | 3.40% | 3.40% |
| ACA Reduction | -0.20% | -0.75% | -0.75% | -0.75% |
| Productivity Adjustment | -0.60% | -0.50 to -0.70% | -0.50 to -0.70% | -0.50 to -0.70% |
| Retrospective Adjustment | -0.80% | -0.80% | .80% | .80% |
| Prospective Adjustment | N/A | N/A | -0.55% | N/A |
| Net Update | 1.1% | 0.85 to 1.05% | 2.20 to 2.40% | 2.75 to 2.95% |

## Marwood believes that hospitals will see modestly positive annual IPPS rate updates, absent deficit reduction legislation

- The IPPS market basket updates, which should be in the range of 2.5 – 3.5%, will be offset by the ACA and ATRA-mandated reductions
  - The updates do not reflect the impact of performance-based payment adjustments (e.g., for readmissions, hospital acquired conditions, value-based purchasing, and reporting quality data) on individual hospitals
  - In the FY 2014 and 2015 rules, CMS referred to the possibility of imposing an additional prospective adjustment of -0.55% in order to account for increases in spending caused by (further) documentation and coding improvements in 2010; such an adjustment would not be imposed until after the ATRA-mandated recoupment is complete (so no earlier than FY 2018)
  - The net update in the FY 2016 IPPS proposed rule is 1.1% -- a 2.7% market basket update offset by a -0.6% productivity adjustment, a 0.2% ACA market basket cut, and the -0.8% ATRA recoupment
- The permanent SGR fix includes, as an offset, a provision to phase-in a reimbursement increase
  - Under prior law, there would have been a 3.2% increase in 2018 due to the ending of the retrospective adjustment
    - In 2018 CMS would have increased the rates to eliminate the cumulative retrospective adjustments (i.e., once the full $11 billion had been recouped)
  - The provision softens the impact on hospitals by also prohibiting recoupment of overpayments for 2010



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

JAE 1344

EUREKA_045325

# Significant Changes To The Medicare Hospital Reimbursement Methodology Are Unlikely

**Marwood believes legislation making broad hospital reimbursement changes is unlikely in the next 3-5 years, although quality will continue to become more important**

- Recently a few bills/proposals have been released to modify the current payment systems, although implementation in the next 3-5 years are unlikely

  - The House Ways and Means Committee released a bipartisan draft bill, the Hospitals Improvement for Payment (HIP) Act, in November 2014 in response to the committee's concerns regarding Medicare's two-midnights policy for determining inpatient stays, short inpatient stays, outpatient observation stays, as well as concerns related to auditing and appeals

    - The bipartisan draft bill would seek to merge the Medicare inpatient and outpatient payment systems
    - The bill would establish a hospital prospective payment system (HPPS) by fiscal year (FY) 2020; ASPS will review the draft legislation to determine which provisions may be of interest to ASPS members

  - In addition, Congress introduced Bundling and Coordinating Post-Acute Care (BACPAC) Act of 2014 which would allow Medicare to pay a lump sum to cover 90 days of care after hospital discharge under the Post-acute providers, physicians and hospitals would share up to 70% of any money left over after they deliver needed, high-quality care

    - A coordinator — which could be an insurance company, hospital, post-acute provider or third-party manager — would help guide the episode of care; the bundled payment system also would waive the three-day hospital stay currently needed to become eligible for Medicare coverage of post-acute care

- Bills of such magnitude would run into committee conflicts with other Congressional committees and would not likely to be enacted as drafted

  - Elements of the legislation, like further quality related elements, could find their way to enactment



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

19

**JAE 1345**

EUREKA_045326

# Medicare And Medicaid DSH Payments

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

20



**JAE 1346**

# Medicare DSH Payments Are Given To Hospitals That Provide High Levels Of Uncompensated Care

**The Medicare DSH program was put into place in 1986 and compensates hospitals for the higher operating costs they incur in treating a large share of low-income patients**

- The origin of the DSH adjustment is rooted in legislation passed in 1982; however, an explicit adjustment to the Medicare PPS was not adopted until May 1986, 2 years after prospective payment began
  - In the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Congress directed the Secretary of Health and Human Services to study the extent to which the TEFRA hospital rates should be adjusted for the extra costs incurred by hospitals in treating low-income patients
    - The original legislation that created the Medicare PPS in 1983 did not include a DSH payment adjustment, but one year later, in the Deficit Reduction Act of 1984, Congress directed the Secretary to define and identify DSH hospitals
  - In April 1986, with the passage of the Consolidated Omnibus Reconciliation Act of 1985 (COBRA) (P.L. 99-272), Congress mandated an explicit adjustment for hospitals that serve a large share of low-income patients
- Medicare DSH funds are available only to acute care hospitals that participate in the IPPS and flow directly from the federal government in the form of increases to the hospitals' normal DRG payment rates
  - DSH payments are made only for fee-for-service discharges, though an amount to cover projected DSH payments is included in the funding formula for payments to Medicare Advantage plans and may figure into the contract rate that the plans negotiate with hospitals
- Hospitals qualify for Medicare DSH payments if the ratio of low-income patients treated by the hospital (called the disproportionate patient percentage, DPP) exceeds 15%
  - In addition, hospitals that are located in an urban area, have 100 or more beds, and can demonstrate that they derive more than 30% of their revenues from state and local government payments for indigent care provided to patients not covered by Medicare or Medicaid are eligible
    - The amount of the adjustment for hospitals qualifying under this alternative criteria is 35%
  - Adjustments for DPP hospitals vary with the hospital's bed count, geographic classification and other factors
    - Like Medicaid DSH payments, Medicare DSH payments are unevenly distributed, with just 200 hospitals accounting for 38% of disbursem[...]



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

21

**JAE 1347**

EUREKA_045328

# New Medicare DSH Formula Established In FY 2014 Final Rule Uses Proxies To Measure Amount Of Uncompensated Care

**Marwood believes that hospitals are generally satisfied with how CMS developed the final rule implementing the ACA's reductions in Medicare DSH payments (effective FY 2014)**

- ACA included reductions to the Medicare DSH programs, with the changes in Medicare DSH using a complex formula which partially accounts for the coverage expansion
  - CMS established a new DSH formula that uses inpatient days of Medicaid-only beneficiaries plus inpatient days of Medicare supplemental security income (SSI) beneficiaries as proxies for measuring the amount of uncompensated care each hospital provides
    - Beginning with FY 2014, DSH payments are the addition of 2 separate categories: empirically justified DSH payments plus uncompensated care payments to be distributed on a per-discharge basis
      - ACA required that beginning in FY 2014, hospitals receive 25% of the DSH funds they would have received under the pre-ACA formula (this is the empirically justified amount), with the remaining 75% flowing into a separate funding pool for DSH hospitals
      - This funding pool is reduced as the percentage of the population that is uninsured declines, and is distributed based on the proportion of total uncompensated care (as defined below) each Medicare DSH hospital provides
    - The empirically justified DSH payment to each hospital is equal to 25% of the DSH payment it would have received under prior law (i.e., the pre-ACA DSH payment approach)
    - The uncompensated care payment to a hospital is determined by three factors:
      - The initial size of the 75% uncompensated care DSH payment pool for a fiscal year
        - The initial size of the pool is equal to the difference between CMS' estimate of the amount that would have been paid in Medicare DSH payments for FY 2014 or a subsequent fiscal year in the absence of the ACA and the amount of the empirically justified Medicare DSH payments that are made for the fiscal year in question (for FY 2014, CMS set the initial size of the pool at $9.579 billion)
      - Change in the Percentage of Uninsured
        - CMS needs to determine how much the 75% pool will be reduced each year as a result of the decline in the percentage of the population that is uninsured, relative to 2013
        - For FY16, CMS proposes to set the 75% pool at $6.371 billion, assuming an uninsured rate of 11.5% for that fiscal year
      - The proportion of aggregate uncompensated care (for all hospitals) provided by that hospital
        - Uses the most recent data on inpatient days of Medicaid-only beneficiaries and Medicare SSI beneficiaries
        - The hospital receives that percentage of the 75% pool as its uncompensated care DSH payment

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

22



CONFIDENTIAL

EUREKA_045329

# Medicaid DSH Payments Are Given To States, States Get To Decide Distribution

**The Medicaid DSH program provides payments to states to distribute to acute care hospitals and psychiatric facilities to help defray the costs incurred by those facilities in providing uncompensated care to low income patients**

- Medicaid DSH payments were established in the Omnibus Budget Reconciliation Act (OBRA) of 1981 when the methodology for Medicaid payment rates to hospitals was amended
  - This law deleted the reasonable cost methodology and transferred the responsibility for determining Medicaid payment rates to the states
    - A provision required Medicaid hospital payment rates to take into account the situation of hospitals that serve a disproportionate number of "low income patients with special needs," which established the Medicaid DSH payments
  - DSH payments quickly became a significant portion of Medicaid spending in the early 1990s, with DSH expenditures growing from 1.3% of total Medicaid medical assistance expenditures in FY 1990 to 15.0% in FY 1992
    - DSH payments were a popular mechanism for returning provider taxes or donations to hospitals – Medicaid payments for regular inpatient rates were subject to federal upper payment limits, but DSH payments were uncapped and did not need to be tied to specific Medicaid enrollees or services
      - As a result, states could increase DSH payments by any amount, tax away the state share of the increased DSH payments through provider taxes, and thus draw down unlimited federal funds
      - In response, Congress passed the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 established ceilings on federal Medicaid DSH funding for each state
    - Each hospital's payments cannot exceed its uncompensated care costs, and additional restrictions apply to psychiatric facilities
- States may specify in their State Medicaid Plans how funds are distributed to hospitals and which hospitals qualify for payments
  - However, states are required to include all hospitals that have a Medicaid inpatient utilization rate one standard deviation or more above the mean for all hospitals in the state, or a low-income utilization rate exceeding 25%



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

23

CONFIDENTIAL

EUREKA_045330

# Congress Has Delayed the Reductions in Medicaid DSH Called for by the ACA

**Marwood believes that Congress will likely continue to delay the ACA Medicaid DSH payment reductions by using it as an offset in healthcare legislation**

- The Medicare Access and CHIP Reauthorization Act (the SGR repeal legislation), enacted in April 2015, further delayed the Medicaid DSH reductions, to FY 2018 through FY 2025; further delays are likely
  - As part of the Bipartisan Budget Act of 2013, the DSH reductions were delayed by two years and extended for an additional year
  - On April 1, 2014, as part of the Protecting Access to Medicare Act (the 2014 doc fix), the DSH reduction was delayed an additional year, with the reductions spanning the period from FY 2017 through FY 2024
  - DSH spending returns to pre-ACA levels at the end of each budget window, so delaying and extending the cuts (i.e., replacing a year on the front end with a year on the back end, when DSH spending would have been higher under prior law) serves as a painless offset
    - In fact, unlike almost all other offsets, this one is welcomed by the affected sector, because it postpones the pain

- If implemented, ACA reduces federal Medicaid DSH allotments by a set amount each year, which is not adjusted based on the decline in the number of uninsured (unlike the ACA Medicare DSH formula)
  - Each year, HHS calculates a DSH allotment for each state, which represents the maximum amount that the state Medicaid agency can claim in federal payments through the DSH program; some states may not draw down their full allocation
    - Per ACA, HHS should impose higher reductions in the DSH allotment on:
      - States with greater reductions in the number of uninsured individuals
      - States that do not direct DSH payments to hospitals with high Medicaid days or uncompensated care
      - States that are not classified as low DSH
    - The total pool of Medicaid DSH funds is increased each year by the change in the CPI-U, subject to a cap of 12% of total Medicaid spending – that figure is then reduced by the amounts specified in the ACA
  - The 2013, 2014 and 2015 DSH allocation final rules did not take into account state decisions on Medicaid expansion, and instead reduced Medicaid DSH funding uniformly for all states (i.e., reduced each state's DSH allotment by the same percentage), ostensibly to allow CMS to more accurately evaluate the effect of coverage expansion on the number of uninsured -- imposing bigger DSH cuts on expansion states could distort the evaluation findings

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

24

CONFIDENTIAL

EUREKA_045331

# ACA-Mandated Medicaid DSH Reductions Have Been Delayed Due The Most Recent Budget Act And Doc-Fix Legislation

| DSH Reductions FY 2014 – FY 2024 (As Proposed In ACA, But Not Implemented) | | | | |
|---|---|---|---|---|
| Fiscal Year | ACA | Bipartisan Budget Act | Protecting Access to Medicare Act | CBO March 2015 Spending Baseline |
| 2014 | -500 | 0 | 0 | 10,000 |
| 2015 | -600 | 0 | 0 | 10,000 |
| 2016 | -600 | -1,200 | 0 | 10,000 |
| 2017 | -1,800 | -1,800 | -1,800 | 7,000 |
| 2018 | -5,000 | -5,000 | -4,700 | 7,000 |
| 2019 | -5,600 | -5,600 | -4,700 | 8.000 |
| 2020 | -4,000 | -4,000 | -4,700 | 8.000 |
| 2021 | 0 | -4,000 | -4,800 | 8.000 |
| 2022 | 0 | -4,200 | -5,000 | 8.000 |
| 2023 | 0 | -4,300 | -5,000 | 8.000 |
| 2024 | 0 | 0 | -4,400 | 9.000 |
| Total Savings-FY 2014-FY 2024 | -14,500 | -30,100 | -35,100 | |

***(in millions of dollars)***

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

# Hospital Quality Incentive/Pay-For-Performance Programs

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

24



# Currently, Inpatient Hospitals Receive Payment Reductions Unless Certain Quality Measures Are Reported

Case 5:20-cv-01176-SB-SHK Document 296-5 Filed 07/05/22 Page 146 of 282 Page ID #:9050

**Since 2003, Congress has mandated a quality measure reporting program for inpatient hospitals; the Hospital Inpatient Quality Reporting program incentivizes higher quality and more transparency**

- Previously known as the Reporting Hospital Quality Data for Annual Payment Update (RHQDAPU), the Hospital Inpatient Quality Reporting (IQR) program requires hospitals to report quality measures in order to receive the full market basket update to payment rates in the ensuing year
    - Hospitals that successfully report designated quality measures receive the full annual market basket update
        - The efforts are intended to reduce the incidence of serious adverse events during inpatient stays that should never have occurred (aka never events) or that are reasonably preventable through adherence to evidence-based guidelines
        - Some of the data is available to the public on the government's hospital compare website: www.hospitalcompare.hhs.gov
    - In contrast, hospitals that do not successfully report the measures undergo a reduced update for the year
        - Initially, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) provided a 0.4 % reduction for hospitals that did not successfully report on the set of 10 quality indicators required by the Secretary
        - In 2005, the Deficit Reduction Act increased the punishment to a 2% reduction in the market basket update
    - The IQR is regularly adjusted via regulation, for instance CMS has both dropped and added measures over time
        - The measures assess treatment of conditions such as acute myocardial infarction, heart failure, and the pneumonia, as well as addressing surgical care, mortality, readmissions, patient experience, patient safety, infections, hospital acquired conditions, immunizations, and cost
    - As part of the FY 2016 IPPS Proposed Rule, CMS proposes removing 7 measures from the IQR Program, including six "topped out" measures (a measure was considered topped out if the 75th percentile, or 25th for measures where lower percentiles indicate better performance, was statistically indistinguishable from the 90th, or 10th, percentile):
        - For FY 2015 there are 59 quality measures on which hospitals must report
    - Almost all hospitals (99%) meet the IQR requirements, so there is no reimbursement pressure from the IQR



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045334

# ACA Quality Initiatives Can Affect Hospital Reimbursement, Impacting The Company

**Marwood believes ACA initiatives to improve outcomes in the hospital setting could have a significant impact on reimbursement for some hospitals**

- <u>Hospital Readmissions</u>
  - Beginning in 2013, hospitals with above-average (i.e., expected) readmission rates are subject to an across-the-board reduction in IPPS payments
    - The readmissions reduction program can cut IPPS payments by up to 3% for hospitals with high readmission rates (was 2% until FY 2015)
- <u>Value-Based Purchasing Program (VBP)</u>
  - Beginning in 2013, a budget-neutral value-based purchasing program was established, using IQR performance measures
    - The amount of the VBP set-aside/payments subject to the VBP will increase gradually from 1% in FY 2013 to 2% in FY 2017 and thereafter
      - Funds from the withhold will be paid to the highest-performing hospitals; other hospitals, which will not receive any funds from the set-aside, will effectively see their IPPS rates cut (i.e., they will be net losers under the program)
      - For FY 2014, 778 hospitals saw their net IPPS payments reduced by more than 0.2% as a result of the VBP, while 630 hospitals received a net bonus of more than 0.2%
- <u>Hospital Acquired Conditions (HAC)</u>
  - Beginning in 2015, hospitals in the top quartile of risk-adjusted HACs will see a 1% across-the-board reduction in IPPS payments
  - As part of the FY 2016 IPPS Final Rule, CMS has made a number of proposals related to the HAC initiative, including:
    - Adding an extraordinary circumstances exception (ECE) policy, allowing a hospital to not be penalized for not meeting the requirements of the HAC program in the event of infrastructure issues, a disaster or unforeseeable event, or factors beyond the hospital's control
- Depending on their performance on the various measures, some of the Company's hospitals could experience significant reimbursement reductions due to one or more of these initiatives
  - CMS is also continuing to conduct research on the issue of risk adjustment for socioeconomic status in its quality programs, in collaboration with the Office of the Assistant Secretary of Planning and Evaluation, which expects to issue a report to Congress on this subject by October 2016

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

28

CONFIDENTIAL

EUREKA_045335

# Most Inpatient Hospitals Experienced A Swing Of -2% To +1% In 2015





© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

29

**JAE 1355**

CONFIDENTIAL

EUREKA_045336

# Health Information Technology

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1356**

EUREKA_045337

# ARRA Included An EHR Implementation Incentive Program For Hospitals And Physicians

**Marwood believes that the vast majority of hospitals are meeting the EHR meaningful use requirements**

- The American Recovery and Reinvestment Act (ARRA) included the Health Information Technology for Economic and Clinical Health (HITECH) Act, which established a set of Medicare and Medicaid incentives for the implementation of EHRs in hospitals and physician offices
  - HITECH created incentive payments for providers that can certify the meaningful use of an EHR as defined by CMS; incentive payments began in 2011 and run through 2016 for Medicare and 2021 for Medicaid
    - Meaningful use is a set of actions/ways a provider must be using its EHR
      - Meaningful use criteria are being defined in stages, with stage 1 being a lower level set of criteria
    - Entities eligible for Medicare EHR incentive payments include acute care hospitals and physicians in private practice; other providers (SNFs, LTCHs, or IRFs), are not eligible, although discussions about requiring EHRs for these providers will likely begin in the next few years
  - Beginning in 2015, Medicare eligible professionals and hospitals who do not successfully demonstrate meaningful use will have a negative payment adjustment to their Medicare reimbursement
- Significant numbers of eligible hospitals and professionals have registered for the program and are receiving incentive payments
  - As of January 2015, there were 4,808 hospitals registered for the Medicare and Medicaid EHR Incentive program, with incentive payments flowing to 4,373 hospitals
    - CMS estimates over 5,000 hospitals are eligible for Medicare and Medicaid incentives, meaning that over 90% of eligible hospitals have registered
      - CMS estimates that by 2019 nearly 100% of hospitals and nearly 70% of eligible professionals will be meaningful users
  - Hospitals have received $18.2 billion in Medicare and Medicaid EHR incentive payments to date

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

**JAE 1357**

CONFIDENTIAL

EUREKA_045338



# Hospital Incentives Depend On Medicare/Medicaid Volume

**For hospitals, their EHR incentive is calculated based on their Medicare/Medicaid volumes; if a hospital cannot demonstrate meaningful use, they will see a reduction to their reimbursement**

- Hospitals will use the same incentive calculation for Medicare and Medicaid, which is adjusted for each hospital's share of Medicare or Medicaid volumes based on the calculation
  - Hospitals can participate in each program for up to 4 years
- In the FY 2016 IPPS rule, CMS proposes a set of procedural recommendations for the EHR program
  - For Medicare-eligible (non-CAH) hospitals, CMS is proposing modifications to some of the IQR and EHR clinical quality measures (CQM) reporting and submission requirements and deadlines in order to align the period for electronic CQM reporting under both programs (to avoid the reporting of identical quality measures at 2 separate times)
  - The rule also specifies the options for the editions of certified EHR technology providers may use and establishes requirements for the version of electronic specifications (eCQMs) a provider must use for electronic submission of quality reporting data

**($2M + Hospital Discharges)*Medicare or Medicaid Share*Transition Factor = Hospital Incentive Payment**

$$\text{Medicare or Medicaid Share} = \frac{\text{Inpatient Bed Days For Part A+ Inpatient Bed Days For Part C}}{\text{Estimated Total Number of Inpatient Days * Estimated Total Charges (-Charity Care)/Estimated Total Charges}}$$

| **"Transition Factor"** | **"Hospital Discharges"** |
|---|---|
| Payment Year 1= 1 | Discharges 1 thru 1,149 = $0 per discharge |
| Payment Year 2= 3/4 | Discharges 1,150 thru 23,000 = $200 per discharge |
| Payment Year 3= 1/2 | |
| Payment Year 4= 1/4 | Discharges Above 23,000 = $0 per discharge |
| Payment Year 5 and Beyond= 0 | |



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045339

# EHR Penalties For Hospitals Began In 2014 And Increase Substantially Over The Next Several Years

**Marwood believes that since most hospitals are meeting the meaningful use requirements, the penalty will have minimal impact on hospital reimbursement**

- Medicare hospitals that are not meaningful users are subject to payment adjustments beginning October 1, 2014 (FY 2015)
  - This adjustment is applied to the annual IPPS market basket update (before the productivity adjustment) for hospitals that are not meaningful EHR users
    - Effectively, negative adjustments will amount to a reduction of the hospital's market basket update of -0.25% in 2015, -0.50% in 2016, and -0.75% in 2017 and beyond
      - For example, if the FY 2016 market basket update is 2%, a hospital that is not a meaningful user would receive a market basket update of 1.5%
  - Eligible hospitals can apply for hardship exceptions to avoid these payment adjustments
    - Hardship exceptions will be granted only under specific circumstances, if CMS determines that the provider has demonstrated that those circumstances pose a significant barrier to its achieving meaningful use
    - Hardship exceptions may be granted to those hospitals experiencing infrastructure issues, those too new to have demonstrated meaningful use, those affected by a disaster or unforeseeable event, or those experiencing vendor issues outside of their control

| Annual Payment Adjustment for Hospitals Failing to Demonstrate "Meaningful Use" | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020+ |
| % Decrease In Annual IPPS Market Basket Update For A Hospital | 25% | 50% | 75% | 75% | 75% | 75% |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

33

**JAE 1359**

EUREKA_045340



# Bundled Payments Initiatives And Demonstration Outlook

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

34



**JAE 1360**

# CMS Bundled Payment Initiative, Which Includes Hospital And Physician Payments, Began In 2013

**Marwood believes that the Bundled Payments for Care Improvement initiative (BPCI) will receive close attention from CMS; it will be several years before CMS will be able to fully analyze this initiative, therefore, the 3-5 year impact is limited**

- Overall, BPCI is meant to allow CMS to test payment arrangements that include financial and performance accountability for episodes of care, and help the agency determine how best to align incentives for providers across all specialties and settings
  - For the participants in this initiative, they will have the opportunity to share in the gains resulting from their more efficient, redesigned care models
    - CMS announced that 464 health care organizations have been selected to participate in the Bundled Payments for Care Improvement (BPCI) initiative, a Center for Medicare & Medicaid Innovation (CMMI) project to test acute and post-acute bundled payments
  - Although the agency will be working closely with the participating health care organizations over the entire program period, they may not publicly share any interval results until the program concludes in 2016
    - This close collaboration between CMS and the participating organizations will allow changes to be made at the provider level as the program proceeds and the appropriate data is analyzed
  - This three-year initiative is comprised of 4 broadly defined models of care that link payments for the multiple services that beneficiaries receive during an episode of care and encourage hospitals, physicians, post-acute care facilities, and other providers to coordinate care
- Ultimately, most providers (hospitals, others) are likely to be strongly opposed to a mandated bundled payment system as they are not interested in assuming risk
  - Such opposition would make it difficult for CMS to adopt this as a nationwide payment system, given hospitals' lobbying strength in Congress
  - Implementation of such a system would likely alter a hospital's relationship with its physicians as the hospital would have to work with those providers to establish payment rates for those services



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045342

# The BPCI Initiative Is A Three-Year Demonstration Comprised Of Four Broadly Defined Models Of Acute/Post-Acute Bundling

## BPCI arrangements are being evaluated by CMS on a case-by-case basis, so many are not yet finalized

- Health care organizations had to share their methodology with CMMI, and the agency has emphasized that physicians and other practitioners are not allowed to reduce or limit services that are medically necessary to a patient entitled to Medicare benefits
    - Model 1: the episode of care is defined as the inpatient stay in the acute care hospital
        - The design calls for Medicare to pay the hospital a discounted amount based on the payment rates established under the Inpatient Prospective Payment System used in the program, while Medicare will continue to pay physicians separately for their services under the Medicare Physician Fee Schedule
    - For Models 2, 3, and 4 CMMI is using the period from January until July 2013 to initiate Phase 1 for this bundled payment program
        - Phase 1 is going to focus on preparing for the implementation and assumption of financial risk
            - Participants will receive new data from CMS on care patterns and engage in shared learning on how to improve care
            - CMS expects that the new models developed will include care redesign and enhancements, such as reengineered care pathways using evidence-based medicine, standardized operating protocols, and improved care transitions as well as enhanced care coordination
        - All four bundling models allow gainsharing arrangements, consisting of the hospital or providers distributing gainsharing payments to physician(s)

| | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| Episode | All acute patients, all DRGs | Selected DRGs, hospital plus post-acute period | Selected DRGs, post-acute period only | Selected DRGs, hospital plus readmissions |
| Services Included In The Bundle | All Part A services paid as part of the MS-DRG payment | All non-hospice Part A and B services during the initial inpatient stay, post-acute period and readmissions | All non-hospice Part A and B services during the post-acute period and readmissions | All Part non-hospice A and B services (including the hospital and physician) during initial impatient stay and readmissions |
| Payment | Retrospective | Retrospective | Retrospective | Prospective |



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

36

**JAE 1362**

EUREKA_045343

# CMS Completed An Acute Care Episode Demonstration

**Marwood believes CMS will continue to provide demonstrations involving payment reform and bundling, although impact is over 5 years away, even it the demonstrations are successful**

- The Acute Care Episode (ACE) Demonstration tested the effect of bundling Part A and B payments for episodes of care
  - The Secretary waived certain requirements to allow the payment of a bundled payment for an ACE and to allow for a shared-savings or gainsharing program at the demonstration sites, as well as to allow payment to Medicare beneficiaries representing a portion of the savings achieved by Medicare under the demonstration
  - The 3-year ACE demonstration tested the use of a global payment for an episode of care as an alternative approach to payment for service delivery
  - The global payment covers all Part A and Part B services, including physician services, pertaining to the inpatient stay for Medicare fee-for-service beneficiaries
  - Medicare paid the 5 participating organizations a global budget for high-margin procedures, including cardiac valve surgery, coronary artery bypass grafts, defibrillator implantation, cardiac pacemaker placement, and knee and hip replacements
  - The hospital sites were Baptist Health System in San Antonio, Texas; Oklahoma Heart Hospital and Hillcrest Medical Center in Tulsa; Lovelace Health System in Albuquerque, New Mexico; and Exempla Saint Joseph Hospital in Denver, Colorado
- Each site negotiated its own discounts from Medicare's usual payment
  - For instance, Baptist Health System discounted hospital payments for cardiovascular stays by 8.25%; physicians continued to receive full Medicare payments
  - At Hillcrest Medical Center, physicians and the hospital received 4.4% less than the usual payment
  - The ACE demonstration further aligned hospital and physician interests by allowing both to share savings, although it capped physicians' gain sharing at 25% of the fee schedule payment



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

37

CONFIDENTIAL

EUREKA_045344

# Acute Care Episode Demonstration Showed Savings But Changes To National Payment Policy Is Unlikely In The Next 3-5 Years

**While initial reviews of the ACE demonstration are positive, Marwood believes that the political opposition will prevent significant changes to national policy based on bundling of physician and hospital payments for the next 3-5 years**

- An article in JAMA in 2014 indicates the ACE demonstration saved Medicare $319 per episode of care for a total of approximately $4 million in net savings for 12,501 episodes of care
  - The mean savings of $585 per episode from the combined Medicare Part A and B expected payments were offset in part by increases in the cost of post–acute care services, particularly for patients undergoing percutaneous coronary interventions
  - The savings were modest, however, compared with the overall costs to Medicare of the cardiac and orthopedic procedures and varied by procedure and hospital
  - The largest aggregate savings were for orthopedic procedures, and the smallest savings per episode were for percutaneous coronary interventions (cost savings of $71)
  - Hospitals also saved money, although the amount varied by hospital and episode of care
  - These savings largely resulted from negotiating lower prices for medical devices



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

**JAE 1364**

CONFIDENTIAL

EUREKA_045345

# Affordable Care Act (ACA)

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1365**

EUREKA_045346

# ACA Is Expanding Healthcare Coverage Through Medicaid And Commercial Insurance

ACA contained a number of reforms, including the expansion of insurance coverage by creating health insurance exchanges (and subsidies to purchase insurance) and expanding Medicaid

| Issue | Affordable Care Act |
|---|---|
| Health Insurance Exchanges | ▪ Establishes health insurance exchanges through which individuals and small businesses with up to 100 employees can purchase coverage beginning in 2014 |
| Individual Mandate | ▪ Enforced for most individuals through an annual penalty per adult beginning at the greater of $95 or 1% of income in 2014 and phased up to the greater of $695 or 2.5% of income in 2016<br>• Exemptions for financial hardship if the lowest-cost plan exceeds 8% of an individual's income |
| Employer Mandate | ▪ Employers who do not offer coverage and have 50 or more employees must pay a penalty of $2,000 per employee if 1 full-time employee receives a government subsidy through an exchange, beginning in 2015 (2016 for employers with 50-99 employees)<br><br>▪ Employers who offer insurance will pay a penalty of $3,000 per full-time employee who receives a subsidy through an exchange if the employer-sponsored coverage is deemed "unaffordable" or does not meet "minimum value" standards |
| Individual Subsidies | ▪ Available on a sliding scale for individuals and families between 100% to 400% of FPL (*139% to 400% FPL in states that choose to expand Medicaid ) |
| Small Employer Subsidies | ▪ Tax credits on a sliding scale for employers with fewer than 25 employees and average wages of less than $50,000 who choose to buy health insurance for their employees |
| Medicaid Expansion | ▪ Expands Medicaid eligibility to 138% of Federal Poverty Level (FPL) beginning in 2014 in states that choose the option<br>• Federal government will pay 100% of the cost of the Medicaid expansion in 2014 to 2016, 95% in 2017, 94% in 2018, 93% in 2019, and 90% thereafter |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

40

CONFIDENTIAL

EUREKA_045347

# Expanded Insurance Coverage Through ACA Likely To Result In An Increase In Hospital Volume

**Marwood believes the increase in insured lives due to the ACA will likely have a positive impact on utilization of the Company's services**

- The Congressional Budget Office (CBO) estimates that in 2015 coverage will increase by approximately 17 million lives, due to expansion of Medicaid and the purchase of (usually) subsidized commercial insurance through the exchanges
  - HHS, however, recently made more modest projections for 2015 enrollment through the exchanges (9 million as opposed to the 11 million estimated by CBO)
- Preliminary data indicate that the ACA coverage expansion has been associated with an increase in hospital inpatient stays, consistent with the expected effect of the legislation on hospital utilization; the expansion could also boost the number of ED and other hospital outpatient visits

| ACA Effects On Insurance Coverage (Millions) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Insurance Coverage Baseline - Prior To ACA | | | | | | | | | | |
| Program | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Employer Coverage | 156 | 156 | 154 | 156 | 157 | 158 | 159 | 160 | 160 | 161 | 161 |
| Nongroup And Other | 25 | 24 | 26 | 26 | 26 | 27 | 27 | 27 | 27 | 28 | 28 |
| Medicaid And CHIP | 35 | 35 | 38 | 38 | 38 | 38 | 38 | 38 | 39 | 39 | 39 |
| Medicare (Part A) | 52 | 54 | 52 | 57 | 59 | 60 | 62 | 64 | 66 | 68 | 70 |
| Uninsured | 57 | 54 | 52 | 52 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| Total | 325 | 323 | 322 | 329 | 331 | 334 | 337 | 340 | 343 | 347 | 349 |
| Effect Of ACA - Increase In Insured Population | | | | | | | | | | |
| Program | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Employer Coverage | 2 | * | -1 | -6 | -7 | -8 | -8 | -7 | -8 | -8 | -8 |
| Exchanges | 0 | 6 | 11 | 21 | 24 | 24 | 23 | 23 | 23 | 23 | 23 |
| Nongroup And Other | * | -1 | -3 | -4 | -4 | -4 | -4 | -4 | -5 | -5 | -5 |
| Medicaid And CHIP | 1 | 7 | 10 | 12 | 12 | 12 | 13 | 14 | 14 | 14 | 14 |
| Uninsured | -2 | -12 | -17 | -23 | -24 | -24 | -24 | -25 | -25 | -25 | -25 |

*Source: CBO March 2015*

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

41



CONFIDENTIAL

EUREKA_045348

# Expect Few Legislative Changes To ACA During The Remainder Of The Obama Administration

**It is a top priority of the Republican majority in the 114th Congress to (eventually) shift its attention from full repeal to tweaks to ACA; Republican takeover of the Senate likely means increased headline risk in 2015-2016 but little substantive impact on ACA**

◦ Expect hearings and legislative "tweaks" targeting the ACA to pick up in the Senate and continued activity in the House

   ◦ Majority Leader Mitch McConnell has publicly acknowledged the obstacles to a full repeal of the ACA

   ◦ The 2016 joint House-Senate (Republican) budget resolution will include language allowing repeal to be done through reconciliation, which requires only 50, rather than 60, votes in the Senate

   ◦ While Republicans picked up a few more seats than most expected in the 2014 mid-term elections, they still fall short of the Congressional votes needed to override the President's veto

• Increasing the full-time employee definition from 30 hours to 40 hours is a top priority of the Republican majority, but the President has stated multiple times he would veto this change

◦ Other changes to the ACA that Republicans are likely to pursue include relaxing the individual mandate and repealing the medical device tax

   ◦ Marwood believes that a change to the individual mandate is a nonstarter for Senate Democrats and the President

◦ After the 2016 presidential election, under a scenario where Republicans have control of the White House and a bicameral majority in Congress, significant changes to the ACA could be enacted

   • The scope and extent of these changes would be determined to a large extent by how popular the ACA is at that point



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

42

CONFIDENTIAL

EUREKA_045349

# *King v. Burwell* Ruling Maintains ACA's Coverage Expansion

**The Supreme Court of the United States (SCOTUS) ruling in *King v. Burwell* preserves subsidies provided through the federal exchange, thereby maintaining the ACA's expansion of commercial coverage**

- *King v. Burwell* grappled with the legality of administering subsidies through federally-facilitated exchanges (FFEs), which the plaintiffs maintained are not exchanges "established by states," the wording found at some points in the ACA
  - King had broad implications for the ACA since a ruling for the plaintiffs would have disallowed subsidies in the majority of states, dramatically scaling back the expansion of commercial coverage through the exchanges
- The Court ruled that the overall context of the ACA indicated that Congress intended for subsidies to be available to individuals purchasing coverage through the FFEs, notwithstanding the most straightforward interpretation of the words "established by the state[s]"
  - Legal experts generally agreed that both sides had strong textual and legislative intent arguments, putting the odds at 50/50 to marginally more likely SCOTUS will rule in favor of the government to uphold the FFE subsidies
- By maintaining the subsidies, the ruling ensures continued coverage for the estimated 9-11 million expected to enroll through the exchanges (federal and state) in 2015



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

43

CONFIDENTIAL                                                                                   EUREKA_045350

# ACA Included Medicare And Medicaid Offsets From (Cuts To) Hospitals; The Hospital Association Still Supported The Bill

## ACA included "pay-fors" from providers, including hospitals, to finance the coverage expansion

- Hospitals are one of the major contributors, with payments reduced by approximately $160 billion over 10 years through a number of policies
  - Both IPPS (inpatient) and OPPS (outpatient) payments to hospitals will be reduced through market basket reductions from 2010 to 2019, and productivity adjustments from 2012 onward
    - For most Medicare providers, including hospitals, the ACA mandates a negative productivity adjustment to the annual inflationary increase in Medicare payments
  - Medicaid DSH reductions were to have gone into effect on October 1, 2013, but have since been delayed; Medicare DSH reductions went into effect in FY 2014
    - The permanent SGR fix includes a provision (further) delaying the Medicaid DSH cuts until FY 2018; delaying the cuts one year on the front end and extending them for a year on the back end actually scores savings, which was the rationale for this provision
  - The hospital industry (i.e., the American Hospital Association) supported the ACA because the expected gains from greater coverage outweighed the cuts

| Sectors Funding ACA Coverage Expansion | $ in Billions from 2010-2019 |
| --- | --- |
| Hospitals (IP and OP) | 160 |
| Medicare Advantage (MA) | 135 |
| Interactions between Medicare FFS & MA | 70 |
| Home Health | 39 |
| Pharmaceuticals | 25 |
| Skilled Nursing Facilities | 15 |
| Independent Payment Advisory Board | 13 |
| Hospice | 8 |
| Other Part B providers | 6 |
| Long Term Acute Care and Psych Hospitals | 6 |
| Durable Medical Equipment | 4 |
| Radiology Utilization Assumption | 2 |

| Taxes and Savings | $ in Billions from 2010-2019 |
| --- | --- |
| Medicare Payroll Tax | 210 |
| HMO Provider Fee | 60 |
| Penalty Payments- Employers | 52 |
| Cadillac Plan Fee | 32 |
| Pharmaceutical Fee | 27 |
| Medical Device Fee | 20 |
| Penalty Payments- Uninsured Individuals | 17 |
| Other Tax Provisions and Savings | 108 |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

44



# Due To The SCOTUS Decision, The Medicaid Coverage Expansion Has Been Somewhat Limited

**Marwood believes that due to the SCOTUS decision in *NFIB vs. Sebelius* the Medicaid expansion in the short term will be smaller than previously estimated, on a national level**

- On June 28, 2012, the Supreme Court upheld the individual mandate as a legitimate exercise of the federal tax power, but ruled that CMS cannot withhold all Medicaid funding if a state does not implement ACA's Medicaid expansion
  - States are no longer required to expand their Medicaid programs to all individuals under age 65 with income up to 133% FPL (effectively 138% FPL); about half of the states have not yet elected to expand Medicaid
- Currently, 22 states and DC have expanded Medicaid without a waiver, six more states have expanded using alternative payment models, and others continue to consider expansion
  - At the time, CBO estimated that 4 million people would not gain Medicaid coverage as a result of the decision



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

45

CONFIDENTIAL

EUREKA_045352

# Status Of State Medicaid Expansion Decisions As Of March 2015

| Expanded (23) | Expanded Using Alternative Model (Section 1115 Waiver) (6) | Path Difficult, but Expansion under Discussion (12) | Not Expanding (10) |
|---|---|---|---|
| Arizona * | Arkansas | Alabama | Georgia |
| California | Indiana | Alaska | Kansas |
| Colorado | Iowa | Florida | Louisiana |
| Connecticut | Michigan | Idaho | Maine |
| Delaware | New Hampshire * | Missouri | Mississippi |
| District of Columbia | Pennsylvania * | Montana | Nebraska |
| Hawaii | | North Carolina | South Carolina |
| Illinois | | Oklahoma | South Dakota |
| Kentucky | | Tennessee | Texas |
| Maryland | | Utah | Wisconsin |
| Massachusetts | | Virginia | |
| Minnesota | | Wyoming | |
| Nevada | | | |
| New Jersey | | | |
| New Mexico | | | |
| New York | | | |
| North Dakota | | | |
| Ohio | | | |
| Oregon | | | |
| Rhode Island | | | |
| Vermont | | | |
| Washington | | | |
| West Virginia | | | |
| **Estimated Number of Total New Lives, Based on Newly Eligible & Currently Uninsured** | | | |
| 6,393,000 | 1,464,000 | 3,535,000 | 3,086,000 |

\* States that have expanded but are facing legal challenges



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

46

Sources: Marwood research; CMS; StateReform; PoliticoPro; Kaiser Family Foundation

# Deficit Reduction Outlook

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

47



**JAE 1373**

# Sequestration Is Unlikely To Be Reversed In The Next Several Years

**Marwood believes that Congress will not reverse Medicare sequestration over the next 3-5 years; sequestration would likely be eliminated or ameliorated only as part of a broad budget deal, which is a remote possibility at this time**

- The Budget Control Act of 2011 (BCA), which was signed on August 2, 2011, raised the debt ceiling and included spending cuts to reduce the size of the deficit through a first round of discretionary spending reductions followed by additional discretionary and mandatory savings
  - The BCA provides for automatic spending reductions (sequestration) in discretionary and Medicare spending (along with other entitlement programs), given the failure of Congress to enact deficit reduction recommendations from the Super-Committee (the Super-Committee was unable to forward any recommendations)
- Medicare payments, including those to physicians and hospitals, were reduced by 2% beginning on April 1, 2013, and this reduction remains in effect through 2024 unless Congress legislates otherwise
  - The American Taxpayer Relief Act of 2012 (ATRA) delayed the FY 2013 sequestration of direct and discretionary spending for 2 months (the delay cost $24 billion)
    - The law required the spending reductions for the sequester to be evaluated and implemented on March 27, 2013
  - The Ryan-Murray budget legislation, enacted in December 2013, scaled back the sequestration cuts to discretionary spending (defense and non-defense) in 2014 and 2015, but extended Medicare sequestration for two more years (2022 and 2023)
    - The deficit reduction in the Ryan-Murray legislation is due almost entirely to this extension of Medicare sequestration
    - The impact of sequestration was more aggressive for discretionary programs than for Medicare, and for the most part Medicare providers did not make amelioration of sequestration a priority
  - Sequestration was extended for another year, until 2024, to offset the cost of reversing a military pension change in Ryan-Murray that proved unpopular
- It is possible Congress continues to extend sequestration on a year-by-year basis as an offset for health care legislation

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

48

CONFIDENTIAL

EUREKA_045355

# Budget Negotiators Reached A "Mini-Bargain" That Generally Does Not Affect Medicare; Status Quo Is Likely in the Near Term

**Marwood believes the $85 billion "mini-bargain" budget deal alleviated some near term risk for additional entitlement savings, including potential Medicare savings, but the interest in larger deficit reduction still poses a risk in the medium and long term**

- Representative Paul Ryan, Chairman of the House Budget Committee, and Senator Patty Murray, Chairman of the Senate Budget Committee, agreed on a mini-bargain that ameliorates the sequestration-driven cuts in discretionary spending (defense and non-defense) in 2014 and 2015
    - The budget conference deal reached in December 2013 was then passed by the House and Senate as the Bipartisan Budget Act of 2013
    - Total discretionary spending for FY 2014 and FY 2015 is increased from the sequester level and is set at just over $1 trillion
        - Under the BCA, discretionary spending for FY 2014 is capped at $967 billion and for FY 2015 is capped at $993 billion
    - The deal replaces $63 billion in sequester cuts over two years ($45 billion for 2014 and another $18 billion for 2015) with other spending reductions and some increases in fees, and will result in net long-term deficit reduction of $23 billion
        - Most of this deficit reduction comes as a result of the Medicare 2% sequester cuts being extended into 2022 and 2023
    - The Bipartisan Budget Act also included a three month "doc-fix"
- Unless one side changes its longstanding position (Republican opposition to revenue increases, Democratic opposition to entitlement program cuts not accompanied by revenue increases), a grand bargain will likely prove beyond reach
    - Consistent with this view, the FY 2016 Joint House-Senate Budget Resolution does not instruct the Senate Finance Committee to make major changes in Medicare or Medicaid through reconciliation; accordingly, it is unlikely that any significant Medicare or Medicaid cuts will be advanced this year
    - Future deficit reduction efforts may occur in 2015 or (more likely) 2017, depending on the outcome of the 2016 election



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

49

CONFIDENTIAL

EUREKA_045356

# If There Is Major Deficit Reduction Legislation, Hospitals Would Be at High Risk for Medicare Cuts

**Marwood believes that if Congress moves to enact major deficit reduction legislation, hospital reimbursement will be under pressure**

◦ Deficit reduction legislation could include ideas similar to those presented in the report from the National Commission on Fiscal Responsibility and Reform and in other plans, all of which recommended reducing the rate of growth in healthcare spending

- The President's FY 2016 Budget includes more than $400 billion in Medicare savings over ten years, achieved through some of the same proposals found in the deficit reduction plans

◦ Hospitals, as the largest Medicare provider in dollar terms, would likely be a target in this context

- There are a number of policies that Congress could consider to achieve savings from hospitals
  ◦ The President's Budget also includes a proposal to reduce Medicare reimbursement for bad debt (resulting from beneficiaries' non-payment of deductibles and co-insurance) from 65% to 25%, purportedly to align Medicare policy with that of private payers; this proposal has been in the President's Budget for each of the last four years
    - The Middle Class Tax Relief and Job Creation Act of 2012 reduced Medicare bad debt reimbursement for hospitals from 70 to 65%, as an offset for that year's temporary doc fix
  ◦ The FY 2013, 2014, 2015 and 2016 President's Budgets all include a proposal to reduce Medicare IME payments (i.e., the IME add-on rate) by 10%, from 5.5 to 4.95%
    - This proposal has not been seriously considered by Congress – e.g., as an offset for the recently enacted permanent SGR fix, or for the 2014 short-term doc fix – and, as with the bad debt proposal, would move only in the context of a major deficit reduction effort

- Major deficit reduction package could include cuts in Medicaid reimbursement to hospitals, but any Medicaid cuts would likely be modest in relation to Medicare spending reductions
  ◦ On the Medicaid side, at the top of the potential cut list is a proposal to reduce or eliminate the amount of Medicaid provider taxes that can be rebated to hospitals and other providers
    - Currently these rebated provider taxes are capped at 6% (i.e., a state cannot impose a provider tax greater than 6% if the amount of the tax is returned to the provider)
    - Lowering this cap would reduce the federal dollars available to states that have provider taxes; such a reduction could translate into lower Medicaid rates for hospitals (e.g., elimination of inflation updates) in some of those states

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

50

# Medicare Advantage

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1377**



EUREKA_045358

# The Number Of Medicare Advantage (MA) Enrollees Will Continue To Grow

**Marwood believes MA enrollment will continue to grow over the next 10 years as baby boomers age into Medicare**

- MA plans are managed care plans that beneficiaries can elect to join instead of receiving benefits through traditional Medicare FFS; MA plans usually offer additional benefits beyond the Medicare FFS program
  - MA plans set their own rates directly with providers, unlike Medicare FFS, where reimbursement is set by CMS
- Currently, roughly 30% of Medicare beneficiaries are in MA, and the Congressional Budget Office (CBO) projects this "penetration rate" to grow to 40% by 2025
  - MA penetration varies widely by state and within states—MA is more prevalent in metropolitan areas
- CBO estimates MA will grow from 17 million in 2015 to roughly 30 million in 2025, meaning enrollment growth is expected to be in the range of 6%-8% annually over that period
  - Over the same time period, Medicare is expected to grow at a rate of roughly 4% each year, from 55 million beneficiaries in 2015 to 74 million in 2025



Medicare Beneficiary Growth – March 2015 CBO Baseline

Fee-For-Service

Medicare Advantage

13% 23% 31% 38% 41%

2005 2010 2015 2020 2025

Sources: March 2015 CBO data; Kaiser Family Foundation

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

52



CONFIDENTIAL

EUREKA_045359

# Growth in Medicare Advantage Penetration Puts Pressure on Hospitals Reimbursement

**Marwood believes that growth in MA enrollment and penetration places pressure on hospitals, especially in areas of high MA penetration, due to utilization controls and increased plan negotiating leverage**

- MA penetration (the share of beneficiaries enrolled in MA vs. FFS) is increasing nationally and is especially high in certain regions of the county, such as the counties in which the Company operates
  - MA penetration has increased from 23% in 2010 to 31% in 2015 in relevant areas for the Company
- As MA penetration increases in a region, plans gain more negotiating power with providers, which places more pressure on hospital reimbursement
  - Hospitals that are highly regarded by Medicare beneficiaries and have high quality ratings, have the capacity to deliver specialized services, or are located in areas with few other hospitals are better positioned to resist this reimbursement pressure and to continue to be included in MA provider networks
- In addition, as the percentage of the Medicare beneficiaries that a hospital services are in MA, the hospital is impacted by utilization controls and increased care coordination in managed care vs. traditional FFS Medicare
- In some areas, MA plans may increase their use of sub-capitation with providers, increasing risk-sharing and value-based payment arrangements
  - These new contracting strategies may require providers to take on more risk (e.g., for utilization) and/or may tie payment to performance metrics



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

53

CONFIDENTIAL

EUREKA_045360

# Accountable Care Organizations (ACOs)

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

51



# Accountable Care Organizations (ACOs) Create Incentives For Providers To Work Together To Treat Patients Across Care Settings

**An Accountable Care Organization (ACO) is a group of doctors and/or hospitals that voluntarily assumes responsibility for both the cost and quality of health care, for a defined population of patients**

- Unlike the traditional fee-for-service reimbursement model, which pays providers for each service delivered, an ACO model directly ties payment to the total cost of care and ability to meet quality standards
  - ACO specifications are flexible enough to accommodate a large range of provider organizations, including fully integrated health care systems, multi-specialty group practices, physician hospital organizations, and independent physician associations
- Payers (e.g., CMS or insurance companies) establish an accountable care framework with predetermined benchmarks for cost and quality
  - The provider groups entering into the ACO agree to care for a patient population, with the goal of reaching or surpassing those benchmarks
- If the ACO meets all the quality benchmarks, and the population's cost of care is below the established threshold, the ACO can share in the cost savings (the difference between the actual cost and the benchmark cost), to an extent determined by the framework agreement
  - Some ACO contracts include additional incentives for reaching even higher quality goals
- A variety of ACO models have been established by both CMS and by commercial payers – the different ACO models offered by CMS include the Medicare Shared Savings Program, the Advance Payment ACO Model, and the Pioneer ACO Model



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

55

CONFIDENTIAL

EUREKA_045362

# CMS Is Attempting To Address The Growth Of Healthcare Costs And Promote Value-Driven Care Through ACOs

**The Medicare Shared Savings Program (MSSP) for ACOs is one of the ACA reforms intended to slow the growth in the Medicare spending rate, while simultaneously improving the quality of care provided to Medicare beneficiaries**

- CMS sees ACOs as a way to better coordinate care and reduce unnecessary services in order to lower the growth in Medicare spending, while improving the quality of care received by beneficiaries
  - Since ACA enactment, providers have expressed a considerable amount of interest in shared savings and ACOs
- Currently, there are 405 MSSP ACOs and an additional 19 Pioneer ACOs (the Pioneer ACOs program started shortly before the MSSP program)
- There are 7.2 million beneficiaries assigned to Medicare ACOs in 49 states plus DC and Puerto Rico
  - Medicare beneficiaries do not have to see providers that are in the participating ACO, beneficiaries can go to any provider that accepts Medicare patients
- As of May 2014, 36 ACOs were participating in the Advance Payment ACO Model
  - This model will provide advance payment of expected shared savings to rural and physician-based ACOs participating in the Shared Savings Program that would benefit from additional start-up resources
- Under the ACA, the Shared Savings ACO Program was to begin on January 1, 2012, but the final rule included 2 application periods for the first year of the program
  - Many providers would not have been able to participate in the program if it started in January 2012, given that the rules for the program were not finalized until October 2011
- Although ACO quality measures are improving, only 25% of Medicare ACOs earned shared savings payments in 2012-2013
  - According to a report issued by CMS on September 16, 2014, 64 Medicare ACOs (or about 25% of the 243 Medicare ACOs that launched in 2012) earned bonuses for the 2012 and 2013 performance years

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

56

CONFIDENTIAL

EUREKA_045363

# Medicare ACOs Could Have A Significant Impact On The Hospital Sector In The Medium And Long Term

**Marwood believes that Medicare ACOs will have a modest overall impact on hospitals, but the impact could grow over time; recent changes in the program may promote growth or at least stability in the number of ACOs**

- Under the ACO model, providers will be paid directly by Medicare at FFS rates, so there is no risk ACOs will negotiate lower reimbursement for these patients (the impact of ACOs will be on utilization rather than rates)
    - MSSP gives hospitals the opportunity to realize savings through coordination of care/utilization management of services delivered outside the hospital
    - There are limits to the extent to which a Medicare ACO can coordinate care – due to freedom of choice (one of Medicare's essential tenets), an ACO cannot require a patient to use a provider that is part of the its network, although it can try to steer patients to these providers
        - Medicare beneficiaries are often assigned to ACOs, based on visits to the entity leading the ACO, at or near the end of the performance period; this effectively requires ACOs to attempt to coordinate the care of every Medicare patient who walks in the door
- Two-thirds of ACOs that participated in a survey by the National Association of ACOs said they want to stick with the one-sided risk model (bonuses but no penalties); as the program was structured, ACOs would have been required to take downside risk in their second three-year contract
    - In response to this issue, CMS, in the ACO final rule published in June 2015, is allowing ACOs to remain in the one-sided risk model for a second three-year contract (i.e., delay taking downside risk), with the same 50% share of savings
        - CMS proposed reducing the share of savings, theoretically creating an incentive for ACOs to move to the two-sided risk model, but did not finalize this proposal
        - CMS estimates (in the final rule) that 90% of current ACOs will opt to remain in the program
- Hospitals that lead an ACO network should also, by virtue of the relationships they can establish with other providers, have greater leverage in negotiations with managed care plans (Medicare and other commercial)
    - A plan contracting with a hospital that leads an ACO network could gain access to the entire network, rather than having to negotiate separately with the providers in the network

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

57

**JAE 1383**

EUREKA_045364

# Commercial ACOs Are Growing Separate From Medicare And May Have A Greater Impact

**Marwood believes that the impact of ACOs on the Medicare fee for service population will be limited, although the growth of ACOs in the commercial health plan realm could have market implications**

- Commercial ACO arrangements may involve a stand-alone arrangement negotiated with commercial payers or a CMS-contracted ACO which enters into accountable care-type arrangement with commercial payers (may include Medicare Advantage Plans)
  - Commercial ACO arrangements can take a number of forms, but some common arrangements include a payer offering an ACO product, a provider forming an ACO and reaching out to the payer, an ACO-payer joint venture, and a provider-owned ACO and payer
    - Many commercial ACO efforts are built on PPO platforms, although some ACOs use HMO platforms
- Although there is limited participation in the Medicare program, commercial ACO-type programs are developing and creating referral alignments for specialty services
  - Providers appear to be utilizing the ACO strategy beyond just their Medicare beneficiary population -- many providers have more quickly established ACO arrangements with private payers
  - In addition, the general trend of hospital chains purchasing physician practices – which has been increased by the ACO concept – may impact referrals within ACOs
- As of January 2015, commercial ACOs, both local and national, serve upwards of 12.4 million patients
  - The growth of non-Medicare, commercial ACOs has been steady in recent years, with 284 in existence as of December 2014
    - This represents a growth of 110% since July 2013 (135)
  - Payers with the largest shares of commercial accountable care contracts include Cigna (19%), Aetna (9.1%), United (4%), Blue Shield of California (3.7%) and the Oregon Health Plan (3.7%), while self-insured employers make up 2.8% of commercial accountable care contracts

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

58

**JAE 1384**

EUREKA_045365

# Recovery Audit Contractors (RACs)



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

**JAE 1385**

CONFIDENTIAL

EUREKA_045366

# Medicare Contracts With Recovery Audit Contractors (RACs) To Detect Overpayments And Underpayments

**RACs are one of the key entities with whom CMS contracts in order to identify improper payments; unlike other program integrity contractors, they are paid on a contingency basis – the awarding of new RAC contracts is currently delayed due to ongoing litigation concerning the bidding process**

- RACs are currently contracted by CMS to reduce improper payments in Medicare (Parts A and B, including DME) by detecting and collecting overpayments, identifying (and reimbursing) underpayments, and undertaking activities to prevent improper payments from occurring in the future
  - RACs were introduced to Medicare by the 2003 Medicare Modernization Act (MMA), which authorized a 3-year demonstration program to test the use of this new type of contractor in Medicare
    - In the demonstration program, RACs corrected over $1 billion in improper payments
      - Federal outlays to RACs for the demonstration program were approximately $187 million
    - RAC jurisdictions were expanded in the summer of 2007 to include Massachusetts, South Carolina, and Arizona
  - The Tax Relief and Health Care Act (TRHCA) of 2006 mandated nationwide RAC expansion by January 1, 2010
    - In October of 2008, CMS announced 4 RAC awardees (each RAC is responsible for reviewing claims for approximately 25% of the country)
  - The RAC contingency fees are negotiated individually with CMS, and range from 9% to 12.45% of the overpayments; there is no limit to the amount of money RACs can earn
    - MACs are responsible for the actual claims adjustment (recoupment of overpayment and reimbursement of underpayment)
- On August 4, 2014, CMS announced that the RAC rebid continues to be delayed and, in response, it is modifying the current RAC contracts to allow the incumbent RACs to resume some review activities
  - Most reviews will be done on an automated basis, but a limited number will be complex reviews of topics selected by CMS
  - The contracts are scheduled for one base year and four option years—the most recent option year was approved for all incumbent RACs
  - CS quietly opened the RAC rebid in early 2013; the original effective date for the rebid was delayed from October 1, 2013 to February 2014 and has since been pushed back further until late summer 2015, at the earliest

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045367

# RACs Primarily Focus On Hospital Issues, But May Increase Their Activity in Other Areas

**Marwood believes that RACs, which have historically focused on hospitals, may devote more time to other providers going forward, which would be good news for hospitals**

- Depending on the RAC, between 70 and 89% of active issues have been focused on hospitals and services performed in hospitals, but RACs may be increasing their reviews in other areas

- A moratorium has been placed, through September 30, 2015, on RAC medical necessity reviews of inpatient hospital stays; the moratorium could lead them to devote more attention to claims from other providers
  - Such a shift in focus by RACs would not only reduce the amount of hospital claims subject to recoupment, but could also allow hospitals to scale back the administrative time and effort devoted to appealing (the findings of) RAC reviews

- In addition, CMS has offered to settle all pending appeals of pre-October 1, 2013, inpatient claims denied on medical necessity grounds (service was necessary but an inpatient stay was not), paying 68 cents on the dollar for these claim
  - The settlement could be beneficial to a hospital from a cash flow standpoint, although AHA cites OIG data showing that 72% of hospital appeals of RAC denials that go before an ALJ are overturned (in the hospital's favor)



Approved Issues By Region And Provider (May 2014)



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045368

# Scenario Analysis

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1388**

EUREKA_045369

# Federal Analysis: Probable Case Scenario

## Probable Case

- A better economy and ACA coverage expansion support more hospital utilization and reduction of bad debt
- CMS net updates for IPPS will be flat to slightly positive (0% to +3%) over the next 3-5 years; DRG weights remain relatively stable as a result of budget neutrality
- Hospital value based purchasing programs continue to grow in importance with potential penalties reaching up to -6% by 2017
- The -2% sequester stays in place for the next five years and it is more unlikely than likely, that Congress and the President agree to deficit reduction legislation to replace the sequester
- Medicaid DSH funding cuts are postponed again
- CMS bundling/risk sharing demonstration projects have limited widespread impact
- Medicare Advantage penetration continues to grow – creating additional utilization management
- Program integrity provisions focus on the need for medical necessity and appropriate use



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045370

# Federal Analysis: Best Case Scenario

## Best Case Scenario

- Hospitals largely benefit from healthcare reform, using volume and bad debt reductions to offset any payment reductions that were included in ACA
  - A better economy and ACA coverage expansion support substantially more hospital utilization and reduction of bad debt
- CMS net updates for IPPS will be flat to slightly positive 2% to 4% over the next 3-5 years except in 2018 where there is a larger increase
  - Congress does not find additional off-sets from hospitals for a permanent doc fix or deficit reduction
- Hospital value programs impacts acute care hospital reimbursement depending on performance and Company hospitals do well
- The -2% sequester stays in place for the next five years and it is more unlikely than likely, that Congress and the President agree to deficit reduction legislation to replace the sequester
- Program integrity provisions focus on the need for medical necessity and appropriate use certain hospital procedures have limited negative effect on utilization
- CMS bundling/risk sharing demonstration projects have limited widespread impact
- Medicare DSH funding remains as scheduled; Congress delays Medicaid reductions an additional 2 years



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1390**

EUREKA_045371

# Federal Analysis: Worst Case Scenario

## Worst Case Scenario

- A Republican President and Congress enact changes to the ACA that negatively impact enrollment
- Congress legislates flat updates for IPPS for several years
- Deficit reduction legislation includes aggressive reductions in Medicare bad debt payments, Medicare and Medicaid DSH, Medicare graduate medical education payments, and reductions in Medicaid provider taxes, which start as soon as 2016 payments
- Hospital value programs impacts acute care hospital reimbursement depending on performance and Company hospitals perform poorly
- The -2% sequester stays in place for more than a decade and gets extended
- Congress implements bundling of physician and hospital payments in a broader manner in the next 3-5 years
- Program integrity provisions focus on the need for medical necessity and appropriate use certain hospital procedures have a negative effect on utilization



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1391**

EUREKA_045372

# 4 | California State Analysis

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1392**

EUREKA_045373

# Budget

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



**JAE 1393**

CONFIDENTIAL

EUREKA_045374

# California's Budget Is Stabilizing Due To Economic Growth And Repayment Of The State Debt

**Marwood believes that the California budget environment is stabilizing due to tax increases and growth in the state economy**

- On June 15, 2015, the CA legislature approved a $117.5 billion FY16 General Fund budget, which is $750 million more than the Governor's proposal and intends to pay down debt and increase funding for education, social services and Medicaid
  - On May 14, 2015, the Governor released his FY16 revised budget proposal, which included $161 billion in general and special funds, a $4.6 billion (3%) increase over FY15
    - Specifically, the May revised budget saw a $6.7 billion increase in general fund revenues ($115 billion total) compared to the January Budget, $5.5 billion in increased funding for K-12 schools and community colleges, and created the first-ever California Earned Income Tax Credit to assist the state's lowest income workers (costing $380 million the first year and providing credits of up to $2,653 annually)
- Increases in tax collections resulted in an estimated $8 billion increase in state revenues from FY13-14
  - In May 2015, the State's controller office estimated that total tax collections were $13.8 billion higher than the Governors' $12.2 billion January estimate
    - May budget revision forecasts are higher than the Governor's January budget by $3.3 billion in 2014-15, and $1.7 billion in 2015-16
    - Most of the excess state revenue will automatically flow to public schools and community colleges under a voter-approved funding formula
  - The LAO expects continued operating surpluses and growth through FY17-18 due to recent increases in taxes from Proposition 30, a 2012 voter approved ballot initiative that temporarily increases taxes to generate annual revenue
    - In addition, Proposition 2, a constitutional amendment requiring money to be saved in a rainy-day fund, passed in November 2014 and will be used to pay off the state's non-retirement debt through 2018
    - The May revised budget calls for an additional $633 million to be saved in its Rainy Day Fund for a total of $1.9 billion with a balance of $3.5 billed
    - However, growth is expected to slow in FY17-18 when Proposition 30 expires, reducing annual revenue by $7.5 billion a year
    - The administration expects General Fund tax revenue to be $111.3 billion by the end of FY15 and $115 billion by FY16, a $6.7 billion increase
- On June 20, 2014, the Governor signed into law the FY15 budget, which totals $156.4 billion in general and special funds, and represents an 8.6% ($12.5 billion) increase over the FY14 budget

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

68

CONFIDENTIAL

EUREKA_045375

# California's Medicaid Budget Stabilizing After -10% Provider Rate Cuts; Hospitals Were And Continue To Be Protected From Cuts

**Marwood believes that hospital inpatient and outpatient services were exempt from -10% across the board Medicaid provider cuts passed in 2011 and implemented in 2013, and continue to be protected from reductions given the Quality Assurance Fund (QAF) program**

- Additional Medicaid cuts are unlikely since there are no deficits projected for the foreseeable future—if there is a Medicaid budget deficit, the state will likely redirect funding rather than impose major cuts
    - Governor Brown's FY16 proposed budget assumes Medi-Cal caseloads of 12.2 million by the end of FY16 and expected spending of $18.6 billion in the General Fund, a 4.3% ($771 million) increase from FY15
        - The budget proposes restructuring the managed care organization tax to comply with federal law and to raise additional revenues in order to restore IHSS hours eliminated as a result of a 2014 reduction, reserve $300 million for costs associated with new Hepatitis-C medication, and greater spending of $73 million from the General Fund
        - The May Budget Revision also includes $125 million in the General Fund for managed care rate increases in FY15-16
- With an improving budget, providers are optimistic that the Medicaid rate cuts will be eliminated (includes a small component of hospital reimbursement)
    - The enacted FY16 budget did not include a 5% restoration of the 2009 Medicaid provider cut although it will likely be further discussed in the June-September 2015 special legislative session
        - Hospitals, except Distinct Part Nursing Facilities (DP/NFs), were exempt from the reductions
        - The legislative FY 16 budget approved a 5% restoration of the cut, including prospectively, to begin in April 2016, although was taken out during final negotiations with the Governor; the issue is expected to be continued to be discussed during the special session that began June 19th and ends September 11th, 2015
        - Legislation, AB 1805, was introduced to reverse the -10% provider cuts during the 2014 legislative session, but the state's enacted FY15 budget did not eliminate the -10% cut, and neither did the governor's proposed FY16 budget
            - The Governor decided to forgive the retroactive payments but refused to eliminate the -10% cut because he saw it as a budget cost saver
    - Legislation was reintroduced again in 2015 to reverse the -10% cuts but it has been held up in the legislature
        - The bills (SB 243 and AB 366) would have reversed the -10% cuts in payments to doctors who treat Medi-Cal patients



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

69

**JAE 1395**

EUREKA_045376

# California Hospitals Were Protected From Potential Cuts During 2011 QAF Negotiations

**Marwood believes that due to an agreement between hospitals and the state in 2011, hospitals in general were protected from the much disputed Medi-Cal cuts dating back to 2008**

- During negotiations over the hospital provider tax in 2011, hospitals and the state reached an agreement on the Medi-Cal rate cut lawsuits—hospitals agreed to drop their lawsuit in exchange for the QAF extension and the state agreed not to pursue retroactive rate reductions that were passed in the FY10 budget
  - The first lawsuit originated from AB 5 (FY09 budget), which included 10% rate cuts to most providers including non-contracting hospitals and outpatient hospital services effective July 1, 2008
    - Provider associations, including the California Hospital Association, sued DHCS claiming that provider access would be threatened by the cuts and that the state did not properly substantiate otherwise—the courts issued a preliminary injunction and retroactively restored funding
    - According to a Department of Health Care Services (DHCS) report, all of the Company's hospitals were contracting hospitals in the Selective Provider Contracting Program (SPCP), therefore the non-contract cuts would not have applied to them, but the outpatient ones would have
      - Hospitals that contracted under the SPCP have been protected from cuts due to the original QAF agreement in 2009
  - As a result of the injunctions, the Legislature passed AB 1183 in September 2008, which sunset the 10% cuts, replacing them with 1% and 5% cuts, effective March 1, 2009; however, these cuts never actually went into effect
    - Outpatient hospital services received a 1% cut; however, this cut was halted by the 9th Circuit on April 6, 2009, when the suit involving outpatient rates was enjoined with other Medi-Cal provider cases that were included in the injunction
    - The 1% cut went back into effect from January 1, 2011 through April 12, 2011, at which point SB 90 (QAF extension) was passed
    - Non-contracting hospitals were not relieved from AB 5's 10% cut, but did receive relief from an additional 5% cut on April 6, 2009
  - As part of the agreement, which passed on April 12, 2011, the state ended the 10% cuts to non-contract hospitals and 1% cuts to outpatient hospital rates
    - The only outstanding hospital-related cuts are those included in the FY12 budget's (AB 97) 10% cuts to Distinct Part Nursing Facilities (DP/NFs) attached to hospitals; however, these cuts are part of the broad discussions during the special legislative session this summer and could potentially see some partial restoration depending on negotiations
  - After a long legal battle between providers and the state, on June 14, 2013, the U.S. Court of Appeals for the Ninth Circuit allowed the state to implement the -10% provider cut to most providers
    - Hospitals were not impacted, regardless of status, since there was no longer a distinction between contract and non-contract hospitals

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045377

# Medicaid Expansion

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

71



**JAE 1397**

# Under ACA, 4.3 Million More Individuals Are Expected To Be Enrolled In Medi-Cal By 2016; This Likely Benefited Hospitals

**Marwood believes that the ACA Medicaid expansion in California will increase the number of childless adults eligible to receive Medicaid benefits**

- As of January 2015, Medi-Cal enrollment was expected to reach 11.9 million by the end of FY15 and 12.2 million by the end of FY16, increasing the number of individuals enrolled in Medi-Cal by 4.3 million individuals since 2013
  - The Governor's FY15-16 proposed budget assumes net costs of $2 billion ($943.2 million in the general fund) in 2015-16 to provide for the Medicaid expansion
    - California Medicaid enrollment is estimated to reach approximately 12.2 million by June 2016
    - Specifically, the Medicaid expansion will increase the program's caseload by an estimated 1 million in 2014-15 and 1.1 million in 2015-16 which is stabilizing compared to approximate 20% increase from 2012—2013 to 2013-2014
      - Medicaid enrollment has increased from 7.9 million in 2012-13 to approximately 12.2 million by the end of 2015-16
- Starting on January 1, 2014, for the first time, the Medicaid expansion allowed coverage of childless adults and parents up to 138% of FPL
  - Prior to expansion, working parents below 106% of FPL received Medicaid services
  - The federal government has committed to pay 100 percent of the cost of the new adult group optional expansion for the first three years
    - By 2020-21, the federal share will have decreased to 90 percent and the state will pay 10 percent.
- Under a 2010 waiver agreement with CMS, California created a temporary county-based Low Income Health Program (LIHP) that was put in place until the state's Medicaid expansion in 2014
  - The program expanded health care coverage through December 31, 2013 to many low-income adults ages 19-64 who were not eligible for Medicaid; they were above 100% of FPL before January 1, 2014
    - There were approximately 630,000 total people enrolled in the LIHP in all but five of the 58 counties
    - Most of the LIHP enrollees transitioned to Medi-Cal on January 1, 2014 (up to 138% of FPL), while some are eligible to receive health insurance under the exchanges (adults between 138% - 400% FPL

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

72



# Quality Assurance Fee (QAF)

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

73



# The QAF ("Provider Tax") Was Implemented As A Method To Increase Medi-Cal Funding For Hospitals

**The QAF increases funding for Medi-Cal reimbursement by utilizing taxes to hospitals to draw down additional federal Medicaid matching funds**

- QAF was implemented on April 1, 2009 and extended through December 31, 2013 under SB 335 (2011)
  - The fee is levied on a per diem basis and varies by insurance coverage
    - The FFS per diem fee is $308.36, Medicare managed care per diem fee is $86.40, Medi-Cal managed care per diem fee is $383.20, pre-paid health plan hospital per diem fee is $48.38 and pre-paid health plan hospital Medi-Cal managed care per diem is $214.59
  - For previous QAFs, payments were allocated from 4 sub-pools – general acute, psychiatric, high acuity and subacute – and payments from each pool is increased annually, as specified in the SPA approved in June 2012
    - A hospital's QAF supplemental payments are calculated for each sub-pool by multiplying a hospital's patient days in each sub-pool category by the payment rate established in the SPA
    - Under the SPA, DHCS and CMS agreed to specific rates under each sub-pool category that increase on an annual basis
  - The state estimates that $6 billion in QAF funding was distributed between July 1, 2011 and December 31, 2013
- Historically, the California Legislature has extended the QAF, and the most recent extension from 2014-2016 represents the longest extension yet (3 years)
  - In early September 2013, the Legislature extended the QAF for an additional 3 years as part of SB 239, for services between January 1, 2014 and December 31, 2016
    - The previous extension was for 2.5 years from July 1, 2011 through December 31, 2013; the program began on April 1, 2009, but took until 2011 for official approval by CMS
  - The DHCS and CMS generally negotiate FFS payments during the SPA process, however managed care payments are separate approved by CMS outside of those discussions, and therefore tend to lag behind FFS payments
    - Historically, the managed care portion of the payments have been approved approximately six months after FFS
    - According to stakeholders, the third installment of Medi-Cal managed care QAF payments for the 2011-2013 QAF were expected to be approved by CMS by the end of Summer 2014, however payments for 2011-2013 and 2014-2016 QAF payments have not yet been approved
  - Between April 2012 and 2013, DHCS changed the structure of fee collections so that fees were not collected until CMS approved the managed care portion of payments; DHCS expects to continue to align fees/payments with CMS approval

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

74

CONFIDENTIAL

EUREKA_045381

# DHCS Increased QAF Payment Levels For 2014 To 2016, With The Exception Of General Acute Payments In FY15

| QAF State Plan Amendment Approved Payment And Subpool Totals (2014 - 2016) | | | | | | | |
|---|---|---|---|---|---|---|---|
| QAF Subpool | 2014-2016 Amounts | SPA Proposed Payments | | | | | |
| | | FY14 (Starting 1/1/2014) | FY15 | % Change | FY16 | % Change | FY17 (To 12/31/2016) * | % Change |
| General Acute | $7,364.43 million | $1,370.04 | $1,042.34 | -24% | $1,222.64 | 17% | $1,484.00 | 21% |
| Psychiatric | $551.36 million | $965.00 | $970.00 | 1% | $975.00 | 1% | $975.00 | 0% |
| High Acuity | $1,316.54 million | $2,500.00 | $2,500.00 | 0% | $2,500.00 | 0% | $2,500.00 | 0% |
| High Acuity Trauma | $404.03 million | $2,500.00 | $2,500.00 | 0% | $2,500.00 | 0% | $2,500.00 | 0% |
| Transplant | $54.26 million | $2,500.00 | $2,500.00 | 0% | $2,500.00 | 0% | $2,500.00 | 0% |
| Subacute | $438.39 million | 50% of 2010 payments | 55% of 2010 payments | 10% | 60% of 2010 payments | 9% | 60% of 2010 payments | 0% |

| QAF Payment And Subpool Totals (July 1, 2011 - 2013) | | | | | | |
|---|---|---|---|---|---|---|
| QAF Subpool | 2011-2013 Amounts | Payments | | | | |
| | | FY12 | FY13 | % Change | FY14 (to 12/31/2013) | % Change |
| General Acute | $4,822.58 million | $974.10 | $1,089.92 | 12% | $1,264.06 | 16% |
| Psychiatric | $268.56 million | $695.00 | $790.00 | 14% | $955.00 | 21% |
| High Acuity | $882.62 million | $1,350.00 | $1,350.00 | 0% | $1,350.00 | 0% |
| High Acuity Trauma | | $1,350.00 | $1,350.00 | 0% | $1,350.00 | 0% |
| Subacute | $115.91 million | 40% of 2009 payments | 40% of 2009 payments | 0% | 20% of 2009 payments* | 0% |

*Represents half of the fiscal year

**Final funding streams were approved in December 2014 as part of CMS approval of the extended program, and total to about $10 billion for hospitals; while General Acute Care payments initially decreased in FY15, increases will follow in FY16, and all of the remaining pools saw increases**

- Hospital payments are calculated by multiplying the payment rates for each subpool by the number of patient days in each subpool during the 2010 calendar year, as reflected in the state's paid claims file on April 23, 2013

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

75

# To Receive QAF Payments, Qualifying Hospitals Are Required To Pay Quarterly Fees Based On Patient Days

**Qualifying hospitals are required to pay fees to the state to draw down federal matching funds, which are then used to distribute supplemental QAF payments to hospitals by hospital type – private, non-designated public, and designated public**

- QAF fees are assessed on patient day data of the individual facility multiplied by the quality assurance fee percentage, and are assessed quarterly in correspondence with federal fiscal years
  - Hospitals are required to pay a fee of $27.25 for every inpatient day of patients enrolled in a managed care plan (excluding Medi-Cal), $233.46 for every inpatient day of patients covered by FFS (excluding Medi-Cal), and $293.00 for every inpatient day of patients covered by Medi-Cal (FFS or managed care)
    - The lower fee imposed on non Medi-Cal managed care days and FFS days is designed to prevent large financial losses from the fee among hospitals where Medi-Cal patients represent a small share of their overall inpatient days
    - The amount of the obligation is estimable as the QAF fee is based on historic and static data
  - Public hospitals, small and rural hospitals, specialty hospitals, and long term care hospitals, are exempt from the QAF fee
- The amount of payment varies based on whether the hospital is a private hospital, non-designated public hospital, or a designated public hospitals; funds are distributed to hospitals in three ways
  - First, DHCS pays hospitals directly – private hospitals receive supplemental payments for IP and OP and sub-acute care services, and are reimbursed up to the maximum rates allowed by the federal government, called the upper payment limit
    - These supplemental payments are made in addition to the existing Medi-Cal APR-DRG payments
  - Second, DHCS increases Medi-Cal payment rates to managed care organizations (MCOs) and require them to pass-through all of these funds to hospitals
    - The amount a hospital receives is based on the number of total Medi-Cal managed care days it provides
    - Plans are prohibited from considering this supplemental payment when negotiating contracted rates and other payments to hospitals
  - Third, DHCS makes quarterly payments to county mental health plans so they can pass through all of these funds to hospitals providing acute psychiatric services; payment is dependent on the total acute inpatient psychiatric days



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1402**

EUREKA_045383

# The QAF Program For Hospitals Includes Both FFS And Managed Care Portions; Managed Care Payments Are Paid Later

**The Medi-Cal Hospital Provider Rate Stabilization Act creates two methodologies to make supplemental payments to participating hospitals**

- The two groups have always been treated separately in the fee program, mostly because the FFS portion has an upper payment limit and managed care payments need to be rates that are actuarially sound
  - FFS supplemental payments are calculated for each hospital using formulas based on the most recently reported utilization information, which is a static data that is set at the beginning of each QAF cycle (e.g., 2014-2016) and is not adjusted throughout the duration of the approved program period
    - For the 2014-2016 cycle, FFS payments were calculated using data from CY2010
    - For private hospitals and non-designated public hospitals, FFS supplemental payments are paid for designated services including certain outpatient visits, inpatient days, acute psychiatric days, certain high acuity Medi-Cal days, and some sub-acute services
  - Additionally, hospitals participate in funds specifically designated for increased capitation payments to managed care plans for hospital services to Medi-Cal beneficiaries
    - The payments to managed care plans are subject to actuarial certification of the payment plan and final federal approval, which has resulted in some lags between approval for managed care payments after FFS payments have already been approved
    - As of July 1, 2015, CMS approved the managed care rates for the 2014-2016 QAF program dating January 2014 through June 2014, and are expected to be paid by Fall 2015; DHCS expects to seek CMS approvals for managed care components in increments that align with plan contract rate periods and consistent with MCO rate/contract approval processes
- Legislation allows DHCS limited flexibility to make adjustments to the QA fee and payments to obtain federal approval and maintain funding levels within allowable federal guidelines; however, there is currently no discussion to make changes to the payment methodology



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045384

# The Company's QAF Payments Are Generally Higher Than The Average Payments Across All Hospitals

| Company Hospitals | FY14 FFS/MC | FY15 FFS/MC | % Change FY14-FY15 | FY16 FFS/MC | %Change FY15-FY16 | FY17 FFS/MC** | % Change FY16-FY17 |
|---|---|---|---|---|---|---|---|
| Western Medical Center - Anaheim | $8,616,581 | $15,860,932 | 46% | $17,703,156 | 10% | $19,808,972 | 11% |
| Western Medical Center – Santa Ana | $13,721,161 | $25,886,081 | 47% | $30,649,154 | 16% | $36,109,128 | 15% |
| Coastal Community Hospital | $12,530,948 | $24,131,429 | 48.% | $28,561,518 | 16% | $32,575,560 | 12% |
| Chapman Medical Center | $272,916 | $290,981 | 6% | $252,534 | -15% | $276,928 | 9% |
| All Company Hospitals | $34,595,774 | $65,587,460 | 47% | $76,661,294 | 14% | $88,216,732 | 13% |
| Avanti Hospitals | $8,233,918 | $14,407,120 | 43% | $17,003,109 | 15% | $18,890,944 | 10% |
| Statewide Average | $13,699,384 | $24,538,405 | 44% | $28,823,868 | 15% | $32,122,824 | 10% |

*Data eliminates outlier hospitals with a net negative impact from the QAF (those paying more fees than they are receiving in supplemental payments back)
**Payment levels for FY17 MMC/FS are prorated for a full year for comparison purposes, considering the QAF program only runs half of the fiscal year 16-17



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

78

**JAE 1404**

CONFIDENTIAL

EUREKA_045385

# Hospital QAF Extension Is Likely Beyond 2016 Expiration, And A Permanent Extension Is Possible Through Ballot Approval

**Marwood believes that it is highly likely that the QAF will continue beyond 2016, as it has strong support from advocates, DHCS, the Governor and Legislature, and a permanent extension is likely by way of a ballot initiative and approval, which was delayed from 2014 to 2016**

- The fee-for-service component of the most recent QAF State Plan Amendment (SPA) was approved by CMS in December 2014 and some of the managed care component was approved July 2015
  - The state negotiated with CMS over the SPA, primarily around properly accounting for the impact of ACA and the state's Medicaid managed care expansion in the Upper Payment Limit (UPL) for hospital services
    - Three recent changes had to be accounted for in the UPL calculation in 2014: 1) the Medicaid expansion, which has a different federal match than the rest of the Medicaid population, 2) the Medicaid managed care expansion to rural counties, and 3) ACA's new Presumptive Eligibility
  - Overall, changes in the UPL are not likely to significantly impact the final QAF payment levels
- The QAF is likely to be renewed beyond 2016 due to strong support throughout the state (Governor, Legislature, providers, advocates)
  - The state has become reliant on the QAF revenue, which supports the likelihood that future Legislatures are likely to extend the program, as they would need to find replacement funds in order to eliminate it
  - Stakeholders note the Legislature could also choose to pass a permanent QAF extension
  - Alternatively, the California Hospital Association's (CHA) ballot initiative to make the QAF permanent and allocate a specified amount to hospital payments has been delayed until 2016
    - CHA was unable to obtain the required level of certified signatures to add the initiative to the 2014 ballot, however, they expect to be able to reach the number of signatures required for 2016



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

79

**JAE 1405**

EUREKA_045386

# Quality Assurance Fee Supplemental Payment Outpatient Hospital Methodology Is Likely Stable

**Marwood believes that outpatient Quality Assurance Fee supplemental payment funding has remained stable since 2009 when the program began, and there is no discussion to change**

- A portion of overall QAF revenue is designated for outpatient hospital supplemental payments
  - From January 1, 2014 to December 31, 2016, $3.74 billion is proposed for designation to QAF outpatient payments
  - From July 1, 2011 to December 31, 2013, $1.74 billion was designated to QAF outpatient payments
  - From January 1, 2011 to June 30, 2011, $509.08 million was designated to QAF outpatient payments
  - From April 1, 2009 to December 31, 2010, $953.75 million was designated to QAF outpatient payments
- On March 28, 2014, DHCS also submitted a proposed SPA for outpatient QAF reimbursement
  - The SPA proposes that outpatient QAF payments be paid out quarterly according to the following methodology:
    - The SPA sets a hospital-specific base amount at the level of 2010 QAF outpatient payments received by each hospital
      - For the last two quarters of FY14, payments would total 150% of the hospital's base amount
      - For FY15, payments would total 257% of the base amount
      - For FY16, payments would total 290% of the base amount
      - For the first two quarters of FY17, payments would total 160% of the base amount
  - In total, the SPA caps outpatient QAF payments at $3.74 billion for all hospitals between 2014 and 2016
- Outpatient QAF payments have remained stable since 2009, when the program began, up to the UPL
  - For the previous QAF period, July 1, 2011 through December 31, 2013, hospitals were paid by calculating the difference between the aggregate hospital payments to private hospitals in the fiscal year of payment and the aggregate UPL for outpatient services for private hospitals in that year, which was divided by the sum of all hospitals' outpatient base amount
    - Formula: (Aggregate UPL Amount – Fiscal Year Total Payments)/Sum of All Hospital Outpatient Base
  - The methodology for QAF outpatient supplemental payments has remained stable, except the year upon which the outpatient base amount is calculated has been updated, as claims data becomes available to DHCS
    - Originally, for the April 1, 2009 – December 31, 2010 authorization term, the base amount was based on 2007 payments



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

80

**JAE 1406**

# Reimbursement Methodology

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1407**

EUREKA_045388

# California Is In The Process Of Transitioning To An APR-DRG Methodology For Inpatient Hospital Reimbursement

**California switched the reimbursement methodology to base reimbursement on patient acuity and hospital resources used to treat the patient rather than a hospital negotiated per diem rate**

- Effective July 1, 2013, DHCS implemented a new reimbursement methodology for inpatient hospital services, transitioning from facility-specific contracted rates under the Selective Provider Contracting Program (SPCP) to an All Patient Refined Diagnosis Related Groups (APR-DRGs) system
  - SB 853 in 2010 authorized the transition from the SPCP to the APR-DRG methodology in a budget neutral manner
  - The new reimbursement methodology multiplies the APR-DRG weight by a base rate that is adjusted by Medicare wage area indexes
    - In FY15, the state updated from Version 29 to Version 31 of the APR-DRG weights
    - The base rate was increased from $6, 223 to $6,289 in FY15, due to the state including non-designated public hospitals into the full dataset; only 68.8% of the base rate is adjusted by the wage area index, as is the case with the Medicare program
    - The base rate is not tied to an inflationary factor or annual update
    - The methodology also makes outlier payments for losses on claims that exceed specified thresholds
- Previously, California had a unique system, the SPCP, where the state contracted and negotiated Medi-Cal per diem rates with hospitals; all of the Company's hospitals were contract hospitals
  - The SPCP began in 1982 and as of 2013, 196 hospitals participated in the program, including the Company's hospitals
    - The California Medical Assistance Commission (CMAC) contracted on a competitive basis with hospitals that wanted to provide inpatient services to Medi-Cal beneficiaries at a negotiated rate in order to incentivize hospitals to better manage and control costs
      - The Company (and all contract hospitals) received per diem rates for each day a patient spent in the hospital, specific to the unit/specialty; the per diem amount was then multiplied by the approved inpatient days to calculate the full payment for that stay
    - The CMAC was eliminated and SPCP was transferred to the DHCS July 1, 2012 until it was replaced by the APR-DRG methodology
  - Non-contracting hospitals could only provide emergency Medi-Cal services and were paid according to costs



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

82

**JAE 1408**

EUREKA_045389

# The APR-DRG Payment Methodology Is Calculated Per Patient Stay



*Calculation For Overall DRG Base Price*

*Illustrative Example Of DRG Base Price Adjusted By Patient Stay*

As Medicare does, hospitals in different geographic areas receive different base prices to reflect prevailing wage levels, called the wage area index. Differences in wage index only affect part of a DRG base price, and for California, the wage accounts for approximately 68.8% of hospital cost; the fact that 77% of all stays are concentrated in the 3 main Southern California areas indicates that a decision on use of wage areas would only have a minor impact on those hospitals, and more of an impact on those in the Bay Area and Silicon Valley

Once the wage index and case mix are applied, the DRG base price is determined

Statewide Total Volume Of Stays X Total Casemix = Overall DRG base price

An inpatient stay is assigned to a single diagnosis related group (DRG) using an algorithm that accounts for patient's diagnoses, age, procedures performed, and discharge status

Each DRG has a relative weight that reflects the typical hospital resources needed to care for a patient in that DRG relative to hospital resources needed to care for the average patient

DRG Base Price Of $8,000 (Per Stay) X DRG relative weight of 0.50 = $4,000

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

83





# Timeline For Transition From SPCP Reimbursement Methodology To APR-DRG For Hospital Acute Inpatient Services

**1983-2013**: Hospitals paid under the Selective Provider Contracting Program (SPCP) – "contracted" hospitals, including the Company's hospitals, negotiate a per diem payment rate with the state, and "non-contract" hospital reimbursed based on cost-to-charge ratios

**July 1, 2012**: Contracting program transferred from California Medical Assistance Commission (CMAC) to Department of Health Care Services (DHCS)

**July 1, 2013- ongoing**: **DRG implementation** Hospitals reimbursed with payment by diagnosis related group (DRG), eliminating the current contract and non-contract status designation once payments are based upon DRGs

**2014-2017**: DRG-based payment method to be phased in over 3 year period with changes fully implemented in the fourth year. Claims paid using the DRG payment method, but some hospitals will see transition DRG base prices higher or lower than they would have been without the transition. In the first year, the intention is average payments per patient will increase/decrease by no more than 5% relative to what they otherwise would have been. In the second year, the range widens to +/- 10%, and in the third year to +/- 15%. Full implementation at the statewide base rate will occur in year four.



**April 2011 - February 2012**: Workgroup of staff from the Department of Health Care Services (DHCS) and other state agencies developed the new DRG method in consultation with a group of hospital managers and other stakeholders convened by the California Hospital Association (CHA) during monthly meetings. The original target date to implement DRG payment was July 1, 2012; as part of the 2012 Budget Act, implementation was set for July 1, 2013

**January 1, 2014**: Non-designated public hospitals (NDPH) DRG implementation

**2017- ongoing**: The Department plans to do an annual review of what changes, if any, in DRG base prices would be appropriate. However, it is expected that legislative appropriations will initially freeze the statewide base price at the July 1, 2013 level. The combination of base prices, the number of stays, the average case mix per stay, and the service-specific and age-specific policy adjustors will determine the overall level of payments.



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1410**

EUREKA_045391

# APR-DRG Transition Period Is Coming To A Close; No Major Changes In Methodology Are Currently Being Discussed

**Marwood believes that California will complete its transition to an APR-DRG system over the next fiscal year; no significant changes are expected**

- Following the transition, the Company hospitals' base rate will be $7,436, when accounting for the DRG wage index for Santa Ana-Anaheim-Irvine, CA
  - Of 337 CA Hospitals, 227 are transitioning toward the statewide base rate and 110 are considered non-transition (i.e., they are already at the statewide rate)
    - The intent was to limit the FY13-14 aggregate impact to a hospital's overall payments to no more than 5% (positive or negative) compared to estimated payments in FY13-14 under the previous SPCP methodology, no more than an additional 5% in FY14-15, and no more than an additional 5% in FY15; the DRG base price will be fully implemented by FY16-17
  - Three of the Company's hospital received transition rates for FY14-17
  - One of the Company's hospitals, Chapman Medical Center, did not receive a transition rate and therefore is already receiving the statewide adjusted base rates and will not see an increase in 2017
    - A transition base price does not apply to a hospital if the estimated change in payment is 5% or less; if the estimated impact of DRG payment is under $50,000; if the hospital had fewer than 100 Medi-Cal stays and Medi-Cal represented less than 2% of the hospital's volume; or if the hospital had no stays in the simulation dataset
  - Stakeholders indicate that hospitals have successfully adjusted to the new methodology during the transition period, and while there may be some adjustments to reimbursement levels for certain services (NICU, Births) there are no other changes being discussed beyond annual reviews
    - The Department plans to do annual reviews of what changes, if any, in DRG base prices is appropriate, however the combination of base prices, number of stays, average case mix per day, and service-specific adjustors determines overall level of payments



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

# The Company's APR-DRG Rates Between FY14 And FY17 Reflected Slightly Higher Rates From Year To Year

| | | FY13-14 | | | FY14-15 | | | FY15-16 | | | FY16-17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hospital | DRG Wage Area | Statewide Base Rate | Wage Adjusted Base Rate (Non- Or Fully- Transition) | Transition/ Actual Rate | Statewide Base Rate | Wage Adjusted Base Rate (Non- Or Fully- Transition) | Transition/ Actual Rate | Statewide Base Rate | Wage Adjusted Base Rate (Non- Or Fully- Transition) | Transition/ Actual Rate | FY16-17 Fully Transitioned Rate |
| Western Medical Center - Anaheim | Santa Ana- Anaheim – Irvine, CA | $6,223 | $7,213 | $6,954 | $6,289 | $7,387 | $7,242 | $6,289 | $7,436 | $7,436 | Not yet available |
| Western Medical Center – Santa Ana | Santa Ana- Anaheim – Irvine, CA | $6,223 | $7,213 | $6,898 | $6,289 | $7,387 | $7,206 | $6,289 | $7,436 | $7,436 | Not yet available |
| Coastal Community Hospital | Santa Ana- Anaheim – Irvine, CA | $6,223 | $7,213 | $6,462 | $6,289 | $7,387 | $6,739 | $6,289 | $7,436 | $7,035* | Not yet available |
| Chapman Medical Center* | Santa Ana- Anaheim – Irvine, CA | $6,223 | $7,213 | $7,213 | $6,289 | $7,387 | $7,387 | $6,289 | $7,436 | $7,436 | Not yet available |

*Company Hospitals' APR-DRG Base Rates FY13-FY17*

## As of FY16, 3 of the Company's hospitals are fully transitioned, while 1 will be by FY17

◦ Western Medical Center-Anaheim, Western Medical Center-Santa Ana, and Chapman Medical Center are now fully-transitioned to the statewide base rate, which is then wage-adjusted for the area

- The Anaheim and Santa Ana locations did experience a rate transition to increase the base rate
- Chapman Medical Center did not get transition rates—base rate increases were due to changes made by the state to the base rate (due to new data) or updated wage index information

◦ Coastal Community Hospital will be fully transitioned by FY17



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

86

**JAE 1412**

CONFIDENTIAL

EUREKA_045393

# Transition To APR-DRGs Will Have A Hospital-Specific Impact On Out-Of-Network Medi-Cal Managed Care Payments

**Marwood believes the transition to APR-DRGs impacts Medi-Cal managed care out-of-network reimbursement to former SPCP hospitals, known as Rogers Rates**

- Prior to the APR-DRGs, SPCP hospitals that did not contract with Medi-Cal managed care plans were reimbursed an average regional per diem SPCP rate for emergency-based inpatient and post-stabilization services, known as Rogers Rates (all of the Company hospitals participated in SPCP)
  - Annually, DHCS set a Rogers Rate in three regions of the state for Tertiary and Non Tertiary hospitals
    - The last time Rogers Rate were published was in 2013, before the SPCP program ended
  - California implemented Rogers Rates for dates of services beginning January 1, 2007, as a result of the federal Rogers Amendment, which passed in the Federal Deficit Reduction Act of 2005 and established upper limits to the amount Medicaid plans were permitted to pay out of network hospitals and state legislation (AB 1183 in 2008)
    - The amendment stemmed from CMS pressure to reduce out-of-network hospital payments that were deemed unreasonable by the agency
    - California passed legislation in 2008 (AB 1183) that statutorily limited payments in California, effective retroactively to January 1, 2007
- With the transition to APR-DRGs on July 1, 2013, managed care plans are now required to limit reimbursement to the applicable Medi-Cal DRG reimbursement for these out-of-network hospitals
  - MCOs are required to use the statewide (wage adjusted) DRG base rate regardless of whether the hospital uses a transition rate for Medi-Cal FFS payment
- The impact of this transition depends on a hospital's case mix and DRG payments, compared to the previous Rogers Rates per diem payments
  - If the Company is in-network with all Medicaid managed care plans in California then there is likely no impact

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

87



CONFIDENTIAL

EUREKA_045394

# California Outpatient Hospital Reimbursement Methodology Is Stable

**Marwood believes that the Medi-Cal hospital outpatient reimbursement methodology has been stable and is expected to remain stable after significant rate increases in the early 2000s**

- Outpatient hospital services are reimbursed by Medi-Cal using 10 HCPCS Z-codes
  - Hospital outpatient departments receive an additional reimbursement for room charges not received by non-hospital providers
    - However, this additional payment is offset by a 20% reduction in the reimbursement rate for physician services furnished in hospital outpatient departments
  - Z-codes reimburse for the use of various outpatient room types
- According to stakeholders, there are no efforts in the Legislature or DHCS to alter the reimbursement methodology for outpatient hospital services
- Outpatient hospital rates were increased by 43.44% between 2001 and 2004 as a result of the *Orthopaedic Hospital, et al. v. Belshe* settlement
  - The court decided that DHCS, at the time, failed "to assure that payments are consistent with efficiency, economy, and quality of care" as required under the California Medicaid State Plan
  - As a result, the state allocates Cigarette and Tobacco Products Surtax (CTPS/Proposition 99) funds to aid in the funding of the settlement
  - The rates listed in the provider manual are considered the base rates that are adjusted by the court-required increases; the increases were:
    - Effective July 1, 2001, through June 30, 2002, the additional amount will equal 30% of the base rate
    - Effective July 1, 2002, through June 30, 2003, the additional amount will equal 34.30% of the base rate
    - Effective July 1, 2003, through June 30, 2004, the additional amount will equal 38.81% of the base rate
    - Effective July 1, 2004, the additional amount will equal 43.44% of the base rate

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045395



# Other Hospital Supplemental Payments

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

89



**JAE 1415**

EUREKA_045396

# California Supplemental Hospital Payments For Private Hospitals Are Stable; Payments Are Minimal Compared To QAF Revenue

**Marwood believes that supplemental hospital funding for private hospitals will remain stable until federal DSH reductions; however, the payments are minimal compared to QAF funding**

- SB 1100 (2005) authorized the Medi-Cal Hospital/Uninsured Care 1115 waiver and established 3 funds for private hospitals in order to replace DSH, which was no longer available to private hospitals
  - SB 1100 established Private Hospital DSH Replacement Payments, Private Hospital Supplemental Fund, and the Distressed Hospital Fund to provide funds for hospitals that had been previously receiving traditional DSH funds
- The Company has received supplemental payments under the Private DSH Replacement Fund and Private Hospital Supplemental Fund, however the Distressed Hospital Fund has since been eliminated and the funding tends to be marginal compared to the QAF program
  - The Private DSH Replacement fund is the largest source of non-QAF supplemental payments for private hospitals in California and is likely stable until FY18 when the federal DSH cuts are scheduled to take effect
    - State funds for the program were $304M in FY14 and $275M in FY15, compared to billions in QAF funding; specific hospital allocations are not released by the state
      - The Private DSH Replacement payment methodology distributes funds under the same DSH formula in place in FY05, where hospitals qualify based on uncompensated care costs of providing services to Medicaid and low income individuals
      - Although not matched with federal DSH dollars, the Private DSH funding methodology is tied to the federal DSH allotment in that hospitals receive an amount in DSH replacement funds equivalent to what they would have received in DSH funds
    - All 4 of the Company's hospitals qualify for Private DSH Replacement funds
  - The Private Hospital Supplemental Fund statutorily receives $118.4 million in state funds, plus some additional funding from Intergovernmental Transfers (IGT) and interest accrued by the fund
    - Legislation reduced funding by $58.9 million between FY12 and FY14 as part of the QAF negotiations and reductions were required to be allocated equally between hospitals that receive payments; the Company contributed additional IGT funding in FY11
  - Distressed Hospital Fund payments were provided from excess funding remaining from the SPCP program and were eliminated in FY14 as part of the transition to APR-DRGs
    - Funding had declined significantly from $53 million in FY09 to no payments in FY12 and $1.5 million in FY13



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

**JAE 1416**

CONFIDENTIAL

EUREKA_045397

# The Company's Private Supplemental Hospital Funding Levels Have Fluctuated

**The Company's payments from the Private Hospital Supplemental Fund have been mostly stable over the last few years; the state will continue the available funding**

- All of the Company's hospitals received Private Hospital Supplemental Funding from FY06-FY13 and are expected to receive FY12 amounts for FY14
  - The fluctuations are likely due to legislative reductions to state funding for the program and only payments to those hospitals that receive payment in FY12 were continued effective July 1, 2013, despite the expiration of the SPCP
  - DHCS has not released official FY14 allocations, but has outlined the methodology for payments in an SPA approved in December 2013, which state that if hospitals received payments in FY12, hospitals receive the FY12 amount in FY14
  - In addition to state money contributed to the Private Hospital Supplemental Fund, additional funds are provided through IGT and interest accrued by the fund; 3 of the Company's hospitals provided IGT in FY11
    - In addition to state funds contributed to the Private Hospital Supplemental Fund, some hospitals contributed IGT money between FY08 and FY13 in order to draw down federal matching funds and increase payments made to hospitals
      - Western Medical Center – Anaheim contributed $48,815 in FY11, Western Medical Center – Santa Ana contributed $68,342, and Coastal Communities Hospital contributed $237,243

| Company's Private Hospital Supplemental Funding FY06-FY13 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Hospital | FY06 | FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | Projected FY14 |
| Western Medical Center - Anaheim | $471,000 | $121,000 | $450,000 | $514,436 | $3,520,294 | $900,000 | $1,400,00 | $855,000 | $1,400,00 |
| Western Medical Center – Santa Ana | $4,558,500 | $1,093,500 | $1,415,000 | $1,469,045 | $1,547,982 | $1,100,000 | $1,100,000 | $1,045,000 | $1,100,000 |
| Coastal Community Hospital | $523,500 | $423,500 | $450,000 | $533,963 | $528,105 | $900,000 | $900,000 | $845,000 | $900,000 |
| Chapman Medical Center | | -- | $75,000 | -- | $102,337 | -- | $75,000 | $70,000 | $75,000 |

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

91



# The Company Received Distressed Hospital Funding From FY07-FY11; The State Stopped Funding The Program In FY14

**Marwood believes that the Company received generally higher than average supplemental payments from California's Distressed Hospital Fund; the state discontinued the fund in FY14**

- According to DHCS documents, one of the Company's hospitals, Western Medical Center – Anaheim, received funding from the Distressed Hospital Fund between FY07 and FY09 that was higher than the all hospital average, and a lower payment in FY11; the state stopped funding the program in FY14
  - Distressed Hospital Fund payments were provided from excess funding remaining from the SPCP program and were eliminated in FY14 as part of the transition to APR-DRGs
- The Distressed Hospital Fund provided payments to a limited number of hospitals statewide with Medi-Cal contracts and which are under financial strain, regardless of ownership
  - The fund was created by SB1100 and recipients of funds are determined by the California Medical Assistance Commission (CMAC), which dissolved in 2012 prior to elimination of the SPCP program
    - It consisted of 2 funding streams: the first, $24 million a year in matching IGT/Federal funds that the state did not use in 2005, and the second, effective since FY07, which is based on a percentage of total stabilization funds and capped at $23.5 million a year

| Company's Distressed Hospital Funding FY07-FY13 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hospital | FY07 | FY08 | FY09 | FY10 | FY11 | FY12* | FY13* |
| Western Medical Center - Anaheim | $3,000,000 | $2,000,000 | $3,500,000 | – | $500,000 | – | – |
| All Hospitals – Average Payment (Of Those Receiving Payment) | $2,125,000 | $1,933,333 | $2,234,375 | $1,957,667 | $687,500 | $1,200,000 | $527,000 |
| All Hospitals – Median Payment (Of Those Receiving Payment) | $1,750,000 | $1,500,000 | $2,000,000 | $2,000,000 | $750,000 | $1,200,000 | $527,000 |

*Only 1 hospital received distressed hospital funding in FY12, and only 2 received funding in FY13*



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

92

**JAE 1418**

EUREKA_045399

# Managed Care & Dual Eligibles



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

93

# California's Medicaid Managed Care Expansion To Rural Areas Has Little Impact On The Company

**Marwood believes that California Medicaid managed care expansion to 28 additional, mostly rural counties, may place pressure on providers in those areas who are now required to negotiate reimbursement with plans; however, the Company's county was already under managed care**

- Implemented as part of 2011's Bridge To Reform 1115 Waiver, ABD beneficiaries who were not dual-eligible or receiving nursing facility services over 60 days and lived in managed care counties were mandatorily phased-into Medicaid managed care between June 1, 2011 and May 31, 2012
    - The waiver expanded mandatory managed care for the ABD population in 14 additional counties; previously, managed care was only mandatory for the ABD population in 11 counties
    - In California, Medicaid managed care can take form in 1 of the following 5 models, depending on the county: Two-Plan Model, Imperial/San Benito models, Regional Model, County Organized Health System (COHS), or Geographic Managed Care (GMC) – the Company's hospitals are in a county under the COHS model
        - In COHS counties, DHCS contracts with a health plan created by the County Board of Supervisors, which is then run by the county
- The FY13 budget expanded Medicaid managed care to the 28 remaining fee-for-service-only counties, which was estimated to cover an additional 386,000 individuals (effective September 1, 2013)
    - The 2013 managed care expansion applied to children, families, and the ABD population, but excluded dual eligibles
        - Individuals receiving long-term care services, including skilled nursing facility (SNF) residents, were included in approximately 1/3 of the expansion in counties that opted for a County Organized Health System model
    - The remaining FFS counties were located in mostly rural counties in the northern and eastern part of the state
    - Previously, 30 counties in California utilized Medicaid managed care plans to deliver Medi-Cal benefits to 5.6 million beneficiaries (80% of the 7 million total Medi-Cal population)
- The FY15 budget assumed an increase in the share of Medi-Cal beneficiaries enrolled in managed care, from 70% in FY14 to 73% in FY15 as a result of the 2013 expansion to rural counties and other policies such as the transfer of beneficiaries from the Healthy Families Program and the ACA Medicaid expansion

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

94

CONFIDENTIAL

EUREKA_045401

# Managed Care Enrollment Under The Model That Exists In The Company's' County Increased By 29% Between 2013 And 2014

| Growth In Medicaid Managed Care Enrollment By Model (2012-2014) | | | |
|---|---|---|---|
| Managed Care Model | May 2012 | May 2013 | May 2014 |
| Two Plan | 3,320,180 | 3,861,750 | 4,758,111 |
| Imperial/San Benito | NA | NA | 54,186 |
| Regional Model (Rural) | NA | NA | 179,309 |
| Geographic Managed Care | 502,111 | 601,369 | 747,795 |
| COHS | 1,044,575 | 1,156,790 | 1,638,448 |
| Total | 4,866,866 | 5,619,909 | 7,386,847 |

**Medi-Cal managed care penetration grew by 5 percentage points between 2013 and 2014 after the managed care expansion**

- Managed care penetration grew from 66% in FY13 (5.6 million of 8.5 million) to 70% in FY14 (7.4 million of 10.5 million)
  - Enrollment growth is likely the result of the state's early efforts to expand Medi-Cal enrollment and overall growth in Medi-Cal enrollment during this time
- Medi-Cal managed care enrollment has steadily increased in the Company's county since 2012
  - The COHS plan in Orange County is CalOptima
  - Enrollment increased 39% from 2012 to 2014 (from 453,500 to 746,800)



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

95

**JAE 1421**

EUREKA_045402

# Dual Demonstration Pilot Counties Cover All Hospital Services For Enrolled Beneficiaries; Opt-Out Rate Remains High

**In select counties, dual eligible's may receive hospital services through managed care; a higher than expected number of beneficiaries have opted out of the dual-demo (after which they are placed in the default Medicaid managed care plan/program for their county)**

- Under the California duals demonstration pilot (Cal MediConnect Program), all hospital services are covered by Medicaid managed care plans; the pilot was approved by CMS for three years until 2017
  - The dual demonstration plans operate in Alameda, Los Angeles, Orange, Riverside, San Bernardino, San Diego, San Mateo, and Santa Clara
    - On March 27, 2013, California signed a MOU with CMS to implement the dual eligible program, though the agreement scaled back the projected size of the program, which will serve approximately 450,000 (original size of the demonstration was around 1 million participants)
      - The demonstration was authorized by the state in 2012 under an initiative known as the Coordinated Care Initiative (CCI)
      - As a result of extensive stakeholder outreach and in coordination with the Department, the duals demonstration program will not move forward in Alameda County and passive enrollment in Orange County will now begin no earlier than July 2015
- The Medicaid agency estimated that the demonstration would generate a -10% reduction in spending on healthcare services in the first year, increasing to -10% once the program is fully implemented (3 years)
  - Stakeholders remain skeptical such savings will be able to be achieved given the high-opt out rate
    - The number of beneficiaries eligible for the program has been scaled back since the original Governor's 2012 proposal, which sought to enroll 800,000 beneficiaries
  - As of June 2015, total enrollment in the duals demonstration was 122,846, with Los Angeles county having nearly 45% of the enrollment; overall opt out rate is around 44% (compared to initial projections of approximately 33%)
    - California will assign an enrollee to a plan based on a "hierarchical logic based on the beneficiary's highest utilized and paid prescribing and/or rendering provider data based on the most recent and available twelve months of claims data"
      - The demo uses a passive enrollment process that enrolls duals in a plan, unless the individual chooses to opt-out
      - Orange county currently does not have any actively enrolled dual-eligible beneficiaries as passive enrollment does not start until August 1, 2015; enrollment is expected to be 2,547 for the month of August (2% of total enrolled)
    - As of January 2015, 159,907 eligible individuals have opt-out of the program, with over 100,000 coming from Los Angeles



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

96

**JAE 1422**

CONFIDENTIAL

EUREKA_045403

# CA Is Phasing-In Automatic Enrollment Into The Dual Demonstration Over 12 Months; Orange County Began July 2015

**California has awarded contracts to the plans that will operate the dual eligible program with auto-enrollment occurring over a 12 month period; opt-in enrollment in Orange County (the Company's county) begins this month, July 2015**

- Medi-Cal will use a passive enrollment process that enrolls duals in a plan, unless an affirmative choice is made to opt-out; duals that opt-out will still be mandatorily enrolled in a Medi-Cal plan, but may choose to remain in Medicare FFS
  - Passive enrollment started phasing in across the 8 counties beginning with San Mateo County in April 2014, and will finish with Orange County this month (July 2015)
    - Enrollment in Orange County will proceed by birth month
  - Enrollees will be placed in a plan that their primary care physician is connected to; if there is no such relationship, then they will be randomly assigned, unless they opt-out or select a plan
    - While the majority of eligible individuals will be included in the demonstration in the participating counties, some specific populations are excluded from passive enrollment or the demonstration entirely
  - Orange County is the last county to start enrollment, which will begin July 1, 2015
- The number of plans in a county were based on the state's various Medicaid managed care structures: the County Organized Health System, Two-Plan, and Geographic Managed Care
  - Members in Orange County will be managed by CalOptima
- A beneficiary can opt-out of the Medicare portion of the dual eligible program effective the first day of the next month, although one cannot opt out of the Medicaid portion; there is no "lock-in period"
  - Despite California's original proposal to have a 6-month lock-in period, the final MOU with CMS has no mention of a lock-in period and will allow beneficiaries to opt in and out at any time



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

97

**JAE 1423**

# Medicaid Managed Care Plans

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



98

# Marwood Conducted A Managed Medicaid Outlook For California Hospitals

**Marwood surveyed 12 Medicaid managed care contracting directors in California to assess hospital Medicaid contracting trends over the next 3 years**

- The 12 participants work in 8 managed care organizations in California, representing more than 90% of the Medicaid managed care enrollees in CA
- Each participant has been involved in contract negotiations with hospitals in California, primarily in the southern CA market, for at least 5 years



Respondents By Title

Director, Provider Relations, 33%

Facility Contracting Director, 50%

VP of Network Contracting, 17%



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

99

**JAE 1425**

CONFIDENTIAL

EUREKA_045406

# 92% Project Increasing Medicaid MCO Enrollment

**11 of the 12 expect California's Medicaid expansion to lead to increased membership for their managed care plan through 2017**

- Increases are largely the result of the state's aggressive plan to expand Medicaid, respondents confirmed
  - "If the state can just figure out how to clear the applicant backlog, this will be a boon for us"
  - "Just added 55,000 as part of a new contract"
  - "Expect an early windfall – likely 40,000 this year – then a leveling over time"
- One smaller plan says enrollment is likely going to increase in the short term due to expansion, but this will change
  - "We are likely to merge in with a different plan or focus on other lines of business"



How do you see your plan's Medicaid membership trending over the next 3 years?

Decrease, 8%

Some increase, 33%

Significant increase, 58%

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

100



# About 80% Of Hospital Services In Network – Modest Change Likely



**Medicaid managed care member services flowing through in network hospitals will remain high as plans ensure access to services and take steps to steer members in network**
- "Partly because most of our members are in LA county area where there's a high Medicaid population"
- "Usually we have a high network level, particularly in metro areas – part of what's required of us to make sure patients can get treatment"
- "Large Hispanic and refugee populations in our markets where hospital services are often their primary care setting"

**With expansion, there will be a slight shift toward more OON elective/surgical services due to two plans narrowing their networks and the general effect of new utilization**
- "In southern CA we might be more selective and reduce the network a bit to only the highest quality hospitals for surgery"
- "Smaller hospitals with poor readmission rates, poor surgical outcomes may not be in the network in 2-3 years"
- "Acquiring members in some areas of southern and northern CA where we don't have all the hospitals in network"
- "Some hospitals may go out of network if they can't accept rates or for other reasons – that's a possibility"



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1427**

EUREKA_045408

# Small Reimbursement Rate Increases Projected Overall; Two Expect Cuts



**Avg. Annual Rate Increases – Elective**

Decrease, 17%
Increase 4-6%, 8%
Flat, 8%
Increase 1-3%, 67%

**In Network^**

**Avg. Annual Rate Increases – Emergency**

Increase 4-6%, 17%
Flat, 8%
Increase 1-3%, 75%

^In network rates 90-110% of Medicaid FS

**In network rates for emergency services are stable to positive, while there's somewhat more attention on rates for elective services/surgery due to utilization increases and as plans move toward preferred and non preferred hospitals (preferred getting a greater percentage of total reimbursement)**

◦ Two plans will reduce in network rates (4% annually on average) to be more in line with the consumer price index and funding; others will try to keep rates relatively flat or at very small increases to address demand/new utilization costs

  • "Need to lower rates due to expansion, utilization increases"
  • "Going more to a preferred, narrower network long term for Medicaid – not in short term – this will keep rates similar"
  • "Members concentrated in the southern LA county so we can tighten the network for savings, trade volume for similar rates as today"

◦ Increases will be likely (especially for emergencies) but small, due to membership increases/overall costs

  • "Hospitals exist to do surgeries and inpatient care so increases are just more common because of that"
  • "Depends on hospital's specialties – anesthesiology, neonatology – they get what they want"
  • "Improving economy and demand, but have to balance rate increases with cost of new membership, utilizers"
  • "There's no shortage of services, hospitals overall so we can be reasonable in keeping increases in relative check"

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



102

**JAE 1428**

CONFIDENTIAL

EUREKA_045409

# 10 of 12 Will Steer Patients/Providers To In Network Hospitals

**With expanding membership and the need to control costs, 83% of the respondents expect to tactically steer patients and providers to use hospitals in the network, including those deemed to be centers of excellence or preferred hospitals**

- 10 of the 12 will create or have already created local and regional hospital centers of excellence; in 3 years, the Medicaid plans will adopt more specificity in terms of who qualifies for this distinction
  - "Today it's really if you're a cancer center or a major hospital with multiple service lines – in a few years, you could be a center of excellence just for pediatrics or just for spine, etc"
  - "Hospitals with an above average patient experience score and good management of say asthma or COPD will be in this group – size and scale aren't everything"
  - "The in network dollars will begin to shift in Medicaid to these network providers who aren't just in, but are clearly high performing"
- Because of the projected utilization increases due to new membership, plans say they must do "everything they can" to ensure services are at lower cost hospitals
  - "Heavy provider education and member education"



Will your hospital steer patients/providers to use in network hospitals?

Not Going To Steer, 17%

Steering To In Network Hospitals, 25%

Will Steer, 58%


© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

103



# Plans Adopting New Utilization Management Tactics

| Characteristics That Will Likely Lead To Reimbursement Increases During Renegotiations | | |
|---|---|---|
| Rank | Characteristic of Hospital | % - Today |
| 1 | Pre Surgery Prior Authorization – Require more evidence of need | 100% |
| 2 | Pre Service Home Assessment – Require a home visit to address situation | 58% |
| 3 | Hiring more "medical advisors/directors" to evaluate coverage requests | 58% |
| 4 | Hiring more case managers – by disease | 42% |
| 5 | Health risk assessments on new members | 25% |
| 6 | Hiring more case managers – to oversee network/site of care decisions | 16% |
| 7 | Creating transitional care teams within plan, by hospital | 16% |

**All 12 respondents say their Medicaid plans will more aggressively manage hospital services simply due to rising membership; interestingly, Medicaid plans have already begun to adjust their utilization management strategy for 2015**

- All 12 will be more vigilant with medical necessity reviews before inpatient services are approved
- 9 of 12 will focus on the potential benefits of home/environment evaluations to figure out "causes" of admission or to direct the care team on the best setting of care post discharge
  - One plan is looking to form a multi-payer asthma management program collaboration (similar to one started in Texas) to help educate parents about asthma and "require" a pre admission visit
  - "Just approved a hospital stay but realized after the fact that the patient's home situation was the real reason for their asthma"
- Additional medical directors and case managers will be hired or used to help manage specific patient disease, evaluating medical necessity, site of care decisions (i.e. hospital, ASC or general outpatient interventions)
- Two plans will create a new transitional care team and assign them to hospitals to help with "high risk patients"
- Three plans are likely to use a third party to go and do Health Risk Assessments



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

104

**JAE 1430**

# Out-Of-Network Billing

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

**JAE 1431**

EUREKA_045412

# There Are No Expected Changes To Commercial Coverage Of Out-Of-Network Emergency Hospital Services

**Marwood believes that the legislative and regulatory environment for commercial insurance coverage and reimbursement of out-of-network emergency hospital services is stable**

- California requires health insurers to cover out-of-network emergency hospital services under Cal. Health & Safety Code § 1371.4(b) and also prohibits emergency services providers from balance billing patients
  - The law requires health insurers to cover emergency services until a patient is stabilized and can be moved to an in-network facility
    - California state law also prohibit health care providers from denying patients emergency services
  - Stakeholders believe that there is unlikely to be any legislative or regulatory initiatives to address the issue of emergency hospital coverage or balance billing, as the balance billing ruling in 2009 was viewed as successfully addressing the issue
    - In January 2009, California Supreme Court ruled in *Prospect Medical Group, Inc v. Northbridge Emergency Medical Group, et al*, that emergency physicians, and by implication other non-contracting emergency services providers, cannot balance bill HMO beneficiaries
- In 2012, legislation (SB 359) was vetoed by Gov. Brown that would have limited out-of-network managed care reimbursement to hospitals with more than a 50% out-of-network emergency utilization rate
  - The bill would have adjusted out-of-network reimbursement to 60% of a payer's average in-network payments, but not less than 150% of the payment a hospital could reasonably expect from Medicare for similar emergency services
  - According to stakeholders, the bill was spearheaded by SEIU as a reaction to Prime Healthcare's decision to cancel all union and managed care contracts after investing in several hospitals in California
  - In his veto message, Gov. Brown expressed support for the goals of the legislation, but was not convinced that the rate setting formula in the bill was the right path
- Stakeholders believe there are no members of the legislature or outside organizations seeking to introduce or push for similar legislation in the near future
  - Although charges for OON emergency room use continue to irritate some plans, there is no discussion to revisit the issue



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

EUREKA_045413

# California Seismic Retrofit

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

CONFIDENTIAL

**JAE 1433**



EUREKA_045414

# Seismic Compliance Extensions Have Been Granted With Hospital Cooperation; No Company Hospitals Are Rated SPC-1

**Marwood believes that extensions for California's seismic compliance program are typically granted if hospitals meet request requirements that are outlined in statute; none of the Company's hospitals have SPC extensions under review**

- California's seismic compliance program dates back to SB 1953, which became law in September 1994
  - The law requires that hospitals with a Structure Performance Category (SPC) rating of 1 to conform to SPC-2 requirements by either retrofitting or replacing existing SPC-1 buildings or moving hospital care to compliant buildings; none of the Company's hospitals currently have a SPC-1 rating
    - Typically, hospitals built prior to 1973 have SPC-1 ratings, as California instituted seismic building requirements under the Alfred E. Alquist Hospital Seismic Safety Act that year in response to the Sylmar Earthquake in 1971
  - The deadline for compliance has repeatedly been extended by the Legislature, with the most recent extension granted in AB2557 in 2014, which only affected 7 hospitals in the Sacramento, San Mateo, and Santa Barbara counties and the City of San Jose, which did not include the Company's hospitals
    - Previously, SB 90 of 2011 allowed hospitals to apply for an extension of up to 7 years (2020) from the previous 2013 deadline
      - Hospitals seeking SB 90 extensions were required to submit a letter of intent by March 31, 2012 and application by September 1, 2012
    - OSPHD reviewed SB 90 applications and hospitals were required to submit construction documents by January 1, 2015 for review
- According to stakeholders, OSHPD typically seeks to work with hospitals that are committed to upgrading their buildings and is not interested in closing buildings or facilities
  - As long as hospitals fulfill the extension request requirements that are outlined in the law, extensions are typically granted
  - SB 90 requires OSHPD to consider 3 factors in determination of eligibility for an extension: structural integrity, community access to essential hospital services and financial hardship of the facility
- The Company's buildings have a variety of SPC ratings from SPC-2 to SPC-5s, however none of its building are currently rated SPC-1, which is the highest risk category that the OSHPD has for hospital buildings
  - Generally, all buildings must be into compliance with structural requirements and adhere to building permits issued by the OSHPD

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited

108

CONFIDENTIAL

EUREKA_045415

# 5 | Appendix

© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



CONFIDENTIAL

EUREKA_045416

# The Company's FFS Component Of QAF Payments – IP UPL Model – Compared To All Hospitals And Avanti

| | | CY 2010 Medi-Cal IP Payments | Share of Cost Adjustment | 2010 Adjusted Medi-Cal IP Payments | 13-14 Projected Medi-Cal IP Payments Minus Duals, SPD, Rural/MC Expansion Adjustments And Supplemental Payments | ACA Expansion And Presumptive Eligibility Adjustments | 13-14 Projected Medi-Cal IP Payments with ACA Adjustments |
|---|---|---|---|---|---|---|---|
| FY13-14 | Western MC- Anaheim | $ 12,440,268 | $ 91,041 | $ 12,531,309 | $ 20,583,357 | $8,511,754 | $27,075,110 |
| | Western MC – Santa Ana | $ 12,603,083 | $ 67,470 | $ 12,670,553 | $ 17,009,587 | $6,075,878 | $23,085,465 |
| | Coastal Communities | $ 6,385,776 | $ 51,020 | $ 6,436,796 | $ 12,830,923 | $6,813,108 | $19,520,535 |
| | Chapman Medical Center | $ 193,466 | $ 5,707 | $ 199,173 | $ 304,966 | $473,767 | $495,988 |
| FY14-15 | Western MC- Anaheim | $ 12,440,268 | $ 91,041 | $ 12,531,309 | $ 20,924,864 | $ 25,143,512 | $ 25,618,644 |
| | Western MC – Santa Ana | $ 12,603,083 | $ 67,470 | $ 12,670,553 | $ 17,312,180 | $ 21,248,352 | $ 21,634,483 |
| | Coastal Communities | $ 6,385,776 | $ 51,020 | $ 6,436,796 | $ 13,053,980 | $ 15,220,876 | $ 15,466,525 |
| | Chapman Medical Center | $ 193,466 | $ 5,707 | $ 199,175 | $ 311,232 | $ 373,107 | $ 379,962 |
| FY15-16 | Western MC - Anaheim | $12,440,267 | $ 91,041 | $ 12,531,309 | $ 21,395,844 | $ 27,057,276 | $ 27,722,179 |
| | Western MC- Santa Ana | $12,603,083 | $ 67,470 | $ 12,670,553 | $ 17,710,108 | $ 22,993,338 | $ 23,613,722 |
| | Coastal Communities | $ 6,385,776 | $ 51,020 | $ 6,436,796 | $ 13,338,292 | $ 18,246,735 | $ 16,598,270 |
| | Chapman Medical Center | $ 193,466 | $ 5,707 | $ 199,173 | $ 318,577 | $ 401,626 | $ 411,379 |
| FY16-17 | Western MC- Anaheim | $ 12,440,268 | $ 91,041 | $ 12,531,309 | $ 21,800,631 | $ 29,719,780 | $ 29,595,183 |
| | Western MC – Santa Ana | $ 12,603,083 | $ 67,470 | $ 12,670,553 | $ 17,971,674 | $ 24,614,564 | $ 23,444,452 |
| | Coastal Communities | $ 6,385,776 | $ 51,020 | $ 6,436,796 | $ 13,370,024 | $ 17,025,866 | $ 17,483,725 |
| | Chapman Medical Center | $ 193,466 | $ 5,707 | $ 199,175 | $ 329,752 | $ 425,171 | $ 438,217 |
| Average All Hospitals | FY12-14 | $ 12,068,729 | $ 237,931 | $ 12,306,660 | $ 12,123,729 | $ 4,366,092 | $ 16,489,822 |
| | FY14-15 | $ 12,068,729 | $ 237,931 | $ 12,306,660 | $ 11,826,314 | $ 1,495,597 | $ 13,308,739 |
| | FY15-16 | $ 11,847,036 | $ 233,089 | $ 12,080,126 | $ 11,791,826 | $ 1,884,042 | $ 13,586,275 |
| | FY16-17 | $ 11,847,036 | $ 233,089 | $ 12,080,126 | $ 11,966,429 | $ 2,387,188 | $ 14,244,195 |
| Average Avanti Hospitals | FY13-14 | $ 16,917,149 | $ 424,308 | $ 17,341,457 | $ 23,753,169 | $ 6,137,746 | $ 29,890,915 |
| | FY14-15 | $ 16,917,149 | $ 424,308 | $ 17,341,457 | $ 23,144,096 | $ 2,059,435 | $ 25,203,531 |
| | FY15-16 | $ 16,917,149 | $ 424,308 | $ 17,341,457 | $ 22,811,202 | $ 2,569,619 | $ 25,180,821 |
| | FY16-17 | $ 16,917,149 | $ 424,308 | $ 17,341,457 | $ 22,827,868 | $ 3,296,033 | $ 25,863,901 |



© Marwood Group Advisory, LLC
Unauthorized reproduction or distribution prohibited



110

CONFIDENTIAL

EUREKA_045417

# EXHIBIT 24

Page 1

1

2                      UNITED STATES DISTRICT COURT

                       CENTRAL DISTRICT OF CALIFORNIA

3                           EASTERN DIVISION

4       ----------------------------------------------------x

5       DANIELLE GAMINO, individually and on behalf of all

        others similarly situated

6

7                                          Plaintiff,

8            v.

9

        KPC HEALTHCARE HOLDINGS, INC., KPC HEALTHCARE, INC.

10      EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE, ALERUS

        FINANCIAL, N.A., KALI PRADIP CHAUDHURI, KALI PRIYO

11      CHAUDHURI, AMELIA HIPPERT, WILLIAM E. THOMAS, LORI

        VAN ARSDALE, and SPCP GROUP, LLC

12

13                                         Defendant

14      and

15      KPC HEALTHCARE, INC., EMPLOYEE STOCK OWNERSHIP PLAN,

16                              Nominal Defendant.

17      7 Times Square

18      May 25, 2022

19      9:30 a.m.

20

21          TESTIMONY OF THOMAS BANKS, appearing at the

22      above-mentioned date, time and place before ANNMARIE

23      OAKLEY, a Notary Public of the State of New York.

24

25

Page 10

1                          T. BANKS

2       deposition will you understand that I'm referring

3       broadly to SPCP Group LLC as well as its affiliates

4       including your employer?

5           A    Sure.

6           Q    And if I mean a specific entity I will

7       refer specifically to the name of that entity is

8       that clear?

9           A    Yes.

10          Q    What is your job title at Silver Point

11      Capital?

12          A    Managing director.

13          Q    What are your job responsibilities as

14      managing director at Silver Point Capital?

15          A    I lead a team of investment analysts that

16      make investments in securities and loans.

17          Q    How many analyst are on your team?

18          A    At present one.

19          Q    How long have you been a managing director

20      at Silver Point Capital?

21          A    Roughly one year.

22          Q    And what was your job title before you

23      were a managing director?

24          A    Senior analyst.

25          Q    And for what period of time did you have

Page 14

1                               T. BANKS

2       depending or their tax status, and what SPCP Group

3       does is rather than when we face third parties or

4       make loans rather than having each fund sign

5       directly SPCP Group signs on behalf of both funds

6       and then allocates based on what the determined

7       allocation is.

8               Q     Are you familiar with an entity SPCP Group

9       IV LLC?

10              A     I have heard the name.

11              Q     Do you have an understanding of what the

12      function of SPCP Group IV LLC is with respect to

13      flagship funds at Silver Point?

14              A     I do not.

15              Q     Are you familiar with the entity known as

16      Silver Point Capital LP?

17              A     Yes.

18              Q     What is the role of Silver Point Capital

19      LP in the structure that you just described?

20              A     It's the management company.

21              Q     So I understand that Silver Point Capital

22      makes investments on behalf of clients; is that

23      correct?

24                      MR. ALAMUDDIN:  Object to form.

25              A     Yes.

Page 19

1                              T. BANKS

2    of that transaction?

3          A     As part of the purchase, no.

4          Q     When did Silver Point acquire warrants in

5    Integrated Healthcare Holdings Incorporated?

6          A     Soon after purchasing the loan we amended

7    the terms of the loan and as part of that amendment

8    we were provided warrants.

9          Q     Was that when the terms of the loan were

10   amended and restated in 2013?

11         A     I don't believe so, no.

12         Q     Do you recall -- strike that.  When did

13   Silver Point acquire those warrants?

14         A     The loan was amended almost immediately

15   after acquiring it.

16               MR. DOWNES:  Marking Exhibit 179.

17               (SPCP_0000011358 was

18               introduced as Exhibit 179.)

19         Q     Mr. Banks, do you see there's an email

20   chain here?

21         A     Yes.

22         Q     And the initial email in the chain is one

23   from you to Mr. Thomas dated May 16, 2013.

24         A     Yes.

25         Q     And then up at the top you're forwarding

Page 27

1                          T. BANKS

2          Q    Do you see in the sixth paragraph that

3     Mr. Thomas writes, "We would support the cashless

4     exercise of warrants by both Silver Point Capital

5     and Dr. Chaudhuri and look forward to running the

6     company with just the two shareholders."

7          A    Yes.

8          Q    Do you recall any discussion about a

9     cashless exercise of warrants by Silver point in

10    connection with Dr. Chaudhuri's acquisition of

11    OCPIN's interest in IHHI?

12         A    I do not.

13         Q    Did Silver Point ultimately exercise its

14    warrants in connection with Dr. Chaudhuri's purchase

15    of OCPIN's interest in IHHI?

16         A    We did not.

17         Q    Why did Silver Point decide not to

18    exercise its warrants in connection with that

19    transaction?

20         A    I don't recall.

21         Q    Do you see in the middle of the page,

22    "it's our preference to keep the Silver Point credit

23    facility in place."?

24         A    Yes.

25         Q    That credit facility was, in fact,

Page 28

```
1                         T. BANKS

2       refinanced in early 2014; correct?

3            A     Yeah.
```

4                    MR. ALAMUDDIN:  Objection to form.

5            Q     Do you recall why the decision was made to

6       refinance the Silver Point credit facility instead

7       of keeping it in place?

8            A     In preparation for this deposition I have

9       seen email correspondence that would indicate they

10      refinanced us in order to achieve the OCPIN buyout.

11                   MR. DOWNES:  I ask the court reporter to

12               please mark this document as 181.  It bears

13               Bates number SPCP13342.

14                   (SPCP0000013342 was introduced

15                   as Exhibit 181.)

16           Q     Mr. Banks do you recognize this document?

17                   MR. ALAMUDDIN:  Give the witness a moment

18               to review it.

19           A     Yes.  I saw this document in preparation

20      for the deposition.

21           Q     Is this email correspondence -- well, this

22      is an email chain; correct?

23           A     Yes.

24           Q     And at the bottom of the chain is an email

25      from Ken Westbrook to you dated October 7, 2013.

Page 29

1                          T. BANKS

2          A    Yes, that's what it appears.

3          Q    And then subsequent emails between you and

4     Bill Thomas; correct?

5          A    That is correct.

6          Q    Who is Mr. Ken Westbrook?

7          A    He was the president and chief executive

8     officer.

9          Q    Of IHHI?

10         A    Correct.

11         Q    And in this email Mr. Westbrook is

12    describing how the last QAF funds were expended, do

13    you see that?

14         A    Yes.

15         Q    What are QAF funds?

16         A    They are supplemental payments made by the

17    Centers for Medicare and Medicaid.

18         Q    Are they a source of revenue for IHHI?

19         A    They are.

20         Q    This notes a 40% tax reserve, is it your

21    understanding that IHHI was applying 40% tax

22    reservations to its receipts of QAF funds?

23              MR. ALAMUDDIN:  Objection.  Foundation.

24         A    I don't recall, other than what's in this

25    email.

Page 33

T. BANKS

1

2      A      I don't recall.

3      Q      In the last sentence you write you need to

4      be able to explain to your committee what happened

5      and you don't feel as though you can.  Do you see

6      that?

7      A      Yes.

8      Q      Is that committee again your credit

9      committee?

10     A      Yes.

11     Q      Why did you need to be able to explain the

12     cash burn at IHHI to the credit committee?

13     A      We actively -- well, the trends seemed to

14     be worsening at the company and one of my job

15     responsibilities is to keep the committee informed

16     of the performance of our investments.

17     Q      And at least at this point in time you

18     didn't have an understanding of why the cash burn

19     had accelerated so dramatically; is that correct?

20     A      That is correct.

21     Q      Did you eventually develop an

22     understanding of why the cash burn at IHHI had

23     accelerated over the course or 2013?

24     A      I don't recall.

25     Q      Sitting here today do you have any

Page 54

1                          T. BANKS

2          Q     What is this document?

3          A     It's a fair value memo.

4          Q     What is a fair value memo?

5          A     It's a memo that we produce at year end

6     for auditors.

7          Q     What -- strike that.  Is one of those

8     memos prepared for each of the credits that you're

9     responsible for?

10         A     No.

11         Q     Is one of them prepared for each of the

12    investments that you are responsible for?

13         A     No.

14         Q     So which credits get a fair value

15    memorandum?

16         A     Those where there is not an observable

17    public price.

18         Q     Are fair value memoranda prepared in the

19    ordinary course of Silver Point's business?

20         A     Yes.

21         Q     And making such record is a regular

22    practice of Silver Point?

23         A     Yes.

24         Q     And this is dated 12/31/13; correct?

25         A     Correct.

Page 55

1                              T. BANKS
2          Q     Are the fair value memoranda prepared at
3    or near the time of the dates recorded on them?
4          A     They're prepared in advance of the dates.
5          Q     So as you're preparing these over the
6    course of the final quarter of the year and then
7    they're dated as of the year end?
8          A     That is correct.
9          Q     You testified that this document is
10   provided to auditors; correct?
11         A     That is correct.
12         Q     What's the purpose of providing a fair
13   value memoranda to auditors?
14         A     So they can complete our audit and issue
15   an audit opinion.
16         Q     And what does fair value mean?
17         A     The market value or the estimated market
18   value.
19         Q     What kind of information are you
20   responsible for recording in a fair value
21   memorandum?
22         A     In general it's some descriptions of the
23   company, its capital structure and, you know,
24   financial performance and some justification of the
25   valuation of Silver Point's position.

Page 56

1                     T. BANKS

2          Q     So as of the year-end 2013 the nature of

3     Silver Point's investment is a term loan to IHHI and

4     warrants; correct?

5          A     Repeat the date.

6          Q     So as of the end of 2013 the nature of

7     Silver Point's investment in IHHI is there is a

8     $47.3 million term loan and there are warrants;

9     correct?

10         A     Unexercised warrants, yes.

11         Q     Can you explain the difference between

12    exercised and unexercised warrants.

13         A     A warrant is akin to an option in that it

14    allows or provides the holder the right to buy a

15    share of newly issued stock, so we had that right

16    but we had not exercised that right.

17         Q     And do you have an understanding of what

18    the term European-style warrant means?

19         A     I do, yes.

20         Q     What is a European-style warrant?

21         A     My understanding is that a European-style

22    warrant is a warrant that can only exercised at its

23    expiry.

24         Q     And were these European-style warrants?

25         A     These were American-style warrants.

Page 61

T. BANKS

1
2      A     You know, there's no set criteria or set
3   method.  You know, quite frankly it's whatever the
4   analyst deems appropriate for the given investment
5   and that, you know, ultimately those fair value
6   numbers are reviewed by senior management and our
7   internal accounting staff and if they find they
8   agree with the methodology and the approach then
9   it's accepted.
10     Q     So there are different methods that are
11  used in different context depending on a particular
12  credits structure or character?
13     A     That is correct, yes.
14     Q     What were the methods used in this
15  memorandum?
16     A     Looking at page seven I believe a multiple
17  base approach was used as well as a liquidation
18  analysis.
19     Q     So can you explain to me in broad terms
20  what an EBITDA multiple approach is to valuation.
21     A     In broad terms it supplies, I guess, a
22  purchase price multiple and, you know, multiplies it
23  against the companies EBITDA to determine an
24  enterprise value and then from there deducts net
25  debt to determine an equity value.

Page 62

T. BANKS

1

2     Q    And how do you determine an appropriate

3     EBITDA multiple for purposes of that methodology?

4     A    I think there are a couple of different

5     ways but the primary one would be looking at

6     comparable companies.

7     Q    Is that what you did here?

8     A    Yes we.  Do have a set of comps. on page

9     eight.

10    Q    And can you explain the borrowing base

11    approach or liquidation approach, I think you

12    characterized a moment ago.

13    A    Yeah.  If you see in the header it says

14    borrowing base analysis and in parenthesis says

15    "assumes a liquidation" so this would assume that

16    the hospitals are shut down, that they're not sold

17    as a going concern and that the assets are sold for

18    their asset value.

19    Q    And so is there a conclusion of value that

20    you arrive at here where you would weight these

21    different methodologies or do you just present the

22    result of the application of these different

23    methodologies to the auditors?

24         MR. ALAMUDDIN:  Object to form.

25    A    In this case we presented these results to

Page 64

T. BANKS

1

2    Q    How did you take into account the

3    probability that the QAF funds might not be

4    received?  These QAF funds are like ATM machines,

5    right?  How did you take into account the risk that

6    QAFs would not be received in developing your

7    valuation?

8        A    In this memo specifically?

9        Q    Yes, this memo specifically.

10       A    It appears that in this memo we were only

11   focused on the current period of QAF, which I

12   believe had been approved.  We did not take into

13   account the next round of QAF.

14       Q    So you were not including projected QAF

15   receipts in coming to your conclusion of value here?

16       A    Correct.

17       Q    Was that because of the uncertainty

18   regarding whether or not those funds would be

19   received?

20       A    If you look at this memo we were primarily

21   a lender, so $47 million of exposure was in the form

22   of a loan and a very small portion of our exposure

23   was in the form of these unexercised warrants, $5.6

24   million, so we were primarily looking at it through

25   the eyes of a lender and as a lender we have no

Page 65

```
 1                        T. BANKS
 2      upside and no sharing in the QAF, in the future QAF,
 3      so we were adopting the most conservative method
 4      possible.
```

 5      Q    So as of the end of 2013, based on some of

 6      the materials that we reviewed previously,

 7      Chaudhuri's efforts to effect the 100% buy out of

 8      IHHI were in progress at this time, right?

 9      A    Can I have a second to review the

10      documents?

11      Q    Please, feel free.  If you're relying on

12      something for your testimony just let me know the

13      exhibit number so we can look at it together.

14      A    So the Exhibit 180, which is dated May

15      30th, indicates that Dr. Chaudhuri is certainly

16      contemplating the buyout of OCPIN.  I don't know

17      from this whether he's actually engaged in

18      discussions with them or not.

19      Q    Did you discuss the potential buyout of

20      OCPIN in your fair value memorandum?

21      A    I don't believe so, no.

22      Q    Is such a transaction relevant to your

23      fair value analysis?

24      A    Well from a creditor's standpoint it's not

25      because it would just be a transaction among the

1                         T. BANKS

2       information about its expected QAF receivables at

3       some point in advance of when it actually received

4       that cash; is that correct?

5                    MR. ALAMUDDIN:  Object to form.

6            Foundation.

7            A    Yes.

8            Q    How did you deal with that in terms of

9       putting together a balance sheet and cash flow

10      information for review by some other party?  When do

11      you actually apply those QAFs to cash flow and

12      balance sheets?

13           A    We relied on GAAP and the financial

14      statements prepared by the company.

15           Q    On page seven the conclusion you reach

16      with respect to the multiple approach is you value

17      the IHHI equity at $89 million, do you see that?

18           A    I do, yes.

19           Q    And that results in a price per share of

20      13 cents, do you see that?

21           A    Yes.

22           Q    Does that accurately reflect your judgment

23      as of year-end 2013 of the equity value of IHHI?

24           A    No.

25           Q    Can you explain why?

Page 69

```
 1                         T. BANKS
 2        A    It reflects our value of the warrant.  We
 3   were not in this exercise valuing IHHI's equity.  We
 4   were valuing what is the warrant held by Silver
 5   Point worth.
 6        Q    Got it.  So if I look down at this table
 7   the 88.9, that's the equity value of the warrant
 8   held by Silver Point; correct?
 9        A    No.
10        Q    All right.  Then can you walk me through
11   how this chart fits together and what is the IHHI
12   equity that's being valued at $89 million?
13        A    If you see the boxed row titled value per
14   warrant we were valuing our warrants at six cents
15   per warrant and the implication from this would
16   imply a total value of $89 million at the midpoint
17   for the equity of IHHI.
18        Q    Let me make sure I understand your
19   testimony.  Is the distinction you're drawing that
20   the only conclusion of value that you're coming to
21   in presenting to the auditor is really this boxed
22   component here, the value of the warrant?
23        A    Yes.  That's all we were asked to value.
24        Q    And there are other figures that you
25   determine along the way or that are implied by that
```

Page 74

1                    T. BANKS

2          Q     A few lines down Mr. Chaudhuri writes

3     that, "IHHI has filed a go dark on its SEC filings."

4     Do you have an understanding of what it means to "go

5     dark" on a company's SEC filings?

6          A     Yes.

7          Q     What does it mean?

8          A     It means to stop making SEC filings.

9          Q     And he goes on to write that, "This will

10    of course not effect the quality of information that

11    IHHI will keep providing to Silver Point."  What

12    kind of information did IHHI provide to Silver

13    Point?

14               MR. ALAMUDDIN:  At what time in question?

15          Q     Let's do both.  First when Silver Point

16    was not just a warrant holder but a lender what was

17    the character of the information that IHHI provided

18    to Silver Point?

19          A     We would, to the best of my recollection,

20    we received monthly financials, we of course

21    received their quarterly 10Ks and 10Qs and they

22    would send us their board packets as well.

23          Q     Did you have board observer rights?

24          A     We did.

25          Q     Did you attend board meetings?

Page 75

1                        T. BANKS

2        A    On occasion.

3        Q    After IHHI went dark on its SEC filings

4   and Mid Cap refinanced the Silver Point loan did

5   IHHI continue to provide Silver Point with the

6   financial materials that you just described?

7        A    To the best of my recollection, no, they

8   did not.

9        Q    After they went dark on their SEC filings

10  what kind of information did IHHI provide to Silver

11  Point?

12       A    If we called and asked they would send us

13  their latest financial statements.

14       Q    And was it Silver Point's practice to

15  regularly call and ask for those financial

16  statements?

17       A    It was not.

18       Q    Did you need those to prepare the annual

19  fair value memorandum?

20       A    Correct.

21       Q    Would you request those financial

22  statements when the time came around to prepare your

23  fair value memoranda for the year?

24       A    I wouldn't say that would be the only time

25  but that clearly prompted us to ask for them, yes.

Page 76

```
 1                         T. BANKS
 2          Q    Did Silver Point board observer rights
 3     expire when the loan was refinanced?
 4          A    To my knowledge, yes.
 5          Q    Did you attend any board meetings of IHHI
 6     after Mid Cap refinance?
 7          A    No.
 8          Q    What was Silver Point's response to the
 9     news that Mid Cap was going to pay down the Silver
10     Point loan?
11          A    My recollection is that we engaged in a
12     review to see if we wanted to compete.
13          Q    And what did Silver Point decide to do?
14          A    I believe we did not compete.
15          Q    Now, if I recall your prior testimony --
16     strike that.  We were discussing the reservation of
17     rights letter that Silver Point sent.  I believe
18     your testimony was that it seemed -- well, correct
19     my recollection if I'm mistaken, I understand your
20     testimony to be that you understand that Silver
21     Point was comfortable with the response in the
22     action that was taken because Silver Point remained
23     a creditor of Integrated Health after that, was that
24     a fair characterization of your testimony or am I
25     missing something?
```

```
                                               Page 87

 1                        T. BANKS

 2     company; correct?

 3          A    Right.

 4          Q    And SPCP decided not to go forward with a

 5     transaction structured along those lines; correct?

 6          A    I don't know that that's true.

 7          Q    Did SPCP at some point engage in a

 8     cashless exercise of its warrants in connection with

 9     the OCPIN?

10          A    Let me rephrase.  I don't know that we had

11     the option.  In other words, I recall the email

12     you're referring to.  It was suggested but I don't

13     know that the discussions ever went any further than

14     that.

15          Q    I understand.  So post refinance with Mid

16     Cap and the OCPIN buyout Silver Point's only

17     exposure to this credit is the warrants; correct?

18          A    Correct.

19          Q    When during the process of the

20     transactions, that we just discussed, did SPCP Group

21     IV stop being a warrant holder?

22          A    I don't know.  I'm sure there's

23     documentation for that.

24          Q    At some point it did stop being a warrant

25     holder; correct?
```

```
                                              Page 88

 1                          T. BANKS

 2              MR. ALAMUDDIN:  Object to form.

 3         Foundation.

 4         A    I'm aware there was some transaction where

 5    it either sold its warrant back to the company or I

 6    believe they were just transferred to another Silver

 7    Point entity.

 8              MR. DOWNES:  Marking a document as Exhibit

 9         190, it bears Bates stamp SPCP28064.

10              (SPCP_0000028064 to

11              SPCP_0000028070 was introduced

12              as Exhibit 190.)

13         Q    Let me know when you had a moment to

14    review this document, Mr. Banks.

15         A    Okay.

16         Q    Do you recognize this document, Mr. Banks?

17         A    I do.

18         Q    What is this document?

19         A    It's a fair value memo.

20         Q    Dated when?

21         A    12/31/2014.

22         Q    And is this the fair value memorandum that

23    you and Mr. Chen prepared for year end of 2014?

24         A    Yes.

25         Q    There's a methodology change this year in
```

Page 89

```
 1                        T. BANKS
 2      the fair value memorandum.
 3              MR. ALAMUDDIN:  Is that a question or are
 4          you stating that?
 5      Q    I'm stating that.  If you turn to page six
 6      up at the top you write the value --
 7      A    When you say "page six"?
 8      Q    Page six of seven.
 9      A    There was an overlap on the writing.  Yup.
10      Q    You write, "We value IHHI using a sum of
11      the parts valuation to value 1) the operating
12      business via an EBITDA multiple approach and 2) a
13      present value of the probability weighted after tax
14      QAF cash flows."  Why did you change your valuation
15      methodology in 2014?
16              MR. ALAMUDDIN:  Object to form.  Assumes
17          facts.
18      A    I don't recall.
19      Q    You did change your valuation methodology
20      in 2014; correct?
21      A    In comparing this memo to the memo that we
22      reviewed earlier from 2013 this has an explicit
23      valuation of the QAF where the other did not.
24      Q    And in addition the EBITDA multiple
25      approach is only being applied to the operating
```

```
 1                          T. BANKS

 2       business; correct?

 3            A      That is correct.

 4            Q      That is ex-QAFs?

 5            A      Correct.

 6            Q      And you are no longer using a liquidation

 7       methodology; correct?

 8            A      That is correct.

 9            Q      Why did you no longer use a liquidation

10       methodology?

11            A      We were no longer a creditor.

12            Q      Can you explain why no longer being a

13       creditor made a liquidation methodology no longer

14       appropriate?

15            A      Well, the borrowing base, as I mentioned

16       previously, as a creditor you attend to value, you

17       look at things on a very conservative approach and

18       so one of those approaches, as a creditor, would be

19       enforcing your collateral and looking at a

20       liquidation.

21                   Generally I would think most valuation

22       experts would agree a liquidation doesn't produce

23       the highest value but for a creditor, you know, it

24       could reflect a meaningful recovery and represents a

25       worse case scenario but without the loan we didn't
```

1                         T. BANKS

2         have to consider that.

3              Q    Did the 2014 valuation represent a less

4         conservative valuation of IHHI relative to 2013?

5                   MR. ALAMUDDIN:  Object to form.

6              A    I don't know that I characterize it as

7         less conservative.  It was obviously, as you pointed

8         out, it was different.

9              Q    Was the change from being a creditor and

10        an equity investor to only being an equity investor

11        connected to why you began breaking out the QAF

12        separately?

13             A    I don't know.

14             Q    In 2014 you assigned a midpoint equity

15        value to IHHI of $33.6 million; correct?

16             A    That's what it says; correct.

17                  MR. ALAMUDDIN:  The operating income,

18             right, not IHHI total?

19                  MR. DOWNES:  Correct, the equity value of

20             the operation business valuation.

21             A    Correct.

22             Q    And you assigned a total value to --

23        strike that.  You assigned a total value to the

24        probability weighted after tax QAF cash flows of

25        $36.8 million, right?

Page 92

T. BANKS

1

2      A     This analysis is looking at only the then

3  current QAF program, which was the program for 2015

4  or -- I apologize.  I believe it was -- I'm not sure

5  of the exact dates of service but I believe the

6  dates of service were through 2017 and it

7  probabilizes the receipt of those, and using the

8  probability by time period and at a 20% discount

9  rate in each time period produces a present value of

10  36.8.

11      Q     And so your total conclusion, your

12  conclusion as to the total value to equity was a

13  midpoint of $70.4 million; correct?

14      A     The conclusion we reached is that the

15  warrants were $773,000 per warrant.

16      Q     Which implies a total value to equity of

17  $70.4 million; correct?

18      A     Correct.

19      Q     Looking at the probability of the receipts

20  that you assigned in valuing the QAF cash flows you

21  assigned a 50% probability to the March 31, 2015

22  date of receipt to QAFs; correct?

23      A     Correct.

24      Q     And a 40% probability to the December 31,

25  2015 QAFs.

Page 93

T. BANKS

1

2     A     Yes.

3     Q     And then respectively for December 31,

4  2016 and June 30, 2017, 30 into 20% probabilities;

5  correct?

6     A     Correct.

7     Q     How did you determine the probabilities of

8  receipt to use for purposes of probability weighting

9  the uncertain QAF payments?

10    A     They were an estimate that we developed on

11 the basis of experience and calls that we had with

12 consultants.

13    Q     What consultants were you talking to about

14 QAFs in 2014?

15    A     I don't recall.

16    Q     Were these consultants with whom Silver

17 Point had a relationship or consultants with whom

18 IHHI had a relationship?

19    A     Silver Point subscribes to consulting

20 networks that connect you with expert in various

21 fields so we would have searched those databases for

22 experts on QAF and asked to speak to those experts.

23    Q     Is it fair to say these figures

24 represented your judgment as to the probability of

25 receipt for those QAFs as of the year-end 2014?

Page 97

1                              T. BANKS

2       need to know which year you're talking about because

3       I don't know that it's the same every year.

4            Q    Was there some change in practice that

5       happened at some point?

6            A    There was a change in practice where we

7       made an effort to deliver them earlier so that the

8       auditors were reviewing them, you know, generally in

9       the fourth quarter of the year so that we could

10      complete our audit faster.

11           Q    When did that change in practice occur?

12           A    I don't recall.

13           Q    Setting aside this particular memoranda

14      can you remember the identities of any experts that

15      Silver Point has ever consulted on QAF issues?

16           A    Matt Absher was a consultant who we met

17      through those networks and spoke to on a regular,

18      you know, at some point on multiple occasions about

19      QAF.

20           Q    Who is Mr. Absher?

21           A    My understanding is that he was an actuary

22      that was formally associated with the California

23      Hospital Association and that the hospital

24      association was the lead organization related to the

25      advocacy and the allocation of QAF payments.

Page 106

1                         T. BANKS

2        true.

3            Q     And at the time you were not that

4        interested in participating in that loan; correct?

5            A     That is correct.  I remember based on the

6        email that's correct because it seems that he had 26

7        other lenders competing to provide the loan.

8            Q     You also write that they're looking at a

9        $170 million valuation for the sale; correct.

10           A     That's correct.

11           Q     And you write you thought that was low;

12       correct?

13           A     Correct.

14           Q     Why did you think that was low given that

15       as of year-end 2014 you were valuing at the midpoint

16       IHHI and the QAF at $70 million?

17                 MR. ALAMUDDIN:  Object to form.

18           A     I wasn't valuing IHHI or the QAF at

19       year-end 2014.

20           Q     Can you explain.

21           A     I was valuing warrants.

22           Q     I would like to refer you back to Exhibit

23       190, page six at the top.  Do you see the bullet

24       that begins "At the midpoint"?

25           A     Yes.

Page 107

1                               T. BANKS

2          Q    I would like you to read that bullet point

3     aloud for me.

4          A    "At the midpoint we value IHHI and the QAF

5     at $70 million which implies a price per share of

6     $1,718,002 and a warrant valuation per share of

7     $773,002."

8          Q    Do you disagree with that statement?

9          A    I don't believe that statement is correct.

10         Q    Why not?

11         A    This is not a valuation memo by IHHI.

12    This is a valuation for the warrant.  We didn't own

13    IHHI.  We owned the warrants.

14         Q    Given that why did you write "at the

15    midpoint we value IHHI and the QAF at $70 million"?

16              MR. ALAMUDDIN:  Object to form.  Assumes

17         facts.

18         A    It was shorthand, I guess is the right way

19    to say it, but obviously there's a relationship

20    between the two but ultimately this exercise was to

21    value the warrant.

22         Q    Why did you think that the proposed

23    valuation of 170,000,000 was low given that your

24    valuation of the warrant implied a value for IHHI in

25    the QAF of $70 million?

Page 108

1              T. BANKS

2        A    They're two separate things.  This is a
3   warrant that would be, if exercised, equity in a
4   liquid company or in a liquid position in a minority
5   position controlled by someone else with no rights
6   and no ability to actually exit which makes it worth
7   significantly less than either shares in the company
8   or in the sale of the entire company, which
9   presumably would have a control premium.

10       Q    So are you saying the difference in value
11  is attributable to the control premium?
12            MR. ALAMUDDIN:  Object to the form.
13       Misstates testimony.  Go ahead.

14       A    No.  I'm saying that -- I'm saying that in
15  the email were discussing the valuation of IHHI for
16  the entire business.  Here we're discussing
17  valuation of a warrant, and I also point out that in
18  the email we relayed new facts that we learned
19  relating to IHHI since the time of the memo that
20  describe both operating improvements in the company
21  and what I believe to be higher amounts of QAF that
22  it would stand to get.

23       Q    You identified two factors just now when
24  you were explaining the difference between valuing
25  the warrant and valuing the company, one of them was

Page 109

1                          T. BANKS

2        the control premium and one of them was the

3        difference between holding equity and holding a

4        warrant; is that correct?

5                 MR. ALAMUDDIN:  Object to the form.

6            Incomplete but go ahead.

7            A    I'm not suggesting that a warrant or an

8        equity have different value what I'm suggesting is

9        when you're valuing a warrant you have to look at

10       what it's exercisable into and in this instance if

11       we had exercised the warrant it was exercisable into

12       a minority position in a private company controlled

13       by someone else with no shareholder agreement, no

14       shareholder rights and no ability to exit the

15       position.

16           Q    So then are the three factors that explain

17       the difference between the $70 million implied

18       equity value and $170 million proposed transaction

19       price, that you thought was to low, the operating

20       improvements, QAF improvements, and the differences

21       between being a minority shareholder and being a

22       100% shareholder?

23                MR. ALAMUDDIN:  Object to form.  Misstates

24           testimony.

25           A    I think those are some of the differences,

Page 113

1                          T. BANKS

2      have entitled the owner to whatever, you know, to

3      the extent the QAF program did continue they would

4      be the beneficiary of that.

5           Q    So I'm sorry I understand that but why did

6      you view the proposed valuation of 170 million as

7      giving away that upside?

8               MR. DELANY:  Asked and answered.

9           A    I guess what we're saying is that our view

10     was when the 170 didn't reflect the optionality that

11     contained in that and this optionality was very

12     valuable, as I believe you referred to it as the

13     bank that keeps giving money or something to that

14     effect, and you know so the optionality of that

15     continuing was very valuable.

16          Q    You also note here that the loan being

17     contemplated to finance the ESOP transaction would

18     be much less attractive then your existing credit

19     arrangement because they are looking to do the deal

20     --

21          A    We didn't have an existing credit

22     arrangement.

23          Q    I'm sorry.  That's correct.  Then what you

24     had previously, the prior credit arrangement.  Let

25     me start the question again.  You write here that,

Page 114

1                           T. BANKS

2        "The loan will be much less attractive than what we

3        had previously because they are looking to do the

4        deal without the real estate collateral to finally

5        achieve a true opco/propco split."  What does "true

6        opco/propco split" mean?

7             A     Well, an opco/propco split generally

8        refers to having two separate entities, one focused

9        on the operations of a business in owning the

10       operations and one owning the property of the

11       business, an agreement between them being a lease

12       and having separate capital structures.

13                  In IHHI's case, as we discussed

14       previously, the real estate was often used or had

15       been used to guarantee the obligations of the

16       operating company so that they were cross

17       collateralized and combined.

18             Q     Why did this contemplated structure make

19       the loan less attractive?

20             A     It was less collateral for the lenders.

21             Q     Does the discussion here in your email

22       reflect how the KPC team was contemplating

23       structuring the ESOP deal as of March of 2015?

24                  MR. ALAMUDDIN:  Object to form and

25             foundation.

Page 132

1                          T. BANKS

2        were trying.  Were they producing results?  No.

3            Q     Do you agree with the statement that "Our

4        reorganization plan didn't kick in until July"?

5                 MR. ALAMUDDIN:  Object to form.

6            A     I have no basis to agree or disagree.

7            Q     What do you mean?

8            A     I don't know.  I wasn't part of the

9        reorganization plan.

10           Q     Was IHHI communicating with Silver Point

11       about its reorganization plan in early 2015?

12           A     In early 2015 we were not a lender to the

13       company anymore.  We owned, as we discussed, a very

14       small position in unexercised warrants so, no, we

15       weren't in frequent communication with IHHI.

16           Q     Going down two paragraphs do you see that

17       Mr. Thomas writes, "We have engage a company called

18       Alerus as a potential ESOP trustee and engaged

19       Credit Suisse to provide the ESOP loan."?

20           A     Yes.

21           Q     Who's Alerus?

22           A     A potential ESOP trustee.

23           Q     And did you understand as of July 14, 2015

24       that Thomas and Chaudhuri had engaged Alerus?

25                 MR. ALAMUDDIN:  Object to form.

1                        T. BANKS

2          A    Did I understand?  The only knowledge I

3     would have had would have been this email which says

4     they were potentially a sub-trustee.

5          Q    Is this the first time that you would have

6     heard of Alerus?

7          A    To my knowledge, yes.  I mean, to my

8     recollection I'm not familiar with them.

9          Q    Is it your understanding that Thomas and

10    Chaudhuri ultimately did engage Alerus as the ESOP

11    trustee?

12         A    Yes.

13         Q    There's a reference here to Credit Suisse

14    and it states they're providing the ESOP loan.  Is

15    that your understanding of Credit Suisse's role in

16    the ESOP transaction?

17         A    Yes.

18         Q    "Both have their financial advisors doing

19    due diligence."  Do you know who the financial

20    advisors for Alerus and Credit Suisse were in the

21    ESOP transaction?

22         A    I'm not certain.

23         Q    Did you have any recollection?

24         A    Well, I know Stout provided a valuation

25    report.  I don't know if that means they were

Page 135

1                    T. BANKS

2         A    I'm not sure whether we were using the

3    same time periods of QAF.

4         Q    And just to be clear your multiple EBITDA

5    for purposes of that valuation is I think based on

6    one fiscal year but not on the trailing 12 months

7    since July 2014, right?

8         A    I'm sorry are you referring to.

9         Q    Your --

10        A    Exhibit 190?

11        Q    Correct.  Your fair value memorandum for

12   the year-ending December 31, 2014 obviously didn't

13   use earnings since July 2014 for its calculations;

14   correct?

15        A    No, it did not.  At the time the memo was

16   prepared the company had negative EBITDA so we did

17   what we had done in the time since becoming involved

18   with the company, which was to use a theoretical

19   normalized margin of what we thought the company

20   could achieve.

21        Q    How do you know that Stout produced a

22   valuation report in connection with the ESOP

23   transaction?

24        A    Because I have been preparing for the

25   deposition.

Page 136

1                         T. BANKS

2          Q    Did you know that before you began

3     preparing for your deposition?

4          A    I never saw the report.  I may have heard

5     the name during the ESOP transaction.

6          Q    Other than hearing the name Stout were you

7     aware in the ESOP transaction that Stout was

8     providing a valuation analysis to Alerus?

9               MR. ALAMUDDIN:  Objection.  Asked and

10              answered.

11         A    I don't recall knowing that.

12         Q    Do you know to whom Stout provided a

13    valuation?

14         A    You just said Alerus so I'm assuming

15    that's who they provided it to.

16         Q    Do you know that independently of me just

17    asking that question?

18         A    Only in preparing for this deposition.

19         Q    Do you know if they provided a valuation

20    to anyone else?

21         A    I don't know.

22         Q    Has Silver Point ever received a copy of

23    that valuation prior to this litigation?

24         A    No.

25         Q    Has Silver Point ever received any

```
 1                         T. BANKS
 2    valuation prepared by Stout of IHHI or KPC
 3    Healthcare?
 4         A    No.
 5         Q    Has it every requested one?
 6         A    To my knowledge, no.
 7         Q    Prior to this litigation were you aware
 8    that Stout prepared annual valuations of KPC
 9    Healthcare?
10         A    No.
11         Q    What was Skadden's role in the transaction
12    as counsel for SPCP?
13              MR. ALAMUDDIN:  Object to form.  Assumes
14         facts.  Go ahead.
15         A    They were to review documents that we were
16    being asked to sign as part of the warrant purchase
17    agreement with KPC.
18         Q    Did they do any due diligence?
19              MR. ALAMUDDIN:  Objection to form.  Vague.
20         A    That wasn't their role.
21         Q    Did they issue any document requests?
22         A    To my knowledge, no.
23              MR. DOWNES:  Off-the-record.
24              (A discussion was held
25              off-the-record.)
```

Page 142

1                         T. BANKS

2        A    I don't remember.

3        Q    Mr. Thomas also writes, "We're told if you

4   require the trustee to vote for our nominees and we

5   have taken on a risk of fiduciary duties to the ESOP

6   beneficiaries, so we don't want to do that."  Do you

7   understand the relationship between requiring the

8   trustee to vote for board nominees and taking on a

9   risk of fiduciary duties?

10            MR. ALAMUDDIN:  Object to the form.

11            Foundation and to the extent it asks for a

12            legal conclusion, go ahead.

13        A    I don't.

14            MR. DELANY:  Calls for speculation.

15        Q    Mr. Thomas also writes, "The trustee

16   retains discretionary power at all times to vote the

17   stocks as it sees fit."  Do you see that?

18        A    Yes.

19        Q    Does that correspond with your

20   understanding of the powers of the trustee at the

21   time of the transaction?

22            MR. ALAMUDDIN:  Object to form.

23        A    Yes.

24        Q    Do you have an understanding as to who

25   hired the trustee?

Page 143

1                              T. BANKS

2          A    I believe in some of the emails we

3      reviewed previously there was mention that

4      Dr. Chaudhuri or Bill Thomas had interviewed

5      trustees but I don't know if that means they hired

6      them or not.

7          Q    Do you understand that the board could

8      fire the trustee?

9               MR. ALAMUDDIN:  Object to form.

10          Foundation.

11          A    No.

12          Q    Do you have any understanding of who could

13      remove the trustee?

14               MR. ALAMUDDIN:  Same objections.

15          A    No.

16               MR. DOWNES:  I'm marking a document as

17          Exhibit 196.  It bears Bates number SPCP23620.

18               (SPCP_0000023620 to

19               SPCP_0000023625 was introduced

20               as Exhibit 196.)

21          Q    Mr. Banks, please, take a moment to review

22      this email and let me know when you are done.

23          A    Okay.

24          Q    Who is Jens Ernberg?

25          A    He is a professional investment

Page 145

T. BANKS

1

2      Q     Does Mr. Ernberg pronounce it Yens?

3      A     Yes.

4      Q     So this is the same loan that previously

5      earlier in the year you had not been interested in

6      pursuing; correct?

7      A     Yes.

8      Q     What changed in the intervening period

9      that changed your view on whether it was worthwhile

10     to participate in this credit arrangement?

11     A     Well, I think there were a number of

12     things that changed but I most importantly to my

13     recollection is Silver Point raised a new fund that

14     we referred to as our specialty credit fund and that

15     fund was designed to make loans to performing

16     companies, healthy performing good companies, which

17     is a different mandate than the funds, our prior

18     funds, and so we looked at the loan that Credit

19     Suisse was arranging and we thought that it was a

20     particularly attractive loan given our views of what

21     the value of the company was and the size of the

22     loan relative to the value of the company.

23     Q     Was the original credit relationship that

24     Silver Point entered with IHHI through the flagship

25     fund?

Page 146

T. BANKS

1

2        A     Correct.

3        Q     And I think you used the word "directive"a

4    moment ago, what's the directive of the flagship

5    fund?

6        A     Mandate, yes, is what we refer to it as.

7    The mandate of the flagship fund is to invest in

8    distress and distressed credit.

9        Q     As of the ESOP transaction was the --

10   well, strike that.  Prior to the ESOP transaction

11   was the warrant position that Silver Point had in

12   IHHI through the flagship fund?

13       A     It was owned by the flagship fund, yes.

14       Q     Skipping a head a little bit, as part of

15   the ESOP transaction Silver Point received cash,

16   notes, QAF rights and warrants; correct?

17            MR. ALAMUDDIN:  Object to the form.

18       Misstates facts.

19            MR. DOWNES:  Strike the question.

20       Q     In consideration for the warrants that

21   were repurchased in August of 2015 Silver Point

22   received cash, notes QAF rights and warrants;

23   correct?

24       A     Correct.

25       Q     Are those assets --

Page 151

1                        T. BANKS

2           197.  It's Bates SPCP29617.

3                (SPCP_0000029617 to

4                SPCP_0000029624 was introduced

5                as Exhibit 197.)

6           Q    Mr. Banks, let me know when you had a

7      moment to review this document.

8           A    Okay.

9           Q    Do you recognize this document, Mr. Banks?

10          A    I do.

11          Q    What this is document?

12          A    A memo.

13          Q    A memo about what?

14          A    A memo about the proposed redemption of

15     our warrants by KPC Healthcare.

16          Q    Did you draft this memo?

17          A    I did.

18          Q    For what purpose did you draft this memo?

19          A    So our committee could evaluate whether or

20     not we wanted to agree to sell our warrants to KPC.

21          Q    Which committee?

22          A    Credit committee.

23          Q    So on the third bullet on the first page

24     you state that, "The deal has been struck at a

25     $270,000,000 equity valuation or a $302 million

Page 152

1                            T. BANKS

2      enterprise valuation."  Do you see that?

3            A    Correct.

4            Q    Does that correspond to your understanding

5      of the terms of the deal?

6            A    That corresponds with my understanding of

7      the headline terms of the deal, yes.

8            Q    You write, "This value is consistent with

9      our base valuation for the business."  Do you see

10     that?

11           A    Yes.

12           Q    When was the last time that you prepared a

13     base valuation for the business prior to August 6,

14     2015?

15           A    Well, we prepared a valuation in this memo

16     so we're referring to the valuation in this memo.

17           Q    So your reference to the base valuation

18     for this business is a reference to this memorandum?

19           A    Correct.

20           Q    The equity value of 270 million is

21     $200 million above the equity value implied by the

22     end-of-year 2014 fair value memorandum; correct?

23                MR. ALAMUDDIN:  Object to form.

24           A    Again, that was a valuation of a minority

25     position of warrants versus the whole company but,

Page 153

1                          T. BANKS

2    yes, that's the correct math.

3          Q    Moving down several bullets do you see the

4    bullet beginning, "The deal is being structured as a

5    stock sale."?

6          A    Yes.

7          Q    The second sentence there is, "As there is

8    no shareholder agreement Chaudhuri cannot force us

9    to sell under this structure.'  Can you explain what

10   you mean by that.

11         A    What I mean is often, and this is one of

12   the issues I was referring to in valuing the

13   warrants, is that a common feature of investors

14   agreements in private companies is some sort of drag

15   or tagalong rights and in this case I'm referring to

16   drag along rights and so what I'm saying is because

17   there's no shareholder agreement here Chaudhuri

18   cannot drag us into the transaction against our

19   consent.

20         Q    To be clear, you're talking about the

21   state of affairs prior to the transaction; correct?

22              MR. ALAMUDDIN:  Object to form.  Vague.

23         A    Yes.  This memo is about holding the

24   warrants and whether -- what I'm trying to, you

25   know, illustrate for the committee is we're here to

Page 154

T. BANKS

1
2      make a decision as to whether or not we want to
3      participate and/or sell our warrants to KPC at the
4      offered price.  However, I wanted them to be aware
5      the primary point of this sentence was not that he
6      didn't have a drag right, the primary point was if
7      we told him no he would have alternatives that he
8      might be able to coerce us into a transaction
9      against our will even if we said no.
10             Q     And your point is that there are no such
11     drag-along rights here; correct?
12             A     No.  My point is actually contained in the
13     next sentence where I said he can move the structure
14     to a merger and he could squeeze us out through a
15     merger and leave us with an appraisal right, so to
16     some extent the lack of a drag was superfluous but
17     what I was saying was to the committee is that there
18     is a means by which if we say no he could force us
19     into this deal.
20             Q     Can you explain in layman's terms, can you
21     explain what would have been involved in a merger
22     structure instead.  How would a merger structure
23     force out Silver Point?
24             A     At this point our warrants, we had
25     warrants that we could have exercised for 17%

Page 157

1                         T. BANKS

2        for the warrants than was being offered to Silver

3        Point as part of the warrant sale transaction?

4                   MR. ALAMUDDIN:  Object to form.  Vague.

5              A    We didn't evaluate that analysis because

6        our analysis of what was being offered suggested

7        that what we were being offered was equivalent

8        value or what we viewed as equivalent value to what

9        we were surrendering.  To the extent that we

10       determined it was not the case then we would have

11       had to examine that.

12             Q    I would like to refer to page three of

13       this document.  You see the bullet point in the top

14       half of the page beginning "further without this

15       deal"?

16             A    Yes.

17             Q    And you write that, "Without this deal we

18       will be left in a minority equity position in a

19       company controlled by Dr. Chaudhuri with no ability

20       to force an exit and get liquidity."  Do you agree

21       with that statement?

22             A    Yes.

23             Q    And, in fact, you write that you would be

24       forced to wait on him to declare dividends to get

25       any cash from the position that you held.  Do you

Page 159

T. BANKS

2    the same projections that were being supplied to the

3    trustee and their advisor?

4         A    That is right.

5         Q    Apart from being supplied with those

6    management projections did Mr. Thomas provide you

7    with any other information about the valuation

8    methodology being used by the ESOP trustee?

9         A    Not that I recall.

10        Q    Did anybody else provide you with any

11   information about the valuation methodology being

12   used by the ESOP trustee?

13        A    No.

14        Q    Next bullet you write that your sceptical

15   of this forecast.  Do you see that?

16        A    I do.

17        Q    Why were you sceptical of management's $28

18   million forecast for year end?

19        A    This is a company that -- if I can start

20   over.  What I would say is you reviewed all our

21   memorandum and data on this company since 2010.

22   This is a company that we thought had significant

23   potential and the biggest asset the company had was

24   its close to $400 million of revenue that was very

25   consistent, despite the distractions from the legal

Page 160

T. BANKS

1    disputes between Dr. Shah and Dr. Chaudhuri, so we

2    believed that company had significant potential but

3    had never achieved that potential and had

4    underperformed and so we were, you know, when given

5    we were naturally inclined to be a little

6    conservative given how the business performed

7    historically in our experience, and I would note

8    that we said that quickly because I do think we

9    believed the business would get to 25 million of

10   EBITDA, we just weren't sure it would get there in

11   that year.

12        Q    I would like to go back to page four.

13   This page sets out your analysis of the QAF issues;

14   correct?

15        A    Correct.

16        Q    So in the second bullet before the table

17   you refer to Matt Absher the consultant we discussed

18   before.

19        A    That is correct.

20        Q    Did he consult for you in connection with

21   this transaction?

22        A    Yes.

23        Q    And you write that, "His view is it's

24   highly likely CMS will approve the rest of the

Page 161

1                          T. BANKS

2       managed care program and the next approval will be

3       for the 12-month period from July 2014 to July

4       2015."  Correct?

5              A     Correct.

6              Q     Did that correspond with your view of the

7       likelihood of approval for the 12-month period from

8       July 2014 to July 2015?

9                    MR. ALAMUDDIN:  Object to form.

10             A     I didn't have a view outside of what I

11      learned from him as an expert.

12             Q     When did you begin working with Absher in

13      connection with the IHHI credit?

14             A     I don't recall but at some point QAF

15      became increasingly important to the company.  So as

16      I mentioned we used our expert networks to begin

17      trying to find people who understood QAF and

18      "consulting" is a very strong word.  We would have

19      an hour-long call with them where they would educate

20      us on the issues, you know, essentially consulting,

21      speaking with an expert to get educated and in that

22      process Absher, we thought, was by far the smartest

23      guy on the topic and so we would continue to call

24      him.

25             Q     And you identify three risks that he saw

Page 220

1                              T. BANKS

2                         C E R T I F I C A T E

3

4            I, ANNMARIE OAKLEY, a Shorthand Reporter

5      and Notary Public within and for the State of

6      New York, do hereby certify:

7            THAT THOMAS BANKS, the witness whose

8      deposition is herein before set forth, was duly

9      sworn by me, and that such deposition is a true

10     record of the testimony given by such witness.

11           I further certify that I am not related to

12     any of the parties to this action by blood or by

13     marriage and that I am in no way interested in the

14     outcome of this matter.

15     IN WITNESS THEREOF, I have hereunto set my hand this

16     25th day of May, 2022.

17

18     _____

                          ANNMARIE OAKLEY

19

20

21

22

23

24

25