1   MORGAN, LEWIS & BOCKIUS LLP
2   Aimee Mackay, Bar No. 221690
    aimee.mackay@morganlewis.com
3   300 South Grand Avenue
    Twenty-Second Floor
4   Los Angeles, CA  90071-3132
    Tel:   +1.213.612.2500
    Fax:   +1.213.612.2501
5
6   MORGAN, LEWIS & BOCKIUS LLP
    Sari Alamuddin (admitted *pro hac vice*)
7   sari.alamuddin@morganlewis.com
    Deborah Davidson (admitted *pro hac vice*)
8   deborah.davidson@morganlewis.com
    110 N. Wacker Drive
9   Chicago, IL 60606-1511
    Tel: +1.312.324.1000
    Fax: +1.312.324.1001
10
11  Attorneys for Defendant
    SPCP GROUP, LLC

12

13              UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15

16  DANIELLE GAMINO, individually and        Case No. 5:20-cv-01126-SB-SHK
    on behalf of all others similarly situated,   [Consolidated Case Number]
17
                 Plaintiff,                    **EXHIBITS TO JOINT
18                                             APPENDIX OF EVIDENCE RE:
           vs.                                 MOTION FOR SUMMARY
19                                             JUDGMENT**
    SPCP GROUP, LLC,
20                                             Hearing Date: August 5, 2022
                 Defendant.                    Time:  8:30 am
21                                             Judge:  Hon. Stanley Blumenfeld, Jr.
        and                                    Ctrm:   6C
22
    KPC HEALTHCARE INC.
23  EMPLOYEE
    STOCK OWNERSHIP PLAN,
24
                 Nominal Defendant.
25

26  **JAE  PART 4 OF 5**

27  **EXHIBITS 25-34**

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1                        EXHIBITS TO JOINT
                        APPENDIX OF EVIDENCE

# EXHIBIT 25

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                    EASTERN DIVISION
 3      Case No. 5:20-cv-01126-SB-SHK
                 5:21-cv-01466-SB-SHK
 4      - - - - - - - - - - - - - - - - - -x
        DANIELLE GAMINO, individually and  :
 5      on behalf of all others similarly  :
        situated,                          :
 6                                         :
                             Plaintiffs,   :
 7              - vs -                      :
                                           :
 8      KPC HEALTHCARE HOLDINGS, INC., KPC :
        HEALTHCARE, INC., EMPLOYEE STOCK   :
 9      OWNERSHIP PLAN COMMITTEE, ALERUS    :
        FINANCIAL, N.A., KALI PRADIP       :
10      CHAUDHURI, KALI PRIYO CHAUDHURI,   :
        AMELIA HIPPERT, WILLIAM E. THOMAS, :
11      LORI VAN ARSDALE, and SPCP GROUP,  :
        LLC,                               :
12                                         :
                             Defendants.:
13                    and                  :
                                           :
14      KPC HEALTHCARE, INC. EMPLOYEE STOCK:
        OWNERSHIP PLAN,                    :
15                                         :
                       Nominal Defendant. :
16      - - - - - - - - - - - - - - - - - -x
                                    June 7, 2022
17                                  9:34 a.m.
                                    New York, New York
18
19
20              VIRTUAL REMOTE DEPOSITION UPON ORAL
21      EXAMINATION OF JENS ERNBERG, held at the
22      above-mentioned time and place, before Randi
23      Friedman, a Registered Professional Reporter,
24      within and for the State of New York.
25
```

Page 31

1     that were to be received by the KPC hospitals?

2                    MR. RUBIN:  Objection to form.

3                    THE WITNESS:  Specifically around

4          this payment or generally?

5     BY MR. DOWNES:

6          Q     More generally for right now.

7          A     Yeah.  Well, look, the underlying

8     tenet of our underwriting here was really around

9     the QAF program and the payments related to that.

10    Our primary source of repayment for our loan was

11    really payments out of this program, which

12    generally were quite predictable in nature and in

13    size.  As such, we relied heavily on those

14    payments in terms of the repayment loan, so it

15    was a critical part of our underwriting and a

16    critical part of our conversations with the

17    Investment Committee as such.

18         Q     Do you remember any specific

19    conversations about this loan term with the

20    Investment Committee?

21                    MR. RUBIN:  Object to the form.

22         You can answer.

23                    THE WITNESS:  I do recall that

24         there were pending QAF payments that the

25         hospitals were due to receive that was

Page 37

1              MR. RUBIN:  Objection to form.

2              THE WITNESS:  The liquidity, yeah.

3         I mean, it was giving them, yeah, more

4         support from a working capital perspective

5         had they had more room on their ABL to draw

6         on that to support those payments.

7    BY MR. DOWNES:

8         Q    I'd like to refer you to Page 3 of the

9    attachment to this email.

10        A    Okay.

11        Q    I'd like to point you down to the line

12   that reads, "Security"?

13        A    Uh-huh.

14        Q    Do you see --

15             MR. ALAMUDDIN:  Is this EUREKA

16        19310, Bates number?

17             MR. DOWNES:  Correct.

18             MR. ALAMUDDIN:  Thank you.

19   BY MR. DOWNES:

20        Q    I'd like to refer you down to the line

21   that reads "Security."  You see that there's a

22   statement that "The facility would be secured by

23   a first priority perfected lien on the company's

24   QAF receivables and non-ABL assets"?

25        A    Yes.

```
1          Q      That's your recollection of what was
2     the contemplated collateral for this term loan?
3          A      Yeah.  Again, we were looking at the
4     QAF as our primary source of repayment and;
5     therefore, it was important for us to have a
6     priority lien on it.
```

```
7          Q      Was that a structure that was proposed
8     by Eureka, or was that a structure that was
9     proposed by Credit Suisse Parkview?
10         A      That was a structure proposed by us.
11    That specific term, yes.
12         Q      The collateral -- the expressed
13    collateralization --
14         A      Correct.
15         Q      -- of the QAF payments?
16         A      Correct.
17         Q      I'm sorry.  I will try to wait for you
18    to finish answering questions, and you will have
19    to do the same; otherwise, Ms. Friedman will have
20    a real hard time putting this together.
21         A      Sorry.
22         Q      No worries.  Like I said, we'll both
23    break that rule today.
24                How did CSPV come to propose that
25    structure for collateralizing this loan?
```

Page 40

1          A      No.

2          Q      At the time of the KPC transaction,

3     had CSPV looked at other transactions where QAF

4     receivables were a substantial portion of the

5     underwriting picture?

6                         MR. RUBIN:  Objection to form.

7                         THE WITNESS:  No.

8     BY MR. DOWNES:

9          Q      Did you have any familiarity with the

10    QAF program before looking at KPC and -- I'll

11    terminate the question there.

12                Did you have any experience with the

13    California QAF program before looking at the KPC

14    deal?

15         A      I did not.

16         Q      How did you go about getting

17    comfortable with the QAF receivables as

18    collateral for the loan?

19                         MR. RUBIN:  Objection to form.

20                         THE WITNESS:  So we did a number

21            of things to get comfortable with that.

22            One, we were provided information from the

23            company as the history of the QAF payments,

24            both contributions and receipts.  We had

25            several calls with the program

```
 1              administrators -- I can't recall their
 2              names -- about the program itself.  How it
 3              was administered.  The reliability and
 4              validity of the payments over time.
 5                   We also contracted with a
 6              third-party called Marwood to evaluate the
 7              program.  Any risks around the program,
 8              whether there was risk that politically it
 9              was turned off.  Just, you know, because,
10              again, our key focus was on these QAF
11              payments.  We wanted to understand that
12              those payments were predictable and reliable
13              as advertised.
```

```
14    BY MR. DOWNES:
15         Q    Can you explain what you mean by
16    "turned off"?
17         A    Well, my understanding at least was
18    that the QAF program was funded at the state
19    level and administered at the state level, and so
20    in order for those programs to operate the way
21    they did with the complexion they did was a
22    politically made decision.  So there was risk if
23    there was a change of administration, for example
24    potentially, that the program was modified which
25    would have changed the payment scheme potentially
```

Page 46

1    would be used to fund operations, including the

2    differences between QAF contributions.  And then

3    you write, "This creates some concerns around

4    liquidity and the ability to support the business

5    needs."

6              Can you explain what you meant by

7    that?

8         A    I can try to explain what I think I

9    meant, yes.  So, again, back to the nascent

10   turnaround of the business and these

11   contributions that need to be made to the QAF,

12   there were certain working capital needs of the

13   business.  And as a prudent underwriter, I wanted

14   to make sure -- I assume that I was trying to

15   make sure that the business had sufficient

16   liquidity to maneuver those working capital needs

17   through a timeline, so that's probably what I'm

18   referring to.

19        Q    So this is relating to some of the

20   same concerns that you were discussing -- that

21   Mr. Smith was discussing in his email from the

22   prior day about ensuring that there's sufficient

23   liquidity for the business?

24        A    Correct.

25        Q    In the third paragraph here you write

Page 48

1    The second full paragraph here, you see that

2    there's a sentence that begins, "I apologize for

3    not having focused"?

4         A    Oh, yeah, the second sentence, yeah.

5         Q    Yeah.  And then later in that sentence

6    you write, "but we certainly want hospitals to

7    have ready liquidity given where they stand in

8    the turnaround effort."

9              You and I discussed a couple reasons

10    why liquidity was something that you were focused

11    on for KPC and why this was something that was

12    being discussed between the parties.

13         A    Yeah.

14         Q    I think you testified that part of the

15    reasons for that was to make sure that there was

16    sufficient liquidity available for the turnaround

17    itself to fund expenditures that were needed for

18    that?

19         A    Correct.

20         Q    You referred to "given where they

21    stand in the turnaround effort."

22              Do you have an understanding of where

23    KPC stood in the turnaround effort at this point

24    in time?

25         A    I assume it was early days based on

Page 49

```
 1        what I'm seeing here.  My recollection is that

 2        they were showing good progress on the turnaround

 3        at the time.

 4             Q     So it was early days.  They were

 5        showing good progress, and you anticipated that

 6        they would have additional liquidity needs in

 7        connection with the turnaround.

 8                  Is that a fair summary of your view as

 9        expressed here?

10             A     Yeah.  I wanted to make sure that they

11        had sort of a rainy day fund for the potential,

12        you know -- like I said, and margin for error, to

13        the extent they had challenges during the

14        turnaround, I wanted to make sure they had ample

15        liquidity to address that.

16             Q     I'm marking a document as Exhibit 252.

17        It bears Bates No. EUREKA 19657.

18                  (Exhibit 252 was marked.)

19                  Take a look at this document.  Let me

20        know when you've had a moment to review it and

21        you're ready to proceed.

22             A     Okay.

23             Q     Could you walk me through, again, at a

24        high level the stages in the life of one of these

25        direct lending deals from getting a phone call
```

1    shared, then they're not committed to the

2    transaction.  These are not commitment documents.

3    They're still indicative, in the sense that if

4    anything doesn't turn up the way you expect it to

5    be, you can walk away from the transaction.

6             And you can get mandated, meaning you

7    were the chosen lender based on a document like

8    that.  In some instances, they request that you

9    actually provide a formal commitment paper.  In

10   this case, I think we just provided an indicative

11   term sheet and that was, you know, what led us to

12   win or be mandated on the transaction.

13             Once that happens, you typically start

14   your real diligence on the business, and that

15   involves management meetings, commissioning

16   third-party reports.  In this case, we

17   commissioned FTI to conduct what's called a

18   quality of earnings report.  That's a report that

19   basically looks at the financial performance,

20   validates the numbers, does sort of forensic

21   accounting on the numbers.  And you might have

22   other third parties that provide industry

23   overviews; or in this case, Marwood provided sort

24   of the perspective on the regulatory environment

25   and the QAF payments in particular.

Page 52

```
 1                    In addition, you're typically provided
 2       with access to a data room that has information
 3       about employees, financials, contracts, etc.
 4       And, you know, the review of those documents and
 5       those meetings and all that diligence, you know,
 6       culminates in the final document, the Credit
 7       Agreement that stipulates the terms upon which
 8       you, as the lender, are willing to lend against
 9       the opportunity.
10            Q    So this email that we're looking at
11       here is Exhibit 252.  It is an email from you to
12       Mark O'Keefe at Eureka.  It's about some of that
13       diligence process; correct?
14            A    Yes, correct.
15            Q    That reference is made to FTI, which
16       is the firm doing that quality of earnings report
17       that you just alluded to?
18            A    Correct.
19            Q    And there's some reference here to
20       face-to-face meetings?
21            A    Yep.
22            Q    Is that an ordinary part of the
23       diligence process, face-to-face meetings with
24       company management?
25            A    Yeah.  For us, that's a critical part
```

```
 1    of the underwriting, meeting management teams.
 2         Q     So in this deal, on how many occasions
 3    did you meet face-to-face with the management
 4    team for KPC?
 5         A     I don't recall.
 6         Q     More than three?
 7         A     Somewhere in that three range, I would
 8    say.  I don't recall exactly, but --
 9         Q     Who did you meet with?
10         A     We met with the CEO.  I was struggling
11    to remember her name, but Suzanne.  And the
12    Eureka folks were there.  Those are the folks I
13    really remember.  Well, Bill Thomas was certainly
14    in one or two of the meetings.  Dr. Chaudhuri,
15    himself, was in the first meeting that we were
16    at.  Beyond that, I can't remember the whole cast
17    of characters.  It was a while ago.
18         Q     Did FTI have face-to-face meetings
19    separate from the ones that you and people at
20    Credit Suisse Parkview had?
21                   MR. RUBIN:  Objection to form.
22                   THE WITNESS:  Yes, they did.  Yes.
23    BY MR. DOWNES:
24         Q     And was part of the purpose you
25    engaged FTI for to engage in due diligence on the
```

Page 54

```
 1    company?
 2          A     Absolutely.
 3          Q     CSPV also engaged Orrick in connection
 4    with this transaction; correct?
 5          A     Correct.
 6          Q     Did CSPV engage any other advisors in
 7    connection with this transaction other than
 8    Orrick, FTI and Marwood?
 9          A     I don't recall.  I don't recall.  I
10    don't think so, but I don't recall.
11          Q     Can you explain to me how advisory
12    responsibilities in the transaction were divided
13    up between Orrick, FTI and Marwood?
14          A     Yeah.
15                MR. RUBIN:  And, Mr. Ernberg, I
16          would just caution you not to share any
17          privileged communications that you may have
18          had with Orrick.
19                THE WITNESS:  Understood.  So FTI
20          is primarily focused on the financial
21          performance of the business, including
22          looking at historical numbers.  Validating
23          that those numbers are right.  Doing what's
24          called a cash reconciliation.  So if you're
25          doing accrual accounting, for example versus
```

Page 55

1         cash accounting, it's important to monitor

2         where the cash is in the system, because on

3         an accrual basis, you're taking in cash and

4         then recognizing those revenues over a

5         period of time, for example.  So it's

6         important to understand or follow the cash

7         and validate that the cash is where it's

8         supposed to be, if you will.

9               But they spend a lot of time

10        understanding all aspects of the P&L, the

11        Profit & Loss Statement; historical and to a

12        degree projected.  They look at the balance

13        sheet.  They look at the working capital

14        needs of the business.  So their focus is

15        strictly on the financials of the business.

16              Marwood is a specialist in the

17        healthcare space around really the

18        regulatory environments and reimbursement

19        rates.  So they're experts across the board.

20        Typically we commission them to understand

21        if there are healthcare operators that are

22        operating in a specific segment, for

23        example.  There's specific codes that they

24        will use for reimbursement, and Marwood can

25        look at the trends in those coding in terms

Page 56

```
 1            of reimbursements and determine based on
 2            their view of the world and their
 3            intelligence around the healthcare
 4            community, the direction they expect those
 5            reimbursements to go, and whether that
 6            impacts the performance of the business.
 7                        In this one as I mentioned, we're
 8            very focused on the quality assurance
 9            funding program, and so that was I believe
10            the area that we asked them to spend the
11            most time on to understand the staying power
12            of that program.  If there were any risks to
13            the payments, how predictable the payments
14            were, etc.
15                        And, sorry, and then legal, which
16            is, in part, documenting the Credit
17            Agreement, but also looking at legal
18            liabilities of the company.  Looking at, you
19            know, all legal aspects, really, of the
20            transaction and legal risks within the
21            company.
22       BY MR. DOWNES:
23            Q    Did Credit Suisse prepare a valuation
24       of KPC?
25                        MR. RUBIN:  Objection to form.
```

1      Q      If I'm referring generally to Credit

2    Suisse today, will you understand that I'm

3    referring generally to Credit Suisse Asset

4    Management, as well as CSPV?

5      A      Yeah.  If it's specifically to Credit

6    Suisse Asset Management as the advisor to the

7    BDC, yes.

8      Q      Understood.  With that set of

9    understandings, did Credit Suisse prepare a

10   valuation of KPC in connection with this

11   transaction?

12     A      I don't believe we did.

13     Q      Did Credit Suisse prepare any kind of

14   model to evaluate the solvency of KPC?

15     A      I don't know that we prepared a model

16   to evaluate the solvency, per se.  We were

17   provided with a model typically by the borrower.

18   The company that we're lending to will generally

19   provide us their view on what the prospective

20   performance of the business will be.

21            We then take that model, which is

22   really their information and we'll sensitize that

23   to a variety of scenarios of our -- you know, of

24   our -- coming from our imagination essentially;

25   right.  To test how the business would perform

Page 59

```
1    under various circumstances.  That model
2    generally informs, you know, the creditworthiness
3    of the business.  Its ability in particular to
4    service the debt obligations over time.
5         Q    Are the set of operations and analysis
6    that you just described something that would be
7    carried out internal to Credit Suisse, or is that
8    something that would have been carried out by FTI
9    as your quality of earnings advisor?
10             MR. RUBIN:  Objection to form.
11             THE WITNESS:  The actual
12        sensitizing of the company's model would be
13        done by us as a team.  Credit Suisse as an
14        investment advisor.  We would leverage
15        whatever FTI provided us in terms of
16        considerations, 'cause they look at each of
17        the expense items and revenue items, and
18        give an overview of, you know, what they
19        think of those and whether there are any
20        risks or which direction they're going.
21             And that may or may not inform how
22        we change the numbers that were given by the
23        company, but the modeling itself around
24        projections is not part of what FTI would be
25        doing.
```

Page 63

```
 1   regulatory climate was going with respect to that

 2   program and if there were any risks around it,

 3   so, yes.

 4        Q    I'm marking a document as Exhibit 253.

 5   It bears Bates No. EUREKA_29824.

 6                 (Exhibit 253 was marked.)

 7                 Mr. Ernberg, let me know when you've

 8   had a moment to review this and you're ready to

 9   proceed.

10        A    Okay, great.

11        Q    So there were other lenders involved

12   in this process; correct?

13        A    Correct.

14                 MR. RUBIN:  Objection to form.

15        Sorry.

16   BY MR. DOWNES:

17        Q    Can you explain the relationship

18   between CSPV and those other lenders who also

19   played a role in the transaction?

20        A    Sure.  So as a matter of practice,

21   both when we worked at Credit Suisse Securities

22   and advising CSPV, we typically tried to lead a

23   range of transactions, and then syndicate or sell

24   off a portion of our loans to partner lenders

25   that we knew well in the market.  We did it for
```

1    economic reasons.  We could charge a fee for

2    arranging the loan that we didn't share with the

3    other lenders.  We also did it to get additional

4    diligence support, so we tried to bring in

5    lenders that had familiarity with a typical --

6    with a specific transaction in terms of industry

7    expertise or whatever so that they can be

8    additive to our diligence process.  We also did

9    it to expand our capacity.  The BDC had a limited

10   capacity to underwrite loans on its balance

11   sheet, and so we needed partners to be able to

12   fulfill a transaction like this.

13        Q     So in this transaction, how did CSPV

14   collaborate with other lenders on diligence?

15        A     We were very transparent.  We brought

16   two lenders in early on, and they were involved

17   intimately in the whole diligence process from

18   the moment we brought them in.  We probably

19   solicited interest from more than those two, but

20   ultimately we had two lenders that joined us in

21   the process, and they were intimately involved,

22   like I said, really from get-go until closing.

23        Q     Who were those two lenders?

24        A     HPS and Tannenbaum.

25              MR. DELANY:  I'm sorry.  So I

Page 66

1   own work and sharing that work with their

2   committee.  It's not something they would

3   typically share with us as the lead lender, their

4   work.

5        Q    So the collaboration that you were

6   referring to before is really more about you as

7   lead arranger, sort of centralizing and sharing

8   some of these diligence work products rather

9   than, you know, all lenders sharing work product

10   with one another?

11             MR. RUBIN:  Objection to form.

12             THE WITNESS:  Correct.  That's

13        typically how it works.  Each lender has to

14        do their own work, of course.  We don't

15        share -- I should restate what I said

16        before.  We don't share everything we do.

17        We didn't share our model with them, for

18        example.  They have to do their own

19        diligence on the opportunity to conclude

20        that they're interested in participating.

21   BY MR. DOWNES:

22        Q    Okay.  They would have also received

23   the management-prepared model that you referred

24   to; right?

25        A    Absolutely.

Page 120

1    page, but once you have a moment to refresh your

2    memory about what this is, let me know you're

3    ready to proceed.

4         A    I'm looking at a high level the

5    takeaways just trying to jog my memory.  I'll

6    stop there if you have any specific questions.

7         Q    Sure thing.  So I'd like to direct

8    your attention to Page 9.

9              Do you see that there's a discussion

10   about the QAF payments?  Headline is QAF Payments

11   Will Likely Continue Unabated?

12        A    Yes.

13        Q    Do you recognize this document?

14        A    Yeah.

15        Q    What is this document?

16        A    This is a report provided by Marwood

17   providing us with an overview of the regulatory

18   environment, and specifically the climate for

19   Medicare and Medicaid reimbursements related to

20   California.

21        Q    This is the diligence work product we

22   discussed earlier that Marwood prepared at Credit

23   Suisse's request?

24        A    Yes, correct.

25        Q    Do you see where Marwood writes that

Page 121

```
 1       they believe "The current QAF will be approved by

 2       CMS, and is likely to continue beyond 2016, as it

 3       has strong support in the state from advocates

 4       DHCS, the governor and legislature."
```

```
 5            A      Yes.

 6            Q      Do you recall any discussions with

 7       Marwood about political risks to the QAF program

 8       if there were changes in personnel in state

 9       government in California?

10            A      I'm sure we had conversations about

11       the political risk.  I don't know specifically

12       what we talked about.

13            Q      Did you have any discussions with

14       Marwood regarding risks to the QAF program from

15       changes in federal policy?

16            A      These are nuance questions.  I don't

17       recall.  I'm sure we asked everything around the

18       QAF.

19            Q      I realize they're nuance questions.

20       Maybe a better way to come at it is how granular

21       was your back and forth with Marwood on these

22       issues?

23                   MR. RUBIN:  Objection to form.

24                   THE WITNESS:  It's tough to

25            recall.  I'm sure we had a lot of
```

1                 C E R T I F I C A T I O N

2            I, Randi Friedman, Registered

3     Professional Reporter and Notary Public of the

4     State of New York, do hereby certify:

5         THAT, the witness whose testimony is herein

6     before set forth, was duly sworn by me, and

7     THAT, the within transcript is a true record of

8     the testimony given by said witness.

9         I further certify that I am not related

10    either by blood or marriage to any of the parties

11    to this action; and that I am in no way

12    interested in the outcome of this matter.

13        IN WITNESS WHEREOF, I have hereunto set my

14    hand this day, June 15, 2022.

15

16

17         *Randi C. Friedman*

18    Randi Friedman, RPR

19

20

21

22

23

24

25        *        *        *        *        *        *        *        *        *

**THIS PAGE INTENTIONALLY LEFT BLANK**

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# EXHIBIT 26

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                    EASTERN DIVISION
   _____
 3 DANIELLE GAMINO,            )
   individually and on behalf  )
 4 of all other similarly      )
   situated,                   )
 5                             )
         Plaintiff,            ) DEPOSITION OF:
 6                             )
     v.                        ) MARK FOURNIER
 7                             )
   KPC HEALTHCARE HOLDINGS,    )
 8 INC., et al.                )
                               ) Case No:
 9     Defendants.             ) 5:20-cv-01126-SB (SHK)
   _____)
10                             )
   DANIELLE GAMINO,            )
11 individually and on behalf  )
   of all other similarly      )
12 situated,                   )
                               )
13 Plaintiff,                  ) February 18, 2022
                               )
14   v.                        ) 8:03 a.m. PST
                               )
15 SPCP GROUP, LLC             )
                               )
16     Defendant              ) Deposition Taken
                               ) Remotely via
17   and                       ) videoconference
                               )
18 KPC HEALTHCARE, INC.        )
   EMPLOYEE STOCK OWNERSHIP    )
19 PLAN                        )
                               )
20     Nominal Defendant.      )
   _____)
21
22              **CONFIDENTIAL**
23 Reported by:
   HEIDI HUNTER, RPR, CSR
24 Job No.: 5071141
25
```

CONFIDENTIAL

Page 173

1      Q     Did Stout tax effect the cash flows from the

2   future QAF net payments?

3      A     Not explicitly.

4      Q     Why not?

5      A     Well, we used a 7-percent discount rate

6   factor, which was a pretax discount rate, so that would

7   capture some inherent tax liability in those future

8   streams.  In addition -- again, we're looking at the

9   QAFs and trying to come up with a reasonable and

10  conservative estimate of what these QAFs are worth.

11            We recognize that there were these future QAF

12  payments beyond the QAF form, which ran through December

13  of '16, and those payments had -- in our opinion, had a

14  lot of value that we didn't consider in that analysis.

15            So when we look at both the 7-percent discount

16  pretax rate, we look at the concluded ▇▇▇▇▇▇▇ value

17  for these QAFs, and we consider the fact that we didn't

18  discreetly value the future QAFs from, you know, future

19  QAF programs, we got comfortable that our value of

20  ▇▇▇▇▇▇▇ was a reasonable estimate for the QAF

21  program.

22     Q     Is any of this reasoning actually discussed in

23  your report?

24            MR. ANDRE:  Objection; argumentative.

25            MS. FEDDER:  Join.

CONFIDENTIAL

Page 222

```
 1                    REPORTER'S CERTIFICATE
 2    STATE OF UTAH        )
 3    COUNTY OF SALT LAKE  )
 4
 5             I, Heidi Hunter, RPR, CCR, for the state
 6    of Utah.
 7             That the foregoing proceedings were taken
      before me at the time and place set forth in the
 8    caption hereof; that the witness was placed under
      oath to tell the truth, the whole truth, and nothing
 9    but the truth.
10             That I thereafter transcribed my said
      shorthand notes into typing and that the typewritten
11    transcript of said deposition is a complete, true
      and accurate transcription of my said shorthand
12    notes taken at said time.
13             I further certify that I am not a relative
      employee, attorney, or counsel of any of the parties
14    nor am I a relative or employee of any of the
      parties' attorney or counsel connected with the
15    action, nor am I financially interested in the
      action.
16
17
18                      Heidi Hunter, RPR, CCR
19
20
21
22
23
24
25
```

# EXHIBIT 27

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4
                                       )
 5   DANIELLE GAMINO, individually and  )Case No.
     on behalf of all others similarly  )5:21-cv-01126-SB-SHK
 6   situated,                          )
                                        )Consolidated with
 7              Plaintiff,              )Case No.
                                        )5:21-cv-01466-SB-SHK
 8         vs.                          )
                                        )
 9   KPC HEALTHCARE HOLDINGS, INC., KPC )
     HEALTHCARE, INC. EMPLOYEE STOCK    )
10   OWNERSHIP PLAN COMMITTEE, ALERUS   )
     FINANCIAL, N.A., KALI PRADIP       )
11   CHAUDHURI, KALI PRIYO CHAUDHURI,   )
     AMELIA HIPPERT, WILLIAM E. THOMAS, )
12   LORI VAN ARSDALE, and SPCP GROUP,  )
     LLC,                               )
13                                      )
                Defendant              )
14                                      )
     and                                )
15                                      )
     KPC HEALTHCARE, INC.,              )
16   EMPLOYEE STOCK OWNERSHIP           )
     PLAN,                              )
17                                      )
                Nominal Defendant       )
18                                      )
19           DEPOSITION OF MICHAEL HARDEN
20               Costa Mesa, California
21               Monday, March 21, 2022
22
23   Reported by:
     RAQUEL L. BROWN, CSR No. 10026, RPR
24
     Job No. PA 5121883
25   PAGES 1 - 241
```

Page 16

1    litigation?

2        A    I don't recall.

3        Q    Okay.  Do you consider it to be an accurate

4    summary of your experience?

5        A    Yes.

6        Q    All right.  Exhibit No. 82 states that you're a

7    Senior Managing Director at Ambrose Advisors; is that

8    right?

9        A    Correct.

10       Q    Do you own equity interest in Ambrose Advisors?

11       A    Yes.

12       Q    How long have you been at Ambrose Advisors?

13       A    About seven or eight years.

14       Q    When you did work related to KPC, you were at

15   Eureka, correct?

16       A    Correct.

17       Q    Did you leave Eureka shortly after the KPC

18   transaction?

19       A    Yes.

20       Q    Do you recall approximately when?

21       A    No.

22       Q    What was your position at Eureka?

23       A    Managing director.

24       Q    Did you also have an equity interest at Eureka?

25       A    Yes.

Page 17

```
 1        Q     How long were you at Eureka?

 2        A     About seven years.
```

```
 3        Q     Where were you prior to Eureka?

 4        A     BCC Capital Partners.

 5        Q     How long were you at BCC Capital?

 6        A     About seven or eight years.

 7        Q     And prior to BCC Capital where did you work?

 8        A     Credit Suisse First Boston.

 9        Q     How long were you at Credit Suisse?

10        A     Six to seven years.

11        Q     Prior to Credit Suisse?

12        A     Arthur Anderson.

13        Q     How long were you at Arthur Anderson?

14        A     Two years.

15        Q     Did you have employment prior to Arthur Anderson?

16        A     Yes.

17        Q     Where was that?

18        A     Coopers & Lybrand.

19        Q     How long were you at Coopers & Lybrand?

20        A     Approximately two years.

21        Q     Were you employed prior to Coopers & Lybrand?

22        A     No.

23        Q     Do you join Coopers & Lybrand straight out of

24     college?

25        A     While in college.
```

Page 29

```
 1        Q      Do you know who completed this document?

 2        A      I do not recall that.

 3        Q      Do you know who it's submitted to?

 4        A      It's submitted to the partners at Eureka Capital

 5   Partners.

 6        Q      In 2014, how many people were at Eureka Capital

 7   Partners?

 8        A      Seven.

 9        Q      Were you also one of the partners?

10        A      Yes.  Oh, eight.  Excuse me.  Forgot one.

11        Q      Seven plus you?

12        A      Yeah.

13        Q      Once the -- once the new -- strike that.

14               Once the new business assessment form was

15   submitted to the partners, what then happened?

16        A      There was a conference call convened to review

17   the new business form and to give anyone an opportunity to

18   object to taking on the new business, conflicts,

19   et cetera.

20        Q      So the title -- strike that.

21               Up on the right-hand side above the title, there

22   is a date submitted and it says October 31st, 2014.  Do

23   you see that?

24        A      Yes.

25        Q      And is that the date that it would likely have
```

Page 193

1       MR. BARTON:  All right.  Let's go off the record.

2                (DISCUSSION HELD OFF RECORD.)

3       MR. BARTON:  All right.  Let's go back on.

4       Q    Is QAF income taxable to your understanding?

5       MR. ANDRE:  Objection, vague and ambiguous.

6       THE WITNESS:  To whom?

7   BY MR. BARTON:

8       Q    To KPC.

9       MR. ANDRE:  Objection, vague and ambiguous.

10      THE WITNESS:  It is not going to be -- was not going

11  to be taxable to KPC.

12  BY MR. BARTON:

13      Q    Is it going to be taxable to anyone?

14      MR. ANDRE:  Objection, argumentative, vague and

15  ambiguous.

16      THE WITNESS:  What's the question there?

17  BY MR. BARTON:

18      Q    Was -- is the -- was the QAF income going to be

19  taxable to anyone, to your understanding, relevant to this

20  transaction?

21      MR. ANDRE:  Objection, vague and ambiguous.

22      THE WITNESS:  My understanding was it wasn't going to

23  be taxable to KPC.

24  BY MR. BARTON:

25      Q    Was it going to -- anyone relevant to this

Page 194

```
1    transaction, was it going to be considered taxable?
2         MR. ANDRE:  Objection, vague and ambiguous, asked and
3    answered.
4         THE WITNESS:  My client was KPC and it wasn't going to
5    be taxable to KPC.
```

```
6         MR. BARTON:  I didn't ask you that.
7         MR. ANDRE:  Objection, argumentative.
8         THE WITNESS:  I can't answer a question I don't
9    understand.
10   BY MR. BARTON:
11        Q    My question was, did you -- to your understanding
12   was the QAF income going to be taxable relevant to any
13   party to this transaction?
14        A    No --
15        MR. ANDRE:  Objection, vague and ambiguous, asked and
16   answered.
17        THE WITNESS:  No.  It was not.
18   BY MR. BARTON:
19        Q    Handed you what's been marked as Exhibit 29.
20   During a phone call during July 2015 with Alerus and/or
21   SRR, did you or anyone from Eureka make the statement that
22   QAF helps unitranche financing be 10 percent rather than
23   13 or 14?
24        MR. DELANY:  Joe, I can't hear you.  Which document
25   are you referring to?  I can't hear what you referenced.
```

Page 235

1          So these were two separate transactions, right?

2     The ESOP transaction on one hand and then the transaction

3     that involved the seller note and the warrant transaction,

4     right?

5          MR. BARTON:  Objection to form.

6          THE WITNESS:  There -- they're integrated transactions

7     but we treat them separately because they are separate

8     business decisions, if you will.  The sellers are selling

9     and, you know, they're getting -- they're getting cash out

10    for the sale and then they're essentially loaning back a

11    portion of the proceeds to the corporation to -- to

12    essentially, um, finance part of the transaction.  So we

13    like to do two separate term sheets to reflect those

14    separate business decisions that are being made.

15    BY MR. KILLEEN:

16         Q    Well, the parties to each of those separate --

17    the parties to each of those transactions were different,

18    correct?

19         A    That is correct.  Let me, um, just review one

20    thing real quick before I answer your question, if that's

21    okay.

22         Q    Sure.

23         A    Okay.

24         Q    And once you review, I can actually ask a

25    different question and I'll just get more to the point.

Page 236

```
1      A      Yeah.  The parties are -- are different.  Um,

2    between the two.  Clearly it's the shareholders or, you

3    know, in this case Dr. Chaudhuri was acting as -- as a

4    representative for the shareholders, um, making that

5    decision to sell the stock, whereas the decision to take

6    back the subordinated debt was on behalf of the creditors,

7    the new creditors that were -- the subordinated creditors

8    that were coming into the deal.  So that was one

9    difference.

10           And then we had warrant holders that were

11   canceling warrants and selling warrants back in the sale,

12   but that had nothing to do with the subordinated debt.

13   Sure.  New warrants were being issued, but that had

14   nothing to do with the existing or outstanding warrants.

15           So, you know, that -- that's -- the parties are a

16   little different.  The trustee was asked to acknowledge

17   both term sheets, though.  That would have been

18   consistent.

19      Q      Well, it's correct that SPCP was not a party to

20   the ESOP transaction, the sale of KPC's stock to the

21   trustee, correct?

22         MR. BARTON:  Objection to form.

23         THE WITNESS:  You are correct.  The SPCP -- sorry.

24           SPCP Group was simply engaged in the warrant

25   redemption transaction.  Dr. Chaudhuri was the only party
```

Page 237

1    to the ESOP transaction via the stock purchase

2    transaction, if you will.

3    BY MR. KILLEEN:

4        Q    Earlier right after the lunch break you had

5    testified that you believe that SPCP's consent was

6    required before the transaction can be executed.  You were

7    referring to the warrant redemption transaction as opposed

8    to the ESOP transaction, correct?

9        A    Correct.  I was using the word transaction as an

10   integrated term.

11       Q    Understood.

12            And because Dr. Chaudhuri needed to own

13   100 percent of the KPC shares before the ESOP transaction,

14   he had to accomplish the warrant transaction first, right?

15   They were sequential transactions?

16       A    I believe they were sequential transactions.  I

17   can verify that, but I believe that from memory they were

18   sequential.

19       Q    The parties could have entered into the warrant

20   transaction without the second ESOP transaction ever

21   taking place?

22   MR. BARTON:  Objection to form.

23   THE WITNESS:  So just to correct one -- one thing, um,

24   the -- the transactions were what we call simultaneous and

25   the reason for that is so that we can do them all at the

Page 238

1    same price per share.

2          But -- so the answer to your first question is it

3    wasn't sequential A, B, C.  It was A, B, C occurring at

4    the same legal moment in time for valuation reasons.

5          Um, however, the answer to your second

6    question -- what was your second question?

7    BY MR. KILLEEN:

8     Q    I'll try to just say it again.

9          So the -- the warrant transaction could have

10   occurred without necessarily having the ESOP transaction

11   occur after it; it could have been independent

12   transaction?

13    A    Yes.  It could have --

14   MR. BARTON:  Objection to form.

15   THE WITNESS:  The warrant transaction, um, could have

16   occurred on its own, but we couldn't have done the ESOP

17   transaction without, um, as you mentioned, Dr. Chaudhuri

18   owning a hundred percent of the shares.  Otherwise, you

19   know, we wouldn't have been able to do a hundred percent

20   ESOP with somebody else either owning shares or having a

21   claim on the shares.

22   MR. KILLEEN:  Okay.  I have no further questions.

23   Thank you very much for your time.

24   MR. BARTON:  You have no questions?

25   MR. BRENNAN:  I'm good, Joe.

Page 241

1

2

3

4            I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6            That the foregoing proceedings were taken before

7    me at the time and place herein set forth; that any

8    witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim record

10    of the proceedings was made by me using machine shorthand

11    which was thereafter transcribed under my direction;

12    further, that the foregoing is an accurate transcription

13    thereof.

14            I further certify that I am neither financially

15    interested in the action nor a relative or employee of any

16    attorney or any of the parties.

17            IN WITNESS WHEREOF, I have this date subscribed

18    my name.

19

20    Dated:  4/1/22

21

22

23

                            RAQUEL L. BROWN

24                          CSR No. 10026, RPR

25

# EXHIBIT 28

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4
 5    DANIELLE GAMINO, individually ) NO. 5:20-cv-01126
      and on behalf of all others   )          SB-SHK
 6    similarly situated,           )
                                    )
 7                    Plaintiff,    )
                                    )
 8          v.                      )
                                    )
 9    KPC HEALTHCARE HOLDINGS, INC., )
      KPC HEALTHCARE, INC. EMPLOYEE )
10    STOCK OWNERSHIP PLAN COMMITTEE,)
      ALERUS FINANCIAL, M.A., KALI  )
11    PRADIP CHAUDHURI, KALI PRIYO  )
      CHAUDHURI, AMELIA HIPPERT,    )
12    WILLIAM E. THOMAS, LORI VAN   )
      ARSDALE, and SPCP GROUP, LLC, )
13                                  )
                    and            )
14                                  )
      KPC HEALTHCARE, INC., EMPLOYEE )
15    STOCK OWNERSHIP PLAN,         )
                                    )
16                    Defendant.    )
      _____)
17
18
                    DEPOSITION OF WILLIAM E. THOMAS
19                      Irvine, California
                      Friday, June 3, 2022
20
21
22    Reported by:
      Heidi Hummel-Grant
23    CSR No. 12556
24    Pages 1 - 262
25
```

Page 10

 1          A      No.

 2          Q      Are you the member of the board or an

 3     officer of any other company?

 4          A      I'm a member of the board of directors of

 5     Provident Financial Holdings, Incorporated.

 6          Q      For how long have you been member of the

 7     board of Provident Financial Holdings?

 8          A      Approximately since 1998.

 9          Q      Are you the member of the board of any

10     other corporations?

11          A      Companies affiliated with Dr. Chaudhuri.

12          Q      Which companies affiliate with

13     Dr. Chaudhuri are you a member of the board?

14          A      Member of the board of KPC Healthcare

15     Holdings, Inc., Victor Valley Hospital Acquisition,

16     Inc., Global Health Plan, Inc.  Trying to think if

17     there any others, but -- there may be other original

18     affiliates, but those are the ones that come to

19     mind.

20          Q      Are you an officer of any companies in

21     which you're also a board member?

22          A      I'm not an officer of Provident Financial

23     Holdings.

24                 I am the general counsel and executive

25     vice president of all of Dr. Chaudhuri's affiliates,

1      and in some cases secretary of those companies.  I

2      believe I'm secretary, for example, of KPC

3      Healthcare Holdings, Inc.

4           Q    And when you refer to being general

5      counsel and executive vice president, I think you

6      said for all of Dr. Chaudhuri's companies, does that

7      include companies in which you're not necessarily a

8      member of the board?

9           A    Yes.

10          Q    Are you member -- strike that.

11               I think you identified your employer as

12     KPC Global Management; is that right?

13          A    Correct.

14          Q    Are you member of the board of that

15     company?

16          A    No.

17          Q    Are you an officer of that company?

18          A    Yes.  Executive vice president, general

19     counsel.

20          Q    For how long have you been member of the

21     board of KPC Healthcare Holdings, Inc. or its

22     predecessor IHHI?

23          A    I believe I joined the IHHI board in --

24     sometime in 19 -- excuse me, 2008, and held that

25     position until roughly, I believe, June of 2014, and

Page 35

1          A     By exercising that warrant.

2          Q     When did you receive a warrant in IHHI?

3     Or obtain a warrant.

4          A     In January or February of 2005.

5          Q     Did you purchase the warrant?

6          A     I received the warrant in connection with

7     the restructuring transaction with Dr. Chaudhuri and

8     the Tenet transaction.

9          Q     What had you -- what was your

10    relationship -- when you said the Tenet transaction,

11    you mean the transaction in which IHHI purchased the

12    four hospitals from Tenet?

13         A     Correct.

14         Q     Okay.

15               And what was your involvement in that

16    transaction in which IHHI purchased the four

17    hospitals from Tenet?

18         A     I was the attorney for Dr. Chaudhuri.

19         Q     And was -- as part of your compensation

20    did you receive warrants?

21         A     The -- yeah, the -- the warrant

22    transaction was -- I guess it's stated here, 20 --

23    it's the third -- third paragraph of this, where

24    the -- Dr. Chaudhuri received money back plus a

25    warrant, and I received 4.9 percent of that warrant.

Page 263

1     Certification of Court Reporter Federal Jurat

2

3          I, the undersigned, a Certified Shorthand

4     Reporter of the State of California do hereby

5     certify:

6          That the foregoing proceedings were taken

7     before me at the time and place herein set forth;

8     that any witnesses in the foregoing proceedings,

9     prior to testifying, were placed under oath; that a

10    verbatim record of the proceedings was made by me

11    using machine shorthand, which was thereafter

12    transcribed under my direction; further, that the

13    foregoing is an accurate transcription thereof.

14         That before completion of the deposition a

15    review of the transcript was requested.

16         I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any of the parties.

19         IN WITNESS WHEREOF, I hereby subscribe my

20    name this 14th day of June 2022.

21

22

23

          Heidi Hummel-Grant

24        Certified Shorthand Reporter No. 12556

25

# EXHIBIT 29

Page 1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2     - - - - - - - - - - - - - :
                                 :
 3     DANIELLE GAMINO,          :
                                 :
 4             Plaintiff,        :   CASE NO.
                                 :
 5             vs.               :   5:20-CV-01126-SB-SHK
                                 :
 6     KPC HEALTHCARE HOLDINGS,  :
       INC, et al.,              :
 7                               :
               Defendants.       :
 8                               :
       - - - - - - - - - - - - - -:
 9
10            DEPOSITION OF ALLISON WILKERSON
11
12     DATE:            April 14, 2022
13     TIME:            11:03 EST
14     LOCATION:        Veritext Legal Solutions
                        1250 I Street, NW
15                      Suite 350
                        Washington, DC 20005
16
17
18     REPORTED BY:     Constance H. Rhodes
                        Reporter, Notary
19
20
21              Veritext Legal Solutions
                1250 Eye Street, Northwest
22               Washington, DC 20005
```

Page 182

1    Yes, sir.

2         Q    Okay.  Great.  So this is an email chain

3    I think between you and Mr. Carlson; is that

4    right?

5         A    Yes.

6         Q    I want you to focus on the email that

7    you wrote that starts on Alerus 002279 dated

8    Saturday, August 1st.  Do you see that?

9         A    Is that the 2:02 email?

10        Q    It's Saturday, August 1, at 2:02 p.m.

11   Yes.

12        A    Yes, sir.  I have it.

13        Q    Okay.  Do you see paragraph 1 there's a

14   reference to Silver Point.  Do you see that?

15        A    I do.

16        Q    And that's Silver Point Capital, or SPCP

17   as we've been referring to them.

18        A    Okay.

19        Q    I'd like to ask you some questions about

20   what you've written here.  Your first sentence

21   states:  As we all know, the message has been that

22   Silver Point is willing to go along with whatever

Page 183

```
 1    deals the doctor can cut.

 2            Can you tell me what that is referring to

 3    specifically?

 4        A    My recollection was that we had asked if

 5    once we negotiated with Dr. Chaudhuri as to price

 6    split of ongoing QAF and things like that, if

 7    we're going to be turning and negotiating one for

 8    others.  I believe it was expressed to us that

 9    they anticipated Silver Point would agree to the

10    financial terms ultimately applied to the ESOP

11    transaction.

12        Q    And where did that understanding come

13    from?

14        A    I believe it was expressed to us by

15    company advisors, either Eureka or Holzman Horner.

16    But that's somewhat speculation.

17        Q    Okay.  Further on you referred to the

18    doctor as taking this to mean that Silver Point

19    will receive the same proceeds from the

20    transaction based upon their ownership, and more

21    importantly, sign on to all representations and

22    warranties that the company/doctor are making.
```

Page 189

1                    CERTIFICATE OF NOTARY PUBLIC

2              I, CONSTANCE HUNT RHODES, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly sworn

6    by me; that the testimony of said witness was

7    taken by me in stenotypy and thereafter reduced to

8    typewriting under my direction; that said

9    deposition is a true record of the testimony given

10   by said witness; that I am neither counsel for,

11   related to, nor employed by any of the parties to

12   the action in which this deposition was taken; and

13   further, that I am not a relative or employee of

14   any attorney or counsel employed by the parties

15   thereto, nor financially or otherwise interested

16   in the outcome of the action.

17

                           _____

18                         CONSTANCE HUNT RHODES

19                         Notary Public in and for

                           the District of Columbia

20

     My commission expires:

21   January 14, 2023

22

# EXHIBIT 30

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 10-K

(Mark One)

☒ Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the fiscal year ended March 31, 2012; or

☐ Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Commission File Number 0-23511

## INTEGRATED HEALTHCARE HOLDINGS, INC.
### (EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| Nevada | 87-0573331 |
| (STATE OF INCORPORATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |
| 1301 North Tustin Avenue, Santa Ana, California | 92705 |
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | (ZIP CODE) |

Registrant's telephone number, including area code: (714) 953-3503

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, $.001 par value
(TITLE OF CLASS)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☐  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer, accelerated filer or smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐  No ☒

The aggregate market value of voting stock held by non-affiliates of the registrant was $1,167,350 as of September 30, 2011 (computed by reference to the last sale price of a share of the registrant's common stock on that date as reported by the Over the Counter Bulletin Board). For purposes of this computation, it has been assumed that the shares beneficially held by directors and officers of registrant were "held by affiliates"; this assumption is not to be deemed to be an admission by such persons that they are affiliates of registrant.

There were 255,307,262 shares outstanding of the registrant's common stock as of June 18, 2012.

DOCUMENTS INCORPORATED BY REFERENCE:

No portions of other documents are incorporated by reference into this Annual Report.

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.

FORM 10-K

ANNUAL REPORT FOR THE YEAR ENDED MARCH 31, 2012

TABLE OF CONTENTS

| | | |
|---|---|---|
| PART I | | 1 |
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 14 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 19 |
| ITEM 2. | PROPERTIES | 20 |
| ITEM 3. | LEGAL PROCEEDINGS | 21 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 21 |
| PART II | | 22 |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 22 |
| ITEM 6. | SELECTED FINANCIAL DATA | 23 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 23 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 33 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 34 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 34 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 34 |
| ITEM 9B. | OTHER INFORMATION | 35 |
| PART III | | 36 |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 36 |
| ITEM 11. | EXECUTIVE COMPENSATION | 40 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 42 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 44 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 45 |
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 46 |
| | SIGNATURES | 48 |

CONFIDENTIAL

PART I

FORWARD-LOOKING INFORMATION

This Annual Report on Form 10-K contains forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995. These statements relate to future events or our future financial performance. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks discussed under the caption "Risk Factors" herein that may cause our Company's or our industry's actual results, levels of activity, performance or achievements to be materially different from those expressed or implied by these forward-looking statements.

Although we believe that the expectations reflected in the forward looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as may be required by applicable law, we do not intend to update any of the forward-looking statements to conform these statements to actual results.

As used in this report, the terms "we," "us," "our," "the Company," "Integrated Healthcare Holdings" or "IHHI" mean Integrated Healthcare Holdings, Inc., a Nevada corporation, unless otherwise indicated.

ITEM 1. BUSINESS

BACKGROUND

Integrated Healthcare Holdings, Inc. is a predominantly physician owned company that, on March 8, 2005, acquired and began operating the following four hospital facilities in Orange County, California (referred to as the "Hospitals"):

- 282-bed Western Medical Center in Santa Ana
- 188-bed Western Medical Center in Anaheim
- 178-bed Coastal Communities Hospital in Santa Ana
- 114-bed Chapman Medical Center in Orange

Together we believe that the Hospitals currently represent approximately 11.6% of all hospital beds in Orange County, California (based on the most recent data, as of June 30, 2011, on the website of the Office of Statewide Health Planning and Development for California).

Prior to March 8, 2005, we were primarily a development stage company with no material operations. On September 29, 2004, the Company entered into a definitive agreement to acquire the four Hospitals from subsidiaries of Tenet Healthcare Corporation ("Tenet"), and the transaction closed on March 8, 2005.

The transaction included operations of four licensed general acute care hospitals with a total of 762 beds. All four hospitals are accredited by the Joint Commission on Accreditation of Healthcare Organizations and other appropriate accreditation agencies that accredit specific programs. All properties are in Orange County, California, and operate as described below.

WESTERN MEDICAL CENTER – SANTA ANA. Western Medical Center - Santa Ana, located at 1001 North Tustin Avenue, Santa Ana, CA 92705, is Orange County's first hospital, founded over 100 years ago. The hospital is one of IHHI's two hospitals in Santa Ana, which are the only two general acute care hospitals in this city of 325,000 people. The hospital has 282 beds and provides quaternary, tertiary and secondary services. It serves the entire county as one of only three designated trauma centers in Orange County along with other tertiary services such as burn center, emergency and scheduled neurosurgical care, cardiac surgical services, a paramedic base station and receiving center. The hospital also maintains Intensive Care Units for adults and pediatrics, and a Neonatal Intensive Care Unit. Additionally, the hospital offers telemetry, neurosurgical definitive observation, medical, surgical, pediatric and obstetric inpatient services. Supporting these services the hospital offers operating and recovery rooms, radiology services, respiratory therapy services, clinical laboratories, pharmacy, physical and occupational therapy services on an inpatient and most on an outpatient basis. The hospital has approximately 258 active physicians and 436 employee nurses, and hospital staff.

WESTERN MEDICAL CENTER – ANAHEIM. Western Medical Center - Anaheim, located at 1025 South Anaheim Boulevard, Anaheim, CA 92805, has 188 beds and offers a full range of acute medical and psychiatric care services serving northern Orange County and providing tertiary services to Riverside County residents. The hospital offers special expertise in the tertiary services of The Heart and Vascular Institute, and Behavioral Health Services. Additionally, the hospital provides the Women and Children Health Services, and 24-hour Emergency Services. Supporting these services the hospital offers critical care, medical, surgical and psychiatric services supported by operating and recovery rooms, radiology services, respiratory therapy services, clinical laboratories, pharmacy, physical and occupational therapy services on an inpatient and outpatient basis. The hospital has approximately 73 active physicians and 222 employee nurses, and hospital staff.

1

CONFIDENTIAL

SPCP_0000001189

COASTAL COMMUNITIES HOSPITAL – SANTA ANA. Coastal Communities Hospital, located in Santa Ana at 2701 South Bristol Street, Santa Ana, CA 92704, has served the community for more than 30 years, providing comprehensive medical and surgical services in a caring and compassionate environment. The hospital is one of IHHI's two hospitals in Santa Ana, which are the only two general acute care hospitals in this city of 325,000 people. The hospital has tailored its services to meet the changing needs of the community. The hospital's staff reflects the cultural diversity of the community and is particularly responsive and sensitive to diverse healthcare needs. The 178-bed hospital offers critical care, medical, surgical obstetric, psychiatric and sub-acute services supported by operating and recovery rooms, radiology services, respiratory therapy services, clinical laboratories, pharmacy, physical and occupational therapy services on an inpatient and most on an outpatient basis. The hospital has approximately 62 active physicians and 183 employee nurses, and hospital staff.

CHAPMAN MEDICAL CENTER – ORANGE. Founded in 1969, Chapman Medical Center is a 114-bed acute care facility located at 2601 East Chapman Avenue, Orange, CA 92869. The hospital's advanced capabilities position the facility as a leader in specialty niche programs, including the following centers: Chapman Center for Obesity (surgical weight loss program); Center for Heartburn and Swallowing; Neuro-spine Center; Center for Senior Mental Health; and Positive Action Center (Adult and Adolescent Chemical Dependency Program). Supporting these services the hospital offers critical care, medical, surgical and geriatric psychiatric services supported by operating and recovery rooms, radiology services, respiratory therapy services, clinical laboratories, pharmacy, physical and occupational therapy services on an inpatient and most on an outpatient basis. The hospital has approximately 28 active physicians and 108 employee nurses, and hospital staff.

EMPLOYEES AND MEDICAL STAFF

At March 31, 2012, the Company had approximately 3,030 employees. Of these employees, approximately 1,303 are represented by two labor unions, the California Nurses Association ("CNA") and Service Employee International Union -United Healthcare Workers ("SEIU"), who are covered by collective bargaining agreements. We believe that our relations with our employees are good. The Company also had approximately 104 individuals from contracting agencies at March 31, 2012, consisting primarily of housekeeping staff.

Our hospitals are fully staffed by physicians and other independently practicing medical professionals licensed by the State, who have been admitted to the medical staff of the individual hospital. Under state laws and licensing standards, hospitals' medical staffs are self-governing organizations subject to ultimate oversight by the hospital's local governing board. None of these physicians are employees of the hospitals. Physicians are not limited to medical staff membership at our hospitals, and many are on staff at our other hospitals, or hospitals not owned or operated by us. Physicians on our medical staffs are free to terminate their membership on our medical staffs and admit their patients to other hospitals, owned, or not owned by us. Non-physician staff, including nurses, therapists, technicians, finance, registration, maintenance, clerical, housekeeping, and administrative staff are generally employees of the hospital, unless the service is provided by a third party contracted entity. We are subject to federal and state minimum wage and hour laws and various state labor laws and maintain an employee benefit plan.

Our hospitals' operations depend on the abilities, efforts, experience and loyalty of our employees and physicians, most of who have no long-term contractual relationship. Our ongoing business relies on our attraction of skilled, quality employees, physicians and other healthcare professionals in all disciplines.

We strive to successfully attract and retain key employees, physicians and healthcare professionals. Our operations, financial position and cash flows could be materially adversely affected by the loss of key employees or sufficient numbers of qualified physicians and other healthcare professionals. The relations we have with our employees, physicians, and other healthcare professionals are key to our success and they are a priority in our management philosophy.

**NURSING CAN HAVE A SIGNIFICANT EFFECT ON OUR LABOR COSTS. THE NATIONAL NURSING SHORTAGE CONTINUES AND IS SERIOUS IN CALIFORNIA. THE RESULT HAS BEEN AN INCREASE IN THE COST OF NURSING PERSONNEL, THUS AFFECTING OUR LABOR EXPENSES. RECENTLY, THERE HAS BEEN SOME LESSENING IN THE NEED FOR CONTRACT AGENCY NURSES FOLLOWING THE RECESSION AS NURSES RETURN TO THE WORK FORCE. THERE IS STILL NO BASIS TO PREDICT THE LONGEVITY OF THIS EFFECT. ADDITIONALLY, CALIFORNIA INSTITUTED MANDATORY NURSE STAFFING RATIOS, THUS SETTING A HIGH LEVEL OF NURSES TO PATIENTS, BUT ALSO REQUIRING NURSING STAFF RATIOS BE MAINTAINED AT ALL TIMES EVEN WHEN ON BREAKS OR LUNCH. THESE REQUIREMENTS IN THE ENVIRONMENT OF A SEVERE NURSING SHORTAGE MAY CAUSE THE LIMITING OF PATIENT ADMISSIONS WITH AN ADVERSE EFFECT ON OUR REVENUES. OUR PLAN IS TO IMPROVE COMPLIANCE AND REDUCE THE COST OF CONTRACT LABOR NEEDED TO ACHIEVE THE NURSE STAFFING RATIOS.**

COMPETITION

Hospital competition is unique to each facility and the community in which it operates. A hospital's competitive position within its geographic area is affected by several factors, including, but not limited to the following:

2

**JAE 1546**

CONFIDENTIAL

SPCP_0000001190

A hospital's competitive position is affected by the services the hospital offers and whether other hospitals in the area offer the same or similar services. Hospitals are dependent on physicians to admit patients to the hospital. Thus, the number of physicians around the hospital, their specialties, and the quality of medicine they practice will have a major impact on hospital competition. The ability of the hospital to employ and retain qualified nurses, other health care professionals and administrative staff will also affect the hospitals' competitiveness in the market place. Further, a hospital's reputation with patients, physicians, employees, and contracting health plans can influence the hospital's competitive position. Southern California is a highly competitive managed health care market; therefore, the relationship a hospital has with managed care organizations is also a key factor in its competitiveness. The hospital's location, the community immediately surrounding it and access to the hospital will also affect the hospital's competitiveness. Other hospitals or health care organizations serving the same locations determine the intensity of the competition. The condition of the physical plant and the ability to invest in new equipment and technology can affect the community's and physicians' desire to use a particular hospital. The amount the hospital charges for services is also a factor in the hospital's competitiveness. The funding sources of the competition can also be a factor if a competitor is tax exempt. Tax-exempt institutions have advantages not available to for-profit hospitals, such as endowments, charitable contributions, tax-exempt financing, and exemptions from certain taxes.

Efforts to control health care costs are encouraging vertical integration in the health care services industry. Hospital systems are acquiring physician practices and other outpatient and sub-acute providers to position themselves for readmission, bundling and other payment restructuring. Similarly, payers are consolidating and acquiring disease management service providers in an effort to offer more competitive programs. As integrated health systems come to dominate the markets of health insurance and medical services, the hospital industry will be dramatically affected.

Finally, laws and regulations governing antitrust, anti-kickback, physician referrals and other applicable regulations, such as requirements imposed on physician-owned hospitals, impact a hospital's ability to compete. Since these factors are individual to each hospital, and are subject to change, each hospital must develop its own strategies, to address the competitive factors in its local service area.

We endeavor to ensure our Hospitals remain competitive. We believe our Hospitals compete within local communities on the basis of many factors, including providing high quality of care, attracting and retaining quality physicians, and attracting and retaining skilled clinical personnel and other health care professionals. We also believe that the location of our Hospitals, the scope of services we offer, and our prices for services help maintain our competitive position. We continue to focus our efforts and resources on these areas to maintain a competitive position in the communities we serve.

HEALTH CARE REGULATION AND LICENSING

Health care, as one of the largest industries in the United States, continues to attract much legislative interest and public attention. Changes in the Medicare and Medicaid programs and other government health care programs, as well as hospital cost-containment initiatives by public and private payers, proposals to limit payments and health care spending, and industry wide competitive factors greatly affect the health care industry. The industry is also subject to extensive federal, state and local regulations relating to licensure, operations, ownership of facilities, physician relationships, expansion of facilities and services, and charges and effective reimbursement rates for services. The laws, rules and regulations governing the health care industry are extremely complex, and the industry often has little or no regulatory or judicial interpretation for guidance. Compliance with such regulatory requirements, as interpreted and amended from time to time, can increase operating costs and thereby adversely affect the financial viability of our business. Failure to comply with current or future regulatory requirements could also result in the imposition of various civil and criminal sanctions including fines, restrictions on admission, denial of payment for services rendered, revocation of licensure, decertification, imposition of temporary management or the closure of a facility.

The Patient Protection and Affordable Care Act

In 2010, the U.S. Congress adopted and President Obama signed into law comprehensive reform legislation through the passage of the Patient Protection and Affordable Care Act (H.R. 3590) and the Health Care and Education Reconciliation Act (H.R. 4872) (collectively, "PPACA"). The primary goal of this comprehensive legislation is to extend health coverage to millions of uninsured legal residents through a combination of public program expansion and private sector health insurance reforms. To fund the expansion of insurance coverage, the legislation contains measures designed to promote quality and cost efficiency in health care delivery and to generate budgetary savings in the Medicare and Medicaid programs. Although the law became effective on March 23, 2010, many provisions of PPACA, including the controversial mandated minimum coverage provisions, do not take effect until 2014. In March 2012, the United States Supreme Court heard arguments in cases challenging PPACA on several grounds, including the constitutionality of the minimum coverage provisions and the severability of those provisions from the other parts of the law. The Court is expected to publish its decision this summer.

Because of the many variables involved, we are unable to predict with certainty the full impact of PPACA on our future revenues and operations at this time due to the law's complexity, the limited amount of implementing regulations and interpretive guidance, gradual or potentially delayed implementation, pending Supreme Court challenges and possible amendment. However, we expect that several provisions of PPACA, including those described below, will have a material effect on our business.

3

**JAE 1547**

CONFIDENTIAL

SPCP_0000001191

- Decreases in Annual Market Basket Updates. With varying effective dates, the annual Medicare market basket updates for many providers will be reduced, and adjustments to payment for expected productivity gains will be implemented. PPACA reduces the market basket update for hospitals beginning in 2012 by a productivity adjustment equal to the 10-year moving average of changes in annual economy-wide private non-farm business multifactor productivity. In addition to the productivity adjustment, the market basket will be reduced by 0.1% in 2012 and 2013, by 0.3% in 2014, by 0.2% in 2015 and 2016, and by 0.75% in 2017, 2018 and 2019. These reductions to the Hospitals' reimbursements for inpatient services under Medicare by PPACA will adversely affect our business.

- Decreases in Medicare and Medicaid DSH Payments. Commencing in federal fiscal year 2014, Medicare Disproportionate Share Hospital ("DSH") payments will be reduced initially by 75% and replaced by an increase to account for the national rate of consumers who do not have health care insurance and are provided uncompensated care. The rules for this uncompensated care adjustment have not yet been published. Commencing in 2014, a state's Medicaid DSH allotment from federal funds will also be reduced. PPACA mandates reductions in Medicaid DSH allotment to states for the years 2014 through 2020. Any reductions to our reimbursement under Medicare and Medicaid programs by PPACA could adversely affect our business. Likewise, any reductions in Medicare and Medicaid DSH payments could adversely affect our business.

- Medicaid Expansion. Medicaid programs will be expanded to a broader population with incomes up to 133% of federal poverty levels. Further, the law permits states to create federally funded, non-Medicaid plans for low-income residents not eligible for Medicaid. To a lesser extent, PPACA also expands the Children's Health Insurance Program ("CHIP"). Our Hospitals may achieve increased revenues from providing care to individuals who, prior to PPACA, were previously uninsured.

PPACA also contains several provisions intended to improve the quality and efficiency of medical care provided to Medicare and Medicaid beneficiaries. We anticipate these provisions, including those described below, may have a material effect on our business:

- Hospital Readmissions Reduction Program. Commencing in federal fiscal year 2012, Medicare payments that would otherwise be made to hospitals will be reduced by specified percentages to account for excess and "preventable" hospital readmissions.

- Medicare and Medicaid Payment Reductions for Hospital-Acquired Conditions. A Hospital-Acquired Condition ("HAC") is a condition that is acquired by a patient while admitted as an inpatient to a hospital. Beginning in 2015, the 25% of hospitals with the highest national HAC rates will receive a 1% reduction in their Medicare payments for inpatient services. Similarly, under the Medicaid program, PPACA prohibits the use of federal funds to reimburse providers for medical services furnished to treat HACs. To the extent that Medicare or Medicaid patients are admitted to the Hospitals to treat HACs, the Hospitals' reimbursements could be reduced.

- Value-Based Purchasing. Effective in 2012, a value-based purchasing program will be established under the Medicare program designed to pay hospitals based on performance of quality measures for services rendered. Where a hospital meets or exceeds the quality measures for the given time period, the base operating Diagnosis Related Group ("DRG") payment amount is increased by a percentage for the following fiscal year. Where a hospital does not meet the quality measures for a given time period, the base operating DRG payment amount is decreased by a percentage for the following fiscal year. To the extent that the Hospitals meet or fail to meet the quality metrics under the value-based purchasing program, their reimbursements for services furnished to Medicare patients may be affected.

- Accountable Care Organizations. PPACA required the Secretary to establish a Medicare Shared Savings Program that promotes accountability and coordination of care through the creation of Accountable Care Organizations ("ACOs"). The first participation period for those ACOs accepted into the Medicare Shared Savings Program began on January 1, 2012. The second participation period began on April 1, 2012, and a third participation period will begin on July 1, 2012. If the Hospitals choose to participate in the Shared Savings program, reimbursements for inpatient and outpatient services may be affected.

- Bundled Payment Pilot Program. In addition to the Medicare Shared Savings Program, PPACA requires the Secretary to establish a five-year, voluntary national bundled payment pilot program for Medicare services beginning no later than January 1, 2013. If the Hospitals receive approval to participate in the pilot program, their reimbursements for inpatient and outpatient services may be affected.

As a result of PPACA's passage, the health care industry will be subjected to significant new statutory and regulatory requirements and consequently to structural and operational changes and challenges for a substantial period of time. We will continue to assess the effect of PPACA and additional legislation on current and projected operations, financial performance and general financial condition.

4

**JAE 1548**

SPCP_0000001192

Medicare

Each of our Hospitals participates in the Medicare program. Medicare is a federal program that provides medical insurance benefits to persons age 65 and over, some disabled persons, and persons with end-stage renal disease. Under the Medicare program, we are paid for inpatient and outpatient services performed by the Hospitals. Our Hospitals continue to be affected by changes in laws and regulations pertaining to Medicare, which are often designed to reduce reimbursement rates.

Inpatient Acute Care Services. Medicare pays most hospitals for services furnished to inpatients under a system known as the Prospective Payment System ("PPS") where hospitals are paid for services based on predetermined rates. Medicare payments under PPS are based on the DRG to which each Medicare patient is assigned. The DRG is determined by the patient's primary diagnosis and other factors for each particular Medicare inpatient stay. The amount to be paid for each DRG is established prospectively by the Center for Medicare and Medicaid Services ("CMS"). The DRG amounts are not directly related to a hospital's actual costs or variations in service or length of stay. Therefore, if a hospital incurs costs in treating Medicare inpatients that exceed the DRG level of reimbursement plus any outlier payments, then that hospital will experience a loss from such services, which will have to be made up from other revenue sources. Payment limitations implemented by other third-party payers may restrict the ability of a hospital to engage in such "cost-shifting." In 2008, CMS replaced the existing 538 DRGs with 745 new severity-adjusted diagnosis related groups ("Medicare Severity DRGs" or "MS-DRGs"). The new MS-DRGs are intended to more accurately reflect the cost of providing inpatient services and eliminate any incentives that hospitals may have to only treat the healthiest and most profitable patients.

The DRG rates are adjusted by an update factor on October 1 of each year. The index used to adjust the DRG rates, known as the "market basket index," takes into consideration the increase of costs experienced by hospitals in purchasing goods and services. Generally, however, the percentage increases in the DRG payments have been lower than the projected increase in the cost of goods and services purchased by hospitals. Also, as discussed above, PPACA provides for annual percentage decreases to the market basket index. Therefore, we cannot assure that in the future our Hospitals will be paid amounts that will adequately reflect changes in the cost of providing health care services. On August 1, 2011, CMS issued the "Changes to the Hospital Inpatient Prospective Payment systems for Acute Care Hospitals and Fiscal Year 2012 Rates" ("IPPS 2012 Final Rule"). The IPPS 2012 Final Rule provides for a 3.0% market basket increase for federal fiscal year 2012, reduced by 2.0% consisting of a 0.1% pre-determined reduction mandated by PPACA, a 1.0% productivity reduction mandated by PPACA, a 2.0% prospective coding adjustment reduction, and an increase of 1.1% for prospective rural floor budget neutrality correction.

Because of the uncertainty of factors that may influence the inpatient PPS payments to our Hospitals, including admission volumes, length of stay and case mix, we cannot estimate the impact of the payment changes to the IPPS 2012 Final Rule will have on our annual Medicare inpatient net revenues.

Outpatient Services. Hospital outpatient services, including hospital operating and capital costs, are reimbursed on a PPS basis. All services paid under the outpatient PPS are classified into groups called Ambulatory Payment Classifications ("APCs"). Services in each APC are similar clinically and in terms of the resources they require. Using hospital outpatient claims data from the most recent available hospital cost reports, CMS determines the median costs for the services and procedures in each APC group, and a payment rate is established for each APC. Depending on the services provided, hospitals may be paid for more than one APC per patient encounter. CMS will make additional payment adjustments under outpatient PPS including "outlier" payments for services where the hospital's cost exceeds 2.5 times the APC rate for that service. In addition, certain other changes have reduced coinsurance payments below what they would have originally been under outpatient PPS. Several Medicare Part B services are specifically excluded from this rule, including certain physician and non-physician practitioner services, ambulance, clinical diagnostic laboratory services and non-implantable orthotics and prosthetics, physical and occupational therapy, and speech language pathology services.

For calendar year 2012 and each subsequent calendar year, PPACA requires that the annual market basket update for outpatient services also be reduced by a productivity adjustment. The amount of that reduction will be the projected according to nationwide productivity gains over the preceding 10 years. To determine the projection, the U.S. Department of Health and Human Services ("HHS") will use the Bureau of Labor Statistics' ("BLS") 10-year moving average of changes in specified economy-wide productivity. PPACA does not contain guidelines for projecting the productivity figure. However, CMS estimates that the combined market basket and productivity adjustments will reduce Medicare payments under the outpatient PPS by approximately $26.3 billion from 2010 to 2019.

Value Based Purchasing. Under CMS's Hospital Value-Based Purchasing Program, CMS will make value-based incentive payments to acute care hospitals based upon the hospital's quality measure performance as well as overall improvements to quality of care. This program will commence in federal fiscal year 2013 and apply to payments for discharges occurring on or after October 1, 2012. Hospitals that do not take part in the quality reporting program or that did not successfully report their quality measures will have their market basket update reduced by two percentage points.

Medicare Managed Care. The Medicare program allows various managed care plans, known as Medicare Advantage Plans, offered by private companies to engage in direct managed care risk contracting with the Medicare program. Under the Medicare Advantage program, these private companies agree to accept a fixed, per-beneficiary payment from the Medicare program to cover all care that the beneficiary may require. Health care providers must contract with Medicare Advantage plans to treat Medicare Advantage enrollees at agreed-upon rates. Covered inpatient and emergency services rendered to a Medicare Advantage beneficiary by a hospital that is an out-of-plan provider (i.e., that has not entered into a contract with a Medicare Advantage plan) will be paid at Medicare fee-for-service payment rates.

5

**JAE 1549**

CONFIDENTIAL

SPCP_0000001193

PPACA reduces, over a three year period, premium payments to managed Medicare plans such that CMS's managed care per capita premium payments are, on average, equal to traditional Medicare. PPACA also implements fee payment adjustments based on service benchmarks and quality ratings. The Congressional Budget Office ("CBO") has estimated that, as a result of these changes, payments to plans will be reduced by $138 billion between 2010 and 2019, while CMS has estimated the reductions will total $145 billion. In addition, PPACA expands the RAC program to include Medicare managed care plans. In light of the current economic downturn and PPACA, managed Medicare plans may experience reduced premium payments, which may lead to decreased enrollment in such plans. All or any of these outcomes may have a disproportionately negative effect upon those providers with relatively high dependence upon Medicare managed care revenues.

Medicaid and Medi-Cal (California's Medicaid Program)

Generally. Medicaid programs are funded jointly by the federal government and the states and are administered by statutes under approved plans. Medicaid reimbursement is often less than a hospital's cost of services. California's Medicaid program, known as "Medi-Cal", is a joint federal/state program that provides health care services to certain persons who are financially needy. Each of our Hospitals participates in the Medi-Cal program. The Medi-Cal program includes both a fee-for-service component and a managed care component.

As referenced above, PPACA requires states to expand Medicaid coverage to all individuals under age 65 with incomes up to 133% of the federal poverty level by 2014. However, PPACA also requires states to apply a 5% income disregard to the Medicaid eligibility standard, so that Medicaid eligibility will effectively be extended to those with incomes up to 138% of the poverty level.

Many states, including California, are adopting budgets that reduce their Medicaid expenditures. The current economic downturn has increased the budgetary pressures on California, and these pressures have resulted in decreased Medi-Cal spending. Additionally, due to the estimated $16 billion California budget deficit, Governor Brown has recently proposed additional cuts in health care reimbursement by the state.

Medi-Cal Fee-for-Service Program. Inpatient hospital services under the Medi-Cal fee-for-service component are reimbursed primarily under the Selective Provider Contracting Program ("SPCP"). Provider agreements under the SPCP are negotiated by the California Medical Assistance Commission ("CMAC"). Our Hospitals are located in areas which are currently "closed areas" under the SPCP. In SPCP closed areas, private hospitals must hold a contract with the Medi-Cal program in order to be paid for their inpatient services (other than services performed in an emergency to stabilize a patient so that they can be transferred to a contracting hospital, and additional care rendered to emergency patients who cannot be so stabilized for transfer or where no contracting hospital accepts the patient). Contracting hospitals are generally paid for these services on the basis of all-inclusive per diem rates they negotiate under their SPCP/CMAC contracts.

Outpatient hospital services under the fee-for service-component are paid for on the basis of a fee schedule, and it is not necessary for hospitals to hold SPCP/CMAC contracts in order to be paid for their outpatient services. Each Hospital currently has an SPCP/CMAC contract in which it is contractually bound to continue until either party terminates the contract. There can be no assurance that each Hospital will maintain SPCP status or that the current Medi-Cal payment arrangements will continue. Also, there can be no assurance that the SPCP/CMAC contract rates paid to our Hospitals will cover each Hospital's cost of providing care. The Medi-Cal payment rates for outpatient services generally cover only a small portion of a Hospital's cost of providing care.

Medi-Cal Managed Care. In addition to the fee-for-service component of Medi-Cal, Orange County, California (where our Hospitals are located) participates in the Medi-Cal managed care program. Many Medi-Cal beneficiaries in Orange County are covered under Medi-Cal managed care, and not under fee-for-service Medi-Cal. Medi-Cal managed care in Orange County is provided through a County Organized Health System known as CalOptima.

In 2006, CalOptima focused on entering into contracts with hospitals on a fee-for-services basis for managed care Medi-Cal enrollees managed directly by CalOptima and CalOptima's capitated hospitals. The rates in these contracts are based on the greater of a county-wide rate established by CalOptima based on past average SPCP/CMAC rates or the individual hospital's SPCP/CMAC rate. Our Hospitals entered into these CalOptima fee for service contracts effective June 2006, and all four Hospitals maintained their Medi-Cal managed care contract at the end of the fourth quarter. There can be no assurance that the amounts paid to our Hospitals for services which are covered or not covered under the contracts between CalOptima and each Hospital will be adequate to reimburse the Hospital's costs of providing care.

6

**JAE 1550**

CONFIDENTIAL

SPCP_0000001194

Medi-Cal DSH Payments. Some of our Hospitals receive substantial additional Medi-Cal reimbursement as a DSH hospital from the DSH Replacement Fund and the Private Hospital Supplemental Fund. Hospitals qualify for additional funding based on the proportion of services they provide to Medi-Cal beneficiaries and other low-income patients. Payments to a hospital are determined on a formula basis set forth by state law and the Medi-Cal State Plan. Hospitals receive funds from the Private Hospital Supplemental Fund pursuant to amendments to their SPCP contracts negotiated with the CMAC. The Medi-Cal funding for DSH hospitals, however, is dependent on state general funding appropriations, and there can be no assurance that the state will fully fund the Medi-Cal DSH payment programs. As referenced above, under PPACA, beginning on October 1, 2013, in fiscal years 2014 through 2020 a state's Medicaid DSH allotment from federal funds will be substantially reduced. Further, California Senate Bill 90, which was approved by the Governor on April 13, 2011, mandated reductions to state disproportionate share funding to private hospitals by $30 million for the 2010-11 fiscal year and by an additional $75 million for the 2011-12 fiscal year, including the corresponding federal participation therewith.

Medicare and Medicaid Recovery Audit Contractor Initiatives

Section 302 of the Tax Relief and Health Care Act of 2006 authorized a permanent program involving the use of third-party recovery audit contractors ("RACs") to identify Medicare overpayments and underpayments made to health care providers. RACs are compensated based on the amount of both overpayments and underpayments they identify by reviewing claims submitted to Medicare for correct coding and medical necessity. Payment recoveries resulting from RAC audits are appealable through administrative and judicial processes.

PPACA expanded the RAC program's scope by requiring all states to enter into contracts with RACs by December 31, 2010 to audit payments to Medicaid providers. CMS issued a letter to state Medicaid directors on October 1, 2010 that (1) provided preliminary guidance to states on the implementation of Medicaid RAC programs, (2) created a deadline of December 31, 2010 for states to establish RAC programs, and (3) established a deadline of April 1, 2011 for states to fully implement their Medicaid RAC programs. On February 1, 2011, CMS issued a notice temporarily suspending the requirement that states implement their RAC programs until the final Medicaid RAC rule is issued. CMS issued the final Medicaid RAC rule on September 16, 2011. Among other things, the final Medicaid RAC rule clarifies the permissible scope of RAC audits, including a maximum three-year look-back period and limits on the number of medical records that may be audited. The Final Rule also requires each RAC to hire certified coders and at least one licensed medical director, subject to limited exceptions. We cannot predict with certainty the impact of the Medicare and Medicaid RAC programs will have on our future results of operations or business.

Workers' Compensation Reimbursement

Fee Schedules. A portion of the Hospitals' revenues is expected to come from Workers' Compensation program reimbursements. As part of an effort in 2003 to control costs under the Workers' Compensation program, the California legislature enacted Labor Code Section 5307.1, which sets reimbursement for hospital inpatient and outpatient services, including outpatient surgery services, at a maximum of 120% of the current Medicare fee schedule for hospitals. The Administrative Director of the Division of Workers' Compensation is authorized to develop and, after public hearings, to adopt a fee schedule for outpatient surgery services, but this schedule may not be more than 120% of current Medicare payment rates for hospitals. This fee limitation caps the amount that our Hospitals can be paid for their services provided to Workers' Compensation patients. We can provide no assurance that the amount of revenues attributable to these payments will not be reduced in the future, which would have an adverse financial impact on the Company.

Provider Networks. Under California law, employers may establish medical provider networks for Workers' Compensation patients and may restrict their employees' access to medical services to providers that are participants in those networks. Employers are free to choose which providers will and will not participate in their networks, and employers pay participating providers on the basis of negotiated rates that may be lower than those that would otherwise be provided for by the Workers' Compensation fee schedules. Employers may also choose to contract with licensed Health Maintenance Organizations ("HMO") and restrict access by their employees to participating providers of these HMOs. Our Hospitals are participating providers in Workers' Compensation networks, and to the extent that the Hospitals are required to negotiate and accept lower reimbursement rates to participate in these networks, there may be an adverse financial impact on the Company. Also, network providers are required to provide treatment in accordance with utilization controls to be established by the Department of Workers' Compensation. Therefore, as network participants, such utilization controls may limit the services for which our Hospitals are reimbursed, which could have an adverse financial impact on the Company.

Commercial Insurance

Many private insurance companies contract with hospitals on a "preferred" provider basis, and many insurers have introduced plans known as Preferred Provider Organizations ("PPO"). Under PPO plans, patients who use the services of contracted providers are subject to more favorable copayments, coinsurance and deductibles than apply when they use non-contracted providers. In addition, under most HMOs, private payers limit coverage to those services provided by selected hospitals. With this contracting authority, private payers can direct patients away from non-selected hospitals by denying coverage for their services.

7

CONFIDENTIAL

**JAE 1551**

SPCP_0000001195

Our Hospitals currently have several contracts with managed care organizations. However, if the Company's managed care rates become less favorable, or if the Company loses contracts and becomes out-of-network for more patients, the Company's profitability may be unfavorably affected.

Electronic Health Records

The 2009 American Recovery and Reinvestment Act ("ARRA") provides stimulus monies for hospitals and physicians that are meaningful users of electronic health records ("EHR") and imposes penalties on providers who are not meaningful users by the end of 2015. The intent of ARRA is to promote the use of technology to improve health outcomes and reduce health care costs. To become a meaningful EHR user, a provider must adopt a "certified EHR system" according to HHS standards. Also, the health care provider must demonstrate that it engages in the exchange of health information to promote quality of care and coordination, and reports on clinical quality measures.

On July 13, 2010, CMS issued two final rules related to the adoption and dissemination of EHRs ("Phase I Rules"). The Phase I Rules define the "meaningful use" requirements that hospitals and other providers must meet to qualify for federal incentive payments for adopting EHRs under ARRA. Also, to demonstrate that they are meaningful EHR users, hospitals must meet 14 clinical quality measures and five of 10 optional quality objectives. In addition, the Phase I Rules describe the technical capabilities required for certified EHR technology. Hospitals and other providers must adopt certified EHR technology, as well as demonstrate their meaningful use thereof, to qualify for the federal incentive payments.

On March 2, 2012, CMS issued "Phase 2" of its EHR incentive plan ("Phase II Proposed Rules"). Under the Phase II Proposed Rules, hospitals must meet, or qualify for an exemption from, 16 core objectives and two of four optional quality objectives. The Phase II Proposed Rules also outline the process by which hospitals may submit quality data electronically, with the intent of reducing the burden associated with quality reporting.

The Company has adopted certified EHR technology and, during the year ended March 31, 2012, we recognized other income of $6.8 million relative to the first year under the Medicaid EHR incentive program

Our Hospitals will continue to endeavor to qualify for available EHR stimulus monies and to avoid penalties associated with failure to implement meaningful use of EHR systems. However, the purchase and implementation of EHR systems can be expensive. Further, as use of electronic health information becomes more pervasive, we anticipate that additional regulations and costs related to the exchange of health information on a regional and national basis will be implemented.

The Federal Emergency Medical Treatment and Active Labor Act

In response to concerns regarding inappropriate hospital transfers of emergency patients based on the patient's inability to pay for the services provided, Congress enacted the Emergency Medical Treatment and Labor Act ("EMTALA") in 1986. This so-called "anti-dumping" law imposes certain requirements on hospitals with Medicare provider agreements to (1) provide a medical screening examination for any individual who comes to the hospital's emergency department, (2) provide necessary stabilizing treatment for emergency medical conditions and labor, and (3) not transfer a patient until the individual is stabilized, unless the benefits of transfer outweigh the risks or the patient gives informed consent to the transfer. Since the Hospitals must provide emergency services without regard to a patient's ability to pay, complying with EMTALA could have an adverse impact on the profitability of the Hospitals, depending upon the number of such patients treated in or through our emergency rooms. Failure to comply with EMTALA can result in exclusion of the physician from the Medicare and/or Medicaid programs or termination of the hospital's Medicare provider agreements, as well as civil penalties.

Anti-kickback, Fraud and Self-Referral Regulations

Federal Anti-kickback Law. The Social Security Act's illegal remuneration provisions (the "Anti-kickback Statute") prohibit the offer, payment, solicitation or receipt of remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, for (a) the referral of patients or arranging for the referral of patients to receive services for which payment may be made in whole or in part under a government-sponsored federal health care program, which includes Medicare, Medicaid and TRICARE (formerly CHAMPUS, which provides benefits to dependents of members of the uniformed services) and any state healthcare program, or (b) the purchase, lease, order, or arranging for the purchase, lease or order of any good, facility, service or item for which payment may be made under a government-sponsored health care program. The Anti-kickback Statute contains both criminal and civil sanctions, which are enforced by the Office of Inspector General ("OIG") of HHS and the United States Department of Justice. The criminal sanctions for a conviction under the Anti-kickback Statute are imprisonment for not more than five years, a fine of not more than $50,000 for each offense, or both, with higher penalties potentially being imposed under the federal Sentencing Guidelines. In addition to the imposition of criminal sanctions, the Secretary of HHS may exclude any person or entity that commits an act prohibited by the Anti-kickback Statute from participation in the Medicare program, and may also direct states to exclude that person from participation in state health care programs. Violators of the Anti-kickback Statute may be subject to a civil money penalty of $50,000 for each prohibited act, and up to three times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose.

8

CONFIDENTIAL

PPACA amended the Anti-kickback Statute to provide that actual knowledge of the law or the specific intent to violate it is not required for a violation to occur. In addition, under PPACA, submission of a claim for services or items generated in violation of the Anti-kickback Statute constitutes a false or fraudulent claim and may be subject to additional penalties under the federal False Claims Act.

There is ever-increasing scrutiny by federal and state law enforcement authority scrutiny, OIG, HHS, the courts, and Congress of arrangements between health care providers and potential referral sources to ensure that the arrangements are not designed as an inappropriate mechanism to generate patient referrals. Enforcement actions have increased and courts have broadly interpreted the scope of the Anti-kickback Statute to the extent that if "one purpose" of a payment arrangement is to induce referrals, a violation has occurred.

In addition, the OIG has long been on record that it believes that physician investments in healthcare companies can violate the Anti-kickback Statute and the OIG has demonstrated an aggressive attitude toward enforcement of the Anti-kickback Statute in the context of ownership relationships.

The OIG has issued regulations specifying certain payment practices that will not be treated as a criminal offense under the Anti-kickback Statute and that will not provide a basis for exclusion from the Medicare or Medicaid programs (the "Safe Harbor Regulations"). These regulations include, among others, safe harbors for certain investments in both publicly traded and non-publicly traded companies. However, physician investments in the Company will not be protected by either of these safe harbor regulations. Nevertheless, the fact that a specific transaction does not meet all of the criteria of a "safe harbor" does not mean that such transaction constitutes a violation of the Anti-kickback Statute, and the OIG has indicated that any arrangement that does not meet all of the elements of a safe harbor will be evaluated on its specific facts and circumstances to determine whether the Anti-kickback Statute has been violated and, thus, if prosecution is warranted. Even in the absence of an enumerated safe harbor for physician-investment in the Company, however, the Company believes that it is not in violation of the Anti-kickback Statute.

California Anti-kickback Prohibitions. California law prohibits the offer, delivery, receipt or acceptance by a licensed person of any remuneration as compensation or an inducement for referring patients. The California statute applies to all patients, regardless of payer, and therefore is not limited to referrals of Medicare or Medi-Cal beneficiaries. There are no "safe harbors" under California's Anti-kickback Statute; however, there are exceptions that are not similarly reflected in the federal Anti-kickback statute. The California statute specifically provides that a medically necessary referral is not illegal where the referring physician has an ownership interest in the health care facility to which the referral is made, provided that the physician's return on investment is based upon the amount of the physician's capital investment or proportional ownership and such ownership is not based upon the number or value of patients referred. The Company believes that the return on investment paid to the physician-investors is relative to their proportional ownership interest, and therefore the Company's physician-investors are not in violation of California's Anti-kickback Statute.

California law contains a separate prohibition against kickbacks for the referral of Medi-Cal patients. California's Medi-Cal fraud and abuse statute prohibits the solicitation or receipt of any remuneration including kickbacks, in return for the referral of any individual to a person for furnishing any services or merchandise which is paid for by Medi-Cal. A violation of this law can result in punishment upon a first conviction by imprisonment in the county jail for not longer than one year, or state prison, or by a fine not exceeding $10,000, or by both imprisonment and fine. California's Attorney General has relied upon exceptions set forth in federal law when reviewing a physician's ownership in a medical device company. Therefore, as the Company believes that its physician-investors are not in violation of the federal Anti-kickback Statute by virtue of their relationships with the Company, they should similarly be considered compliant with California's Medi-Cal Anti-kickback Statute.

The Federal False Claims Act. The federal government is authorized to impose criminal, civil, and administrative penalties on any person or entity that files a false claim for payment from the Medicare or Medi-Cal programs. In addition to other federal criminal and civil laws to punish health care fraud, the federal government, over the past several years, has accused an increasing number of health care providers of violating the federal civil False Claims Act. The False Claims Act imposes civil liability (including substantial monetary penalties and damages) on any person or corporation which (1) knowingly presents a false or fraudulent claim for payment to the federal government, (2) knowingly uses a false record or statement to obtain payment or (3) engages in a conspiracy to defraud the federal government to obtain allowance for a false claim. Recently, provisions of the False Claims Act were clarified under the Fraud Enforcement and Recovery Act of 2009 ("FERA") to eliminate the requirement that a false claim be presented to a federal official or that it directly involves federal funds. False claims allegations could arise, for example, with respect to the Hospital's billings to the Medicare program for its services or the submission by the Hospital of Medicare cost reports. Also, under PPACA, the False Claims Act is now implicated by the knowing failure to report and return an overpayment within 60 days of identifying the overpayment or by the date a corresponding cost report is due, whichever is later. The False Claims Act defines "knowingly" to include not only actual knowledge of a claim's falsity, but also reckless disregard for, or intentional ignorance of, the truth or falsity of a claim. A party that does not "knowingly" submit false claims is not liable under the False Claims Act. Because our Hospitals perform hundreds of procedures a year for which they submit claims to Medicare, submission of claims known to be erroneous, or submission of claims in reckless disregard of their truth or falsity, could result in significant civil penalties under the False Claims Act. Our Hospitals, however, have significant quality control measures in place to identify and correct any errors in coding and claim submission that could lead to False Claims Act violations.

9

**JAE 1553**

CONFIDENTIAL                                                                                                        SPCP_0000001197

Under the *qui tam*, or whistleblower, provisions of the False Claims Act, private parties may bring actions on behalf of the federal government. These private parties, often referred to as relators, are entitled to share in any amounts recovered by the government through trial or settlement. Both direct enforcement activity by the government and whistleblower lawsuits have increased significantly in recent years and have increased the risk that a health care company, like us, will have to defend a false claims action, pay fines or be excluded from the Medicare and Medicaid programs as a result of an investigation resulting from a whistleblower case. Although the Company intends for its Hospitals to comply with both federal and state laws related to the submission of claims, there can be no assurance that a determination that we have violated these claims-related laws will not be made, and any such determination would have a material adverse effect on the Company.

In addition to the False Claims Act, federal civil monetary penalties ("CMP") provisions authorize the imposition of substantial civil money penalties against an entity that engages in activities including, but not limited to, (1) knowingly presenting or causing to be presented a claim for services not provided as claimed or which is otherwise false or fraudulent in any way, (2) knowingly giving or causing to be given false or misleading information reasonably expected to influence the decision to discharge a patient, (3) offering or giving remuneration to any beneficiary of a federal health care program likely to influence the selection of a particular provider, practitioner or supplier for the ordering or receipt of reimbursable items or services, (4) arranging for reimbursable services with an entity which is excluded from participation from a federal health care program, (5) knowingly or willfully soliciting or receiving remuneration for a referral of a federal health care program beneficiary or (6) using a payment intended for a federal health care program beneficiary for another use.

The Secretary of HHS, acting through the OIG, has both mandatory and permissive authority to exclude individuals and entities from participation in federal programs pursuant to the CMP statute. Also, it is a federal offense to: (1) knowingly and willfully execute or attempt to execute any scheme to defraud any health care benefit program, including any private or governmental program or (2) to obtain, by means of false or fraudulent pretenses, any property owned or controlled by any health care benefit program. Penalties for a violation of this federal law include fines and/or imprisonment, and a forfeiture of any property derived from proceeds traceable to the offense. In addition, if an individual is convicted of a criminal offense related to participation in the Medicare program or any state health care program, or is convicted of a felony relating to health care fraud, the Secretary of HHS is required to bar the individual from participation in federal health care programs and to notify the appropriate state agencies to bar the individuals from participation in state health care programs.

While the criminal statutes are generally reserved for instances of fraudulent intent, the federal government is applying its criminal, civil, and administrative penalty statutes in an ever-expanding range of circumstances. For example, the government has taken the position that a pattern of claiming reimbursement for unnecessary services violates these statutes if the claimant merely should have known the services were unnecessary, even if the government cannot demonstrate actual knowledge. The government has also taken the position that claiming payment for low-quality services is a violation of these statutes if the claimant should have known that the care was substandard. In addition, some courts have held that a violation of the Stark Law or the Anti-kickback Statute can result in liability under the federal False Claims Act. PPACA clarified this issue with respect to the Anti-kickback Statute by providing that submission of claims for services or items generated in violation of the Anti-kickback Statute constitutes a false or fraudulent claim under the False Claims Act. Noncompliance with other regulatory requirements can also lead to liability under the False Claims Act if it can be established that compliance with those requirements are necessary in order for a hospital to be paid for its services.

Claims filed with private insurers can also lead to criminal and civil penalties under federal law, including, but not limited to penalties relating to federal mail and wire fraud statutes and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") provisions which made the defrauding of any health care insurer, public or private, a crime. Our Hospitals are also subject to various state insurance statutes and regulations that prohibit the Hospitals from submitting inaccurate, incorrect or misleading claims. The Company intends for its Hospitals to comply with all state insurance laws and regulations regarding the submission of claims. However, the Company cannot guarantee that the Hospitals' insurance claims will not be challenged. If a Hospital is found to be in violation of a state insurance law or regulation, it could be subject to fines and criminal penalties which would have an adverse effect on the Company's business and operating results.

Federal Physician Self-Referral Law. Provisions of the Social Security Act commonly referred to as the Stark Law prohibit referrals by a physician of Medicare and Medicaid beneficiaries to providers for a broad range of health services if the physician (or his or her immediate family member) has an ownership or other financial arrangement with the provider, unless an exception applies. The "designated health services" to which the Stark Law applies include all inpatient and outpatient services provided by hospitals. Hospitals cannot bill for services they provide as a result of referrals that are made in violation of the Stark Law. In addition, a violation of the Stark Law may result in a denial of payment, require refunds to the Medicare program and its beneficiaries, civil monetary penalties of up to $15,000 for each violation, civil monetary penalties of up to $100,000 for certain "circumvention schemes," and exclusion from participation in Medicare, Medicaid, and other federal programs. Violations of the Stark Law may also be actionable as violations of the federal False Claims Act.

10

---

**JAE 1554**

CONFIDENTIAL

SPCP_0000001198

Notwithstanding the breadth of the Stark Law's general prohibition, the law contains an exception which protects ownership interests held by physicians in hospitals where the referring physician is authorized to perform services at the hospital and the physician's ownership is in the hospital itself, and not merely in a subdivision of the hospital. The Hospitals intend to rely upon this exception to protect the ownership interests that physicians hold in them. PPACA made changes to this exception by effectively preventing new physician-owned hospitals after March 23, 2010 and limiting the capacity and amount of physician ownership in existing physician-owned hospitals. As revised, the Stark law prohibits physicians from referring Medicare patients to a hospital in which they have an ownership or investment interest unless the hospital has physician ownership and a Medicare provider agreement as of March 23, 2010 (or, for those hospitals under development at the time of the PPACA's enactment, as of December 31, 2010). A physician-owned hospital that meets these requirements will still be subject to restrictions that limit the hospital's aggregate physician ownership to the level that existed on March 23, 2010 and, with certain narrow exceptions for hospitals with a high percentage of Medicaid patients, prohibit expansion of the number of operating rooms, procedure rooms or beds. The legislation also subjects a physician-owned hospital to reporting requirements and extensive disclosure requirements on the hospital's website and in any public advertisements.

In addition to physician ownership, the Hospitals have various arrangements by which they compensate physicians for services. Payments by the Company to such physicians who refer patients to our Hospitals will constitute financial relationships for purposes of the Stark Law. Exceptions exist under the Stark Law and its implementing regulations for various types of compensation relationships. The Company strives to ensure that all of its financial relationships qualify for one or more exceptions to the Stark Law. However, there can be no assurance that the Company will be successful in structuring all of its relationships with physicians so as to qualify for protection under one or more of the Stark Law's exceptions.

California Physician Self-Referral Law. In California, the legislature has enacted two laws which broadly prohibit physician self-referral of patients. The first law, codified in the California Labor Code, applies to workers' compensation patients, while the second law, codified in the California Business and Professions Code, applies to all patient referrals, regardless of the payer source. The first law has applied to workers injured on or after January 1, 1994. The other became operative on January 1, 1995, and applies to all patient referrals, regardless of the patient's payer. Generally, these laws prohibit physicians from referring patients to healthcare facilities in which they have an ownership interest, except in limited circumstances.

Both laws contain broad exceptions permitting physicians to refer patients to hospitals, so long as the referring physician is not compensated by the hospital for the referral, and any so long as equipment leases between the hospital and the physician satisfies certain requirements. Based on the enumerated exceptions, the Company believes that referrals to its Hospitals received from physician-owners are in compliance with both laws.

Disclosure of Financial Interests

California law provides that it is unlawful for a physician to refer a patient to an organization in which the physician or a member of the physician's immediate family has a significant beneficial interest, unless the physician first discloses the interest to the patient in writing and advises the patient regarding alternative services, if such services are available. A "significant beneficial interest" means any financial interest equal to or greater than five percent of the total beneficial interest, or $5,000. This disclosure requirement may be satisfied by the posting of a conspicuous sign likely to be seen by all patients who use the facility or by providing patients with written disclosure statements. Physicians must disclose the names of entities in which they hold significant financial interests to a patient's payer upon the request of the payer (not to be made more than once a year). A violation of this disclosure requirement constitutes "unprofessional conduct," and is grounds for the suspension or revocation of the physician's license. Further, it is deemed a misdemeanor punishable by imprisonment not to exceed six months, or by a fine not to exceed $2,500.

In addition, California's general self-referral laws require that any physician who refers a person to, or seeks consultation from an organization in which the physician has a financial interest must disclose the financial interest to the patient in writing at the time of the referral. This requirement applies regardless of whether the financial interest is otherwise protected by one of the exemptions under the self-referral law. There is no minimum threshold of ownership required in order for this disclosure requirement to be triggered, and this disclosure requirement cannot be satisfied by the posting of a sign. A violation of this disclosure requirement may be subject to civil penalties of up to $5,000 for each offense. Physician investors in the Company are individually responsible for complying with these disclosure requirements with respect to their referrals to the Hospital. A failure to make the required disclosure by any physician who holds a financial interest in the Company could have an adverse impact on the Company.

Health Insurance Portability and Accountability Act

The HIPAA law mandates the adoption of uniform standards for the exchange of health information in an effort to encourage overall administrative simplification, protect the confidentiality of a patient's confidential health information, and enhance the overall effectiveness and efficiency of the health care industry. Under HIPAA, health care providers and other "covered entities," such as health insurance companies and other third-party payers, must adopt uniform standards for the electronic transmission of billing statements and insurance claims forms. These standards require the use of standard data formats and code sets when electronically transmitting information in connection with health claims and equivalent encounter information, healthcare payment and remittance advice and health claim status. PPACA requires HHS to adopt standards for additional electronic transactions and to establish operating rules to promote uniformity in the implementation of each standardized electronic transmission.

11

---

**JAE 1555**

CONFIDENTIAL

SPCP_0000001199

HHS also has promulgated security standards and privacy standards which are aimed, in part, at protecting the confidentiality, availability and integrity of health information by "covered entities," including health plans, healthcare clearinghouses and healthcare providers, that receive, store, maintain or transmit health and related financial information in electronic form. In addition, ARRA amended HIPAA to include "business associates," i.e., those entities that perform business functions for health plans, health care clearinghouses and providers. The privacy standards require compliance with rules governing the use and disclosure of patient health and billing information. ARRA also created rights for patients in their health information, such as the right to amend their health information, and they require us to impose these rules, by contract, on any business associate to which we disclose such information to perform functions on our behalf. These provisions required us to implement expensive computer systems, employee training programs and business procedures to protect the privacy and security of each patient's health information and enable electronic billing and claims submissions consistent with HIPAA. On July 14, 2010, HHS issued a proposed rule that would implement many of these ARRA provisions. If finalized, these changes may require amendments to existing agreements with business associates and would subject business associates and their subcontractors to direct liability under the HIPAA privacy and security regulations.

The HIPAA security standards require us to maintain reasonable and appropriate administrative, technical, and physical safeguards to ensure the integrity, confidentiality and the availability of electronic health and related financial information. The security standards were designed to protect electronic information against reasonably anticipated threats or hazards to the security or integrity of the information and to protect the information against unauthorized use or disclosure. Under ARRA, covered entities, including the Hospitals, must notify patients of most security breaches pursuant to HHS regulations.

HIPAA provides both criminal and civil fines and penalties for covered entities that fail to comply. These fines and penalties were strengthened under ARRA to provide for penalties of (1) in the amount of $1,000 per violation due to "reasonable cause and not to willful neglect" (with a maximum penalty of $100,000), (2) up to $10,000 for each violation due to willful neglect that is corrected (subject to a $250,000 maximum) and (3) up to $50,000 for each willful violation that is not corrected properly (subject to a maximum penalty of $1.5 million dollars during a calendar year).

California Confidentiality of Medical Information Act

The Confidentiality of Medical Information Act ("CMIA"), California's general health information privacy law, applies to California health care providers, including hospitals, and several other types of entities. The CMIA prohibits the disclosure of an individual's confidential health information "for any purpose not necessary to provide health care services to the patient," unless the individual authorizes it, or it is otherwise permitted by the CMIA.

The CMIA allows a person whose medical information has been used or disclosed in violation of the CMIA to recover (1) compensatory damages for resulting economic loss or personal injury, (2) nominal damages in the amount of $1,000 (whether or not actual damages were sustained), (3) punitive damages of up to $3,000, (4) attorneys' fees of up to $1,000 and the (5) costs of litigation. A violation of the CMIA that results in economic loss or personal injury to a patient is also a misdemeanor. The CMIA further provides for civil penalties, ranging from $2,500 for negligent disclosures of medical information in violation of the CMIA to $250,000 for knowing and willful disclosures for the purposes of financial gain. Any wrongful disclosure of patient medical information by the Hospitals may result in significant financial penalties to the Hospitals, and would have an adverse effect on the Company's business.

California Security Breach Information Act

The California Security Breach Information Act, effective July 1, 2003, requires those businesses that own or license personal information about Californians to provide reasonable security measures to protect the confidentiality of such information and to inform those individuals if the security of their information is compromised. The disclosure must be made in the "most expedient time possible" and without unreasonable delay, consistent with the legitimate needs of law enforcement or any measures necessary to determine the extent of the breach.

On August 31, 2011, Governor Brown signed Senate Bill 24, which amended California's security breach notification law. Senate Bill 24 applies to breaches occurring on or after January 1, 2012, and makes several important changes to disclosure requirements required under the law. As required by Senate Bill 24, notices to affected individuals must now also contain (1) the name and contact information of the reporting person or business, (2) the types of personal information subject to the breach, (3) the date or date range of the breach, and (4) the toll-free telephone numbers and addresses of the three major credit bureaus if the breach exposed an individual's social security number and driver's license or state identification card number. The bill also requires notification of California's attorney general regarding the breach if more than 500 California residents are affected and amends the law's substitute notice provisions. Also, a covered entity under HIPAA will be deemed to have complied with the notice requirements of California's Security Breach Information Act if it has complied completely with Section 13402(f) of the federal Health Information Technology for Economic and Clinical Health Act ("HITECH").

**JAE 1556**

CONFIDENTIAL

SPCP_0000001200

Corporate Practice of Medicine

California has a body of law, known as the corporate practice of medicine prohibition, which prohibits non-professional corporations and other entities from employing or otherwise controlling the professional medical judgment of physicians. Although we exercise care in structuring our arrangements with physicians to comply with California law and we believe that such arrangements will comply with applicable laws in all material respects, we cannot provide any assurance that governmental officials charged with responsibility for enforcing these laws will not assert that the Company, or certain transactions that we are involved in, are in violation of such laws, or that the courts will ultimately interpret such laws in a manner consistent with our interpretations.

Certain Antitrust Considerations

The addition of physician-investors in the Company could affect competition in the geographic areas in which its Hospitals operate. Such effects on competition could give rise to claims that the Hospitals and physician-investors violate federal and state antitrust and unfair competition laws under a variety of theories. There can be no assurance that the Federal Trade Commission, the Antitrust Division of the Department of Justice, or any other party, including a physician participating in the Company's business, or a physician denied participation in the Company's business, will not challenge or seek to delay or enjoin the activities of the Company on antitrust grounds. If such a challenge is made, there can be no assurance that such challenge would be unsuccessful. We have not obtained an analysis of any possible antitrust implications of the activities of the Company or of the continuing arrangements and anticipated operations of the Hospitals.

Licensing, Certification, Accreditation, Surveys, Investigations and Audits

Health facilities, including the Hospitals, are subject to numerous legal, regulatory, professional and private licensing, certification and accreditation requirements. These include requirements relating to Medicare and Medi-Cal participation and payment, state licensing agencies, private payers and the Joint Commission. Renewal and continuance of these licenses, certifications and accreditations are based on inspections, surveys, audits, investigations or other reviews, some of which may require or include affirmative action or response by the Company. Some investigations by licensing bodies may result in financial penalties to the Hospitals. These activities are generally conducted in the normal course of business of health care facilities. Nevertheless, an adverse determination could result in a loss or reduction in a Hospital's scope of licensure, certification or accreditation, or could reduce the payment received or require repayment of amounts previously remitted. Any failure to obtain, renew or continue a license, certification or accreditation required for operation of a Hospital could result in the loss of utilization or revenues or the loss of the Company's ability to operate all or a portion of a Hospital, and, consequently, could have a material and adverse effect on the Company.

The hospital industry has seen a number of ongoing investigations related to referrals, physician recruiting practices, cost reporting and billing practices, laboratory and home health care services and physician ownership and joint ventures involving hospitals. Federal and state government agencies have announced heightened and coordinated civil and criminal enforcement efforts. PPACA includes additional federal funding to fight health care fraud, waste and abuse, increasing incrementally through federal fiscal year 2020. The operational mission of the OIG is to protect the integrity of the Medicare and Medicaid programs and the well-being of program beneficiaries by: detecting and preventing waste, fraud and abuse; identifying opportunities to improve program economy, efficiency and effectiveness; and holding accountable those who do not meet program requirements or who violate federal laws. The OIG carries out its mission by conducting audits, evaluations and investigations and, when appropriate, imposing civil monetary penalties, assessments and administrative sanctions. Although we have policies and procedures in place to facilitate compliance with the laws, rules and regulations affecting the health care industry, if a determination is made that we were in material violation of such laws, rules or regulations, our business, financial condition, results of operations or cash flows could be materially adversely affected.

The laws and regulations with which we must comply are complex and subject to change. In the future, different interpretations or enforcement of these laws and regulations could subject our operations to allegations of impropriety or illegality or could require us to make changes in our facilities, equipment, personnel, services, capital expenditure programs and operating expenses. If we fail to comply with applicable laws and regulations, we could suffer civil or criminal penalties, including the loss of our licenses to operate our hospitals and our ability to participate in the Medicare, Medicaid and other federal and state health care programs.

Earthquake Safety Compliance

The Hospitals are located in an area near active and substantial earthquake faults. The Hospitals carry earthquake insurance with a policy limit of $50.0 million. A significant earthquake could result in material damage and temporary or permanent cessation of operations at one or more of the Hospitals.

The State of California has imposed new hospital seismic safety requirements. Under these new requirements, the Hospitals must meet stringent seismic safety criteria in the future. In addition, there could be other remediation costs pursuant to this seismic retrofit.

13

CONFIDENTIAL

The State of California has introduced a new seismic review methodology known as HAZUS. The HAZUS methodology may preclude the need for some structural modifications. All four Hospitals requested HAZUS review and received a favorable notice pertaining to structural reclassification. All Hospital buildings, with the exception of one (an administrative building), have been deemed compliant until January 1, 2030 for both structural and nonstructural retrofit. We do not have an estimate of the cost to remediate the seismic requirements for the administrative building as of March 31, 2012.

There are additional requirements that must be complied with by 2030. The costs of meeting these requirements have not yet been determined. Compliance with seismic ordinances will be costly and could have a material adverse effect on our cash flow. In addition, remediation could possibly result in certain environmental liabilities, such as asbestos abatement.

Environmental Regulations

The Hospitals are subject to various federal, state and local statutes and ordinances regulating the discharge of materials into the environment. Our health care operations generate medical waste, such as pharmaceuticals, biological materials and disposable medical instruments that must be disposed of in compliance with federal, state and local environmental laws, rules and regulations. Our operations are also subject to various other environmental laws, rules and regulations. Environmental regulations also may apply when we renovate or refurbish hospitals, particularly older facilities. Remediation costs relating to toxic substances, if encountered during construction, could be material to the Company.

Corporate History

The Company was originally incorporated under the laws of the State of Utah on July 31, 1984 under the name "Aquachlor Marketing Inc." On December 23, 1988, the Company reincorporated in the State of Nevada. From 1989 until 2003, the Company was a development stage company with no material assets, revenues or business operations. On November 18, 2003, a group of investors purchased a controlling interest in the Company (then known as First Deltavision) with the objective of transforming the Company into a leading provider of high quality, cost-effective healthcare through the acquisition and management of financially distressed and/or underperforming hospitals and other healthcare facilities. On September 29, 2004, the Company entered into a definitive agreement to acquire the four Hospitals from Tenet and the transaction closed on March 8, 2005.

In the first quarter of 2004, the Company changed its fiscal year end from June 30 to December 31, and changed the Company's name to "Integrated Healthcare Holdings, Inc." On December 21, 2006, the Company changed its fiscal year end from December 31 to March 31. Our principal executive offices are located at 1301 North Tustin Avenue, Santa Ana, California 92705, and our telephone number is (714) 953-3503.

**ITEM 1A.  RISK FACTORS**

An investment in our common stock involves a high degree of risk. You should carefully consider the following information about these risks, together with the other information contained in this report. Our business is subject to a number of risks and uncertainties—many of which are beyond our control—that may cause our actual operating results or financial performance to be materially different from our expectations. You should carefully consider the following information about these risks, together with the other information contained in this report, before you decide to buy our common stock. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also harm our operations. If any of the following risks actually occur, our business would likely suffer and our results could differ materially from those expressed in any forward-looking statements contained in this Annual Report on Form 10-K including our consolidated financial statements and related notes. In such case, the trading price of our common stock could decline, and shareholders could lose all or part of their investment.

WE MUST OBTAIN ADDITIONAL CAPITAL WHICH, IF OBTAINED THROUGH THE ISSUANCE OF EQUITY SECURITIES, WILL LIKELY RESULT IN SUBSTANTIAL DILUTION TO OUR CURRENT SHAREHOLDERS

We will require additional capital to fund our business. If we raise additional funds through the issuance of common or preferred equity, warrants or convertible debt securities, these securities will likely substantially dilute the equity interests and voting power of our current shareholders, and may have rights, preferences or privileges senior to those of the rights of our current shareholders. We cannot predict whether additional financing will be available to us on favorable terms or at all.

WE HAVE PREVIOUSLY EXPERIENCED SIGNIFICANT DIFFICULTIES WITH OUR LIQUIDITY AND MUST REFINANCE OUR OUTSTANDING INDEBTEDNESS WITH SILVER POINT BY NO LATER THAN APRIL 13, 2013

The consolidated financial statements have been prepared on a going concern basis, which assumes a continuing of our operations and the realization of assets and settlement of obligations in the normal course of business. As of March 31, 2012, the Company has a total stockholders' deficiency of $11.6 million and a working capital deficit of $14.7 million. For the year ended March 31, 2012, the Company had net income of $7.5 million. The consolidated financial statements do not include any adjustments that might result if we were forced to liquidate or discontinue operations.

14

CONFIDENTIAL

SPCP_0000001202

As discussed further below in Item 6 under "Liquidity and Capital Resources," the stated maturity date of our $45.0 million Term Note under our Credit Agreements with Silver Point is April 13, 2013. If we are unable to refinance, restructure or extend our obligation to repay the principal amount by the maturity date, such failure would constitute a default under the Credit Agreement with Silver Point and our other loan facilities, which would permit Silver Point and our other lenders to seize our assets and those of our variable interest entity, Pacific Coast Holdings Investment, LLC ("PCHI"). Any actions by Silver Point or our other lenders to enforce their rights by seizing our assets could force us into bankruptcy or liquidation, which would have a material adverse effect on our liquidity and financial position and the value of our common stock.

WE HAVE INCURRED SIGNIFICANT LOSSES IN OPERATIONS TO DATE. IF OUR SUBSTANTIAL LOSSES CONTINUE, THE MARKET VALUE OF OUR COMMON STOCK WILL LIKELY DECLINE FURTHER. WE HAVE A HIGH DEGREE OF LEVERAGE AND SIGNIFICANT DEBT SERVICE OBLIGATIONS.

As of March 31, 2012, we had an accumulated deficit of $71.8 million. We are attempting to improve our operating results and financial condition through a combination of contract negotiations, expense reductions, lowering the costs of borrowings through refinancing our debt, and new issues of equity. However, new issues of equity are encumbered by warrant anti-dilution provisions and there can be no assurance that we will achieve profitability in the future. If we are unable to achieve and maintain profitability, the market value of our common stock will likely decline further.

As of March 31, 2012, the debt service requirements on our $59.0 million debt are approximately $750,000 per month. Our relatively high level of debt and debt service requirements have several effects on our current and future operations, including the following: (i) we will need to devote a significant portion of our cash flow to service debt, reducing funds available for operations and future business opportunities and increasing our vulnerability to adverse economic and industry conditions and competition; (ii) our leveraged position increases our vulnerability to competitive pressures; (iii) the covenants and restrictions contained in agreements relating to our indebtedness restrict our ability to borrow additional funds, dispose of assets, issue additional equity or pay dividends on or repurchase common stock; and (iv) funds available for working capital, capital expenditures, acquisitions and general corporate purposes are limited. Any default under the documents governing our indebtedness could have a significant adverse effect on our business and the market value of our common stock.

THE IMPACT OF PPACA ON OUR BUSINESS, FINANCIAL CONDITION, CASH FLOWS AND OPERATIONS IS UNCERTAIN

The extent to which PPACA will remain in effect will have a major impact upon the manner in which health care services are covered, delivered and reimbursed in the United States. The expansion of health insurance coverage under the law may result in a material increase in the number of patients using our facilities who have either private or public program coverage. However, PPACA also provides for significant reductions in the growth of Medicare spending and reductions in Medicare and Medicaid disproportionate share hospital payments. A significant portion of both our patient volumes and, as a result, our revenues is derived from government health care programs, principally Medicare and Medicaid. Reductions to our reimbursement under the Medicare and Medicaid programs by PPACA could adversely affect our business and results of operations to the extent such reductions are not offset by increased revenues from providing care to previously uninsured individuals.

We are unable to predict with certainty the full impact of PPACA on our future revenues and operations at this time due to the law's complexity and the limited amount of implementing regulations and interpretive guidance, as well as our inability to foresee how individuals and businesses will respond to the choices available to them under the law. Furthermore, many of the provisions of PPACA that expand insurance coverage will not become effective until 2014 or later. In addition, PPACA will result in increased state legislative and regulatory changes in order for states to comply with new federal mandates, such as the requirement to establish health insurance exchanges and to participate in grants and other incentive opportunities. Due to the uncertainty of the outcome of cases challenging PPACA before the U.S. Supreme Court, we are unable to predict the timing and impact of such changes at this time. For a further discussion of PPACA, see "ITEM 1. BUSINESS – HEALTH CARE REGULATION AND LICENSING."

IF WE ARE UNABLE TO ENTER INTO MANAGED CARE PROVIDER ARRANGEMENTS ON ACCEPTABLE TERMS, OR IF WE HAVE DIFFICULTY COLLECTING FROM MANAGED CARE PAYERS, OUR RESULTS OF OPERATIONS COULD BE ADVERSELY AFFECTED

It would harm our business if we were unable to enter into managed care provider arrangements on acceptable terms. Any material reductions in the payments that we receive for our services, coupled with any difficulties in collecting receivables from managed care payers, could have a material adverse effect on our financial condition, results of operations or cash flows.

15

**JAE 1559**

**FURTHER CHANGES IN THE MEDICARE AND MEDICAID PROGRAMS OR OTHER GOVERNMENT HEALTH CARE PROGRAMS COULD HAVE A MATERIAL ADVERSE EFFECT ON OUR BUSINESS**

On August 2, 2011, the federal Budget Control Act of 2011 (the "Budget Control Act") was enacted into law. The law mandates more than $900 billion in discretionary spending reductions over 10 years, and also provides for new spending initiatives aimed at reducing fraud and abuse in the Medicare program. The Budget Control Act also establishes the Joint Select Committee on Deficit Reduction (the "Joint Committee"), a bipartisan Congressional committee required to make recommendations regarding decreasing future federal budget deficits. Due to the Joint Committee's failure to meet the November 2011 recommendation deadline for recommendations, the Budget Control Act requires automatic Medicare payment reductions, beginning in 2013.

Further, due to a nearly $16 billion state budget deficit, Governor Brown has recently proposed an additional $8.3 billion in cuts, which include reductions to state health care reimbursement. On May 13, 2012, the Governor released an updated budget proposal which calls for reducing supplemental reimbursements to private hospitals by approximately $150 million in 2012 through 2013.

California's continuing fiscal crisis has resulted in a reduction in Medi-Cal payments to providers, including hospitals. State lawmakers recently approved a final budget proposal that reduces Medi-Cal program funding by $1.6 billion. The reduction includes a 10 percent reduction in some provider payments. It also increases Medi-Cal beneficiaries' share of cost for service payment, decreases annual dollar caps on services, and reduces funding for Adult Day Health Care. These reductions are only partially offset by federal stimulus spending, which is scheduled to expire.

If the rates paid by governmental payers are further reduced, if the scope of services covered by governmental payers is limited or if we, or one or more of our Hospitals, are excluded from participation in the Medicare or Medi-Cal program or any other government healthcare program, there could be a material adverse effect on our business, financial condition, results of operations or cash flows.

In addition to the changes implemented by PPACA, the Medicare and Medicaid programs are subject to statutory and regulatory changes, administrative rulings, interpretations and determinations concerning patient eligibility requirements, funding levels and the method of calculating payments or reimbursements, among other things; requirements for utilization review; and federal and state funding restrictions, all of which could materially increase or decrease payments from these government programs in the future, as well as affect the cost of providing services to our patients and the timing of payments to our facilities. We are unable to predict the effect of future government healthcare funding policy changes on our operations.

OUR BUSINESS CONTINUES TO BE ADVERSELY AFFECTED BY A HIGH VOLUME OF UNINSURED AND UNDERINSURED PATIENTS

The primary collection risks associated with our accounts receivable relate to uninsured patient accounts and those patient accounts for which the primary insurance carrier has paid the amounts covered by the applicable agreement, but patient responsibility amounts (deductibles and co-payments) remain outstanding. The provision for doubtful accounts relates primarily to amounts due directly from patients. This risk has increased, and will likely continue to increase, if more individuals enroll in high deductible and co-payment insurance plans or forego health insurance coverage entirely. These trends will likely be exacerbated if general economic conditions remain challenging or if unemployment levels in the communities in which we operate rise. If unemployment rates increase, our business strategies to generate organic growth and to improve admissions and adjusted admissions at our hospitals may become more difficult to accomplish.

The amount of our provision for doubtful accounts is based on our assessments of historical collection trends, business and economic conditions, trends in federal and state governmental and private employer health coverage and other collection indicators. A continuation in trends that results in increasing the proportion of accounts receivable being comprised of uninsured or under-insured accounts could adversely affect our collections of accounts receivable, results of operations and cash flows.

PPACA seeks to decrease the number of uninsured individuals through employer mandates and individual requirements, which may have a positive effect on our accounts receivable. However, due to the lack of implementing regulations, delayed implementation timelines, and pending Supreme Court action seeking to invalidate several key provisions of the law, it is difficult to predict the full impact PPACA will have on our results of operations.

COST CONTAINMENT, PAY FOR PERFORMANCE, AND OTHER PROGRAMS IMPOSED BY THIRD-PARTY PAYERS, INCLUDING GOVERNMENT HEALTH CARE PROGRAMS, MAY DECREASE THE COMPANY'S REVENUE

The health care industry is currently undergoing significant changes and is regularly subject to regulatory and political intervention. We expect to derive a considerable portion of the Company's revenue through our Hospitals from government-sponsored health care programs and third-party payers (such as employers, private insurers, HMOs or preferred provider organizations). It is possible that reimbursement from government and private third-party payers for hospital services may be reduced in the future due to a deterioration in general economic conditions and fiscal pressures placed upon federal and state governments. Further reductions in payments or other changes in reimbursement for health care services could have a material adverse effect on the Company's business, financial condition and/or results of operations. Also, rates paid by private third-party payers are generally higher than Medicare, Medicaid and HMO payment rates. Any decrease in the relative number of patients covered by private insurance would have a material adverse effect on the Company's revenues and operations.

16

**JAE 1560**

CONFIDENTIAL

SPCP_0000001204

WE ARE REQUIRED TO TREAT PATIENTS WITH EMERGENCY MEDICAL CONDITIONS REGARDLESS OF THE PATIENT'S ABILITY TO PAY

In accordance with EMTALA, we are required to provide medical treatment to stabilize any patient who arrives at our Hospitals with an emergency medical condition, regardless of the patient's ability to pay. Accordingly, our results of operations may be negatively impacted by an increase in the number of indigent or charity care patients with emergency medical conditions treated at our Hospitals.

CONTINUING TO PROVIDE QUALITY MEDICAL SERVICES FROM TALENTED PHYSICIANS IS CRITICAL TO OUR BUSINESS

Generally, physicians are responsible for making patient admission decisions at our hospitals. Physicians are not employees and may terminate their affiliation with our Hospitals at any time. Our business depends, in large part, upon the number, quality, and success of the physicians who perform services at our Hospitals, as well as the strength of our relationships with these physicians. Any failure of these physicians to maintain the quality of medical care provided or to otherwise adhere to professional guidelines at the Hospitals, or any damage to the reputation of a key physician or group of physicians, could damage the Company's and the Hospitals' reputations in the medical marketplace and may subject us to liability and significantly reduce our revenue and increase our costs.

Also, like many hospitals, we face a growing shortage of primary care and specialty physicians. Should this shortage continue or worsen, the utilization of our hospitals may be adversely impacted. This could have a negative impact on our revenues and profitability.

WE MAY BE INVOLVED IN LITIGATION WITH OUR MEDICAL STAFF

The primary relationship between a hospital and the physicians who practice in it is through the hospital's organized medical staff. Medical staff bylaws, rules and policies establish the criteria and procedures at acute care hospitals by which a physician may have his or her privileges or membership curtailed, denied or revoked. Physicians who are denied medical staff membership or certain clinical privileges, or who have such membership or privileges curtailed, denied or revoked may file legal actions against hospitals. Such actions may include a wide variety of claims, some of which could result in substantial uninsured damages to a hospital. In addition, unanticipated failure of the governing body to adequately oversee the conduct of its medical staff may result in hospital liability to third parties.

WE FACE COMPETITION IN STAFFING QUALIFIED NURSES AND MEDICAL SUPPORT STAFF FOR OUR HOSPITALS, WHICH COULD INCREASE OUR LABOR COSTS

Health care providers depend on qualified nurses, as well as other medical support staff, to provide quality health care services to patients. We must compete with other health care providers in attracting and retaining qualified nurses and medical support personnel, which may cause our labor expenses to rise. In addition, California has adopted legislation and regulations mandating a series of specific minimum patient-to-nurse ratios in all acute care hospital nursing units. Any failure to comply with nurse staff ratios could result in action by licensure authorities and/or subject the Hospitals to liability which could have a material adverse effect on the Company's results of operations.

UNION CONTRACTS HAVE EXPIRED AND THERE CAN BE NO ASSURANCE THAT THE CONTRACTS WILL BE RENEWED

Approximately 43% of the Company's employees are represented by labor unions as of March 31, 2012. The CNA Agreement expired on February 28, 2011 and the SEIU Agreement expired on August 31, 2011. Both agreements are currently in negotiations. The agreements have "no strike" provisions and compensation caps which provide the Company with long term compensation and workforce stability.

For both unions, all prior grievances regarding retiree medical benefits, the administration of pay adjustments and pay practices, changes in medical benefits and several wrongful terminations have been resolved in the form of settlement agreements.

17

CONFIDENTIAL

**IF EITHER THE COMPANY OR THE HOSPITALS FAIL TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS, WE MAY SUFFER PENALTIES OR BE REQUIRED TO MAKE SIGNIFICANT CHANGES TO OUR OPERATIONS**

The Company and our Hospitals are subject to many laws and regulations at the federal, state and local levels. These laws and regulations require our Hospitals to meet various licensing, certification and other requirements, including those relating to:

- billing and coding for services and properly handling overpayments
- licensure and certification issues
- physician ownership
- payments to specialty hospitals, should any of the Hospitals be determined to be a specialty hospital
- prohibited inducements for patient referrals and restrictions on payments for marketing
- the adequacy of medical care, equipment, personnel, operating policies and procedures
- confidentiality, maintenance, data breach, identify theft and security issues associate with health-related and personal information and medical records
- activities regarding competitors
- reimbursement audits
- environmental protection

If the Company fails to comply with applicable laws and regulations, it could suffer civil or criminal penalties. States are increasingly regulating the delivery of health care services. The hospital industry is subject to extensive state and local regulation with respect to reimbursement, licensure, certification and health planning. This regulation relates, among other things, to the adequacy of physical plant and equipment, qualifications of personnel, standards of medical care and operational requirements. Compliance with such regulatory requirements, as interpreted and amended from time to time, can increase operating costs and thereby adversely affect the financial viability of the company. In the future, different interpretations or enforcement of existing or new laws and regulations could subject the current practices to allegations of impropriety or illegality, or could require the Company to make changes in its facilities, equipment, personnel, services, capital expenditure programs and operating expenses. Current or future legislative initiatives or government regulation may have a material adverse effect on the Hospitals' operations or reduce the demand for their services.

**THE COMPANY CONDUCTS ON-GOING REVIEWS OF ITS COMPLIANCE WITH VARIOUS LAWS RELATED TO PHYSICIAN ARRANGEMENTS, WHICH MAY REVEAL VIOLATIONS THAT COULD SUBJECT THE COMPANY TO FINES OR PENALTIES**

The Company and our Hospitals have entered into a variety of relationships with physicians. In an increasingly complex legal and regulatory environment, these relationships may pose a variety of legal or business risks. The Company conducts reviews of its compliance with the federal Anti-kickback Statute, Stark Law and other applicable laws as they relate to the Company's relationships with potential referral sources.

One of the Company's largest shareholders, OC-PIN, is owned and controlled by physicians who also refer to and practice at our Hospitals. The Hospitals have various contractual relationships with OC-PIN physicians as well as physicians who are not owners of the Company.

The Company entered into a sale leaseback transaction for substantially all of the real estate with Pacific Coast Holdings Investment, LLC ("PCHI") whereby the Company leases substantially all of the real property of our Hospitals from PCHI. PCHI is owned by Ganesha Realty, LLC, which is managed by Dr. Kali P. Chaudhuri and various physician investors.

The Company has a review process in place to ensure that its agreements with potential referral sources are in writing and comply with applicable laws. Additionally, the Company has reviewed the terms of the purchase of ownership interests in the Company by OC-PIN, as well as the real estate sale-leaseback agreement with PCHI, and has determined that these transactions should be determined to be permissible under applicable law. However, if the Company or any of our Hospitals are not in compliance with federal and state fraud and abuse laws and physician self-referral laws, the Company could be subject to repayment obligations, fines, penalties, exclusion from participation in federal health care programs, and other sanctions which would have a material adverse effect on the Company's profitability.

**WE FACE INTENSE COMPETITION IN OUR BUSINESS**

The health care industry is highly competitive. We compete with a variety of other organizations in providing medical services, which may have greater financial resources available to them. Some of the hospitals that compete with our hospitals are owned by government agencies or are not-for-profit organizations. Tax-exempt competitors may have certain financial advantages not available to our facilities, such as endowments, charitable contributions, tax-exempt financing, and exemptions from sales, property and income taxes. In certain states, including California, some not-for-profit hospitals are permitted by law to directly employ physicians while for-profit hospitals are generally prohibited from doing so. We also face increasing competition from physician-owned specialty hospitals and freestanding surgery, diagnostic and imaging centers for market share in high-margin services and for quality physicians and personnel. If competing health care providers are better able to attract more patients, recruit and retain physicians, expand services or obtain favorable managed care contracts at their facilities, we may continue to experience a decline in patient volume levels.

**JAE 1562**

CONFIDENTIAL

SPCP_0000001206

A SIGNIFICANT PORTION OF OUR BUSINESS IS CONCENTRATED IN CERTAIN MARKETS AND THE RESPECTIVE ECONOMIC CONDITIONS OR CHANGES IN THE LAWS AFFECTING OUR BUSINESS IN THOSE MARKETS COULD HAVE A MATERIAL ADVERSE EFFECT ON THE COMPANY

We receive all of our inpatient services revenue from operations in Orange County, California. The economic condition of this market could affect the ability of our patients and third-party payers to reimburse us for our services, through its effect on disposable household income and the tax base used to generate state funding for Medicaid programs. An economic downturn, or changes in the laws affecting our business in our market and in surrounding markets, could have a material adverse effect on the Company.

Further, many individuals receive health insurance coverage through their employers. If unemployment levels continue to increase, the number of individuals with health insurance may decrease. As a result, our Hospitals may in turn experience a decrease in patient volumes or an increase in services provided to uninsured patients. These factors, although uncertain, could have a negative impact on our results of operations.

WE MUST EFFECTIVELY AND TIMELY IMPLEMENT ELECTRONIC HEALTH RECORD SYSTEMS IN ORDER TO AVOID MEDICARE PAYMENT REDUCTIONS

The Health Information Technology for Economic and Clinical Health Act ("HITECH") was introduced as part of the American Recovery and Reinvestment Act of 2009. The legislation was created to both stimulate the adoption of electronic health records in the United States and to require enhanced privacy safeguards for protected health information. The HITECH Act provides for incentives to those providers who have adopted EHR systems and meet Medicare's requirements for meaningful use thereof. Further, beginning in 2015, providers who fail to demonstrate meaningful use will receive negative adjustments in Medicare reimbursement. Failure to demonstrate meaningful use of an electronic health record system by the 2015 deadline could have an adverse effect on our results of operations.

WE MAY BE SUBJECT TO GOVERNMENTAL INVESTIGATIONS AND WHISTLEBLOWER ACTIONS

The federal False Claims Act imposes penalties on anyone who knowingly submits or causes the submission of a fraudulent reimbursement claim to the government. The law further allows a private party to initiate a False Claims Act suit on behalf of the government, known as a *qui tam* action. In past years, settlements and judgments related to False Claims Act violations have totaled in the billions of dollars. While we believe that our company operates in compliance with applicable laws and regulations, being named as a defendant in a False Claims Act lawsuit could have a material adverse effect on our results of operations.

WE MAY BE LIABLE FOR LOSSES NOT COVERED BY OR IN EXCESS OF OUR INSURANCE

We are subject to medical malpractice suits and other legal actions in the ordinary course of business. These actions may involve significant defense costs and large monetary claims. We cannot predict the frequency or the effect these lawsuits will have on our results of operations. While we believe that we have retained adequate insurance coverage to protect our operations, all general liability insurance we purchase is subject to policy limitations. If any insurance policy limitations are reached, we may be subject to payments not covered by insurance and which may have a material adverse effect on our results of operations.

ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

19

CONFIDENTIAL
SPCP_0000001207

**ITEM 2. PROPERTIES**

In March 2005, the Company completed the acquisition of the Hospitals and their associated real estate from Tenet. At the closing of the acquisition, the Company transferred all of the fee interests in the acquired real estate to PCHI, a company owned indirectly by two of the Company's largest shareholders. As further discussed in the consolidated financial statements, the Company consolidates PCHI. The Company entered into a Triple Net Lease dated March 7, 2005 (amended and restated as of April 13, 2010) under which it leased back from PCHI all of the real estate that it transferred to PCHI. Additionally, the Company leases property from other lessors. As of March 31, 2012, the Company's principal facilities are listed in the following table:

| PROPERTY | APPROXIMATE AGGREGATE SQUARE FOOTAGE | LEASE RATE | INITIAL LEASE EXPIRATION |
|---|---|---|---|
| Western Medical Center-Santa Ana 1001 North Tustin Avenue Santa Ana, CA 92705 | 360,000 | See note 1. | February 28, 2030 |
| Administrative Building 1301 N. Tustin Avenue Santa Ana, CA | 40,000 | See note 1. | February 28, 2030 |
| Western Medical Center-Anaheim 1025 South Anaheim Boulevard Anaheim, CA 92805 | 132,000 | See note 1. | February 28, 2030 |
| Coastal Communities Hospital 2701 South Bristol Street Santa Ana, CA 92704 | 115,000 | See note 1. | February 28, 2030 |
| Chapman Medical Center 2601 East Chapman Avenue Orange, CA 92869 | 140,000 | See note 2. | December 31, 2023 |

1. Effective April 13, 2010, the Company entered into an amended and restated lease with PCHI. The amended lease terminates on the 25-year anniversary of the original lease (March 7, 2005), grants the Company the right to renew for one additional 25-year period, and requires combined annual base rental payments of $8.3 million for all four properties. However, until PCHI refinances the related real estate loan, the annual base rental payments are reduced to $7.3 million. In addition, the Company may offset, against its rental payments owed to PCHI, interest payments that it makes on the related real estate loan. Lease payments to PCHI are eliminated in consolidation.

2. Leased from an unrelated party. Monthly lease payments are $133,860.

The State of California has imposed new hospital seismic safety requirements. Under these new requirements, the Hospitals must meet stringent seismic safety criteria in the future. In addition, there could be other remediation costs pursuant to this seismic retrofit.

The State of California has introduced a new seismic review methodology known as HAZUS. The HAZUS methodology may preclude the need for some structural modifications. All four Hospitals requested HAZUS review and received a favorable notice pertaining to structural reclassification. All Hospital buildings, with the exception of one (an administrative building), have been deemed compliant until January 1, 2030 for both structural and nonstructural retrofit. The Company does not have an estimate of the cost to remediate the seismic requirements for the administrative building as of March 31, 2012.

There are additional requirements that must be complied with by 2030. The costs of meeting these requirements have not yet been determined. Compliance with seismic ordinances will be costly and could have a material adverse effect on the Company's cash flow. In addition, remediation could possibly result in certain environmental liabilities, such as asbestos abatement.

The Company believes that its current leased space is adequate for its current purposes and for the next fiscal year.

20

CONFIDENTIAL

**ITEM 3. LEGAL PROCEEDINGS**

LABOR AND EMPLOYMENT

From time to time, health care facilities receive requests for information in the form of a subpoena from licensing entities, such as the Medical Board of California, regarding members of their medical staffs. Also, California state law mandates that each medical staff is required to perform peer review of its members. As a result of the performance of such peer reviews, action is sometimes taken to limit or revoke an individual's medical staff membership and privileges in order to assure patient safety.

Approximately 43% of the Company's employees are represented by labor unions as of March 31, 2012. The CNA Agreement expired on February 28, 2011 and the SEIU Agreement expired on August 31, 2011. Both agreements are currently in negotiations. The agreements have "no strike" provisions and compensation caps which provide the Company with long term compensation and workforce stability.

For both unions, all prior grievances regarding retiree medical benefits, the administration of pay adjustments and pay practices, changes in medical benefits and several wrongful terminations have been resolved in the form of settlement agreements.

OTHER LEGAL PROCEEDINGS

On January 6, 2012, the Regents of the University of California (UC), acting on behalf of UC Irvine Healthcare, filed suit in Orange County Superior Court against Western Medical Center-Anaheim (WMC-A) for breach of contract based upon an allegation that WMC-A guaranteed payment for health care services provided to a patient WMC-A transferred to UC Irvine Medical Center because the patient needed a higher level of care than WMC-A could provide. The Company filed an answer to the complaint and UC demurred to the Company's answer. The Company then filed an amended answer to UC's complaint and UC demurred to the Company's amended answer. UC's demurrer is currently set for hearing in June 2012. At March 31, 2012, the Company had accrued $1.8 million for this guarantee.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

21

CONFIDENTIAL   SPCP_0000001209

PART II

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

The Company's common stock is listed for trading on the OTC Bulletin Board under the symbol "IHCH.OB." The trading market for the Company's common stock has been extremely thin. In view of the extreme thinness of the trading market, the prices reflected upon the chart below as reported on the OTC Bulletin Board may not be indicative of the price at which any prior or future transactions were or may be effected in the Company's common stock. Stockholders are cautioned against drawing any conclusions from the data contained herein, as past results are not necessarily indicative of future stock performance.

The following table sets forth the quarterly high and low bid price for the Company's common stock for each quarter for the period from April 1, 2010 through March 31, 2012, as quoted on the Over-the-Counter Bulletin Board. Such Over-the-Counter market quotations reflect inter dealer prices, without retail mark-up, mark-down or commission, and may not necessarily represent actual transactions.

| PERIOD | HIGH | LOW |
|---|---|---|
| Apr 2010 - Jun 2010 | $0.07 | $0.05 |
| Jul 2010 - Sep 2010 | $0.07 | $0.03 |
| Oct 2010 - Dec 2010 | $0.06 | $0.02 |
| Jan 2011 - Mar 2011 | $0.05 | $0.02 |
| Apr 2011 - Jun 2011 | $0.22 | $0.01 |
| Jul 2011 - Sep 2011 | $0.09 | $0.05 |
| Oct 2011 - Dec 2011 | $0.06 | $0.03 |
| Jan 2012 - Mar 2012 | $0.08 | $0.02 |

As of the date of this report, there were approximately 131 record holders of the Company's common stock; this number does not include an indeterminate number of stockholders whose shares may be held by brokers in street name. The Company has not paid and does not expect to pay any dividends on its shares of common stock for the foreseeable future, as any earnings will be retained for use in the business.

The following table provides summary information concerning the Company's equity compensation plan as of March 31, 2012.

Equity Compensation Plan Information

| Plan Category | Number of Securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 8,235,000 | $ 0.18 | 15,290,489 |
| Equity compensation plans not approved by security holders | 405,000,000 | $ 0.07 | - |
| Total | 413,235,000 | $ 0.07 | 15,290,489 |

22

CONFIDENTIAL

SPCP_0000001210

**ITEM 6. SELECTED FINANCIAL DATA**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

FORWARD-LOOKING INFORMATION

This Annual Report on Form 10-K contains forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995. These statements relate to future events or our future financial performance. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks discussed under the caption "Risk Factors" herein that may cause our Company's or our industry's actual results, levels of activity, performance or achievements to be materially different from those expressed or implied by these forward-looking statements.

Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as may be required by applicable law, we do not intend to update any of the forward-looking statements to conform these statements to actual results.

As used in this report, the terms "we," "us," "our," "the Company," "Integrated Healthcare Holdings" or "IHHI" mean Integrated Healthcare Holdings, Inc., a Nevada corporation, unless otherwise indicated.

Unless otherwise indicated, all amounts included in this Item 7 are expressed in thousands (except percentages and per share amounts).

OVERVIEW

On March 8, 2005, we completed our acquisition (the "Acquisition") of four Orange County, California hospitals and associated real estate, including: (i) 282-bed Western Medical Center - Santa Ana, CA; (ii) 188-bed Western Medical Center - Anaheim, CA; (iii) 178-bed Coastal Communities Hospital in Santa Ana, CA; and (iv) 114-bed Chapman Medical Center in Orange, CA (collectively, the "Hospitals") from Tenet Healthcare Corporation. The Hospitals were assigned to four of our wholly owned subsidiaries formed for the purpose of completing the Acquisition. We also acquired the following real estate, leases and assets associated with the Hospitals: (i) a fee interest in the Western Medical Center at 1001 North Tustin Avenue, Santa Ana, CA, a fee interest in the administration building at 1301 North Tustin Avenue, Santa Ana, CA, certain rights to acquire condominium suites located in the medical office building at 999 North Tustin Avenue, Santa Ana, CA; (ii) a fee interest in the Western Medical Center at 1025 South Anaheim Blvd., Anaheim, CA; (iii) a fee interest in the Coastal Communities Hospital at 2701 South Bristol Street, Santa Ana, CA, and a fee interest in the medical office building at 1901 North College Avenue, Santa Ana, CA; (iv) a lease for the Chapman Medical Center at 2601 East Chapman Avenue, Orange, CA, and a fee interest in the medical office building at 2617 East Chapman Avenue, Orange, CA; and (v) equipment and contract rights. At the closing of the Acquisition, we transferred all of the fee interests in the acquired real estate (the "Hospital Properties") to Pacific Coast Holdings Investment, LLC ("PCHI"), a company owned 51% by various physician investors and 49% by our largest shareholder.

SIGNIFICANT CHALLENGES

COMPANY – Our Acquisition involved significant cash expenditures, debt incurrence and integration expenses that has seriously strained our consolidated financial condition. If we are required to issue equity securities to raise additional capital or for any other reasons, existing stockholders will likely be substantially diluted, which could affect the market price of our stock. In April 2010 we issued equity securities to existing shareholders and a new lender. (see "WARRANTS").

INDUSTRY – Our Hospitals receive a substantial portion of their revenues from Medicare and Medicaid. The healthcare industry is experiencing a strong trend toward cost containment, as the government seeks to impose lower reimbursement and resource utilization group rates, limit the scope of covered services and negotiate reduced payment schedules with providers. These cost containment measures generally have resulted in a reduced rate of growth in the reimbursement for the services that we provide relative to the increase in our cost to provide such services.

Changes to Medicare and Medicaid reimbursement programs have limited, and are expected to continue to have limited, payment increases. Also, the timing of payments made under the Medicare and Medicaid programs is subject to regulatory action and governmental budgetary constraints resulting in a risk that the time period between submission of claims and payment could increase. Further, within the statutory framework of the Medicare and Medicaid programs, a substantial number of areas are subject to administrative rulings and interpretations which may further affect payments.

23

CONFIDENTIAL

SPCP_0000001211

Our business is subject to extensive federal, state and, in some cases, local regulation with respect to, among other things, participation in the Medicare and Medicaid programs, licensure and certification of facilities, and reimbursement. These regulations relate, among other things, to the adequacy of physical property and equipment, qualifications of personnel, standards of care, government reimbursement and operational requirements. Compliance with these regulatory requirements, as interpreted and amended from time to time, can increase operating costs and thereby adversely affect the financial viability of our business. Since these regulations are amended from time to time and are subject to interpretation, we cannot predict when and to what extent liability may arise. Failure to comply with current or future regulatory requirements could also result in the imposition of various remedies including (with respect to inpatient care) fines, restrictions on admission, denial of payment for all or new admissions, the revocation of licensure, decertification, imposition of temporary management or the closure of a facility or site of service.

We are subject to periodic audits by the Medicare and Medicaid programs, which have various rights and remedies against us if they assert that we have overcharged the programs or failed to comply with program requirements. Rights and remedies available to these programs include repayment of any amounts alleged to be overpayments or in violation of program requirements, or making deductions from future amounts due to us. These programs may also impose fines, criminal penalties or program exclusions. Other third-party payer sources also reserve rights to conduct audits and make monetary adjustments in connection with or exclusive of audit activities.

The healthcare industry is highly competitive. We compete with a variety of other organizations in providing medical services, many of which have greater financial and other resources and may be more established in their respective communities than we are. Competing companies may offer newer or different centers or services than we do and may thereby attract patients or customers who are presently our patients or customers or are otherwise receiving our services.

An increasing trend in malpractice litigation claims, rising costs of malpractice litigation, losses associated with these malpractice lawsuits and a constriction of insurers have caused many insurance carriers to raise the cost of insurance premiums or refuse to write insurance policies for hospital facilities. Also, a tightening of the reinsurance market has affected property, vehicle, and excess liability insurance carriers.

We receive all of our inpatient services revenue from operations in Orange County, California. The economic condition of this market could affect the ability of our patients and third-party payers to reimburse us for our services, through its effect on disposable household income and the tax base used to generate state funding for Medicaid programs. An economic downturn, or changes in the laws affecting our business in our market and in surrounding markets, could have a material adverse effect on our financial position, results of operations, and cash flows.

LIQUIDITY AND CAPITAL RESOURCES

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and settlement of obligations in the normal course of business. We had a total stockholders' deficiency of $11.6 million and a working capital deficit of $14.7 million at March 31, 2012. For the year ended March 31, 2012, we had net income of $7.5 million. As discussed below, the stated maturity date of our $45.0 million Term Note under our Credit Agreements with Silver Point is April 13, 2013. If we are unable to refinance, restructure or extend our obligation to repay the principal amount by the maturity date, such failure would constitute a default under the Credit Agreement with Silver Point and our other loan facilities, which would permit Silver Point and our other lenders to seize our assets and those of our variable interest entity, PCHI. Any actions by Silver Point or our other lenders to enforce their rights by seizing our assets could force us into bankruptcy or liquidation, which would have a material adverse effect on our liquidity and financial position and the value of our common stock.

Key items for the year ended March 31, 2012 included:

1.  Net service patient revenues (patient service revenues, net of contractual allowances and discounts, less provision for doubtful accounts) for the years ended March 31, 2012 and 2011 were $365.3 million and $423.1 million, respectively, representing a decrease of 13.7%. The Hospitals serve a disproportionate number of indigent patients and receive governmental revenues and subsidies in support of care for these patients. Governmental revenues include payments from Medicaid, Medicaid DSH, and Orange County, CA (CalOptima). Governmental net revenues decreased $58.5 million for the year ended March 31, 2012 compared to the year ended March 31, 2011. The primary reason for the significant decrease in governmental net revenues related to the Hospital Quality Assurance Fee program ("QAF") payments received from the State of California. During the year ended March 31, 2012, we received $31.9 million in QAF payments compared to $87.2 million during the year ended March 31, 2011 (see "HOSPITAL QUALITY ASSURANCE FEES").

Inpatient admissions decreased by 7.8% to 21.3 for the year ended March 31, 2012 compared to 23.1 for the year ended March 31, 2011. The decline in admissions is primarily related to reductions in managed care, shifts from inpatient to outpatient observation, and obstetrics admissions.

24

**JAE 1568**

CONFIDENTIAL

SPCP_0000001212

Uninsured patients, as a percentage of gross charges (retail charges), were 5.3% for the year ended March 31, 2012 compared to 5.4% for the year ended March 31, 2011.

2.    Operating expenses: Management is working aggressively to reduce costs without reduction in service levels. These efforts have in large part been offset by inflationary pressures. Operating expenses before interest for the year ended March 31, 2012 were $352.6 million, or 6.8%, lower than during the year ended March 31, 2011. The most significant factor of this decrease related to QAF fees paid totaling $15.9 million and $47.8 million during the years ended March 31, 2012 and 2011, respectively. Without including the QAF fees in fiscal years 2012 and 2011, operating expenses before interest for the year ended March 31, 2012 increased by $6.1 million over the same period in fiscal 2011. The primary reason for this increase related to an increase in salaries and benefits of $7.2 million, of which $4.7 million related to increased costs of health insurance for our employees.

DEBT – On April 13, 2010 (the "Effective Date"), we entered into an Omnibus Credit Agreement Amendment (the "Omnibus Amendment") with SPCP Group IV, LLC and SPCP Group, LLC (together, "Silver Point"), Silver Point Finance, LLC, as the Lender Agent, PCHI, Ganesha Realty LLC ("Ganesha"), Dr. Chaudhuri and KPC Resolution Company ("KPC"). KPC and Ganesha are companies owned and controlled by Dr. Chaudhuri, who is our majority shareholder. Ganesha owns a 49% membership interest in PCHI.

We entered into the Omnibus Amendment in connection with the Loan Purchase and Sale Agreement (the "Loan Purchase Agreement"), dated as of January 13, 2010, as amended, by and between KPC and the previous lender's receiver. Under the Loan Purchase Agreement, and as approved by the Court on April 2, 2010, KPC agreed to purchase all of the Credit Agreements from Medical Capital Corporation's receiver for $70.0 million. Concurrent with the closing of the Loan Purchase Agreement, KPC sold its interest in the Credit Agreements to Silver Point, and KPC purchased from Silver Point a 15% participation interest in the Credit Agreements. On April 13, 2010, concurrent with the effectiveness of the Omnibus Amendment and the closing of the Loan Purchase Agreement, Silver Point acquired all of the Credit Agreements, including the security agreements and other ancillary documents executed by us in connection with the Credit Agreements, and became the "New Lender" under the Credit Agreements.

The following are material terms of the Omnibus Amendment:

- The stated maturity date under each Credit Agreement was changed to April 13, 2013.

- Affirming release of prior claims between us and the previous lender's receiver, Silver Point agreed to waive any events of default that had occurred under the Credit Agreements and waived claims to accrued and unpaid interest and fees of $6.4 million under the Credit Agreements as of April 13, 2010.

- The $80.0 million Credit Agreement was amended so that the $45.0 million term note (the "$45.0 million Loan") and $35.0 million non-revolving line of credit note (the "$35.0 million Loan") will each bear a fixed interest rate of 14.5% per year. These loans previously bore interest rates of 10.25% and 9.25%, respectively. In addition, we agreed to make certain mandatory prepayments of the $35.0 million Loan when we received proceeds from certain new financing of our accounts receivable or provider fee funds from Medi-Cal under the Hospital Quality Assurance Fee program (see "HOSPITAL QUALITY ASSURANCE FEES PROGRAM"). The $35.0 million non-revolving line of credit was refinanced on August 30, 2010 (see below).

- The $50.0 million Revolving Credit Agreement was amended so that Silver Point would, subject to the terms and conditions contained therein, make up to $10.0 million in new revolving funds available to us for working capital and general corporate purposes. Each advance under the $50.0 million Revolving Credit Agreement would bear interest at an annual rate of Adjusted LIBOR (calculated as LIBOR subject to certain adjustments, with a floor of 2% and a cap of 5%) plus 12.5%, compared to an interest rate of 24.0% that was previously in effect under the $50.0 million revolving credit agreement. In addition, we agreed to make mandatory prepayments of the $50.0 million Revolving Credit Agreement under the conditions described above with respect to the $80.0 million Credit Agreement. The financial covenants under the $50.0 million Revolving Credit Agreement were also amended to increase the required levels of minimum EBITDA (as defined in the Omnibus Amendment) from the levels previously in effect under the $50.0 million Revolving Credit Agreement. This $50.0 million revolving line of credit was refinanced on August 30, 2010 (see below).

- The $10.7 million Credit Agreement was amended so that the $10.7 million convertible term note will bear a fixed interest rate of 14.5% per year, compared to the interest rate of 9.25% previously in effect and to eliminate the conversion feature of the loan. In addition, we agreed to make mandatory prepayments of the $10.7 million Credit Agreement under the conditions described above with respect to the $80.0 million Credit Agreement. This $10.7 million term note was refinanced on August 30, 2010 (see below).

25

**JAE 1569**

SPCP_0000001213

In connection with the sale of the Credit Agreements, all warrants and stock conversion rights issued to the previous lender were cancelled. In connection with the Omnibus Amendment, we issued new warrants (see "WARRANTS").

On August 30, 2010, we (excluding PCHI) entered into a Credit and Security Agreement (the "New Credit Agreement") with MidCap Financial, LLC, a commercial finance lender specializing in loans to middle market health care companies, and Silicon Valley Bank (collectively, the "AR Lender").

Under the New Credit Agreement, the AR Lender committed to provide up to $40.0 million in loans to us under a secured revolving credit facility (the "New Credit Facility"), which may be increased to up to $45.0 million upon our request, if the AR Lender consents to such increase. Upon execution of the New Credit Agreement, the AR Lender funded approximately $39.7 million of the New Credit Facility, which funds were used primarily to repay approximately $35.0 million in loans outstanding to affiliates of Silver Point ("Term Lender"). Upon such repayment, the remaining balances on our $35.0 million non-revolving line of credit loan, $50.0 million revolving credit agreement and $10.7 million credit agreement with the Term Lender were fully repaid and terminated. The only loan currently outstanding to the Term Lender consists of a $45.0 million Loan issued under our $80.0 million Credit Agreement.

The New Credit Facility is secured by a first priority security interest on substantially all of our assets, including the equity interests in all of our subsidiaries (excluding PCHI). The availability of the AR Lender's commitments under the New Credit Facility is limited by a borrowing base tied to our eligible accounts receivable and certain other availability restrictions.

Loans under the New Credit Facility accrue interest at LIBOR (subject to a 2.5% floor) plus 5.0% per annum, subject to a default rate of interest and other adjustments provided for in the New Credit Agreement. For purposes of calculating interest, all payments we make on the New Credit Facility are subject to a six business day clearance period. We also pay a collateral management fee of .0625% per month on the outstanding balance (or a minimum balance amount equal to 85% of the monthly average borrowing base (the "Minimum Balance Amount"), if such amount is greater than the outstanding balance), a monthly minimum balance fee equal to the highest interest rate applicable to the loans if the Minimum Balance Amount is greater that the outstanding balance, and an unused line fee equal to .042% per month of the average unused portion of the New Credit Facility. We paid to the AR Lender a non-refundable origination fee of 1.0% of the AR Lender's commitments under the New Credit Facility at closing.

The New Credit Agreement contains various affirmative and negative covenants and customary events of default, including payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to similar obligations, events of bankruptcy and insolvency, judgment defaults, the invalidity of liens on collateral, and the occurrence of events which have a material adverse effect on us.

Amendment to $80.0 million Credit Agreement – Concurrently with the execution of the New Credit Agreement, on August 30, 2010 we entered into an amendment to its existing $80.0 million Credit Agreement, as amended (the "Original Credit Agreement"), with the Term Lender, PCHI, and Ganesha. Under this amendment, we agreed with the Term Lender to the following material changes to the Original Credit Agreement:

- In the event of a mandatory prepayment of our accounts receivable based financing facility under the Original Credit Agreement, the outstanding loans under such agreement shall not be required to be prepaid below $10.0 million. There is also a floor of $10.0 million below which commitments under such accounts receivable based facility would not be mandatorily reduced as a result of such prepayment.

- The Original Credit Agreement was amended to add an affirmative covenant requiring us to deliver financial statements and other financial and non-financial information to the Term Lender on a regular basis, and a negative covenant requiring that we maintain a minimum fixed charge coverage ratio of 1.0 and minimum levels of earnings before interest, tax, depreciation and amortization.

- We agreed to the provisions of an Intercreditor Agreement executed on August 30, 2010 by and between the AR Lender and the Term Lender with respect to shared collateral of ours that is being pledged under both the New Credit Agreement and the Original Credit Agreement. Under the Intercreditor Agreement, among other things the Term Lender consented to the AR Lender having a first priority lien on substantially all of the operating company's assets while the Term Lender retained a second lien on such assets, in addition to the Term Lender's first priority lien on our leased properties owned by PCHI.

On October 29, 2010, we entered into Amendment No. 1 to the New Credit Agreement, dated as of August 30, 2010, by and among us and the AR Lender. Under Amendment No. 1, the AR Lender committed to increase the total revolving loan commitment amount under the New Credit Agreement from $40.0 million to $45.0 million, and we agreed to pay to the AR Lender a non-refundable origination fee of 1.0% of the AR Lender's increased commitment under the amendment, or $50.

26

CONFIDENTIAL SPCP_0000001214

Also under Amendment No. 1, the AR Lender agreed to allow the inclusion in Eligible Accounts that are used to determine our Borrowing Base of up to $33.6 million in aggregate federal or state matching payments to us related to the Hospital Quality Assurance Fee program (see "HOSPITAL QUALITY ASSURANCE FEES PROGRAM") which amount was increased from $11.8 million for the first matching payment.

In addition, the optional prepayment and permanent commitment reduction provisions of the New Credit Agreement were amended to change the minimum Revolving Loan Commitment Amount to $20.0 million from $5.0 million. In addition, the prepayment fee calculation under the New Credit Agreement was changed so that the prepayment fee is based on $40.0 million rather than the amount of the permanent revolving loan commitment reduction amount.

Lastly, under Amendment No. 1, in the event we permanently reduce our Revolving Loan Commitment Amount to $20.0 million (and assuming there is no Event of Default at the time), we would be permitted to transfer funds that are swept into the Lender's account from our lockbox accounts to a different bank account designated by us. Effective March 1, 2011, we reduced our Revolving Loan Commitment Amount to $20.0 million. Beginning in April 2011, the funds that were previously swept into the Lender's account were swept directly to our main account.

During the year ended March 31, 2012, we paid down the balance of the $20.0 million revolving line of credit to $14.0 million. On June 8, 2012, we entered into Amendment No. 2 to the New Credit Agreement with the AR Lender. Under Amendment No. 2, the minimum Revolving Loan Commitment Amount under the New Credit Agreement was permanently reduced from $20.0 million to $14.0 million, and the AR Lender agreed that no Prepayment Fee will be payable in connection with such reduction.

As of March 31, 2012, we had the following Credit Agreements:

- A $45.0 million Term Note issued under the $80.0 million Credit Agreement, bearing a fixed interest rate of 14.5% per year ($45.0 million outstanding balance at March 31, 2012). If any event of default occurs and continues, the lender can increase the interest rate to 19.5% per year. As of March 31, 2012, we were in compliance with all financial covenants. The stated maturity date for this Credit Agreement is April 13, 2013.

- A $20.0 million Revolving Credit Agreement, bearing an interest rate of 5.0% plus LIBOR, with a 2.5% floor, per year (7.5% at March 31, 2012) and an unused commitment fee of 0.625% per year ($14.0 million outstanding balance at March 31, 2012). For purposes of calculating interest, all payments we make on the New Credit Facility are subject to a six business day clearance period. As of March 31, 2012, we were in compliance with all financial covenants. The stated maturity date for this New Credit Facility is August 30, 2013.

WARRANTS – On April 13, 2010 we issued warrants (the "Omnibus Warrants") to purchase our common stock for a period of three years at an exercise price of $0.07 per share in the following denominations: 139.0 million shares to KPC or its designees and 96.0 million shares to Silver Point or its designees. The Omnibus Warrants also provide the holders with certain pre-emptive, information and registration rights. As of April 13, 2010, we recorded warrant expense and the related warrant liability of $2.9 million, representing fair value. As of March 31, 2012, the fair value of the Omnibus Warrants was $952.

In addition, on April 13, 2010, we issued a three-year warrant (the "Release Warrant") to acquire up to 170.0 million shares of common stock at $0.07 per share to Dr. Chaudhuri who facilitated the release (see "DEBT") enabling us to recover amounts due from our prior lender and a $1.0 million reduction in principal of our outstanding debt, among other benefits to us. The Release Warrant also provides the holder with certain pre-emptive, information and registration rights. During the year ended March 31, 2010, we recorded the fair value of $2.1 million as an offsetting cost of the recovery. As of March 31, 2012, the fair value of the Release Warrant was $689.

The Omnibus Warrants and the Release Warrant are collectively referred to as the "April Warrants." The net gain (loss) related to the April Warrants for the year ended March 31, 2012 and 2011 was $(1.5) million and $1.9 million, respectively.

HOSPITAL QUALITY ASSURANCE FEES PROGRAM – In October 2009, the Governor of California signed legislation supported by the hospital industry to impose a provider fee on general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental Medi-Cal payments to hospitals. The state submitted the plan to the Centers for Medicare and Medicaid Services ("CMS") for a required review and approval process, and certain changes in the plan were required by CMS. Legislation amending the fee program to reflect the required changes was passed by the legislature and signed by the Governor on September 8, 2010. Among other changes, the legislation leaves distribution of "pass-through" payments received by Medi-Cal managed care plans that will be paid to hospitals under the program to the discretion of the plans.

The hospital quality assurance fee program ("QAF") created by this legislation initially provided payments for up to 21 months retroactive to April 2009 and expiring on December 31, 2010 ("2010 QAF"). In February 2011, CMS gave final approval for the 2010 QAF. In December 2011, CMS gave final approval for the extension of the QAF for the six month period from January 1 through June 30, 2011 ("2011 QAF").

CONFIDENTIAL

During the year ended March 31, 2012, we recognized $31.9 million in revenue from the state for the 2011 QAF ($18.4 million from the fee-for-service portion and $13.5 million from the supplemental managed care portion). During the year ended March 31, 2012, we recorded expenses of $15.1 million for the 2011 QAF fees paid to the state and $0.8 million in other expenses relating to the 2011 QAF.

During the year ended March 31, 2011, we recognized $87.2 million in revenue from the state for the 2010 QAF ($44.4 million from the fee-for-service portion and $42.8 million from the supplemental managed care portion). During the year ended March 31, 2011, we recorded expenses of $44.7 million for the 2010 QAF fees paid to the state and $3.1 million in other expenses relating to the 2010 QAF.

We cannot provide any assurances or estimates in connection with a possible continuation of the QAF program beyond June 30, 2011.

ELECTRONIC HEALTH RECORDS INCENTIVE PROGRAM – Provisions of the American Recovery and Reinvestment Act of 2009 provide incentive payments for the adoption and meaningful use of certified electronic health record (EHR) technology. The Medicare EHR incentive program provides incentive payments to eligible hospitals (and certain other providers) that are meaningful users of certified EHRs. The Medicaid EHR incentive program provides incentive payments to eligible hospitals (and certain other providers) for efforts to adopt, implement, upgrade, or meaningfully use of certified EHR technology.

CMS has established the final rule which requires eligible providers in their first year of participation in the Medicaid incentive payment program to demonstrate that they have adopted (acquired, purchased, or secured access to), or implemented, or upgraded to certified EHR technology in order to qualify for an incentive payment. During the second and subsequent years of the program, eligible providers are required to meet other criteria, including meaningful use, to receive additional funds. We have been awarded a total amount of $13.6 million under the Medicaid EHR incentive program, which will be earned and received over a four year period.

We adopted certified EHR technology and we recognized income of $6.8 million relative to the first year under the Medicaid EHR incentive program during the year ended March 31, 2012.

LONG TERM LEASE COMMITMENT WITH VARIABLE INTEREST ENTITY – On April 13, 2010, we and PCHI entered into a Second Amendment to Amended and Restated Triple Net Hospital Building Lease (the "2010 Lease Amendment"). Under the 2010 Lease Amendment, the annual base rent to be paid to PCHI was increased from $5.4 million to $7.3 million, but if PCHI refinances the $45.0 million Loan, the annual base rent may increase to $8.3 million. This lease commitment with PCHI is eliminated in consolidation.

COMMITMENTS AND CONTINGENCIES – The State of California has imposed new hospital seismic safety requirements. Under these new requirements, the Hospitals must meet stringent seismic safety criteria in the future. In addition, there could be other remediation costs pursuant to this seismic retrofit.

The State of California has introduced a new seismic review methodology known as HAZUS. The HAZUS methodology may preclude the need for some structural modifications. All four Hospitals requested HAZUS review and received a favorable notice pertaining to structural reclassification. All Hospital buildings, with the exception of one (an administrative building), have been deemed compliant until January 1, 2030 for both structural and nonstructural retrofit. We do not have an estimate of the cost to remediate the seismic requirements for the administrative building as of March 31, 2012.

There are additional requirements that must be complied with by 2030. The costs of meeting these requirements have not yet been determined. Compliance with seismic ordinances will be costly and could have a material adverse effect on our cash flow. In addition, remediation could possible result in certain environmental liabilities, such as asbestos abatement.

On July 1, 2011, we entered into software and services agreements with McKesson Technologies Inc. ("McKesson") to upgrade our information technology systems.

Under the agreements, McKesson will provide us with a variety of services, including new software implementation and education/training services for our personnel, software maintenance services and professional services related to movement and migration of data from legacy systems. McKesson will also furnish to us and maintain new hardware to accommodate the upgraded software and systems. The new hardware will include computers and servers, among other things, and will include installation, testing, and ongoing maintenance. We have entered into the arrangement to enhance our clinical information systems and upgrade our billing and revenue management information systems.

The agreements will initially run for a period of five years, and the recurring services may be renewed by us for successive periods. The agreements do not provide that they may be terminated by us prior to the initial expiration date. The agreements provide for one-time fees and recurring fees which aggregate a total of $22.0 million. Approximately 60% of the fees are for one-time charges, while the balance is for recurring services.

28

CONFIDENTIAL

SPCP_0000001216

CASH FLOW – Net cash provided by operating activities for the years ended March 31, 2012 and 2011 was $4.5 million and $32.5 million, respectively. Net income, adjusted for depreciation and other non-cash items, excluding the provision for doubtful accounts and net income from non-controlling interests (not a measurement under accounting principles generally accepted in the United States of America ("GAAP"), totaled $14.2 million and $23.1 million for the years ended March 31, 2012 and 2011, respectively. We used $9.1 million and provided $9.8 million in working capital for the years ended March 31, 2012 and 2011, respectively. Net cash provided in payment of accounts payable, accrued compensation and benefits and other current liabilities was $4.3 million and $0.1 million for the years ended March 31, 2012 and 2011, respectively. Cash provided by accounts receivable, net of provision for doubtful accounts, was $1.1 million and $0.6 million for the years ended March 31, 2012 and 2011, respectively.

Net cash used in investing activities during the years ended March 31, 2012 and 2011 was $5.5 million and $1.7 million, respectively. In the years ended March 31, 2012 and 2011, we invested $5.5 million and $1.7 million in cash, respectively, in new property and equipment.

Net cash used in financing activities for the years ended March 31, 2012 and 2011 was $7.8 million and $20.4 million, respectively.

RESULTS OF OPERATIONS AND FINANCIAL CONDITION

The following table sets forth, for the years ended March 31, 2012 and 2011, our consolidated statements of operations expressed as a percentage of net patient services revenues.

|  | Year ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
| Net patient service revenues | 100.0% | 100.0% |
| Operating expenses: | | |
| Salaries and benefits | 59.9% | 50.0% |
| Supplies | 15.1% | 12.5% |
| Other operating expenses | 20.4% | 26.0% |
| Depreciation and amortization | 1.1% | 1.0% |
|  | 96.5% | 89.5% |
| Operating income | 3.5% | 10.5% |
| Other income (expense): | | |
| Income from electronic health records incentive program | 1.9% | 0.0% |
| Interest expense, net | (2.8%) | (2.9%) |
| Gain (loss) on warrants | (0.4%) | 0.5% |
|  | (1.3%) | (2.4%) |
| Income before income tax provision (benefit) | 2.2% | 8.1% |
| Income tax provision (benefit) | (0.0%) | 3.3% |
| Net income | 2.2% | 4.8% |
| Net income attributable to noncontrolling interests | (0.1%) | (0.1%) |
| Net income attributable to Integrated Healthcare Holdings, Inc. | 2.1% | 4.7% |

29

CONFIDENTIAL

SPCP_0000001217

FISCAL YEAR ENDED MARCH 31, 2012 COMPARED TO FISCAL YEAR ENDED MARCH 31, 2011

NET PATIENT SERVICE REVENUES – Net patient service revenues for the year ended March 31, 2012 decreased 13.7% compared to fiscal year 2011, from $423.1 million to $365.3 million. Net patient service revenues for the year ended March 31, 2011 included QAF payments received from the State of California totaling $31.9 million and a lump sum distressed hospital fund payment of $50. Net patient service revenues for the year ended March 31, 2011 included QAF payments received from the State of California totaling $87.2 million and a lump sum distressed hospital fund payment of $450. If the QAF payments and one-time lump sum payments noted above are excluded, net patient service revenues for fiscal year 2012 were $2.1 million, or 0.6%, lower than fiscal year 2011 primarily due to a decline in admissions. The provision for doubtful accounts for the year ended March 31, 2012 was $40.4 million compared to $34.8 million for the year ended March 31, 2011, representing a 16.1% increase. The primary reason for the increase in the provision for doubtful accounts was related to the write off of receivables of $4.0 million due to the termination of Section 1011 of the Medicare Modernization Act of 2003 program which provided federal funding of emergency health services for "eligible aliens."

Admissions for the year ended March 31, 2012 decreased 8.0% compared to fiscal year 2011. The decline in admissions is the combined result of lower obstetrical deliveries, psychiatric admissions, and managed care contracts that have reached term and are pending renegotiation. Net patient service revenues per admission declined 6.2% during the year ended March 31, 2012 primarily due to the decrease in QAF payments received from the state.

Essentially all patient service revenues come from external customers. The largest payers are the Medicare and Medicaid (including Medicare and Medicaid managed care plans) programs accounting for 59.4% and 65.5% of the patient service revenues for the years ended March 31, 2012 and 2011, respectively.

Uninsured patients, as a percentage of gross charges, decreased to 5.3% from 5.4% for the year ended March 31, 2012 compared to the year ended March 31, 2011.

The Hospitals serve a disproportionate number of indigent patients and receive governmental revenues and subsidies in support of care for these patients. Governmental revenues include payments from Medicaid, Medicaid DSH, and Orange County, CA (CalOptima). Governmental net revenues decreased $58.5 million for the year ended March 31, 2012 compared to the year ended March 31, 2011. The primary reason for the significant decrease in governmental net revenues was related to a $55.3 million decrease in QAF payments received ($31.9 million) during the year ended March 31, 2012 compared to the QAF payments received ($87.2 million) during the year ended March 31, 2011.

OPERATING EXPENSES - Operating expenses for the year ended March 31, 2012 decreased to $352.6 million from $378.4 million, a decrease of $25.8 million, or 6.8%, compared to fiscal year 2011. The primary reason for decrease in operating expenses was related to a $31.9 million decrease in QAF fees paid during the year ended March 31, 2012 ($15.9 million) compared to the QAF fees paid during the year ended March 31, 2011 ($47.8 million). Operating expenses expressed as a percentage of net patient services revenues for the years ended March 31, 2012 and 2011 were 96.5% and 89.5%, respectively. On a per admission basis, operating expenses increased 1.3%.

Salaries and benefits increased $7.2 million (3.4%) for the year ended March 31, 2012 compared to fiscal year 2011. The increase is primarily due to an increase in health insurance ($4.7 million).

Other operating expenses during the year ended March 31, 2012 decreased to $74.5 million from $109.8 million, a decrease of $35.3 million, or 32.1%, compared to fiscal 2011, primarily due to the decrease in QAF fees paid, as described above.

OPERATING INCOME – The operating income for the years ended March 31, 2012 and 2011 was $12.7 million and $44.7 million, respectively. Of the $32.0 million decrease in operating income, $23.4 million related to the decrease in net QAF payments received.

OTHER INCOME (EXPENSE) – We adopted certified EHR technology and recognized other income of $6.8 million under the Medicaid EHR incentive program during the year ended March 31, 2012.

Interest expense for the year ended March 31, 2012 was $10.2 million compared to $12.0 million for the same period in fiscal year 2011. The decrease primarily related to the paydown of our revolving line of credit (see "DEBT").

On April 13, 2010, we issued warrants which had a fair value at the date of issuance of $5.0 million. Of the fair value on April 13, 2010, $2.1 million was related to the warrants issued to Dr. Chaudhuri and were a component of the recovery of overswept funds by our previous lender that was recorded during fiscal year 2010. The remaining $2.9 million was recorded as warrant expense during the year ended March 31, 2011. As of March 31, 2012, the fair value of the warrants aggregated $1.64 million compared to $167 as of March 31, 2011. Accordingly, a gain (loss) relating to the change in fair value of the April Warrants of $(1.5) million and $1.9 million was recorded during the years ended March 31, 2012 and 2011, respectively. See "WARRANTS."

NET INCOME – Net income for the years ended March 31, 2012 and 2011 was $7.5 million and $20.2 million, respectively.

30

CONFIDENTIAL

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

PATIENT SERVICE REVENUES – Patient service revenues are recognized in the period in which services are performed and are recorded based on established billing rates (gross charges) less contractual allowances and discounts, principally for patients covered by Medicare, Medicaid, managed care, and other health plans. Gross charges are retail charges. They are not the same as actual pricing, and they generally do not reflect what a hospital is ultimately paid and therefore are not displayed in the consolidated statements of operations. Hospitals are typically paid amounts that are negotiated with insurance companies or are set by the government. Gross charges are used to calculate Medicare outlier payments and to determine certain elements of payment under managed care contracts (such as stop-loss payments). Since Medicare requires that a hospital's gross charges be the same for all patients (regardless of payer category), gross charges are also what the Hospitals charge all other patients prior to the application of discounts and allowances.

Revenues under the traditional fee-for-service Medicare and Medicaid programs are based primarily on prospective payment systems. Discounts for retrospectively cost based revenues and certain other payments, which are based on the Hospitals' cost reports, are estimated using historical trends and current factors. Cost report settlements for retrospectively cost-based revenues under these programs are subject to audit and administrative and judicial review, which can take several years until final settlement of such matters are determined and completely resolved. Estimates of settlement receivables or payables related to a specific year are updated periodically and at year end and at the time the cost report is filed with the fiscal intermediary. Typically no further updates are made to the estimates until the final Notice of Program Reimbursement is received, at which time the cost report for that year has been audited by the fiscal intermediary. There could be a time lag of several years between the submission of a cost report and receipt of the Final Notice of Program Reimbursement. Since the laws, regulations, instructions and rule interpretations governing Medicare and Medicaid reimbursement are complex and change frequently, the estimates recorded by the Hospitals could change by material amounts. We have established settlement receivables of $190 and $456 as of March 31, 2012 and 2011, respectively.

The Hospitals receive supplemental payments from the State of California to support indigent care (Medi-Cal Disproportionate Share Hospital payments or "DSH") and from the California Medical Assistance Commission ("CMAC") under the SB 1100 and SB 1255 programs. The Hospitals received supplemental payments of $14.3 million and $21.4 million during the years ended March 31, 2012 and 2011, respectively. The related revenue recorded for the years ended March 31, 2012 and 2011, was $15.4 million and $20.6 million, respectively. As of March 31, 2012 and 2011, estimated DSH receivables were $5.0 million and $3.9 million, respectively, which are included as due from government payers in the accompanying consolidated balance sheets.

Revenues under managed care plans are based primarily on payment terms involving predetermined rates per diagnosis, per-diem rates, discounted fee-for-service rates and/or other similar contractual arrangements. These revenues are also subject to review and possible audit by the payers. The payers are billed for patient services on an individual patient basis. An individual patient's bill is subject to adjustment on a patient-by-patient basis in the ordinary course of business by the payers following their review and adjudication of each particular bill. The Hospitals estimate the discounts for contractual allowances utilizing billing data on an individual patient basis. Management believes the estimation and review process allows for timely identification of instances where such estimates need to be revised. We do not believe there were any adjustments to estimates of individual patient bills that were material to our patient service revenues.

The Hospitals provide charity care to patients whose income level is below 300% of the Federal Poverty Level. Patients with income levels between 300% and 350% of the Federal Poverty Level qualify to pay a discounted rate under AB 774 based on various government program reimbursement levels. Patients without insurance are offered assistance in applying for Medicaid and other programs they may be eligible for, such as state disability, Victims of Crime, or county indigent programs. Patient advocates from the Hospitals' Medical Eligibility Program ("MEP") screen patients in the hospital and determine potential linkage to financial assistance programs. They also expedite the process of applying for these government programs. The estimated costs (based on direct and indirect costs as a ratio of gross uncompensated charges associated with providing care to charity patients) for the years ended March 31, 2012 and 2011 were approximately $7.0 million and $8.7 million, respectively.

Receivables from patients who are potentially eligible for Medicaid are classified as Medicaid pending under the MEP, with appropriate contractual allowances recorded. If the patient does not qualify for Medicaid, the receivables are reclassified to charity care and written off, or they are reclassified to self-pay and adjusted to their net realizable value through the provision for doubtful accounts. Reclassifications of pending Medicaid accounts to self-pay do not typically have a material impact on the results of operations as the estimated Medicaid contractual allowances initially recorded are not materially different than the estimated provision for doubtful accounts recorded when the accounts are reclassified. All accounts classified as pending Medicaid, as well as certain other governmental receivables, over the age of 90 days were reserved in contractual allowances as of March 31, 2012 and 2011 based on historical collections experience.

We previously received payments for "eligible alien" care under Section 1011 of the Medicare Modernization Act of 2003. During the year ended March 31, 2012, the federal funds available under Section 1011 were exhausted by the state and, as a result, we wrote-off $1.3 million in related receivables, net of previously accrued discount allowances. As of March 31, 2012 and 2011, we established a receivable in the amount of $0 and $1.6 million, respectively, related to discharges deemed eligible to meet program criteria.

31

**JAE 1575**

CONFIDENTIAL

SPCP_0000001219

We are not aware of any material claims, disputes, or unsettled matters with any payers that would affect revenues that have not been adequately provided for in our consolidated financial statements.

PROVISION FOR DOUBTFUL ACCOUNTS – We provide for accounts receivable that could become uncollectible by establishing an allowance to reduce the carrying value of such receivables to their estimated net realizable value. The Hospitals estimate this allowance based on the aging of their accounts receivable, historical collections experience for each type of payer and other relevant factors. There are various factors that can impact the collection trends, such as changes in the economy, which in turn have an impact on unemployment rates and the number of uninsured and underinsured patients, volume of patients through the emergency department, the increased burden of copayments to be made by patients with insurance and business practices related to collection efforts. These factors continuously change and can have an impact on collection trends and the estimation process.

Our policy is to attempt to collect amounts due from patients, including copayments and deductibles due from patients with insurance, at the time of service while complying with all federal and state laws and regulations, including, but not limited to, the Emergency Medical Treatment and Labor Act ("EMTALA"). Generally, as required by EMTALA, patients may not be denied emergency treatment due to inability to pay. Therefore, until the legally required medical screening examination is complete and stabilization of the patient has begun, services are performed prior to the verification of the patient's insurance, if any. In nonemergency circumstances or for elective procedures and services, it is the Hospitals' policy, when appropriate, to verify insurance prior to a patient being treated.

Effective  March 31, 2012, we adopted Accounting Standards Update ("ASU") 2011-07, "Health Care Entities (Topic 954): Presentation and Disclosure of Patient Service Revenue, Provision for Bad Debts, and the Allowance for Doubtful Accounts for Certain Health Care Entities," which requires health care entities to present the provision for doubtful accounts relating to patient service revenue as a deduction from patient service revenue in the statement of operations rather than as an operating expense. All periods presented have been reclassified in accordance with the provisions of ASU 2011-07.

INCOME TAXES – Deferred income tax assets and liabilities are determined based on the differences between the book and tax basis of assets and liabilities and are measured using the currently enacted tax rates and laws using the asset and liability method. We assess the realization of deferred tax assets to determine whether an income tax valuation allowance is required. We have recorded a 100% valuation allowance on its deferred tax assets.

There is a recognition threshold and measurement attribute for recognition and measurement of a tax position taken or expected to be taken in a tax return. It also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

We and our subsidiaries file income tax returns in the U.S. federal jurisdiction and California. Certain tax attributes carried over from prior years continue to be subject to adjustment by taxing authorities. Any penalties or interest arising from federal or state taxes are recorded as a component of our income tax provision.

INSURANCE – We accrue for estimated general and professional liability claims, to the extent not covered by insurance, when they are probable and reasonably estimable. We have purchased as primary coverage a claims-made form insurance policy for general and professional liability risks. Estimated losses within general and professional liability retentions from claims incurred and reported, along with incurred but not reported ("IBNR") claims, are accrued based upon projections and are discounted to their net present value using a weighted average risk-free discount rate of 5%. To the extent that subsequent claims information varies from estimates, the liability is adjusted in the period such information becomes available. As of March 31, 2012 and 2011, we had accrued $11.5 million and $11.3 million, respectively, which is comprised of $4.5 million and $6.6 million, respectively, in incurred and reported claims, along with $7.0 million and $4.7 million, respectively, in estimated IBNR. Estimated insurance recoveries of $3.0 million and $2.7 million are included in other prepaid expenses and current assets as of March 31, 2012 and 2011, respectively.

We have also purchased occurrence coverage insurance to fund our obligations under our workers compensation program. We have a "guaranteed cost" policy, under which the carrier pays all workers compensation claims, with no deductible or reimbursement required of us. We accrue for estimated workers compensation claims, to the extent not covered by insurance, when they are probable and reasonably estimable. The ultimate costs related to this program include expenses for deductible amounts associated with claims incurred and reported in addition to an accrual for the estimated expenses incurred in connection with IBNR claims. Claims are accrued based upon projections and are discounted to their net present value using a weighted average risk-free discount rate of 5%. To the extent that subsequent claims information varies from estimates, the liability is adjusted in the period such information becomes available. As of March 31, 2012 and 2011, we had accrued $673 and $836, respectively, comprised of $338 and $434, respectively, in incurred and reported claims, along with $335 and $402, respectively, in estimated IBNR.

In addition, we have a self-insured health benefits plan for our employees. As a result, we have established and maintain an accrual for IBNR claims arising from self-insured health benefits provided to employees. Our IBNR accruals at March 31, 2012 and 2011 were based upon projections. We determine the adequacy of this accrual by evaluating our historical experience and trends related to both health insurance claims and payments, information provided by our insurance broker and third party administrator and industry experience and trends. The accrual is an estimate and is subject to change. Such change could be material to our consolidated financial statements. As of March 31, 2012 and 2011, we had accrued $2.2 million and $1.8 million, respectively, in estimated IBNR.

32

**JAE 1576**

CONFIDENTIAL

SPCP_0000001220

We have also purchased umbrella liability policies with aggregate limits of $25 million. The umbrella policies provide coverage in excess of the primary layer and applicable retentions for insured liability risks such as general and professional liability, auto liability, and workers compensation (employer's liability).

NEW ACCOUNTING STANDARDS

In August 2010, the FASB approved certain modifications to existing accounting standards that will directly affect health care entities in the future. The first change provides clarification to companies in the healthcare industry on the accounting for professional liability insurance. Specifically, it states that receivables related to insurance recoveries should not be netted against the related claim liability and such claim liabilities should be determined without considering insurance recoveries. The second change clarifies that disclosures regarding the level of charity care provided by a health care entity must (i) represent the direct and indirect costs of providing such services, and (ii) include a description of the method used to determine those costs. Additionally, disclosures about charity care must now include information regarding any related reimbursements received by a health care entity. The modified accounting standards are required to be adopted for fiscal years that begin after December 15, 2010. The charity care disclosure change must be applied on a retrospective basis; however, the accounting change for insurance recoveries may be applied on either a prospective or retrospective basis (the Company has applied the accounting change for insurance recoveries on a retrospective basis). The Company adopted the modified accounting standards during the yeard ended March 31, 2012, which did not have a material impact on the consolidated financial statements.

OFF BALANCE SHEET ARRANGEMENTS

As of March 31, 2012 we had no off-balance sheet arrangements.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

33

---

CONFIDENTIAL

SPCP_0000001221

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The following consolidated financial statements are filed as a part of this report beginning on page F-1:

| PAGE | DESCRIPTION |
|------|-------------|
| F-1 | Report of Independent Registered Public Accounting Firm |
| F-2 | Consolidated Balance Sheets as of March 31, 2012 and 2011 |
| F-3 | Consolidated Statements of Operations for the years ended March 31, 2012 and 2011 |
| F-4 | Consolidated Statements of Stockholders' Deficiency for the years ended March 31, 2012 and 2011 |
| F-5 | Consolidated Statements of Cash Flows for the years ended March 31, 2012 and 2011 |
| F-6 | Notes to Consolidated Financial Statements |
| F-25 | Schedule II - Valuation and Qualifying Accounts for the years ended March 31, 2012 and 2011 |

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None

**ITEM 9A. CONTROLS AND PROCEDURES**

MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

Management of Integrated Healthcare Holdings, Inc. is responsible for the preparation, integrity and fair presentation of its published consolidated financial statements. The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and, as such, include amounts based on judgments and estimates made by management. The Company also prepared the other information included in the annual report and is responsible for its accuracy and consistency with the consolidated financial statements.

Management is also responsible for establishing and maintaining effective internal control over financial reporting. The Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report reliable financial data. The Company maintains a system of internal control over financial reporting, which is designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation of reliable published consolidated financial statements and safeguarding of the Company's assets. The system includes a documented organizational structure and division of responsibility, established policies and procedures, including a code of conduct to foster a strong ethical climate, which are communicated throughout the Company, and the careful selection, training and development of our people.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of the Company's accounting policies, financial reporting, and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The Audit Committee is responsible for the appointment and compensation of the independent registered public accounting firm. It meets periodically with management, the independent registered public accounting firm, and the internal auditors to ensure that they are carrying out their responsibilities. The Audit Committee is also responsible for performing an oversight role by reviewing and monitoring the financial, accounting and auditing procedures of the Company in addition to reviewing the Company's financial reports. Internal auditors monitor the operation of the internal control system and report findings and recommendations to management and the Audit Committee. Corrective actions are taken to address control deficiencies and other opportunities for improving the internal control system as they are identified. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Management recognizes that there are inherent limitations in the effectiveness of any system of internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation and may not prevent or detect misstatements. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

The Company assessed its internal control system as of March 31, 2012 in relation to criteria for effective internal control over financial reporting described in "Internal Control – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its assessment, the Company has determined that, as of March 31, 2012, its system of internal control over financial reporting was effective.

34

CONFIDENTIAL

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to an exemption for smaller reporting companies under Section 989G of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

During the fiscal quarter ended March 31, 2012, there was no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

DISCLOSURE CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. Our disclosure controls and procedures are designed to provide a reasonable level of assurance of reaching the Company's desired disclosure control objectives. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives and management necessarily was required to apply its judgment in evaluating the cost benefit relationship of possible controls and procedures.

We conducted an evaluation under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2012. This evaluation was based on the framework in Internal Control Integrated Framework published by the Committee of Sponsoring Organizations of the Treadway Commission. The evaluation by management as of March 31, 2012 concluded that the Company's disclosure controls and procedures are effective as of such date to ensure that the information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

ITEM 9B. OTHER INFORMATION

None.

**JAE 1579**

CONFIDENTIAL

SPCP_0000001223

PART III

ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The following table contains certain information concerning our directors and executive officers as of March 31, 2012:

| NAME | AGE | POSITION WITH COMPANY | DATE BECAME DIRECTOR |
|---|---|---|---|
| Maurice J. DeWald | 72 | Chairman of the Board | August 1, 2005 |
| Hon. C. Robert Jameson | 72 | Director | July 11, 2007 |
| Ajay G. Meka, M.D. | 61 | Director | September 28, 2006 |
| Michael Metzler | 65 | Director | September 5, 2007 |
| J. Fernando Niebla | 72 | Director | August 1, 2005 |
| William E. Thomas | 63 | Director | September 5, 2007 |
| Kenneth K. Westbrook | 61 | Director, Chief Executive Officer & President | December 2, 2008 |
| Steven R. Blake | 59 | Chief Financial Officer & Executive Vice President, Finance | |
| Daniel J. Brothman | 57 | Chief Operating Officer & Executive Vice President, Operations | |

MAURICE J. DEWALD has served as a member of the Board of Directors of the Company since August 1, 2005 and has served as Chairman of the Board of Directors since October 7, 2008. Mr. DeWald is chairman of the Audit Committee and sits on the Compensation Committee, Finance Committee, and Special Committee. As a senior finance executive, Mr. DeWald brings to our Board extensive qualifications and experience in management, finance, and public accounting, as well as his experience in the healthcare industry. Mr. DeWald is Chairman and Chief Executive Officer of Verity Financial Group, Inc., a private investment firm that he founded in 1992. From 1962-1991, Mr. DeWald was with KPMG LLP, one of the world's largest international accounting and tax consulting firms, where he served at various times as director and as the Managing Partner of the Chicago, Orange County and Los Angeles Offices. Mr. DeWald is the non-executive Chairman of Targeted Medical Pharma, Inc. and a director of Healthcare Trust of America, Inc. and Emmaus Life Sciences, Inc. Mr. DeWald is a former director of Tenet Healthcare Corporation ("Tenet") and Quality Systems, Inc. He also sits on the Advisory Council of the University of Notre Dame Mendoza School of Business. Mr. DeWald is a past Chairman and director of United Way of Greater Los Angeles. Mr. DeWald received a B.B.A. from the University of Notre Dame in 1962. He is also a Certified Public Accountant (inactive) and a member of the American Institute of CPAs, the California Society of CPAs, and the National Association of Corporate Directors.

HON. C. ROBERT JAMESON has been a director of the Company since July 11, 2007. Judge Jameson is a retired Orange County Superior judge. Judge Jameson brings to our Board extensive experience in the legal profession and negotiating skills. He is now affiliated with Judicate West, a provider of alternative dispute resolution, handling complex alternative dispute resolution matters. Before leaving the bench, he was Presiding Judge of the Orange County Superior Court Appellate Division. Judge Jameson obtained his B.A. degree in Political Science from the University of California, Davis in 1963 and his Juris Doctor degree at the University of California, Hastings College of the Law in 1966. He served as a judge from 1984-2005 and also was President of the Banyard Inn of Court and an Adjunct Professor of Law at Whittier Law School during his tenure. Judge Jameson was awarded "Judge of the Year" nine times over the course of his career by organizations such as: the Orange County Bar Association Business Litigation section, Orange County Trial Lawyers, the American Board of Trial Advocates and the Consumer Attorneys of California.

AJAY G. MEKA, M.D has served as a member of the Board of Directors of the Company since September 28, 2006. Dr. Meka brings to our Board extensive experience in the healthcare industry. Dr. Meka has been a licensed physician in California for the past 26 years. He is a board certified physician practicing in Orange County, California. Dr. Meka received his medical degree from Guntur Medical College in Gunter, India. He performed his postgraduate training at Brooklyn Jewish Hospital and Coney Island Hospital, both in Brooklyn, New York.

MICHAEL METZLER has been a member of the Board of Directors of the Company since September 5, 2007 and is Chairman of the Nominations and Governance Committee and sits on the Audit Committee and Special Committee. Mr. Metzler brings to our Board extensive leadership, organizational, and management skills. He is CEO of Metzler and Associates, a consulting firm specializing in organization development. He served as President and Chief Executive Officer of the Santa Ana Chamber of Commerce for 27 years from 1983 to 2010. Mr. Metzler has served on numerous community boards, city commissions, and county, regional, state and national committees and task forces. He was a founder of the Santa Ana Business Bank. Mr. Metzler received a Ford Foundation Fellowship in Regionalism and Sustainable Development in 2008. He is a graduate of California State University, Fullerton, and attended Loyola University School of Law and the Peter F. Drucker Graduate School of Management at Claremont University.

J. FERNANDO NIEBLA has served as a member of the Board of Directors of the Company since August 1, 2005. Mr. Niebla is the Chairman of the Compensation Committee and sits on the Audit Committee, Finance Committee, and Special Committee. Mr. Niebla brings to our Board extensive experience in executive leadership and board membership experience with large publicly traded companies. He has served as Managing Partner of International Technology Partners, LLC, an information technology and business consulting services company based on Orange County, California since August 1998. He is also a founder of Infotec Development Inc. and Infotec Commercial Systems, two national information technology firms. He currently serves on the Boards of Directors of Union Bank of California, Pacific Life Corp., Life Modeler, Inc., and Granite Construction Corp., the Board of Trustees of the Orange County Health Foundation, and is the Chairman of the California Advisory Committee to Nacional Financiera, a Mexican Government agency similar to the U.S. Government Small Business Administration office. Mr. Niebla holds a B.S. degree in Electrical Engineering from the University of Arizona and an M.S. QBA from the University of Southern California.

36

**JAE 1580**

WILLIAM E. THOMAS brings to our Board extensive experience in the legal profession and healthcare industry. Mr. Thomas is the Executive Vice President and General Counsel of Strategic Global Management, Inc., a healthcare ventures firm in Riverside, California. He has served in such capacity since October of 1998. Prior to that Mr. Thomas was a founding and managing partner of a law firm in Riverside, California specializing in business, real estate, and other transactional matters. He is a member of the board of directors of Provident Financial Holdings, Inc. Mr. Thomas graduated from the University of California at Santa Barbara with a Bachelor of Arts degree in History and Political Science. He holds a Juris Doctor degree from the University of California, Hastings College of the Law, and a Master of Laws degree from New York University. He is a member of the California Bar Association.

KENNETH K. WESTBROOK has served as President and Chief Executive Officer of the Company since December 2, 2008. Mr. Westbrook brings to our Board extensive experience as a healthcare executive with unique operational and management skills. Mr. Westbrook was Senior Vice President for Operations for OrNda HealthCorp (1996) and Senior Vice President of Operations for Tenet (1997 through 2004). Mr. Westbrook sold the four hospitals that created the Company as he left Tenet. During the years at OrNda and Tenet, Mr. Westbrook also had the experience of acting as each of the four hospitals' interim CEO when vacancies occurred. Prior to OrNda, Mr. Westbrook was the Chief Operating Officer for Hospital Corporation of America's Pacific Division and was previously a hospital CEO at several Southern California hospitals. He has graduate and undergraduate degrees in business from the University of Redlands and is currently a member of several healthcare professional associations.

STEVEN R. BLAKE – FHFMA, CPA has served as Chief Financial Officer of the Company since July 1, 2005 and Executive Vice President, Finance since March 21, 2008. He is a California licensed Certified Public Accountant. Mr. Blake came to the Company with over 20 years of experience in multi-hospital financial management. He also has extensive experience serving in financial roles with public companies. Most recently, he served as Regional Vice President of Finance for Tenet, a position he held for over 17 years. In this position, Mr. Blake was responsible for the financial management of numerous Tenet assets covering five western states (California, Arizona, Washington, Nebraska and Texas). Mr. Blake is a past President for the Southern California Chapter of the Healthcare Financial Management Association; is a member of the Audit Committee for the Hospital Association of Southern California and a former Trustee for the California Hospital Association.

DANIEL J. BROTHMAN has served as Chief Operating Officer & Executive Vice President, Operations since May 6, 2008 and as Chief Executive Officer of Western Medical Center - Santa Ana since March 8, 2005. Mr. Brothman also served as Senior Vice President, Operations of the Company from March 8, 2005 to May 6, 2008. Mr. Brothman is an experienced single and multi-hospital operations executive. Since 1999, prior to the acquisition of the Hospitals by the Company he helped build the Western Medical Center in Santa Ana for Tenet. Mr. Brothman also ran HCA's Utah Division from 1996 to 1998. Mr. Brothman has in excess of 30 years experience in hospital administration. Mr. Brothman earned his Bachelor of Arts degree from Washington University at St. Louis and his Master's in Health Care Administration from the University of Colorado at Denver.

CORPORATE GOVERNANCE

Director Independence and Executive Sessions

The Board of Directors has determined that Directors DeWald, Jameson, Meka, Metzler, Niebla, and Thomas each satisfy the definition of "independent director" as established in the NASDAQ listing standards. The independent directors regularly meet in executive sessions without the CEO or other members of management present to review the performance of management and other relevant matters.

Board's Leadership Structure

The Board's current leadership structure is characterized by an active and independent Chairman (who is not the same person as our CEO), robust Committee structure with oversight of various types of risks and an engaged and majority-independent Board. The Board believes that its current leadership structure provides strong and independent board leadership while deriving the benefit of having our CEO serve as a member of our Board.

Risk Oversight

Our Board oversees an enterprise-wide approach to risk management, designed to support the achievement of our strategic and organizational objectives, to improve long-term organizational performance and enhance shareholder value. A fundamental part of risk oversight is to understand the risks our Company faces, the steps management is taking to manage those risks and to assess management's appetite for risk. It is management's responsibility to manage risk and bring to the Board's attention material risks facing our Company. Our Board receives regular reports from management on matters relating to strategic and operational initiatives, financial performance and legal developments which are each integrated with enterprise-risk exposures. The Compensation Committee of our Board also approves our CEO's performance goals for each year. In doing so, the Committee has an opportunity to ensure that the CEO's goals include responsibility for broad risk management. The involvement of the full Board in setting our strategic plan is a key part of its assessment of the risks inherent in our corporate strategy.

37

**JAE 1581**

CONFIDENTIAL

SPCP_0000001225

While the Board has the ultimate responsibility for overall risk oversight, each Committee of the Board also has responsibility for particular areas of risk oversight. For example, the Audit Committee focuses on financial risk and internal controls, and receives an annual risk assessment report from our internal auditors. In addition, the Compensation Committee evaluates and sets compensation programs that encourage decision making predicated upon a level of risk consistent with our business strategy. The Compensation Committee also reviews compensation and benefit plans affecting employees in addition to those applicable to executive officers.

Attendance at Meetings

Directors are elected at our annual meeting and each director serves until the following annual meeting and until his successor is elected and qualified.

Although we do not have a formal policy regarding attendance by Board members at our annual meeting of stockholders, directors are encouraged to attend our annual meetings. All of our current directors attended our last Annual Meeting of Stockholders.

Our Board of Directors held six meetings during fiscal 2012. All of the directors attended or participated in 75% or more of the aggregate number of meetings of the Board and of meetings of the committees of the Board on which such director served.

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires our officers and directors, and persons who own more than 10% of a registered class of our equity securities, to file reports of ownership and changes in ownership with the SEC. Officers, directors and greater than 10% stockholders are required by SEC regulation to furnish us with copies of all Section 16(a) reports they file.

Based solely upon the copies of Section 16(a) reports filed by such persons or written representations from them regarding their transactions in our common stock, we believe that, during the year ended March 31, 2012, all such forms, if required to be filed, were filed in a timely fashion.

CODE OF ETHICS

We have adopted Standards of Conduct and Ethics that apply to our employees (including our principal executive officer, principal financial officer, principal accounting officer, and controller) and our directors. Our Standards of Conduct and Ethics can be accessed on our website at http://www.ihhioc.com under the Investor Relations section.

STOCKHOLDER COMMUNICATIONS

In order to facilitate communications with the Board of Directors, or any individual members or any committees of the Board of Directors, stockholders should direct all communication in writing to our General Counsel at Integrated Healthcare Holdings, Inc., 1301 North Tustin Avenue, Santa Ana, California 92705, who will forward all such correspondence to the Board of Directors, individual members of the Board of Directors or applicable chairpersons of any committee of the Board of Directors, as appropriate and as directed in the communication.

BOARD COMMITTEES

Our board of directors has established an Audit Committee, Compensation Committee, and Nominations and Governance Committee.

Audit Committee

The Audit Committee of the Board of Directors was formed in August 2005 and consists of three of our independent directors, Maurice DeWald and J. Fernando Niebla, who joined the Board of Directors in August 2005, and Michael Metzler, who joined the Board of Directors in September 2007. The Board of Directors has determined that Maurice DeWald is an "audit committee financial expert" as defined in the rules and regulations of the SEC. The Audit Committee of the Board of Directors preapproves all audit and permissible non-audit services to be performed by the independent registered public accounting firm. The Audit Committee will also advise management on the engagement of experts with sufficient expertise to advise on accounting and financial reporting of complex financial transactions. Of the five audit committee meetings held during the year ended March 31, 2012, Messrs. DeWald, Niebla, and Metzler attended all meetings. The Board of Directors has adopted and approved an Audit Committee Charter for the Audit Committee. A current copy of this charter is posted on our website at http://www.ihhioc.com under the Investor Relations section.

38

CONFIDENTIAL

Management is responsible for the Company's internal controls and financial reporting process. The independent registered public accounting firm is responsible for performing an independent audit of the Company's consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States) and to issue a report on the consolidated financial statements. The Audit Committee's responsibility is to oversee these activities.

In this context, the Audit Committee has met and held discussions with management and the independent registered public accounting firm. Management represented to the Audit Committee that the Company's consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States and the Audit Committee has reviewed and discussed the consolidated financial statements with management and the independent registered public accounting firm. The Audit Committee also discussed with the independent registered public accounting firm matters required to be discussed by Statement on Auditing Standards No. 114, "Communication with Audit Committees," as modified or supplemented, including the auditor's judgment about the quality, as well as the acceptability, of our accounting principles as applied in the financial reporting.

Our independent registered public accounting firm also provided to the Audit Committee the written disclosures required by Rule 3520 of the Public Company Accounting Oversight Board (Independence Discussions with Audit Committees), and the Audit Committee discussed with the independent registered public accounting firm that firm's independence as well as internal quality control procedures.

Based on the Audit Committee's discussions with management and the independent registered public accounting firm and the Audit Committee's review of the representations of management and the report of the independent registered public accounting firm to the Audit Committee, the Audit Committee recommended to the Board of Directors, and the Board has approved, that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended March 31, 2012 for filing with the SEC. This report was submitted by Mr. DeWald, Chair, and Messrs. Metzler and Niebla.

Compensation Committee

The Compensation Committee of the Board of Directors was formed in October 2005 and consists of three directors, Mr. Maurice DeWald, Mr. J. Fernando Niebla, chair, and Mr. William E. Thomas. In our fiscal year ended March 31, 2012, the Compensation Committee held three meetings. The Compensation Committee is responsible for overseeing the administration of the Company's executive compensation programs, establishing and interpreting the Company's compensation policies and approving all compensation paid to executive officers, including the named executive officers listed in the Summary Compensation Table. The Board of Directors has adopted and approved a Compensation Committee Charter for the Compensation Committee.

Nominations and Governance Committee

The Nominations and Governance Committee of the Board of Directors (the "Nominations Committee") consists of three directors, Mr. Maurice DeWald, Mr. Michael Metzler, chair, and Judge Jameson. In our fiscal year ended March 31, 2012, the Nominations Committee held three meetings. The general purpose and authority of the Nominations Committee is (1) to select, or recommend for the Board of Directors' selection, the individuals to stand for election as directors at the annual meeting of shareholders or, if applicable, a special meeting of shareholders, (2) to receive communications from shareholders directed to the Board of Directors, including shareholder proposals regarding director nominations to the Board of Directors, (3) to oversee the selection and composition of Committees of the Board of Directors and, as applicable, oversee management continuity planning processes, and (4) to oversee and maintain the corporate governance principles that apply to the Company, the Board of Directors and Committees of the Board.

When considering a potential candidate for membership on our Board of Directors, our Nominations Committee considers relevant business and industry experience and demonstrated character and judgment. The Nominations Committee considers diversity in identifying candidates by generally seeking to achieve a diversity of occupational and personal backgrounds on the Board. However the Nominations Committee has no formal policy regarding diversity. The Nominations Committee will consider stockholder nominations for directors submitted in accordance with the procedures and the deadlines set forth in our Bylaws. Such recommendations should be addressed to Michael Metzler, Chairman of the Nominations and Governance Committee, at the Company's headquarters at 1301 North Tustin Avenue, Santa Ana, California 92705. There are no differences in the manner in which the Nominations Committee evaluates a candidate that is recommended for nomination for membership on our Board of Directors or by a stockholder.

CONFIDENTIAL

**JAE 1583**

SPCP_0000001227

**ITEM 11. EXECUTIVE COMPENSATION**

The following table sets forth summary information regarding compensation to (i) our Chief Executive Officer; and (ii) our two other most highly compensated executive officers employed by us as of March 31, 2012 whose salary and bonus for the fiscal year ended March 31, 2012 was in excess of $100,000 for their services rendered in all capacities to us. The listed individuals are referred to as the "Named Executive Officers."

SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary (1) ($) | Bonus ($) | Option awards ($) | All other compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Kenneth K. Westbrook | 2012 | 575,532 | - | - | 20,509 | 596,041 |
| Principal Executive Officer (2) | 2011 | 556,742 | 204,500 | - | 26,953 | 788,195 |
| Steven R. Blake | 2012 | 444,550 | - | - | 16,706 | 461,256 |
| Principal Financial Officer & | | 423,404 | 185,722 | - | 22,267 | 631,393 |
| Executive Vice President, Finance (3) | 2011 | | | | | |
| Daniel J. Brothman | 2012 | 444,550 | - | - | 16,108 | 460,658 |
| Chief Operating Officer (4) | 2011 | 423,404 | 181,875 | - | 21,497 | 626,776 |

(1) Salary amounts for 2012 include 27 pay periods compared to 26 pay periods in 2011.
(2) All other compensation for 2012 and 2011 includes auto allowance of $18,000 and the balance is Company contribution to the 401(k) plan.
(3) All other compensation for 2012 and 2011 consists of an auto allowance of $12,000 and the balance is Company contribution to the 401(k) plan.
(4) All other compensation for 2012 and 2011 includes auto allowance of $12,000 and the balance is Company contribution to the 401(k) plan.

The following table sets forth summary information regarding stock options the Company has granted to the Named Executive Officers as of March 31, 2012 under the Company's 2006 Stock Incentive Plan.

OUTSTANDING STOCK OPTIONS AWARDS AT FISCAL YEAR-END

| Name | Grant date | Number of securities underlying unexercised options exercisable | Number of securities underlying unexercised options unexercisable | Equity incentive plan awards: Number of securities underlying unexercised unearned options | Option exercise price ($) | Option expiration date | Grant date fair value per share ($) |
|---|---|---|---|---|---|---|---|
| Kenneth K. Westbrook (1) | December 2, 2008 | 2,000,000 | - | - | 0.01 | December 2, 2015 | 0.00 |
| Steven R. Blake (2) | August 6, 2007 | 300,000 | - | - | 0.26 | August 6, 2014 | 0.03 |
| Daniel J. Brothman (3) | August 6, 2007 | 1,000,000 | - | - | 0.26 | August 6, 2014 | 0.02 |

(1) 1/3 of the shares vested on the grant date, and an additional 1/12 of the shares vest on each subsequent fiscal quarter-end of the Company beginning on March 31, 2009, all options were fully vested as of March 31, 2012.
(2) 1/3 of the shares vested on the twelve month anniversary of the grant date, and an additional 1/12 of the shares vest on each subsequent fiscal quarter-end of the Company following such twelve month anniversary, all options were fully vested as of March 31, 2012.
(3) Vesting retroactively commenced on March 8, 2005, all options were fully vested as of March 31, 2012.

40

**JAE 1584**

CONFIDENTIAL

EMPLOYMENT AGREEMENTS

The Company has employment agreements with each of the Named Executive Officers.  The Employment Agreements provide for the following material terms:

- Each individual's employment is for a fixed term of employment of three years, commencing April 1, 2010, with automatic renewals for successive one year periods. The Company or the Named Executive may only terminate the employment relationship during the final 120 days of the initial three-year period or one-year renewal periods, except for a termination by either party "for cause" (as defined in the employment agreements).
- The base salary of Mr. Westbrook is set at $550,000 per annum, and the base salaries of each of Messrs. Blake and Brothman are set at $422,000 per annum.
- The agreements provide for the establishment of annual performance targets for each individual by the Compensation Committee and the Executive within 60 days after the end of each fiscal year. Each Executive's annual bonus will be determined based on his achievement in reaching his individual performance targets.
- The employment agreements provided for payment of a severance package to each Executive upon a termination by the Executive "for cause" or termination by the Company "without cause." The severance period is 24 months (36 months during the first year of effectiveness of the employment agreements). The employment agreements also provide for payment of severance in the event of (i) a termination of employment following a change of control of the Company or (ii) a non-renewal of the Executive's employment by the Company at the end of the fixed 3-year or 1-year employment term. In the case of Messrs. Westbrook and Brothman, the right to receive severance terminates if the individual accepts employment with a competing hospital in a specified geographic area during the severance period.

POTENTIAL PAYMENTS UPON TERMINATION

Each of the Company's Named Executive Officers have employment agreements which provide, generally, for payments in the event of resignation for cause. Cause includes, among other items, changes in job duties, reporting relationships, bankruptcy of the Company or change in shareholders of over 50% of the stock. As of April 1, 2012, unless otherwise noted, each Named Executive Officer would be entitled to up to 24 months' salary, benefits and health insurance, but not any additional accruals of paid time off, vacation or sick pay.

The following table provides information concerning the estimated payments and benefits that would be provided in the circumstances described above for each of the Named Executive Officers. Payments and benefits are estimated assuming that the triggering event took place on April 1, 2012. There can be no assurance that a triggering event would produce the same or similar results as those estimated below if such event occurs on any other date or if any other assumption used to estimate potential payments and benefits is not correct. The amounts which would be due the Named Executive Officers as of April 1, 2012, if they resigned for cause is as follows.

PAYMENTS DUE UPON TERMINATION

| Name and principal position | | Salary | | Employee health insurance | | Car allowance | | Other benefits | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Kenneth K. Westbrook Chief Executive Officer (1) | $ | 1,100,000 | $ | 11,279 | $ | 36,000 | | - | $ | 1,147,279 |
| Steven R. Blake Chief Financial Officer & Executive Vice President, Finance (1) | $ | 844,000 | $ | 14,385 | $ | 24,000 | | - | $ | 882,385 |
| Daniel J. Brothman Senior Vice President, Operations (1) | $ | 844,000 | $ | 11,565 | $ | 24,000 | | - | $ | 879,565 |

(1)    Represents payments for 24 months per employment agreement, as of April 1, 2012.

COMPENSATION OF DIRECTORS

The following table provides information concerning the compensation of our non-management directors during the fiscal year ended March 31, 2012.

41

**JAE 1585**

CONFIDENTIAL

SPCP_0000001229

DIRECTOR COMPENSATION

| Name | Fees earned or paid in cash ($) | Stock options ($) | Total ($) |
|---|---|---|---|
| Maurice J. DeWald | 82,750 | - | 82,750 |
| Hon. C. Robert Jameson | 57,000 | - | 57,000 |
| Ajay G. Meka, M.D. | 127,125 | - | 127,125 |
| Michael Metzler | 75,000 | - | 75,000 |
| J. Fernando Niebla | 52,750 | - | 52,750 |
| William E. Thomas | 47,500 | - | 47,500 |

Our current compensation and reimbursement policy for Directors is as follows:

1. Cash: Each non-employee Director earns an annual fee of $30,000 and an attendance fee of $1,500 for each Board meeting attended, and a separate $1,000 fee for each committee meeting attended. The Chairman of the Board earns an additional annual retainer of $25,000. Committee chairmen earn an additional annual retainer of $5,000 or $10,000. The above fees were received in cash by the named Directors during the year ended March 31, 2012. For some directors, the fees listed may include fees which relate to service in a prior fiscal year but were paid in fiscal 2012.
2. Stock: No options were granted to the Directors during the year ended March 31, 2012.
3. Travel Reimbursement: All travel and related expenses incurred by Directors to attend Board meetings, committee meetings and other Company activities are reimbursed by the Company.

Employee directors receive no compensation for Board service and the Company does not provide any retirement benefits to non-employee directors. Director Westbrook is not included above as all compensation paid to him is included in the Summary Compensation Table.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

For a discussion of securities authorized for issuance under equity compensation plans, please refer to Item 5 above.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information known to us with respect to the beneficial ownership of our Common Stock as of June 18, 2012 by:

- each stockholder known to us to own beneficially more than 5% of our Common Stock;
- each of our directors and executive officers; and
- all of our current directors and executive officers as a group.

Except as otherwise noted below, the address of each person or entity listed on the table is 1301 North Tustin Avenue, Santa Ana, California 92705. The address of Dr. Kali P. Chaudhuri and KPC Resolution Company, LLC is 3321 Loma Linda Lane, Las Vegas, NV 89121. The address of William E. Thomas is 3192 American Saddler Drive, Park City, UT 84060. The address of Silver Point Capital, L.P. is Two Greenwich Plaza, 1st Floor, Greenwich, CT 06830. The address of Orange County Physicians Investment Network, LLC and Dr. Anil V. Shah is 2621 S. Bristol Street, Santa Ana, CA 92704.

42

CONFIDENTIAL

SPCP_0000001230

| NAME | BENEFICIAL OWNERSHIP (1) | PERCENTAGE OF TOTAL (2) |
|---|---|---|
| **DIRECTORS AND EXECUTIVE OFFICERS** | | |
| Maurice J. DeWald (3) | 350,000 | * |
| Hon. C. Robert Jameson (3) | 250,000 | * |
| Ajay G. Meka, M.D. (3)(4) | 300,000 | * |
| Michael Metzler (3) | 250,000 | * |
| J. Fernando Niebla (3) | 350,000 | * |
| William E. Thomas (5) | 9,998,498 | 3.91% |
| Kenneth K. Westbrook (3) | 2,000,000 | * |
| Steven R. Blake (3) | 300,000 | * |
| Daniel J. Brothman (3) | 1,000,000 | * |
| All current directors and executive officers as a group (9 persons) | 14,798,498 | 5.80% |
| **PRINCIPAL STOCKHOLDERS** | | |
| Kali P. Chaudhuri, M.D. (6) | 437,601,334 | 77.55% |
| KPC Resolution Company, LLC (7) | 139,000,000 | 35.25% |
| Silver Point Capital, L.P. (8) | 96,000,000 | 27.33% |
| Orange County Physicians Investment Network, LLC (9) | 73,798,430 | 28.91% |
| Anil V. Shah, M.D. (10) | 19,812,000 | 7.76% |

* Less than 1%

(1)    Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options, warrants and convertible instruments that are exercisable or convertible within 60 days of June 18, 2012 are deemed outstanding for computing the percentage of the person holding such option, warrant or convertible instrument, but are not deemed outstanding for computing the percentage of any other person. Except as reflected in the footnotes or pursuant to applicable community property laws, the persons named in this table have sole voting and investment power with respect to all shares of Common Stock beneficially owned.

(2)    Percentages are based on 255,307,262 shares of Common Stock outstanding as of June 18, 2012, which does not include up to 23,525,489 shares of Common Stock which may be issued under the Company's 2006 Stock Incentive Plan, and are otherwise calculated in accordance with Rule 13d-3 under the Exchange Act.

(3)    Consists of a stock option award approved by the Board of Directors pursuant to the Company's 2006 Stock Incentive Plan.

(4)    Dr. Meka is a member of Orange County Physicians Investment Network, LLC ("OC-PIN") and disclaims beneficial ownership of shares held by OC-PIN except to the extent of his pecuniary interest therein.

(5)    Consists of 9,748,498 issued and outstanding shares and a stock option award approved by the Board of Directors pursuant to the Company's 2006 Stock Incentive Plan.

(6)    Consists of 128,601,334 issued and outstanding shares, 170,000,000 shares which may be acquired by Kali P. Chaudhuri, M.D. pursuant to a three-year warrant issued to him on April 13, 2010, and 139,000,000 shares which may be acquired by KPC Resolution Company, LLC ("KPC Resolution") pursuant to a three-year warrant issued to it on April 13, 2010. Dr. Chaudhuri is the manager of KPC Resolution and, as a result, he may be deemed to be the beneficial owner of the securities held by KPC Resolution. Dr. Chaudhuri disclaims beneficial ownership of the reported securities held by KPC Resolution except to the extent of his pecuniary interest therein.

(7)    Consists of 139,000,000 shares which may be acquired by KPC Resolution pursuant to a three-year warrant issued to it on April 13, 2010.

(8)    Consists of 79,182,635 shares and 16,817,365 shares which may be acquired by SPCP Group, LLC and SPCP Group IV, LLC (the "Funds"), respectively, pursuant to three-year warrants issued to the Funds on April 13, 2010. Silver Point Capital, L.P. ("Silver Point") is the investment manager of the Funds and, by reason of such status, may be deemed to be the beneficial owner of all of the reported securities held by the Funds. Silver Point Capital Management, LLC ("Management") is the general partner of Silver Point and, as a result, may be deemed to be the beneficial owner of the securities held by the Funds. Messrs. Edward A. Mule and Robert J. O'Shea are each members of Management and, as a result, may be deemed to be the beneficial owner of all of the securities held by the Funds. Silver Point, Management and Messrs. Mule and O'Shea disclaim beneficial ownership of the reported securities held by the Funds except to the extent of their respective pecuniary interests therein.

(9)    Consists of 73,798,430 issued and outstanding shares.

(10)    Includes 14,700,000 issued and outstanding shares. The amount does not include any shares held of record by OC-PIN. Dr. Shah is a member of OC-PIN. The inclusion of 5,112,000 shares in Dr. Shah's holdings is based on information filed by Dr. Shah in a Schedule 13D/A filed on April 9, 2009. The Company has no independent information verifying the acquisition of such shares by Dr. Shah.

43

**JAE 1587**

CONFIDENTIAL

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

CREDIT AGREEMENTS

On April 13, 2010 (the "Effective Date"), the Company entered into an Omnibus Credit Agreement Amendment (the "Omnibus Amendment") with SPCP Group IV, LLC and SPCP Group, LLC (together, "Silver Point"), Silver Point Finance, LLC, as the Lender Agent, PCHI, Ganesha Realty LLC ("Ganesha"), Dr. Chaudhuri and KPC Resolution Company ("KPC"). KPC and Ganesha are companies owned and controlled by Dr. Chaudhuri, who is the majority shareholder of the Company. Ganesha is a member of PCHI with a 49% membership interest in PCHI. The Omnibus Amendment and our obligations thereunder are discussed further above under "ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS – Liquidity and Capital Resources."

During the year ended March 31, 2012, we paid down the balance of the $20.0 million revolving line of credit to $14.0 million.  On June 8, 2012, we entered into Amendment No. 2 to the New Credit Agreement with the AR Lender.  Under Amendment No. 2, the minimum Revolving Loan Commitment Amount under the New Credit Agreement was permanently reduced from $20.0 million to $14.0 million, and the AR Lender agreed that no Prepayment Fee will be payable in connection with such reduction.

REVIEW, APPROVAL OR RATIFICATION OF TRANSACTIONS WITH RELATED PARTIES

The Company's human resources written policies and procedures provide guidance for conflicts of interest and their relation to the standards of ethical behavior expected of employees. The policies specifically require immediate written disclosure of any business, financial, or other relationship that either creates, or is perceived to create a conflict of interest. The Corporate Compliance Officer is responsible for monitoring compliance with this policy.

As part of the quarterly disclosure control procedures, the Chief Financial Officer and Chief Executive Officer for each hospital disclose or certify that employees or officers have not acted in a manner inconsistent with the Company policy related to Conflict of Interest. The CFO and Director of Internal Audit monitor certifications for potential disclosure events.

Company policy requires the General Counsel to review and approve all contracts involving related parties, including contracts with related parties who are considered potential referral sources. The Audit Committee has requested that the General Counsel provide periodic updates of such transactions to the Committee.

During the initial acquisition of the Hospitals, the Company entered into agreements with the Medical Executive Committee ("MEC") at the largest hospital, Western Medical Center – Santa Ana ("WMC-SA") requiring MEC's advance review of all agreements involving hospital operations with related parties, excluding the lease arrangements between the Company and PCHI. The Company applies the disclosure provisions applicable to WMC-SA to all of its facilities.

DIRECTOR INDEPENDENCE

The information called for by this item in response to Item 407(a) of Regulation S-K concerning director independence is contained above under "ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE."

CONFIDENTIAL                                                                                           SPCP_0000001232

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

    The following table sets forth the aggregate fees that we incurred for audit and non-audit services provided by BDO USA, LLP, which acted as our independent registered public accounting firm for the years ended March 31, 2012 and 2011, and performed audit services for us during those periods. The audit fees include only fees that are customary under generally accepted auditing standards and are the aggregate fees that we incurred for professional services rendered for the years ended March 31, 2012 and 2011.

| | For the years ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Audit fees (financial) | $ 750,000 | $ 775,000 |
| Audit related fees | 15,000 | - |
| Tax fees | 113,000 | 62,000 |
| All other | - | - |
| Total fees | $ 878,000 | $ 837,000 |

    The Audit Committee of the Board of Directors pre-approves all audit and permissible non-audit services to be performed by the independent auditors. The Board of Directors of the Company considered that the provision of the services and the payment of the fees described above are compatible with maintaining the auditors' independence.

CONFIDENTIAL

SPCP_0000001233

**ITEM 15. EXHIBITS; FINANCIAL STATEMENT SCHEDULES**

Exhibits required to be filed are listed below and except where incorporated by reference, immediately follow the Financial Statements. Each document filed with this report is marked with an asterisk (*).

3.1    Amended and Restated Articles of Incorporation (incorporated by reference to Appendix A to the Registrant's Information Statement on Schedule 14C filed on March 17, 2009).

3.2    Amended and Restated Bylaws (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q filed with the Commission on February 10, 2012).

4.1    Warrant to purchase 170,000,000 shares of common stock, dated April 13, 2010, issued to Kali P. Chaudhuri, M.D. (incorporated by reference to Exhibit 99.2 to the Registrant's Report on Form 8-K filed on April 19, 2010).

4.2    Warrant to purchase 139,000,000 shares of common stock, dated April 13, 2010, issued to KPC Resolution Company, LLC (incorporated by reference to Exhibit 99.3 to the Registrant's Report on Form 8-K filed on April 19, 2010).

4.3    Warrant to purchase 79,182,635 shares of common stock, dated April 13, 2010, issued to SPCP Group, LLC (incorporated by reference to Exhibit 99.4 to the Registrant's Report on Form 8-K filed on April 19, 2010).

4.4    Warrant to purchase 16,817,365 shares of common stock, dated April 13, 2010, issued to SPCP Group IV, LLC (incorporated by reference to Exhibit 99.5 to the Registrant's Report on Form 8-K filed on April 19, 2010).

10.1    Amended and Restated Employment Agreement, executed as of March 29, 2010, by and between the Registrant and Kenneth K. Westbrook (incorporated by reference to Exhibit 10.17 to the Registrant's Report on Form 10-K filed on June 29, 2010).

10.2    Amended and Restated Employment Agreement, executed as of March 29, 2010, by and between the Registrant and Steven R. Blake (incorporated by reference to Exhibit 10.18 to the Registrant's Report on Form 10-K filed on June 29, 2010).

10.3    Amended and Restated Employment Agreement, executed as of March 29, 2010, by and between the Registrant and Daniel J. Brothman (incorporated by reference to Exhibit 10.19 to the Registrant's Report on Form 10-K filed on June 29, 2010).

10.1    2006 Stock Incentive Plan (incorporated by reference to Appendix B to the Registrant's Definitive Proxy Statement on Schedule 14A filed by the Registrant on November 14, 2006).

10.4.1    Form of Notice of Stock Option Award and Stock Option Agreement under 2006 Stock Incentive Plan (incorporated herein by reference from Exhibit 4.5 to the Registrant's Registration Statement under the Securities and Exchange Act of 1933 on Form S-8 filed with the Commission on February 2, 2007).

10.5    Release, dated April 13, 2010, by and between the Registrant and Thomas A. Seaman, Receiver (incorporated by reference to Exhibit 99.7 to the Registrant's Report on Form 8-K filed on April 19, 2010).

10.6    Amended and Restated Triple Net Hospital Building Lease, dated as of October 1, 2007, between Pacific Coast Holdings Investment, LLC and the Registrant (incorporated by reference to Exhibit 99.10 to the Registrant's Report on Form 8-K filed on October 15, 2007).

10.6.1    Amendment to Amended and Restated Triple Net Hospital Building Lease, dated as of March 27, 2009, between Pacific Coast Holdings Investment, LLC and the Registrant (incorporated by reference to Exhibit 10.8 to the Registrant's Report on Form 8-K filed on April 7, 2009).

10.6.2    Second Amendment to Amended and Restated Triple Net Hospital Building Lease, dated as of April 13, 2010, between Pacific Coast Holdings Investment, LLC and the Registrant (incorporated by reference to Exhibit 99.6 to the Registrant's Report on Form 8-K filed on April 19, 2010).

10.7    Credit and Security Agreement, dated August 30, 2010, by and among the Company, MidCap Financial, LLC, as Administrative Agent and Lender, and Silicon Valley Bank as Lender (incorporated by reference to Exhibit 99.1 to the Registrant's Report on Form 8-K filed on September 2, 2010).

10.7.1    Amendment No. 1 to the Credit and Security Agreement, dated October 29, 2010, by and among the Company, MidCap Funding IV, LLC, as Administrative Agent and Lender, and Silicon Valley Bank as Lender (incorporated by reference to Exhibit 99.1 to the Registrant's Report on Form 8-K filed on November 4, 2010).

**JAE 1590**

CONFIDENTIAL

SPCP_0000001234

10.7.2 Amendment No. 2 to the Credit and Security Agreement, dated October 29, 2010, by and among the Company, MidCap Funding IV, LLC, as Administrative Agent and Lender, and Silicon Valley Bank as Lender (incorporated by reference to Exhibit 99.1 to the Registrant's Report on Form 8-K filed on June 14, 2012).

10.8 $80,000,000 Credit Agreement, dated October 9, 2007, by and among the Company, its subsidiaries, Pacific Coast Holdings Investment, LLC, West Coast Holdings, LLC, Ganesha Realty, LLC, Orange County Physicians Investment Network, LLC, and Medical Provider Financial Corporation II (incorporated by reference to Exhibit 99.1 to the Registrant's Report on Form 8-K filed on October 15, 2007).

10.8.1 Form of $45,000,000 Term Note, dated October 9, 2007 (incorporated by reference to Exhibit 99.2 to the Registrant's Report on Form 8-K filed on October 15, 2007).

10.8.2 Form of $35,000,000 Non-Revolving Line of Credit Note, dated October 9, 2007 (incorporated by reference to Exhibit 99.3 to the Registrant's Report on Form 8-K filed on October 15, 2007).

10.8.3 Omnibus Credit Agreement Amendment, dated as of April 13, 2010, among the Registrant, WMC-SA, Inc., WMC-A, Inc., Chapman Medical Center, Inc., Coastal Communities Hospital, Inc., Pacific Coast Holdings Investment, LLC, Ganesha Realty, LLC, SPCP Group IV, LLC, SPCP Group, LLC, and Silver Point Finance, LLC, as the Lender Agent (incorporated by reference to Exhibit 99.1 to the Registrant's Report on Form 8-K filed on April 19, 2010).

10.8.4 Amendment to $80,000,000 Credit Agreement, dated August 30, 2010, by and among the Company, Pacific Coast Holdings Investment, LLC, Ganesha Realty, LLC, SPCP Group IV, LLC, SPCP Group, LLC and Silver Point Finance, LLC (incorporated by reference to Exhibit 99.2 to the Registrant's Report on Form 8-K filed on September 2, 2010).

10.9 Master Information System Agreement, dated March 31, 2008, between McKesson Information Solutions LLC and the Registrant (incorporated by reference to Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q filed with the Commission on November 9, 2011).

10.9.1 Contract Supplement, dated July 1, 2011, to Master Information System Agreement, dated March 31, 2008, between McKesson Information Solutions LLC and the Registrant (incorporated by reference to Exhibit 10.9.1 to the Registrant's Quarterly Report on Form 10-Q filed with the Commission on November 9, 2011). **

21.1 The subsidiaries of the Registrant are WMC-SA, Inc., a California corporation, WMC-A, Inc., a California corporation, Chapman Medical Center, Inc., a California corporation, and Coastal Communities Hospital, Inc., a California corporation.

23.1 Consent of BDO USA, LLP.*

31.1 Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

31.2 Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

32.1 Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

32.2 Certification of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

---

** Confidential treatment has been granted with respect to certain confidential portions of this exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, which confidential portions have been omitted from the exhibit and filed separately with the Securities and Exchange Commission.

CONFIDENTIAL

**JAE 1591**

SPCP_0000001235

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**INTEGRATED HEALTHCARE HOLDINGS, INC.**

Dated: June 20, 2012

By:    /s/ Kenneth K. Westbrook
        Kenneth K. Westbrook
        Chief Executive Officer & President (Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

Dated: June 20, 2012

/s/ Kenneth K. Westbrook
Kenneth K. Westbrook
Chief Executive Officer, President & Director
(Principal Executive Officer)

Dated: June 20, 2012

/s/ Steven R. Blake
Steven R. Blake
Chief Financial Officer
(Principal Financial Officer)

Dated: June 20, 2012

/s/ Jeremiah R. Kanaly
Jeremiah R. Kanaly
Chief Accounting Officer and Treasurer
(Principal Accounting Officer)

Dated: June 20, 2012

/s/ Maurice J. DeWald
Maurice J. DeWald
Chairman of the Board of Directors

Dated: June 20, 2012

/s/ Hon. C. Robert Jameson
Hon. C. Robert Jameson
Director

Dated: June 20, 2012

/s/ Ajay Meka, M.D.
Ajay Meka, M.D
Director

Dated: June 20, 2012

/s/ Michael Metzler
Michael Metzler
Director

Dated: June 20, 2012

/s/ J. Fernando Niebla
J. Fernando Niebla
Director

Dated: June 20, 2012

/s/ William E. Thomas
William E. Thomas
Director

48

**JAE 1592**

CONFIDENTIAL

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Integrated Healthcare Holdings, Inc.
Santa Ana, California

We have audited the accompanying consolidated balance sheets of Integrated Healthcare Holdings, Inc. (the "Company") as of March 31, 2012 and 2011 and the related consolidated statements of operations, stockholders' deficiency, and cash flows for each of the two years in the period ended March 31, 2012. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Integrated Healthcare Holdings, Inc. at March 31, 2012 and 2011, and the results of its operations and its cash flows for each of the two years in the period ended March 31, 2012, in conformity with accounting principles generally accepted in the United States of America.

Also, in our opinion, the financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, the Company changed its presentation of revenues and provision for doubtful accounts as a result of the retrospective adoption of the amendments to the Accounting Standards Codification resulting from Accounting Standards Update No. 2011-07, *Presentation and Disclosure of Patient Service Revenue, Provision for Bad Debts, and the Allowance for Doubtful Accounts for Certain Healthcare Entities*, effective March 31, 2012.

BDO USA, LLP
Costa Mesa, California
June 22, 2012

F-1

CONFIDENTIAL

**JAE 1593**

INTEGRATED HEALTHCARE HOLDINGS, INC.
CONSOLIDATED BALANCE SHEETS
(amounts in 000's, except par value)

| | | March 31, | | |
|---|---|---|---|---|
| | | 2012 | | 2011 |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 11,829 | $ | 20,539 |
| Restricted cash | | 10 | | 24 |
| Accounts receivable, net of allowance for doubtful accounts of $18,201 and $20,076, respectively | | 53,599 | | 54,649 |
| Inventories of supplies, at cost | | 6,855 | | 5,945 |
| Due from governmental payers | | 5,183 | | 4,352 |
| Prepaid insurance | | 366 | | 3,108 |
| Prepaid income taxes | | 892 | | - |
| Hospital quality assurance fee receivable | | 2,436 | | 1,815 |
| Other prepaid expenses and current assets | | 8,339 | | 6,774 |
| Total current assets | | 89,509 | | 97,206 |
| | | | | |
| Property and equipment, net | | 55,529 | | 54,251 |
| Debt issuance costs, net | | 64 | | 445 |
| Total assets | $ | 145,102 | $ | 151,902 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIENCY** | | | | |
| Current liabilities: | | | | |
| Revolving line of credit | $ | 14,000 | $ | 19,081 |
| Accounts payable | | 52,700 | | 43,968 |
| Accrued compensation and benefits | | 19,847 | | 18,707 |
| Accrued insurance retentions | | 14,377 | | 16,642 |
| Income taxes payable | | - | | 12,800 |
| Other current liabilities | | 3,242 | | 7,261 |
| Total current liabilities | | 104,166 | | 118,459 |
| | | | | |
| Debt, noncurrent | | 45,000 | | 45,000 |
| Warrant liability, noncurrent | | 1,641 | | 167 |
| Capital lease obligations, net of current portion of $891 and $1,131, respectively | | 5,944 | | 6,837 |
| Total liabilities | | 156,751 | | 170,463 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Stockholders' deficiency: | | | | |
| Integrated Healthcare Holdings, Inc. stockholders' deficiency: | | | | |
| Common stock, $0.001 par value; 800,000 shares authorized; 255,307 shares issued and outstanding | | 255 | | 255 |
| Additional paid in capital | | 62,911 | | 62,911 |
| Receivable from stockholders | | - | | (882) |
| Accumulated deficit | | (71,828) | | (79,280) |
| Total Integrated Healthcare Holdings, Inc. stockholders' deficiency | | (8,662) | | (16,996) |
| Noncontrolling interests | | (2,987) | | (1,565) |
| Total stockholders' deficiency | | (11,649) | | (18,561) |
| | | | | |
| Total liabilities and stockholders' deficiency | $ | 145,102 | $ | 151,902 |

The accompanying notes are an integral part of these consolidated financial statements.

F-2

CONFIDENTIAL

**JAE 1594**

SPCP_0000001238

INTEGRATED HEALTHCARE HOLDINGS, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS
(amounts in 000's, except per share amounts)

| | For the year ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Patient service revenues (net of contractual allowances and discounts) | $ 405,653 | $ 457,836 |
| Provision for doubtful accounts | (40,368) | (34,773) |
| Net patient service revenues | 365,285 | 423,063 |
| | | |
| Operating expenses: | | |
| Salaries and benefits | 218,801 | 211,636 |
| Supplies | 55,066 | 52,831 |
| Other operating expenses | 74,515 | 109,769 |
| Depreciation and amortization | 4,208 | 4,165 |
| | 352,590 | 378,401 |
| | | |
| Operating income | 12,695 | 44,662 |
| | | |
| Other income (expense): | | |
| Income from electronic health records incentive program | 6,802 | - |
| Interest expense, net | (10,218) | (12,046) |
| Gain (loss) on warrants | (1,474) | 1,949 |
| | (4,890) | (10,097) |
| | | |
| Income before income tax provision (benefit) | 7,805 | 34,565 |
| Income tax provision (benefit) | (139) | 14,000 |
| Net income | 7,944 | 20,565 |
| Net income attributable to noncontrolling interests (Note 9) | (492) | (400) |
| | | |
| Net income attributable to Integrated Healthcare Holdings, Inc. | $ 7,452 | $ 20,165 |
| | | |
| Per Share Data (Note 8): | | |
| Earnings per common share attributable to Integrated Healthcare Holdings, Inc. stockholders | | |
| Basic | $ 0.03 | $ 0.08 |
| Diluted | $ 0.03 | $ 0.08 |
| Weighted average shares outstanding | | |
| Basic | 255,307 | 255,307 |
| Diluted | 256,840 | 256,944 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

**JAE 1595**

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY
(amounts in 000's)

| | Integrated Healthcare Holdings, Inc. Stockholders | | | | | | |
| | Common Stock | | Additional Paid-in Capital | Receivable from Stockholders | Accumulated Deficit | Noncontrolling Interests | Total |
| | Shares | Amount | | | | | |
|---|---|---|---|---|---|---|---|
| Balance, March 31, 2010 | 255,307 | $ 255 | $ 62,871 | $ (1,800) | $ (99,445) | $ 1,334 | $ (36,785) |
| Share-based compensation | - | - | 40 | - | - | - | 40 |
| Payment received on receivable from stockholders | - | - | - | 918 | - | - | 918 |
| Net income | - | - | - | - | 20,165 | 400 | 20,565 |
| Noncontrolling interests distributions | - | - | - | - | - | (3,299) | (3,299) |
| Balance, March 31, 2011 | 255,307 | 255 | 62,911 | (882) | (79,280) | (1,565) | (18,561) |
| Payment received on receivable from stockholders | - | - | - | 882 | - | - | 882 |
| Net income | - | - | - | - | 7,452 | 492 | 7,944 |
| Noncontrolling interests distributions | - | - | - | - | - | (1,914) | (1,914) |
| Balance, March 31, 2012 | 255,307 | $ 255 | $ 62,911 | $ - | $ (71,828) | $ (2,987) | $ (11,649) |

The accompanying notes    are an integral part of these consolidated financial statements.

F-4

CONFIDENTIAL

**JAE 1596**

SPCP_0000001240

INTEGRATED HEALTHCARE HOLDINGS, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(amounts in 000's)

| | For the year ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Cash flows from operating activities: | | |
| Net income | $ 7,944 | $ 20,565 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization of property and equipment | 4,208 | 4,165 |
| Provision for doubtful accounts | 40,368 | 34,773 |
| Amortization of debt issuance costs | 525 | 304 |
| Loss (gain) on warrants | 1,474 | (1,949) |
| Noncash share-based compensation expense | - | 40 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (39,318) | (36,278) |
| Inventories of supplies | (910) | (127) |
| Due from governmental payers | (831) | 627 |
| Prepaid income taxes | (892) | 1,238 |
| Hospital quality assurance fee receivable | (621) | (1,815) |
| Prepaid insurance, other prepaid expenses and current assets, and other assets | 1,033 | (4,635) |
| Accounts payable | 8,732 | (1,500) |
| Accrued compensation and benefits | 1,140 | (1,713) |
| Income taxes payable | (12,800) | 12,800 |
| Accrued insurance retentions and other current liabilities | (5,534) | 6,006 |
| Net cash provided by operating activities | 4,518 | 32,501 |
| Cash flows from investing activities: | | |
| Decrease in restricted cash | 14 | 3 |
| Additions to property and equipment | (5,486) | (1,685) |
| Net cash used in investing activities | (5,472) | (1,682) |
| Cash flows from financing activities: | | |
| Proceeds from (paydown on) revolving line of credit, net | (5,081) | 19,081 |
| Debt issuance costs | - | (919) |
| Repayment of debt | - | (34,968) |
| Payment received - receivable from stockholders | 132 | 918 |
| Noncontrolling interests distributions | (1,914) | (3,299) |
| Payments on capital lease obligations | (893) | (1,252) |
| Net cash used in financing activities | (7,756) | (20,439) |
| Net increase (decrease) in cash and cash equivalents | (8,710) | 10,380 |
| Cash and cash equivalents, beginning of period | 20,539 | 10,159 |
| Cash and cash equivalents, end of period | $ 11,829 | $ 20,539 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

CONFIDENTIAL

SPCP_0000001241

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

NOTE 1 – DESCRIPTION OF BUSINESS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION – The accompanying consolidated financial statements include the accounts of Integrated Healthcare Holdings, Inc. and its subsidiaries (collectively, the "Company") and have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

The Company has also determined that Pacific Coast Holdings Investment, LLC ("PCHI") (Note 9), is a variable interest entity as defined by GAAP and the Company is the primary beneficiary and, accordingly, the financial statements of PCHI are included in the accompanying consolidated financial statements.

All significant intercompany accounts and transactions have been eliminated in consolidation. Unless otherwise indicated, all amounts included in these notes to the consolidated financial statements are expressed in thousands (except per share amounts, percentages and stock option prices and values).

LIQUIDITY – As of March 31, 2012 and 2011, the Company had a total stockholders' deficiency of $11.6 million and $18.6 million, respectively, and a working capital deficit of $14.7 million and $21.3 million, respectively. For the years ended March 31, 2012 and 2011, the Company had net income of $7.5 million and $20.2 million, respectively. At March 31, 2012, the Company had no additional availability under its revolving credit facility (Note 3).

The stated maturity date of our $45.0 million Term Note under our Credit Agreements with Silver Point is April 13, 2013 (Note 3). If we are unable to refinance, restructure or extend our obligation to repay the principal amount by the maturity date, such failure would constitute a default under the Credit Agreement with Silver Point and our other loan facilities, which would permit Silver Point and our other lenders to seize our assets and those of our variable interest entity, PCHI. Any actions by Silver Point or our other lenders to enforce their rights by seizing our assets could force us into bankruptcy or liquidation, which would have a material adverse effect on our liquidity and financial position and the value of our common stock.

DESCRIPTION OF BUSINESS – Effective March 8, 2005, the Company acquired four hospitals (the "Hospitals") from subsidiaries of Tenet Healthcare Corporation (the "Acquisition"). The Company owns and operates the four community-based hospitals located in southern California, which are:

- 282-bed Western Medical Center in Santa Ana
- 188-bed Western Medical Center in Anaheim
- 178-bed Coastal Communities Hospital in Santa Ana
- 114-bed Chapman Medical Center in Orange

RECLASSIFICATION FOR PRESENTATION – Certain amounts previously reported have been reclassified to conform to the current period's presentation with no impact on the reported net income of the Company.

CONCENTRATION OF RISK – The Hospitals are subject to licensure by the State of California and accreditation by the Joint Commission on Accreditation of Healthcare Organizations. Loss of either licensure or accreditation would impact the ability to participate in various governmental and managed care programs, which provide the majority of the Company's revenues.

Substantially all patient service revenues come from external customers. The largest payers are Medicare and Medicaid (including Medicare and Medicaid managed care plans), which combined accounted for 59.4% and 65.5% of the patient service revenues for the years ended March 31, 2012 and 2011, respectively. No other payers represent a significant concentration of the Company's patient services revenues.

The Company receives all of its inpatient services revenue from operations in Orange County, California. The economic conditions of this market could affect the ability of patients and third-party payers to reimburse the Company for services, through its effect on disposable household income and the tax base used to generate state funding for Medicaid programs.

USE OF ESTIMATES – The accompanying consolidated financial statements have been prepared in accordance with GAAP. The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Principal areas requiring the use of estimates include third-party cost report settlements, income taxes, accrued insurance retentions, self-insurance reserves, and net patient receivables. Management regularly evaluates the accounting policies and estimates that are used. In general, management bases the estimates on historical experience and on assumptions that it believes to be reasonable given the particular circumstances in which its Hospitals operate. Although management believes that all adjustments considered necessary for fair presentation have been included, actual results may materially vary from those estimates.

F-6

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

PATIENT SERVICE REVENUES – Patient service revenues are recognized in the period in which services are performed and are recorded based on established billing rates (gross charges) less contractual allowances and discounts, principally for patients covered by Medicare, Medicaid, managed care, and other health plans. Gross charges are retail charges. They are not the same as actual pricing, and they generally do not reflect what a hospital is ultimately paid and therefore are not displayed in the consolidated statements of operations. Hospitals are typically paid amounts that are negotiated with insurance companies or are set by the government. Gross charges are used to calculate Medicare outlier payments and to determine certain elements of payment under managed care contracts (such as stop-loss payments). Since Medicare requires that a hospital's gross charges be the same for all patients (regardless of payer category), gross charges are also what the Hospitals charge all other patients prior to the application of discounts and allowances.

The following is a summary of sources of patient service revenues (net of contractual allowances and discounts) before provision for doubtful accounts:

|  | Year ended March 31, | |
|  | 2012 | 2011 |
| --- | --- | --- |
| Medicare | $ 58,046 | $ 59,870 |
| Medicaid | 80,153 | 143,355 |
| Managed care | 201,758 | 189,044 |
| Indemnity, self-pay and other | 62,607 | 62,455 |
| Miscellaneous | 3,089 | 3,112 |
|  | $ 405,653 | $ 457,836 |

Revenues under the traditional fee-for-service Medicare and Medicaid programs are based primarily on prospective payment systems. Discounts for retrospectively cost based revenues and certain other payments, which are based on the Hospitals' cost reports, are estimated using historical trends and current factors. Cost report settlements for retrospectively cost-based revenues under these programs are subject to audit and administrative and judicial review, which can take several years until final settlement of such matters are determined and completely resolved. Estimates of settlement receivables or payables related to a specific year are updated periodically and at year end and at the time the cost report is filed with the fiscal intermediary. Typically no further updates are made to the estimates until the final Notice of Program Reimbursement is received, at which time the cost report for that year has been audited by the fiscal intermediary. There could be a time lag of several years between the submission of a cost report and receipt of the Final Notice of Program Reimbursement. Since the laws, regulations, instructions and rule interpretations governing Medicare and Medicaid reimbursement are complex and change frequently, the estimates recorded by the Hospitals could change by material amounts. The Company has established settlement receivables of $190 and $456 as of March 31, 2012 and 2011, respectively.

The Hospitals receive supplemental payments from the State of California to support indigent care (Medi-Cal Disproportionate Share Hospital payments or "DSH") and from the California Medical Assistance Commission ("CMAC") under the SB 1100 and SB 1255 programs. The Hospitals received supplemental payments of $14.3 million and $21.4 million during the years ended March 31, 2012 and 2011, respectively. The related revenue recorded for the years ended March 31, 2012 and 2011, was $15.4 million and $20.6 million, respectively. As of March 31, 2012 and 2011, estimated DSH receivables were $5.0 million and $3.9 million, respectively, which are included as due from government payers in the accompanying consolidated balance sheets.

Revenues under managed care plans, including Medicare and Medicaid managed care plans, are based primarily on payment terms involving predetermined rates per diagnosis, per-diem rates, discounted fee-for-service rates and/or other similar contractual arrangements. These revenues are also subject to review and possible audit by the payers. The payers are billed for patient services on an individual patient basis. An individual patient's bill is subject to adjustment on a patient-by-patient basis in the ordinary course of business by the payers following their review and adjudication of each particular bill. The Hospitals estimate the discounts for contractual allowances utilizing billing data on an individual patient basis. Management believes the estimation and review process allows for timely identification of instances where such estimates need to be revised. The Company does not believe there were any adjustments to estimates of individual patient bills that were material to patient service revenues.

The Hospitals provide charity care to patients whose income level is below 300% of the Federal Poverty Level. Patients with income levels between 300% and 350% of the Federal Poverty Level qualify to pay a discounted rate under AB 774 based on various government program reimbursement levels. Patients without insurance are offered assistance in applying for Medicaid and other programs they may be eligible for, such as state disability, Victims of Crime, or county indigent programs. Patient advocates from the Hospitals' Medical Eligibility Program ("MEP") screen patients in the hospital and determine potential linkage to financial assistance programs. They also expedite the process of applying for these government programs. The estimated costs of charity care (based on direct and indirect costs as a ratio of gross uncompensated charges associated with providing care to charity patients) for the years ended March 31, 2012 and 2011 were approximately $7.0 million and $8.7 million, respectively.

F-7

**JAE 1599**

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

The Company previously received payments for "eligible alien" care under Section 1011 of the Medicare Modernization Act of 2003. During the year ended March 31, 2012, the federal funds available under Section 1011 were exhausted by the state and, as a result, the Company wrote-off $1.3 million in related net receivables. As of March 31, 2012 and 2011, the Company established a receivable in the amount of $0 and $1.6 million, respectively, related to discharges deemed eligible to meet program criteria.

The Company is not aware of any material claims, disputes, or unsettled matters with any payers that would affect revenues that have not been adequately provided for in the accompanying consolidated financial statements.

PROVISION FOR DOUBTFUL ACCOUNTS – The Company provides for accounts receivable that could become uncollectible by establishing an allowance to reduce the carrying value of such receivables to their estimated net realizable value. The Hospitals estimate this allowance based on the aging of their accounts receivable, historical collections experience for each type of payer and other relevant factors. There are various factors that can impact the collection trends, such as changes in the economy, which in turn have an impact on unemployment rates and the number of uninsured and underinsured patients, volume of patients through the emergency department, the increased burden of copayments to be made by patients with insurance and business practices related to collection efforts. These factors continuously change and can have an impact on collection trends and the estimation process.

The Company's policy is to attempt to collect amounts due from patients, including copayments and deductibles due from patients with insurance, at the time of service while complying with all federal and state laws and regulations, including, but not limited to, the Emergency Medical Treatment and Labor Act ("EMTALA"). Generally, as required by EMTALA, patients may not be denied emergency treatment due to inability to pay. Therefore, until the legally required medical screening examination is complete and stabilization of the patient has begun, services are performed prior to the verification of the patient's insurance, if any. In nonemergency circumstances or for elective procedures and services, it is the Hospitals' policy, when appropriate, to verify insurance prior to a patient being treated.

The provision for doubtful accounts for the year ended March 31, 2012 was $40.4 million compared to $34.8 million for the year ended March 31, 2011, representing a 16.1% increase.  The primary reason for the increase in the provision for doubtful accounts was related to the write off of receivables of $4.0 million due to the termination of Section 1011 of the Medicare Modernization Act of 2003 program which provided federal funding of emergency health services for "eligible aliens."

Effective March 31, 2012, the Company adopted Accounting Standards Update ("ASU") 2011-07, "Health Care Entities (Topic 954): Presentation and Disclosure of Patient Service Revenue, Provision for Bad Debts, and the Allowance for Doubtful Accounts for Certain Health Care Entities," which requires health care entities to present the provision for doubtful accounts relating to patient service revenue as a deduction from patient service revenue in the statement of operations rather than as an operating expense. All periods presented have been reclassified in accordance with the provisions of ASU 2011-07.

CASH AND CASH EQUIVALENTS – The Company considers all highly liquid debt investments purchased with a maturity of three months or less to be cash equivalents.

Cash and cash equivalents are maintained at financial institutions and, at times, balances may exceed federally insured limits. The Company has never experienced any losses related to these balances. All of the non-interest bearing cash balances were fully insured at March 31, 2012 due to a temporary federal program in effect from December 31, 2010 through December 31, 2012. Under the program, there is no limit to the amount of insurance for eligible accounts. Beginning 2013, insurance coverage will revert to $250,000 per depositor at each financial institution, and the Company's non-interest bearing cash balances may again exceed federally insured limits.

F-8

**JAE 1600**

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

RECEIVABLES AND ALLOWANCE FOR DOUBTFUL ACCOUNTS – The following is a summary of the principal components of accounts receivable and due from government payers as of March 31, 2012 and 2011:

|  | March 31, | | | |
|  | 2012 | | 2011 | |
|---|---|---|---|---|
| Accounts receivable: | | | | |
| Patient accounts receivable | $ | 71,800 | $ | 74,725 |
| Allowance for doubtful accounts | | (18,201) | | (20,076) |
| Accounts receivable, net | $ | 53,599 | $ | 54,649 |
| | | | | |
| Due from government payers: | | | | |
| Settlement receivables | $ | 190 | $ | 456 |
| DSH | | 4,993 | | 3,896 |
| | $ | 5,183 | $ | 4,352 |

The Company's self-pay collection rate, which is the blended collection rate for uninsured and balance after insurance accounts receivable, was approximately 11.3% and 6.3% as of March 31, 2012 and 2011, respectively. These self-pay collection rates include payments made by patients, including co-payments and deductibles paid by patients with insurance. As of March 31, 2012 and 2011, the allowance for doubtful accounts for self-pay uninsured was 90.3% and 95.5%, respectively, of self-pay uninsured patient accounts receivable. As of March 31, 2012 and 2011, the allowance for doubtful accounts for self-pay balance after insurance was 77.4% and 86.2%, respectively, of self-pay balance after insurance patient accounts receivable, consisting primarily of co-pays and deductibles owed by patients with insurance. As of March 31, 2012 and 2011, the allowance for doubtful accounts for managed care was 16.1% and 12.0%, respectively, of managed care patient accounts receivable.

Receivables from patients who are potentially eligible for Medicaid are classified as Medicaid pending under the MEP, with appropriate contractual allowances recorded. If the patient does not qualify for Medicaid, the receivables are reclassified to charity care and written off, or they are reclassified to self-pay and adjusted to their net realizable value through the provision for doubtful accounts. Reclassifications of pending Medicaid accounts to self-pay do not typically have a material impact on the results of operations as the estimated Medicaid contractual allowances initially recorded are not materially different than the estimated provision for doubtful accounts recorded when the accounts are reclassified. All accounts classified as pending Medicaid, as well as certain other governmental receivables, over the age of 90 days were reserved in contractual allowances as of March 31, 2012 and 2011 based on historical collections experience.

INVENTORIES OF SUPPLIES – Inventories of supplies are valued at the lower of weighted average cost or market.

PROPERTY AND EQUIPMENT - Property and equipment are stated at cost, less accumulated depreciation and any impairment write-downs related to assets held and used. Additions and improvements to property and equipment are capitalized at cost. Expenditures for maintenance and repairs are charged to expense as incurred. Capital leases are recorded at the beginning of the lease term as property and equipment and a corresponding lease liability is recognized. The value of the property and equipment under capital lease is recorded at the lower of either the present value of the minimum lease payments or the fair value of the asset. Such assets, including improvements, are amortized over the shorter of the lease term or their estimated useful life, where applicable.

The Company uses the straight-line method of depreciation for buildings and improvements, and equipment over their estimated useful lives of 25 years and 3 to 15 years, respectively.

LONG-LIVED ASSETS – The Company evaluates its long-lived assets for possible impairment whenever circumstances indicate that the carrying amount of the asset, or related group of assets, may not be recoverable from estimated future undiscounted cash flows. Fair value estimates are derived from established market values of comparable assets or internal calculations of estimated undiscounted future net cash flows. The estimates of future net cash flows are based on assumptions and projections believed by the Company to be reasonable and supportable. These assumptions take into account patient volumes, changes in payer mix, revenue, and expense growth rates and changes in legislation and other payer payment patterns.

DEBT ISSUANCE COSTS – On August 30, 2010, the Company entered into a new revolving credit facility (Note 3) under which it incurred debt issuance costs consisting of a $450 origination fee for the Company's $40 million Revolving Line of Credit (new debt) and $469 in legal and other expenses paid to third parties. These amounts are amortized over the credit facility's three year life using the straight-line method. Subsequently, the $40 million Revolving Line of Credit was reduced to $20 million, resulting in an acceleration of the amortization of the related debt issuance costs. Debt issuance costs of $525 (including $334 in accelerated amortization) and $304 were amortized as interest expense during the years ended March 31, 2012 and 2011, respectively. At March 31, 2012 and 2011, prepaid expenses and other current assets in the accompanying consolidated balance sheets included $153 and $300, respectively, as the current portion of debt issuance costs.

F-9

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

FAIR VALUE MEASUREMENTS – The Company's financial assets and liabilities recorded in the consolidated balance sheets include cash and cash equivalents, restricted cash, receivables, debt, accounts payable, and other liabilities, all of which are recorded at book value which approximates fair value.

GAAP has established a hierarchy for ranking the quality and reliability of the information used to determine fair values and requires that assets and liabilities carried at fair value be classified and disclosed in one of the following three categories:

Level 1:        Unadjusted quoted market prices in active markets for identical assets or liabilities.

Level 2:        Unadjusted quoted prices in active markets for similar assets or liabilities, unadjusted quoted prices for identical or similar assets or liabilities in markets that are not active, or inputs other than quoted prices that are observable for the asset or liability.

Level 3:        Unobservable inputs for the asset or liability.

The Company utilizes the best available information in measuring fair value.  Assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. The Company currently has no financial or nonfinancial assets or liabilities subject to fair value measurement on a recurring basis except for warrants issued in April 2010 (Note 4).

The following table sets forth the Company's financial assets and liabilities measured at fair value on a recurring basis and where they are classified within the hierarchy as of March 31, 2012 and 2011:

|  | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| Warrant liability at March 31, 2012 | $        1,641 | - | - | $        1,641 |
| Warrant liability at March 31, 2011 | $          167 | - | - | $          167 |

| Warrant liability - fair value measurements using significant unobservable inputs (Level 3) | |
|---|---|
| Balance at March 31, 2010 | $              - |
| Fair value of warrants issued and vested | 5,041 |
| Change in fair value of warrant liability included in earnings | (4,874) |
| Balance at March 31, 2011 | 167 |
| Change in fair value of warrant liability included in earnings | 1,474 |
| Balance at March 31, 2012 | $          1,641 |

WARRANTS – The Company has entered into complex transactions that contain warrants (Notes 3 and 4). If an instrument (or an embedded feature) that has the characteristics of a derivative instrument is indexed to an entity's own stock, it is still necessary to evaluate whether it is classified in stockholders' equity (or would be classified in stockholders' equity if it were a freestanding instrument). The Company has concluded that the warrants should be classified as liabilities.

INCOME PER COMMON SHARE – Income per share is calculated under two different methods, basic and diluted. Basic income per share is calculated by dividing the net income by the weighted average shares of common stock outstanding during the period. Diluted income per share is calculated by dividing the net income by the weighted average shares of common stock outstanding during the period and dilutive potential shares of common stock. Dilutive potential shares of common stock, as determined under the treasury stock method, consist of shares of common stock issuable upon exercise of stock warrants or options, net of shares of common stock assumed to be repurchased by the Company from the exercise proceeds (Note 8).

SUPPLEMENTAL CASH FLOW INFORMATION – Interest paid during the years ended March 31, 2012 and 2011 was $9.0 million and $9.4 million, respectively.

The Company made cash payments for taxes of $14.0 million and $0 during the years ended March 31, 2012 and 2011, respectively.

The Company entered into new capital lease obligations of $0 and $2.2 million during the years ended March 31, 2012 and 2011, respectively.

F-10

**JAE 1602**

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

INCOME TAXES – Deferred income tax assets and liabilities are determined based on the differences between the book and tax basis of assets and liabilities and are measured using the currently enacted tax rates and laws using the asset and liability method. The Company assesses the realization of deferred tax assets to determine whether an income tax valuation allowance is required. The Company has recorded a 100% valuation allowance on its deferred tax assets.

There is a recognition threshold and measurement attribute for recognition and measurement of a tax position taken or expected to be taken in a tax return. It also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

The Company and its subsidiaries file income tax returns in the U.S. federal jurisdiction and California. Certain tax attributes carried over from prior years continue to be subject to adjustment by taxing authorities. Any penalties or interest arising from federal or state taxes are recorded as a component of the Company's income tax provision.

SEGMENT REPORTING – The Company operates in one line of business, the provision of healthcare services through the operation of general hospitals and related healthcare facilities. The Company's Hospitals generate substantially all of its net patient services revenues.

The Company's four Hospitals and related healthcare facilities operate in one geographic region in Orange County, California. The region's economic characteristics, the nature of the Hospitals' operations, the manner in which they are managed, and the regulatory environment in which they operate are all similar. This region is an operating segment, as defined by GAAP. In addition, the Company's Hospitals and related healthcare facilities share certain resources and benefit from many common clinical and management practices. Accordingly, the Company aggregates the facilities into a single reportable operating segment.

NEW ACCOUNTING STANDARDS – In August 2010, the FASB approved certain modifications to existing accounting standards that will directly affect health care entities in the future. The first change provides clarification to companies in the healthcare industry on the accounting for professional liability insurance. Specifically, it states that receivables related to insurance recoveries should not be netted against the related claim liability and such claim liabilities should be determined without considering insurance recoveries. The second change clarifies that disclosures regarding the level of charity care provided by a health care entity must (i) represent the direct and indirect costs of providing such services, and (ii) include a description of the method used to determine those costs. Additionally, disclosures about charity care must now include information regarding any related reimbursements received by a health care entity. The modified accounting standards are required to be adopted for fiscal years that begin after December 15, 2010. The charity care disclosure change must be applied on a retrospective basis; however, the accounting change for insurance recoveries may be applied on either a prospective or retrospective basis (the Company has applied the accounting change for insurance recoveries on a retrospective basis). The Company adopted the modified accounting standards during the year ended March 31, 2012, which did not have a material impact on the consolidated financial statements.

NOTE 2 – PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

|  | March 31, 2012 | | March 31, 2011 | |
|---|---|---|---|---|
| Buildings | $ | 35,376 | $ | 34,624 |
| Land and improvements | | 13,523 | | 13,523 |
| Equipment | | 18,268 | | 13,266 |
| Construction in progress | | 1,160 | | 1,375 |
| Assets under capital leases | | 11,218 | | 11,218 |
| | | 79,545 | | 74,006 |
| Less accumulated depreciation | | (24,016) | | (19,755) |
| Property and equipment, net | $ | 55,529 | $ | 54,251 |

Accumulated depreciation on assets under capital leases as of March 31, 2012 and 2011 was $5.0 million and $3.7 million, respectively.

The Hospitals are located in an area near active and substantial earthquake faults. The Hospitals carry earthquake insurance with a policy limit of $50.0 million. A significant earthquake could result in material damage and temporary or permanent cessation of operations at one or more of the Hospitals.

F-11

**JAE 1603**

CONFIDENTIAL

SPCP_0000001247

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

The State of California has imposed new hospital seismic safety requirements. Under these new requirements, the Hospitals must meet stringent seismic safety criteria in the future. In addition, there could be other remediation costs pursuant to this seismic retrofit.

The State of California has introduced a new seismic review methodology known as HAZUS. The HAZUS methodology may preclude the need for some structural modifications. All four Hospitals requested HAZUS review and received a favorable notice pertaining to structural reclassification. All Hospital buildings, with the exception of one (an administrative building), have been deemed compliant until January 1, 2030 for both structural and nonstructural retrofit. The Company does not have an estimate of the cost to remediate the seismic requirements for the administrative building as of March 31, 2012.

There are additional requirements that must be complied with by 2030. The costs of meeting these requirements have not yet been determined. Compliance with seismic ordinances will be costly and could have a material adverse effect on the Company's cash flow. In addition, remediation could possibly result in certain environmental liabilities, such as asbestos abatement.

NOTE 3 – DEBT

On April 13, 2010 (the "Effective Date"), the Company entered into an Omnibus Credit Agreement Amendment (the "Omnibus Amendment") with SPCP Group IV, LLC and SPCP Group, LLC (together, "Silver Point"), Silver Point Finance, LLC, as the Lender Agent, PCHI, Ganesha Realty LLC ("Ganesha"), Dr. Chaudhuri and KPC Resolution Company ("KPC"). KPC and Ganesha are companies owned and controlled by Dr. Chaudhuri, who is the majority shareholder of the Company. Ganesha owns a 49% membership interest in PCHI.

The Company entered into the Omnibus Amendment in connection with the Loan Purchase and Sale Agreement (the "Loan Purchase Agreement"), dated as of January 13, 2010, as amended, by and between KPC and the previous lender's receiver. Under the Loan Purchase Agreement, and as approved by the Court on April 2, 2010, KPC agreed to purchase all of the Credit Agreements from Medical Capital Corporation's receiver for $70.0 million. Concurrent with the closing of the Loan Purchase Agreement, KPC sold its interest in the Credit Agreements to Silver Point, and KPC purchased from Silver Point a 15% participation interest in the Credit Agreements. On April 13, 2010, concurrent with the effectiveness of the Omnibus Amendment and the closing of the Loan Purchase Agreement, Silver Point acquired all of the Credit Agreements, including the security agreements and other ancillary documents executed by the Company in connection with the Credit Agreements, and became the "New Lender" under the Credit Agreements.

The following are material terms of the Omnibus Amendment:

- The stated maturity date under each Credit Agreement was changed to April 13, 2013.

- Affirming release of prior claims between the Company and the previous lender's receiver, Silver Point agreed to waive any events of default that had occurred under the Credit Agreements and waived claims to accrued and unpaid interest and fees of $6.4 million under the Credit Agreements as of April 13, 2010.

- The $80.0 million Credit Agreement was amended so that the $45.0 million term note (the "$45.0 million Loan") and $35.0 million non-revolving line of credit note (the "$35.0 million Loan") will each bear a fixed interest rate of 14.5% per year. These loans previously bore interest rates of 10.25% and 9.25%, respectively. In addition, the Company agreed to make certain mandatory prepayments of the $35.0 million Loan when it received proceeds from certain new financing of its accounts receivable or provider fee funds from Medi-Cal under the Hospital Quality Assurance Fee program ("QAF") (Note 11). The $35.0 million Loan was refinanced on August 30, 2010 (see below).

F-12

**JAE 1604**

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

- The $50.0 million Revolving Credit Agreement was amended so that Silver Point will, subject to the terms and conditions contained therein, make up to $10.0 million in new revolving funds available to the Company for working capital and general corporate purposes. Each advance under the $50.0 million Revolving Credit Agreement will bear interest at an annual rate of Adjusted LIBOR (calculated as LIBOR subject to certain adjustments, with a floor of 2% and a cap of 5%) plus 12.5%, compared to an interest rate of 24.0% that was previously in effect under the $50.0 million revolving credit agreement. In addition, the Company agreed to make mandatory prepayments of the $50.0 million Revolving Credit Agreement under the conditions described above with respect to the $80.0 million Credit Agreement. The financial covenants under the $50.0 million Revolving Credit Agreement were also amended to increase the required levels of minimum EBITDA (as defined in the Omnibus Amendment) from the levels previously in effect under the $50.0 million Revolving Credit Agreement. This $50.0 million revolving line of credit was refinanced on August 30, 2010 (see below).

- The $10.7 million Credit Agreement was amended so that the $10.7 million convertible term note will bear a fixed interest rate of 14.5% per year, compared to the interest rate of 9.25% previously in effect and to eliminate the conversion feature of the loan. In addition, the Company agreed to make mandatory prepayments of the $10.7 million Credit Agreement under the conditions described above with respect to the $80.0 million Credit Agreement. This $10.7 million term note was refinanced on August 30, 2010 (see below).

In connection with the sale of the Credit Agreements, all warrants and stock conversion rights issued to the previous lender were cancelled. In connection with the Omnibus Amendment, the Company issued new warrants (Note 4).

On August 30, 2010, the Company (excluding PCHI) entered into a three year Credit and Security Agreement (the "New Credit Agreement") with MidCap Financial, LLC, a commercial finance lender specializing in loans to middle market health care companies, and Silicon Valley Bank (collectively, the "AR Lender").

Under the New Credit Agreement, the AR Lender committed to provide up to $40.0 million in loans to the Company under a secured revolving credit facility (the "New Credit Facility," which may be increased to up to $45.0 million upon the Company's request, if the AR Lender consents to such increase. Upon execution of the New Credit Agreement, the AR Lender funded approximately $39.7 of the New Credit Facility, which funds were used primarily to repay approximately $35.0 million in loans outstanding to affiliates of Silver Point ("Term Lender"). Upon such repayment, the remaining balances on the Company's $35.0 million Loan, $50.0 million Revolving Credit Agreement and $10.7 million Credit Agreement with the Term Lender were fully repaid and terminated. The only loan currently outstanding to the Term Lender consists of the $45.0 million Loan issued under the Company's $80.0 million Credit Agreement.

The New Credit Facility is secured by a first priority security interest on substantially all of the Company's assets, including the equity interests in all of the Company's subsidiaries (excluding PCHI). The availability of the AR Lender's commitments under the New Credit Facility is limited by a borrowing base tied to the Company's eligible accounts receivable and certain other availability restrictions.

Loans under the New Credit Facility accrue interest at LIBOR (subject to a 2.5% floor) plus 5.0% per annum, subject to a default rate of interest and other adjustments provided for in the New Credit Agreement. For purposes of calculating interest, all payments the Company makes on the New Credit Facility are subject to a six business day clearance period. The Company also pays a collateral management fee of .0625% per month on the outstanding balance (or a minimum balance amount equal to 85% of the monthly average borrowing base (the "Minimum Balance Amount"), if such amount is greater than the outstanding balance), a monthly minimum balance fee equal to the highest interest rate applicable to the loans if Minimum Balance Amount is greater that the outstanding balance, and an unused line fee equal to .042% per month of the average unused portion of the New Credit Facility. The Company paid to the AR Lender a non-refundable origination fee of 1.0% of the AR Lender's commitments under the New Credit Facility at closing.

The New Credit Agreement contains various affirmative and negative covenants and customary events of default, including payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to similar obligations, events of bankruptcy and insolvency, judgment defaults, the invalidity of liens on collateral, and the occurrence of events which have a material adverse effect on the Company.

<u>Amendment to $80.0 million Credit Agreement</u> – Concurrently with the execution of the New Credit Agreement, on August 30, 2010 the Company entered into an amendment to its existing $80.0 million Credit Agreement, as amended (the "Original Credit Agreement"), with the Term Lender, PCHI, and Ganesha. Under this amendment, the Company agreed with the Term Lender to the following material changes to the Original Credit Agreement:

- In the event of a mandatory prepayment of the Company's accounts receivable based financing facility under the Original Credit Agreement, the outstanding loans under such agreement shall not be required to be prepaid below $10.0 million. There is also a floor of $10.0 million below which commitments under such accounts receivable based facility would not be mandatorily reduced as a result of such prepayment.

- The Original Credit Agreement was amended to add an affirmative covenant requiring the Company to deliver financial statements and other financial and non-financial information to the Term Lender on a regular basis, and a negative covenant requiring that the Company maintain a minimum fixed charge coverage ratio of 1.0 and minimum levels of earnings before interest, tax, depreciation and amortization.

- The Company agreed to the provisions of an Intercreditor Agreement executed on August 30, 2010 by and between the AR Lender and the Term Lender with respect to shared collateral of the Company that is being pledged under both the New Credit Agreement and the Original Credit Agreement. Under the Intercreditor Agreement, among other things, the Term Lender consented to the AR Lender having a first priority lien on substantially all of the Company's assets while the Term Lender retained a second lien on such assets in addition to its first priority lien on the Company's leased properties owned by PCHI.

F-13

**JAE 1605**

CONFIDENTIAL

SPCP_0000001249

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

On October 29, 2010, the Company entered into Amendment No. 1 (the "Amendment") to the New Credit Agreement, dated as of August 30, 2010, by and among the Company and the AR Lender.

Under the Amendment, the AR Lender committed to increase the total revolving loan commitment amount under the New Credit Agreement from $40.0 million to $45.0 million, and the Company agreed to pay to the AR Lender a non-refundable origination fee of 1.0% of the AR Lender's increased commitment under the Amendment, or $50.

Also under the Amendment, the AR Lender agreed to allow the inclusion in Eligible Accounts that are used to determine the Company's Borrowing Base of up to $33.6 million in aggregate federal or state matching payments to the Company related to QAF (Note 11), which amount was increased from $11.8 million for the first matching payment.

In addition, the optional prepayment and permanent commitment reduction provisions of the New Credit Agreement were amended to change the minimum Revolving Loan Commitment Amount to $20.0 million from $5.0 million.  In addition, the prepayment fee calculation under the New Credit Agreement was changed so that the prepayment fee is based on $40.0 million rather than the amount of the permanent revolving loan commitment reduction amount.

Lastly, under the Amendment, in the event the Company permanently reduces its Revolving Loan Commitment Amount to $20.0 million (and assuming there is no Event of Default at the time), the Company would be permitted to transfer funds that are swept into the AR Lender's account from the Company's lockbox accounts to a different bank account designated by the Company. Effective March 1, 2011, the Company reduced its Revolving Loan Commitment Amount to $20.0 million.  Beginning in April 2011, the funds that were previously swept into the AR Lender's account were swept directly to the Company's main account.

During the year ended March 31, 2012, the Company paid down the balance of the $20.0 million revolving line of credit to $14.0 million. Effective June 8, 2012, the Company and its AR Lender entered into Amendment No. 2 to Credit and Security Agreement which reduced the Revolving Loan Commitment Amount to $14.0 million.

As of March 31, 2012, the Company had the following Credit Agreements:

- $45.0 million Loan issued under the $80.0 million Credit Agreement, bearing a fixed interest rate of 14.5% per year. If any event of default occurs and continues, the lender can increase the interest rate to 19.5% per year. As of March 31, 2012, the Company was in compliance with all financial covenants.  The stated maturity date for this Credit Agreement is April 13, 2013.

- $20.0 million revolving line of credit under the New Credit Facility, bearing an interest rate of 5.0% plus LIBOR, with a 2.5% floor, per year (7.5% at March 31, 2012) and an unused commitment fee of 0.625% per year.  For purposes of calculating interest, all payments the Company makes on the New Credit Facility are subject to a six business day clearance period.  As of March 31, 2012, the Company was in compliance with all financial covenants.  The stated maturity for this New Credit Facility is August 30, 2013.

The Company's outstanding debt consists of the following:

|  | March 31, 2012 | March 31, 2011 |
| --- | --- | --- |
| Current: | | |
| Revolving line of credit | $ 14,000 | $ 19,081 |
| Noncurrent: | | |
| Secured term note | $ 45,000 | $ 45,000 |

F-14

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

NOTE 4 – COMMON STOCK WARRANTS

On April 13, 2010, the Company issued warrants (the "Omnibus Warrants") to purchase its common stock for a period of three years at an exercise price of $0.07 per share in the following denominations: 139.0 million shares to KPC or its designees and 96.0 million shares to the Term Lender or its designees. The Omnibus Warrants also provide the holders with certain pre-emptive, information and registration rights. As of April 13, 2010, the Company recorded warrant expense and the related warrant liability of $2.9 million, representing fair value.  As of March 31, 2012, the fair value of the Omnibus Warrants was $952.

In addition, on April 13, 2010, the Company issued a three-year warrant (the "Release Warrant") to acquire up to 170.0 million shares of common stock at $0.07 per share to Dr. Chaudhuri who facilitated a release enabling the Company to recover amounts due from the Company's prior lender and a $1.0 million reduction in principal of its outstanding debt, among other benefits to the Company. As a result, the Company recorded the fair value of the Release Warrant ($2.1 million) as an offsetting cost of the recovery of amounts due from the Company's prior lender. The Release Warrant also provides the holder with certain pre-emptive, information and registration rights. As of March 31, 2012, the fair value of the Release Warrant was $689.

The Omnibus Warrants and the Release Warrant are collectively referred to as the "April Warrants." The net gain (loss) recorded related to the April Warrants for the years ended March 31, 2012 and 2011 was $(1,474) and $1,949, respectively.

The fair value of warrants issued by the Company is estimated using the Black-Scholes valuation model, which the Company believes is the appropriate valuation method under the circumstances. Since the Company's stock is thinly traded, the expected volatility is based on an analysis of the Company's stock and the stock of eight other publicly traded companies that own hospitals.

The risk-free interest rate is based on the average yield on U.S. Treasury notes with maturity commensurate with the terms of the warrants. The dividend yield reflects that the Company has not paid any cash dividends since inception and does not anticipate paying cash dividends in the foreseeable future.  The assumptions used in the Black-Scholes valuation model are as follows:

| | March 31, 2012 | March 31, 2011 |
|---|---|---|
| Expected dividend yield | 0.0% | 0.0% |
| Risk-free interest rate | 0.2% | 0.8% |
| Expected volatility | 57.3% | 50.9% |
| Expected term (in years) | 1.04 | 2.0 |

F-15

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

NOTE 5 – INCOME TAXES

The preparation of consolidated financial statements in conformity with GAAP requires the Company to make estimates and assumptions that affect the reported amount of tax-related assets and liabilities and income tax provisions. The Company assesses the recoverability of the deferred tax assets on an ongoing basis. In making this assessment the Company is required to consider all available positive and negative evidence to determine whether, based on such evidence, it is more likely than not that some portion or all of the net deferred assets will be realized in future periods. This assessment requires significant judgment. In addition, the Company has made significant estimates involving current and deferred income taxes, tax attributes relating to the interpretation of various tax laws, historical bases of tax attributes associated with certain tangible and intangible assets and limitations surrounding the realization of the deferred tax assets. The Company does not recognize current and future tax benefits until it is deemed more likely than not that certain tax positions will be sustained.

The income tax provision (benefit), all current, consisted of the following:

|  | For the years ended March 31, | |
|  | 2012 | 2011 |
|---|---|---|
| Income tax provision (benefit): | | |
| Federal | $ (136) | $ 11,000 |
| State | (3) | 3,000 |
| Income tax provision (benefit) | $ (139) | $ 14,000 |

A reconciliation between the amount of reported income tax expense (benefit) and the amount computed by multiplying income before income tax provision (benefit) by the statutory federal income tax rate is as follows:

|  | For the years ended March 31, | |
|  | 2012 | 2011 |
|---|---|---|
| U.S. federal statutory income taxes | $ 2,654 | $ 12,096 |
| State and local income taxes, net of federal benefits | 406 | 1,797 |
| Change in valuation allowance | (2,975) | (21,860) |
| Uncertain tax positions | - | 12,471 |
| Warrants | 516 | (663) |
| Variable interest entity | (172) | (136) |
| Deferred tax adjustments | (593) | 10,391 |
| Other | 25 | (96) |
| Income tax provision (benefit) | $ (139) | $ 14,000 |

F-16

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

Deferred income taxes reflect the tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amount used for income tax purposes. The following table discloses those significant components of deferred tax assets and liabilities, including the valuation allowance at March 31:

|  | 2012 | 2011 |
|---|---|---|
| Deferred tax assets: | | |
| Allowance for doubtful accounts | $       1,457 | $       5,360 |
| Accrued vacation | 2,813 | 2,629 |
| Net operating losses | 1,023 | 899 |
| State taxes | (532) | (1,167) |
| Accrued insurance | 3,445 | 5,109 |
| Other | (169) | (1,818) |
|  | 8,037 | 11,012 |
| Valuation allowance | (8,037) | (11,012) |
| Total deferred tax assets | $       - | $       - |

The valuation allowances above were recorded based on an assessment of the realization of deferred tax assets as described below. The Company assesses the realization of deferred tax assets to determine whether an income tax valuation allowance is required. The Company recorded a 100% valuation allowance on its net deferred tax assets based primarily on the following factors:

- Cumulative losses in recent years
- Income/losses expected in future years
- Unsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels
- The availability, or lack thereof, of taxable income in prior carryback periods that would limit realization of tax benefits
- The carryforward period associated with the deferred tax assets and liabilities

ASU 2009-06, "Income Taxes (Topic 740)," prescribes a consistent financial reporting recognition threshold and measurement standard, as well as criteria for subsequently recognizing, derecognizing and measuring tax positions taken or expected to be taken in a tax return. ASU 2009-06 also requires certain disclosures with respect to the uncertainty in income taxes.  A reconciliation of the change in the amount of gross unrecognized income tax benefits is a follows:

|  | March 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Gross unrecognize income tax benefits at the beginning of the year | $       18,900 | $       - |
| Changes based on tax positions related to current year | 2,914 | - |
| Increases for tax positions related to prior years | - | 18,900 |
| Gross unrecognize income tax benefits at the end of the year | $       21,814 | $       18,900 |

The Company's California Enterprise Zone credits were recently examined by the California taxing authority, which issued a Notice of Proposed Adjusted Carryover Amount.  The Company has filed a Protest requesting an oral hearing with the taxing authority.  The Protest is currently pending review by the taxing authority.  As a result of the examination, during the year ended March 31, 2011, the Company recorded a liability of approximately $18.9 million for unrecognized tax benefits. The Company's utilization of these credits is also subject to significant IRC Section 383 limitations, and these limitations have been incorporated into the tax provision calculation.

As of March 31, 2012, approximately $18.9 million of unrecognized income tax benefits would affect the fiscal 2012 effective tax rate if released into income due to the impact of the valuation allowance.

F-17

**JAE 1609**

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

The Company's net operating losses for federal of $1.4 million and for state of $6.0 million expire through 2029. The utilization of net operating losses and credit carryforwards are limited under the provisions of the IRC Section 382 and similar state provisions. Section 382 of the IRC of 1986 generally imposes an annual limitation on the amount of NOL carryforwards that may be used to offset taxable income where a corporation has undergone significant changes in stock ownership. In fiscal year 2009, the Company entered into an amended purchase agreement which resulted in a change in control. The Company conducted an analysis and determined that it is subject to significant IRC Section 382 limitations. For both Federal and state tax purposes, the Company's utilization of NOL and credit carryforwards is subject to significant IRC Section 382 limitations.  The Company evaluates its ability to utilize the net operating losses each period with regard to the limitations imposed under IRC 382 and also considering the continuing expiration of statutes of limitation for prior years; and in the current period determined that a portion of the federal and state net operating losses were no longer realizable, and removed from the schedule of deferreds those net operating losses in excess of the IRC 382 limitation and also considering prior years statutes now closed.

PCHI TAX STATUS - PCHI is a limited liability corporation. PCHI's taxable income or loss will flow through to its owners and be their separate responsibility. Accordingly, the accompanying consolidated financial statements do not include any amounts for the income tax expense or benefit, or liabilities related to PCHI's income or loss.

NOTE 6 – STOCK INCENTIVE PLAN

The Company's 2006 Stock Incentive Plan (the "Plan"), which is shareholder-approved, permits the grant of share options to its employees and board members for up to a maximum aggregate of 12.0 million shares of common stock. In addition, as of the first business day of each calendar year in the period 2007 through 2015, the maximum aggregate number of shares shall be increased by a number equal to one percent of the number of shares of common stock of the Company outstanding on December 31 of the immediately preceding calendar year. Accordingly, as of March 31, 2012, the maximum aggregate number of shares under the Plan was 23.5 million. The Company believes that such awards better align the interests of its employees with those of its shareholders. In accordance with the Plan, incentive stock options, nonqualified stock options, and performance based compensation awards may not be granted at less than 100 percent of the estimated fair market value of the common stock on the date of grant. Incentive stock options granted to a person owning more than 10 percent of the voting power of all classes of stock of the Company may not be issued at less than 110 percent of the fair market value of the stock on the date of grant. Option awards generally vest based on 3 years of continuous service (1/3 of the shares vest on the twelve month anniversary of the grant date, and an additional 1/12 of the shares vest on each subsequent fiscal quarter-end of the Company following such twelve month anniversary). Certain option awards provide for accelerated vesting if there is a change of control, as defined. The option awards have 7-year contractual terms.

When the measurement date is certain, the fair value of each option grant is estimated on the date of grant using the Black-Scholes valuation model. Since there is limited historical data with respect to both pre-vesting forfeiture and post-vesting termination, the expected life of the options was determined utilizing the simplified method described in the SEC's Staff Accounting Bulletin 107, "Share-Based Payment"("SAB 107"). SAB 107 provides guidance whereby the expected term is calculated by taking the sum of the vesting term plus the original contractual term and dividing that quantity by two.

The Company recorded $0 and $40 of compensation expense relative to stock options during the years ended March 31, 2012 and 2011, respectively. No options were exercised during the years ended March 31, 2012 and 2011. A summary of stock option activity for the two years ended March 31, 2012 is presented as follows.

|  | Shares | Weighted-average exercise price | Weighted-average grant date fair value | Weighted-average remaining contractual term (years) | Aggregate intrinsic value |
|---|---|---|---|---|---|
| Outstanding, March 31, 2010 | 8,645 | $ 0.19 | | | |
| Granted | - | $ - | $ - | | |
| Exercised | - | $ - | | | |
| Forfeited or expired | (275) | $ 0.25 | | | |
| Outstanding, March 31, 2011 | 8,370 | $ 0.18 | | | |
| Granted | - | $ - | $ - | | |
| Exercised | - | $ - | | | |
| Forfeited or expired | (135) | $ 0.25 | | | |
| Outstanding, March 31, 2012 | 8,235 | $ 0.18 | | 2.7 | $ - |
| Exercisable at March 31, 2012 | 8,235 | $ 0.18 | | 2.6 | $ - |

F-18

**JAE 1610**

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

A summary of the Company's nonvested options as of March 31, 2012, and changes during the two years ended March 31, 2012 is presented as follows.

| | Shares | | Weighted- average grant date fair value |
|---|---|---|---|
| Nonvested at March 31, 2010 | 913 | $ | 0.03 |
| Granted | - | $ | - |
| Vested | (905) | $ | 0.03 |
| Forfeited | (8) | $ | 0.08 |
| Nonvested at March 31, 2011 | - | $ | - |
| Granted | - | $ | - |
| Vested | - | $ | - |
| Forfeited | - | $ | - |
| Nonvested at March 31, 2012 | - | $ | - |

NOTE 7 – RETIREMENT PLAN

The Company has a 401(k) plan for its employees. All employees with 90 days of service are eligible to participate, unless they are covered by a collective bargaining agreement which precludes coverage. The Company matches employee contributions up to 3% of the employee's compensation, subject to IRS limits. During the years ended March 31, 2012 and 2011, the Company incurred expenses of $3.1 million and $2.9 million, respectively. These costs are included in salaries and benefits in the accompanying consolidated statements of operations. At March 31, 2012 and 2011, accrued compensation and benefits in the accompanying consolidated balance sheets included $3.9 million and $3.8 million, respectively, in accrued employer contributions.

NOTE 8 – INCOME PER SHARE

Income per share is calculated under two different methods, basic and diluted. Basic income per share is calculated by dividing the net income by the weighted average shares of common stock outstanding during the period. Diluted income per share is calculated by dividing the net income by the weighted average shares of common stock outstanding during the period and dilutive potential shares of common stock. Dilutive potential shares of common stock, as determined under the treasury stock method, consist of shares of common stock issuable upon exercise of stock warrants or options, net of shares of common stock assumed to be repurchased by the Company from the exercise proceeds.

Income per share for the years ended March 31, 2012 and 2011 was computed as shown below. Stock options and warrants aggregating approximately 412 million shares and 412 million shares were not included in the diluted calculation since they were anti-dilutive during the years ended March 31, 2012 and 2011, respectively.

**JAE 1611**

CONFIDENTIAL

SPCP_0000001255

|  | Years ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
| Numerator: | | |
| Net income attributable to Integrated Healthcare Holdings, Inc. | $ 7,452 | $ 20,165 |
| Denominator: | | |
| Weighted average common shares | 255,307 | 255,307 |
| Dilutive options | 1,533 | 1,637 |
| Denominator for diluted calculation | 256,840 | 256,944 |
| Income per share - basic | $ 0.03 | $ 0.08 |
| Income per share - diluted | $ 0.03 | $ 0.08 |

NOTE 9 – VARIABLE INTEREST ENTITY

Concurrent with the close of the Acquisition, PCHI simultaneously acquired title to substantially all of the real property acquired by the Company in the Acquisition. The Company received $5.0 million and PCHI guaranteed the Company's $45.0 million Loan. The Company remains primarily liable as the borrower under the $45.0 million Loan notwithstanding its guarantee by PCHI.  The $45.0 million Loan is cross-collateralized by substantially all of the Company's assets and all of the real property of the Hospitals. All of the Company's operating activities are directly affected by the real property that was sold to PCHI, which is a related party entity that is affiliated with the Company through common ownership and control. As of March 31, 2012, PCHI was owned 51% by various physician investors and 49% by Ganesha (Dr. Chaudhuri and Mr. Thomas).

The Company entered into a lease agreement dated March 7, 2005 (amended and restated as of April 13, 2010) under which it leased back from PCHI all of the real estate that it transferred to PCHI (Note 13).  The amended lease terminates on the 25-year anniversary of the original lease (March 7, 2005), grants the Company the right to renew for one additional 25-year period, and requires combined annual base rental payments of $8.3 million for all the properties. However, until PCHI refinances the related real estate loan, the annual base rental payments are reduced to $7.3 million. In addition, the Company offsets, against its rental payments owed to PCHI, interest payments that it makes on the related real estate loan. Lease payments to PCHI and offsetting interest payments are eliminated in consolidation.

GAAP defines variable interest entities ("VIE") as entities with a level of invested equity that is not sufficient to fund future activities to permit them to operate on a stand-alone basis, or whose equity holders lack certain characteristics of a controlling financial interest. Then, for entities identified as a VIE, the guidance sets forth a model to a primary beneficiary based on an assessment of which party to a VIE, if any, bears a majority of the exposure to expected losses, or stands to gain from a majority of its expected returns and has the power to direct activities of the VIE that impacts economic performance. The primary beneficiary of a VIE should consolidate the VIE.

The Company determined that it provided the majority of financial support to PCHI through various sources including lease payments, remaining primarily liable under the $45.0 million Loan, and cross-collateralization of the Company's non-real estate assets to secure the $45.0 million Loan. The Company concluded that PCHI is a VIE and it is the primary beneficiary.  Accordingly, the financial statements of PCHI are included in the accompanying consolidated financial statements.

F-20

CONFIDENTIAL

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

PCHI's assets, liabilities, and deficiency are set forth below.

|  | March 31, 2012 | | March 31, 2011 | |
|---|---|---|---|---|
| Cash | $ | 68 | $ | 330 |
| Property, net | | 40,984 | | 42,273 |
| Other | | 207 | | 70 |
| Total assets | $ | 41,259 | $ | 42,673 |
| | | | | |
| Debt (as guarantor) | $ | 45,000 | $ | 45,000 |
| Other | | 641 | | 634 |
| Total liabilities | | 45,641 | | 45,634 |
| | | | | |
| Deficiency | | (4,382) | | (2,961) |
| Total liabilities and accumulated deficit | $ | 41,259 | $ | 42,673 |

As noted above, PCHI is a guarantor on the $45.0 million Term Note should the Company not be able to perform. PCHI's total liabilities represent the Company's maximum exposure to loss.

PCHI rental income and the Company's related rental expense of $7.5 million and $7.2 million were eliminated upon consolidation for the years ended March 31, 2012 and 2011, respectively.

The Company has a lease commitment to PCHI (Note 9). Additionally, the Company is responsible for seismic remediation under the terms of the lease agreement (Note 2).

NOTE 10 – RELATED PARTY TRANSACTIONS

The Company leases substantially all of the real property of the acquired Hospitals from PCHI which is owned by various physician investors and Ganesha, which is managed by Dr. Chaudhuri. As of March 31, 2012 and 2011, Dr. Chaudhuri and Mr. Thomas are the beneficial holders of an aggregate of 447.5 million shares of the outstanding stock of the Company. As described in Note 9, PCHI is a variable interest entity and the Company is the primary beneficiary, accordingly, the Company has consolidated the financial statements of PCHI in the accompanying consolidated financial statements.

NOTE 11 – HOSPITAL QUALITY ASSURANCE FEES ("QAF")

In October 2009, the Governor of California signed legislation supported by the hospital industry to impose a provider fee on general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental Medi-Cal payments to hospitals. The state submitted the plan to the Centers for Medicare and Medicaid Services ("CMS") for a required review and approval process, and certain changes in the plan were required by CMS. Legislation amending the fee program to reflect the required changes was passed by the legislature and signed by the Governor on September 8, 2010. Among other changes, the legislation leaves distribution of "pass-through" payments received by Medi-Cal managed care plans that will be paid to hospitals under the program to the discretion of the plans.

The hospital quality assurance fee program ("QAF") created by this legislation initially provided payments for up to 21 months retroactive to April 2009 and expiring on December 31, 2010 ("2010 QAF"). In February 2011, CMS gave final approval for the 2010 QAF. In December 2011, CMS gave final approval for the extension of the QAF for the six month period from January 1 through June 30, 2011 ("2011 QAF").

During the year ended March 31, 2012, the Company recognized $31.9 million in revenue from the state for the 2011 QAF ($18.4 million from the fee-for-service portion and $13.5 million from the supplemental managed care portion). During the year ended March 31, 2012, the Company recorded expenses of $15.1 million for the 2011 QAF fees paid to the state and $0.8 million in other expenses relating to the 2011 QAF.

F-21

**JAE 1613**

CONFIDENTIAL

SPCP_0000001257

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

During the year ended March 31, 2011, the Company recognized $87.2 million in revenue from the state for the 2010 QAF ($44.4 million from the fee-for-service portion and $42.8 million from the supplemental managed care portion).  During the year ended March 31, 2011, the Company recorded expenses of $44.7 million for the 2010 QAF fees paid to the state and $3.1 million in other expenses relating to the 2010 QAF.

The Company cannot provide any assurances or estimates in connection with a possible continuation of the QAF program beyond June 30, 2011.

NOTE 12 – ELECTRONIC HEALTH RECORDS INCENTIVE PROGRAM

Provisions of the American Recovery and Reinvestment Act of 2009 provide incentive payments for the adoption and meaningful use of certified electronic health record (EHR) technology.  The Medicare EHR incentive program provides incentive payments to eligible hospitals (and certain other providers) that are meaningful users of certified EHRs.  The Medicaid EHR incentive program provides incentive payments to eligible hospitals (and certain other providers) for efforts to adopt, implement, upgrade, or meaningfully use of certified EHR technology.

CMS has established the final rule which requires eligible providers in their first year of participation in the Medicaid incentive payment program to demonstrate that they have adopted (acquired, purchased, or secured access to), or implemented, or upgraded to certified EHR technology in order to qualify for an incentive payment.  During the second and subsequent years of the program, eligible providers are required to meet other criteria, including meaningful use, to receive additional funds.  The Company has been awarded a total amount of $13.6 million under the Medicaid EHR incentive program, which will be earned and received over a four year period.

The Company adopted certified EHR technology and it recognized other income of $6.8 million relative to the first year under the Medicaid EHR incentive program during the year ended March 31, 2012.

NOTE 13 – COMMITMENTS AND CONTINGENCIES

INFORMATION TECHNOLOGY SYSTEMS – On July 1, 2011, the Company entered into software and services agreements with McKesson Technologies Inc. ("McKesson") to upgrade the Company's information technology systems (Note 12).

Under the agreements, McKesson will provide the Company with a variety of services, including new software implementation and education/training services for the Company's personnel, software maintenance services and professional services related to movement and migration of data from legacy systems.  McKesson will also furnish to the Company and maintain new hardware to accommodate the upgraded software and systems.  The new hardware will include computers and servers, among other things, and will include installation, testing, and ongoing maintenance.  The Company has entered into the arrangement to enhance its clinical information systems and upgrade its billing and revenue management information systems.

The agreements will initially run for a period of five years, and the recurring services may be renewed by the Company for successive periods.  The agreements do not provide that they may be terminated by the Company prior to the initial expiration date.  The agreements provide for one-time fees and recurring fees which aggregate a total of $22.0 million.  Approximately 60% of the fees are for one-time charges, while the balance is for recurring services.

GUARANTEE – At March 31, 2012, the Company had accrued $1.8 million for a guarantee extended to a state supported teaching institution to accept the transfer of an uninsured patient for a necessary higher level of care.  See "CLAIMS AND LAWSUITS."

OPERATING LEASES AND LONG TERM LEASE COMMITMENT WITH VARIABLE INTEREST ENTITY – On April 13, 2010, the Company and PCHI entered into a Second Amendment to Amended and Restated Triple Net Hospital Building Lease (the "2010 Lease Amendment").  Under the 2010 Lease Amendment, the annual base rent to be paid by the Company to PCHI was increased from $5.4 million to $7.3 million, but if PCHI refinances the $45.0 million Loan, the annual base rent may increase to $8.3 million.  The amended lease terminates on the 25-year anniversary of the original lease (dated March 7, 2005) and grants the Company the right to renew for one additional 25-year period.  This lease commitment with PCHI is eliminated in consolidation (Note 9).

Following is a schedule of the Company's future minimum operating lease payments, excluding the long term lease commitment with PCHI, that have initial or remaining non-cancelable lease terms in excess of one year as of March 31, 2012:

| Year ended March 31, | |
|---|---:|
| 2013 | $ 1,561 |
| 2014 | 1,396 |
| 2015 | 1,186 |
| 2016 | 1,123 |
| 2017 | 1,123 |
| Thereafter | 12,277 |
| Total | $ 18,666 |

F-22

CONFIDENTIAL

**JAE 1614**

SPCP_0000001258

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

Total rental expense (excluding PCHI rent) for the years ended March 31, 2012 and 2011 was $4.8 million and $4.8 million, respectively. The Company received sublease rental income in relation to certain leases of approximately $552 and $625 for the years ended March 31, 2012 and 2011, respectively.

CAPITAL LEASES – In connection with the Acquisition, the Company also assumed the leases for the Chapman facility, which include buildings and land with terms that were extended concurrently with the assignment of the leases to December 31, 2023. The Company leases equipment under capital leases expiring at various dates through December 2015. Assets under capital leases with a net book value of $6.2 million and $7.5 million are included in the accompanying consolidated balance sheets as of March 31, 2012 and 2011, respectively. Interest rates used in computing the net present value of the lease payments are based on the interest rates implicit in the leases.

The following is a schedule of future minimum lease payments under the capitalized leases with the present value of the minimum lease payments as of March 31, 2012:

| Year ended March 31, | | |
|---|---|---:|
| 2013 | $ | 1,529 |
| 2014 | | 1,270 |
| 2015 | | 1,283 |
| 2016 | | 1,209 |
| 2017 | | 744 |
| Thereafter | | 5,023 |
| Total minimum lease payments | | 11,058 |
| Less amount representing interest (weighted average interest rate of 5.1%) | | (4,223) |
| Net present value of net minimum lease payments | | 6,835 |
| Less current portion | | (891) |
| Noncurrent portion | $ | 5,944 |

INSURANCE – The Company accrues for estimated general and professional liability claims, to the extent not covered by insurance, when they are probable and reasonably estimable. The Company has purchased a claims-made form insurance policy for general and professional liability risks. Estimated losses within general and professional liability retentions from claims incurred and reported, along with incurred but not reported ("IBNR") claims, are accrued based upon projections and are discounted to their net present value using a weighted average risk-free discount rate of 5%. To the extent that subsequent claims information varies from estimates, the liability is adjusted in the period such information becomes available. As of March 31, 2012 and 2011, the Company had accrued $11.5 million and $11.3 million, respectively, which is comprised of $4.5 million and $6.6 million, respectively, in incurred and reported claims, along with $7.0 million and $4.7 million, respectively, in estimated IBNR. Estimated insurance recoveries of $3.0 million and $2.7 million are included in other prepaid expenses and current assets as of March 31, 2012 and 2011, respectively.

The Company has also purchased occurrence coverage insurance to fund its obligations under its workers compensation program. The Company has a "guaranteed cost" policy, under which the carrier pays all workers compensation claims, with no deductible or reimbursement required of the Company. The Company accrues for estimated workers compensation claims, to the extent not covered by insurance, when they are probable and reasonably estimable. The ultimate costs related to this program include expenses for deductible amounts associated with claims incurred and reported in addition to an accrual for the estimated expenses incurred in connection with IBNR claims. Claims are accrued based upon projections and are discounted to their net present value using a weighted average risk-free discount rate of 5%. To the extent that subsequent claims information varies from estimates, the liability is adjusted in the period such information becomes available. As of March 31, 2012 and 2011, the Company had accrued $673 and $836, respectively, comprised of $338 and $434, respectively, in incurred and reported claims, along with $335 and $402, respectively, in estimated IBNR.

In addition, the Company has a self-insured health benefits plan for its employees. As a result, the Company has established and maintains an accrual for IBNR claims arising from self-insured health benefits provided to employees. The Company's IBNR accruals at March 31, 2012 and 2011 were based upon projections. The Company determines the adequacy of this accrual by evaluating its limited historical experience and trends related to both health insurance claims and payments, information provided by its insurance broker and third party administrator and industry experience and trends. The accrual is an estimate and is subject to change. Such change could be material to the Company's consolidated financial statements. As of March 31, 2012 and 2011, the Company had accrued $2.2 million and $1.8 million, respectively, in estimated IBNR.

F-23

CONFIDENTIAL

SPCP_0000001259

INTEGRATED HEALTHCARE HOLDINGS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2012

The Company has also purchased umbrella liability policies with aggregate limits of $25 million. The umbrella policies provide coverage in excess of the primary layer and applicable retentions for insured liability risks such as general and professional liability, auto liability, and workers compensation (employers liability).

As of March 31, 2012, the Company finances various insurance policies at an interest rate of 4.03% per annum. The Company incurred finance charges relating to such policies of $32.9 and $31.5 for the years ended March 31, 2012 and 2011, respectively. As of March 31, 2012 and 2011, the accompanying consolidated balance sheets include the following balances relating to the financed insurance policies.

|  | March 31, 2012 | | March 31, 2011 | |
| --- | --- | --- | --- | --- |
| Prepaid insurance | $ | 366 | $ | 3,108 |
| Accrued insurance premiums (Included in other current liabilities) | $ | 60 | $ | 1,951 |

PURCHASE COMMITMENTS – The Company has commitments with two unrelated party service provider vendors extending over one year. Commitments total $3.8 million and $1.0 million for the years ending March 31, 2013 and 2014, respectively.

BONUSES – The Company has implemented discretionary bonus plans, under which eligible employees receive bonuses based on the Company's performance and individual performances. For the years ended March 31, 2012 and 2011, the Company awarded eligible employees an aggregate of $0 and $535.6, respectively.

UNION CONTRACTS – Approximately 43% of the Company's employees are represented by labor unions as of March 31, 2012. The CNA Agreement expired on February 28, 2011 and the SEIU Agreement expired on August 31, 2011. Both agreements are currently in negotiations. The agreements have "no strike" provisions and compensation caps which provide the Company with long term compensation and workforce stability.

For both unions, all prior grievances regarding retiree medical benefits, the administration of pay adjustments and pay practices, changes in medical benefits and several wrongful terminations have been resolved in the form of settlement agreements.

CLAIMS AND LAWSUITS – The Company and the Hospitals are subject to various legal proceedings, most of which relate to routine matters incidental to operations. The results of these claims cannot be predicted, and it is possible that the ultimate resolution of these matters, individually or in the aggregate, may have a material adverse effect on the Company's business (both in the near and long term), financial position, results of operations, or cash flows. Although the Company defends itself vigorously against claims and lawsuits and cooperates with investigations, these matters (1) could require payment of substantial damages or amounts in judgments or settlements, which individually or in the aggregate could exceed amounts, if any, that may be recovered under insurance policies where coverage applies and is available, (2) cause substantial expenses to be incurred, (3) require significant time and attention from the Company's management, and (4) could cause the Company to close or sell the Hospitals or otherwise modify the way its business is conducted. The Company accrues for claims and lawsuits when an unfavorable outcome is probable and the amount is reasonably estimable.

On January 6, 2012, the Regents of the University of California (UC), acting on behalf of UC Irvine Healthcare, filed suit in Orange County Superior Court against Western Medical Center-Anaheim (WMC-A) for breach of contract based upon an allegation that WMC-A guaranteed payment for health care services provided to a patient WMC-A transferred to UC Irvine Medical Center because the patient needed a higher level of care than WMC-A could provide. The Company filed an answer to the complaint and UC demurred to the Company's answer. The Company then filed an amended answer to UC's complaint and UC demurred to the Company's amended answer. UC's demurrer is currently set for hearing in June 2012. At March 31, 2012, the Company had accrued $1.8 million for this guarantee.

F-24

CONFIDENTIAL

**JAE 1616**

SPCP_0000001260

The following financial statement schedule is the only schedule required to be filed under the applicable accounting regulations of the Securities and Exchange Commission.

INTEGRATED HEALTHCARE HOLDINGS, INC.
SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS
[amounts in 000's]

| PERIOD | DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | | ADDITIONS | | DEDUCTIONS | | BALANCE AT END OF PERIOD | |
|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivable: | | | | | | | | | |
| Year ended March 31, 2012 | Allowance for doubtful accounts | $ | 20,076 | $ | 44,369 | $ | 46,244 | $ | 18,201 |
| Year ended March 31, 2011 | Allowance for doubtful accounts | $ | 15,258 | $ | 40,435 | $ | 35,617 | $ | 20,076 |
| | | | | | | | | | |
| Deferred tax assets: | | | | | | | | | |
| Year ended March 31, 2012 | Valuation allowance | $ | 11,012 | $ | 16,463 | $ | 19,438 | $ | 8,037 |
| Year ended March 31, 2011 | Valuation allowance | $ | 32,872 | $ | 1,002 | $ | 22,862 | $ | 11,012 |

F-25

**JAE 1617**

CONFIDENTIAL

SPCP_0000001261

**EXHIBIT 23.1**

Consent of Independent Registered Public Accounting Firm

Integrated Healthcare Holdings, Inc.
Santa Ana, California

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 of Integrated Healthcare Holdings, Inc. filed on February 2, 2007, (File No. 333-140417) of our report dated June 22, 2012 relating to the consolidated financial statements and financial statement schedule of Integrated Healthcare Holdings, Inc. which appears in this Form 10-K for the year ended March 31, 2012.

BDO USA, LLP
Costa Mesa, California
June 22, 2012

**JAE 1618**

SPCP_0000001262

EXHIBIT 31.1

### CERTIFICATION PURSUANT TO RULE 13a-14 AND 15d-14
### UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED

I, Kenneth K. Westbrook, Chief Executive Officer of Integrated Healthcare Holdings, Inc., certify that:

1.   I have reviewed this Annual Report on Form 10-K of Integrated Healthcare Holdings, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15 (e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated, or caused such disclosure controls and procedure to be designed under our supervision, subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

(c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Dated: June 20, 2012

/s/ Kenneth K. Westbrook
Kenneth K. Westbrook
Chief Executive Officer

**JAE 1619**

EXHIBIT 31.2

## CERTIFICATION PURSUANT TO RULE 13a-14 AND 15d-14
## UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED

I, Steven R. Blake, Chief Financial Officer of Integrated Healthcare Holdings, Inc., certify that:

1.      I have reviewed this Annual Report on Form 10-K of Integrated Healthcare Holdings, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15 (e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     (a)      designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated, or caused such disclosure controls and procedure to be designed under our supervision, subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

     (b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

     (c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     (d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

     (a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Dated: June 20, 2012

/s/ Steven R. Blake
Steven R. Blake
Chief Financial Officer

**JAE 1620**

SPCP_0000001264

EXHIBIT 32.1

**CERTIFICATE PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Report of Integrated Healthcare Holdings, Inc. (the "Company") on Form 10-K for the period from April 1, 2011 to March 31, 2012, as filed with the Securities and Exchange Commission (the "Report"), each of the undersigned, in the capacities and on the dates indicated below, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

    1)        the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

    2)        the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company at the dates and for the period indicated. This Certificate has not been, and shall not be deemed, "filed" with the Securities and Exchange Commission.

Dated: June 20, 2012

                                        /s/ Kenneth K. Westbrook
                                        Kenneth K. Westbrook
                                        Chief Executive Officer

**JAE 1621**

SPCP_0000001265

EXHIBIT 32.2

**CERTIFICATE PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Report of Integrated Healthcare Holdings, Inc. (the "Company") on Form 10-K for the period from April 1, 2011 to March 31, 2012, as filed with the Securities and Exchange Commission (the "Report"), each of the undersigned, in the capacities and on the dates indicated below, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

    1)    the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

    2)    the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company at the dates and for the period indicated. This Certificate has not been, and shall not be deemed, "filed" with the Securities and Exchange Commission.

Dated: June 20, 2012

                                        /s/ Steven R. Blake
                                        Steven R. Blake
                                        Chief Financial Officer

**JAE 1622**

CONFIDENTIAL

# EXHIBIT 31

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
CONSOLIDATED CASE No. 5:20-CV-01126-SB (SHK)

DANIELLE GAMINO, INDIVIDUALLY

AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

PLAINTIFF

AND

KPC HEALTHCARE HOLDINGS, INC.,

KPC HEALTHCARE, INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE,
ALERUS FINANCIAL, N.A., KALI PRADIP CHAUDHURI, KALI PRIYO CHAUDHURI,
AMELIA HIPPERT, WILLIAM E. THOMAS, LORI VAN ARSDALE,

DEFENDANTS

AND

KPC HEALTHCARE, INC. EMPLOYEE STOCK OWNERSHIP PLAN

NOMINAL DEFENDANT

EXPERT REPORT OF

ANNAPOORANI BHAT

May 27, 2022



EXPERT REPORT OF
ANNAPOORANI BHAT
CASE NO. 01-2020-CA-003059



Figure 2 - Historical Adjusted EBITDA Trend (Excluding QAF)

57. Given the significant variability in financial performance, including sustained losses for multiple years, improvements seen only over a short 12 to 15-month period (between April 2014 and June 2015) and the limited evidence available regarding the sustainability of Management's cost cutting measures, SRR's approach of placing "primary emphasis" [38] on the RLE calculated using annualized six-month data in its GCM and GTM was, at the time of the Transaction, an unreasonable assumption.

58. In my experience, it is unusual and unreasonable to rely upon only six months operating results to represent a full year when the actual results for the immediate prior periods are materially different.

59. In addition, Management's Projected Year 1 EBITDA of $28.812 million, estimated based on additional cost cutting measures and simultaneous increases in revenue implied an EBITDA margin of 8.0% (excluding QAF), a significant increase from FY 2015 margins of 2.7% and the negative or near zero EBITDA margins of prior years.

60. If net revenue from QAF is included in SRR's projected EBITDA, the implied EBITDA margins are 18.0%, 26.1% and 40.2% for FY 2016, FY 2017 and FY 2018 respectively. *See Table 5* below. In my experience and based on SRR's own benchmarking analysis within the

---

[38] SRR Report (STOUT_0000086).

*Danielle Gamino, et al. v. KPC Healthcare Inc., et al.*
**United States District Court, Central Court of California, Eastern Division**
**Case No. 5:20-cv-01126-SB (SHK)**                                    Page 16

**JAE 1625**



EXPERT REPORT OF
ANNAPOORANI BHAT
CASE NO. 01-2020-CA-003059

## X.   CONCLUSION

75. The opinions expressed herein are subject to change based upon any additional discovery
related to this case or information that I may receive after the date of this report.


Respectfully submitted,

Annapoorani Bhat
Principal
May 27, 2022

*Danielle Gamino, et al. v. KPC Healthcare Inc., et al.*
**United States District Court, Central Court of California, Eastern Division**
**Case No. 5:20-cv-01126-SB (SHK)**                                                                 Page 24

**JAE 1626**

# CERTIFICATE OF SERVICE

I, Dan Feinberg, hereby certify that on May 27, 2022, a copy of the Expert Report of Annapoorani Bhatdated May 27, 2022 was served on the counsel of record listed below by email and U.S. mail.

Dated this 27th day of May 2022.

Maria Rodriguez
Christopher A. Braham
Julian L. Andre
Laurie Ann Baddon
McDermott Will & Emery LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
mcrodriguez@mwe.com
cbraham@mwe.com
jandre@mwe.com
lbaddon@mwe.com

Theodore M. Becker
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
tbecker@mwe.com

Aimee Mackay
Morgan, Lewis & Bockius LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071
aimee.mackay@morganlewis.com

Sari Alamuddin
Deborah S. Davidson
Morgan Lewis and Bockius LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
sari.alamuddin@morganlewis.com
deborah.davidson@morganlewis.com

Lars C. Golumbic
Sarah M. Adams
Rachael E. Hancock
Shaun A. Gates
William J. Delany
Groom Law Group, Chartered
1701 Pennsylvania Ave. NW
Washington, DC 20006
lgolumbic@groom.com
sadams@groom.com
rhancock@groom.com
sgates@groom.com
wdelany@groom.com

Andrew J. Waxler
Madeleine C. Halley
Kaufman Dolowich & Voluck LLP
11111 Santa Monica Blvd., Suite 850
Los Angeles, CA 90025
awaxler@kdvlaw.com
mhalley@kdvlaw.com

Dan Feinberg

# EXHIBIT 32

1   MORGAN, LEWIS & BOCKIUS LLP
    Aimee Mackay, Bar No. 221690
2   aimee.mackay@morganlewis.com
    300 South Grand Avenue
3   Los Angeles, CA 90071-3132
    Tel:  +1.213.612.2500
4   Fax: +1.213.612.2501

5   MORGAN, LEWIS & BOCKIUS LLP
    Sari Alamuddin (admitted *pro hac vice*)
6   sari.alamuddin@morganlewis.com
    Deborah Davidson (admitted *pro hac vice*)
7   deborah.davidson@morganlewis.com
    110 N. Wacker Drive
8   Chicago, IL 60606-1511
    Tel: +1.312.324.1000
9   Fax: +1.312.324.1001

10

11  Attorneys for Defendant
    SPCP GROUP, LLC

12              UNITED STATES DISTRICT COURT
13              CENTRAL DISTRICT OF CALIFORNIA

14  DANIELLE GAMINO, individually and on      Case No. 5:21-cv-01466-SB-SHK
    behalf of all others similarly situated,   (consolidated with Case No. 5:20-
15                                              cv-01126-SB-SHK)
                Plaintiff,
16                                              **DEFENDANT SPCP GROUP
                vs.                             LLC'S AMENDED RESPONSES
17                                              TO PLAINTIFF'S FIFTH SET
    SPCP GROUP, LLC,                            OF INTERROGATORIES**
18
                Defendant, and
19
    KPC HEALTHCARE, INC. EMPLOYEE
20  STOCK OWNERSHIP PLAN,

21              Nominal Defendant.

22  PROPOUNDING PARTY:      Plaintiff, Danielle Gamino

23  RESPONDING PARTY:       Defendant, SPCP Group, LLC

24  SET NUMBER:             Five (5)

25

26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP                        1
ATTORNEYS AT LAW                                    DEFENDANT'S AMENDED RESPONSES
  LOS ANGELES                                       TO FIFTH SET OF INTERROGATORIES;
                                                    NO. 5:21-CV-01466-SB-SHK

1  <u>**RESPONSES AND OBJECTIONS TO INTERROGATORIES**</u>

2  <u>**INTERROGATORY NO. 15**</u>

3        With respect to the WARRANT PURCHASE CASH CONSIDERATION, the

4  WARRANT PURCHASE INCOME STREAMS, and the money you have received

5  from the WARRANT PURCHASE INCOME STREAMS, state what use YOU made

6  of those assets from the time you received them until the present, including by stating

7  information regarding the financial or investment institution and account name(s) and

8  number(s) where the money or assets were deposited or invested, the history of the

9  transactions involving those assets, and, to the extent that the WARRANT

10  PURCHASE CASH CONSIDERATION or the money you have received from the

11  WARRANT PURCHASE INCOME STREAMS were comingled with other funds

12  or assets, the history of the transactions involving those commingled funds or assets.

13  <u>**RESPONSE TO INTERROGATORY NO. 15**</u>

14        SPCP objects to this Interrogatory on the grounds that it is overbroad, unduly

15  burdensome, and not proportional to the needs of the case to the extent it (a) seeks

16  information concerning the "use" of any WARRANT PURCHASE CASH

17  CONSIDERATION, WARRANT PURCHASE INCOME STREAMS, and money

18  SPCP received from the WARRANT PURCHASE INCOME STREAMS, "from the

19  time [SPCP] received them until the present," which amounts to a period of over six

20  years, (b) seeks information unrelated to Plaintiff's underlying claim under ERISA

21  that other defendants breached their fiduciary duties and engaged in a prohibited

22  transaction because they received unreasonable compensation related to a stock-sale

23  transaction to which SPCP was not a party, and (c) seeks information related to relief

24  that is beyond what Plaintiff is entitled to under ERISA.  SPCP further objects to this

25  Interrogatory as vague, ambiguous, and overbroad to the extent it seeks information

26  regarding "the history of the transactions involving those assets."

27        Subject to and without waiving the foregoing General and Specific Objections,

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

DEFENDANT'S AMENDED RESPONSES
TO FIFTH SET OF INTERROGATORIES;
NO. 5:21-CV-01466-SB-SHK

**JAE 1630**

1    and pursuant to Fed. R. Civ. P. 33(d), SPCP refers Plaintiff to the bank account

2    statements contained in SPCP's third document production made on April 27, 2022

3    (Bates    stamped    SPCP_0000008311-SPCP_0000009220),    and    supplemental

4    document productions made on June 7, 2022 (Bates stamped SPCP_0000029631-

5    SPCP_0000059107), and June 10, 2022 (Bates stamped SPCP_0000059108 -

6    SPCP_0000061770).

7         SPCP is owned by two investment funds: (1) the Silver Point Capital Fund,

8    L.P. (the "Onshore Fund"), and (2) the Silver Point Capital Offshore Master Fund,

9    L.P. (the "Offshore Fund"). The Onshore Fund and the Offshore Fund make a variety

10   of investments. The investments in KPC and the proceeds related thereto were fully

11   allocated to the Onshore Fund. Therefore, any WARRANT PURCHASE CASH

12   CONSIDERATION, WARRANT PURCHASE INCOME STREAMS, or money

13   received from the WARRANT PURCHASE INCOME STREAMS were tied to the

14   Onshore Fund.

15        As part of its cash management system, the Onshore Fund used a Citibank

16   account, among others, between 2015 and the present (ending -0960), known as the

17   "onshore" operating account. The onshore operating account may receive funds from

18   and transfer funds to various other proprietary operational accounts and third-party

19   accounts. One such account is a Citibank account belonging to and used by SPCP

20   between 2015 and the present (ending -2081), known as the SPCP Group LLC

21   account. This account acted as a "participation vehicle" or an "aggregator" account

22   into which SPCP periodically received funds related to certain transactions, including

23   the warrant repurchase transaction executed on August 28, 2015. Any WARRANT

24   PURCHASE CASH CONSIDERATION, WARRANT PURCHASE INCOME

25   STREAMS, or money from the WARRANT PURCHASE INCOME STREAMS

26   were received as inflows to the SPCP Group LLC account and transferred to the

27   onshore operating account.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

DEFENDANT'S AMENDED RESPONSES
TO FIFTH SET OF INTERROGATORIES;
NO. 5:21-CV-01466-SB-SHK

JAE 1631

1       Funds in the onshore operating account may be transferred to other proprietary

2  operational accounts or to Silver Point Capital, L.P. for various purposes, including

3  to pay for expenses, management fees, new investments, investor redemptions, and

4  other business needs.  In the onshore account, any WARRANT PURCHASE CASH

5  CONSIDERATION, WARRANT PURCHASE INCOME STREAMS, or money

6  received from the WARRANT PURCHASE INCOME STREAMS were

7  commingled with other assets.  Aside from the account statements of any Silver

8  Point-related operational accounts which received assets from the onshore account,

9  the onshore account does not maintain additional records concerning the "use" or

10  "history" of those funds.  As part of its supplemental productions on June 7 and June

11  10, 2022, SPCP produced account statements for certain operational accounts that

12  received funds from the onshore account between 2015 and the present.

13

14  **INTERROGATORY NO. 16**

15       Identify any Person to whom was given, paid, or directed any of the

16  WARRANT PURCHASE CASH CONSIDERATION or the money you have

17  received from the WARRANT PURCHASE INCOME STREAMS or any other

18  funds with which the WARRANT PURCHASE CASH CONSIDERATION or the

19  money you have received from the WARRANT PURCHASE INCOME STREAMS

20  was or is commingled by (a) name, (b) telephone number, (c) address, and (d)

21  description of relationship to You.

22  **RESPONSE TO INTERROGATORY NO. 16**

23       SPCP objects to this Interrogatory on the grounds that it is overbroad, unduly

24  burdensome, and not proportional to the needs of the case to the extent it (a) seeks

25  information concerning any "Person" to whom was given, paid, or directed any

26  WARRANT PURCHASE CASH CONSIDERATION, WARRANT PURCHASE

27  INCOME STREAMS, or any money SPCP received from the WARRANT

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

DEFENDANT'S AMENDED RESPONSES
TO FIFTH SET OF INTERROGATORIES;
NO. 5:21-CV-01466-SB-SHK

JAE 1632

1

2  Dated: June 10, 2022                    MORGAN, LEWIS & BOCKIUS LLP

3

4                                          By:

5                                          Aimee Mackay
                                           Sari Alamuddin (admitted *pro hac vice*)
                                           Deborah Davidson (admitted *pro hac
6                                          vice*)

7                                          Attorneys for Defendant
                                           SPCP Group, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES                                9           DEFENDANT'S AMENDED RESPONSES
                                                       TO FIFTH SET OF INTERROGATORIES;
                                                       NO. 5:21-CV-01466-SB-SHK

JAE 1633

**VERIFICATION OF THOMAS BANKS**
*Danielle Gamino v. SPCP Group, LLC*
**Case No. 5:21-cv-01466-SB-SHK**
**United States District Court of the Central District of California**

I, Thomas Banks, declare:

I am a managing director at Silver Point Capital, L.P., the manager for Defendant SPCP Group, LLC, in the action entitled *Danielle Gamino v. SPCP Group, LLC,* Case No. 5:32-cv-01466-SB-SHK, in the United States District Court of the Central District of California, and I have been authorized to make this verification on its behalf.

I have read DEFENDANT SPCP GROUP LLC'S AMENDED RESPONSES TO PLAINTIFF'S FIFTH SET OF INTERROGATORIES, and know of its contents. The responses contained therein are accurate, to my knowledge, based on information and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in _Greenwich_, Connecticut, on June _10_, 2022.

_____
Thomas Banks

1

## CERTIFICATE OF SERVICE

2          I, Denise D. Brown, declare:

3          I am a citizen of the United States and employed in Los Angeles County,
California.  I am over the age of eighteen years and not a party to the within entitled
4   action.  My business address is 300 South Grand Ave., Los Angeles CA 90071-3132.
On June 10, 2022, I served a copy of the within document(s)

5

6   **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIFTH SET OF
INTERROGATORIES**

7   **VERIFICATION OF THOMAS BANKS**

8

9          ☒          by placing the document(s) listed above in a sealed envelope with
postage thereon fully prepaid, in the United States mail at Los Angeles,
10                      California addressed as set forth below.

11         ☒          by transmitting via e-mail or electronic transmission the document(s)
listed above to the person(s) at the e-mail address(es) set forth below.
12

13

14  R. Joseph Barton                          Lars C. Golumbic
    Colin M. Downes                           Sarah M. Adams
15  **BLOCK & LEVITON LLP**                    Shaun A. Gates
16  1735 20th Street NW                        Rachael E. Hancock
    Washington, DC 20009                       William J. Delany
17  Email: *jbarton@blockleviton.com*         Sean C. Abouchedid
18  Email: *colin@blockleviton.com*            **GROOM LAW GROUP**
19                                             1702 Pennsylvania Ave NW
    Daniel Feinberg                            Washington, DC 20006
20  Darin Ranahan                              Email: *lgolumbic@groom.com*
    Nina Wasow                                 Email: *sadams@groom.com*
21  **FEINBERG JACKSON**                       Email: *sgates@groom.com*
22  2030 Addison Street, Suite 500             Email: *rhancock@groom.com*
    Berkeley, CA 94704                         Email: *wdelany@groom.com*
23  Email: *dan@feinbergjackson.com*           Email: *sabouchedid@groom.com*
24  Email: *darin@feinbergjackson.com*
    Email: *nina@feinbergjackson.com*
25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

10                    DEFENDANT'S AMENDED RESPONSES
                      TO FIFTH SET OF INTERROGATORIES;
                      NO. 5:21-CV-01466-SB-SHK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Richard E. Donahoo
Sarah L. Kokonas
William E. Donahoo
**DONAHOO & ASSOCIATES, P.C.**
440 W. First Street, Suite 101
Tustin, CA 92780
Email: *rdonahoo@donahoo.com*
Email: *skokonas@donahoo.com*
Email: *wdonahoo@donahoo.com*

Theodore M. Becker
Julian L. Andre
Christopher Braham
Laurie Baddon
**MCDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
Email: *tbecker@mwe.com*
Email: *jandre@mwe.com*
Email: *cbraham@mwe.com*
Email: *lbaddon@mwe.com*

Andrew J. Waxler
Madeleina C. Halley
**KAUFMAN DOLOWICH & VOLUCK LLP**
11755 Wilshire Blvd., Suite 2400
Los Angeles, CA 90025
Email: *awaxler@kdvlaw.com*
Email: *mhalley@kdvlaw.com*

Major Khan
**MKLLC LAW**
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Email: *mk@mk-llc.com*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on June 10, 2022, at Los Angeles, California. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

*Denise D. Brown*
Denise D. Brown

DEFENDANT'S AMENDED RESPONSES TO FIFTH SET OF INTERROGATORIES; NO. 5:21-CV-01466-SB-SHK

**JAE 1636**

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL
(ENTIRE DOC. SEALED)**

# Exhibit 33

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEALED

# Exhibit 34



# KPC Healthcare, Inc.

## ESOP Transaction Lender Presentation

*July 2015*



**NEW YORK**
52 VANDERBILT AVENUE, SUITE 902
NEW YORK, NY 10017
T (646) 277-8420
F (646) 277-8421

**EUREKA**

**CALIFORNIA**
555 ANTON BOULEVARD, SUITE 910
COSTA MESA, CA 92626
T (949) 719-2260
F (949) 719-2314

CONFIDENTIAL                                                                                    EUREKA_045761

**JAE 1648**

# Engagement Overview

**Purpose of Engagement**

❑ KPC Healthcare, Inc. ("KPC" or the "Company") has engaged Eureka Capital Markets, LLC ("Eureka") to act as its exclusive financial advisor in evaluating, structuring and implementing a potential ESOP transaction, whereby all of the Company's outstanding stock will be sold to the KPC Employee Stock Ownership Plan ("ESOP") such that the ESOP becomes a shareholder of the Company (the "ESOP Transaction")

**Board Objectives**

❑ Create a partial liquidity event for the shareholder ("Selling Shareholder") at fair market value;

❑ Develop an ownership succession and transition plan for the long-term, stable, secure and sustainable operation of the Company;

❑ Realize all available tax benefits for the Company from a 100% sale of stock to the ESOP to reduce taxable income after transaction;

❑ Structure the Transaction to enable the Selling Shareholder to realize a tax-deferred sale;

❑ Establish a meaningful benefit for retention, motivation and recruitment of key employees; and

❑ Allow employees to have the benefits of ownership through participation in the equity upside of KPC

2

**EUREKA**

EUREKA_045762



# Company Overview



CONFIDENTIAL

EUREKA_045763

# Company Overview
## Fact Sheet

| KPC Healthcare, Inc. ("KPC") | |
|---|---|
| **Company Formation** | |
| State of Incorporation: | Nevada |
| Type of Corporation: | C-Corporation |
| Fiscal Year End: | March 31 |
| Primary Facilities: | Anaheim, CA; Orange, CA; Santa Ana, CA (2 Santa Ana Locations) |
| **Employee Information** | |
| Total Employees: | Approximately 2,238 (792 union employees & 1,446 non-union employees) |
| **Ownership Information** | |
| Share/Warrant Holders: | Dr. Kali P. Chaudhuri – ███████<br>Dr. Kali P. Chaudhur ███████<br>KPC Resolution Company, LLC – ███████<br>William E. Thomas ███████<br>SPCP Group, LLC ███████<br>SPCP Group IV, LLC ███████ |

4



EUREKA_045764

# Company Overview
## *Ownership Structure & Corporate Structure*

**KPC Ownership Structure**

While there are warrants outstanding, Dr. Kali P. Chaudhuri owns 100% of outstanding common stock.



**Corporate Structure**



[1]Pacific Coast Holdings Investment, LLC ("PCHI") is owned by KPC Shareholders. Neither PCHI nor its real estate holdings will be included in the contemplated ESOP buyout transaction.

5

**EUREKA**

EUREKA_045765

JAE 1652

# Company Overview

## Introduction

**Business Snap Shot**





- ❑ KPC Healthcare, Inc. ("KPC" or the "Company") is a leading, predominantly physician owned and operated, group of four community based hospitals located in Orange County, CA (the "Hospitals")

- ❑ The Hospitals operated by the Company include 282-bed Western Medical Center in Santa Ana ("WMCS"); the 188-bed Western Medical Center in Anaheim ("WMCA"); the 178-bed Coastal Communities Hospital in Santa Ana ("CCH"); and the 114-bed Chapman Medical Center in Orange ("CMC")

- ❑ In aggregate, the Hospitals account for approximately 12% market share of the county that the Hospitals reside in within Southern California

- ❑ The Hospitals are accredited by the Joint Commission on Accreditation of Healthcare Organizations, the College of American Pathologists, American College of Surgeons (Trauma Program) and other appropriate accreditation agencies

- ❑ The Hospitals provide tertiary and secondary services and operate one of only three trauma centers in the region

  - ○ Services include neurosurgical care, cardiac services, burn center care, medical services, surgical services, pediatric intensive unit, neonatal intensive care unit, obstetrical, subacute, geropsychiatric, adult psychiatric, and chemical dependency in addition to developing a new Acute Rehabilitation Care unit









6

**EUREKA**

EUREKA_045766

**JAE 1653**

# Company Overview
## Hospitals Overview

| Hospital Overview[1] | Locations |
|---|---|

**Western Medical Center – Santa Ana, CA**

- 282 Beds
- 316,488 Sq. Ft.
- 115 Active Physicians
- 415 Employee Nurses & Hospital Staff

**Western Medical Center – Anaheim, CA**

- 188 Beds
- 132,554 Sq. Ft.
- 88 Active Physicians
- 221 Employee Nurses & Hospital Staff

**Coastal Communities Hospital – Santa Ana, CA**

- 178 Beds
- 116,268 Sq. Ft.
- 62 Active Physicians
- 182 Employee Nurses & Hospital Staff

**Chapman Medical Center – Orange, CA**
- 114 Beds
- 140,000 Sq. Ft.
- 34 Active Physicians
- 113 Employee Nurses & Hospital Staff



Coastal Communities Hospital

Western Medical Center – Anaheim

Western Medical Center – Santa Ana

Chapman Medical Center

General Acute Care
Trauma Level II
Replantation
High Risk Obstetrical
NICU, Level II
Acute Burn and Outpatient Burn
Coumadin Clinic
Diabetic Clinic
Gastric Bypass
Acute Psychiatric and Geriatric Psych
Partial and Intensive Outpatient Program
Chemical Dependency

Subacute
Multispecialty Clinic
Emergency Services
HBP Program—Emergency, Anesthesia, Radiology
Bloodless Surgery Program
Neurosurgery
Cardiovascular Surgical
Interventional Catheterization Laboratory
Diagnostic Catheterization Laboratory
Pediatric ICU

[1] Source: KPC Healthcare, Inc. 10-K, June 28, 2013

7

❁ EUREKA

CONFIDENTIAL

EUREKA_045767

# Company Overview
## Industry Recognition

 Anaheim Global **Medical Center**

 Orange County Global **Medical Center**

 South Coast Global **Medical Center**

 Chapman Global **Medical Center**
















8

❆ **E U R E K A**

CONFIDENTIAL

EUREKA_045768

# Company Overview
*Payor Mix*

## Payor Mix



☐ The Hospitals are located in a region where median household income is below $60,000 per year and roughly 20% of the Hospitals' potential constituents are below the Federal poverty line (2010 U.S. Census)

○ the Company is a primary beneficiary of Medicare and Medicaid (MediCal) reimbursements including supplement income from the Quality Assurance Fee (to be discussed in the Industry Section)



9

EUREKA

EUREKA_045769

**JAE 1656**

# Company Overview
## *Workforce*

### Employee Summary



❑ As of February 2015, KPC employed a total of 2,238 well-trained employees.  Of these employees, approx. 792 are represented by two labor unions, the California Nurses Association ("CNA") and Service Employee International Union – United Healthcare Workers ("SEIU"), who are covered by collective bargaining agreements

  ○ KPC maintains a staff of 103 non-union employees that work out of the corporate office




### Employee Benefits



❑ KPC provides customary employee benefits such as health, dental and group life insurance coverage

❑ The Company also maintains a 401(k) plan designed to retain and motivate employees.  All employees with 90 days of service are eligible to participate, unless they are covered by a collective bargaining agreement which precludes coverage

10



CONFIDENTIAL

EUREKA_045770

**JAE 1657**

## Company Overview
**Comparable Publicly Traded Competitors**



*Operates, owns and leases 207 hospitals in 29 states in non-urban and select urban markets throughout the United States*



*Operates 4 community hospitals, 2 nursing homes and a specialty pharmacy business in the United States*



*Operates 165 hospitals and 115 freestanding surgery centers in 20 states and England*



*Operates 79 hospitals and 189 outpatient centers across 15 states in the United States*



*Operates 54 hospitals in 18 states in non-urban communities in the United States*



*Owns and operates 25 hospitals, 187 behavioral health facilities and six ambulatory surgery centers in 36 states*

11



**JAE 1658**



# Management



CONFIDENTIAL

EUREKA_045772

# Management
## Management Company Arrangement



13

CONFIDENTIAL

EUREKA_045773

# Management

## Org Chart

Executive Management team members have been top level executives for several well known corporations: Prime Healthcare, Tenet, Kaiser, University Health System and Vanguard. Management has both non-profit and for-profit experience, along with transitioning facilities from non-profit to for profit status.

Suzanne Richards, CEO of Healthcare Operations: transitioned over 23 facilities to profitability, 18 for Prime Healthcare and 5 for KPC Healthcare



14

CONFIDENTIAL

**EUREKA**

EUREKA_045774

**JAE 1661**

# Management

*Past Achievement – Victor Valley*

**Before KPC Acquisition**

- ❏ EBITDA before QAF was negative $7MM
- ❏ NICU opened, Cardiac Cath Lab and GI Lab were in suspension
- ❏ Loss of CLIA for laboratory services
- ❏ Older, deteriorating facilities & equipment
- ❏ No IT System in place—losing meaningful use
- ❏ Low scores on service and satisfaction metrics
- ❏ CMS, CDPH, and HFAP issues
- ❏ Poor public image
- ❏ Average daily census averaged below 50 patients
- ❏ ED Visits approximately 60 per day

**After KPC Acquisition**

- ❏ Positive net income of $6MM by the first anniversary of the acquisition date
- ❏ NICU opened, Cardiac Cath Lab and GI Lab opened in first three months
- ❏ CLIA reinstated for laboratory services in first six months
- ❏ All brand new equipment and upgrades to building, spending over $19MM throughout two years
- ❏ McKesson Paragon implemented in five months—obtaining meaningful financial
- ❏ Increased scores in patient satisfaction and core measures
- ❏ CMS, CDPH, and HFAP all in good standing—dual accreditation obtained with TJC
- ❏ Voted best hospital in the high desert
- ❏ Average daily census averaged above 70 patients
- ❏ ED Visits approximately 150-200 per day

15



CONFIDENTIAL

EUREKA_045775

**JAE 1662**

# Management

*Past Achievement – Victory Valley*



Average Daily Census



CONFIDENTIAL

EUREKA_045776

**JAE 1663**

## Management
*Past Achievement – Hemet*

**Before KPC Acquisition**

- ❏ Losing $7 million income annually (chapter 9 bankruptcy) and had no cash to service debt and CAPEX
- ❏ Poor public image with older, deteriorating facilities & equipment
- ❏ Lack of harmony amongst medical staff
- ❏ Out migration of services due to lack of specialty availability
- ❏ Low scores on service and satisfaction metrics
- ❏ CMS, CDPH, and The Joint Commission issues
- ❏ Limited available services
- ❏ Long LOS with Low CMI
- ❏ Culture of a "County Hospital"

**After KPC Acquisition**

- ❏ Financial turn around - $6.3M income year one and 55 months of positive EBITDA
- ❏ $30 million reduction in debt plus $17.3 million reinvested in facilities & operations
- ❏ Improvement in documentation, LOS, CMI, QA
- ❏ 17,000 capitated lives
- ❏ Resolution of CMS & CDPH issues as well as two full 3-year Joint Commission accreditation with Gold Seal
- ❏ Improved Scores in Core Measures (Quality), Satisfaction (HCAHPS), Safety (Leap Frog, etc.)
- ❏ Reduction in ER wait times & LWBS, as well as in LOS with Increased CMI
- ❏ Growing collaboration among medical staffs – By laws, rules, regulations, and cooperation
- ❏ Improved perception from the community
- ❏ ADEPT training for staff "Culture Change"
- ❏ New ER and Anesthesia MD's

17



EUREKA_045777

**JAE 1664**

## Management
### Officer Bios

| Name *(Title)* | Biography |
|---|---|
| **Kali P. Chaudhuri, MD** *(Chairman and Founder)* | Dr. Kali Pradip Chaudhuri is the Chairman and Founder of the KPC Group of Companies, which is consisted of numerous businesses around the world serving diverse industries, such as healthcare services and facilities, pharmaceutical and biotechnology, education, real estate, infrastructure development, agriculture, architecture and engineering, alternative energy, waste management, travel services and information technology. As one of the pioneers in creating integrated Health Care System in Southern California, Dr. Chaudhuri is the sole owner of KPC Healthcare, Inc. and is a majority shareholder of PHH enterprise. His diversified quest for progress in many business verticals proved great synergy in catalysis research in the healthcare services and facilities industry. As a health care visionary, Dr. Chaudhuri is constantly giving back to the industry, including his latest acquisition of the Victor Valley Medical Centre. He obtained his MBBS degree in Kolkata from National Medical College and is a certified Orthopedic Surgeon since 1982. |
| **Bill E. Thomas, ESQ** *(Senior Vice-President and General Counsel)* | As the Executive Vice President and General Counsel for Strategic Global Management, Inc. and the affiliated entities of The KPC Group, Mr. Thomas supervises M&As , financings, and contracting for the organization. He single-handedly completed the acquisition of all seven hospital acquisitions along with medical group acquisition of FutureCare IPA. Prior to joining The KPC Group in 1998, Mr. Thomas was the founding and managing partner of a 15 attorney firm – Thomas, Mort and Prosser, in Riverside, California;  a business partner at the Riverside law firm of Reid, Babbage & Coil; an associate at Loeb & Loeb in Los Angeles; and a staff attorney at the Securities and Exchange Commission in Washington, D.C. in the Division of Investment Management Regulation.  He completed the Masters of Law from New York University Law School in 1975, where he was a Fellow at the NYU Securities Institute. |

18

 EUREKA

CONFIDENTIAL

## Management
### *Officer Bios*

| Name *(Title)* | Biography |
|---|---|
| **Suzanne Richards**<br>*(Chief Executive Officer of Healthcare Operations)* | Suzanne Richards is the Chief Operating Officer for Strategic Global Management, Inc., and the Chief Executive Officer for Victor Valley Global Medical Center, Western Medical Center Anaheim, and Western Medical Center Santa Ana. At KPC Healthcare, Suzanne is currently employed as a Joint Commission surveyor and surveys healthcare entities all over the United States. She has worked to develop a team to push the profitability of the three facilities she manages, by changing systems and improving workflow. Suzanne is a Certified Professional in Healthcare Quality (CPHQ), a Certified Healthcare Executive (CHE), a Diplomat from the American Board of Quality Assurance and Utilization Review Physicians (CHCQM), a Certified HIPAA Professional (CHP), a Fellow of the American Institute of Healthcare Quality (FAIHQ), and a Fellow of the American College of Healthcare Executives (FACHE). Suzanne has been appointed to the Foundation Board of the Victor Valley College Foundation and is the 2014 and 2015 Chair of the March of Dimes for the High Desert. |
| **Kali P. Chaudhuri, CPA, MBA**<br>*(Executive Vice President of Finance)* | As the Executive Vice President of Finance and overall Head of Finance and Accounting for the KPC Group's various entities, Mr. Chaudhuri engages in direct management and advisory positions within several of the KPC Group's key companies. He is the visionary of the financial diligence and analysis team behind all of the KPC Group's M&A and strategic business development. His technical responsibilities include preparing/reviewing the financial statements, creating acquisition, turnaround, and operational models, preparing/analyzing P&L oriented forecasts/projections, cash flow optimizations, and budgets for all of the KPC Group's affiliated entities. Prior to joining The KPC Group, Mr. Chaudhuri served as a member of the Finance and Strategy division of Amgen, Inc. and as a Financial Analyst at Walt Disney Studios. Mr. Chaudhuri attained his CPA license during his time as Senior at Ernst & Young, LLP, and he received his MBA at the UCLA Anderson School of Management. |



CONFIDENTIAL

**JAE 1666**

# Management
### *Officer Bios*

| Name *(Title)* | Biography |
|---|---|
| **Kelly Thomas, ESQ**<br>*(Executive Vice President of Legal Affairs)* | As the Executive Vice President of Legal Affairs, Ms. Thomas' responsibilities include oversight and management of legal matters including corporate governance, healthcare regulatory compliance, commercial contracting, labor and employment, healthcare contracting (including managed care contracting), insurance and claims management, policy review, and supervision of litigation.  Ms. Thomas has also assisted with due diligence and definitive document drafting for numerous M&A and real estate and debt financing transactions.  In addition, she handles the day to day management of the KPC Group's real estate partnerships.  Ms. Thomas also serves as the Risk Manager and Chief Compliance Officer for Hemet Valley Medical Center and Menifee Valley Medical Center. Ms. Thomas graduated from Stanford University with a Bachelor of Arts in Economics and International Relations, and received her juris doctor degree from the University of the Pacific, McGeorge School of Law. |
| **John R. Collins**<br>*(Chief Financial Officer)* | Prior to his appointment as Chief Financial Officer for Strategic Global Management, Inc., John was the Chief Hospital Financial Officer (CHFO) for Physicians for Health Hospitals, Inc. (PHH, Inc.), comprised of two acute care hospitals, Hemet Valley Medical Center and Menifee Valley Medical Center, and a Chemical Dependency Program, Hemet Valley Recover Center and Sage Retreat. During his time at PHH John has been instrumental in a complete financial turnaround which improved revenue cycle management, financial controls, and improved treasury functions. At KPC, he now manages and analyzes company assets to improve on the overall competitiveness of the organization. Mr. Collins has more than 20 years of professional finance skills in a highly competitive marketplace for investor-owned as well as not for profit healthcare organizations and hospitals, and was the former CFO at Vanguard Health System facilities. |

20



EUREKA_045780

**JAE 1667**



# Industry Overview



CONFIDENTIAL

EUREKA_045781

# Industry Overview
### *Introduction*

## Executive Summary



| Key Industry Drivers |
|---|
| Healthcare Reform |
| Reimbursement Trends |
| Electronic Records |
| Personnel Shortages |
| # of Insured Patients |
| Aging Population |

❏ As a primary provider of healthcare in the United States, hospitals are expected to generate $935.6 billion in revenue in 2014 and $969.2 billion in 2015

❏ The healthcare industry is one of the largest industries in the United States, and continues to attract much legislative interest and public attention

❏ In 1965, Lyndon B. Johnson signed the Medicare and Medicaid programs into law.

  ○ Medicare was designed to provide health insurance for those aged 65 and older, including certain disabled peoples, and Medicaid (MediCal in California), was established to serve the health needs of the indigent

  ○ In 2009, legislation was signed to provide supplemental MediCal payments to hospitals with disproportional exposure to indigent patients

❏ In 2010, the U.S. Congress adopted and President Obama signed into law comprehensive reform legislation through the passage of the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act (collectively, "PPACA")

  ○ The goal was to extend health coverage to millions of uninsured legal residents through a combination of public program expansion and private sector health insurance reform

❏ Changes in the Medicare and Medicaid programs, enactment of the PPACA and other government healthcare programs, as well as hospital cost-containment initiatives by public and private payers, proposals to limit payments and healthcare spending, and industry-wide competitive factors greatly affect the healthcare industry

❏ Over the next few  years, the hospital industry will continue to face these challenges. IBISWorld expects industry revenue to increase at an average annual rate of 3.8% to $1.1 trillion during the five years to 2019.  In 2015 alone, revenue is forecast to grow 3.6%

22



CONFIDENTIAL

EUREKA_045782

**JAE 1669**

# Industry Overview
## Factors Effecting the Industry

### Medicare & Medicaid



*Federal funding for Medicare and Medicaid*

*Source: IBISWorld*

- Currently, MediCal reimburses based on a fee for service and a managed care component
- Managed care is a health care delivery system organized to manage cost, utilization, and quality. Medicaid managed care provides for the delivery of Medicaid health benefits and additional services through contracted arrangements between state Medicaid agencies and managed care organizations that accept a set per member per month (capitation) payment for these services
- Federal funding for Medicare and Medicaid is expected to increase slightly during 2015
- Planned cuts to Medicare Disproportionate Share Hospital payments, which provide compensation to providers who treat a disproportionate number of uninsured patients, are replaced by Quality Assurance Fee programs at the state level, matched by Federal funding

### Number of People with Private Health Insurance



*Source: IBISWorld*

- The enactment of the PPACA will help to decrease the number of uninsured individuals through employer mandates and individual requirements, which is expected to have a positive effect on the industry
- Individuals will be incentivized to enroll in coverage through the new health insurance marketplace as the PPACA requires individuals to maintain minimum coverage or be subject to a tax penalty starting in 2014
  - Due to this, the number of people with private health insurance spiked in 2014 before leveling off to a more normal % change in projected 2015 and 2016
- People covered by private health insurance typically use healthcare services more frequently and private health insurers often pay more for hospital procedures
- As more of the US population is covered by private health insurance, demand and spending on health services will rise helping the industry

23



CONFIDENTIAL

EUREKA_045783

# Industry Overview

*Factors Effecting the Industry*

**Electronic Health Record Incentive Program**



❑ The Industry is currently making a shift toward electronic health records as evident by the 2009 American Recovery and Reinvestment Act ("ARRA") which provides stimulus monies for hospitals and physicians that are meaningful users of electronic health records ("EHR") and imposes penalties on providers who are not meaningful users by the end of 2015

❑ For small operators in the Industry, shifting toward an electronic health record system can be very expensive as implementation of EHR systems can require a great deal of resources that many smaller Hospitals can't afford

❑ This risk is partially offset by hospitals in the industry that qualify for available EHR stimulus monies and can avoid penalties associated with failure to implement meaningful use of EHR systems

**CA Quality Assurance Fee**

 

❑ In October 2009, the Governor of California signed legislation supported by the hospital industry to impose a provider fee on general acute care hospitals that, combined with Federal matching funds, would be used to provide supplemental MediCal payments to hospitals with disproportional exposure to indigent patients ("QAF")

❑ Since its inception, the QAF program has garnered strong support at both the state and Federal levels and has been extended and renewed three times since the program's inception in 2009

❑ The initial QAF program provided payments for up to 21 months retroactive to April 2009 and expiring on December 31, 2010

❑ In December 2011, the Centers for Medicare and Medicaid Services ("CMS") gave final approval for the extension of the QAF for the 6 months period ending June 30, 2011

❑ In June 2012, the QAF program was approved by CMS for another 30 months retroactive to July 1, 2011 through December 31, 2013

24

**❈ EUREKA**

EUREKA_045784

**JAE 1671**

# Industry Overview
## *Industry Outlook*

**Industry Outlook**



☐ Over the next five years, hospitals are expected to face a wide variety of challenges, including ongoing healthcare reform changes, reimbursement volatility, electronic record implementation, and continued personnel shortages

☐ Healthcare reform will likely continue to increase the number of insured patients, which will boost revenue.  Other factors, such as the aging population, will also support revenue growth

☐ Rising labor costs will continue to pressure industry profitability. However, the increasing number of people with health insurance will help offset these effects

☐ Due to the pressures of healthcare reform, this traditionally fragmented industry has begun consolidating to combat the effects of the following

   ○ Increased IT expenses related to the Electronic Health Record Incentive Program

   ○ Recruiting and retaining qualified personnel

   ○ Combat competition from new facilities that deliver physician-run outpatient surgery centers, specialty hospitals and diagnostic centers



**Hospitals in the U.S. Industry Revenue**

*Source: IBISWorld*

25

**E U R E K A**

CONFIDENTIAL

EUREKA_045785

JAE 1672



# Financial Observations



CONFIDENTIAL

EUREKA_045786

# Financial Observations

## Historical Balance Sheet*

### Assets



### Liabilities & Equity

*2011-2013 financials are based on internal worksheets for the CPA audits excluding PCHI (the related real estate holding company) results.

27



EUREKA_045787

**JAE 1674**

# Financial Observations

## Working Capital & Capital Expenditures

**Debt-Free-Non-Cash Working Capital**

Definition:
(Current Assets minus Cash[1]) – (Current Liabilities minus Current Portion of Interest Bearing Debt)

**Cash CAPEX**

Definition:
Unfinanced expenditure for capital equipment, acquisition, etc.

28

## EUREKA

CONFIDENTIAL

EUREKA_045788

**JAE 1675**

# Financial Observations – BEFORE QAF

*Restructuring Initiatives*

| Item | Completely Implemented 12 mo Total | Improvements - Forecasted by Quarter | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jul-Sep '14 | Oct-Dec '14 | Jan-Mar '15 | Apr- Jun '15 | Jul-Sep '15 | Oct-Dec '15 | Jan-Mar '16 | Apr-Jun '16 |
| | | | | | | | | | |
| Total | | | | | | | | | |

30



CONFIDENTIAL

EUREKA_045790

**JAE 1677**

# Financial Observations – BEFORE QAF

### EBITDA Bridge FY2014-FY2015



31



CONFIDENTIAL

EUREKA_045791

**JAE 1678**

# Financial Observations – BEFORE QAF

### EBITDA Bridge FY2015-FY2016



32



CONFIDENTIAL

EUREKA_045792

**JAE 1679**

# Financial Observations – BEFORE QAF

**Projected Income Statement (Fiscal Year Ending March 31)**



| Revenue |
| Revenue Growth % |
| Adjusted EBITDA |
| Adj. EBITDA % |

## Revenue & Profitability

Definitions:
Gross Margin = Gross Profit/ Revenue

EBITDA = Pre-tax income plus depreciation and amortization and interest expenses.

33

**EUREKA**

CONFIDENTIAL

EUREKA_045793

**JAE 1680**

# Financial Observations - QAF

### Factors Effecting the Industry

**Timing of QAF Approval and Disbursements**





*Providing Leadership in Health Policy and Advocacy*

**Timing of QAF Approval and Disbursements**

 

- ❑ In 2013, the Governor of California signed legislation (Senate Bill 239) that would continue the QAF program for *36* months from January 1, 2014 through December 31, 2016 ("2016 QAF"), which covers the 2nd half of state fiscal year 2014 ("SFY 2014"), SFY 2015 & SFY 2016 and 1st half of SFY 2017

- ❑ The amount of the 2016 QAF for each hospital is calculated by California Hospital Association ("CHA"), an industry trade organization, based on each hospital's MediCal patient census in 2010

- ❑ CHA publishes these reimbursement estimates to all hospitals in California. Based on the analyses prepared by the CHA, the Company's total net reimbursement under this program for services performed from January 1, 2014 through December 31, 2016 is estimated to be ▮▮▮▮▮

- ❑ The QAF reimbursements can be segregated into 2 portions: (i) Fee-For-Service ("FFS") and (ii) Managed Care

- ❑ During December 2014, California Department of Healthcare Services received approval on the entire 2016 QAF program under Senate Bill 239 from Department of Health and Human Services of the Federal Government as well as the approvals on the inpatient and outpatient fee for service payments

- ❑ With these approvals, the state will start disbursing the FFS portion of the 2016 QAF. First FFS reimbursement is expected in Q1 of calendar 2015

- ❑ The Managed Care portion is subject to annual approval retroactively. Anticipated approval and receipt of Managed Care portion of the QAF funding is typically within 12 months after the end of the corresponding state fiscal year (i.e. by June 30, 2015 for funding related to SFY 2014)

34





# Financial Observations - QAF
### QAF Reimbursement

$ in Millions

| | Est. FFS QAF | Est. MC QAF | Est. QAF Fee | Est. CHFT | Net QAF Cash Proceeds |
|---|---|---|---|---|---|
| Collected During the Month of | | | | | |

■ 2016 QAF
■ 2013 QAF
■ 2011 QAF
■ 2010 QAF

7/31/2015
8/31/2015
9/30/2015
10/31/2015
11/30/2015
12/31/2015
1/31/2016
2/29/2016
3/31/2016
4/30/2016
5/31/2016
6/30/2016
7/31/2016
8/31/2016
9/30/2016
10/31/2016
11/30/2016
12/31/2016
1/31/2017
2/28/2017
3/31/2017
4/30/2017
5/31/2017
6/30/2017
7/31/2017
8/31/2017
9/30/2017
10/31/2017
11/30/2017
12/31/2017
1/31/2018
Total

FYE 3/31/2011  FYE 3/31/2012  FYE 3/31/2013  FYE 3/31/2014  FYE 3/31/2015

35

## EUREKA

CONFIDENTIAL
EUREKA_045795

**JAE 1682**

# Financial Observations - Summary

## Normalized Income Statement with QAF (Fiscal Year Ending March 31)

*(Dollars in Thousands)*

|  | Historical [1] | | | | | Projected [2] | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Mar-11 | Mar-12 | Mar-13 | Mar-14 | Mar-15 | Mar-16 | Mar-17 | Mar-18 | Mar-19 |
| **Net Revenue** |  |  |  |  |  |  |  |  |  |
| Less: Recognized QAF Income (rounded) |  |  |  |  |  |  |  |  |  |
| **Revenue before QAF** |  |  |  |  |  |  |  |  |  |
| Operating Expenses |  |  |  |  |  |  |  |  |  |
| Less: QAF Expenses (rounded) |  |  |  |  |  |  |  |  |  |
| Less: Operating Expense Adjustments [3] |  |  |  |  |  |  |  |  |  |
| **Adjusted EBIT before QAF** |  |  |  |  |  |  |  |  |  |
| *Margin* |  |  |  |  |  |  |  |  |  |
| Depreciation and Amortization |  |  |  |  |  |  |  |  |  |
| **Adjusted EBITDA before QAF** |  |  |  |  |  |  |  |  |  |
| *Margin* |  |  |  |  |  |  |  |  |  |
| Interest Expense (Income) |  |  |  |  |  |  |  |  |  |
| Other Expense (Income) |  |  |  |  |  |  |  |  |  |
| Add: Other Expense Adjustments |  |  |  |  |  |  |  |  |  |
| Total Other Expenses (Income) |  |  |  |  |  |  |  |  |  |
| **Adjusted Pre-Tax Income before QAF** |  |  |  |  |  |  |  |  |  |
| Adjusted EBITDA including QAF* | $40,575 | $15,290 | ($11,653) | $90,210 | $32,754 | $67,471 | $102,692 | $158,308 | $82,335 |

| Trends/Assumptions: | Mar-11 | Mar-12 | Mar-13 | Mar-14 | Mar-15 | Mar-16 | Mar-17 | Mar-18 | Mar-19 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue (No QAF) Growth |  |  |  |  |  |  |  |  |  |
| Adj. OPEX as a % of Revenue (No QAF) |  |  |  |  |  |  |  |  |  |
| Dep & Amort as % of Revenue (No QAF) |  |  |  |  |  |  |  |  |  |

*QAF Income and Expenses herein are recognized on accrual basis, not cash basis*

36



EUREKA_045796

**JAE 1683**

# Financial Observations - Summary

## EBITDA Adjustments(Fiscal Year Ending March 31)

*(Dollars in Thousands)*

|  | Mar-11 | Mar-12 | Mar-13 | Mar-14 | Mar-15 | Mar-16 | Mar-17 | Mar-18 | Mar-19 |
|---|---|---|---|---|---|---|---|---|---|
| Legal Settlement Expenses [1] | - | - | - |  |  |  |  |  |  |
| Legal Appeal Contingency [2] | - | - | - |  |  |  |  |  |  |
| Severance Expense [3] | - | - | - |  |  |  |  |  |  |
| ESOP-Related Professional Fees [4] | - | - | - |  |  |  |  |  |  |
| Discretionary Consulting Fee [5] | - | - | - |  |  |  |  |  |  |
| Reclassify: EHR Income from Other Income | - | - | - |  |  |  |  |  |  |
| Reclassify: Bank Charges to Interest Expense | - | - | - |  |  |  |  |  |  |
| Management Fee [6] | - | - | - |  |  |  |  |  |  |
| Total Operating Expense Adjustment | - | - |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
| Reclassify: EHR Income from Other Income |  |  |  |  |  |  |  |  |  |
| Reclassify: Bank Charges to Interest Expense |  |  |  |  |  |  |  |  |  |
| Total Other Expense Adjustment |  |  |  |  |  |  |  |  |  |

**Notes:**

NA = Data Not Available

YTD = Year To Date

FYE = Fiscal Year End

[1] Settlement expenses incurred relating to extraordinary litigation

[2] In March 2015, Company accrued a legal contingency reserve relating to an extraordinary litigation

[3] Extraordinary severance expenses incurred due to the cost cutting initiatives in FY2015

[4] Professional fees incurred are relating to the contemplated ESOP transaction

37

**EUREKA**

EUREKA_045797

**JAE 1684**



# ESOP Transaction Structure



CONFIDENTIAL

EUREKA_045798

## ESOP Transaction
*Preliminary Valuation Analysis Summary*

*(Dollars in Thousands, Except Per Share Value)*

| Indicated Enterprise Value from Operations | Concluded |
|---|---|
| Discounted Cash Flow Analysis | |
| Guideline Public Company Method | |
| Comparable Acquisitions Method | |
| **Indicated Enterprise Value from Operations (Rounded)** | |
|    Add: Cash | |
|    Add: Present Value of 2016 QAF | |
|    Add: Notes Receivable | |
| **Indicated Enterprise Value** | |
|    Less: Interest Bearing Debt | |
|    Less: Working Capital Deficit | |
| **Indicated Equity Value, Control Basis, Fully Marketable** | |
|    Discount for Lack of Marketability @ 5.0% | |
| **Indicated Equity Value, Control Basis, Rounded** | |

39



CONFIDENTIAL

# ESOP Transaction

*Transaction Funding*

### Sources & Uses

☐ Transaction Value is still being negotiated

☐ Reserves at closing will be trued up prior to closing based on actual revolver balance and transaction fee amounts

| Amount of Financing: | | Transaction Assumptions: | |
|---|---|---|---|
| QAF Term Loan | ███████ | Transaction Value - Net of Exercise Price | ███████ |

| Sources: | Amounts | Uses: | Amounts |
|---|---|---|---|
| QAF Term Loan (Funded) | ███████ | Warrant Redemption - Cash | ███████ |
| Jr. Sub Seller Note | ███████ | Warrant Redemption - Notes | ███████ |
| | | Transaction Funding - Cash | ███████ |
| | | Transaction Funding - Notes | ███████ |
| | | Various Reserves at Closing | ███████ |
| **Total** | ███████ | **Total** | ███████ |

40


❈ EUREKA

**JAE 1687**

# ESOP Transaction

### Transaction Parameters – Subject to Negotiation with the ESOP Trustee

## Summary

*$20.5 million is assumed for various reserves at closing for fees, revolver pay down and term loan P&I*

*Assumed Closing Date = 7/31/2015*

- ❏ 100% of KPC equity value on a control basis and net of exercise price of warrants is estimated at ▮▮▮▮▮▮
- ❏ KPC will obtain the following credit facilities to fund the Transaction (excluding the line of credit for operations):
    - ◇ ▮▮▮▮▮▮ of QAF Term Loan
    - ◇ ▮▮▮▮▮▮ of 1-day bridge loan
- ❏ KPC will redeem the warrants held by Mr. Thomas, SCPC Group, LLC, and SCPC Group IV, LLC ("Warrant Holders") for ▮▮▮▮▮▮
- ❏ KPC will cancel warrants held by Dr. Chaudhuri, and KPC Resolution Company, LLC, of which Dr. Chaudhuri is the sole member
- ❏ KPC will split its outstanding common stock from ▮▮▮▮▮▮
- ❏ From the financing proceeds KPC will lend ▮▮▮▮▮▮ to a newly created ESOP in exchange for a promissory note ("Inside Loan")
- ❏ ESOP will purchase all of the outstanding common stock for ▮▮▮▮▮▮ from Dr. Chaudhuri
- ❏ Dr. Chaudhuri and the Warrant Holders will collectively lend ▮▮▮▮▮▮ to KPC in exchange for jr. subordinated notes ("Seller Notes") with warrants ("Warrants") enabling the Company to repay the ▮▮▮▮▮▮
- ❏ Dr. Chaudhuri is eligible to elect a 1042 tax deferral strategy on all of his transaction proceeds
- ❏ KPC will minimize C-Corp income taxes using transaction debt interest expense, "cashless" deductions  consisting of ESOP contributions and possibly tax-deductible dividends up to ▮▮▮▮▮▮ while it is a C-Corp
- ❏ KPC will elect S-Corp status, change its fiscal year to 8/1/2015, and operate as a tax-exempt entity thereafter (other than a 1.5% CA S-Corp tax)

41



CONFIDENTIAL



CONFIDENTIAL

EUREKA_045802

## ESOP Transaction
### ESOP Purchase Funds Flow



43

CONFIDENTIAL

EUREKA_045803

**JAE 1690**



# ESOP Transaction Financing



CONFIDENTIAL

EUREKA_045804

# ESOP Credit Facility Terms

**Facility Term Overview**



☐ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

☐ The ▇▇▇▇▇ QAF Term Loan will carry the following terms:

- ○ ▇▇▇▇▇▇ interest rate
- ○ ▇▇▇▇▇▇
- ○ Issued at ▇▇
- ○ ▇▇ maturity
- ○ ▇▇▇▇▇▇▇▇▇▇▇
- ○ Debt service reserve account o▇▇▇▇▇ 6 months P&I)

☐ Amortization of the QAF Term Loan will be comprised of:

- ○ ▇▇ annual amortization
- ○ ▇▇▇▇▇▇▇▇
- ○ ▇▇▇▇▇▇▇▇
- ○ ▇▇▇▇

☐ The Jr. Subordinated Notes are expected to carry the following terms (subject to trustee and other approvals):

- ○ Cash coupon equaling ▇▇▇▇▇▇
- ○ ▇▇▇▇▇▇▇▇
- ○ ▇▇▇▇
- ○ ▇▇▇▇

45

## EUREKA

**JAE 1692**



# Post Transaction



CONFIDENTIAL

## Post Transaction
### Repayment of Debt Funds Flow



47



CONFIDENTIAL

EUREKA_045807

**JAE 1694**



# Deal Considerations



CONFIDENTIAL

EUREKA_045808

# ESOP Transaction
## *Underwriting Considerations*

| Company | Cash Flow | Collateral | Capital Structure |
|---------|-----------|------------|-------------------|
| Long-standing hospitals with strong community ties | Strong operating cash flow before QAF | Approximately ▉ of net proceeds from the 2016 QAF to be received by KPC | The majority of the transaction proceed are in a deeply subordinated note ("friendly" creditor) |
| Excellent management team with a proven track record | Under-exploited revenue generation and cost saving opportunities | ▉ n Accounts Receivable | Projected cash flow and tax savings will allow rapid deleveraging post-Transaction |
| ESOP will improve labor relations which is critical to operations | High certainty of receiving 2016 QAF funding | ▉ n inventory | |
| ESOP structure aligns the interests of management, employees, and creditors | ESOP structure enhances cash flow to allow accelerated debt repayment using pre-tax income | Pledge of borrower stock owned by the ESOP is available to the lender | |

49





# Next Steps



CONFIDENTIAL

EUREKA_045810

# Next Steps

**Key Milestones**

- ❑ Board approves ESOP Implementation – Done
- ❑ Board engages Trustee team – Done
- ❑ Trustee Due Diligence Kick-Off – Done
- ❑ Submit LOI to Trustee – Done
- ❑ Trustee Negotiation – By July 20, 2015
- ❑ Lender Documentation – In Process
- ❑ Closing – On or before July 31, 2015

**Professionals Involved**

- ❑ Sell Side
  - ○ Selling Shareholder, Board of Directors, Key Management
  - ○ KPC Financial Advisor – Eureka Capital
  - ○ Corporate Legal Counsel – Holzman & Horner + Loeb & Loeb
  - ○ TPA/ ESOP Consultant (TBD)
- ❑ Buy Side
  - ○ Trustee (Alerus Financial)
  - ○ Trustee Financial Advisor (Stout Risius Ross)
  - ○ Trustee Counsel (K&L Gates)
- ❑ Lender
  - ○ Lenders – Credit Suisse Park View BDC, Inc. and a group of lenders satisfactory to CSPV and the Company
  - ○ Lender Legal Counsel – Orrick, Herrington & Sutcliffe LLP
  - ○ Lender Diligence Professionals – FTI Consulting (QofE) and Marwood Group (Industry)

51



CONFIDENTIAL

EUREKA_045811

**JAE 1698**