MORGAN, LEWIS & BOCKIUS LLP
Aimee Mackay, Bar No. 221690
aimee.mackay@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
Tel:   +1.213.612.2500
Fax:   +1.213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
Sari Alamuddin (admitted *pro hac vice*)
sari.alamuddin@morganlewis.com
Deborah Davidson (admitted *pro hac vice*)
deborah.davidson@morganlewis.com
110 N. Wacker Drive
Chicago, IL 60606-1511
Tel: +1.312.324.1000
Fax: +1.312.324.1001

Attorneys for Defendant
SPCP GROUP, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE GAMINO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SPCP GROUP, LLC,<br><br>Defendant.<br><br>and<br><br>KPC HEALTHCARE INC. EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>Nominal Defendant. | Case No. 5:20-cv-01126-SB-SHK [Consolidated Case Number]<br><br>**EXHIBITS TO JOINT APPENDIX OF EVIDENCE RE: MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: August 5, 2022<br>Time:  8:30 am<br>Judge:  Hon. Stanley Blumenfeld, Jr.<br>Ctrm:  6C |

# JAE  PART 5 OF 5
# EXHIBITS 35-51

# Exhibit 35

JAE 1699

**From:**     Thomas Banks [tbanks@silverpointcapital.com]
**Sent:**     9/1/2015 8:36:20 AM
**To:**       Ian Carvalho [icarvalho@silverpointcapital.com]; Andrew Margius [amargius@silverpointcapital.com]
**Cc:**       Foster Perlmutter [fperlmutter@silverpointcapital.com]
**Subject:**  RE: IHHI - Updated Marks

They sold the company to an ESOP and had to take us out in order to do it.  We were a very small part of the deal.

**From:** Ian Carvalho
**Sent:** Tuesday, September 01, 2015 11:36 AM
**To:** Andrew Margius; Thomas Banks
**Cc:** Foster Perlmutter
**Subject:** RE: IHHI - Updated Marks

What made the company so eager to take out our warrants at this time? I had been under the impression that they really had no reason to.

Thanks



**Ian Carvalho**
Silver Point Capital | Two Greenwich Plaza, Greenwich, CT 06830
P: 203-542-4232 | C: 203-312-3105 | F: 203-542-4332
icarvalho@silverpointcapital.com

**From:** Andrew Margius
**Sent:** Tuesday, September 01, 2015 11:28 AM
**To:** Ian Carvalho
**Cc:** Thomas Banks; Arbab Khalid
**Subject:** IHHI - Updated Marks

Ian,

Please see attached the updated marks for IHHI.

Thanks,
Andy



**Andrew Margius**
Silver Point Capital | Two Greenwich Plaza, Greenwich, CT 06830
P: 203-542-4203 | C: 203-309-2283 | F: 203-542-4303
amargius@silverpointcapital.com

CONFIDENTIAL

SPCP_0000022179

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# Exhibit 36

1   MORGAN, LEWIS & BOCKIUS LLP
    Aimee Mackay, Bar No. 221690
2   aimee.mackay@morganlewis.com
    300 South Grand Avenue
3   Los Angeles, CA 90071-3132
    Tel: +1.213.612.2500
4   Fax: +1.213.612.2501

5   MORGAN, LEWIS & BOCKIUS LLP
    Sari Alamuddin (admitted *pro hac vice*)
6   sari.alamuddin@morganlewis.com
    Deborah Davidson (*pro hac vice* to be filed)
7   deborah.davidson@morganlewis.com
    110 N. Wacker Drive
8   Chicago, IL 60606-1511
    Tel: +1.312.324.1000
9   Fax: +1.312.324.1001

10
    Attorneys for Defendant
11  SPCP GROUP, LLC

12          UNITED STATES DISTRICT COURT
13          CENTRAL DISTRICT OF CALIFORNIA

14  DANIELLE GAMINO, individually and on      Case No. 5:21-cv-01466-SB-SHK
    behalf of all others similarly situated,   (consolidated with Case No. 5:20-
15                                              cv-01126-SB-SHK)
                    Plaintiff,
16                                             **DEFENDANT'S RESPONSES**
                    vs.                        **TO PLAINTIFF'S FIRST SET**
17                                             **OF REQUESTS FOR**
    SPCP GROUP, LLC,                           **ADMISSION**
18
                    Defendant, and
19
    KPC HEALTHCARE, INC. EMPLOYEE
20  STOCK OWNERSHIP PLAN,

21                  Nominal Defendant.

22  PROPOUNDING PARTY:        Plaintiff, Danielle Gamino

23  RESPONDING PARTY:         Defendant, SPCP Group, LLC

24  SET NUMBER:               One (1)

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

DEFENDANT'S RESPONSES TO FIRST
SET OF RFAs,; NO. 5:21-CV-01466-SB-SHK

**JAE 1702**

1  Pursuant to Rule 33 of the Federal Rules of Civil Procedure ("FRCP") and the

2  Local Rules of the United States District Court for the Central District of California,

3  Defendant SPCP Group, LLC ("Defendant" or "SPCP") hereby answers, objects, and

4  otherwise responds to Plaintiff Danielle Gamino's ("Plaintiff" or "Gamino") First Set

5  of Requests for Admission, as follows:

6  <u>**GENERAL OBJECTIONS**</u>

7  The following General Objections apply to each and every applicable Request,

8  and are incorporated by reference into each and every applicable Response as if set

9  forth in full in each such numbered Response.

10  1.  The Responses are made solely for the purpose of the above-captioned

11  action and are not to be used in connection with any other action.

12  2.  Defendant's discovery, internal investigation, and preparation for trial

13  are not complete as of the date of this response.  Consequently, the Responses set

14  forth below represent Defendant's present knowledge, based on discovery,

15  investigation, and trial preparation to date.  Defendant anticipates that discovery and

16  investigation will reveal new or additional information, including facts, documents,

17  witnesses, or legal theories not presently known to it, but upon which it may rely in

18  support of its contentions in this action.  The Responses contained herein shall not

19  preclude Defendant from introducing evidence based on subsequently discovered

20  information.

21  3.  Defendant will make reasonable efforts to respond to every Request, to

22  the extent the Request has not been objected to, as Defendant understands and

23  interprets the Request.   In the event that Plaintiff subsequently asserts an

24  interpretation of a Request that differs from that of Defendant, Defendant reserves

25  the right to amend and/or supplement its Response, but undertakes no obligation to

26  do so.

27  4.  Defendant objects to each Request to the extent it calls for information

28  subject to a claim of privilege, including, but not limited to, the attorney-client

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Los Angeles

2

DEFENDANT'S RESPONSES TO FIRST
SET OF RFAs,; NO. 5:21-CV-01466-SB-SHK

JAE 1703

privilege or the work-product doctrine.  Defendant hereby claims the attorney-client privilege and invokes the work-product doctrine for any information protected by either or both of such privileges.

5.     Defendant objects to each of Plaintiff's Requests to the extent that they seek information protected by the constitutional, statutory, or common law right of privacy of any person.

6.     Defendant objects to all Requests to the extent they seek information that is not in Defendant's possession or control, has been previously disclosed, or is equally within the Plaintiff's possession or control.

7.     Defendant's Responses to these Requests are not admissions that such information is relevant or admissible evidence.  Defendant reserves the right to object to the admission of such information on any grounds at time of trial.

Subject to and without waiving these General Objections, Defendant responds as follows:

**RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSIONS**

**REQUEST FOR ADMISSION NO. 1:**

Admit that you sold a common stock warrant to KPC on August 28, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the consideration you received for the common stock warrant you sold to KPC on August 28, 2015, included $█████████ in cash.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit.

MORGAN, L W S &
BOCK US LLP
A  ORNEYS A   AW
OS ANGELIS

3

DEFENDANT'S RESPONSES TO FIRST
SET OF RFAs,; NO. 5:21-CV-01466-SB-SHK

**JAE 1704**

**REQUEST FOR ADMISSION NO. 3:**

Admit that the consideration you received for the common stock warrant you sold to KPC on August 28, 2015, included a promissory note in the original principal amount of ▉▉▉▉▉.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that you are still in possession of the promissory note that you received as partial consideration for the common stock warrant you sold to KPC on August 28, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Defendant incorporates and asserts the General Objections set forth above. Defendant further objects to this Request on the ground that the word "possession" renders the Request vague and ambiguous. Subject to and without waiving those objections, Defendant responds as follows: Admit that Defendant owns the promissory note described in this Request, and possesses an electronic copy of same. Except as expressly admitted herein, Denied.

**REQUEST FOR ADMISSION NO. 5:**

Admit that the consideration you received for the common stock warrant you sold to KPC on August 28, 2015, included a warrant to purchase ▉▉▉ shares of KPC at an exercise price of ▉▉ per share.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Denied.

**REQUEST FOR ADMISSION NO. 6:**

Admit that you are still in possession of the warrant that you received as partial consideration for the common stock warrant you sold to KPC on August 27, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Defendant incorporates and asserts the General Objections set forth above. Defendant further objects to this Request on the ground that the word "possession" renders the Request vague and ambiguous.  Subject to and without waiving those objections, Defendant responds as follows: Admit that Defendant owns the warrant described in this Request and possesses electronic copies of certain documents evidencing Defendant's ownership of the warrant.  Except as expressly admitted herein, denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the consideration you received for the common stock warrant you sold to KPC on August 28, 2015, included ███ of any net payments received by KPC or its subsidiaries under California's hospital quality assurance fee (QAF) program based on services provided from January 1, 2017, to December 31, 2024.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 8:**

Admit that you are still in possession of the QAF rights that you received as partial consideration for the common stock warrant you sold to KPC on August 28, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Defendant incorporates and asserts the General Objections set forth above. Defendant further objects to this Request on the ground that the word "possession" renders the Request vague and ambiguous.  Subject to and without waiving those

objections, Defendant responds as follows: Admit that Defendant owns the QAF rights described in this Request.  Except as expressly admitted herein, Denied.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the consideration you received for the common stock warrant you sold to KPC on August 28, 2015, did not include anything of value except: (a) $███████ in cash; (b) a promissory note in the original principal amount of $███████; (c) a warrant to purchase ██████ shares of KPC at an exercise price of $███ per share; and (d) ██████ of any net payments received by KPC or its subsidiaries under California's hospital quality assurance fee (QAF) program based on services provided from January 1, 2017, to December 31, 2024.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, as well as the specific objections set forth in Defendant's responses to Requests 1 through 8, Defendant responds as follows: Admit that the consideration Defendant received for the common stock warrant it sold to KPC on August 28, 2015, included items (a), (b), and (d) above, but deny that it included point (c) as described above.  Except as expressly admitted herein, Denied.

//
//
//
//

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

DEFENDANT'S RESPONSES TO FIRST
SET OF RFAs,; NO. 5:21-CV-01466-SB-SHK

JAE 1707

1    Dated: March 8, 2022            MORGAN, LEWIS & BOCKIUS LLP

2

3                            By: _____

4                              Aimee Mackay
                                Sari Alamuddin (admitted *pro hac vice*)

5                                 Deborah Davidson (*pro hac vice* to be filed)

6

7                                 Attorneys for Defendant
                                SPCP Group, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

DEFENDANT'S RESPONSES TO FIRST
SET OF RFAs.: NO. 5:21-CV-01466-SB-SHK

JAE 1708

# CERTIFICATE OF SERVICE

I, Denise D. Brown, declare:

I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 300 South Grand Ave., Los Angeles CA 90071-3132.  On March 8, 2022, I served a copy of the within document(s)

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION**

☒      by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☒      by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

R. Joseph Barton
Colin M. Downes
**BLOCK & LEVITON LLP**
1735 20th Street NW
Washington, DC 20009
Email: *jbarton@blockleviton.com*
Email: *colin@blockleviton.com*

Daniel Feinberg
Darin Ranahan
Nina Wasow
**FEINBERG JACKSON**
2030 Addison Street, Suite 500
Berkeley, CA 94704
Email: *dan@feinbergjackson.com*
Email: *darin@feinbergjackson.com*
Email: *nina@feinbergjackson.com*

Lars C. Golumbic
Sarah M. Adams
Shaun A. Gates
Rachael E. Hancock
William J. Delany
**GROOM LAW GROUP**
1702 Pennsylvania Ave NW
Washington, DC 20006
Email: *lgolumbic@groom.com*
Email: *sadams@groom.com*
Email: *sgates@groom.com*
Email: *rhancock@groom.com*
Email: *wdelany@groom.com*

Morgan, L w s &
Bock us LLP
A  orneys a  aw
os Angeles

8

DEFENDANT'S RESPONSES TO FIRST SET OF RFAs,; NO. 5:21-CV-01466-SB-SHK

**JAE 1709**

Richard E. Donahoo
Sarah L. Kokonas
William E. Donahoo
**DONAHOO & ASSOCIATES, P.C.**
440 W. First Street, Suite 101
Tustin, CA 92780
Email: *rdonahoo@donahoo.com*
Email: *skokonas@donahoo.com*
Email: *wdonahoo@donahoo.com*

Theodore M. Becker
Julian L. Andre
Christopher Braham
Laurie Baddon
**MCDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
Email: *tbecker@mwe.com*
Email: *jandre@mwe.com*
Email: *cbraham@mwe.com*
Email: *lbaddon@mwe.com*

Andrew J. Waxler
**KAUFMAN DOLOWICH & VOLUCK LLP**
11755 Wilshire Blvd., Suite 2400
Los Angeles, CA 90025
Email: *awaxler@kdvlaw.com*

Major Khan
**MKLLC LAW**
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Email: *mk@mk-llc.com*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on March 8, 2022, at Los Angeles, California. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

*Denise D. Brown*
Denise D. Brown

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL
(ENTIRE DOC. SEALED)**

# Exhibit 37

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL**

# Exhibit 38

**From:** Bill Thomas [bthomas@GlobalMSO.com]
**Sent:** 8/25/2015 6:24:45 AM
**To:** Thomas Banks [tbanks@silverpointcapital.com]
**Subject:** Re: Revision to investor rights agreement


Yes and no

The initial board will be kali, Priyo and I. We will add two independents

Although it is likely board control will remain with kali so long as his note is outstanding that is not a legal certainty

The trustee retains discretionary power at all times to vote the stock as it sees fit. We're told if you require the trustee to vote for our nominees then we have taken on erisa fiduciary duties to the ESOP beneficiaries so we don't want to do that

We're advised in practice the trustee will have little or no incentive to exercise this power to replace our nominees, particularly if the business is doing well but for kali he would like to be 100% certain that an irresponsible trustee won't vote in a rogue board which puts senior debt in front of his seller note

It's a remote circumstance but he's owed a lot of money and wants belt and suspenders

Happy to discuss further

> On Aug 25, 2015, at 6:03 AM, Thomas Banks <tbanks@silverpointcapital.com> wrote:

>

> Thanks for the email Bill. Is the current intent that Dr. Chaudhuri, Prio and Suzanne will not be on the board? I thought they had this right as long as the seller debt was outstanding.

>

> Tom

>

> -----Original Message-----

> From: Bill Thomas [mailto:bthomas@GlobalMSO.com]

> Sent: Tuesday, August 25, 2015 1:26 AM

> To: Thomas Banks

> Cc: kpeglobal@gmail.com

> Subject: Revision to investor rights agreement

>

>

>

> To be able to sleep at night, dr Chaudhuri has negotiated new 8.4 of the investor rights agreement requiring his consent if the company proposes to incur senior debt other than the revolver that could prime his seller note

>

> It reduces his rate of return from ▮▮ to ▮▮▮ meaning his warrants are reduced from a projected value of ▮▮ to ▮▮

>

> Silverpoint is offered the same deal if you would like a similar consent right. I'm told it would reduce the value of your warrants about ▮▮▮

>

> Need to decide tomorrow in order to timely close

>

> Happy to discuss

> This e-mail and any file(s) transmitted with it may contain confidential and/or privileged information. Nothing contained in this e-mail and/or any file(s) transmitted with it constitutes a solicitation or an offer to buy or sell any securities. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient (or have received this email in error), please notify the sender immediately and delete this e-mail without making a copy. If this e-mail is misdirected, Silver Point Capital, L.P. and its affiliates do not waive confidentiality or any privilege.

**JAE 1759**

# Exhibit 39

| From: | Lin Chen [lchen@silverpointcapital.com] |
|---|---|
| Sent: | 3/5/2015 10:39:36 AM |
| To: | Thomas Banks [tbanks@silverpointcapital.com] |
| CC: | James Kasmarcik [jkasmarcik@silverpointcapital.com] |
| Subject: | RE: IHHI |

Here you go.

| | |
|---|---|
| TEV | $170 |
| Less: debt | (40) |
| **Equity value from operating business** | $130 |
| Cash from warrant exercise | 32 |
| **Total value to equity** | $162 |
| Fully diluted shares | 41 |
| **Price per share** | **$3,961,912** |
| Less: warrant exercise cost per share | (945,000) |
| **Value per warrant** | **$3,016,912** |
| # of warrants | 7.1 |
| **Total warrant value ($ MM)** | **$21.5** |
| **Current warrant value ($ MM)** | **$5.9** |
| *Total PnL impact* | *$15.5* |



**Lin Chen**
Silver Point Capital | Two Greenwich Plaza, Greenwich, CT 06830
P: 203-542-4051 | F: 203-542-4151 | C: 404-918-5458
lchen@silverpointcapital.com

**From:** Thomas Banks
**Sent:** Thursday, March 05, 2015 1:37 PM
**To:** Lin Chen
**Cc:** James Kasmarcik
**Subject:** RE: IHHI

Pls take the 38MM QAF out and add the PNL impact

**From:** Lin Chen
**Sent:** Thursday, March 05, 2015 1:30 PM
**To:** Thomas Banks
**Subject:** IHHI

Tom,

I'm sure you're aware this is substantially higher than the equity value we'd previously ascribed to the operating business (+$100MM.)

Here is the build-up on the math. I'm assuming you're EV is only for the operating business. The mark is currently $835K (compare w/ "Value per warrant".)

CONFIDENTIAL

**JAE 1761**

SPCP_0000029612

| | |
|---|---|
| TEV | 170 |
| Less: debt | (40) |
| Equity value from operating business | 130 |
| PV of QAF payments | 38 |
| Cash from warrant exercise | 32 |
| **Total value to equity** | **200** |
| Fully diluted shares | 41 |
| **Price per share** | **$4,889,531** |
| Less: warrant exercise cost per share | (945,000) |
| **Value per warrant** | **$3,944,531** |
| # of warrants | 7.1 |
| **Total warrant value ($ MM)** | **$28.0** |
| **Value per warrant (pre-split equiv)** | **$0.292** |

Let me know if you have any questions.

Thanks,
Lin



**Lin Chen**
Silver Point Capital | Two Greenwich Plaza, Greenwich, CT 06830
P: 203-542-4051 | F: 203-542-4151 | C: 404-918-5456
lchen@silverpointcapital.com

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL**

# Exhibit 40



# KPC Healthcare Holdings, Inc.

## Analysis of Transaction Fairness

**Issued: August 28, 2015**





CONFIDENTIAL

STOUT_0000016

**[This page is intentionally left blank.]**

CONFIDENTIAL

STOUT_0000017

*For more information, please contact one of the following members of the engagement team:*

| Mark R. Fournier, CFA | Joseph D. Demetrius, CFA | Vikram Sinnathamby |
|---|---|---|
| Managing Director | Vice President | Associate |
| (703) 848-4946 | (703) 848-4956 | (703) 848-4948 |
| mfournier@srr.com | jdemetrius@srr.com | vsinnathamby@srr.com |



**STOUT | RISIUS | ROSS**

Atlanta | Baltimore | Chicago | Cleveland | Dallas | Denver | Detroit | Houston | Los Angeles | New York | Tysons Corner | Washington, D.C.

**www.srr.com**

CONFIDENTIAL

STOUT_0000018

**JAE 1766**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Transaction Overview | 6 |
| III. | Company Overview | 15 |
| IV. | Economic and Industry Outlook | 25 |
| V. | Financial Statement Analysis | 36 |
| VI. | Valuation Methodology | 49 |
| VII. | Guideline Company Method | 53 |
| VIII. | Transaction Method | 60 |
| IX. | Discounted Cash Flow Method | 65 |
| X. | Valuation Reconciliation and Conclusion | 72 |
| XI. | Fairness Analysis | 76 |
| XII. | Opinion | 85 |



- i -



**JAE 1767**

## APPENDICES

**Appendix A**..................................................................................................................Valuation Exhibits

**Appendix B**..........................................................................................................................IRR Exhibits

**Appendix C**........................................................................................Guideline Company Descriptions

**Appendix D**......................................................................................Guideline Transaction Descriptions

**Appendix E**...................................................................................................................... Control Premium

**Appendix F**................................................................................................Discount for Limited Marketability

**Appendix G**......................................................................................Assumptions and Limiting Conditions

**Appendix H**..................................................................................................Statement of Qualifications



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000020

**JAE 1768**

# Section I
# Introduction



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000021

**JAE 1769**

## I.   INTRODUCTION

### Description of the Engagement

- Stout Risius Ross, Inc. ("SRR") has been retained by Alerus Financial, N.A., not in its corporate capacity, but solely in its capacity as the trustee (the "Trustee") of the KPC Healthcare, Inc. Employee Stock Ownership Trust (the "Trust"), which forms a part of the KPC Healthcare, Inc. Employee Stock Ownership Plan (the "Plan," together with the Trust are collectively referred to herein as the "ESOP"), to evaluate the opinions set forth below.

- Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Stock Purchase Agreement (the "Stock Purchase Agreement") by and among KPC Healthcare Holdings, Inc., a California corporation ("KPC" or the "Company"), the Trustee, on behalf of the Trust, and Dr. Kali Pradip Chaudhuri (the "Seller"), dated as of August 28, 2015 (the "Transaction Date").

In our capacity as the Trustee's independent financial advisor, the Trustee has specifically asked us to render a written opinion (the "Opinion") as to whether:

- the consideration to be paid by the ESOP for the shares of KPC common stock pursuant to the terms of the Stock Purchase Transaction (defined herein) is not greater than the Fair Market Value of such shares;

- the interest rates on each of the ESOP Loans (defined herein) are not in excess of reasonable rates;

- the financial terms of each of the ESOP Loans (defined herein) are at least as favorable to the ESOP as would be the terms of comparable loans resulting from arm's-length negotiations between independent parties;

- The strike price of the Warrants (defined herein), on a per share basis, is equal to at least 90% of the Fair Market Value of one share of the underlying common stock of the Company on the date the Warrant (defined herein) is issued; and

- the terms and conditions of the Transactions (defined herein), taken as a whole, are fair to the ESOP from a financial point of view.

### Standard of Value

- In accordance with Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i)) (the "Proposed Regulation"), the term "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties being able, as well as willing, to trade and being well-informed about the asset and the market for the asset.



- 2 -

Valuation & Financial Opinions  **SRR** STOUT | RISIUS | ROSS

**JAE 1770**

# I. INTRODUCTION

## Factors Considered

We considered the following factors in performing our analysis:

- The nature of the business and the history of the Company from its inception;
- The economic outlook in general and the condition and outlook of the industry in which the Company operates;
- The book value of the stock and the financial condition of the Company;
- The earning capacity of the Company;
- The dividend-paying capacity of the Company;
- Whether goodwill or other intangible value exists within the Company;
- Previous sales of the Company's stock and the size of the block of stock to be valued; and
- The market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Sources of Information

In connection with this analysis, we made such reviews, analyses, and inquiries as we deemed necessary and appropriate under the circumstances. The principal sources of information used in performing our analysis included, but were not limited to:

- KPC Healthcare, Inc.'s internally prepared financial statements for the fiscal years ended March 31, 2010 through March 31, 2013;
- Integrated Healthcare Holdings, Inc.'s (a predecessor of KPC Healthcare, Inc.) 10-K filings with the U.S. Securities and Exchange Commission for the fiscal years ended March 31, 2010 through March 31, 2013;
- KPC Healthcare, Inc.'s financial statements for the fiscal years ended March 31, 2014 and March 31, 2015, audited by BDO USA, LLP;
- KPC Healthcare, Inc.'s internally prepared interim financial statements for the three-month periods ended June 30, 2014 and June 30, 2015;
- KPC Healthcare, Inc.'s projected financial statements for the fiscal years ending March 31, 2016 through March 31, 2019, prepared by Company management;
- certain schedules detailing net payments receivable by the Company pursuant to the 2016 QAF Program (defined herein);



- 3 -



Valuation & Financial Opinions

JAE 1771

## I.  INTRODUCTION

- a document titled "Future of the Quality Assurance Program", prepared by Company management;
- the ESOP Transaction Profile, prepared by Eureka Capital Markets, LLC ("Eureka"), dated April 2015;
- certain amendments related to the ESOP Transaction Profile, prepared by Eureka;
- the Project Solus Revised Summary of Terms, prepared by Credit Suisse, dated May 7, 2015;
- the Project Solus Medicare and Medicaid Analysis for Hospital Provider in California, prepared by Marwood Group Advisory, LLC, dated July 8, 2015;
- the Letter of Intent & Summary Term Sheet, dated August 3, 2015;
- the Subordinated Debt Offering & Detachable Warrants Term Sheet, dated August 3, 2015;
- the Stock Purchase Agreement;
- a draft of the Credit Agreement among KPC, KPC Healthcare, Inc., the Lenders, Wilmington Trust, N.A., and Credit Suisse Park View BDC, Inc., dated August 24, 2015;
- a draft of Amendment No. 2 to the Amended and Restated Credit and Security Agreement, dated August 26, 2015;
- the Warrant Purchase Agreement among the Company and SPCP Group, LLC, dated August 28, 2015;
- the Warrant Purchase Agreement among the Company and William E. Thomas, dated August 28, 2015;
- the Warrant Cancellation and Release Agreement, among the Seller, KPC Resolution Company, LLC, KPC, and the Subsidiary, dated August 28, 2015;
- the KPC Healthcare Holdings, Inc. Subscription Agreement, by and between KPC, the Seller, and Redeemed Warrantholders;
- the forms of the Subordinated Promissory Note;
- the forms of the Warrant to Purchase Shares of Common Stock;
- the Investor Rights Agreement among the Trust, the Seller, the Redeemed Warrantholders, and KPC Healthcare, Inc., dated August 28, 2015;
- the Company ESOP Credit Agreement by and between the ESOP and KPC, dated August 28, 2015;
- the Company ESOP Loan ESOP Non-Recourse Promissory Note by and between the ESOP and KPC, dated August 28, 2015;
- the Company ESOP Pledge Agreement by and between the ESOP and KPC, dated August 28, 2015;
- the Seller ESOP Credit Agreement by and between the ESOP and the Seller, dated August 28, 2015;
- the Seller ESOP Loan Non-Recourse Promissory Note by and between the ESOP and the Seller, dated August 28, 2015;
- the Seller ESOP Pledge Agreement by and between the ESOP and the Seller, dated August 28, 2015;



- 4 -



Valuation & Financial Opinions

**JAE 1772**

# I.  INTRODUCTION

- the Amended and Restated ESOP Credit Agreement by and between the ESOP and KPC, dated August 28, 2015;

- the Amended and Restated ESOP Loan ESOP Non-Recourse Promissory Note by and between the ESOP and KPC, dated August 28, 2015;

- the Amended and Restated ESOP Pledge Agreement by and between the ESOP and KPC, dated August 28, 2015;

- the Assignment and Assumption Agreement by and between KPC, the Seller, and the ESOP, dated August 28, 2015;

- the Exchange Agreement by and between KPC and the Seller, dated August 28, 2015;

- the Statement of Representation prepared by Company management, dated August 27, 2015;

- site visits at the four Hospitals located in Orange County, California and discussions with certain members of the senior management of KPC and Eureka regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;

- publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and

- other information, studies, and investigations that we deemed appropriate.

## Assumptions and Limiting Conditions

- This report and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and should not be referred to or distributed, in whole or in part, without our prior written consent. Reference should be made to Appendix G, as well as our engagement letter dated May 6, 2015, for certain assumptions and limiting conditions that are applicable to our analysis and report.



Valuation & Financial Opinions   **SRR** STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000025

**JAE 1773**

# Section II

## Transaction Overview



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000026

**JAE 1774**

## II.   TRANSACTION OVERVIEW

### Description of Transaction

On the Transaction Date, a series of simultaneous transactions will occur, including:

#### Warrant Redemption and Cancellation Transactions

■ The Company will enter into a separate Warrant Purchase Agreement with each of William E. Thomas and SPCP Group, LLC, a Delaware limited liability company (collectively the "Redeemed Warrantholders"), both of which will be dated as of August 28, 2015 (each a "Warrant Purchase Agreement"). Pursuant to the terms of the Warrant Purchase Agreements, the Company will purchase all of the ▓▓▓▓ outstanding warrants held by the Redeemed Warrantholders for an aggregate consideration amount of $▓▓▓▓▓▓▓▓ net of exercise price of these warrants of ▓▓▓▓▓▓ (the "Warrant Redemption Transaction"), which will consist of cash consideration in the amount of ▓▓▓▓▓▓▓▓ to be paid at Closing and the issuance of subordinated promissory notes to the Redeemed Warrantholders in the amount of ▓▓▓▓▓▓ the "Warrant Redemption Notes").

  ➢ Each Redeemed Warrantholder will also receive detachable warrants in connection with the issuance of the Warrant Redemption Notes.

  ➢ As further consideration for the Warrant Redemption Transaction, the Company has contractually agreed to pay to the Redeemed Warrantholders: (i) the product of 60% of any and all future Qualifying QAF Payments (as defined in the Warrant Purchase Agreement) received by the Company or its direct or indirect subsidiaries for services rendered between January 1, 2017 through December 31, 2024 regardless of when paid; multiplied by (ii) 19.5%. If no Qualifying QAF Payments are received by the Company or its direct or indirect subsidiaries, no amounts will be owed to the Redeemed Warrantholders, and the "earn out" specifically excludes all payments received under a QAF Program (as defined in the Warrant Purchase Agreement) for services rendered on or before December 31, 2016.

■ KPC Healthcare, Inc. (the "Subsidiary") will enter into that certain Warrant Cancellation and Release Agreement with each of the Seller and KPC Resolution Company, LLC, a California limited liability company, dated as of August 28, 2015 (the "Warrant Cancellation and Release Agreement") pursuant to which all 22.8889 outstanding warrants collectively held by the Seller and KPC Resolution Company, LLC will be cancelled (the "Warrant Cancellation Transaction") in exchange for a contractual right to receive consideration of (i) the product of 60% of any and all future Qualifying QAF Payments (as defined in the Warrant Cancellation Agreement) received by the Company or its direct or indirect subsidiaries for services rendered between January 1, 2017 through December 31, 2024 regardless of when paid; multiplied by (ii) 80.5%. If no Qualifying QAF Payments are received by the Company or its direct or indirect subsidiaries, no amounts will be owed under the Warrant Cancellation and Release Agreement and the "earn out" specifically excludes all payments received under a QAF Program (as defined in the Warrant Cancellation and Release Agreement) for services rendered on or before December 31, 2016.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000027

**JAE 1775**

## II.  TRANSACTION OVERVIEW

**Stock Purchase Transaction**

- The Trustee, on behalf of the Trust, will acquire 10,000,000 shares of KPC common stock, representing 100% of the Company's common equity (the "Stock Purchase Transaction"), from the Seller for consideration of $217,574,000 (the "Consideration"). The Consideration will consist of $89,448,000 of cash paid at Closing and a $128,126,000 non-recourse promissory note issued by the ESOP to the Seller (the "Seller ESOP Loan").

  - The ESOP will finance the cash portion of the purchase price with a $79,448,000 loan from the Company to the ESOP (the "Company ESOP Loan") and a $10,000,000 cash contribution from the Subsidiary to the ESOP. The Company ESOP Loan will have a term of 30 years and will bear interest at an annual rate equal to 2.82% per annum. The Company ESOP Loan is pre-payable without penalty. The Company ESOP Loan and the Seller ESOP Loan are collectively referred to herein as the "ESOP Loans".

  - The Seller ESOP Loan will have a term of 30 years and will bear interest at an annual rate equal to 2.82% for the first six months. In the event the Seller ESOP Loan is not assumed by the Company from the ESOP within six months of Closing (as it is contractually obligated to do under the terms of that certain Assignment and Assumption Agreement dated as of August 28, 2015 and entered into among the Company, the Trustee, on behalf of the Trust, and the Seller (the "Assignment and Assumption Agreement")), the interest rate on the Seller ESOP Loan will increase to 13%. The Seller ESOP Loan will be pre-payable without penalty.

- The Company will also approve the adoption of a management incentive plan ("MIP") that will provide Company management with stock appreciation right ("SAR") units in an aggregate amount of up to 10.0% of fully-diluted equity of the Company. The SAR plan will consist of retention SARs (the "Retention SARs") and performance SARs (the "Performance SARs").

  - Up to 5.0% of the Company's fully diluted equity may be granted in the form of Retention SARs immediately following the Closing Date (as defined in the Stock Purchase Agreement).

  - Annual grants of the Performance SARs are contingent upon the Company achieving at least 105% of projected adjusted EBITDA for each respective fiscal year. However, the Company may grant SARs "allocated" to prior years if the Company is able to achieve cumulative adjusted EBITDA equal to at least 105% of adjusted EBITDA for that cumulative period.

- On the date following the Transaction Date, or as soon as otherwise possible thereafter, the Company will assume from the ESOP all rights and obligations under the Seller ESOP Loan (the "Assignment and Assumption Transaction"). Simultaneous with the Assignment and Assumption Transaction, the Company will issue a subordinated promissory note in favor of the Seller (the "Exchange Transaction") in the original principal amount of $128,126,000 (the "Seller Note"). The Seller Note will include certain detachable warrants. Following the Stock Purchase Transaction and in connection with the Assignment and Assumption Transaction, the ESOP will issue an amended and restated promissory note to the Company (the "Amended and Restated ESOP Loan") in the amount of $207,574,000 to evidence its total indebtedness to the Company.

  - The Amended and Restated ESOP Loan will bear interest at the then-long-term annual Applicable Federal Rate and will amortize with 30 equal annual fixed payments of principal and interest.

 

Valuation & Financial Opinions

- 8 -

## II.   TRANSACTION OVERVIEW

- For clarification purposes, as used herein, the term "Transactions" will include, but not be limited to, each transaction contemplated by the following: (1) the Warrant Redemption Agreement, (2) the Warrant Cancellation and Release Agreement, (3) the Stock Purchase Agreement, (4) the Seller ESOP Loan, (5) the Company ESOP Loan, (6) each of the Subordinated Notes (as herein defined), (7) each of the Warrants (as herein defined), (8) the Assignment and Assumption Agreement, (9) the Exchange Agreement, (10) the Amended and Restated ESOP Loan, and (11) the adoption of the MIP.

- The total value of the Transactions is  which assumes ███████ of net debt and ██████ of net shareholder receivables. "Net debt" is defined as outstanding debt less balance sheet cash. The value of the Transactions will be adjusted upwards or downwards, on a dollar for dollar basis, based on the actual net debt of the Subsidiary on the Closing Date, to be determined post-Closing via a Closing Date balance sheet, which will be prepared to reflect net debt prior to the funding of the Transactions.

- Aggregate cash consideration paid to the Seller and Redeemed Warrantholders in connection with the Warrant Redemption Transaction and Stock Purchase Transaction of ████████ will be financed via a ████████ erm loan with Credit Suisse (the "Term Loan"). Remaining cash proceeds related to the Term Loan will be used to (i) repay existing debt; (ii) pay transaction fees and expenses; (iii) set aside a reserve for a litigation settlement; (iv) set aside a principal and interest reserve for the Term Loan; and (v) finance ongoing working capital needs of the Company.

  - The Term Loan has a ██████ term and bears interest at a floating rate of ███████ (with a ███████ with quarterly principal payments of █████ and an excess cash flow provision.

- The Warrant Redemption Notes and the Seller Note are referred to herein as the "Subordinated Notes".

  - The Subordinated Notes will have a ██████ term and bear interest at ████ per annum. Principal will be amortized quarterly over a ██████ period commencing after full repayment of outstanding senior debt.

  - The Subordinated Notes will each have a detachable warrant to purchase an aggregate of █████ shares of KPC common stock at an exercise price of █████ per warrant (the "Warrants"). The Seller will receive █████ Warrants, William Thomas will receive █████ Warrants, and SPCP Group will receive █████ Warrants.

  - The Warrants will expire on December 31, 2027 (the "Maturity Date"). The Warrants will be exercisable, partially or fully, on the earlier of (i) the repayment in full of the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes; or (ii) on the Maturity Date.

- In connection with the Transactions, the Company expects to amend its fiscal year end to August 31, 2016 and elect S corporation status effective September 1, 2015. In addition, a separate management contract will be entered into with KPC Global Management, LLC, a California limited liability company ("KPCGM"), and certain identified individuals will cease to be W-2 employees or 1099 contractors of the Subsidiary but will instead become part of KPCGM. The management contract will have a 10-year term, which thereafter may be renewed on a year-to-year basis with the consent of both the Company and KPCGM. Pursuant to the management contract, for each of the fiscal years ending August 31, 2016, through August 31, 2020, KPCGM will be eligible to receive a performance bonus equal to 30% of adjusted EBITDA before receipt of payments under the QAF Program



- 9 -

Valuation & Financial Opinions   **SRR**

STOUT_0000029

## II.   TRANSACTION OVERVIEW

(as defined in the Stock Purchase Agreement) in excess of the Company's current forecasted adjusted EBITDA before receipt of payments under the QAF Program (as defined in the Stock Purchase Agreement). After the fiscal year ending August 31, 2020, a subsequent arrangement may be adopted by the Company or Subsidiary, with Trustee approval.

### Financing



| Term Loan | |
|---|---|
| Lender: | Credit Suisse AG |
| Amount: | |
| Term: | |
| Rate: | (Floor of ███) |
| Covenants: | Minimum fixed charge coverage ratio, minimum interest coverage ratio, maximum senior leverage ratio |
| Collateral: | First priority perfected lien on the Company's QAF receivables and tangible and intangible assets, including all outstanding capital stock of the Company and each of its current and future subsidiaries, to the extent legally and commercially reasonable |
| Amortization: | Quarterly principal payments of ████ Mandatory prepayments of managed care-related QAF payments dependent on the Company's senior leverage ratio, provided that for any managed care QAF payments received in calendar year 2015, the first ████ will be used to prepay the Term Loan. Additionally, mandatory annual prepayments of ██ of excess cash flow. |
| Prepayment Penalties: | Prepayment penalty of ███ on prepayments funded by managed care-related QAF payments subsequent to the end of calendar year 20██. |
| | For voluntary prepayments (i.e. payments in excess of the excess cash flow provision): |
| | (a) Prior to the first anniversary of the Closing Date, prepayment penalties of ███ of the prepayment amount plus the present value of interest that would have been required on the amount of principal prepaid between the date of the prepayment and the first anniversary of the Closing Date. |
| | (b) Between the first and the second anniversary of the Closing Date, prepayment penalties of ██ of the prepayment amount. |
| | (c) Between the second and the third anniversary of the Closing Date, prepayment penalties of ██ of the prepayment amount. |
| | (d) Between the third and the fourth anniversary of the Closing Date, prepayment penalties of ██ of the prepayment amount. |
| | (e) No prepayment penalties subsequent to the fourth anniversary of the Closing Date. |



– 10 –

Valuation & Financial Opinions   **SRR**

**JAE 1778**

## II. TRANSACTION OVERVIEW



| Subordinated Notes | |
|---|---|
| Lender: | The Seller and the Redeemed Warrantholders |
| Amount: | █████████ |
| Term: | ████ years |
| Rate: | ████ PIK interest while LTM EBITDA is below ████████ thereafter ████ cash interest |
| Amortization: | Quarterly principal installments of ████████ subsequent to the repayment of the Term Loan, with the balance of the Subordinated Notes due at maturity |
| Warrant: | |
| Ownership: | ████ warrants or ████ of common equity on a fully-diluted basis |
| Strike Price: | ████ per underlying common share |
| Expiration: | December 31, 2027 |
| Exercisable: | The Warrant will be exercisable, partially or fully, on the earlier of (i) the repayment in full of the Subordinated Notes, or the future senior debt incurred to refinance the Subordinated Notes; or (ii) on the expiration date. |
| Put/Call Provisions: | Upon a change in control. Additionally, the Company may call the Warrant after the full repayment of the Subordinated Notes, or if a warrantholder becomes ineligible to own S Corporation stock. |

| Amended and Restated ESOP Loan | |
|---|---|
| Lender: | KPC Healthcare, Inc. |
| Amount: | $207,574,000 |
| Term: | 30 years |
| Rate: | 2.82% |
| Amortization: | Equal annual payments of principal and interest |



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000031

**JAE 1779**

## II.  TRANSACTION OVERVIEW

### Sources and Uses

The following chart illustrates the sources and uses for KPC in the Transaction:



| Sources of Cash | | Uses of Cash | |
|---|---|---|---|
| *In Thousands of U.S. Dollars* | | | |
| Term Loan | $ ▮ | Repay Existing Debt | $ ▮ |
| Thomas Subordinated Notes | | Purchase of Common Stock | 217,574 |
| Chaudhuri & SPCP Subordinated Notes | | Warrant Redemption | ▮ |
| | | Transaction Fees | |
| | | Senior Term Debt Reserve | |
| **Total Sources of Cash** | $ ▮ | **Total Uses of Cash** | $ ▮ |



Valuation & Financial Opinions  **SRR**

CONFIDENTIAL

STOUT_0000032

**JAE 1780**

## II.  TRANSACTION OVERVIEW

### Pre- & Post-Transaction Ownership and Capitalization



**Pre-Transaction Ownership Schedule**

| Shareholder | Common Stock | Warrants | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|
| Kali P. Chaudhuri, M.D. | | | | |
| KPC Resolution Company, LLC | | | | |
| William E. Thomas | | | | |
| SPCP Group, LLC | | | | |
| SPCP Group IV, LLC | | | | |
| **Total** | | | | **100.0%** |



**Ownership Schedule - Immediately Post-Transaction**

*In Thousands*

| Shareholder | Common Stock | SARs | Warrants | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|
| ESOP | 10,000.0 | | | 10,000.0 | |
| Management | 0.0 | | | | |
| Holders of Thomas Subordinated Notes | 0.0 | | | | |
| Holders of Chaudhuri & SPCP Subordinated Notes | 0.0 | | | | |
| **Total** | **10,000.0** | | | | **100.0%** |



**Fully-Diluted Post-Transaction Ownership Schedule**

*In Thousands*

| Shareholder | Common Stock | SARs | Warrants | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|
| ESOP | 10,000.0 | | | 10,000.0 | |
| Management [a] | 0.0 | | | | |
| Holders of Thomas Subordinated Notes | 0.0 | | | | |
| Holders of Chaudhuri & SPCP Subordinated Notes | 0.0 | | | | |
| **Total** | **10,000.0** | | | | **100.0%** |

[a] Company management will be granted performance SARs of up to ███ of fully-diluted equity if the Company exceeds the adjusted EBITDA projections provided by Company management, which would result in SARs comprising ███ of fully-diluted equity. For purposes of our analysis, we have assumed the performance SARs will not be issued.



- 13 -

**Valuation & Financial Opinions**   SRR

**JAE 1781**

## II.  TRANSACTION OVERVIEW

**QAF Program**

- The ESOP will be entitled to 100% of the proceeds related to the 2016 QAF Program (defined herein) – which involves the stream of payments expected to be received through January 2018, as illustrated in Exhibit K.

- In the event a subsequent QAF or similar Federal matching program is established, the Company has contractually agreed to pay to the Redeemed Warrantholders: 60% of any and all future Qualifying QAF Payments received by the Company or its direct or indirect subsidiaries for services rendered between January 1, 2017 through December 31, 2024 regardless of when paid (the "Future QAF"). If no Qualifying QAF Payments are received by the Company or its direct or indirect subsidiaries, no amounts will be owed to the Redeemed Warrantholders, and the "earn out" specifically excludes all payments received under a QAF Program for services rendered on or before December 31, 2016.

  - ➢ It is important to note that given the uncertainty related to the amount or timing of Future QAF payments, we did not explicitly incorporate or assign any value to the Future QAF payments that may be received by the Company in our analysis.

- The Future QAF payments will exclude payments made in connection with the 2016 QAF Program (defined herein) received by the Company during calendar years 2017 and 2018 which will be 100% payable to the Company. Additionally, the Company is entitled to 100% of all QAF payments for calendar years 2025 and beyond.



- 14 -

**Valuation & Financial Opinions**  SRR

**JAE 1782**

# Section III

## Company Overview



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000035

**JAE 1783**

## III.   COMPANY OVERVIEW

### Company Synopsis

■ KPC consists of a group of four community based hospitals, Western Medical Center Santa Ana, Western Medical Center Anaheim, Coastal Communities Hospital, and Chapman Medical Center (collectively, the "Hospitals"), located in Orange County, California. The Hospitals have approximately 760 beds and have 2,240 employees in total, and collectively represent approximately 12% of the market share of Orange County.

### Company History

■ In 2004, Integrated Healthcare Holdings, Inc. ("IHHI"), a publicly-traded holding company in which Dr. Chaudhuri was a minority shareholder, acquired the Hospitals from Tenet Healthcare Corporation. The transaction included the real property underlying three of the four hospital campuses, with the fourth remaining under lease from an unaffiliated landlord. The three campuses were placed in a separate entity, known as Pacific Coast Holdings Investment LLC, owned 49% by Dr. Chaudhuri and 51% by a group of physicians, the Orange County Physicians Investment Network ("OCPIN"). In exchange for providing a $10.0 million deposit for the acquisition (which was subsequently refunded), Dr. Chaudhuri received warrants to acquire 24.9% of the fully-diluted equity of IHHI.

■ OCPIN defaulted on an obligation to invest more capital into IHHI, resulting in litigation between IHHI and OCPIN. During 2007 and 2008, Dr. Chaudhuri provided an equity investment in IHHI and exercised his warrants, resulting in Dr. Chaudhuri owning 50.1% of the equity of IHHI.

■ In late 2009, IHHI's secure lender was seized by the Securities and Exchange Commission for various securities-related violations. Dr. Chaudhuri arranged a restructuring of IHHI's debt, for which he received additional warrants.

■ On March 28, 2014, IHHI commenced a going-private transaction, and repurchased common shares from OCPIN and other minority shareholders at an implied Enterprise Value of approximately $170.0 million. As a result, Dr. Chaudhuri became the sole owner of the common stock of IHHI. IHHI then brought in a new management team and initiated turnaround efforts to improve operations, regain lost certifications, and reduce costs.

■ In February 2015, IHHI was renamed KPC Healthcare, Inc.

### Facilities and Services

■ The Company's facilities are accredited by a variety of organizations, including the Joint Commission on Accreditation of Healthcare Organizations, the College of American Pathologists, and the American College of Surgeons (Trauma Program).

■ The facilities include one of only three trauma centers in the region. Services include neurosurgical care, cardiac services, burn center care, medical services, surgical services, pediatric intensive unit, neonatal intensive care unit, obstetrical, subacute,



 Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000036

**JAE 1784**

## III.   COMPANY OVERVIEW

geropsychiatric, adult psychiatric, and chemical dependency. The Company is also in the process of developing a new acute rehabilitation care unit.

### KPC Hospitals – Key Statistics and Overview

| Facility | Beds | Size (sq. ft.) | Physicians | Nurses and Hospital Staff | Other Characteristics |
|---|---|---|---|---|---|
| Western Medical Center - Santa Ana, CA | 282 | 316,488 | 115 | 415 | Level II trauma center draws patients from surrounding areas<br>One of two burn centers in Orange County<br>One of five hospitals in Southern California specializing in replantation<br>Opening acute rehabilitation center to serve the large volume of patients injured in car accidents |
| Western Medical Center - Anaheim, CA | 188 | 132,554 | 88 | 221 | Only acute psychiatric program in all of Orange County<br>One of the largest psychiatric wards in Orange County<br>Open-heart surgery center |
| Coastal Communities Hospital - Santa Ana, CA | 178 | 116,268 | 62 | 182 | Minimally-invasive treatment for gastro-esophageal reflux disease<br>Generates significant QAF payments due to high portion of MediCal patients |
| Chapman Medical Center - Orange, CA | 114 | 140,000 | 113 | 113 | Leader in orthopedic and neurosurgical spine programs<br>Specialization in bariatric surgery attracts patients from around the United States |
| Total | 762 | 705,310 | 378 | 931 | |

■ The Company is in the process of rebranding its hospitals as part of the Company's efforts to improve brand recognition and reputation:

| Old Name | New Name |
|---|---|
| Western Medical Center Santa Ana | Orange County Global Medical Center |
| Western Medical Center Anaheim | Anaheim Global Medical Center |
| Chapman Medical Center | Chapman Global Medical Center |
| Coastal Communities Hospital | South Coast Global Medical Center |



Valuation & Financial Opinions   SRR   STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000037

**JAE 1785**

## III.   COMPANY OVERVIEW

### Payor Mix

- The Company is a primary beneficiary of Medicare and Medicaid reimbursements, including supplemental income from the Quality Assurance Fee (discussed herein).



Source: Company records.

### Employees

- The Company had approximately 2,240 employees as of February 2015. Of these employees, a total of approximately 792 are represented by two labor unions, the California Nurses Association and the Service Employee International Union – United Healthcare Workers, which are covered by collective bargaining agreements. The Company has never experienced a work stoppage with either union, and considers relations with both unions to be good. Approximately 100 of KPC's employees work out of the Company's corporate office.



Valuation & Financial Opinions   SRR
STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000038

**JAE 1786**

## III.   COMPANY OVERVIEW

### Competition

- The Company competes primarily with approximately 30 other acute care hospitals in Orange County, including University of California Irvine, Hoag Memorial Hospital, St. Joseph Hospital, Orange Coast Memorial Hospital, and Fountain Valley Regional Hospital. Additionally, the Company faces competition from outpatient care facilities in the region. Company management believes the Company differentiates itself through its quality of care, reputation, and specialties. However, the Company specializes in high acuity procedures (for example, the Level II Trauma Center) that generally experience less competition from outpatient facilities.

### Quality Assurance Fee Program

- The Hospital Quality Assurance Fee Program ("QAF") is a long standing federal matching program for Medicaid used by 49 states as well as the District of Columbia. The California Department of Health Care Services implemented its first QAF program in 2009 when the Governor of California signed legislation to impose a provider fee on general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental Medicaid payments to hospitals with disproportional exposure to indigent patients via MediCal, California's Medicaid program. Revenue from the QAF also provides funding for children's healthcare coverage, pays direct grants to public hospitals, and reimburses the costs of administering the program.

- All private acute care hospitals in California are assessed a provider fee based on patient days and payor mixes. The QAF payments are based only on MediCal patient days. FFS hospital providers are reimbursed directly by California. California pays MediCal health plans and the health plans pay hospitals additional capitation.

- In 2013, the Governor of California signed legislation (Senate Bill 239) that would continue the QAF program for 36 months from January 1, 2014 through December 31, 2016 (as it pertains to the Company, the "2016 QAF Program"). The amount of this most recent QAF for each hospital is calculated by the California Hospital Association based on each hospital's MediCal patient census in 2010. The California Hospital Association has sponsored a ballot initiative on the 2016 ballot to make the QAF permanent and to limit the percentage that the State can take for its purposes from fees levied.

- Since its inception, the QAF program has garnered strong support at both the state and federal levels, providing billions of dollars in supplemental payments to California hospitals, and has been extended and renewed three times since the program's inception in 2009. Although the federal matching percentage could change, the California Hospital Association has stated that they expect the QAF program will continue beyond its current round of funding. Further, industry analysts expect the QAF program will continue for several reasons, such as the consistent growth of the QAF program since 2010; expanded MediCal eligibility and a decrease in charity care as a result of the ACA; and the fact that California has frozen the base rate for reimbursing MediCal claims with the understanding that normal inflationary increases in payment rates will be reimbursed through QAF.



 Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000039

## III.  COMPANY OVERVIEW

- The Company has historically realized both revenue and expenses related to the QAF program. Given the volatile nature of the Company's historical and projected QAF revenue and expenses, we removed the financial impact of QAF revenue and expenses from the Company's "core" operations and valued the QAF payments separately.

- Pursuant to the Transaction, Credit Suisse commissioned an analysis by Marwood Group Advisory, LLC (the "Marwood Report"), a healthcare-focused advisory and consulting firm, regarding the outlook of Medicare and California's Medicaid programs for California hospitals. The Marwood Report concluded that California's QAF program would likely continue beyond 2016 due to strong support from a variety of stakeholders in the state. Additionally, the Company's hospitals are expected to benefit from Medicaid expansion resulting in increased enrollment, as well as increased fee-for-service rates as part of changes in reimbursement methodologies.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000040

**JAE 1788**

## III.  COMPANY OVERVIEW

### Key Risks and Opportunities

- Key risk factors faced by the Company include the following:

  - The Company generated operating losses in fiscal years 2013 and 2015. Removing the financial impact of QAF, the Company generated negative adjusted EBITDA in fiscal years 2012 through 2014.

    - However, this risk is mitigated by changes more recently implemented by the Company's new management team, resulting in a significant improvement in operating performance over the past 12 months (as further discussed in Section V).

  - Given the Company's limited track record of operating profitably, there is a high degree of risk with regards to the Company's ability to achieve Company management's projections.

    - The Company's management team has significant experience in turning around distressed hospitals. The Company's CEO of Healthcare Operations, Suzanne Richards, has managed the turnaround of 18 hospitals and was previously the Chief Clinical Officer of Prime Healthcare Services, which operates acute care hospitals in California, Kansas, Nevada, Pennsylvania, Rhode Island, and Texas.

    - This risk is somewhat mitigated by the fact that for purposes of our valuation analysis, we placed primary emphasis on the Company's representative level of LTM EBITDA and placed less emphasis on the Company's projected long-term performance. Accordingly, in order to better account for risks inherent in a turnaround situation and to substantially discount growth as projected by Company management, we assumed no EBITDA growth in fiscal years 2017 through 2019 for purposes of our Discounted Cash Flow analysis. Furthermore, the selected market multiples utilized in the Market Approaches account for risks inherent in a turnaround situation and substantially discount growth as projected by Company management.

  - The Company exhibits geographic concentration as the four Hospitals are located in Orange County, California.

    - Personal income and employment conditions in Orange County, California are generally above state and national averages. Furthermore, given its significant elderly population, Orange County has favorable patient demographics relative to other parts of the United States.

  - Despite decreasing deficits in recent years, the State of California faces a continued deficit, which may put pressure on future QAF payments.

    - On June 15, 2015, the California legislature approved a $117.5 billion General Fund budget.

    - Recent state and federal legislation suggests stable QAF funding conditions, with some optimism regarding a 2015 ballot initiative to make the QAF permanent (beyond the 2016 QAF Program).



- 21 -

Valuation & Financial Opinions  SRR

**JAE 1789**

## III.   COMPANY OVERVIEW

- ➢ The Company faces pressure on reimbursement rates from private insurers. Additionally, the Company is exposed to risk regarding funding for Medicare and Medicaid, particularly in light of recent pressure on U.S. government spending.
  - These risks are common across the U.S. hospital industry.
  - Recent budget surpluses in California are generally positive for Medicaid funding in the state.
- ➢ Hospitals are facing increasing competition from outpatient facilities.
  - However, this is not expected to significantly impact KPC due to the high acuity nature of the inpatient procedures in which the Company's hospitals specialize.
  - This risk is common across the U.S. hospital industry.
- ➢ The Company is exposed to risk of recruiting and retaining top-performing physicians.
  - ➢ In recent years, the Company has made substantial investments in medical equipment, clinical spaces, EHR systems, and has completed or is in the process of completing substantial renovations of the Hospitals in order to facilitate the Company's recruitment of high-performing physicians. According to Company management, these investments have largely been successful in aiding the Company's recruitment efforts.
  - This risk is common across the U.S. hospital industry.
- ■ Key opportunities for the Company include the following:
  - ➢ While industry analysts generally expect California's QAF program to continue beyond the 2016 QAF Program, we have not attributed any value to subsequent QAF programs in our analysis. The Company has averaged approximately $38.8 million per year in QAF income over the past five years.
  - ➢ Company management has a track record of turning around distressed hospitals.
  - ➢ The Affordable Care Act ("ACA") and Medicaid expansion have generally resulted in a larger patient base for healthcare providers – adding an estimated 9.9 million and 9.0 million newly-enrolled patients into the healthcare base in 2015 while generally lowering uncompensated care rates.
  - ➢ Personal income and employment conditions in Orange County, California are generally above state and national averages. Furthermore, given its significant elderly population, Orange County has favorable patient demographics relative to the United States.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000042

**JAE 1790**

## III.   COMPANY OVERVIEW

### Management

- The majority of the Company's current management team began with KPC in July 2014. However, the management team has significant experience in hospital management.

- The current Chief Executive Officer of Healthcare Operations, Suzanne Richards, has managed the turnaround of 18 hospitals and was previously the Chief Clinical Officer of Prime Healthcare Services, which operates acute care hospitals in California, Kansas, Nevada, Pennsylvania, Rhode Island, and Texas.

- The Company's Chief Financial Officer, John Collins, has over 20 years of experience in healthcare finance and was previously the former Chief Financial Officer of Vanguard Health Systems, an operator of 26 hospitals and medical facilities in Arizona, Illinois, Massachusetts, Michigan, and Texas.

| Management Team | |
| --- | --- |
| **Individual** | **Position** |
| Kali P. Chaudhuri, M.D. | Chairman and Chief Executive Officer |
| Bill Thomas | Senior Vice President and General Counsel |
| Suzanne Richards | Chief Executive Officer of Healthcare Operations |
| Kali P. Chaudhuri | Executive Vice President, Finance Affairs |
| Kelly Thomas | Executive Vice President, Legal Affairs |
| Sri Yarramsetti | Chief Information Officer |
| John Collins | Chief Financial Officer |
| Eric Royal | Chief Compliance Officer |



Valuation & Financial Opinions   **SRR** STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000043

**JAE 1791**

## III.   COMPANY OVERVIEW

### Board of Directors

- The sole member of the board of directors of KPC is Dr. Chaudhuri. Subsequent to the Transaction, the Company will increase the size of its Board of Directors to five members within 12 months of the closing date, including two independent directors.

### Litigation

- In July 2013, the Company settled a class action lawsuit regarding the incorrect payment of overtime wages for $14.5 million. Pursuant to the settlement, the Company does not anticipate further legal actions related to this issue.

- As of the Transaction Date, the Company had booked a contingent reserve of $5.7 million due to a May 2015 court decision related to litigation filed by a former employee of the Company. As of the Transaction Date, the Company is appealing the decision to the Supreme Court of California.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000044

**JAE 1792**

# Section IV

## Economic and Industry Outlook



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000045

**JAE 1793**

## IV.   ECONOMIC AND INDUSTRY OUTLOOK

### Economic Outlook

#### Gross Domestic Product

- Real (i.e., inflation adjusted) GDP growth of 2.0% to 2.5% is generally considered optimal when the economy is operating at full employment.
- GDP increased at an annual rate of 3.7% in the second quarter of 2015, following an increase of 0.6% in the first quarter of 2015. Relative to the first quarter of 2015, the increased growth rate is primarily the result of increases in consumer spending, exports, and government spending.
- GDP is forecasted to increase at an annual rate of 2.3% in 2015 and 2.8% in 2016

#### Employment Situation

- Typically, economists consider the economy to be operating at full employment when the unemployment rate is between 5.5% and 6.0%.
- In July 2015, 215,000 jobs were added, and the unemployment rate remained stable at 5.3% relative to June 2015.
- The unemployment rate is forecasted to average 5.3% in 2015 and 5.0% in 2016.







**Valuation & Financial Opinions**   SRR

CONFIDENTIAL

STOUT_0000046

**JAE 1794**

## IV.   ECONOMIC AND INDUSTRY OUTLOOK

### Consumer Price Index

- The CPI has increased at an average rate of 2.4% over the past 20 years.
- The CPI increased 0.1% in July 2015 and has increased 0.2% over the past 12 months.
- The core index, excluding food and energy prices, increased 0.1% in July 2015, and has increased 1.8% over the past 12 months.
- The CPI is projected to increase 0.1% in 2015 and 2.1% in 2016.

### Equity Markets

- Over the past 20 years, the S&P 500 and Russell 2000 have increased 6.8% and 7.4% per annum, respectively.
- For the month ended July 31, 2015, the S&P 500 increased 2.0% and the Russell 2000 decreased 1.2%.
- For the year ended July 31, 2015, the S&P 500 increased 9.0% and the Russell 2000 increased 10.6%.



Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia



Source: Capital IQ, Inc.



- 27 -

Valuation & Financial Opinions   SRR   STOUT|RISIUS|ROSS

**JAE 1795**

## IV.   ECONOMIC AND INDUSTRY OUTLOOK

### Healthcare and Hospital Industry

■ Companies in the healthcare industry provide a wide range of healthcare and social services through hospitals, doctors' offices, nursing homes, outpatient surgery centers, and other facilities. Major companies include Ascension Health, HCA, Kaiser Permanente, and Tenet Healthcare. The U.S. healthcare sector includes more than 830,000 establishments with combined annual revenue of about $2.2 trillion, according to First Research.

■ The profitability of individual healthcare companies depends on efficient operations and, in the case of many nonprofit healthcare providers, obtaining grants and federal funds. The U.S. healthcare sector is highly fragmented with the top 50 organizations generating approximately 15.0% of total revenue.

■ Major services include hospital medical care (45% of industry revenue) and outpatient care provided by physicians (20%). Other services include dental work, urgent care, elderly and hospice care, medical labs, home health, rehabilitation, and social assistance. Of the approximately 6,500 U.S. hospitals, around 75% are not-for-profit. Hospitals can be operated by the government, charitable organizations, or for-profit corporations. Hospitals typically have between 50-1,000 beds and provide both inpatient and outpatient services, with larger facilities providing more complex care. Many hospitals are part of multi-facility health systems.

■ Federal and state governments are heavily involved in the U.S. healthcare sector, as a direct-care provider, an operator of health insurance programs, and as providers of various social services programs. According to First Research, approximately 87% of Americans are covered by some form of private or government health insurance, while approximately 13% of Americans are uninsured. Many are covered by combinations of private and government policies. About 55% of Americans are covered by employer-sponsored health insurance, about 15% by Medicaid, and about 15% by Medicare.

■ Medicare was designed to provide health insurance for those aged 65 and older, including certain disabled peoples, and Medicaid was established to serve the health needs of the indigent. Medicaid is managed by each individual state and jointly funded by the state and the federal government. The California Medical Assistance Program ("MediCal") is California's Medicaid program.

■ U.S. healthcare expenditures were approximately $3 trillion, or about 18% of GDP in 2014, the highest among industrialized nations, and are expected to increase to almost 20% of GDP by 2023, according to the Centers for Medicare and Medicaid Services ("CMS").



- 28 -

Valuation & Financial Opinions   **SRR**

**JAE 1796**

## IV.   ECONOMIC AND INDUSTRY OUTLOOK

- On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act (H.R. 3590) ("ACA"), a federal statute designed to extend health coverage to millions of uninsured legal residents through a combination of public program expansion and private sector health insurance reform. This comprehensive reform legislation was then amended by the Health Care and Education Reconciliation Act on March 30, 2010. The ACA is expected to extend healthcare coverage to approximately 31 million people in the United States. The law requires insurance companies to cover all applicants within new minimum standards and offer the same rates regardless of pre-existing conditions or sex. Several provisions of the law went into effect during 2014, including health insurance exchanges and expansion of Medicaid and the State Children's Health Insurance Program. In an effort to cut Medicare costs, the ACA encourages hospitals to reduce their readmission rates through the reduction of payments to hospitals with excess hospital readmissions, a key factor in high hospital bills. Other provisions of the law call for more medical training and the establishment of healthcare technologies, such as electronic health records, that are expected to cut costs through efficiency.

- The ACA is expected to decrease the number of uninsured individuals through employer mandates and individual requirements. The ACA requires individuals to maintain minimum coverage through the new health insurance marketplace or be subject to a tax penalty starting in 2014. As more of the U.S. population is covered by private health insurance, demand and spending on health services is expected to increase, positively affecting the industry.

- Healthcare providers have begun to adapt to new regulations introduced by the ACA. The ACA has brought in new patients and revenue, a trend that will likely continue as the law is fully implemented. However, healthcare facilities still face the challenge of adapting to a new reimbursement system as the new payment models seek to emphasize results rather than number of procedures. Many employers are switching to high-deductible plans for employees in order to comply with the ACA and reduce costs. This has led many employees to further scrutinize costs, potentially putting pressure on industry margins. Because of higher healthcare costs and expanded coverage for uninsured patients, the healthcare and hospital industries must face the risk that higher deductibles and co-payment requirements for insured patients will increase, resulting in the potential for greater write-offs of uncollectible amounts from those patients.

- In the King v. Burwell decision in June 2015, the Supreme Court ruled that the ACA allows for the federal government to provide nationwide tax subsidies to help poor and middle-class people buy health insurance.

- The industry is currently making a shift towards electronic health records ("EHRs"), as evidenced by the 2009 American Recovery and Reinvestment Act, which provides stimulus money for hospitals and physicians and imposes penalties on providers who are not using EHRs by the end of 2015.

- According to Mercer Capital's Healthcare Facilities Industry Newsletter, healthcare companies outperformed the broader market during 2014, and are poised for strong gains in 2015. An improving economy and rising consumer spending, coupled with favorable healthcare dynamics, have benefited the sector. Transaction activity remains healthy, as industry participants aim to vertically integrate multiple steps of the patient experience. Integration has allowed healthcare facility companies to capture revenue from multiple sources, increasing industry performance while reducing costs. Risks facing the industry include a decreasing supply of doctors and healthcare professionals, and cuts to federal outlays to Medicare and Medicaid.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000049

**JAE 1797**

## IV.   ECONOMIC AND INDUSTRY OUTLOOK

- In 2014, the U.S. Congressional Budget Office ("CBO") lowered its projections for Medicare funding, consistent with pressure on government spending over the last few years. The CBO projects actual spending per Medicare beneficiary after accounting for inflation will increase at an average annual rate of approximately 1.0% through 2025, slower than the 4.0% real growth realized from 1985 to 2007. Overall, the CBO estimates Medicare will remain around 13.0% to 15.0% of federal spending and 3.0% of GDP through 2023.

- The U.S. hospital industry is broadly defined to include acute care, rehabilitation, and psychiatric facilities that are either public (government owned and operated), not-for-profit private (religious or secular), or for-profit institutions (investor owned). These facilities offer a broad range of healthcare services, including internal medicine, general surgery, cardiology, oncology, orthopedics, obstetrics/gynecology, and emergency services. In addition, hospitals offer other ancillary services, including psychiatric, diagnostic, rehabilitation, home care and outpatient surgery services.

- Factors that can influence a hospital's financial and operating performance include facility size and location, facility ownership structure, a facility's ability to participate in group purchasing organizations, and facility payor mix. Due to the costs associated with healthcare reform, the hospital industry has begun consolidating in order to take advantage of economies of scale to offset the effects of increased IT expenses related to the EHR incentive program, recruiting and retaining qualified personnel, and competition from new facilities that deliver physician-run outpatient surgery centers, specialty hospitals, and diagnostic centers.

- S&P Capital IQ analysts project that federal and state budget deficits may negatively impact reimbursement rates for Medicare and Medicaid, and rising enrollment in these programs may result in a less favorable patient mix for most providers. Incentive payments for implementing health care IT initiatives are expected to moderately benefit the industry in 2015. Uncompensated care levels, consisting largely of bad debt expense and charity care, have remained above historical levels, but have improved due to the impact of health care reform and are expected to continue to improve over time.

- Hospitals in Medicaid expansion states (with California among those states) benefited from a 13% decline in unpaid bills compared to an increase in bad debt in non-expansion states, according to a recent study from Moody's Investors Service. The study found that hospitals in expansion states have not comprehensively shifted this lessened exposure to bad debt into higher cash flow or better financial results. This may be because some hospitals were negatively impacted by lower Medicaid reimbursement rates and an influx of newly covered Medicaid patients needing expensive care, according to *The Wall Street Journal*. Hospitals may also be using the windfalls from reduced bad debt to restore programs that were cut during leaner years instead of applying them to the bottom line.

- Because of the growing availability of stand-alone outpatient healthcare facilities and the increase in the services that are able to be provided at these locations, many individuals are seeking a broader range of services at outpatient facilities. This trend has contributed to an increase in outpatient services while slowing the growth of inpatient hospital admissions.

- Over the next five years, challenges facing the hospital industry include ongoing healthcare reform changes, reimbursement volatility, electronic record implementation, and continued personnel shortages, according to IBISWorld. Healthcare reform and an aging population are expected to increase industry demand. Rising labor costs will continue to pressure industry profitability.



- 30 -

**Valuation & Financial Opinions**   SRR

**JAE 1798**

## IV. ECONOMIC AND INDUSTRY OUTLOOK

According to INFORUM, U.S. personal consumption expenditures at hospitals are forecasted to increase at an annual compounded rate of 6.0% between 2015 and 2016.

### MediCal and the QAF Program

- MediCal is the California Medicaid welfare program serving low-income individuals, as well as some families, seniors, persons with disabilities, children in foster care, pregnant women, and childless adults with incomes below 138% of the federal poverty level. MediCal is jointly administered by the California Department of Health Care Services and the federal Centers for Medicare and Medicaid Services, with many services implemented at the local level by the counties of California.

- California, one of 29 states that has expanded its Medicaid program under the ACA, has approximately 12.2 million beneficiaries, slightly under one-third of California's population. Before the ACA, MediCal had an average of 9.2 million beneficiaries. MediCal enrollment has increased by approximately 34.0% since the ACA went into effect, and is the largest Medicaid program in the country in terms of total beneficiaries, according to data from the Kaiser Family Foundation. Industry analysts expect healthcare facilities companies to benefit from increased patient volumes and lower uncompensated care rates in connection with increased enrollment in healthcare exchanges under the ACA as well as incremental enrollment under the Medicaid expansion.

- In June 2015, the U.S. Supreme Court upheld subsidies for federally run exchanges, a key provision of the ACA. As a result of the decision, health insurance was kept in place for millions of individuals across a number of states. Hospital and managed-care stocks increased subsequent to the ruling, as reflected in the 19.4% average increase in stock prices for KPC's guideline companies between December 31, 2014 and August 3, 2015.

- Planned cuts to Medicare Disproportionate Share Hospital payments, which provide compensation to providers who treat a disproportionate number of uninsured patients, have been replaced by QAF programs at the state level, matched by federal funding.

- The California Department of Health Care Services implemented its first QAF program in 2009 when the Governor of California signed legislation to impose a provider fee on general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental MediCal payments to hospitals with disproportional exposure to indigent patients. Revenue from the QAF also provides funding for children's healthcare coverage, pays direct grants to public hospitals, and reimburses the costs of administering the program. The QAF reimbursements can be segregated into two portions: (i) fee-for-service ("FFS") and (ii) managed care.

- Since its inception, the QAF program has garnered strong support at both the state and federal levels, providing billions of dollars in supplemental payments to California hospitals, and has been extended and renewed three times since the program's inception in 2009. Although the federal matching percentage could change, the California Hospital Association has stated that they expect the QAF program will continue beyond its current round of funding. Further, industry analysts expect the QAF program will continue for several reasons, such as the consistent growth of the QAF program since 2010; expanded MediCal



- 31 -



JAE 1799

# IV. ECONOMIC AND INDUSTRY OUTLOOK

eligibility and a decrease in charity care as a result of the ACA; and the fact that California has frozen the base rate for reimbursing MediCal claims with the understanding that normal inflationary increases in payment rates will be reimbursed through QAF.



Orange County, California and U.S. Population Growth Comparison

Source: U.S. Census Bureau, 2010 Census

## Orange County Economy

- Orange County, California's current population is over 3.1 million, with an average age of just over 36 years, according to the U.S. Census Bureau's 2014 estimate. Additionally, 26.1% of the population is under the age of 19 years old, 61.2% is between the ages of 20 and 64, and 12.8% is age 65 or above. Compared to state averages, Orange County has a slightly older population. Projections over the next several decades show both a dramatic rise in the county's concentration of residents over the age of 65 and an associated decrease in the relative proportion of all other age groups as a percentage of the total population.

- According to the U.S. Census Bureau, Orange County has traditionally exceeded state and national population growth rates since 1950, but the population growth rate from 2000 to 2010 was just above 5%, a significantly slower rate than the prior 50 years. From April 2010 to July 2014, however, the total population grew by an estimated 4.5%, once again placing it back above the state level of 4.2%.

- The median household income of Orange County residents is roughly $72,000, nearly $15,000 greater than the California state median wage and more than $20,000 higher than the United States median wage, according to the State of California Department of Finance. However, the year-over-year increase in earning power grew more gradually in Orange County, improving by only 1.6% in the last two years compared to growth of 5% at the state level and 3.5% at the national level. The slower growth is likely due to the large number of part-time and lower-paying service sector jobs.



Projected Components of Population by Age in Orange County, 2010-2060

Percent of Population

Source: State of California, Department of Finance



- 32 -


Valuation & Financial Opinions

**JAE 1800**

## IV.   ECONOMIC AND INDUSTRY OUTLOOK

- ■ The California Poverty Measure ("CPM"), which was recently developed by the Public Policy Institute of California and Stanford University, is a method of estimating poverty rates in California counties with greater precision regarding regional differences in terms of overall cost of living, especially housing, and other factors unique to California. With a CPM estimated poverty rate of 24.3%, Orange County has the fourth-highest poverty rate of 41 California counties.





Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000053

**JAE 1801**

## IV. ECONOMIC AND INDUSTRY OUTLOOK

- The unemployment rate in Orange County, California was 4.2% in May 2015, up slightly from 4.1% in the prior month but down from 5.2% in May 2014.

**Unemployment in Orange County relative to the state of California and the United States:**





- 34 -

**Valuation & Financial Opinions**

CONFIDENTIAL

# IV.   ECONOMIC AND INDUSTRY OUTLOOK

## Applicability to the Company

- Recent healthcare reforms have led to uncertainty in the healthcare market, reimbursement volatility, and challenges adapting to new regulation. However, the ACA and Medicaid expansion have materially increased the supply of insured patients, which is expected to increase industry revenue. Demand is expected to continue to benefit in the long term from an aging population, as well as an improving economy and rising consumer spending. Risks facing the industry include further cuts to federal and state outlays to Medicare and Medicaid as government agencies attempt to further reduce costs. While the Company is generally exposed to risks and opportunities of the broader U.S. healthcare industry, the Company expects to benefit from continued stable funding conditions for the QAF program.



- 35 -

Valuation & Financial Opinions   SRR

**JAE 1803**

# Section V
## Financial Statement Analysis



- 36 -

Valuation & Financial Opinions **SRR**

**JAE 1804**

# V.  FINANCIAL STATEMENT ANALYSIS

## Historical Trends Analysis

### Net Working Capital

### Hospital Quality Assurance Fee Receivable

### Net Property and Equipment

KPC
Healthcare, Inc.

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000057

**JAE 1805**

# V.   FINANCIAL STATEMENT ANALYSIS

**Interest Bearing Debt**

- ███████████████████████████████████████████████████████

**Stockholders' Equity**

- ███████████████████████████████████████████████████████

**Adjusted Revenue**

- ███████████████████████████████████████████████████████
- ███████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████

Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000058

# V. FINANCIAL STATEMENT ANALYSIS

### Adjustments to Historical Income Statements

- A number of adjustments were made to the Company's reported financial results to more accurately reflect KPC's normalized ongoing operating performance.

  - ➤ <u>Investment Income</u> – We removed the financial impact of the Company's investment income during the historical period, as we consider the value of the Company's investments separately in our analysis.

  - ➤ <u>Warrant-Related Expense</u> – We removed the financial impact of noncash income and expense related to changes in the value of the Company's outstanding warrants.

  - ➤ <u>Litigation Expenses</u> – The Company incurred nonrecurring litigation and settlement expenses in fiscal 2014 in connection with a lawsuit related to the payment of overtime expense. Accordingly, we removed the impact of these nonrecurring expenses from the Company's historical results.

  - ➤ <u>Severance Expense</u> – The Company implemented headcount reductions in fiscal 2015 as part of operational improvements to increase profitability. Accordingly, we removed the financial impact of nonrecurring severance expense from the Company's historical results.

  - ➤ <u>Transaction Expenses and Bank Fees</u> – We removed the financial impact of nonrecurring expenses related to the Transaction.

  - ➤ <u>QAF Income</u> – Given the volatile nature of the Company's historical and projected QAF revenue and expenses, we removed the financial impact of QAF revenue and expenses from the Company's "core" operations and valued the QAF payments separately.

  - ➤ <u>Consulting Fees</u> – In fiscal 2015 the Company paid one-time consulting fees to an affiliated company in connection with the Company's reorganization. Accordingly, we removed the financial impact of these nonrecurring fees.

  - ➤ <u>Appeal Contingency</u> – In fiscal 2015 the Company reserved $5.7 million as a result of litigation filed by a former employee of the Company. We removed the impact of this nonrecurring expense.



- 39 -

Valuation & Financial Opinions   **SRR**

**JAE 1807**

# V.   FINANCIAL STATEMENT ANALYSIS

**Historical Adjusted Earnings**



| U.S. Dollars in Thousands | | For the Fiscal Year Ended | | | | | 12 Months Ended | | 5-Year | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 3/31/2011 | % | 3/31/2012 | % | 3/31/2013 | % | 3/31/2014 | % | 3/31/2015 | % | 6/30/2015 | % | Average [a] | % |

Net Revenue
Less: Recognized QAF Income
**Adjusted Revenue**
  *Growth Rate*

**Earnings Before Taxes**

Investment Income
Warrant-Related Expense
Litigation Expenses
Severance Expense
Transaction Expenses
QAF Income, Net
Consulting Fees
Appeal Contingency
Bank Fees
**Total Adjustments**

Adjusted Earnings Before Taxes

Interest Expense
Depreciation and Amortization

**Adjusted EBIT**
**Adjusted EBITDA**

[a] Based on fiscal years 2011 through 2915.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000060

## V.   FINANCIAL STATEMENT ANALYSIS

### Adjusted EBITDA

■ Adjusted EBITDA increased from ▮▮▮▮▮▮▮ in fiscal 2014 to ▮▮▮▮▮▮▮ or ▮▮▮ of adjusted revenue in the LTM period.

■ The improvements in profitability in fiscal 2015 and the LTM period are attributable to changes implemented by the Company's management team, which was hired in July of 2014. These operational improvements are expected to result in over ▮▮▮▮▮▮ of increased profitability on an annual basis once fully implemented, and include:

 ➢ headcount reductions of both the Company's nursing and corporate staff;

 ➢ benefits stemming from recent investments in information technology systems that facilitate accurate billing leading to improved billing of reimbursable expenses;

 ➢ restructuring financial systems and practices;

 ➢ savings on supplies;

 ➢ the recruitment of specialists in certain high-demand, more profitable practice areas;

 ➢ the establishment of medical and geriatric psychiatry units, which generate higher revenue and profits relative to traditional psychiatric services.

### Representative Level EBITDA

■ As a result of the recently implemented changes, profitability during the six months ended June 30, 2015 is higher than profitability during the first six months of the LTM period and is more indicative of the Company's future profitability. It is important to note that the Company's new management team was brought in in July 2014 and gradually began to implement operational improvements at that time. We calculated a representative level of adjusted EBITDA for the Company by annualizing the last six months of the LTM period, as presented in the following chart.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000061

**JAE 1809**

# V.   FINANCIAL STATEMENT ANALYSIS



**Historical Adjusted Monthly Earnings**

| U.S. Dollars in Thousands | 6 Months Ended 6/30/2015 | % | Annualized 6 Months Ended 6/30/2015 | % |
|---|---|---|---|---|
| **Net Revenue** | | | | |
| Less: Recognized QAF Income | | | | |
| **Adjusted Revenue** | | | | |
| | | | | |
| **Earnings Before Taxes** | | | | |
| | | | | |
| Investment Income | | | | |
| Warrant-Related Expense | | | | |
| Severance Expense | | | | |
| Transaction Expenses | | | | |
| QAF Income, Net | | | | |
| Consulting Fees | | | | |
| Appeal Contingency | | | | |
| **Total Adjustments** | | | | |
| | | | | |
| Adjusted Earnings Before Taxes | | | | |
| | | | | |
| Interest Expense | | | | |
| Depreciation and Amortization | | | | |
| | | | | |
| **Adjusted EBIT** | | | | |
| **Adjusted EBITDA** | | | | |



- 42 -

Valuation & Financial Opinions   SRR

STOUT_0000062

**JAE 1810**

# V.   FINANCIAL STATEMENT ANALYSIS

## Projected Trends Analysis

- ▪

### Adjusted Revenue

- ▪



**Adjusted Revenue**

Source:  Exhibits C and F



- 43 -

   Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000063

**JAE 1811**

## V.  FINANCIAL STATEMENT ANALYSIS

### Adjustments to Projected Income Statements

■ As discussed below, two adjustments were made to management's projected income statements to reflect KPC's normalized earnings. Incorporating these adjustments into management's projected income statements yields the adjusted projected income statements presented in Exhibit F.

> ➢ QAF Income – Given the volatile nature of the Company's historical and projected QAF revenue and expenses, we removed the financial impact of QAF revenue and expenses from the Company's "core" operations and valued the QAF payments separately.

> ➢ Increase in Management Fee – The projections provided to us as part of this analysis did not include cost of living increases for compensation payable to certain members of the management team. We adjusted the Company's projected financials to reflect annual increases in Company management compensation pursuant to the terms of the Transaction.



- 44 -

Valuation & Financial Opinions   **SRR**
STOUT | RISIUS | ROSS

**JAE 1812**

## V.   FINANCIAL STATEMENT ANALYSIS

**Projected Adjusted Earnings**



| *U.S. Dollars in Thousands* | Annualized 6 Months Ended 6/30/2015 [a] | % | 3/31/2016 | % | 3/31/2017 | % | 3/31/2018 | % | 3/31/2019 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Revenue** | | | | | For the Fiscal Year Ending | | | | | |
| Less: Recognized QAF Income | | | | | | | | | | |
| **Adjusted Revenue** | | | | | | | | | | |
| Growth Rate | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | |
| Recognized QAF Income | | | | | | | | | | |
| Increase in Management Fee | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | |
| Adjusted Earnings Before Taxes | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | |
| **Adjusted EBIT** | | | | | | | | | | |
| **Adjusted EBITDA** | | | | | | | | | | |

[a]  Based on the Company's annualized financial results for the six months ended June 30, 2015.


KFC Healthcare, Inc.

Valuation & Financial Opinions    SRR

CONFIDENTIAL

STOUT_0000065

**JAE 1813**

# V.  FINANCIAL STATEMENT ANALYSIS

**Adjusted EBITDA**





Source: Exhibits C and F


**JAE 1814**

## V.  FINANCIAL STATEMENT ANALYSIS

**Select Historical and Projected Ratios**

| Select Historical and Projected Metrics | | | | | | |
|---|---|---|---|---|---|---|
| | KPC Healthcare, Inc. Select Ratios | | | | Guideline Public Company Historical | |
| | 5-Year Historical Average | 5-Year Historical Median | 4-Year Projected Average | 4-Year Projected Median | 5-Year Average Low | 5-Year Average High |
| Return on Assets | | | | | 0.7% | 7.5% |
| Return on Equity | | | | | -29.5% | 29.7% |
| EBIT Margin | | | | | 3.6% | 20.0% |
| EBITDA Margin | | | | | 6.7% | 24.2% |
| Net Capital Expenditures to Sales | | | | | 2.9% | 6.4% |
| Unlevered Free Cash Flow to Sales | | | | | 2.1% | 8.3% |
| | | | 4-Year Historical CAGR [a] | 4-Year Projected CAGR [a] | 4-Year Historical Low CAGR | 4-Year Historical High CAGR |
| Revenue Growth Rate | | | | | 7.0% | 22.4% |
| Adjusted EBITDA Growth Rate | | | | | 5.0% | 21.4% |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.

■ As a result of the Company's historical lack of profitability, the Company's historical return on assets and EBIT and EBITDA margins are below the levels of the guideline companies. Due to operational improvements instituted by the Company's new management team, profitability is expected to increase in the projection period, and return on assets, return on equity, and EBIT and EBITDA margins are projected to increase to within the range of the guideline companies.

■ Due to the Company's negative equity balance in the historical period, average historical return on equity is not meaningful.

■ We were not provided with cash flow statements for KPC as a standalone entity for fiscal years 2011 through 2013, and accordingly were unable to calculate average net capital expenditures to sales and unlevered free cash flow to sales for the historical period. Net capital expenditures are projected to be below the low end of the range of the guideline companies due largely to the Company's lower level of real estate holdings relative to the guideline companies.



- 47 -

Valuation & Financial Opinions   

CONFIDENTIAL

STOUT_0000067

**JAE 1815**

## V.   FINANCIAL STATEMENT ANALYSIS

- ■ The Company's historical revenue growth rate is below the low end of the range of the guideline companies, while the historical adjusted EBITDA growth rate is not meaningful due to negative adjusted EBITDA during the historical period. Revenue is projected to increase at a rate near the low end of the range of the guideline companies, while adjusted EBITDA is projected to increase at a higher rate due to the expected benefits of recent operational improvements.



Valuation & Financial Opinions   SRR
STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000068

**JAE 1816**

# Section VI
## Valuation Methodology



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000069

**JAE 1817**

# VI.   VALUATION METHODOLOGY

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our estimation of value. A description of each approach is discussed below.

## Market Approach – Guideline Company Method

- The Guideline Company Method is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

- Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (i.e., equity plus net interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

### Applicability to the Company – Guideline Company Method

- In our application of the Guideline Company Method, we were able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value. A description of each company is presented in Appendix C and the assumptions behind our analysis are presented in Section VII of this report.

## Market Approach – Transaction Method

- The primary focus of the Transaction Method is to examine the terms, prices, and conditions found in either actual sales of the subject company's stock or sales of companies in the industry. After the relevant transactions are identified, transaction multiples (e.g., total capital to earnings before interest and taxes) are derived and applied to the corresponding operating results of the subject company to estimate its implied value.

### Applicability to the Company – Transaction Method

- Transactions involving similar companies in KPC's industry have also taken place in the recent past. As such, we researched these transactions and were able to draw meaningful conclusions from them. Our application of this form of the Transaction Method is presented in Section VIII of this report.



- 50 -

   Valuation & Financial Opinions

**JAE 1818**

## VI. VALUATION METHODOLOGY

### Income Approach – Discounted Cash Flow Method

- The Income Approach is a valuation technique in which the value of a company is estimated based on the earning capacity of that company.

- The Discounted Cash Flow Method is a valuation technique in which the value of a company is estimated based on the present value of its expected future economic benefits. The level of benefit we chose to utilize is distributable cash flow. Distributable cash flow is a preferred measure of a company's earning and dividend-paying capacity because it represents the earnings available for distribution to investors after considering the reinvestment required for a company's future growth. Distributable cash flow is the amount that could be paid to owners of a business without impairing its operations.

- To perform a Discounted Cash Flow analysis, the available cash flow that a business can generate is projected into the future. Each year's cash flow is then discounted to the valuation date at a rate of return commensurate with the risk involved in realizing those cash flows. An investor would accept a rate of return no lower than that available from other investments with equivalent risk, and would value the investment accordingly. Each element of this computed rate is expressed in terms of current market yields as of the valuation date.

### Applicability to the Company – Discounted Cash Flow Method

- The application of the Discounted Cash Flow Method is meaningful with respect to the valuation of KPC. KPC is an operating entity which is expected to produce positive cash flows in the future. Moreover, a potential buyer of the Company would likely place a great deal of weight upon the future cash flows generated by the Company in determining its value.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000071

**JAE 1819**

# VI.   VALUATION METHODOLOGY

## Asset Approach

- The Asset Approach provides an indication of Enterprise Value by developing a Fair Market Value balance sheet. All of the business' assets are identified and listed on the Fair Market Value balance sheet, with intangible assets being determined either collectively or discretely. Restating all liabilities to Fair Market Value and subtracting this amount from the Fair Market Value of assets yields the Fair Market Value of equity.

### Applicability to the Company – Asset Approach

- KPC is an operating entity that is producing a return on its assets that indicates value exists over-and-above the value of its tangible underlying assets; that is, it possesses intangible asset value. A significant portion of this intangible asset value does not readily lend itself to discrete valuation and is therefore more appropriately valued collectively as a part of the Company's "goodwill."   Since the calculation of the Company's goodwill would largely require using a valuation method that shares numerous underlying assumptions with the Discounted Cash Flow Method, its use would render a duplicative, and not independent, indication of value. Accordingly, we considered but did not employ the Asset Approach in our determination of the Company's value.



- 52 -

Valuation & Financial Opinions   SRR

**JAE 1820**

# Section VII
## Guideline Company Method



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000073

**JAE 1821**

## VII.   GUIDELINE COMPANY METHOD

### Selection of Guideline Companies

■ We searched several sources and held discussions with Company management to identify guideline public companies that are sufficiently similar to the Company to render the Guideline Company Method relevant for application in our analysis. Specifically, we started with a broad group of publicly traded companies that operate in the healthcare services industry. To further refine our search, we removed companies that (1) do not have common stock actively traded on a major U.S-based exchange, (2) are financially insolvent, and/or (3) derive more than 50% of their sales internationally.

■ Although there are few public companies directly comparable to KPC in terms of underlying relevant investment characteristics, such as markets, products/services, growth, cyclical variability, or other pertinent factors, we were able to identify a group of public companies we deem similar from a risk and return perspective. While these companies differ from KPC in terms of specific markets served, exact comparability is not required under this valuation method. Furthermore, the guideline public company group, as a whole, reflects economic conditions and business risks for the Company's industry in general. A summary description of each of the guideline public companies considered relevant for purposes of our analysis is presented in Appendix C. The following is a list of the companies we identified as similar to KPC for purposes of our analysis:

➢ Community Health Systems, Inc.

➢ HCA Holdings, Inc.

➢ LifePoint Health, Inc.

➢ SunLink Health Systems Inc.

➢ Tenet Healthcare Corp.

➢ Universal Health Services Inc.

➢ HealthSouth Corp.

➢ Kindred Healthcare Inc.

### Analysis

#### Methods of Comparison

■ The market multiple considered in our analysis includes EV / EBITDA.

■ We considered this market multiple over two distinct time periods:

➢ Next fiscal year ("NFY"); and

➢ Latest twelve months ("LTM").



Valuation & Financial Opinions   **SRR**  STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000074

**JAE 1822**

# VII. GUIDELINE COMPANY METHOD

**Calculation of Multiples**

### Implied Pricing Multiples [a]

*Multiples as of August 28, 2015*

|  | EV / NFY EBITDA | EV / LTM EBITDA |
|---|---|---|
| Community Health Systems, Inc. | 7.9x | 8.2x |
| HCA Holdings, Inc. | 9.1x | 9.2x |
| LifePoint Health, Inc. | 8.3x | 9.3x |
| Tenet Healthcare Corp. | 9.5x | 10.0x |
| Universal Health Services Inc. | 11.2x | 11.8x |
| HEALTHSOUTH Corp. | 10.0x | 10.8x |
| Kindred Healthcare Inc. | 8.5x | n/m |
| Low | 7.9x | 8.2x |
| High | 11.2x | 11.8x |
| Mean | 9.2x | 9.9x |
| Median | 9.1x | 9.7x |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.



Valuation & Financial Opinions  **SRR** STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000075

**JAE 1823**

# VII. GUIDELINE COMPANY METHOD

## Selection of Multiples

- To arrive at concluded multiples, we considered differences between the risk and return characteristics of KPC and the guideline companies. The comparative analysis of the guideline companies to KPC is based on the performance and characteristics of the sample as a whole rather than on any individual company selected.

### Selected Financial Information [a]

*In Millions of U.S. Dollars*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (4-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| HCA Holdings, Inc. | $38,429.0 | HCA Holdings, Inc. | $7,753.0 | Tenet Healthcare Corp. | 22.4% | Kindred Healthcare Inc. | 42.6% |
| Community Health Systems, Inc. | 19,491.0 | Community Health Systems, Inc. | 2,982.0 | LifePoint Health, Inc. | 15.2% | HEALTHSOUTH Corp. | 27.2% |
| Tenet Healthcare Corp. | 17,568.0 | Tenet Healthcare Corp. | 2,202.0 | Community Health Systems, Inc. | 15.1% | LifePoint Health, Inc. | 22.6% |
| Universal Health Services Inc | 8,575.8 | Universal Health Services Inc. | 1,585.3 | Kindred Healthcare Inc. | 10.6% | Universal Health Services Inc. | 13.1% |
| Kindred Healthcare Inc. | 6,003.0 | HEALTHSOUTH Corp. | 629.3 | HEALTHSOUTH Corp. | 8.6% | Tenet Healthcare Corp. | 11.8% |
| LifePoint Health, Inc. | 4,963.0 | LifePoint Health, Inc. | 627.6 | HCA Holdings, Inc. | 7.7% | Community Health Systems, Inc. | 9.4% |
| HEALTHSOUTH Corp. | 2,678.0 | Kindred Healthcare Inc. | 444.2 | Universal Health Services Inc. | 7.0% | HCA Holdings, Inc. | 8.4% |
| KPC Healthcare, Inc. | ████ | KPC Healthcare, Inc. | ████ | KPC Healthcare, Inc. | ████ | KPC Healthcare, Inc. | ████ |
| **Guideline Company Median** | **$8,575.8** | **Guideline Company Median** | **$1,585.3** | **Guideline Company Median** | **10.6%** | **Guideline Company Median** | **13.1%** |

| Growth (4-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Growth (NFY Revenue) | | Growth (NFY EBITDA) | |
|---|---|---|---|---|---|---|---|
| Tenet Healthcare Corp. | 21.4% | Kindred Healthcare Inc. | 67.9% | Kindred Healthcare Inc. | 44.2% | Kindred Healthcare Inc. | 89.3% |
| Kindred Healthcare Inc. | 19.0% | Tenet Healthcare Corp. | 27.3% | HEALTHSOUTH Corp. | 29.2% | KPC Healthcare, Inc. | ████ |
| Community Health Systems, Inc. | 14.6% | LifePoint Health, Inc. | 18.3% | Universal Health Services Inc. | 26.4% | LifePoint Health, Inc. | 27.4% |
| HEALTHSOUTH Corp. | 8.8% | Universal Health Services Inc. | 15.5% | LifePoint Health, Inc. | 9.0% | HEALTHSOUTH Corp. | 16.4% |
| Universal Health Services Inc | 8.5% | Community Health Systems, Inc. | 14.5% | Tenet Healthcare Corp. | 8.7% | Universal Health Services Inc. | 12.3% |
| HCA Holdings, Inc. | 7.3% | HEALTHSOUTH Corp. | 12.5% | HCA Holdings, Inc. | 6.3% | Tenet Healthcare Corp. | 9.6% |
| LifePoint Health, Inc. | 5.0% | HCA Holdings, Inc. | 8.9% | KPC Healthcare, Inc. | ████ | Community Health Systems, Inc. | 5.5% |
| KPC Healthcare, Inc. | ████ | KPC Healthcare, Inc. | ████ | Community Health Systems, Inc. | 5.2% | HCA Holdings, Inc. | -2.7% |
| **Guideline Company Median** | **8.8%** | **Guideline Company Median** | **15.5%** | **Guideline Company Median** | **9.9%** | **Guideline Company Median** | **12.3%** |

| Growth (Long-Term Earnings) | | Profitability (LTM EBITDA Margin) | | Profitability (5-Year Average EBITDA Margin) | | Profitability (LTM EBIT Margin) | |
|---|---|---|---|---|---|---|---|
| KPC Healthcare, Inc. | ████ | HEALTHSOUTH Corp. | 23.5% | HEALTHSOUTH Corp. | 24.2% | HEALTHSOUTH Corp. | 19.0% |
| Kindred Healthcare Inc. | 14.0% | HCA Holdings, Inc. | 20.2% | HCA Holdings, Inc. | 19.9% | HCA Holdings, Inc. | 15.3% |
| Community Health Systems, Inc. | 13.3% | Universal Health Services Inc. | 18.5% | Universal Health Services Inc. | 18.3% | Universal Health Services Inc. | 14.0% |
| HCA Holdings, Inc. | 12.1% | Community Health Systems, Inc. | 15.3% | Community Health Systems, Inc. | 15.2% | Community Health Systems, Inc. | 9.5% |
| Tenet Healthcare Corp. | 12.0% | LifePoint Health, Inc. | 12.8% | LifePoint Health, Inc. | 14.4% | Tenet Healthcare Corp. | 7.7% |
| HEALTHSOUTH Corp. | 11.3% | Tenet Healthcare Corp. | 12.5% | Tenet Healthcare Corp. | 12.5% | LifePoint Health, Inc. | 7.1% |
| Universal Health Services Inc | 10.1% | Kindred Healthcare Inc. | 7.4% | Kindred Healthcare Inc. | 6.7% | Kindred Healthcare Inc. | 4.8% |
| LifePoint Health, Inc. | 7.5% | KPC Healthcare, Inc. | ████ | | | KPC Healthcare, Inc. | ████ |
| **Guideline Company Median** | **12.0%** | **Guideline Company Median** | **15.3%** | **Guideline Company Median** | **15.2%** | **Guideline Company Median** | **9.5%** |

Source:  Capital IQ, Inc. and KPC Healthcare, Inc. financials.

[a] LTM financial results based on the Company's annualized financial results for the six months ended June 30, 2015.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000076

**JAE 1824**

# VII. GUIDELINE COMPANY METHOD

## Selected Financial Information

*In Millions of U.S. Dollars*

| Profitability (5-Year Average EBIT Margin) | | Cash Flow (LTM Net Working Capital / Sales) | | Cash Flow (5-Year Average Net Working Capital / Sales) | | Cash Flow (LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| HEALTHSOUTH Corp. | 20.0% | HEALTHSOUTH Corp. | 11.8% | LifePoint Health, Inc. | 11.5% | LifePoint Health, Inc. | 2.4 |
| HCA Holdings, Inc. | 15.0% | Tenet Healthcare Corp. | 11.7% | HEALTHSOUTH Corp. | 10.3% | HEALTHSOUTH Corp. | 2.0 |
| Universal Health Services Inc. | 13.8% | Community Health Systems, Inc. | 11.0% | Community Health Systems, Inc. | 8.7% | Community Health Systems, Inc. | 1.7 |
| Community Health Systems, Inc. | 9.4% | HCA Holdings, Inc. | 9.4% | HCA Holdings, Inc. | 8.3% | Tenet Healthcare Corp. | 1.6 |
| LifePoint Health, Inc. | 8.3% | LifePoint Health, Inc. | 9.0% | Tenet Healthcare Corp. | 7.3% | Kindred Healthcare Inc. | 1.5 |
| Tenet Healthcare Corp. | 7.7% | Universal Health Services Inc. | 6.4% | Universal Health Services Inc. | 6.5% | HCA Holdings, Inc. | 1.5 |
| Kindred Healthcare Inc. | 3.6% | Kindred Healthcare Inc. | 6.1% | Kindred Healthcare Inc. | 6.2% | Universal Health Services Inc. | 1.4 |
| **KPC Healthcare, Inc.** |  | **KPC Healthcare, Inc.** |  | **KPC Healthcare, Inc.** |  | **KPC Healthcare, Inc.** |  |
| **Guideline Company Median** | **9.4%** | **Guideline Company Median** | **9.4%** | **Guideline Company Median** | **8.3%** | **Guideline Company Median** | **1.6** |

| Cash Flow (LTM Receivables Turnover) | | Cash Flow (5-Year Average Capital Expenditure / Sales) | | Leverage (LTM Total Debt to EBITDA) | | Leverage (Debt / EV) | |
|---|---|---|---|---|---|---|---|
| HEALTHSOUTH Corp. | 7.6 | HEALTHSOUTH Corp. | 6.4% | Kindred Healthcare Inc. | 7.3 | Community Health Systems, Inc. | 69.6% |
| Tenet Healthcare Corp. | 7.0 | HCA Holdings, Inc. | 5.8% | Tenet Healthcare Corp. | 6.7 | Tenet Healthcare Corp. | 67.3% |
| LifePoint Health, Inc. | 6.9 | LifePoint Health, Inc. | 5.7% | Community Health Systems, Inc. | 5.7 | Kindred Healthcare Inc. | 62.7% |
| HCA Holdings, Inc. | 6.6 | Tenet Healthcare Corp. | 5.4% | HCA Holdings, Inc. | 3.9 | HCA Holdings, Inc. | 41.7% |
| Universal Health Services Inc. | 6.3 | Community Health Systems, Inc. | 5.4% | LifePoint Health, Inc. | 3.5 | LifePoint Health, Inc. | 37.8% |
| Community Health Systems, Inc. | 5.6 | Universal Health Services Inc. | 4.9% | HEALTHSOUTH Corp. | 3.4 | HEALTHSOUTH Corp. | 31.4% |
| **KPC Healthcare, Inc.** |  | Kindred Healthcare Inc. | 2.9% | **KPC Healthcare, Inc.** |  | Universal Health Services Inc. | 16.2% |
| Kindred Healthcare Inc. | 4.8 | **KPC Healthcare, Inc.** |  | Universal Health Services Inc. | 1.9 | **KPC Healthcare, Inc.** |  |
| **Guideline Company Median** | **6.6** | **Guideline Company Median** | **5.4%** | **Guideline Company Median** | **3.9** | **Guideline Company Median** | **41.7%** |

Source: Capital IQ, Inc. and KPC Healthcare, Inc. financials.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000077

**JAE 1825**

# VII.  GUIDELINE COMPANY METHOD

### Size

- All else held constant, investors are willing to pay a higher price for shares in a larger company vis-à-vis a smaller company. Various studies have documented the fact that companies' price to earnings ratios are directly correlated with size, where size is measured by a number of financial indicators (e.g., revenue, equity market capitalization, and total assets). In this case, the Company is smaller than all of the guideline companies in terms of total revenue and EBITDA. In particular, the median revenue level generated by the guideline companies was $8.6 billion compared with ▮▮▮▮▮▮ or KPKC. The relative size of the Company indicates a pricing multiple near or below the range of indicated market multiples for the guideline companies.

### Growth

- Everything else held constant, the higher the expected growth rate for a company, the higher the applicable multiple. Thus, to the extent that the Company and the guideline companies have different growth expectations, adjustments to the calculated market multiple are required. The Company's historical and projected revenue growth rates are below the medians of the guideline companies. However, the Company's projected NFY and long-term adjusted EBITDA growth rates are above the medians of the available analyst forecasts for the guideline companies. Still, given the Company's relative lack of a profitable track record, we placed less emphasis on the Company's projected long-term performance. The historical and projected growth rates of the Company indicate a pricing multiple near or below the range of indicated market multiples for the guideline companies.

### Additional Risk

- The higher the expected risk of a company, the lower the applicable multiple.
  - The Company has a limited track record of generating positive adjusted EBITDA.
  - The Company primarily serves Orange County, California, whereas the guideline companies operate in a variety of locations. The geographical concentration of KPC relative to the guideline companies increases its investment risk.
  - The Company generally has less management depth than the guideline companies.
  - As a privately-held entity, the Company lacks the same access to the public capital markets as the guideline companies, which may hinder future growth opportunities. Additionally, the Company does not own significant real estate assets, limiting the Company's borrowing capacity.
- These combined factors increase the risk associated with holding an investment in the Company relative to the guideline companies and suggest a multiple near the low end of the range.



- 58 -



Valuation & Financial Opinions

STOUT_0000078

## VII. GUIDELINE COMPANY METHOD

### Conclusion

- Given the Company's relative lack of consistent historical profitability (when QAF payments are excluded), we selected market multiples significantly lower than the median of the range to account for risks inherent in the Company's ability to maintain or grow current representative level EBITDA. These selected multiples implicitly give little value to the Company's forecasted results. Absent these risks and uncertainties, we would have selected higher multiples.

- Given the factors outlined above, we selected EBIT and EBITDA pricing multiples below the low end of the range of the guideline companies. Applying the selected market multiples to the financial fundamentals of the Company yields a range of Enterprise Value, as presented in the following chart.

- It is important to note that for purposes of our analysis, we applied multiples to the Company's annualized results for the six months ended June 30, 2015 as opposed to the Company's LTM results, due to the annualized results being more representative of the Company's prospective operating performance as of the date hereof.

**Guideline Company Method**

U.S. Dollars in Thousands

| | KPC Healthcare, Inc. Results | Indicated Pricing Multiples[a] | | | | Selected Multiples | | Indicated Values |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low | High | Mean | Median | | | |
| Next Fiscal Year: EBITDA | $ ■ | 7.9x | 11.2x | 9.2x | 9.1x | ■ - ■ | | $ ■ |
| Representative Level [b]: EBITDA | ■ | 8.2x | 11.8x | 9.9x | 9.7x | ■ - ■ | | ■ - ■ |

| Enterprise Value, Controlling Interest Basis (Rounded) | $ ■ ■ |
| --- | --- |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.
[b] Based on the Company's annualized financial results for the six months ended June 30, 2015.





Valuation & Financial Opinions

- 59 -

CONFIDENTIAL

# Section VIII

## Transaction Method



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000080

**JAE 1828**

## VIII.   TRANSACTION METHOD

### Guideline Transactions

- We relied on information available from merger and acquisition databases maintained by Irving Levin Associates, Inc. and Capital IQ, Inc.

- In preparing our analysis under the Transaction Method, we considered information available on 11 recent transactions involving the acquisitions of hospitals. In selecting the transactions, we focused primarily on companies that were publicly traded or that were acquired by a publicly traded company. Information on these types of acquisitions is typically available in greater detail through required filings and/or press releases than transactions of privately held entities. We reviewed proxy statements, various filings with the Securities and Exchange Commission ("SEC"), and press releases for operational results, transaction pricing, and other information on the transactions. This information, as well as our understanding of the acquisition and target companies, is the basis for our analysis.

### Analysis

#### Calculation of Multiples

- The market multiple considered in our analysis includes EV / EBITDA.

- These indicators were generally calculated based on the information available in the latest financial statements issued prior to the transaction announcement date or the actual closing date. In general, nonrecurring expenses and/or restructuring charges were ignored in our calculations of EBITDA.

- The analysis presented below reflects a summary of the transaction information and the calculation of EBITDA multiples.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000081

**JAE 1829**

# VIII.   TRANSACTION METHOD

## Guideline Transactions

*In Millions of U.S. Dollars*

| | | | | Target LTM Fundamentals | | | Indicated Multiples | |
|---|---|---|---|---|---|---|---|---|
| Close Date | Target | Acquirer | EV | Revenue | EBITDA | EBITDA Margin | EV/LTM Revenue | EV/LTM EBITDA |
| 1/29/15 | **Hackettstown Regional Medical Center** <br> Provides medical care services | **Atlantic Health System** <br> Operates a network of hospitals | $54.0 | $89.7 | $7.5 | 8.3% | 0.60x | 7.2x |
| 8/1/14 | **MedWest Haywood** <br> Provides healthcare services | **Duke LifePoint Healthcare (Nasdaq:LPNT)** <br> Operates general acute care hospitals | $36.0 | $105.5 | $4.0 | 3.7% | 0.34x | 9.1x |
| 7/10/14 | **Stanly Health Services** <br> Medical center | **Carolinas HealthCare System** <br> Provides healthcare and wellness services and programs | $70.0 | $105.1 | $14.1 | 13.4% | 0.67x | 5.0x |
| 7/1/14 | **Garden City Hospital, Inc.** <br> Owns and operates healthcare facilities | **Prime Healthcare Services, Inc.** <br> Owns and operates acute care hospitals | $48.8 | $139.7 | $5.3 | 3.8% | 0.35x | 9.2x |
| 6/9/14 | **Casa Grande Regional Medical Center** <br> Non-profit hospital | **Banner Health** <br> Operates acute-care hospitals and healthcare facilities | $87.0 | $135.3 | $8.4 | 6.2% | 0.64x | 10.4x |
| 4/1/14 | **Sharon Regional Health System** <br> Hospital with various satellite centers | **Community Health Systems, Inc. (NYSE:CYH)** <br> Operates general acute care hospitals | $70.0 | $179.5 | $7.6 | 4.2% | 0.39x | 9.2x |
| 1/27/14 | **Health Management Associates, Inc. (NYSE:HMA)** <br> Operates hospitals and other health care facilities | **Community Health Systems, Inc. (NYSE:CYH)** <br> Operates general acute care hospitals | $7,630.0 | $5,868.3 | $880.1 | 15.0% | 1.30x | 8.7x |
| 10/29/13 | **Oak Park Hospital** <br> Hospital and nursing care facility | **Rush University Medical Center** <br> Not-for-profit academic medical center | $21.1 | $107.5 | $2.3 | 2.1% | 0.20x | 9.2x |
| 10/1/13 | **3 IASIS Healthcare Hospitals** <br> Acute care hospitals | **HCA West Florida (NYSE:HCA)** <br> Operates general, acute care hospitals | $146.0 | $231.3 | $15.8 | 6.8% | 0.63x | 9.2x |
| 10/1/13 | **Vanguard Health Systems (NYSE:VHS)** <br> Operates hospitals and outpatient facilities | **Tenet Healthcare Corporation (NYSE:THC)** <br> Healthcare services company | $4,295.6 | $5,936.7 | $523.9 | 8.8% | 0.72x | 8.2x |
| 6/28/13 | **Physicians Specialty Hospital** <br> General acute care hospital | **Carter Validus Mission Critical REIT** <br> Private investment firm | $22.6 | $94.8 | $1.5 | 1.6% | 0.24x | 15.1x |
| Low | | | | $89.7 | $1.5 | 1.6% | 0.20x | 5.0x |
| High | | | | $5,936.7 | $880.1 | 15.0% | 1.30x | 15.1x |
| Mean | | | | $1,181.2 | $133.7 | 6.7% | 0.55x | 9.1x |
| Median | | | | $135.3 | $7.6 | 6.2% | 0.60x | 9.2x |


KPC Healthcare, Inc.

**Valuation & Financial Opinions**   SRR STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000082

**JAE 1830**

## VIII.   TRANSACTION METHOD

As discussed in the *Guideline Company Method* section of this report, the use of an EBITDA multiple in our analysis focuses on company results before interest expense and taxes in order to eliminate the effects of different capital structures and special tax situations, respectively. Further, the use of financial results prior to the consideration of depreciation adjusts for varying levels of capital investment, amounts of depreciable assets, and differing depreciation methods between the target companies and KPC.

### Selection of Multiples

- Similar to the application of the Guideline Company Method, to arrive at concluded multiples, we considered differences between the risk and return characteristics of KPC and the target companies involved in the transactions. Given the limited historical information available for the target companies, the relative size and profitability of the target companies were the principal characteristic studied in our analysis.

### Size

- As discussed previously in the *Guideline Company Method* section of this report, size is one indication of the perceived investment risk inherent in a company. In the instant case, KPC's size (in terms of revenue and EBITDA) is below the mean but above the median indicated by the target company group. Thus, KPC's comparatively similar size may suggest similar risk in relation to the target company group and, all else held constant, indicate a pricing multiple near the median of the target company group.

### Other Factors

- Additionally, as previously discussed in the *Valuation Methodology* section of this report, it is important to note that the multiples implied by transaction prices may not be representative of Fair Market Value as defined herein. Frequently, the acquiring party is willing to pay a premium for the target company or interest because of such items as revenue enhancement opportunities, economies of scale, the reduction in competition, increased purchasing power, knowledge of the entity, potential to gain control, etc. Thus, all else held constant, the multiple of unadjusted target company earnings may be higher due to the fact that a strategic buyer is paying for synergies (i.e., higher or adjusted earnings), that may not be present in this situation.



Valuation & Financial Opinions    SRR

CONFIDENTIAL

STOUT_0000083

**JAE 1831**

## VIII.   TRANSACTION METHOD

### Conclusion

- Given the Company's relative lack of consistent historical profitability (when QAF payments are excluded), we selected market multiples significantly lower than the median of the range to account for risks inherent in the Company's ability to maintain or grow current representative level EBITDA. These selected multiples implicitly give little value to the Company's forecasted results. Absent these risks and uncertainties, we would have selected higher multiples.

- Based on the available information, and recognizing the fact that synergistic premiums may be embedded in the indicated pricing multiples, we estimate that the Company's overall risk and return characteristics are sufficient to support EBITDA multiples between the low end and the median of the range established by the guideline transactions.

- Applying the selected market multiples to the financial fundamental of the Company yields a range of Enterprise Value, as presented in the following chart.

**Transaction Method**

*In Millions of U.S. Dollars*

| Representative Level [a]: | KPC Healthcare, Inc. Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values | |
|---|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | | |
| EBITDA | $ ███ | 5.0x | 15.1x | 9.1x | 9.2x | ███ $ ███ | $ ███ | |

| Enterprise Value, Controlling Interest Basis (Rounded) | $ ███ — $ ███ |
|---|---|

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.



- 64 -

**Valuation & Financial Opinions**   SRR

**JAE 1832**

# Section IX

## Discounted Cash Flow Method



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000085

**JAE 1833**

# IX. DISCOUNTED CASH FLOW METHOD

The Discounted Cash Flow Method utilizes market data in the derivation of a value estimate through the use of a market-derived discount rate to capitalize anticipated financial performance.

## Distributable Cash Flows

- Given the Company's relative lack of consistent historical profitability (when QAF payments are excluded), we placed primary emphasis on the Company's representative level of LTM EBITDA and placed less emphasis on the Company's projected long-term performance. Accordingly, in order to better account for risks inherent in the Company's ability to grow current representative level EBITDA and to substantially discount growth as projected by Company management, we assumed an EBITDA growth rate of 0.0% in fiscal years 2017 through 2019.

- The following chart summarizes Company management's forecasted EBITDA relative to EBITDA utilized for purposes of our Discounted Cash Flow analysis.



Source: Exhibit F and Exhibit I



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000086

**JAE 1834**

## IX. DISCOUNTED CASH FLOW METHOD

■ The Company's projected distributable cash flows are calculated in the following chart:



**Calculation of Distributable Cash Flow**

| U.S. Dollars in Thousands | For the Fiscal Year Ending | | | |
|---|---|---|---|---|
| | Year 1 3/31/2016 | Year 2 3/31/2017 | Year 3 3/31/2018 | Year 4 3/31/2019 |
| **Distributable Cash Flows** | | | | |
| EBITDA | | | | |
| Depreciation and Amortization | | | | |
| Income Taxes | | | | |
| **Debt-Free Net Income** | | | | |
| | | | | |
| Depreciation and Amortization | | | | |
| Capital Expenditures | | | | |
| Additional Working Capital | | | | |
| **Distributable Cash Flows** | | | | |

■ The cash flows expected to be generated by the Company are discounted to their present value equivalent using a rate of return that reflects the relative risk of an investment in KPC, as well as the time value of money. This return is an overall rate based upon the individual rates of return for invested capital (equity and interest-bearing debt). The return, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure.



- 67 -

Valuation & Financial Opinions **SRR**

CONFIDENTIAL

STOUT_0000087

**JAE 1835**

## IX. DISCOUNTED CASH FLOW METHOD

■ The following chart illustrates our concluded WACC:

| Weighted Average Cost of Capital | | |
|---|---|---|
| **Required Return on Equity** | | |
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.6% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta [b] | 0.95 | 5.7% |
| Small Stock Risk Premium [c] | | 5.8% |
| Company-Specific Risk Premium | | |
| **Required Return on Equity - CAPM** | | |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [d] | | |
| Less: Income Tax Factor | 40.0% | -3.2% |
| **After-tax Cost of Debt** | | |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure [e] | 65.0% | |
| Debt Allocation of Capital Structure [e] | 35.0% | |
| **Weighted Average Cost of Capital (Rounded)** | | |

[a] 20-year U.S. Treasury bond yield as of the Transaction Date.
[b] Based on the selected guideline companies.
[c] Based on Duff & Phelps LLC, *2015 Valuation Handbook – Guide to Cost of Capital.*
[d] Based on the Company's actual cost of debt as of the Transaction Date.
[e] Based on an industry long-term average capital structure.



- 68 -

Valuation & Financial Opinions 

CONFIDENTIAL

STOUT_0000088

**JAE 1836**

## IX.   DISCOUNTED CASH FLOW METHOD

### Company Specific Risk Premium

- We considered the following factors in selecting the Company Specific Risk Premium:
  - ➤ The Company has generated minimal or negative adjusted EBITDA for much of the historical period. While the Company's new management team has largely been successful in improving revenue and profitability, and while we assumed an EBITDA growth rate of 0.0% in fiscal years 2017 through 2019 for purposes of the Discounted Cash Flow analysis, there is still incremental risk associated with the Company's ability to maintain a level of profitability comparable to its current representative level.
  - ➤ The Company lacks geographical diversification.
  - ➤ The Company generally has less management depth than the guideline companies.

### Residual Cash Flow Value

- The Company can be reasonably expected to generate cash flows beyond year four of the projection period. Therefore, the value of the cash flows in year five and beyond must be determined.
- The residual cash flow value is estimated as the equivalent of the present value of the sum of the cash flows from year five to perpetuity using the Gordon Growth Model. Specifically, the residual cash flow is divided by a capitalization rate to arrive at the value of the residual cash flow as of year four. The capitalization rate is calculated as the WACC less the expected long-term growth of the cash flows.
- Since the residual value represents the value of the future cash flows as of year four, it is necessary to calculate the present value of the residual cash flow as of the Transaction Date.

### Conclusion – Discounted Cash Flow Method

- Adding the present value of the residual cash flow to the present value of the discrete projection period cash flows yields the Enterprise Value of the Company, as presented in the following chart. Varying the WACC and long-term growth rate yields a range of Enterprise Values for the Company.



- 69 -

**Valuation & Financial Opinions**   SRR

CONFIDENTIAL

STOUT_0000089

**JAE 1837**

# IX.   DISCOUNTED CASH FLOW METHOD



**Discounted Cash Flow Method**

*U.S. Dollars in Thousands*

For the Fiscal Year Ending

| | Year 1 3/31/2016 | Year 2 3/31/2017 | Year 3 3/31/2018 | Year 4 3/31/2019 | Residual |
|---|---|---|---|---|---|

**Distributable Cash Flows**
EBITDA [a]
Depreciation and Amortization
Income Taxes
**Debt-Free Net Income**

Depreciation and Amortization
Capital Expenditures
Additional Working Capital [b]
**Distributable Cash Flows**

Partial Period Adjustment [c]
**Distributable Cash Flows Allocated to Projection Period**

**Present Value of Distributable Cash Flows**
Weighted Average Cost of Capital
Discount Period [d]
**Present Value Factor**

**Present Value of Distributable Cash Flows**

**Enterprise Value**
Total Present Value of Distributable Cash Flows (Through 2019)
Present Value of Residual Cash Flows

**Enterprise Value, Controlling Interest Basis (Rounded)**

**Terminal Value**
Residual Cash Flow

Weighted Average Cost of Capital
Less:  Residual Growth Rate
**Capitalization Rate**

**Residual Cash Flow Value**
Present Value Factor
**Present Value of Residual Cash Flows**

[a]
[b]
[c] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Transaction Date and the end of the first projection year.
[d] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions   

CONFIDENTIAL

STOUT_0000090

**JAE 1838**

## IX.   DISCOUNTED CASH FLOW METHOD



**DCF Sensitivity Analysis**

**Present Value of Discrete Cash Flows**

For the Fiscal Year Ending

| | Year 1<br>3/31/2016 | Year 2<br>3/31/2017 | Year 3<br>3/31/2018 | Year 4<br>3/31/2019 | Total |
|---|---|---|---|---|---|
| WACC | | | | | |

**Present Value of Residual Cash Flows**

Residual Year Growth Rate

| | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
|---|---|---|---|---|---|
| WACC 12.0% | | | | | |
| 12.5% | | | | | |
| 13.0% | | | | | |
| 13.5% | | | | | |
| 14.0% | | | | | |

**Concluded Range of Enterprise Value**

Residual Year Growth Rate

| | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
|---|---|---|---|---|---|
| WACC 12.0% | | | | | |
| 12.5% | | | | | |
| 13.0% | | | | | |
| 13.5% | | | | | |
| 14.0% | | | | | |



Valuation & Financial Opinions  

CONFIDENTIAL

STOUT_0000091

**JAE 1839**

## Section X

## Valuation Reconciliation and Conclusion



- 72 -

Valuation & Financial Opinions **SRR**

**JAE 1840**

## X.   VALUATION RECONCILIATION AND CONCLUSION

### Conclusion of Enterprise Value

- We considered the appropriateness, accuracy, and quantity of evidence as primary criteria in reconciling the aforementioned valuation approaches. To determine the EV of KPC, we considered the strengths and weaknesses of each of the valuation methods applied in terms of the above three criteria. Based thereon, we estimate KPC's Enterprise Value to range from ███████ ███████████ This estimate of value implicitly incorporates approximately equal weighting of each valuation methodology utilized.

### Adjustments to Enterprise Value

- Enterprise Value incorporates the value of total invested capital, including the value of both debt and equity. Several adjustments are necessary in order to derive the Fair Market Value of equity.

#### Net Interest-Bearing Debt

- The Company expects to have interest-bearing debt of ███████ (net of cash) as of the Transaction Date. Accordingly, we subtracted net interest-bearing debt of ███████ from the Company's Enterprise Value.

#### Receivable from Shareholder

- The Company has a non-operating asset in the form of a ███████ note receivable from the Seller. We added the value of this non-operating asset to the Company's Enterprise Value.

#### Indicated Value of QAF Payments

- The Company expects to collect approximately ███████ of QAF payments through January of 2018. Given the stable to positive outlook for QAF funding conditions, the short "maturity" of the projected 2016 QAF payment stream, the fact that a significant portion of these payments had been "earned" as of the Transaction Date (the 2016 QAF applies to the Company's performance for calendar years 2014 through 2016), and the potential for increases to QAF reimbursement rates based on a more recent census, we discounted the QAF payments at an interest rate of 7.0% based on the current three-year rate on U.S. Treasury securities and a conservative credit spread of approximately 600 basis points. Accordingly, we estimated the indicated value of these payments to be ███████ which we added to the Company's Enterprise Value.



- 73 -

Valuation & Financial Opinions   **SRR**

**JAE 1841**

## X.   VALUATION RECONCILIATION AND CONCLUSION

**After-Tax Contingent Reserve**

■  As of the Transaction Date, the Company had booked a contingent reserve of $5.7 million due to a May 2015 court decision related to litigation filed by a former employee of the Company. While Company management believes the lawsuit to be without merit and is appealing the court decision to the California Supreme Court, we subtracted the after-tax value of contingent reserve from the Company's Enterprise Value.

**Adjustments to Equity Value**

**Discount for Limited Marketability**

■  To this point in our analysis, the suggested value reflects a fully marketable security comparable to interests in public companies (i.e., securities whose values are not burdened by limited marketability). KPC is a privately held company whose common stock is not traded on a public exchange. However, unlike typical privately held, non-ESOP companies, KPC will have a repurchase obligation (often referred to as a "put" option) to redeem shares from terminated employees. The effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability. In addition, due to the long-term allocation of shares, the Company's repurchase obligation is not expected to be material in the near-term. We deemed a discount for limited marketability of 5.0% to be appropriate. (See Appendix F for more information regarding the selection of the discount for limited marketability.)



- 74 -

**Valuation & Financial Opinions**

**JAE 1842**

# X. VALUATION RECONCILIATION AND CONCLUSION

## Conclusion of Value

**Conclusion of Value**

| U.S. Dollars in Thousands | | Indicated Range of Value | |
|---|---|---|---|
| | | Low | High |
| Guideline Company Method | | | |
| Transaction Method | | | |
| Discounted Cash Flow Method | | | |
| **Concluded Enterprise Value** | | | |
| Less: Net Interest-Bearing Debt [a] | | | |
| Add: Receivable from Shareholder [b] | | | |
| Add: Present Value of QAF Payments | | | |
| Less: After-Tax Contingent Reserve | | | |
| **Total Adjustments to Enterprise Value** | | | |
| **Marketable, Controlling-Interest Value of Equity (Rounded)** | | | |
| Less:  Discount for Limited Marketability | 5.0% | | |
| **Fair Market Value of Equity (Rounded)** | | | |



[a] Pursuant to the Stock Purchase Agreement.
[b] Based on the Company's balance sheet as of June 30, 2015.



Valuation & Financial Opinions  SRR

CONFIDENTIAL

STOUT_0000095

**JAE 1843**

# Section XI

## Fairness Analysis



Valuation & Financial Opinions    SRR

CONFIDENTIAL

STOUT_0000096

**JAE 1844**

## XI. FAIRNESS ANALYSIS

### Adequate Consideration – Stock Purchase Transaction

**Consideration Comparison**

| U.S. Dollars in Thousands | Indicated Range of Value | | |
|---|---|---|---|
| | Low | | High |
| Fair Market Value of Common Equity (Rounded) | $ 208,574 | | $ 229,574 |
| Proposed Purchase Price [a] | | $ 217,574 | |

[a] Based on the proposed purchase price of ████ less the Warrant Redemption Transaction price of ████



- 77 -

Valuation & Financial Opinions

**JAE 1845**

# XI.  FAIRNESS ANALYSIS

## Consideration Comparison – Overall Transaction

### Consideration Comparison - Overall Transaction

| U.S. Dollars in Thousands | Indicated Range of Value | |
|---|---|---|
| | Low | High |
| Fair Market Value of Equity (Rounded) | $ █████ | $ █████ |
| Proposed Purchase Price | $ █████ | |
| **Implied Multiples** | | |
| EV / Representative Level EBITDA | ███ | |
| EV / NFY EBITDA | | |



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000098

**JAE 1846**

# XI. FAIRNESS ANALYSIS

## Reasonableness of Interest Rates

| Market Summary of Interest Rates [a] | |
| --- | --- |
| Debt Instrument | Interest Rate |
| Prime Rate | 3.25% |
| 30 day LIBOR | 0.19% |
| 90 day LIBOR | 0.31% |
| 1-Year LIBOR | 0.63% |
| 5-Year Treasury | 1.52% |
| 10-Year Treasury | 2.16% |
| 30-Year Treasury | 2.86% |
| 5-Year Corporate Bonds | |
| A Rating | 2.41% |
| BBB Rating | 2.94% |
| BB Rating | 4.84% |
| 10-Year Corporate Bonds | |
| A Rating | 3.44% |
| BBB Rating | 4.08% |
| BB Rating | 6.20% |
| 30-Year Corporate Bonds | |
| A Rating | 4.31% |
| BBB Rating | 4.92% |
| BB Rating | 6.99% |
| Merrill Lynch High Yield Master II Index | 7.04% |
| CCC and Lower Rated Constrained Index | 13.60% |
| American Capital, Ltd. [b] | |
| Subordinated Debt Investments | 4.4% - 19.0% |
| Median of Subordinated Debt Investments | 15.00% |
| Pepperdine Capital Markets Project [c] | |
| Mezzanine Debt Investments, Cash Interest Rate | 8.0% - 12.0% |
| Mezzanine Debt Investments, PIK Expected Return | 1.0% - 2.0% |
| Mezzanine Debt Investments, Total Return | 8.0% - 20.0% |
| **ESOP Loans [d]** | **2.8%** |
| **Chaudhuri & SPCP Subordinated Notes - IRR** | **11.8%** |
| **Thomas Subordinated Note - IRR** | **13.0%** |

[a] Rates as of August 3, 2015.
[b] From American Capital, Ltd. 10-Q for the period ending March 31, 2015.
[c] From Pepperdine University's Private Capital Markets Project survey report, 2015.
[d] Equal to the long-term AFR for August 2015.



- 79 -

Valuation & Financial Opinions

**JAE 1847**

# XI. FAIRNESS ANALYSIS

## Internal Rate of Return for Subordinated Debt

- Private mezzanine debt securities are typically used to fund middle-market companies with total revenue of less than $500 million. These securities include debt with an equity option. The equity option is usually a contingent common equity interest, either by way of warrants or a conversion option to which registration rights are typically attached. Interest payments on private mezzanine debt securities usually involve both a cash pay portion and paid-in-kind ("PIK") portion. The total stated interest rate usually ranges between 12.0% and 19.0%, with the cash portion of interest generally ranging between 10.0% and 15.0%, and the remainder interest portion in PIK. Mezzanine investors are typically looking for a 14.0% to 20.0% all-in return (including the return from the equity component). Private mezzanine debt securities usually have a maturity of between six and eight years. The average transaction size for mezzanine securities typically ranges between $10 million and $30 million.

- For higher risk mezzanine transactions with smaller companies in cyclical industries that have high leverage ratios, mezzanine investors are typically looking for a 20.0% to 25.0% all-in return.

- In connection with the issuance of their respective Subordinated Notes, in exchange for fewer Warrants, the Seller and SPCP received certain rights that require their consent in the event the Company elects to assume additional indebtedness. Accordingly, for purposes of our analysis, we calculated an IRR for each of (i) the Seller and SPCP Subordinated Notes; and (ii) the William Thomas Subordinated Note.



– 80 –

Valuation & Financial Opinions   SRR

## XI.  FAIRNESS ANALYSIS



**Calculation of IRR for Chaudhuri & SPCP Subordinated Notes**

*In Thousands of U.S. Dollars*

| | For the Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| | |
|---|---|
| **Internal Rate of Return** | |

[a] Based on cash interest of ▮ per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of ▮ per share as of August 31, 2020 less the exercise price of ▮ multiplied by ▮ warrants outstanding.



- 81 -

Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000101

**JAE 1849**

# XI.  FAIRNESS ANALYSIS



**Calculation of IRR for Thomas Subordinated Notes**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| Internal Rate of Return | |
|---|---|

[a] Based on cash interest of ▮▮▮ per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of ▮▮▮ per share as of
    August 31, 2020 less the exercise price of ▮▮▮ multiplied by ▮▮▮ warrants outstanding.



- 82 -

**Valuation & Financial Opinions**   SRR

CONFIDENTIAL

STOUT_0000102

**JAE 1850**

## XI.  FAIRNESS ANALYSIS

### Warrant Strike Price

**Post-Transaction Fair Market Value of Common Stock**



*In Thousands of U.S. Dollars*

| | Indicated Value | |
|---|---|---|
| | Low | High |
| **Enterprise Value** | | |
| Add:  Cash and Cash Equivalents | | |
| Less: Capital Leases | | |
| Less: Line of Credit | | |
| Less: Term Loan | | |
| Less: Thomas Subordinated Notes | | |
| Less: Chaudhuri & SPCP Subordinated Notes | | |
| Less: Fair Market Value of Retention SARs | | |
| Add: Present Value of QAF Payments | | |
| Add: Present Value of ESOP Debt Tax Benefit | | |
| Add: Receivable from Former Shareholder | | |
| Less: After-Tax Contingent Reserve | | |
| **Total Adjustments to Enterprise Value** | | |
| **Marketable, Controlling-Interest Value of Equity** | | |
| Less:  Discount for Limited Marketability | 5.0% | |
| **Fair Market Value of Equity (Rounded)** | | |
| Divided by:  Common Shares Outstanding (Thousands) | | |
| **Fair Market Value of Equity Per Share** | | |
| **90% of Fair Market Value of Equity Per Share** | | |
| **Proposed Strike Price** | | |



KFC
Healthcare, Inc.

**Valuation & Financial Opinions**   SRR

CONFIDENTIAL

STOUT_0000103

**JAE 1851**

# XI. FAIRNESS ANALYSIS

## Additional Considerations

- Our analysis does not ascribe value to Future QAF payments or QAF programs beyond 2024.
    - ➤ However, in the event of a Future QAF, the Company is entitled to 40% of all Future QAF payments covering any of the periods from January 1, 2017 to December 31, 2024. The Company is entitled to 100% of all QAF payments in 2025 and beyond.
    - ➤ Given the complexity of the regulatory and legislative processes, there is a high degree of uncertainty in accurately forecasting Future QAF payments. Still, industry analysts generally forecast stable QAF funding conditions. Furthermore, the Company has averaged approximately ▮▮▮▮▮ in QAF income over the past five years.
- Our concluded range of Enterprise Value for the Hospitals is ▮▮▮▮▮ a representative level of LTM EBITDA of ▮▮▮▮▮
    - ➤ These implied multiples represent a significant discount to the guideline public company multiples of 9.7x LTM EBITDA and 9.2x LTM EBITDA for the guideline transactions.
    - ➤ This discount accounts for risks inherent in the Company's ability to maintain or grow current levels of profitability. Furthermore, our selected multiples implicitly give little value to the Company's forecasted results. Absent these risks and uncertainties (i.e. if the Company had a track record of stable profitability), we would have selected higher multiples.



- 84 -

Valuation & Financial Opinions **SRR**

STOUT_0000104

**JAE 1852**

# Section XII

## Opinion



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000105

**JAE 1853**

## XII. Opinion

### Opinion

Based on all of the foregoing, it is our Opinion, as of the date hereof, that:

- the Consideration to be paid by the ESOP for the shares of KPC common stock pursuant to the terms of the Stock Purchase Transaction is not greater than the Fair Market Value of such shares;

- the interest rates on each of the ESOP Loans and the Amended and Restated ESOP Loan are not in excess of reasonable rates;

- the financial terms of each of the ESOP Loans and the Amended and Restated ESOP Loan are at least as favorable to the ESOP as would be the terms of comparable loans resulting from arm's-length negotiations between independent parties;

- the strike price of the Warrants, on a per share basis, is equal to at least 90% of the Fair Market Value of one share of the underlying common stock of the Company on the date the Warrant is issued; and

- the terms and conditions of the Transactions, taken as a whole, are fair to the ESOP from a financial point of view.

### Assumptions and Limiting Conditions

- This Opinion is solely for the use and benefit of the Trustee, and any summary of or reference to the Opinion or any other reference to SRR by the Company will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld. The Opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

- Reference should be made to Appendix G, as well as our engagement letter dated May 6, 2015, for assumptions and limiting conditions that are applicable to our conclusions and our financial advisory role.



Valuation & Financial Opinions   **SRR** STOUT | RISIUS | ROSS

CONFIDENTIAL

STOUT_0000106

**JAE 1854**

# Appendix A

## Valuation Exhibits



- 87 -

Valuation & Financial Opinions   SRR

## A. VALUATION EXHIBITS

### Exhibit A - Conclusion of Value



| U.S. Dollars in Thousands | | Indicated Range of Value | |
| --- | --- | --- | --- |
| | | Low | High |
| Guideline Company Method | | | |
| Transaction Method | | | |
| Discounted Cash Flow Method | | | |
| | | | |
| **Concluded Enterprise Value** | | | |
| | | | |
| Less: Net Interest-Bearing Debt [a] | | | |
| Add: Receivable from Shareholder [b] | | | |
| Add: Present Value of QAF Payments | | | |
| Less: After-Tax Contingent Reserve | | | |
| **Total Adjustments to Enterprise Value** | | | |
| | | | |
| **Marketable, Controlling-Interest Value of Equity (Rounded)** | | | |
| | | | |
| Less:  Discount for Limited Marketability | 5.0% | | |
| | | | |
| **Fair Market Value of Equity (Rounded)** | | | |

[a] Pursuant to the Stock Purchase Agreement.
[b] Based on the Company's balance sheet as of June 30, 2015.



- 88 -

Valuation & Financial Opinions



**JAE 1856**

## A. VALUATION EXHIBITS

**Exhibit B – Reported Balance Sheets**

*U.S. Dollars in Thousands*

As of

| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | | | | | | |
| Accounts Receivable, Net | | | | | | |
| Inventories | | | | | | |
| Due from Governmental Payers | | | | | | |
| Hospital Quality Assurance Fee Receivable | | | | | | |
| Prepaid Insurance | | | | | | |
| Prepaid Income Taxes | | | | | | |
| Deferred Tax Assets, Net | | | | | | |
| Other Prepaid Expenses and Current Assets | | | | | | |
| **Total Current Assets** | | | | | | |
| **Net Property and Equipment** | | | | | | |
| Other Assets | | | | | | |
| Receivable from Shareholder | | | | | | |
| Deferred Tax Assets, Net | | | | | | |
| **Total Other Assets** | | | | | | |
| **Total Assets** | | | | | | |



Source:  Internally-prepared financial statements for fiscal years 2011 through 2013, audited financial statements for fiscal years 2014 and 2015, and internally-prepared financial statements for the latest 12-month period ended June 30, 2015.



- 89 -

Valuation & Financial Opinions   SRR

**JAE 1857**

## A.   VALUATION EXHIBITS

### Exhibit B – Reported Balance Sheets



*U.S. Dollars in Thousands*

As of

| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 |
|---|---|---|---|---|---|---|
| Revolving Line of Credit | | | | | | |
| Current Portion of Long-Term Debt | | | | | | |
| Accounts Payable | | | | | | |
| Accrued Expenses | | | | | | |
| Accrued Insurance Retentions | | | | | | |
| Hospital Quality Assurance Payable | | | | | | |
| Interest Payable | | | | | | |
| Income Taxes Payable | | | | | | |
| Other Current Liabilities | | | | | | |
| **Total Current Liabilities** | | | | | | |
| Capital Lease Obligations and Long-Term Debt | | | | | | |
| Warrant Liability | | | | | | |
| **Total Long-Term Liabilities** | | | | | | |
| **Total Liabilities** | | | | | | |
| Common Stock and Additional Paid-In Capital | | | | | | |
| Retained Earnings | | | | | | |
| Shareholder Note | | | | | | |
| **Total Stockholders' Equity** | | | | | | |
| **Total Liabilities & Stockholders' Equity** | | | | | | |

Source:  Internally-prepared financial statements for fiscal years 2011 through 2013, audited financial statements for fiscal years 2014 and 2015, and internally-prepared financial statements for the latest 12-month period ended June 30, 2015.



- 90 -

Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000110

## A.   VALUATION EXHIBITS

### Exhibit B - Reported Income Statements



| U.S. Dollars in Thousands | For the Fiscal Year Ended | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/31/2011 | % | 3/31/2012 | % | 3/31/2013 | % | 3/31/2014 | % | 3/31/2015 | % | 6/30/2015 | % |
| Patient Service Revenues | | | | | | | | | | | | |
| Provision for Bad Debts | | | | | | | | | | | | |
| Net Revenue | | | | | | | | | | | | |
| Salaries and Benefits | | | | | | | | | | | | |
| Supplies | | | | | | | | | | | | |
| Other Operating Expenses | | | | | | | | | | | | |
| Depreciation & Amortization | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | |
| Operating Income | | | | | | | | | | | | |
| Other Income (Expense) | | | | | | | | | | | | |
| EBIT | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | |
| Earnings Before Taxes | | | | | | | | | | | | |
| Income Taxes | | | | | | | | | | | | |
| Net Income | | | | | | | | | | | | |
| EBIT | | | | | | | | | | | | |
| EBITDA | | | | | | | | | | | | |

Source:  Internally-prepared financial statements for fiscal years 2011 through 2013, audited financial statements for fiscal years 2014 and 2015, and internally-prepared financial statements for the latest 12-month period ended June 30, 2015.



- 91 -

Valuation & Financial Opinions   SRR

**JAE 1859**

## A. VALUATION EXHIBITS



Exhibit B - Reported Monthly Income Statements

Source: Internally-prepared financial statements.


KPC Healthcare, Inc.

- 92 -

Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000112

**JAE 1860**

# A.   VALUATION EXHIBITS



Exhibit C - Historical Adjusted Earnings

[a] Based on fiscal years 2011 through 2015.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000113

**JAE 1861**

## A.   VALUATION EXHIBITS

### Exhibit C - Historical Adjusted Monthly Earnings



| U.S. Dollars in Thousands | 6 Months Ended 6/30/2015 | % | Annualized 6 Months Ended 6/30/2015 | % |
|---|---|---|---|---|
| Net Revenue | | | | |
| Less: Recognized QAF Income | | | | |
| Adjusted Revenue | | | | |
| | | | | |
| Earnings Before Taxes | | | | |
| | | | | |
| Investment Income | | | | |
| Warrant-Related Expense | | | | |
| Severance Expense | | | | |
| Transaction Expenses | | | | |
| QAF Income, Net | | | | |
| Consulting Fees | | | | |
| Appeal Contingency | | | | |
| Total Adjustments | | | | |
| | | | | |
| Adjusted Earnings Before Taxes | | | | |
| | | | | |
| Interest Expense | | | | |
| Depreciation and Amortization | | | | |
| | | | | |
| Adjusted EBIT | | | | |
| Adjusted EBITDA | | | | |



KFC Healthcare, Inc.

- 94 -

Valuation & Financial Opinions

SRR

CONFIDENTIAL

STOUT_0000114

**JAE 1862**

## A.   VALUATION EXHIBITS

**Exhibit D - Ratio Analysis**

| | For the Fiscal Year Ended | | | | | 12 Months Ended | 5-Year Average [b] |
|---|---|---|---|---|---|---|---|
| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 | |

**Activity Ratios**
Receivables Turnover
Asset Turnover

**Liquidity and Working Capital Ratios**
Current Ratio
Current Ratio (Net of Cash, NOAs, & IBD)
Net Working Capital / Net Revenue

Days in Accounts Receivable
- Days in Accounts Payable
  **Net Trade Cycle**

**Leverage and Coverage [a]**
Liabilities / Equity
Debt / (Debt + Equity)
Assets / Equity
EBIT / Interest Expense
Total Debt / EBITDA

**Profitability [a]**
EBITDA Margin
EBIT Margin
Net Profit Margin
Return on Assets
Return on Equity

**Other Ratios [a]**
Depreciation and Amortization / Sales
Net Capital Expenditures / Sales
Unlevered Free Cash Flow / Sales



[a]  Ratios are calculated based on adjusted results.
[b]  Based on fiscal years 2011 through 2015.



- 95 -

Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000115

**JAE 1863**

# A. VALUATION EXHIBITS

### Exhibit E - Projected Income Statements



| U.S. Dollars in Thousands | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | For the Fiscal Year Ending | | | | | | | |
| | 3/31/2016 | % | 3/31/2017 | % | 3/31/2018 | % | 3/31/2019 | % |
| **Net Revenue** | | | | | | | | |
| Salaries and Benefits | | | | | | | | |
| Supplies | | | | | | | | |
| Other Operating Expenses | | | | | | | | |
| Depreciation & Amortization | | | | | | | | |
| Operating Expenses | | | | | | | | |
| **Operating Income** | | | | | | | | |
| Other Income (Expense) | | | | | | | | |
| **EBIT** | | | | | | | | |
| Interest Expense | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | |
| Income Taxes | | | | | | | | |
| **Net Income** | | | | | | | | |

Source: Company management prepared projections.



- 96 -

Valuation & Financial Opinions   SRR

**JAE 1864**

## A. VALUATION EXHIBITS

### Exhibit F - Projected Adjusted Earnings

| U.S. Dollars in Thousands | Annualized 6 Months Ended 6/30/2015 [a] | % | 3/31/2016 | % | 3/31/2017 | % | 3/31/2018 | % | 3/31/2019 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Fiscal Year Ending | | | | | |
| Net Revenue | | | | | | | | | | |
| Less: Recognized QAF Income | | | | | | | | | | |
| **Adjusted Revenue** | | | | | | | | | | |
| Growth Rate | | | | | | | | | | |
| **Earnings Before Taxes** | | | | | | | | | | |
| Recognized QAF Income | | | | | | | | | | |
| Increase in Management Fee | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | |
| Adjusted Earnings Before Taxes | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | |
| **Adjusted EBIT** | | | | | | | | | | |
| **Adjusted EBITDA** | | | | | | | | | | |



[a]  Based on the Company's annualized financial results for the six months ended June 30, 2015.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000117

**JAE 1865**

## A.   VALUATION EXHIBITS

**Exhibit G – Guideline Company Method**

*U.S. Dollars in Thousands*



|  | KPC Healthcare, Inc. Results | Indicated Pricing Multiples[a] | | | | Selected Multiples | | Indicated Values | |
|---|---|---|---|---|---|---|---|---|---|
|  |  | Low | High | Mean | Median |  |  |  |  |
| Next Fiscal Year: EBITDA | $ ▮▮▮ | 7.9x | 11.2x | 9.2x | 9.1x | ▮▮ - ▮▮ | $ ▮▮ | $ ▮▮ |
| Representative Level [b]: EBITDA | ▮▮▮ | 8.2x | 11.8x | 9.9x | 9.7x | ▮▮ - ▮▮ | ▮▮ | ▮▮ |

| Enterprise Value, Controlling Interest Basis (Rounded) | $ ▮▮ - $ ▮▮ |
|---|---|

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.
[b] Based on the Company's annualized financial results for the six months ended June 30, 2015.



**Valuation & Financial Opinions**   SRR

CONFIDENTIAL

STOUT_0000118

**JAE 1866**

## A.   VALUATION EXHIBITS

### Exhibit G - Implied Pricing Multiples [a]

*Multiples as of August 28, 2015*

|  | EV / NFY EBITDA | EV / LTM EBITDA |
|---|---|---|
| Community Health Systems, Inc. | 7.9x | 8.2x |
| HCA Holdings, Inc. | 9.1x | 9.2x |
| LifePoint Health, Inc. | 8.3x | 9.3x |
| Tenet Healthcare Corp. | 9.5x | 10.0x |
| Universal Health Services Inc. | 11.2x | 11.8x |
| HEALTHSOUTH Corp. | 10.0x | 10.8x |
| Kindred Healthcare Inc. | 8.5x | n/m |
| | | |
| Low | 7.9x | 8.2x |
| High | 11.2x | 11.8x |
| | | |
| Mean | 9.2x | 9.9x |
| Median | 9.1x | 9.7x |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000119

**JAE 1867**

# A.  VALUATION EXHIBITS

## Exhibit G - Calculation of Enterprise Value

*In Millions of U.S. Dollars, except per Share Price*

| General Market Information | | Community Health Systems, Inc. | HCA Holdings, Inc. | LifePoint Health, Inc. | Tenet Healthcare Corp. | Universal Health Services Inc. | HEALTHSOUTH Corp. | Kindred Healthcare Inc. |
|---|---|---|---|---|---|---|---|---|
| Ticker Symbol | | CYH | HCA | LPNT | THC | UHS | HLS | KND |
| Stock Exchange | | NYSE | NYSE | NasdaqGS | NYSE | NYSE | NYSE | NYSE |
| Fiscal Year End | | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 | 12/31/14 |
| Latest Financial Information | | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 | 6/30/15 |
| Next Fiscal Year | | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 | 12/31/15 |
| | | | | | | | | |
| 20-Day Average Common Stock Price (08/28/2015) [a] | | $ 62.21 | $ 98.67 | $ 88.93 | $ 56.88 | $ 155.84 | $ 48.55 | $ 23.58 |
| 20-Day Average Common Stock Price (12/31/2014) [a] | | 57.83 | 81.05 | 78.95 | 55.73 | 119.32 | 42.90 | 20.08 |
| Percent Change | | 7.6% | 21.7% | 12.6% | 2.1% | 30.6% | 13.2% | 17.4% |
| | | | | | | | | |
| Average Percent Change | 15.0% | | | | | | | |
| Median Percent Change | 13.2% | | | | | | | |
| | | | | | | | | |
| 52-Week Price Range | | | | | | | | |
| 52-Week High Common Stock Price [a] | | 71.50 | 105.04 | 97.00 | 69.97 | 163.43 | 53.21 | 27.13 |
| 52-Week Low Common Stock Price [a] | | 49.21 | 48.30 | 69.25 | 45.62 | 105.19 | 39.42 | 18.63 |
| **Calculation of Enterprise Value** | | | | | | | | |
| 20-Day Average Stock Price (08/28/2015) | | $ 62.21 | $ 98.67 | $ 88.93 | $ 56.88 | $ 155.84 | $ 48.55 | $ 23.58 |
| Multiplied by: Shares Outstanding | | 115.3 | 416.3 | 44.4 | 99.3 | 99.0 | 91.5 | 83.7 |
| **Market Value of Equity ("MVE")** | | $ 7,171.0 | $ 41,080.9 | $ 3,948.3 | $ 5,649.0 | $ 15,432.1 | $ 4,442.1 | $ 1,973.6 |
| | | | | | | | | |
| Add: Total Debt | | 16,937.0 | 29,904.0 | 2,211.1 | 14,754.0 | 3,035.3 | 2,125.8 | 3,259.7 |
| Add: Preferred Stock | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Add: Minority Interest in Subsidiaries | | 607.0 | 1,451.0 | 117.4 | 1,806.0 | 310.6 | 257.3 | 193.3 |
| Less: Cash and Short-Term Investments | | (365.0) | (750.0) | (422.8) | (299.0) | (42.5) | (52.9) | (224.1) |
| **Enterprise Value ("EV")** | | $ 24,350.0 | $ 71,685.9 | $ 5,854.0 | $ 21,910.0 | $ 18,735.6 | $ 6,772.3 | $ 5,202.5 |

[a] The share prices of the guideline companies incorporate a control premium of 10.0%.

Source: Capital IQ, Inc.



- 100 -

Valuation & Financial Opinions  

CONFIDENTIAL

STOUT_0000120

**JAE 1868**

## A.   VALUATION EXHIBITS

---

### Exhibit G - Selected Financial Information [a]

*In Millions of U.S. Dollars*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (4-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| HCA Holdings, Inc. | $36,429.0 | HCA Holdings, Inc. | 87,753.0 | Tenet Healthcare Corp. | 22.4% | Kindred Healthcare Inc. | 42.6% |
| Community Health Systems, Inc. | 19,491.0 | Community Health Systems, Inc. | 2,982.0 | LifePoint Health, Inc. | 15.2% | HEALTHSOUTH Corp. | 27.2% |
| Tenet Healthcare Corp. | 17,568.0 | Tenet Healthcare Corp. | 2,202.0 | Community Health Systems, Inc. | 15.1% | LifePoint Health, Inc. | 22.6% |
| Universal Health Services Inc. | 8,575.8 | Universal Health Services Inc. | 1,585.3 | Kindred Healthcare Inc. | 10.6% | Universal Health Services Inc. | 13.1% |
| Kindred Healthcare Inc. | 6,003.0 | HEALTHSOUTH Corp. | 629.3 | HEALTHSOUTH Corp. | 8.6% | Tenet Healthcare Corp. | 11.8% |
| LifePoint Health, Inc. | 4,963.0 | LifePoint Health, Inc. | 627.5 | HCA Holdings, Inc. | 7.7% | HCA Holdings, Inc. | 8.4% |
| HEALTHSOUTH Corp. | 2,678.0 | Kindred Healthcare Inc. | 444.2 | Universal Health Services Inc. | 7.0% | | |
| KPC Healthcare, Inc. | ▮ | KPC Healthcare, Inc. | ▮ | KPC Healthcare, Inc. | ▮ | KPC Healthcare, Inc. | ▮ |
| **Guideline Company Median** | **$8,575.8** | **Guideline Company Median** | **$1,585.3** | **Guideline Company Median** | **10.6%** | **Guideline Company Median** | **13.1%** |

| Growth (4-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Growth (NFY Revenue) | | Growth (NFY EBITDA) | |
|---|---|---|---|---|---|---|---|
| Tenet Healthcare Corp. | 21.4% | Kindred Healthcare Inc. | 67.9% | Kindred Healthcare Inc. | 44.2% | Kindred Healthcare Inc. | 89.3% |
| Kindred Healthcare Inc. | 19.0% | Tenet Healthcare Corp. | 27.3% | HEALTHSOUTH Corp. | 29.2% | KPC Healthcare, Inc. | ▮ |
| Community Health Systems, Inc. | 14.6% | LifePoint Health, Inc. | 18.3% | Universal Health Services Inc. | 28.4% | LifePoint Health, Inc. | 27.4% |
| HEALTHSOUTH Corp. | 8.8% | Universal Health Services Inc. | 15.5% | LifePoint Health, Inc. | 9.9% | HEALTHSOUTH Corp. | 16.4% |
| Universal Health Services Inc. | 8.5% | Community Health Systems, Inc. | 14.6% | Tenet Healthcare Corp. | 8.7% | Universal Health Services Inc. | 12.3% |
| HCA Holdings, Inc. | 7.3% | HEALTHSOUTH Corp. | 12.5% | KPC Healthcare, Inc. | ▮ | Tenet Healthcare Corp. | 9.6% |
| LifePoint Health, Inc. | 5.0% | | | Community Health Systems, Inc. | 5.2% | Community Health Systems, Inc. | 5.5% |
| KPC Healthcare, Inc. | ▮ | KPC Healthcare, Inc. | 8.9% | | | HCA Holdings, Inc. | 2.7% |
| **Guideline Company Median** | **8.8%** | **Guideline Company Median** | **15.5%** | **Guideline Company Median** | **9.9%** | **Guideline Company Median** | **12.3%** |

| Growth (Long-Term Earnings) | | Profitability (LTM EBITDA Margin) | | Profitability (5-Year Average EBITDA Margin) | | Profitability (LTM EBIT Margin) | |
|---|---|---|---|---|---|---|---|
| KPC Healthcare, Inc. | ▮ | HEALTHSOUTH Corp. | 23.5% | HEALTHSOUTH Corp. | 24.2% | HEALTHSOUTH Corp. | 19.0% |
| Kindred Healthcare Inc. | 14.0% | HCA Holdings, Inc. | 20.2% | HCA Holdings, Inc. | 19.9% | HCA Holdings, Inc. | 15.3% |
| Community Health Systems, Inc. | 13.3% | Universal Health Services Inc. | 18.5% | Universal Health Services Inc. | 18.3% | Universal Health Services Inc. | 14.0% |
| HCA Holdings, Inc. | 12.1% | Community Health Systems, Inc. | 15.3% | Community Health Systems, Inc. | 15.2% | Community Health Systems, Inc. | 9.5% |
| Tenet Healthcare Corp. | 12.0% | LifePoint Health, Inc. | 12.6% | LifePoint Health, Inc. | 14.4% | Tenet Healthcare Corp. | 7.7% |
| HEALTHSOUTH Corp. | 11.3% | Tenet Healthcare Corp. | 12.5% | Tenet Healthcare Corp. | 12.5% | LifePoint Health, Inc. | 7.1% |
| Universal Health Services Inc. | 10.1% | | | Kindred Healthcare Inc. | 6.7% | Kindred Healthcare Inc. | 4.8% |
| LifePoint Health, Inc. | 7.5% | KPC Healthcare, Inc. | ▮ | KPC Healthcare, Inc. | ▮ | PC Healthcare, Inc. | ▮ |
| **Guideline Company Median** | **12.0%** | **Guideline Company Median** | **15.3%** | **Guideline Company Median** | **15.2%** | **Guideline Company Median** | **9.5%** |

Source:  Capital IQ, Inc. and KPC Healthcare, Inc. financials.
[a] LTM financial results based on the Company's annualized financial results for the six months ended June 30, 2015.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000121

**JAE 1869**

## A. VALUATION EXHIBITS

### Exhibit G - Selected Financial Information

*In Millions of U.S. Dollars*

| Profitability (5-Year Average EBIT Margin) | | Cash Flow (LTM Net Working Capital / Sales) | | Cash Flow (5-Year Average Net Working Capital / Sales) | | Cash Flow (LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| HEALTHSOUTH Corp. | 20.0% | HEALTHSOUTH Corp. | 11.8% | LifePoint Health, Inc. | 11.5% | LifePoint Health, Inc. | 2.4 |
| HCA Holdings, Inc. | 15.0% | Tenet Healthcare Corp. | 11.7% | HEALTHSOUTH Corp. | 10.3% | HEALTHSOUTH Corp. | 2.0 |
| Universal Health Services Inc. | 13.8% | Community Health Systems, Inc. | 11.0% | Community Health Systems, Inc. | 8.7% | Community Health Systems, Inc. | 1.7 |
| Community Health Systems, Inc. | 9.4% | HCA Holdings, Inc. | 9.4% | HCA Holdings, Inc. | 8.3% | Tenet Healthcare Corp. | 1.6 |
| LifePoint Health, Inc. | 8.3% | LifePoint Health, Inc. | 9.0% | Tenet Healthcare Corp. | 7.3% | Kindred Healthcare Inc. | 1.5 |
| Tenet Healthcare Corp. | 7.7% | Universal Health Services Inc. | 6.4% | Universal Health Services Inc. | 6.5% | HCA Holdings, Inc. | 1.5 |
| Kindred Healthcare Inc. | 3.6% | Kindred Healthcare Inc. | 6.1% | Kindred Healthcare Inc. | 6.2% | Universal Health Services Inc. | 1.4 |
| **KPC Healthcare, Inc.** | ▮ | **KPC Healthcare, Inc.** | ▮ | **KPC Healthcare, Inc.** | ▮ | **KPC Healthcare, Inc.** | ▮ |
| **Guideline Company Median** | **9.4%** | **Guideline Company Median** | **9.4%** | **Guideline Company Median** | **8.3%** | **Guideline Company Median** | **1.6** |

| Cash Flow (LTM Receivables Turnover) | | Cash Flow (5-Year Average Capital Expenditure / Sales) | | Leverage (LTM Total Debt to EBITDA) | | Leverage (Debt / EV) | |
|---|---|---|---|---|---|---|---|
| HEALTHSOUTH Corp. | 7.6 | HEALTHSOUTH Corp. | 6.4% | Kindred Healthcare Inc. | 7.3 | Community Health Systems, Inc. | 69.6% |
| Tenet Healthcare Corp. | 7.0 | HCA Holdings, Inc. | 5.8% | Tenet Healthcare Corp. | 6.7 | Tenet Healthcare Corp. | 67.3% |
| LifePoint Health, Inc. | 6.9 | LifePoint Health, Inc. | 5.7% | Community Health Systems, Inc. | 5.7 | Kindred Healthcare Inc. | 62.7% |
| HCA Holdings, Inc. | 6.6 | Tenet Healthcare Corp. | 5.4% | HCA Holdings, Inc. | 3.9 | HCA Holdings, Inc. | 41.7% |
| Universal Health Services Inc. | 6.3 | Community Health Systems, Inc. | 5.4% | LifePoint Health, Inc. | 3.5 | HEALTHSOUTH Corp. | 37.8% |
| Community Health Systems, Inc. | 5.6 | Universal Health Services Inc. | 4.9% | HEALTHSOUTH Corp. | 3.4 | HEALTHSOUTH Corp. | 31.4% |
| **KPC Healthcare, Inc.** | ▮ | Kindred Healthcare Inc. | 2.9% | **KPC Healthcare, Inc.** | ▮ | Universal Health Services Inc. | 16.2% |
| Kindred Healthcare Inc. | 4.8 | **KPC Healthcare, Inc.** | ▮ | Universal Health Services Inc. | 1.9 | **KPC Healthcare, Inc.** | ▮ |
| **Guideline Company Median** | **6.6** | **Guideline Company Median** | **5.4%** | **Guideline Company Median** | **3.9** | **Guideline Company Median** | **41.7%** |

Source: Capital IQ, Inc. and KPC Healthcare, Inc. financials.



- 102 -

Valuation & Financial Opinions



**JAE 1870**

## A.   VALUATION EXHIBITS



**Exhibit H - Transaction Method**

*In Millions of U.S. Dollars*

| Representative Level [a]: | KPC Healthcare, Inc. Results | Indicated Pricing Multiples | | | | Selected Multiples | | Indicated Values | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low | High | Mean | Median | | | | |
| EBITDA | $ ▮▮▮ | 5.0x | 15.1x | 9.1x | 9.2x | ▮▮▮ - ▮▮▮ | | $ ▮▮▮ - $ ▮▮▮ | |
| | Enterprise Value, Controlling Interest Basis (Rounded) | | | | | | $ ▮▮▮ - $ ▮▮▮ | | |

[a] Based on the Company's annualized financial results for the six months ended June 30, 2015.



Valuation & Financial Opinions **SRR**

CONFIDENTIAL

STOUT_0000123

**JAE 1871**

## A.   VALUATION EXHIBITS

**Exhibit H - Guideline Transactions**

*In Millions of U.S. Dollars*

| | | | | Target LTM Fundamentals | | | Indicated Multiples | |
|---|---|---|---|---|---|---|---|---|
| Close Date | Target | Acquirer | EV | Revenue | EBITDA | EBITDA Margin | EV/LTM Revenue | EV/LTM EBITDA |
| 1/29/15 | Hackettstown Regional Medical Center<br>Provides medical care services | Atlantic Health System<br>Operates a network of hospitals | $54.0 | $89.7 | $7.5 | 8.3% | 0.60x | 7.2x |
| 8/1/14 | MedWest Haywood<br>Provides healthcare services | Duke LifePoint Healthcare (Nasdaq:LPNT)<br>Operates general acute care hospitals | $36.0 | $105.5 | $4.0 | 3.7% | 0.34x | 9.1x |
| 7/10/14 | Stanly Health Services<br>Medical center | Carolinas HealthCare System<br>Provides healthcare and wellness services and programs | $70.0 | $105.1 | $14.1 | 13.4% | 0.67x | 5.0x |
| 7/1/14 | Garden City Hospital, Inc.<br>Owns and operates healthcare facilities | Prime Healthcare Services, Inc.<br>Owns and operates acute care hospitals | $48.8 | $139.7 | $5.3 | 3.8% | 0.35x | 9.2x |
| 6/9/14 | Casa Grande Regional Medical Center<br>Non-profit hospital | Banner Health<br>Operates acute-care hospitals and healthcare facilities | $87.0 | $135.3 | $8.4 | 6.2% | 0.64x | 10.4x |
| 4/1/14 | Sharon Regional Health System<br>Hospital with various satellite centers | Community Health Systems, Inc. (NYSE:CYH)<br>Operates general, acute care hospitals | $70.0 | $179.5 | $7.6 | 4.2% | 0.39x | 9.2x |
| 1/27/14 | Health Management Associates, Inc. (NYSE:HMA)<br>Operates hospitals and other health care facilities | Community Health Systems, Inc. (NYSE:CYH)<br>Operates general acute care hospitals | $7,630.0 | $5,866.3 | $880.1 | 15.0% | 1.30x | 8.7x |
| 10/29/13 | Oak Park Hospital<br>Hospital and nursing care facility | Rush University Medical Center<br>Not-for-profit academic medical center | $21.1 | $107.5 | $2.3 | 2.1% | 0.20x | 9.2x |
| 10/1/13 | 3 IASIS Healthcare Hospitals<br>Acute care hospitals | HCA West Florida (NYSE:HCA)<br>Operates general, acute care hospitals | $146.0 | $231.3 | $15.8 | 6.8% | 0.63x | 9.2x |
| 10/1/13 | Vanguard Health Systems (NYSE:VHS)<br>Operates hospitals and outpatient facilities | Tenet Healthcare Corporation (NYSE:THC)<br>Healthcare services company | $4,295.6 | $5,936.7 | $523.9 | 8.8% | 0.72x | 8.2x |
| 6/28/13 | Physicians Specialty Hospital<br>General acute care hospital | Carter Validus Mission Critical REIT<br>Private investment firm | $22.6 | $94.8 | $1.5 | 1.6% | 0.24x | 15.1x |
| Low | | | | $89.7 | $1.5 | 1.6% | 0.20x | 5.0x |
| High | | | | $5,936.7 | $880.1 | 15.0% | 1.30x | 15.1x |
| Mean | | | | $1,181.2 | $133.7 | 6.7% | 0.55x | 9.1x |
| Median | | | | $135.3 | $7.6 | 6.2% | 0.60x | 9.2x |



- 104 -

**Valuation & Financial Opinions**   SRR

**JAE 1872**

# A. VALUATION EXHIBITS

**Exhibit I - Discounted Cash Flow Method**



*U.S. Dollars in Thousands*

| | For the Fiscal Year Ending | | | | Residual |
|---|---|---|---|---|---|
| | Year 1 3/31/2016 | Year 2 3/31/2017 | Year 3 3/31/2018 | Year 4 3/31/2019 | |

**Distributable Cash Flows**
EBITDA [a]
Depreciation and Amortization
Income Taxes
**Debt-Free Net Income**

Depreciation and Amortization
Capital Expenditures
Additional Working Capital [b]
**Distributable Cash Flows**

Partial Period Adjustment [c]
**Distributable Cash Flows Allocated to Projection Period**

**Present Value of Distributable Cash Flows**
Weighted Average Cost of Capital
Discount Period [d]
**Present Value Factor**

**Present Value of Distributable Cash Flows**

**Enterprise Value**
Total Present Value of Distributable Cash Flows (Through 2019)
Present Value of Residual Cash Flows

**Enterprise Value, Controlling Interest Basis (Rounded)**

**Terminal Value**
Residual Cash Flow

Weighted Average Cost of Capital
Less: Residual Growth Rate
**Capitalization Rate**

**Residual Cash Flow Value**
Present Value Factor
**Present Value of Residual Cash Flows**

[a]
[b]
[c] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Transaction Date and the end of the first projection year.
[d] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.

 KFC Healthcare, Inc.

Valuation & Financial Opinions   

CONFIDENTIAL

STOUT_0000125

**JAE 1873**

## A.   VALUATION EXHIBITS



**Exhibit I - DCF Sensitivity Analysis**

**Present Value of Discrete Cash Flows**

**Present Value of Residual Cash Flows**

**Residual Year Growth Rate**

**Concluded Range of Enterprise Value**

**Residual Year Growth Rate**



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000126

**JAE 1874**

## A.  VALUATION EXHIBITS

**Exhibit I - Weighted Average Cost of Capital**

| Required Return on Equity | | |
|---|---|---|
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.6% |
| Market Equity Risk Premium | 6.0% | |
| Selected Equity Beta [b] | 0.95 | 5.7% |
| Small Stock Risk Premium [c] | | 5.8% |
| Company-Specific Risk Premium | | |
| **Required Return on Equity - CAPM** | | |

| Cost of Debt | | |
|---|---|---|
| Cost of Debt | | |
| Cost of Debt [d] | | |
| Less:  Income Tax Factor | 40.0% | -3.2% |
| **After-tax Cost of Debt** | | |

| Weighted Average Cost of Capital | | |
|---|---|---|
| Equity Allocation of Capital Structure [e] | 65.0% | |
| Debt Allocation of Capital Structure [e] | 35.0% | |
| **Weighted Average Cost of Capital (Rounded)** | | |

[a] 20-year U.S. Treasury bond yield as of the Transaction Date.
[b] Based on the selected guideline companies.
[c] Based on Duff & Phelps LLC, *2015 Valuation Handbook – Guide to Cost of Capital.*
[d] Based on the Company's actual cost of debt as of the Transaction Date.
[e] Based on an industry long-term average capital structure.



Valuation & Financial Opinions  

CONFIDENTIAL

STOUT_0000127

**JAE 1875**

## A.   VALUATION EXHIBITS

### Exhibit J - Analysis of Net Working Capital

*U.S. Dollars in Thousands*



| Historical Analysis | As of | | | | | |
|---|---|---|---|---|---|---|
| | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 | 6/30/2015 |
| Accounts Receivable | | | | | | |
| Inventories | | | | | | |
| Other Prepaid Expenses and Current Assets | | | | | | |
| Due from Governmental Payers | | | | | | |
| **Total Cash-Free Current Assets** | | | | | | |
| Accounts Payable | | | | | | |
| Accrued Expenses | | | | | | |
| Other Current Liabilities | | | | | | |
| **Total Debt-Free Current Liabilities** | | | | | | |
| **Net Working Capital** | | | | | | |
| Adjusted Revenue | | | | | | |
| **Net Working Capital / Revenue** | | | | | | |



Valuation & Financial Opinions    SRR

CONFIDENTIAL

STOUT_0000128

**JAE 1876**

## A.   VALUATION EXHIBITS

### Exhibit K - Present Value of QAF Income

*U.S. Dollars in Thousands*

| Month Ending | QAF Net Payments | Discount Period | Present Value Factor @ 7.0% | Present Value of QAF Payments |
|---|---|---|---|---|
| 9/30/2015 | | 0.09 | 0.9940 | |
| 10/31/2015 | | 0.18 | 0.9882 | |
| 11/30/2015 | | 0.26 | 0.9829 | |
| 12/31/2015 | | 0.34 | 0.9771 | |
| 1/31/2016 | | 0.43 | 0.9717 | |
| 2/29/2016 | | 0.50 | 0.9666 | |
| 3/31/2016 | | 0.59 | 0.9608 | |
| 4/30/2016 | | 0.67 | 0.9555 | |
| 5/31/2016 | | 0.76 | 0.9500 | |
| 6/30/2016 | | 0.84 | 0.9448 | |
| 7/31/2016 | | 0.93 | 0.9393 | |
| 8/31/2016 | | 1.01 | 0.9341 | |
| 9/30/2016 | | 1.09 | 0.9290 | |
| 10/31/2016 | | 1.18 | 0.9236 | |
| 11/30/2016 | | 1.26 | 0.9186 | |
| 12/31/2016 | | 1.34 | 0.9132 | |
| 1/31/2017 | | 1.43 | 0.9081 | |
| 2/28/2017 | | 1.50 | 0.9035 | |
| 3/31/2017 | | 1.59 | 0.8979 | |
| 4/30/2017 | | 1.67 | 0.8930 | |
| 5/31/2017 | | 1.76 | 0.8878 | |
| 6/30/2017 | | 1.84 | 0.8830 | |
| 7/31/2017 | | 1.93 | 0.8779 | |
| 8/31/2017 | | 2.01 | 0.8729 | |
| 9/30/2017 | | 2.09 | 0.8682 | |
| 10/31/2017 | | 2.18 | 0.8632 | |
| 11/30/2017 | | 2.26 | 0.8585 | |
| 12/31/2017 | | 2.34 | 0.8535 | |
| 1/31/2018 | | 2.43 | 0.8487 | |
| **Total QAF Payments** | | **Present Value of QAF Payments (Rounded)** | | |



Valuation & Financial Opinions



CONFIDENTIAL

STOUT_0000129

**JAE 1877**

# Appendix B
## IRR Exhibits



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000130

# B.   IRR Exhibits

### Exhibit A - Calculation of IRR for Chaudhuri & SPCP Subordinated Notes



*In Thousands of U.S. Dollars*

|  | For the Year Ending | | | | | |
|---|---|---|---|---|---|---|
|  | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| Internal Rate of Return |  |
|---|---|

[a] Based on cash interest of ▮▮▮▮ per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of ▮▮▮▮ per share as of August 31, 2020 less the exercise price of ▮▮▮▮ multiplied by ▮▮▮▮ warrants outstanding.



- 111 -

Valuation & Financial Opinions   SRR

**JAE 1879**

## B.  IRR EXHIBITS



**Exhibit A - Calculation of IRR for Thomas Subordinated Notes**

*In Thousands of U.S. Dollars*

| | | For the Fiscal Year Ending | | | | |
|---|---|---|---|---|---|---|
| | 8/28/2015 | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| Initial Outlay | | | | | | |
| Interest Payments [a] | | | | | | |
| Principal Payments | | | | | | |
| Prepayments | | | | | | |
| Payment for Warrants [b] | | | | | | |
| **Total Debt Cash Flows** | | | | | | |

| Internal Rate of Return | |
|---|---|

[a] Based on cash interest of ▮▮▮▮ per annum.
[b] Warrant payment is estimated based on the calculated value of the common stock of ▮▮▮▮ share as of August 31, 2020 less the exercise price of ▮▮▮ multiplied by ▮▮▮▮ warrants outstanding.


CONFIDENTIAL

STOUT_0000132

**JAE 1880**

## B.   IRR EXHIBITS



Exhibit A - Debt Schedule - Base Case

*In Thousands of U.S. Dollars*

**Capital Leases**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| Beginning Balance | | | | | |
| Interest Payment [a] | | | | | |
| Principal Payment | | | | | |
| Additional Principal Payment | | | | | |
| Total Debt Payment | | | | | |
| Ending Balance | | | | | |

[a] Based on cash interest of ██████ per annum. Interest calculation is based on quarterly payments.

**Line of Credit**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| Beginning Balance | | | | | |
| Interest Payment [b] | | | | | |
| Principal Draw | | | | | |
| Principal Payment | | | | | |
| Total Debt Payment | | | | | |
| Ending Balance | | | | | |

[b] Based on cash interest ██████ per annum. Interest calculation is based on beginning balance.

**Term Loan**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|
| Beginning Balance | | | | | |
| Interest Payment [c] | | | | | |
| Principal Payment | | | | | |
| Additional Principal Payment | | | | | |
| Total Debt Payment | | | | | |
| Ending Balance | | | | | |

[c] Based on cash interest of ██████ with a ████ oor per annum. Interest calculation is based on quarterly payments.



- 113 -

Valuation & Financial Opinions    **SRR**

CONFIDENTIAL

STOUT_0000133

**JAE 1881**

## B.   IRR EXHIBITS



**Exhibit A - Debt Schedule - Base Case**

*In Thousands of U.S. Dollars*

**Thomas Subordinated Notes**

[d] Based on cash interest of ▮ per annum.

**Chaudhuri & SPCP Subordinated Notes**

| | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
|---|---|---|---|---|---|

[e] Based on cash interest of ▮ per annum.



Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000134

**JAE 1882**

## B.  IRR EXHIBITS

### Exhibit A - Projected Cash Flow Statements - Base Case



*In Thousands of U.S. Dollars*

|  | For the Year Ending | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |

**Adjusted EBIT**

Less: Interest Expense - Capital Leases
Less: Interest Expense - Line of Credit
Less: Interest Expense - Term Loan
Less: Cash Interest Expense - Thomas Subordinated Notes
Less: Interest Expense - Chaudhuri & SPCP Subordinated Notes
Total Interest Expense

**Adjusted Earnings Before Taxes**

Less: Income Taxes
Add: QAF Payments
Less: Prepayment Fees
Add: Depreciation and Amortization
Less: Capital Expenditures
Less: Additional Working Capital

**Free Cash Flow ("FCF")**
Prior Years Cash Balance

**Cash Available for Debt Payments**

Less: Principal Payment - Term Loan
Less: Principal Payment - Thomas Subordinated Notes
Less: Principal Payment - Chaudhuri & SPCP Subordinated Notes
Less: Warrant Repayment / Stock Repurchase
Total Mandatory Financing Activities

**FCF After Mandatory Financing Activities**

Less: Payment / Draw - Line of Credit
Less: Prepayments - Term Loan
Less: Prepayments - Thomas Subordinated Notes
Less: Prepayments - Chaudhuri & SPCP Subordinated Notes
Total Discretionary Financing Activities

**FCF After Cash Sweep(s)**



- 115 -

Valuation & Financial Opinions  

# B.   IRR EXHIBITS

## Exhibit A - Projected Share Price

*In Thousands of U.S. Dollars*

|  |  | For the Year Ending | | | | |
|---|---|---|---|---|---|---|
|  |  | 8/31/2016 | 8/31/2017 | 8/31/2018 | 8/31/2019 | 8/31/2020 |
| **Adjusted EBITDA** |  |  |  |  |  |  |
| EBITDA Multiple |  |  |  |  |  |  |
| **Enterprise Value** |  |  |  |  |  |  |
| Add:  Cash |  |  |  |  |  |  |
| Add:  Receivable from Former Shareholder |  |  |  |  |  |  |
| Less:  Capital Leases |  |  |  |  |  |  |
| Less:  Intrinsic Value of Retention SARs [a] |  |  |  |  |  |  |
| Less:  Intrinsic Value of Thomas Subordinated Notes Warrants [b] |  |  |  |  |  |  |
| Less:  Intrinsic Value of Chaudhuri & SPCP Subordinated Notes Warrants [c] |  |  |  |  |  |  |
| Add:  ESOP Debt Tax Benefit |  |  |  |  |  |  |
| Total Adjustments |  |  |  |  |  |  |
| **Marketable, Controlling Interest Equity Value** |  |  |  |  |  |  |
| Less:  Discount for Limited Marketability | 5.0% |  |  |  |  |  |
| **Projected Equity Value (Rounded)** |  |  |  |  |  |  |
| Common Shares Outstanding (Thousands) |  |  |  |  |  |  |
| **Projected Equity Value Per Share** |  |  |  |  |  |  |



[a] Calculated based on the 732,316 SARs outstanding, each with an exercise price of $2.50.
[b] Calculated based on the 114,000 warrants outstanding, each with an exercise price of $2.50.
[c] Calculated based on the 3,800,000 warrants outstanding, each with an exercise price of $2.50.



- 116 -

Valuation & Financial Opinions   **SRR**

CONFIDENTIAL

STOUT_0000136

**JAE 1884**

# Appendix C

## Guideline Company Descriptions



Valuation & Financial Opinions

CONFIDENTIAL

STOUT_0000137

**JAE 1885**

## C.   GUIDELINE COMPANY DESCRIPTIONS

### Community Health Systems, Inc.

Community Health Systems, Inc., together with its subsidiaries, provides general and specialized hospital healthcare services to patients in the United States. The company operates general acute care hospitals that offer a range of inpatient and outpatient medical and surgical services, such as general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric, and rehabilitation services, as well as skilled nursing and home care services based on individual community needs. It also provides outpatient services at urgent care centers, occupational medicine clinics, imaging centers, cancer centers, ambulatory surgery centers, and home health and hospice agencies. In addition, the company offers management and consulting services to non-affiliated general acute care hospitals. As of May 14, 2015, it owned, leased, or operated 199 affiliated hospitals in 29 states with approximately 30,000 licensed beds. Community Health Systems, Inc. was founded in 1985 and is headquartered in Franklin, Tennessee.

### HCA Holdings, Inc.

HCA Holdings, Inc., through its subsidiaries, provides health care services in the United States. It operates general, acute care hospitals that offer medical and surgical services, including inpatient care, intensive care, cardiac care, diagnostic, and emergency services; and outpatient services, such as outpatient surgery, laboratory, radiology, respiratory therapy, cardiology, and physical therapy services. The company also operates psychiatric hospitals, which provide therapeutic programs comprising child, adolescent and adult psychiatric care, adult and adolescent alcohol and drug abuse treatment, and counseling. In addition, it operates outpatient health care facilities consisting of freestanding ambulatory surgery centers, freestanding emergency care facilities, diagnostic and imaging centers, comprehensive outpatient rehabilitation and physical therapy centers, outpatient radiation and oncology therapy centers, and various other facilities. As of December 31, 2014, the company operated 166 hospitals, including 162 general acute care hospitals with 42,860 licensed beds; 3 psychiatric hospitals with 396 licensed beds; and 1 rehabilitation hospital, as well as 113 freestanding surgery centers. HCA Holdings, Inc. was founded in 1968 and is headquartered in Nashville, Tennessee.

### LifePoint Health, Inc.

LifePoint Health, Inc., through its subsidiaries, operates general acute care hospitals primarily in non-urban communities in the United States. Its hospitals offer a range of medical and surgical services, such as general surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, rehabilitation, and pediatric services, as well as specialized services comprising open-heart surgery, skilled nursing,



- 118 -



Valuation & Financial Opinions

CONFIDENTIAL

## C.   GUIDELINE COMPANY DESCRIPTIONS

psychiatric care, and neuro-surgery. The company's hospitals also provide various outpatient services, including same-day surgery, laboratory, X-ray, respiratory therapy, imaging, sports medicine, and lithotripsy. In addition, it owns and operates schools of nursing and other allied health professions. As of February 12, 2015, LifePoint Health, Inc. operated 65 hospitals campuses in 21 states. The company was formerly known as LifePoint Hospitals, Inc. and changed its name to LifePoint Health, Inc. in May 2015. LifePoint Health, Inc. was founded in 1997 and is based in Brentwood, Tennessee.

### Tenet Healthcare Corp.

Tenet Healthcare Corporation, a healthcare services company, primarily operates acute care hospitals and related healthcare facilities in the United States. It operates through two segments, Hospital Operations and Other, and Conifer. The company's general hospitals offer acute care services, operating and recovery rooms, radiology services, respiratory therapy services, clinical laboratories, and pharmacies. It also provides intensive care, critical care and/or coronary care units, physical therapy, orthopedic, oncology, and outpatient services; tertiary care services, including open-heart surgery, neonatal intensive care, and neurosciences; quaternary care services in the areas of heart, liver, kidney, and bone marrow transplants; quaternary pediatric and burn services; advanced treatment options for patients; gamma-knife brain surgery; cyberknife radiation therapy for tumors and lesions in the brain, lung, neck, and spine; and outpatient services. In addition, the company offers clinical research programs related to cardiovascular disease, pulmonary disease, musculoskeletal disorders, neurological disorders, genitourinary disease, and various cancers, as well as drug and medical device studies. Further, it provides operational management for patient access, health information management, revenue integrity, and patient financial services; communications and engagement solutions to optimize the relationship between providers and patients; and management services comprising clinical integration, financial risk management, and population health management. As of July 15, 2015, the company operated 81 general acute care hospitals, 18 short-stay surgical hospitals, and approximately 400 outpatient centers in the United States; and 9 facilities in the United Kingdom. Tenet Healthcare Corporation was founded in 1967 and is headquartered in Dallas, Texas.

### Universal Health Services Inc.

Universal Health Services, Inc., through its subsidiaries, owns and operates acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers, and radiation oncology centers. The company's hospitals offer various services, including general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care,



- 119 -

Valuation & Financial Opinions   **SRR**

**JAE 1887**

## C. GUIDELINE COMPANY DESCRIPTIONS

coronary care, pediatric services, pharmacy services, and/or behavioral health services. As of February 26, 2015, it owned and/or operated 24 acute care hospitals and 216 behavioral health centers located in 37 states, Washington, D.C.; the United Kingdom; Puerto Rico; and the U.S. Virgin Islands. Universal Health Services, Inc. was founded in 1978 and is headquartered in King of Prussia, Pennsylvania.

### HealthSouth Corp.

HealthSouth Corporation owns and operates inpatient rehabilitation hospitals in the United States. The company provides specialized rehabilitative treatment on an inpatient and outpatient basis. Its inpatient rehabilitation hospitals offer specialized rehabilitative care services to patients in various disabilities or injuries due to medical conditions, such as strokes, hip fractures, and various debilitating neurological conditions. The company also provides facility-based and home-based post-acute services through its network of inpatient rehabilitation hospitals, home health agencies, and hospice agencies. As of December 31, 2014, it operated 107 inpatient rehabilitation hospitals, including 75 owned hospitals and 32 jointly owned hospitals in 29 states and Puerto Rico; and managed 3 inpatient rehabilitation units through management contracts. The company was founded in 1983 and is headquartered in Birmingham, Alabama.

### Kindred Healthcare Inc.

Kindred Healthcare, Inc. provides healthcare services in the United States. It operates in four divisions: Hospital, Nursing Center, Rehabilitation, and Care Management. The Hospital division operates transitional care hospitals that provide services for medically complex patients, including the critically ill, suffering from multiple organ system failures, primarily the cardiovascular, pulmonary, kidney, gastro-intestinal, and cutaneous systems. This division also operates inpatient rehabilitation hospitals, which offer services to patients who require intensive inpatient rehabilitative care. The Nursing Center division operates nursing centers and assisted living facilities that provide short stay patients and long stay residents with a range of medical, nursing, rehabilitative, pharmacy, and routine services, including daily dietary, social, and recreational services. The Rehabilitation division provides rehabilitation services, including physical and occupational therapies, and speech pathology services to residents and patients of nursing centers, acute and long-term acute care hospitals, outpatient clinics, home health agencies, assisted living facilities, school districts, and hospice providers under the RehabCare name. The Care Management division provides home health, hospice, and private duty services to patients in various settings, including homes, skilled nursing facilities, and other residential settings under the Kindred at Home name. As of December 31, 2014, Kindred



- 120 -



Valuation & Financial Opinions

**JAE 1888**

## C.   GUIDELINE COMPANY DESCRIPTIONS

Healthcare, Inc. provided healthcare services in 2,872 locations, including 97 transitional care hospitals, 16 inpatient rehabilitation hospitals, 90 nursing centers, 22 sub-acute units, and 100 inpatient rehabilitation units; and 634 Kindred at Home hospice, home health, and non-medical home care locations, as well as a contract rehabilitation services business, which served, 1,913 non-affiliated facilities. The company is headquartered in Louisville, Kentucky.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000141

**JAE 1889**

# Appendix D

## Guideline Transaction Descriptions



Valuation & Financial Opinions

CONFIDENTIAL

**JAE 1890**

# D. GUIDELINE TRANSACTION DESCRIPTIONS

## Hackettstown Regional Medical Center

Hackettstown Regional Medical Center provides medical care services to patients in New Jersey. It offers emergency care, diagnostic imaging, ambulance and transport, childbirth, lab/pathology, pediatric, sleep disorders, surgical, kids care, therapy, vascular, women's health, and wound healing services; cardiac services, including cardio-pulmonary, stress testing, cardiac echocardiography, electrocardiography, and electroencephalography; and outpatient counseling, consultation, and therapeutic services for adults and adolescents. The company also provides cancer care services, such as infusion therapy, radiation therapy, and PET/CT scanning services; services in the areas of diabetes/endocrinology, gastroenterology, intensive coronary care, mobile intensive care, pneumonia, respiratory therapy, stroke, and urology, as well as ear, nose, and throat; and pulmonary services. In addition, it provides surgical services that comprise in-patient surgery, bariatric surgery, minor procedures/same day surgery, and hip arthoscopy; and kids care services in the areas of apraxia of speech, articulation disorders, auditory processing disorders, autism spectrum disorders, cerebral palsy, developmental coordination disorders, developmental disability, dysarthria, hearing impairment, receptive and expressive language disorders, orthopedic conditions, sensory integration disorders, stuttering, tongue thrust, torticollis, traumatic brain injury,

and voice disorders. Further, the company provides pastoral care services, including support, reassurance, and counseling to patients and their families, staff, physicians, and volunteers; and wellness programs. Hackettstown Regional Medical Center was formerly known as Hackettstown Community Hospital and changed its name in 1982. The company was founded in 1973 and is based in Hackettstown, New Jersey. As of January 29, 2015, Hackettstown Regional Medical Center operates as a subsidiary of Atlantic Health System, Inc.

## MedWest Haywood

MedWest Health System, Inc. provides healthcare services in Haywood, Jackson, Swain, Macon, and Graham Counties. It offers services in the areas of behavioral health, cancer, cardiac and invasive radiology, cardiopulmonary, case management, continence services, critical care, emergency department, emergency medical services, endoscopy, health promotion and education, health and fitness center, home care, hospice and palliative care, imaging, laboratory, medical acupuncture, medical records, nutritional, nursing, and occupational services; and a chaplaincy program. The company also provides orthopedic services, osteoporosis center, pain management, patient financial services, pharmacy, progressive care unit, pulmonary, rehabilitation, senior life, sleep, sports medicine, surgery, urgent care, vascular access nurse, women and children, wound care, orthopedics, and women's care



- 123 -


Valuation & Financial Opinions

## D. GUIDELINE TRANSACTION DESCRIPTIONS

services, as well as diabetes education. MedWest Health System, Inc. was formerly known as Haywood Regional Medical Center and changed its name to MedWest Health System, Inc. in October 2009. The company was founded in 1927 and is based in Clyde, North Carolina with locations in Harris, Haywood, Swain, and Franklin, North Carolina. MedWest Health System, Inc. operates as a subsidiary of The Charlotte-Mecklenburg Hospital Authority.

### Stanly Health Services

Stanly Health Services, Inc. owns and operates a medical center and includes 119 beds. It also owns Stanly Medical Services, Stanly Manor nursing facility, Home Care of the Carolinas, and Alliance Medical Inc. and provides healthcare services and medical instruments. The company was founded in 1988 and is based in Albemarle, North Carolina. As of July 10, 2014, Stanly Health Services, Inc. operates as a subsidiary of The Charlotte-Mecklenburg Hospital Authority.

### Garden City Hospital, Inc.

Garden City Hospital Inc. owns and operates healthcare facilities. Its services include birth care, breast care, cancer care, cardiology, counseling, diabetes management, emergency, health and wellness, home health care, home medical equipment, hyperbaric treatment, imaging, laboratory services, neurology and

neurosurgery, nutrition, orthopedics, outpatient infusion, pain management, pharmacy, prime medical group, pulse EMS, rehabilitation, respiratory/pulmonary, sleep medicine, sports medicine, stroke care, surgery, and wound care. The company also provides services ranging from obstetrics to end-of-life; residency programs; and medical education to students, interns, residents, and others. In addition, it operates deli and convenience stores in its hospitals. The company was founded in 1947 and is based in Garden City, Michigan. As of July 1, 2014, Garden City Hospital Inc. operates as a subsidiary of Prime Healthcare Services, Inc.

### Casa Grande Regional Medical Center

Banner Casa Grande Medical Center is a full-service non-profit hospital that provides health care to the Casa Grande Valley, as well as the surrounding areas. It offers cardiac catheterization laboratory, and obstetrical care unit and Joe Jonas nursery services; imaging services that include CT scanning, digital mammography, ultrasound, bone densitometry, X-rays, and MRI; and rehabilitation services that include physical, occupational, and speech therapy. The company also operates as urgent care facility to treat various illnesses, such as upper respiratory infections, coughs, ear infections, insect bites, nausea, diarrhea, minor burns, sunburns, fever, minor cuts, minor wound checks, pink eye, sore throat, colds and flu, urinary tract infections, vaginitis, STDs, mild abdominal pain, sprains, strains, and IV infusion. In addition, it



- 124 -



**JAE 1892**

## D. GUIDELINE TRANSACTION DESCRIPTIONS

offers wound center services; and anticoagulation clinic, case management, emergency care, heart care, GI and endoscopy, infection control, occupational health, pediatric, respiratory, sleep laboratory, surgical care, women's health, and outpatient surgery services. Banner Casa Grande Medical Center was formerly known as Casa Grande Regional Medical Center and changed its name to Banner Casa Grande Medical Center in 2014. The company was incorporated in 1981 and is based in Casa Grande, Arizona. As of June 9, 2014, Banner Casa Grande Medical Center operates as a subsidiary of Banner Health.

### Sharon Regional Health System

Sharon Regional Health System Inc. owns and operates a hospital with various satellite centers that provide a range of health and medical services to patients in northwest Pennsylvania and northeast Ohio. It offers services in the areas of wound recovery, bariatric surgery, behavioral health, breast care, cancer care, digestive diseases, corporate health services, diabetes care, diagnostic and imaging, ear/nose/throat care, emergency care, heart and vascular care, home health, hospice and palliative care, diagnostic and specialty care, inpatient and outpatient rehabilitation, interventional pain management, medical imaging, pediatric rehabilitation, sleep medicine, sports medicine, surgical services, travel clinic, therapeutic pool, transitional care, and women's health. The company also operates a nursing school for educating registered professional nurses; and radiography school that provides educational programs in the field of radiography. Sharon Regional Health System Inc. was formerly known as Sharon General Hospital and changed its name to Sharon Regional Health System Inc. in May 1990. The company was founded in 1893 and is based in Sharon, Pennsylvania. As of April 1, 2014, Sharon Regional Health System Inc. operates as a subsidiary of Community Health Systems, Inc.

### Health Management Associates, Inc.

Health Management Associates, Inc., through its subsidiaries, engages in the operation of general acute care hospitals and other health care facilities in non-urban communities in the United States. Its hospitals offer general surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, and pediatric services. The company also provides outpatient services, such as one-day surgery, laboratory, x-ray, respiratory therapy, cardiology, and physical therapy. In addition, its hospitals offer specialty services in cardiology, neuro-surgery, oncology, radiation therapy, computer-assisted tomography scanning, magnetic resonance imaging, lithotripsy, and full-service obstetrics. As of June 13, 2013, the company operated 71 hospitals with a total of 11,100 licensed beds in non-urban communities of Alabama, Arkansas, Florida, Georgia, Kentucky, Mississippi, Missouri, North Carolina, Oklahoma, Pennsylvania, South Carolina,



- 125 -


Valuation & Financial Opinions

**JAE 1893**

## D.   GUIDELINE TRANSACTION DESCRIPTIONS

Tennessee, Texas, Washington, and West Virginia. Health Management Associates was founded in 1977 and is based in Naples, Florida. As of January 27, 2014, Health Management Associates Inc. operates as a subsidiary of Community Health Systems, Inc.

### Oak Park Hospital

Rush Oak Park Hospital, Inc. (formerly known as Oak Park Hospital) operates as a general medical and surgical hospital and skilled nursing care facility in Oak Park, Illinois. Rush Oak Park Hospital was acquired by Rush University Medical Center on October 25, 2013.

### Three IASIS Healthcare Hospitals

IASIS Healthcare LLC, a healthcare services company, owns and operates acute care hospitals in urban and suburban markets. It operates through two segments, Acute Care and Health Choice. The company owns or leases 16 acute care hospital facilities and 1 behavioral health hospital facility with a total of 3,800 licensed beds. It operates acute care hospitals in Arizona, Arkansas, Colorado, Louisiana, Texas, and Utah. The company also offers healthcare services to approximately 340,900 members through various health care plans, accountable care networks, third party management and administrative services, and other managed care solutions.

IASIS Healthcare LLC was founded in 1998 and is based in Franklin, Tennessee. IASIS Healthcare LLC is a subsidiary of IASIS Healthcare Corporation.

### Vanguard Health Systems

Vanguard Health Systems, Inc. owns and operates general acute care and specialty hospitals, and outpatient facilities in urban and suburban markets in the United States. The company's general acute care and specialty hospitals offer various medical and surgical services, including emergency services, general surgery, internal medicine, cardiology, obstetrics, orthopedics, and neurology, as well as tertiary services, such as open-heart surgery, advanced neurosurgery, children's specialty, level II and III neonatal intensive care, and level 1 trauma. It also provides on-campus and off-campus outpatient and ancillary services comprising outpatient surgery, physical therapy, rehabilitation, radiation therapy, home health, diagnostic imaging, and laboratory services, as well as outpatient services at its imaging centers and ambulatory surgery centers. In addition, it operates health plans, which include Phoenix Health Plan, a Medicaid managed health plan in Arizona; Abrazo Advantage Health Plan, a Medicare and Medicaid dual eligible managed health plan in Arizona; Chicago Health Systems, a contracting entity for outpatient services under multiple contracts and inpatient services for one contract in the Chicago area; ProCare Health Plan, a Medicaid managed health plan operating in



- 126 -

Valuation & Financial Opinions   SRR

**JAE 1894**

## D.   GUIDELINE TRANSACTION DESCRIPTIONS

Michigan; and Valley Baptist Insurance Company that offers health maintenance organization products to its members in the form of large group, small group, and individual product offerings in south Texas. The company was founded in 1997 and is headquartered in Nashville, Tennessee. As of October 1, 2013, Vanguard Health Systems Inc. operates as a subsidiary of Tenet Healthcare Corp.

### Physicians Specialty Hospital

Physicians Specialty Hospital comprises an acute care surgical hospital. It includes 20 beads and is spread over an area of 55,740 square feet. The hospital is located in Fayetteville, Arkansas. As of June 28, 2013, Physicians Specialty Hospital in Fayetteville was acquired by Carter Validus Mission Critical REIT.



Valuation & Financial Opinions   SRR

CONFIDENTIAL

STOUT_0000147

**JAE 1895**

# Appendix E

## Control Premium





CONFIDENTIAL

STOUT_0000148

**JAE 1896**

# E.   CONTROL PREMIUM

## Control Premium

The value of a fractional interest in a company may be equal to, more than, or less than a pro rata share of the value of the entire company. That is, certain valuation approaches provide indications of value on a controlling ownership basis, and other approaches provide indications of value on a minority ownership interest basis. The analyst must reconcile these differing value indications to arrive at an indication of value consistent with the purpose and objective of the assignment. The adjustment from a minority ownership interest basis to a controlling ownership interest basis is typically made by applying a premium for control.

In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of KPC, we arrive at an indication of the Fair Market Value of KPC on a minority ownership interest basis. Because our analysis seeks to value KPC on a controlling ownership basis interest, however, it is appropriate to apply a premium to the guideline company multiples to reflect the additional value of control.

With respect to the DCF Method, the indication of value can reflect a minority or a controlling ownership interest, depending on a number of factors. In our analysis, we used a capital structure based on industry averages and KPC's long-term optimal capital structure in estimating the WACC. In addition, based on our discussions with KPC's management and our review of KPC's financial projections, the forecasted results reflect optimal financial performance that a hypothetical financial buyer could not affect materially. Therefore, the indication of value from the DCF method in our analysis represents a controlling ownership interest value.

Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling shareholders' ability to exercise any or all of the various rights typically associated with control. As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in our selection of the appropriate control premium.

The most objective and established evidence of control premiums is the study of cash tender offers. By looking at premiums offered during a tender for control of a company with publicly held shares, we can approximate the difference between a controlling and minority ownership interest value.



- 129 -



Valuation & Financial Opinions

STOUT_0000149

**JAE 1897**

# E.  CONTROL PREMIUM

### Mergerstat Review

A control premium can be inferred by observing control premiums paid in acquisitions of publicly traded companies. *Mergerstat Review 2015* tracks publicly announced formal transfers of ownership of at least 10% of a company's equity. According to these annual studies, the premium paid for controlling interests relative to noncontrolling interests in publicly traded companies ranged from 23.1% to 41.1% over the past 20 years, with a median premium of 30.9%. The results of these studies are summarized in the table below.

| | | | | | |
|---|---|---|---|---|---|
| **Percent Premium Paid Over Market Price** | | | | | |
| Year | Number of Transactions | Median Premium Paid | Year | Number of Transactions | Median Premium Paid |
| 1995 | 324 | 29.2% | 2005 | 392 | 24.1% |
| 1996 | 381 | 27.3% | 2006 | 454 | 23.1% |
| 1997 | 487 | 27.5% | 2007 | 491 | 24.7% |
| 1998 | 512 | 30.1% | 2008 | 294 | 36.5% |
| 1999 | 723 | 34.6% | 2009 | 239 | 39.8% |
| 2000 | 574 | 41.1% | 2010 | 348 | 34.6% |
| 2001 | 439 | 40.5% | 2011 | 321 | 37.8% |
| 2002 | 326 | 34.4% | 2012 | 323 | 37.1% |
| 2003 | 371 | 31.6% | 2013 | 257 | 29.7% |
| 2004 | 322 | 23.4% | 2014 | 328 | 28.7% |
| | | | **20-Year Median Control Premium** | | **30.9%** |

Source: Factset Mergerstat LLC, *Mergerstat Review 2015*.

In addition, we searched for control premiums paid in transactions within KPC's industry. According to *Mergerstat Review 2015,* there were five transactions in the health services industry in 2014 with an average control premium of 60.4%.

### Applicability to the Subject Company

There is one important factor to consider when applying the data above to the Company. The transactions of the interests in the companies discussed above represent both financial and strategic acquisitions. Oftentimes, strategic acquisitions include a premium for such items as economies of scale, the reduction in competition, increased purchasing power, etc. Fair Market Value, however, represents a hypothetical buyer, not a specific strategic buyer. Accordingly, the control premium that would apply to an interest in KPC would be lower than that indicated by the study.

Based on the facts and circumstances related specifically to the KPC equity, we applied a 10.0% control premium to the stock prices of the guideline companies used in the Guideline Company Method to account for any enhanced benefits that may be realized by a controlling shareholder of KPC.



- 130 -



Valuation & Financial Opinions

**JAE 1898**

# Appendix F

## Discount for Limited Marketability



- 131 -



**JAE 1899**

## F.  DISCOUNT FOR LIMITED MARKETABILITY

### Discount for Limited Marketability

In calculating the Company's market value of equity, it is appropriate to consider a discount for limited marketability. All else being equal, an investment in which the owner is able to achieve liquidity (i.e., convert into cash) quickly is worth more than an investment that is not as liquid. Thus, publicly traded companies, which are readily marketable, are worth more than privately held companies. The diminution in value associated with this factor is referred to as a discount for limited marketability.

There is a significant difference, however, between the stock held by an ESOP and similar, closely held, non-ESOP stock in that there is a mandatory repurchase obligation (often referred to as a "put" option) associated with the ESOP shares. This put option requires the ESOP company to repurchase a participant's shares upon certain events (such as retirement, death, or disability) unless they are purchased by the ESOP. Typically, a put option requires the ESOP company to repurchase the shares at the then prevailing Fair Market Value.

The effect of such a put option is that it greatly improves the marketability of the underlying closely held company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability. The

selection of an appropriate discount for limited marketability for ESOP shares subject to a put option depends on several factors, including the payment terms of the put option, the ESOP company's historical record (if any) of redeeming ESOP shares, and the Company's financial ability to redeem the shares. However, the ultimate selection of a discount for limited marketability, if any, is a function of the analyst's professional judgment and experience.

We have analyzed the Company's ability to honor its put obligation. The Company generates sufficient cash flow to finance its repurchase obligation. Based on our analysis, we believe the Company should be able to honor the put obligations when they arise. Therefore, any discount for limited marketability would be minimal and would not exceed 5.0% of the market value of equity.



- 132 -



Valuation & Financial Opinions

Appendix G

## Assumptions and Limiting Conditions





CONFIDENTIAL

STOUT_0000153

**JAE 1901**

## G. ASSUMPTIONS AND LIMITING CONDITIONS

This report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company. However, we have exercised our independent judgment in evaluating the information that we received from the Company and/or its representatives, and we have not relied on information that we know to be inadequate or incomplete.

- For the purpose of this engagement and report, we have made no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our analysis assumes the assets and liabilities presented in the Company's June 30, 2015 balance sheet were intact as of that date and were not materially different as of the Transaction Date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- Our analysis is applicable for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report, and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. The analyses and opinions set forth herein do not constitute and should no way be interpreted to be a "solvency opinion."

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- Stout Risius Ross, Inc. is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the report provided compensation arrangements for such additional services have been made.

- This analysis contemplates facts and conditions that are known or knowable as of the Transaction Date. Events and conditions occurring after the Transaction Date have not been considered, and Stout Risius Ross, Inc. has no obligation to update our report for such events and conditions.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.



- 134 -



Valuation & Financial Opinions

**JAE 1902**

# Appendix H

## Statement of Qualifications





CONFIDENTIAL

STOUT_0000155

**JAE 1903**

## H.   STATEMENT OF QUALIFICATIONS

## Mark R. Fournier, CFA

Mark R. Fournier is a Managing Director in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. Mr. Fournier has nearly 20 years of experience with Employee Stock Ownership Plans including ESOP security formation; transaction analysis; determination of transaction fairness and adequate consideration; and annual valuation updates. He also has extensive experience providing fairness and solvency opinions for corporate acquisitions and divestitures; going-private transactions; leveraged buy-out transactions; leveraged recapitalizations; and related party transfers.

Mr. Fournier has significant experience in performing analyses for a broad array of industries, including, but not limited to advertising, architectural and engineering, aerospace and defense, automotive, banks and thrifts, broadcasting, consulting, construction, consumer goods, craft brewing, distribution, food and beverage, forest products, government contracting, healthcare, homebuilding, insurance, investment companies and partnerships, manufacturing, mining, oil and gas, plastics, printing and publishing, retailing, and trucking and transportation.

Mr. Fournier has lectured and presented at numerous professional conferences and seminars on a variety of ESOP related topics, involving valuation, ESOP transaction structures, and repurchase liability. He has also authored several articles related to the valuation of privately held companies and other ESOP related topics. Mr. Fournier was a contributing author to the chapter entitled "Valuation for Employee Stock Ownership Plans" in Business Valuation, published by the Law Journal Press. Mr. Fournier also was a contributing author to the chapter entitled "Estimating a Required Rate of Return for Use in the Income Approach" in Business Valuation: A Primer for the Legal Professional, published by the Business Law Section of the American Bar Association.

Mr. Fournier is the chair of the Finance Committee of the ESOP Association and former Vice President of the Michigan Chapter of the ESOP Association. Mr. Fournier is a member of the CFA Institute, the National Center for Employee Ownership, and the ESOP Association.



- 136 -

Valuation & Financial Opinions    SRR

**JAE 1904**

## H. STATEMENT OF QUALIFICATIONS

## Joseph D. Demetrius, CFA

Joseph D. Demetrius is a Vice President in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. He has experience in the valuation of business interests in both private and public corporations for numerous purposes, including providing fairness and solvency opinions in connection with corporate acquisitions and divestitures, financing events, and other corporate transactions. He has extensive experience in the valuation of equity interests in companies owned by Employee Stock Ownership Plans (ESOPs), and has performed analyses related to ESOP security design, determination of ESOP transaction fairness and adequate consideration, and annual ESOP-owned company valuation updates.

Among the many industries that Mr. Demetrius has served are advertising, construction, engineering, financial services, government and defense contracting, healthcare, information technology, paint, oil and gas services, and restaurants, among others. His experience spans a diverse client base, from regional middle-market businesses to large public corporations, private equity funds, law firms, and financial institutions.

Mr. Demetrius graduated from the University of North Carolina at Chapel Hill and has earned the right to use the Chartered Financial Analyst designation.



- 137 -

Valuation & Financial Opinions   SRR

**JAE 1905**

REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL

# Exhibit 41

| From: | Phillip Chou [phillip.chou@eurekacap.com] |
|---|---|
| Sent: | 8/6/2015 12:42:37 PM |
| To: | 'Bill Thomas' [bthomas@GlobalMSO.com] |
| Subject: | RE: Question on ESOP |

Bill,

Here is what CS and Trustee appraiser have. Our understanding is Trustee is using a run-rate EBITDA of ▇▇▇ based on info provided. Our estimate of LTM normalized EBITDA through 6/30/2015 (not shown below) is about ▇▇▇ (up from ▇▇▇ for FYE 3/31/2015).



**From:** Bill Thomas [mailto:bthomas@GlobalMSO.com]
**Sent:** Thursday, August 6, 2015 12:37 PM
**To:** 'Phillip Chou' <phillip.chou@eurekacap.com>
**Subject:** FW: Question on ESOP

Could you provide a response to this question by Banks

William E. Thomas
Executive Vice President and General Counsel
Strategic Global Management, Inc.
6800 Indiana Avenue, Suite 130
Riverside, California 92506
(951) 782-8812 (phone)
(951) 782-8850 (fax)
bthomas@globalmso.com   PLEASE NOTE THE CHANGE IN EMAIL ADDRESS

**From:** Thomas Banks [mailto:tbanks@silverpointcapital.com]
**Sent:** Thursday, August 06, 2015 11:15 AM
**To:** 'Bill Thomas (bthomas@thekpcgroup.com)'
**Subject:** RE: Question on ESOP

CONFIDENTIAL                    **JAE 1907**                    EUREKA_032870

Bill,

Would you also please confirm the LTM EBITDA of the company (normalized for severance and the lawsuit) that is being used for the valuation and the discount rate used to calculate the present value of the QAF?  Thanks.

Tom

**JAE 1908**

# Exhibit 42

1 MORGAN, LEWIS & BOCKIUS LLP
  Aimee Mackay, Bar No. 221690
2 aimee.mackay@morganlewis.com
  300 South Grand Avenue
3 Los Angeles, CA 90071-3132
  Tel:  +1.213.612.2500
4 Fax: +1.213.612.2501

5 MORGAN, LEWIS & BOCKIUS LLP
  Sari Alamuddin (admitted *pro hac vice*)
6 sari.alamuddin@morganlewis.com
  Deborah Davidson (*pro hac vice* to be filed)
7 deborah.davidson@morganlewis.com
  110 N. Wacker Drive
8 Chicago, IL 60606-1511
  Tel: +1.312.324.1000
9 Fax: +1.312.324.1001

10

11 Attorneys for Defendant
   SPCP GROUP, LLC

12            UNITED STATES DISTRICT COURT
13            CENTRAL DISTRICT OF CALIFORNIA

14 DANIELLE GAMINO, individually and on      Case No. 5:21-cv-01466-SB-SHK
   behalf of all others similarly situated,   (consolidated with Case No. 5:20-
15                                             cv-01126-SB-SHK)
                   Plaintiff,
16                                             **DEFENDANT'S RESPONSES
            vs.                                TO PLAINTIFF'S SECOND SET
17                                             OF REQUESTS FOR
   SPCP GROUP, LLC,                            ADMISSION**
18
                   Defendant, and
19
   KPC HEALTHCARE, INC. EMPLOYEE
20 STOCK OWNERSHIP PLAN,

21                 Nominal Defendant.

22 PROPOUNDING PARTY:        Plaintiff, Danielle Gamino

23 RESPONDING PARTY:         Defendant, SPCP Group, LLC

24 SET NUMBER:               Two (2)

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1                    DEFENDANT'S RESPONSES TO SECOND
                     SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

JAE 1910

Pursuant to Rule 33 of the Federal Rules of Civil Procedure ("FRCP") and the Local Rules of the United States District Court for the Central District of California, Defendant SPCP Group, LLC ("Defendant" or "SPCP") hereby answers, objects, and otherwise responds to Plaintiff Danielle Gamino's ("Plaintiff" or "Gamino") Second Set of Requests for Admission, as follows:

## **GENERAL OBJECTIONS**

The following General Objections apply to each and every applicable Request, and are incorporated by reference into each and every applicable Response as if set forth in full in each such numbered Response.

1. The Responses are made solely for the purpose of the above-captioned action and are not to be used in connection with any other action.

2. Defendant's discovery, internal investigation, and preparation for trial are not complete as of the date of this response. Consequently, the Responses set forth below represent Defendant's present knowledge, based on discovery, investigation, and trial preparation to date. Defendant anticipates that discovery and investigation will reveal new or additional information, including facts, documents, witnesses, or legal theories not presently known to it, but upon which it may rely in support of its contentions in this action. The Responses contained herein shall not preclude Defendant from introducing evidence based on subsequently discovered information.

3. Defendant will make reasonable efforts to respond to every Request, to the extent the Request has not been objected to, as Defendant understands and interprets the Request. In the event that Plaintiff subsequently asserts an interpretation of a Request that differs from that of Defendant, Defendant reserves the right to amend and/or supplement its Response, but undertakes no obligation to do so.

4. Defendant objects to each Request to the extent it calls for information subject to a claim of privilege, including, but not limited to, the attorney-client

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

DEFENDANT'S RESPONSES TO SECOND
SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

JAE 1911

privilege or the work-product doctrine.  Defendant hereby claims the attorney-client privilege and invokes the work-product doctrine for any information protected by either or both of such privileges.

5.     Defendant objects to each Request to the extent that it seeks information protected by the constitutional, statutory, or common law right of privacy of any person.

6.     Defendant objects to each Request to the extent it seeks information that is not in Defendant's possession or control, has been previously disclosed, or is equally within the Plaintiff's possession or control.

7.     Defendant's Responses to these Requests are not admissions that such information is relevant or admissible evidence.  Defendant reserves the right to object to the admission of such information on any grounds at time of trial.

Subject to and without waiving these General Objections, Defendant responds as follows:

**RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSIONS**

**REQUEST FOR ADMISSION NO. 10:**

Admit that as of August 28, 2015, YOU knew that Dr. Kali Pradip Chaudhuri was the chairman of the board of directors of KPC.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

SPCP incorporates and asserts the General Objections set forth above.  Subject to and without waiving those objections, SPCP responds as follows: Denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that as of August 28, 2015, YOU knew that William Thomas was a member of the board of directors of KPC.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

SPCP incorporates and asserts the General Objections set forth above.  Subject to and without waiving those objections, SPCP responds as follows: Admit.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

DEFENDANT'S RESPONSES TO SECOND
SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

JAE 1912

**REQUEST FOR ADMISSION NO. 12:**

Admit that as of August 28, 2015, YOU possessed a copy of the written instrument of the PLAN.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

SPCP incorporates and asserts the General Objections set forth above.  Subject to and without waiving those objections, SPCP responds as follows: Denied.

**REQUEST FOR ADMISSION NO. 13:**

Admit that as of August 28, 2015, YOU knew that Defendant Alerus Financial, N.A. was the Trustee of the PLAN.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

SPCP incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, SPCP responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 14:**

Admit that as of August 28, 2015, YOU knew that Defendant Kali Pradip Chaudhuri owned 100% of the outstanding common stock of KPC.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 15:**

Admit that as of August 28, 2015, YOU knew that under the terms of the 2015 ESOP TRANSACTION ALERUS, acting on behalf of the PLAN, agreed to purchase 100% of the 100,000,000 shares of KPC stock at a purchase price of $22.71 per share.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

SPCP incorporates and asserts the General Objections set forth above.  Subject to and without waiving those objections, SPCP responds as follows: Admit that Alerus agreed to purchase 100% of KPC stock.  Except as expressly admitted herein, Denied.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

DEFENDANT'S RESPONSES TO SECOND
SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

**JAE 1913**

**REQUEST FOR ADMISSION NO. 16:**

Admit that prior to the close of the 2015 ESOP TRANSACTION YOU received and reviewed a draft of the Warrant Purchase Agreement between KPC and Defendant William Thomas.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 17:**

Admit that prior to the close of the 2015 ESOP TRANSACTION YOU received and reviewed a draft of the Warrant Purchase Agreement between KPC and YOU.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

SPCP incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, SPCP responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 18:**

Admit that prior to the close of the 2015 ESOP TRANSACTION YOU received and reviewed a draft of the Warrant Cancellation Agreement between KPC and Defendant Kali Pradip Chaudhuri.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Defendant incorporates and asserts the General Objections set forth above. Subject to and without waiving those objections, Defendant responds as follows: Admit

**REQUEST FOR ADMISSION NO. 19:**

Admit that prior to the close of the 2015 ESOP TRANSACTION YOU received and reviewed drafts of the Investor Rights Agreement entered into as part of the 2015 ESOP TRANSACTION.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

1   Defendant incorporates and asserts the General Objections set forth above.

2   Subject to and without waiving those objections, Defendant responds as follows:

3   Admit

4

5   Dated: April 6, 2022                    MORGAN, LEWIS & BOCKIUS LLP

6

7                                    By:

8                                          Aimee Mackay
                                           Sari Alamuddin (admitted *pro hac vice*)
9                                          Deborah Davidson (*pro hac vice* to be
                                           filed)

10                                         Attorneys for Defendant
                                           SPCP Group, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

DEFENDANT'S RESPONSES TO SECOND
SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

JAE 1915

1

# **CERTIFICATE OF SERVICE**

2        I, Denise D. Brown, declare:

3        I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 300 South Grand Ave., Los Angeles CA 90071-3132.  On April 6, 2022, I served a copy of the within document(s)

4

5

**DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION**

6

7

8        ☒        by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

9

10        ☒        by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

11

12

13 R. Joseph Barton                    Lars C. Golumbic
   Colin M. Downes                     Sarah M. Adams
14 **BLOCK & LEVITON LLP**              Shaun A. Gates
15 1735 20th Street NW                 Rachael E. Hancock
   Washington, DC 20009                William J. Delany
16 Email: *jbarton@blockleviton.com*   **GROOM LAW GROUP**
17 Email: *colin@blockleviton.com*     1702 Pennsylvania Ave NW
                                       Washington, DC 20006
18 Daniel Feinberg                     Email: *lgolumbic@groom.com*
19 Darin Ranahan                       Email: *sadams@groom.com*
   Nina Wasow                          Email: *sgates@groom.com*
20 **FEINBERG JACKSON**                Email: *rhancock@groom.com*
21 2030 Addison Street, Suite 500      Email: *wdelany@groom.com*
   Berkeley, CA 94704
22 Email: *dan@feinbergjackson.com*
23 Email: *darin@feinbergjackson.com*
   Email: *nina@feinbergjackson.com*
24

25

26

27

28

7        DEFENDANT'S RESPONSES TO SECOND
         SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

**JAE 1916**

Richard E. Donahoo
Sarah L. Kokonas
William E. Donahoo
**DONAHOO & ASSOCIATES, P.C.**
440 W. First Street, Suite 101
Tustin, CA 92780
Email: *rdonahoo@donahoo.com*
Email: *skokonas@donahoo.com*
Email: *wdonahoo@donahoo.com*

Theodore M. Becker
Julian L. Andre
Christopher Braham
Laurie Baddon
**MCDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
Email: *tbecker@mwe.com*
Email: *jandre@mwe.com*
Email: *cbraham@mwe.com*
Email: *lbaddon@mwe.com*

Andrew J. Waxler
**KAUFMAN DOLOWICH & VOLUCK LLP**
11755 Wilshire Blvd., Suite 2400
Los Angeles, CA 90025
Email: *awaxler@kdvlaw.com*

Major Khan
**MKLLC LAW**
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Email: *mk@mk-llc.com*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on April 6, 2022, at Los Angeles, California.  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Denise D. Brown

DEFENDANT'S RESPONSES TO SECOND SET OF RFAs; NO. 5:21-CV-01466-SB-SHK

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

**JAE 1917**

# Exhibit 43

# ALERUS

## ALERUS FINANCIAL, N.A.

## INDEPENDENT TRUSTEE ENGAGEMENT AGREEMENT

This Independent Trustee Engagement Agreement (the "Agreement"), executed this 6th day of May, 2015, will confirm the understanding and agreement between KPC Healthcare, Inc. (the "Company") and Alerus Financial, N.A. ("Alerus") concerning the engagement of Alerus to provide certain services as an independent trustee on behalf of the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Trust (the "Trust"), established pursuant to the to-be-formed KPC Healthcare, Inc. Employee Stock Ownership Plan (the "Plan", together with the Trust, the "ESOP"), and the applicable fees associated with such services.

**A.      Engagement of Independent Trustee Services.**

Alerus is hereby engaged by the Company to act as an independent trustee of the ESOP for the purpose of reviewing, analyzing, and making a determination as to whether the ESOP should approve, consent to, and/or otherwise engage in certain proposed transactions that may include:

(i)      a purchase of common stock by the ESOP;

(ii)     a redemption of common stock by the Company;

(iii)    the implementation of certain performance incentive and/or compensation arrangements for key management employees of the Company and certain related party management agreements; and

such other transactions and/or stock dispositions which, separately or in combination may result in the ESOP owning up to 100% of the Company's common stock.

In providing its services under this Agreement, Alerus will act independently to perform all actions and execute all documents necessary or required to negotiate transaction terms and conditions that are in the "best interests of Plan participants" and consistent with the requirements of the Plan document and applicable law.

(1)    <u>Services Not Provided by Alerus; Ability to Perform</u>



(2)    <u>Termination of Engagement</u>

In performing services under this Agreement, Alerus acknowledges that it is a fiduciary as that term is defined in Section 3(21)(A) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and will continue to serve in its capacity as a fiduciary until such time as it resigns, is removed, or upon the completion or cancellation of the proposed engagement.

**JAE 1919**

**B.** **Alerus' Fees.**



In the event that the proposed transaction is cancelled or suspended, or if Alerus is terminated for any reason, Alerus will be paid for any and all services performed through the date of cancellation or termination. Fees under the preceding sentence will be prorated, based upon a reasonable estimation of the ratio of services actually performed to services expected to be performed if the transaction had been completed.

The Company and Alerus each acknowledge that all terms, conditions and fees related to any post-transaction ongoing trustee services performed by Alerus, will be covered under a separate written service agreement executed by both parties.

**C.** **Retention of Independent Financial Advisor.**

To perform its duties as an independent trustee, Alerus intends to retain the services and rely on the advice of an independent financial advisor, Stout Risius Ross, Inc. (the "Appraiser"). The Company shall be responsible for negotiating fees for financial advisory services, and unless other arrangements are agreed to between the Appraiser, Alerus and the Company, the Appraiser will invoice the Company directly for its fees and expenses, subject to review and approval by Alerus.

**D.** **Retention of Independent Legal Counsel.**

To perform its duties as an independent trustee, Alerus will retain the services and rely on the advice of independent legal counsel. Subject to the completion of a satisfactory conflict check, the law firm of K&L Gates LLP ("Legal Counsel") will act as the independent legal counsel for Alerus. Legal Counsel will charge its standard hourly rates and fees (as specified in a separate agreement) in performing its required services for Alerus, in addition to out of pocket expenses and disbursements. Unless other arrangements are agreed to between Legal Counsel, Alerus, and the Company, Legal Counsel will invoice the Company directly for its legal fees and expenses, subject to review and approval by Alerus.

**E.** **Substantial Modification of Scope; Additional Required Services.**

(1)



CONFIDENTIAL

ALERUS_0040754

(2) 

**F.** **Obligations of Company.**

(1)

(2)

**G.** **Confidentiality.**

**H.** **Indemnification.**

CONFIDENTIAL

**JAE 1921**

ALERUS_0040755



CONFIDENTIAL

**JAE 1922**

ALERUS_0040756



**JAE 1923**

CONFIDENTIAL

ALERUS_0040757



**JAE 1924**

CONFIDENTIAL

**I.      Successor and Assigns.**

The provisions of this Agreement shall be binding upon and inure to the benefit of the successors, assigns, and legal representatives of each party to this Agreement.

**J.      Notices.**

Any notice required or permitted to be given under this Agreement shall be in writing and shall be delivered in person or sent by certified or by private express mail, postage prepaid, and properly addressed as follows:

<u>To the Company:</u>
KPC Healthcare, Inc.
Attention:  Dr. Kali P. Chaudhuri, MD
1301 N. Tustin Avenue
Santa Ana, CA  92705

<u>With copies by email or standard mail to:</u>

Strategic Global Management, Inc.
Attention: William E. Thomas
Executive Vice President & General Counsel
6800 Indiana Avenue, Suite 130
Riverside, CA 92506
E-mail: bthomas@globalmso.com

Holzman Horner PLLC
Attention: Michael R. Holzman
1875 Eye Street, N.W., Suite 500
Washington, D.C. 20006-5424
E-mail: mholzman@holzmanhorner.com

<u>To Alerus:</u>
Alerus Financial, N.A.
Attention:  Nels Carlson
10900 Wayzata Boulevard, Suite 120
Minnetonka, MN  55305

<u>With a copy by e-mail or standard mail to:</u>
K&L Gates LLP
Attention: Erin Turley
1717 Main Street, Suite 2800
Dallas, TX 75201

**JAE 1925**

CONFIDENTIAL

**K.     Partial Invalidity.**

If any portion of this Agreement shall be determined to be unenforceable, it shall be modified to the maximum extent enforceable by law and all remaining provisions of this Agreement shall remain in full force and effect.

**L.     Waiver.**

Any party may, by written notice to the other party: extend the time for the performance of any of the obligations or other actions of the other party under this Agreement.  Except as provided in the preceding sentence, no action taken pursuant to this Agreement shall be deemed to constitute a waiver by that party of compliance with any of the obligations contained in this Agreement.  The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

**M.     Governing Law.**

To the extent not superseded or otherwise preempted by any federal law, the laws of the State of California shall control in all matters relating to this Agreement.

**N.     Authorization; Entire Agreement.**

Each party hereto represents and warrants to the other party that the individual executing this Agreement on its behalf has been properly authorized and has full power and authority to enter into this Agreement. This Agreement supersedes all prior agreements and understandings between the parties and may not be changed or terminated orally.  No attempted change, termination, or waiver of any of the provisions of this Agreement shall be binding, unless in writing and signed by the party against whom the change, termination, or waiver is sought to be enforced.

**O.     Counterparts.**

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  A signature hereon transmitted by facsimile, .pdf or other electronic means may be substituted for, shall be as valid as, and shall have the same force and effect as an original signature.

**[Signatures on Following Page]**

CONFIDENTIAL

**JAE 1926**

ALERUS_0040760

IN WITNESS WHEREOF, Alerus and the Company have caused this Agreement to be executed as of the day and year first written above.

**ALERUS FINANCIAL, N.A.**

By: Nels Carlson
Its: Managing Director

**KPC HEALTHCARE, INC.**

Dr. Kali P. Chaudhuri, MD
Chairman of the Board of Directors

CONFIDENTIAL

# ALERUS

**ALERUS FINANCIAL, N.A.**

**TRANSACTIONAL SERVICES ENGAGEMENT**

**SUMMARY SERVICE PROVIDER DISCLOSURE**

**DOL REGULATION 408b-2**

**Employer:**     KPC Healthcare, Inc. (the "Company")
**Plan Name:**   To-be-formed KPC Healthcare, Inc. Employee Stock Ownership Plan ("Plan")
**Date:**          May 6, 2015

## A. Background Information

Alerus Financial, N.A. ("Alerus") has entered into a Transactional Engagement Agreement
("Agreement") with the Company for the provision of certain services to the Plan.  This disclosure
("Disclosure") compliments the Agreement.

## B. Disclosures

**(1)  Services Provided by Alerus.**  Alerus will provide Fiduciary Services to the Plan in the capacity as a
Discretionary Trustee, Special Trustee, Independent Trustee, or Independent Fiduciary (refer to the
Agreement for a specific description of Alerus' status as a fiduciary).

**(2)  Direct Compensation.**

**(3)  Indirect Compensation.**

**(4)  Manner of Receipt of Compensation.**  The manner of receipt of compensation is set out in the
Agreement.

CONFIDENTIAL

# Exhibit 44

| From: | Michael Harden [michael.harden@eurekacap.com] |
|---|---|
| Sent: | 8/24/2015 1:27:34 PM |
| To: | Phillip Chou [Phillip.Chou@eurekacap.com] |
| Subject: | Fwd: KPC Healthcare, Inc. |

Respond

Sent from my iPhone

Begin forwarded message:

**From:** "Lee, Eric C" <Eric.Lee@skadden.com>
**Date:** August 24, 2015 at 1:19:35 PM PDT
**To:** "'Phillip Chou'" <phillip.chou@eurekacap.com>, "Cohen, Jeffrey H" <Jeffrey.Cohen@skadden.com>
**Cc:** "'Michael Harden'" <michael.harden@eurekacap.com>, "'Michael Holzman'" <mholzman@holzmanhorner.com>
**Subject: RE: KPC Healthcare, Inc.**

Phillip,

Wanted to follow up on the calculations below.  Our client appears to be fine with the methodology of the cashless exercise but the percent of gross value results seem to be a bit off.  For SPCP, should it not be ▮▮▮▮ (if you are rounding to the tenth) or ▮▮▮▮ if you are rounding to the hundredth)?

**Eric C. Lee**
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5463 | F: 213.621.5463
eric.lee@skadden.com

---

**From:** Phillip Chou [mailto:phillip.chou@eurekacap.com]
**Sent:** Monday, August 10, 2015 4:26 PM
**To:** Lee, Eric C (LAC); Cohen, Jeffrey H (LAC)
**Cc:** 'Michael Harden'; 'Michael Holzman'
**Subject:** RE: KPC Healthcare, Inc.

Jeff & Eric,

Here is the cap table attached.

With regards to the allocation of proceeds, the ▮▮▮▮ million negotiated value is net of exercise price of outstanding warrants. We first grossed it up by the amount of exercise price (as if the warrant holders were buying in and paid KPC the exercise price in cash) to get to a gross value of ▮▮▮▮ million. Then we allocated the gross value to each seller based on the fully-diluted % (ie, the SCPC got ▮▮▮▮ of the "after-money" value). Lastly, we subtracted the exercise price warrant holders "paid" into the KPC to get to the net value. We think it is more accurate way to allocate value than apply ▮▮▮▮ to ▮▮▮▮ and then subtract the exercise price of ▮▮▮▮ for SCPC (which would arrive at ▮▮▮▮ If you have a different methodology in mind, please show us your calculation so we can compare notes. Thank you.



**From:** Michael Harden [mailto:michael.harden@eurekacap.com]
**Sent:** Monday, August 10, 2015 3:45 PM
**To:** 'Michael Holzman' <mholzman@holzmanhorner.com>; 'Lee, Eric C' <Eric.Lee@skadden.com>; 'Cohen, Jeffrey H'
<Jeffrey.Cohen@skadden.com>; 'Phil Chou' <phillip.chou@eurekacap.com>
**Subject:** RE: KPC Healthcare, Inc.

Phil – Please send the pre and post transaction cap table including all warrant and MIP shares (retention and
performance units) to Jeff and Eric from Skadden.  Thanks

**From:** Michael Holzman [mailto:mholzman@holzmanhorner.com]
**Sent:** Monday, August 10, 2015 2:58 PM
**To:** 'Lee, Eric C' <Eric.Lee@skadden.com>
**Cc:** 'Michael Harden' <michael.harden@eurekacap.com>; 'Cohen, Jeffrey H' <Jeffrey.Cohen@skadden.com>
**Subject:** RE: KPC Healthcare, Inc.

We are calling in now, thanks

**From:** Lee, Eric C [mailto:Eric.Lee@skadden.com]
**Sent:** Monday, August 10, 2015 5:19 PM
**To:** Michael Holzman
**Cc:** 'Michael Harden'; Cohen, Jeffrey H
**Subject:** RE: KPC Healthcare, Inc.

I was assuming you would be free at 3 pm but you can email us when to open the line, thanks

**Eric C. Lee**
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5463 | F: 213.621.5463
eric.lee@skadden.com

**From:** Michael Holzman [mailto:mholzman@holzmanhorner.com]
**Sent:** Monday, August 10, 2015 2:18 PM
**To:** Lee, Eric C (LAC)
**Cc:** 'Michael Harden'; Cohen, Jeffrey H (LAC)
**Subject:** RE: KPC Healthcare, Inc.

Great, thanks

**From:** Lee, Eric C [mailto:Eric.Lee@skadden.com]
**Sent:** Monday, August 10, 2015 5:17 PM
**To:** Michael Holzman
**Cc:** 'Michael Harden'; Cohen, Jeffrey H
**Subject:** RE: KPC Healthcare, Inc.

Mike,

That works for Jeff and I but we have a call on another matter at 3:45 pm Pacific so have a hard stop then.  We can use the following dial-in:

USA (Toll-free):
    1-888-453-4408

Participant Passcode: 36923 90811

Blackberry friendly 1-888-453-4408x3692390811#
iPhone friendly 1-888-453-4408,,3692390811#  (copy and paste the number into your phone)

**Eric C. Lee**
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5463 | F: 213.621.5463
eric.lee@skadden.com

**From:** Michael Holzman [mailto:mholzman@holzmanhorner.com]
**Sent:** Monday, August 10, 2015 2:04 PM
**To:** Lee, Eric C (LAC)
**Cc:** 'Michael Harden'
**Subject:** RE: KPC Healthcare, Inc.

Mike Harden and I are on an all hands call with Credit Suisse but can call you in about an hour to discuss your issues. Please let me know if that works for you, thanks

**From:** Lee, Eric C [mailto:Eric.Lee@skadden.com]
**Sent:** Monday, August 10, 2015 4:38 PM
**To:** Cohen, Jeffrey H; Michael Holzman
**Cc:** Lopo, Diana M; Christopher Horner; Turley, Erin; Wilkerson, Allison; Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); Michael Harden; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); Mark O'Keefe; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; Gomos, Colleen Kelly; Thomas Banks; Freeman, Robin S.; Garrett Fletcher; llenderman@midcapfinancial.com; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Bar-Kokhva, Rotem
**Subject:** RE: KPC Healthcare, Inc.

All,

**JAE 1932** EUREKA_046976

Attached is the issues list we would like to discuss with the group.  Please let us know when the appropriate people are available to discuss.

Regards,

**Eric C. Lee**
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5463 | F: 213.621.5463
eric.lee@skadden.com

---

**From:** Cohen, Jeffrey H (LAC)
**Sent:** Monday, August 10, 2015 12:00 PM
**To:** Michael Holzman
**Cc:** Lopo, Diana M (NYC); Christopher Horner; Turley, Erin; Wilkerson, Allison; Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); Michael Harden; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); Mark O'Keefe; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; Gomos, Colleen Kelly; Lee, Eric C (LAC); Thomas Banks; Freeman, Robin S.; Garrett Fletcher; llenderman@midcapfinancial.com; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Bar-Kokhva, Rotem (NYC)
**Subject:** Re: KPC Healthcare, Inc.

Not tax, as that will be on a separate call. They are corporate or business matters.

Jeffrey H. Cohen
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5288 || M: 310.738.3888. |F:213.621.5288
jeffrey.cohen@skadden.com

On Aug 10, 2015, at 11:59 AM, Michael Holzman <mholzman@holzmanhorner.com> wrote:

I suppose it really depends on the nature of your comments. If no one else is available, I can answer what I can and direct the questions I cannot answer to the appropriate subject matter expert.

---

**From:** Cohen, Jeffrey H [mailto:Jeffrey.Cohen@skadden.com]
**Sent:** Monday, August 10, 2015 2:49 PM
**To:** Michael Holzman; Lopo, Diana M; Christopher Horner; Turley, Erin; 'Wilkerson, Allison'
**Cc:** Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); 'Michael Harden'; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); 'Mark O'Keefe'; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; 'Gomos, Colleen Kelly'; Lee, Eric C; Thomas Banks; Freeman, Robin S.; 'Garrett Fletcher'; llenderman@midcapfinancial.com'; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Bar-Kokhva, Rotem
**Subject:** RE: KPC Healthcare, Inc.

Thanks, Michael.  Not sure who else should be on the call, so please let us know so that we can hold the time.

---

**From:** Michael Holzman [mailto:mholzman@holzmanhorner.com]
**Sent:** Monday, August 10, 2015 11:19 AM
**To:** Cohen, Jeffrey H (LAC); Lopo, Diana M (NYC); Christopher Horner; Turley, Erin; 'Wilkerson, Allison'
**Cc:** Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); 'Michael Harden'; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); 'Mark O'Keefe'; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; 'Gomos, Colleen Kelly'; Lee, Eric C (LAC); Thomas Banks; Freeman, Robin S.; 'Garrett Fletcher'; 'llenderman@midcapfinancial.com'; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Bar-Kokhva, Rotem (NYC)
**Subject:** RE: KPC Healthcare, Inc.

Holzman Horner is available at 4:30 EDT today, thanks

**JAE 1933**

**From:** Cohen, Jeffrey H [mailto:Jeffrey.Cohen@skadden.com]
**Sent:** Monday, August 10, 2015 2:11 PM
**To:** Lopo, Diana M; Christopher Horner; Turley, Erin; 'Wilkerson, Allison'
**Cc:** Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); Michael Holzman; 'Michael Harden'; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); 'Mark O'Keefe'; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; 'Gomos, Colleen Kelly'; Lee, Eric C; Thomas Banks; Freeman, Robin S.; 'Garrett Fletcher'; 'llenderman@midcapfinancial.com'; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Bar-Kokhva, Rotem
**Subject:** RE: KPC Healthcare, Inc.

Separately, we wanted to update you as to where we are.  We are putting together a bullet point list of the comments we have, which we will be sending around soon.  We will send around later today a hand mark of some smaller comments.  We would suggest a call with whomever should be included to talk about the bigger substantive points that will be on our list.  Please let us know if any of the following work:

Today, from 4:30 to 6:30 eastern
Tomorrow, from noon to 2pm eastern

Jeff

**From:** Lopo, Diana M (NYC)
**Sent:** Monday, August 10, 2015 11:04 AM
**To:** Cohen, Jeffrey H (LAC); 'Christopher Horner'; Turley, Erin; 'Wilkerson, Allison'
**Cc:** Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); Michael Holzman; 'Michael Harden'; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); 'Mark O'Keefe'; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; 'Gomos, Colleen Kelly'; Lee, Eric C (LAC); Thomas Banks; Freeman, Robin S.; 'Garrett Fletcher'; 'llenderman@midcapfinancial.com'; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Bar-Kokhva, Rotem (NYC)
**Subject:** RE: KPC Healthcare, Inc.

Chris,

Thanks.  Can you put us in touch with the tax advisors on the deal?  We would like to catch up with them.  Thanks.

**Diana M. Lopo**
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square | New York | 10036-6522
T: 212.735.3475 | F: 917.777.3475
diana.lopo@skadden.com

<div style="background:red;color:white;text-align:center">Skadden</div>

**From:** Cohen, Jeffrey H (LAC)
**Sent:** Monday, August 10, 2015 11:06 AM
**To:** 'Christopher Horner'; Turley, Erin; 'Wilkerson, Allison'
**Cc:** Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); Michael Holzman; 'Michael Harden'; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); 'Mark O'Keefe'; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; 'Gomos, Colleen Kelly'; Lee, Eric C (LAC); Thomas Banks; Freeman, Robin S.; 'Garrett Fletcher'; 'llenderman@midcapfinancial.com'; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.; Lopo, Diana M (NYC); Bar-Kokhva, Rotem (NYC)
**Subject:** RE: KPC Healthcare, Inc.

Thank you.  I would appreciate if you would please include our tax colleagues, who have been added to this email, on future emails.  Jeff

**From:** Christopher Horner [mailto:chorner@holzmanhorner.com]
**Sent:** Monday, August 10, 2015 4:36 AM

**To:** Turley, Erin; 'Wilkerson, Allison'
**Cc:** Mark R. Fournier - Stout Risius Ross (mfournier@srr.com); Michael Holzman; 'Michael Harden'; Phillip Chou - Eureka Capital Partners, LLC (Phillip.Chou@eurekacap.com); 'Mark O'Keefe'; Bill Reavey; Kali Chaudhuri; Kelly Thomas; Rosen, B. J.; 'Gomos, Colleen Kelly'; Cohen, Jeffrey H (LAC); Lee, Eric C (LAC); Thomas Banks; Freeman, Robin S.; 'Garrett Fletcher'; 'llenderman@midcapfinancial.com'; Wachtel, Matthew D.; Ernberg, Jens J.; Lin, David Y.
**Subject:** KPC Healthcare, Inc.

Erin & Allison:

Good morning. I attach marked copies of a number of the ESOP transaction documents. In addition, I attach a draft of the SPA disclosure schedule.

On a logistics note, we will be preparing a separate warrant purchase agreement for each of SPCP Group and Mr. Thomas and will forward the same to you as soon as they are available. The substance will be largely similar to the marked warrant purchase agreement attached to this e-mail.

Please note that no edits have been made to the ESOP loan documents approved by you over the weekend. The marked copies attached to this e-mail are simply for the benefit of the other parties copied on this e-mail.

Please note that I am circulating these documents simultaneously to Dr. Chaudhuri, KPC and SPCP Group and that these documents remain subject to their review and comment in all respects.

Thank you. Please let me know whether you have any immediate questions.

**Christopher T. Horner II**

*Member*

1875 Eye Street, N.W.
Suite 500
Washington, D.C. 20006

D (202) 618-3402
C (202) 642-0633
F (202) 905-2156
chorner@holzmanhorner.com
www.holzmanhorner.com

Download vCard

<image001.png>

*Holzman Horner PLLC is an affiliate member of Ambrose Advisors, LLC.*

*The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.*

*Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein.*

----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================
----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================
----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================
----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================
----------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments

CONFIDENTIAL

EUREKA_046980

thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================
----------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================

**JAE 1937**

CONFIDENTIAL

EUREKA_046981

# Exhibit 45

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4    DANIELLE GAMINO, individually   )
      and on behalf of all others     )
 5    similarly situated,             )
                                      )
 6         PLAINTIFF,                 ) Case No.
                                      ) 5:20-cv-01126-sb-shk
 7         VS.                        )
                                      )
 8    KPC HEALTHCARE HOLDINGS,        )
      INC., KPC HEALTHCARE, INC.      )
 9    EMPLOYEE STOCK OWNERSHIP PLAN   )
      COMMITTEE, ALERUS FINANCIAL,    )
10    N.A., KALI PRADIP CHAUDHURI,    )
      KALI PRIYO CHAUDHURI, AMELIA    )
11    HIPPERT , WILLIAM E. THOMAS,    )
      LORI VAN ARSDALE, and SPCP      )
12    GROUP, LLC,                     )
                                      )
13         DEFENDANTS.                )
                                      )
14    AND                            )
                                      )
15    KPC HEALTHCARE, INC.,           )
      EMPLOYEE STOCK OWNERSHIP        )
16    PLAN,                           )
                                      )
17         NOMINAL DEFENDANT.         )
      _____)
18
                DEPOSITION OF STEVEN BLAKE
19
            THURSDAY, MAY 5, 2022, 9:36 A.M.
20
                  COSTA MESA, CALIFORNIA
21
22
23    Reported by Desiree Cooks, CSR No. 14075
24    Job No. 5166036
25    Pages 1 - 202
```

```
                                                        Page 6

  1                 THURSDAY, MAY 5, 2022, 9:36 A.M.

  2                      COSTA MESA, CALIFORNIA

  3

  4                         STEVEN BLAKE,

  5         having been first duly sworn, testifies as follows:

  6

  7                          EXAMINATION

  8    BY MR. BARTON:

  9         Q    Good morning.

 10         A    Good morning.

 11         Q    Would you state your full name, please?

 12         A    Steven Richard Blake.

 13         Q    What is your residential address?

 14         A    1064 South Taylor Court, Anaheim.

 15         Q    Is there a ZIP Code?

 16         A    92808.

 17         Q    Do you have a business address?

 18         A    That is also my business address.

 19         Q    Do you presently have a business, or are you

 20    employed?

 21         A    I'm employed.  That address is -- I have to

 22    look it up -- it's in El Segundo on PCH.

 23         Q    Who is your present employer?

 24         A    Pipeline Health.

 25         Q    You said Pipeline Health?
```

1     A      Yeah.

2     Q      Have you ever been deposed before?

3     A      Yes.

4     Q      Approximately how many times?

5     A      Maybe three.

6     Q      Have you ever testified in any other proceeding

7  like trial, arbitration?

8     A      Yes.

9     Q      How many times?

10    A      Once that I recall.

11    Q      What kind of proceeding was it?

12    A      A civil.

13    Q      Was it a trial?  Arbitration?  Something else?

14    A      Trial.

15    Q      Other than the -- strike that.

16           Other than the three depositions and the one

17  civil trial, have you ever provided any verbal or live

18  testimony in any other proceeding?

19    A      No.

20    Q      When was the last time that you provided live

21  testimony?

22    A      I don't recall.  Not for a long time.

23    Q      Let me just, as a refresher, go over what's

24  going to happen here today.  I'm going to ask you a

25  series of questions.  I'll expect that, unless you're

Page 70

1        Q        Are those related to the QAF program?

2        A        In the case of the State of California, yes.

3        Q        I'm sorry, what?  I didn't hear what you said.

4        A        In the case of the State of California, yes,

5    the QAF program.

6        Q        Is it correct that at least in 2015, there was

7    separate QAF payments for fee for service and managed

8    care services?

9        A        2015?  Well, this cycle refers to dates prior

10   to 2015.

11       Q        Well, we can first focus on the dates prior to

12   2015.

13               Prior to 2015, were there separate QAF payments

14   for fee for service and managed care services?

15       A        Yes.

16       Q        And were there also, prior to 2015, separate

17   QAF fees for fee for service and managed care services?

18       A        Yes.

19       Q        To your understanding, did that also continue

20   into 2015?

21       A        Correct.

22       Q        Okay.  And what was the difference between the

23   fee for service and managed care QAF payments?

24       A        Fee for service got paid quicker because it

25   wasn't subject to an evaluation of the feasibility for

Page 71

1    the managed care companies by CMS.  That took more time.

2        Q     What approximately would you say is the average

3    difference between payment for fee for services versus

4    managed care?

5        A     At that time, fee for service versus managed

6    care, probably a one or two-year delay on average for the

7    managed care portion.

8        Q     And when you said at that time, you're

9    referring to 2015?

10       A     Yeah.  It takes longer than that now, but due

11   to events that have transpired since then.

12       Q     What are the events that have transpired since

13   2015 that require even longer payment or delay of

14   payment?

15       A     CMS initiated a requirement in their approval

16   of an 1115 waiver, which is where they approve these

17   programs.  The state transitioned to Medicaid managed

18   care only being available if they're in that work,

19   meaning you have a contract with the managed care payor.

20   If it's out of network, it would be excluded.

21             And the State of California is transitioning

22   over like a ten-year period from one extreme to

23   everything being 100 percent only available to

24   in-network.  It's a way of encouraging providers to

25   contract with managed care plans.

Page 72

1      Q      How does that result or translate into a

2   greater delay?

3      A      I'm sorry?

4      Q      Why is there now a greater delay as a result of

5   this?

6      A      Because the way it's administered in

7   California, we wait until the claims have all been fully

8   matured and they're in a state database to determine what

9   percentage of your claims were in network versus out of

10  network.

11     Q      Now, what is the difference in terms of the

12  delay?

13     A      Now, it could take up to two years.

14     Q      And what's the -- is there a rough

15  approximation in terms of how quickly the fee for

16  services gets paid, the QAF payments get paid?

17     A      Once the waiver is approved for that phase --

18  and there's three periods for each phase -- it's

19  usually -- within a few months of that will be the first

20  payment because the approval may follow the effective

21  date it started.  It could be within two months.

22     Q      And the subsequent development that you

23  referenced, when did that happen?

24     A      Oh, that started happening maybe three,

25  four years ago.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEAL**

# Exhibit 46

```
                                                    Page 1

 1

 2                  UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

 3                        EASTERN DIVISION

 4      ---------------------------------------------------x

 5      DANIELLE GAMINO, individually and on behalf of all

        others similarly situated

 6

 7                                        Plaintiff,

 8          v.

 9

        KPC HEALTHCARE HOLDINGS, INC., KPC HEALTHCARE, INC.

10      EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE, ALERUS

        FINANCIAL, N.A., KALI PRADIP CHAUDHURI, KALI PRIYO

11      CHAUDHURI, AMELIA HIPPERT, WILLIAM E. THOMAS, LORI

        VAN ARSDALE, and SPCP GROUP, LLC

12

13                                        Defendant

14      and

15      KPC HEALTHCARE, INC., EMPLOYEE STOCK OWNERSHIP PLAN,

16                                   Nominal Defendant.

17      7 Times Square

18      May 25, 2022

19      9:30 a.m.

20

21          TESTIMONY OF THOMAS BANKS, appearing at the

22      above-mentioned date, time and place before ANNMARIE

23      OAKLEY, a Notary Public of the State of New York.

24

25
```

```
                                                    Page  3

 1

 2        T H O M A S   B A N K S, having first been duly sworn

 3        by a Notary Public of the State of New York, was

 4        examined and testified as follows:

 5        EXAMINATION BY MR. DOWNES:

 6             Q    Would you state your name for the record,

 7        please.

 8             A    Thomas Banks.

 9             Q    Would you state your address for the

10        record, please.

11             A    My business address is 2 Greenwich Plaza,

12        First Floor in Greenwich Connecticut 06830.

13             Q    Your home address?

14             A    3 Tulip Lane, Westport, Connecticut 06800.

15             Q    Mr. Banks, have you ever been deposed

16        before?

17             A    I have.

18             Q    On how many occasions?

19             A    Two, I believe.

20             Q    When was the first occasion which you were

21        deposed?

22             A    It was a case involving an oil and gas

23        investment that we had in Texas.

24             Q    Where was that case brought?

25             A    I believe in Houston.
```

**JAE 1947**

Page 4

1                          T. BANKS

2          Q    In federal court or state court?

3          A    I don't recall.

4          Q    Do you remember who the parties to that

5     litigation were?

6          A    I believe Constellation Energy Partners

7     was one party and I don't recall who the other party

8     was.

9          Q    Was Silver Point a nonparty to that case?

10         A    I believe we were an investor in one of

11    the parties.

12         Q    And you were a fact witness?

13         A    Yes.

14         Q    What was the second occasion that you were

15    deposed?

16         A    A dispute involving an investment that we

17    had in Washington D.C. in a lawsuit between our

18    landlord and our portfolio company.

19         Q    You said that case -- was the investment

20    in D.C. or the case in D.C.?

21         A    Both.

22         Q    In federal or state court?

23         A    In DC Circuit Court or --

24         Q    The District?

25         A    The District Court meaning the nonfederal

Page 16

1                          T. BANKS

2          A     Analyst.

3          Q     Are you familiar with a company called

4    Integrated Healthcare Holdings Incorporated?

5          A     Yes.

6          Q     If I refer to that company as IHHI will

7    you know I'm referring to Integrated Healthcare

8    Holdings Incorporated?

9          A     Yes.

10         Q     When did the relationship between Silver

11   Point Capital and Integrated Health begin?

12         A     I'm sorry.  Can you repeat the question.

13         Q     When did the relationship between Silver

14   Point Capital and IHHI begin?

15         A     To the best of my recollection in 2010.

16         Q     And what was the nature of that

17   relationship when it began in 2010?

18         A     We purchased a loan that Medical Capital

19   had made to IHHI in a court proceeding.

20         Q     And just to clarify your response Medical

21   Capital had acquired that loan in a court proceeding

22   or Silver Point acquired that loan from Medical

23   Capital through court proceeding?

24         A     Silver Point acquired that loan from

25   Medical Capital in a court proceeding.

1                    T. BANKS

2        Q    Were you involved in identifying that

3    investment opportunity in 2010?

4        A    I was.

5        Q    How did you identify that investment

6    opportunity in 2010?

7        A    I read in the Daily Bankruptcy Review

8    about the bankruptcy of Medical Capital Group which

9    was a lender to healthcare businesses.

10        Q    And I take it you researched the assets

11    that were being sold to the bankruptcy proceeding?

12        A    Yes.  To clarify it was not a bankruptcy

13    proceeding.

14        Q    I'm sorry.  I misunderstood.  What was

15    nature of the proceeding through which SPCP acquired

16    this loan?

17        A    The District Court in California imposed a

18    receiver but had refused the referral to the

19    bankruptcy court.

20        Q    So to the best of your knowledge there was

21    no relationship between IHHI and Silver Point

22    Capital prior to 2010?

23        A    That is correct.

24        Q    Was there any relationship between Silver

25    Point Capital and Dr. Chaudhuri prior to 2010?

Page 104

                              T. BANKS

1

2       A    From me to Michael Gatto copying Lin Chen

3    and James Kasmarcik.

4       Q    And it's dated March 5, 2015.

5       A    Yes.

6       Q    You write that IHHI is evaluating an ESOP

7    sales; correct?

8       A    Correct.

9       Q    Did you write this email close in time to

10   when you learned that IHHI was evaluating an ESOP

11   sale?

12      A    I don't recall.

13      Q    Were you previously familiar with ESOPs?

14      A    I knew what an ESOP was but I'd never been

15   a part of one.

16      Q    When you say you've never been a part of

17   one you mean you never worked on an ESOP

18   transaction?

19      A    Correct.

20      Q    You write here, "The main benefit of the

21   ESOP transaction is that the company would avoid

22   taxes on the QAF and get the full benefit of the

23   money."  Can you explain that statement?

24      A    My understanding is that the structure

25   that was being targeted would be an S-corporation

Page 105

1                          T. BANKS

2      owned by an ESOP that would not be subject to income

3      taxes and so as a result whereas the company was

4      essentially paying at the time my recollection is

5      close to 50% or more of the QAF payment in taxes,

6      they would not have to pay that in the future if the

7      structure was successful.

8           Q    Did you tell IHHI that -- strike that.

9      Did this email come out of conversations that you

10     were having with Mr. Thomas?

11               MR. ALAMUDDIN:  Object to form.

12          A    I don't recall.

13          Q    Did it come out of conversations you were

14     having with Dr. Chaudhuri?

15               MR. ALAMUDDIN:  Same objection.

16          A    I don't recall.

17          Q    You write that Dr. Chaudhuri inquired

18     regarding your interest in providing the debt.  Did

19     Mr. Chaudhuri make that inquiry by email?

20               MR. ALAMUDDIN:  Object to form.  Assumes

21          facts.

22          A    I don't know.

23          Q    Did he inquire regarding your interest in

24     providing the debt?

25          A    I have no reason to believe that's not

Page 134

1                             T. BANKS

2       Alerus' financial advisor but it would seem likely.

3       I don't know who Credit Suisse used.

4            Q    Did Silver Point work with any advisors

5       in the ESOP transaction?

6                 MR. ALAMUDDIN:  Object to form.

7            A    No.

8            Q    Did Silver Point hire counsel?

9            A    Yes.

10           Q    Who?

11           A    Skadden Arps.

12           Q    Moving up a paragraph Mr. Thomas writes

13      that, "Eureka Capital believes the company can be

14      valued for purposes of an ESOP based on a present

15      value for the 2016 three-year round of QAF and the

16      multiple EBITDA without QAF based on trailing 12

17      month earnings since July 2014."  Is this the same

18      as or different from the valuation methodology that

19      Silver Point was using for its year-end 2014

20      valuation?

21                MR. ALAMUDDIN:  Object to form and

22           incomplete hypothetical.

23           A    I'm not sure.

24           Q    Can you tell me what piece of that you're

25      not sure about.

Page 158

1                              T. BANKS

2       agree with that statement?

3            A    Agreed.  This is what I was referring to

4       when I talked about how we would value a warrant

5       position in a company controlled by someone else

6       with no ability to force an exit.

7            Q    Page five in the third bullet you write,

8       "We understand the ESOP trustee is valuing the

9       business off of a ████████ EBITDA before QAF run

10      rate based on management's ████████ forecast for

11      year end.'  Do you see that?

12           A    I do.

13           Q    How did you learn that?

14           A    I learned that through a conversation with

15      Bill Thomas.

16           Q    Did Mr. Thomas tell you anything else

17      about the valuation methodology being used by the

18      ESOP trustee?

19           A    I would have a -- there was an email.  I

20      would have to review the email but my recollection

21      of the email is he introduces or copies an analyst

22      at Eureka who also provides a set of projections for

23      the company in the future.

24           Q    So that is you were provided with a set of

25      projections and your understanding was those were

1                           T. BANKS

2      think some firms refer to it as the back office.  We

3      refer to as our infrastructure.

4           Q    And what's the question that Megan is

5      asking you here?

6           A    So I believe for purposes of investor

7      reporting we report the composition of our portfolio

8      and that composition has some level of detail that,

9      you know, would generally be equities, performing

10     credit, distressed credit, and so she's asking why

11     the entitlement to future QAF was in the trade

12     claims bucket and was it accurate to be in the trade

13     claims bucket.

14          Q    And why were the future QAF distributions

15     placed in the trade claims bucket?

16          A    Well, I think they were placed there for a

17     lack of any better alternative because they didn't

18     really fit neatly in any bucket in the sense they

19     weren't a credit, they weren't an equity, and trade

20     claims is frequently used for, what I would call,

21     esoteric or unusual assets, and assets that are put

22     in the trade claims bucket often times have some

23     level of contingency related to them such that they

24     may, you know, come into being or not come into

25     being.

# Exhibit 47

**JAE 1956**

Page 1

1             UNITED STATES DISTRICT COURT
2             CENTRAL DISTRICT OF CALIFORNIA
3                   EASTERN DIVISION
4
5    DANIELLE GAMINO, individually ) NO. 5:20-cv-01126
     and on behalf of all others   )          SB-SHK
6    similarly situated,            )
                                    )
7                    Plaintiff,     )
                                    )
8          v.                       )
                                    )
9    KPC HEALTHCARE HOLDINGS, INC., )
     KPC HEALTHCARE, INC. EMPLOYEE  )
10   STOCK OWNERSHIP PLAN COMMITTEE,)
     ALERUS FINANCIAL, M.A., KALI   )
11   PRADIP CHAUDHURI, KALI PRIYO    )
     CHAUDHURI, AMELIA HIPPERT,     )
12   WILLIAM E. THOMAS, LORI VAN    )
     ARSDALE, and SPCP GROUP, LLC,  )
13                                  )
                   and              )
14                                  )
     KPC HEALTHCARE, INC., EMPLOYEE )
15   STOCK OWNERSHIP PLAN,          )
                                    )
16                   Defendant.     )
     _____)
17
18
                DEPOSITION OF WILLIAM E. THOMAS
19                    Irvine, California
                    Friday, June 3, 2022
20
21
22   Reported by:
     Heidi Hummel-Grant
23   CSR No. 12556
24   Pages 1 - 262
25

Page 9

```
 1                    Irvine, California

 2          Friday, June 3, 2022, 9:45 a.m. - 6:00 p.m.

 3

 4                    WILLIAM E. THOMAS,

 5           called as a witness by and on behalf of

 6      Plaintiff, having been first duly sworn by the

 7      Certified Shorthand Reporter, was examined and

 8      testifies as follows:

 9

10                       EXAMINATION

11

12      BY MR. BARTON:

13           Q    Good morning.

14           A    Good morning.

15           Q    Would you state your full name, please?

16           A    William Edward Thomas.

17           Q    What is your home address?

18           A    227 Grand Canal, Newport Beach,

19      California, 92662.

20           Q    Who is your present employer?

21           A    KPC Global Management, LLC.

22           Q    Where is your business address?

23           A    9 KPC Parkway, Suite 301, Corona,

24      California, 92879.

25           Q    Do you have any other employers?
```

```
                                                    Page 10

 1          A     No.

 2          Q     Are you the member of the board or an

 3    officer of any other company?

 4          A     I'm a member of the board of directors of

 5    Provident Financial Holdings, Incorporated.

 6          Q     For how long have you been member of the

 7    board of Provident Financial Holdings?

 8          A     Approximately since 1998.

 9          Q     Are you the member of the board of any

10    other corporations?

11          A     Companies affiliated with Dr. Chaudhuri.

12          Q     Which companies affiliate with

13    Dr. Chaudhuri are you a member of the board?

14          A     Member of the board of KPC Healthcare

15    Holdings, Inc., Victor Valley Hospital Acquisition,

16    Inc., Global Health Plan, Inc.  Trying to think if

17    there any others, but -- there may be other original

18    affiliates, but those are the ones that come to

19    mind.

20          Q     Are you an officer of any companies in

21    which you're also a board member?

22          A     I'm not an officer of Provident Financial

23    Holdings.

24                I am the general counsel and executive

25    vice president of all of Dr. Chaudhuri's affiliates,
```

Page 109

1          Q    Were you aware in 2015 that at least some

2     people had expressed the concern that there were

3     possibilities that the QAF program either would be

4     eliminate -- would be eliminated or would be reduced

5     in terms of the amount of payments?

6          A    Yes.

7          Q    And did you have an understanding in terms

8     of the scenarios in which people who expressed those

9     concerns thought that might come about?

10         MR. ANDRE:  Objection.  Vague and ambiguous.

11    Confusing.

12         THE WITNESS:  I am confused by the question.

13         MR. BARTON:

14         Q    Sure.  Let me see if I can improve it for

15    you.

16              Did you have an understanding in terms of

17    under what circumstances people who thought the QAF

18    program either might be eliminated or reduced when

19    or how that might come about?

20         A    Not specifically, no.

21         Q    Did you have any understanding in terms of

22    whether people had expressed concerns that if a --

23    there was a Republican control in the Federal

24    government that the QAF programs might be

25    eliminated?

Page 110

1            MR. ANDRE:  Objection.  Vague.

2            THE WITNESS:  I do recall that there was that

3       discussion, that a Republican administration might

4       be less hospitable to the QAF program.

5            MR. BARTON:

6            Q    Where did you learn that information?

7            A    I remember being at a -- there's two big

8       outfits, one's called California Hospital

9       Association, one's called Hospital Association of

10      Southern California.  I remember going to both of

11      those meetings and having that as a common concern

12      in the industry.

13           Q    Was there ever a concern raised that if

14      there was a single-payer healthcare program adopted

15      that that would effectively end the QAF program?

16           MR. ANDRE:  Objection.  Vague.  Ambiguous.

17           THE WITNESS:  Yes, that -- that was one of the

18      concerns, yes.

19           MR. BARTON:

20           Q    Were there any other concerns like that

21      about the potential elimination or significant

22      reduction of the QAF program?

23           A    The one I remember is that there was a

24      discussion regarding -- not necessarily eliminating

25      it but turning it into some kind of Block Grant

Page 111

1    program.  That was a proposal that was being

2    floated.

3         Q    And what was your understanding of what

4    that proposal entailed?

5         A    Under QAF there is basically a tax on the

6    hospitals, you ship the money to Washington, you get

7    match, and you send it back to California.  Under

8    the Block Grant there's a certain amount -- as I

9    understood it a certain amount of payment for

10   basically care to the poor that is just granted to

11   the states and they can do what they want with it.

12   And that the -- there was a discussion as to the

13   fact that the Block Grant program might have less

14   financial benefit to the hospitals then the QAF

15   program.

16        Q    Did you -- did you understand whether or

17   not an implementation of a Block Grant program would

18   negatively impact the amount of QAF payments that

19   KPC would receive?

20        MR. ANDRE:  Objection.  Vague and ambiguous.

21        THE WITNESS:  Yeah, I don't know for sure, but

22   that was the concern, was that depending on how the

23   Block Grant program was devised and funded by the

24   Federal government that there may be less money in

25   it than KPC was receiving in the QAF program.  That

Page 112

1     was the concern.

2          MR. BARTON:

3          Q    Prior to the 2015 ESOP transaction were

4     you aware that SRR did not include, as part of its

5     valuation, any value for QAF payments beyond the

6     2016 program?

7          MR. ANDRE:  Objection.  Vague.  Ambiguous.

8          THE WITNESS:  What time period are we talking

9     about now?

10         MR. BARTON:

11         Q    Prior to the ESOP transaction.

12         A    Yes.

13         Q    Did you have an understanding in terms of

14    why SRR did not include a value for the -- in its

15    valuation of KPC -- let me restart that again.

16    Strike that.

17              Did you have an understanding in terms of

18    why SRR chose not to include post-2016 program QAF

19    payments in its valuation?

20         A    What Mike Harden told me, which is my

21    source of information on the Stout situation, was

22    that they were concerned regarding the permanency of

23    the QAF program, that why pay for an income stream

24    that may disappear on you.

25         Q    Did you have an understanding in terms of

Page 194

```
 1      with Mr. Banks after this email?

 2           A    Yes, I'm sure I did.

 3           Q    Do you remember what you discussed about

 4      the ESOP?

 5           A    After this email?

 6           Q    Correct.

 7           A    What I remember as I sit here today is I

 8      think a week or two after this, Eureka and Alerus,

 9      Stout had come up with a -- kind of an agreed

10      negotiated value of the company.  And I think I was

11      conveying to him what the trustee was willing to pay

12      and upon what terms.

13           Q    Do you remember just providing him any

14      additional information in terms of the ESOP

15      transaction beyond what the likely value of the deal

16      was going to be?

17           A    It would have been my practice to.  If we

18      had documents about a valuation, I would have sent

19      that off him for his consideration.

20           Q    When you say documents about valuation

21      what are you referring to.

22           A    As I recall the -- the transaction was

23      reduced to a term sheet.

24           Q    You believe at some point you sent

25      Mr. Banks a copy of the term sheet?
```

1        A    Yes, I believe I did.

2        Q    Did -- and you referenced information

3    about a valuation.

4             Did you send Mr. Banks any information

5    such as the Eureka materials?

6        A    I can't recall.  I send the Eureka

7    materials?  I may have.  I just don't recall.

8        Q    All right.

9             Did you send Mr. Banks any information in

10   terms of how the value of KPC that had been

11   calculated for purposes of the ESOP transaction?

12       MR. ANDRE:  Objection.  Vague and ambiguous.

13       THE WITNESS:  Calculated.  Best -- you know, I

14   didn't have anything from Stout or Alerus so I

15   couldn't have sent anything of that sort.  So the --

16   I may have sent him the Eureka valuation report, but

17   I just don't recall.  It would be on my email if I

18   did.

19       MR. BARTON:

20       Q    Did you provide him with any financial

21   results beyond March 2015 or financial projections?

22       MR. ANDRE:  Vague as to time.  Objection.

23       MR. BARTON:

24       Q    Prior to the ESOP transaction.

25       A    Yeah, I think he did ask for more

Page 229

```
 1              Do you see that?
 2      A    I do.
 3      Q    Do you understand the LTM to be last
 4    twelve months?
 5      A    Yes.
 6      Q    And you then pass this question on to
 7    Phillip Chou; is that right?
 8      A    Correct.
 9      Q    And Phillip Chou then responds to you --
10      A    Yes.
11      Q    -- and provides the information to you?
12      A    Yes.
13      Q    You see the statement from Phillip Chou to
14    you.  He says:  Our understanding is trustee is
15    using a run rate EBIDTA of ████████ based on info
16    provided?
17      A    Yes.
18      Q    You understand the EBIDTA the -- strike
19    that.
20              You understand the run rate EBIDTA of
21    25 million to be on an annual basis?
22      A    Don't know.
23      Q    Do you have an understanding of whether
24    the 25 million is with or without QAF?
25      A    No.  Looking at this I'm -- I believe it
```

Page 230

```
 1     was on an annual basis.
 2           Q     I'm sorry, was?
 3           A     Was.  I believe it was on an annual basis.
 4           Q     Yeah.  And do you have an understanding
 5     whether or not the EBIDTA of ██████████ is with or
 6     without QAF?
 7           A     I don't know.
 8           Q     In the next sentence he says, "Our
 9     estimate of LTM normalized EBIDTA through June 30th,
10     2015 -- in parentheses -- not shown below, is about
11     ██████████."  And he says, "Up from ████████ for
12     fiscal year end March 31st, 2015."
13                 Do you see that?
14           A     I do.
15           Q     Do you have an understanding in terms of
16     why the trustee is using an EBIDTA value that is
17     about ████████████████ more than the EBIDTA
18     that Eureka used?
19           A     No.
20           Q     Would you agree that that is what he is
21     conveying to you, that the trustee's EBIDTA is ██████
22     ████████████████ dollars more than what Eureka
23     used for its valuation?
24           MR. ANDRE:  Objection.  Calls for speculation.
25           THE WITNESS:  I would -- there's -- I would be
```

Page 231

1          speculating what the -- what are these adjustments

2          that the trustee is using versus what Eureka's use.

3                    MR. BARTON:

4               Q    But do you understand the trustee is using

5          a higher EBIDTA than Eureka used for its valuation?

6               A    That's what Chou was saying.

7               Q    Okay.

8                    Did you understand that the amount of

9          EBIDTA was a component in determining the value or

10         valuation of the company?

11              A    I believe EBIDTA was a component of

12         valuation.

13              Q    Did you understand that if you -- that if

14         someone was using a higher EBIDTA number it would

15         result in an increase in the total valuation?

16              A    A lot of factors that come into play, but

17         the --

18              Q    Hold on.

19              A    -- higher EBIDTA generally would be a

20         higher valuation.

21              Q    Did you actually provide the information

22         that Phillip Chou provided to you to SPCP?

23              A    I have no reason to believe I didn't.

24                   MR. BARTON:  I'm going to now show you what's

25         been previously marked as Exhibit Number 197.  It is

Page 236

```
 1              Q    Is 50 percent a reasonable estimate of

 2       that rate?

 3              A    Probably.

 4              Q    I want to turn your attention to page 4 at

 5       the bottom?

 6              A    Hold on.

 7              Q    I'm sorry.

 8              A    Let me get to 4.  Okay.  I'm with you.

 9              Q    All right.

10                   You see there's a discussion of three key

11       risks to the future of QAF program beyond the 2016

12       program?

13              A    Yes.

14              Q    And to be clear, this is not

15       necessarily -- this does not reflect a discussion

16       they had with you, but I want to know whether or not

17       you had a discussion about risks of the future QAF

18       program with SPCP.

19              A    Ever?

20              Q    Yes, ever.

21              A    I'm sure we talked about the future of the

22       program with Banks at some point in time.

23              Q    Do you believe you talked to him about the

24       future of the QAF program in the 2015 time frame?

25              A    I can't recall.
```

Page 237

```
 1        Q    You see the three risks that are
 2   identified here?
 3        A    I do.
 4        Q    Okay.
 5             One is a Republican administration and a
 6   Republican congress barring these types of programs.
 7   And that's a risk that we discussed before?
 8        A    Correct.  Correct.
 9        Q    Two is recent CMS ruling that prevents a
10   prescribed distribution to hospitals of the managed
11   care piece.
12             Do you know what that refers to?
13        A    No.
14        Q    And three:  Union opposition to the
15   program if further benefits are not shared with
16   labor.
17             Do you know what that refers to?
18        A    No.  I mean, I can read the words, but I
19   don't --
20        Q    Right.
21             You see the bullet point below that where
22   it says:  Per the terms of the deal?
23        A    Yes.
24        Q    It says:  Per the terms of the deal
25   Silver Point stands to receive ████████████ of QAF
```

# Exhibit 48

Page 1

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                   EASTERN DIVISION
3       Case No. 5:20-cv-01126-SB-SHK
              5:21-cv-01466-SB-SHK
4       - - - - - - - - - - - - - - - - -x
        DANIELLE GAMINO, individually and   :
5       on behalf of all others similarly   :
        situated,                           :
6                                           :
                           Plaintiffs,      :
7              - vs -                        :
                                            :
8       KPC HEALTHCARE HOLDINGS, INC., KPC  :
        HEALTHCARE, INC., EMPLOYEE STOCK    :
9       OWNERSHIP PLAN COMMITTEE, ALERUS     :
        FINANCIAL, N.A., KALI PRADIP         :
10      CHAUDHURI, KALI PRIYO CHAUDHURI,     :
        AMELIA HIPPERT, WILLIAM E. THOMAS,  :
11      LORI VAN ARSDALE, and SPCP GROUP,    :
        LLC,                                :
12                                          :
                           Defendants.:
13                   and                     :
                                            :
14      KPC HEALTHCARE, INC. EMPLOYEE STOCK:
        OWNERSHIP PLAN,                     :
15                                          :
                       Nominal Defendant. :
16      - - - - - - - - - - - - - - - - - -x
                                   June 7, 2022
17                                 9:34 a.m.
                                   New York, New York
18
19
20           VIRTUAL REMOTE DEPOSITION UPON ORAL
21      EXAMINATION OF JENS ERNBERG, held at the
22      above-mentioned time and place, before Randi
23      Friedman, a Registered Professional Reporter,
24      within and for the State of New York.
25

**JAE 1972**

```
                                                    Page 4

 1                         * * *

 2               JENS ERNBERG, the witness herein,

 3        after first having been duly sworn, was

 4        examined and testified as follows:

 5                         * * *

 6               MR. DOWNES:  Why don't we start

 7        with appearances.  Colin Downes, Block &

 8        Leviton, for plaintiff in the class.

 9               MR. RUBIN:  Aaron Rubin, Orrick

10        Herrington & Sutcliffe, counsel for the

11        witness, Jens Ernberg.  Also present with me

12        is Maryana Schwartz, in-house counsel at

13        Credit Suisse.

14               MR. DELANY:  William Delany on

15        behalf of Alerus.

16               MR. ALAMUDDIN:  Sari Alamuddin on

17        behalf of defendant, SPCP.

18               MS. EGAN:  Allison Egan on behalf

19        of all defendants other than Alerus and

20        SPCP.

21                         EXAMINATION

22     BY MR. DOWNES:

23        Q     Good morning, sir.

24        A     Good morning.

25        Q     Can you please state and spell your
```

Page 5

1    full name for the record?

2         A    Sure.   Jens Ernberg, spelled J-E-N-S,

3    E-R-N-B-E-R-G.

4         Q    Have you ever been deposed before, Mr.

5    Ernberg?

6         A    No.

7         Q    Have you ever testified at a trial?

8         A    No.

9         Q    Have you ever testified in an

10   arbitration proceeding?

11        A    No.

12        Q    All right.   Then I'll explain some of

13   the ground rules for today's proceedings.

14   They're a little bit different than the way we

15   talk in ordinary conversations.   You just had the

16   oath administered.   You're speaking here under

17   oath just as if you were in a court of law in

18   front of a judge under penalty of perjury.

19             I'm going to ask questions.   I'll ask

20   you to answer those questions.   The court

21   reporter will make a written record of everything

22   that I ask and everything that you answer.   At

23   any point today you can let us know that you need

24   to make changes to your testimony.   If you

25   remember something you didn't or you realize

Page 37

```
 1              MR. RUBIN:  Objection to form.
 2              THE WITNESS:  The liquidity, yeah.
 3        I mean, it was giving them, yeah, more
 4        support from a working capital perspective
 5        had they had more room on their ABL to draw
 6        on that to support those payments.
 7  BY MR. DOWNES:
 8        Q     I'd like to refer you to Page 3 of the
 9  attachment to this email.
10        A     Okay.
11        Q     I'd like to point you down to the line
12  that reads, "Security"?
13        A     Uh-huh.
14        Q     Do you see --
15              MR. ALAMUDDIN:  Is this EUREKA
16        19310, Bates number?
17              MR. DOWNES:  Correct.
18              MR. ALAMUDDIN:  Thank you.
19  BY MR. DOWNES:
20        Q     I'd like to refer you down to the line
21  that reads "Security."  You see that there's a
22  statement that "The facility would be secured by
23  a first priority perfected lien on the company's
24  QAF receivables and non-ABL assets"?
25        A     Yes.
```

Page 38

1          Q      That's your recollection of what was

2     the contemplated collateral for this term loan?

3          A      Yeah.   Again, we were looking at the

4     QAF as our primary source of repayment and;

5     therefore, it was important for us to have a

6     priority lien on it.

7          Q      Was that a structure that was proposed

8     by Eureka, or was that a structure that was

9     proposed by Credit Suisse Parkview?

10         A      That was a structure proposed by us.

11    That specific term, yes.

12         Q      The collateral -- the expressed

13    collateralization --

14         A      Correct.

15         Q      -- of the QAF payments?

16         A      Correct.

17         Q      I'm sorry.  I will try to wait for you

18    to finish answering questions, and you will have

19    to do the same; otherwise, Ms. Friedman will have

20    a real hard time putting this together.

21         A      Sorry.

22         Q      No worries.  Like I said, we'll both

23    break that rule today.

24                How did CSPV come to propose that

25    structure for collateralizing this loan?

Page 39

1        A       Again, for us, the most important
2    source of repayment for the loan was the payment
3    proceeds from the QAF program.  So for us, it was
4    critically important that we had a first priority
5    security interest in those payments, and that
6    those payments came to us first for repayment of
7    the loan.  If there was residual amounts, it
8    could be added to the company's liquidity.
9        Q       Prior to the KPC deal, had you ever
10   worked on an ESOP transaction before?
11       A       No.
12       Q       Had CSPV worked -- financed ESOP
13   transactions before?
14       A       No.
15       Q       Have you since?
16       A       We looked at one following this, but
17   did not close on it.
18       Q       At the time of the KPC deal, had CSPV
19   done other transactions in the healthcare space?
20       A       Yes.
21       Q       With other hospital systems?
22       A       Yes.
23       Q       Had CSPV done any other transactions
24   where QAF receivables were explicitly identified
25   as collateral for a term loan?

Page 56

```
 1            of reimbursements and determine based on
 2            their view of the world and their
 3            intelligence around the healthcare
 4            community, the direction they expect those
 5            reimbursements to go, and whether that
 6            impacts the performance of the business.
 7                      In this one as I mentioned, we're
 8            very focused on the quality assurance
 9            funding program, and so that was I believe
10            the area that we asked them to spend the
11            most time on to understand the staying power
12            of that program.  If there were any risks to
13            the payments, how predictable the payments
14            were, etc.
15                      And, sorry, and then legal, which
16            is, in part, documenting the Credit
17            Agreement, but also looking at legal
18            liabilities of the company.  Looking at, you
19            know, all legal aspects, really, of the
20            transaction and legal risks within the
21            company.
22       BY MR. DOWNES:
23            Q     Did Credit Suisse prepare a valuation
24       of KPC?
25                      MR. RUBIN:  Objection to form.
```

Page 57

```
 1                    THE WITNESS:  I don't believe we
 2        did.
 3   BY MR. DOWNES:
 4        Q     Did Credit Suisse develop any kind of
 5   model that was used to evaluate the solvency or
 6   creditworthiness of KPC?
 7                    MR. RUBIN:  When you say "Credit
 8        Suisse," are you talking about CSPV or are
 9        you talking about the broader --
10                    MR. DOWNES:  I'm talking about the
11        broader entity.
12   BY MR. DOWNES:
13        Q     Let me ask you a few questions to
14   qualify.
15             I understand you were not, in fact,
16   employed by CSPV; correct?
17        A     Correct.
18        Q     You held various positions where you
19   gave investment advice to CSPV or acted as an
20   officer of CSPV?
21        A     We were effectively officers of CSPV,
22   correct.
23        Q     But you were, yourself, an employee of
24   Credit Suisse Asset Management?
25        A     Correct.
```

Page 117

1     the QAF program was renewed on a periodic basis.

2     So not knowing the exact answer, I think it

3     probably was a reflection of the time period in

4     which this current program was active.

5          Q     Was there a particular timeframe of

6     QAF payments that Credit Suisse was interested in

7     for diligence purposes?

8                     MR. RUBIN:  Objection to form.

9                     THE WITNESS:  Yeah.  You know, we

10         were underwriting a loan that I think was a

11         five-year maturity, so we were obviously

12         particularly curious about what the payments

13         looked like for the succeeding five years

14         from the time of close.

15    BY MR. DOWNES:

16         Q     Presumably because at the maturity of

17    the loan, you would no longer have any concerns

18    about the creditworthiness of the borrower;

19    correct?

20         A     If they paid, correct.  Now that I'm

21    looking at this, if I could correct a previous

22    comment?

23         Q     Please.

24         A     I think they were -- my assumption

25    around what FTI was providing in terms of

**JAE 1980**

# Exhibit 49

```
                                                    Page 1

 1             UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2     - - - - - - - - - - - - - - :
                                   :
 3     DANIELLE GAMINO,            :
                                   :
 4             Plaintiff,          :   CASE NO.
                                   :
 5             vs.                 :   5:20-CV-01126-SB-SHK
                                   :
 6     KPC HEALTHCARE HOLDINGS,    :
       INC, et al.,               :
 7                                 :
               Defendants.         :
 8                                 :
       - - - - - - - - - - - - - -:
 9

10           DEPOSITION OF ALLISON WILKERSON

11

12     DATE:             April 14, 2022
13     TIME:             11:03 EST
14     LOCATION:         Veritext Legal Solutions
                         1250 I Street, NW
15                       Suite 350
                         Washington, DC 20005
16

17

18     REPORTED BY:      Constance H. Rhodes
                         Reporter, Notary
19

20

21             Veritext Legal Solutions
               1250 Eye Street, Northwest
22               Washington, DC 20005
```

Page 6

1                   P R O C E E D I N G S

2      WHEREUPON,

3                        ALLISON WILKERSON

4      called as a witness, and having been first duly

5      sworn, was examined and testified as follows:

6                   EXAMINATION BY COUNSEL FOR PLAINTIFFS

7      BY MR. FEINBERG:

8           Q    Good morning, Ms. Wilkerson.  Can you

9      state your full name for the record and spell your

10     last name?

11          A    Allison Wilkerson.  W-I-L-K-E-R-S-O-N.

12          Q    And have you ever been deposed before?

13          A    No.

14          Q    Did you hear me?

15          A    I can hear you.  Can you not hear me?

16          Q    I didn't hear your answer.  Sorry.

17          A    No, I have not.

18          Q    Have you ever testified at trial?

19          A    No, I have not.

20          Q    Have you ever testified at an

21     arbitration before?

22          A    No.

1      Q     Have you ever taken a deposition of a

2   witness before?

3      A     No.

4      Q     Well, then, I will review the rules of

5   depositions with you.  As you know, there is a

6   court reporter sitting in the room with you, and

7   you have been have sworn under oath so that, just

8   as in a court of law, you are testifying today

9   under the penalty of perjury.

10          The court reporter is making a record of

11   everything we say.  She's taking down the questions

12   and the answers, and she'll be preparing a

13   transcript.  You will have an opportunity to review

14   the transcript and make any changes, but it's best

15   if you provide complete and accurate testimony

16   today.  If you make changes to the transcript at a

17   late time I can comment on those changes at trial

18   and raise an issue of credibility.  So if at some

19   point today you realize that you need to make a

20   change to prior testimony, please let me know that

21   and you can make the change on the record today.

22          Because the court reporter is taking down

Page 149

1    the --

2         Q    Sorry.  Just to be clear, you are not

3    sure who you were speaking with when you made

4    these notes?

5         A    I remember that we had this conversation

6    with the trustee team generally.  I do not recall

7    timing or who was represented on the various

8    parties.

9              MR. FEINBERG:  All right.  Can we take a

10   five-minute break, please.  And then we can come

11   back on.  Thanks.

12              (Whereupon, a brief recess was taken.)

13   BY MR. FEINBERG:

14        Q    Ms. Wilkerson, do you recall any

15   communications with counsel for SPCP as part of

16   your work on the 2015 ESOP transaction?

17        A    I don't recall communications directly

18   with counsel.

19        Q    Do you recall whether counsel for SPCP

20   was involved in the drafting or revision of any of

21   the transaction documents?

22              MR. ANDRE:  Objection to form.

**JAE 1985**

Page 150

```
 1            THE WITNESS:  I believe that we got
 2    certain communications through KPC counsel that
 3    changes were being requested, but I don't recall
 4    which changes and I don't recall which documents.
 5    BY MR. FEINBERG:
 6        Q    And to clarify, your answer is that
 7    changes were being requested by KPC?
 8        A    Yes.
 9        Q    Are you familiar with the term
10    "clawback"?
11        A    I am.
12        Q    What's your understanding of the term?
13            MR. ROGACZEWSKI:  Objection to form.
14            THE WITNESS:  It is simply a mechanism by
15    which to adjust a purchase price if whatever the
16    defined parameters in that clawback are met.
17    BY MR. FEINBERG:
18        Q    Is it something -- have you negotiated
19    ESOP transactions on behalf of a trustee that
20    included a clawback provision?
21            MR. ANDRE:  Objection to form.
22            THE WITNESS:  Some.
```

# Exhibit 50

Page 1

1                    UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION
3
4       DANIELLE GAMINO,              )
        individually and on          )
5       behalf of all others         )
        similarly situated,          )
6                                     )
                  Plaintiffs,         )
7                                     )
                  vs.                 ) Case No. 5:20-cv-001126-
8                                     ) SB-SHK
        KPC HEALTHCARE HOLDINGS,      )
9       INC., KPC HEALTHCARE,         )
        INC., EMPLOYEE STOCK          )
10      OWNERSHIP PLAN COMMITTEE,     )
        ALERUS FINANCIAL, N.A.,       )
11      KALI PRADIP CHAUDHURI,        )
        KALI PRIYO CHAUDHURI,         )
12      AMELIA HIPPERT, WILLIAM E.    )
        THOMAS, LORI VAN ARSDALE,     )
13      and SPCP GROUP, LLC,          )
                                      )
14                Defendants.         )
                                      )
15      and                           )
                                      )
16      KPC HEALTHCARE, INC.,         )
        EMPLOYEE STOCK OWNERSHIP      )
17      PLAN,                         )
                                      )
18                Nominal Defendant. )
        _____)
19
20              DEPOSITION OF KALI PRIYO CHAUDHURI
21                    Irvine, California
22                  Tuesday, June 7, 2022
23
24      Reported by:
        Deborah K. Sylvester
25      CSR No. 10532

**JAE 1988**

```
                                                    Page 5

  1                      KALI PRIYO CHAUDHURI,

  2         called as a witness by and on behalf of the

  3         Plaintiffs, and having been first duly sworn by the

  4         Certified Shorthand Reporter, was examined and

  5         testified as follows:

  6

  7                            EXAMINATION

  8         BY MR. FEINBERG:

  9              Q    Good morning, Mr. Chaudhuri.  Let's start off

 10         by having you spell your full name for the record,

 11         please.

 12              A    Okay.  K-A-L-I, then Priyo, P-R-I-Y-O, and

 13         then Chaudhuri, C-H-A-U-D-H-U-R-i.

 14                   MR. FEINBERG:  Counsel for SPCP wanted to put

 15         a stipulation on the record, so I'll let you do that,

 16         Ms. Davidson.

 17                   MS. DAVIDSON:  Sure.  So it's a stipulation,

 18         as we've seen in other depositions, where an

 19         objection by one defendant will be an objection by

 20         all defendants without counsel for the other

 21         defendants having to join in verbally.

 22                   MR. FEINBERG:  That's agreed by Plaintiff.

 23                   MR. BECKER:  KPC Defendants' counsel agrees

 24         to that as well.

 25                   MR. GATES:  Alerus is fine as well.
```

```
                                                    Page 6

 1      BY MR. FEINBERG:

 2           Q    Mr. Chaudhuri, have you ever been deposed

 3      before?

 4           A    I don't so.  I think one time I did a 401(k)

 5      interview.  It may have been a deposition.  I'm not

 6      sure.  But nothing like this before.

 7           Q    Have you ever testified at trial before?

 8           A    I have not.

 9           Q    Have you ever testified at an arbitration

10      hearing before?

11           A    I don't believe so.

12           Q    Let me go over some of the ground rules for

13      today's deposition.

14                You're sitting in the same room as the court

15      reporter, and you've taken an oath, so you're

16      testifying under oath.  That's the same penalty of

17      perjury as if you were testifying in court at trial.

18                The court reporter is making a record of

19      everything that we say today, so she's going to be

20      taking down the questions and the answers and

21      preparing a written transcript.  You'll have an

22      opportunity to review the transcript when it's

23      completed and make any changes, but if at some point

24      during the course of the day you realize that some of

25      your prior testimony was not correct or needs to be
```

Page 75

1    qualified hospitals in order to cover the

2    unreimbursed cost of health care.  So what I mean by

3    that is certain payors, like Medi-Cal, are very low

4    in how much they pay per patient or per procedure,

5    and to help bridge that gap, the government passed

6    this QAF program to help provide additional funding

7    to cover the cost of those low-payor groups.

8         Q    During your time at KPC Global Management,

9    did KPC Healthcare receive QAF payments?

10        A    Yes.

11        Q    Were those payments consistent each year or

12   did they vary?

13        A    They varied.  They varied both in the amount

14   and the timing.

15        Q    And would you say that they -- is it fair to

16   say that the QAF payments varied widely from year to

17   year?

18        A    I don't know what "widely" means.  They were

19   different numbers.  It was not like one number every

20   year.  And it was based on a calculation, and that

21   calculation is like -- I know one of the inputs to

22   the calculation was Medi-Cal days, and Medi-Cal days

23   is a variable, so it cannot be the same number every

24   year.

25        Q    Would you have a sense as to the range of QAF

# Exhibit 51

JAE 1992

Page 1

1                    UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION
3
4    DANIELLE GAMINO,                )
     individually and on            )
5    behalf of all others           )
     similarly situated,            )
6                                    )
             Plaintiffs,             )
7                                    )
             vs.                     ) Case No. 5:20-cv-001126-
8                                    ) SB-SHK
     KPC HEALTHCARE HOLDINGS,        )
9    INC., KPC HEALTHCARE,           )
     INC., EMPLOYEE STOCK            )
10   OWNERSHIP PLAN COMMITTEE,       )
     ALERUS FINANCIAL, N.A.,         )
11   KALI PRADIP CHAUDHURI,          )
     KALI PRIYO CHAUDHURI,           )
12   AMELIA HIPPERT, WILLIAM E.      )
     THOMAS, LORI VAN ARSDALE,       )
13   and SPCP GROUP, LLC,            )
                                     )
14           Defendants.             )
                                     )
15   and                             )
                                     )
16   KPC HEALTHCARE, INC.,           )
     EMPLOYEE STOCK OWNERSHIP        )
17   PLAN,                           )
                                     )
18           Nominal Defendant. )
     _____)
19
20              DEPOSITION OF SUZANNE RICHARDS
21                  Costa Mesa, California
22                Wednesday, April 13, 2022
23
24   Reported by:
     Deborah K. Sylvester
25   CSR No. 10532

Page 8

1                    SUZANNE RICHARDS,

2    called as a witness by and on behalf of the

3    Plaintiffs, and having been first duly sworn by the

4    Certified Shorthand Reporter, was examined and

5    testified as follows:

6

7                    EXAMINATION

8    BY MR. BARTON:

9        Q    Good morning.

10       A    Good morning.

11       Q    Can you state your full name for me?

12       A    Suzanne Richards.

13       Q    Do you have a middle name?

14       A    Suzanne Marie Richards.

15       Q    And do you have a maiden name?

16       A    Di Gerlando.

17       Q    What's your current address?

18       A    ███████████████████████████ Las Vegas,

19    Nevada ██████.

20       Q    Do you also have an address here in Orange

21    County?

22       A    No.

23       Q    Do you have a business address here in Orange

24    County?

25       A    Yes.

**JAE 1994**

Page 9

```
 1      Q    What is your business address here in Orange
 2  County?
 3      A    2400 East Katella Avenue, 8th floor, Anaheim,
 4  California.  I don't know the ZIP code off the top of
 5  my head.
 6      Q    Do you also have a business address in
 7  Las Vegas?
 8      A    The same address.
 9      Q    The same address as your residence?
10      A    Yes.
11      Q    Have you ever had your deposition taken
12  before?
13      A    Yes.
14      Q    How many times?
15      A    Approximately five.
16      Q    Were those depositions in a business capacity
17  or a personal capacity?
18      A    All business.
19      Q    What was the business or the employer that
20  those depositions related to?
21      A    To the best of my recollection, one for KPC,
22  three for Prime, and one as an expert witness.
23      Q    When was the last time you had your
24  deposition taken?
25      A    As --
```

Page 171

1   basically one-year lag in the timing with respect to

2   the receipt of QAF payments?

3       A    I don't recall that, but I'm not -- I don't

4   recall that.

5       Q    Would you agree that there was uncertainty in

6   terms of the timing of payments with respect to the

7   QAF payment program?

8               MR. TOOCH:  Objection.  Vague.

9               MR. DELANY:  Objection to the form.

10              THE WITNESS:  Every year we were always

11  having delays with payments from the government.

12  BY MR. BARTON:

13      Q    Including the QAF program?

14      A    QAF, DSH.

15              MR. DELANY:  Same objection.  Form.

16              MR. BARTON:  What number are we on?

17              THE REPORTER:  115.

18              MR. BARTON:  115, thanks.

19              (Plaintiffs' Exhibit 115 was marked for

20  identification.)

21  BY MR. BARTON:

22      Q    I've handed you what's been marked Exhibit

23  No. 115, which bears the Bates stamp KPCDEF_010422,

24  with a native attachment of KPCDEF_10423.  Do you

25  recognize this document?

**JAE 1996**